**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**CENTRAL DIVISION**

NORMAN BROWN, RALPH McELROY,  )
SIDNEY ROBERTS, and THERON ROLAND, on )
behalf of themselves and a class of similarly  )
situated individuals,  )
  )
    Plaintiffs,  )
  )
   v.    )  Case No. 17-cv-4082
  )
ANNE L. PRECYTHE, Director of Missouri  )
Department of Corrections, in her official capacity; )
KENNETH JONES, Chairman of the Missouri )
Board of Probation and Parole, in his official  )
capacity; JIM WELLS, Member of the Missouri )
Board of Probation and Parole, in his official  )
capacity; MARTIN RUCKER, Member of the )
Missouri Board of Probation and Parole, in his )
official capacity; ELLIS MCSWAIN, JR., Member )
of the Missouri Board of Probation and Parole, in )
his official capacity; DON RUZICKA, Member of )
the Missouri Board of Probation and Parole, in his )
official capacity; JENNIFER ZAMKUS, Member )
of the Missouri Board of Probation and Parole, in )
her official capacity; GARY DUSENBERG,  )
Member of the Missouri Board of Probation and )
Parole, in his official capacity,  )
  )
    Defendants.  )

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

  COME NOW the plaintiffs Norman Brown, Ralph McElroy, Sidney Roberts, and Theron

Roland, on behalf of themselves and a class of similarly situated individuals, and for their cause

against defendants Anne L. Precythe, Kenneth Jones, Jim Wells, Martin Rucker, Ellis McSwain,

Don Ruzicka, Jennifer Zamkus, and Gary Dusenberg, state as follows:

1

## INTRODUCTION

1.      This challenge is brought by and on behalf of over 80 Missouri prisoners who were sentenced to die behind bars for crimes they allegedly committed as children and who, decades later, are being deprived of a meaningful opportunity for release, in contravention of their federal and state constitutional rights. Unfortunately, the Missouri Parole Board seems to believe its discretion is absolute and its actions beyond reproach. But the Board cannot violate inmates' constitutional rights. Absent intervention by this Court, the Board will continue to do so in the context of juvenile offenders whose rehabilitation and maturation is not being meaningfully considered.

2.      Plaintiffs and the class they seek to represent received mandatory life without parole ("LWOP") sentences – *de facto* death sentences imposed without appropriate and constitutionally-required consideration of their youth and its attendant characteristics.

3.      In 2012, the United States Supreme Court declared such sentences unconstitutional for those under 18 at the time of their crimes, noting "the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." *Miller v. Alabama*, 132 S.Ct. 2455, 2458, 2469 (2012) (citing *Roper v. Simmons*, 543 U.S. 551, 560 (2005), and *Graham v. Florida*, 560 U.S. 48, 68-69 (2010)).

4.      The Court continued that, in light of juvenile offenders' immaturity, recklessness, impetuosity, sensitivity to peer pressure, and capacity for change, LWOP should be imposed only in the rarest of cases. *Miller*, 132 S.Ct. at 2469 (quoting *Roper*, 543 U.S. at 573; *Graham*, 560 U.S. at 68); *see also Montgomery v. Louisiana*, 577 U.S. __, 136 S.Ct. 718 (2016) (holding that *Miller* applies retroactively and LWOP is only appropriate for the most incorrigible juvenile offenders).

2

5. The United States Supreme Court has reiterated that proposition in more recent opinions. *See Tatum v. Arizona*, 137 S.Ct. 11, 13 (Oct. 31, 2016) (noting the critical question when LWOP is on the table for juvenile offenders is "whether the petitioner was among the very 'rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility.'") (Sotomayor, J., concurring) (quoting *Montgomery*, 136 S.Ct. at 734); *Adams v. Alabama*, 136 S.Ct. 1796, 1799 (May 23, 2016) (noting LWOP appropriate only for "the rare juvenile offender whose crime reflects irreparable corruption.") (Sotomayor, J., concurring) (citations omitted).

6. Simply put: children are different for sentencing purposes. As a result, Plaintiffs are entitled to a "**meaningful opportunity** to obtain release based on demonstrated maturity and rehabilitation." *Graham*, 560 U.S. at 75 (emphasis added). Juvenile offenders sentenced to life without parole now have a constitutionally-protected liberty interest in parole proceedings permitting release based on demonstrated maturity and rehabilitation. Defendants' practices and customs governing the parole review process for Plaintiffs and the class they seek to represent deny them that right. For purposes of review, Defendants treat these "juvenile offenders" no differently than typical adult offenders.[1]

7. Instead, Plaintiffs' parole hearings are shrouded in privacy, with little-to-no ability to present mitigating evidence in their defense or see the evidence against them contained in their

---

[1] This is not to say adult offenders receive appropriate treatment in Missouri's parole proceedings either. Indeed, countless critiques have been lodged against the Board's arbitrary and standard-less processes. *See, e.g.,* Bogan, *Missouri Parole Board Lumbers on in Secrecy with Unfilled Seats*, ST. LOUIS POST DISPATCH, Sept. 20, 2015; David Leib, *Missouri Parole Board Among the More Secretive Agencies*, SOUTHEAST MISSOURIAN, Mar. 15, 2011; *see also* Beth Schwartzapfel, *How Parole Boards Keep Prisoners in the Dark and Behind Bars*, WASHINGTON POST, July 11, 2015 ("*Parole Boards Keep Prisoners in the Dark*"); Beth Schwartzapfel, *Life Without Parole*, THE MARSHALL PROJECT (July 10, 2015) (quoting former operations manager of Missouri's Parole Board referring to Board as "paranoid closed . . . [c]losed to the extreme.").

3

parole file, and with no substantive consideration of so-called *Miller* factors, including the individual's age at the time of the crime.

8.      The hearings themselves last no more than 15 to 30 minutes, with the majority of the discussion focused not on the individual's rehabilitation and maturation but on the facts and circumstances of the offense, which occurred decades prior and, very much unlike the minds and behavior of juvenile offenders, are not subject to change over time.

9.      Plaintiffs are not guaranteed the right to counsel at their parole hearings, and in fact are discouraged from having counsel appear as their one and only permitted delegate.

10.      Of those who have had parole review hearings under RSMo. § 558.047, the vast majority have been denied parole. Upon information and belief, these denials are in whole or part based on conclusory concerns about the "circumstances of the offense." The Board has denied parole to 90% of those who are eligible under the recent change in Missouri law and requested a hearing with the Board.

11.      As a result of Defendants' actions, Plaintiffs have been and continue to be denied a realistic and meaningful opportunity for release, in violation of the Eighth and Fourteenth Amendments to the United States Constitution and in violation of the Missouri Constitution, Art. I, §§ 10, 21.

12.      The goal of this action is not to challenge the fact or duration of Plaintiffs' current confinement. Instead, Plaintiffs seek a declaration that the current parole process afforded individuals serving JLWOP sentences[2] is unconstitutional, and an injunction requiring Defendants to provide proceedings that afford a meaningful opportunity to obtain release based on

---

[2]      As defined herein, "JLWOP" refers to a mandatory LWOP sentence imposed on an individual who was under 18 years of age at the time of the crime.

4

demonstrated maturity and rehabilitation for youthful offenders currently serving unconstitutional LWOP sentences.

## JURISDICTION AND VENUE

13.     Plaintiffs bring this action pursuant to 42 U.S.C. § 1983, the Eighth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1331 and 28 U.S.C. § 1343, and Article I, Sections 10 and 21 of the Missouri Constitution.

14.     Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(g) and L.R. 3.1(a)(2) because substantial events at issue in this litigation occurred in the Western District of Missouri and the County of Cole, Missouri.

## PARTIES

15.     Plaintiff Norman Brown is a youthful offender, now 41 years of age, incarcerated at South Central Correctional Center in Licking, Missouri, assigned MDOC No. 191425. Mr. Brown seeks declaratory and injunctive relief on behalf of himself and a class of plaintiffs sentenced to JLWOP who are currently or will in the future be subject to the unconstitutional policies and practices of the Missouri Board of Probation and Parole.

16.     Plaintiff Ralph McElroy is a youthful offender, now 47 years of age, incarcerated at Eastern Reception Diagnostic and Correctional Center in Bonne Terre, Missouri, assigned MDOC No. 169637. Mr. McElroy seeks declaratory and injunctive relief on behalf of himself and a class of plaintiffs sentenced to JLWOP who are currently or will in the future be subject to the unconstitutional policies and practices of the Missouri Board of Probation and Parole.

17.     Plaintiff Sidney Roberts is a youthful offender, now 45 years of age, incarcerated at Jefferson City Correctional Center in Jefferson City, Missouri, assigned MDOC No. 171590. Mr. Roberts seeks declaratory and injunctive relief on behalf of himself and a class of plaintiffs

5

sentenced to JLWOP who are currently or will in the future be subject to the unconstitutional policies and practices of the Missouri Board of Probation and Parole.

18.     Plaintiff Theron "Pete" Roland is a youthful offender, now 46 years of age, incarcerated at Crossroads Correctional Center in Cameron, Missouri, assigned MDOC No. 165253. Mr. Roland seeks declaratory and injunctive relief on behalf of himself and a class of plaintiffs sentenced to JLWOP who are currently or will in the future be subject to the unconstitutional policies and practices of the Missouri Board of Probation and Parole.

19.     Defendant Anne Precythe is the Director of the Missouri Department of Corrections ("MDOC"). She is responsible for the operations of MDOC, including adopting, approving and implementing and/or modifying the policies, practices and customs applicable to the prisons that MDOC operates throughout the State of Missouri, the Division of Probation and Parole, and the Missouri Board of Probation and Parole (the "Board" or "Parole Board"). The Parole Board is responsible for determining whether a person confined in the Department of Corrections shall be paroled or conditionally released, and for supervising all persons on probation and parole. Upon information and belief, Director Precythe is the final policymaker for MDOC, including the Board. She is sued in her official capacity.

20.     Defendant Kenneth Jones is the chairman of the Parole Board. In that capacity, Chairman Jones is responsible for, among other things, the operations of the Board, including the policies, practices and customs governing the parole hearings for individuals serving JLWOP sentences. He is sued in his official capacity.

21.     Defendant Jim Wells is a member of the Parole Board. In that capacity, Defendant Wells personally participates in, leads, or directs parole hearings, and contributes to or makes decisions regarding parole determinations, including for individuals serving JLWOP sentences.

6

Defendant Wells is responsible for *inter alia* complying with operative law and Board policies, practices and customs vis-à-vis these hearings. He is sued in his official capacity.

22. Defendant Martin Rucker is a member of the Parole Board. In that capacity, Defendant Wells personally participates in, leads, or directs parole hearings, and contributes to or makes decisions regarding parole determinations, including for individuals serving JLWOP sentences. Defendant Wells is responsible for *inter alia* complying with operative law and Board policies, practices and customs vis-à-vis these hearings. He is sued in his official capacity.

23. Defendant Ellis McSwain, Jr. is a member of the Parole Board and the former Chairman of the Board. As Chairman, McSwain was responsible for, among other things, the operations of the Board, including the policies, practices and customs governing the parole hearings for individuals serving JLWOP sentences. In his current capacity, Defendant McSwain personally participates in, leads, or directs parole hearings, and contributes to or makes decisions regarding parole determinations, including for individuals serving JLWOP sentences. Defendant McSwain is responsible for *inter alia* complying with operative law and Board policies, practices and customs vis-à-vis these hearings. He is sued in his official capacity.

24. Defendant Don Ruzicka is a member of the Parole Board. In that capacity, Defendant Ruzicka personally participates in, leads, or directs parole hearings, and contributes to or makes decisions regarding parole determinations, including for individuals serving JLWOP sentences. Defendant Ruzicka is responsible for *inter alia* complying with operative law and Board policies, practices and customs vis-à-vis these hearings. He is sued in his official capacity.

25. Defendant Jennifer Zamkus is a member of the Parole Board. In that capacity, Defendant Zamkus personally participates in, leads, or directs parole hearings, and contributes to or makes decisions regarding parole determinations, including for individuals serving JLWOP

7

sentences. Defendant Zamkus is responsible for *inter alia* complying with operative law and Board policies, practices and customs vis-à-vis these hearings. She is sued in her official capacity.

26.    Defendant Gary Dusenberg is a member of the Parole Board. In that capacity, Defendant Dusenberg personally participates in, leads, or directs parole hearings, and contributes to or makes decisions regarding parole determinations, including for individuals serving JLWOP sentences. Defendant Dusenberg is responsible for *inter alia* complying with operative law and Board policies, practices and customs vis-à-vis these hearings. He is sued in his official capacity.

27.    At all times relevant to this Complaint, Defendants Precythe, Jones, Wells, Rucker, McSwain, Ruzicka, Zamkus, and Dusenberg (collectively, "Defendants") acted under color of law.

## FACTS

### *The United States Supreme Court's Clear Mandate that Children are Different*

28.    Starting in 2005, the United States Supreme Court issued a series of decisions soundly establishing the principle that children are different from adults, drawing on science and social science as well as legal precedent and common sense.

29.    Because adolescent brains are not fully developed, young people do not appreciate risks, are more susceptible to peer pressure, and do not understand the consequences of their actions in the same way as adults. They also are more likely than adults to mature and change over time, or become "rehabilitated" through incarceration. For those reasons, the legal and carceral system must treat minors differently than adults.

30.    In *Roper v. Simmons* – a case that originated here in Missouri – the United States Supreme Court held that the Constitution forbids the imposition of the death penalty on individuals who were under the age of 18 when their crimes were committed. 543 U.S. at 578-79. In so holding, the Supreme Court described juveniles as "categorically less culpable than the average criminal." *Id.*, at 567 (quoting *Atkins v. Virginia*, 536 U.S. 304, 316 (2002)).

8

31.     The *Roper* opinion set forth three general differences that separate juveniles from adults: (1) lack of maturity and impetuosity; (2) susceptibility to "negative influences and outside pressures, including peer pressure"; and (3) the more transitory nature of juveniles' personality traits. 543 U.S. at 569-70.

32.     Five years later, in *Graham v. Florida*, the Court held that LWOP sentences were unconstitutional for juvenile offenders who did not intentionally kill and that the state must give such individuals a meaningful opportunity to obtain release. 560 U.S. 48.

33.     *Graham* drew on *Roper*, observing that "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds" – differences that caution against infliction of the most severe punishments on incarcerated youth. *Id.* at 68.

34.     The Court further acknowledged that LWOP is "the second most severe penalty permitted by law," and especially harsh for a juvenile defendant who would "on average serve more years and a greater percentage of his life in prison than an adult offender" serving the same sentence – "the same punishment in name only." *Graham*, 560 U.S. at 70-71 (internal citations omitted).

35.     Both *Roper* and *Graham* emphasized that juveniles' lessened culpability, potential for rehabilitation, and reduced response to deterrent efforts diminish the typical penological justifications for imposing the harshest sentences. *See Graham*, 560 U.S. at 68, 71-74 (noting that "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds" – for example, in "parts of the brain involved in behavior control"); *Roper*, 543 U.S. at 570 ("Only a relatively small proportion of adolescents who experiment in risky or illegal activities develop entrenched patterns of problem behavior that persist into adulthood.") (internal quotations and citations omitted).

9

36.     Thus, as a matter of constitutional law, when juveniles are sentenced, they must be provided with some "realistic opportunity to obtain release before the end of that term." 560 U.S. at 82; *see also id.* at 75 (state must provide "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation").

37.     *Graham*, *Miller* and *Montgomery* thus created a constitutionally-protected liberty interest in parole proceedings permitting early release based on demonstrated maturity and rehabilitation.

### Elimination of Mandatory LWOP and the Need for Meaningful and Realistic Opportunity to Obtain Release

38.     *Roper* and *Graham* converged in the Court's 2012 decision of *Miller v. Alabama*, which held that mandatory LWOP sentences for juveniles ("JLWOP" sentences) violate the Eighth Amendment. 132 S.Ct. at 2469.

39.     *Miller* again reiterated that children are "less deserving of the most severe punishment." *Id.* at 2464. As the Court summarized:

> Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him.

*Id.* at 2468.

40.     Furthermore, a mandatory punishment of LWOP for juvenile offenders "disregards the possibility of rehabilitation even when the circumstances most suggest it." *Id.*

41.     In light of the unique characteristics of youth, and their "heightened capacity for change," the Court further concluded that JLWOP sentences should be "uncommon" and imposed

only on "the rare juvenile offender whose crime reflects irreparable corruption" as opposed to "unfortunate yet transient immaturity." *Id*. at 2469.

42.     Furthermore, prior to the imposition of JLWOP sentences, youth are entitled to individualized hearings at which the individual's chronological age and other relevant mitigating factors relating to age must be considered. *Id*., at 2468. The sentence must "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id*. at 2469.

43.     Nearly four years later, the Court decided *Montgomery v. Louisiana*, clarifying that *Miller* did not merely impose a procedural requirement for individualized sentencing but "announced a substantive rule of constitutional law," which applied retroactively to cases on collateral review. 136 S.Ct. at 732, 736.

44.     *Miller*'s substantive rule that LWOP "is only an appropriate punishment for the 'rare juvenile offender whose crime reflects irreparable corruption,'" *Adams*, 136 S.Ct. at 1799 (quoting *Montgomery*, 136 S.Ct. at 735), carries categorical constitutional guarantees, *Montgomery*, 136 S.Ct. at 729. Given the historical imposition of mandatory JLWOP sentences, the Court warned that "*Miller*'s conclusion that the sentence of life without parole is disproportionate for the vast majority of juvenile offenders raises a grave risk that many are being held in violation of the Constitution." *Id*. at 736.

45.     In these ways, *Miller* provided both substantive and procedural requirements. In addition, juveniles "must be given the opportunity to show their crime did not reflect irreparable corruption; and, if it did not, their hope for some years of life outside prison walls must be restored." *Id*. at 736-37.

### *Missouri's SB 590: Placing **Miller** Process with the Parole Board*

46.    Approximately 80 individuals incarcerated within MDOC were and remain impacted by the *Miller* decision. In its wake, the vast majority of those individuals sought state habeas corpus relief from the Missouri Supreme Court.

47.    In most instances, those habeas petitions remained pending for over three years.

48.    After the United States Supreme Court's opinion in *Montgomery* was announced, the Missouri Supreme Court issued a uniform order providing that *Miller*-impacted petitioners would be eligible to apply for parole after serving 25 years' imprisonment, "unless his sentence is otherwise brought into conformity with *Miller* and *Montgomery* by action of the governor or enactment of necessary legislation."[3]

49.    This March 15 Order was not the end for those habeas petitions. Several months later, on July 19, the Court on its own motion vacated the March 15 Order, denied the petitions, and referred petitioners to new legislation: Senate Bill 590, 98th General Assembly ("SB 590" or "the Bill").

50.    SB 590, passed by the General Assembly on May 12, 2016, sought to codify, in part, the terms of the Court's March 15 Order. The Bill was signed into law on July 13, 2016. A copy of the Bill, as signed into law, is attached hereto as **Exhibit 1**.

51.    The Bill provided, in relevant part, that any person sentenced to JLWOP prior to August 28, 2016, "may submit to the parole board a petition for a review of his or her sentence, regardless of whether the case is final for purposes of appeal, after serving twenty-five years of incarceration on the sentence of life without parole." *See* Exhibit 1; *see also* RSMo. § 558.047.1(1).

---

[3]    This March 15, 2016 Order said nothing about other consecutive or concurrent sentences the individual petitioners might be serving.

52.     SB 590 further provides that, at a "parole review hearing" under RSMo.

§ 558.047, the Parole Board is to consider the following factors:

> (1) Efforts made toward rehabilitation since the offense or offenses occurred, including participation in educational, vocational, or other programs during incarceration, when available;
>
> (2) The subsequent growth and increased maturity of the person since the offense or offenses occurred;
>
> (3) Evidence that the person has accepted accountability for the offense or offenses, except in cases where the person has maintained his or her innocence;
>
> (4) The person's institutional record during incarceration; and
>
> (5) Whether the person remains the same risk to society as he or she did at the time of the initial sentencing[;]

as well as:

> (1) The nature and circumstances of the offense committed by the defendant;
>
> (2) The degree of the defendant's culpability in light of his or her age and role in the offense;
>
> (3) The defendant's age, maturity, intellectual capacity, and mental and emotional health and development at the time of the offense;
>
> (4) The defendant's background, including his or her family, home, and community environment;
>
> (5) The likelihood for rehabilitation of the defendant;
>
> (6) The extent of the defendant's participation in the offense;
>
> (7) The effect of familial pressure or peer pressure on the defendant's actions;
>
> (8) The nature and extent of the defendant's prior criminal history, including whether the offense was committed by a person with a prior record of conviction for murder in the first degree, or one or more serious assaultive criminal convictions;
>
> (9) The effect of characteristics attributable to the defendant's youth on the defendant's judgment; and

(10) A statement by the victim or the victim's family member as provided by section 557.041 until December 31, 2016, and beginning January 1, 2017, section 595.229.

RSMo. §§ 558.047.5, 565.033.1.

53. The process contemplated by SB 590 is constitutionally inadequate for a number of reasons. For example, the Bill attempts to delegate the job of the judiciary to probation and parole staff.

54. The Bill also impermissibly provides special enhancement protections for some youth but not others. For instance, going forward the prosecution must prove beyond a reasonable doubt the existence of certain aggravating factors before LWOP is a possibility. That was not required when Plaintiffs were sentenced, and the Bill imposes no such standard of proof on the Board's decision-making process.

55. The Bill also creates ambiguity with respect to individuals serving consecutive sentences and what weight the Board should give each factor listed in RSMo. §§ 558.047.5, 565.033.1. Upon information and belief, the Board is giving near-exclusive weight to the nature and circumstances of the offense relative to any other factor enumerated above.

56. It is also apparent that the Board is not giving meaningful consideration to the other factors delineated in SB 590 prior to making parole determinations for *Miller*-impacted inmates.

### *The Missouri Parole Board*

57. Neither the Missouri Supreme Court nor SB 590 altered the sentences of Plaintiffs and the putative class they represent. Instead, SB 590 put their future in the hands of the Missouri Board of Probation and Parole: a political body long criticized for its arbitrariness, dysfunction, and lack of transparency.

58. For example, under Missouri law, all meetings of the Board are closed meetings unless posted as open, and all votes of the Board are closed. *See* RSMo.

§§ 217.670.5, 217.690; 14 CSR 80-1.010 (2). Although the hearings are recorded, the Board treats the recordings as closed records, and does not make them available to defendants. *See* RSMo. §§ 217.670.5, 217.690; 14 CSR 80-1.010 (2); *see also, e.g.*, Bogan, *supra* note 1; Leib, *supra* note 1; *Parole Boards Keep Prisoners in the Dark*, *supra* note 1; *Life Without Parole*, *supra* note 1 (quoting former operations manager of Missouri's Parole Board referring to Board as "paranoid closed . . . [c]losed to the extreme.").

59.     The Missouri Parole Board is comprised of seven full-time members, with one designated by the Governor as Chair of the Board. Each member serves a six-year term, and not more than four members of the Board may be of the same political party. RSMo. § 217.665. The Board currently consists of the following individuals: (1) Kenneth Jones, Chairman; (2) Jim Wells, Member; (3) Martin Rucker, Member; (4) Ellis McSwain, Jr., Member; (5) Don Ruzicka, Member; (6) Jennifer Zamkus, Member; and (7) Gary Dusenberg, Member.

60.     Jones is a former Moniteau County sheriff and Republican state representative. Jones' son, Caleb Jones, is Governor Eric Greitens' deputy chief of staff.

61.     Wells is a former Pike County sheriff, and has served on the Board since 2009.

62.     Rucker is a former Democratic state representative.

63.     McSwain is a former probation and parole officer, warden at Algoa Correctional Center, and manager at other MDOC institutions. Until recently, McSwain was Chairman of the Board.

64.     Ruzicka is a former Republican state representative from Mount Vernon, Missouri.

65.     Zamkus is the only woman on the Board. She is a military veteran, the former human resources director for MDOC, formerly worked as a probation and parole officer and managed the Office of Civil Rights at the Missouri Department of Social Services.

66.     Dusenberg is a former Republican state representative, state trooper, and Vietnam veteran from Blue Springs, Missouri.

67.     None of the current members of the Board have significant background in or understanding of adolescent development or child psychology. Yet, following the passage of SB 590, the Board declined the opportunity to receive training on these issues by the Campaign for Fair Sentencing of Youth, which had specifically contacted the Board to provide technical assistance relating to the law and science applicable to such cases.

68.     Along with heightened secrecy, the Board also has historically enjoyed broad discretion in its decision making. *See* RSMo. § 217.690; *see also, e.g.*, *Blackburn v. Missouri Bd. of Prob. & Parole*, 83 S.W.3d 585, 588 (Mo. App. W.D. 2002) ("The Board is vested with wide discretion in making parole release decisions and in adopting, implementing, and following its own rules and regulations."). Where a decision is made by the full Board – even if an inmate has a hearing only before a panel – the decision is not reviewable. *See* RSMo. § 217.670.

69.     Further, parole decisions are not grievable through the administrative process. *See* Missouri Department of Corrections Offender Rulebook, 68-69 (Sept. 12, 2014), available at https://doc.mo.gov/Documents/offender-rulebook-9-12-14.pdf ("You may grieve any issue except . . . matters concerning probation and parole . . . .").

70.     In Missouri, the Board bears a very heavy caseload. For recent months during which data was made available, the Board was responsible for, on average, 38 parole hearings every business day. There were many occasions during the past several months where the Board conducted over 60 hearings in one day.

71.     Having to review and decide this volume of cases each day all but ensures the Board does not to fully review Plaintiffs' files or evidence presented, or give adequate consideration to their chronological age and hallmark features of youth, as required by state and federal law.

### *Plaintiffs Denied a Meaningful and Realistic Opportunity for Release*

72.     Constitutionally speaking, a juvenile offender's parole review demands far more procedural protection than in typical adult parole hearings. *See Graham*, 560 U.S. at 79. That is because *Graham* and *Miller* announced both substantive and procedural requirements when assessing proportionate punishment for youth.

73.     It is clear that, to date, the Board has made little-to-no distinction between parole reviews for juvenile offenders as compared with adult offenders, and has done nothing to specially protect their rights.

74.     To the contrary, the JLWOP parole hearings are generally treated no differently than typical Missouri parole hearings, which themselves do not comply with due process or other constitutional norms.

75.     The Board has now acknowledged a change in the law in its booklet *Procedures Governing the Granting of Paroles and Conditional Releases* (also known as the "Bluebook"), revised in January 2017[4]: "Certain offenders who were under the age of eighteen (18) at the time of the offense may petition the Board after serving twenty-five (25) years in accordance with 558.047 RSMo. Parole consideration will be determined by the Board on an individual basis." Bluebook, ¶ 20(D).

76.     But there is no other mention of youthful offenders in the Bluebook. The Bluebook does not specify, for example, what factors the Board is required to consider in making a parole

---

[4]     The Bluebook (Jan. 1, 2017) is available at http://doc.mo.gov/Documents/prob/Blue-Book.pdf.

determination for juvenile offenders serving LWOP sentences. And, upon information and belief, the Board and Institutional Parole Officers ("IPOs") are not provided with training or tools specifically tailored to considering youthful characteristics in preparing parole recommendations or reaching parole decisions for Plaintiffs and the impacted class.

77. Prior to their actual parole hearings, IPOs conduct pre-hearing interviews with inmates and, from that interview, prepare a report and recommendation for the Board. The Board does not permit inmates or their attorneys to see that report, or any other reports or recommendations from IPOs or other MDOC officials to the Board. And it is unclear what evidence-based instruments or interview techniques, if any, are used by these IPOs, who themselves lack social-scientific training.

78. Inmates are permitted to have only one person present at the hearings. This individual is referred to as the "inmate's delegate." Although an individual may choose to have their attorney present at the hearing as their sole delegate, Defendants' expectation is that the delegate will be someone who can speak to the inmate's home plan or support they would provide the inmate upon release – and no other topic.

79. Prior to hearings, attorneys also are reminded that the hearing is not a "lawyering moment." Indeed, in Norman Brown's case, the IPO admonished in advance of the hearing that the attorney-delegate would not be treated like a lawyer. *See* **Exhibit 2**.

80. Upon information and belief, a representative from MDOC's Office of Victim Services ("OVS") is also present at every hearing. The prosecuting attorney also generally attends.

81. The victims' family members face very few limitations on their participation in the hearing. They may appear in any number, are the first persons heard at the hearings, and may speak for any length of time.

82. An inmate's delegate or attorney is not permitted to share information directly with the victim's family members. In at least one instance, an attorney's attempt to share a copy of information provided to the Board with the victim's family was abruptly intercepted and halted by the representative from OVS.

83. Shortly thereafter, undersigned counsel received a letter directly from Defendant Precythe, who was not present for the proceedings. *See* **Exhibit 3**. That letter included a list of warnings and "procedures" counsel were to follow. The "procedures," which cannot be found in any law or lawfully-promulgated regulation, purport to prohibit the inmate and their delegate from, among other things, making any contact with the victims of the case, "either directly or indirectly . . . except through the Office of Victim Services." *Id.*

84. The "procedures" also reiterate that "[t]he delegate will address only issues related to transition into the community," in contravention of lawfully-promulgated Missouri regulations and *Miller* factors. *Id.*

85. In some instances where inmates or their delegate attempt to speak regarding the inmate's youth or the impact of a particular instance of childhood trauma, the Board member has cut them off and prevented them from making such further comments.

86. Attorneys are discouraged from participating in the process overall. In fact, in at least one instance an IPO told an inmate that if his attorney acted as his delegate at his parole hearing he would "pay for it." Others have similarly reported negative reactions and treatment for seeking representation at the hearing.

87. Where attorneys have appeared as delegates on behalf of their clients, they have been told on at least two occasions that they are not permitted to bring any "legal materials" – including pen and paper – into the hearing. In fact, the very first "procedure" included in Director

Precythe's April 27, 2017 letter states that "note taking during the hearing is prohibited." *See* Exhibit 3.

88.     These hearings are often traumatic experiences for inmates. Yet delegates generally are not permitted to meet or speak with the inmates before or after hearings. They enter and leave the hearing room through separate doors.

89.     Plaintiffs are encouraged to conduct their parole hearings via video conference, rather than in person. In some instances, inmates are encouraged to agree to a video conference without being informed of their right to have the hearing conducted in person. At other times, inmates are told they are permitted to have their hearing conducted in person rather than via video conference, but that making that election would significantly delay the hearing date.

90.     Although the hearings are recorded, Plaintiffs are not permitted access to those recordings. On February 9, 2017, one of Mr. McElroy's attorneys requested the parole hearing recording on his behalf. *See* **Exhibit 4**. That request was promptly denied. *See* **Exhibit 5**.

91.     The Board's decisions are often arbitrary and carelessly made. According to a report by the ACLU, "One parole board staff member in Missouri explained to a reporter that some members never read the files at all and instead based their decision on how the reviewing board member before them voted." *False Hope: How Parole Systems Fail Youth Serving Extreme Sentences*, American Civil Liberties Union (Nov. 2016) ("*False Hope*"), at 58, FN448; *see also Life Without Parole*, *supra* note 1 at 11.

92.     This is especially problematic because of who attends the parole hearings. Individuals eligible for parole review do not have the pleasure of a hearing before all seven of the Board members. Instead, they are only permitted access to a "hearing panel" consisting of a single Board member and two other corrections staff members. As a result, the individual potentially

eligible for parole may never sit in the same room as the person responsible for deciding whether to grant or deny their request for parole.

93.  Inmates themselves are not allowed to know or review what is in the file the Board considers at each hearing. Thus, inmates have no way of confronting evidence against them, or presenting evidence or witnesses who might provide a counter-narrative.

94.  For example, at a 2013 parole hearing, a Board member told Roosevelt Price, "I think you've been involved in other murders that you haven't been caught for." Mr. Price had never been accused of another killing, and indicated he did not know where the Board member was getting that information. She simply responded, "There's things in your file I know about that I think you don't know." *Life Without Parole*, *supra* note 1 at 11.

95.  At a more recent SB 590 hearing, an inmate was told by the Board member "his file" showed he had more than 100 conduct violations. That inmate was not permitted to see the Board's file. However, according to a print out the inmate received from MDOC staff, he had only 59 conduct violations – and only three in the previous six years.

96.  Upon information and belief, no special accommodations are made for inmates with developmental disabilities.

97.  In 2015, of the 14 individuals in Missouri serving a juvenile life sentence, only four (29%) were approved for parole.[5] The grant rate for those serving JLWOP sentences is far lower.

98.  Upon information and belief, to date the Board has conducted 20 hearings under SB 590. It has granted parole in only two instances. **Thus, the Board's denial rate is 90%.**

99.  The majority of *Miller*-impacted individuals who have been denied parole under this new process have received five-year setbacks – the maximum permitted under Board policies.

---

[5]  *False Hope*, *supra* at 46, FN340.

Others were not, in the Board's opinion, yet eligible for parole and received setbacks of many more years. Yet no explanation was provided for the lengthy delay in review or what might be needed to satisfy *Miller* factors the next time around.

100.    For example, prior to Mr. Roberts' parole hearing, his IPO, Jessica Bliesath, told him that, because of the *Miller* decision, the Board could not deny parole solely based on the circumstances of the offense.[6] After receiving a denial notice, Mr. Roberts' asked IPO Bliesath why he was denied based solely on circumstances of the crime given her earlier representation. Given the barebones denial notice, even IPO Bliesath was left guessing as to the basis for the Board's decision, conjecturing that the Board's one-line explanation represented just one of the reasons the Board made their decision: "I can assure you it is not the sole reason you received a reconsideration hearing verses [sic] a release date." *See* **Exhibit 6**. But Mr. Roberts has received no notice or further explanation as to whether the Board denied parole on any other basis.

101.    Further, outdates are not a guarantee of release – the Board can revoke them in their discretion. *See, e.g.*, *Life Without Parole*, *supra* note 1 at 5 (discussing the case of Keith Drone, a juvenile offender who was denied parole at five separate hearings – including once when the Board granted him parole, but then took it away).

102.    If they were involved in the hearing process, the victim's family receives notification of the Board's decision before the inmate does.

103.    The Board's decisions are provided to inmates on a single sheet of paper – a barebones, boilerplate form that is used to notify inmates of all manner of events related to parole considerations. Some of these forms, including those provided to Messrs. McElroy, Roland and Roberts, are attached hereto as collective **Exhibit 7**.

---

[6]    Undersigned counsel were provided the same information by high-level Parole Board staff.

104.    There is no indication on these forms who made the decision or how the Board voted. In fact, the forms are not signed at all. *See* Exhibit 7. This stands in stark contrast with, for example, the Commonwealth of Massachusetts's policy of providing written decisions regarding parole review. *See, e.g.*, **Exhibit 8**.[7]

105.    Decisions by the full Board, as opposed to a panel decision, are not subject to appeal. *See* RSMo. § 217.670. But Plaintiffs McElroy, Roberts and Roland, whose hearings were held before a panel, were still precluded from any review by the full Board. And it is unclear what, if any, information is shared from the panel to the Board.

106.    In denying parole release, including in the JLWOP context, the Board most often cites to the "circumstances surrounding the offense(s)." in this way, the parole determination does not differ from the Board's standard procedures and customs. Upon information and belief, every single parole denial under SB 590, at least in part, focused on the circumstances of the present offense as a reason for denial.

107.    A former operations manager of the Board admitted that denial forms would almost always say the same thing:

> Their forms would always say the same thing: "Release at this time would depreciate the seriousness of the present offense."
>
> But that was "not always the truth. Sometimes I'd make that crap up. The real reason," [Janet] Barton said, was "we don't believe in parole for people like you.

*Life Without Parole*, *supra* note 1 at 11.

---

[7]    This is just one of the many ways Missouri's parole process for juvenile offenders stands in stark contrast to how such hearings are conducted elsewhere. *See, e.g., PBS Frontline: Second Chance Kids* (PBS television broadcast May 2, 2017), available at http://www.pbs.org/wgbh/frontline/film/second-chance-kids/.

108.     Yet the circumstances of the offense should not foreclose a child's entitlement to release from prison. *See Adams*, 136 S.Ct. at 1800 (Sotomayor, J., concurring) ("[T]he gruesomeness of a crime is not sufficient to demonstrate that a juvenile offender is beyond redemption: 'The reality that juveniles still struggle to define their identity means it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character.'") (quoting *Roper*, 543 U.S. at 570); *see also Montgomery*, 136 S.Ct. at 736 ("The opportunity for release [on parole] will be afforded to those who demonstrate the truth of *Miller*'s central intuition—that children who commit even heinous crimes are capable of change.").

109.     The hearings themselves last, on average, no more than 15 to 30 minutes. The bulk of the short parole hearing is spent discussing the circumstances of the offense in detail, rather than the inmate's childhood, youth at the time of the offense, or demonstrated rehabilitation over years of imprisonment.

110.     The Missouri Parole Board's policies, procedures, and customs deprive Plaintiffs and members of the putative class of the "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation" to which they are entitled under law.

111.     Thus, although SB 590 granted them the opportunity for review of their sentence before the Parole Board[8], the Board's arbitrary and standard-less practices all but guarantee that juveniles sentenced to LWOP – even those entitled to relief under SB 590 – will die in prison regardless of whether they have demonstrated rehabilitation and maturity.

---

[8]     Plaintiffs do not concede that SB 590, even if fully complied with, remedies their unconstitutional sentences in compliance with *Miller*. But Plaintiffs continue to be subjected to SB 590 hearings.

112. At the very least, the possibility of release after 25 years, as envisioned by the Missouri Supreme Court and SB 590, is illusory.

113. Furthermore, because of the lack of transparency in parole proceedings and inability to appeal decisions, individuals are prevented from vindicating their right to a meaningful opportunity for release.

**Norman Brown**

114. Norman Brown has served over 25 years on his LWOP sentence – a sentence imposed on him mandatorily despite the fact that he was only 15 years old at the time of the crime, and an unarmed, unwitting accomplice to an adult co-defendant twice his age.

115. Mr. Brown is a model inmate who has completed thousands of hours of restorative justice programs, serves as a prison hospice worker, and helps run the "Puppies for Parole" dog training program.

116. Mr. Brown has a parole hearing scheduled for May 24, 2017. One of his attorneys intends to appear as his delegate. However, she has already been admonished in advance against attempting to advocate on behalf of Mr. Brown. *See* Exhibit 2.

117. Mr. Brown anticipates that he will receive the same lack of process and consideration afforded others similarly situated who have already had their parole hearings under a change in the law.

**Ralph McElroy**

118. Ralph McElroy has served over 30 years on his LWOP sentence.

119. Mr. McElroy has completed a GED in prison, has received numerous training certificates, and has been employed as a caretaker in the Enhanced Care Unit.

25

120. Mr. McElroy's parole hearing was held before a panel of the Board on December 13, 2016. His sister, Malena Riggs, attended as his only permitted delegate, as he was precluded from having both counsel and a delegate present.

121. At the hearing, as well as in the letters provided to the Board prior to the hearing, Mr. McElroy and his sister explained his extensive home plan which included a responsible fiancée, a place to live, and a potential job.

122. Upon information and belief, the hearing lasted less than half an hour. Mr. McElroy requested the transcript from his hearing, which the Board refused to provide. *See* Exhibits 4 and 5.

123. On or about, January 23, 2017, Mr. McElroy was informed that the Board denied his request for parole. The Board cited two reasons for its decision: (1) release would depreciate the seriousness of the offense based on the circumstances of the offense, and (2) a risk of later violating the law due to poor institutional adjustment. He is not scheduled for a reconsideration hearing until December 2021. This is the maximum possible setback under the Board's policies.

124. The denial notice expressly stated that the decision was not subject to appeal.

*Sidney Roberts*

125. Sidney Roberts has served over 28 years on his LWOP sentence.

126. During his many years in prison, Mr. Roberts completed various courses and pursued informal means of self-improvement. He maintained a steady work history, and had five different supervisors write letters of support to the Board on his behalf, commending Mr. Roberts' industriousness and good character.

127. The vast majority of Mr. Roberts' conduct violations were received when he was still in his twenties. He has had no violations in nearly eight years.

128.     Like many other *Miller*-impacted youthful offenders, Mr. Roberts has attempted to request *Miller*-compliant processes at his SB 590 hearing. *See* **Exhibit 9**. His request, as with all others, has been essentially ignored by the Board.

129.     Mr. Roberts' parole hearing was held before a panel of the Board on March 9, 2017. Mr. McSwain was the only Board member present at the hearing. Mr. Roberts' mother attended the hearing as his delegate because he was precluded from having both counsel and a delegate present.

130.     During the hearing, Mr. McSwain grilled Mr. Roberts about the circumstances of the crime until Mr. Roberts broke down, sobbing.

131.     On or about April 11, 2017, the Board denied Mr. Roberts' request for parole solely because of the circumstances of the offense. He is not scheduled for a reconsideration hearing until March 2021.

132.     The denial notice expressly stated that the decision was not subject to appeal.

### Theron "Pete" Roland

133.     Theron "Pete" Roland has served over 29 years on his LWOP sentence. He is now 46 years old.

134.     Mr. Roland also has an exceptional institutional record. At the time of his parole hearing in January 2017, Mr. Roland had not received a conduct violation in 15 years, and had been in honor dorm for approximately 14 years. In fact, over his nearly 30 years in prison, he has received no more than 14 violations.

135.     Mr. Roland received a panel hearing on January 3, 2017. His sister, Kelly, attended as his only permitted delegate.

136.     During Kelly's statement in support of Mr. Roland, the Board cut her off, and directed her to speak only to Mr. Roland's home plan.

137.     Martin Rucker was the sole Board member at Mr. Roland's hearing. At the hearing, Mr. Rucker admitted on record that he had not reviewed Mr. Roland's file beforehand.

138.     On or about January 30, 2017, the Board denied Mr. Roland's request for parole solely because of the circumstances of the offense. He is not scheduled for a reconsideration hearing until January 2022. This is the maximum possible setback under Board policies, imposed without any explanation or justification.

139.     The denial notice expressly stated that the decision was not subject to appeal.

*Class Action Allegations*

140.     Plaintiffs bring this suit as a class action on behalf of themselves and all others similarly situated, pursuant to Rules 23(a) and 23(b)(2).

141.     Plaintiffs seek to represent the following class on claims for declaratory and injunctive relief: individuals in the custody of MDOC who were sentenced to LWOP under a mandatory sentencing scheme and who were under 18 years of age at the time of the offense (the "Class").

142.     Information as to the precise size of the Class and the identity of those in it is exclusively controlled by Defendants. However, Plaintiffs' counsel estimate the Class includes approximately 83 individuals, including the named Plaintiffs. These individuals are geographically dispersed throughout various MDOC facilities throughout the State of Missouri. The number of persons who are members of the Class described above are so numerous that joinder of all members in one action is impracticable.

143. The named Plaintiffs will fairly and adequately represent the interests of the Class. They each possess a strong personal interest in the subject matter of the lawsuit, and will be represented by competent and skilled counsel with expertise in civil litigation and civil rights litigation. Counsel have the legal knowledge and resources to fairly and adequately represent the interests of all Class members in this action.

144. As a result of Defendants' unconstitutional policies and practices governing the JLWOP parole review process, members of the Class are or will be subjected to cruel and unusual punishment and deprived of their constitutional rights to due process. Plaintiffs seek declaratory and injunctive relief to remedy Defendants' illegal and unconstitutional policies, practices and customs.

145. Questions of law and fact that are common to the entire Class predominate. The common question at issue in this lawsuit is whether Defendants maintain a policy or custom of conducting JLWOP parole review hearings in a manner that prevents Plaintiffs from obtaining a realistic and meaningful opportunity for release based on demonstrated rehabilitation, in violation of state and federal due process requirements and prohibitions on cruel and unusual punishment.

146. Because Defendants have acted or refused to act on grounds generally applicable to the entire Class, final injunctive and declaratory relief is appropriate as to the Class as a whole. Thus, certification of the Class under Rule 23(b)(2) is proper.

## CLAIMS

## COUNT I
**Cruel and Unusual Punishment in Violation of the Eighth Amendment to the United States Constitution – 42 U.S.C. § 1983**

147. Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

148. Defendants' current policies, procedures, and customs with respect to the parole review process for Plaintiffs and the putative class fail to provide a realistic and meaningful

opportunity for release upon demonstrated rehabilitation. These policies, procedures, and customs lack legitimate penological justification, are arbitrary and capricious, and constitute cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution (as incorporated to the states by the Fourteenth Amendment).

**COUNT II**
**Deprivation of Due Process in Violation of the Fourteenth Amendment to the United States Constitution – 42 U.S.C. § 1983**

149.     Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

150.     Defendants' aforementioned actions, including but not limited to their ongoing failure to provide Plaintiffs and the putative class with (1) a meaningful opportunity for release upon demonstrating their growth, maturity, and rehabilitation, (2) the right to review and rebut evidence presented against them at parole hearings, and (3) sufficient notice and explanation of the basis for parole determinations constitute denial of due process of law in violation of the Fourteenth Amendment to the United States Constitution.

**COUNT III**
**Cruel and Unusual Punishment in Violation of Article I, Section 21 of the Missouri Constitution**

151.     Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

152.     Defendants' current policies, procedures, and customs with respect to the parole review process for Plaintiffs and the putative class fail to provide a realistic and meaningful opportunity for release upon demonstrated rehabilitation. These policies, procedures, and customs lack legitimate penological justification, are arbitrary and capricious, and constitute cruel and unusual punishment in violation of Article I, Section 21 of the Constitution of the State of Missouri.

**COUNT IV**
**Deprivation of Due Process in Violation of Article I, Section 10 of the Missouri Constitution**

153.     Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

30

154. Defendants' aforementioned actions, including but not limited to their ongoing failure to provide Plaintiffs and the putative class with (1) a meaningful opportunity for release upon demonstrating their growth, maturity, and rehabilitation, (2) the right to review and rebut evidence presented against them at parole hearings, and (3) sufficient notice and explanation of the basis for parole determinations constitute denial of due process of law in violation of Article I, Section 10 of the Constitution of the State of Missouri.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs pray this Court:

A. For the named Plaintiffs and members of the plaintiff class, issue a declaratory judgment that Defendants' policies, procedures, and customs for JLWOP parole reviews violate the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 21 of the Missouri Constitution;

B. For the named Plaintiffs and members of the plaintiff class, grant injunctive relief ordering that Defendants formulate and implement policies, procedures, and customs for JLWOP parole reviews that ensure a realistic and meaningful opportunity for release based on demonstrated maturity, and any further appropriate injunctions to prevent the future deprivation of the rights of Plaintiffs and members of the plaintiff class, including but not limited to requiring Defendants to provide Plaintiffs with, among other things:

    i. The right to meaningful representation by counsel at parole hearings;

    ii. The right to review all information provided to the Board or panel, including but not limited to the IPO's report and recommendation, in advance of the hearing;

iii.    The right to submit written material to the Board in advance of the hearing;

iv.    The right to present lay and expert witness testimony at the hearing;

v.    The right to cross-examine at the hearing those who have provided evidence against them and otherwise challenge evidence presented against them

vi.    The right to have an independent recording made of the hearing, and to access any recording of the hearing made or maintained by the Board or panel; and

vii.    The right to have a statement made, on the record and in the inmate's presence, of the decision and the specific reasons for the decision;

C. For the named Plaintiffs and members of the plaintiff class who have already had a hearing pursuant to SB 590, but have been denied parole, grant injunctive relief ordering that Defendants provide those individuals with a parole review hearing within 90 days that complies with *Graham*, *Miller*, and *Montgomery*'s constitutional mandate and ensures a realistic and meaningful opportunity for release based on demonstrated maturity;

D. Award Plaintiffs' costs, including reasonable attorneys' fees, under 29 U.S.C. § 794a and other relevant provisions of law; and

E. Allow such other and further relief to which Plaintiffs may be entitled.

Respectfully submitted,

MACARTHUR JUSTICE CENTER AT ST. LOUIS

By: /s/ Mae C. Quinn       By: /s/ Amy E. Breihan   
Mae C. Quinn, # 61584      Amy E. Breihan, # 65499MO

3115 South Grand Blvd., Suite 300
St. Louis, MO 63118
Phone: (314) 254-8540
Fax: (314) 254-8547
mae.quinn@macarthurjustice.org
amy.breihan@macarthurjustice.org


HUSCH BLACKWELL LLP

By: /s/ Matthew Gartner
Matthew Gartner, # 64320MO
Matt D. Knepper, # 61731MO
Sarah L. Zimmerman, # 69440MO
Denyse L. Jones, # 53611
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105
Phone: (314) 480-1500
Fax: (314) 480-1505
Matthew.Gartner@huschblackwell.com
Matt.Knepper@huschblackwell.com
Sarah.Zimmerman@huschblackwell.com
Denyse.Jones@huschblackwell.com

Dated: May 18, 2017