**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION**

| | | |
|---|---|---|
| NORMAN BROWN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 2:17-cv-04082-NKL |
| | ) | |
| ANNE L. PRECYTHE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

Plaintiffs Norman Brown, Ralph McElroy, Sidney Roberts, and Theron Roland are serving Missouri prison sentences for first-degree murder offenses committed when they were less than 18 years of age. Each originally received a sentence of life without the possibility of parole. However, the United States Supreme Court recently held that a mandatory sentence of life without parole for a person who was under the age of 18 when he committed the offense violates the Eighth Amendment prohibition on cruel and unusual punishment. After the Supreme Court clarified that this holding applies retroactively, the Missouri legislature enacted a law permitting those who had been convicted to life without the possibility of parole for offenses they committed as juveniles to petition for parole after serving 25 years in prison. Each of the plaintiffs then petitioned for, but was denied, parole. Each is scheduled for reconsideration of the parole determination in five years.

Plaintiffs allege in their first amended complaint that Missouri's parole policies and practices violate their rights to be free from cruel and unusual punishment and their rights to due process under the Constitutions of both the United States and Missouri. They sue the Director of the Missouri Department of Corrections and members of the Missouri Board of Probation and

Parole (the "Board"), seeking declaratory and injunctive relief. Plaintiffs seek to represent a class of offenders sentenced to life without parole for crimes committed as juveniles.

Defendants have moved to dismiss and Plaintiffs have moved for leave to file a second amended complaint to add a new count for declaratory judgment concerning Defendants' alleged failure to satisfy Missouri Revised Statutes Sections 558.047.5 and 565.033.2. Plaintiffs also seek to compel production of certain categories of information that Defendants object to producing.

## I.      The Legal Background

### a.   Constitutional Limitations on Sentences for Juveniles

The bar in the U.S. Constitution's Eighth Amendment against cruel and unusual punishment prohibits subjecting an individual "to excessive sanctions." *Roper v. Simmons*, 543 U.S. 551, 560 (2005). In a series of cases over the last eight years, the United States Supreme Court has concluded that the imposition of the sentence of life without parole on those who were under the age of eighteen when they committed an offense generally violates this prohibition. First, in *Graham v. Florida,* 560 U.S. 48 (2010), the Supreme Court held that sentencing juvenile, non-homicide offenders to life without the possibility of parole violates the Eighth Amendment. Subsequently, in *Miller v. Alabama*, 567 U.S. 460 (2012), the Supreme Court held that mandatory life without parole for juvenile homicide offenders, too, violates the Eighth Amendment. Finally, in *Montgomery v. Louisiana*, 136 S. Ct. 718 (2016), the Supreme Court clarified that *Miller*'s holding constitutes substantive law that must be applied retroactively to offenders already facing mandatory life in prison. The Supreme Court explained that a state need not guarantee freedom to the juvenile offender, but the sentence must provide "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation."

*Miller*, 567 U.S. at 479 (quoting *Graham*, 560 U.S. at 75); *see also Montgomery*, 136 S. Ct. at 736 ("Those prisoners who have shown an inability to reform will continue to serve life sentences. The opportunity for release will be afforded to those who demonstrate . . . that children who commit even heinous crimes are capable of change.").

The rationale for treating juvenile offenders differently from adult offenders is simply that "children are different . . . ." *Miller*, 567 U.S. at 481. "[D]evelopments in psychology and brain science continue to show fundamental differences between juvenile and adult minds." *Graham*, 560 U.S. at 68. As *Miller* explains,

> First, children have a lack of maturity and an underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking. Second, children are more vulnerable to negative influences and outside pressures, including from their family and peers; they have limited control over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings. And third, a child's character is not as well formed as an adult's; his traits are less fixed and his actions less likely to be evidence of irretrievable depravity.

*Miller*, 567 U.S. at 471 (quotation marks and citations omitted). Youth "is a time of immaturity, irresponsibility, impetuousness, and recklessness." *Id.* at 476 (quotation marks and citation omitted). It is "a condition of life when a person may be most susceptible to influence and to psychological damage." *Id.* (quotation marks and citation omitted).

"Parts of the brain involved in behavior control continue to mature through late adolescence." *Graham*, 560 U.S. at 68. Studies have shown that "only a relatively small proportion of adolescents who engage in illegal activity develop entrenched patterns of problem behavior." *Miller*, 567 U.S. at 471 (quotation marks and citation omitted). Thus, the actions of a juvenile "are less likely to be evidence of irretrievably depraved character than are the actions of adults." *Graham*, 560 U.S. at 68 (quotation marks and citation omitted).

Because "a greater possibility exists that a minor's character deficiencies will be

reformed," it "would be misguided" to treat a juvenile offender in the same fashion as an adult. *Id.* (quotation marks and citation omitted). A mandatory sentence of life without parole takes no account of the fact that the "signature qualities" of youth described above "are all transient." *Miller*, 567 U.S. at 476 (quotation marks and citation omitted). As *Miller* explains,

> Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. . . . It ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys.

*Id.* at 477-78. The sentence of life without parole for a juvenile "disregards the possibility of rehabilitation even when the circumstances most suggest it." *Id.* at 478.

Although the rule enunciated in *Miller* applies retroactively, it "does not require States to relitigate sentences, let alone convictions, in every case where a juvenile offender received mandatory life without parole." *Montgomery*, 136 S. Ct at 736. "A State may remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them." *Id.* at 736. Nonetheless, the Supreme Court noted that "*Miller* did bar life without parole . . . for all but the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility." *Id.* at 734. "[G]iven . . . children's diminished culpability and heightened capacity for change, . . . appropriate occasions for sentencing juveniles to this harshest possible penalty" are supposed to "be uncommon." *Miller*, 567 U.S. at 479.

### b. Missouri Law on Juveniles Serving Life Without Parole

After *Montgomery*, the Missouri legislature amended state law to permit those who were sentenced to mandatory life without parole for offenses committed when they were juveniles to

petition for parole after serving 25 years in prison. *See* Mo. Rev. Stat. § 558.047. The amended law provides, in relevant part:

> Any person sentenced to a term of imprisonment for life without eligibility for parole before August 28, 2016, who was under eighteen years of age at the time of the commission of the offense or offenses, may submit to the parole board a petition for a review of his or her sentence . . . after serving twenty-five years of incarceration on the sentence of life without parole.

Mo. Rev. Stat. § 558.047.1.1.

The statute requires the Board to hold a hearing to determine whether parole is appropriate. *See* Mo. Rev. Stat. § 558.047.4. It also enumerates factors that the Board "shall consider":

> (1) Efforts made toward rehabilitation since the offense or offenses occurred, including participation in educational, vocational, or other programs during incarceration, when available;
>
> (2) The subsequent growth and increased maturity of the person since the offense or offenses occurred;
>
> (3) Evidence that the person has accepted accountability for the offense or offenses, except in cases where the person has maintained his or her innocence;
>
> (4) The person's institutional record during incarceration; and
>
> (5) Whether the person remains the same risk to society as he or she did at the time of the initial sentencing.

Mo. Rev. Stat. § 558.047.5. The statute also incorporates by reference the following additional factors that the Board must consider (*see id.*):

> (1) The nature and circumstances of the offense committed by the defendant;
>
> (2) The degree of the defendant's culpability in light of his or her age and role in the offense;
>
> (3) The defendant's age, maturity, intellectual capacity, and mental and emotional health and development at the time of the offense;
>
> (4) The defendant's background, including his or her family, home, and community environment;
>
> (5) The likelihood for rehabilitation of the defendant;

(6) The extent of the defendant's participation in the offense;

(7) The effect of familial pressure or peer pressure on the defendant's actions;

(8) The nature and extent of the defendant's prior criminal history, including whether the offense was committed by a person with a prior record of conviction for murder in the first degree, or one or more serious assaultive criminal convictions;

(9) The effect of characteristics attributable to the defendant's youth on the defendant's judgment; and

(10) A statement by the victim or the victim's family member as provided by [other specified statutes].

Mo. Rev. Stat. § 565.033.2.

## II.    The Alleged Facts[1]

Plaintiffs allege that, although they now are eligible for parole under Missouri law, they have been denied a meaningful opportunity for release, in violation of their constitutional rights, because of the policies, procedures, and customs of the defendants—the Missouri Director of Corrections and each of the members of the Board.

Plaintiffs allege that the Board, which has sole authority to grant or deny parole applications, is "a political body long criticized for its arbitrariness, dysfunction, and lack of transparency." Doc. 22, ¶ 60. The Board also presides over too many hearings to fairly consider the plaintiffs' applications. The full board may decide a prisoner's petition, even when only a subset—often even just one Board member—sits on the hearing panel. The Board has "historically enjoyed broad discretion in its decision making" and decisions purportedly rendered by the full board are not reviewable. *Id.*, ¶ 71.

Parole proceedings, by statute, are closed, unless they are posted as open, and votes are

---

[1] For purposes of deciding the motion to dismiss, the Court accepts the factual allegations in the complaint as true and construes them in the light most favorable to the plaintiff. *See Stodghill v. Wellston Sch. Dist.,* 512 F.3d 472, 476 (8th Cir. 2008).

closed.  Hearings last on average just 15 to 30 minutes, and the majority of that time is spent discussing the circumstances of the offense.  Parole hearings for youthful offenders, according to the plaintiffs, "are generally treated no differently than typical Missouri parole hearings, which themselves do not comply with due process or other constitutional norms."  *Id.*, ¶ 77.  Prisoners are not permitted access to their parole files, so they do not know—and cannot challenge or correct—much of the information the Board considers.  Prisoners are permitted just one delegate at a hearing, and if the delegate is an attorney, she is not permitted to act as a lawyer in a hearing or even to meet with the prisoner beforehand.  Both the information that prisoners are permitted to present and their time for speaking is severely limited.  In contrast, victims may have multiple delegates and their presentations are not limited in any fashion.  Inmates are not permitted to procure recordings of the hearings.

An ACLU report cites a "parole board staff member" as stating that "some members never read the files at all and instead base their decision on how the reviewing board member before them voted."  *Id.,* ¶ 94.  "A former operations manager of the Board admitted that denial forms would almost always say the same thing," *i.e.,* "Release at this time would depreciate the seriousness of the present offense."  *Id.,* ¶ 110.  Yet, she admitted that "that was 'not always the truth.  Sometimes I'd make that crap up.  The real reason' . . . was 'we don't believe in parole for people like you.'"  *Id.*

Plaintiffs allege that Defendant Ruzicka was investigated by the Missouri Department of Corrections, Office of Inspector General, for turning parole hearings into games.  Mr. Ruzicka and a parole analyst would compete against each other to see how many times each could use a particular word or refer to a song lyric during a proceeding.  Although he was removed from the hearing schedule during the investigation, Mr. Ruzicka returned to participate in hearings after

the report was issued.  He has conducted over 45,000 parole hearings, and Plaintiffs plead upon information and belief that he presided over two of 22 hearings for prisoners serving juvenile life without possibility of parole sentences, and has contributed to every Board decision denying such prisoners parole.

Plaintiffs allege that just four prisoners out of fourteen prisoners who were serving life sentences for crimes committed before they were 18 years old were granted parole in 2015.  The parole-grant rate for juveniles serving life without possibility of parole is even lower:  as of June 2017, the Board had conducted 20 hearings under the new Missouri law enacted in light of *Montgomery*, but it granted parole in only two instances.  Each of these denials cited the circumstances of the offense as a reason for the denial.  The majority of the *Miller*-impacted individuals, including all of the plaintiffs, will not be eligible for parole again for 5 years.

According to Plaintiffs, approximately 80 Missouri inmates currently are impacted by *Miller*.

The complaint includes allegations specific to the plaintiffs' individual parole hearings as well.  Plaintiff Brown alleges that he has served over 25 years of his sentence.  The complaint describes him as a "model inmate" who has completed "thousands of hours of restorative justice programs" and who serves as a prison hospice worker and helps to run a "Puppies for Parole" dog training program.  Doc. 22, ¶ 130.  He had a parole hearing in May 2017.  His delegate, his attorney, was not permitted to bring pen and paper into the hearing.  Mr. Brown "offered his deepest apologies, regrets, and condolences" to the victim, but both Mr. Brown and his attorney were told not to look at the victim.  *Id.*, ¶¶ 136, 134.  The victim was permitted to read a 12-page statement and offer any factual assertions, feelings, and opinions about the law that she wished.  She told the Board that the *Miller* decision was wrong and should not be followed.  Mr. Brown's

attorney was not permitted to respond to anything the victim said.  The victim also apparently had been given non-public information about Mr. Brown.  The prosecutor, like the victim, was permitted to speak freely and to present any information he wished, including a new crime scene diagram he had created that was never shown to Mr. Brown.  In contrast, Mr. Brown's attorney was permitted only to speak about support that she might provide Mr. Brown upon his release.  Two days after the hearing, Mr. Brown received a notice of denial that cited as the sole basis the seriousness of the offense.  Defendant Ruzicka was one of the Board members who had conducted the hearing.

Plaintiff McElroy alleges that he has served over 30 years of his original sentence, during which time he completed a GED and received numerous training certificates.  He has been employed as a caretaker in the Enhanced Care Unit.  He had a parole hearing in December 2016, at which he was permitted only one delegate.  His sister, his hearing delegate, sent letters to the Board prior to the hearing.  At the hearing, she explained his "extensive home plan which included a responsible fiancé, a place to live, and a potential job."  *Id.*, ¶ 150.  Mr. McElroy received a notice of denial about five weeks after the hearing that cited just two reasons for the denial:  (1) that release would depreciate the seriousness of the offense based on the circumstances of the offense, and (2) the risk of Mr. McElroy's later violating the law due to poor institutional adjustment.  The denial notice stated that the decision was not appealable.  Mr. McElroy is scheduled for reconsideration in December 2021.

Plaintiff Mr. Roberts alleges that he has served over 28 years of his original sentence.  He has improved himself through completion of courses, has maintained a steady work history, and has several letters of support from supervisors who commend his industriousness and good character.  He received the vast majority of his conduct violations while in his 20s, and he has

not received a single conduct violation in the last eight years.  He was permitted just one delegate at his March 2017 parole hearing.  At the hearing, defendant McSwain "grilled Mr. Roberts about the circumstances of the crime until Mr. Roberts broke down, sobbing." *Id.*, ¶ 159.  Four weeks later, the Board denied Roberts' request for parole, citing the circumstances of the offense.  Roberts' Institutional Parole Officer, Jessica Bliesath, had told Roberts before the hearing that the Board could not deny parole based solely on the circumstances of the offense.  When Roberts asked her about the denial notice he had received, she responded, "I can assure it is not the sole reason you received a reconsideration versus a release date." *Id.*, ¶ 103; Doc. 22-6.  The denial notice stated that the decision was not appealable.  Roberts is scheduled for reconsideration in March 2021.

Plaintiff Roland has served over 29 years of his original sentence.  He has "an exceptional institutional record," having had no conduct violations in about 15 years, and no more than 14 conduct violations during his 30 years in prison.  Doc. 22, ¶ 163.  At his January 2017 parole hearing, he was permitted only one delegate.  When his delegate delivered a statement, the Board cut her off and directed her to speak only to his home plan.  Defendant Rucker, the only Board member at the hearing, admitted on the record that he had not read Roland's file.  Four weeks later, the Board denied Roland's request for parole, citing the circumstances of the offense.  The notice stated that the decision was not appealable.  Roberts is scheduled for reconsideration in January 2022.

In Counts I and III of the First Amended Complaint, Plaintiffs allege that the denials of their requests for parole amount to cruel and unusual punishment under the United States and Missouri Constitutions because the Defendants' policies, procedures, and customs do not provide a meaningful opportunity for release upon demonstrated rehabilitation.  In Counts II and IV of

the First Amended Complaint, Plaintiffs allege that that their right to due process of law under the United States and Missouri Constitutions was violated because they are not afforded (1) a meaningful opportunity for release upon demonstration of their maturity and rehabilitation; (2) the right to review and rebut evidence against them at parole hearings; and (3) sufficient notice of and explanation about the basis for their parole denials. Plaintiffs expressly state that they are not challenging the fact or duration of their confinement. They seek declaratory and injunctive relief.

### III.    The Motion to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks and citation omitted). A claim is "plausible on its face" when the allegations allow the court to draw the reasonable inference that the defendants are liable for the misconduct alleged—there must be more than "a sheer possibility" that the defendants acted unlawfully. *Id.* (citation omitted). Allegations of fact that are "merely consistent with" liability are insufficient. *Id.* (citation omitted).

To succeed on their § 1983 claims, Plaintiffs must prove: (1) that Defendants deprived them of a right secured by the United States Constitution, and (2) that Defendants acted under color of state law. *See Gonzales-Perez v. Harper*, 241 F.3d 633, 637 (8th Cir. 2001). Because Missouri interprets its corresponding constitutional provisions similarly, analysis of Plaintiffs' claims under the Missouri Constitution is the same as under the United States Constitution. *See Jamison v. State Dep't of Social Services, Div. of Family Services,* 218 S.W.3d 399, 405 n.7 (Mo. 2007) (noting that "Missouri's due process clause parallels its federal counterpart"); *Burnett v. State,* 311 S.W.3d 810, 814 n.3 (Mo. App. 2009) (noting that

Missouri courts "apply the same standard in determining whether a punishment violates the United States Constitution or Missouri Constitution" because both provide the "same protection against cruel and unusual punishment").

There is no dispute that the Defendants at all relevant times acted under color of state law. The parties dispute only whether Defendants violated any of Plaintiffs' constitutional rights.

### a. Cruel and Unusual Punishment

### i. A Meaningful Opportunity for Release for the Juvenile Offender

Plaintiffs allege that the Defendants' policies, procedures, and customs violate the constitutional prohibition against cruel and unusual punishment because they do not provide juvenile offenders a meaningful opportunity for release. Defendants counter that, to the contrary, Plaintiffs have a meaningful opportunity for release as a matter of law because they each are eligible for parole and are subject to the normal Missouri parole process, and because the Board is required by Missouri statute to consider, among other factors, the juvenile offenders' age at the time of the offense as well as their subsequent maturity and rehabilitation. Defendants argue that the constitutional right to freedom from excessive punishment requires nothing more—and that certainly, it does not require special parole procedures or policies for juvenile offenders beyond those outlined in the newly enacted Missouri statutes.

The Supreme Court cases concerning life-without-parole sentences for juvenile offenders "do[] not require the State to release [a juvenile] offender during his natural life." *Graham*, 560 U.S. at 75. Nor do they "require States to relitigate sentences, let alone convictions, in every case where a juvenile offender received mandatory life without parole." *Montgomery*, 136 S. Ct.

at 736. A state may "remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them." *Id.* And "[i]t is for the State, in the first instance, to explore the means and mechanisms for compliance." *Graham*, 560 U.S. at 75.

Nonetheless, these Supreme Court cases contemplate that the juvenile offender will have an opportunity to obtain release upon demonstrating maturity and rehabilitation. As *Montgomery* explains,

> Allowing those offenders to be considered for parole ensures that juveniles whose crimes reflected only transient immaturity—and who have since matured—will not be forced to serve a disproportionate sentence in violation of the Eighth Amendment. . . . Those prisoners who have shown an inability to reform will continue to serve life sentences. The opportunity for release will be afforded to those who demonstrate the truth of *Miller*'s central intuition—that children who commit even heinous crimes are capable of change.

*Montgomery*, 136 S. Ct. at 736; *see also Graham*, 560 U.S. at 73 ("A life without parole sentence improperly denies the juvenile offender a chance to demonstrate growth and maturity."). Thus, juvenile offenders "must be given the opportunity to show their crime did not reflect irreparable corruption; and if it did not, their hope for some years of life outside prison walls must be restored." *Montgomery*, 136 S. Ct. at 736-37. The opportunity to demonstrate maturity and reform must be "meaningful" and "realistic." *See Graham*, 560 U.S. at 75 ("What the State must do . . . is give defendants like Graham some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation."); *id.* at 82 ("[I]f [a State] imposes a sentence of life it must provide [the juvenile offender] with some realistic opportunity to obtain release before the end of that term."). Failure to provide a juvenile offender eligible for parole with a "meaningful opportunity" to demonstrate maturity and reform violates the prohibition against excessive punishment.

Defendants argue that the Supreme Court's citation of a Wyoming statute that permitted juvenile offenders to apply for parole after 25 years but did not provide for any special parole

procedures for juvenile homicide offenders demonstrates that *Montgomery* does not impose special requirements for *Miller*-affected offenders' parole proceedings. However, immediately after referring to the Wyoming statute, the Supreme Court added in *Montgomery* that "[a]llowing those offenders to be considered for parole ensures that juveniles whose crimes reflected only transient immaturity—and *who have since matured*—will not be forced to serve a disproportionate sentence in violation of the Eighth Amendment." *Montgomery*, 136 S. Ct. at 736 (emphasis added). Thus, even though the Wyoming statute did not on its face provide special protections for a juvenile offender's parole proceedings, the Supreme Court expressly noted that a Miller-affected offender should be permitted to show maturity and how transient immaturity factored into the crime. Such offenders therefore are different.

Defendants argue also that the Supreme Court's recent decision in *Virginia v. LeBlanc*, 137 S. Ct. 1726 (2017), establishes that Miller does not establish either substantive or procedural requirements for parole proceedings. However, that case is distinguishable because it dealt with special rules applicable only to habeas corpus actions, not to a section 1983, Eighth Amendment violation.

In *LeBlanc*, the offender was sentenced to life without parole after he was convicted of rape committed while he was 16 years old. *See id.* at 1727. At that time, Virginia had abolished the traditional parole framework for felony offenders and had instead enacted a "geriatric release" program that permitted inmates to be released before the end of their prison terms under certain circumstances after they passed the age of 60 or 65 years. *See id.* Seven years after LeBlanc was convicted, *Graham* was decided. *Id.* LeBlanc then moved in state court to vacate his sentence in light of *Graham*. *See id.* The Virginia trial court denied LeBlanc's motion, relying on the Virginia Supreme Court's decision in a prior case that held that the geriatric

release program satisfied *Graham*'s requirement of parole for juvenile offenders because it provided "the meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation required by the Eighth Amendment." *See id.* (citing *Angel v. Commonwealth*, 281 Va. 248, 275 (2011)). The Virginia Supreme Court subsequently summarily denied LeBlanc's requests to appeal the trial court decision. *See LeBlanc*, 137 S. Ct. at 1728.

LeBlanc then filed a federal habeas petition in federal district court in Virginia pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See id.* In relevant part, the AEDPA permits federal habeas relief if an underlying state court merits ruling resulting in a person's imprisonment was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States . . . ." 28 U.S.C. § 2254(d)(1). Both the federal district court and the Fourth Circuit concluded that the state trial court's ruling was an unreasonable application of *Graham* because Virginia's geriatric release program did not provide a meaningful opportunity for release based on demonstrated maturity and rehabilitation. *See Leblanc*, 137 S. Ct. at 1728.

In a *per curiam* opinion, the U.S. Supreme Court reversed, concluding that "[t]he Virginia trial court did not unreasonably apply the *Graham* rule." 137 S. Ct. at 1728. The Supreme Court explained that, because it was a habeas petition being reviewed, "[i]n order for a state court's decision to be an unreasonable application of th[e Supreme] Court's case law, the ruling must be objectively unreasonable, not merely wrong; even clear error will not suffice." *Id.* (quotation marks and citation omitted). LeBlanc was required to show, in other words, that "the state court's ruling was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* (quotation marks and citation omitted). This was "meant to be a difficult standard to meet." *Id.*

(quotation marks and citation omitted). The Supreme Court noted that "*Graham* did not decide that a geriatric release program like Virginia's failed to satisfy the Eighth Amendment because that question was not presented. It merely decided that it was not objectively unreasonable for the state court to conclude that, because the geriatric release program employed normal parole factors, it satisfied Graham's requirement that juveniles convicted of a nonhomicide crime have a meaningful opportunity to receive parole." *Id.* at 1728-29. The Supreme Court noted that "[t]he geriatric release program instructs Virginia's Parole Board to consider factors like the individual's history and the individual's conduct during incarceration, . . . and changes in attitude toward self and others." *Id.* at 1729 (quotation marks and citation omitted). The Supreme Court then concluded that "[c]onsideration of these factors could allow the Parole Board to order a former juvenile offender's conditional release in light of his or her demonstrated maturity and rehabilitation." *Id.* The Virginia courts therefore had "not diverge[d] so far from Graham's dictates as to make it so obvious that there could be no fairminded disagreement about whether the state court's ruling conflicts with th[e] [Supreme] Court's case law." *Id.* (quotation marks and citation omitted). There were "reasonable arguments on both sides" as to whether the geriatric release program satisfied the Eighth Amendment, including the inmate's "contentions that the Parole Board's substantial discretion to deny geriatric release deprives juvenile nonhomicide offenders a meaningful opportunity to seek parole and that juveniles cannot seek geriatric release until they have spent at least four decades in prison." *Id.* The Supreme Court volunteered that it "expresse[d] no view on the merits of the underlying Eighth Amendment claim" because of the "narrow" scope of federal habeas review. *Id.* (quotation marks and citation omitted). Thus, *Leblanc* did not hold, as Defendants argue, that the Eighth Amendment

does not require more than normal parole procedures. To the contrary, the Supreme Court expressly stated that it was not deciding that issue.

Multiple sister court decisions have concluded that *Graham*, *Miller*, and *Montgomery* require a meaningful opportunity for a juvenile offender's release upon demonstration of maturity and rehabilitation. *See Greiman v. Hodges*, 79 F. Supp. 3d 933, 943-44 (S.D. Iowa 2015) (denying motion to dismiss claim that parole review procedures were not compliant with *Graham* where plaintiff alleged that the parole board "failed to take account of Plaintiff's youth and demonstrated maturity and rehabilitation" and relied solely on "seriousness of the offense" in denying parole) (quotation marks and citation omitted); *Maryland Restorative Justice Initiative v. Hogan*, No. 16-1021, 2017 WL 467731, at *27 (D. Md. Feb. 3, 2017) (denying motion to dismiss because plaintiffs sufficiently alleged that Maryland's parole system provided only "remote," rather than "meaningful" and "realistic," opportunities for release, including by "den[ying] parole due to the nature of their offenses or their status as lifers"); *Hayden v. Keller*, 134 F. Supp. 3d 1000, 1009 (E.D. N.C. 2015) (denying defendants' motion for summary judgment and granting plaintiff's motion for summary judgment in part after finding that the North Carolina parole system failed to provide a meaningful opportunity for parole because the commissioners and case analysts did not "distinguish parole reviews for juvenile offenders from adult offenders, and thus fail[ed] to consider 'children's diminished culpability and heightened capacity for change'") (citing *Miller*, 567 U.S. at 479); *Wershe v. Combs*, No. 12-1375, 2016 WL 1253036, at **3-4 (W.D. Mich. Mar. 31, 2016) (finding the reasoning in *Greiman*, *Maryland Restorative Justice*, and *Hayden* "persuasive," and noting that the Supreme "Court's discussion of a meaningful opportunity to obtain release . . . suggests that the decision imposes some

requirements after sentencing as well," but concluding that the evidence in that case indicated that the parole board did consider the plaintiff's "maturity and rehabilitation").[2]

For these reasons, the Court concludes that the constitutional prohibition against cruel and unusual punishment, as interpreted in *Graham*, *Miller*, and *Montgomery*, requires states to provide juvenile offenders with a meaningful and realistic opportunity for release—an opportunity that permits the offenders to demonstrate maturity and rehabilitation.

### ii. Whether Plaintiffs State a Claim

The Court now considers whether the plaintiffs' allegations state a plausible claim that the defendants have failed to provide plaintiffs with a meaningful and realistic opportunity for release. The following allegations are salient:

- The information that prisoners are permitted to present is severely limited. *See* Doc. 22, ¶¶ 11, 141.

- The majority of the hearing is devoted to discussing the circumstances surrounding the offense for which the juvenile was sentenced. *See id.*, ¶¶ 11, 112, 159.
- Advocates are directed to speak only to the offenders' home plans, and have been cut off when they attempt to speak to the offenders' youth at the time of the offense, or childhood trauma. *See id.*, ¶¶ 87-88, 113, 142, 165.

- In contrast, the presentations of the victim(s) and the prosecutor, who focus only on the crime itself, are not limited in any fashion. *See id.*, ¶¶ 83-84, 140.

---

[2] A decision from within this District that Defendants cite in supplemental briefing, *Ramirez v. Griffith*, also is in accord with these decisions. In *Ramirez*, Judge Whipple noted that Missouri parole procedures are supposed to take account of "the youth-related concerns identified in *Miller*, such as the offender's age and maturity, his family environment, the circumstances of the offense, and prospects for rehabilitation." *Ramirez*, No. 16-1058, Doc. 8, p. 5 (W.D. Mo. Dec. 2, 2016), *cert. of appealability denied*, No. 17-1478 (8th Cir. Aug. 3, 2017). Although the court ultimately dismissed the petition in that case, it did so in relevant part because petitioner "fail[ed] to adequately explain how or why Missouri's parole system is deficient either on its face or as applied to him." No. 16-1058, Doc. 8, p. 5. Here, in contrast, as discussed below, plaintiffs have alleged how and why Missouri's parole system is deficient. *Ramirez* therefore is of limited applicability here.

- One victim was permitted to testify that the juvenile offender may have shot her—although that theory never before been advanced, and the government previously had conceded that the juvenile was unarmed and not even in the same room as the victim when the shooting occurred. *See id.*, ¶ 139.

- In one instance, a prosecutor urged the Board to consider facts that were erroneous and never proven at trial, and he presented a new crime scene diagram that he had put together for the Board's consideration. Neither the offender nor his advocate were provided with the information. *See id.*, ¶ 140.

- Offenders are not permitted to know or review the contents of the parole files that the Board takes into consideration, and the files often contain errors. *See id.*, ¶¶ 96-98.

- The Board member(s) deciding a prisoner's petition may not have been the Board member(s) present at the hearing. *See id.*, ¶ 95.

- Board members frequently treat the hearings as games. *See id.*, ¶¶ 118-127.

- Some Board members never read the offenders' files. *See id.*, ¶ 94.

- After conducting 20 parole hearings for *Miller*-affected offenders, the Board granted parole in just two instances. *See id.*, ¶ 101.

- Most of the *Miller*-affected offenders who were denied parole were deemed ineligible for parole for another five years—the maximum setback period permitted under Board rules. The remaining offenders were deemed ineligible for parole for even longer terms, without explanation. *See id.* ¶ 102.

- The Board almost invariably cites only one reason for denial of parole: the seriousness of the offense. *See id.*, ¶¶ 109-110, 145, 160, 167. Yet, high-level Board staff have acknowledged that *Miller*-affected offenders cannot be denied parole solely based on the circumstances of the offense. *See id.*, ¶ 103 and n.7.

- In fact, the Board members frequently just "don't believe in parole for people like [the plaintiffs]." *See id.*, ¶ 110.

- Plaintiffs' prison records may show maturity and rehabilitation. *See id.*, ¶ 130, 148, 155-156, 163.

If these allegations are proven, Plaintiffs very well could convince a reasonable factfinder that they have not had a meaningful opportunity consistent with Supreme Court teachings to demonstrate maturity and rehabilitation. *See, e.g., Hawkins v. New York State Dep't of Corr. & Cmty. Supervision*, 140 A.D.3d 34, 36 and 39-40 (N.Y. App. Div. 2016) (holding that, where

"neither the hearing transcript nor the Board's written determination reflect[ed] that the Board met its constitutional obligation to consider petitioner's youth and its attendant characteristics in relationship to the commission of the crime," the "petitioner was denied his constitutional right to a meaningful opportunity for release").

Defendants argue that "Plaintiff's complaints about specific parole procedures and anecdotal misconduct do not diminish their meaningful opportunity for parole release" because, "[a]long with parole hearings, the Board also reviews all available reports, case history, social history, medical, psychological and psychiatric reports, prior criminal history, institutional adjustment, work history, and participation in rehabilitative programs." *See* Doc. 26, p. 11. Defendants cite the Board's published procedures, Procedures Governing the Granting of Paroles and Conditional Release, in support of this claim. However, while that publication and the Missouri statute may be evidence of what the Board *should* do in making a parole determination, it is not evidence of what the Board has done or is doing.[3] Plaintiffs specifically allege that Board members often do not read the parole files, and in at least one instance, a Board member admitted on the record that he had not reviewed the file prior to the hearing. *See* Doc. 22, ¶ 166.[4]

---

[3] It is axiomatic that, even if a state's black-letter law does not on its face violate a constitutional provision, it is nonetheless possible that the law as applied violates the provision. *See, e.g., Turner v. Fouche*, 396 U.S. 346, 353 (1970) (holding that "the District Court properly entertained the question whether the constitutional and statutory complex, even if not invalid on its face, was unconstitutionally administered").

[4] Defendants argue that, although "Plaintiffs complain about anecdotal incidents of Board misconduct," Plaintiffs fail to "allege that this misconduct took place during their parole proceedings or affected them in any way." This is not the case. *See, e.g.,* Doc. 22, ¶ 133 (alleging that the plaintiff's advocate was prohibited from bringing pen or paper into the hearing); *id.*, ¶ 140 (alleging that the Board permitted the prosecutor to submit a new crime scene diagram that had not been submitted in the criminal proceedings against the plaintiff); *id.*, ¶ 166 (alleging that the sole Board member at one plaintiff's hearing "admitted on record that he had not reviewed Mr. Roland's file beforehand"). Moreover, given Plaintiffs' allegation that requests for transcripts of their parole hearings have been denied (*see id.*, ¶ 151), any omission

Thus, even if the Court were to take judicial notice of the published procedures, as Defendants request, they would not be determinative at the motion to dismiss stage.

Defendants also argue that there can be no merit in Plaintiffs' claims because statistics show that most parole-eligible offenders are released before the end of their sentence. But Defendants' claim that 95% of offenders in Missouri who are eligible for parole are released from prison before the end of their sentence is irrelevant, because that does not address Plaintiffs' claim that they have not been given a meaningful opportunity for release based on demonstrated maturity and rehabilitation.

The Court thus concludes that Plaintiffs have stated a claim for violation of the constitutional prohibition against cruel and unusual punishment. Defendants' motion to dismiss Counts I and III is denied.[5]

### b. Due Process Violations

In Counts II and IV of the First Amended Complaint, Plaintiffs allege that that their right to due process of law under the United States and Missouri Constitutions was violated because they are not afforded a meaningful opportunity for release upon demonstration of their growth, maturity, and rehabilitation, and because the Board does not take into account the mandatory factors set forth under applicable Missouri statutes. The due process and cruel-and-unusual-punishment claims are based on the same alleged conduct.

---

by Plaintiffs of specific examples of misconduct in the Plaintiffs' hearings should not be held against the Plaintiffs at this stage.

[5] This Court's denial of the defendants' motion to dismiss does not mean that the plaintiffs are entitled to the specific parole procedures they seek. Rather, they have a right to show that they have not been provided a meaningful opportunity to obtain parole as required by the Supreme Court. An appropriate remedy for the alleged Eighth Amendment violation must be addressed after the violation is established.

### i. Whether Plaintiffs Have a Liberty Interest
### for Which They Are Entitled to Due Process

Absent a liberty or property interest, an individual can have no constitutional right to due process. *See Greenholtz v. Inmates of Nebraska Penal & Corr. Complex*, 442 U.S. 1, 7 (1979) ("The Due Process Clause applies when government action deprives a person of liberty or property; accordingly, when there is a claimed denial of due process we have inquired into the nature of the individual's claimed interest.").

The ordinary offender has no more than "a mere hope" of parole and therefore is not entitled to due process protections in parole proceedings. *Id.* at 11. Yet, the Supreme Court has recognized that, in some instances, an offender may possess a liberty interest in parole. *See Bd. of Pardons v. Allen*, 482 U.S. 369, 371 (1987) ("In *Greenholtz* the Court held that, despite the necessarily subjective and predictive nature of the parole-release decision, . . . the mandatory language and the structure of the Nebraska statute at issue . . . created an 'expectancy of release,' which is a liberty interest entitled to [due process] protection."); (citing *Greenholtz*, 442 U.S. at 12).

Here, there is no law guaranteeing parole release to the juvenile offender. To the contrary, the Supreme Court has expressly stated that juvenile offenders "who have shown an inability to reform will continue to serve life sentences." *Montgomery*, 136 S. Ct. at 736.

Nonetheless, as discussed above, *Graham*, *Miller*, and *Montgomery* demand for the juvenile offender "substantially more than a *possibility* of parole or a mere hope of parole . . . ." *Greiman*, 79 F. Supp. 3d at 945 (emphasis in original) (quotation marks and citation omitted). They require that juvenile offenders be afforded a meaningful and realistic opportunity for release. *See Hayden*, 134 F. Supp. 3d at 1010-11 ("The Supreme Court has now clarified that juvenile offenders' parole reviews demand more procedural protections.") (citing *Graham*, 560

U.S. at 79; *Greiman*, 79 F. Supp. 3d at 945); *Greiman*, 79 F. Supp. 3d at 945 ("[A]lthough *Graham* stops short of guaranteeing parole, . . . it creates a categorical entitlement to 'demonstrate maturity and reform,' to show that 'he is fit to rejoin society,' and to have a 'meaningful opportunity for release') (quoting *Graham*, 560 U.S. at 79); *see also Diatchenko v. Dist. Attorney for Suffolk Dist.*, 471 Mass. 12, 18–19 (2015) (observing that "where the meaningful opportunity for release through parole is necessary in order to conform the juvenile homicide offender's mandatory life sentence to the requirements of art. 26 [of the Massachusetts Constitution], the parole process takes on a constitutional dimension that does not exist for other offenders whose sentences include parole eligibility").

That *Graham*, *Miller*, and *Montgomery* affect not only the nature of the sentence imposed on juvenile offenders like Plaintiffs but also the procedure by which their parole determinations are made is further apparent in the Supreme Court's discussion of evidence that might be used to show rehabilitation:

> Petitioner states that he helped establish an inmate boxing team, of which he later became a trainer and coach. He alleges that he has contributed his time and labor to the prison's silkscreen department and that he strives to offer advice and serve as a role model to other inmates. . . . The petitioner's submissions are relevant . . . as an example of one kind of evidence that prisoners might use to demonstrate rehabilitation.

*Montgomery*, 136 S. Ct. at 736. The Supreme Court would not have provided these examples of evidence for use in parole proceedings had it not contemplated that some process for providing meaningful evidence would be afforded the juvenile inmate seeking parole.

Thus, under *Graham*, *Miller*, and *Montgomery*, the juvenile offender has a liberty interest in a meaningful parole review. [6]

---

[6] Since the Court has concluded that the Supreme Court's Eighth Amendment jurisprudence has vested the juvenile offender with a liberty interest in meaningful parole review, the Court need

### ii. Whether Plaintiffs Have Stated a Claim
### for Violation of Their Due Process Rights

"[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). "A fundamental requirement of due process is 'the opportunity to be heard' . . . at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965).

The complaint alleges, *inter alia*, that the Board does not review the inmates' written submissions, that inmates are not permitted to review or respond to erroneous information presented against them, and that the hearings—at which the Board members making the determinations may not even be present—are limited to discussion of the circumstances of the offense and the inmates' home plans. *See* Doc. 22, ¶ 166; ¶¶ 140, 142; ¶¶ 11, 112, 159; ¶¶ 87-88, 113, 142, 165. If proven, such allegations could warrant a finding that the Defendants have denied Plaintiffs the meaningful opportunity for release that the Constitution requires. *See Hayden*, 134 F. Supp. 3d at 1011 (finding that "North Carolina's parole process fails to meet th[e] constitutional mandate" that there be "a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation" because there was "no advance notice or opportunity for juvenile offenders to be heard on the question of maturity and rehabilitation—either in writing or in person"); *Greiman*, 79 F. Supp. 3d at 945 (finding that plaintiff's assertion that "Defendants' existing procedures and policies deprive him of the 'meaningful opportunity' to which he is entitled . . . if true, would support a conclusion that Defendants have denied him process to which he is due, namely a 'meaningful opportunity to obtain release based on

---

not consider whether state law vests in such an offender a liberty interest meriting due process protection.

demonstrated maturity and rehabilitation," and therefore "Plaintiff ha[d] adequately stated a plausible due process claim").[7]

Defendants' motion to dismiss Counts II and IV is denied.

### IV.     Plaintiffs' motion for leave to amend

Plaintiffs seek leave to amend the first amended complaint to add a fifth count, seeking a declaration that Defendants have failed to comply with the requirements of Missouri Revised Statutes Sections 558.047.5 and 565.033.2.[8]  *See* Doc. 48.

A court should "freely" grant leave to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2).  "[D]enial of leave to amend pleadings is appropriate only in those limited circumstances in which undue delay, bad faith on the part of the moving party, futility of the amendment, or unfair prejudice to the nonmoving party can be demonstrated."  *Roberson v. Hayti Police Dept.*, 241 F.3d 992, 995 (8th Cir. 2001).

Defendants oppose the motion to amend on one basis alone:  that amendment would be futile.  They maintain that Plaintiffs seek only special procedural rights that are not encapsulated within the statutes at issue.  Plaintiffs, without conceding the constitutionality or adequacy of either Section 558.047.5 or Section 565.033.2, allege that the defendants do not comply even

---

[7] The Court does not deem it necessary to address Plaintiffs' contentions that they should have counsel, experts furnished at the government's expense, an opportunity to communicate with a victim or his or her family, or better notice or explanation about the basis for their parole denials, as the plaintiffs' other allegations alone are sufficient to state a due process claim.  For the same reason, the Court need not evaluate Plaintiffs' argument that the Missouri law governing parole consideration for *Miller*-affected inmates itself fails to guarantee the process to which Plaintiffs are due.

[8] Plaintiffs moved for leave to amend on August 11, 2017, prior to the expiration of the August 14, 2017 deadline for amendment of the pleadings established under the scheduling order.  *See* Doc. 35, p. 1.

with the letter of those laws, as they fail to give adequate consideration to the factors specified therein.

The proposed second amended complaint adequately alleges that the Board does not consider factors delineated in Sections 558.047.5 and 565.033.2, including Plaintiffs' rehabilitative efforts; Plaintiffs' growth and maturity since the commission of the underlying offense; Plaintiffs' age, maturity, intellectual capacity, and mental and emotional health and development at the time of the offense; and whether Plaintiffs remain the same risk to society as they were at the time of sentencing. *See*, *e.g.*, Doc. 49-1, ¶¶ 74, 76, 81, 87, 88, 94, 95, 97, 98, 103, 109, 110, 112, 187. If proven, these allegations could warrant a declaration that the defendants' policies, practices, and customs with respect to the parole review process for the plaintiffs and the putative class do not satisfy the requirements of Sections 558.047.5 and 565.033.2. Amendment therefore would not be futile.

The Court grants Plaintiffs' motion for leave to amend.

## V.     The Parties' Discovery Disputes

Plaintiffs have asked the Court to compel production of four categories of information that Defendants refuse to provide: (a) an unredacted copy of the Inspector General's Investigation Report detailing purported misconduct by parole staff; (b) recordings of Plaintiffs' parole hearings; (c) Plaintiffs' parole files, including notes and memoranda created by the Board or parole staff; and (d) information regarding who participated in Plaintiffs' parole hearings and parole-related decisions, and in what capacity.[9]

The Court addresses the request for the Inspector General's Investigation Report first. Plaintiffs already have access to a redacted version of the report, and indeed have relied upon it

_____

[9] Plaintiffs have agreed, for the time being, to seek only the parole files, hearing recordings, and Board member information related to the named plaintiffs.

in their pleadings.  It is not clear that the redacted portions of the report are relevant to this lawsuit.  Accordingly, the Court will review the unredacted report *in camera* to determine whether the redacted portions are relevant and to determine whether any redacted portions should be made available to Plaintiffs' counsel.

The Court turns now to the parole review-related documents and information specific to the named plaintiffs.  Defendants object to producing such documents, citing irrelevance, undue burden, and privilege.  First, Defendants argue that the information Plaintiffs seek is irrelevant because Missouri law already provides special parole consideration for juvenile offenders, consistent with *Miller* and *Montgomery*, and "either plaintiffs are entitled as a matter of law to a set of procedures that will turn parole hearings into adversarial mini-trials, or they are not. Examining confidential information will not make that proposition more or less true."

Second, Defendants argue that the materials Plaintiffs seek are privileged under Section 549.500 of the Missouri Revised Statutes, which provides as follows:

> All documents prepared or obtained in the discharge of official duties by any member or employee of the board of probation and parole shall be privileged and shall not be disclosed directly or indirectly to anyone other than members of the board and other authorized employees of the department pursuant to section 217.075.  The board may at its discretion permit the inspection of the report or parts thereof by the offender or his attorney or other persons having a proper interest therein

Mo. Rev. Stat. § 549.500.

Finally, Defendants argue that producing the requested information would be unduly burdensome because it would have a chilling effect on third parties who customarily provide information used in the parole process, such as victims and institutional parole officers, and on the Board members themselves, who may be subject to public criticism for their votes for or against release of inmates if their votes do not remain confidential.  Defendants state that they are concerned that information produced in this litigation will be leaked to the public, despite the

protective order in place, because the state's confidential information had been made public, either inadvertently or intentionally, in certain death penalty cases.

The Court overrules the objection that the information is irrelevant. Information concerning the parole hearings, parole files, and board members involved in parole hearings and decisions for each of the named plaintiffs is relevant to the question of whether the plaintiffs were afforded a meaningful opportunity to secure release upon demonstrated maturity and rehabilitation. As discussed in Section III(a)(ii) above, the fact that the Board is required by statute to consider maturity and rehabilitation is not evidence that it is permitting inmates the meaningful opportunity for release that the Constitution demands.

The Court overrules the privilege objection as well. As a preliminary matter, "the law is clear that a state privilege statute cannot limit a federal court's control of discovery in a federal question lawsuit." *Zink v. Lombardi,* No. 12-4209, 2013 WL 11768304, at *3 (W.D. Mo. May 31, 2013) (Laughrey, J.) (citing Wright & Miller, 8 Fed. Prac. & Proc. Civ. § 2016 (3d ed.); *see also, e.g., Bryant v. Armstrong*, 285 F.R.D. 596, 604 (S.D. Cal. 2012) ("State privilege law does not govern discovery issues in federal § 1983 cases."). This case, like *Zink*, "involves civil rights claims brought by state prisoners in federal court," and "[a]s such, federal privilege law, and not state privilege law, applies." *See Zink*, 2013 WL 11768304, at *3. Moreover, the statute expressly authorizes the Board to permit the offender or his attorney—or others "having a proper interest therein"—to review the documents. Thus, even under state law, the privilege is not absolute, especially as against the affected inmates.

Finally, the Court overrules the objection that producing the documents would be overly burdensome. Given the serious constitutional issues at stake, the Board's interest in withholding the parole-related materials for the named plaintiffs must give way to the plaintiffs' right to

assess whether they were afforded a meaningful opportunity to obtain release. The protective order to which the parties have agreed, and which the Court has so-ordered, exists precisely for this kind of situation. *See* Doc. 54. Any sensitive information may be marked "Highly Confidential," and the parties are at liberty to seek to amend the protective order to include an additional "attorneys eyes only" designation to further limit access to especially sensitive information. As always, failure to comply with the terms of the protective order may result in sanctions or contempt of court. The remote possibility that confidential information concerning the named plaintiffs' parole review processes may be leaked to the public does not justify precluding Plaintiffs' access to documents relevant to their constitutional claim.

## VI.    Conclusion

For the reasons stated above, Defendants' motion to dismiss, Doc. 23, is denied, and Plaintiffs' motion for leave to amend, Doc. 48, is granted. Plaintiffs must file the amended complaint within 5 days of the entry of this order.

The Court orders Defendants to produce to Plaintiffs, within 10 days of entry of this order, all of the following documents and information: (1) recordings of Plaintiffs' parole hearings; (2) Plaintiffs' parole files, including notes and memoranda created by the Board or parole staff; and (3) information regarding who participated in Plaintiffs' parole hearings and parole-related decisions, and in what capacity. Further, the Court orders Defendants to provide to the Court for *in camera* inspection, within 10 days of entry of this order, an unredacted copy of the Inspector General's Investigation Report. If the Court determines that Plaintiffs are entitled to review any portion of that report that has been redacted, the Court will notify the

parties and permit Defendants an opportunity to designate the document as appropriate in accordance with the protective order.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  October 31, 2017
Jefferson City, Missouri