IN THE UNITED STATES DISTRICT COURT
STATE OF MISSOURI
WESTERN DISTRICT


NORMAN BROWN, et al.,          )
                               )
          Plaintiffs,          )
                               )
     vs.                       ) Case No. 17-CV-4082
                               )
ANNE L. PRECYTHE,              )
et al.,                        )
                               )
          Defendants.          )


          DEPOSITION OF STEVEN MUELLER,

produced, sworn and examined on the 2nd day of

November, 2017, between the hours of eight o'clock in

the forenoon and six o'clock in the afternoon of that

day, at the offices of Missouri Attorney General's

Office, Broadway State Office Building, Jefferson City,

Missouri, before Kim D. Murphy, Certified Court

Reporter, within and for the State of Missouri.

1                  A P P E A R A N C E S

2

            For the Plaintiffs:
3
                MacArthur Justice Center
4               By:  Mae Quinn and Amy Breihan
                3115 S. Grand
5               Suite 300
                St. Louis, MO  63118
6               314-254-8540

7

8           For the Defendants:

9               MISSOURI ATTORNEY GENERAL
                By:  Michael Spillane
10              Andrew Crane
                Broadway State Office Building
11              Jefferson City, MO  65101
                Michael.Spillane@ago.mo.gov
12              Andrew.Crane@ago.mo.gov

13

14

15                  I N D E X

16  Direct Examination by Ms. Quinn              7
    Cross-Examination by Mr. Spillane          270
17  Cross-Examination by Mr. Crane             281
    Redirect Examination by Ms. Quinn          282
18

19

20

21

22

23

24

25

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 2 of 285

1

DEPOSITION EXHIBIT INDEX

2  ID                                                    MARKED

3  1:    Subpoena                                        12

4  2:    Chart                                           47

5  3:    Defendants' Initial Disclosures
         under Rule 26 A1A                               54
6
   4:    Mission Statement                               57
7
   5:    Table of Contents                               85
8
   6:    Spreadsheets                                    88
9
   7:    Regulations                                     94
10
   8:    Analyst group meeting notes
11       September 24th, 2012                            111

12 9:    Email exchange January 25, 2016                 118

13 10:   Email exchanges                                 120

14 11:   Statutes                                        124

15 12:   Analysis Senate Bill 590                        128

16 13:   July 13, 2016 email                             134

17 14:   July 19, 2016 email                             136

18 15:   July 29, 2016                                   139

19 16:   Final Petition                                  140

20 17:   Minutes                                         142

21 18:   August 1, 2016 memo                             145

22 19:   August 8th, 2016 email                          147

23 20:   Memos                                           147

24 21:   Email                                           151

25

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 3 of 285

DEPOSITION EXHIBIT INDEX (Continued)

| ID | | MARKED |
|---|---|---|
| 22: | Worksheet | 154 |
| 23: | September 19th, 2016 email | 170 |
| 24: | Worksheet | 173 |
| 25: | Email | 175 |
| 26: | December 6th, 2016 email | 176 |
| 27: | January 6th, 2017 email | 178 |
| 28: | Analyst meeting minutes | 181 |
| 29: | Two-page board action sheet | 183 |
| 30: | Materials Re: Lidell Wilson | 193 |
| 31: | (Not identified.) | |
| 32: | Board meeting minutes from May 1st, 2016 | 199 |
| 33: | February 24, 2016 email | 203 |
| 34: | Jennifer Zamkus email | 205 |
| 35: | Video hearings | 209 |
| 36: | Emails, Re: Seddens | 210 |
| 37: | Salient factor score sheet | 212 |
| 38: | Email | 215 |
| 39: | Memos | 216 |
| 40: | Inmate notice | 224 |
| 41: | Letter Re: McElroy | 230 |
| 42: | Materials Re: Sidney Roberts | 232 |
| 43: | Materials Re: Norman Brown | 235 |

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 4 of 285

1           DEPOSITION EXHIBIT INDEX (Continued):

2    ID                                          MARKED

3    44:  Inquiry made by Mr. Jarrett       239

4    45:  Email                             242

5    46:  Log entry forms, Re:  Norman Brown   244

6    47:  Complaints, Re:  Ruzicka       246

7    48:  Investigation request, Re:  Jarrett  247

8    49:  Investigation, Re: Jarrett      248

9    50:  Letter, Re:  Ruzicka          252

10   51:  Press conference             253

11   52:  Resignation, Re: Ruzicka       256

12   53:  CNN reporting               259

13   54:  Request for investigation, Re:  Zamkus  260

14   55:  Campaign for Fair Sentencing of Youth
           invitation                      262

15

    56:  July 2017 notification

16        Re: Training for IPOs         263

17   57:  Data run                     265

18   58:  Spreadsheets                 266

19   59-60:   (Not identified)

20   61:  Calendars                   267

21   64:  CV of Steven Mueller          26
    64:  Emails                      245

22   (Marked twice)

23

24

25

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 5 of 285

1                    DEFENDANTS' EXHIBIT INDEX

2      ID                                        MARKED

3      1:   Juvenile life without parole worksheet      270

4      2:   Analyst information sheet                    272

5      3:   Data sheet                                   274

6

7

8

9

10

11

12

13

14

15

16

17     Court Reporter:
       Kim D. Murphy, CCR
18

19

20

21

22

23

24

25

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 6 of 285

1       IT IS HEREBY STIPULATED AND AGREED, by and

2  between counsel for the Plaintiffs and counsel for the

3  Defendants that this deposition may be taken in

4  shorthand by Kim D. Murphy, CCR, and afterwards

5  transcribed into typewriting; and the signature of the

6  witness is expressly reserved.

7                    *    *    *    *    *

8                    STEVEN MUELLER,

9  of lawful age, produced, sworn and examined on behalf

10  of the Plaintiffs, deposes and says:

11                  DIRECT EXAMINATION

12  QUESTIONS BY MS. QUINN:

13       Q.   Good morning everyone.  We're here for the

14  deposition of Mr. Steve Mueller in the case of Brown,

15  et al, versus Precythe, et al.

16           And perhaps we'll go around the table and

17  put all our appearances on the record.

18           I am Mae Quinn from the MacArthur Justice

19  Center on behalf of the Plaintiffs.

20           MS. BREIHAN:  Amy Breihan from MacArthur

21  Justice Center.

22           MR. CRANE:  Andrew Crane from the Attorney

23  General's Office for the Defendants.

24           MR. SPILLANE:  Mike Spillane for the

25  defendants, Steve Mueller, Missouri Board of Probation

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 7 of 285

1    and Parole.

2           MS. QUINN:  And before we went on the

3    record, we had a conversation amongst counsel about

4    confidential considerations, confidentiality

5    considerations in this proceeding.

6           And so what we've talked about, and what

7    the understanding is, is that this deposition, the

8    information talked about during this deposition, and

9    the materials shared during this deposition are to be

10   treated as confidential and covered under a protective

11   order, until such time as we are provided with the

12   transcript.  And then the parties shall have ten days

13   from that time in which to designate those lines and

14   materials attached to the transcript that they deem to

15   be confidential or might be seeking a higher coverage

16   of confidentiality to matters that might be seen as

17   highly confidential.

18          But for purposes of today we recognize and

19   will treat as confidential the materials that are

20   shared here today.

21          Does that adequately and accurately reflect

22   what was discussed?

23          MR. SPILLANE:  I'm gonna say one thing.  We

24   try to refer to the things that we're doing today as

25   confidential.  And theoretically they might be highly

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 8 of 285

1 confidential depending on how we designate within two

2 weeks after receiving the deposition.

3            MR. CRANE:  Yes.

4            MS. QUINN:  At that time, once you see the

5 materials, I imagine --

6            MR. SPILLANE:  Until that point, I think

7 the order would define -- we would treat them as highly

8 confidential until the designation comes out.

9            MS. QUINN:  I mean, because we're getting

10 items today that are marked -- there's no item that's

11 been marked as highly confidential.

12            MR. SPILLANE:  Exactly.  There might be

13 testimony that turns out to be highly confidential, so

14 we'll treat it as highly confidential until it's

15 designated or by omission two weeks after we receive

16 the transcript.

17            MS. QUINN:  By two weeks you mean ten

18 business days?

19            MR. SPILLANE:  Ten business days.

20            MS. QUINN:  And with that modification we

21 are fine with that.

22       Q.   So Mr. Mueller, your full name is, is it

23 Steven Mueller?

24       **A.    Steven Mueller.**

25       Q.   And have you testified under oath before?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 9 of 285

1      A.   Yes.

2      Q.   How many times?

3      A.   I don't know.

4      Q.   More than one?

5      A.   One deposition.  And multiple times with

6  probation revocations.

7      Q.   So when you say "multiple times with

8  probation revocations," were they in the context of

9  court proceedings?

10     A.   Probation violations.  Yes.  It's a court

11  proceeding.

12     Q.   So they were probation violation matters

13  that were in court?

14     A.   Yes.

15     Q.   And so how many times would you say you

16  have testified under oath in court?

17     A.   I mean, it's been 30 years ago.  So more

18  than -- probably more than five, less than 15.

19     Q.   So you're used to being sworn and

20  testifying to the truth of matters, correct?

21     A.   Yes.

22     Q.   And that was only one time you said in the

23  context of a deposition that that has taken place?

24     A.   Yes.

25     Q.   So you then, I assume you sort of know the

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 10 of 285

1  ground rules for such proceedings, to listen to the

2  question that is asked of you, and not to answer if you

3  don't understand?

4       **A.    Yes.**

5       Q.    Seek clarification if something seems

6  ambiguous or you're uncertain of what's being

7  requested?

8       **A.    Yes.**

9       Q.    And we'll try not to speak over each other.

10      **A.    Okay.**

11      Q.    And myself, I need to remind myself for

12  that.  I am from New York and we tend to speak fast

13  sometimes, so I also want to check myself in that

14  respect.

15           If you need a break, that's fine.  If you

16  want a break.  Just let us know.  Let your attorney

17  know.  But if there's a question that's been posed,

18  we'd ask that that question get answered before we take

19  a break, okay?

20      **A.    Okay.**

21      Q.    And you today as you sit here, you have no

22  inability to respond accurately and correctly?  Nothing

23  impairing your ability to participate in this

24  deposition today?

25      **A.    Clarify that.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 11 of 285

1          Q.   Are you suffering from any medical

2     condition, or sleep deprivation, or inability to recall

3     that might impair your ability to be deposed today?

4          **A.   No.**

5          Q.   Is there anything I've not asked about?

6          **A.   I have kids.  I live with sleep**

7     **deprivation.**

8          Q.   I'm not sure that's a legal matter.  Okay.

9               So we have been reminded by Mr. Crane, who

10    so kindly went and got us a copy of your Subpoena Duces

11    Tecum; is that correct?

12         **A.   Yes.**

13              **(Deposition Exhibit No. 1 was marked for**

14    **identification.)**

15    BY MS. QUINN:

16         Q.   I'm going to show you your own specially

17    marked copy.  You can work from yours if you wish.  We

18    have marked it here as Exhibit 1 for purposes of

19    today's deposition, a Subpoena Duces Tecum that was

20    delivered to your attorney in this matter.

21              Have you seen it before?

22         **A.   Yes.**

23         Q.   And you're familiar with its contents and

24    its warnings?

25         **A.   And its warnings?**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 12 of 285

1    Q.   Yeah.  Just indicating that, you know, you

2    must respond as directed and bring the materials that

3    have been requested of you?

4        **A.   Yes.**

5        Q.   And you see that there's an exhibit

6    attached to this item that lists various materials that

7    we have sought from you today?

8        **A.   Yes.**

9        Q.   And I'm just going to take you through

10   that, that list of items, just so that we're clear

11   about what those requests are and what you have brought

12   as responsive to those requests.

13           So was there a request for communications

14   between you and anyone else between January 1st of '16

15   to the present that refers to or relates to juvenile

16   life without parole hearings, inmates, and the

17   plaintiffs here.

18           Did you bring any materials responsive to

19   that?

20       **A.   Yes.**

21       Q.   And what are those materials?

22       **A.   It's been provided to you.**

23       Q.   Right.  So are you able to say which of the

24   materials -- and I'll note for the record that we have

25   been provided with Attorney General's documents 1

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 13 of 285

1  through 176 today.  They've been provided to me at

2  least in three stacks, so it's a little unclear to me

3  which.

4          **A.    Which ones I provided?**

5          Q.    Yeah.

6          **A.    I believe, from what I understand in**

7  **looking at it, I believe it probably starts at**

8  **number 48.  And a lot of this stuff may be duplicates.**

9  **Because anything I had that pertained to that I just**

10 **made copies and provided it.**

11         Q.    And by "duplicates" you mean I might have

12 been provided some of these documents in the document

13 production that occurred earlier in these proceedings?

14         **A.    Yes.**

15         Q.    So with that clarification, you indicated

16 that you think the document marked or Bates-stamped

17 48 provided to us today starts the items that cover

18 communications between you and anyone else from

19 January '16 until the presentment relating to JL WOP

20 and the inmates impacted by juvenile life without

21 parole sentences and our clients?

22         **A.    From what I can tell, it appearance that I**

23 **provided documents beginning at number 48 up to 176.**

24         Q.    As responsive to that first request?

25         **A.    Actually, it's responsive to all the**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 14 of 285

1    requests.

2          Q.   Okay.  I'm just trying to, if we can, I

3    want to make sure that we're not missing anything and

4    that no request has been overlooked.

5               So as far as the first request in this

6    document, number one, all communications between

7    January of 2016 to the present.  You said it starts at

8    48 and runs through what.

9          A.   This may be difficult.  Because what I did

10   was I took these questions, anything that pertained to

11   these questions, I copied and put it into one larger

12   packet.

13         Q.   So you didn't segregate by response?

14         A.   I didn't segregate by response.  I just

15   brought what was asked to be brought.

16         Q.   Have you provided responsive documents to

17   each and every one of the eight items that have been

18   listed here in the rider?

19         A.   Yes.  To the best of my knowledge,

20   everything that I had that dealt with juvenile life

21   without and your four defendants that I was involved

22   with, that was not privileged, was provided.

23         Q.   All right.  And what about notes and

24   memoranda created by you relating to JL WOP?  And to be

25   clear, when we say JL WOP today, I think we all

Pohlman**USA** Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 15 of 285

1   understand juvenile life without parole.  You're all

2   right with that designation?

3       **A.   Yes.**

4       Q.   So notes and memoranda relating to JL WOP?

5       **A.   Yes.  From what I -- everything that I can**

6   **tell, I have provided everything that was involving**

7   **these juvenile life withouts, including memoranda,**

8   **notes, communications that I would have had.**

9       Q.   All right.  So, for instance, No. 5 asks

10  for all non-privileged documents in your possession,

11  custody and control relating to the allegations in the

12  complaint.

13          So, for instance, emails between you and

14  your colleagues relating to this lawsuit; have you

15  produced those items for today?

16      **A.   Yes.  I don't know if there were very many.**

17  **Everything that dealt with these defendants I have**

18  **produced.**

19      Q.   I asked about the lawsuit itself.  So not

20  just -- it's relating to the allegations in the

21  complaint, so it's not just these defendants.

22          Did you provide these for today?

23      **A.   What I think was non-privileged, yes, the**

24  **interrogatories, all that, I mean, that stuff was not**

25  **provided.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 16 of 285

1       Q.   I'm not following.  What interrogatories

2  were not provided?

3       A.   Unless --

4            MR. CRANE:  I think he's talking about

5  emails between his -- us -- and DOC legal counsel about

6  what we were -- what information was going to be

7  provided for Interrogatories.

8  BY MS. QUINN:

9       Q.   And I will clarify.  I'm not asking for any

10 emails from your attorneys in this matter.  But emails

11 between you and any staff members of MDOC, emails

12 between you and any parole board officials?

13      A.   Yes.  I mean, to my knowledge, you have

14 everything.  There's maybe some emails between myself

15 and our department legal counsel that I feel were

16 privileged and did not provide.

17      Q.   And can you talk more about that?  Why you

18 felt like those were privileged?

19      A.   It was communications back between the two,

20 as far as a lot of it was responding to as an

21 intermediary between our department legal counsel and

22 the Attorney General's Office.

23           You know, there may be questions that go

24 through our department legal counsel that needed

25 confirmation through me.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 17 of 285

1      Q.   All right.  So the department's legal

2  counsel, and by that you mean the MDOC general

3  counsel's office?

4      **A.   Yes.**

5      Q.   And those individuals are part of MDOC

6  staff, correct?

7      **A.   Yes.**

8      Q.   And they're not representing you personally

9  in this matter; they're not the attorney of record on

10  behalf of MDOC in this matter?

11      **A.   They're not the attorney of record.**

12      Q.   In this matter?

13      **A.   In this matter.  They're not representing**

14  **us as a -- for this matter, no.  It's the Attorney**

15  **General's Office.**

16      Q.   But they helped create policies and

17  practices for MDOC, correct?

18      **A.   Clarify that.  I'm not sure.**

19      Q.   So the general counsel's office of Missouri

20  Department of Corrections is part of the group of

21  staffers who helped create policies for the Missouri

22  Department of Corrections?

23      **A.   I think every division creates their own**

24  **policies.  Our department counsel may review some**

25  **policies before they are finalized.  But as far as**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 18 of 285

1    developing policies, I'm not sure how -- creating is

2    maybe too strong of a word.

3            Q.   They participate in the conversation about

4    development of policies and implementation of policies?

5            A.   Yes.  Yes.  If they are -- if there's some

6    concern with those policies they do a legal review.

7            Q.   Let me turn to No. 6 on our list.  Data

8    sets, compilations, reports, abstracts, referring to

9    statistical information about JL WOP parole hearings,

10   including, but not limited to, their outcomes.

11           Did you bring those materials today?

12           A.   We provided our juvenile life

13   without, yes, spreadsheets which talks about some of

14   that.

15           There's also -- actually, yesterday I did a

16   data analysis of board decision-making on juvenile life

17   withouts to try to get a feel with where the board was

18   involved, how the board was making decisions in

19   juvenile life withouts.  That was included also based

20   on the data from the spreadsheet.

21           MR. CRANE:  I don't know if we have a copy

22   of that in the packet because Steve mailed it to us

23   yesterday.

24           MR. SPILLANE:  It's the third thing.  I

25   think.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 19 of 285

1    MR. CRANE:  I'm talking about the thing he

2    emailed us yesterday at 4:30.  I forwarded it to you.

3    You said thanks.

4        We'll make you copy if we don't.

5        THE WITNESS:  I've got a copy of it right

6    here.  This was the stuff I was gonna provide.

7        MR. CRANE:  Hand it to Mike and I'll hand

8    it to them.

9    BY MS. QUINN:

10       Q.  All right.  Is there anything else that is

11   not before us today that you -- strike that.

12       We've been provided with documents 1

13   through 176 as purportedly responsive to our requests

14   one through eight attached to this subpoena.  We have

15   now been provided with an additional document that

16   appears to be responsive.

17       Is there anything else that you can think

18   of that is responsive to these requests that you have

19   with you here today?  And I see some stacks of

20   documents in front of you or perhaps back in your

21   office.

22       **A.   Not that I'm aware of.  Not that I have a**

23   **copy of at least.  Let me -- I mean, I'm not aware of**

24   **anything else.**

25       Q.  So there's awareness and then there's

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 20 of 285

1    having a copy it.  I don't mean -- I know this is

2    annoying -- but you've indicated not that you're aware

3    of and you said not that I have a copy of it.  Perhaps

4    meaning you're aware of something but you don't have

5    your hands on it.

6         **A.   I indicated not that I have a copy of it.**

7    **Because outside of Probation & Parole, we have**

8    **a -- people that do data runs and stuff like for other**

9    **matters.  So I don't know what everybody else has done.**

10   **What I can speak to is the stuff that I have sent you**

11   **guys, have had a copy of, to the best of my knowledge.**

12        Q.   Very well.  And I'll just note for the

13   record for counsel I won't mark this 1 through 176 that

14   you-all -- I may mark these later.  I'll proceed with

15   my questions now to Mr. Mueller.  And thank you for

16   bringing the documents you brought.

17        **A.   You're welcome.**

18        Q.   So beyond bringing the documents, did you

19   do anything else to prepare yourself for this

20   deposition today?

21        **A.   Other than reviewing -- I reviewed some of**

22   **the documents.  I mean, the number was pretty high, so**

23   **I didn't review in detail.  That is about it.**

24             **Yesterday we just did a -- we had a**

25   **pre-meeting with our -- with the Attorney General's**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 21 of 285

1  **Office just to -- as a prep.  But other than that, no.**

2  Q.   And again, I don't mean to delve into your

3  conversations with the representatives of the Missouri

4  Department of Corrections, but you said you reviewed

5  some documents; what documents did you review?

6  **A.   Well, the ones I provided.  When you go**

7  **through these documents, you say this is -- this is**

8  **stuff that needs to be sent over.  So, I mean, just**

9  **reviewing stuff, like looking at this, oh, yeah, I**

10  **remember it being done.  We generate so many documents.**

11  **I mean, when you say did you review stuff, I'm not**

12  **exactly sure in what context.**

13  Q.   I mean did you put your eyes on documents

14  or your computer or folder or anything in preparation

15  for today?

16  I'm being as exhaustive as necessary.

17  **A.   Yes.  In order to find documents that would**

18  **meet the subpoena request you have to put your eyes on**

19  **the computer to do data runs.  As far -- or generate,**

20  **you know, certain -- yes, to provide documents and go**

21  **through that stuff.  So we've done that.**

22  **I looked at the file this morning to make**

23  **sure that there was nothing in there that I needed to**

24  **provide.  And that's why I brought more material.**

25  **Because we have so -- there was a -- something from the**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 22 of 285

1    file that I think that -- it was a response from one of

2    the juvenile life withouts to a legislator, so that got

3    added.  So that was generated from reviewing the file

4    and making sure that we had that in there.

5           The reason I did that is because I knew

6    that previously I was involved in responding to one of

7    these accusations or complaints about one of these

8    juvenile life withouts.  And I looked at what we had,

9    and I said I can't find the response in there.  So I

10   dug deeper to make sure you guys got provided

11   everything that was available.

12        Q.   All right.  And when you say "the file," I

13   heard you a couple times now say "the file."

14           Can you tell us what you mean by "the

15   file?"

16        A.   We have electronic files.  And we have hard

17   copy working files that the board member would take to

18   a hearing.  Everything that's in the -- everything

19   that's in the hard copy file should be in the

20   electronic file.  So I went on the computer and looked

21   at the electronic file.

22        Q.   When I heard the term "file" being used it

23   indicates there is a file for this case; is that so?

24        A.   Not for the -- clarify that, "the case."

25        Q.   So the federal lawsuit that is pending, is

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 23 of 285

1    there a file?

2         **A.   That's not accurate.  When I said "the**

3    **file," I meant the file of one of the named offenders.**

4         Q.   Thank you for that clarification.

5              Beyond reviewing the computer files and

6    hard copy files you've mentioned, have you had

7    conversations with anyone other than the attorneys

8    for the Missouri Department of corrections or the

9    Attorney General's Office?

10        **A.   In -- clarify that.  Conversations**

11   **regarding the suit?  An offender?**

12        Q.   I mean, did you talk --

13        **A.   That's pretty broad.**

14        Q.   Absolutely.

15             Did you speak to anyone?

16             Did words come out of your mouth, go in the

17   direction to another person relating to your deposition

18   today, to communicate with them to better prepare you

19   for your testimony?

20        **A.   No.  Not to better prepare me.**

21             **I let my chairman know that I had a**

22   **deposition coming up.  I let him know that I did an**

23   **analysis of our juvenile life withouts last night.  And**

24   **that I sent him a copy of that.**

25             **But as far as preparing, as far as what to**

*PohlmanUSA Court Reporting*
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 24 of 285

1  say, what not to say, no.

2      Q.   So did you provide to us a copy of the

3  email you sent to the chairman last night?

4      A.   Yes.  That was the one you didn't have in

5  your stuff that you provided.

6      Q.   Thank you very much.

7           Anyone else you've spoken to about

8  testifying at the deposition?

9      A.   Other than just saying -- other than just

10  telling people, that, yeah, I've been ordered to be

11  deposed, content really wasn't, you know, no, not

12  regarding content.

13      Q.   Did anyone tell you what to say or not to

14  say today other than your attorneys?

15      A.   No.

16      Q.   All right.  So, Mr. Mueller, can you tell

17  us where you grew up?

18      A.   Columbia, Missouri.

19      Q.   And where did go to high school?

20      A.   Hickman High School.

21      Q.   And did you attend college after that?

22      A.   Yes.

23      Q.   Where did you go to college?

24      A.   Started at MU.  Ended at Central Missouri

25  State.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 25 of 285

1          (Deposition Exhibit No. 64 was marked for

2     identification.)

3     BY MS. QUINN:

4          Q.   And I'm going to show to you what I have

5     marked as Exhibit No. 64 for purposes of this

6     deposition.

7               You'll note it also has Attorney General's

8     Bates-stamped No. 93 at the bottom.  This was a

9     document that we were provided today.

10              Is this a fair and accurate reflection of

11    your experience to date?

12              MR. CRANE:  Do you want to say what it is

13    for the record?

14    BY MS. QUINN:

15         Q.   I think it's a resume, in terms of the

16    original title at the top of it.

17         A.   Yes.  That's a -- that's a resume.  And

18    this highlights my work with Missouri Board of

19    Probation and Parole.

20         Q.   So I'll go back to where I left off before

21    we turned to the resume.

22              So you went to the University of Missouri

23    for -- yeah, for your undergraduate education.  Looks

24    like you were there for two years at University of

25    Missouri Columbia; is that right?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 26 of 285

1      A.    Yes.

2      Q.    And with a GPA of 2.29; is that right?

3      A.    Yes.

4      Q.    What was your course of study during that

5  period?

6      A.    Initially?  Or --

7      Q.    Whatever happened during that two years.

8      A.    Initially started out with computer

9  science.  Ended up at some point changing to

10  psychology.  Not -- I am not sure if it was at --

11  declared that at MU or whether I declared that at

12  Central Missouri.

13      Q.    And so is -- you have no degree from the

14  University of Missouri-Columbia during that two-year

15  period; is that right?

16      A.    No.

17      Q.    Then you moved on to Central Missouri State

18  in 1986; is that correct?

19      A.    From what I remember, yes.

20      Q.    Well, that's what's listed on your resume.

21      A.    I would hope it's correct.  I would hope

22  it's correct.  Yes.  I went there two years, so in '86,

23  I believe that's when I went over to Central Missouri.

24      Q.    You put this resume together, correct?

25      A.    It's correct.  Did I miss a six or a five

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 27 of 285

1    or a typo.  But yes as far as this is -- I graduated

2    from high school in 1984; I went two years at Central

3    Missouri State -- or University of Missouri, before I

4    transferred to Central Missouri State.  Yes.  I can say

5    it is correct.

6         Q.    And why did you transfer?

7         A.    Why did I transfer?

8         Q.    Yeah.

9         A.    Um, just probably difficult -- the honest

10   answer would be it's difficult to go to school in the

11   same city you grew up.  'Cause it's -- I mean, it's

12   hard to go to class because I knew everybody on campus.

13   So I would sometimes miss class because I was talking

14   on campus on Laurie Mall and not making it over to

15   class.

16         I mean, that's the honest answer.  I mean,

17   did I have to transfer?  No.  My last semester at MU

18   was probably my best semester with a 3.0.  And part of

19   it was just trying to get to the point where I could --

20   I was focused.  It's difficult to focus when you're not

21   making it to class.

22         Q.    And at Central Missouri State your B.S.

23   was awarded in 1988; is that right?

24         A.    Yes.

25         Q.    And that's in psychology?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 28 of 285

1       **A.   Yes.**

2       Q.   And what did you study at Central Missouri

3  relating to psychology?

4       **A.  It's been forever.  I'm trying to think of**

5  **some of the classes.  They had different classes.**

6  **Industrial psychology.  I think I took a course in**

7  **that.**

8         **I couldn't tell you all of them.  It's been**

9  **so long ago.  I mean, it's a psychology degree.  We**

10  **studied -- general psych was over at MU.  Physiology.**

11  **Statistics.  I mean, there's, I'm not sure exactly how**

12  **to answer that because I don't remember all the classes**

13  **we took.**

14       Q.  And safe to say you don't remember all the

15  content of those courses either?

16       **A.  No.  I think it's safe to say that nobody**

17  **knows every word of every book.**

18       Q.  So between 1988 and 1989, do you recall

19  what you were doing?

20       **A.  1988 to 1989 -- I graduated in December of**

21  **1988.  I started in October of 1989 with Probation &**

22  **Parole.**

23         **In the meantime, I worked at the Prenger**

24  **Center, which is the juvenile center, for about,**

25  **probably four to six months.**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL  Document 134-3  Filed 06/12/18  Page 29 of 285

1        I worked also part-time at a bakery.

2        Q.    Prenger Center; is that a detention center

3   for the juvenile court system?

4        A.    No.

5        Q.    What is it?

6        A.    It's an attention center.  It's not a

7   detention center.  It's an attention center.

8        Q.    I don't know what that means; can you tell

9   us?

10       A.    Attention.  Detention centers are more

11  secure and require more lockdown cells.  Attention

12  centers are actually less secure, no offense, doors are

13  unlocked but alarmed.  A couple security cells.  It's

14  more for kids who don't need to be locked up in

15  facilities that require that amount of security.

16            A lot of them are kids whose parents -- who

17  are abusive, and the DFS has to have a place to put

18  them.

19            Some criminal behaviors, but minor.

20  Occasionally you get more major crime and they would

21  end up at least temporarily being in one of the two

22  secure cells they had at the time.

23       Q.    I see.  So that was for four to six months

24  and then you went to the Department of Corrections?

25       A.    Yes.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 30 of 285

1       Q.   And how did you come to obtain your job

2   through the Department of Corrections?

3       A.   Filled out a merit exam.  Applied.  I was

4   applying for jobs in other areas, too.  And then got

5   accepted.  Interviewed.  Accepted a job.

6       Q.   And when you say "filled out a merit exam,"

7   what does that mean?

8       A.   The state has a merit system that requires

9   you to fill out -- provide a resume, not resume -- but

10  a copy of transcripts.  Make sure that the position

11  that you are applying for you're qualified to receive.

12      Q.   So is it a test of substantive specialized

13  information?

14      A.   No.

15      Q.   What is the exam part?

16      A.   It's -- it's not an exam as you would --

17  it's more of a -- the merit exam is more of just an

18  application.  I guess that's more of a proper term.

19  Merit application.

20      Q.   Did they tell you it was called a merit

21  exam?

22      A.   That may have been my -- there's merit

23  exams for people like clerical that have to type a

24  certain number of words a minute.  It was probably a

25  merit application is probably more the title.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 31 of 285

1      Q.   And did you know --

2      **A.   It's been 30 years ago.**

3      Q.   Did you know anybody at the Missouri

4    Department of Corrections when you applied?

5      **A.   No.**

6      Q.   And when you had your first job with the

7    Missouri Department of Corrections, is it correct here

8    that you were working in District 26 Probation & Parole

9    office?

10     **A.   Yes.**

11     Q.   And your resume indicates your job title

12   was state Probation & Parole officer, correct?

13     **A.   Yes.**

14     Q.   Can you tell us what you did in that

15   capacity?

16     **A.   I supervised offenders in a satellite**

17   **office in Montgomery County.**

18         **As part of that supervision I conducted**

19   **presentence investigations.  Occasionally pre-trial**

20   **bond investigations.  We did supervision of offenders**

21   **on regular supervision.  We did supervision of**

22   **offenders on electronic monitoring.  Just a whole array**

23   **of things.**

24         **Attended court.  I was court liaison for**

25   **Montgomery County.  Did whatever the judge asked us to**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 32 of 285

1  do.  That's one of your -- also worked part-time in

2  Audrain County for a while as a -- because they needed

3  assistance over there.  But standard supervision of

4  offenders.

5      Q.  When you say "part-time" --

6      A.  It was actually -- when I say part-time, I

7  had a full caseload in Montgomery County, and had a

8  handful of cases in Audrain County that I also

9  supervised, the same type of supervision.

10     Q.  When you moved from your work at the

11 juvenile attention center to MDOC, did you have any

12 kind of specialized training before you took your job

13 with MDOC?

14     A.  Yes.  They had a -- they had a four-week

15 training for Probation & Parole officers.

16     Q.  So for four weeks, five days a week, eight

17 hours a day you attended training?

18     A.  Four -- it wasn't all four.  I don't

19 believe it was four in a row.  I think we probably

20 broke it down into two and had some supervision and

21 then two.

22         We were provided four full weeks of

23 training.  Now, whether that was eight to five, eight

24 hours, I couldn't tell you, because sometimes if you

25 got done with the curriculum early you may get out at

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 33 of 285

1  4:30.  But it was a 40-hour training.

2      Q.   So 40 hours training over the course of

3  four weeks?

4      A.   Forty hours of training each week.  It was

5  a full-time, five days per week, training.  I don't

6  know whether one day started at ten to allow travel.

7  I can't tell you when it was, but four weeks of

8  training.

9      Q.   And what topics were covered during the

10 training?

11     A.   I do not remember.  Report writing I know

12 was in there.  I mean, the specific curriculum I could

13 not tell you.  Investigations, there was probably a

14 piece on.  I just don't remember it all.

15     Q.   And was the training online or was it in

16 person?

17     A.   In person.

18     Q.   And so between 1989 and 1998 while you were

19 at District 26 as a Probation & Parole officer, did you

20 have any other training during that period?

21     A.   Yes.  There were trainings.  I do not

22 remember all.  I remember we had DNA come in and do

23 telephone training back in the '90s.

24          There was sex offender training.

25          There was advanced -- I don't know -- it

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 34 of 285

1    was called advanced -- it was an additional sex

2    offender training that we had.  I mean, we periodically

3    would attend trainings, yes.

4         Q.   Any other topics of training that you

5    recollect?

6         A.   It's so long ago.  Not that I can swear to.

7         Q.   And in 1998 you went on to working in the

8    specialized parole violator unit?  Would that be safe

9    to say?

10        A.   Yes.

11        Q.   And if I mischaracterize it, the parole

12   violator unit is a separate unit than just the ordinary

13   supervision unit?

14        A.   No.  The parole violator unit is a unit

15   within Probation & Parole Central Office that responds

16   to parole violation reports.  Not probation.  Strictly

17   a -- parole violation reports that were sent in to the

18   board.

19        Q.   So you moved then from the district office

20   to Jeff City at that point?

21        A.   Yes.

22        Q.   And you moved into a supervisory role,

23   correct?

24        A.   Yes.

25        Q.   Who did you supervise?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 35 of 285

1          A.    I supervised a clerical supervisor, who

2     supervised a office support assistance, clerical.  At

3     one point we ended up receiving an additional employee.

4     It was a parole officer position to assist with, you

5     know, some of the stuff.  So I supervised him once he

6     was brought on board.  I don't have a date when that

7     occurred.  It's been a long time ago.

8          Q.    Any training that took place during the

9     period of time you were serving in that role from 1998

10    to 2001?

11         A.    I would have gone through supervisory

12    training.

13              I would have gone through -- FMLA training

14    should have been part of that supervisory training.

15              ADH.  The discrimination training, which we

16    do ongoing.

17              That's all I can swear to for sure.

18         Q.    And then in 2001 you had a job change again

19    to become a parole violator analyst; is that right?

20         A.    Yes.

21         Q.    And how did that come to be?  Is that --

22    you were elevated?  Or did you apply?  How did you get

23    that position?

24         A.    That position, because of the workload in

25    the parole violator unit, my supervisor was unable to

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 36 of 285

1 do all of the review of violation reports.  So I was --

2 I got assigned a lot of -- part of her duties in order

3 to get the work done.

4          Eventually, because I was working out of

5 class, I was not promoted, I was re -- it's not

6 reassigned.  It was not a promotional interview.  It

7 was a -- we did a position description to OA.

8          They said yes, you're working out of class,

9 so the division basically has to either elevate your

10 class or take those duties away, which it was unable to

11 do because there was too many -- too much work for one

12 person to do.

13     Q.   And who initiated that procedure to have

14 this new job description created and have you move into

15 that new class role?

16     A.   My supervisor.

17     Q.   And then once that happened were there any

18 new training sessions, or new required educational --

19 or any educational requirements in that new parole

20 violator analyst role?

21     A.   I believe the analyst position didn't have

22 formal training curriculum, no.

23     Q.   And then in the role of parole violator

24 analyst, looks like you served in that role for

25 11 years?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 37 of 285

1    A.    Um, yes.  Yes.

2    Q.    And then in 2012 you became a lead parole

3    analyst?

4    A.    Yes.

5    Q.    How did that switch happen?

6    A.    That -- I'm trying to remember if I --

7    reclassified is what happened my initial time.  That

8    was the word I was looking for.  I believe that was

9    through an interview process.  Because I think there

10   was other analysts that were wanting that position,

11   too.

12   Q.    So is it your recollection there was a job

13   posting, internal job posting you applied to?

14   A.    I don't remember at this point.

15   Q.    And up to this point, 2012, before you

16   become a lead parole analyst, how much interaction did

17   you have with the parole board itself?

18   A.    Probably -- I mean, we had daily

19   interaction.  Because we were reviewing violation

20   reports, and some of those were being sent to the board

21   for votes.  So there would be that kind of, you know,

22   they would receive a hard copy file.

23           Other times there would be cases that we

24   were -- we would talk to the board separately.  You

25   know, talk to the board member who was going to be

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 38 of 285

1    reviewing it, and say, this is where I'm at.  What do

2    you think?  Kind of discuss, you know, the pros and

3    cons to continue somebody on supervision or returning

4    someone to prison.

5         Q.   So outside of the parole violation hearing

6    process you were having informal conversations with

7    board members about what might be done on a particular

8    parole violation case?

9         A.   This is not outside the parole hearing

10   process.  We haven't gotten even to a formal hearing.

11   These are way prior to that process.  This is violation

12   reports coming in, that we have not ordered an offender

13   returned or continued.

14             But, yes, we would have additional

15   conversations on some cases where we were wavering

16   whether or not to keep them in the community or to

17   return to prison.  Or to do another, like,

18   institutional programming.  You know, institutional

19   treatment.  A wide range of options that the board

20   would have.

21             So, I mean, the discussions would be, you

22   know, they want to put this guy in a community release

23   center, but I think he's got a home plan that would

24   justify electronic monitoring and staying with his

25   family.  You know, those types of conversations.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 39 of 285

1        Q.   And during this period, your office, is it

2   in the same office space after the parole board

3   members?

4        **A.   Define office space.  It's in the same**

5   **building.**

6        Q.   Same floor?

7        **A.   We were on the same floor.  But we were**

8   **not -- we were on the opposite side of the building.**

9   **My unit.**

10        **My office was -- the board members were on**

11   **one side of the building, the analysts' offices were**

12   **down the other side of the building, and I was close to**

13   **the far end.**

14        Q.   And while parole violator analysts are on

15   the same floor but on the other side of that floor, you

16   were able to walk into the space where the parole

17   members were officed to speak with them?

18        **A.   Of course.**

19        Q.   And then when you moved into the role of

20   lead parole analyst did your office space change?

21        **A.   No.  Actually, the outline of the office**

22   **that I gave you before was our old office.**

23        **Now when I was still a violator analyst, we**

24   **moved to a new building.  And then that office makeup**

25   **changed to the point that the board members were on one**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 40 of 285

1  side of the building.  We were on the -- all on one

2  floor.  But my office was more towards the front of the

3  building.  So I could still walk around the corner.

4  But, no, my office didn't change.

5      Q.   So I didn't get too confused on the

6  building move; do you know when that was, around about?

7      A.   I don't know.

8      Q.   Some time though between 2001 and 2012?

9      A.   Yes.

10     Q.   And currently the office space is such that

11 the parole board members are on one side of the hallway

12 and the analysts are on the other?

13     A.   No.

14     Q.   Tell us me the setup now.

15     A.   Parole board members on one side of the

16 office.  Hearing analysts -- which we have five

17 of -- are in the same hallway, but on the opposite side

18 of the hall, or in the hall.

19          And then the violator analysts are

20 on -- more towards the front of the building.  And as

21 lead analyst, that's where my office remained.

22     Q.   So throughout the time you were lead parole

23 analyst from 2012 until your recent job change, you

24 were towards the front of the building, but still on

25 the same floor as the board members?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 41 of 285

1          A.   Yes.  It's a one-story building.  There's

2     one floor only.

3          Q.   And about how many offices Aaron that

4     floor?

5          A.   In our whole central office complex, I

6     would say probably best guess is 25.  There's

7     additional cubicles specific to offices.

8          Q.   So in front of a violator analyst office

9     there might be a cubicle with support staff?  Is

10    that --

11         A.   Yes.

12         Q.   Any common areas where people congregate on

13    that floor?

14         A.   I mean, we have a break room.  There's

15    hallways.  There is -- we have two -- we have a board

16    room.  We have a conference room.

17              But as far as just congregate and talk

18    amongst themselves, generally that's gonna be -- I

19    mean, if someone comes in it's usually going to be

20    something in an office, I would assume.  But that's

21    not -- I mean, it's just like any other office.

22         Q.   But there is a designated break room?

23         A.   Yes.

24         Q.   And other spaces?

25         A.   Bathrooms.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 42 of 285

1    Q.   Designated from the offices themselves?

2    **A.   Yes.  Lobby.**

3    Q.   Lobby.  Okay.

4         And then during your time as a lead parole

5    analyst from 2012 until recently, can you tell us about

6    your job and your role?

7    **A.   2012, became lead analyst.  Duties at that**

8    **time, I supervised the violator analysts.  And**

9    **one -- which was basically two staff, two analysts, and**

10   **a parole officer.**

11        **I also did as a lead analyst, I was -- I**

12   **did analyst meetings.  I did, you know, I would -- I**

13   **fielded questions a lot from outside parties, public**

14   **defenders, attorneys, prosecutors, judges, things like**

15   **that.**

16        **I also, as my role specific, I kept**

17   **involved with interstate responses to violations**

18   **through the interstate compact.**

19        **I kept -- had duties assigned with**

20   **extradition of offenders from other states who were**

21   **parole violators.**

22        **At that time I was doing conditional**

23   **release extensions.  You know, not holding hearings,**

24   **but actually receiving the conditional release packets**

25   **from our other divisions.**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 43 of 285

1           I'm trying to think of what other duties I

2   had at that time.

3           A lot of little things.  Like changes in

4   special conditions requests.  Requests to travel

5   outside of the country.  I would be the first reviewer

6   on those.

7           And that pretty much was, you know, there

8   was -- I'm sure I forgot something.

9           Video parole hearings.  I was involved in

10  getting those started.  Setup.  Was kind of the expert

11  on video parole hearing equipment, whether I liked to

12  be or not.

13          Served on, you know, some department

14  committees.  Sex offender committees.

15          Special projects as assigned.  Which I'm --

16  I'm trying to think what that would be.  Any time they

17  asked me to do something you try to accommodate if I

18  needed to.

19          And I do designated sex offender reviews

20  for those offenders.  So that was -- I did that

21  probably until recent, which would have been around

22  April of 2017.

23      Q.   Okay.  So before we get to April of 2017,

24  do you remember when it was in 2012 that you moved from

25  being a parole violator analyst to the lead analyst

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 44 of 285

1  position?

2      A.  I don't remember the exact date.  We had a

3  retirement -- and actually passed away before he could

4  retire -- the lead analyst.  So it would have had to

5  have been, I believe, around summer, June, July of

6  2012.

7      Q.  And then you indicated there were others

8  who were interested in that position, other analysts;

9  who did you interview with for that job?

10      A.  You mean who was on the interview team?

11      Q.  Uh-huh.

12      A.  I'm trying to remember.  I know my direct

13  supervisor was -- who was Janet Barton.  I

14  couldn't -- yeah.  I'm not sure.

15      Q.  Any parole member boards involved in that

16  process in elevating you from parole violator analyst

17  to lead parole analyst?

18      A.  I'm not -- I'm not sure.  I don't want to

19  speculate.  Generally on those types of decisions I

20  would think that the chairman would have been there.

21          But, again, I mean, that whole -- I'm not

22  exactly sure.  The one I know for sure would have been

23  Ms. Barton because she would have been the board

24  operations manager at that time.

25      Q.  Now, you've earlier indicated that in April

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 45 of 285

1    of 2017 you had another job change, correct?

2         **A.   Was not a job change.  My title is still**

3    **the same.  I just assumed additional duties.**

4         Q.   So you are not the board operations

5    manager?

6         **A.   At this time there is no board operations**

7    **manager.**

8         Q.   Is there a posting to fill that role?

9         **A.   No.**

10        Q.   And I'm jumping around a little bit, so

11   forgive me.

12             As to the lead parole analyst role, is

13   there a job description for it that is posted

14   somewhere?

15        **A.   I couldn't tell you for sure.**

16   **It was -- there probably would had to have been some**

17   **type of a job posting.  That would have gone out.**

18   **Initially.  That, I'm not a hundred percent on.**

19             **Because it's not really a separate**

20   **position.  It's a -- you're still a hearing analyst.**

21   **It's just elevated.  Because you become the supervisor**

22   **of those.  It's not a separate merit position as a lead**

23   **hearing analyst.  There's a little bump in pay, but**

24   **other than that, you're not -- you're still a hearing**

25   **analyst with merit standards.  They just designated you**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 46 of 285

1  to be the lead person.

2         Q.    Within MDOC there are job descriptions

3  generally, however, for a range of positions?  Yes?

4         A.    Yes.

5         Q.    For junior and senior positions under a

6  particular title?

7         A.    That, I don't know.

8         Q.    You've indicated that in April of '17 you

9  assumed many of the duties of the board operations

10  manager, but you were not given the title of board

11  operations; is that safe to say?

12         A.    Yes.

13         Q.    And why is that?

14         A.    I was the lucky person, I guess.  I mean,

15  why did I assume those positions or those duties?

16         Q.    Well, I'll break it down.  Why aren't you

17  named the board operations manager if you're doing that

18  job?

19         A.    Um, there was a realignment after a new

20  chairman came in.  So the board operations -- board

21  operations manager position is no longer -- it's been

22  moved to field operations.

23                (Deposition Exhibit No. 2 was marked for

24  identification.)

25  BY MS. QUINN:

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 47 of 285

1          Q.    Okay.  I'm going to show you what's been

2     marked as Exhibit 2 for purposes of this deposition.

3     So I've shown to you a chart which has on it a title of

4     Missouri Department of Corrections, Division of

5     Probation & Parole.  It appears to be an organizational

6     chart.

7               Is this a familiar document to you?

8          **A.    Yes.**

9          Q.    Where have you seen it before?

10         **A.    It's been sent out at one point some years**

11    **ago.**

12         Q.    And so you've indicated there has been some

13    realignment of positions now that there is a new board

14    of Probation & Parole chairman starting in April of

15    2017.

16               Is that a correct assessment of what you

17    said?

18         **A.    Yes.**

19         Q.    Has anything on this chart changed as a

20    result of that?

21         **A.    I've assumed the duties of the board**

22    **operations manager.  That position, which is a**

23    **corrections manager ban two, has been moved to under**

24    **supervision of the assistant division director of**

25    **administration.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 48 of 285

1       Now, what her specific duties are, I

2  am -- I know that she has interstate compact.

3       Q.   All right.  So what I'm going to do here is

4  ask you to bring out your creative side, Mr. Mueller.

5  Perhaps you can circle what, you know, what the

6  position is you've just mentioned, and where it's been

7  moved to, and X out anything that is no longer valid so

8  we have in front of us an accurate layout of the

9  organization.

10      A.   Do you want me to do it on your paper?

11      Q.   No, you can do it on yours.

12      A.   This is -- I've assumed the role of the

13 board operations manager.

14      That corrections manager ban two

15 position -- because there is no board operations

16 manager position titled in that way -- it's now right

17 here.  (The witness indicated.)  And my understanding

18 is that she has oversight of the community corrections

19 coordinator, and the interstate, and all the stuff on

20 this end.

21      Q.   And so you're talking about something ban

22 two.  I don't know what that means.

23      Are you talking about the assistant

24 administrator?

25      A.   No, that's an unclassified position, I

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 49 of 285

1  believe.  But she directly reports to the assistant

2  director of administration.

3              And my understanding of her job duties --

4  which, I mean, this is from what I believe she's

5  doing -- is oversight of the community corrections

6  administrator and interstate compact, electronic

7  monitoring, command center and retentional facilities.

8      Q.   And the "she" in that sentence, are you

9  talking about Kelly Dills?

10     A.   Yes.

11     Q.   Kelly Dills used to be the board operations

12  manager?

13     A.   Yes.

14     Q.   She's no longer that person or in that role

15  as of April of 2017?

16     A.   Yes.

17     Q.   She's been moved over now to oversee

18  community corrections and some of the other items on

19  the right-hand side of the chart; is that right?

20     A.   Yes.

21     Q.   And you are doing her job in content but

22  not in title?

23     A.   Um --

24     Q.   Part of her job?

25     A.   Yeah.  A lot of the duties related to

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 50 of 285

1  supervision of the analysts, and a lot of her duties as

2  board operations manager I was assigned.  You know,

3  yes, I was assigned.

4           Does not mean that my -- that position

5  won't be elevated because I've done a position

6  description.  Because I think I'm working outside

7  of -- I think what I'm doing now more relates to a

8  corrections manager ban two than a lead analyst.  Or,

9  actually there's no lead.  It's a hearing analyst.  In

10  a sentence.

11       Q.   Can you mark on your chart, so we're clear

12  on the record, Kelly Dills, where she fits in there now

13  and what her title is?

14       A.   I do not know what her specific -- what

15  they call her.  I can tell you that that position is a

16  corrections manager ban two.  Now, whether they call

17  that something else, that, I'm not aware of, 'cause I

18  don't deal with field services, but where that box is.

19       Q.   So safe to say she's been demoted?

20       A.   No.  She's not been demoted.  She carries

21  the same corrections manager ban two position that

22  she's always had.  She's just not working for board

23  operations at this point.

24       Q.   And this box that we've all X'd through,

25  this board operations manager, and you're sort of

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 51 of 285

1    serving in that role but as a lead analyst title, does

2    that operations manager -- there's a line that sort of

3    goes across on the chart and connects up to a line that

4    runs down to chief supervisor; does that mean the board

5    operations manager-type role?  Or you oversee the chief

6    supervisor?

7        **A.   No.  I think that line is there because**

8    **this position, and the former board operations manager**

9    **position, did not report to the chief state supervisor**

10   **but reported to the chairman.**

11           **So the chairman -- the chief state**

12   **supervisor reports to the chairman, as does the board**

13   **members, and as does the board operations manager**

14   **previously.  But myself, my direct supervisor is the**

15   **chairman.**

16       Q.   And who is the chief state supervisor right

17   now?

18       **A.   Julie Kempker.**

19       Q.   And is it safe to say in this box of board

20   operations manager, but not in title, are now

21   overseeing parole hearing analysts, parole violator

22   caseload managers, analyst managers and caseload

23   managers?

24       **A.   Yes.**

25       Q.   And all -- are all those folks in the -- in

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 52 of 285

1  that same area, that floor that we described earlier,

2  with about 25 plus or minus offices?

3      A.   A lot of these -- the parole hearing

4  analysts are in offices.  The caseload managers,

5  they're in my chain of command, but we have a -- an OSA

6  is the title position -- that supervises the clerical

7  SOSAs of each of those places.  These -- each of those

8  OSAs.  Other than the appeal hearing analyst.

9          The parole hearing analysts I directly

10  supervise.  And I directly supervise a -- the violator

11  analysts, and I directly supervise the AOSA, who

12  supervises these.  And I directly supervise one PO 2

13  position.

14      Q.   All right.  So these four boxes on the

15  chart we're all looking at together, that are below the

16  board operations manager box, all of those roles, all

17  of those staff do not necessarily report to -- not

18  necessarily overseen by you at this point?

19      A.   No, they are overseen by me.  I do not have

20  direct supervision of them.  I supervise the AOSA, who

21  has -- each one of these units have SOSAs in them.  And

22  then she supervises them.

23      Q.   So they're not your direct reports?

24      A.   But they're all under my chain of command.

25      Q.   Now, the bodies, are their bodies on the

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 53 of 285

1   floor, that we just talked about earlier, where

2   there's, like, 25 offices plus or minus at the Board of

3   Probation & Parole?

4           **A.   What do you mean?**

5           Q.   Where do they report to work every day?

6           **A.   Yes.  A lot of them are in cubicles.  These**

7   **folks all report to our central office building.**

8           Q.   And are they on that same floor as you?  Or

9   are they on different floors?

10          **A.   Our building is only one floor.**

11          Q.   I apologize.

12              What about Kelly Dills; where does she

13  report every day now?

14          **A.   To this office also.**

15          Q.   Same office building?

16          **A.   Yes.  Every -- nearly everybody -- most of**

17  **the people that Aaron this chart are in our office.**

18  **There's some we have across the street.  We have some**

19  **in a warehouse.**

20          Q.   And we're going to talk some more about

21  change in staff and Kelly Dills, but for the moment, I

22  want to show you what I'm marking as Exhibit No. 3 for

23  purposes of this deposition.

24          **A.   Okay.**

25              **(Deposition Exhibit No. 3 was marked for**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 54 of 285

1    **identification.)**

2    BY MS. QUINN:

3        Q.    And I will say, as we get done with marked

4    exhibits, if you can give them to the court reporter.

5            So this Exhibit 3 is titled Defendants'

6    Initial Disclosures under Rule 26 A1A.

7            Would you mind taking a look at the list of

8    names here.  You'll see names that span about five

9    pages with different titles.  And if you see anything

10   that's incorrect or has changed, can you mark that for

11   us or note that for us?

12       **A.    Yes.  Mr. McSwain is retired.**

13           **Mr. Ruzicka resigned.**

14       Q.    Is that how you say his name?

15       **A.    Yes.**

16       Q.    The operations manager is probably -- I

17   would assume is what her current title is -- but it

18   deals more with field operations as opposed to board

19   operations.  I don't know what the date of this

20   document is.

21           MR. CRANE:  Probably two or three months

22   ago.

23           THE WITNESS:  Given that, I would assume

24   that's probably what her job title is.  It's still a

25   corrections manager ban two.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 55 of 285

1   BY MS. QUINN:

2        Q.   Okay.

3        A.   There's some people that I -- I don't know

4   everybody on this list.

5        Q.   Okay.

6        A.   Aaron Jarrett, I think he's a unit

7   supervisor, but I'm not -- I can't swear by that.

8             Aaron Jarrett.  I don't know.  I'm not a

9   hundred percent.  He is the chief CAO of the office in

10  south central, so that would be either a district

11  administrator or, I believe, it's probably a unit

12  supervisor position.

13       Q.   And I'll interject here with a question:

14  These institutional parole officers, or IPOs, do they

15  fall within your portfolio?

16            Are they among the folks that are in those

17  four boxes we talked about?

18       A.   No.  These are institutional appeal

19  officers and supervisors, they are all supervised under

20  the chief state supervisor.  And under her title, it

21  would be the institutional parole region.  So I can't

22  attest to what their positions are.

23       Q.   Got it.

24            And anyone else here that, from your

25  knowledge, you know, has changed roles or are no longer

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 56 of 285

1   in their position or any changes?

2        **A.**   **The only thing I can testify to is those**

3   **that I'm aware of, and that would be the retirement of**

4   **Mr. McSwain and the resignation of Mr. Ruzicka, and**

5   **that's it.**

6        Q.   Great.   Thank you.

7        And again, the marked ones we can maybe

8   move towards the corner of the table.

9        So now I'm going to show you what's been

10   marked as Exhibit No. 4.

11        (Deposition Exhibit No. 4 was marked for

12   identification.)

13        This is the Missouri Department of

14   Corrections Probation & Parole mission statement,

15   correct?

16        **A.**   **Yes.**

17        Q.   And you've seen this before?

18        **A.**   **Yes.**

19        Q.   It indicates that the board -- that the

20   parole board is committed to offender success; is that

21   right?

22        **A.**   **Yes.**

23        Q.   And that it believes in the ability of

24   people to change?

25        **A.**   **Yes.**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 57 of 285

1        Q.    Also talks about accountability?

2        **A.    Yes.**

3        Q.    And accountability includes planning,

4   measuring and managing work?

5        **A.    Yes.**

6        Q.    Can you tell us about the planning,

7   measuring and managing work part of this statement?

8        **A.    There's different portions of that, I would**

9   **believe.  Planning, measuring and manage your workload**

10  **is making sure that you get your job done in a manner**

11  **that is, you know, professional and good use of**

12  **resources that you're given.**

13       Q.    What about measuring?  How does the parole

14  board measure its work?

15       **A.    We have, I mean, we keep track of, you**

16  **know, total number of hearings that are held.**

17              **We keep track of, you know, the workload.**

18  **But as far as decisions by individuals, things like**

19  **that, that's not -- we do not keep track of individual**

20  **votes and things like that.**

21              **We also look at how many salient factors --**

22  **scoring on parole cases.**

23              **We review, you know, how well we're staying**

24  **within established guidelines.  But those are -- the**

25  **board's discretion of release is pretty broad.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 58 of 285

1        So we look at each case individually and

2   make decisions based on what we assess risk.

3        Q.   What about measuring maturation?

4        A.   Define that.

5        Q.   How does the Board of Probation & Parole

6   define maturation?

7        A.   You mean as far as?

8        Q.   Maturation of inmates.

9        A.   Well, I mean, I think we -- we look to see

10  if they've -- is that the same person that came in as

11  the person that is before them in a hearing.

12           I mean, everyone matures, just by the time

13  clock for one thing.  We look at how people mature in

14  relations to are you -- a lot of times young offenders

15  come in and they are trying -- you know, they get a lot

16  of conduct violations.  We look whether they're

17  volunteering for programming.  What their attitudes

18  are.

19       Q.   Do you test folks coming and going out in

20  terms of age level in reading or other measures?

21       A.   Does Probation & Parole or the department?

22       Q.   The department.

23       A.   I believe the department, their

24  educational -- they're doing that because of the

25  requirement to have a good-faith effort towards your

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 59 of 285

1    GED.

2        Q.    So MDOC testing is different from testing

3    for age level at different stages, yes?

4        A.    I could not answer that.  I can't answer

5    what another division in the department is responsible

6    for.

7        Q.    Well, then it's obviously not something

8    that's put before the parole board then?  It's

9    something you're unfamiliar with?

10       A.    At the time of doing parole hearings there

11   are a lot of times that the board is aware of reading

12   levels.  They're aware of academic achievements.

13   They're aware of programming achievements for other

14   things.

15           But as far as how they scored on a reading

16   equivalency, I mean, we're told that they get their

17   GED.  We're told that they're working on it.

18           But as far as knowing a specific score and

19   where they were a year before that, I don't believe

20   that the board is apprised of that at the hearing.

21       Q.    The mission statement also makes reference

22   to evidence-based practices under accountability,

23   correct?

24       A.    Yes.

25       Q.    Can you tell us some of the evidence-based

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 60 of 285

1  practices in place on the part of MDOC and the parole

2  board?

3  A.  I believe one of those is we try to give

4  lower -- we have a salient factor score that is

5  provided at the time of the hearing.  It's made of

6  multiple factors that go into developing a score, and

7  that is placed on -- it's applied to a time-to-serve

8  guideline.

9  Some of those issues are evidence-based.

10  We also understand that low-risk offenders

11  generally -- studies have indicated that low-risk

12  offenders are not -- your best bet is not to hold them

13  long lengths of time.  You know, so they have some of

14  these understandings when they're making their

15  decisions.

16  Q.  Going back to salient factors, according

17  to -- well, what does the term evidence-based mean?

18  A.  What does the term evidence-based mean?

19  Q.  Yeah.

20  A.  The decisions that -- I would say that the

21  decisions that you make for release are based on some

22  type of valid evidence that person is good for release.

23  It's just not, well, I feel like this guy -- I feel

24  like this guy's a risk.  You have to have some measures

25  of that.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 61 of 285

1          Q.    Okay.   And what courses have you taken
2     relating to evidence-based practices?
3          A.    As far as evidence-based practices, I'm
4     trying to remember if we've had training on that.   I
5     know we've had some -- it's touched on in some of our
6     training.
7               The -- I mean, I've read through
8     competencies of board members before.   There's articles
9     I've read through that have talked about evidence-based
10    programming.
11              But as far as a specific, have I attended
12    an evidence-based complete structure of, to my
13    knowledge, I have not.
14         Q.    And so you've indicated that salient factor
15    scores, in your mind, falls in the definition of an
16    evidence-based practice using salient factor scores.
17         A.    I think -- I think it is -- we validate
18    data.   We validate that through our planning and
19    research as far as looking at risk.
20              I mean, we're -- is it a perfect system?
21    You know, assessment of offenders and risk to
22    re-offend, it gets difficult.   We're in the process of
23    doing other stuff, as far as looking at other
24    assessments, but at this time, we're looking at the
25    salient factor score.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 62 of 285

1      Q.   So, again, I would just like to understand

2   why you think it is evidence-based practice to use

3   salient factor scoring?

4      **A.   Why do I think that?**

5          **I think some of the components on there**

6   **have shown that offenders in those areas can be of more**

7   **risk or less risk.  And based on that, it provides some**

8   **measure as to a risk to re-offend, or risky, or a good**

9   **risk to release.**

10      Q.   And I'm jumping ahead a bit, but can you

11   explain to us how a salient factor score is established

12   for an inmate?

13      **A.   Some of the things are dynamic and change.**

14   **Other things don't.  I mean, we look at criminal**

15   **behavior.  Prior incarcerations.  We look at substance**

16   **abuse issues.  Treatment can make them a better risk**

17   **for release.**

18          **We look at age.  We look at -- I'm trying**

19   **to think of the others that Aaron there.  Is this**

20   **person involved in high-risk offenses that are at risk**

21   **for recidivism.**

22          **We also look at escape.  You know, you can**

23   **-- salient factor takes into consideration escape.**

24   **So --**

25      Q.   So let me make it concrete.  If I asked you

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 63 of 285

1    to ascertain my salient factor score, how would you go

2    about doing that?  How would you score me?

3          A.    Well, interview first of all.

4          Q.    Okay.

5          A.    We would look at criminal history.  And

6    this is all -- I'm not sure I'm the best person to talk

7    to, because my field -- I come from a field supervision

8    perspective.

9                I know what's on the salient factor score.

10   I've never been an institutional parole officer to say

11   you've got to do this, this and this to do it.

12               We look at the day we have.  We interview

13   the offender.

14               We look at prior -- one of the factors is

15   prior failure of supervision.  And so we would get that

16   information, gather it up, determine a score based on

17   those factors, and then apply it to time-to-serve

18   guidelines.

19         Q.    You've never conducted a salient factor

20   score for an inmate?

21         A.    I have -- no.  That is done by an

22   institutional parole officer.

23         Q.    And safe to say you don't know how to do

24   that interviewing scoring process?

25         A.    I don't.  I am aware of how they score it.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 64 of 285

1  That's -- that is written in our policies.  I have

2  never actually taken an offender down, taken them out

3  of his cell into the parole officer, interviewed and

4  done a salient factor score that I'm aware of.

5       Q.   And so my hypothetical to apply the salient

6  factor analysis to me, you couldn't do that because

7  you've never walked through that process before?

8       A.   So to do it, I would pull that policies

9  procedures, review those, and go from there.

10      Q.   So regardless of one's training, they can

11  just pull out a policy and apply the salient factor

12  score testing to figure out what somebody's salient

13  factor score is?

14      A.   No, I don't think it's that simple.

15  Because you have institutional parole supervisors that

16  are available to answer questions related to scoring

17  those factors.

18           And so, I mean, all that stuff, if I would

19  have to do a salient factor score on you, I would get

20  the policy out.  I would read it.  I would try to make

21  sure that I knew what was in it.  Interview you.  Get

22  all the information through it, and run it through my

23  supervisor, because I don't do that on a regular basis.

24      Q.   And this policy that you pull down and

25  apply to me, who wrote that?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 65 of 285

1          **A.    That would be our divisional policy.**

2          Q.   So who came up with this concept of salient

3     factor scoring in Missouri?

4          **A.    That was done years ago.  As far as who**

5     **actually did it, I could not tell you the person that**

6     **developed it.**

7               **I can tell you that our research, and our**

8     **planning and research, has been involved in it.**

9     **Because they're the ones that helped develop it and**

10    **were able to determine what scores or what factors that**

11    **you look at are -- relate to potential recidivism or**

12    **return to prison.**

13         Q.   But you don't know what year it was

14    developed?

15         **A.    I do not know what year it was developed.**

16    **It was revised several years back -- probably ten years**

17    **ago -- but I don't have the date that it was revised.**

18         Q.   Do you know anything about the actual

19    science or studies that it's based upon?

20         **A.    No.**

21         Q.   And what about -- what kind of scoring

22    system is it?  Is it one to 100?  One to 50?

23         **A.    It is a -- the scoring is not 1 to 50.  The**

24    **current revised salient factor score we use now, you**

25    **get zero, one, negative one.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 66 of 285

1       So it's a -- I don't have a copy of the

2   salient factor score here now.  But if you score in the

3   negatives, then you're a poorer risk.  I think you can

4   go out to, I believe -- I think it's negative -- it's

5   negative four or five, something like that, up to the

6   good chance for release, which is going to be getting

7   lower time-to-serve guidelines.

8       It can go up to, I believe, I think it's up

9   to a six.

10      Q.   But you don't know as you sit here,

11  correct?

12      A.   I don't know, because I don't have the

13  document in front of me.  If I had a copy of -- if I

14  had a copy of the -- the salient factor score

15  time-to-serve guidelines in front of me.  Which, I

16  don't think it's part of this.  I mean, I didn't -- as

17  far as whether I know -- I mean, I don't get into that

18  piece of this release process.

19      I can tell you how to apply -- I can tell

20  you how to apply time-served guidelines based on

21  salient factor score, but I've never conducted an

22  actual salient factor score.

23      Q.   So as a parole hearing analyst you didn't

24  spend time figuring out what the salient factor scoring

25  system was all about?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 67 of 285

1      A.    I know what the factors are.  As a parole

2  hearing analyst, the majority of my work as a parole

3  hearing analyst has been in the violator world, which

4  does not -- it does not touch on the time-to-serve

5  guidelines on parole releases.

6      Q.    And just so we're clear, you're the analyst

7  who's working most closely with the board right now on

8  juvenile life without parole releases, correct?

9      A.    Yes.

10     Q.    So you've held out salient factor scores as

11  one example of an evidence-based practice in place at

12  the Missouri Department of Corrections, and used by

13  the --

14     A.    Can we back up?  When you say I'm the

15  parole hearing analyst that works most closely working

16  with the board on releases, I work with the board

17  related to -- I supervise the hearing analysts.  The

18  hearing analysts are the ones that are attending the

19  parole hearings with the juvenile life withouts and any

20  other parole consideration hearing.

21     Q.    So the analysts --

22     A.    And I supervise the analysts.

23     Q.    Okay.  And the analysts, but not you,

24  understand salient factor scores?

25     A.    The hearing analysts will have a,

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 68 of 285

1  they -- the hearing analysts that we have doing parole

2  consideration hearings have all been institutional

3  parole hearing supervisors or institutional parole

4  officers prior to being a hearing analyst.  So they

5  will -- I would think it would be safe to say that they

6  would have a lot more experience in conducting a

7  salient factor score.

8       Q.   And yet you're their supervisor and you

9  don't understand it?

10      A.   I understand the premise of it.  Do I

11 understand every piece of how do I score this?  I am

12 not the best person to do that.

13      Q.   Explain the premise.

14      A.   Pardon me?

15      Q.   Could you explain the premise behind

16 salient factor scoring?

17      A.   About the -- yes.  It's a tool that is

18 developed to determine whether or not -- to -- to have

19 some measure of risk.  To re-offend.  So we apply that

20 to the board's time-to-serve guidelines and come up

21 with guidelines of release.

22      Q.   Earlier, as I recollect, and this is how we

23 went down this path, you flagged salient factor scoring

24 as a key evidence-based practice on the part of MDOC

25 and the parole board; yes?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 69 of 285

1          A.    I think that's one of evidence-based

2     practices tools that they use, among other things, our

3     field offices use.  But for parole consideration

4     hearings, that's the primary one that I believe would

5     be used.

6          Q.   And salient factor scoring is not used in

7     the juvenile life without parole cases, correct?

8          A.    There are no guidelines.

9          Q.   So explain what you mean by that.

10          A.    Life sentences, sentences I believe over

11     45 years.  We do not apply guidelines to those.

12          Q.   So what evidence-based practice are you

13     applying in the context of the juvenile life without

14     parole cases?

15          A.    That, you know, that, I'm not completely

16     clear.  I'm not sure what -- I've got to think about

17     that.

18          Q.   You are the most senior member of the

19     parole staff who is working on juvenile life without

20     parole cases, correct?

21          A.    Yes.

22          Q.   All right.  You also mentioned a second

23     thing that might be considered an evidence-based

24     practice, low-risk offenders per studies.

25               What do you mean by that?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 70 of 285

1          A.    What I would mean by that is that there's

2     been research that offenders who are low-risk, lower

3     risk as far as -- the premise non-violent offenders and

4     low-risk offenders should not be taking up beds for

5     those that are more violent and, you know, to keep the

6     community safe.  So things like treatment.  People that

7     need treatment.

8                Are you -- are you getting -- should we be

9     locking up people for addicts in need of treatment, or

10    is the best place to treat out in the community?

11    Which, I believe, you know, community treatment I think

12    would be shown to be more successful anyway.

13         Q.    Tell it us why you think that.

14         A.    Part of it is, we've been -- some of these

15    studies have occurred.  Part of justice reinvestment

16    that has occurred that the state's going through has

17    confirmed that.  Through their -- through their data.

18         Q.    Any other thoughts on low-risk offenders

19    and who might qualify as a low-risk offender?

20         A.    I believe offenders that have strong, you

21    know, looking at criminogenic needs.  Offenders that

22    have strong families.  An ability to have assistance in

23    the community.  Home plans.  Those make someone better

24    for risk.

25                Those that have good prosocial attitudes.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 71 of 285

1  You know, those people are good candidates for, you

2  know, lower risk.

3       Q.   You said a lot.  What is a prosocial

4  attitude?

5       A.   Not -- could be involving himself with

6  people who are, like, in the community approach, social

7  attitude would be those that are very, you know,

8  somebody that is not taking them down areas of, you

9  know, not gang members, not -- not -- not other justice

10 involved offenders who are going to try to get them out

11 of that type of a lifestyle.

12            Ones that are not -- their attitude is

13 not -- their attitude is not what is for -- what's in

14 it for me.  As opposed to more of a, you know, thinking

15 about others.

16            How you act.  How you -- what, you know,

17 probably a little more -- a better term is being a

18 little more -- little more -- being self -- more

19 selfless.  Thinking of others and thinking of, you

20 know, understanding that the impact that you have

21 is -- affects others.

22       Q.   And where are you getting that?  Is that

23 from a book?  Or is that from a study?

24       A.   We've had some studies on criminogenic

25 needs probably within the last year or two.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 72 of 285

1      Q.   So the criminogenic needs theory talks

2  about prosocial attitudes; is that right?

3      **A.   Yeah.**

4      Q.   And so where's that kind of come from?

5           Who studies that?

6           Who came up with that term?

7      **A.   That, I don't know.**

8      Q.   And where's, you know, a lot about what you

9  think it means, where'd you get that definition?

10     **A.   That's -- that definition would come from**

11 **my understanding of what it is.  Just from --**

12     Q.   And tell us about the criminogenic needs

13 theory.

14     **A.   The big thing, my understanding of the**

15 **criminogenic needs is if you -- if you can address**

16 **those criminogenic needs, may be substance abuse,**

17 **prosocial behaviors, it could be employment, those**

18 **things that are going to make an offender a better risk**

19 **to release, because it eliminates -- a lot of the**

20 **employment, substance abuse, treatment, things like**

21 **that -- will address some of those things and eliminate**

22 **some of the obstacles of the offenders becoming**

23 **involved in criminal behavior.**

24     Q.   So as far as criminogenics, do you have

25 a -- can you have too high of a needy score?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 73 of 285

1       **A.**  **No, I don't think that's the case.  I mean,**

2  **we don't -- we don't say too needy.  I mean --**

3       Q.  Well, how then does the parole board, which

4  you advise, help determine somebody's criminogenic

5  needs such that they should be released or held?

6       **A.**  **Some of those are -- those criminogenic**

7  **needs, I believe, are addressed in the prehearing**

8  **report that is given to the board at the time of the**

9  **hearing.**

10      Q.  But you don't know for sure?

11      **A.**  **I know that our policies require them to**

12  **look at criminogenic needs.**

13      Q.  And how does criminogenic needs apply to

14  the cases of juvenile life without parole offenders,

15  children who have killed?

16      **A.**  **I think some of it's going to be -- some of**

17  **those issues that they can, you know, education.  Some**

18  **of it is going to be attitude.  Some of it is going to**

19  **be substance abuse.  What programming have you worked**

20  **on or identified?  What is your attitude at the time of**

21  **the interview with the institutional parole officer?**

22          **Are you -- I mean, these cases are not**

23  **-- no one case is ever the same.  I mean, we have**

24  **offenders who have involved themselves in multiple**

25  **programming before we, you know, pre-juvenile life**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 74 of 285

1    without, you know, becoming, quote, "Miller case."

2            So in my mind -- and this is, I guess --

3    this would be what I would -- I kind of look at some of

4    those cases, too, and I go, "This guy has really grown

5    up.  Because he doesn't think that he's going to be

6    released and he's still trying to improve himself."

7            Now those that now have -- I mean, I don't

8    know the motivation of theirs.  I'm not really sure I

9    really care as much about motivation as I do as what

10   are you doing to make yourself ready for release.

11           Does it matter whether -- if you're an

12   alcoholic, and you -- you go through treatment and quit

13   drinking, do I really care what the motivation was?

14   The end result is, are you safe, sober and productive.

15   You know what I mean?

16       Q.   So you raised a point about juvenile life

17   without parole offenders; did they undertake

18   programming even though they thought they were not

19   going to be released.

20           Am I correct in summarizing what you just

21   mentioned?

22       A.   Yes.  There's some offenders who were

23   involved in programming prior to their knowledge that

24   they had an ability to be released.

25       Q.   So is it your position that if somebody

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 75 of 285

1  thought they were never going to be released it should

2  be held against them that they did not participate in

3  programming?

4         **A.   Absolutely not.  I think -- I do not think**

5  **it should be held against them.  And I don't -- I don't**

6  **know what motivates.  I don't know what the motivation**

7  **is.**

8                **What my statement was is that when you have**

9  **somebody that has no ability to be released, but is**

10 **taking steps to improve themselves, I mean, that, to**

11 **me, says that that person has matured.  And has made a**

12 **statement that regardless -- if I'm in prison my entire**

13 **life, I want to better myself.**

14        Q.   So we got into this line of conversation by

15 talking about who might qualify as a low-risk offender.

16             Do you have any understanding of, on

17 average, children who have killed, how high of a risk

18 are they for re-offending?

19        **A.   I don't have statistics on that.**

20        Q.   So do you know anything about the

21 likelihood of such youth potentially re-offending?

22        **A.   I don't have statistics on that.**

23        Q.   Do you have a book, an article, knowledge,

24 beyond statistics?

25        **A.   I think -- I think if you look at murder**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 76 of 285

1    cases in general, murder cases have lower recidivism

2    rates than a lot of other, like property crimes.

3        Q.   So you mentioned the justice reinvestment

4    initiative that is underway, correct?

5        A.   Uh-huh.

6        Q.   That is the effort on the part of

7    Governor Greitens, who's brought in outside

8    organizations to look at our system, to determine the

9    ways in which it is inefficient, and perhaps keeping

10   people incarcerated beyond the time when they ought to

11   be; is that a fair summary?

12       A.   It's an overall view of our system from top

13   to bottom.  Looking at -- going anywhere from pre-trial

14   up into release.

15            And, yes, I mean, they're taking a look at

16   the entire system, including practices of release and

17   assessment of offenders' risk.  Yes.

18       Q.   And that justice reinvest initiative is

19   working with the task force that was appointed by

20   Greitens in the fallout, for lack of a better term, of

21   Mr. Ruzicka's resignation.

22            Is that your understanding?

23       A.   I -- that's not my understanding of

24   the -- of the reason why they put the task force

25   together.  It's not solely looking at parole board

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 77 of 285

1   processes, which would have been, to me, that's

2   Mr. Ruzicka, that issue.

3           This is a top-to-bottom review, including

4   practices of bond, pre-trial board releases.  It's not

5   designated saying -- I don't believe this was developed

6   to address the Ruzicka issue.

7       Q.   And the task force has a timeline that it's

8   following; is that fair to say?

9       A.   Yes.

10      Q.   Sounds like you may be following this

11  pretty closely, what they're up to?

12      A.   I've attended some of the meetings, yes.

13      Q.   Have you shared any views at those

14  meetings?

15      A.   Um, in the absence of Mr. Jones, I'm not

16  sure if I shared any views.  I clarified one.  I think

17  I spoke and clarified one issue related about a

18  process.

19          But as far a -- I'm not involved in sharing

20  views directly with the task force.  I have met with

21  some of the people that are presenting at the task

22  force, as far as, you know, looking at what better ways

23  that everyone can do business.

24      Q.   Okay.

25      A.   Including the board.  I mean, we're looking

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 78 of 285

1   at assessment tools that may be better than what we

2   have.

3           Q.   Can you share what those assessment tools

4   are?

5           A.   Well, we have not selected any.  We've

6   looked at several.  But we are, as an agency, we are

7   looking at the ability to do better case management

8   through an assessment tool that -- and this is -- an

9   assessment tool that will be started at the time of

10  entry into the system, whether it's probation,

11  pre-trial, and it will follow throughout the system,

12  and feed -- identify needs of the offender and

13  hopefully keep them out of the system.

14          Get them to -- take care of them before

15  they get into prison.  The hope is to get an assessment

16  that will be an ongoing case management assessment that

17  will go in and out of prison, as you circulate through.

18  Hopefully, they don't circulate through.  We want

19  something that the user -- it's not a step in the

20  system that you get a different assessment tool.  It's

21  a better -- we're looking at better systems.

22          Q.   And none of that is being used right now?

23          A.   Those assessment tools are not being used

24  at this time.

25          MS. QUINN:  Let's take a break.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 79 of 285

1                (A break was taken.)

2    BY MS. QUINN:

3        Q.   At this point I'd like, after the break, to

4    turn our attention to the bodies of law or authorities

5    that are relied on in the parole system.

6            So, Mr. Mueller, can you share with me what

7    are sort of bodies of law or authorities that control

8    the practices of the parole board?

9        **A.   Statutes that are listed in 217 are related**

10   **to parole.  I didn't bring those with me.  I do**

11   **have -- there's also those with the juveniles' life**

12   **without because those have to do with this proceeding.**

13       Q.   So the statutes.  Any other laws or

14   authorities that are relied upon in the parole board's

15   work?

16       **A.   Explain that.**

17       Q.   Any other body of law?

18       **A.   Authorities?**

19       Q.   Legal authorities, yeah.

20       **A.   I mean, there's authorities.  That's --**

21   **the appointment of board members is also outlined in**

22   **law.**

23           **You know, parole abilities, acts that's**

24   **outlined in our statutes.**

25           **Juvenile life withouts, those statutes are**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 80 of 285

1    followed.

2           We have -- there's case law that occurs

3    that we, you know, you look at that try to make sure

4    that you're in line with that.  And that policies are

5    in line with that.

6           Q.   So you mentioned case law.  What case law

7    would apply to the cases of juvenile life without

8    parole matters?

9           A.   Well, the first one was Miller.  And then

10   there's been several others after that.

11          There was just recently one, I believe,

12   that we received about -- I'm trying to think what the

13   name of it was.  But as far as do I have the names of

14   the cases?  I do not have all of those.  I know Miller

15   is the first one that came out.

16          Q.   Have you read all of the Miller decision?

17          A.   Have I read all the Miller decision?  Yeah,

18   when it first came out.  But that was several years

19   ago.

20          Q.   How many other cases have you read related

21   to the juvenile life without parole cases?

22          A.   I'm trying to remember.  There was one that

23   was -- we just recently had a ruling on one.  I believe

24   I might have that in here.

25          You mean read an entire case other than

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 81 of 285

1    Miller's?  I have not read -- I mean, we usually get

2    stuff from our legal counsel that says, "this is what

3    came out of it and this is what didn't."

4         Q.   So you receive summaries?

5         A.   Yeah.  Some type of summary.  I probably

6    did not read the entire Miller.  I probably read a

7    summary of Miller.

8         Q.   Okay.  So you're amending your answer about

9    Miller?

10        A.   Yes.

11        Q.   Okay.  So safe to say you haven't read the

12   entirety of -- none of the United States Supreme

13   Court's cases relating to juveniles' sentencing and

14   meaningful opportunities for release?

15        A.   I have not read any of the entire cases.

16        Q.   Okay.  So far you've mentioned law, or

17   authority that might get relied upon, statutes.  You

18   mentioned statutes and case law.

19             Any other body, or authority, or law that

20   the board relies on, that you rely on, when you do your

21   job?

22        A.   I mean, I'm not sure if you consider

23   policies and procedures part of that authority.

24        Q.   Okay.  So what are policies and procedures?

25        A.   Related to parolees.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 82 of 285

1          Q.   You mentioned them, so tell us what you

2     meant.

3          **A.   What I'm mentioning, our division has**

4     **policies and procedures.  I do not have them -- I don't**

5     **have a policy and procedure manual sitting in front of**

6     **me.**

7               **But we have policies and procedures for our**

8     **institutional parole officers to follow when doing**

9     **these --  any parole, pre-parole interviews.**

10              **We have, you know, we have additional**

11    **worksheets that they use on these specific cases.**

12    **Things like that.**

13         Q.   So focusing on the policies and procedures,

14    you said there's a policies and procedure manual?

15         **A.   Yes.**

16         Q.   And how does something get into the

17    policies and procedure manual?

18         **A.   We have a manual work group that develops**

19    **policies and procedures.**

20         Q.   A manual worker?

21         **A.   Work group.**

22         Q.   I'm sorry.  Work group.  And who's part of

23    that work group?

24         **A.   I don't know everybody on it.  I know that**

25    **Ms. Pat McClure is the -- chairs that manual work**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 83 of 285

1    group.

2           Q.    Have you played a role in that group?

3           A.    No.  Other than sometimes reviewing

4    policies before they are sent out just for comment.

5           Q.    So it's your understanding that a work

6    group gets together and comes up with proposed

7    policies; is that a fair statement?

8           A.    Yes.

9           Q.    And then what happens with them?

10          A.    Those policies get sent out for review, and

11   end up, eventually, after review, it occurs.  Then they

12   get sent out to finalize them and put them into -- they

13   go from a draft to a final policy.

14          Q.    And who are they being sent out to for

15   review?

16          A.    Um, I believe they go out to the --

17   I think -- I know that they go out to the Probation &

18   Parole administrators' group, which would include

19   institutional parole services, regional administrators,

20   field regional administrators.  I don't know who else

21   is on that distribution.

22          Q.    And who finalizes those policies and

23   procedures you mentioned when they get finalized?

24          A.    I think it's finalized -- the final

25   procedures are sent, I think the manual work group

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 84 of 285

1    chairman finalizes those.  And I believe, it's my

2    understanding, that the chairman signs after as the

3    last -- to finalize them.

4         Q.   Just to be clear, you mean the chairman of

5    the Board of Probation & Parole?

6         A.   Yes.

7         Q.   I'm going to show you what we've marked as

8    Exhibit 5 for purposes of this deposition.

9              You'll note that this is a multipage

10   document that begins with the title Table of Content.

11             Would you please take a look at this

12   document.

13             (Deposition Exhibit No. 5 was marked for

14   identification.)

15   BY MS. QUINN:

16        Q.   Does this look familiar to you?

17        A.   Yes.  This is our table of contents for our

18   Probation & Parole procedural manual.

19        Q.   And you'll notice there are Bates stamps on

20   the bottom indicating that these were materials we

21   received from the Attorney General's Office.

22             Do you see there the Bates numbers 264

23   through 272?

24        A.   Yes.

25        Q.   And you'll also note on the first page, it

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 85 of 285

1    says last updated 7-31 of 2017?

2         **A.   Yes.**

3         Q.   Is it your understanding that the policies

4    and procedures manual that you just referenced earlier

5    was last updated July 31, 2017?

6         **A.   That would be the day that one of these**

7    **policies in this manual was updated, I believe.**

8         Q.   And I didn't mean to be confusing.

9              Are you aware of any subsequent updates?

10   Are you aware of any additional changes to the policies

11   and procedures manual since 7-31 of 2017?

12        **A.   I believe there's probably been some**

13   **updates since this time.  We update quite regularly.**

14        Q.   But you can't draw to mind what subsequent

15   updates have been?

16        **A.   What specific policy was changed, no.**

17        Q.   So we would ask then for any, you know --

18   not right now -- but any subsequent updates that have

19   been referenced, updates to this table of contents and

20   the manual.

21             So looking at this Exhibit No. 5, can you

22   tell us where it references juvenile life without

23   parole cases or Senate Bill 590 cases.

24        **A.   There are no specific juvenile life without**

25   **policies.  The policies that institutional parole**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 86 of 285

1 **officers would be using are those that would be related**

2 **to parole consideration hearings.**

3     Q.   So the regular parole consideration hearing

4 policies in this book are the same, then, as that are

5 applied to the juvenile life without parole matters?

6     **A.   That, with an additional prehearing**

7 **worksheet that is used.**

8     Q.   And the worksheet has not been adopted as a

9 policy in the manual, correct?

10     **A.   I don't -- it is not part of the**

11 **appendices.**

12     Q.   And you've mentioned maybe there was some

13 subsequent updates since July of 2017.

14     Do you recollect there being any updates to

15 the policy manual as to appendices?

16     **A.   That, I don't know.**

17     Q.   But you're in charge of juvenile life

18 without parole hearings, correct?

19     **A.   I don't know if there have been any updates**

20 **that were published.**

21     Q.   Wouldn't it be part of your job to know

22 what the policies are with juvenile life without parole

23 cases?

24     **A.   Is it part of -- I don't believe there are**

25 **any, but I can't confirm that.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 87 of 285

1    Q.   I'm going to show you what's been marked as

2  Exhibit 6 for purposes of this deposition.

3          (Deposition Exhibit No. 6 was marked for

4  identification.)

5  BY MS. QUINN:

6    Q.   This is also a multipage document with

7  Attorney General's Bates-stamped numbers 273 through

8  280. Same as your copy, Mr. Mueller.

9    **A.   What are the numbers?  273 to 280?  That's**

10 **the document I have.**

11   Q.   Take a look at this and tell me if it's

12 familiar to you.

13   **A.   Yeah.  This is a procedure on parole**

14 **decision-making.**

15   Q.   And anything in here that speaks to

16 juvenile life without parole matters or Senate Bill

17 590?

18   **A.   There's nothing specific that I can find.**

19   Q.   To your mind, your knowledge, is this a

20 complete set of the materials relating to parole

21 hearings?

22          We were provided these documents; is there

23 anything missing from this set of policies and

24 procedures from the manual as they relate to parole

25 hearings?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 88 of 285

1          A.   It does not include the setting of

2     eligibility, which is P6-3.1.

3               P6-3.2, which is eligible and restrictive

4     cases.

5               P6-3.3, appearance of delegates and victims

6     and clients.

7               P6-4.1, prehearing report.

8               Some of the additional ones will not

9     specifically go to the juvenile life withouts, but more

10    in the parole process in general.

11         Q.   Can I ask, were you part of the document

12    production that resulted in us receiving these

13    materials?

14         A.   Was I part of that production?

15         Q.   Yeah.

16         A.   I did not produce policies and procedures.

17    My -- my -- I know what the production

18    was, but I didn't review everything that went out.

19         Q.   We would just ask for those additional

20    policies that were not turned over in the original

21    production.

22               If I was a member of the public and I

23    wanted to access these materials, how would I do that?

24         A.   Our policies and procedures are -- you just

25    have to request them.  We -- they're not -- I mean, you

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 89 of 285

1    can request them from a Sunshine.

2              Our policies and procedures are not, for

3    the most part, are not non-public information.  You

4    just have to request them, I believe.

5         Q.   But they're not available online currently;

6    yes?

7         A.   They are not available online to the

8    public, no.

9         Q.   You have to make a Sunshine request to

10   access the policies and procedures?

11        A.   That, or, I mean, I don't know if it has to

12   be a formal Sunshine request or not.

13             If I had somebody call in and say what --

14   you know, how do I do this?  And they said do you have

15   policy on that, I probably wouldn't make them go get a

16   Sunshine request.  I would try to work through the

17   policy.  And if they wanted a copy of it I would

18   contact Pam Rogers to see if she would send them a

19   copy.

20        Q.   Who's Pam Rogers?

21        A.   She's the administrative assistant to the

22   chairman.  She's -- she acts -- she's not really the

23   chairman's -- a custodian of records, but she works for

24   the chairman.  So that's why these policies would come

25   through her.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 90 of 285

1          Q.   What if you're an offender and you'd like

2     to have an entire set of the policies and procedures,

3     how would that happen?

4          **A.   That, I don't know.**

5          Q.   Are you aware that offenders are not

6     allowed to have policies and procedures?

7          **A.   That, I don't know.**

8          Q.   What about the Blue Book?

9          **A.   Blue Book is a document that we send out to**

10    **all offenders.  It's published online for anybody to**

11    **review.  And it is rules and regulations related to the**

12    **governing of parole or conditional release, I believe,**

13    **is what it's called.**

14         Q.   And when you say "rules and regulations,"

15    do you -- what is your understanding of a rule or

16    regulation?  Is it different from a policy or

17    procedure?

18         **A.   It's a -- can you give me that one again?**

19         Q.   Sure.  Is the policy and procedure manual

20    the same thing as the rules and regulations you've just

21    spoken about?

22         **A.   The rules and regulations were developed to**

23    **assist offenders in understanding the parole hearing**

24    **process.  So it's going to have information related to,**

25    **you know, the setting of hearings.  Ineligibility.  You**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 91 of 285

1      know, cases -- some of them being ineligible.

2                  It's going to have time-to-serve

3      guidelines.  Salient factor score information.

4                  It's -- but it was a document that was

5      developed to assist offenders, family members,

6      something that you could hand them to provide them

7      information related to parole release.

8           Q.    And this is what you mean by rules and

9      regulations?  They're developed to help offenders?

10          A.    That's what you asked, what the document is

11     called.  That is what the document is called.

12          Q.    The rules and regulations?

13          A.    Yeah.

14          Q.    And I don't mean to confuse you, so is the

15     Blue Book the same thing as the rules and regulations

16     that control all of parole practices?

17          A.    There's -- there's administrative rules

18     that are also involved.  And there's policies and

19     procedures that the Blue Book, again, is just developed

20     to kind of simplify some of that stuff so an offender

21     can have, or family member, or an outside public --

22     whether it's prosecutor or anybody -- can have a better

23     view as to how we -- ready for a parole consideration

24     hearing, and the factors that are -- some of the

25     factors that are involved.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 92 of 285

1    Q.   Which of the two policies and procedures or

2    rules and regs is the controlling law?  Which one is

3    more -- has more weight or authority?

4    **A.   You mean the rules and regulations in the**

5    **Blue Book?  Or the regulations by Secretary of State's**

6    **office?  Or our policies?**

7    Q.   It sounds like you're talking about three

8    sets of materials?

9    **A.   Well, there are administrative rules that**

10   **are second to laws.**

11          **Then we have our policies and procedures.**

12          **And then we have -- the Blue Book is there**

13   **to try to explain that, how those are applied.**

14   Q.   So the Blue Book's a summary, and it is not

15   intended to be the law?

16   **A.   It's not the law, no.**

17          MR. SPILLANE:  I'm going to break in now,

18   because I don't want to mislead the court, or the

19   people, to be giving answers to not knowing that are

20   not accurate.

21          It is my understanding that the Blue Book

22   is incorporated into the Code of State Regulations.

23   And there are state regulations dealing with parole

24   specifically set out.

25          MS. QUINN:  It's not referenced.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 93 of 285

1      MR. SPILLANE:  It is referenced.  I don't

2 want him to say something that he didn't know and will

3 mislead somebody.  If you want me to stop, I will.

4      MS. QUINN:  If you don't mind, It is my

5 record.  I'm not done with the examination of this

6 witness.  You know, but I appreciate your position.

7      MR. SPILLANE:  All right.

8      (Deposition Exhibit No. 7 was marked for

9 identification.)

10 BY MS. QUINN:

11      Q.  Could you take a look at this document,

12 which is Bates-stamped, as provided to us by the

13 Attorney General's Office.

14      Does this document look familiar to you?

15      **A.   Yes.  These are our regulations.**

16      Q.  And what about the email on the cover of

17 these regulations; is that familiar to you?

18      **A.   Looks like it was a distribution of the**

19 **final draft.**

20      Q.  And having reviewed this, is your memory

21 refreshed in any way about the statute of the Blue Book

22 currently, whether it is part of the rules and

23 regulations or it is not?

24      **A.   It is established -- it is referenced in**

25 **the state regs.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 94 of 285

1    **So is it a -- so, you know, referencing it**

2  **in the state regs would make it a part of the state**

3  **regulations, I guess, is what you're saying.**

4    Q.  So I'm asking if that's your position, as

5  the person in charge of juvenile life without parole

6  hearings, that the Blue Book is now part of the regs?

7    **A.  Repeat that question.**

8    Q.  What's your understanding currently of the

9  Blue Book?

10    Is it just a guide for offenders or is it

11  part of the rules and regs?

12    **A.  It comes as part of the rules and regs as**

13  **it is referenced.**

14    Q.  And so was it provided for public comment

15  along with the rules, as far as you're aware?

16    **A.  I think all -- that, I'm not aware of.  I**

17  **couldn't tell you one way or the other.  Generally**

18  **anything that involves the rules and regulations is**

19  **provided for public comment.**

20    Q.  What about appendices to those materials?

21  Should those be submitted for public comment?

22    MR. SPILLANE:  I'll object that's a legal

23  question, and there's case law on that, and he has no

24  idea.

25    MS. QUINN:  I didn't hear an answer.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 95 of 285

1          MR. SPILLANE:  Answer if you know the

2     answer.

3          THE WITNESS:  I do not know.

4     BY MS. QUINN:

5          Q.   Were you familiar with this modification of

6     the rules and regulations when it took place?

7          **A.   Which modification is that?**

8          **Can you outline?**

9          Q.   The document I provided to you apparently

10    reflects a series of amendments that took place at the

11    same time.  We can go one by one through them if you

12    like.

13         **A.   No, that's fine.**

14         Q.   If you'd look at page 1458.  And you see in

15    bold, a medical parole cannot be granted --

16         **A.   I was aware of that.**

17         Q.   And what role did you play in having this

18    language added to the rules and regs?

19         **A.   I did not play a role in that.  But I know**

20    **that that was part of the medical parole process,**

21    **because of the statutory requirements required to serve**

22    **certain percentages, either 558.019, or other parole**

23    **restrictive cases.**

24         Q.   And what about on page 1459 where the term

25    "representative" has been struck and the word

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 96 of 285

1  "delegate" put in its place.

2          Did you play any role in that?

3      **A.   I did not play a role in that.**

4      Q.   And then in this entire document is there

5  any reference to juvenile life without parole?

6      **A.   I don't believe there is.  'Cause we would**

7  **hear any -- we would hear juvenile life withouts for**

8  **parole consideration are given the same opportunities**

9  **as we would any other offender, but taking into**

10 **consideration of the additional factors.**

11     Q.   I'm going to switch gears slightly and just

12 want to make sure all the exhibits get to the court

13 reporter.  The ones with the stickers.

14          I want to talk to you about parole board

15 meetings.

16          The parole board meets quarterly; is that

17 right?

18     **A.   In what capacity?**

19     Q.   There's some kind of quarterly meeting

20 involving the parole; is that --

21     **A.   The parole board generally meets monthly**

22 **too.  That's the general meeting schedule.**

23     Q.   There are meetings -- I'm sorry -- minutes

24 that are created, distributed for review in draft form,

25 and then finalized that were provided to us in the

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 97 of 285

1    document production.

2              Do you know what those are referring to?

3         A.   Those are minutes that reference the -- the

4    meeting that's for the board meeting minutes, for the

5    board meeting.

6         Q.   So that's a monthly meeting, not a

7    quarterly meeting?

8         A.   Well, it's usually monthly.  Some months,

9    due to scheduling issues for parole consideration

10   hearings, that they cannot get one in for the month.

11   'Cause sometimes there's just not enough days in the

12   month, so they may get those items that may get pushed

13   to the following month.

14        Q.   And what happens at those meetings?

15        A.   There's review of prior -- prior meetings

16   to finalize them.  You know, to finalize draft

17   meetings.

18             There's some votes related to how the board

19   will proceed with different issues.  Those meetings --

20   there are times in those meetings that there's

21   discussions of, you know, requested changes in policies

22   and procedures.

23             Some of those meetings there is as part of

24   the meeting, guests will attend providing -- some of

25   them are providing training at those meetings.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 98 of 285

1    Q.   All right.  Maybe I misunderstood.

2         So these monthly meetings that generally

3    take place, some months are skipped, is that where

4    decisions are made on particular parole cases?

5         **A.   No.  They could be though.  Because there**

6    **could be a split.  That after -- after -- in a closed**

7    **meeting, afterwards they may bring in, talk about a**

8    **case that they can't -- they can't decide on.**

9         **So there could be six board members.**

10   **now, you could have a 3-3 split, where they need to**

11   **finalize that decision to get that offender a decision.**

12        **So there may be occasions where they will**

13   **have some case review, but generally that's not the**

14   **case.**

15        Q.   And you've been present for those instances

16   where there's been a case review like that?

17        **A.   No.  Those are not open to the analyst.**

18        Q.   So --

19        **A.   It's a complete -- it's just the board**

20   **members.**

21        Q.   I'm sorry.  I misunderstood.  I think you

22   said a closed meeting where a decision cannot be

23   reached?

24        **A.   Yes.**

25        Q.   So they'll bring it to the more open

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 99 of 285

1    meeting.

2         A.    No.   There's their open meeting.   And

3    sometimes they may have a case they want to discuss,

4    and that is the board members only.

5         Q.    I see.   Do they -- is that executive

6    session?   Something like that?

7         A.    I'm not sure what they call it.

8         Q.    So who generally attends the monthly open

9    meetings of the board?

10        A.    Analysts.

11              The parole board members.

12              Operations manager, when we had a board

13   operations manager.

14              There may be an institutional parole

15   regional administrator at times.

16              That's primarily it.

17        Q.    In your various roles in MDOC, how many

18   years would you say you've been attending those

19   meetings?

20        A.    Probably since -- I believe I probably

21   attended some of those as a unit supervisor, so since

22   '98, possibly.

23        Q.    So since 1998?

24        A.    Since I came to Central Office.   At one

25   point I started attending those, I believe, even as a

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 100 of 285

1    unit supervisor.

2         Q.   And those meetings generally have a written

3    agenda in advance?

4         A.   Yes.

5         Q.   Have you been in charge of putting together

6    that written agenda?

7         A.   No.

8         Q.   Who does that?

9         A.   That's put together by the administrative

10   assistant to the chair.

11        Q.   I wanna switch gears a little bit and take

12   us back.

13        A.   As far as -- probably to clarify that

14   though -- I've not put together the agenda.  There have

15   been agenda items that an analyst or myself have asked

16   to be placed on the board.

17        Q.   Can you tell us what some of those items

18   were?

19        A.   Um, I've requested that Ms. Gould be placed

20   on the agenda for one of her programs that we have in

21   one of our prisons, St. Louis University.

22             I did that, to get a school over there, so

23   she could explain the program to the board.

24        Q.   Okay.  Who's Ms. Gould?

25        A.   Mary Gould.  She works for St. Louis

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 101 of 285

1    University.  I think she's a professor.

2              There's a program that we have through

3    St. Louis University that provides a college education

4    to incarcerated offenders.

5         Q.   I see.

6              And have you ever requested for anything

7    related to juvenile life without parole matters to be

8    put onto the agenda?

9         A.   I don't recall putting that on the agenda.

10        Q.   Have you been present for any conversations

11   during those meetings where juvenile life without

12   parole matters have taken place?

13        A.   There's been some brief discussion, I

14   believe, by Ms. Dills, as far as the requirements.  And

15   I think she sent out an email to the board.

16        Q.   Okay.  We'll talk a little bit more about

17   Ms. Dills and presentations at the meetings, but let me

18   make sure -- I understand the shift in her role.

19              She previously was the director of

20   operations?  Maybe I'm saying it wrong.

21        A.   Ms. Barton had that position and it was

22   board operations manager.  At some point that position,

23   duties did not change, but changed in name only, to

24   board operations director, or director of board

25   operations, whichever it was.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 102 of 285

1    Q.   Okay.  And Ms. Dills has now been removed

2    from that role; yes?

3        **A.   She has been moved to field services.**

4    Q.   And why is that?

5        **A.   I think that -- I'm not -- I don't have the**

6    **knowledge to understand exactly why it was.  That was a**

7    **decision made, like any other decision -- it was a**

8    **decision made by the chairman of the board.**

9        **And there was a change in chairmans, and I**

10   **don't know if it was philosophy or what, but there**

11   **was -- that was one position that was moved around.**

12   Q.   And so it's your understanding that she did

13   not get moved until Chairman Jones took over?

14       **A.   Yeah.  I know that for a fact.**

15   Q.   And how do you know that?

16       **A.   Because I assumed her duties from**

17   **Chairman Jones.**

18   Q.   And has --

19       **A.   Supervision duties.**

20   Q.   And has Chairman Jones shared with you his

21   views why Ms. Dills should be moved?

22       **A.   He shared some of his views.  I can't read**

23   **his mind.**

24       **He shared that -- I believe any time you**

25   **deal with people, I think a lot of it deals with**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 103 of 285

1    loyalty.  And are you loyal to the person you work for

2    or the person you used to work for.

3           That would be my -- that's the feeling that

4    I've got from Mr. Jones.

5           Q.   And your sentence is that he was concerned

6    about her loyalty?

7           A.   Yes.  And some of her supervision practices

8    with some of the analysts.  Meaning not practices in

9    accountability, but more practices in just day-to-day

10   encounters, and that type of stuff.

11          Q.   So can you tell us what you mean by that?

12   I'm not sure I follow.

13          A.   Um, through my own personal experience,

14   the -- I'm not sure how to say this politely.  There

15   are times when responses from Ms. Dills were not as

16   kind as it could have been.

17          Q.   And did you experience that yourself?

18          A.   Yes.

19          Q.   And her responses of that were less kind

20   than maybe they could have been, was that to the public

21   as well?

22          A.   What do you mean "to the public?"

23          Q.   So the lack of kindness, was the concern

24   more internal?  She was not engaging with her

25   colleagues as she ought to be?  Or complaints from the

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 104 of 285

1    outside public?

2         A.   No.  I think it was more how she was

3    treating some of the people within the office.

4         Q.   And was one of those people Don Ruzicka?

5         A.   Not that I'm aware of.

6         Q.   Are you aware of Chairman Jones being

7    troubled by her handling of that situation?

8         A.   Am I aware of the troubling --

9         Q.   Was Chairman Jones troubled Ms. Dills lack

10   of loyalty to Mr. Ruzicka?

11        A.   I don't think that was -- I don't think

12   that was the issue.

13             Mr. Jones was not -- when Mr. Ruzicka's

14   participation and unprofessional behavior of the time

15   of hearings came to light, Mr. McSwain was chairman at

16   the time.

17        Q.   Right.  But were there concerns that she

18   did not do as she ought to have done with regards to

19   Mr. Ruzicka?

20        A.   That, I'm not a hundred percent aware of.

21   Whether there was concerns -- whether handling in-house

22   versus sending it out, or -- I don't know what

23   Mr. Jones -- Mr. Jones has not said, "I moved her

24   because she didn't do this regarding an investigation

25   on Mr. Ruzicka."

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 105 of 285

1          It was more about, I think, from what I

2   understand, is how she was treating some of the staff

3   in the office, including the analysts and myself.

4          Q.   And had you reported problems with

5   Ms. Dills?

6          A.   Um, did I report problems with Ms. Dills?

7   Um, I did not share them with -- I don't believe I

8   shared them with Mr. Jones.  I probably shared them

9   with co-workers, other analysts, because some of the

10  encounters were less than professional.  Some of them

11  could be kind of rude.

12         Q.   But you didn't go above your colleagues?

13  You didn't report up the chain?

14         A.   No.  You just -- I mean, work.  Continue to

15  do business.

16         Q.   You mentioned, in talking about Ms. Dills,

17  accountability as an important issue.  And we looked

18  earlier together at the mission statement for the

19  Department of Probation & Parole.

20         A.   Yes.

21         Q.   Accountability is one of the factors set

22  forth?

23         A.   Uh-huh.

24         Q.   What about transparency?  Is that one of

25  the features of the mission of the Department of

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 106 of 285

1   Probation & Parole?

2        **A.   I would have to look at the mission**

3   **statement.**

4        Q.   So we were talking about accountability.

5   This is what triggered this in my mind, that

6   transparency is part of being accountable?

7        **A.   We strive to create a transparent system of**

8   **operation that embraces integrity and accountability.**

9        Q.   Yes.  So would you say transparency is

10  important to accountability?

11       **A.   Transparency in this statement, yeah.  I**

12  **think transparency of operations is important.**

13       Q.   But you're aware of complaints that have

14  been made about MDOC and the board of parole not having

15  sufficient transparency; yes?

16       **A.   I have -- I understand those complaints.**

17  **As a matter of fact, I believe we had conversations, a**

18  **conversation about that a while back.  And I think we**

19  **are transparent in that our policies and procedures are**

20  **available to the public to receive.**

21       Q.   Through a Sunshine request; yes?

22       **A.   Yes.  For sure with a Sunshine request.**

23       Q.   So do you feel like the board is

24  sufficiently transparent?

25       **A.   I believe that, yes, we provide our**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 107 of 285

1   policies and procedures on how we -- you know, the

2   parole process, I believe that is transparent.

3              I know that we do not provide board votes.

4   I know that we don't provide victims' names, of who's

5   at hearings, things like that.  But I think that there

6   are -- I think that we are transparent in our system of

7   operations.

8         Q.   Did you and Ms. Dills differ in your views

9   regarding how transparent the board ought to be?

10        A.   As far as?

11        Q.   Did she want to be more transparent?

12        A.   That, I don't know.

13        Q.   You never talked to her about that?

14        A.   I never had discussions as far as that,

15   where she wanted to be more transparent.

16             We've had discussions related to

17   confidentiality of board votes.  And what we believe

18   would occur if you start releasing those board votes.

19   Things like that.  Just general conversations.  It

20   wasn't anything that was, you know, a meeting to talk

21   about.

22        Q.   And the two of agreed that that information

23   should not be shared more broadly?

24        A.   I think we both agree that if we were to

25   start releasing votes to the public that it would

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 108 of 285

1   probably -- given our knowledge of how the system is,
2   and how we -- these are political appointees -- that
3   you may see less risk-taking and less of a desire to
4   release prior to conditional release on some offenses.
5          Q.   It sounds like in your answer there was
6   some disagreement in positions between you and
7   Ms. Dills?
8          A.   Um, I really think we're both on the same
9   page.  I think we both believe if you start releasing
10  board votes, that decisions will -- it would be
11  detrimental to the offender, because people making
12  those votes are political appointees, and I think we
13  both agree on that piece.
14         Q.   And is there anything position-wise in
15  which you and Ms. Dills differ?
16         A.   You mean on?
17         Q.   Let's start with juvenile life without
18  parole cases.
19         A.   We had some initial disagreements on
20  whether or not circumstances of the offense could be
21  taken into whether that should be ever considered.
22         Q.   Okay.  We'll talk about that.
23              Can I have my document back?
24         A.   Yeah.
25         Q.   So you and Ms. Dills differ in your

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 109 of 285

1  position regarding whether circumstances of the offense

2  should be considered in these juvenile life without

3  parole or Senate Bill 590 cases, correct?

4      **A.  I think should, can be, can be considered,**

5  **is more where we differ.**

6      Q.  And your position is that it is a factor to

7  be considered?

8      **A.  Yes.**

9      Q.  And her position was, no, it should not be?

10     **A.  I think it was her belief that they -- that**

11 **they should not be.  Not due to -- I'm not -- not due**

12 **to her philosophy possibly, as much as due to -- I'm**

13 **not sure she understood -- I think it's 565.033 -- one**

14 **of the statutes -- it talks about juvenile life without**

15 **statute references, in addition to those other factors**

16 **and circumstances is one of those other factors.**

17         **So when I'm reading the law, I think that I**

18 **believe that circumstances can be considered when**

19 **reviewing a juvenile life without.**

20         **I think Ms. Dills believed that it was more**

21 **like the court -- she believed that it was more like**

22 **the domestic violence cases, murders, where the court**

23 **came in and said you cannot do that.  But that's not**

24 **the case with these juvenile life withouts at this**

25 **point.**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 110 of 285

1          Q.   And Miller vs. Alabama indicated that the

2     nature of the offense is not an appropriate factor for

3     youthful offenders, correct?

4               MR. CRANE:  Are you testifying to that

5     fact?

6               MS. QUINN:  I said, "correct."  I put a

7     question mark.

8               THE WITNESS:  That, I don't know.

9     BY MS. QUINN:

10          Q.   You didn't talk with her about that?

11          **A.   We did not talk specifically about**

12     **Miller vs. Alabama.**

13          Q.   I'm going to show what's marked as Exhibit

14     No. 8.

15               (Deposition Exhibit No. 8 was marked for

16     identification.)

17     BY MS. QUINN:

18          Q.   So Exhibit No. 8 is analyst group meeting

19     notes from September 24th, 2012; is that correct?

20          **A.   What date?**

21          Q.   September 24th, 2012.

22          **A.   Yes, ma'am.**

23          Q.   And can you just -- so we're on the same

24     page -- explain analyst group meeting, and the board

25     meetings that we were talking about earlier, what's the

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 111 of 285

1  difference?

2  **A.   Analyst group meetings are meetings that**

3  **are generally monthly, but board members can attend it**

4  **if they want, but generally it's the analysts.  Some**

5  **institutional parole supervisors.  Sometimes the**

6  **institutional parole regional administrator is in**

7  **attendance.  And it's basically to talk about different**

8  **issues that come up throughout the month that may need**

9  **some attention or just review.**

10  Q.   Okay.  And in this set of meeting notes

11  there's reference to your presentation to the group of

12  analysts, correct?

13  **A.   Yes.**

14  Q.   And can you tell us what you presented to

15  the group?

16  **A.   Let me read it.  It's been so long I don't**

17  **remember sometimes what I write.**

18  **This was an initial heads-up to the**

19  **analysts group that this decision came down.  At the**

20  **time, we were not sure how this would affect our**

21  **business.  It's kind of like -- it was more of a --**

22  **just a preliminary notification to the analysts that**

23  **this is on the horizon.**

24  Q.   And so when you say "this decision," we're

25  talking about Miller vs. Alabama; is that right?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 112 of 285

1      **A.    Yes.**

2           Q.   And so you shared this information,

3      although you had not fully read the entire decision,

4      yes?

5      **A.    I believe we -- I probably reviewed a**

6      **summary.**

7           Q.   And it indicates here that you told the

8      group about the number of potentially impacted inmates,

9      84 under the age of 18; is that right?

10     **A.    Yes.  It looks like that's what was**

11     **written.**

12          Q.   Do you know where you got that information

13     from?

14     **A.    I do not.  It may have been from**

15     **Ms. Barton.  I'm unclear as to where I got that from.**

16     **I would assume there was some data run made at some**

17     **point to see how many were affected.**

18          Q.   And then the minutes further reflect that

19     you told the group if they received inquiries, they

20     should simply tell people that the department will

21     abide by any court orders issued in any case

22     involving a person affected by the decision; is that

23     right?

24     **A.    I think that was what we were told.  That's**

25     **how we should proceed with these cases, yes.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 113 of 285

1        Q.   And who told you that?

2        **A.   I would imagine that was either legal**

3 **counsel gave us something, or that would have come from**

4 **Ms. Barton to me.**

5        Q.   Were you considered the point person for

6 these matters already?

7        **A.   No.  Not at that point.  It would have been**

8 **the board operations manager.**

9        **This would have probably come out because I**

10 **probably got something come across on a, you know, some**

11 **summary of it or something, and I was simply giving the**

12 **analysts' group, this would be an alert that this is on**

13 **the horizon.  And we didn't -- we weren't sure how to**

14 **proceed at that point.**

15        Q.   And the minutes further reflect that you

16 told the group, "If the offender believes they're

17 affected by the decision, they should contact an

18 attorney for advice and guidance."

19        Is that right?

20        **A.   Yes.  And, yes, that -- because at the**

21 **time, we had no -- we did not know exactly how we would**

22 **proceed with these cases.**

23        **So if an offender asks, "I'm a juvenile**

24 **life without," we had no -- there was no policies,**

25 **there was no mechanisms to get that offender back**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 114 of 285

1  before the court.  Or before, you know, to appeal, or

2  determine whether -- how to do the petition.

3           It was so early stages that we were -- we

4  didn't know what advice to give an offender.  We were

5  certainly not going to give legal advice to an

6  offender.

7       Q.   So would it be appropriate for an analyst

8  IPO to be answering questions about the implication of

9  the decision to inmates?

10      A.   I don't think at that time we would -- we

11 wouldn't have had enough information on how that

12 affected us to even make those responses to any

13 offenders.

14      Q.   Is it ever appropriate for an analyst IPO

15 to answer a question from an offender about the

16 implication of a decision like Miller?

17      A.   Is it ever appropriate?  I think that if

18 you -- it depends on what the question is.

19           What question are you -- I mean, we

20 notify -- once we got the process, we notified all the

21 offenders that they could be affected if they were a

22 juvenile life without.  So that is appropriate in my

23 mind.

24           But to tell somebody, yeah, you need --

25 yeah, this affects you, and we're going to release you

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 115 of 285

1    as soon as we get the, you know, a process to do that.

2    Or we're going to have a hearing as soon as we get a

3    process to do that.  That, to me that would not be

4    appropriate at this stage because this was so infantile

5    in its development.

6        Q.    Okay.  So it would be okay later on, once

7    there was process in place, for IPOs to directly answer

8    those questions?

9        A.    Yeah.  I think if an IPO called, or family

10   members called, "I think my daughter or son is a

11   juvenile life without sentence," I think it's -- I

12   think by review of the sentence that they were

13   sentenced under, being juvenile life without, and

14   calculating their age, being prior to coming -- prior

15   to the age of 18, I think it's appropriate to say, I

16   believe, you, you know, he needs to contact his IPO to

17   talk about, you know, having a petition.  I think it's

18   completely appropriate.

19            But when you don't know enough about the

20   implications of it, I think it's not good, sound advice

21   to be providing offenders with information that you

22   don't know how the process will occur.  Or how to even

23   further that process.

24       Q.    You mentioned in this 2012 meeting that

25   they ought to speak with lawyers.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 116 of 285

1          Did you-all provide access to counsel for

2     these individuals impacted by Miller?

3          **A.    No.**

4          Q.   Have you ever provided access to counsel

5     for individuals impacted by Miller?

6          **A.    Not that I'm aware of.**

7          Q.   Has any question ever been raised that was

8     directed to an attorney so that the attorney could

9     answer it for the inmate?

10         **A.    I'm not sure I understand that question.**

11         Q.   So has any IPO or analyst shared with you

12    conversations they've had with an inmate saying they're

13    seeking legal advice, we should have a lawyer speak to

14    them?

15         **A.    I don't recall any conversations where --**

16    **of that nature.**

17         Q.   So it's the IPOs, who've had the contacts

18    with the inmates at MDOC, to let them know about

19    Senate Bill 590?

20         **A.    This -- these minutes are distributed, and**

21    **so the IPO supervisor gets copies of those minutes.  So**

22    **this is some direction as to how to proceed because**

23    **this was so early in the development.**

24         Q.   Okay.  Well, I'll move us forward from

25    2012.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 117 of 285

1          I'm going to show you what's been marked as

2    Exhibit No. 9.

3          (Deposition Exhibit No. 9 was marked for

4    identification.)

5    BY MS. QUINN:

6          Q.   This is an email exchange dated January 25,

7    2016, correct?

8          **A.   Yes.**

9          Q.   And can you tell us what this email

10   exchange is all about?

11         **A.   Looks like it's a new article regarding**

12   **Supreme Court rulings on juvenile life without**

13   **sentences.**

14         Q.   And the email from Kelly Dills indicates

15   "legal is reviewing at my request."

16         Is that right?

17         **A.   Yes.**

18         Q.   And it appears that she's referring to this

19   article about Miller's retroactivity as decided by

20   Montgomery; is that right?

21         **A.   I -- I would assume that her request for**

22   **legal was based on this article.**

23         Q.   And the article was shared by David Owen;

24   yes?

25         **A.   Yes.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL    Document 134-3    Filed 06/12/18    Page 118 of 285

1    Q.   Who is he?

2    **A.   David Owen, I believe at the time, was**

3    **probably our informational -- public information**

4    **officer.**

5    Q.   And this article again relates to

6    Miller being applied retroactively; is that right?

7    **A.   Yeah.  It references the Montgomery**

8    **decision.**

9    Q.   So between 2012 and 2016, there was no

10   action taken by the parole board as it awaited word of

11   whether or not Miller was going to be retroactive;

12   is that a fair statement?

13   **A.   Repeat that.**

14   Q.   For these JL WOP people that you mentioned

15   in 2012 to the analysts, no action was taken on cases

16   between 2012 until 2016 until it was decided that

17   Miller was going to be retroactive; is that right?

18   **A.   Our first hearings for any juvenile life**

19   **without was in 2016, I believe, yes.**

20   Q.   So between 2012 and 2016, what, if

21   anything, did MDOC or the parole board do with regard

22   to the JL WOP guys and gals?

23   **A.   We did not have any hearings.  I don't know**

24   **of anything that we did do in that time period.  I**

25   **can't tell you.  I know we did not do hearings at that**

Pohlman USA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 119 of 285

1    point.

2         Q.   Did you, or anyone else at MDOC,

3    participate at all in the legislative process relating

4    to Miller's implementation in Missouri?

5         **A.   There was -- I was not involved in**

6    **developing that 590.  I'm not sure of who was involved**

7    **in those meetings.**

8              **(Deposition Exhibit No. 10 was marked for**

9    **identification.)**

10   BY MS. QUINN:

11        Q.   I'm going to show you what has been marked

12   as Exhibit No. 10.

13             Can you please take a look at this set of

14   email exchanges relating to juvenile life without

15   parole cases in Senate Bill 590.

16        **A.   Okay.**

17        Q.   Have you seen these before?

18        **A.   I have seen some of them for sure.  The**

19   **May 26, 2016 memo from Chairman McSwain I have seen.**

20        Q.   So from these materials, is it safe to say

21   that Kelly Dills was providing interpretations of

22   Senate Bill 590 for the parole board and parole staff?

23        **A.   It appears that Ms. Dills was involved with**

24   **these emails, yes.**

25        Q.   So in particular, there's a memo dated May

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 120 of 285

1    26, 2016 from Kelly Dills to Ellis McSwain, Chairman,

2    and Julie Kempker, state supervisor -- chief state

3    supervisor?

4         A.   Yes.

5         Q.   Does this look familiar to you?

6         A.   Yes.

7         Q.   And so here she lays out five factors, it

8    looks like, for consideration, in her mind?

9         A.   Yes.  In addition to those under 565.033.

10        Q.   Okay.  So she's delineating here the five,

11   however; yes?

12        A.   Yes.  This appears to be how it was written

13   in the statute.

14        Q.   Okay.  And was this memo shared more

15   broadly amongst staffers, if you're aware?

16        A.   I believe -- I believe this was sent out to

17   the analysts.

18             I would also believe -- it doesn't have

19   a -- doesn't say who it was sent to other than the

20   chairman and Ms. Kempker -- but I believe it was --

21   this was shared with the analysts.  Ms. Kempker may

22   have shared it with the other staff.  That, I can't

23   confirm a hundred percent.

24        Q.   And Kelly Dills is not a lawyer, correct?

25        A.   Not that I'm aware of.

Pohlman USA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 121 of 285

1    Q.   Safe to say the board deferred to

2   Ms. Dills' leadership authority for implementing

3   Senate Bill 590?

4       **A.   I think it's fair to say that she**

5   **was -- she wrote this email and was -- if that's -- so**

6   **this was one of the first emails that had gone out to**

7   **staff, so it would be fair to say that, yes, she did**

8   **present this out to the board chief state supervisor.**

9       Q.   So prior to this exhibit, we looked at an

10  exhibit where Ms. Dills was noting that she sent this

11  to legal, the article relating to Montgomery; is that

12  right?

13      **A.   Yes.**

14      Q.   Are you aware of any board member taking

15  the initiative to seek guidance on the meaning of

16  Montgomery?

17      **A.   I'm not aware of any board member**

18  **specifically doing that.**

19      Q.   Are you aware of any board member --

20      **A.   I would say that I believe that Ms. Dills**

21  **and Mr. McSwain, who was chairman at the time, were**

22  **involved in discussions related to this.  But I do not**

23  **know whether Mr. McSwain contacted an attorney or**

24  **talked to our legal counsel directly.**

25      Q.   Was it your impression during this time

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 122 of 285

1    that Ellis McSwain was deferring to Ms. Dills, again,

2    to take leadership in the implementation of Senate Bill

3    590?

4          **A.   I believe Ms. Dills was intrinsically -- I**

5    **believe she was involved in the development of how we**

6    **would -- how we would implement Senate Bill 590.  Yes.**

7          Q.   Are you aware of the board doing anything

8    different from what Ms. Dills recommended?

9          **A.   Not that I'm aware of at this time.**

10          Q.   And to be clear, my question isn't just to

11    that exhibit.  At all, ever?

12          **A.   Um, I think, as I spoke previously, I think**

13    **there was a disagreement as to whether circumstances**

14    **could be considered when reviewing a juvenile life**

15    **without case.  And I think that Ms. Dills believed that**

16    **circumstances could not be considered.**

17          Q.   And the board disagreed with her in that

18    respect?

19          **A.   Yes.  Based on the statute, and how the**

20    **juvenile life without statute referenced the 033**

21    **statute that outlines circumstances, they believe, as I**

22    **do, that circumstances can be considered.**

23               **It's not the only thing to be considered,**

24    **obviously, but can be considered as part of the overall**

25    **determinations.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 123 of 285

1    Q.   So you've spoken to each board member, and

2    each one has told you what you just said there?  That

3    here are our reasons why we believe circumstances of

4    the offense should be considered in these 590 hearings?

5    **A.   Did I talk to each board member**

6    **individually?  No.**

7    Q.   So what leads you to believe that's their

8    thinking?

9    **A.   I believe it was discussed at one point,**

10   **briefly, at a board meeting.  I believe.  That whether**

11   **or not -- what their belief was.**

12           **Now, what board meeting, the date of that,**

13   **I do not know.  I'm not sure if it was a conversation.**

14   **It wasn't a board vote that we're going to -- who wants**

15   **to vote to do this.  It was more of an explanation of**

16   **the statute.**

17   Q.   And who explained the statute?

18   **A.   I believe it was probably Mr. Baker.**

19   Q.   Who is that?

20   **A.   Charlie Baker.  An analyst.**

21   Q.   Okay.  I see.  All right.

22           (Deposition Exhibit No. 11 was marked for

23   identification.)

24   BY MS. QUINN:

25           I'm going to show you what's been marked as

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 124 of 285

1    Exhibit No. 11.

2              And so you have been mentioning various

3    provisions in your testimony.

4         **A.   Yes.**

5         Q.   558.047.  565.033.  Also in this exhibit

6    you'll see 565.034.

7              Do these look familiar to you?

8         **A.   Yes.**

9         Q.   And what are these?

10        **A.   These are statutes pertaining to offenders**

11   **who are under 18 at the time of their offense, for**

12   **murder first-degree, that were sentenced to life.  To**

13   **life or -- it's the product of Senate Bill 590.  My**

14   **understanding.**

15        Q.   And it sounded like you took issue with

16   Ms. Dills not adequately taking into account the ten

17   factors under 565.033?

18        **A.   I'm not sure.  "Take issues."  Explain what**

19   **that means.**

20        Q.   You disagreed with her evaluation, or --

21        **A.   I disagreed with the specific subsection 1,**

22   **No. 2 of 565.033, that indicates nature and current**

23   **circumstances of the offense committed by the**

24   **defendant.**

25             **And that that allows consideration as one**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 125 of 285

1  of the many factors when determining whether or not a

2  juvenile life without, you know, when a parole date

3  should be set.

4      Q.   And so how are these ten factors, and then

5  the five factors under 558.047, to be considered or

6  weighed in your mind?

7      A.   Weighed?

8      Q.   How do all these factors play into an

9  evaluation?

10     A.   I don't think that we weigh them one over

11 the other.  There's just many factors that are used to

12 consider when making parole decisions on these cases.

13 There's no -- we have no system of weighing one over

14 the other.

15     Q.   What is the system that's used to consider

16 the various factors when a JL WOP -- previously

17 sentenced JL WOP individual comes before the board?

18     A.   What is the system?

19     Q.   Yeah.

20     A.   We have a parole hearing.  Parole

21 eligibility hearing with them.

22          We have a prehearing report that outlines

23 the offender.

24          We receive documents from other people

25 outside that's considered.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 126 of 285

1          We have victims' testimony.

2          We have prosecutors.  All that stuff plays

3  a role in making a discretionary decision of the board

4  whether to release or not.

5          We look at the maturity.

6          We look at conduct.

7          We look at has this offender progressed

8  while he's there.  What programs does he do?  There's

9  just a vast array of things that we look at.

10          We look at how -- we're looking at

11  childhood.  How was he, you know, what was it like at

12  that point.

13          A lot of different -- we look at home

14  plans.  Do you have a home plan?  Do you have family

15  support?

16          There's -- all those things are looked at,

17  as with any other, we just make sure, these additional

18  items, that we do take into consideration, and that we

19  need to make sure that we do consider prior to making a

20  decision on parole.

21     Q.   So is it your position the board is

22  investigating the childhood of each one of these

23  individuals that comes before them?

24     A.   We are not investigating a child.  We have

25  information, you know, in our prehearing report that we

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 127 of 285

1    respond to.

2         Q.   And somebody hasn't gathered that

3    information, through their attorney or otherwise, that

4    is not put before the board; is that right?

5         A.   If it's -- if it's not in the prehearing

6    report, and it's not put together as a packet through

7    an attorney, or through the offender or family members,

8    it probably would not.

9             It may not be available with our prehearing

10   report, but it should include some of that information.

11   Touch on those items.

12        Q.   What do you mean "touch on them?"

13        A.   Well, we have a prehearing worksheet for

14   juvenile life withouts that are -- IPO -- institutional

15   parole officers are using.

16        Q.   Let's talk a little bit more about some of

17   these documents being used by the IPOs and others.

18             (Deposition Exhibit No. 12 was marked for

19   identification.)

20   BY MS. QUINN:

21        Q.   I'll show you Exhibit No. 12.

22             Take a look and let me know what this

23   document is.

24        A.   This is an analysis of Senate Bill 590 for

25   juvenile life without reviews.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 128 of 285

1      Q.   And you've seen this item before?

2      **A.   Yes.**

3      Q.   And this is a memo written by Kelly Dills

4  to the board, to Ellis McSwain as chairman of the

5  board, on May 26, 2016; is that right?

6      **A.   May 26th, 2016, yes.**

7      Q.   And did you see this memo at that time or

8  since then?

9      **A.   This memo came out fairly close -- I would**

10  **have seen it around the same time that it was**

11  **delivered.**

12     Q.   And in her memo Ms. Dills indicates that,

13  "existing procedures and practice, to a degree" --

14     **A.   Where are you reading that at?**

15     Q.   Good question.  So after the list of five

16  items.

17     **A.   "Through existing procedure and practice,**

18  **the items above are presented during the parole**

19  **consideration process to a degree.  The second point**

20  **outlined in the statute will be more difficult to**

21  **substantiate."**

22     Q.   And what's your understanding of what

23  Ms. Dills is conveying there?

24     **A.   That efforts to determine some of these**

25  **issues regarding vocational programming, and education**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 129 of 285

1  and stuff, are very -- more, I guess, objective,

2  because we would have information on those.

3           Increased maturity, since the offense

4  occurred, is somewhat subjective.

5           And subsequent growth, I mean, technically,

6  if you -- you know, some of these things are very

7  subjective.  Everybody from 18 on, I mean, I've grown

8  physically since I was 18.  And matured physically

9  since I was 18.  So is that what, you know, some of

10 that stuff is subjective as to what you -- how you

11 interpret that.

12          And I think some of those are going to be

13 more difficult to substantiate.  We've never taken a

14 position that No. 2, just reiterate from what -- we've

15 never taken the position that No. 2 is only, Well, have

16 you become bigger, and stronger, and age-wise matured,

17 by aging?  That's not what it is.

18          It's more about how -- have you growth --

19 have you grown, growth, developmentally.  Have you

20 shown growth in your attitudes?  And of those type of

21 things.  Those are difficult to quantify.  And I think

22 that's what that meant, is some of these things that

23 were listed in the statute are difficult to quantify.

24      Q.   And what efforts has the board taken to

25 quantify them?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 130 of 285

1      A.    As far as -- well, we're relying on our

2   institutional parole officers.

3           If we have information from, that we had

4   previously, like, psych evals, things like that?

5   We -- I would assume we would probably use that

6   information if it's available.

7           Information received from outside parties.

8   We use that.

9      Q.   So let me --

10     A.    Interviewing the offender.  A lot of times,

11  interviewing the offender is one if the best things.

12  Because they -- a kid is going to talk and present

13  themselves differently than an 18-year-old or

14  17-year-old, than at the time of arrest, than a person

15  who is sitting before you 25-plus years later.

16     Q.   So just to be clear, all of these JL WOP

17  defendants who have hearings, they haven't had the same

18  IPO all along, correct?

19     A.    No.  They're in different institutions so

20  they will get different institutional parole officers.

21     Q.   And for many of these folks, the very first

22  time they ever met the IPO, is for prehearing report

23  for this JL WOP?

24     A.    Not a hundred percent, but I would assume

25  that's correct because there -- the -- they were

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 131 of 285

1    ineligible for parole prior to that.  So I would say

2    they would not have had contact, but I don't know for

3    certain.

4         Q.   Beyond talking to the offender in this

5    prehearing interview, what else is the IPO required to

6    do to prepare for the hearing?

7         A.   Part of that the juvenile life without

8    worksheet.

9              MR. SPILLANE:  You're looking at what's

10   stamped 126.

11             THE WITNESS:  This is something that the

12   IPO fills out in addition to that to generate the

13   prehearing report.

14             MR. SPILLANE:  I'm sorry.  I misspoke.

15   Bates stamp 23.  I read the digit above it.

16   BY MS. QUINN:

17        Q.   So here's what we're gonna do if it's okay.

18   I have a marked document that I will show to you, but

19   your point is that there's a worksheet that the IPO

20   works through; is that correct?

21        A.   Yes.  This assists the IPO in obtaining

22   information required, yes.

23        Q.   And is there writing on that?

24             MR. SPILLANE:  The copy I have has my

25   exhibit label on it.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 132 of 285

1    BY MS. QUINN:

2          Q.   I don't mean to confuse matters.

3               You reference that the IPO interviews the

4    offender and there's a worksheet that is used for that

5    process?

6          **A.   Yes.**

7          Q.   We'll return to that subject and this

8    document shortly and you can give that back to counsel

9    if you wish.

10              We'll stick with the exhibit that is before

11   you, Exhibit No. 12.

12         **A.   Okay.**

13         Q.   So we talked about Kelly Dills pointing out

14   some of the challenges of using existing practices and

15   procedures to satisfy 590.

16              What does she say about risk assessment

17   tools being used, if anything?

18              And I'll point you to the

19   second-to-the-last full paragraph starting with the

20   fifth point.

21         **A.   "The risk reduction success, using**

22   **evaluated tool and corroborated by satisfactory**

23   **institutional adjustment participation in**

24   **rehabilitative services or efforts coupled with the**

25   **supportive community placement plan."**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 133 of 285

1        Q.   All right.  And so you've indicated earlier

2  that you've seen this memo before?

3        **A.   Yes.**

4        Q.   And what validated tool is she referencing?

5        **A.   That, I'm unsure if she's talking to the**

6  **salient factor score.**

7        Q.   You're overseeing all these hearings now;

8  yes?

9        **A.   Am I overseeing hearings?**

10        Q.   Yes.

11        **A.   I don't oversee the hearings.  I supervise**

12  **the analysts who are involved in the hearings.**

13        Q.   All right.  So what validated tool is being

14  used by the analysts, or anyone else, in these

15  hearings?

16        **A.   That, I am unsure of.  Because I**

17  **would --  I'm not -- I don't want to speculate.**

18        Q.   Okay.  I'm going to show you what's been

19  marked as Exhibit 13.

20        (Deposition Exhibit No. 13 was marked for

21  identification.)

22  BY MS. QUINN:

23        Q.   This is a July 13, 2016 email notifying

24  people at the parole department that Governor Nixon

25  signed Senate Bill 590 into law.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 134 of 285

1          Does that sound about right?

2     A.   Yes.

3     Q.   Were you part of this email exchange?

4     A.   I don't -- I don't believe I was involved

5 as a part of this email exchange.  From what I can

6 tell.

7     Q.   And, again, it's Kelly Dills and

8 Ellis McSwain in conversation it appears from this

9 email, correct?

10    A.   The email was from -- looks like it was

11 sent from Chairman McSwain to Kelly Dills and copied to

12 Julie Kempker.

13    Q.   And then he invites her, Kelly, let's

14 discuss tomorrow?

15    A.   Okay.

16    Q.   Were you part of that conversation or any

17 discussions immediately following Senate Bill 590 being

18 signed into law?

19    A.   I don't remember any specific discussions

20 with Mr. McSwain or Ms. Dills.  I don't remember any

21 discussions.  I believe I was probably notified it was

22 signed into law at some point.

23    Q.   But it doesn't sound like you were in that

24 inner circle group who are developing responses at that

25 moment?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 135 of 285

1          **A.    Yeah.  I don't believe I was.**

2              **(Deposition Exhibit No. 14 was marked for**

3      **identification.)**

4      BY MS. QUINN:

5          Q.   All right.  I'm going to show you

6      Exhibit 14.

7              So here's another email exchange from Ellis

8      McSwain to Kelly Dills from July 19, 2016; is that

9      right?

10         **A.    Yes.**

11         Q.   I don't see your name on this email

12     exchange anywhere.

13         **A.    No.**

14         Q.   Have you seen this information before or

15     this exchange before?

16         **A.    I don't recall seeing this specific email.**

17     **No.**

18         Q.   There is a reference in this on the second

19     page to "we will schedule all hearings within 90 days

20     of processing the petition."

21         **A.    Yes.**

22         Q.   Are you aware of where that 90-day period

23     came from?

24         **A.    Appears that the 90 days was to allow time**

25     **to conduct an investigation as to the elements outlined**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 136 of 285

1   in the statute.

2           Looks like we needed additional time to

3   schedule a hearing, because of -- these files were not

4   parole -- did not have parole consideration previously,

5   so our files would have been very limited as to what

6   information we would have had.

7       Q.   And she indicates, as you've just said,

8   that these were not previously parole eligible and will

9   have no prior file material, and as offenses have been

10  25 years ago, materials may be difficult to obtain.

11          Do you see that section?

12      A.   Yes.

13      Q.   What efforts are being made to obtain

14  materials relating to these cases?

15      A.   I'm not -- I'm not sure I know what

16  specific efforts are to obtain information.  Some

17  things, offense reports, circumstances of the offense,

18  we have a process already in place to request those

19  types of -- that material.

20          Looks like that there's some access to be

21  procured through the Attorney General's Office.  But as

22  far as what processes are in place to provide those, I

23  am not sure.

24      Q.   What's an offense report referring to?

25      A.   Circumstances of the offense.  Police

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 137 of 285

1    report.  Somebody gets arrested, the police write an

2    offense report or an arrest report.

3         Q.   So in your mind an arrest report is the

4    same as the circumstances of the offense?

5         A.   We get circumstances for an offense through

6    an arrest report, and through other documents,

7    including, like, we would have -- sometimes we have the

8    complaint, things like that.

9         Q.   Sometimes you don't, correct?

10        A.   You mean as far as at the time?

11        Q.   At the time of the hearing.

12        A.   Generally, we're -- on all these juvenile

13   life withouts, I believe we would have the offense

14   reports.

15        Q.   I asked about the complaint.

16        A.   That, I am not sure.

17        Q.   Have you looked in all of the files for the

18   JL WOP hearings to see what's in there?

19        A.   As far as?

20        Q.   Do you know what's in the file?

21        A.   I know what our files contain.  Now,

22   whether or not there's a complaint attached in that

23   file, that, I don't know.

24        Q.   Have you looked in every file?

25        A.   I have not looked in every file to make

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 138 of 285

1    sure that every piece of paper has a complaint, no.

2         Q.   So this Exhibit 14, Ms. Dills indicates to

3    Chairman McSwain, "And I met last week to piece a plan

4    together with regard to how we will process petitions

5    received by offenders since -- prior to August 28, 2016

6    to life without parole."

7              Were you part of that meeting to piece

8    together a plan?

9         A.   I don't remember attending a specific

10   meeting with Chairman McSwain and Ms. Dills on the

11   juvenile life withouts.

12             There may have been circumstances outside

13   that meeting where Ms. Dills may have asked a question

14   about what do you think about this, what do you think

15   about that.  But a specific meeting with Chairman

16   McSwain, I don't remember attending a specific meeting.

17             (Deposition Exhibit No. 15 was marked for

18   identification.)

19   BY MS. QUINN:

20        Q.   Okay.  I'm going to show you Exhibit 15 at

21   this point.

22             This is a July 29, 2016 email with a draft

23   petition and petition process for JL WOP cases;

24   is that right?

25        A.   Yes.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 139 of 285

1    Q.   And, by the way, during this time -- strike

2  that.

3         Were you part of this conversation or

4  process to create this sample petition?

5    A.   No.

6    Q.   But you received this memo or have seen

7  this memo relating to the IPOs engaging with offenders

8  and offenders being given notice of their ability to

9  make the petition?

10   **A.   Yeah.  I believe -- this sample petition is**

11 **not unfamiliar, so I believe, yes, I have received it.**

12   Q.   I just didn't hear you.

13   **A.   Yes.  The sample petition is familiar, so**

14 **at some point I did see this.**

15   Q.   And you've not changed that petition since

16 you stepped into Kelly Dills' role; is that right?

17   **A.   No, there's been no changes to the**

18 **petition.**

19   Q.   And you've not changed that process for how

20 notifications and submitting the petition takes place?

21   **A.   No.**

22        **(Deposition Exhibit No. 16 was marked for**

23 **identification.)**

24 BY MS. QUINN:

25   Q.   And here's Exhibit 16.  And I'd

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 140 of 285

1 imagine -- it appears that this is the final petition,

2 not just a draft, being shared with the board and other

3 parole officials; is that right?

4     **A.   Yes.**

5     Q.   And have you seen these materials to the

6 July 29th memo and the final petition attached to this

7 email stack?

8     **A.   I have.  I believe I have seen this before.**

9 **And the final petition, yes.**

10     Q.   And again, no changes to that petition have

11 taken place?

12     **A.   No changes to the petition have taken**

13 **place.  I mean, obviously Ms. Dills -- I don't believe**

14 **they're coming in to Ms. Dills.  She's not receiving**

15 **them since she's in field operations.  So those will**

16 **now be coming to me.  I would get -- I don't know if**

17 **she's still getting those are not.**

18     **I still -- my role in these juvenile life**

19 **withouts has not changed, in that I'm the one -- I get**

20 **the file, review, set the hearing, and make sure that**

21 **the notice gets out to the offender and to the other**

22 **parties involved.**

23     Q.   And you were doing that when Kelly Dills

24 was in her position, too?

25     **A.   Yes.**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 141 of 285

1          Q.   I mean, you say "get the file."

2               Are we talking about the parole board's

3     file?

4          A.   Yeah.  It's a hard copy file, working file

5     that would be used.  Basically at that point there's

6     very little in it, other than the institutional face

7     sheet, which would give date of birth.

8               And there would be the sentence and

9     judgments for sure would be in there, I believe.

10    Enough to have information to set a hearing.

11              What was the age at the time of the crime.

12    What has he pled guilty or been found guilty of.  And

13    the face sheet determines the sentence structure.

14         Q.   All right.  We'll come back to that part of

15    the process.  Let me show you Exhibit 17.

16              (Deposition Exhibit No. 17 was marked for

17    identification.)

18    BY MS. QUINN:

19         Q.   Exhibit 17 appears to be minutes from the

20    August 1, 2016 parole board meeting, correct?

21         A.   Yes.

22         Q.   And there appears to be some reference here

23    to Senate Bill 590's implementation; is that right?

24         A.   Yes.

25         Q.   And you were present for this meeting?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 142 of 285

1          **A.     Yes.**

2          Q.     And here it indicates the petitions will be

3    sent to Kelly Dills and the board and analysts will

4    work together to ensure correct time calculation; is

5    that right?

6          **A.     Yes.**

7          Q.     And so this statement is referring

8    to -- when it's referring to analysts, it's a reference

9    to you as being the person who will do the time

10   calculation?

11         **A.     Yes.   The time calculations, they were all**

12   **coming to me.   If I had questions on -- if I had**

13   **questions as to application of consecutive sentences or**

14   **something like that, just like any other case we**

15   **would -- there's times we'll go to other analysts and**

16   **we'll try to make sure that we're all on the same page**

17   **on calculations.**

18              **But I was setting the consideration**

19   **hearings, and I was also calculating any -- I would**

20   **calculate when he was eligible based on the 25 for the**

21   **hearing, and also calculate minimum prison terms that**

22   **were established.**

23         Q.     And you were the single person responsible

24   for that analysis on these cases?

25         **A.     Yes.   As far as I'm aware.   Unless I was on**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 143 of 285

1    vacation.

2         Q.   And you did that without out seeing the

3    petitions themselves it sounds like?

4         **A.   The petition was part of the information**

5    **that was received.**

6         Q.   I see.

7              So you said the petitions were going to

8    Kelly and then they were going from Kelly to you?

9         **A.   Well, Kelly would review them, send them**

10   **for clerical to make up a file.  And once the file was**

11   **made up, I would calculate that.**

12             **Kelly did some preliminary calculations to**

13   **review the petition, that the age was appropriate,**

14   **under 18 at the time of the offense, that kind of**

15   **thing.  But as far as setting the hearing date, I was**

16   **responsible for that.**

17        Q.   And since Ms. Dills left her role have you

18   received any petitions?

19        **A.   There have been juvenile life withouts that**

20   **have come in.  And I couldn't tell you if those**

21   **petitions are still going to Kelly.  I would assume**

22   **they probably are not.  But she may still be getting**

23   **those, and doing her preliminary, and sending them**

24   **over.  I'd have to get back with you on that.**

25             **They still come to me in the same form they**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 144 of 285

1    always did.  The petition came.  This is a juvenile

2    life without.  Here's the file.  Can you calculate a

3    hearing date, and give it back to clerical to set the

4    hearing, send the notice to the offender.

5                 (Deposition Exhibit No. 18 was marked for

6    identification.)

7    BY MS. QUINN:

8         Q.   Okay.  I'm going to show you what's been

9    marked as Exhibit 18.  It's memo dated August 1, 2016,

10   to the board members, wardens and IPO supervisors, from

11   Ellis McSwain.

12                Have you seen this document before?

13        A.   It looks like exactly like the one I just

14   looked at.

15        Q.   They all start running together,

16   Mr. Mueller.  I can tell you.

17        A.   I would have to look at them to compare

18   them.

19        Q.   I'm not trying to be tricky about this.  It

20   is possible we have a duplicate attached to an email.

21        A.   And this is an exhibit?

22        Q.   This is 18.  I will note that No. 16 is a

23   memo dated July 29 that is quite similar.

24        A.   Yes.  I'm having difficulty.  Without doing

25   a line-by-line comparison.  That there's much

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 145 of 285

1   difference.

2       Q.   I'm just asking have you seen this?

3       A.   I have seen this.

4       Q.   All right.  So this is August 1st.  This

5   memo.  And it talks about a thorough investigation to

6   be completed so that the elements outlined in the

7   statute can be considered.  That's in the

8   second-to-the-last paragraph on the first page.

9       A.   Yes.

10      Q.   And were you privy to what that

11  investigation was supposed to be at the time, August 1,

12  2016?  Is there any further information or instructions

13  about what that thorough investigation was to be?

14      A.   Pertaining to this specific memo, I am not

15  aware of any additional discussions as to what a

16  thorough investigation meant.  I do know there was the

17  prehearing interview questionnaire that was developed.

18           At some point during this whole process,

19  after Senate Bill 590 passed, there was discussions

20  where can we find information of such.  You know, can

21  we get copies of court proceedings?  Because a lot of

22  those issues were involved.

23           I think there was questions whether or not

24  we could get that information from the Attorney

25  General's Office.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 146 of 285

1           But specific to this, I don't remember any

2    specific conversations what that exactly meant.  This

3    was a developing process based on the law that passed

4    that we were trying to figure out how to implement.

5           Q.    Okay.

6                 MS. QUINN:  Let's take a break.

7                 (A break was taken.)

8                 (Deposition Exhibit No. 19 was marked for

9    identification.)

10                MS. QUINN:  Back on the record.

11   BY MS. QUINN:

12          Q.    I'm going to show you, Mr. Mueller, after

13   our break, Exhibit 19.  And it appears to be a memo,

14   email, from August 8th, 2016, with an attached memo.

15                Have you seen these materials before?

16          A.    I don't remember seeing this specific memo.

17   But it's simply advising they signed legislation of

18   590.

19          Q.    And so this sample memo that can be posted

20   at the different sites to inform defendants of the 590

21   hearings, were you part of the creation of this

22   document?

23          A.    No.

24                (Deposition Exhibit No. 20 was marked for

25   identification.)

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 147 of 285

1    BY MS. QUINN:

2        Q.   I'm going to show you Exhibit No. 20, which

3    is a stack of these memos.  They appear to be the final

4    versions that ultimately got posted at the different

5    facilities.

6        **A.   Okay.**

7        Q.   Do these look familiar to you?

8        **A.   Only in review from the discovery stuff.  I**

9    **was not part of developing this or posting.  I would**

10   **assume they would post them somewhere in the**

11   **institution that is accessible to all inmates, but**

12   **that's an assumption.**

13       Q.   Do you know if these are still posted at

14   the facilities?

15       **A.   I couldn't tell you that.**

16       Q.   In your role, are you doing anything to get

17   word out, to continue to get word out to folks who

18   might be impacted by Senate Bill 590?

19       **A.   In my role am I continuing to get word out**

20   **to people?**

21       Q.   Uh-huh.

22       **A.   No, I have not sent anything out to the**

23   **inmate population.**

24       Q.   Now, we talked earlier about the notices

25   being provided to inmates who might be impacted by

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 148 of 285

1   Senate Bill 590 and the IPOs being the individual to

2   have one-on-one communications with the inmates; is

3   that right?

4   **A.   They would be the ones that has direct**

5   **access to the inmate, yes.**

6   Q.   And they're required, in essence, to have a

7   conversation with that person before they go before the

8   board; is that right?

9   **A.   Before they go before the -- before the**

10  **petition or before they have a hearing?**

11  Q.   Before they have a hearing.

12  **A.   Yes.  An institutional parole officer.**

13  **Sometimes it's their supervisor, in their absence,**

14  **would be the one that do the prehearing report,**

15  **interview the offender, that kind of thing.**

16  Q.   And these IPOs, what is their training and

17  background?

18  **A.   They would go through -- institutional**

19  **parole officers have their own training block, I**

20  **believe, on like conducting interviews, things like**

21  **that.**

22  **But that, I am -- as far as the specific**

23  **training, every institutional parole officer goes**

24  **through training just as a field parole officer.  But**

25  **specific to that, I am not -- I could not tell you.**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 149 of 285

1    Q. And are you aware of whether they were

2 given any trainings relating to Miller vs. Alabama?

3    **A. I'm not aware of that.**

4    Q. Are you aware of any scripts or information

5 beyond the worksheet to gather information, scripts

6 about sharing information that were given to these IPOs

7 under 590?

8    **A. Can you explain that?  I'm not sure what**

9 **you mean.**

10    Q. So it sounds like the IPO in their job is

11 supposed to be gathering some information from the

12 offenders to share with the board relating to Senate

13 Bill 590 hearings?

14    **A. Yes.**

15    Q. Is there any guidance, script, information

16 given to the IPOs about what information should or

17 should not be shared with the offenders?

18    **A. I'm not sure if institutional parole**

19 **services gave guidance or what guidance they did give.**

20    Q. And the board hasn't told you to ensure

21 that they are not giving misinformation or wrong

22 information?

23    **A. I think the board has the belief that our**

24 **IPOs are acting in good faith and are always giving us**

25 **good information and not wrong information.**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 150 of 285

1      Q.   But nobody has instructed them directly?

2  You've not instructed them directly:  Here's what you

3  shouldn't say when you're talking to an offender?

4           MR. SPILLANE:  I'll object to the compound

5  question.  Instructed them, or anyone had instructed

6  them?

7           MS. QUINN:  That's a fair objection.

8  BY MS. QUINN:

9      Q.   Have you instructed IPOs not to share

10  certain information with offenders who are seeking 590

11  hearings?

12      **A.   No.**

13      Q.   Are you aware of the board instructing the

14  IPOs in this way?

15      **A.   Not that I'm aware of.**

16      **(Deposition Exhibit No. 21 was marked for**

17  **identification.)**

18  BY MS. QUINN:

19      Q.   I'm going you show what's been marked as

20  Exhibit 21 for purposes of this deposition.

21      **A.   Okay.**

22      Q.   This appears to be an email exchange

23  involving Ellis McSwain and Kelly Dills and other

24  parole officials.

25           On page two it appears there's some

Pohlman USA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 151 of 285

1    instruction to change the way Senate Bill 590 is talked

2    about?

3         A.   Oh, the "Should read?"

4         Q.   Yes.  Can you take a look at that and tell

5    me what that means?

6         A.   This gets to, page two, the initial

7    sentence above, "Offenders will have to serve.

8    Offenders will have to have been under the age of 18

9    when the offense was committed, and must serve 25 years

10   of their sentence, before being allowed to petition a

11   review for -- by the parole board."

12        That was changed to, "offenders will have

13   to be -- have to have been under the age 18 when the

14   offense was committed, and must have served 25 years of

15   the sentence of life without parole before being

16   allowed to petition a review."

17        What I believe this does is, the "should

18   read," reflects what the statute advises, where the

19   sentence, "you'd have to serve 25 years of the sentence

20   of life without parole," not "their sentence."

21        Because some people can take their sentence

22   as being their whole aggregate sentence structure.

23   That you've got, you know, 25 years on the juvenile

24   life without, plus a consecutive ACA, plus a

25   consecutive ACA, the 25 years, you can petition in

Pohlman USA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 152 of 285

1    25 years by statute.  But this more closely reflects

2    what the statute is.  And both of them are going to be

3    eligible to hear after they serve 25 years on juvenile

4    life without.

5             I think it probably goes -- I believe it

6    goes more to what you do with consecutive sentences

7    with statutory minimums.

8        Q.    And you would agree that Senate Bill 590 is

9    silent on that score, correct?

10       A.    Can you rephrase that?

11       Q.    Senate Bill 590 does not talk about what

12   you've referred to as statutory minimum terms on

13   non-JL WOP sentences?

14       A.    I believe -- I believe the statute, the way

15   it is written, requires 25 years to be served on that

16   specific sentence.

17             We apply statutory minimums outside of 590

18   as -- because that is to be served -- the statute

19   requires some offenses to serve a period of time prior

20   to being eligible.  Some of them are restricted, some

21   are non-parolable.

22             So at this point in reviewing this, I don't

23   think -- I don't know if it addresses specifically

24   consecutive sentences, but there are other statutes

25   that require time -- statutory time to be served on.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 153 of 285

1  Like an ACA three years, things like that.  And do not

2  account for that in a sentence structure -- because it

3  did not say "serve 25 years" on the entire sentence

4  structure, we would -- it's our belief that he still

5  has statutory mandates of time to serve.

6          Q.   And who's the "our" in that sentence?

7  Who's the "our" that believes that?

8          A.   The analysts.  We've run -- I am trying to

9  determine whether -- I think I would assume we probably

10  have run that through our legal.

11          Q.   But you don't know?

12          A.   Um, I'm not a hundred percent, no.

13          Q.   And you're the one on the front who's doing

14  the calculations though?

15          A.   Yes.

16          (Deposition Exhibit No. 22 was marked for

17  identification.)

18  BY MS. QUINN:

19          Q.   I'm going to show you what's been marked as

20  Exhibit 22.

21          Have you seen these materials before,

22  Mr. Mueller?

23          A.   Yes.  I became aware of this during the

24  discovery.

25          Q.   I think you also earlier made reference to

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 154 of 285

1  a worksheet; is that right?

2       **A.   Yes.**

3       Q.   And this contains the worksheet that you

4  were referencing; is that true?

5       **A.   This contains the juvenile life without**

6  **worksheet that I referenced.  I assume.  I don't know**

7  **whether the date -- this date is 8-24-16 -- whether**

8  **that's been updated or changed.  As far as I know, this**

9  **is still in effect.**

10      MS. QUINN:  Let's go off the record a

11  minute.

12      (An off-the-record discussion was held.)

13  BY MS. QUINN:

14      Q.   So this August 24, 2016 juvenile life

15  without worksheet, is this still used today?

16      **A.   I believe so.**

17      Q.   And who is it that completes this form?

18      **A.   This would be the institutional parole**

19  **officer who was assigned to conduct the prehearing**

20  **interview and write the prehearing report.**

21      Q.   And have you seen one of these once it's

22  been completed?

23      **A.   I have not.**

24      Q.   Do you know if they're completed in ink or

25  if there's a typed version?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 155 of 285

1      A.    I do not.

2      Q.    What happens, if you know, to this form,

3  once it's completed?

4      A.    I do not know what happens to the form.  I

5  believe what happens to the information that is gained

6  through this form is included in the prehearing report

7  that's provided to the board at the time of the parole

8  consideration hearing.

9      Q.    So how long before the hearing is this PHR

10 worksheet completed?

11     A.    That, I could not say.  We set the hearings

12 out around 90 days, so some time in that 90-day period.

13     Q.    And at the -- towards the end of that

14 90-day period is when the file is delivered to you?  Or

15 is it before that?

16            Strike that.

17            When in that process do you get the file

18 delivered to you?

19     A.    The file is delivered to me before this

20 process.

21     Q.    So you don't see this document?

22     A.    I don't see this document.  I'm in the

23 initial part of that process.

24            So I -- the petition comes in.  I believe

25 it's going in to Kelly.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 156 of 285

1           Kelly provides -- gets the -- checks to

2    make sure the qualifications -- checks the date.

3    Sends it to me.  I recheck the -- recalculate.  Make

4    sure that what we have is a juvenile life without.  And

5    I set the -- a parole consideration hearing at that

6    point.  And then -- and that's 90 days out.

7           So then, somewhere in that process, my

8    understanding, the IPO will do the prehearing report

9    using this as a reference guide.

10        Q.   So who creates the prehearing report?

11        A.   The IPO.

12        Q.   When you say "we create," it's not you?

13   You don't physically create it?

14        A.   Not "we" "we."  I'm saying "we" as a

15   division.  But it's the individual parole officer who

16   is assigned to do the prehearing report and get the

17   report ready for the board.

18        Q.   So it's your understanding this form then

19   doesn't get delivered to the board, instead the report

20   of the IPO gets delivered to the board?

21        A.   Yes.  This is a reference guide to get the

22   information to -- for the prehearing report.

23        Q.   And is there any instructions that say, for

24   instance, you must include this, and you may not leave

25   out, when you turn this over to the board as part of

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 157 of 285

1    your report?

2         **A.    The instructions that are on top of the**

3    **form should be include in the report.  The highlighted**

4    **information.**

5              **So the issues -- items are highlighted to**

6    **make sure that the institutional parole officer, when**

7    **they're gaining information, that this stuff be**

8    **included.**

9         Q.   And it says "should," not "must," correct?

10        **A.    Yes.  It says "should."**

11        Q.   Are you aware of any report being bounced

12   back to an IPO for failing to include certain

13   information relating to juveniles life without parole?

14        **A.    I'm not aware of that.  I couldn't tell**

15   **you, because the report -- if they didn't include this**

16   **information, it should be bounced back from the**

17   **institutional parole officer's supervisor before it**

18   **gets finalized and sent to the board, because the final**

19   **product should have these highlighted items.**

20        Q.   Is there a Senate Bill 590 factors?

21        **A.    No.**

22        Q.   Anything along those lines, to suggest,

23   here are the juvenile life without parole features the

24   board needs to focus on in those reports?

25        **A.    I don't believe our hearing reports**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 158 of 285

1  **specifically say these are the five additional items**

2  **that have to be considered and here's what we found**

3  **out, no.**

4      Q.   And you mentioned the five factors.

5      So on page 12 of this report, are these the

6  five factors that you're referencing from

7  Senate Bill 590?

8      A.   **I'd have to look at Senate Bill 590 to make**

9  **sure.**

10      **Actually, I'd like to see the statute.**

11  **They are not worded identical to the statute, but they**

12  **are identified in these items.  There's four items**

13  **listed and some of them are combined.**

14      Q.   So the worksheet that is given to the

15  IPOs don't even use the exact language of Senate

16  Bill 590; is that what you're saying?

17      A.   **The worksheet does not outline the**

18  **identical verbiage in Senate Bill 590, or more**

19  **importantly, the statute.**

20      Q.   And then it takes those factors listed at

21  the end of page 12 and asks the IPOs to consider these

22  things using the seven critical criminogenic needs.

23      Are the seven criminogenic needs a part of

24  Senate Bill 590?

25      A.   **No.**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 159 of 285

1    Q.   And these parentheticals that appear to

2  limit the actual information, like mental health

3  medications, diagnosis, IQ, are those things taken from

4  Senate Bill 590?

5         MS. SPILLANE:  I'm going to object to the

6  form of the question in that it assumes the

7  parentheticals limit, as opposed to doing something

8  else.

9         Subject to that, you may answer, sir.

10        THE WITNESS:  These -- what I believe is

11  that statute requires these additional items to be

12  considered.  But there are also other items that we

13  consider with any parole offender that's going up for a

14  parole hearing.

15        So some issues -- you asked about the last

16  statement that you made -- you want to know whether

17  they were in Senate Bill 590, which ones did you speak

18  of?

19    Q.   Well, the term "seven critical criminogenic

20  needs," is that term something derived from Senate Bill

21  590?

22    **A.   No.**

23    Q.   And then the term "et cetera" is not used

24  anywhere with these parentheticals to suggest there may

25  be others; is that right?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 160 of 285

1      A.    Et cetera is not used where?

2      Q.    At the end of the parenthetical language?

3      A.    In the statute?

4      Q.    At the end of page 12 there.  The end of

5      the form.

6      A.    It's not.

7            When you read the consideration below with

8      the brief summary of strengths, weaknesses, utilizing

9      the seven criminogenic needs, associates recreation, they

10     list those out and then these additional things that

11     were outlined in Senate Bill 590 are in the statute.

12           So they're going to be doing a parole

13     consideration hearing with consideration of what they

14     would normally do in any parole consideration hearing

15     and making sure that they address these additional

16     items that were developed based on Senate Bill 590.

17     Q.    You mentioned this form doesn't go to the

18     board; yes?

19     A.    No.  It doesn't go to the board.

20     Q.    And it also doesn't go to the inmate,

21     right?

22     A.    No.  This is a questionnaire used to

23     develop the prehearing report.

24     Q.    And so it also doesn't get involved with

25     defense counsel who may be involved in defense of the

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 161 of 285

1    inmate?

2          **A.    Not to my knowledge.**

3          Q.    Do you see referenced on the first page in

4    this email in bold, about midway through, "The first

5    Petition has been processed and the hearing is

6    scheduled for November 2016 at ERDCC."  And it is

7    referencing Inmate Houston.  Number 155400.

8          **A.    Okay.**

9          Q.    Were you involved at all in Inmate Houston,

10   155400 having his hearing set up?

11         **A.    I would have to look.  I believe I probably**

12   **set the -- I believe I probably set the hearing.**

13   **Because I believe I set most of the hearings.  To be**

14   **sure that that was one that I set a parole**

15   **consideration hearing for, I could not answer**

16   **definitely.  But I would say that I have -- my belief,**

17   **I probably set all hearings.  That would have been my**

18   **involvement in that case.**

19         Q.    Do you have any knowledge of why

20   Mr. Houston went first?

21         **A.    Have no idea.**

22         Q.    That name Houston doesn't mean anything to

23   you?

24         **A.    No.  I generally don't remember a whole lot**

25   **of names regarding offenders.  But if it came first, it**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 162 of 285

1    was probably one that we received.

2              I believe we were putting them -- once we

3    received them and verified that they were eligible for

4    a juvenile life without hearing, then they processed

5    them.  But I couldn't tell you if that was the first

6    one that came in or not.

7         Q.   Are you aware of IPOs making initial

8    contact with inmates to recommend that they file their

9    petition?

10        A.   No.

11        Q.   So we've talked about the parole file.  We

12   know it's not in there and that's that worksheet.  You

13   mentioned that a report that's written by the IPO is in

14   the file.

15             What else is in the file?

16        A.   In the parole consideration file?

17        Q.   Yes.

18        A.   There should be correspondence.

19        Q.   From whom to whom?

20        A.   It could be support correspondence.  Could

21   be a letter from the offender.  Could be a letter.

22             There can be information from the

23   prosecutor's office.  From the victims.

24             There would be probably victim advocate

25   letters in there.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 163 of 285

1             Letters that indicate that we have notified

2    victims based on requirements.

3             There's probably -- there should be

4    sentence and judgment.

5             There will be an institutional face sheet

6    that indicates time calculations.

7             There will be an initial board action sheet

8    with my -- which would likely have my signature because

9    I was setting the initial hearings.

10            There would be a notice to the offender the

11   month of the hearing.  Another notice when it got

12   closer to scheduling the actual day of the hearing.

13            They'd get notice of the day of the

14   hearing.

15            I can't think of anything else.  I'm sure

16   that's not everything.

17     Q.   And let me clarify.  Of the items you just

18   named, which items are required must be in every parole

19   consideration file?

20     A.   Every parole consideration file should have

21   a notice to the offender of the hearing date or the

22   hearing month.

23            There should be a sentence and judgment.

24            And are we talking at the time of the

25   hearing or at the time of my setting it?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 164 of 285

1      Q.   At the time of the hearing.

2      **A.   The prehearing report will be in there.**

3           **There will be correspondence that comes in**

4      **a lot of times from the offender.  From offender's**

5      **family.  From legal counsel.**

6           **If there's additional information provided**

7      **to the board at that time that would make it to the**

8      **file.**

9      Q.   And that single physical file, who keeps

10     it?

11     **A.   That file is kept in our filing cabinets in**

12     **our office.**

13     Q.   And who gets to review it prior to the

14     hearing?

15     **A.   The file is pulled prior to the hearing and**

16     **it is given to the analyst who will be conducting the**

17     **hearing.**

18          **As far as who reviews it, the analyst can**

19     **review that file.  I don't know if they do prior to the**

20     **hearing or at the hearing.**

21          **They can review -- I believe a lot**

22     **of -- there's so much information a lot of times on**

23     **these juvenile life withouts that we review some of**

24     **that stuff prior to the hearing.**

25          **I think your organization put in quite a**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 165 of 285

1    bit of information, too, on Norman Brown.  I believe

2    that was the case.

3            Mr. Baker, I know that he told me that he

4    received that and that they had reviewed that prior to

5    the hearing, I believe.  So the board member can review

6    it.

7            The files are generally kept with the

8    analyst because they'll be bringing the files to the

9    hearing.

10           Q.   So the board members are not required to

11   review it before the hearing; is that your

12   understanding?

13           A.   There's not a requirement, no.

14           Q.   And are all these materials that are in the

15   physical file scanned and uploaded to an electronic

16   system?

17           A.   I believe so.

18           Q.   And can that electronic system be accessed

19   by all board members?

20           A.   It can be accessed by all board members, by

21   the hearing panel if they wanted to.  It should be in

22   the hard copy file also.  But it can be accessed, yes.

23           Q.   And the inmate does not get to see that

24   file; is that right?

25           A.   Our files are -- no.  Our files are a

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 166 of 285

1    closed record.  They do not get a copy of the

2    prehearing report.  They don't get a copy of the file

3    to review prior to the hearing.

4        Q.  And attorneys for the inmates are

5    prohibited from reviewing those files as well; is that

6    right?

7        A.  Yes.  They cannot review the file.  It's a

8    closed record.

9        Q.  And this initially BAS report that you

10   mentioned as traveling with the physical file, tell me

11   what the BAS form is again.

12       A.  BAS is a board action sheet.  Which one are

13   you talking about?

14       Q.  Are there multiple board action sheets?

15       A.  That's a form that we use.  There's an

16   additional form that we attach to the juvenile life

17   without cases so that we know that the hearing panel

18   addressed the additional five issues outlined in Senate

19   Bill 590, and you have a copy of that.

20       Q.  And so you have in every single instance

21   for these JL WOP hearings an additional BAS for those

22   cases?

23       A.  That, I'm not -- I would have to look.  I'm

24   unsure whether or not the first hearing had one of

25   those are not.  That is something that I'm not a

Pohlman USA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 167 of 285

1   hundred percent on.

2          Q.   There have been about 23 hearings so far,

3   yes?

4          A.   There's been more than that.  We've

5   conducted -- we actually held 27.

6          Q.   And you don't know if all 27 specialized

7   JL WOP board action sheets was attached to the physical

8   file?

9          A.   No.

10         Q.   And the physical file you already noted is

11  something that the analyst is in charge of?

12         A.   At the time of the hearing, he's the one

13  that gets that file prior to the hearing and takes it

14  with him.

15              Once the hearing is over with, they do

16  their initial vote.  Then he -- he doesn't keep that

17  file.  It goes from board member to board member to

18  review and vote on.

19         Q.   Does the prosecutor get to access the

20  parole boards' file?

21         A.   The prosecutor?  No.

22         Q.   What about the victim advocate or victim

23  services representative?

24         A.   The victim services has access to our

25  parole file.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 168 of 285

1      Q.    Why?

2      **A.    What's that?**

3      Q.    Why does she have access to it?

4      **A.    That, I can't -- I just know that she does**

5      **have access to it.  I'm not sure.  I don't think I**

6      **could tell you the reasoning why she did or didn't.**

7      **She's an employee of the Department of Corrections.**

8      Q.    And do all employees of the Department of

9      Corrections have free access to parole files?

10     **A.    No.  But our victim notification is in that**

11     **file.  So she'd have to have access to that to make**

12     **sure the victim was notified.  And information in it**

13     **comes and goes.**

14     Q.    What things are there in the file

15     containing potentially inaccurate information?

16     **A.    Inaccurate information?**

17     Q.    Something that's wrong.

18     **A.    At what point?**

19     Q.    Any point.

20     **A.    Well, the prehearing report is signed off**

21     **by the institutional parole supervisor.  That's the**

22     **checks and balances on that report.**

23            **The analyst, at the time of the hearing,**

24     **will review it.  And when they're doing hearings**

25     **they'll review it and check.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 169 of 285

1    And, for instance, Norman Brown's case,

2    initially with Norman Brown's case, there was a -- we

3    set the hearing at 25 years, plus three, plus three,

4    plus three.  That was based on the institutional face

5    sheet that was in the file at the time.

6    Now, after that point, there was some --

7    there was an institutional face sheet that since

8    structure changed, it was changed from an armed

9    criminal action to a -- either robbery first or assault

10   first.  One that did not have a mandatory percentage of

11   time to serve.  Our analyst caught that at the time of

12   the hearing and changed that minimum prison term.  And

13   I believe he notified Mr. Brown of that.  That was --

14   that there was a change on some type of court

15   proceeding.

16   Q.   Safe to say you don't catch all errors,

17   correct?

18   A.   I don't think we catch all errors, no.

19   Q.   In fact, you had a hearing for an

20   18-year-old that was ineligible under Senate Bill 590

21   and it wasn't discovered until after the fact; isn't

22   that right?

23   A.   We caught that at the time of the hearing,

24   not after the time the board ruled.

25   (Deposition Exhibit No. 23 was marked for

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 170 of 285

1  **identification.)**

2  BY MS. QUINN:

3      Q.   I'll show you what's been marked

4  Exhibit 23.

5          This is an email from Mr. Rogers sharing

6  board meeting minutes from September 19th, 2016.

7          Have you seen these materials before?

8      **A.   I believe I received it.**

9      Q.   And it indicates here that Kelly Dills in

10 this board meeting talked about elements of

11 deliberation to be used at the JL WOP proceedings;

12 is that right?

13     **A.   Yes.**

14     Q.   And it says that, "Kelly Dills advised that

15 Michelle Kasick and her staff created a worksheet to

16 explain the elements required for consideration."

17         What is?  What are the elements of

18 deliberation?

19     **A.   They're the five elements outlined from**

20 **Senate Bill 590.  That's what she's referring to.**

21     Q.   How do you know?

22     **A.   For one thing, I believe I was in that**

23 **meeting when there were discussions of the**

24 **deliberations.**

25     Q.   Well, this worksheet is not the same

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 171 of 285

1   worksheet that the IPO is supposed to fill out in the

2   prehearing situation, right?

3       A.   She is referring to the worksheet that

4   Michelle Kasick and her staff created to explain the

5   required elements for consideration.

6            And then she is referencing that when

7   making a decision, those -- although the circumstances

8   of the offense remain a factor over consideration, the

9   element related in the offender's age, maturity level,

10  and adjustment noted in statute should be factored in

11  the decision.

12           So Ms. Kasick's worksheet relates to

13  preparation of the prehearing report where the last --

14  what I just read refers to the elements required in

15  statute when making a decision to release or not to

16  release on juveniles life without.

17      Q.   This is further instructions about the

18  worksheet that the IPOs are supposed to be using?

19      A.   This is -- I believe this is advising the

20  board that a worksheet was developed for them to use in

21  preparation for the prehearing report.  But the

22  instruction to the board was that they needed to

23  consider the additional elements in the statute when

24  making their decision.

25      Q.   And does it not say that she created a

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 172 of 285

1  worksheet to explain the elements required for

2  consideration, meaning for the board?

3         Who's doing the consideration if not the

4  board?

5     **A.   They developed a worksheet to explain the**

6  **elements required for consideration during**

7  **deliberation.**

8         **This worksheet -- again, this worksheet is**

9  **a working document for them to use when they interview**

10 **one of these juvenile life withouts.  So when they do**

11 **the prehearing part, this information is put into the**

12 **prehearing report so the board can understand or make**

13 **deliberations and consider the additional five factors**

14 **that were outlined in Senate Bill 590.**

15    Q.   So the worksheet for consideration isn't

16 given to the board?

17    **A.   No.  Again, the worksheet is used as a tool**

18 **for them to prepare the prehearing report.**

19         **(Deposition Exhibit No. 24 was marked for**

20 **identification.)**

21 BY MS. QUINN:

22    Q.   I'm going to share with you Exhibit No. 24.

23 Would you mind telling me what that document is?

24    **A.   This is the additional sheet that these**

25 **juvenile life without parole cases.  It outlines --**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 173 of 285

1 should include these additional factors that are

2 outlined the five factors from statute.

3     Q.  So is this the special board action sheet

4 you were referring to earlier?

5     A.  This is an attachment to the board action

6 sheet, that when they conduct a juvenile with life

7 hearing, this is filled out by the hearing panel --

8 generally I believe it's by the analyst -- as to make

9 sure that these additional factors were considered at

10 the time of hearing.

11     Q.  And what is it that the analyst is writing

12 on here, if you know?

13     A.  I don't know specifics.  It's going to be

14 answers to try to address growth and maturity,

15 rehabilitation.  Things like conduct.  Changes in

16 conduct.  And then an assessment as to remains a risk.

17     Q.  And this is -- it's not called a worksheet

18 by folks at the parole board; this is referred to as a

19 special board action sheet?

20     A.  I don't know that we have a name for it.

21 We developed this because we did not want a hearing to

22 occur without them taking into consideration these

23 additional five factors so we met our statutory

24 obligation.

25     Q.  And this is not part of the policies and

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 174 of 285

1  procedures manual, correct?

2      **A.  No.**

3          **(Deposition Exhibit No. 25 was marked for**

4  **identification.)**

5  BY MS. QUINN:

6      Q.  I'm going to share with you Exhibit No. 25.

7  This is an email from Kelly Dills -- no -- yes -- to

8  David Owen with a copy to Ellis McSwain.

9          Have you seen this email before?

10     **A.  I have not seen this.**

11     Q.  Are you familiar with the content of this?

12 That her office raised concerns about the adequacy of

13 the process early on in these hearings?

14     **A.  Yes, I am aware there was some concern.**

15 **There was a disagreement between how our process was**

16 **and how you felt the process should be.**

17     Q.  And it seems here Ms. Dills is concerned

18 about potentially being quoted in the newspaper;

19 is that right?

20     **A.  Looks like that she said, "Let me know in**

21 **case I get quoted in the Post-Dispatch."**

22          **Yes.  I don't know if that was just a**

23 **facetious statement or it was a concern.  I couldn't**

24 **tell you a level of concern or if it was a concern.**

25     Q.  Were there any meetings called relating to

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 175 of 285

1  our suggested changes in the process?

2        **A.    Not that I'm aware of.**

3        Q.    Any conversations about taking seriously

4  the recommendations that were made by our office?

5        **A.    There were some -- there were some.  There**

6  **weren't meetings, but some discussion on how we should**

7  **conduct our parole consideration hearings.**

8        Q.    And what were those conversations and who

9  was involved?

10       **A.    The ones I can tell you is what I was**

11 **involved in.**

12             **There was some discussion -- for instance,**

13 **there was a question whether or not victims should have**

14 **any participation based on some of your concerns.  And**

15 **we discussed that.  I think Kelly had raised that.  And**

16 **we're statutorily required to.**

17             **As far as discussions on every concern you**

18 **had, there was not.**

19             **(Deposition Exhibit No. 26 was marked for**

20 **identification.)**

21 BY MS. QUINN:

22       Q.    I'll show you what's been marked

23 Exhibit No. 26.

24             This is a December 6th, 2016 email. Again,

25 with this sample petition for Senate Bill 590 inmates.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 176 of 285

1        And the message attached to it indicates

2   the offender -- if the offender chooses to use another

3   type of form or format they may do so.

4        Is that your understanding of the policy?

5       **A.   Yes.  We don't -- my understanding is we do**

6   **not require them to fill out this specific sample form.**

7       Q.   And you are familiar, though, with the form

8   that we had been submitting on behalf of our clients,

9   or forms we were submitting to the parole board

10  invoking their rights at their hearings?

11      **A.   Yeah.  I'm familiar with that form.**

12      Q.   And what, if any consideration, was given

13  to those forms?

14      **A.   That, I don't know.  I know that no**

15  **consideration was as far as leaving the victims out of**

16  **the process because of the statute.  I don't remember**

17  **what all the other issues were that were on the**

18  **petition.**

19      Q.   And was it your understanding no changes

20  were made because the hearings were to be conducted the

21  same as any other parole hearing?

22      **A.   They were to be conducted as any other**

23  **parole hearing except we -- except we would**

24  **specifically -- we would specifically discuss, as far**

25  **as -- or deliberate with the mind that we need to make**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 177 of 285

1   these five additional elements are required by statute

2   to provide.

3        Q.   What you said was two different things.

4   Let me clarify.

5             Was the understanding in every hearing the

6   factors would be discussed?  Or was it that after the

7   fact they would be deliberated upon?

8        A.   I think the instruction was that

9   consideration had to be given to these additional

10  factors.

11       Q.   But they need not be talked about with the

12  inmate in the hearing?

13       A.   Those items were outlined -- are part of

14  the prehearing report that they are reviewing.  Did we

15  say -- do we specifically read off, well, No. 1 says

16  this, what have you done?  I'm sure we did not do that.

17       Q.   I'm going to show you what's been marked as

18  Exhibit 27.

19            (Deposition Exhibit No. 27 was marked for

20  identification.)

21  BY MS. QUINN:

22       Q.   This is an email with the board minutes

23  from the parole board from January 6th, 2017.

24       A.   Yes.

25       Q.   Have you seen these before?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 178 of 285

1      **A.    Yes.**

2             Q.    You were present for this meeting?

3      **A.    Yes.**

4             Q.    This set of minutes reiterates the

5      commitment of the Department of Corrections and board

6      to conduct the hearings as normal with the additional

7      criteria; is that right?

8      **A.    Yes.**

9             Q.    And it does not indicate that the

10     additional criteria needs to be actually discussed in

11     the hearing?

12     **A.    No.**

13            Q.    And you, in fact, were in contact -- we may

14     get tricky here -- with the AG's office, and they

15     advised you to conduct the hearings as normal?

16                 MR. SPILLANE:  Um --

17     BY MS. QUINN:

18            Q.    With the additional criteria outlined in

19     RSMo 558.047?

20                 MR. SPILLANE:  I'm not going to object.

21                 Go ahead.

22                 THE WITNESS:  I had a conversation with

23     Ms. Colburn.  It wasn't -- initial contact with her was

24     not based on that, I don't believe.  But it just came

25     up.  I don't know if I brought it up or what.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 179 of 285

1      And that's, you know, just through

2  catch-all conversation.  She said you guys are fine.

3  Conduct -- make sure you address the additional items

4  outlined in the statute.  Because we were giving

5  meaningful parole consideration.  It was not as a legal

6  counsel as much as Caroline's a friend of mine from our

7  prior legal department.

8  BY MS. QUINN:

9      Q.   This set of minutes, it also indicates

10  Jimmy Wells debriefed with all of you about difference

11  in opinion with defense attorney; do you recollect

12  that?

13      **A.   I remember some of that.  I think it may**

14  **have been one of your-all's cases and how we should**

15  **process one of these hearings.  But other than that, I**

16  **don't.  I don't remember the specifics.**

17      Q.   I think you've already said this, but let

18  me clarify.

19          There is no written protocol to be followed

20  during the course of a Senate Bill 590 hearing, right?

21      **A.   No written protocol as far as policy and**

22  **procedure?**

23      Q.   Any kind of written document that instructs

24  the parole board member on the panel to follow certain

25  steps during that hearing?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 180 of 285

1    **A.   There's no direct protocol that said you**

2    **have to do this, this and this.**

3    Q.   No script to be followed for JL WOP

4    hearings in particular?

5    **A.   No.  Other than the analyst and the board**

6    **members understand that the additional factors outlined**

7    **in statute must be considered.**

8    **(Deposition Exhibit No. 28 was marked for**

9    **identification.)**

10   BY MS. QUINN:

11   Q.   Okay.  I'll show you what's been marked

12   Exhibit 28.

13   This appears to be analyst meeting minutes,

14   and there's a section on juvenile life without parole.

15   **A.   Yes.**

16   Q.   Can you tell us what that means?  That

17   section there?

18   **A.   Which sentence?**

19   Q.   Well, the whole thing.

20   It was asked if there are no guidelines for

21   the offender; does there need to be a reason marked on

22   the second sheet of the BAS.  That's one area of

23   confusion.

24   **A.   If an offender is a normal parole case that**

25   **is -- has guidelines, it's not a life sentence, not a**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 181 of 285

1    sentence over 45 years, a seven-year sentence comes in

2    for driving while intoxicated, if the board goes above

3    guidelines, then they will notify a reason why they

4    went above guidelines.

5              If there's no guidelines to address, then

6    the reasons for going above guidelines we don't mark

7    anything on those files.

8         Q.   So how did that present itself in the case

9    of a child offender in the jail in context?

10        A.   I'm not sure I understand your question.

11        Q.   Well, I'll not sure either.  So I'll

12   withdraw it.

13             Let me ask this.  The next paragraph talks

14   about, "Kelly indicated that the worksheet filled out

15   during the hearing provides enough reasoning for a

16   denial of parole."

17             So is that the single-page document that we

18   referenced earlier as a specialized board action sheet?

19        A.   They're referencing that additional sheet

20   that outlines the five items.

21        Q.   So that's a single-page document.

22             This set of minutes also references the

23   second sheet of the BAS.  So the ordinary board action

24   sheet, is it a multi-page document?

25        A.   It's a two-page document.  And with the

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 182 of 285

1    juvenile life withouts, we add a third page with the

2    five elements outlined in 590.

3            (Deposition Exhibit No. 29 was marked for

4    identification.)

5    BY MS. QUINN:

6        Q.   Okay.  I'll show you what's been marked as

7    Exhibit 29.  So this is the two-page board action

8    sheet?

9        A.   Yes.

10       Q.   We were just talking about together?

11       A.   Yes.

12       Q.   Who fills this out and when?

13       A.   It depends.

14            At the time of the parole consideration

15   hearing, it is filled out by the hearing panel.

16   Whoever's conducting the hearing generally will write

17   most of the comments.

18            Any of the hearing panel members can put

19   comments in the hearing panel section comments section.

20            Then they will vote in the -- the board

21   analyst and the hearing officer box, which is -- that

22   should be the CAO at that institution, or someone

23   representing the CAO who's conducting the panel, part

24   of the hearing panel.

25            Now, the majority.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 183 of 285

1          MR. CRANE:  Can you tell us what CAO means?

2          THE WITNESS:  Chief administrative officer.

3     It's the supervisor at the institution.  Generally

4     going to be the member on the hearing panel.

5          On cases that do not require a majority

6     board vote and can be finalized with the hearing panel,

7     then the analyst would make sure the bottom portion of

8     this is filled out.

9          For those that go to majority board, this

10    hearing panel may make a recommendation, but in

11    deliberating or in determining a final decision, that's

12    going to be reliant on the majority board and all the

13    board members, it's written out what the recommendation

14    was from the analyst and the board member or the

15    analyst and the institutional supervisor.  But the

16    board members are really the only board vote that

17    counts when doing a majority board decision.  And once

18    that decision is finalized, the final board member will

19    make sure appropriate boxes are checked.

20         Q.   So in the context of the juvenile life

21    without parole hearings, the comments box, are there

22    any requirements for certain information to be included

23    in there?

24         **A.   No.**

25         Q.   And is there any requirements for any

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 184 of 285

1    particular person to write anything there?

2         **A.   No.**

3         Q.   And what about the vote of the panel?

4              Is that to be marked on this form at the

5    conclusion of the hearing?

6         **A.   Um, yes.  At the conclusion of the hearing,**

7    **after the hearing they'll deliberate and make a**

8    **recommendation.  Because they're all majority board**

9    **decisions, because they involve death.**

10             **So they would deliberate and make a**

11   **recommendation.  And they would also -- there would be**

12   **a third page attached with the five items that are**

13   **required to be considered under statute.**

14        Q.   And you noted earlier that it's the analyst

15   who fills that out?

16        **A.   I believe it's usually the analyst that**

17   **fills that out.**

18        Q.   But you noted that it's the board members

19   only whose vote counts in this process?

20        **A.   It's the board members -- on the majority**

21   **board decision, the analyst and institutional parole**

22   **supervisor's recommendation does not count to make a**

23   **majority board vote.**

24        Q.   Why is it that these cases are handled as

25   majority board decisions versus a majority of the

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 185 of 285

1    panel?

2         **A.   It's based on the board's policies related**

3    **to their case referral policy.**

4         Q.   And when you say "policies," that's

5    something that's in the policies and procedures manual

6    we looked at earlier?  The table of contents?

7         **A.   They have a case referral policy that tells**

8    **what votes require.**

9              **Certain offenses that are -- involve death,**

10   **things like that, are required to have majority board**

11   **vote.**

12             **And there's other sentences also.**

13        Q.   So those are policies that are not at all

14   included in the policies and procedures manual I could

15   get if I made a Sunshine request?

16        **A.   Case referral policy, I believe we sent**

17   **that in the prior case.  In the prior Sunshine request.**

18   **So I do not believe that is protected, but that would**

19   **be a question for Ms. Rogers.**

20        Q.   I just mean that it's not been -- has not

21   gone not through the policy and procedure approval

22   format like an ordinary policy and procedure in your

23   manual?

24        **A.   No.  Any decision by -- any decision by the**

25   **board or -- can be majority, based on what they -- what**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 186 of 285

1    the panel wants to do.

2              You could have a panel decision vote, but

3    because one of the persons on that panel wants to refer

4    to the majority board, I believe they can do that per

5    their case referral policy.

6              This is an agreement with certain cases

7    that are higher profile.  Higher potential, you know,

8    like cases that are more -- considered more serious --

9    they go out to the majority board vote.

10        Q.   And this form with the recommendation of

11   the panel, how does it get to the board?

12        A.   The form?

13        Q.   The board action sheet.

14        A.   It stays with the hard file that the board

15   has, and that gets passed to the next board member in

16   rotation.

17        Q.   And it's the hard copy file that goes

18   office to office; is that right?

19        A.   Yes, ma'am.

20        Q.   What about the recordings from the

21   proceedings?

22        A.   The recordings from the proceedings,

23   they're available.  We have them recorded and put into

24   a database.  So if they wanted to listen to them they

25   could.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 187 of 285

1          If they wanted to, I mean, if they wanted

2   to talk to a board member who was conducting the

3   hearing or the analyst, they can.  If they're seeking

4   more information.

5          If they want to -- they're needing more

6   information, they can speak to the hearing panel that's

7   there and get that information from them.

8      Q.   But they're not required to do that?

9      A.   No.  They're not required to do that.

10     Q.   They can just check the box and say no?

11     A.   Or yes.

12     Q.   And how many yeses have been given in these

13  JL WOP proceedings?

14     A.   18.2 percent.

15     Q.   As to the recordings that they may or may

16  not access, who does the recording of the proceedings?

17     A.   Recordings are generally going to be done

18  by the analyst.  They're in charge of -- they're the

19  technical experts at the hearings.  They're also

20  involved with -- they record.

21          The board members have laptops generally.

22  They can have laptops there at the hearings also, but

23  the recordings are generally done by the analyst.

24     Q.   And you noted the recordings are actually

25  done on the laptop itself?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 188 of 285

1          A.    Yes.

2          Q.    And that's been a change over time.  You

3     used to have a vendor that provided for professional

4     recording in these hearings; is that right?

5          A.    At one point in time, it was a professional

6     vendor.  It was not -- he didn't do the recordings.

7     They sold software to -- similar to what the courts

8     were using, FTR, and we used that to record hearings.

9     But at this point we've got the ability to make

10    hearings.  And maintenance -- we were paying ongoing

11    maintenance for software that we didn't really need,

12    because we can keep recordings and put them in a folder

13    ourselves without spending additional tax dollars.

14         Q.    And the laptops that are used to record the

15    hearings, what kind of software is used to do that?

16         A.    That, I don't know.  I'm not familiar

17    enough with the software.  I know it's got an accessory

18    recorder and we use that.  Some analysts will use the

19    mic that's provided within the laptop.  Some will use

20    external mics.  They both record pretty good quality

21    recordings.

22         Q.    And then those recordings are -- that may

23    be reviewed by the board members, where are they saved

24    for subsequent review?

25         A.    We have those on an I drive, an internal

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 189 of 285

1   drive, that's accessible by the board members,

2   analysts.  I'm not sure who has additional access to

3   those recordings.  It's very limited.

4           And the actual folder is FTR, because we

5   keep them all together.  We just don't have to have

6   their software to listen to the hearing.

7       Q.   Do you know if there's any required period

8   of time that they are maintained?

9       A.   I believe the -- that, I am not -- it was

10  we kept them forever.  Then two years.  I'm not a

11  hundred percent on the hearings.  I believe it's one

12  year.  But Ms. Rogers takes care of that, retention of

13  records.

14      Q.   I'll come back to the full board versus the

15  panel.

16          Within the panel proceedings themselves,

17  how many delegates are permitted on behalf of the

18  inmate?

19      A.   They can have one delegate.

20      Q.   And are you familiar with any policies or

21  practices relating to where delegates may sit in the

22  proceedings?

23      A.   That, I am not aware there's specific

24  policy related to that.

25      Q.   Where they may look or not look?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 190 of 285

1       A.      That, I don't know.

2       Q.      What is the role of the delegate?

3       A.      What is the role of the delegate?

4       Q.      Yes.

5       A.      To assist in the ability to help with

6    parole consideration release.

7               A lot of times it is a family member who is

8    providing verification of home plans.

9               Sometimes it's an employer.

10              Sometimes it's an attorney who helps

11   provide information.

12              Whether it's a juvenile life without, or

13   any parole consideration hearing, we have attorneys

14   come in and assist in presenting information as to why

15   this person should be considered for release.

16      Q.      What if the delegate thinks information

17   discussed during the hearing is incorrect?

18              What can they do?

19      A.      What if the offender --

20      Q.      The delegate, if they hear information that

21   is incorrect, can they object?

22      A.      I'm not sure that the process of a delegate

23   is there to object as much as to assist in release

24   consideration.

25      Q.      So where are you getting that from, that

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 191 of 285

1  their role is to address release consideration or

2  planning only?

3      A.   That's just traditionally been the role of

4  the delegate.

5      Q.   What about bringing materials in front of

6  the panel, can the delegate do that?

7      A.   That -- I'm -- I believe we would accept

8  any information, including through, you know, before

9  the hearing.  When people send stuff in to have

10  consideration, we keep that information and make it

11  available.

12      Q.   What about bringing a pen and paper into

13  the hearing; can the delegate do that in a regular

14  parole hearing?

15      A.    I think there was some concerns about the

16  role of a delegate versus the adversarial role of the

17  attorney.  And, yes, they can do that.

18      Q.   Let me clarify.

19          In the past during regular parole hearings,

20  the delegate could bring a pen or paper into the

21  proceedings; yes?

22      A.    I don't know.  I don't know if that was

23  being allowed or not.  But I know that a delegate can

24  bring a pen or pencil in at this point.

25          Prior to that, I'm not sure whether they

Pohlman USA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 192 of 285

1    were allowing it or not.

2              I'm not sure they were in all

3    circumstances, and even allowing victims to bring pen

4    and paper in.  But that I'm not sure about.

5              (Deposition Exhibit No. 30 was marked for

6    identification.)

7    BY MS. QUINN:

8         Q.   Let me show you what's been marked as

9    Exhibit 30.

10              Is this set of materials familiar to you?

11        A.   Yes.  It's in regards to a hearing on

12    ████████████████  ███.

13        Q.   And you're aware that my colleague,

14    Amy Breihan, who's here today, handled that hearing on

15    ████████████████████

16        A.   Yes.

17        Q.   And you know that she was not permitted to

18    serve as an attorney, but only permitted to serve as a

19    delegate, like a family member?

20        A.   Yes.

21        Q.   And there was some concerns about

22    ████████████████████████████████████████████████;

23    is that right?

24        A.   I heard there were concerns, yes.

25        Q.   Can you tell us what you heard?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 193 of 285

1          A.   That there was concerns that Ms. Breihan

2     was writing everything down that occurred, and it was a

3     closed meeting, and can they do that or not do that.

4               And it was a concern that what we wanted

5     perceived to be a closed hearing was becoming an open

6     hearing based on note-taking.

7          Q.   And are you aware of any reactions by

8     Kelly Evans to that activity on the part of

9     Ms. Breihan?

10              MR. CRANE:  Do you mean Kimberly Evans?

11    BY MS. QUINN:

12         Q.   Yes.  Sorry.

13         A.   Are you taking about regarding the

14    note-taking?  Or contact in the parking lot?

15              I'm not familiar with Ms. Evans' complaint

16    regarding one of these juvenile life withouts having

17    note-taking.

18              My thought, the issue was, is Ms. Breihan

19    having contact with a victim in the parking lot before

20    they were able to leave the facility.

21         Q.   So I'll just draw attention to page 1746,

22    the last paragraph.  Perhaps you hadn't seen this

23    before.  It's talking about consistencies about

24    note-taking.

25              Attorneys can bring a pen.  Some

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 194 of 285

1  institutions are allowing attorneys to bring pen and

2  paper to make notes.  In the case of Frazier, he did

3  not follow the protocol.

4      **A.   Yeah.  I'm aware that there was -- of this.**

5  **I'm not sure that Ms. Evans brought this forward.**

6      Q.   Were you part of conversations about this

7  question of whether attorneys should be permitted to

8  take notes or not in these proceedings?

9      **A.   With who?**

10     Q.   Anybody.

11     **A.   Yes.**

12     Q.   And what was discussed?

13     **A.   I think we said what was the harm.**

14     Q.   Who's "we?"

15     **A.   Mr. Baker and I both.**

16     Q.   And what about this person here on these

17 emails, Michelle Kasick, who's she?

18     **A.   She's the institutional parole supervisor.**

19     Q.   And what has her position been with regard

20 to attorneys taking notes during hearings?

21     **A.   I can't answer that.**

22     Q.   Are you familiar with the letter that is in

23 this packet, and something marked parole hearing

24 procedures, sent to my office by Anne Precythe on

25 April 27th, 2017?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 195 of 285

1    A.   Yes.

2    Q.   What do you know about these materials?

3    A.   **I know this was sent out by Ms. Precythe to**

4    **you, to your-all's office.**

5    Q.   And these materials indicate that

6    note-taking is not permitted even for lawyers?

7    A.   **I believe so.**

8    Q.   And, by the way, this parole hearing

9    procedure document that's part of this packet, have you

10   seen this before?

11   A.   **This one here?**

12   Q.   Yes.

13   A.   **Yes, I saw it.**

14   Q.   Do you know if that went through the

15   regular procedure creation and adoption process?

16   A.   **No.**

17   Q.   No, it did not?

18   A.   **It did not.**

19   Q.   There are emails from June 14th, some of

20   which you are involved in, correct?

21   A.   **Yes.**

22   Q.   And this is started by Brian George,

23   providing an FYI to you that Ms. Quinn, me, took notes

24   even after instructed not to?

25   A.   **Yes.**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 196 of 285

1       Q.   Can you tell me about this exchange,

2   please?

3       A.   Well, it was a concern that was sent to me

4   that you were taking notes during a hearing

5   without -- when instructed not to, regardless of what

6   instructions were given.  So that led to other

7   discussions about note-taking.

8            I think I had one in here.  I'm not sure.

9   I didn't know we were prohibiting note-taking.  Because

10  it was not -- I did not know what the issue would be,

11  because you could conduct a hearing and go out in the

12  hallway and write everything that occurred in the

13  hearing.  So that was pretty much the length of

14  discussion that we had.

15           And then later, our chairman made contact

16  with our legal counsel, and said, yeah, you need to.

17  Why would you not let them?  And we allow note-taking.

18  At this point.

19           It was a fairly brief -- a fairly brief

20  period of time that it occurred, where I think people

21  were concerned that this, you know, adversarial role

22  that was occurring.

23      Q.   So is it wrong for those people that have

24  been sentenced to die behind bars, who now have a

25  chance to be released, to have an adversary on their

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 197 of 285

1    side?

2        **A.    No.    Not at all.    My opinion is it's not**

3    **wrong to be able to take notes.    I mean, I don't see**

4    **the purpose of not allowing notes.    And that's been**

5    **resolved.**

6        Q.    And do you think it seemed like an

7    insignificant period of time to Norman Brown, who's

8    hearing I was not permitted to take notes during?

9        **A.    No.    I'm not saying it's an insignificant**

10   **period of time.    In that aspect.    But it was resolved**

11   **fairly quickly.**

12       Q.    And, by the way, he emailed you in the

13   middle of that hearing, didn't he?

14       **A.    Who?**

15       Q.    Mr. George.

16       **A.    Whether he was in the middle of the hearing**

17   **or not, I don't even know that I responded.**

18   ███   ████████████████████████████████

19   ████████████████████████████████

20   ████████

21            MR. SPILLANE:    I'm going to object

22   and -- all right.    Go ahead and answer.    I withdraw my

23   objection.

24            MR. CRANE:    I object that the question's

25   ambiguous.    You said "the hearing."    You mean this

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 198 of 285

1 hearing?

2 BY MS. QUINN:

3       Q.   No, not this hearing.

4

5

6

7            MR. SPILLANE:  I'll tell you what, I'm

8 still going to object, because the judge is going to

9 review in-camera whether we have to disclose the

10 un-redacted thing.  And she hasn't decided yet.  So I'm

11 going to direct him not to answer.  And if she's says

12 you can have that, then that will be in the un-redacted

13 report we send you.

14            MS. QUINN:  Okay.  Strike that.  No

15 problem.  We're moving on to Exhibit 32.

16            (Deposition Exhibit No. 32 was marked for

17 identification.)

18 BY MS. QUINN:

19       Q.   These are board meeting minutes from

20 May 1st, 2016.

21            It appears you were present for this

22 meeting; is that right?

23       **A.   Yes.**

24       Q.   And there's a discussion about an attorney

25 who was turned away from a hearing because he wasn't on

Pohlman USA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 199 of 285

1     the right list?

2          A.   Yes.

3          Q.   Is this familiar to you?

4          A.   I cannot tell you what offender it was,

5     but, yes, it was familiar enough to me that I was

6     advised that at one of our hearings one of the

7     attorneys wasn't allowed in to participate.

8               And knowing that, that is one of the

9     reasons why I think I gave -- I ushered one through of

10    yours, so we wouldn't have that issue again.  Because

11    attorneys have a right to be there as a delegate and

12    present information to the board.

13         Q.   So it's your position that attorneys have a

14    right to be there, but only as a delegate, right?

15         A.   Yes.

16         Q.   We can't object to misinformation

17    presented?

18         A.   I think you can provide additional

19    information to clarify issues.

20         Q.   In the middle of the hearing, if there's

21    wrong information discussed, we're supposed to remain

22    silent until spoken to?

23         A.   I think the delegate generally speaks at

24    the end of the hearing.

25               Now, whether or not a board member gives

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 200 of 285

1  latitude to that or not, it's up to the individual

2  board member that's in control of the hearing.

3      Q.   Let's talk about prosecutors.  Are they

4  allowed to speak only at the end of the hearing?

5      A.   That, I don't know.

6      Q.   Do you know about when they're allowed to

7  arrive on the day of the hearing?

8      A.   When they're allowed?

9      Q.   Are they permitted access to the panel

10 before the hearing begins?

11     A.   That, I don't know.

12     Q.   Are you aware of any prosecutor being told

13 they can't take notes?

14     A.   That, I don't know either.

15     Q.   Or being turned away from a hearing?

16     A.   That, I don't know.

17     Q.   Well, you would know if it happened; would

18 you not?

19     A.   I have not heard -- I do not know of any

20 cases where that has occurred.

21     Q.   What about victims; what is communicated

22 with them prior to the hearings?

23     A.   They are notified of a date to attend if

24 they want to attend.

25          As far as what they're told, my

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 201 of 285

1      understanding is they are told the sentence structure.

2      On these cases, I would assume -- I don't want to

3      assume.  I don't know.

4           Q.   So Ms. Evans is in charge of being in touch

5      with the victims; is that right?

6           A.   Yes.

7           Q.   And you've already indicated she has access

8      to the entire parole file; is that right?

9           A.   Yes.

10          Q.   And she can share with the victims as much

11     as she likes from that file if she chooses to?

12          A.   That would be a breach in our policies, I

13     believe.

14          Q.   So if a victim attended a hearing and

15     indicated she had access to information about a

16     parole -- inmate's programming, programs he had or had

17     not completed, would that be a violation of protocol?

18          A.   I don't believe that would be information

19     we would share.  But that's not -- that is something

20     that would have to be verified through Ms. Evans.

21          Q.   And are the victims limited to speaking

22     only to a particular topic?

23          A.   I think we follow victim statutes related

24     to what they can and can't say.  And how many can and

25     can't attend.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 202 of 285

1      Q.   How many can attend?

2      A.   I don't believe statute allows us to limit

3  the number of victims if they're a victim of a crime.

4      Q.   So as many as wish can attend?

5      A.   Yes.  In these cases, obviously it's not

6  the victims, it's victims of the family.

7      Q.   Noted.  It would be the family of the

8  victim.

9           And the same with police, is that right, as

10  many as wish to attend can attend?

11      A.   I think by statute we're going to require

12  them to be involved in that case.  You can't just -- if

13  the case occurs out of Cole County, we're not going to

14  let five people from Boone County to come in and

15  testify.

16      Q.   It sounds like you don't know that for

17  sure; is that right?

18      A.   The law enforcement should have -- be

19  involved with the case.

20      Q.   Is that a policy?

21      A.   I believe that's part of statute.  I'd have

22  to pull that and look.

23           (Deposition Exhibit No. 33 was marked for

24  identification.)

25  BY MS. QUINN:

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 203 of 285

1    Q.   I'm going to show you Exhibit 33.  This is

2    an email from February 24, 2016, with a memo attached

3    from Kimberly Evans, whom I keep wanting to call Kelly

4    Evans.

5         **A.   Okay.**

6    Q.   Have you seen this before?

7         **A.   I don't remember seeing this.**

8    Q.   Is there anything that's written here by

9    Ms. Evans incorrect in your mind?

10        **A.   I don't have any reason to believe that**

11   **this is not correct.**

12   Q.   Are you familiar with anything in the law

13   that would prohibit a defendant from asking to be

14   forgiven?

15        **A.   I don't know of anything in the law that**

16   **prohibits that.**

17   Q.   But Ms. Evans has instructed the board to

18   not permit that to happen?

19        **A.   I know they do not want the defendant to**

20   **directly respond to the victim due to trauma that has**

21   **occurred.**

22   Q.   What does it say about the ability of the

23   offender to ask forgiveness?

24        **A.   "Although offenders may desire forgiveness,**

25   **it is not always appropriate to ask for it.  If the**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 204 of 285

1    **victim -- it is the victim's right to choose it or not.**

2    **I believe it is the role of the board member to**

3    **interrupt the offender as it is not the purpose of the**

4    **hearing to forgive -- to get forgiveness for the**

5    **offender."**

6          Q.   Are you familiar with the term "restorative

7    justice?"

8          **A.   Yes.**

9          Q.   Is restorative justice an evidence-based

10   practice?

11         **A.   It's a -- yes.  Trying to make victims**

12   **whole.  Yes.**

13         Q.   Is it your sense that forgiveness is part

14   of restorative justice practices?

15         **A.   It is.  But I'm not sure at a hearing is**

16   **the best place, due to the emotions, to do that.**

17           **If the offender wants to request**

18   **forgiveness, and send a letter, they can do that**

19   **through victim services, I believe.**

20         Q.   Are there any other processes through the

21   parole board to permit for reconciliation?

22         **A.   Not that I'm aware of.**

23         **(Deposition Exhibit No. 34 was marked for**

24   **identification.)**

25         MR. SPILLANE:  Can we take five minutes?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 205 of 285

1          (A break was taken.)

2  BY MS. QUINN:

3          Q.   So we're looking at Exhibit No. 34.   This

4  is an email sent from Jennifer Zamkus.

5          **A.   Yes.**

6          Q.   With an attachment four pages long.

7  Reflecting a May 2017 parole hearing protocol.   And

8  then interview questions.

9          Have you seen these materials before?

10          **A.   Yes.**

11          Q.   And this parole hearing protocol sets out a

12  script to be followed during parole hearings; does it

13  not?

14          **A.   Yes.**

15          Q.   And it walks through the person running the

16  hearing introducing the various attendees; is that

17  right?

18          **A.   Yes.**

19          Q.   And it indicates at letter D about a

20  delegate may be a family member, friend, clergy, or

21  attorney; is that right?

22          **A.   Yes.**

23          Q.   So, again, an attorney is treated no

24  differently in the hearings as a family member or

25  friend?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 206 of 285

1       **A.    Yes.**

2       Q.    And it again indicates no materials, other

3    than letters of support, are to be allowed in the

4    hearing.  And no note-taking is to be conducted?

5       **A.    Yes.**

6       Q.    And when I say "no note-taking," it's by

7    the delegates, they may not take notes?

8       **A.    Yes.**

9       Q.    And the first question, "determine if the

10   offender accepts responsibility for his involvement in

11   the crime;" is that right?

12      **A.    Where do you read that at?**

13      Q.    It's Bates-stamped 1761.  And it's section

14   2-A.

15           And then it goes on with letters A through

16   P of, areas to be covered by the parole panel during

17   the hearing, right?

18      **A.    Yes.**

19      Q.    And none of those refer to Senate Bill 590?

20      **A.    No.**

21      Q.    Or juvenile life without parole?

22      **A.    No.**

23      Q.    Is the word age or maturity mentioned

24   anywhere in here?

25      **A.    No.**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 207 of 285

1      Q.    And the email from board member Zamkus

2  actually suggests that some of these seem like they're

3  not even relevant, and maybe could not be gone into

4  with much depth?

5      A.    Yeah.  This is not specific to juvenile

6  life without.  This is any parole consideration

7  hearing.

8           I don't believe this was a working document

9  that they were trying to develop protocol.  To my

10 knowledge, I do not believe that this document became

11 effective protocol.  But I am not a hundred percent on

12 that.  I don't remember it becoming protocol.

13     Q.    Who would know?

14     A.    I'm going to say Ms. Zamkus.  From what I

15 can tell from this, this is still a working document

16 and asking about getting advice.  I can tell you it's

17 not a working document now, because the "delegates may

18 not take notes during the hearing" is not board

19 practice at this point.

20     Q.    But you're not in all of the hearings,

21 right?

22     A.    What's that?

23     Q.    You don't know if this is or is not being

24 followed in hearings?

25     A.    I cannot tell you if at every hearing they

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 208 of 285

1  do not allow note-taking.  I know the instruction that

2  went out to the board and analysts was clear that

3  resolved this issue.

4          (Deposition Exhibit No. 35 was marked for

5  identification.)

6  BY MS. QUINN:

7      Q.   I'll show you what's been marked as

8  Exhibit 35.  This document relates to video hearings.

9          Now, Senate Bill 590 does not specifically

10  indicate that video hearings would be permitted before

11  the parole board; is that right?

12      A.   No.

13      Q.   And this document talks about video

14  hearings being potentially problematic, particularly

15  for those with mental health issues or functioning

16  disabilities?

17      A.   Yes.

18      Q.   And is that your belief as well?  That a

19  video hearing could be potentially problematic for

20  somebody with mental health problems or capacity

21  issues?

22      A.   I think offenders with severe mental health

23  issues would be better served by an in-person hearing.

24      Q.   And what steps are being taken to discern

25  if inmates with Senate Bill 590 hearings might have

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 209 of 285

1   mental disabilities or impairments that make video

2   hearings inappropriate?

3        **A.**   **Our institutional parole supervisor makes**

4   **that assessment if an offender would be served better.**

5        Q.   And you're the one that's scheduling and

6   setting up the hearings, right?

7        **A.**   **The juvenile life withouts; yes.**

8        Q.   And you don't think it's part of your role

9   then to determine whether offenders who have video

10   hearings arranged are capable or participating in such

11   a proceeding?

12        **A.**   **I believe at the time I set the hearing up**

13   **that information is not even available.  Because**

14   **the -- we have institutional parole supervisors making**

15   **contact with these offenders.  Or even during the**

16   **interview.  I mean, those offenders, once they're seen,**

17   **if they identify an issue that they believe the**

18   **offender could be better served with an in-person**

19   **hearing, then they should -- they will contact us and**

20   **should schedule it for an in-person hearing.**

21        **(Deposition Exhibit No. 36 was marked for**

22   **identification.)**

23   BY MS. QUINN:

24        Q.   I'll show you what's been marked as

25   Exhibit 36.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 210 of 285

1          This is a series of emails from December of

2     2016 relating to Bryan Seddens.

3          Are you familiar with Bryan Seddens' case.

4          **A.    I'm not familiar with this specific case.**

5          Q.   But you were copied on this exchange;

6     is that right?

7          **A.    Yeah.**

8          Q.   And it indicates that Bryan had already

9     waived the hearing, in-person hearing, therefore

10    efforts of his attorney to demand an in-person hearing

11    on his behalf should not be respected?

12         **A.    Yes.  We would want the offender who**

13    **requested a video hearing to then say he wants an**

14    **in-person.**

15         Q.   What if that individual is mentally

16    retarded?

17         **A.    If he was mentally retarded and identified**

18    **there was significant issues, I would -- we probably**

19    **would have set him for an in-person hearing based on**

20    **that.  I don't know what his demeanor was or is now.**

21         Q.   So are you not familiar with material

22    submitted, along with the document attached here, that

23    reflected Mr. Seddens' IQ and intellectual disability?

24         **A.    I'm not sure.  I'm not sure I was aware of**

25    **this, no.  His IQ or disability.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 211 of 285

1          (Deposition Exhibit No. 37 was marked for

2     identification.)

3     BY MS. QUINN:

4          Q.   I'll show you Exhibit 37.  This appears to

5     be something called a salient factor score sheet.

6          Can you tell me what this is?  When is it

7     used?  Who uses it?

8          A.   This is a -- looks like it's

9     Norman Brown's.  From what I can tell.

10          No.  Okay.  Never mind.

11          This is -- a salient factor sheet is used

12     to develop a score, and then apply guidelines to

13     serve -- to develop parole consideration guidelines.

14          Now, guidelines are guidelines.  They're

15     not -- guidelines are not required for the board to

16     follow.  They give like offenders positioned

17     a guideline of release that is established by the

18     board.

19          Q.   Do the board members ever come to you

20     seeking advice about how to decide a case?

21          A.   Decide an individual case?

22          Q.   Yeah.

23          A.   I mean, they've never -- I won't say

24     they've never done it.  But generally those -- they

25     will talk to the analyst there that is attending the

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 212 of 285

1    hearing.

2         Q.   Do they ever ask your input whether to

3    grant or deny parole?

4         A.   It's -- I mean, it has in the past.  I

5    mean, there's been times that I've given advice to

6    board members on whether or not they should.  I

7    couldn't tell you the names.  But it happens on

8    occasion.

9              But generally that's a conversation -- on

10   whether to release or not -- is occurring with the

11   hearing panel and the analyst that is performing the

12   hearing.

13        Q.   How about in the JL WOP proceedings; have

14   you had input?

15        A.   On whether to release or not?

16        Q.   Yes.

17        A.   No.  Those are better answered by hearing

18   panels.

19        Q.   And given your role, you can't interpret

20   with this form means, can you?

21        A.   Given my role?

22        Q.   Yes.

23        A.   Well, he's got an excellent salient factor

24   score because of the components in this.  An excellent

25   score would be applied to guidelines, and he -- the

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 213 of 285

1    guidelines would be early in his parole -- the board's

2    discretion of parole.

3        Q.   Is that really what this form means?

4        A.   That's what this form is used for.

5        Q.   Okay.  So we get that it's supposed to be

6    used to determine if someone is high-risk, low-risk.

7    But what do these variables mean?  What does the term

8    value mean?

9        A.   Where do you see value?

10       Q.   It's in the titles of the columns.

11       A.   Mine's cut off. Oh.  This is the -- is

12   generated by the IPO.

13       Q.   You can't really take it line through line

14   and interpret it, correct?

15       A.   I could tell you what each of these are

16   looking at.

17            Substance abuse.  That's a -- they're

18   trying to determine whether or not these issues are

19   currently a factor of -- to consider as far as

20   elevating risk or not elevating risk.

21            You have conviction free which is the

22   second one.

23            Nonviolent.  That relates to conduct

24   violations and whether they're violent.

25            One's education.  Major conduct violations.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 214 of 285

1  **This is what the IPO used to generate a salient factor**

2  **score.**

3  　　　　(Deposition Exhibit No. 38 was marked for

4  **identification.)**

5  BY MS. QUINN:

6  　　　　Q.　Okay.　I'll show you what's been marked as

7  Exhibit 38.

8  　　　　This is an email from Kelly Dills to

9  various parole officials.　And someone named

10 Tina Crowder.

11 　　　　So this seems to be telling Ms. Crowder

12 about the salient factor assessment for a family

13 member.　And it indicates that "the factor measures

14 different variables than the instrument used for an

15 initial parole consideration, and is calculated during

16 the parole revocation process."

17 　　**A.　Yes.**

18 　　　　Q.　So is she wrong?

19 　　**A.　Is this the salient factor used at the time**

20 **of the revocation?**

21 　　　　Q.　Her message indicates it is not used for an

22 initial consideration or grant of parole, but only used

23 during the revocation process.

24 　　**A.　That is correct.　This is a separate**

25 **assessment.**

PohlmanUSA Court Reporting
(877) 421-0099　www.PohlmanUSA.com
Case 2:17-cv-04082-NKL　Document 134-3　Filed 06/12/18　Page 215 of 285

1        Q.    So the parole violator salient factor is a

2    different test or tool than the regular salient factor

3    assessment?

4        **A.    Yes.**

5            **(Deposition Exhibit No. 39 was marked for**

6    **identification.)**

7    BY MS. QUINN:

8        Q.    Okay.  I'll show you what's been marked as

9    Exhibit 39.  This is a series of memos with an attached

10   email.

11            Have you seen these materials before?

12       **A.    Yes.**

13       Q.    And so page two of this exhibit indicates

14   that in June -- June 23, 2015, a majority board

15   decision is comprised of three consensual votes.

16            What does that mean?

17       **A.    What that means is a majority board**

18   **decision takes three votes that have the same release**

19   **date.  There's a consensus in release dates.**

20            **So if you have a hearing panel of five, or**

21   **a board -- you have five board members -- then to get a**

22   **majority board vote, it would take three of those five**

23   **board members to agree.**

24       Q.    And what is this bit about the same release

25   date that you just shared?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 216 of 285

1          A.    Where do you see same release date?

2          Q.    I don't.  You said it.

3          A.    Oh.  When they're voting to establish a

4    parole release date, three board members must agree on

5    the same release date.

6          Q.    So if someone says three votes yes, two say

7    release in two years, one says release in three years,

8    that's not --

9          A.    That's not a board consensus.

10          Q.    So that's a denial?

11          A.    That would be a denial.  They all have to

12    agree to a specific release date.

13          Q.    And at the time this memo was written, do

14    you know how many members were on the parole board?

15          A.    I do not.

16          Q.    So then there's a memo from December 7th,

17    2015.  It indicates that a majority board decision will

18    consist of four members in agreement with the

19    chairman's vote reserved for purposes of resolving

20    ties.

21          What does that mean?

22          A.    That would mean that if there were seven

23    board members, and the board was full, and three voted

24    one way -- whether it was a release or a re-hear -- and

25    three voted in agreement of a release or re-hear, the

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 217 of 285

1  board chairman as being the seventh vote would resolve

2  the tie.

3      Q.   So does that mean the chair generally does

4  not vote in all cases?

5      A.   The chairman does not vote in all cases.

6  No.

7      Q.   Why?

8      A.   Because it depends on when the decision

9  becomes a majority board decision.  In this scenario,

10 if four members agree to a final release date, it would

11 be a final decision.

12     Q.   Is this a matter of statute, these changes

13 taking place?

14     A.   As far as statute, I do not believe statute

15 requires a -- every board member to vote on every case.

16     Q.   What is a full board case?  Does the law --

17 does the statutory scheme for the parole board dictate

18 if the board -- if the chair is to vote?

19          I'll start there.

20     A.   Repeat that question.

21     Q.   Does the law allow for the chairman to sit

22 out as he sees fit?

23     A.   I believe the law allows the majority board

24 to vote -- vote to occur without the chairman's vote;

25 yes.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 218 of 285

1    Q.   During these JL WOP hearings, what has been

2    the voting practice and structure?

3    **A.   They've been sent around for a majority**

4    **board vote.**

5    Q.   Has the chairman sat in or sat out with

6    those votes?

7    **A.   That, I couldn't answer.  It depends on**

8    **whether there was an agreement before you reach**

9    **the -- if there was a consensus to make a majority**

10   **board decision.  Or whether the board member -- the**

11   **chairman could be a split -- could be the one that**

12   **makes the final, you know, the -- breaks up the 3-3**

13   **tie.  Or the 2-2 tie.  Whatever.**

14   Q.   So during the period that there have been

15   JL WOP hearings, how many parole members have been in

16   place?

17   **A.   Right now, we have six.  For a while we had**

18   **five, with the resignation of Mr. Ruzicka.  I believe**

19   **there was -- at one point we were down to either four**

20   **or five.**

21   **There was one point there was three board**

22   **members who were announced by the Governor's office at**

23   **the same time.  Now, whether one of those board members**

24   **was still in an active position, and they just -- I**

25   **believe a couple of them were just re-termed, so ...**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 219 of 285

1      Q.   So during these periods when there was

2    fewer than a full board, were there memos in place

3    instructing members how votes were going to be counted

4    and what constituted a majority?

5          **A.   That's what this memo is for.**

6      Q.   So these are the memos that were in place

7    at the time of the JL WOP hearings?

8          **A.   I don't know if there was an additional**

9    **memo to this.  That, I would not know.**

10     Q.   When these votes are taking place with the

11   full board, you're saying the file travels from office

12   to office; is that right?

13         **A.   The majority board.  Majority or full**

14   **board?**

15     Q.   In any case, there's a file?

16         **A.   Uh-huh.**

17     Q.   And it has to go from board member to board

18   member for a vote?

19         **A.   Yes.**

20     Q.   And in the JL WOP cases, that's what's

21   taking place?

22         **A.   Yes.**

23     Q.   And is it requiring a majority vote to get

24   a grant?

25         **A.   It's a majority board decision.  Yes.**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 220 of 285

1          Q.    And they have to agree on the exact

2    outdate?

3          **A.    Yes.**

4          Q.    And as that file travels from office to

5    office for the vote, are the board members using any

6    kind of risk assessment instruments?

7          **A.    Not that I'm aware of.  They're using the**

8    **prehearing report information received from the**

9    **other -- the hearing panel.  But a specific, is a risk**

10   **assessment tool being -- following the file going, no,**

11   **not that I'm aware of.**

12         Q.    And there are no mental health assessments

13   that MDOC has conducted that the full board or the

14   panel looks at?

15         **A.    Not other than would be included in the**

16   **prehearing report.**

17         Q.    Is it required in every instance?

18         **A.    To have an assessment?**

19         Q.    Yeah.

20         **A.    Or talk about mental health?**

21         Q.    Have an assessment.

22         **A.    That, I don't know.**

23         Q.    You don't know if the MDOC screens every

24   single member that comes before the parole board?

25         **A.    They do an assessment of mental health, but**

Pohlman USA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 221 of 285

1  if it's a formal assessment, I don't know.  That's done

2  through Division of Rehabilitative Services, I believe.

3       Q.   The board used to have a psychologist; am I

4  wrong about that?

5       A.   At one point we did have a psychologist

6  that provided some information.

7       Q.   And that psychologist is no longer

8  employed?

9       A.   No.

10      Q.   You have no mental health expert working

11 with the board?

12      A.   No, we have no mental health expert hired

13 by the board at this time to assess a case.

14      Q.   What if it was a hearing done by video

15 before the panel, can the board, as it's voting on this

16 majority vote, can it access the video?

17      A.   Video hearings are not recorded.  Audio is

18 recorded, but not the video.

19      Q.   So can what's being said at the prison be

20 picked up on that audio?

21      A.   Are you -- our audio tapes will provide

22 information from -- explain that.

23      Q.   I did Bryan Seddens' hearing.  I was across

24 from the board by way of a video camera.  Was the

25 recording only taking place in Jeff City on a laptop?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 222 of 285

1      A.   It's taking place on a laptop in

2 Jefferson City.  And those video recordings do have the

3 offender's statements on them.  They're recording that

4 information.  They're recording delegates.  The

5 microphones will pick up the offender's statements.

6      Q.   There's no mic on the side of the offender,

7 however, to specifically pick up what they're saying?

8      A.   No.  We have a TV with a volume.  When we

9 record from our office, it picks up what is said on our

10 side, as it picks up what's said on their side.

11      Q.   There's no mic on the prison side to

12 specifically pick up -- you're hoping the laptop in

13 Jeff City picks up what comes across the television

14 set?

15      A.   Yes.  And I've reviewed some before, and

16 they've -- it's been very audible.

17      Q.   In terms of writing the decision, who

18 writes a decision at -- well, what forms are used for

19 delivering the decision of the board in a JL WOP case?

20      A.   An inmate notice is sent out to the

21 offender.

22      Q.   I'm sorry?

23      A.   An inmate notice is sent out to the

24 offender and delivered by the institutional parole

25 officer.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 223 of 285

1          (Deposition Exhibit No. 40 was marked for

2    identification.)

3    BY MS. QUINN:

4          Q.   I'll show you Exhibit 40.

5               Are these documents familiar to you?

6          A.   Yes.

7          Q.   And looking at the first document, can you

8    tell us what that is?

9          A.   The first document is the inmate notice to

10   the offender setting the month and year of the hearing.

11         Q.   And here it indicates the month is one, and

12   the day is zero, but the year is 2017.

13              Can you tell us what that means?

14         A.   That means that they scheduled this

15   offender for a hearing some time in January of 2017.

16              So then when the -- so then the institution

17   will docket the case on a specific date, and do the

18   inmate notice to the offender to give a specific date

19   as to when the hearing is.

20         Q.   And then on page two of this document,

21   there's a parenthetical, date created, 9-29-16, and

22   there's some initials next to that.

23              Can you tell us what those initials mean?

24         A.   Those are my initials from the initial

25   hearing setting.  And DMU is the person who would have

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 224 of 285

1    typed the initial inmate notice.

2         Q.   And is that like a secretarial assistant?

3         A.   She's a senior office assistant.  She's a

4    SOSA.  Senior office-something assistant.

5         Q.   Okay.  And then turn to the second document

6    in this packet.  It looks very similar to the first;

7    yes?

8         A.   Yes.  Are you talking about the one dated

9    11-2 of '16?

10        Q.   Yes.  What's different about this document?

11        A.   This sets the specific date on the -- on

12   the -- for the offender, for a date where the

13   offender's going to be at the institution, or we have a

14   video parole hearing occurring at that institution.

15        Q.   So the same form that gives general notice

16   of the hearing is then used to give the specific date

17   of the hearing?

18        A.   Yes.

19        Q.   And page two of this I see the initials

20   JLB; what does that mean?

21        A.   I'm not sure who that is.  But generally

22   should be the person at the institution who dockets the

23   specific day of the hearing.

24        Q.   And the last page here is dated

25   January 30th, 2017.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 225 of 285

1                What is this document?

2           A.    This is the inmate notice that's given to

3      the offender after the decision from the hearing

4      occurred.

5           Q.    So where's the decision part on here?

6           A.    No. 3.  "You have been given parole

7      consideration in a parole hearing 01-03-0217.  You will

8      be scheduled for a reconsideration hearing on

9      01-00-2022.

10          Q.    And at the bottom, what is the information

11     at the bottom in the lined section?

12          A.    That would be notification of one of the

13     reasons -- or the reason of -- that the panel cited as

14     to deny parole consideration.

15          Q.    And to be clear, there's only one single

16     reason provided here?  Circumstances surrounding --

17          A.    Yes.

18          Q.    And on page two, I see some initials.  Who

19     is that?

20          A.    CTB is Charlie Baker.  Parole analyst.  And

21     DMU would be the SOSA.

22          Q.    And is it usually the same SOSA that does

23     the notice that does the decision?

24          A.    Not in all cases.  No.

25          Q.    Is there anyone else who plays a role in

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 226 of 285

1  putting this decision form into final form?

2      A.   Um, we have Dawn Umfleet.  She has OSAs

3  that work for her that create decision notices for

4  offenders.

5      Q.   Anyone else?

6      A.   The one that types this decision is

7  clerical staff.

8      Q.   What do they use to put this form together?

9      A.   They use the corresponding board action

10 sheet.

11          And juvenile life without, you have the

12 additional factors that were considered.  But this

13 is -- the analyst or board member would check reason

14 for denial.

15     Q.   So on the regular -- the ordinary board

16 action sheet there's a space to check a reason?

17     A.   Yes.  Page two of the board action sheet.

18     Q.   And that is what the administrative

19 assistant is trained to look to when typing this up?

20     A.   Yes.

21     Q.   And does it say anything about reasons for

22 the duration of the setback?

23     A.   No.

24     Q.   Does the board action sheet indicate that

25 sort of information?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 227 of 285

1    A.    I can't answer every -- some board members

2    may make notations on it.  Others may not.

3         Some may say, "cannot release because of

4    MPTT.  Consider in three years or four years."

5         Others may say nothing.

6         Some of them are set out for five years.

7    Some set out for three.  That's at the board's

8    discretion.

9         Parole cases is generally setting parole

10   reconsideration one to five years.

11   Q.   From this form, how is a JL WOP offender in

12   particular, supposed to figure out what it is they're

13   supposed to do to be able to be released in the future?

14   A.   On this particular one?

15   Q.   Yeah.  Mr. Roland's form?

16   A.   That, I'm not sure.

17   Q.   So how's Mr. Roland supposed to figure out

18   what he needs to do to get released?

19   A.   He should be making contact with his

20   institutional parole officer.  In this particular case,

21   it looks like reasoning was circumstances of

22   surrounding the offense.

23   Q.   Right.

24   A.   That doesn't mean that that's -- although

25   that factor may never change, it doesn't mean that he

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 228 of 285

1  will always never get released because of those

2  circumstances.

3          The board may say -- well, they may have

4  made a thought of, well, let's hear him in five years.

5  Three to five is statutorily.  And they may make

6  notations and say, consider release, future release, at

7  next hearing.

8          You know, that individual board member's

9  filling these out.  There's no requirement to tell us

10 what you're going to do next time.  They're termed.

11 You may have a completely separate or different panel

12 at a later date.  Which may be more favorable or less

13 favorable, I guess.

14      Q.   How's that decision provided to the JL WOP

15 inmate physically?

16      A.   The institutional parole officer delivering

17 the decision to the offender.

18      Q.   Is it also provided to the prosecutor?

19      A.   That, I don't know.

20      Q.   What about the victim; do you know?

21      A.   The victims are notified of decisions.

22      Q.   What about delegates?

23      A.   After ten days we would release that to a

24 delegate.

25      Q.   Do you mail it to them automatically?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 229 of 285

1    A.    No, not automatically.    No.    If they

2    contacted the institution they can release it.

3    Q.    And attorneys are not provided notice

4    automatically?

5    A.    We don't provide automatic notice to the

6    delegates.

7    Q.    I also noticed on this decision form, it's

8    indicated that "there's no right to appeal this

9    decision."

10    Is that right?

11    A.    Yes.

12    Q.    Why is there no right to appeal?

13    A.    That's because it's -- the majority board

14    has already reviewed the file and made a majority board

15    decision.

16    Q.    And so tell me about how majority board

17    decisions preclude inmates from seeking an appeal.

18    A.    That's part of the board case referral

19    policy related to the majority board decisions.

20    (Deposition Exhibit No. 41 was marked for

21    identification.)

22    BY MS. QUINN:

23    Q.    Okay.    I'll show you what's been marked as

24    Exhibit 41.

25    This is a set of materials relating to one

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL    Document 134-3    Filed 06/12/18    Page 230 of 285

1    of the Plaintiffs, Mr. McElroy.

2              You'll notice it's a letter from

3    Husch Blackwell, with the same documents we just talked

4    about, from Mr. Roland, and attached are various

5    notices and decision in this case.

6              Were you part of the document production

7    for these materials to us in this specific file?

8    Issues?

9         **A.    I've never seen this document.**

10        Q.    So you don't have any understanding of why

11   in Mr. Roland's case he only got the forms, but for

12   Mr. McElroy we got a letter from his lawyer at

13   Husch Blackwell?

14        **A.    I don't know why -- I don't know why that**

15   **occurred.**

16        Q.    And in his case too, there is no

17   explanation for the duration of the setback?

18        **A.    There's no explanation for the duration.**

19   **There is additional explanation for reason based upon**

20   **poor institutional conduct.**

21        Q.    No.  No.  Just the duration, why 2021

22   versus 2020, versus --

23        **A.    No.  That's a discretionary decision of the**

24   **board.**

25        Q.    What would be considered poor institutional

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 231 of 285

1    adjustment for a minor?

2         **A.    Generally, poor institutional conduct is**

3    **related to their conduct in the institution.**

4         Q.    So is there any difference in the analysis

5    between those who were incarcerated while children

6    versus adults when weighing institutional adjustment?

7              MR. CRANE:  I'm going to object.  That

8    assumes this offender was incarcerated as a child.

9    BY MS. QUINN:

10        Q.    Oh, okay.  Let me try to lay a foundation.

11   You said you don't know Ralph McElroy?

12        **A.    No.**

13        Q.    Should we go through all the documents to

14   see that he's on the list of --

15        **A.    I understand.  He is one of the juveniles.**

16             MR. CRANE:  I was saying he was probably

17   not incarcerated as a child.

18             (Deposition Exhibit No. 42 was marked for

19   identification.)

20             MS. QUINN:  I'll withdraw that question.

21   BY MS. QUINN:

22        Q.    I'll show you Exhibit 42.

23        **A.    Okay.**

24        Q.    So generally, putting aside individual

25   JL WOP cases, is there any kind of specialized analysis

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 232 of 285

1    that's supposed to take place when someone's been

2    incarcerated as a child in the prison system versus an

3    adult, and looking at their institutional adjustment?

4            MR. SPILLANE:  I'm going to object to the

5    question unless you can define what a child is.

6    BY MS. QUINN:

7        Q.   Anyone under 18 who came into the prison

8    system.

9        **A.   It depends.  One of the things they look**

10   **for as institutional adjustment is at the time of the**

11   **hearing versus time of commitment.  How long -- how**

12   **many violations are occurring.**

13           **So an offender that comes in as a young**

14   **offender on a short sentence, he doesn't have a whole**

15   **lot of time to improve conduct.  Because he's probably**

16   **going to be released.**

17           **These juvenile life withouts, one of the**

18   **things we look at is what's your conduct at the time of**

19   **when you got incarcerated, and what's that conduct**

20   **history been up until the hearing.**

21       Q.   So is there any training that you're

22   familiar with provided to the board about normal

23   adolescent behaviors?

24       **A.   No.**

25       Q.   And is there any policy or practice to

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 233 of 285

1    discount misbehaviors in prison while an individual is

2    a child under the age of 18?

3         **A.    No.**

4         Q.   So looking now at Exhibit No. 42.  This

5    appears to be a packet of materials related to JL WOP

6    Sidney Roberts.  It's a very long document put together

7    by attorney Amy Breihan and then the decision forms.

8         **A.    Okay.**

9         Q.   On his decision forms, starting with the

10   notice about when his hearing is to take place --

11        **A.    Do you have a number?**

12        Q.   Page 1990.  Towards the end.  It's the last

13   six pages?

14        **A.    Okay.**

15        Q.   And so the initials for his notice form are

16   the same as we saw on Roland?

17        **A.    Yes.  This would have been reviewed when it**

18   **first came in with the petition.**

19        Q.   And then as for the decision, who

20   participated in the decision?  The initials on the last

21   page?

22        **A.    On which page?**

23        Q.   The very last page of your packet.

24        **A.    Oh.  That would be Robin Worder, was the**

25   **analyst.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 234 of 285

1     Q.   And so it can be an analyst and not a board

2     member who's responsible for this decision?

3     **A.   No.   That's incorrect.   The decision notice**

4     **is separate from the decision.**

5          **The board members make the decision -- the**

6     **majority board decisions without any vote from the**

7     **analyst, or CAO, or the institutional parole**

8     **supervisor.   This inmate notice is generated to reflect**

9     **the decision of the board.**

10    Q.   I see.   Okay.   Thank you for that

11    clarification.

12         And Mr. Roberts parole was denied strictly

13    on circumstances of the offense?

14    **A.   Yes.   That's the reason given for the**

15    **denial.   Yes.**

16    Q.   And no explanation for the duration of the

17    setback?

18    **A.   No.   But I would note that he didn't get a**

19    **five-year setback, he got four.   So the reason for that**

20    **is a discretionary decision of the board.**

21    Q.   And everybody had to agree, the majority,

22    that four was the right number?

23    **A.   Yes.**

24         **(Deposition Exhibit No. 43 was marked for**

25    **identification.)**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 235 of 285

1    BY MS. QUINN:

2          Q.   I'll show you 43.  These are the materials

3    for Norman Brown.  Here again, we've got four sets of

4    documents.  The first page says that Mr. Brown has

5    three consecutive sentences for ACA to be served;

6    therefore, he's not eligible for release until 2025?

7          **A.   Yes.**

8          Q.   And this is a form that you completed?

9          **A.   Yes.**

10         Q.   But that's wrong, correct?

11         **A.   No.  At the time this board action sheet**

12   **was completed, and the calculation of the sentence,**

13   **this was correct.**

14         Q.   So he was sentenced at that time for three

15   consecutive ACAs?

16         **A.   That's what our institutional face sheet**

17   **indicated.**

18              **It was later changed to a -- the sequence**

19   **of that sentence, which was a 30-year sentence, was**

20   **changed to robbery-first or assault-first, one of the**

21   **two.  So at the time this was calculated, which I did,**

22   **was based on three consecutive armed criminal actions.**

23              **At the time of the hearing, a new face**

24   **sheet was completed.  It was after this was done and**

25   **prior to the hearing, it was determined -- and our**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 236 of 285

1 analyst picked up that the sentence structure had

2 changed -- and changed the minimum prison term based on

3 the change in the sentence structure.

4     Q.   Were you also aware that complaints were

5 being made about the way his sentence was being

6 calculated?

7     A.   I understand that there was disagreement

8 amongst some parties about how we calculated

9 consecutive sentences, yes.

10     Q.   And that's when you went back and looked at

11 the original form?

12     A.   No.  That was caught at the time of the

13 hearing.  In general, there was some complaints how

14 consecutive sentences are determined.  Whether you do

15 25 or 25 plus statutory minimum of statutory minimums.

16     Q.   So going into this hearing, Norman Brown

17 was not given accurate information about when he was

18 going to be eligible for release?

19     A.   No.  Because the initial notice had 7-28 of

20 2025.

21     Q.   And then 3-3 of '17 was the second notice

22 providing him with a date for his hearing, and that

23 date is May 23, '17, right?

24     A.   Second notice was May 23rd of 2017; yes.

25     Q.   And that notice makes no mention whatsoever

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 237 of 285

1    of his not being eligible for release?

2         **A.   No.**

3         Q.   And then he gets another notice on

4    March 15th that changes the date of the hearing,

5    correct?

6         **A.   Yes.  To the 24th of May.**

7         Q.   And that notice says nothing at all about

8    his not being eligible for release?

9         **A.   No.**

10        Q.   And then he received his decision dated

11   May 30th, 2017; is that right?

12        **A.   I don't know if he received it that date.**

13   **That's the date of this document.**

14        Q.   Thank you for the correction.

15             And this form, the initials at the back,

16   who are these folks?

17        **A.   Michael Davis.  And one of our clerical**

18   **support, Risa.**

19        Q.   And the only information he has been

20   provided about the reason for the denial is

21   circumstances surrounding the present offense?

22        **A.   Yes.**

23        Q.   There's no mention of ACAs or stacked

24   sentences, right?

25        **A.   Not on this notice.  And he's been set for**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 238 of 285

1    reconsideration in 2021.  In four years.  May of 2021.

2    **Which is less than a year prior to his minimum prison**

3    **term.**

4         Q.   How would we know that?  Where's that?

5         **A.   That's not on this notice, no.**

6         Q.   Seems like something important for the guy

7    and his lawyer to know about; no?

8         **A.   What's that?**

9         Q.   That would be an important bit of

10   information for the defendant and his lawyer to know?

11        **A.   To know his minimum prison term, yes.**

12        Q.   You know that heading into Norman Brown's

13   hearing our office filed on his behalf, as we have in

14   other cases, a document asserting his right to various

15   protections, right?

16        **A.   I believe so.**

17             **(Deposition Exhibit No. 44 was marked for**

18   **identification.)**

19   BY MS. QUINN:

20        Q.   I'll show you what's been marked as

21   Exhibit 44.  And this document is one where inquiries

22   are being made about how to respond to our request for

23   certain rights for Mr. Brown?

24        **A.   Yes.**

25        Q.   And the inquiry was made by Aaron Jarrett,

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 239 of 285

1  the IPO at Licking; is that right?

2         A.   Yes.

3         Q.   And your response is that there's no reason

4  to respond to that request for rights?

5         A.   Yes.

6         Q.   There's no need to do anything different

7  for his hearing versus regular parole hearing?

8         A.   **There's no reason to do anything different**

9  **than what we're doing for our regular parole hearing on**

10 **a juvenile life without.**

11        Q.   And you made sure to let him know that

12 lawyers don't control these processes?

13        A.   **Yes.  I made notice that the attorney can**

14 **attend as a delegate.  As with any parole hearing.  And**

15 **present written documents for the board to consider.**

16 **Including those below items that are required under**

17 **Senate Bill 590.**

18        Q.   You instructed these five considerations

19 are the required considerations for Senate Bill 590

20 JL WOP hearings?

21        A.   **What I instructed him was these cases are**

22 **not to retry a case.  But to determine suitability of**

23 **release.  Release planning identification of needs upon**

24 **release, institutional programming, to address risks**

25 **needs.  And that Senate Bill 590 required us to address**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 240 of 285

1   and give consideration to the below five items.

2        Q.   So these are different from the information

3   provided in the worksheet that Jarrett is being asked

4   to follow; no?

5        A.   It's different?

6        Q.   Yeah.

7        A.   I don't believe it's different.

8        Q.   How long is the worksheet?

9        A.   Oh, the worksheet's an interview worksheet.

10  I didn't tell Mr. Jarrett that he needed to -- the

11  staff needed to fill out the prehearing worksheet.

12  That's a process that they should be doing on all

13  these.

14            This was more as generality how to respond

15  to complaints from your office on conducting juvenile

16  life without hearings.  That's the context of this

17  message.

18       Q.   One of the things that you pointed out is

19  supposed to be considered is institutional programming

20  to address risks and needs?

21       A.   Yes.

22       Q.   And so what programming was identified for

23  Norman Brown to address risks and needs?

24       A.   I don't know that specific answer.

25       Q.   What has been identified for any of the

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 241 of 285

1   JL WOP defendants as programming that would help

2   address their risks and needs before release?

3        **A.   I'd have to look at board action sheets to**

4   **determine what specific needs were identified, or**

5   **prehearing reports on each one.**

6             **Some offenders are going to be identified**

7   **needing substance abuse treatment prior to release.**

8             **Some will be identified needing anger**

9   **management.  All kind of things that we can make**

10  **attempts to mitigate risk with programming.**

11             **(Deposition Exhibit No. 45 was marked for**

12  **identification.)**

13  BY MS. QUINN:

14       Q.   This is Exhibit No. 45.

15             So Exhibit 45.  This is an email exchange

16  from May of 2017 relating to inquiries from an attorney

17  from Starbucks in Seattle.

18       **A.   Yes.**

19       Q.   Does this seem familiar to you?

20       **A.   Yeah, briefly.**

21       Q.   Some gal with a soft heart from Seattle

22  caring about our JL WOP guys.

23             And so you have been called upon to deal

24  with this inquiry; why is that?

25       **A.   I would imagine I was called upon to do**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 242 of 285

1    this, like I am from different board members, that

2    phone calls are made, a lot of times they'll send them

3    to me.

4             Why this one came to me, I can't assume

5    what Ms. Zamkus was thinking, but it was probably

6    because I would be able to tell them what information

7    we were looking for and what the requirements of the

8    law were.

9        Q.   And it appears that you agreed to respond

10   to this gal directly?

11       A.   Yes.

12       Q.   And did you?

13       A.   I made a call and I never got a call back.

14   So I don't know.

15       Q.   And the bolded information you have here in

16   your response to Zamkus, that looks familiar, doesn't

17   it?

18       A.   Yes.

19       Q.   It's the same cut and pasted bolded

20   information from the email from Aaron Jarrett, correct?

21       A.   I don't know if it's from Aaron Jarrett or

22   from -- could have been copied out of the statute.

23       Q.   No, it's word-for-word the language that

24   you used in your email to Jarrett in Exhibit 44.

25       A.   It may have been.  I would have copied and

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 243 of 285

1    **pasted that from somewhere.**

2         Q.   And you're noting here that this is what

3    you think the board should quote/unquote look at as a

4    set of factors?

5         **A.   This is what we would normally tell people,**

6    **that in addition to what we look for on a normal parole**

7    **consideration hearing, that is not a juvenile life**

8    **without, that we also look at these factors.**

9         Q.   Look at.  What does "look at" mean?

10        **A.   Consider when making a decision.  Not look**

11   **at, consider.**

12             **(Deposition Exhibit No. 46 was marked for**

13   **identification.)**

14   BY MS. QUINN:

15        Q.   I'm showing you what's been marked as

16   Exhibit 46.  These are various log entry forms

17   apparently relating to Norman Brown's parole denial and

18   Mr. Ruzicka's involvement in his parole hearing.

19        **A.   Okay.**

20        Q.   Have you seen these before?

21        **A.   I have never seen these.**

22        Q.   Were you aware of complaints being made

23   about --

24        **A.   Mr. Brown?**

25        Q.   Yeah.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 244 of 285

1    **A.    Yes.**

2         Q.    Tell me what you know about the complaints

3    being made about Mr. Brown's situation.

4         **A.    The complaint -- my information from the**

5    **complaint that we received regarding Mr. Brown -- was**

6    **based on a phone call from Senator Schupp's office.  I**

7    **think I provided you a document of that.  And that was**

8    **indicating that Mr. Ruzicka was involved in his**

9    **hearing.**

10             **So what I -- receiving that complaint,**

11   **that's where I became aware of that.  I'm not sure what**

12   **these edit log entries are.  I've never seen this**

13   **document.**

14        Q.    And so you communicated with Senator Schupp

15   that the reason Norman Brown was denied was because of

16   two consecutive ACA sentences that required a minimum

17   of three years to be served per the statute?

18        **A.    Is there a number on that one?**

19        Q.    154.

20             I'll mark it as Exhibit 64 for purposes of

21   this deposition.

22             (Deposition Exhibit No. 64 was marked for

23   identification.)

24             THE WITNESS:  Yes.

25   BY MS. QUINN:

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 245 of 285

1      Q.   As we noted earlier, that's not what's

2  written on his decision?

3      **A.   No.**

4           **(Deposition Exhibit No. 47 was marked for**

5  **identification.)**

6  BY MS. QUINN:

7      Q.   Okay.  We're going to look at Exhibit

8  No. 47.

9           So beyond the problem of Mr. Ruzicka

10 handling Norman Brown's hearing, there were other

11 complaints lodged about his treatment by MDOC around

12 the time of his parole hearing; are you aware of that?

13     **A.   I'm not.  I don't believe I was aware of**

14 **those issues.**

15     Q.   I'll ask you to take a look at Exhibit 47,

16 see if this refreshes your recollection about other

17 concerns following Norman Brown's hearing.

18     **A.   I have not seen this.  I do not recognize**

19 **any of these documents.**

20     Q.   Are you aware Mr. Brown got removed from

21 his facility after he complained of Ruzicka doing his

22 hearing?

23     **A.   I'm not aware of that's why he got moved.**

24     Q.   Are you aware of his move?

25     **A.   I'm aware that he's over at Crossroads**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 246 of 285

1 Correctional Center at this time.

2      Q.   Why did he get moved?

3      A.   That, I don't know.

4      Q.   Are you not familiar with his raising

5 concerns about retaliation and that's why he was moved?

6      A.   No.  I do not know that was the reason he

7 got moved.  That would have been handled through

8 someone else.

9      Q.   Did Aaron Jarrett raise anything with you

10 following Norman Brown's hearing?

11      A.   As far as?

12      Q.   Anything.

13      A.   No.  I think I've got the information from

14 the senator's office calling.  And there was

15 allegations on Mr. Ruzicka being the board member, and

16 that was the issue that I heard.  I know that they

17 moved Mr. Brown.  The reasons that they moved him I

18 don't get concerned with.  That's not my issue.  That's

19 a DAI issue.

20           (Deposition Exhibit No. 48 was marked for

21 identification.)

22 BY MS. QUINN:

23      Q.   I'll show you what's been marked as

24 Exhibit 48.

25           Have you seen any of these before?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 247 of 285

1      **A.    This would be a personnel issue outside my**

2   **chain of command.**

3      Q.    And you didn't know anything about someone

4   requesting an -- investigating Mr. Jarrett's activities

5   relating to Norman Brown?

6      **A.    No, I didn't know anything about this.  Nor**

7   **should I.  It is a personnel issue.**

8           **(Deposition Exhibit No. 49 was marked for**

9   **identification.)**

10  BY MS. QUINN:

11     Q.    I'll show you Exhibit 49.  This is another

12  request for investigation form.

13          Have you seen this document before today?

14     **A.    No.**

15     Q.    And you never saw a page two of this set of

16  materials which references you as having information

17  about the activities of the parole board potentially

18  counting words and phrases during hearings?

19     **A.    I had a conversation with my supervisor who**

20  **inquired about this.  And that was the first time I'd**

21  **heard of this issue.**

22     Q.    And just to be clear, when we're saying

23  "this issue," we mean about Don Ruzicka essentially

24  turning hearings into games; they were scoring the

25  ████████████████████████████████████████████

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 248 of 285

1  could make inmates say certain goofy phrases?

2      **A.  Yeah.  I'm not sure that I recall -- I'm**

3  **reading.  I've never seen this document.**

4      Q.  But you said you were contacted by your

5  supervisor about what you might know?

6      **A.  Yes.**

7      Q.  And that supervisor was Kelly Dills?

8      **A.  Yes.**

9      Q.  And Ms. Dills seems to have been sort of

10  charged with or took charge of having this

11  investigation undertaken; is that fair to say?

12     **A.  Yes.**

13     Q.  And the board chair went out of town at the

14  time the investigation was undertaken; is that right?

15     **A.  I wouldn't know that one way or the other.**

16     Q.  And when you reported to her that you might

17  have some recollection of words and phrases being

18  counted, is it fair to say at the time you knew these

19  games were being played by Ruzicka and your colleagues?

20     **A.  No.  I think I'm misquoted in here.  What I**

21  **told her was I think there has been issues in the past**

22  **with other board members maybe doing issues with -- um,**

23  **not Ruzicka specific, but there's been other times in**

24  **the past where you may have had somebody who was, you**

25  **know, discussing, talking about -- I'm trying to**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 249 of 285

1    remember.

2           I didn't get that directly, but was told

3    that counting paperclips, based upon some, you know, a

4    delegate that comes in.  That was provided to me by my

5    supervisor in the past.

6           But as far as having direct knowledge, they

7    were not discussing games and stuff in front of me.

8        Q.   So to go back about the paperclip

9    situation, what was it you were told?

10       A.   From what I can recollect, there

11   was -- Ms. Barton had made some statements

12   about hearing teams taking and putting paperclips on

13   the desk to rate delegates, or rate interviewers, or,

14   you know, whatever.  It wasn't something -- this was

15   years and years ago.  This is not something I clearly

16   remember.

17          But I did not hear -- I can tell you for a

18   fact, I did not hear Don Ruzicka, or the other unnamed

19   person who complained, that it was occurring.

20       Q.   Well, are you familiar with any other

21   unprofessional conduct on the part of parole board

22   members, parole analysts, or others involved in these

23   proceedings?

24       A.   No.  In these four?

25       Q.   No.  In any parole proceeding at all.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 250 of 285

1     A.   I'd have to think about that.  I mean, none

2     that -- none that -- that I can speak to.

3          Q.   Why couldn't you speak to them?

4          A.   Well, I'm just trying to think.  You'd have

5     to give me -- you know, I've been doing this in the

6     same office --

7          Q.   Let's go with the last five years.

8          A.   Um, I'm trying to think of what was in the

9     last five years.

10              No.  Not that I can think of.  Not any

11    specifics.  And even what I spoke to as far as the

12    paperclips, that was based on my former supervisor just

13    saying that, you know, this had been going on.

14              Now, whether it did or not, I can't verify.

15    That's what was told to me.

16         Q.   I don't mean to put you on the spot.

17         A.   I know.  I know.  I understand.

18         Q.   But --

19         A.   I don't.

20         Q.   Any situations that you've disagreed with

21    where the parole board, the analysts, the IPOs or

22    others are engaging conduct that you think is

23    inappropriate?

24         A.   Not -- not that's contrary to law.  I have

25    disagreements all the time with people that, yeah,

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 251 of 285

1    maybe we should consider this, or not have said this,

2    but that's a difference in opinion as far as release

3    decisions.

4                I think there's -- not specific to

5    hearings -- can we -- can -- do I have -- I think

6    there's been times when, just antics in the office, as

7    far as, you know, different -- like my supervisor,

8    former supervisor -- not Ms. Dills, but Ms. Barton -- I

9    think there was some disagreements in how the board

10   should do business.  But I don't have specifics.

11               But, you know, that was a difficult time,

12   because it was very -- the board member -- the chairman

13   and Ms. Barton were kind of at odds, butting heads.

14               Do I know exactly the specifics of what

15   everything was?  You would have to ask Ms. Barton about

16   that.  But it was a stressful position to be in.

17               (Deposition Exhibit No. 50 was marked for

18   identification.)

19   BY MS. QUINN:

20        Q.   I'm going to show you Exhibit No. 50.

21               Have you seen this letter before?

22        A.   No.  I wouldn't have been privy to this.

23        Q.   Yeah.  I'm wondering "to the whom it may

24   concern" is in this letter.

25               Do you know?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 252 of 285

1    A.   That, I do not know.  I can't answer that.

2    I've never seen this.

3    Q.   Were you aware of Mr. Ruzicka in 2016 being

4    asked to step away from hearings for a period of time?

5    A.   Yeah.

6    Q.   Can you tell us about that?

7    A.   I was made aware of the allegations when

8    Ms. Dills asked me about it.  And I was -- I think at

9    that time I was probably doing the hearing schedule.  I

10   know he was removed from the hearing schedule.  I don't

11   remember if I was still doing hearings at that time or

12   if Ms. Worder had taken over for me.

13          That's pretty much how I became aware of

14   it.  He could not conduct hearings.  He has to stay in

15   the office, do file work, that kind of thing.

16   Q.   Do you know how long that went on for?

17   A.   That, I'm not completely sure when he got

18   placed back on the hearing schedule.  Or if he ever

19   did.  I don't know if he was doing hearings towards the

20   end or not.  I mean, I don't remember.

21   Q.   He did Norman Brown's hearing, didn't he?

22   A.   I guess he was doing hearings again, yes.

23          (Deposition Exhibit No. 51 was marked for

24   identification.)

25   BY MS. QUINN:

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 253 of 285

1      Q.   I'll show you what's been marked

2  Exhibit 51.

3      **A.   And I also knew -- just to make clear -- I**

4  **can get -- I knew that the allegations hit the papers.**

5  **I mean, that was -- the initial notification was from**

6  **Kelly Dills.  When she asked.  But there were so many**

7  **newspaper articles going out, so I knew about that.**

8      Q.   Exhibit 51 talks about a press conference

9  that my office called relating to Ruzicka's conduct.

10      Have you seen these materials before?

11      **A.   No, I haven't seen this.**

12      Q.   Do you remember when that press conference

13  took place?

14      **A.   No, I haven't seen this.**

15      Q.   There wasn't activity in the office, kind

16  of a flurry of activity around this effort on our part,

17  to surface Don Ruzicka's behaviors?

18      **A.   I was aware that there was the media**

19  **articles being sent out.  Every employee was aware of**

20  **that.  I don't think I was aware that you guys did a**

21  **press conference.  It may have been included in one of**

22  **the articles.**

23      **But as far as the date and everything, my**

24  **indication came from Ms. Dills.  The initial articles.**

25      Q.   So between when the initial investigation

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 254 of 285

1    took place, and then the press started covering it

2    months later, was there any training done at the

3    Department of Corrections or the parole board relating

4    to Ruzicka-like activities?

5          **A.    No.  Not that I'm aware of.  I don't know**

6    **what was said to the board outside of the board that I**

7    **was not involved in.**

8                **I don't know whether the chairman brought**

9    **everybody in and did any training or what he said to**

10   **the board members.**

11         Q.   There was no training given to the analysts

12   about this problem, right?

13         **A.    No.  Not that I'm aware.**

14         Q.   Well, you were an analyst.

15         **A.    I was not trained in this process.  Other**

16   **than everybody was embarrassed by the whole issue.**

17         Q.   And you, as an analyst, were you ever at

18   hearings with Don Ruzicka?

19         **A.    I've conducted hearings with Don Ruzicka.**

20         Q.   And did you ever see him addressing

21   offenders in funny ways?

22         **A.    Absolutely not.**

23         Q.   Making jokes?

24         **A.    Nope.**

25         Q.   Okay.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL    Document 134-3    Filed 06/12/18    Page 255 of 285

1            A.   Not that I'm aware of.  There was

2    never -- no coordination of throwing names out there.

3    I wouldn't have allowed it.

4                 (Deposition Exhibit No. 52 was marked for

5    identification.)

6    BY MS. QUINN:

7            Q.   I'll show you what's been marked as

8    Exhibit 52.

9                 These are documents relating to Ruzicka

10   declaring that he is resigning from the board and

11   Kenny Jones accepting that resignation.  And a press

12   release from the Governor -- no, from the corrections

13   department about the resignation.

14                Have you seen these before?

15           A.   I'm sure I have.  I'm sure it probably

16   passed through my desk.  I don't really remember it.

17           Q.   Did Ruzicka resign?

18           A.   Yeah.  He signed his resignation.

19           Q.   I see that document.

20                Did you hear any other assessment of how he

21   came to leave?

22           A.   I don't know whether he was -- if he did

23   not resign, whether he would have been terminated.  I

24   would -- whether he was pressured.  I mean, something

25   like this happens, I would assume there's pressure that

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 256 of 285

1  occurs that you need to resign.  I was not sitting in

2  the room when they said you either resign or we're

3  gonna fire you.  I wouldn't be part of that.

4        Q.   Did Kelly Dills tell you that is what took

5  place?  Or anyone else?

6        A.   No.  Chairman Jones did tell me -- he did

7  tell me that Mr. Ruzicka was going to resign.  And

8  Kenny Jones felt that was a good thing.

9        Q.   What else did Kenny Jones say to you about

10  Ruzicka's behavior?

11        A.   He didn't say.  I think -- I don't remember

12  direct conversations with Mr. Jones.  I think he

13  thought that was improper.  I mean, I think you have to

14  know that, especially if Mr. Jones was the one that

15  self-policed the board and brought that to light.

16        Q.   Have there been complaints made to the

17  parole board that you're aware of relating to

18  Ruzicka's impacting hearings, people looking for new

19  hearings?

20        A.   Yes, there have been.

21        Q.   What's going on about that situation?

22        A.   When there's been allegations that improper

23  behavior occurred at a hearing, I know that has

24  occurred because we had Senator Schupp's office call in

25  regards to Norman Brown and Mr. Ruzicka being a part of

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 257 of 285

1    that.

2            What we've done is, in Norman Brown's case,

3    you know, I've spoke with the analyst.  He's one of our

4    best analysts, Mr. Baker.  I reviewed the hearing tape

5    in its entirety to make sure there was no games being

6    played in that.

7            And there was a good hearing.

8    Mr. Ruzicka was nothing but professional in that

9    hearing.  From everything I heard, he did a good

10   hearing with Mr. Brown, and Mr. Brown had a good

11   hearing and good responses back.

12       Q.   And what about the other people who have

13   complained, have they all gotten reviews of their

14   proceedings?

15       A.   If there was a complaint that Mr. Ruzicka

16   did any game-playing in the hearings, we basically had

17   the same procedure.  We would review those and see if

18   there was any substance to the allegations.

19            The ones that I've received have not

20   had -- that I've listened to, there's been no

21   game-playing.  Those specific hearings I believe were

22   identified through the investigation, and a lot of

23   those were already released on parole.

24       Q.   How many hearings have you personally

25   reviewed where a complaint was made?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 258 of 285

1          MR. CRANE:  Do you mean on this issue or

2     any other issue?

3     BY MS. QUINN:

4          Q.   I'm sorry.  On this issue, on these

5     specific Ruzicka hearings, did anyone say, "I want a

6     new hearing?"

7          **A.   I believe there was probably two to three,**

8     **Mr. Brown being one of them.**

9          **(Deposition Exhibit No. 53 was marked for**

10    **identification.)**

11    BY MS. QUINN:

12         Q.   I'm showing you Exhibit 53.

13              You mentioned earlier press coverage of

14    Ruzicka and this game-playing and resignation.

15              And you sent this coverage from CNN to

16    Kenny Jones?

17         **A.   Yes.**

18         Q.   Is that right?

19         **A.   Yes.**

20         Q.   Why did you do that?

21         **A.   Generally, if there's any press coverage**

22    **that comes in on a Google alert from my computer, I**

23    **will forward it just so that the board member is aware**

24    **of it.**

25              **I would assume this was probably after he**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 259 of 285

1    was the chairman.  And it's more of an issue that I

2    want to make sure that he's aware of any press

3    coverage, positive or negative.

4         Q.   Don't you have a press person that does

5    that?

6         A.   Yeah, we do.  It's kind of -- I think that

7    I do that just as -- make sure that he sees it.  I'm

8    sure we have a -- we have a PIO, whatever that stands

9    for.

10              MR. CRANE:  Public information officer.

11              THE WITNESS:  If I receive something in a

12   Google alert, then I will forward it over to him to

13   make sure that he's aware of that situation.

14              (Deposition Exhibit No. 54 was marked for

15   identification.)

16   BY MS. QUINN:

17   ████  ███████████████████████████

18   ██████████████████████████████████████

19   █████████████████████  ██████████████████████

20   ███████

21   ██████████████████████████████

22   ████  ███████████████████████  █████████████

23   █████████  █████████████████████████

24   ███████████████

25   ██████████████████████████████████

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 260 of 285



PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 261 of 285

1 ██████████

2 ██ ██

3 ██ ████████████

4 █████ █ ██████████████

5 ██ █████████████

6 ██ ████

7 ██ █████████████

8 ███████████████ ██████

9 ████████████ ████████████

10 █████████████████████

11 █████

12        **(Deposition Exhibit No. 55 was marked for**

13 **identification.)**

14 BY MS. QUINN:

15        Q.   I'll show you what I'm going to mark as

16 Exhibit 55 for purposes of this deposition.

17        This is a packet of material relating to

18 the Campaign for Fair Sentencing of Youth inviting

19 parole officials from Missouri to attend a conference

20 and special programming for parole board members.

21        Have you seen this before?

22        **A.   I don't remember seeing this.  I don't have**

23 **any knowledge of this.  But not that I'm aware of.**

24        Q.   Had anyone mentioned to you the opportunity

25 to go to a Campaign for Fair Sentencing of Youth

Pohlman*USA* Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 262 of 285

1  training?

2      A.   No.  I don't remember anybody mentioning

3  this.

4      Q.   If we called them on the phone right now

5  and invited you, would you go?

6      A.   It would have to be approved.

7           I do know there's very limited funds for

8  outside training.

9           But if it was a -- if it was a conference

10 that was on fair sentencing, I would say I'd have to

11 get my supervisor to approve.  And if there was no cost

12 to the department, I don't know why he would not.

13          If that makes sense.

14     Q.   The only impediment, it sounds like, you

15 believe --

16     A.   Cost.

17     Q.   -- is them paying for the travel?

18     A.   Yeah.  Out-of-state travel is very costly.

19 And it is -- I have not seen many approvals for

20 out-of-state travel.

21          (Deposition Exhibit No. 58 was marked for

22 identification.) (Changed to 56)

23 BY MS. QUINN:

24     Q.   Here's Exhibit 58.

25          This is a July 2017 notification relating

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 263 of 285

1    to training made available to IPOs.

2              Are you familiar with this training?

3       A.   I would have to look at it first.

4              IPO specific training, it's my

5    understanding, it's training designated to IPOs.

6              As far as further information related to

7    that, I'm not exactly sure what it all -- I know that

8    there's specific IPO training.

9       Q.   You had no part of setting this up or

10   planning it?

11      A.   No.  I'm not sure who it's addressed to.

12      Q.   Okay.

13      A.   We have new IPO training.  I don't know if

14   that's what this is.

15      Q.   Okay.

16      A.   From what I can tell, I believe that's

17   probably new IPO training.

18      Q.   But fair to say, nothing relating to

19   adolescent development or youth sentencing?

20      A.   There's no specific topics to that.

21   Whether they touch on that issue in some of these

22   sessions, that, I would not know.

23      Q.   And I think I mis-numbered that.  I think

24   that's 56 if you can correct it.

25      A.   Okay.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 264 of 285

1          (Deposition Exhibit No. 57 was marked for

2     identification.)

3     BY MS. QUINN:

4          Q.   I'll show you Exhibit 57.

5               Maybe you can tell me what this is.

6          A.   I believe this was a data run by our

7     planning and research as to the number of juvenile life

8     without sentences.

9          Q.   And it looks like maybe there's a page

10    missing from this, 54; do you know anything about that?

11         A.   Some of this is -- seems to be some of the

12    same information, I believe.

13              MR. CRANE:  Looks like copying from Excel.

14              THE WITNESS:  Looks like the same.

15    BY MS. QUINN:

16         Q.   But the date on this one that you're

17    looking at, May 2017, if you look at the second --

18    there's two sets -- one is dated August of 2016.  One

19    is dated July of 2017.

20              Sounds like there are different versions

21    yet floating around of this spreadsheet 'cause that one

22    you just talked about is May.

23         A.   Yes.  Looks like these are run at different

24    times.

25         Q.   So Exhibit 57, the last document, is dated

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 265 of 285

1    July of 2017.

2              Are you aware of any more recent runs than

3    this?

4         A.    No.  Not that I'm aware of.

5         Q.    So who's putting these spreadsheets

6    together; if you know?

7         A.    This would come from our research --

8    planning and research.

9         Q.    Is that that fellow Mr. Gin?

10        A.    Who?

11        Q.    Gin?

12        A.    I have no idea who you're talking about.

13        Q.    Never mind.

14        A.    Probably David Ottfield and his group.  I

15   would imagine.  This is not something that we would

16   hand calculate.

17        Q.    And then separately there are spreadsheets

18   related to JL WOP hearings that are taking place?

19        A.    Yes.

20        Q.    And your office is handling those

21   spreadsheets?

22        A.    Yes.  We're handling those spreadsheets and

23   tracking those hearings that had juvenile life

24   withouts.

25              (Deposition Exhibit No. 58 was marked for

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 266 of 285

1    **identification.)**

2    BY MS. QUINN:

3         Q.   Here we have Exhibit No. 58.

4              These are items produced in the document

5    production that took place before today.

6              One is an undated spreadsheet.  One is

7    dated October 23, 2017.

8         **A.   Okay.**

9         Q.   Is there any more recent spreadsheet that

10   you produced?

11        **A.   Yes.  We provided it to you guys today.**

12        Q.   Okay.  And are you personally maintaining

13   and updating this spreadsheet for the hearings?

14        **A.   This spreadsheet is -- Dawn Umfleet is**

15   **putting these together and updating them as decisions**

16   **come back, yes, but not me personally.**

17        Q.   Okay.  This is Amy's area.

18             Now we're going to talk about -- very

19   quickly -- Exhibit 61.

20             (Deposition Exhibit No. 61 was marked for

21   identification.)

22   BY MS. QUINN:

23        Q.   Here is a set of calendars provided to us

24   that appear to set forth the schedules for the parole

25   board members from November 2016 to March of 2017.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 267 of 285

1          Am I right in my assessment of what this

2     is?

3          A.    Yes.

4          Q.    How does this schedule get put together?

5          A.    The schedule is put together by the hearing

6     analyst.  They determine what days are available to

7     have hearings.

8               We try to -- we run -- I can tell you what

9     I did when I did the hearing schedule.

10         Q.    No, I'd like to know what's going on from

11    November of 2016 to March of 2017 first.

12         A.    What happens is that they will generally

13    get an idea of how many hearings are going to be held

14    for the Monday in each institution.  So this hearing

15    calendar in November was probably done three months in

16    advance.  That's why we don't -- so that's why they

17    have this ahead of time.

18               And then we try to determine how many

19    hearings will occur at that institution for that month.

20    And then we determine how many are scheduled to occur,

21    and then we figure out how many days that we likely

22    need, and we draw up an initial hearing calendar.

23               As you can see, there are a lot of changes

24    that occur to the hearing calendar.  A lot of that is

25    based on waiver -- hearing waivers, where offenders

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 268 of 285

1    waive personal appearance and get decisions from the

2    board without a personal appearance.

3             There are others that, you know, you may

4    collapse days so that you don't go up to an institution

5    for three hearings on one day and the next week go for

6    another three hearings.

7             So it's developed to determine -- it's

8    developed to schedule out what institutions need

9    hearings and what days to put them on.

10        Q.    Is there a maximum number of hearings that

11   will be scheduled for any given day?

12        A.    There are maximums.  At this point, I

13   believe it's still 18.  I believe.  That's something

14   the hearing scheduler would know for sure.

15        Q.    And is that based on hearings taking

16   30 minutes or less?

17        A.    It's based on -- I don't know how

18   many -- what that's based on.  It's what they believe

19   they can accomplish in an eight-hour workday.  So you

20   probably have to average that out.

21             Some hearings take longer than others.

22   Victim cases.  Juvenile life without cases.  They take

23   a longer period of time than a non-support, first-time

24   offender.

25        Q.    But the plan is to be at the facility no

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 269 of 285

1   more than eight hours?

2          **A.    That's the hope.  Do they always reach that**

3   **goal?  I couldn't say.  They're usually able to get**

4   **hearings done within the workday.**

5          Q.   And there's nothing that instructs the

6   board members to take longer with juvenile life without

7   parole hearings than regular hearings, right?

8          **A.    There's nothing on the calendar that**

9   **instructs that.  I think the board members understand**

10  **the complexity of some of these cases, just like they**

11  **do with victim cases, and they are going to take**

12  **longer.**

13         Q.   But there's no written policy that requires

14  them to do that, correct?

15         **A.    No.**

16             MS. QUINN:  Let's take a break.

17             (A break was taken.)

18             MS. QUINN:  I'm finished.

19  CROSS-EXAMINATION BY MR. SPILLANE:

20         Q.   I'm Mike Spillane from the Attorney

21  General's Office.  I represent the Defendants in this

22  is case.  I have a couple of quick questions.

23             I handed you something, the juvenile life

24  without parole worksheet, designated for this purpose

25  as Respondent's Exhibit 1.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 270 of 285

1          Who designed this?

2     A.   This would have been designed by the

3  IPO region.

4          As far as a specific name, I cannot tell

5  you.  I can tell you that it would have -- I can give

6  you who I believe designed it.

7     Q.   That's fine.

8     A.   I believe this would have been designed by

9  Michelle Cassidy, the IPO regional administrator, or

10  her staff.

11     Q.   What purpose was it designed for; if you

12  know?

13     A.   This purpose was designed so that when

14  institutional parole officers were interviewing

15  juvenile life withouts for parole consideration, that

16  they did not just ask questions that they would with

17  every other parole consideration hearing, but they

18  would touch on issues that are required by statute due

19  to Senate Bill 590.

20     Q.   All right.  Last question on this one.

21          The first line says, "those considerations

22  are highlighted and should be included in the report."

23     A.   Yes.

24     Q.   What does that mean?

25     A.   That means that these items that are

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 271 of 285

1  **highlighted are required to be placed into the reports.**

2  **Should be included in the report.**

3  Q.  When it says "the report," is that the

4  institutional parole officer's report?

5  **A.  That would be the parole -- the prehearing**

6  **report that is conducted that is written by the**

7  **institutional parole officer.**

8  Q.  Did I understand you correctly when you

9  testified on direct that that goes into the file that

10  is seen by the parole board?

11  **A.  No.  This goes -- goes in a working file by**

12  **the institutional paroles officer's use in order to**

13  **develop the prehearing report.**

14  Q.  That was a very bad question.

15  What I was trying to ask, did I understand

16  you correctly to testify that the report by the

17  institutional parole officer that incorporates this

18  information goes into the file that is reviewed by the

19  board?

20  **A.  Yes.  This information is placed into the**

21  **prehearing report that is part of the file material**

22  **that the board uses for parole consideration hearings.**

23  Q.  Let's move on to Respondent's

24  Depo Exhibit 2.  Which is a sheet that says -- well,

25  why don't you read the first line for us in the report.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 272 of 285

1      A.    "In a parole review hearing, under this

2  section, the board shall consider, in addition to the

3  factors listed in 565.033:"

4      Q.    And there's a list of five things with

5  lines for information next to them?

6      A.    Yes.

7      Q.    Who does this go to?  This document?

8      A.    This document is taken to the parole

9  consideration hearing, and is filled out by --

10  generally going to be the analyst filling this

11  information out.

12      Q.    And is this document in the file when it

13  is -- goes to the parole board for decision?

14      A.    Yes.

15      Q.    And when it says "board shall consider,"

16  is that a directive that the board must consider the

17  information here?

18      A.    Yeah.  I believe "shall" is a directive

19  term.

20      Q.    And where it says "in addition to the

21  factors listed in 565.033," what is 565.033?

22      A.    That's a statute in -- that lists factors

23  that are required to be viewed at trial for juvenile

24  offenders, which would include circumstances of the

25  offense being one of those factors.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 273 of 285

1      Q.   So when I read that sentence that you just

2   told me was a directive, it said, "the board shall

3   consider in addition to the factors listed in 565.033,"

4   does that directive go both to the factors in 565.033,

5   and these five additional factors?

6           MS. QUINN:  I'm going to object to the form

7   of that question.

8   BY MR. SPILLANE:

9      Q.   You may answer if you understand it.  If

10  not, I'll ask a better one.

11     **A.   I believe that this statute requires the**

12  **board to -- that they shall consider these additional**

13  **factors in addition to those in 565.033.**

14          **I believe that is not a "shall consider**

15  **these additional factors," and possibly may consider**

16  **the others.  I believe that is a "shall consider" both.**

17     Q.   I'm going to move forward to Respondent's

18  Exhibit 3, which you produced this morning.  And I

19  think I gave you a copy.

20          Tell us what this is.

21     **A.   This is -- yesterday, I took the juvenile**

22  **life without spreadsheet for the decisions, I took that**

23  **updated decision to try to see what the -- to get a**

24  **feel as to what the board's decision-making practices**

25  **were on juvenile live withouts.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 274 of 285

1          I anticipated that that would probably be a

2     question:  How does the board feel about juvenile life

3     without.  So what I wanted to have is data, actual hard

4     data, as to the board's decision-making process.

5          Q.   I'm going to ask you some specific

6     questions.

7               There's a line labeled total number of

8     JL WOP offenders who petitioned.  And the number next

9     to it is 31.

10              What is that?

11         A.   That is how many petitions we received on

12    juvenile live withouts.

13         Q.   The next line says "minus four ineligible

14    due to time served."

15         A.   Can I clarify that?

16         Q.   Sure.

17         A.   This is the total number of juvenile life

18    without offenders who petitioned.  It's not the total

19    number of petitions that were received.  Because

20    there's been, I think, three offenders that

21    re-petitioned.

22              So I didn't want -- I wanted to know of the

23    hearings that we conducted, what was the board's

24    decision-making process.

25              So those -- it's a -- I know it's a slight

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 275 of 285

1  deviance from what you said.  But there's 31 offenders

2  who have petitioned.  There's three that petitioned

3  twice.  But there's 31 different offenders that we

4  received petitions.

5       Q.   And do I read the next line to mean that

6  four of them didn't get hearings because you looked at

7  them and they weren't JL WOPs; is that an accurate

8  reading?

9       A.   Yes.  There was one that was a life without

10  for 50 years.

11            There's one offender who actually withdrew

12  his petition.

13            And there's also two that did not have

14  sufficient time in on the 25 years to be eligible to

15  petition by statute.

16       Q.   And so you held 27 hearings?

17       A.   We held 27 hearings.

18       Q.   And one of those, -- as I read the next

19  line -- was a mistake, because the fellow actually was

20  over 18 when he committed the crime?

21       A.   Yeah.  That was one that, it was determined

22  at the time of the hearing, that the offender was not a

23  juvenile at the time that the offense occurred.

24       Q.   Okay.  And then the next line you take --

25  you end up with 26, and then you take three out because

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 276 of 285

1    three were ineligible for release within five years?

2        **A.    There was three offenders who had**

3    **consecutive sentences with statutory requirements of**

4    **time to be served.  Armed criminal action, I believe,**

5    **was in all of them was the issue, which carries a**

6    **three-year time-to-serve on that specific sentence.**

7             **The way the juvenile life without is**

8    **written, you have to serve 25 years on the juvenile**

9    **life without sentence, and it's not specific to the**

10   **entire sentence structure.**

11       Q.    So as I read this, you have the number of

12   eligible who asked for release, and were eligible for

13   release within five years, were 23?

14       **A.    Yes.  And where that number came from, it**

15   **is the board's practice not to set a reconsideration**

16   **hearing out more than five years.**

17       Q.    Okay.  And then it says one hasn't been

18   decided; is that still accurate?

19       **A.    One is currently pending a final board**

20   **decision.**

21       Q.    So as I read the last number, which is

22   bolded, it says you did 22 hearings for people who were

23   eligible for release; is that accurate?

24       **A.    Yes.  That's what I came up with my data**

25   **set.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 277 of 285

1    Q.   And how many received release dates of

2    those 22?

3    **A.   Four.**

4    Q.   And you calculated that as 18.2 percent?

5    **A.   That's -- yes.**

6    Q.   And these were all the first parole hearing

7    they'd ever had?

8    **A.   These are -- yes.  We have not conducted**

9    **any reconsideration hearings on any of the juvenile**

10   **life withouts.**

11           **So these are -- these are four offenders,**

12   **or 18 percent of the offenders, on their first official**

13   **parole consideration on a juvenile life without, we set**

14   **a release date.**

15   Q.   I'm going to ask you a question based upon

16   your experience.  And if you don't know the answer,

17   then tell me.

18           Is there generally a higher percentage of

19   people who are paroled at the second hearing than at

20   the first?

21           That's probably a horrible question because

22   it doesn't take into account there are very minor

23   offenses.

24           So maybe you can -- for serious offenses,

25   is it generally so that there's a higher percentage of

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 278 of 285

1  release on the second and subsequent hearings than at

2  the first?

3      A.   That's a hard -- that's a hard question to

4  answer.  Because most general -- most -- there's

5  nothing really to compare these general life withouts

6  to.  These are murder-first case.  Juvenile life

7  without.

8           We have murder-second cases.  And that's

9  the closest thing you can come to, would be a

10  murder-second case life sentence.  And right now,

11  anybody with a life sentence would be 85 percent of 30.

12           I can't give you statistics on how many

13  first-time offenders for murder are released on their

14  first hearing.

15           I can give you what I speculate.

16      Q.   I don't want you to speculate.

17           And I'm thinking you may not have actually

18  even done anybody that had a 30 with an 85 percent on

19  it, because that just came in in 1994, so those guys

20  probably haven't run their 25.

21      A.   No.  There's nothing to compare to.  And

22  there's nothing to compare the crimes.  Because the

23  elements of a murder-first are significantly different

24  with the premeditation on a murder-second.  So I think

25  you're comparing oranges to apples.  And there's other

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 279 of 285

1  oranges and apples with, are you an adult or are you a

2  juvenile?

3        This is all stuff -- we're trying to sift

4  through this and make good release decisions based on

5  what these factors are to consider and the growth of

6  the offender.

7        Q.  Let me ask you another question:  If a

8  youth -- one of these JL WOP offenders, or any offender

9  wants to get something to the parole board about their

10  maturation or rehabilitation, how do they do that?

11        A.  It's either through the prehearing

12  interview, or if they want to present documentation,

13  they can present it.  If family members want to present

14  information, or attorneys, we'll make that part of the

15  file.

16        Q.  So if they sent you something in advance,

17  does that all go into the file that the board sees?

18        A.  It should go into the parole consideration

19  file.  The parole hard copy file.  And it will also go

20  into our file.

21        MR. SPILLANE:  Do you have any questions

22  that I missed, Mr. Crane?

23        MR. CRANE:  I have one question.

24        MS. QUINN:  I want to object to Mr. Crane

25  asking questions.  If Amy wants to jump in here.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 280 of 285

1            MR. SPILLANE:  That's fine.

2    CROSS-EXAMINATION BY MR. CRANE:

3            Q.   Ms. Quinn brought up a scenario earlier

4    where three boards members vote to release an offender,

5    but have different dates that they voted to release,

6    and two members vote to reconsider the offender instead

7    of releasing him.

8            In that the situation, can the board

9    members confer to see if they can agree on a release

10   date?

11           **A.   Yes.  Until you get a majority board**

12   **decision, and in some cases because it's a split vote,**

13   **the board members will have to go back and confer and**

14   **try to come up with a resolution to the spit vote.**

15           Q.   So until there are three votes to re-hear,

16   the -- so a majority vote either way --

17           **A.   Yes.**

18           Q.   -- a split vote, the decision stays

19   unresolved until the board can resolve it?

20           **A.   Yes.**

21           MR. CRANE:  Thank you.

22           MR. SPILLANE:  I'm glad you asked that.  I

23   didn't understand that either.

24           MS. QUINN:  So I'll ask two follow-up

25   questions.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 281 of 285

1  REDIRECT EXAMINATION BY MS. QUINN:

2       Q.  So what you said then earlier, Mr. Mueller,

3  is incorrect.  If three do not agree on a release date,

4  then that will become a denial at some point if there's

5  no agreement on a date?

6       A.  I'm not sure I understand what you just

7  asked.  You have to have -- depending on the number of

8  board members, depends on what your majority board

9  decision is.

10           So if there's five board members, majority

11  is three.  If there's seven -- or if it's six, there's

12  four.  If it's seven, it's still four.

13           So when decisions are being made to make a

14  majority board decision, all -- there has to be a

15  majority board -- the vote, depending on the numbers --

16  the majority board has to agree on a release date or

17  have to agree on a re-hear date with a specific date up

18  to five years out.

19       Q.  If they don't agree on a release date, it's

20  treated as a denial, and they have to come up with a

21  joint rehearing date?

22       A.   No.  If they don't agree on a release date,

23  and it's a split decision, it's going to take longer.

24  It's going to be held until there can be a majority

25  board agree one way or the other.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 282 of 285

1    So those board members may take this file

2    and go to another person and go, "You wanted to release

3    him a year later, this guy had a good hearing, would

4    you consider releasing on this date that we gave?"

5    Or, you may see them do it in a closed

6    meeting and go, "Okay, we can't come to an agreement on

7    this.  Let's hash this out."  Because that -- there's

8    no automatic denial of release.  There's no automatic

9    grant of release.  It has to be a majority board

10    decision.

11    And if I misspoke, I didn't mean that every

12    split vote they can't decide whether there's going to

13    be a denial or a re-hear.  What it's gonna be, it's not

14    going to be final until there is a majority board

15    decision.

16    Q.   And let me ask about JL WOP hearings that

17    are taking place; when did the last one take place.

18    A.   I'd have to look at my spreadsheet.

19    The last one was a withdrawal.

20    The last hearing for a juvenile life

21    without, the last hearing occurred in October of 2017.

22    This doesn't have the specific date that it occurred,

23    but the month of October of 2017.

24    Q.   Have there been any decisions to --

25    A.   Actually -- that is correct.  Sorry.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 283 of 285

1          Q.    It was actually held in October?

2          **A.    It was held in October.**

3          Q.    And that's the one we're still waiting for

4    a decision?

5          **A.    Yes.**

6          Q.    Has there been any decision to slow down

7    the setting of these hearings?

8          **A.    I don't understand what you're asking.**

9          Q.    Since you've taken over this position, have

10   you set any hearings for JL WOP individuals?

11         **A.    Generally, hearings are going to take place**

12   **in approximately 90 days.**

13             **Now, there may be times when 90 days --**

14   **there is a breakdown.  If it's after 21st of the month,**

15   **then that goes to the following month,**

16   **90 days after that.**

17             **But other than that, no, we haven't done**

18   **anything different in slowing these cases down.  We**

19   **haven't done anything different spreading time out to**

20   **not hear them in more than that 90-day window.**

21             MR. SPILLANE:  Okay.  That's it.

22             Thank you so much.

23             MS. QUINN:  Thank you all.

24

25

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 284 of 285

1                    CERTIFICATE OF REPORTER

2

3            I, Kim D. Murphy, Certified Court Reporter,

4     for the State of Missouri, do hereby certify that the

5     witness whose testimony appears in the foregoing

6     deposition was duly sworn by me; that the testimony of

7     said witness was taken by me to the best of my ability

8     and thereafter reduced to typewriting under my

9     direction; that I am neither counsel for, related to,

10    nor employed by any of the parties to the action in

11    which this deposition was taken, and further that I am

12    not a relative or employee of any attorney or counsel

13    employed by the parties thereto, nor financially or

14    otherwise interested in the outcome of the action.

15

16

17

18

19            _____

20            Kim D. Murphy, CCR

21

22

23

24

25

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-3   Filed 06/12/18   Page 285 of 285