

**Pohlman**USA®
Court Reporting and
Litigation Services

---

Kenny Jones

January 25, 2018

---

Norman Brown, et al.

vs.

Anne L. Precythe, et al.

Case 2:17-cv-04082-NKL   Document 134-4   Filed 06/12/18   Page 1 of 122

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION


NORMAN BROWN, et al.,          )
                               )
          Plaintiffs,          )
                               )
     vs.                       ) Case No. 17-CV-4082
                               )
ANNE L. PRECYTHE, et           )
al.,                           )
                               )
          Defendants.          )


          CONFIDENTIAL DEPOSITION OF KENNY JONES,

produced, sworn and examined on the 25th day of

January, 2018, between the hours of eight o'clock in

the forenoon and six o'clock in the afternoon of that

day, at the offices of the Missouri Attorney General's

Office, Broadway State Office Building, Jefferson City,

Missouri, before Kim D. Murphy, Certified Court

Reporter, within and for the State of Missouri.

```
 1                  A P P E A R A N C E S

 2

               For the Plaintiffs:
 3
                    MACARTHUR JUSTICE CENTER
 4                  By:  Amy Breihan
                    3115 S. Grand
 5                  Suite 300
                    St. Louis, MO  63118
 6

 7


 8
               For the Defendants:
 9
                    MISSOURI ATTORNEY GENERAL
10                  By:  Michael Spillane
                    and Andrew Crane
11                  Broadway State Office Building
                    221 West High Street
12                  Jefferson City, MO  65101

13

14                        I N D E X
15
   Direct Examination by Ms. Breihan            4
16 Cross-Examination by Mr. Spillane           117
   Redirect Examination by Ms. Breihan         118
17

18

19

20

21

22

23

24

25
```

1              DEPOSITION EXHIBIT INDEX

2

   ID                                              MARKED
3
   1:    AGO3194 through 3198                        54
4
   2:    Interrogatory responses                     65
5
   3:    AGO28                                       67
6
   4:    AGO1274 and 1275                            72
7
   5:    AGO 2624 and 2625                           77
8
   6:    AGO 2617 through 19                         78
9
   7:    AGO110                                      85
10
   8:    Document dated 10-23-17                     98
11
   9:    Email to Kenny Jones                        99
12
   10:   AGO0176                                    105
13

14

15
   Court Reporter:
16 Kim D. Murphy, CCR

17

18

19

20

21

22

23

24

25

 1          IT IS HEREBY STIPULATED AND AGREED, by and

 2   between counsel for the Plaintiffs and counsel for the

 3   Defendants that this deposition may be taken in

 4   shorthand by Kim D. Murphy, CCR, and afterwards

 5   transcribed into typewriting; and the signature of the

 6   witness is expressly waived.

 7                    *    *    *    *    *

 8                    KENNY JONES,

 9   of lawful age, produced, sworn and examined on behalf

10   of the Plaintiffs, deposes and says:

11                    DIRECT EXAMINATION

12   QUESTIONS BY MS. BREIHAN:

13          Q.   Good morning, sir.

14          Could you please state your name for the

15   record?

16          **A.   Kenny Jones.**

17          Q.   Mr. Jones, my name is Amy Breihan.  We

18   actually met before?

19          **A.   Yes.  At the federal courthouse.**

20          Q.   Right.  You understand you're here for your

21   deposition today?

22          **A.   Uh-huh.**

23          Q.   And is that a yes?

24          **A.   Yes.**

25          Q.   So one of the rules that's important to

1    keep in mind today is trying to verbalize answers so it

2    makes the court reporter's job easier to take down a

3    written transcript of what we say here today.

4                   Have you ever been deposed before?

5         **A.    Long time ago.**

6         Q.    Multiple times?

7         **A.    No.**

8         Q.    Do you remember what the case was about

9    that you were deposed in?

10        **A.    I have no memory of what it was.**

11        Q.    So I'll just talk about a couple ground

12   rules.  One of which is, as I just mentioned, is

13   verbalizing our answers -- your answers -- so that the

14   court reporter can make an accurate record of what's

15   said here today.

16                  My job is to ask you questions that are

17   relevant to this case, and then your job is to answer

18   truthfully.  But in order to be able to do that, you

19   have to understand my question.  So if I ever a ask a

20   question that's unclear, just let me know.  I'll

21   rephrase it, repeat it, have the reporter read it back;

22   otherwise, if you answer a question I ask, I'm going to

23   assume you understood it; is that fair?

24        **A.    Fair.**

25        Q.    We'll try not to speak over one another.

1   There will be times when I'm asking you a question and

2   you know where I'm going, and the inclination is to

3   start the answer.

4           If you would, wait for me to finish the

5   question before answering, and I'll try to give you the

6   same courtesy so there's a clean written record of

7   today's deposition, okay?

8       **A.   Okay.**

9       Q.   We'll try to take breaks about every hour.

10  But if you ever need a break, just let us know and

11  we'll accommodate that.

12          The only caveat is if there's a question

13  pending, I'd ask that you answer it before we take a

14  break, okay?

15      **A.   Yes.**

16      Q.   Could you tell me what you did to prepare

17  for your deposition today?

18      **A.   I read the Interrogatory that you sent out.**

19  **Someone sent out.**

20      Q.   And it looks like you're referring to a

21  stack of papers in front of you?

22      **A.   Yes.**

23      Q.   Is that your responses to the First Set of

24  Interrogatories in the case?

25          MR. SPILLANE:  Yes.  Would you like to look

1   at it?

2   BY MS. BREIHAN:

3       Q.   So you brought with you your Responses to

4   Plaintiffs' First Set of Interrogatories directed to

5   the parole board defendants.

6            Did you review this document before today?

7       **A.   I glanced at it yesterday.**

8       Q.   Other than the Interrogatory responses you

9   signed, did you review any other documents?

10      **A.   No.**

11      Q.   Did you speak with anyone other than your

12  attorneys who are in the room today?

13      **A.   No.**

14      Q.   Did you review any audio recordings of

15  parole hearings before your deposition today?

16      **A.   No.**

17      Q.   I want to ask some questions about your

18  educational and your work history just to get some

19  background information.

20           Could you tell me the highest level of

21  education you've obtained?

22      **A.   I have a BS in agriculture from the**

23  **University of Missouri.**

24           **And then I went to the**

25  **Highway Patrol Academy.  That would be a lot higher**

1  training.

2      Q.   When did you graduate from the University

3  of Missouri?

4      A.   1972.

5      Q.   And when did you join -- you said the

6  Highway Patrol Academy?

7      A.   November of 1973.

8      Q.   How long was that academy program?

9      A.   I think it was 24 -- 22 or 24 weeks.

10     Q.   When you were getting your BS at the

11  University of Missouri, did you take any courses in the

12  law?

13     A.   Agriculture law.

14     Q.   Did you take any courses in criminal law?

15     A.   No.

16     Q.   Or constitutional law?

17     A.   No.

18     Q.   Did you take any courses at the University

19  of Missouri in psychology?

20     A.   No.

21     Q.   Did you take any courses at the University

22  of Missouri in adolescent development?

23     A.   No.

24     Q.   And what about when you were at the

25  Highway Patrol Academy, did you take any courses in

```
 1   constitutional or criminal law?
 2         A.   We studied the traffic statutes.
 3         Q.   Other than the traffic statutes, did you
 4   take any courses or have any training in constitutional
 5   or criminal law at the Highway Patrol Academy?
 6         A.   Not that I recall.
 7         Q.   And what about on the topics of psychology
 8   or adolescent development, did you take any coursework
 9   or training at the Highway Patrol Academy in those
10   fields?
11         A.   Not that I recall.
12         Q.   Do you have any other -- strike that.
13              When you completed your time at the academy
14   did you get a degree or certification?
15         A.   I got a certificate of completion and was
16   on active duty for the Highway Patrol.
17         Q.   But it wasn't like a graduate degree
18   program or a licensing program?
19         A.   No.
20         Q.   Do you have any professional licenses or
21   certifications?
22         A.   Not at this time.
23         Q.   Did you at one point?
24         A.   I was POST certified for many years.
25         Q.   POST?
```

1          **A.    Police Officers Standards Training.   That's**
2  **since expired.**
3          Q.   Do you know when that expired?
4          **A.    No.**
5          Q.   Did it occur prior, before you joined the
6  Missouri parole board?
7          **A.    Yes.**
8          Q.   And are you a member of any professional
9  organizations?
10         **A.    I don't think so.**
11         Q.   You don't pay membership dues for any
12  parole-related or corrections-related organization?
13         **A.    No.**
14         Q.   So after you completed your time at the
15  Highway Patrol Academy, you said you were on active
16  duty with the Highway Patrol?
17         **A.    Yes.**
18         Q.   How long were you with the Highway Patrol?
19         **A.    I think it was ten months -- or ten years**
20  **and four months.**
21         Q.   Thirteen years, four months?
22         **A.    Ten.**
23         Q.   I'm sorry, ten years.
24              What did you do after your time with the
25  Highway Patrol?

```
 1          A.   I was sheriff of Moniteau County.
 2          Q.   Is that near Jeff City?
 3          A.   It's the next county west of Cole County.
 4          Q.   How long were you Moniteau County sheriff?
 5          A.   Twenty years.
 6          Q.   Did you receive any training during your
 7   employment as the county sheriff in constitutional law?
 8          A.   We had regular yearly training, but I don't
 9   recall any constitutional law training.
10          Q.   And after your time as a sheriff in
11   Moniteau County, what was your next position?
12          A.   I was elected to the State Legislature.  I
13   served six years there as a state representative.
14          Q.   And your party designation was Republican,
15   right?
16          A.   Yes.
17          Q.   What year were you first elected as a state
18   rep?
19          A.   I think it was 2005.
20          Q.   And what committees did you serve on when
21   you were a state representative?
22          A.   Public institutions.  Corrections.
23               I was the accounts chair for four years.  I
24   was a chairman of that.
25          Q.   What kind of work did you do, generally
```

1  speaking, on the corrections committee that you were a
2  member of while a Republican state representative?
3      **A.    The corrections and public institutions**
4  **committee, we toured some of the facilities.  Mostly,**
5  **actually, just around Fulton area.**
6      Q.    Anything else?
7      **A.    No.  I'd been in at Tipton as sheriff so I**
8  **was familiar with that institution.**
9      Q.    Were you involved in any way in drafting
10  proposed legislation that impacted or related to parole
11  proceedings at all?
12      **A.    No.**
13      Q.    Were you involved in drafting proposed
14  legislation that related to or impacted juvenile
15  offenders in any way?
16      **A.    No.**
17      Q.    And at some point you were appointed to the
18  parole board of Missouri, correct?
19      **A.    Yes.**
20      Q.    Was that in 2012?
21      **A.    I think it was.**
22      Q.    Was that immediately prior to your last
23  time as a Republican state representative?
24      **A.    No.  I was -- that was probably a year or**
25  **two after my term expired.**

```
 1          Q.   What did you do in between the expiration

 2   of your term as state rep and your appointment to the

 3   board?

 4          A.   I had a small farm and had a propane sales

 5   business.

 6          Q.   Did do you any sort of criminal justice

 7   work or corrections work?

 8          A.   No.

 9          Q.   During that one-year period -- do you still

10   have that propane sales business?

11          A.   No.

12          Q.   Do you still have the farm?

13          A.   I still live on the farm.

14          Q.   When you were first appointed to the board

15   in 2012 did you receive any training?

16          A.   Shortly after being appointed I went to an

17   academy in Colorado.  I think it was NIC.

18          Q.   National Institute of Corrections?

19          A.   Yes.

20          Q.   And that was training specifically for new

21   board members; is that correct?

22          A.   Yes.

23          Q.   What do you recall from that training?

24          A.   We studied risk versus public safety.  And

25   evidence-based type sentencing.  Meaning that release
```

1    is based on experience from history.

2          Q.   Can you explain what you mean by the first

3    thing you mentioned, risk versus public safety?

4          A.   Recidivism.  Risk, coming back to the

5    penitentiary or to be rearrested.

6          Q.   What did you learn about that at the time

7    of your NIC training?

8          A.   That about half the people who are released

9    will at some point be rearrested or become involved

10   with law enforcement.

11         Q.   Did you learn anything about how that risk

12   of rearrest or rate of rearrest varies among different

13   populations of people?

14         A.   They -- I'm sure they covered that.  That's

15   been several years ago, too.  But the concept is that

16   younger people are more likely to come back than older

17   more mature people.

18         Q.   And do you know, either from your training

19   at NIC or based off of your experience over the last

20   six or so years, whether the rate of recidivism or

21   rearrest varies depending upon the nature of the

22   underlying offense, not just the age of the individual

23   when they are released from prison?

24         A.   Repeat that, would you please?

25         Q.   Sure.

1          Do you know -- we were talking about the

2     rate of rearrest, right, and whether it might vary

3     depending on different demographics information.

4          You talked about younger people generally

5     would be more likely to be rearrested than an older

6     more mature person that's released on parole, correct?

7          **A.   Yes.**

8          Q.   So is there a variance in recidivism rates

9     on the nature of the underlying offense?  So for

10    example if someone who is released for a lesser offense

11    more or less likely to re-offend than someone who's

12    released on a more serious offense, for example, second

13    degree?

14         **A.   Yes.  The lower level offenses are more**

15    **likely to come back.**

16         Q.   Do you remember anything else about the

17    risk of recidivism that was discussed at the NIC

18    training when you were first appointed as a board

19    member?

20         **A.   We learned that education and job training**

21    **has a lot to do with whether or not an offender is**

22    **brought back.  And to some degree, programs that are**

23    **taken in the prison system before release.**

24         Q.   And the Missouri Department of Corrections

25    has various programs available and classes for inmates,

 1   correct?

 2        **A.   Yes.  They call it HSE now.**

 3        Q.   HSE?

 4        **A.   Is that what you were --**

 5        Q.   Yes, an equivalency degree?

 6        **A.   Yes.  High school equivalency.**

 7        Q.   And they have also, like, restorative

 8   justice programs, and anger management programming,

 9   that kind of programming available as well?

10        **A.   Correct.**

11        Q.   And then there are vocational programs that

12   might provide on-the-job training for inmates, correct?

13        **A.   Yes.**

14        Q.   Do you know whether the availability of any

15   of those programs varies by institution?

16        **A.   I think there is more availability in the**

17   **lower-level institutions.**

18        Q.   And how is it determined what level

19   institution an inmate will be housed in?

20        **A.   I don't know.  That's not in my purview.**

21   **That's a Department of Corrections question.**

22        Q.   Another thing you mentioned having learned

23   at that new board member training in Colorado was

24   making evidence-based release decisions; is that

25   correct?

1          **A.     Yes.**

2          Q.     Can you tell me what you mean by that?

3          **A.     I think it means that the studies have been**

4     **made on people who are released on particular crimes.**

5     **And the evidence shows that they would come back more**

6     **likely or stay out more likely.**

7          Q.     Let me know if this is sort of a fair

8     summary of what that means.  You're relying on data and

9     research in order to make an objective and reliable

10    decision; is that fair?

11         **A.     Data and research, along with what they**

12    **have completed in programming, and education, and job**

13    **training while incarcerated.**

14         Q.     So you're sort of -- if you're making an

15    evidence-based decision in the context of a parole

16    grant proceeding, you'd be looking at who the inmate

17    is, what they've done, and then lining that up to or

18    comparing it to what data or research has shown

19    recidivism rates or risk to re-offend; is that fair?

20         **A.     That would be a fair estimate.**

21         Q.     Are there certain evidence-based practices

22    that are considered best practices to use in -- for

23    paroling authorities?

24         **A.     The -- we use something called the salient**

25    **factor, which has been around longer than I have.  It**

1    **takes into consideration those factors of**

2    **evidence-based sentencing.**

3         Q.   And who developed the salient factor score

4    that the board uses?

5         **A.   I don't know.**

6         Q.   Do you know when it was last updated or

7    revised?

8         **A.   I don't.**

9         Q.   Other than the salient factor score, does

10   probation and parole use any other risk assessment

11   tools to make paroling decisions?

12        **A.   Personal interview.**

13        Q.   Are you saying that a personal interview is

14   a risk assessment tool?

15        **A.   It is a method to communicate with**

16   **offenders to see if they're ready for release.**

17        Q.   I understand.  Maybe it would be helpful if

18   you told us what your understanding of what a risk

19   assessment tool is.

20        **A.   A risk assessment tool, they have static**

21   **and dynamic.  Static is -- refers to age, education,**

22   **things that are not moving.**

23             **Dynamic is education, which is always**

24   **changing, treatment, job training, programming.  Of**

25   **course your age is going to be always moving.**

1      Q.   So it sounds like you're talking about

2  different factors or variables that might be considered

3  when making a risk assessment, right?

4      **A.   Yes.**

5      Q.   What's your -- and then the tools that you

6  sort of run those factors through include the salient

7  factor score, however that's calculated; is that

8  correct?

9      **A.   Yes.**

10      Q.   Is there any other tool or scoring

11  mechanism that probation and parole used to run those

12  factors through in order to make an evidence-based

13  paroling decision?

14      **A.   During the interview we talk about home**

15  **plan.  If they are ready for release, their interests**

16  **in treatment.  Their interest in job placement.  Job**

17  **training.  And in-depth communication.  Try to get some**

18  **idea if they're ready for release.**

19      Q.   And do you -- does probation and parole use

20  risk assessment -- strike that.

21           Does probation and parole use the salient

22  factor score for every inmate who is being considered

23  for parole release?

24      **A.   I don't think there's a salient factor for**

25  **juveniles.**

 1          Q.    So the case we're here about today is about

 2    people who are impacted by Senate Bill 590, and serve

 3    mandatory life without parole sentences or offenses

 4    that were committed when they were under 18.

 5               So I might call them juvenile offenders,

 6    even though they're adults now.  I just want to make

 7    that clear.

 8               So are you saying that for these juvenile

 9    offenders, who are the Plaintiffs in this case, that

10    the salient factor score is not used in making their

11    paroling decisions?

12          **A.    I don't think it is.**

13          Q.    And why is that?

14          **A.    Because when they came in -- they might**

15    **have a salient factor score as they became older, but**

16    **they wouldn't have any education, usually.  Wouldn't**

17    **have a high school diploma.  Their age is below adult**

18    **status.  And I think -- I think it would be irrelevant**

19    **at the time of their incarceration.**

20          Q.    So is the salient factor score calculated

21    at the time the inmate is admitted into the Department

22    of Corrections?

23          **A.    No.  It's dynamic.  It keeps changing with**

24    **age, education, job training, readiness for employment.**

25          Q.    And is it used in all instances where the

1    inmate who's being considered for parole is not a

2    juvenile offender?

3            **A.    I think so, yes.**

4            Q.    Regardless of the severity of the crime?

5            **A.    Yes.**

6            Q.    Who calculates the salient factor score?

7            **A.    I think it's done by the institutional**

8    **parole officer.    It's already calculated when the**

9    **parole board gets the reports.**

10           Q.    And by "the reports" are you talking about

11   the prehearing reports?

12           **A.    Yes.**

13           Q.    We kind of got sidetracked a little bit.

14   So I want to go back to the training question which was

15   asked a few minutes ago.

16                 I'd asked whether you received any training

17   when you were appointed to the board, and we talked

18   about the NIC training.

19                 Is there anything else that you recall from

20   that NIC training in Colorado that we haven't talked

21   about yet?

22           **A.    Not specifically.**

23           Q.    Okay.    I know it was a while back, and so

24   if anything comes to your mind throughout today, you

25   can always let us know and we can add it to the record.

```
 1              I think your interrogatory responses, which

 2    you brought with you today, also mentioned a training

 3    you received with the Association of Paroling

 4    Authorities International?

 5         A.   Yes.

 6         Q.   When was that training?

 7         A.   I think I went to one in 2007 in Ohio.  And

 8    went to Providence, Rhode Island the next year, I

 9    believe.  And they -- and one more in Florida.  Three

10    years ago, I believe.

11         Q.   So about 2015 you went to the one in

12    Florida?

13         A.   Yes.

14         Q.   Let's just focus on the most recent one you

15    went to in Florida in 2015.

16              What do you recall from your training in

17    Florida in 2015?

18         A.   Lots of training on lots of topics.  But

19    the one that I recall most is about fatigue, fatigue of

20    the individuals having the parole hearing.

21         Q.   And I think we've heard testimony from

22    other board members about that.  They've used the term

23    board fatigue.  Is that what you're talking about?

24         A.   Uh-huh.

25         Q.   Can you just describe for me generally what
```

1    your understanding of that term is?

2         A.    Generally, that after about four hours,

3    your attention is -- it's harder to hold your

4    attention.  And you should take a break, perhaps a few

5    minutes, and get some refreshments, both food and

6    drink.

7         Q.    We'll try to wrap up the deposition today

8    within four hours so we don't wear ourselves out too

9    much.

10         Anything else about the phrase "board

11   fatigue" as you understand it.

12         A.    No.  That pretty well summed it up.

13         Q.    And the idea being that if you're fatigued

14   that you might not make as sound decisions as you

15   otherwise would; is that correct?

16         A.    That was the implication, yes.

17         Q.    Do you recall anything other than board

18   fatigue from your Florida training in 2015?

19         A.    No.

20         Q.    I assume then that there weren't any

21   training sessions on adolescent development or

22   psychology?

23         A.    Not that I recall.

24         Q.    Were there any training sessions at that

25   2015 training or conference regarding juvenile

    1    offenders in particular?

    2        **A.    There could have been, but I didn't go to**

    3    **any that I recall.**

    4        Q.    So other than those Association of Paroling

    5    Authorities International trainings, and the NIC

    6    training, can you recall any other specific training

    7    that you've received since you've been appointed to the

    8    board in 2012?

    9        **A.    We've had training at some of the board**

   10    **meetings.   Motivational interviewing training.**

   11        Q.    Anything else?

   12        **A.    We have regular training.   In fact, we have**

   13    **40 hours.   It usually has to do with security of**

   14    **information, as computer training is.**

   15        Q.    So that's 40 hours a year that's required?

   16        **A.    Yes.**

   17        Q.    And it's more security or HR-related type

   18    training; is that fair?

   19        **A.    Yes.   Security of information, and who to**

   20    **release it to, and how to protect the information that**

   21    **is on your computer or other methods of communication.**

   22        Q.    Board members in Missouri serve six-year

   23    terms, correct?

   24        **A.    Yes.**

   25        Q.    So your term expired at the end of 2017,

1   correct?

2          **A.   Yes.**

3          Q.   Were you then -- you've been reappointed to

4   another six-year term?

5          **A.   No.**

6          Q.   But are you still a member of the board?

7          **A.   Yes.**

8          Q.   So how does that work?

9          **A.   I'm there until I'm replaced.**

10         Q.   Okay.   So do you expect to be released?

11  It's unclear to me what your current status is with the

12  board if your term is expired.

13         **A.   I'm just operating -- you're still there**

14  **until you're either replaced or reappointed.**

15         Q.   And you're currently the chair of the

16  board; is that right?

17         **A.   That is correct.**

18         Q.   You were appointed in February of 2017?

19         **A.   Yes.**

20         Q.   Did you receive any particular training

21  when you transitioned from member to chair?

22         **A.   No.**

23         Q.   Tell me a little bit how your

24  responsibilities as chair differ from the

25  responsibilities and duties when you were just a board

1    member.

2         A.    Since I became chair we have tried to make

3    our employees work together with one another more

4    closely.  Better communication skills with each other.

5    Try to get the morale and camaraderie up a little bit.

6              Actually, it's up a lot.  And --

7         Q.    So morale was down when you became chair

8    last year?

9         A.    Yes.

10        Q.    Why was that?

11        A.    I think people just came to work not

12   understanding that they were a small part of a big

13   picture.  They just came to work, did their job and

14   went home.

15             And since my time as chairman, I've

16   instilled into everyone that they're part of the big

17   picture and we should work as a team.

18        Q.    What steps did you take to improve

19   communication and morale among employees and staff?

20        A.    Just personal communication.  And we have

21   an occasional -- days when we have, like, an employees'

22   meeting, building-wide employees' meeting.

23        Q.    Can you clarify, for my sake, what you mean

24   by employees?  Does that include more, like, board

25   members and parole analysts?

```
 1        A.    Clerical.  It's in the same building, yes.
 2        Q.    And that's the Central Office here in
 3   Jefferson City?
 4        A.    Yes.
 5        Q.    Is there anyone other than clerical
 6   support, analysts, and board members that fall under
 7   that umbrella of employees you're talking about?
 8        A.    The members of the command center.  Or
 9   their employees and they come to the meetings.
10        Q.    And how often are these meetings?
11        A.    Quarterly.
12        Q.    Have you discussed this case of juvenile
13   offenders at all at any of those meetings?
14        A.    No.
15        Q.    So maybe it would be more helpful if you
16   tell me what your general responsibilities were when
17   you were a member of the board.  You were hearing --
18   conducting parole hearings, correct?
19        A.    Just conducting parole hearings.
20        Q.    And reviewing parole files?
21        A.    Yes.
22        Q.    And voting on parole grants or revocations,
23   correct?
24        A.    Yes.
25        Q.    Is that still true in your position as
```

1    chair?

2         A.   I do occasionally fill in for someone on

3    parole hearings.

4         Q.   But you're conducting fewer hearings than

5    you were when you were a member?

6         A.   Yes.

7         Q.   So is the chairmanship more of an

8    administrative managerial position then?

9         A.   It is.

10        Q.   And who do you report to?

11        A.   The Governor.

12        Q.   You're the divisional director for

13   probation and parole, too?

14        A.   Correct.

15        Q.   So who do you supervise as chair?

16        A.   Everyone on the board and all the analysts.

17   And as division director, the entire division of

18   probation and parole.

19        Q.   So that would include all institutional

20   parole officers and district administrators and field

21   officers as well?

22        A.   Yes.

23        Q.   Do you know how many people in total that

24   is?

25        A.   Somehow 1170 comes to mind.

     1          Q.   That's a lot of people.

     2              So you said that you supervise all the

     3     board.  So do the board members report to you then?

     4          **A.   They don't really report to me.  They do**

     5     **their jobs.  They're pretty -- we're pretty -- we're**

     6     **able to do our jobs without much supervision from me.**

     7          Q.   Do you have hiring and firing power for

     8     board members?

     9          **A.   No.**

    10          Q.   Are you able to discipline board members if

    11     they do something unethical or unprofessional?

    12          **A.   Yes.**

    13          Q.   You are?  Okay.  Have you ever done that --

    14          **A.   No.**

    15          Q.   -- in your time as chair.

    16              And do you work hand in hand with the

    17     director of the Department of Corrections?

    18          **A.   Yes.  I don't know if you'd call it hand in**

    19     **hand.  We're separate from them.**

    20          Q.   Have you had any discussions with the

    21     current director, Ms. Precythe, about any of the

    22     allegations in this case?

    23          **A.   No.**

    24          Q.   Have you had any discussions on Senate Bill

    25     590 hearings, the parole hearings for these juvenile

1    hearings?

2         A.    No.

3         Q.    Why not?

4         A.    She doesn't supervise the parole board.

5         Q.    So other than supervising these 1170

6    members of the probation and parole division, what are

7    your other duties as chair of the board?

8         A.    Always looking for a better way to do the

9    job.

10        Q.    What does that mean?

11        A.    Look for other risk assessment tools.  Go

12   to training about communication skills, between

13   employees, or among employees.

14        Q.    What research have you done regarding

15   various risk assessment tools?

16        A.    I haven't done any personal research.

17        Q.    Have you asked that research be done about

18   what risk assessment tools are available?

19        A.    I'm not sure who started the search for a

20   new risk assessment tool, but there has been one that

21   has developed by Ohio, the state of Ohio that we're

22   looking at.

23        Q.    And who's "we?"

24        A.    The department.  Division of probation and

25   parole.

```
 1        Q.   And who is the -- who would be making the
 2   decision about whether or not to start using a new risk
 3   assessment tool?
 4        A.   Myself, along with the -- I forgot her
 5   status -- but it's the person who works right under me.
 6        Q.   Is this a district administrator?  A parole
 7   analyst?
 8        A.   No.  Higher than that.  It's Julie Kempker.
 9   I'm not sure what her status is.  But we work closely
10   together.
11        Q.   And you said you don't know how this search
12   for a new risk assessment tool got started; is that
13   what you said?
14        A.   I've been meeting -- I've been in meetings
15   with the director, and with a committee -- really not
16   with the director, but with a committee who was looking
17   at new risk assessment tools.
18        Q.   What committee is this?
19        A.   It's just a committee to research new risk
20   assessment tools.
21        Q.   Does it have a name?
22        A.   No.
23        Q.   Who else is on the committee?
24        A.   I don't know.
25        Q.   You've been in meetings with this
```

```
 1   committee, right?

 2        A.   Yes.

 3        Q.   More than one meeting?

 4        A.   Yes.

 5        Q.   When was the last meeting you had with the

 6   committee?

 7        A.   Probably a month ago.

 8        Q.   Do you remember who was at that meeting?

 9        A.   Ms. Kempker was there.  Michelle Kasak.

10   And there were about ten other people.

11        Q.   Are there minutes kept from these meetings

12   about new risk assessment tools?

13        A.   Not that I'm aware of.

14        Q.   Is there any -- do you take any notes from

15   this meeting?

16        A.   We just watched a video and listened to

17   conversation.

18        Q.   What video were you watching?

19        A.   Put on by somebody who's trying to sell a

20   risk assessment tool.

21        Q.   So you watched a sales video?

22        A.   Yes.

23        Q.   Do you remember what the name of the

24   company or organization was that was promoting the sale

25   of this risk assessment tool?
```

```
 1          A.   It's LS something.  But it was costly to

 2     the state of Missouri, so I wasn't interested

 3     personally.

 4          Q.   So you're interested in getting new risk

 5     assessment tools, but only if it's at no cost to the

 6     state of Missouri?

 7          A.   Or minimal cost.

 8          Q.   Why are you interested in getting a new or

 9     different risk assessment tool?

10          A.   Missouri is recognized as having one of the

11     best parole systems in the nation and I want to keep us

12     on top.

13          Q.   Recognized by whom?

14          A.   By other correctional institutions and

15     parole boards.

16          Q.   Is there some sort of, like, certificate or

17     award that Missouri received?

18          A.   No.

19          Q.   Are you aware of articles that were, in

20     fact, attached as exhibits to the complaint filed in

21     this case that actually say the opposite about the

22     Missouri parole system?

23          A.   No.

24          Q.   Are you aware of any public criticism of

25     the Missouri parole system?
```

 1          A.    No.

 2          Q.    I guess other than the criticisms that are

 3    alleged in the complaint, have you read the complaint

 4    in this case?

 5          A.    I did read some information on it but it's

 6    been some time ago.

 7          Q.    What do you mean by you read some

 8    information about it?

 9          A.    About the allegations that were brought

10    forward.

11          Q.    But do you mean you read it in the

12    complaint?  Or you read it in a newspaper article?

13          A.    It would have been in a complaint.

14          Q.    So other than this Ohio risk assessment

15    tool that you mentioned, are there any other tools that

16    the board is -- this committee is considering or

17    exploring?

18          A.    No.  The state supervisor -- chief state

19    supervisor is the title.

20          Q.    Julie Kempker?  So other than supervising

21    the employees we talked about, and always looking for a

22    better way to do the job, do you have any other duties

23    as chair?

24          A.    No.

25          Q.    Are you involved in determining policy and

```
1    procedure for the board?

2          A.    Yes.

3          Q.    And what about policy and procedure that

4    impacts IPOs or district administrators, have you been

5    involved in that process as well?

6          A.    Yes.

7          Q.    And that would include policies or

8    procedures that talk about how hearings are run?

9          A.    Yes.

10         Q.    And the caps for the number of hearings

11   that the board can conduct each day?

12         A.    Yes.

13         Q.    And what factors are to be considered in

14   making parole decisions?

15         A.    Yes.

16         Q.    And the process for voting or deliberation?

17         A.    Yes.

18         Q.    And also the process for notifying inmates

19   of their parole decisions?

20         A.    Yes.

21         Q.    Is Director Precythe involved at all in

22   setting or determining policy and procedure for the

23   board?

24         A.    No.

25         Q.    She doesn't have to sign off on anything?
```

```
 1          A.   No.

 2          Q.   And how are written policies and procedures

 3   memorialized?  Or where are they memorialized?

 4          A.   They're kept on the computer.

 5          Q.   I guess my question is confusing.

 6   I apologize for that.

 7               My understanding is there's a divisional

 8   manual for probation and parole; is that correct?

 9          A.   There is a manual.

10          Q.   And does that contain all the policies and

11   procedures which governs the parole review process?

12          A.   Yes.

13          Q.   Do you ever issue operational memos?

14          A.   Occasionally.

15          Q.   And are those considered policy and

16   procedure in your mind?

17          A.   No.

18          Q.   No.  Under what circumstances might you

19   issue an operational memo?

20          A.   If we had some incident come up -- or not

21   an incident -- but a question about something we were

22   doing, or who could attend parole hearings.

23          Q.   Can you give me an example?

24          A.   New parole officers are encouraged to

25   attend a parole board -- or a parole hearing of an
```

1    offender.

2         Q.   So you might issue an operational memo

3    saying that new parole officers are encouraged to

4    attend a parole hearing; is that what you're saying?

5         **A.   Yes.**

6         Q.   And are you familiar with what is called

7    the Blue Book?

8         **A.   Or the Red Book.   There's a Blue Book and a**

9    **Red Book and a White Book.**

10        Q.   What are those?

11        **A.   Just rules and regulations pertaining to**

12   **parole.**

13        Q.   And are those part of the policies and

14   procedures that help guide the board in doing their

15   job?

16        **A.   Yes.**

17        Q.   Who's responsible for drafting or revising

18   this operational -- I'm sorry -- this divisional

19   manual?

20        **A.   Well, they have a manual work group who**

21   **works on it for changes should they -- should it need**

22   **to be updated.**

23        Q.   And who determines when the divisional

24   manual needs to be updated?

25        **A.   I would say that the chief state**

1    supervisor.

2         Q.    So Ms. Kempker, correct?

3         A.    Yes.

4         Q.    Who's on this manual work group or this

5    manual working committee?

6         A.    Several managers throughout probation and

7    parole statewide.

8         Q.    Do you know their names?

9         A.    No.

10        Q.    Is there a board member on the committee?

11        A.    No.

12        Q.    As chair, do you have to sign off on any

13   changes that are made to the divisional manual?

14        A.    Yes.

15        Q.    When was the last time that you did that?

16        A.    It's been several weeks ago.

17        Q.    Since you were appointed as chair have you

18   signed off on any changes to the divisional manual that

19   relate or impact in any way the issues in this case?

20        A.    No.

21        Q.    And what about the Blue Book that we were

22   just talking about, who is responsible for drafting or

23   updating that as necessary?

24        A.    I would have to assume that it's also the

25   manual work group.

```
 1           Q.   You don't know for sure?

 2           A.   I believe it's a product of that committee.

 3           Q.   Do you also have to sign off on any changes

 4    to the Blue Book?

 5           A.   I don't think so.

 6           Q.   Does anybody on that committee have to sign

 7    off on changes to the Blue Book or the Red Book or the

 8    White Book?

 9           A.   I would be the only one to review the

10    changes, yes.

11           Q.   But as you sit here today you don't

12    remember ever doing that?

13           A.   No.

14           Q.   Are you also responsible for not just for

15    determining policy and procedure, but also for ensuring

16    that these staff and board members who you oversee

17    comply with policy and procedure?

18           A.   Yes.

19           Q.   How do you do that?

20           A.   Simply if there's a change in the book, or

21    a question, we -- we would go over it.  If there's a

22    question they would bring it to me, or to other

23    analysts, and discuss the situation.

24           Q.   Anything else?

25           A.   No.
```

1        Q.   Do you ever audit or review hearings or

2  decisions in order to ensure compliance with policy and

3  procedure?

4        **A.   No.**

5        Q.   Are you also responsible as chair for

6  ensuring that the staff you oversee, including board

7  members, comply with the law by statute and also the

8  Code of State Regulations?

9        **A.   Yes.**

10       Q.   And how do you do that?

11       **A.   I rely on my staff to make sure that their**

12  **subordinates maintain integrity of the statutes and the**

13  **Code of State Regulations.**

14       Q.   But again, you don't do any sort of audit

15  of decisions or hearings to make sure that the law is

16  being followed?

17       **A.   I don't personally.**

18       Q.   Do you know of somebody who does?

19       **A.   Every case is looked over.  Every file is**

20  **looked over by more than one set of eyes before it is**

21  **finalized.**

22       Q.   You're talking about the voting process

23  after a hearing?

24       **A.   Yes.**

25       Q.   But there's not some sort of auditing or

1    review process in place through which those decisions

2    are reviewed and checked against procedure or policy?

3          **A.    No.**

4          Q.    And the hearings themselves, there's only

5    one board member that's physically present during the

6    hearing, correct?

7          **A.    Yes.**

8          Q.    There's not a transcript of the hearing in

9    the parole file, correct?

10         **A.    No.**

11         Q.    Are you also responsible as chair for

12   ensuring that hearings are conducted in an ethical and

13   professional manner?

14         **A.    Yes.**

15         Q.    How do you do that?

16         **A.    I review any complaints that we get.**

17         Q.    Other than the named Plaintiffs in this

18   case, have you received any complaints about other

19   Senate Bill 590 hearings?

20         **A.    No.**

21         Q.    Are you also responsible as chair for

22   ensuring that the paroling decisions are objective,

23   fair and evidence-based?

24         **A.    Yes.**

25         Q.    And how do you do that?

1         A.   By communicating to the board members and

2    sending them to training so that they're aware of the

3    effective ways to do their job.

4         Q.   So part of it is identifying and providing

5    training opportunities to the board members?

6         A.   Yes.

7         Q.   Especially on developing areas of the law

8    or new risk assessment tools or best practices,

9    correct?

10        A.   Yes.

11        Q.   Have you offered or sought out any training

12   related to juvenile offenders in particular?

13        A.   No.

14        Q.   Has the board received or requested any

15   training on how to implement Senate Bill 590 which was

16   passed in 2016?

17        A.   No.

18        Q.   And one of the things you talked about

19   earlier was the board fatigue.

20             Is that also one way that you try to ensure

21   that parole decisions are objective, fair and

22   evidence-based to try to avoid board fatigue for your

23   staff?

24        A.   It would be, yes.

25        Q.   Would you agree that having too high a

 1  number of hearings every day is a barrier to a fair and

 2  evidence-based decision?

 3       **A.   It could be.**

 4       Q.   How do you keep abreast of changes in the

 5  law that might impact the board's job?

 6       **A.   Just communication between attorneys for**

 7  **the department, and the updates in the state law that**

 8  **are passed and signed into law every year.**

 9       Q.   As chair are you involved at all in

10  updating the Code of State Regulations?

11       **A.   No.**

12       Q.   Does the board vote on changes to state

13  regs?

14       **A.   Only to policy and procedures.**

15       Q.   And who's in charge of hiring parole

16  analysts?

17       **A.   I guess that would probably be my job.**

18       Q.   Do you know what the hiring criteria is for

19  a parole analyst?

20       **A.   It's usually someone who's very experienced**

21  **in the process, and has a lot of knowledge about the**

22  **parole process, as well as experience supervising other**

23  **people.**

24       Q.   So generally speaking are parole analysts

25  hired from positions already within probation and

```
 1   parole?

 2          A.   Yes.

 3          Q.   What about institutional parole officers,

 4   do you know who's in charge of selecting and hiring

 5   IPOs?

 6          A.   The district administrators and the

 7   regional administrators, they interview for those

 8   position -- interview people for those positions.

 9          Q.   And who makes the hiring decision?

10          A.   It would be the interview panel.

11          Q.   Are you on that interview panel?

12          A.   Not for the institutional parole officers.

13          Q.   Are you on the interview panel for district

14   administrators?

15          A.   Yes.

16          Q.   And are you on the interview panel for

17   regional administrators?

18          A.   Yes.  And sometimes on the district

19   administrators, but always on the regional.

20          Q.   And is that just because the regional

21   administrators are a higher level position --

22          A.   Yes.

23          Q.   -- or they can be?

24               So that's an example you knew where I was

25   going with the question, but we talked over each other
```

1    a little, so I'll try to avoid that going forward.

2             Are there written policies or procedures

3    that govern formal or -- sorry.

4             Are there written policies and procedures

5    that dictate a formal structure order for parole

6    hearings?

7        **A.    I don't know if it's in policy and**

8    **procedures, but the prehearing reports are written in**

9    **a -- in the same manner statewide so that we can follow**

10   **them as we conduct our hearings.**

11       Q.    And just to clarify, I think we're on the

12   same page here, but there are different kinds of parole

13   hearings, correct?  Parole grant hearings, or

14   revocation hearings might be other types of hearings?

15       **A.    Yes.**

16       Q.    I'm talking about parole grant hearings

17   specifically in the context of this case, okay?

18             So you said that the prehearing reports

19   which were prepared by the IPOs follow a standard and

20   consistent order and outline, correct?

21       **A.    That's a fair statement.**

22       Q.    And then those prehearing reports

23   themselves are basically the structure for running a

24   parole hearing; is that fair?

25       **A.    Yes.**

 1          Q.   Other than what's in the prehearing report,

 2     are there any other written policies and procedures or

 3     rules that govern how these hearings should be run?

 4          **A.   There are guideline memos.  But they**

 5     **basically indicate how the prehearing report is**

 6     **structured as far as content.**

 7          Q.   Who issues these guideline memos?

 8          **A.   They've just been around for years.**

 9          Q.   I don't know if any such documents have

10     been produced in this case.

11          **A.   I don't think it's a document that is**

12     **formalized.  It's something I had a gentleman write it**

13     **down on a piece of paper for me when I started.**

14               MS. BREIHAN:  We can talk about it during

15     break.  But if there are written guideline memos that

16     talk about how hearings are run, I think it would be

17     responsive to our request for production.

18               We can talk about it at a break.

19     BY MS. BREIHAN:

20          Q.   Are there any policies or procedures in

21     place that discuss accommodations to be made for

22     inmates with mental or physical disabilities?

23          **A.   Not that I'm aware of.**

24          Q.   Is there any process in place for screening

25     inmates for mental disabilities or limitations in

1    preparation for parole hearings?

2         **A.    I'm not sure if there's any policies and**

3    **procedures, but the offenders are examined to see if**

4    **they're sound mentally and physically before a hearing.**

5    **And if they're taking their prescribed medication.**

6         Q.    So as part of the parole review process,

7    there's a physical and mental health examination?

8         **A.    I think they are screened for mental**

9    **health, yes.**

10        Q.    And so I just want to make sure I

11   understand the timeline.

12             You think they are screened for mental

13   health in proximity and in preparation for their parole

14   hearing.

15        **A.    I think that's ongoing while they're**

16   **incarcerated.**

17        Q.    And that's the case even if they're not

18   receiving mental health services on a regular basis?

19        **A.    (The witness nodded his head.)  As far as I**

20   **know.**

21        Q.    And then the prehearing report includes

22   some of this health information?

23        **A.    Yes.**

24        Q.    There's no policy or procedure that

25   requires a full board for these juvenile life without

1  parole hearings, correct?

2      A.  Correct.

3      Q.  They're run just the same as any other

4  parole hearing, correct?

5      A.  Yes.

6      Q.  With a three-person panel, and then one of

7  those panel members being a board member, correct?

8      A.  That's correct.

9      Q.  And they've been described, fair to say by

10  other board members, as sort of informal, not court,

11  not retrying the case is what they like to say?

12      A.  Right.

13      Q.  Is that correct?  They've been referred to

14  as like interviews or conversations; is that consistent

15  with your experience?

16      A.  Yes.

17      Q.  Who's allowed to attend parole hearings?

18      A.  The hearing panel.  Victim advocate.

19  Victims.  A delegate for the offender.  And a

20  spokesperson or a support person for a victim.

21      Q.  Anyone else?

22      A.  Only parole officers who are observing.

23      Q.  Are prosecuting attorneys allowed to

24  attend?

25      A.  As a victim.  They have.  They've come to

1   **hearings as a victim.**

2        Q.   Okay.  So you talked about sort of three

3   people who seem to fall within the category of a victim

4   or victims representative.  As to who can attend, it

5   includes the victim or victim advocate and a support

6   person, correct?

7        **A.   Support person for the victim, yes.**

8        Q.   And so there might be instances where, for

9   example, there is a victim, a victim's advocate, and a

10  support person for the victim all present on that side

11  of things?

12       **A.   Yes.**

13       Q.   And then could the prosecuting attorney

14  also be present in addition to the victim support

15  person and the victim's advocate?

16       **A.   Yes.**

17       Q.   So that's four people on the victim's side.

18            How many delegates does the inmate get?

19       **A.   One.**

20       Q.   And can law enforcement also attend?

21       **A.   Yes.**

22       Q.   Are there any limitations on the number of

23  law enforcement officers who are allowed to attend

24  parole hearings?

25       **A.   Not that I'm aware of.**

```
 1        Q.   Are victims ever allowed to have more than
 2   one support person present?
 3        A.   I don't think so.
 4        Q.   And if it's multiple victims they all have
 5   the right to be there, correct?
 6        A.   They do.
 7        Q.   And they can speak outside of the inmate's
 8   presence if they want to, correct?
 9        A.   Yes.
10        Q.   They can give a detailed account of the
11   crime, underlying crime, correct?
12        A.   Yes.
13        Q.   And then they can make a request to the
14   board whether or not this inmate should be released on
15   parole, correct?
16        A.   Yes.
17        Q.   Similarly, law enforcement, they're allowed
18   to speak outside of the inmate's presence if they want,
19   correct?
20        A.   Yes.
21        Q.   And the prosecuting attorneys, too, if they
22   want to speak outside of the inmate's presence they can
23   do that?
24        A.   Yes.
25        Q.   And they can also give an account of the
```

```
 1   crime?

 2        A.   Yes.

 3        Q.   And they can also make a request as to

 4   whether or not the inmate should be released on parole,

 5   correct?

 6        A.   Correct.

 7        Q.   And the victims -- victim representative,

 8   law enforcement, and the prosecuting attorneys, they

 9   can have written statements?

10        A.   They can.

11        Q.   Are they kept in the parole file?

12        A.   Yes.

13        Q.   And is the inmate allowed to see the parole

14   file?

15        A.   No.

16        Q.   So there may be instances where an inmate

17   has his or her parole hearing, and there is opposition

18   from the victims, from law enforcement, and from

19   prosecuting attorneys that they never hear or see,

20   correct?

21        A.   I think that could happen.

22        Q.   Where is it memorialized in policy and

23   procedure who can attend parole hearings?

24        A.   I don't know the exact policy and

25   procedure.
```

    1        Q.   And why is it that the inmate's only
    2    allowed to bring one delegate?
    3        **A.   I don't know.**
    4        Q.   Have you ever had discussions, either as a
    5    member of the board, or now as chair, about modifying
    6    that one delegate limit?
    7        **A.   No.**
    8        Q.   Have there been instances where an inmate
    9    has asked to have an attorney and a delegate present?
   10        **A.   Yes.**
   11        Q.   Tell me about that.
   12        **A.   It was a case at J triple C.  And there was**
   13    **an attorney and a family member, and he chose the**
   14    **family member to be with him during the hearings.**
   15        Q.   Are you thinking of Sidney Roberts, by
   16    chance?
   17        **A.   I'm not sure.  I was on the panel that day.**
   18        Q.   You were?
   19        **A.   I don't think it was Sidney Roberts.**
   20        Q.   Was this when you were a member or chair?
   21        **A.   Yes.  Member.**
   22        Q.   Do you know if it was a juvenile life
   23    without parole case?  Or no?
   24        **A.   It was not.**
   25        Q.   Okay.

1      A.   To my recollection, it was not.

2      Q.   And did you have any discussions with the

3  inmate about that decision between attorney or family

4  member?

5      A.   Simply that he wanted his family member

6  there.

7      Q.   As chair, why wouldn't you allow an inmate

8  to have a family member and an attorney present during

9  the parole hearing?

10     A.   I never gave it much thought.

11     Q.   Well, as you sit here today thinking about

12  it for the first time, are there any concerns that come

13  to mind that would perhaps dissuade you from making

14  such an accommodation or a change in procedure?

15     A.   No.

16     Q.   As you already testified to, if statements

17  are made outside of the inmate's presence at a hearing

18  by a victim or representative, either in person or by

19  written submission, they -- they would have no idea

20  what was said, correct?

21     A.   That's correct.

22     Q.   Because they're not allowed to see the

23  parole file, correct?

24     A.   Yes.

25     Q.   And making a decision about whether

1  somebody's released from prison is an important

2  decision, I think we can all agree; fair?

3       **A.    Yes.**

4       Q.    It's important to carefully consider as

5  much relevant evidence as you can, right?

6       **A.    Yes.**

7       Q.    And then make an objective evidence-based

8  decision, correct?

9       **A.    That's correct.**

10      Q.    Don't you think it's important that the

11 inmate know what evidence was considered in making that

12 decision?

13      **A.    Yes.**

14      Q.    I just have one document to show you and

15 then we can take a break.

16           I'll hand you what I've marked as

17 Exhibit 1.

18           (Deposition Exhibit No. 1 was marked for

19 identification.)

20 BY MS. BREIHAN:

21      Q.    It's Bates-stamped AGO3194 through 3198.

22           Do you recognize this document, Mr. Jones?

23      **A.    I don't recognize it.**

24      Q.    It appears to be a letter from ▉▉▉▉

25 ▉▉▉▉▉▉ to you dated June 13th, 2017, correct?

1        **A.   Yes.**

2        Q.   And it looks like it contains a letter from

3  Florence Honickman, and it has a stamp on the first

4  page that says Received June 15th, Missouri Board of

5  Probation and Parole.

6          Is that the stamp that goes on the mail

7  when it arrives at your office?

8        **A.   Yes.**

9        Q.   So you probably received this, you just

10  don't remember it as you sit here today?

11        **A.   Yes.**

12        Q.   Is it uncommon for you as chairman to get

13  correspondence like this from the prosecuting attorney

14  on a parole file?

15        **A.   It's not uncommon.**

16        Q.   And when you receive letters like this that

17  relate, in this instance, to Norman Brown's parole

18  decision, do you provide a copy of it to the inmate?

19        **A.   No.**

20        Q.   Why not?

21        **A.   Because it goes into the file.**

22        Q.   Is there a particular concern you have that

23  precludes you from providing it to the inmate?

24        **A.   There is a concern for safety of the**

25  **victims in these cases.**

```
 1          Q.   Is the concern that the inmate would know
 2    the identity of the victim?
 3               I don't quite understand that.
 4               Could you clarify that for me?
 5          A.   It would be the identity of not only the
 6    victim, but also the prosecuting attorney's name is on
 7    here.
 8          Q.   And Norman Brown's hearing -- I know you
 9    weren't on the panel -- but both the prosecuting
10    attorney and Ms. ████████    were present at
11    Norman Brown's hearing.
12               Did you know that?
13          A.   No.
14          Q.   And they, I believe, both made statements
15    with Mr. Brown present so he was aware of their
16    presence that day.
17               Did you know that?
18          A.   I wasn't on that panel.
19          Q.   I understand.  But would that impact your
20    decision about whether or not you would share this with
21    Mr. Brown?
22               If the concern was the identity of the
23    attorney and the victim, and he already knew their
24    identities obviously in their participation in the
25    process, would that change whether or not you would
```

1    share this letter with Mr. Brown?

2          **A.   No.**

3          Q.   Did you respond to either Mr. ███████ or

4    Ms. ███████?

5          **A.   If I did, I don't recall.**

6          Q.   Had you responded would you have kept a

7    copy of your written response in the parole file as

8    well?

9          **A.   Yes.**

10         Q.   So if it's not in the parole file, can we

11   assume then that you probably didn't respond?

12         **A.   Yes.**

13         Q.   Might you have responded with a phone call?

14   Or would you typically respond in writing?

15         **A.   I think this is simply a statement, as I**

16   **read it, and doesn't really ask for a reply.**

17            **(A break was taken.)**

18   BY MS. BREIHAN:

19         Q.   Mr. Jones, you testified earlier that one

20   of your many responsibilities as chair is setting the

21   number of hearing caps per day, correct?

22         **A.   Yes.**

23         Q.   What is the current cap?

24         **A.   I think the cap is 18 at this time.**

25         Q.   And you actually raised that from 14 when

PohlmanUSA Court Reporting
(877) 421-0099    PohlmanUSA.com
Case 2:17-cv-04082-NKL  Document 134-4  Filed 06/12/18  Page 58 of 122

1    you became chair; is that right?

2         A.   Yes.

3         Q.   Why did you raise it?

4         A.   **Because I felt like we could take breaks,**

5    **and be more efficient in our hearing schedule, and also**

6    **get the board more training time.**

7         Q.   What was the reaction to that decision?

8         A.   **I didn't hear a lot of criticism about it**

9    **from the board members.**

10        Q.   Did you consult any resources in

11   determining that 18 was a magic number?  Or --

12        A.   **No.  Simply the time it takes to do**

13   **hearings.  You could do that in an eight-hour day and**

14   **take several breaks.**

15        Q.   So rather than test my math, what's the

16   average length of a hearing?

17        A.   **There is no average.  And I say that**

18   **because each case is individual.  And even a minor case**

19   **may take 45 minutes to an hour.**

20             **But usually you can get through a case in**

21   **20, 30 minutes, if it doesn't have any -- if it's a**

22   **simple -- and I call it simple -- one that's, like, a**

23   **Class C felony, like a burglary, where they can tell**

24   **their story, we can read the report, and know real**

25   **extenuating circumstances.**

1            Every case is on its own, though, on its

2      own time schedule.  It's very flexible.

3            Q.   I understand.  But if you're doing 18

4      hearings a day, you can't spend 20 or 30 minutes on

5      each of them, right?

6            A.   You're correct.

7            Q.   And I think there was testimony by others

8      in this case that some hearings might be very short,

9      they might be five minutes if the inmate doesn't want

10     to talk?

11           A.   If he says "just max me out," it can be

12     very fast.

13           Q.   So you don't think 18 hearings every day is

14     too many?

15           A.   Eighteen hearings like Mr. Brown's case

16     would be too many.

17           Eighteen hearings at a prerelease center,

18     where the offender has already done time, gotten all

19     his -- you could see the prerequisites to release.  He

20     has his education.  He has his job training.  He's gone

21     to programs and training.  And you can get through that

22     case, and you know that you're gonna release him very

23     shortly.

24           And some of the cases are waiver of hearing

25     cases, which either the offender or the board decides

1    to hear, and they go very fast also.

2         Q.   Kelly Dills testified that she thinks 14

3    hearings a day is too many.  You don't agree with that?

4         **A.   Fourteen hearings in a day is a very light**

5    **load at a prerelease center.**

6         Q.   Understood.

7              When you were talking about hearings at a

8    prerelease center you talked about prerequisites to

9    release.

10             Are there certain conditions that if you

11   satisfy them you will be released on parole?

12        **A.   Sooner.  You would be given a better date.**

13        Q.   And what are those prerequisites?

14        **A.   As I indicated, the education, the**

15   **training.  Readiness for release is what we call it.**

16        Q.   Other than education or job training is

17   there any other prerequisite to release?

18        **A.   Drug treatment.**

19        Q.   And that's true even if the inmate doesn't

20   have a history of drug or alcohol abuse?

21        **A.   It's not effective.  We don't have enough**

22   **resources to send everyone who doesn't need it to the**

23   **school.**

24             **In fact, it's considered a negative to the**

25   **person to send them to treatment.**

```
 1          Q.   As a prerequisite to release, education,

 2    job training, and, if applicable, drug treatment.

 3               Anything else?

 4          A.   There are other programs in there.  They

 5    have a lot of programs.

 6          Q.   Such as ICBC, or criminal thinking, or

 7    anger management?

 8          A.   Pathways to Change.

 9          Q.   Is there a certain hours requirement that

10    inmates are expected to satisfy?

11          A.   No.

12          Q.   And by education, do you mean whether or

13    not they have their high school equivalency?

14          A.   Or if they're working on it.  They are not

15    prerequisites.  Just things that would help them get a

16    better date by indicating that they're wanting to

17    better themselves personally.

18          Q.   So an inmate doesn't have to have their HSE

19    to be released on parole you're saying?

20          A.   No.

21          Q.   Is there a written policy and procedure

22    that identifies what factors the board is supposed to

23    consider in making its decision?

24          A.   I'm sure there is.

25          Q.   Where would you find it?
```

1    **A.**  **In the policies and procedures.**

2    Q.  In the divisional manual we were talking

3 about?

4    **A.**  **Yes.**

5    Q.  Anywhere else that you would be likely to

6 find policies or procedures that would identify the

7 factors that the board is supposed to consider in

8 making its decisions?

9    **A.**  **Those books you referenced, perhaps.**

10   Q.  The Blue Book?

11   **A.**  **Yes.**

12   Q.  There's not a policy or procedure requiring

13 panel -- hearing panel members to read the entire

14 parole file before voting, correct?

15   **A.**  **Correct.  Yes.**

16   Q.  There's not any policy or procedure

17 requiring hearing panel members to review the

18 prehearing report before the actual hearing, correct?

19   **A.**  **No.**

20   Q.  I should phrase that better so it's clear

21 for the record.

22      Is there a policy and procedure requiring

23 hearing panel members to read the prehearing report

24 before hearing?

25   **A.**  **No.**

1      Q.   So what is the standard that the board
2   considers in making its decision?
3      **A.   The standard is consider the individual,**
4   **along with the report, and determine their readiness**
5   **for release.  Based on those two things, the interview**
6   **and the report.**
7      Q.   Are you aware of the statute that talks
8   about reasonable probability?  In assessing reasonable
9   probability that an inmate can be released without
10  being a detriment to themselves or others?
11     **A.   Yes.**
12     Q.   What does that mean to you?  That term
13  "reasonable probability?"
14     **A.   Reasonable probability that they will not**
15  **be a danger to others means just that.  It means that**
16  **there's a good chance that they have -- they will not**
17  **re-offend.**
18     Q.   And how do you calculate that reasonable
19  probability?
20     **A.   We use not only factors that are involved**
21  **in the salient factor, the items that are factored used**
22  **to create the salient factor, but also the interview**
23  **and the report.  Perhaps conduct violations.  And the**
24  **report written by their institutional parole officer,**
25  **which is the prehearing report.**

```
 1        Q.   But in the juvenile life without cases you
 2   don't use the salient factor score, correct?
 3        A.   I don't think so.
 4        Q.   Do you use any actuarial tools in assessing
 5   readiness for parole in these juvenile life without
 6   cases?
 7        A.   What do you mean by actuarial?
 8        Q.   Any sort of evidence-based tool, or
 9   research-based tool for assessing risk, or
10   rehabilitation, other than the narrative that's in the
11   prehearing report?
12        A.   No.
13        Q.   Do you use any guidelines in making
14   decisions in the juvenile cases?
15        A.   I'm not sure if there are guidelines on the
16   juveniles.
17        Q.   Well, for example, the Blue Book contains
18   an appendices guidelines for release dates for various
19   offenses, correct?
20        A.   Yes.  That would be a good way to say it.
21        Q.   Does the board consult those guidelines at
22   all in these juvenile life without cases?
23        A.   Not that I'm aware of.
24        Q.   And is the board provided any training or
25   tools that are specifically tailored to considering
```

1    youthful characteristics in reaching parole decisions

2    in these cases?

3         **A.    Repeat that question.**

4         Q.    Is the board provided with any training or

5    tools that are specifically tailored to considering

6    youthful characteristics?

7         **A.    No.**

8         Q.    Are IPOs provided with any training or

9    tools that are specifically tailored to considering

10   youthful characteristics in making parole decisions in

11   these cases?

12        **A.    I don't know.**

13        Q.    Who would know that?

14        **A.    The IPOs themselves.**

15        Q.    One of the documents you brought with you

16   today was your Interrogatory Responses.  I also brought

17   a copy I was going to introduce as an exhibit.

18             I'll mark this as Exhibit 2.

19             (Deposition Exhibit No. 2 was marked for

20   identification.)

21   BY MS. BREIHAN:

22        Q.    As you mentioned, Exhibit 2 is

23   Defendant Jones Responses to Plaintiffs' Response to

24   Parole Board Defendants.

25             Do you remember preparing these responses,

 1    I guess some time ago back in September of 2017

 2    thereabouts?

 3         **A.   Yes.**

 4         Q.   If you would turn to page 12, I want to

 5    direct your attention to Interrogatory No. 17, which

 6    asks you to describe in detail the process in which the

 7    parole board decided to deny parole to any of the

 8    Plaintiffs.

 9              And the Plaintiffs in this case, the named

10    Plaintiffs are Norman Brown, Ralph McElroy,

11    Theron Roland and Sidney Roberts.

12              And your answer is that essentially what

13    the board considers is confidential, correct?

14         **A.   Yes.**

15         Q.   Are you aware that there's a protective

16    order in place in this case?

17         **A.   No.**

18         Q.   Well, I'll represent to you that there's a

19    protective order in place in this case, under which

20    your attorneys are -- we may designate information or

21    documents as confidential or highly confidential.

22              With that knowledge in hand, are you able

23    to answer substantively Interrogatory No. 17 as you sit

24    here today?

25         **A.   The process would be basically the same as**

1  any other hearing process with the exception that there

2  is -- there are questions that have -- that are to be

3  answered by the analyst about certain things that were

4  taken into consideration during the hearing.

5          (Deposition Exhibit No. 3 was marked for

6  identification.)

7  BY MS. BREIHAN:

8      Q.   I'll show you Exhibit 3.  And is this is

9  what you're referring to, it's marked AGO 28.

10         Is this the list of questions the analyst

11  has to have answered that you're talking about?

12     A.   Yes.

13     Q.   So it's your testimony that other than this

14  Exhibit 3, the process through which the parole board

15  decides whether or not to grant parole in these JL WOP

16  cases is the same?

17     A.   Yes.

18     Q.   Is there any sort of policy and procedure

19  dictating how the board votes in parole reviews?

20     A.   On any parole reviews?

21     Q.   Yeah.  Any parole grant decisions; yes?

22     A.   I guess you probably ought to repeat that

23  question.

24     Q.   Are there any written policies or

25  procedures that dictate how the board votes in parole

1    reviews?

2         A.   Yes.

3         Q.   And are those in the divisional manual?

4         A.   Yes.

5         Q.   Would they be written down anywhere else?

6         A.   I don't know.

7         Q.   And is the procedure for a board vote in

8    these juvenile life without cases the same as your

9    standard parole review hearing?

10        A.   Yes.

11        Q.   And these cases don't require a full board

12   vote, correct?

13        A.   That is correct.

14        Q.   They do require a majority decision; is

15   that right?

16        A.   Yes.

17        Q.   And that is determined, at least in part,

18   the order in which the physical file is passed around

19   in the office; is that fair?

20        A.   Yes.

21        Q.   Is there any sort of policy or procedure

22   that requires any kind of deliberation or discussion by

23   the board before voting?

24        A.   Yes.  The policy and procedures manual.

25        Q.   So your testimony is that there's a written

1  policy and procedure that requires the board to have a

2  discussion or open deliberation on a case before

3  voting?

4          **A.   I guess I don't understand your question.**

5              MR. SPILLANE:  I'll object, compound.  I

6  think you asked him two separate things.

7  BY MS. BREIHAN:

8          Q.   Let's take it part by part.

9              Is there any written policy or procedure

10 that requires the board to discuss a case amongst

11 itself before voting on the case?

12         **A.   I'm not sure.**

13         Q.   Is there any written policy or procedure

14 which requires the board to deliberate on a case

15 together, the full board, before voting on a case?

16         **A.   Not that I'm aware of.**

17         Q.   You're chair of the board, so I assume that

18 you're expected to have a working knowledge of policies

19 and procedures that govern the board's operations,

20 correct?

21         **A.   Yes.**

22         Q.   Is there a policy or procedure that

23 requires voting members to read the entire parole file

24 before they vote?

25         **A.   No.**

1        Q.   Is there a policy or procedure to review

2    the prehearing report before voting?

3        **A.   I'm not sure on the last question.  I might**

4    **have answered it wrong.  There are policies and**

5    **procedures that require us to go over the information**

6    **of the hearing panel before we make any decision or**

7    **vote on a case.**

8        Q.   So are you referring to the board action

9    sheet?

10       **A.   Yes.**

11       Q.   So it's your testimony that there is a

12   written policy and procedure that requires voting

13   members to read the board action sheet before voting?

14       **A.   I'm fairly certain there is.**

15       Q.   And that would be in the divisional manual?

16       **A.   Should be, yes.**

17       Q.   But the board action sheet is just part of

18   the parole file, correct?

19       **A.   Yes.**

20       Q.   And in the case of these juvenile life

21   withouts individuals.  We've seen parole files that

22   could be a couple hundred pages; is that fair?

23       **A.   Yes.**

24       Q.   Is there any policy or procedure that

25   requires voting members to read not just the board

1  action sheet, but the entire parole file before voting?

2      **A.   Not that I'm aware of.**

3      Q.   And I can't remember -- I'm sorry if you

4  answered this question -- is there any policy or

5  procedure requiring voting members to review the

6  prehearing report before voting?

7      **A.   I think there is.**

8      Q.   And, again, that would be in the divisional

9  manual?

10     **A.   It would be.**

11     Q.   How many times have you as a chair had to

12 vote because of a tie in these juvenile life without

13 cases?

14     **A.   I don't think I have.**

15     Q.   My understanding is that as chair you

16 typically do not vote in parole grants; is that

17 accurate?

18     **A.   That's correct.**

19     Q.   The only instances under which you as chair

20 would vote is if you were on the hearing panel, or

21 there was a tie amongst the voting members, correct?

22     **A.   That would be the common practice, yes.**

23     Q.   So I think you just said that there have

24 been no instances that you've had to vote because of a

25 tie in the juvenile life without cases?

```
 1          A.    I don't think so.

 2          Q.    Do you know, when Ellis McSwain was chair,

 3     how many times he had to vote because of a tie?

 4          A.    No.

 5          Q.    And so in most instances a majority

 6     decision was reached without the chair having to

 7     intervene?

 8          A.    I would assume.

 9          Q.    Would you agree with Mr. McSwain and

10     Ms. Dills' assessment of Senate Bill 590 that it would

11     be difficult for the board to determine this factor of

12     subsequent growth and increased maturity since the

13     underlying offense?

14                I can show you what I'm referring to if

15     that would be helpful.

16                I'll go ahead and mark it Exhibit 4.  It's

17     AGO1274 and 1275.

18                (Deposition Exhibit No. 4 was marked for

19     identification.)

20     BY MS. BREIHAN:

21          Q.    This is a memo from Ms. Dills to

22     Ellis McSwain and Julie Kempker.  Subject of the memo

23     is analysis of Senate Bill 590, juvenile reviews.

24                Have you seen this before today, sir?

25          A.    Not that I recall.
```

 1        Q.   So the language that I'm talking about is

 2   actually the first sentence of the last paragraph on

 3   the first page, where Ms. Dills says, "that measurement

 4   of subsequent growth and increased maturity since the

 5   offense will be difficult to gauge?"

 6             Would you agree with that assessment?

 7             MR. SPILLANE:  I'll object to the question.

 8   I think you just read part of a sentence.  Maybe if you

 9   read the whole sentence.

10             MS. BREIHAN:  Sure.  I can read the whole

11   sentence.

12   BY MS. BREIHAN:

13        Q.   The first sentence on the last paragraph of

14   the first page, "Measurement of subsequent growth and

15   increased maturity since the offense will be difficult

16   to gauge unless there's file material available for the

17   board's comparison that was obtained either during

18   initial or subsequent court proceedings or as part of

19   the process to certify the individual.

20             "The board has no ability to pursue

21   clinical opinions outside of departmental or contracted

22   behavioral health staff to assess mental status or

23   maturity level.

24             "Likewise, the board does not have the

25   ability to assess the reliability of evidence presented

1    during the trial, or adjudication process, with regard

2    to the level of maturity or mental status at the time

3    of the offense."

4              So to me it sounds like Ms. Dills is

5    pointing out that this second factor, subsequent growth

6    and increased maturity of the person since the offense

7    or offenses occurred will be difficult, in her words,

8    difficult to substantiate.

9              Would you agree with that assessment?

10         **A.   Well, the assessment by the board would be**

11   **the member who's doing the interview.  But she is**

12   **definitely not a -- none of us, to my knowledge, are**

13   **clinicians in that area.**

14         Q.   My question was poorly worded.  I

15   apologize.

16              Would you agree that it is difficult for

17   the board to substantiate or evaluate in these juvenile

18   life without cases the inmate's subsequent growth and

19   maturity since the underlying offense occurred?

20         **A.   I think the reason for the interview is so**

21   **that you can determine the individual's growth and**

22   **increased maturity.**

23         Q.   Yeah.  I understand and appreciate that.

24              My question is whether or not you think

25   it's difficult for the board to assess the subsequent

1    growth and increased maturity.

2         **A.   Is it difficult?   Yes.**

3         Q.   And so you mentioned a big part of making

4    that assessment is the in-person interview with the

5    inmate, correct?

6         **A.   Yes.**

7         Q.   Where you might be able to get information

8    from the inmate themselves about their childhood, their

9    youth, and how they've matured over time, correct?

10        **A.   Yes.**

11        Q.   And perhaps if their delegate is a family

12   member, he might also be able to get relevant

13   information from that delegate as well, correct?

14        **A.   Yes.**

15        Q.   And on the second page here, Ms. Dills also

16   says that "Risk reduction is assessed using a validated

17   tool."

18             Looking at the paragraph that starts with

19   the fifth point, my question is, if you know, what

20   validated tool she's talking about that's used to

21   assess risk reduction?

22        **A.   I would have to assume that would be the**

23   **salient factor.**

24        Q.   Do you recall in 2016 having any

25   discussions with Ms. Dills, or Ms. Kempker, or any of

1  the other board members or chair, about Senate

2  Bill 590?

3       A.   We discussed it as a board that we were

4  gonna start doing this as a result of the Senate bill.

5  And anyone who was convicted and had 25 years in would

6  be given the opportunity for a parole hearing.

7       Q.   There are certainly instances where inmates

8  have more than 25 years in and they've not been given a

9  hearing, correct?

10      A.   I would assume that.

11      Q.   Or they've been told you're not eligible

12  because of other consecutive sentences you have?

13      A.   Yes.

14      Q.   But to your recollection, there was a

15  meeting of the board after 590 was passed where you

16  discussed the impact of the bill; is that fair?

17      A.   Yes.

18      Q.   What do you recall from that discussion?

19      A.   That we would have to fill out an

20  additional piece of paper at the parole hearings on

21  juvenile life without parole.

22      Q.   Anything else?

23      A.   Not really.  Except the 25 years rule.

24      Q.   What do you mean "the 25 years?"

25      A.   If they served 25 years unless they had a

1  **consecutive sentence.**

2      Q.   To confirm, that's Exhibit 3?

3      **A.   Yes.**

4      Q.   And were you given any instruction as to

5  how to elicit information on each of these five factors

6  on Exhibit 3?

7      **A.   I don't think we had any training on that.**

8      Q.   Do you know who prepared Exhibit 3?  Who

9  designed it?

10     **A.   No.**

11     Q.   How is an inmate told about their parole

12  decision once a majority decision has been reached?

13  How is that conveyed to the inmate?

14     **A.   I am told -- and I don't know except**

15  **second-hand -- the institutional parole officer gets**

16  **the answer from the parole board, and it is -- he calls**

17  **the offender in and gives him the information.**

18         **(Deposition Exhibit No. 5 was marked for**

19  **identification.)**

20  BY MS. BREIHAN:

21     Q.   I'm going to show you Exhibit 5.  It's

22  AGO2624 and 2625.

23         Have you ever seen this document before

24  today, sir?

25     **A.   I have.  I don't know about this particular**

1  **one.**

2      Q.   But the form that this is on is familiar to

3  you; is that fair?

4      **A.   Yes.**

5      Q.   This is a decision notice to Mr. Theron

6  Roland, correct?

7      **A.   Yes.**

8      Q.   And, to your knowledge, is this the

9  standard form that's used to convey all parole

10  decisions to inmates?

11      **A.   Yes.**

12      Q.   And this language on the first page, the

13  bottom of the first page regarding the reasons for the

14  action taken, that's standard language from the second

15  page of the board action sheet, correct?

16      **A.   Yes.**

17      Q.   And I can show you what I'm talking about

18  so we're not referring to things in the abstract here.

19           I'll mark it Exhibit 6.

20           (Deposition Exhibit No. 6 was marked for

21  identification.)

22  BY MS. BREIHAN:

23      Q.   This is Mr. Roland's board action sheet.

24  So the standard language I'm talking about here is on

25  the second page of Exhibit 6, the four different

1  reasons with sub-parts, correct?

2      **A.   Yes.**

3      Q.   Who determines what sort of boilerplate

4  language is here to select from on the second page of

5  the board action sheet?

6      **A.   Who determines the language printed on**

7  **that?**

8      Q.   Yeah.  Do you know who designed this board

9  action sheet?

10     **A.   I have no clue.**

11     Q.   Do you know how it's determined what

12 different bases for your decisions are made available

13 here to select from?

14     **A.   Just the form?**

15     Q.   Right.

16     **A.   It's been there since I've been there.**

17     Q.   Okay.  If, for example, you wanted to add a

18 factor here as an option, would you be able to do that?

19     **A.   I would definitely talk to other people for**

20 **advice.  But if there was a good reason to change this,**

21 **we could change it.**

22     Q.   You'd have authority to do that?

23     **A.   I think so.**

24     Q.   And it also looks like there are blank

25 lines, for example, it says other, and there's a place

1    to handwrite a reason as well?

2         **A.   Yes.**

3         Q.   Have you ever done that during your time

4    with the board?

5         **A.   I don't specifically recall any time that I**

6    **did.**

7         Q.   Have you ever seen in any of these juvenile

8    life without cases a unique basis for denial in the

9    board action sheet?

10        **A.   No.  There is writing at the top where it**

11   **says hearing panel comments.  You can see on page one**

12   **of Exhibit 6.**

13        Q.   And why are you pointing that out to me?

14        **A.   Because that would be the same as you would**

15   **write on the 1G.**

16        Q.   Okay.  So is it your testimony that the

17   basis for the decision is not only the box that's

18   marked on the second page, but also the handwritten

19   comments in the hearing panel comments?

20        **A.   Yes.**

21        Q.   Is there anywhere else where the basis for

22   the board's decision would be indicated in a file?

23        **A.   No.**

24        Q.   And this Exhibit 5, which is the notice

25   that actually goes to the inmate -- strike that.

1          The inmate doesn't get a copy of the board
2     action sheet, right?
3          **A.   That is correct.**
4          Q.   So the only written information that the
5     inmate gets about why their parole decision was made is
6     this notice, an example of which we've marked as
7     Exhibit 5, correct?
8          **A.   Yes.**
9          Q.   In your opinion, does this notice give
10    enough explanation to an inmate as to why they've been
11    denied parole?
12          Let's talk specifically about Mr. Roland's
13    notice here, if that's easiest for you.
14          Does this notice in your opinion give
15    enough explanation to the inmate about why they're
16    being denied parole?
17          **A.   No.**
18          Q.   And in your opinion does this give enough
19    information to the inmate about why they're being given
20    a five-year setback, in particular, rather than, for
21    example, a two, three, or four-year setback?
22          **A.   No.**
23          Q.   What does it mean, "based solely on the
24    circumstances of the offense," as is indicated in
25    Exhibit 5?

1       A.   Are you referring to the writing at the

2   bottom of the page?

3       Q.   This Exhibit 5, the notice that went to

4   Mr. Roland in January of 2017, it conveys to him he's

5   been given a five-year setback.  And the basis for this

6   decision is because "release at this time would

7   depreciate the seriousness of the present offense based

8   on circumstances surrounding the present offense."

9            I'm wondering in layman's terms what that

10  means.

11      A.   That means just what it says.  The offense

12  as it occurred, the circumstances that they were

13  involved in.

14           And this is the reason I said this is not

15  enough.  If the IPO, who delivers this, is also a part

16  of the notification, and would explain -- if he doesn't

17  recall the present offense -- the IPO could go over the

18  present offense and remind him of those circumstances.

19      Q.   Is the IPO on the hearing panel?

20      A.   The IPO is not part of the hearing panel.

21      Q.   So they're not present during these

22  hearings, correct?

23      A.   No.

24      Q.   And they're certainly not present when the

25  board is voting on these cases, correct?

1          A.    Yes.

2          Q.    But it's the IPO's job you're saying

3     to explain to the inmate beyond what's provided in this

4     notice?

5          A.    I certainly hope so.

6          Q.    And I guess I'm still -- I don't understand

7     what it means to you -- why -- can you just sort of

8     tell me hypothetically why would you deny someone based

9     on the circumstances of the present offense?

10         A.    Why would I deny parole?

11         Q.    Based on circumstances surrounding the

12    present offense.  I'm trying to understand what that

13    particular basis for a decision means.

14         A.    The offense as it occurred and those

15    circumstances around it.  The evidence that was

16    produced and given to us, not only in the interview,

17    but also in the reports that the parole boards gets.

18         Q.    Does it mean it's a particularly bad or

19    serious crime?

20         A.    It could be.

21         Q.    Does it mean that in the board's opinion

22    the inmate hasn't served the punitive and deterrent

23    portion of their sentence yet?

24         A.    It could be that also.

25         Q.    Would you agree that all of these juvenile

```
 1   life without cases involve serious crimes?
 2        A.   Yes.
 3        Q.   They're all serving sentences for
 4   first-degree murder, correct?
 5        A.   Yes.
 6        Q.   Did you ever have any discussion with
 7   anybody about not denying parole in these juvenile life
 8   without cases based on circumstances of the offense?
 9        A.   No.
10        Q.   Were you ever witness to any such
11   discussion or conversation?
12        A.   Not that I recall.
13        Q.   Have you had any discussions with anyone
14   about -- other than your attorneys who are here
15   today -- about modifying this notice to inmates of
16   their parole decisions?
17        A.   No.
18        Q.   Parole hearings in Missouri are closed to
19   the public, correct?
20        A.   That is correct.
21        Q.   Why are they not open to the public?
22        A.   Safety and security of those involved on
23   the parole board.
24        Q.   Are you aware of other states that have
25   parole hearings that are open to the public?
```

1        **A.    I think there is another state out west.**

2  **But I'm not for certain which state it is.**

3        Q.    Do you know a man by the named O.J.

4  Simpson?

5        **A.    Yes.    That would be the western state,**

6  **wouldn't it?**

7        Q.    Maybe.

8              I'll show you what I'm going to mark as

9  Exhibit 7.

10             (Deposition Exhibit No. 7 was marked for

11  identification.)

12  BY MS. BREIHAN:

13        Q.    This is AGO110.

14             It looks like a letter that you wrote to

15  your attorney, Mr. Spillane, on or about August 14,

16  2017.

17             Do you recognize this document?

18        **A.    Yeah.**

19        Q.    This was produced in this case in

20  discovery.

21             Did you speak with anyone other than your

22  attorneys in preparing this letter.

23        **A.    I might have talked to some other people in**

24  **the office.    I don't particularly recall any**

25  **conversation about it.**

1       Q.   Can you describe for me generally what the

2 purpose of this letter was?

3       **A.   It was -- it was to answer the question of**

4 **why we think the majority of the records should be**

5 **confidential.  And also how we consider parole for**

6 **juvenile offenders, yes, as in that first paragraph.**

7       Q.   Let's talk about the first chunk of that,

8 specifically why the division of probation and parole

9 keeps the majority of its record confidential.

10       You indicate in the letter that releasing

11 parole files to inmates would significantly hinder the

12 division's ability to make the best paroling decisions

13 possible.

14       Why is that?

15       **A.   I think the ability to be able to make a**

16 **parole decision in many cases, especially in**

17 **recidivism, would receive a lot of criticism.  And the**

18 **safety of the people making the decision.**

19       **And also the reaction by the general public**

20 **to somebody being released on parole.**

21       Q.   So you mentioned that there might be fear

22 of criticism.  Criticism by whom?

23       **A.   Criticism by the general public.**

24       Q.   Are you saying these files are not given to

25 inmates because of the potential backlash by the

PohlmanUSA Court Reporting
(877) 421-0099    PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-4   Filed 06/12/18   Page 87 of 122

1    general public in response to parole decisions?

2          **A.   No.  They're not given to the -- well, that**

3    **could be part of the reason.  But if they're given to**

4    **the -- if it was open to the public, the abilities of**

5    **the parole board to take a risk and give a shorter or a**

6    **better parole date, I think, would be hindered.**

7          Q.   Have you ever been on the Missouri

8    Department of Corrections website?

9          **A.    No.**

10         Q.   Are you aware that there's an inmate lookup

11   function?  I actually use it quite a bit.

12              Do you know about this?

13         **A.   I guess you can get on the internet and**

14   **look up on other -- on most anything.  And FileBound.**

15   **Our files.**

16         Q.   In my experience, there's this publicly

17   available tool called the inmate lookup, or something

18   like that, where you can look up by name an inmate

19   under the supervision of the Department of Corrections,

20   and it will tell you where they're housed, or if

21   they're on probation, where their parole office is.

22              So the public has access to information

23   about whether or not someone has been released on

24   parole; isn't that correct?

25         **A.   I think they can get it, yes.**

1       Q.    My question here is specifically focused on

2    why the parole file is not shared with the inmate.  So

3    not the general public, but the inmate, whose decision,

4    whose case you're considering, why you think it would

5    hinder making good parole decisions if you would allow

6    inmates access to their parole file?

7          **A.    As in the face sheet?**

8       Q.    Well, so may you could tell what you think

9    of when you hear the term "parole file."

10          **A.    A parole file is -- it would include the**

11    **board action sheet.**

12       Q.    And it also probably include the prehearing

13    report, correct?

14          **A.    Yes.**

15       Q.    And any police reports or incident reports,

16    correct?

17          **A.    Yes.**

18       Q.    Any letters of support or opposition from

19    the community or family members or staff, correct?

20          **A.    Yes.**

21       Q.    Would have it also contain case-related

22    documents?

23          For example, in the named Plaintiffs' case,

24    I think they had a copy of our lawsuit in their parole

25    file.  Is that uncommon?

```
 1        A.    Is it uncommon for it to be in the parole

 2   file?

 3        Q.    Yes.

 4        A.    No.

 5        Q.    Is there anything else that I haven't asked

 6   about that you would generally would see in a parole

 7   file?

 8        A.    I don't think so.

 9        Q.    Okay.  So maybe we are in agreement --

10   that's sort of what we're thinking of when we use that

11   term "parole file."

12              So I'll repeat my question, which is why

13   would allowing an inmate access to their parole file

14   hinder -- significantly hinder, in your words -- the

15   division's ability to make the best paroling decisions

16   possible?

17        A.    I think because of the danger to the

18   officer making recommendation.

19        Q.    Who are you referring to by "officer?"

20        A.    The parole board member.  Or the analyst.

21   Or the person in the institution.

22        Q.    Any other reasons why you think it would

23   significantly hinder the board's abilities to make a

24   decision?

25        A.    They may think that the decision we make is
```

1    **based on evidence.  The offender may think it's based**

2    **on trying to get back -- um, trying to punish them**

3    **more, or do something.  They would be looking for**

4    **someone to blame if they don't like the date or like**

5    **the setback.**

6             **And there's some fear that -- and some**

7    **evidence -- that things have happened as a result of**

8    **these files being made open to the offender.**

9        Q.   But the explanation for the board's

10   decision is in this board action sheet, right?

11       **A.   Yes.**

12       Q.   So you explained that the inmate might

13   think the decision is not based on evidence, but you're

14   explaining the evidence-based reasons for your decision

15   in the board action sheet, right?

16       **A.   Yes.**

17       Q.   So, for example, in Mr. Roland's board

18   action sheet, it talks about in multiple places how

19   he's done very well, he accepted responsibility.

20             The third sheet of this Exhibit 6, it

21   mentions in multiple places he hasn't had any conduct

22   violations since 2001, and he's been in honor dorm for

23   over 13 years.

24       **A.   I see that.**

25       Q.   So that's part of the -- some of the

Pohlman USA Court Reporting
(877) 421-0099    PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-4   Filed 06/12/18   Page 91 of 122

1   factors that were considered in determining whether

2   Mr. Roland was ready for release; is that fair to say?

3          **A.    Yes.   These should be factors that are**

4   **recognized.**

5          Q.   ███████████████████████████████████

██  ████████████████████████████████████████

██        ██    ████

██        ██    ████    ██████████████████████

██   ████████████████████████

██        ██    █████████████████████████████

██        ██    ██████████████████

██        ██    ████

██        ██    █████████████████████  ████████

██   ██████████

██        ██    ███████████████████████████████

██   █████████████████

██        ██    ████  ██████████████████████████

██   ████████  ██████████████

██        ██    █████████████████████████████

██   ██████████

██        ██    ███████████████████████████████

██        ██    ██████████████████████████████

██   ████████████████████████████████████████

██   ████████████████████████████████████████,

1 ███████████████████████████████████████

██ █████

██ ████ ██████

██ ████ █████████████████████

██ ██████████████

██ ████ ███████████████

██ █████████████████████.

8       Q.   So I think you were saying that the concern

9 is that -- and correct if I'm wrong -- if the inmate's

10 given access to the parole file and board action sheet

11 that perhaps board members might not be comfortable

12 voting a certain way for fear of retaliation; is that

13 fair?

14       **A.   I think there would be retaliation,**

15 **perhaps, from the offender, but also reaction from the**

16 **general public.**

17       Q.   What about the rest of the parole file?  So

18 excluding the board action sheet, do you have similar

19 concerns with respect to the inmate's access to that

20 information?

21       **A.   These files are all prepared by**

22 **individuals.  They're human beings.  And they put**

23 **things in files that are confidential.  That they**

24 **are -- they know is not going to be made public;**

25 **therefore, they can make a more accurate statement, if**

PohlmanUSA Court Reporting
(877) 421-0099    PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-4   Filed 06/12/18   Page 93 of 122

1    there are serious accusations, or serious evidence to

2    be presented.

3              This is very easy to print, 'cause this is

4    all positive.  But the prehearing report is not a

5    positive report.  Always.  Parts of it is.  Parts of it

6    are not.  This particular sheet is positive.

7              If the person has made the efforts towards

8    rehabilitation, had growth and maturity, and accepted

9    responsibility.  And it could also be negative.  But

10   you would hope if the person was trying to get parole,

11   that these would all be positives.  So the board could

12   take into consideration and have it overbalance the

13   facts of the case.

14       Q.   You also mentioned in your letter that if

15   inmates had access to their parole file they might be

16   able to influence who supervises them and how.

17              Could you clarify what you mean by that?

18       A.   That would be -- I think it would have to

19   do with their home plan, and who they would be

20   supervised with on the street.  Perhaps location.  Some

21   parole officers hold offenders more accountable.  We're

22   all different.  And they are all different.

23       Q.   So can you explain for me -- I'm

24   confused -- how an inmate would be able to influence

25   who they would be supervised by in the field by nature

1    of having access to their parole file?

2              What information is in the parole file that

3    would give the inmate the ability to influence which

4    field supervisor he would have?

5        **A.    If they knew that a particular officer**

6    **didn't -- was more lenient, perhaps, if they were being**

7    **supervised for drugs.  Or perhaps knows that a**

8    **particular parole officer didn't work nights and**

9    **weekends.  And they could get a home plan to an area**

10   **where they wouldn't have as much supervision.**

11       Q.    The prehearing report contains or is

12   supposed to contain the inmate's home plan, right?

13       **A.    Sometimes.**

14       Q.    And another concern you mentioned is the

15   victim information being present in the parole file,

16   correct?

17       **A.    Yes.**

18       Q.    And you also say parole files may contain

19   accounts of an offender's crimes.

20              Why is it concerning that an inmate might

21   have access to the accounts of their crimes?  That's

22   not concerning because that information usually comes

23   from the offender.

24              I was wondering why it's included in this

25   letter that's talking about the importance of

1    confidentiality.

2         **A.    They might not know who their victims were.**

3    **If it was included.**

4         Q.    Is that true with these juvenile life

5    without cases?

6         **A.    I don't know.**

7         Q.    In the last paragraph of this letter, you

8    talk about the second part of the letter which is the

9    process for considering parole in these juvenile life

10   without cases.

11             You say that the board's created a

12   worksheet that outlines the additional factors that the

13   General Assembly directed to board to consider when

14   making paroling decisions on these offenders.

15             You use the word "offenders."  Is that the

16   Exhibit 3 that we marked earlier?

17        **A.    Yes.**

18        Q.    So for these juvenile life without cases,

19   the only additional factors that the board considers

20   are the ones that are outlined in this Exhibit 3?

21        **A.    What was the question again?**

22        Q.    So is it true that for these juvenile life

23   without cases the only additional factors that the

24   board considers are outlined in the worksheet we marked

25   as Exhibit 3?

```
 1          A.   Yes.

 2          Q.   You talked earlier about board meetings,

 3     and it was in the context of training sessions.  How

 4     often are board meetings held?

 5          A.   Generally, once a month.

 6          Q.   And are they open to the public?

 7          A.   No.

 8          Q.   Can they be?

 9          A.   I never gave it much thought.  I don't

10     know.

11          Q.   So you're not aware of whether there's any

12     sort of statute or regulation when board meetings can

13     be open versus closed?

14          A.   That's correct.

15          Q.   Are board votes ever posted as open?

16          A.   No.

17          Q.   Do you know whether they can be?

18          A.   I don't know.

19          Q.   So you're not aware of any statutes or

20     regulations when -- or when votes might be open to the

21     public?

22          A.   No.

23          Q.   And are hearings themselves recorded?

24          A.   Yes.

25          Q.   Are the hearings ever made public?
```

```
 1          A.    No.

 2          Q.    I'm sorry, the hearing of the recordings?

 3          A.    No.

 4          Q.    Are the hearing recordings provided to the

 5    inmate?

 6          A.    I don't think so.

 7          Q.    Are the recordings of these hearings made

 8    available to anyone other than board members?

 9          A.    Not without a court order.  It would be my

10    assumption.

11          Q.    What are you basing that assumption off of?

12          A.    Because I don't think anyone else has

13    access to those recordings.

14          Q.    Were recordings provided to Amy Roger, the

15    Inspector General, to your knowledge?

16          A.    I don't know.

17          Q.    Does probation and parole track the

18    outcomes of these juvenile life without hearings?

19          A.    I think we keep track of them, yes.

20          Q.    Do you know who does that?

21          A.    No.

22          Q.    Do you ever check on the progress of how

23    many grants versus denials there are in the juvenile

24    life without cases?

25          A.    I saw some data on that.
```

```
1          Q.   When was that?

2          A.   Recently.

3          Q.   Is it something you asked for or something

4    that was voluntarily provided to you?

5          A.   I think I asked Mr. Mueller about it.

6          Q.   Is it something that you asked for on a

7    regular basis?

8          A.   No.  Just when this case came up.

9          Q.   Okay.  So are you saying that after this

10   case was filed you asked Mr. Mueller for data on the

11   outcomes on these juvenile life without hearings?

12         A.   Yes.

13              (Deposition Exhibit No. 8 was marked for

14   identification.)

15   BY MS. BREIHAN:

16         Q.   I'll show you Exhibit 8.  This was produced

17   but it wasn't Bates-stamped.  I think it was a

18   supplement.  It's dated 10-23-17.

19              Have you seen this chart before today,

20   Mr. Jones?

21         A.   I may have seen it.  I don't know that I

22   remember it.

23         Q.   So do you know who maintains this worksheet

24   by chance?

25         A.   There are several people that work on
```

 1    **information like that.  I don't know who particularly**

 2    **does this.**

 3         Q.   It appears to be -- please take your time

 4    to look it over.  It's just a one and a quarter page

 5    document.  But it appears to be a chart of the petition

 6    dates, hearing dates, and results for juvenile life

 7    without parole inmates as of October 23rd, 2017.

 8              Is that fair?

 9         **A.   Yes.**

10         Q.   And it looks like there are three release

11    dates indicated here.  For Houston, Edward Ramsey and

12    Michael McRoberts, correct?

13         **A.   Yes.**

14         Q.   Are you aware of any other release dates

15    being given by the board since the date of this chart?

16         **A.   No.  In juvenile life without cases.**

17         Q.   I'll show you another document produced by

18    Mr. Mueller, but not marked.  I'll mark it now as

19    Exhibit 9.

20              (Deposition Exhibit No. 9 was marked for

21    identification.)

22    BY MS. BREIHAN:

23         Q.   This appears to be a November 1st email to

24    you, Mr. Jones, from Mueller and Jennifer Zamkus.

25              Do you recognize this email?

 1          **A.    I remember seeing it, yeah.**

 2          Q.    Had you asked Mr. Mueller to prepare this

 3     JL WOP decision analysis?

 4          **A.    I don't know if I asked it or if it was a**

 5     **mutual, in a conversation.**

 6          Q.    Okay.

 7          **A.    That he was able to get this information.**

 8          Q.    Okay.  And he seems to indicate that there

 9     were four release dates set.  He says of 22 eligible

10     for release within five years there were four release

11     dates set.

12               But this chart marked as Exhibit 8 shows

13     three.  Do you know who that fourth person was that was

14     given a release date?

15          **A.    No, I don't.**

16          Q.    Who would you talk to to find that out?

17          **A.    Probably Mr. Mueller.**

18          Q.    Does the name Edward Anderson ring a bell

19     to you?

20          **A.    No.**

21          Q.    Are there any juvenile life without parole

22     hearings scheduled in 2018 yet?

23          **A.    I don't know.**

24          Q.    Do you generally keep track of, or keep

25     yourself informed on the parole hearing calendar that's

1   part of your duties as chair?

2        **A.   I do.**

3        Q.   But you don't know if there are any

4   juvenile life without parole hearings coming up?

5        **A.   I don't know.**

6        Q.   Do you know what the conditions for parole

7   are for those who are given outdates under this new

8   Senate Bill 590?

9        **A.   No.**

10       Q.   Who would you talk to to find that out?

11       **A.   The conditions of parole, you'd have to**

12   **look at the board action sheet.**

13       Q.   And would that also indicate how long that

14   person was expected to be on parole?

15       **A.   Yes, that information would be in there,**

16   **yes.**

17       Q.   Do you know what the term of parole is for

18   individuals who are being given outdates under this

19   change in the law?

20       **A.   I don't.**

21       Q.   So you don't know if they'll have to be on

22   parole and supervision for the rest of their lives?

23       **A.   I don't.**

24       Q.   Did you discuss this lawsuit with anyone

25   other than your attorneys that are here today?

1        **A.   Mr. Mueller.  In getting these figures.**

2        Q.   And you're referring to the figures in

3  Exhibit 9?

4        **A.   Yes.**

5        Q.   Tell me everything you remember about your

6  conversation with Mr. Mueller regarding the Exhibit 9.

7        **A.   It was -- we had a discussion.  I wanted to**

8  **know how many we released versus how many we hear.  And**

9  **how many were ineligible because of other factors.**

10       Q.   And you said you wanted to know how many of

11  them were released?

12       **A.   Set a release date.**

13       Q.   And that release date can be taken away,

14  right?

15       **A.   It can be.**

16       Q.   It can be adjusted as well, right?

17       **A.   Yes.**

18       Q.   And you also mentioned that there might be

19  individuals who are ineligible, correct?

20       **A.   Yes.**

21       Q.   For example, the name escapes me, but my

22  understanding, there is an individual who is serving

23  two active life without parole sentences, correct?

24           I'm trying to find it here.  Donald

25  Stewart.  If you look on Exhibit 8, it indicates that

PohlmanUSA Court Reporting
(877) 421-0099    PohlmanUSA.com
Case 2:17-cv-04082-NKL  Document 134-4  Filed 06/12/18  Page 103 of 122

1    he had hearing on December 20th, 2016, by

2    videoconference, but due to CS -- does CS mean

3    consecutive sentence?

4         **A.   Yes.**

5         Q.   That he would not be eligible until 2032,

6    correct?

7         **A.   Yes.**

8         Q.   So Mr. Stewart's case is an example of an

9    instance where the individual impacted by Senate Bill

10   590 is not eligible according to the board for parole

11   release after 25 years, correct?

12        **A.   That's correct.**

13        Q.   In fact, he was told he has to serve

14   50 years before he can be considered for release,

15   correct?

16        **A.   Yes.**

17        Q.   So?

18        **A.   Apparently.  It's quite apparent that's**

19   **what it is.**

20        Q.   I don't know Mr. Stewart's age at the time

21   of the underlying offense, but we know he was under 18

22   by being impacted by Senate Bill 590.

23             Safe to say he would be in his late 60s by

24   the time he even becomes parole eligible, right?

25        **A.   He would be if he was 16 or 17.**

1          Q.   And if Mr. Stewart has a parole hearing in

2     2032 when he's in his 60s, in your mind is that

3     providing him a meaningful opportunity for release?

4               MR. SPILLANE:  I'll object to the question

5     because it calls for a legal conclusion.

6               You can answer it if you have an opinion.

7               THE WITNESS:  I don't have an opinion.

8     BY MS. BREIHAN:

9          Q.   Do you know anything about life expectancy

10    of people who are incarcerated versus the general

11    public?

12         **A.   No.**

13         Q.   Do you know that people who are

14    incarcerated, black men in particular, have a lower

15    life expectancy than their counterparts in general?

16              MR. SPILLANE:  I'll object to you

17    testifying.  If you know the answer ...

18              THE WITNESS:  I don't know the answer.

19    BY MR. BREIHAN:

20         Q.   And when somebody's granted parole, it's up

21    to the board to set an outdate, one, two, three,

22    five years in the future, correct?

23         **A.   Yes.**

24         Q.   So even if -- continuing this discussion on

25    Mr. Stewart -- even if he has a hearing in 2032, what's

1    the earliest he could be released from prison by the

2    parole board?

3        **A.    The earliest that someone can be given is**

4    **ASAP.**

5        Q.    So he could walk out the day of his

6    hearing?

7        **A.    He could get that answer.  But he wouldn't**

8    **be processed out for a few days.**

9        Q.    I understand.  In August of 2017, didn't

10   you have a meeting where you and others listened to

11   audio recordings relevant to this case?

12       **A.    In reference to which case?**

13       Q.    The named Plaintiffs, Mr. Roland,

14   Mr. Brown, Mr. Roberts, and Mr. McElroy's hearings.

15           Do you remember that?

16       **A.    I don't remember that.**

17       Q.    You don't remember that?

18       **A.    No.**

19       Q.    Okay.

20           (Deposition Exhibit No. 10 was marked for

21   identification.)

22       Q.    This is AGO0176.  Take a look at that.

23       **A.    Okay.**

24       Q.    This is an email from Pam Rogers to you and

25   others.

```
 1            Do you recall receiving this email?
 2       A.   My name is on there.  On the list.  But I
 3  don't remember.
 4       Q.   Okay.  It's dated August 28th, 2017.
 5  "Please plan to attend JL WOP 1:30 p.m. in Kenny's
 6  office.  You will by listening to the hearings on the
 7  four defendants in the pending lawsuit."
 8            Do you know who called this meeting in your
 9  office on August 30th, 2017?
10       A.   I don't know.
11       Q.   Safe to assume, since it was at your
12  office, that you were involved in setting this up?
13       A.   I'm sure I was.
14       Q.   Do you recall listening to the hearings on
15  the four named plaintiffs in this lawsuit?
16       A.   No.
17       Q.   Do you recall any discussion that day about
18  the plaintiffs' hearings?
19       A.   No.
20       Q.   Do you recall any discussion since that day
21  about any of the named Plaintiffs' parole hearings?
22       A.   No.
23       Q.   And it looks like some other individuals
24  were invited to attend this JL WOP hearing review,
25  including Steve Mueller, correct?
```

1          **A.    Yes.**

2          Q.    And is he the lead parole analyst?

3          **A.    Yes.**

4          Q.    And then Gary Dusenberg was also on this

5     email invitation, and Mr. Dusenberg is a board member,

6     correct?

7          **A.    Yes.**

8          Q.    Charlie Baker and Brian George, they're

9     both parole analysts?

10         **A.    Yes.**

11         Q.    And Jay Boresi, he's DOC legal, correct?

12         **A.    Yes.**

13         Q.    Mr. ██████ was involved in Mr. Roland's

14    hearing along with ██████████.  Why was he not

15    invited to this JL WOP hearing review?

16         **A.    I don't know.**

17         Q.    Mr. ██████ was involved in Mr. Roberts --

18    he was on his hearing panel along with Brian George,

19    but he was not invited to this JL WOP hearing review;

20    why was that?

21         **A.    I don't know.**

22         Q.    Do you know what the purpose of this

23    hearing review was?

24         **A.    No.**

25         Q.    Have you reviewed the audio recordings in

1  any other juvenile life without cases?

2         A.   No.

3         Q.   Are you aware -- strike that.  You're aware

4  of Mr. Don Ruzicka's misconduct during certain parole

5  hearings, correct?

6         A.   Yes.

7         Q.   In fact, you reported it to Kelly Dills in

8  2016, didn't you?

9         A.   I did.

10         Q.   Were you involved at all in disciplining

11  Mr. Ruzicka?

12         A.   No.

13         Q.   Do you know, in fact, whether he was

14  disciplined at all?

15         A.   No.  I knew that he had resigned.

16         Q.   You accepted his resignation letter, in

17  fact, right?

18         A.   I did.

19         Q.   And he resigned on June 12th, 2017,

20  correct?

21         A.   I'm not sure of the exact date.  It's been

22  a while; but, yes, I accepted his resignation.

23         Q.   The effective date was August 1st, 2017, so

24  he had some time?

25         A.   I think he had leave.

1          Q.   So he used up leave before his retirement
2    was effective, correct?
3          A.   Yes.
4          Q.   And his seat has since been filled by
5    Mr. Fitzwater, correct?
6          A.   That's correct.
7          Q.   Has Mr. Fitzwater run any juvenile life
8    without hearings?
9          A.   I don't know.
10         Q.   Do you know whether he's scheduled to?
11         A.   I don't know that either.
12         Q.   And there is actually one vacancy on the
13   board currently, correct?
14         A.   That's correct.
15         Q.   A democratic seat, correct?
16         A.   It can be either way.  We have three and
17   three.
18         Q.   You're referring to the requirement that
19   there be no more than?
20         A.   Four.
21         Q.   Four of one political party, correct?
22         A.   That's correct.
23         Q.   But the seat vacant was left by
24   Mr. McSwain, correct?
25         A.   Yes.

1         Q.   Have you had discussions with anybody about

2    who might fill that vacancy?

3         **A.   No.**

4         Q.   Do you know the timeline for filling the

5    vacancy?

6         **A.   No.**

7         Q.   Are you aware of any other misconduct or

8    unethical conduct by board members or parole staff?

9         **A.   No.**

10        Q.   And, Ms. Dills, whose name we mentioned

11   here a few times, she's no longer the board operations

12   manager, correct?

13        **A.   Correct.**

14        Q.   Who made the decision to move her away from

15   that position?

16        **A.   I did.**

17        Q.   Why did you make that decision?

18        **A.   Because I wanted someone who was closer to**

19   **the other analysts and could communicate better with**

20   **them.**

21        Q.   What do you mean closer with the other

22   analysts?  Like personally?  Had a better relationship

23   with them?

24        **A.   Yes.**

25        Q.   And who is the current board operations

1    manager?

2         A.   Steve Mueller.

3         Q.   So I'm confused.  I thought his title was

4    lead parole analyst?

5         A.   It is.

6         Q.   So he -- he has the position?

7         A.   He assumed the duties --

8         Q.   Understood.

9         A.   -- of the board operations manager.

10        Q.   So there's no intention to fill any vacant

11   board operations manager position, is there?

12        A.   With one board vacancy we don't -- we have

13   the same workload, but we don't have someone available

14   to go to hearings, so we haven't hired another analyst.

15   We almost need another analyst to go with the board

16   member.  Should we get a new board member, at that

17   point we might restructure again.

18        Q.   Okay.  I know the board members are

19   gubernatorial appointees, correct?

20        A.   Yes.

21        Q.   Does the Governor consult with you at all

22   in determining who to appoint?

23        A.   I haven't had any communication with him

24   about anyone else after Mr. Fitzwater.

25        Q.   Okay.  Your son used to work for

```
 1    Governor Greitens, correct?
 2         A.   He did.
 3         Q.   And he also served four terms as state
 4    representative for Moniteau County, correct?
 5         A.   Yes.
 6         Q.   Did you ever discuss Senate Bill 590 with
 7    Caleb Jones?
 8         A.   No.
 9         Q.   Did you ever discuss 590 with any other
10    state legislators?
11         A.   No.
12         Q.   Are you aware of the Justice Reinvestment
13    Task Force that Greitens set up?
14         A.   Yes.
15         Q.   Are you involved in that task force in any
16    way?
17         A.   Yes.  I'm a member of it.
18         Q.   You're a member of the task force?
19         A.   Yeah.
20         Q.   Can you tell me what your duties or role is
21    one that task force?
22         A.   As a member of the task force.
23         Q.   And what do you do?
24         A.   We listen to information and discuss ideas
25    from council of state governments that might be
```

1    **beneficial to the State of Missouri prison system and**

2    **the parole system.**

3        Q.   So have you had discussions, been part of

4    discussions as a member of the task force, about parole

5    in Missouri?

6        **A.   Yes.**

7        Q.   Have any of those discussions included

8    juvenile offenders' parole?

9        **A.   No.**

10        Q.   No.  Okay.  So what are the parole-related

11    discussions about then?

12        **A.   There is a concern in Missouri about the**

13    **high -- increasing number of women in our prisons.  We**

14    **only have two women's prisons, but they're becoming**

15    **full.**

16            **And some of the discussions are around the**

17    **recidivism and why people are brought back.**

18        Q.   So you're talking about new arrests, or

19    parole revocations, or both?

20        **A.   Technical violations that bring people**

21    **back.**

22        Q.   Are you familiar with the Supreme Court

23    decision Miller versus Alabama?

24        **A.   No.**

25        Q.   Have you ever read that decision before,

1  that opinion?

2      **A.   If you would remind me I could tell you,**

3  **but I don't recall reading it.**

4      Q.   Are you familiar with the Supreme Court

5  decision Montgomery versus Louisiana?

6      **A.   No.**

7      Q.   Have you read Senate bill 590?

8      **A.   I have.**

9      Q.   When's the last time you read it?

10     **A.   It's been last summer.**

11     Q.   2017?

12     **A.   Yes.**

13         MS. BREIHAN:  Let's take a break.

14         (A break was taken.)

15         MS. BREIHAN:  Back on the record.

16 BY MS. BREIHAN:

17     Q.   Earlier today you were talking about how

18 the board doesn't use the salient factor score in these

19 juvenile life without cases because you think it's

20 irrelevant.

21         Do you remember that testimony?

22     **A.   It's irrelevant when they come in, yes.**

23     Q.   Can you explain to me then why the board

24 does not use the salient factor score in these juvenile

25 life without cases?

```
 1          A.   I'm not sure if -- I know some of the

 2   factors on the salient -- some of the parts of the

 3   salient factor deal with prior crime.  A juvenile would

 4   not have a criminal history, as such.

 5               The education probably would not be

 6   complete.

 7               Job readiness for a job would not be -- I'm

 8   just going by memory, I don't try to memorize this --

 9   but you wouldn't have education, job readiness.

10               The age of that would -- could change the

11   salient factor.

12          Q.   So are you saying that because of that,

13   because the inmate's very young at the time that they

14   were committed, that if you calculated the salient

15   factor score it wouldn't be reliable?

16          A.   I guess reliable would be one word.  It

17   wouldn't be relevant to that person's life at that

18   time, because in my mind, the salient factor is made

19   for an adult who's had life experiences, who's perhaps

20   been incarcerated before, who has an education, or has

21   the opportunity to have had an education.  Maybe a job

22   or job training.  And other factors that I can't

23   remember.

24               But it might be possible to develop one at

25   a later time of their -- when they mature.
```

1      Q.   So the salient factor score is really

2  geared for adult offenders, right?

3      **A.   In my opinion, yes.**

4      Q.   And children are different, correct?

5      **A.   Absolutely.**

6      Q.   Are you aware of any risk assessment tools

7  that are designed specifically for juvenile offenders?

8      **A.   No.**

9      Q.   Have you researched or asked someone to

10 research what such tools might be available?

11     **A.   The Ohio risk assessment tool may have some**

12 **factors in it about juvenile -- about the age.  About**

13 **juveniles.  I'm not sure.  I don't remember the**

14 **conversation.**

15     Q.   Does the salient factor score take into

16 consideration age at all?

17     **A.   It does.**

18     Q.   And how do you know how that factors into

19 the score?

20     **A.   It can change the score at a certain point.**

21 **Like I said, at 40 you'd go from perhaps a zero to a**

22 **one.  One being better.**

23     Q.   And so if -- strike that.

24          MS. BREIHAN:  That's all the questions that

25 I have.

```
 1              MR. SPILLANE:  I have a couple, sir.
 2    CROSS-EXAMINATION BY MR. SPILLANE:
 3         Q.    Is the salient factor score a tool that you
 4    use with the guideline range for -- guides to the
 5    parole board about when on a grid someone might be
 6    paroled based on a particular offense and other
 7    factors?
 8         A.    Yes.
 9         Q.    Does the guideline range apply to juvenile
10    life without parole offenders?
11         A.    I don't believe so.
12         Q.    You talked earlier about the involvement of
13    the director of DOC with the parole board.
14              As far as you know, does the director of
15    the DOC have any operational role in the activities of
16    the parole board?
17         A.    No.
18         Q.    You talked a little bit earlier when you
19    were shown the circumstances of the offense as a reason
20    for decision, and you indicated that that might not
21    be -- I don't remember the exact adjective -- but that
22    might not be the best way to describe to the inmate
23    what happened; is that fair?
24         A.    Yes.
25         Q.    In each of these cases, do you consider the
```

1    parole file, the parole report, and all of those

2    factors in every JL WOP case, those five factors that

3    are on the addition to the sheet?

4         **A.   Yes.**

5         Q.   So when it says circumstances of the

6    offense, that doesn't indicate you didn't consider all

7    those things?

8         **A.   No.**

9              MR. SPILLANE:  Those are all the questions

10   I have.

11             MS. BREIHAN:  Just a couple follow-ups.

12   REDIRECT EXAMINATION BY MS. BREIHAN:

13        Q.   You testified that the guideline range

14   doesn't apply?

15        **A.   No.**

16        Q.   There's no guidelines that the board uses

17   in making a decision about when to release these

18   inmates, other than this board action sheet, and the

19   Exhibit 3 here, correct?

20        **A.   Yes.**

21        Q.   And you voted, as we saw in Exhibit 6, on

22   Mr. Roland's parole decision, correct?

23        **A.   Yes.**

24        Q.   Did you review his entire parole file

25   before you voted?

1      **A.    I certainly did.**

2      Q.    Okay.  So what evidence did you consider in

3  regard to his subsequent growth and increased maturity

4  since the offense occurred?

5      **A.    I reviewed the prehearing report.  I didn't**

6  **do any further research into his -- is that your**

7  **question?**

8      Q.    I'm asking what evidence.  You just told

9  Mr. Spillane that you considered these five factors

10  that are in Exhibit 3 in these cases; is that correct?

11     **A.    Yes.  In each case.**

12     Q.    I'm trying to get an understanding of what

13  evidence you considered in particular in Mr. ██████

14  case.

15         And I asked you specifically about the

16  second factor, subsequent growth and increased maturity

17  since the offense or offenses occurred.

18     **A.    We -- I would have to say that I relied on**

19  **this piece of paper here.**

20     Q.    And you're referring to Exhibit 6, page

21  three?

22     **A.    Yes.**

23     Q.    And all it says there is no CVs since 2001

24  and honor dorm for 13 years, correct?

25     **A.    Yes.**

1      Q.   It doesn't say anything who Mr. Roland was

2  at the time of the underlying offense, does it?

3      **A.   It does not.**

4      Q.   And what evidence did you consider with

5  respect to the fifth factor?  Was it again what's

6  listed here on this third page of Exhibit 6?

7      **A.   It would be.**

8      Q.   Again, it doesn't say anything about who

9  Mr. Roland was, what his life circumstances were at the

10 time of sentencing for the underlying offense, does it?

11     **A.   That's correct.**

12     Q.   And nowhere on this board action sheet, or

13 the third page that's attached to it, does it talk

14 about his home life growing up, does it?

15     **A.   Not on this.  But it does in the prehearing**

16 **report.**

17     Q.   Okay.  Did you listen to an audio recording

18 of Mr. Roland's hearing before you voted?

19     **A.   No.**

20          MS. BREIHAN:  I have no further questions.

21          MR. SPILLANE:  We're good.

22          If you wish, you may review the transcript

23 after it is completed to look for typographical errors,

24 or you can sign that it is correct.

25          Or you may waive signature and just assume

1    the reporter will get it correct.  In the past we've

2    been waiving, but it's completely your decision.

3                THE WITNESS:  She looks trustworthy.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25