IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION


NORMAN BROWN, et al,          )
                              )
        Plaintiffs,           )
                              )
    vs.                       )  Case No. 17-CV-4082
                              )
ANNE L. PRECYTHE, et          )
al,                           )
                              )
        Defendants.           )


        CONFIDENTIAL DEPOSITION OF ELLIS McSWAIN,

JR., produced, sworn and examined on the 20th day of

December, 2017, between the hours of eight o'clock in

the forenoon and six o'clock in the afternoon of that

day, at the Missouri Attorney General's Office,

Broadway State Office Building, Jefferson City,

Missouri, before Kim D. Murphy, Certified Court

Reporter, within and for the State of Missouri.

1                    A P P E A R A N C E S

2

            For the Plaintiffs:
3
                THE MACARTHUR JUSTICE CENTER
4               By:  Amy Breihan
                3115 S. Grand
5               Suite 300
                St. Louis, MO  63118
6               314-254-8540

7
            For the Defendants:
8
                MISSOURI ATTORNEY GENERAL
9               By:  Michael Spillane and Andrew Crane
                221 West High Street
10              Jefferson City, MO  65101
                Michael.Spillane@ago.mo.gov
11

12

13          Also present:  Rebecca Moreland

14

15
                       I N D E X
16

    Direct Examination by Ms. Breihan              4
17  Cross-Examination by Mr. Spillane            229
    Redirect Examination by Ms. Breihan          235
18

19

20

21

22

23

24

25

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 2 of 244

1                    DEPOSITION EXHIBIT INDEX

2     ID                                          MARKED

3     1:    AGO99 through 105                        7

4     2:    AGO3584 through 3593                     49

5     3:    Docket No. 65-3                          81

6     4:    AGO1276 through 1278                     94

7     5:    AGO1309 through 1313                    106

8     6:    AGO30 through 41                        117

9     7:    AGO1508                                 131

10    8:    Board Action Sheet                      133

11    9:    AGO28                                   134

12    10:   AGO2720 through 2996                    140

13    11:   Transcript                              180

14    12:   Decision                                196

15

16

17

18

19

20

21

22

23

24
      Court Reporter:
25    Kim D. Murphy, CCR

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 3 of 244

1          IT IS HEREBY STIPULATED AND AGREED, by and

2   between counsel for the Plaintiffs and counsel for the

3   Defendants that this deposition may be taken in

4   shorthand by Kim D. Murphy, CCR, and afterwards

5   transcribed into typewriting; and the signature of the

6   witness is expressly waived.

7                    *    *    *    *    *

8               ELLIS McSWAIN, JR.,

9   of lawful age, produced, sworn and examined on behalf

10  of the Plaintiffs, deposes and says:

11               DIRECT EXAMINATION

12  QUESTIONS BY MS. BREIHAN:

13       Q.   Good morning.  My name's Amy Breihan.

14            I have our law clerk here,

15  Rebecca Moreland.  We're here for your deposition

16  today.

17            Can you state and spell your name for the

18  record, sir.

19       **A.   Ellis McSwain, Junior.  Ellis, E-l-l-i-s,**

20  **M-c-S-w-a-i-n, Jr., period.**

21       Q.   And, Mr. McSwain, have you ever been

22  deposed before?

23       **A.   At least once before that I recall, yes.**

24       Q.   How long ago was that; do you remember?

25       **A.   It was a couple years ago.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 4 of 244

1       Q.    So just for, you know, we're all on the

2   same page, I'll set forth a couple ground rules.  My

3   job today is to ask you questions about this case.  And

4   you are here to answer the questions truthfully.

5             What that means is that you have to

6   understand the question before you can answer

7   truthfully.  So if I ask a question that you don't hear

8   or understand, I can either rephrase it or have the

9   reporter read it back for you, okay?

10      **A.    Okay.**

11      Q.    Your testimony is under oath just as if

12  you're testifying in court; do you understand that?

13      **A.    Yes.**

14      Q.    And everything you say is being written

15  down.  So it's important to make sure your answers are

16  verbal and not uh-huh or huh-uh.

17      **A.    I understand.**

18      Q.    Okay.  I'll try not to speak over you.

19  There will probably be times when you know where I'm

20  going with a question, and you might be inclined to

21  answer before I finish, but let me finish before you

22  answer.

23      **A.    Okay.**

24      Q.    Otherwise, if I ask you a question and you

25  answer, I'm going to assume that you understood the

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 5 of 244

1  question; is that fair?

2      **A.    That's understood.**

3      Q.    If you need any breaks today for

4  water -- since it's kind of a sauna in here -- or

5  anything else, just let us know and we can accommodate

6  that.

7          The only caveat to that is if there's a

8  question, I'd ask that you answer the question before

9  we break, okay?

10     **A.    Okay.**

11     Q.    I want to ask you what you did to prepare

12  for today's deposition.

13     **A.    Um, I've had a discussion previously with**

14  **our attorneys a few months back.  But that's it.**

15     Q.    And I don't want you to divulge the details

16  of any confidential communications you had with your

17  attorneys here today.

18          So other than speaking with your attorneys

19  a couple months ago, did you speak with anybody else?

20     **A.    No, I haven't.**

21     Q.    Did you look at any documents?

22     **A.    I have no documents.**

23     Q.    But you're aware that you're here in

24  connection with the case of Brown versus Precythe,

25  correct?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 6 of 244

1    **A.    Yes.**

2    Q.    And do you know generally what the case is

3    about?

4    **A.    Um, the juvenile lives without.**

5    Q.    Okay.  I'm going to hand you what I have

6    marked as Exhibit 1.

7         (Deposition Exhibit No. 1 was marked for

8    identification.)

9    BY MS. BREIHAN:

10   Q.    This is a document that your attorneys'

11   previously produced to us.  It's Bates labeled AGO99

12   through 105.

13        Do you recognize this document, sir?

14   **A.    Yes.  It's my resume.**

15   Q.    And this resume is up to date as we sit

16   here today?

17   **A.    Absent the retired being at the top of the**

18   **page, I'm going to presume this is my resume.**

19   Q.    So --

20   **A.    But my last position was as chairman of the**

21   **parole board as a member.  After a new chairman was**

22   **appointed.  That's the only thing that would be**

23   **missing, is I went back to a member position after the**

24   **chair position was changed in February or March of this**

25   **year.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 7 of 244

1    Q.   Okay.  So March of 2017, a new chair was
2  put in place, correct?
3    **A.   Correct.**
4    Q.   And you were demoted back to member?
5    **A.   Yes.  Well -- yes.**
6    Q.   And then when did you resign from your
7  position with the parole board?
8    **A.   I actually retired from the parole board**
9  **in -- on September 1st this year.**
10   Q.   And were you hearing parole considerations
11 up until your September 1st retirement?
12   **A.   Yes.  From March of '17 through the last**
13 **day of my employment, I was back on what would be**
14 **called the regular calendar conducting hearings.**
15   Q.   And it looks like your highest level of
16 education is a Bachelor's degree; is that correct?
17   **A.   That's correct.**
18   Q.   That you got in 1980?
19   **A.   Correct.**
20   Q.   Have you obtained any other degrees other
21 than your Bachelor's?
22   **A.   No.**
23   Q.   And when you were at Lincoln University
24 obtaining your Bachelor's, did you take any courses in
25 psychology?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 8 of 244

1       **A.    I don't recall.  I may have.**

2       Q.   Do you recall taking any courses in

3  adolescent development when you were at

4  Lincoln University?

5       **A.    I just have no recollection of that.  It's**

6  **a long time ago.**

7       Q.   Fair enough.

8            It looks like overall you've been involved

9  in corrections work largely since you graduated in

10 1980; is that fair to say?

11      **A.    Thirty-seven years, yes.**

12      Q.   And in Missouri and in Florida for a period

13 of time as well, correct?

14      **A.    Correct.**

15      Q.   While in Florida, you worked as a private

16 consultant for Friends of Children, correct?

17      **A.    Yes.  Uh-huh.**

18      Q.   Can you describe for me what Friends of

19 Children is?

20      **A.    They were an organization that dealt with**

21 **adolescent youth, and they -- I don't know the juvenile**

22 **structure, to be very honest with you.  It wasn't my**

23 **role there at all.**

24           **But they were kids placed in a -- what I**

25 **would call a secure environment, absent offense.  And**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 9 of 244

1  placed there by the court.  That's as detailed as I can

2  get with you about that, absent an offense.

3      Q.   What exactly were you doing as a private

4  consultant for Friends of Children?

5      A.   I was hired there to look at their

6  facilities.  They had several facilities.

7          And as to the duties and responsibilities

8  each day, it was really sort of at the behest of the

9  executives that were above me.

10          There would be some, you know, reviewing of

11 facilities, in terms of, you know, safety, things like

12 that.  I mean, I was coming out of an institutional

13 setting and those were some of the things that we

14 looked at.  Or that I looked at.  I think for about a

15 six-week period that I was there.  I think I was there

16 for about six weeks.  I wasn't there for very long.

17      Q.   Do you remember what year it was that you

18 were there?

19      A.   I believe that was 19 -- I think 1999.  And

20 perhaps early 2000.

21          I left my position in Florida with the ad

22 corporation in September of '99, came back to Missouri.

23 And then was contacted, and went back to Florida to do

24 a little work there, and was there for a few months and

25 then I returned back to Missouri.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 10 of 244

1    Q.    And it sounds like overall you were doing

2    more security-type work rather than parole-related work

3    there; is that correct?

4        **A.    Oh, I had nothing to do with anything**

5    **related to that.**

6        Q.    Okay.    In connection with your involvement

7    with Friends of Children, did you receive any sort of

8    training about adolescent development?

9        **A.    I don't recollect any training that I might**

10   **have received down there.**

11       Q.    Your resume says that you're a member of

12   the Association of Paroling Authorities International.

13   Are you still a member of that organization?

14       **A.    APAI.    I attended last year's conference in**

15   **2016.    And I didn't attend this year.    So I'm not sure**

16   **as to what my standing might be with the organization.**

17       Q.    Well, I guess, how do you become a member

18   of it?

19       **A.    My presumption is that we may have had a**

20   **corporate membership.    I don't really know beyond that.**

21       Q.    Can you explain to me what the organization

22   is?

23       **A.    It's an organization that allows a number**

24   **of varying paroling authorities from around the world.**

25   **I think it's distinction is that rather that it be**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL    Document 134-5    Filed 06/12/18    Page 11 of 244

1    something that is germane to just the United States,

2    that there are paroling officials that come as far as

3    Japan.  A lot of different countries.  And they get

4    together as a conference setting, with workshops and

5    exchange of information, and things of that nature.

6    And, I mean, that's about the extent of it.

7         Q.   It's an annual conference?

8         A.   Yes, it is.

9         Q.   You mentioned you didn't go in 2017 to the

10   conference.  Did you go every year from 2011 to 2016?

11        A.   I had gone at least four consecutive years.

12   I'm not sure exactly what year I started to go.  But I

13   had gone four consecutive years and each year I tried

14   to take more board staff with me to that conference for

15   training purposes.

16        Q.   Do you recall attending any workshops or

17   lectures at an APAI conference that related to juvenile

18   offenders in particular?

19        A.   You know, I don't recall that.  My interest

20   would have been in adult offenders.  I mean, if there

21   was a workshop about juveniles, I likely would have

22   looked at something else that might have been more

23   related to the adult offender in the community as

24   opposed to a juvenile, because I didn't work with

25   juveniles specifically.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 12 of 244

1    Q.    And I should clarify, when I'm using the

2    term juvenile offender, I mean someone who was under 18

3    at the time of the underlying offense.

4        **A.    Okay.**

5    Q.    But very well may be, you know, an adult at

6    this point.  So, for example, the plaintiffs in this

7    case, right, they were juveniles at the time --

8        **A.    Right.**

9    Q.    -- they were arrested.  But they're

10   currently much older now.

11       **A.    Right.**

12   Q.    So with that clarification, did you receive

13   any or attend any workshops or sessions at any APAI

14   conference that talked about, in particular, juvenile

15   offenders as I sort of defined it?

16       **A.    I don't know that I did.**

17   Q.    Did you attend any workshops or training

18   sessions at an APAI conference about Miller versus

19   Montgomery, or Miller versus Alabama, or Montgomery

20   versus Louisiana?

21       **A.    I don't know what those cases are.**

22   Q.    Okay.  Your resume indicates that you are a

23   member of the Missouri Corrections Association.

24        Are you still a member of the Missouri

25   Corrections Association?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 13 of 244

1       A.    Yes, I am.

2       Q.    And what is that organization?

3       A.    It's an organization that is for

4  professionals, both in the Department of Corrections --

5  and the organization tries to reach out to others in

6  law enforcement to attend an annual conference.

7              The conference has grown exponentially in

8  the last -- when I say grown, in terms of people that

9  attended it -- that attended.  Because it was not

10  attended as well as I thought it should have been

11  attended when I first got back from Florida, and I was

12  involved in that organization before I left.

13             Having gotten involved with that

14  organization, I wanted to do what I could in my

15  position to try and help get more department staff

16  attending.  And to get the department executives to

17  look at us as training, as opposed to just a

18  conference, per se.  And that did occur.

19             That was important because it means the

20  department was paying for things like registration and

21  things like that.  Because before that, they were not.

22  So that hampered those that would attend.

23             I have been involved in MCA for many years.

24  And I'm currently a board member on the board for MCA.

25  And we have one annual conference each year.  And then

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 14 of 244

1   we have what amounts to a workshop in the spring.  And

2   it's really geared toward student participation, that

3   may have an interest in, you know, the criminal justice

4   world collectively.

5        Q.   And either the annual conferences or the

6   spring workshops you talked about, were there any

7   presentations or trainings regarding juvenile

8   offenders, again, as I sort of defined that term today?

9        A.   I just don't specifically recall that.

10       Q.   You also talk about a sort of shift within

11  the Department of Corrections viewing that as a

12  training versus a conference; do you know when that

13  shift happened?

14       A.   Yes.  That would have been in the last two

15  years.

16       Q.   Your resume also indicates you were a

17  member of the American Corrections Association.

18            Are you still a member of that

19  organization?

20       A.   When you become a member of MCA you

21  automatically become a member of ACA also.  So I'm

22  still a member of MCA, so my guess is I'm still a

23  member of ACA as well.

24       Q.   And what's the distinction between MCA and

25  ACA?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 15 of 244

1    A.   MCA is really more localized, germane to

2  Missouri and the department staff.  ACA is a national

3  organization.  And they have an annual conference.

4         I've not attended any ACA conferences.

5  There was one in St. Louis, I believe, this past year.

6  I didn't attend it.  But it's a national organization.

7  A national criminal justice organization.

8    Q.   And why have you chosen not to attend any

9  of the annual ACA conferences?

10   A.   Because it's expensive.

11   Q.   Do you know whether ACA has offered any

12 training in the last five years specific to juvenile

13 offenders?

14   A.   No.

15   Q.   So shifting back to the time with the

16 Missouri parole board, you mentioned until about March

17 of '17 you were chair of the board; is that correct?

18   A.   That's correct.

19   Q.   When did you become chair of the board?

20   A.   February of 2010.

21   Q.   And prior to that you were a member of the

22 board, correct?

23   A.   That's correct.

24   Q.   And you were a board member starting in

25 September of 2009, correct?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 16 of 244

1    **A.    That's correct.**

2        Q.    Did you receive any formal training when

3    you joined the board as a member?

4        **A.    No.**

5        Q.    What about when you were appointed chair in

6    February of 2010, did you receive any formal training

7    then?

8        **A.    No.**

9        Q.    During any time when you were a board

10   member, or chair of the board, was there any sort of

11   annual or periodic training requirement for board

12   members?

13       **A.    Certainly, there's no requirement.   In**

14   **regards to any training, it was my intent as chair, as**

15   **I become more familiar with, one, my job, and two,**

16   **later in my term, that I thought it was important,**

17   **while it was nothing formal set out by the department's**

18   **training entity, to train parole board members, I**

19   **thought it was important to still get these folks to**

20   **trainings that would talk about -- because a lot of**

21   **those folks come from other disciplines, or other kinds**

22   **of work.**

23           **And I thought it was important that they**

24   **would understand perhaps at the lowest level what the**

25   **appeal board was; the kind of work that it did; and**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 17 of 244

1   what their voting impact might be in terms of their

2   jobs.  And to familiarize them with the criminal

3   justice piece.

4           Some of those folks came from law

5   enforcement, but not necessarily my discipline in terms

6   of Probation and Parole or the Corrections side.  The

7   prison side.

8           And it was an opportunity to get those

9   folks to training that would talk about the parole

10  board.

11          So, no, nothing formal, but sort of an

12  attempt to get folks to trainings as much as we could

13  in the past few years.

14      Q.   And you said board members come from

15  varying backgrounds, correct?

16      A.   That's correct.

17      Q.   Is there any sort of minimum qualifications

18  or degree requirement?

19      A.   The statute does not call for that.

20      Q.   What statute are you referring to?

21      A.   I'm thinking 217.  I forget the numbers

22  after the dot.  The statute that relates to the parole

23  board.

24      Q.   Okay.  And before you were a member of the

25  board in 2009, you held various positions within the

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 18 of 244

1    division of Probation and Parole, correct?

2         A.   No, that's not correct.  I only held one

3    other position.  I can go in reverse order of my resume

4    and I'll tell you what I held.

5              I don't know if you want me to do that, or,

6    I can answer your questions.  I only had one other

7    position with Probation and Parole, and that was when I

8    was initially hired.

9         Q.   And that was 1980 to 1987, correct?

10        A.   Correct.

11        Q.   When you started as a board member did you

12   receive any training?

13        A.   I'm sure that I did.

14        Q.   What training did you receive?

15        A.   I don't know.  Whatever the initial

16   training requirements were that you were required to

17   complete once you were hired.  I recollect it might

18   have been a one or two-week training that I went to

19   here in Jefferson City in 1980, I believe it was.  But

20   I don't know what the specific trainings were that I

21   received.

22        Q.   Well, you testified you didn't receive any

23   formal training when you first started as a board

24   member.

25              You didn't receive any formal training when

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 19 of 244

1  you were first appointed as chair in 2010.

2         During any time during your tenure on the

3  parole board did you ever receive any training?

4         A.   Other than going to workshops, conferences,

5  and things of that nature.  As I said, there's the

6  required training that all staff complete in the

7  department, like sexual harassment, and things of that

8  nature that you're required to either attend or

9  complete on the computer.  And those kinds of trainings

10 were things that all the parole board members,

11 including me, completed.

12        But a specific training geared toward

13 parole board, new members or a new chairman,

14 there's -- there was no training of that nature then.

15        Q.   Is there now?

16        A.   I have no idea.

17        I will tell you this:  That there was a --

18 there's training for new parole board members at NIC in

19 Colorado that I sent every one of our members to,

20 including myself.

21        Q.   And when was that NIC training in Colorado?

22        A.   It would have been -- it would have been

23 from probably 2000 -- would have been 2010, or perhaps

24 2011.  I believe every one of our existing members that

25 are there now, perhaps with the exception of the newest

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 20 of 244

1  member, attended training at NIC for new parole board

2  members.

3          It was the only training that I was aware

4  of in the country that was occurring that was called

5  new parole member training.  There was not a -- they

6  may have been developing a new parole board chairman's

7  training.  And that may be in the queue, or something

8  occurring right now in NIC.  I don't know.  But there

9  was new parole member training and I believe there

10  still is.

11          Q.    What does NIC stand for?

12          A.    National Institute of Corrections.

13          Q.    And the newest member is Paul Fitzwater,

14  correct?

15          A.    Correct.

16          Q.    Do you know if Jennifer Zamkus would have

17  gone to this new parole board training in Colorado?

18          A.    I'm almost positive that she did.  I can't

19  say a hundred percent that she did, but I'm almost

20  positive that everybody, when I was chair, went to

21  Colorado.

22          Q.    What kind of issues and materials did the

23  training cover?

24          A.    Parole board decision-making in general.

25              Things that a parole member may encounter

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 21 of 244

1  dealing with external entities.  It would have in

2  things of that nature.

3          You know, probably how best to be a parole

4  board member.

5          I mean, I don't remember the specifics of

6  what the training calendar was when I was out there.

7  But, I mean, it would have been something that would

8  have been I think along those same lines.

9      Q.   Tell me everything that you remember about

10  the training you received when you were at the NIC

11  training in Colorado on parole board decision-making in

12  general.

13      A.   I can't tell you what I specifically recall

14  on the training that I received out there.  I'd have to

15  speak in, quite frankly, very general terms.  I just

16  don't recall what the training was when I went out

17  there.  I just don't have a specific recollection of

18  what the training was.

19      Q.   Did you get any materials or handouts at

20  the training?

21      A.   Oh, I'm sure that I did.

22      Q.   Do you still have those?

23      A.   I don't know.  If I do, I don't know where

24  that stuff might be at.  I kind of cleaned out all my

25  paperwork when I retired, to be honest with you.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 22 of 244

1          In terms of some of that training, you look
2    at some of that stuff and you review it, and if you're
3    familiar with it, unless you're passing it onto someone
4    else, likely you don't keep it.  I just don't have any
5    recollection of where that could be at.
6          Q.   I understand.
7               But if you had anything that was
8    potentially relevant, you gave it to your attorneys,
9    since when you retired this lawsuit was pending; is
10   that correct?
11         A.   That I gave anything to my attorneys?
12   Like?
13         Q.   Anything relevant, as you were cleaning out
14   your office, you talked about cleaning out before you
15   retired?
16         A.   When I mentioned that, I mean, I'm talking
17   about just old, you know, board IOCs and things of that
18   nature.
19               I didn't give anything relevant, I believe,
20   to my attorneys, unless they pulled emails down that
21   might be relevant to this matter.  Beyond that, I
22   didn't hand someone a file, if that's what you're
23   asking me.
24         Q.   So is it fair to say then that you don't
25   recall anything specific that you learned or received

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 23 of 244

1  materials on at this NIC training on the issue of

2  dealing with external entities?

3      A.   No.  But, you know, I went to that training

4  with, you know, more than 25 years' worth of training

5  understanding of how to deal with offenders.  And I had

6  a pretty good understanding of offenders, and with my

7  background on the prison side.

8           And I'm sure of that, because, you know,

9  you're talking about a parole board and there would

10  have been discussions about parolees that would be

11  coming up for hearings, or how to interact or exchange

12  information, or create a dialogue with an offender,

13  which is most important.  I was pretty comfortable in

14  that world with offenders.

15      Q.   Did you have any experience before you were

16  a board member in using risk assessment tools?

17      A.   No.  Other than -- I mean, prior to that, I

18  was on the prison side.  And the only other occasion

19  that I could recall the use of any kind of a risk

20  assessment tool would have been probably just prior to

21  when I was leaving Probation and Parole to transition

22  over to DAI, Division of Adult Institutions.

23           When they were developing the salient

24  factor instrument at that time, I think that came in

25  some time in the late '80s.  And I transferred over to

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 24 of 244

1    DAI, from my PO position in the institutions, to a

2    caseworker position in the institutions.  And the

3    development of the salient factor may have been at

4    around that time.  But beyond that, I used no

5    instrument.  There's no instrument in DAI for risk

6    assessment.

7          Q.   DAI is Division of Adult Institutions?

8          A.   Yes.

9          Q.   So I'd like to get an understanding of what

10   your duties were as a member versus the chair.  But I'm

11   sure I'll see in your testimony there may have been

12   some differences and responsibilities.  So could you

13   first explain what your duties were when you were a

14   board member?

15         A.   As a board member you're obligated to

16   conduct parole hearings.  That's your biggest

17   responsibility.

18              You're obligated to provide a vote or

19   abstain from a vote.  And if you abstain, there's

20   reasons you indicate why you abstain.

21              You conduct parole hearings, and you

22   inquire, ask questions at parole hearings, and then you

23   vote on the case.  And to stay up with your work

24   otherwise.

25              I mean, that aspect, I'm probably

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 25 of 244

1   simplifying what you do there, because it's an
2   important job.  But the primary part of that job is to
3   conduct parole hearings.  So you spend most of your
4   time, doing in Missouri, conducting a number of
5   hearings, by comparison to other states.
6           Q.   And how many hearings does Missouri conduct
7   on an annual basis?
8           A.   The last number that I had was probably
9   over 11,000 annually; 11,300, maybe 11,500.  And they
10  chart that information.  When I say "they," meaning
11  Julie's office, Julie Kempker's office, charts all that
12  kind of information.  How many hearings we do, how many
13  releases we do, and things of that nature.
14          Q.   And what's the name of Julie Kempker's
15  office?
16          A.   She's the chief state supervisor.
17          Q.   And I think you testified a minute ago that
18  Missouri conducts more hearings per year than other
19  states?
20          A.   I'm not sure where we fall in the rank
21  aside from the enormous states, like California and
22  others, who have huge correction entities or prisons.
23               But Missouri, for a state of our size, with
24  30,000 population, conducts you know, 11,500 hearings.
25  That's a lot of hearings that we do.  And I'm sure by

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 26 of 244

1   comparison of other states, they conduct their hearings

2   differently than Missouri.  There's a variety of ways

3   in which they conduct hearings across this country.

4   But Missouri does conduct a number of parole hearings

5   on a monthly basis, yearly basis.

6        Q.   Now when we're talking about that 11,500

7   number, understanding that's an approximation, is that

8   all parole grant hearings, or revocation hearings,

9   reconsideration hearings?

10       A.   I'm only talking about parole hearings.

11  There are other hearings that we conduct.  Revocation

12  hearings, as you mentioned.  There are CRE hearings,

13  conditional release extension hearings, that the parole

14  board also conducts.

15            If asked to consider a CRE request, it's

16  provided to us by DAI.  It's been a bit.  But those are

17  the primary types of hearings that we do.  Parole

18  hearings.  Revocation hearings, of course.  Very

19  important.  And conditional release extension hearings

20  that we conduct as well.

21       Q.   So as a board member you were doing not

22  only parole grant hearings, but also CRE hearings, and

23  DOC hearings; is that correct?

24       A.   That's correct.

25       Q.   Can you walk me through what the parole

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 27 of 244

1    hearing process is as a board member?

2         A.   Yes.  I'll walk you through from the moment

3    you leave your office.  You leave your office with a

4    parole board analyst, who is someone that assists the

5    board in a variety of different ways.  They're there to

6    set up the computers to let the hearing -- so that the

7    audio is captured as well.

8              They are a part of the panel team, which

9    consists of the parole board member, an analyst, and an

10   institutional district supervisor, or a unit

11   supervisor, depending on who's available.

12             Your docket may be as -- when I say docket,

13   that you're going to see that day -- it may -- there

14   may be as many as seven, to -- I know when I first

15   joined the board, they were seeing 25 hearings a day or

16   more.  And I was just astonished with the number that

17   they were seeing.  And worked, to the best of my

18   ability, to reduce that number.  I thought it didn't

19   seem prudent to see that many hearings in one day.  And

20   at the time I left as chair, I had it reduced down

21   to -- I did a lot of reviewing on something called

22   decision fatigue.  And I actually took the board to a

23   training in -- APAI training in Columbus, Ohio, where

24   decision fatigue was one of the main topics.  And I

25   know that they sat through that topic.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 28 of 244

1          Because I thought it was something

2    relatively important in terms of how your

3    decision-making can be impacted if you're doing, in the

4    course of the day, when you're doing 20 hearings as a

5    number, or 25 hearings.  The long and short of it is I

6    had the docket reduced down to 14.  So the hearing size

7    went from, on average ten, to 14 hearings a day.

8          And I believe after I left that number was

9    elevated back up to a higher number.

10        Q.   Do you know what it was elevated to after

11   you left?

12        A.   I believe it was 18 or so, was, I think,

13   the static number.  But you can go over that number

14   depending on what the docket size might be.  There

15   could be cancellations from another day and you move

16   them to another day.

17        Q.   So how did you decide to set the cap at 14

18   hearings per day when you were chair?

19        A.   You know, I just -- I looked at, you know,

20   how much could -- how much could a parole board member

21   take in and make a prudent, good decision.  You know, I

22   reduced it from, I think, 25 to 18.  I don't know the

23   real numbers.  But I know it was in the 20s when I got

24   there, and it reduced it down to 18.  And then I

25   reduced it to 14.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 29 of 244

1        And to be frank, if I'd stayed, I would

2   have reduced it again.  It was -- it wasn't a very

3   popular decision, I don't think.  It was my decision.

4   I don't think others at -- or peers were crazy about

5   the reduction.

6        But I thought it was the best decision to

7   make, to get you to the best decision-making potential

8   that was available to you.  It was my sense that the

9   more hearings you conducted in the course of a day,

10  perhaps the more prone your decision-making was to not

11  being the very best.

12      Q.   And the less time you had to spend with

13  each individual, and each individual's parole file?

14      A.   I just think it was just a very obvious

15  thing.  Why it was never reduced, I don't know.  But in

16  my tenure, I made a decision that I thought was in the

17  best interest of anybody, including the people that

18  were having parole hearings, to get to the most prudent

19  decision, giving you more time to consider a case.

20      So you can't do that with a static number

21  of 25, or 22, or even 18, in my opinion.  That's just

22  one opinion.  And my opinion.  And then I think the

23  training sort of bears it out, is that in your cases

24  that you do, I think is the better opportunity for you

25  to make better decisions.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 30 of 244

1      I'm not saying people were making bad

2  decisions, but, you know, if, from an evidence-based

3  culture -- and the board is or was -- you have to

4  consider the fact that there's data out there that

5  says, you know, when you conduct more parole hearings,

6  reasonably through the course of the day, your

7  decision-making may not be as strong as -- you might

8  not be as apt to make great decisions for cases 18, 19

9  and 20 as you would for cases two through ten, for

10  example.  And that was just my position that I held.

11  And I held it very firmly.  And I changed it.

12      Q.   So when you started, and the docket could

13  have gone up to 25 or more hearings per day, how

14  many -- how long were you spending on each case, we'll

15  call it?

16      A.   If I have to go just by the report that we

17  use, the report that we use is blocked out with several

18  different points what parole board members should cover

19  during a hearing.  You can't cover all that information

20  in ten minutes.

21      I think, on average -- and anyone else

22  would probably say 15 to 20 minutes gets you through a

23  hearing.  A regular hearing.

24      Now, if you have a victim's case, or if you

25  have a revocation hearing, those hearings are much

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 31 of 244

1 longer.

2          When I say a victim's case, I mean the

3 victim comes to the hearing, they're part of the

4 process, and the statute's pretty clear about victims

5 and their testimony.

6          If you fit the criteria for a victim case,

7 then you're allowed to speak at that hearing.  Then you

8 are permitted to speak for -- my -- my admonition was

9 as long as they wanted to talk.  They had a statutory

10 role in the process and it needed to be honored.  So

11 those hearings were always longer.

12          But if you have an average docket, and you

13 have no victims' cases, I think the number that you

14 might hear from others that conduct hearings, it would

15 take probably, on average, twenty minutes, I think is a

16 fair number.

17      Q.   So I need to clarify.  Is it your testimony

18 that when the docket was about 25 hearings per day that

19 you were spending an average of twenty minutes on each

20 case?

21      A.   You would spend less on some, and you would

22 spend, perhaps, more on others.  I'm just talking

23 about, perhaps, an average that fits maybe that number,

24 that parameter.

25      Q.   I'm just trying to do the math in my head.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 32 of 244

1  And it seems like it would be hard to spend 25 minutes

2  on 25 hearings a day.

3          MR. SPILLANE:  Twenty five in eight hours?

4          MS. BREIHAN:  We'll let the witness testify

5  for himself.

6          THE WITNESS:  If you have a docket, you're

7  going to be there until you're done that day.  Whatever

8  that takes.

9          Now, you have eight hours in the course of

10  a day to -- technically eight hours to complete your

11  work.  And if not, then you just come back the next

12  day.  Which, most hearing dockets, if you traveled,

13  there was the next day.

14          But if you -- I mean, and there have been

15  cases where folks have stayed well past 6 o'clock,

16  7 o'clock, to conduct hearings.  Which gets back to my

17  other point that I thought that was a long time in the

18  nest to conduct hearings, and how clear were you by the

19  end of the day.

20          So, yeah, I mean, you could look at that

21  number, and it's an average, but I don't think it gives

22  you the real picture of what hearings are.

23          Some are shorter than.  What you can lose

24  site of, sometimes offenders aren't very participatory

25  in their own process.  If they go with yes and no

*PohlmanUSA Court Reporting*
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 33 of 244

1  answers, and you do what you can to get out of them,

2  you're going to have a short hearings that day.  I used

3  that number twenty minutes, because I think that's a

4  calculation that's actually utilized by Kelly Dills,

5  and her staff, to establish -- I'm not sure exactly

6  what that part is -- but I think the average is around

7  15 to 20 minutes.

8          But, again, some can be shorter and some

9  can be a lot longer than that.  And that's a regular

10 hearing.

11         If the hearing calls for you to -- if an

12 offender is really communicative at the hearing, my

13 take is you shouldn't be looking at a clock.  You

14 should be conducting the hearing.  And if it takes 30

15 or 40 minutes, then it takes 30 or 40 minutes on just a

16 regular case.  And some do.  Depending on how engaging

17 the offender was.

18         It's our job to engage them, you know, even

19 when they're sort of unwilling.  You know, I think

20 there is training the parole board goes through to show

21 you how to talk to an offender.  To engage him, to get

22 him to be more communicative.  I hope you don't ask me

23 the name of that training.  I'm guessing you're going

24 to.  But I don't remember the specific name.  But it is

25 standard training I think for POs both in the field and

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 34 of 244

1   in the institutions.  And it teaches you how to get

2   more than a yes/no discussion with an offender.  To get

3   him to really engage and get him to really talk.

4           Maybe I'll think of it.

5       Q.   And if I do ask you a question, and you

6   think of the answer later, just let us know.  I'm sure

7   it's been a while on some of these questions.  So

8   that's fair.

9           So when the docket was about 25 a day, you

10  said on average you'd spend 15 to 20 minutes on each

11  case.  Did that average change at all when you as chair

12  reduced the cap to 14 per day?

13      **A.   I just don't have that number.  That would**

14  **have been an interesting number for me to capture.  My**

15  **hope would be that it would have gone up on average,**

16  **because you're spending more time engaging the offender**

17  **in a conversation.  I don't know that to be the case**

18  **though.**

19      Q.   It was not something that the board was

20  tracking at all?

21      **A.   I can't tell you that that's the case**

22  **either.  There are others that could answer that**

23  **question.**

24          **Unless I brought something up, and I had a**

25  **curiosity about something relative to that, I could get**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 35 of 244

1    the information as chair.  But I can't tell you

2    specifically that there are some matrix where they

3    track the time of the hearing, and then they create

4    this average per hearing.  I don't have that

5    information available to me.

6              Q.   So there are others who might know.

7              Who would know the answer to that question?

8              A.   I think most analysts.  Kelly Dills at that

9    time.  Steve Mueller.  I mean, these are analysts and

10   folks that work with the board.  They would have

11   greater insight on that information than I do.

12             Q.   You testified that if you would have

13   stayed you would have reduced the cap yet again; is

14   that correct?

15             A.   That's correct.

16             Q.   Why would you have done that?

17             A.   For the same reason I reduced it the first

18   time.  And the second time.  Because in my opinion, if

19   your docket is not -- 14 still sounds high to me, in

20   the course of a day.  Single digits would have been

21   preferable.  I'm not sure we could have got to that.

22             But you have to understand, we do a lot of

23   hearings.  While you're looking at trying to reduce the

24   docket size, you have five days a week to put that

25   into.  So when you're reducing the docket size, you're

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 36 of 244

1    adding to the week.  If the regular week for parole

2    board members is three days a week, and you're doing 25

3    hearings, which is sort of what it was, once you knock

4    the docket size down, well, you're pulling off of those

5    existing days, so you have to create another docket

6    day.

7              And, you know, you can take that down only

8    so far before you're looking at Saturday, and you just

9    don't do that.  It's a problem with the institutions.

10   It gets into some other things.

11             And so -- but anyway, I would have done

12   considerable research before I would have reduced it

13   again, to make sure that we weren't creating some

14   inefficiencies in the institution as well.

15        Q.   And you said your decision to reduce the

16   cap wasn't very popular.  Who was it not popular with?

17        A.   I guess when I say that, you're adding

18   another day in the work week.  You know, that's on the

19   road, or sitting at a table conducting hearings.

20   Keeping in mind, at the board, while we do a lot of

21   hearings, there's also a lot of files waiting on your

22   files for you.  It just makes the days longer.

23             But it was my position that we have the

24   full week to work.  You know.  And that's what you do.

25   I mean, there's a book shelf that is full of files

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 37 of 244

1    waiting on you, when you just get through with your big

2    long day of hearings, that you need to review and vote

3    on.  So it just adds to the day.  It takes away the

4    day.  You know, there's a give and take in all of this.

5              I thought it was important to conduct

6    hearings and make the best decision that we could.

7    While sometimes that could get into what might be some

8    free time, but to review also more files that have

9    already been reviewed at a hearing so that you can vote

10   on them.  It's just a fine line that you try to draw.

11   I reduced it to a number that I thought allowed us to

12   do both.

13        Q.   Is there an industry standard as to how

14   many hearings should be conducted per day?

15        A.   I don't have that information in terms

16   of -- that's a difficult question to answer, because as

17   I mentioned earlier, states conduct hearings

18   differently.  I mean, other states aren't as equipped

19   as Missouri is with the kind of staffing we have with

20   the board.

21              In some other states, you just have the

22   board member, and they may have a support staff, and,

23   you know, they're putting the reports together, for

24   example.

25              I mean, the Missouri system is very unique

PohlmanUSA Court Reporting
(877) 421-0099     www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 38 of 244

1   in that there are a number of staff that are assigned

2   to work with the board.  And if you check in some other

3   states, I think that the staffing levels look different

4   by comparison to Missouri.

5           Now, some of those states also don't do as

6   many hearings as we do.  They don't have as many

7   members as we do.  If you don't have as many members --

8   I mean as many cases -- you don't have as many members

9   in most circumstances.

10      Q.   We kind of got sidetracked on the cap

11  issue, and I appreciate you explaining that to me, but

12  I want to go back to the process of the hearing.

13          When I asked you about the process you

14  started with the morning after getting in the car.

15      A.   So then you get to the institutions.  You

16  come in.  You sign in.  There are -- there's a docket

17  to be conducted.  The institution works with you to get

18  the offenders in, one at a time, to conduct the

19  hearing.

20          And do you want to see how a hearing looks

21  like when he actually sits down?  And your Q and A?

22      Q.   I'll ask some follow-up questions, but

23  first I want to know what happens before you get in the

24  car.

25          Do you do any work on the case before you

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 39 of 244

1  get out to head out to an institution for the day?

2          A.    Only on victims' cases did I ever get

3  anything sent to me in advance of a hearing.

4          Q.    So the first time you're seeing the

5  inmate's parole file, or any materials that support, or

6  opposition, is when you sit down at the parole hearing;

7  is that correct?

8          A.    That's correct.

9          Q.    Except when there's a victim or victim's

10 representative involved?

11         A.    That's correct.  And I know that the parole

12 board analysts get the materials for revocation

13 hearings, for example.  But for the standard hearings,

14 non-victims' hearings, there's no routine that gives

15 you files before that hearing is conducted, other than

16 a victim's case.

17         Q.    Why is it different in victim's cases?

18         A.    I think that in a victim's case you

19 just -- I mean, everything about a hearing is

20 important.  And they're all important.  There's just

21 some unique things happening in a victim's case.  The

22 emotion in the moment.  You don't want to not capture

23 something in a report that might be important, that you

24 might not always, you know, speak to at a hearing.

25                 You just want to be as prepared as you can

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 40 of 244

1    be at a victim's case.  For whatever questions might

2    come.  I mean that's been that way from the onset when

3    we were doing victims' cases.  It was that way when I

4    came on, and it was always that way.

5         Q.   Do you categorize as a victim's case a

6    hearing where the prosecuting attorney is present, and

7    someone from the victims services office, but not the

8    victim themselves, or the victim's relative themselves?

9         A.   At a victim's hearing, there are

10   individuals that can be there.  The prosecutor is one

11   that can be there.  The victims are certainly there.

12   Along with any support staff that have been approved to

13   be there for that particular victim.

14             And then, of course, you have the offender

15   there, along with his delegate that is also there at

16   the hearing as well.

17        Q.   So then walk me through what actually

18   happens at the hearing itself.  A victim's hearing in

19   this case.

20        A.   A hearing -- if you're conducting a

21   victim's hearing, you're going to have the victims come

22   in, ask them how they would like to speak to their

23   concerns for the day.  Being that they could speak to

24   you without the offender being present.  That was their

25   option.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 41 of 244

1    They could speak to you, of course, on the

2    record with the offender present so he could hear what

3    is being said.  And it varies as to what people decide

4    to do.

5    You can also speak to the parole board, and

6    you can leave and not be there for the rest of the

7    hearing.  That's your choice if you're a victim.

8    After that's decided, then you conduct the

9    hearing.  If they choose to speak on the record with

10   the offender there, then that's where we start at.  You

11   start by identifying who's present, his name and

12   number, and anyone present with him, like a delegate.

13   Then you get that person's name in the record as well.

14   And then the hearing would then switch over to the

15   victim's case.

16   Absent the victim, then you would just go

17   into an interview with the offender.  Which we do at

18   the end of the victim's presentation anyway.

19   So the victims make their statement.

20   Whatever that is.

21   There's to be -- and there are rules set

22   forth that are very clear.  You know, this can't be --

23   there can't be any antagonistic comments made to the

24   offender.  You can't look at the offender when you're

25   making your presentation to the panel.  You must look

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 42 of 244

1 straightforward. To the member. Members are the ones

2 that always conduct the victim's cases, not the

3 analyst. And there's a rotation between the three.

4 But on victim's cases, only one member conducts the

5 hearing.

6 Everyone is told at the same time, the

7 victims, as well as the offender, that any

8 communications you're to keep your eyes forward, not to

9 look down toward the table, or toward the other. To

10 comport yourself in a certain way. This is a difficult

11 thing to do with the circumstances that are involved,

12 given the nature of the case.

13 And we want to make sure that everybody is

14 safe in the room. We have a corrections officer in the

15 room that stands between the victim and the offender.

16 Sits right in the middle of the table on the opposite

17 side.

18 And then they do their presentation. And

19 if there's multiple folks that want to speak, then they

20 all get to speak. And when they're done, if they stay,

21 then you switch to a regular hearing then.

22 Q. Let me stop you here to ask you a couple

23 questions.

24 You said there's no limitations on how long

25 a victim or victim's representative may speak?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 43 of 244

1      A.    Correct.

2      Q.    And there are rules about certain

3   limitations, for example, such as being antagonistic

4   toward the inmate, correct?

5      A.    **They can't call them names, things like**

6   **that.**

7      Q.    Where are those rules found?

8      A.    **I don't know if that's written at all.**

9      Q.    Okay.

10      A.    **I think just from a purely a safety**

11   **standpoint, you want to be sure that folks understand**

12   **that in order to make this safe for everybody involved,**

13   **you're not there to name-call.  It's unproductive.  We**

14   **understand the emotion of it.**

15            **I don't know that it's been captured in any**

16   **kind of writing.  In terms of whether it's, like, a**

17   **board policy is what you're asking me?**

18      Q.    Yeah.  If there's a written policy or it's

19   in the regulations?

20      A.    **I've not seen it if there is.**

21      Q.    And so then after the victim speaks, it

22   proceeds as if it's a regular hearing, correct?

23      A.    **Correct.**

24      Q.    So what happens then?

25      A.    **You interview the offender.  Having him to**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 44 of 244

1 identify, again, what he's there for.  You'll ask him,

2 you know, did you plead guilty to this case?  Whatever

3 that might be.  Or did you take it to trial.  If it's a

4 TC case.  Or if it was an Alford plea.  Then you ask

5 them -- let's just say there was multiple cases.  You

6 would indicate what the case was, and did you plead

7 guilty to these charges?  And they would say yes.

8     I'm talking about how I conduct it.  I

9 can't tell you how anyone else conducts it.

10     That tells me that you are good for the

11 case; is that true?  Are those the cases?  And they'll

12 say yes.  If they're not, you know, they will share

13 with you whatever their other view is.  And then we'll

14 have to remind them, well, you know I'm not a judge or

15 a jury.  You're sitting here in prison.  The board, you

16 know, doesn't make any assumptions.  You're good for

17 the case in terms of the charges that you're here for.

18 Some folks say they didn't do it.  They want to spend

19 time on that.  You listen to it.  But we're not here to

20 retry the case, in other words.

21     So once you're past that point, you get

22 into the other parts of the case.  The criminal

23 history.  I mean, the case itself.  What the offenders

24 did.  And you go through whatever that Q and A is for

25 that particular case.  Some other cases are a bit more

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 45 of 244

1   simpler than other cases.  Some cases are going to

2   create a lot of questions.  Murder cases, sex cases,

3   you know, child cases, domestic cases.  I mean, they

4   can create more questions for you.  Because just of the

5   general circumstances.

6           As opposed to someone that may have broken

7   into a home, and no one was there, he took something,

8   and he was caught when he came out, and he says he did

9   it.  You may ask why'd you do it?  But other issues

10  tied to them, more questions.  Then you get through

11  that part, and then you go over their criminal history,

12  if they have one.

13          And then you discuss their substance abuse

14  issues if they've had any.

15          I'm just trying to recollect what the

16  report's profile is from the top to bottom.

17      Q.   And by report are you referring to the

18  prehearing report?

19      A.   Yes.

20      Q.   And that's prepared by the institutional

21  parole officer; is that correct?

22      A.   Correct.

23      Q.   Does the prehearing report sort of guide

24  how you conduct parole hearings or conduct parole

25  hearings?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 46 of 244

1          A.    In large part, it can.  It does.

2          Q.    Is there any other sort of guidance or

3   script for parole members to conduct these hearings?

4          A.    Nothing that I'm aware of.

5          Q.    So how do they know now to run hearings?

6          A.    When someone comes on board as a new

7   member, you know, if you do get any training, you're

8   not just thrown into a hearing.  You get a chance to go

9   around, with an experienced parole board member, and

10  sit and observe hearings until actually you're

11  comfortable with conducting a hearing.

12          The process is sort of, are you ready to do

13  a hearing?  So then you'll give them a hearing and a

14  file to begin to review.  And perhaps by the end of

15  that docket they'll be comfortable enough to be able to

16  conduct the hearing.

17          You know, it's just sort of the way the

18  process, you know, has been.  Some folks, they gleen it

19  quicker, and they jump into it.  For folks that come

20  from the department, like myself or anyone else that

21  would have come from the department, you're sort of

22  familiar with these things.

23          If you're from outside of the department,

24  or from the CJ world, you may take a little while

25  longer in your preparation to be able to start to

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 47 of 244

1  conduct hearings with a panel, absent of the parole

2  member being there.

3          And everyone is different on that time

4  frame.  You want to be sure they're comfortable with

5  being able to jump into it.  And you can tell if they

6  are or not.  And when they are, then they head out with

7  the team, and they're the panel.  And then you go from

8  there with it.

9          And, of course, the repetition of

10  conducting a hearing in the course of a day, you sort

11  of get up to speed on how to conduct the hearing.  In

12  terms of you're walking through it, you cover the parts

13  that are important.

14      Q.  And how do you know what points are

15  important?

16      A.  I think what's in the report.  You know, I

17  mean, that report has been modified and tweaked over

18  years.  And I think the tweaking has to do with what's

19  best to discuss at a hearing.

20          And so when you look at all those

21  components and sections that make up that report, you

22  touch upon those.  You touch upon those areas of the

23  report.

24          You know, that, plus any other questions

25  that you may have that's not scripted, you know, I

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 48 of 244

1 **think helps get you to a point where you can say that**

2 **you've conducted a hearing with an offender, and that**

3 **you've also gotten the information that you at least**

4 **felt relevant as that panel into the record that day.**

5     Q.   And is there a written policy and procedure

6 that governs how those reports are to be prepared?

7     **A.   I'm sure there's board policy on what's in**

8 **a prehearing report.**

9     Q.   I'll show you what I've marked as

10 Exhibit 2.

11     (Deposition Exhibit No. 2 was marked for

12 identification.)

13 BY MS. BREIHAN:

14     Q.   Go ahead and look at this document.  It's

15 Bates numbers AGO3584 through 3593.

16     **A.   (The witness complied.)**

17     Q.   Let me know when you've had a chance to

18 look through it.

19     **A.   Okay.**

20     Q.   Do you recognize this document, sir?

21     **A.   I'm sure I've seen it before.**

22     Q.   It appears to be a policy and procedure

23 related to prehearing reports; is that fair?

24     **A.   Yes.**

25     Q.   Do you know who was involved in preparing

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 49 of 244

1  this procedure or this policy?

2       **A.   There's a committee that works to outline**

3  **policies.  I forget the exact name of the committee.**

4  **There's a chairperson for the committee.  And they look**

5  **at policies, update policies, add policies, to the**

6  **point that it's been reviewed, and then ready for**

7  **signature by -- probably gone through legal by**

8  **then -- and is ready for the signature of the**

9  **chairperson, whoever that is.**

10       Q.   We'll get to your duties as chair of the

11  board.  But was one of your duties was approving

12  policies and procedures for the board?

13       **A.   Correct.**

14       Q.   And the effective date of this policy and

15  procedure is November 26, 2014, if you look on the

16  first page, correct?

17       **A.   Yes.**

18       Q.   Is it fair to assume then that you would

19  signed off as approving this specific procedure

20  No. P6-4.1?

21       **A.   It's reasonable to believe that I would**

22  **have signed it if that were put in front of me, yes.**

23       Q.   And how did the Division of Probation and

24  Parole determine what information was to be covered in

25  the prehearing report?  It looks like it's delineated

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL  Document 134-5  Filed 06/12/18  Page 50 of 244

1   starting on page four of this Exhibit 2.

2       A.   Can you clarify that question again?  What

3   should go in the report?

4       Q.   If you look in paragraph C, it says the

5   prehearing report should follow this format.  And then

6   it lays out a number of bullet points on different

7   topics.  It looks like nine -- I'm sorry -- 16

8   different headings for the report.

9           How did they determine how the Division of

10  Probation and Parole that they should follow this

11  format and cover these topics?

12      A.   Um, that's going to come, I think, from

13  input from those folks that conduct hearings.  The

14  parole board analyst.  The district administrators.

15  The unit supervisor staff.  The board.

16          As I said, there's always been a report to

17  work off of, and that report over the years, I mean, I

18  used to be an institutional parole officer back in the

19  '80s, and the report looks different now than it did

20  then.  And it continues to evolve.

21          I have no doubt if someone makes a

22  suggestion that at some hearing, or they make an

23  observation, that that information would go to the

24  board ops people, and they would look at that and

25  consider that, and likely bring that to a parole board

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 51 of 244

1    meeting and discuss it with the parole board.

2         Q.   But it's practice to follow the prehearing

3    report when you were conducting hearings, correct?

4         A.   It's certainly a guide.  It's a significant

5    guide for you to follow, yes.

6         Q.   Is there any other guide that you might

7    follow or other board members might follow while

8    conduct hearings?

9         A.   There's only one prehearing report that you

10   have at a hearing.

11        Q.   I guess I'll ask my question again.  Other

12   than the prehearing report, is there any other guide or

13   guidance that would direct a parole board member in

14   conducting hearing?

15        A.   Either I don't understand your question or

16   I'm not aware of anything like that.  Other than this

17   hearing, which is what you utilize during the parole

18   hearing process, there's no other document that you

19   have that you would use to help guide you in your

20   questioning of an offender.

21        Q.   Thank you.

22             And then you talked about when new members

23   are brought in they shadow or observe hearings until

24   they're ready to conduct them on their own; is that

25   correct?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 52 of 244

1      A.    That's correct.

2      Q.    Is there any sort of audit when they first

3 start conducting hearings on their own?

4      A.    When you say "audit" what do you mean?

5      Q.    Any type of oversight or probationary

6 period for new board members?

7      A.    No.  Once you're appointed by the Governor,

8 you start to work as a member as soon as you can

9 possibly get over to the board.

10      Q.    And the hearings are conducted in person

11 and by videoconference, correct?

12      A.    That's correct.

13      Q.    When you started on the board in 2009,

14 could you estimate how many percentage-wise were

15 conducted by videoconference?

16      A.    Zero.

17      Q.    And obviously that's gone up over time?

18      A.    Yes.  It was one of the areas I really

19 wanted to work to improve upon with the board.  And we

20 worked to get language in the existing statute which

21 what was required.  We couldn't just do it willy-nilly.

22 It had to be statutorily directed.

23           So we, I think in 2011, we pursued that

24 through the legislature.  We got the permissive

25 language into the statute, I believe, in 2012.  And

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 53 of 244

1  then we implemented the beginnings of the process that

2  would get us to utilization of a -- of that process in

3  2013.

4            In other words, we set up a task force to

5  begin looking at how to best do that.

6       Q.   And when you retired this year, could you

7  estimate a percentage-wise how many hearings were

8  conducted by video rather than in person?

9       A.   More than half.  It's a ballpark guess.

10  But my recollection is, from the report that I -- from

11  the management report that goes out that references how

12  many hearings that we do a year, I think that I had

13  asked that there be a section indicated that shares

14  with us how many hearings are done in person and how

15  many are being done by video.

16       Q.   Are there any situations in which it would

17  be your preference to have the hearing in person rather

18  than by video conference?

19       A.   Was there a preference.

20       Q.   Any situations wear that would be your

21  preference?

22       A.   Not a preference.  No.  In my view, if

23  you -- if you had the equipment that was necessary to

24  be able to engage with the offender, you see him

25  clearly, he could see you clearly, I could see his body

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 54 of 244

1   language, reaction to my questions, he could hear and

2   see me clearly.  We ask those questions pretty

3   routinely at hearings to be sure that we can all see

4   and hear one another.  And in my view -- and I think in

5   the state's view, and in the view of many other states

6   that conduct video hearings, states conduct hearings

7   over videoconference.

8               Missouri started the process, and

9   initially, starting out, we sort of instrumentally

10  decided we'd do these kinds of hearings to make sure we

11  could come along at the right pace and the right speed

12  so we'd get this right.  And by the end of the process,

13  the implementation process, we were conducting

14  hearings, including victim's cases, by video.

15      Q.   What, hypothetically, if an inmate is

16  intellectually disabled, or severely cognitively

17  limited, would that have any sway on the board's

18  decision to have the hearing?

19      A.   The hearing won't be conducted.  If there

20  was clear -- if there was -- when I say an

21  understanding, if an offender in any way -- first of

22  all, the statute makes it clear that the offender has

23  the right to not have a video hearing.  If he says no,

24  there won't be a video hearing.  That's in the current

25  statute, when the law changed, relative to that.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 55 of 244

1    So then if he does want to have a hearing,

2    there is something through the IPO's engagement with

3    that person, which is well before the hearing, that

4    throws up a red flag, then the next thing that should

5    be occurring is brought up to the district

6    administrator staff that this guy doesn't seem like he

7    could converse with me in person, much less at a video

8    hearing.

9    And, yes, there are occasions where if you

10   believe that the offender would not be served fairly

11   with the video hearing, then it's not conducted.

12   And if the staff perhaps may miss that, for

13   example, and a member you know, it's in their queue and

14   in someone's notes, or sees something, or has a concern

15   that this person isn't communicating the way that we

16   think they should be, then that member can say, well,

17   we need to reschedule this hearing for an in-person

18   hearing.

19        Q.   How often does that happen in your

20   experience?

21        A.   I couldn't tell you that.  It's not

22   something that we sat down and talked about or that was

23   being captured in some report.

24        Q.   But the IPOs are expected to do an

25   assessment with the inmate prior to the hearing to

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 56 of 244

1  determine whether or not they are competent to have a

2  videoconference?

3      A.   I would think if you spoke to Michelle

4  Kasak, who's over the institutional staff, or

5  Kelly Dills, that there has been some discussion for

6  those kind of red flag cases, because they just simply

7  aren't able to communicate perhaps in that setting,

8  then that needs to be brought to the attention of

9  someone and that person be placed in an in-person

10 hearing.  Which, of course, still occurs.

11      Q.   And what special accommodations, if any,

12 are made for an in-person hearing with someone with an

13 intellectual disability or cognitive limitations?

14      A.   If someone can't speak English, for

15 example, I mean there are entities that come in.  There

16 have been psychology staff that have come to hearings

17 before with an offender.  Doesn't happen very often,

18 but it's happened.  I know it's happened before.  I

19 don't know the complete specifics of something like

20 that.

21           Again, I think that there are other staff

22 that deal with that more routinely than I do that can

23 answer that question a lot better than I can.

24      Q.   But during your tenure with the board, did

25 you modify your approach at all when you were dealing

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 57 of 244

1  with an inmate who had a low IQ or an intellectual

2  disability?

3      **A.   If during a hearing that I saw someone I**

4  **was concerned with?**

5      Q.   Let me back up.  The prehearing report,

6  does it say anything about an inmate's IQ or

7  educational level?

8      **A.   It discusses their educational level, yes.**

9      Q.   So does the prehearing report give you an

10  adequate idea at the hearing as to what the inmate's

11  competency level is?

12     **A.   There is an education section.  If the**

13  **offender got his GED.  I think there's some sort of**

14  **process when they're being -- I don't want to use**

15  **rated -- how they're being assessed by educational**

16  **staff, I think that that issue can come up.**

17          **If an offender is seeing psychology staff**

18  **for some reason, that might be documented by those**

19  **people clinically.  And that can be in the report.  May**

20  **be in the report.  So I think there is a place where**

21  **that information can bear that out.**

22     Q.   But the report might, but not always, give

23  the panel an idea of the inmate's competency; is that

24  fair to say?

25     **A.   I would think that would be a fair**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 58 of 244

Page 59

response. Keeping in mind that the people that write
the reports are the first-line staff, and they're the
ones that are making that critical assessment. And the
ones above don't know how the inmate may have engaged
themselves. So if you get the report, and something
was missed and is not there, that was the point where
that staff assess that, I guess in their mind's eye,
that that information may not be necessarily relative.
So I can't tell you that it's always there. I can say
that it's important and it should be there.

Q. And those institutional parole officers,
they're not trained psychologists?

A. They're not clinicians, and neither is the
parole board.

Q. So what's the criteria for determining
whether someone who is parole eligible should be
released on parole?

A. The criteria for release?

Q. Yes.

A. You're an individual vote at a parole
hearing. When there are seven members that -- you need
four members voting your way. That's the No. 1
criteria that gains you release.

If you're saying there's some sort of a
matrix that you check off if you get this, this, this,


1    you set a release date, there's nothing like that.

2          Q.   I'm asking you as a board member, as the

3    chair that sat on a panel, if you're casting a vote,

4    you have to come to a decision, correct, whether to

5    grant or set a reconsideration hearing?

6          A.   Correct.

7          Q.   What's the criteria you use to come that

8    decision?

9          A.   You know, I look at the retributive

10   factors.  I look at the case in point.  And, you know,

11   while I don't -- while it's not written, I think that

12   there is a retributive aspect to every case.  Meaning

13   do you think they should serve a certain amount of time

14   as an individual member.  You may look at it that way.

15               And I think if you feel like that aspect of

16   it has been satisfied, then I think you just look at

17   other components as you break the case down.  How good

18   has their adjustment been in prison?

19               If they've had bad behavior, you know, in

20   prison.  You know, you're not likely going to vote for

21   someone's release if they've not conducted themselves

22   in what would otherwise be an expected way that you

23   would act as an offender.

24               And if someone has conducted themselves in

25   a satisfactory fashion, then there's more of an

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 60 of 244

1  opportunity to consider that release because of that.

2          What things have they accomplished through

3  groups, or through achievements like GED.  You know.

4  Restorative justice time.  Have they put in some time

5  with RJ, to have restorative justice, to give back in

6  the way that they -- the only way they can inside

7  prison.  Aside from getting themselves back to a point

8  where they can return to prison.

9          If they've got substance abuse issues, have

10  they, you know, done all the things they can to address

11  that issue with no relapses in prison.

12          And the offender's remorse for his case.

13  Ownership of his case.  You know, where are they at

14  with those kinds of pieces as well.

15          And at some point, through your own

16  personal deliberation, you consider those kinds of

17  factors, and then you'll arrive at something that you

18  believe -- or I'm speaking for myself -- that I believe

19  is a fair decision given the cases in front of me.  And

20  then you make that decision to either set a release

21  date or not.

22      Q.   I want to walk through those one by one.

23  You talked lastly about remorse and ownership for a

24  case, correct?

25          How does an inmate who's claiming innocence

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 61 of 244

1 factor into that.

2      A.   I mean, the offender has an opinion of his

3 case.  It's something that you can consider.  I would

4 never go so far to say that someone could not have made

5 a case that could have convinced some member that he

6 may, in fact, be truly innocent.  I don't know that.

7 Those questions don't come up very often.  Very few

8 offender's actually go into a hearing claiming

9 innocence.  Most say that they've done it.  Whether

10 that's true or not is another thing.

11           Those that have said they didn't do it, and

12 stick to that story, I mean, that's their opinion.

13 That's their view of what happened.  And you -- it's

14 just another point for you to consider.  How it fits

15 into what you consider in a case.

16      Q.   It sounds like you want to hear remorse or

17 ownership?

18      A.   I want to hear whatever his account is to

19 the case.  So if his accountability is I did nothing,

20 I'm here and I shouldn't be, I consider that as a part

21 of the pieces when I'm deliberating on the case.

22      Q.   And substance abuse was another factor that

23 you talked about.  Another criteria.  You mentioned has

24 the inmate done all they can with no relapse in prison.

25           What did you mean have they done all they

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 62 of 244

1  can to address substance abuse issues?  What does that

2  entail in your mind?

3      A.    There's a part of the prehearing report

4  called a SACA score.  And that score is 1 through 5, I

5  believe it is.

6          If a certain -- the red flag would come if

7  that score is three or above.  Because it means they

8  may have mild, or more involvement with drugs or

9  alcohol, or a combination of the two.  And when you

10 have those factors, you want to make sure that the

11 offender, one, recognizes that, and two, they've done

12 what they can to address those concerns or issues.

13     Q.    Have you ever calculated a SACA score?

14     A.    I haven't, no.

15     Q.    Who calculates that on the inmates?

16     A.    It's done, I think, on intake.  And a SACA

17 score is really a self-report.  It's not a clinical

18 assessment.

19     Q.    So it's conducted after an interview with

20 an inmate based on what they divulge; is that what

21 you're saying?

22     A.    It's a self-report number, yes.

23     Q.    And it's done at commitment to the DOC?

24     A.    At some point after commitment, yes.

25     Q.    Do you know if it's ever redone?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 63 of 244

1      A.   I can't answer that question.

2      Q.   And that sort of leads into the next

3  criteria you mentioned was whether what they've

4  accomplished, where they've taken restorative justice,

5  or education courses.  Does every inmate in the

6  Department of Corrections have the same access to

7  courses?  Whether it's for education, or restorative

8  justice, or substance abuse courses?

9      A.   I can't answer that question.  That's an

10 institutional question now.  I do know, having been a

11 former warden, that some institutions have programs and

12 some don't.

13          Not every institution replicates itself in

14 terms of its programming.  I mean, it just doesn't.

15          But if there's programming that's available

16 there, the offenders, on their own, they're certainly

17 encouraged by staff to seek out those programs.

18          I'm sure the case manager staff work with

19 those folks to encourage them to set themselves up for

20 the best process going forward in terms of their

21 eventual release.

22          It also helps the parole board, if you're

23 attending programs and completed them successfully, it

24 adds to your resume as an offender coming to the parole

25 board.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 64 of 244

1      Q.   So programming varies by institution,

2  correct?

3      A.   I would say yes.

4      Q.   And then within an institution is there a

5  priority as to who is first in line for those programs?

6      **A.   I can't -- you mean like a waiting list?**

7  **I can't answer that question.  I've been away from it**

8  **for a long time on the prison side.  And I can't answer**

9  **that question in terms of how they provide weight to**

10 **see who needs to --**

11     Q.   Have you encountered that issue when you

12 were conducting parole hearings?  Where inmates might

13 say, "I was on the waiting list, but I couldn't get

14 into the course?"

15     **A.   That's a very true and accurate statement.**

16 **All the time.  You will get that as a response more**

17 **than, you know, I've -- because I don't ask the**

18 **question if I know they completed it.  I go into, "I**

19 **see that you completed programming."  And, you know, "I**

20 **want to commend you for that."**

21          **And if you don't see that, either they've**

22 **chosen not to become involved in it, or there's not a**

23 **need for it, or they're on a waiting list.  Most**

24 **offenders will tell you that they're on a waiting list**

25 **and that's a more truer statement than not.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 65 of 244

1      Q.   You said you don't ask the question if you

2  know they completed the course?

3      A.   Well, I always discuss anything relative to

4  substance abuse.  If there is something there that is a

5  red flag for me.

6      Q.   Just in case there's something missing from

7  the prehearing report?

8      A.   You know, listen, it's self-report.  Some

9  offenders may not want to self-report the complete

10 truth.

11          Some of the offenders are in prison, and

12 they go through programming that tells you it's best to

13 just to be on the table as you can about yourself.  So

14 they may say more at a hearing that they said at the

15 beginning of their incarceration to the caseworker, for

16 example.

17          I mean, as an offender grows in prison

18 because they've changed, they may be more apt to say

19 what the truth was when I was out there.  And that will

20 spark some questions whether it's covered in the SACA

21 or not.

22     Q.   And another criteria you mentioned was

23 behavior in prison.  And you testified have they --

24 it's a key question in your mind, have they behaved the

25 way you would expect them to act as an offender.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 66 of 244

1           Can you explain to me what you mean by

2   that?

3       A.   Yes.  My expectation is that you don't

4   violate the rules.  Number one.  And offenders know

5   what the rules are.

6           Most staff in prison recognize the

7   fact -- I'm sure that it occurs for a CO I training and

8   above -- that when someone comes to prison, especially

9   for the first time, that they may err.  They may not

10  know you can't cross that particular line.  If you do,

11  it's a violation.  So they'll give them opportunities

12  and not write them up.

13          When an offender is written up and goes

14  through a process and continues to get multiple

15  violations, then you have someone that simply isn't

16  adjusting the way you would expect them to be.

17          I would expect an offender, once he's been

18  there and understands exactly how it all works, to

19  conduct themselves in the best way they possibly can,

20  but getting as few violations as possible.

21      Q.   So you're not expecting an inmate to come

22  with no conduct violations against them?

23      A.   No.  It's just going to happen sometimes.

24  Although you do get a lot of hearings that they didn't

25  have a violation.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 67 of 244

1        That dynamic works in two ways. You can

2   have an offender that's gotten a bunch of violations at

3   the beginning of his incarceration. He comes to a

4   hearing. There's been three years since his 50

5   violations. Well, how's that look to you on paper?

6   I'm reasonable. For me, it looks like you were

7   struggling, and now you got it. I want to commend you

8   for that judgment change. I commend them for that.

9        So it's all in how you decide that you want

10  to look at the report. For me, I take a global look at

11  the whole thing. I don't look at what you just did. I

12  look at the whole picture.

13       I've had offenders that have absolutely

14  just torqued themselves from the beginning. And then

15  for whatever the reason, they've now -- they're

16  adjusting and not getting violations. I'm not going to

17  wear an offender out with going over all those

18  violations. I just don't see the need to do that. To

19  me, he's shown me that he's adjusting appropriately.

20  The only time I probably would is if it was a

21  significant violation.

22       If it's the kind that you see -- and I

23  recognize those that haven't come from the prison

24  world -- they didn't know you couldn't cross that line.

25  You know, something minor, I'm not going to wear them

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 68 of 244

**out with that.**

**If I see someone that has a gotten a No. 11 for drugs, we're going to talk about that, even if it was five years ago. But I'm also going to say to them, "And I see that you've had nothing in the last three years. I want to commend you for that change."**

Q. How many years without conduct violations would an inmate have to go in order to be, in your opinion, well-adjusted to the prison environment and behaving the way you would expect them to?

**A. I'm not sure that I can even answer that question. Again, I have to look at the entire case on it's one. Including what the offender says during the hearing. To make, you know, to make a determination.**

**I don't have the static number in my head. I look at the report, and the report tells me what it does, and then I go from there with it. And listen to what the offender says as he's sharing with me the why parts of his behavior. Because we're going to discuss it.**

Q. So in this ten to twenty minutes on average that you spend on the hearing, you're reviewing the parole file for the first time, you're hearing potentially from the victim, you're interviewing the inmate themselves, and you're considering these seven

1  factors all twenty minutes?

2         A.    Not on the victim's cases.  You're going to

3  have a lot more time to consider those.  Because those

4  cases are going to be more than double a twenty-minute

5  regular hearing.  Sometimes victim's cases may be an

6  hour.

7         Q.    How many hour-long parole hearings have you

8  conducted?

9         A.    Victim's cases?

10        Q.    Period.

11        A.    On a standard hearing, I think I could

12 reasonably say I've not conducted an hour-long hearing

13 on a regular non-victim case.

14        Q.    How many hour-long victim case hearings

15 have you conducted?

16        A.    I'd have to go through the record.  Most of

17 the victim's cases -- just how you introduce the case

18 takes a while.  Just the introductory part.  Including

19 their speaking.  And you may have one victim, or you

20 may have fifteen victims that want to speak.  That's

21 not an easy question for me to answer on an average

22 basis.

23        Q.    More than a dozen?

24        A.    I can't answer that question.  I want to

25 clarify for you why.  As parole board chairman, you're

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 70 of 244

1    not always on the docket.  The docket is for the

2    members.  The chairman covers when people are not

3    available.  If there's someone sick.  If your docket

4    size goes down below a certain number -- I mean, if

5    your board docket goes down, I've put myself into

6    rotation when it was down to five members.

7              Most of the time you have all your members.

8    So the chairman's not on the hearing docket very often.

9    If I did -- if I was a member for the last seven years,

10   that number 12 that you mentioned might work for

11   hour hearings for victim's cases.

12             But as the chair, I didn't set hearings

13   that frequently.  But I did sit on some victim's cases.

14   And victim's cases, you know, take a great deal more

15   time, I think, than a regular case, a non-victim case.

16        Q.   And then you talked about a retributive

17   factor that you might expect an inmate to serve a

18   certain amount of time in order to satisfy the factor

19   of their sentence.

20             How do you determine the retributive factor

21   of the inmate's sentence?

22        A.   It's, I think, my experience over my years

23   tells me if I believe someone, you know, may be ready

24   for release, for example.

25             When I look at the retributive aspect of a

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 71 of 244

1   sentence, while there's nothing in this state, like a

2   matrix for that, that is written, you know, anyone

3   conducting hearings I think looks to if the guy's got a

4   ten-year sentence, and he did two years, or five, I

5   mean, you just need to sort of come to all of those

6   aspects of it, and then that sort of helps influence

7   the retributive part of the sentence, when I'm

8   conducting a hearing.

9           So I can't give you an absolute number.

10      Q.   Are you saving that behavior in prison, and

11  accomplishments in the prison weigh toward whether an

12  inmate has satisfied the retributive part of the

13  sentence?

14      A.   His behavior?

15      Q.   I just want to understand.

16      A.   No, I'm not saying that.  I'm saying if you

17  have a 25-year sentence, I think anyone in your mind,

18  unless there's some matrix that identifies it for you,

19  and if there's nothing, then I think that you look at a

20  20-year sentence, and perhaps in your mind you think

21  someone may do five years of that sentence.  I mean,

22  there's no standard number.  I think everybody might be

23  different on how they place value on that.  That's all

24  I'm saying.

25      Q.   It's just the panel's gut, depending on who

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 72 of 244

1  makes up the panel?

2       A.   Yeah.  I try not to use the word gut.  But

3  all those factors.  And the case in point.  The nature

4  of the case.  The term sentence of the case.  You know,

5  it gets you to a point where you think in your mind

6  that this is enough time.  That's probably the best way

7  for me to answer that question.

8       Q.   You talked about panel hearings.  Have you

9  ever conducted a hearing with the entire board?

10      A.   No.

11      Q.   Have you ever conducted a hearing where the

12  panel was composed of only board members?

13      A.   Once.

14      Q.   And when was that?

15      A.   That when I first came on board.  I'm not

16  sure if I was the chair then.

17           But there was a case that had occurred by

18  offenders.  They had filed a case.  This was four

19  female offenders.  And the court ruled.

20           Based upon the court's ruling, we had to

21  conduct these cases again, I believe.  Again, this was

22  a long time ago.

23           And I do recall that there were three

24  members that were at the hearing -- the hearing that

25  day for those cases.  And I'm not sure if I was there,

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 73 of 244

1    if I was the chair then.

2              It was as a result of some court action

3    that -- or some ruling by the court that had these

4    women -- and I think they were women that were life

5    withouts for, like, 50-year stipulation cases.  Which

6    goes way, way back.  And they were given hearings.  And

7    I believe on that occasion there were members for that.

8    I'm not a hundred percent sure.

9         Q.   Are these the women who were victims of

10   domestic violence?

11        A.   It may have been.

12        Q.   And why were there only board members on

13   the panel for those four female inmates?

14        A.   I'm not a hundred percent sure of that

15   question back then.  It was a long time ago.  I don't

16   recall what it might have been, the discussion.

17        Q.   And was that hearing more than one hearing?

18   Was it four separate hearings, sounds like, perhaps?

19        A.   Yeah.  Each offender would have had their

20   own hearing.

21        Q.   Were those recorded?

22        A.   Every hearing is recorded.

23        Q.   By audio, correct?

24        A.   Yes.

25        Q.   Was there any video recording of those

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 74 of 244

1  hearings?

2      **A.    No.**

3      Q.    Has there ever been media access given to a

4  parole hearing during your tenure?

5      **A.    No.  Missouri is a closed state for**

6  **parolees.**

7          MS. BREIHAN:  We can take a break.

8          (A break was taken.)

9  BY MS. BREIHAN:

10     Q.    So we just spent a significant amount of

11 time on your duties as a member, and covered some of

12 the questions I might have about your duties as chair

13 of the board.

14         But can you describe generally what your

15 duties of the chair of the parole board were?

16     **A.    Yes.  As chairman of the parole board, it's**

17 **kind of a three-headed animal.  You're certainly the**

18 **chair over the parole board conducting parole board**

19 **meetings, and things of that nature.**

20         **Now, members don't report directly to the**

21 **parole board chairman.  People confuse that.  They**

22 **still all report to the Governor's office.  They work**

23 **with the chairman.  The chairman conducts the board**

24 **meetings, but I have no supervisory authority over the**

25 **members.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 75 of 244

1          That being said, my main duty or additional

2     duty as parole board chairman, you're also the

3     appointing authority and the division director for the

4     Board of Probation and Parole.  So you are the state

5     director over Probation and Parole.

6          Thirdly, you are also the interstate

7     compact commissioner when you're appointed to the

8     parole board.  So you have that position title, and we

9     have an interstate compact office, and they do all the

10    real work.  Yours is more title than anything else in

11    that regard.

12         Those are the things that come to me as the

13    chairman.

14    Q.   You mentioned that one of your duties was

15    overseeing the discipline process?

16    A.   Yes.

17    Q.   So if you're not supervising board members,

18    they report to the Governor's office, who then were you

19    responsible for disciplining, if necessary?

20    A.   Only staff that work directly for the

21    board.  They're not gubernatorial appointees.

22    Q.   Would that include parole analysts?

23    A.   Yes.

24    Q.   Would it include institutional parole

25    officers?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 76 of 244

1      A.    Every employee in the Board of Probation

2  and Parole except gubernatorial appointees.

3      Q.    And who are the gubernatorial appointees?

4      A.    The parole board members.  And there's

5  seven.  Or six, including me.

6      Q.    So you could not suspend a board members

7  for misconduct?

8      A.    I can't do anything to a board member.

9      Q.    And did your duties as chair change over

10 time?

11     A.    You'd have to clarify what you mean by

12 that.

13     Q.    Well, did you ever take on more duties?

14 Or --

15     A.    Well, I think of duties, you may come in.

16 You have, I think, specific things that are germane to

17 you, and then over time, because of one thing or

18 another, policy change, you may no longer be doing

19 something.  So you no longer have that to look after.

20 But I'm sure that over the course of my seven years as

21 chairman, that my duties from my onset, to when I left,

22 you know, changed, or increased or decreased over time.

23     Q.    Who did you report to when you were chair?

24     A.    Like the other members, the Governor.  I

25 did also work hand in hand with the department

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 77 of 244

1    **director.**

2         Q.   And who was the department director during

3    your tenure as chair?

4         **A.   George Lombardi.**

5         Q.   He's no longer with the Department of

6    Corrections, correct?

7         **A.   That's correct.**

8         Q.   You worked closely with Kelly Dills when

9    you were chair of the board; is that correct?

10        **A.   Yes.**

11        Q.   And were you involved at all in drafting

12   proposed legislation that impact Probation and Parole?

13        **A.   I certainly signed the information.**

14             **Did you say legislation?**

15        Q.   Uh-huh.

16        **A.   I missed that part.**

17             **Yeah.  If there was something we were**

18   **pursuing legislatively, the board chairman is going to**

19   **have some input into that discussion if it affects the**

20   **parole board.**

21        Q.   And your resume mentioned that one of your

22   duties was approving policy, procedure, and the

23   operating practices for parole board functions.

24             We were talking earlier about Exhibit 2,

25   which is one of the procedures that governs the parole

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 78 of 244

1   board, correct?

2          A.    The parole board what?

3          Q.    We were talking about Exhibit 2 earlier,

4   which is one of the procedures that governs the parole

5   board?

6          A.    I thought you said track.  Okay.

7                Yes, that's correct.

8          Q.    Other than the policy and procedure manual,

9   of which Exhibit 2 is just one part, are there any

10  other policies, procedures or operating practices

11  documented that you as chair were involved in in

12  approving?

13         A.    I would never say that there may not have

14  been, for example, an operational memo that sometimes

15  you may put forth to address something at that time.

16  That doesn't come into a policy.

17                As to what those could have been, I just

18  can't tell you.  You may put out written directives

19  that don't rise to the level of making a new policy.  I

20  think that happens in business and in operations at

21  times.

22         Q.    Do you know what the Blue Book is?

23         A.    The state Blue Book or the Blue Book for

24  Probation and Parole?

25         Q.    What's the difference?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 79 of 244

1    A.    Well, if you're talking about the Blue Book

2    for Probation and Parole, I'm familiar with it.  But

3    it's not something that I could remotely begin to tell

4    you what's inside it.

5              Or the red book, or the white book, other

6    than one might be for revocation hearings.  The other

7    one tells you how to, I believe, it gives you

8    information about the board, and parole as it were.

9    But it's very surfaced in terms of my knowledge of the

10   books and what's inside it.

11        Q.    But when you were chair were you

12   responsible for being knowledgeable about what policies

13   and procedures, regulations were in place, that

14   governed the parole board's practices?

15        A.    I think without question, yes, you are.

16        Q.    And the board members were too as well?

17        A.    Yes.  I think every employee is required to

18   understand and know what the policy is.

19        Q.    And when there was a change in the law,

20   part of your responsibilities as the chair was to make

21   sure it was updated to reflect that change in the law

22   correct?

23        A.    To its implementation, that's correct.

24        Q.    And you talked earlier about committee that

25   was in place, and you weren't exactly sure who was on

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 80 of 244

1  it but there was a policies and procedure committee

2  that was responsible for revising P & P's policies and

3  procedures?

4       **A.    Yes.  And there still is.  I just don't**

5  **have the name at the top of my head.**

6       Q.    When you were asked for -- strike that.

7            Were you ever asked by anyone within the

8  Governor's office, or the Department of Corrections, to

9  give an analysis of proposed legislation?

10      **A.   I don't believe that I was.  I know every**

11  **year there's a point where if our division, and, like,**

12  **the other three divisions were going to propose**

13  **legislation, there's a time that you bring that**

14  **information forward prior to the beginning of the next**

15  **session.  That may answer your question.**

16           **(Deposition Exhibit No. 3 was marked for**

17  **identification.)**

18  BY MS. BREIHAN:

19      Q.    I'll show you what I've marked as

20  Exhibit 3.  This is Docket No. 65-3.

21           And Mr. McSwain, have you seen this

22  document before?  Take your time to look through it.

23  It's a four-page document.

24      **A.   I don't believe that I have.  I mean, it**

25  **wasn't copied to me.  I was a member at that point, so**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 81 of 244

1  **it may have gone to the chairman -- the new chairman.**

2       Q.   And it's a letter dated April 27, 2017,

3  correct?

4       **A.   Yes.**

5       Q.   And it looks like it's a letter from

6  Anne Precythe to Mae Quinn, correct?

7       **A.   Yes.**

8       Q.   Who's Anne Precythe?

9       **A.   She's the department director.**

10      Q.   As I mentioned, this is an exhibit to the

11  complaint that was filed in this lawsuit.

12           Have you reviewed the complaint that was

13  filed in this lawsuit that was filed, by chance?

14      **A.   I don't believe I have.**

15      Q.   If you look on page two of this exhibit,

16  looks like there's a document titled parole hearing

17  procedures.

18           Do you see where I'm looking?

19      **A.   This page?**

20      Q.   Yeah.

21      **A.   Yes.**

22      Q.   Do you recognize these parole hearing

23  procedures?

24      **A.   I don't have my glasses.  I left them in my**

25  **car.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 82 of 244

1              I haven't seen this document before.

2        Q.   Have you seen these procedures in this form

3   before?

4        A.   I haven't seen this letter before.

5        Q.   The very first bullet point here says, "The

6   parole hearings are confidential proceedings, and

7   note-taking during the hearing is prohibited."

8              Do you see that first bullet point?

9        A.   Yes.

10       Q.   Is it your understanding that the rules

11  restrict note-taking during a parole hearing?

12       A.   Um, it's certainly a closed session.  And I

13  think there had been discussion about note-taking

14  before previously.  And it being prohibited.  But

15  beyond that, I don't have any other recollection of a

16  discussion about it.

17       Q.   Is there any written policy or regulation

18  or statute that you're aware of that prohibits

19  note-taking during parole hearings?

20       A.   I'm just not aware if it is.  It may be

21  covered somewhere in policy.  But the department --

22  institutional -- I'm sorry, either divisional policy or

23  board policy, I'm just not familiar from a glance that

24  I know that to be the case.

25       Q.   But you mentioned as chair you were

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 83 of 244

1   responsible for being aware of the policies and

2   procedures that govern the parole board, correct?

3           **A.    Yes.**

4           Q.   And as a member, too, you were expected to

5   be familiar with those policies and procedures?

6           **A.    That's correct.**

7           Q.   You're not aware of any written policy,

8   procedure, rule that prohibits note-taking during

9   parole hearings, correct?

10          **A.    Only other than the fact that there's been**

11  **a discussion about it in the past.  And, you know, has**

12  **that issue come up at a parole board meeting, for**

13  **example, I'm not sure that it has.**

14          **I think the discussion's been had, perhaps,**

15  **in offices.  But beyond that, I may have seen the**

16  **policy.  I saw a lot of policies.**

17          **You know, a specific recollection of it, or**

18  **a sentence in that policy, I would rather err by saying**

19  **I've likely seen it, and don't specifically recall**

20  **everything that might relate to it.  Other than the**

21  **fact that this is pretty self-explanatory when you see**

22  **it.**

23          Q.   You mentioned that there might have been

24  discussion about note-taking outside of an official

25  board meeting; is that correct?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 84 of 244

1    A.   I mean, there could have been.  You know, I

2  don't know if that discussion would have happened at a

3  parole board meeting.  We had them monthly.  Or when

4  that could have occurred.

5         I think the issue's come up at some point,

6  and it may have come up about a member asking about it.

7  Those are the kinds of questions that likely were

8  handled by an analyst, or Kelly Dills, who deal with

9  those issues on a day-to-day basis, that, for example,

10  could answer that question, you know, more succinctly.

11    Q.   What do you recall from any discussion that

12  you witnessed, or were a part of, about note-taking?

13    A.   If it was okay or not.  That would have

14  been the only concern.  Can they or can they not.  And

15  if it's not prohibited, then I'm sure that the answer

16  was that they can't do that.  I mean if it's

17  prohibited, you can't do that.

18    Q.   Do you recall anything specific from any of

19  those discussions?

20    A.   I just don't have recollection of who would

21  have brought that, you know, to a meeting.  Other than

22  the fact that I believe that that may have come up at

23  a -- likely at a board meeting.

24    Q.   And you mentioned earlier that one of the

25  participants in a parole hearing might be the inmate's

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 85 of 244

1  delegate, correct?

2        **A.**    **Correct.**

3        Q.    What's the role of a delegate?

4        **A.**    **A delegate is there to -- it can be**

5  **anybody -- but that person is there to provide what**

6  **amounts to a plan of some sort that might be of**

7  **assistance to the offender.**

8        **Usually delegates are family members, but**

9  **I've seen employers come there and be delegates.**

10  **Friends come there to be delegates.  Folks, pastors**

11  **from the church.  Anyone that believes, or the offender**

12  **believes -- cannot speak on his behalf -- but share how**

13  **they can assist him upon his release.**

14        Q.    Can a delegate be an attorney?

15        **A.**    **Yes.  But they can't come in there and act**

16  **as an attorney.**

17        Q.    Why not?

18        **A.**    **Because it's not a court proceeding.**

19        Q.    But prosecutors are allowed to participate

20  in the hearing, right?

21        **A.**    **They are allowed to come and share why they**

22  **believe the offender -- if the prosecutor's there, he's**

23  **there to tell you why they shouldn't be released.**

24        Q.    And is the prosecutor allowed to act as

25  attorney?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 86 of 244

1          A.    He's there to tell why the offender should

2    or shouldn't be released.  That's why he's there.

3               I'll share with you that at hearings, if

4    I'm conducting a hearing -- and I've had lawyers at

5    hearings before, you know -- it's just made clear that

6    this isn't a courtroom.  And, you know, everybody

7    participates within the scope of the rules.

8               And if the prosecutor's there, because they

9    can be there legally, then they're there to do as the

10   victim would do, and that's to tell why that person

11   should be released.  And I haven't heard a prosecutor

12   relitigate the case.  I cut them off.

13        Q.    What do you mean by relitigate the case?

14        A.    I mean, act like they're in the courtroom,

15   I guess.  I haven't had that happen to me.  I've not

16   seen what that looks like.  Because I make it clear,

17   we're not going to get into that place at all.  You're

18   here to tell me why this person shouldn't be released.

19        Q.    But as prosecutors they're allowed to give

20   a lengthy description of the facts of the underlying

21   offense, correct?

22        A.    If they believe that's germane as to why

23   the person shouldn't be released, that's what they do.

24        Q.    And they're allowed to submit written

25   materials at or in advance of the hearing, correct?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 87 of 244

1    **A.    They can.**

2        Q.    And they're allowed to bring papers to the

3    hearings with them, that they might give to the board,

4    that are either diagrams, or trial testimony, or

5    something about the underlying offense, correct?

6        **A.    Anyone there that can be there can provide**

7    **us with information that we can consider.  On either**

8    **side.**

9        Q.    And is there any rule or regulation that

10   talks about this role of the delegate of being able to

11   describe assistance to the inmate upon release?

12       **A.    It may be covered in one of those books**

13   **that you spoke to.  There's a blue, white and a red**

14   **book.**

15           **But the offender, by the IPO, is told**

16   **what -- I mean, they're asked, are you going to have a**

17   **delegate, and if so, this is what they can do.  They**

18   **are told they can talk at the complete end of the**

19   **hearing.**

20           **And if it's a victim's case, I'm sure they**

21   **could tell them that there's to be no discussions,**

22   **because we've seen that begin to, or try to occur at a**

23   **hearing, where a delegate will be angry with the**

24   **victims.  And they want to try to go there.  You just**

25   **have to make sure that doesn't occur.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 88 of 244

1          I'm sure there's some pre-discussion,

2     before a hearing to an offender, about what to tell

3     your delegate once they get there.  And it might be

4     captured in writing somewhere for the offender's

5     knowledge.

6          Q.   Do you know where it's captured in writing?

7          A.   I would refer that to Kelly Dills or

8     Steven Mueller.

9          Q.   You'd mentioned attending board meetings on

10     a monthly basis, correct?

11          A.   Yes.

12          Q.   Who would be in attendance at those

13     meetings?

14          A.    It would be the members.  All of the

15     analysts.  It would be the board operations manager.

16     It would also be the institutional regional

17     administrator.  The chief supervisor may attend the

18     meeting.

19          Other than that group, and the parole

20     board's executive assistant that takes notes, other

21     than that, you would have folks coming in to conduct

22     training.  We had training in the last couple years

23     before meetings.  We would do those at the beginning of

24     the meeting, before the meeting was opened officially.

25     But those are the folks that ordinarily come to the

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 89 of 244

1  meeting.

2       Q.   Would you ever hold executive sessions at

3  board meetings?

4       A.   We would do an executive board meeting

5  after the regular meeting.  And that meeting was

6  primarily just to -- that was instituted by my

7  predecessor, and it may have been occurring before

8  that, when he got there.

9            But what occurred at a board executive

10 meeting is that if someone at a hearing set a release

11 date with a high-term prison sentence, like life, then

12 that member would present that case to other members,

13 because he was present and could identify more about

14 why that panel arrived at a date.

15           It's just to provide more information.  It

16 didn't happen a lot.  And for my purposes that was the

17 only occasion it could occur.  We didn't do executive

18 board very often when I was chair.  We did it primarily

19 for those reasons.  There may be a couple reasons that

20 we talked about training and things like that.  Stuff

21 like that.

22      Q.   Who was permitted to attend the executive

23 sessions?

24      A.   Just the board members.

25      Q.   The executive assistant, was he or she?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 90 of 244

1      A.   No.  There may be an occasion where

2  Kelly Dills or Julie Kempker, the chief, may have

3  wanted to informationally explain something to the

4  parole board.  I mean, that happened a couple of times.

5           I mean, but primarily it was to discuss and

6  pass files back and forth.  If you set a hearing on

7  someone that had a really long-term sentence, or was

8  something, I guess -- I hate to use the term

9  high profile -- I mean, there aren't a lot of

10 high-profile cases -- but if you had a long term or

11 life sentence, and you set a date, you would discuss

12 that at that meeting.

13      Q.   If you had a long-term sentence and didn't

14 set a date would you still discuss it at the executive

15 session?

16      A.   No.  If someone had -- a panel had set a

17 date for someone that you would look at, you'd want to

18 explain further why he might have 25 years in on a life

19 sentence, and you're explaining why you feel the need

20 to explain.  It wasn't anything automatic, if a person

21 has a life sentence, you have to bring that.  It was

22 nothing like that.  It was purely if you felt like

23 there might be some bit of further explaining that case

24 to the other members.

25      Q.   And you mentioned that sometimes before the

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 91 of 244

1    board meeting that there might be training, correct?

2         A.    Correct.

3         Q.    Was there ever any training during those

4    board meetings about adolescent development?

5         A.    Adolescent development?

6         Q.    Yes.

7         A.    I don't recall any training of that nature.

8         Q.    Was there ever any training provided at

9    those board meetings that was specific to juvenile

10   offenders?

11        A.    I don't recall anything like that.

12        Q.    Was there any training presented at those

13   board meetings that touched on psychology?

14        A.    I'm just trying to think back.  I think we

15   had some mental health staff come over to conduct

16   training before.  But I can't recollect who or when.

17   And it may have occurred.  Those things would have been

18   set up by Kelly Dills or Steve Mueller.  They had more

19   insight about that.  We were trying to get more

20   training to the members.  Because I think it was just

21   important, because there was no schedule for training,

22   so to speak.

23        Q.    And do the analysts have regular

24   administrative meetings aside from the board members?

25        A.    There was a monthly analyst meeting with

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 92 of 244

1    the operations manager.

2         Q.   Kelly Dills?

3         A.   Yeah.  Now Steve Mueller.  I believe it's

4    Steve Mueller.

5         Q.   Would any board members attend any of those

6    board meetings?

7         A.   They could.

8         Q.   Did you ever?

9         A.   No, I don't think I did.

10        Q.   I think earlier I mentioned the case

11   Miller versus Alabama.  Are you familiar with that

12   case?

13        A.   I don't recognize it off the top of my

14   head, no.

15        Q.   Are you familiar with the Montgomery versus

16   Louisiana decision?

17        A.   I'm not familiar with those names, no.

18        Q.   During your time as board chair, do you

19   recall any decisions coming down from the United State

20   Supreme Court that impacted juvenile offenders serving

21   life without parole sentences in the

22   Missouri Department of Corrections?

23        A.   I mean, other than the recent change where

24   we had to allow folks that had come into the

25   institution as juveniles with a life sentence with no

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 93 of 244

1  access to parole, for the folks that fit that criteria,

2  we had to allow them to have a parole hearing.

3      Q.   You're talking about Senate Bill 590?

4      A.   I believe I am.

5      Q.   I can show you it.

6      A.   If it's the bill that discussed that point

7  then, that's what I'm talking about.

8      Q.   Do you know why this bill was passed?

9      A.   I don't have any particulars of it, no.

10      Q.   That was perhaps a bad question.  Are you

11  aware of any change in the law that prompted the

12  legislature to act to make these individuals parole

13  eligible?

14      A.   Well, the law would have had to have

15  changed for that to be the case.  That's the best way

16  for me to answer that question.  Once notified -- the

17  parole board was notified, then we acted to follow the

18  law, or the court, whichever that it was, or both.

19           (Deposition Exhibit No. 4 was marked for

20  identification.)

21  BY MS. BREIHAN:

22      Q.   Let me show you what I've marked as

23  Exhibit No. 4.  It's Bates labeled AGO1276 through

24  1278.  Let me know if you recognize this document.

25           Do you recognize this?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 94 of 244

1    A.    Yes.

2    Q.    What is it?

3    A.    That would have been the operational memo

4    that directed staff to begin conducting hearings for

5    those folks that had -- that were related to Senate

6    Bill 590, which allowed juveniles under 18 that had

7    previously not been allowed to have hearings have

8    hearings conducted.

9    Q.    And it looks like the memorandum subline is

10   analysis of Senate Bill 590-juvenile reviews, correct?

11   A.    Correct.

12   Q.    Why was Kelly Dills conducting an analysis

13   of Senate Bill 590?

14   A.    I mean, I think that's a question better

15   asked to Kelly Dills.  But whenever there was a change

16   to the parole board through statute, through some court

17   action, whatever it might be, Kelly has always worked

18   with our lawyers, the general counsel to review those

19   things.

20        So that's my answer to that.  She was

21   looking at it from that vein as well, to ensure that

22   the parole board does what the statute and the law says

23   that we're supposed to minimally do with 590.

24   Q.    And if you look at her email to Jeff Earl,

25   she says that, "Our position is neutral with regard to

Pohlman USA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 95 of 244

1    the bill language."

2              That would seem to suggest that this

3    analysis was provided before the bill was passed; is

4    that fair to say?

5         A.   You'd have to ask her.  But the board is

6    going to be neutral.  I mean, I can't tell you that

7    that's the exact case during the timeframe that you

8    just described.  But the parole board isn't going to

9    state how they feel about some court action one way or

10   the other.

11             We're simply going to go about the business

12   of doing our jobs and make sure that we're compliant

13   with that court action, or court order, or whatever

14   that it might be that directs us accordingly.

15        Q.   Would the board ever give a non-neutral

16   position with regard to proposed legislation?

17        A.   Would the board give a position?  Could you

18   clarify that?

19        Q.   Sure.  Here Kelly is saying our position is

20   neutral with regard to the bill.  And my question is,

21   were there ever instances where the board would give a

22   position that was not neutral with regard to proposed

23   legislation?

24        A.   I'm not aware of anything like that.

25        Q.   And it looks like the email she consulted

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 96 of 244

1  with you and Julie on conducting this analysis; is that

2  Julie Kempker?

3      **A.   Yes.**

4      Q.   Do you recall working with Ms. Dills and

5  Ms. Kempker on this memo analyzing Senate Bill 590?

6      **A.   The memo was likely more the work of Julie**

7  **and Kelly working with the general counsel's office to**

8  **make sure that we have all of our bases covered.**

9          **Those -- they're put in front of me for**

10 **review, and if I have any questions, I ask questions.**

11 **And if I don't, if I'm good with what's written in**

12 **front of me and satisfied, then I will certainly sign**

13 **it and get on with implementing it, as we did.**

14     Q.   Do you recall reviewing this memo before it

15 was sent to Mr. Earl?

16     **A.   I've seen the memo.  I know Kelly worked on**

17 **it.  As to the time frame, I don't know when.**

18     Q.   I'm asking if you did review it before it

19 went to Mr. Earl?

20     **A.   Again, I just don't recall if I did do**

21 **that.  Kelly may have brought that to me to review.**

22     Q.   Did you ask Kelly or Julie any questions

23 about this memo?

24     **A.   I'm not sure what I would have asked.  If I**

25 **would have asked any questions about this, or anything**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 97 of 244

1 that directs the parole board otherwise from our usual

2 operating pace, are we covering everything that the law

3 says we're supposed to be covering in this memo before

4 we put it out, that would be a standard question that I

5 would have.

6      Because in my mind's eye, what I saw before

7 me -- and I think it was discussed at the parole board

8 meeting with Kelly sharing this new information to the

9 parole board, we were being told for folks that are

10 under the 590, you know, umbrella that were under 18

11 and had a life sentence without parole, they now will

12 be heard by the parole board.  That's the biggest

13 nuance you walk away with in that discussion.

14      All of the particulars that follow might

15 have been referenced, I would have expected they would

16 be captured, provided to the board to be sure that

17 we're following every aspect of whatever the law was.

18 And that's for anything that comes down that way from

19 the court.

20      Q.   Did you agree with Kelly's analysis in this

21 May 26th, 2016 memorandum?

22      A.   Yes.  Or I wouldn't have signed it.

23      Q.   And she acknowledges on the second page of

24 her memorandum, "there's ambiguity in the statute,"

25 correct?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 98 of 244

1      A.    Yes.

2      Q.    And she acknowledges also that, "It's

3  difficult for the board to determine subsequent growth

4  and increased maturity since the underlying offense,"

5  correct?

6      A.    Yes.

7      Q.    And she also mentions that there would be

8  limited file material available and limited resources

9  that would impede the board's ability to assess the

10  offender's subsequent growth and increased maturity?

11      A.    Yes.

12      Q.    And you agreed with all that?

13      A.    **I understood the points that she was**

14  **making, yes.**

15      Q.    And agreed with that, correct?

16      A.    **And I signed it.**

17      Q.    And agreed with that, correct?

18      A.    Yes.

19      Q.    Thank you.

20           She also mentioned that there's some

21  precedent, she mentions the victims of domestic

22  violence cases.  Are those the cases you were talking

23  about earlier?

24      A.    **I think that would have been, yes.**

25      Q.    And how were those hearings handled

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 99 of 244

1    differently, if at all, from this standard parole

2    hearing?

3         **A.    I think for that hearing that day, the only**

4    **thing I can tell you is, that I seem to recall, that**

5    **there was, in addition to the analyst, there were at**

6    **least two other members that might have been on that**

7    **panel.  You'd have to go to the board action sheet to**

8    **be able to determine that.  But it just seems that's a**

9    **recollection that I do have for those four hearings.**

10        Q.   And these four hearings, the women who were

11   victims of domestic violence, were they allowed to have

12   one delegate present?

13        **A.    I don't recall that.**

14        Q.   Were they allowed to present witnesses?

15        **A.    I don't believe that anything changed in**

16   **the policy about the delegates.  Or has changed.  So**

17   **while I don't have any sort of an absolute**

18   **understanding, I believe that there would have only**

19   **been one delegate allowed at that hearing on behalf of**

20   **that offender.**

21        Q.   Are there similar limitations on how

22   victims or victim's representative may attend the

23   hearing?

24        **A.    No.**

25        Q.   And Kelly --

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 100 of 244

1          A.    Can I qualify that?

2          Q.    Please.

3          A.    On a victim's, you still have to meet the

4    qualification to be considered a victim by statute.  If

5    you meet that, the parole board can't tell you, no,

6    that you can't come to the hearing if you want to come

7    to the hearing.

8                So there have been cases where there have

9    been ten people or more that were victims.  More than

10   that.  If they fit that criteria because they're a

11   large family, and they all wanted to say something at

12   that hearing, if you fit that qualifier, there could be

13   multiple numbers of people speak.

14         Q.    Kelly's memo also indicates on the second

15   page, that "risk reduction is assessed using a

16   validated tool."  The paragraph that starts with the

17   fifth point.

18                What validated tool is used by the board to

19   assess risk reduction?

20         A.    Oh, that would be the salient factor risk

21   assessment.

22         Q.    The salient factor score?

23         A.    Yes.

24         Q.    Is that used in -- strike that.

25                Is that score used for Senate Bill 590

Pohlman USA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 101 of 244

1   hearings?

2        A.   It's used for all hearings.

3        Q.   Regardless of the inmate's sentence?

4        A.   There's going to be -- salient factor

5   scores are assessed on all offenders that come before

6   the parole board.  If an offender comes to a hearing,

7   there's going to be a salient factor score in that

8   report, in that file somewhere, that is there.

9             They can change.  They're one of the few

10  documents that can actually change because of good

11  behavior or bad behavior.

12       Q.   And is the salient factor score assessed

13  periodically?

14       A.   You mean is it tweaked periodically?

15       Q.   When is the salient factor score

16  calculated?

17       A.   Somewhere at the beginning of their

18  institutional stay.  You'd have to ask the people that

19  do that.  I do know they're made available to the

20  parole board for our hearings.  There may be an initial

21  salient factor, which I'm sure does occur at some

22  point, early on.

23            I think there are 14 points that make it

24  up.  It may have been reduced in the last cycle.  I

25  know it was being looked at.  And information relative

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 102 of 244

1   to those 14 points can change.  Some stuff is static,

2   like the crimes and your crime history.  That doesn't

3   change.

4          There can be other things that can change.

5   Your behavior.  How you addressed any -- how you may

6   have completed programs to address issues.  And those

7   are positives.

8          So salient factors with an offender that is

9   doing well in prison, his score can be a negative five,

10  and he can make it a positive something.  Or a positive

11  six.

12         I mean, they can -- the point I'm making is

13  that they can change.  If you're accomplishing things,

14  it can be captured in that salient factor when they

15  review it the next time.

16         I'm not sure how frequently they do it.  I

17  don't know.  That's an institutional thing.  I'm not

18  really up to speed how frequently they review the

19  salient factors.

20     Q.   But the salient factor score is the only

21  risk assessment tool that's used in parole hearings; is

22  that correct?

23     A.   That is correct.

24     Q.   So it's a pretty important tool or

25  guideline for the hearings, correct?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 103 of 244

1       A.   It's a guideline, yes.

2       Q.   Do you know, when you sit down to conduct a

3  hearing, when the last time the salient factor score

4  was calculated?

5       A.   It would be in the file material.  It's an

6  actual sheet that has a score at the bottom of it with

7  a date when they did it.  If it was updated, there

8  would be a later date, things of that nature.

9       Q.   So it should be in the parole file is what

10 you're saying?

11      A.   It's going to be somewhere in his file.  In

12 his material somewhere.

13      Q.   So at some point after Ms. Dills wrote this

14 memo of May 26th, 2016, and you sign off on it and

15 agreed with it, did the board implement any sort of

16 process for conducting the Senate Bill 590 hearings?

17      A.   When you say "process," what do you mean?

18      Q.   Well --

19      A.   I mean, we talked about the bill.  We

20 talked about conducting hearings that we were now being

21 required to.  There was some discussion about that at

22 board meetings I know.

23      Q.   So before Senate Bill 590 was passed the

24 board was conducting hearings on a regular basis,

25 correct?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 104 of 244

1     A.    That is correct.

2     Q.    And Senate Bill 590 was passed and it made

3  a certain class of inmates now eligible for parole

4  consideration, correct?

5     A.    That's correct.

6     Q.    So what did the board do in response to

7  that change in the law in order to hear those annual

8  eligible inmates for parole consideration?

9     A.    You mean did we create some new way that we

10  would conduct the hearing?

11     Q.    Yeah.

12     A.    I don't believe that we initiated some new

13  process by which we conducted hearings.  I believe --

14  again, I only sat on one of these -- I believe there

15  was a document, that the analysts at the hearing would

16  have, that would ensure that these certain questions

17  were asked of those particular offenders.  And that the

18  board member would fill that out at that hearing.

19            But beyond that, nothing that I'm aware of

20  changed the process by how we questioned people.

21            Generally speaking, these offenders were

22  now eligible for parole.  And in large part they would

23  go through the process of an interview with an IPO.

24  They would be a prehearing report.  In that report,

25  there might have been a paragraph where it talked about

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 105 of 244

1   this person's status change as a result of 590.   It was

2   just an informational piece in there.   And the rest of

3   the report was largely the same.

4          Q.   And that was the same process for every

5   inmate who was now eligible under Senate Bill 590 for a

6   parole hearing?

7          A.   I believe it was.

8               (Deposition Exhibit No. 5 was marked for

9   identification.)

10  BY MS. BREIHAN:

11         Q.   I'm going to show you what I've marked

12  Exhibit 5.   This document is Bates-stamped AGO1309

13  through 1313.

14              Take your time to review this.   Let me know

15  when you've had a chance to do that.

16         A.   (The witness complied.)

17              I think I remember seeing this.

18         Q.   And what is it?

19         A.   Looks like an email to one of the general

20  counsel attorneys talking about how to process the

21  petitions.   If they fit the criteria, et cetera, things

22  of that nature.   If they didn't, issue them a letter

23  identifying that.

24              And in reference to materials being

25  available to the board that -- looks like if they would

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 106 of 244

1   warrant, they would extend it to try to get the

2   materials for the hearing.

3           And I believe that's all that it states.

4       Q.   So this is a July 18th, 2016, email from

5   Kelly Dills to Jay Boresi, and you're one of the people

6   copied on email; is that correct?

7       A.   Yes.

8       Q.   And Kelly indicates that you and she met

9   the week prior to come up with a plan as to how to

10  process petitions for inmates who were now eligible for

11  parole under 590, correct?

12      A.   Yes.

13      Q.   She talks about scheduling hearings within

14  90 days of processing petitions in order to allow the

15  timeline to conduct a thorough investigation.

16          Do you know what she means by thorough

17  investigation there?

18      A.   Rereading this, my take would be to get

19  information relative to the case.  Things of that

20  nature.

21      Q.   Where would you get that information?

22      A.   You'd start back at the local Probation and

23  Parole office, and then go back to the court.  I mean,

24  you just go backwards.  That would be my assessment of

25  that.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 107 of 244

1        Q.    And who's conducting that investigation?

2        **A.    I'm certain that's going to be given out to**

3   **one of the district offices and their staff to do that.**

4        Q.    Can I clarify?  That would be an

5   institutional parole officer or somebody else?

6        **A.    I can't specifically say it would be an**

7   **institutional PO, in actuality, it would be in the**

8   **field.  The field, PSI, and things of that nature.  And**

9   **the guy comes to the prison, and now the institutional**

10  **parole officers are involved as well.  It may be a**

11  **combination of the two of them coming together.**

12       Q.    And aside from the local Probation and

13  Parole office and court records, is there anywhere else

14  that whoever is going to be looking for this thorough

15  investigation looking for material relative to these

16  parole considerations?

17       **A.    I'd have to say you'd be relying upon the**

18  **district administrator and Michelle Kasak, Kelly, and**

19  **anyone that might get pulled into it to help get to**

20  **that thoroughness that you're speaking to.**

21       Q.    Was there any written policy or procedure

22  for these district offices in how to conduct this

23  investigation?

24       **A.    To conduct an investigation?**

25       Q.    The one here in Kelly's email based on your

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 108 of 244

1  discussion with her.

2          A.   Pertaining to this?

3          Q.   Uh-huh.

4          A.   I couldn't answer that question.  Our staff

5  are trained on how to conduct investigations from the

6  date that they're hired.  There's training that you go

7  through, training to update those kinds of things.

8               But as it relates to just this, I couldn't

9  answer that question.  That would be something for

10 Michelle Kasak, or Julie, or perhaps Kelly to answer.

11         Q.   So who receives this regular training on

12 how to conduct investigations?

13         A.   What I'm saying is that when POs come into

14 the -- this line of work, they go through a training

15 early on.

16              And then there's journeyman training that

17 occurs.  I mean, every year staff go through 40 hours

18 of training, something of that nature.  And I'm just

19 going to gather that a part of that discussion at times

20 will involve investigations.  I don't specifically know

21 that to be the case.  Conducting investigations for a

22 field staff is a big part of their world.  We're

23 talking about field staff.

24         Q.   So you don't know whether there's training

25 provided to parole staff on how to conduct

Pohlman USA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 109 of 244

1    investigations in the context of Senate Bill 590?

2         A.   I said initially.  Their initial training

3    is what I said.

4         Q.   But you don't know; you're making an

5    assumption?

6         A.   As it relates to this, I don't know

7    anything that was said pertaining to this.  When

8    they're first hired, I have no doubt when they're first

9    hired out of school that a part of their training has

10   to be this is how you conduct a PSI investigation for

11   example.

12        Q.   What's that stand for?

13        A.   A presentence investigation.  Or SRA score.

14        Q.   Is the PSI conducted in every case?

15        A.   No.  It's at the Judge's request.  It's

16   called SARS now.  It's an acronym that replaced PSI.

17   This replicates the PSI request from the Judge who

18   orders it if he wants a score.

19        Q.   And toward the bottom of this first page of

20   the exhibit, leading onto the exhibit, Kelly also

21   notes, "If release is denied then the board will likely

22   cite institutional adjustment, or that the inmate would

23   be unlikely to remain at liberty without violating the

24   law rather than seriousness or circumstances

25   surrounding the present offense.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 110 of 244

1          Why is that the case?

2          A.   I guess this is the aspect of that that it

3   still lends itself to the parole board member's

4   discretion if they believe this person could remain in

5   the community or not without violating the law.

6          I mean, that's my read on that.  As to what

7   discussion might have been had about that, I just don't

8   fully recall it.  To me, this was her talking to the

9   attorneys.  Jay Boresi was the attorney there.

10          Q.   That's right.  And if you look on the first

11  page, she starts out the email to Jay mentioning that

12  she met with you.

13          A.   Yeah.

14          Q.   To piece this plan together.  So I assume

15  that you and she worked together on this process that

16  you outlined, correct?

17          A.   We certainly talked about it.  I don't

18  recall the specifics of what that discussion was.  I do

19  know that to the sentence on the second page that

20  you're referring to, it allows the parole board member

21  to still make a decision for or against with their

22  discretion utilizing that sentence structure in the

23  decision.

24          Q.   So are you -- is it your understanding that

25  Kelly Dills' opinion was that -- was the board should

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 111 of 244

1  not be denying parole based on the circumstances of the

2  offense in these 590 hearings, either from the exhibit

3  you have in front of you, or your memory of

4  conversations with Ms. Dills, or communications with

5  Ms. Dills?

6          **A.    That would be the inference, yeah.**

7          Q.    Did you agree with that?

8          **A.    If we have decisions that only they had.**

9  **If that was the word that was being utilized, then**

10 **certainly I agreed with it.  I don't know that I had**

11 **another question about it, because I don't recall our**

12 **specific discussions.  I'm sure Kelly may know what**

13 **that was.**

14         **As it relates to me questioning the aspect**

15 **of the case where you talk about the case itself, and**

16 **that not being considered or that being considered, I'm**

17 **sure that there was some discussion about that.**

18 **Obviously this is where we landed at.  That would have**

19 **been with my involvement, yes.**

20         Q.    I want to make sure I understand.

21               Is it your opinion individuals who are

22 eligible for parole under Senate Bill 590, juvenile

23 offenders should not be denied parole based on the

24 circumstances of the offense?

25         **A.    You mean solely on that?**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 112 of 244

1          Q.    Let's start with solely.

2          **A.    I guess my issue and my discussion would**

3    **have been with Kelly on that topic.**

4          Q.    Well, let's set aside the exhibit.

5                Just as you sit here today, you have

6    37 years of experience, you were the chair of the board

7    for, what, eight years?

8          **A.    Seven years.**

9          Q.    Seven years.

10               And you were the chair of the board during

11   time when the bill came out and you were coming up with

12   a plan to implement in.

13               In your opinion, and your review of the

14   bill, and implementation of the bill, in your opinion,

15   would it have been proper to deny individuals eligible

16   for parole under Senate Bill 590 based solely on the

17   circumstances of the offense?

18         **A.    I think since I looked at these**

19   **cases -- meaning these juvenile withouts -- once they**

20   **were eligible, like I did any other case that was a**

21   **juvenile.  Which had been any that had a hearing.**

22   **Which, they just weren't under this umbrella.  And I**

23   **know those were denied because of the seriousness of**

24   **their offense.**

25               **I don't know that I would say that you**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 113 of 244

1   can't consider that.  I just don't recall that.  And I

2   don't want to say something if I just can't recall it.

3        Q.   I'm not asking you to recall what

4   your -- what your discussion with Kelly was.  You've

5   already testified you don't remember specifics.  I'm

6   asking your opinion.  Whether it would be proper to

7   deny a juvenile offender who's eligible for parole,

8   deny them parole, based solely on the circumstances of

9   the offense?

10       A.   I think that you could.  I think that you

11  could.  Given the nature of the offense, we deny parole

12  for offenders that have very heinous offenses, and that

13  is the reason that it's given at times, is the nature

14  of the offense.

15            And there could be some other things tied

16  to it.  But that may be the only thing at times.  For

17  these cases, these crimes, they're serious crimes, and

18  you can be denied based upon that point.

19       Q.   So you and Kelly disagreed on that point

20  then?

21       A.   I'll be honest that I don't recall a

22  discussion.  I do know Kelly and I did disagree on

23  things at times.  Okay.  If this is one of things,

24  could have been.  I'll bet she recalls the discussion.

25       Q.   But it looks like you agreed with her

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 114 of 244

1  analysis, and her summary of her discussion with you

2  about the process, including that parole be denied

3  based on the circumstances of the offense, right?

4        **A.   I do see that, yes.**

5        Q.   Did you and Kelly consult with any experts

6  to implement this process?

7        **A.   When you say "experts," what do you mean?**

8        Q.   Did you consult with any psychologists?

9        **A.   Not that I'm aware of.**

10        Q.   Or any psychiatrists?

11        **A.   Not that I'm aware of.  I'm not sure that**

12  **Julie, or Michelle, or Kelly, as a subgroup, may have**

13  **gotten into discussion about that kind of a thing.  I**

14  **mean, I just don't know that that ever came up before**

15  **this was implemented.**

16        Q.   Or any at any time before or after?

17        **A.   I'm just not aware if that happened.**

18        Q.   And then Kelly asks whether the process

19  will need to be defined in the Blue Book or Code of

20  State Regs at the close of her email.

21            Do you see that?

22        **A.   Yes.**

23        Q.   Do you know whether the regulations were

24  revised after Senate Bill 590 was passed?

25        **A.   If it needed to be revised in the Blue**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 115 of 244

1  Book, they're always updating it.  And my guess is then

2  that that was revised.

3      Q.   Do you recall specifically whether it was

4  or wasn't as you sit here today?

5      A.   As I sit here today, I don't know that that

6  was revised.

7           But my guess is that when it's a statutory

8  change that guides the parole board, and it affects the

9  offenders, that would be information for the offenders

10  to be aware of, that that's likely in the Blue Book.

11      Q.   And as chair was one of your duties to make

12  sure that that happened?

13      A.   Yes, it would be.

14           MS. BREIHAN:  We can take a break.  Five

15  minutes real quick.

16           (A break was taken.)

17  BY MS. BREIHAN:

18      Q.   When you were talking about the hearing

19  process earlier today, one of the things you talked

20  about was the prehearing between the inmate and the

21  institutional parole officer, correct?

22      A.   Yes.

23      Q.   And Exhibit 2 was a procedure that talked

24  about the prehearing report which is the work product

25  of that prehearing interview with the inmate, correct?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 116 of 244

1          A.    Right.

2                (Deposition Exhibit No. 6 was marked for

3    identification.)

4    BY MS. BREIHAN:

5          Q.    I'm going to show you Exhibit 6.  This is

6    Bates-stamped AGO30 through 41.

7                Do you recognize this document, sir?

8          A.    I mean, I don't specifically recall it, no.

9          Q.    So you don't know if you've seen it before

10   today?

11         A.    It's just not jumping out at me.  My answer

12   would be I don't recall it.

13         Q.    The procedure number P64-1, the very last

14   page of that Exhibit, it refers to an attachment called

15   the interview and assessment worksheet.

16               Are you familiar with what the interview

17   and assessment worksheet is?  I'm looking at

18   Exhibit No. 2 related to the prehearing report.

19         A.    If you can show it to me.

20         Q.    The interview and assessment worksheet

21   referred to as an attachment to procedure number P64.1.

22         A.    I would have to see it to be able to say

23   yes to it.

24               MS. BREIHAN:  Would you be able to provide

25   that attachment?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 117 of 244

1          THE WITNESS:  Is it a part of the

2   prehearing report?

3          MR. CRANE:  You wouldn't see it probably.

4   I'll see if I can get a copy of it.

5          THE WITNESS:  The IPO utilizes this to

6   conduct their interview, I'm guessing, with the

7   offender.  Maybe.

8          MR. SPILLANE:  I don't know if you want me

9   to intervene here.  I think that's what it is.

10         MR. CRANE:  Well, the one she mentioned in

11  the manual would be used in non-juvenile life without

12  parole cases.

13         MR. SPILLANE:  Then I misunderstood.

14         THE WITNESS:  This is an IPO document that

15  they use for work

16  BY MS. BREIHAN:

17     Q.   And you're referring now to Exhibit 6?

18     **A.   Yes.  This is what the IPO goes through**

19  **with the offender.  I've not seen the document before.**

20     Q.   This Exhibit 6 along the top juvenile life

21  with a PHR worksheet, correct?

22     **A.   Yeah.  I've only done one hearing with a**

23  **juvenile life without and I don't remember a document**

24  **like this.  This is thicker than a prehearing report,**

25  **or as thick as.**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 118 of 244

1    Q.    What juvenile lifer hearing did you

2  conduct?

3    **A.    I think I did one.**

4    Q.    Do you know the inmate's name?

5    **A.    I think one of the folks that's suing us.**

6    Q.    Do you remember the outcome from that?

7    **A.    No.**

8    Q.    And you said you don't recall this

9  Exhibit 6 being in that inmate's parole file?

10    **A.    There's a lot of documents in these files**

11  **and not a lot in some.  I see a lot of documents every**

12  **day.  I just can't tell you that I've seen this and I**

13  **know it for a fact.**

14    Q.    So if there were a new worksheet that was

15  developed for IPOs to utilize during prehearing

16  interviews with lifers, as chair of the board would you

17  have reviewed and approved that worksheet?

18    **A.    Could have been brought to my attention.**

19    Q.    Would it have been used without it having

20  been run by you?

21    **A.    I would want to think not.  But as to**

22  **whether I saw this or not, I mean, I'm not sure what**

23  **this document is in front of me.  This is something**

24  **that -- if this is something that the IPO fills out for**

25  **the purposes of conducting or completing his report,**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 119 of 244

1    the question is then does this worksheet document stay

2    in the file.  And I don't know that it does.

3              There are occasions where the prehearing

4    report, and discussion with the parole board -- we may

5    ask for it to be tweaked.  I know that the -- they'll

6    go and look at that.  We've done that with edit

7    sections to the reports in the past.  Expecting that

8    what the board said we should do is what they follow up

9    on.

10             This is something that would have

11   certainly, if there were any issues with it, probably,

12   may have come to the board.  But I don't know if it was

13   created by the DA for their staff to thoroughly conduct

14   an interview with that offender.  You'd have to ask one

15   of them.  I just don't recall this worksheet.

16        Q.   So who would know that?  Michelle Kasak?

17        A.   She would know that.  She's over all the

18   institutional staff.  Because Kelly's been involved

19   with this, she may be aware of it.  She was

20   institutional administrator, so she may be aware of

21   that.

22             This might be the worksheet the IPO works

23   from to complete the report relative to the pieces that

24   need to be there on 590.  And that might not be

25   something that is in the file for the parole board to

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 120 of 244

1  see, to see their worksheet and their notes and things

2  like that.  Keeping in mind there are worksheets for

3  hearings now.

4          I've not seen an IPOs worksheet in the file

5  before.  It could be there.  But I've not seen that.  I

6  don't know if it's for them and their dictation.  But

7  that's what this is.

8      Q.   Do you know whether IPOs were given any

9  training in how to use this worksheet or run prehearing

10  interviews with those impacted by Senate Bill 590?

11     A.   I think those are questions for the staff

12  at the district offices.  Michelle and her folks.  Very

13  well could have been.  There was a change, so likely

14  that there may have been.

15     Q.   You testified earlier that one of your

16  duties as chair of the board was to help arrange

17  training for parole staff, correct?

18     A.   Yeah.  Yes.  That's a global description of

19  my duties.  When I say that, we have staff that are

20  required to get 40 hours a week of training.  If they

21  don't get their training, some of that could occur in

22  terms of the 40 a year.

23          So you want to ensure that we're meeting

24  that, because if we don't get our training done, then

25  we get hit from training, who sends over a memo that

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 121 of 244

1  says these people haven't got their hours in.  We're

2  there to ensure our staff are completing

3  the required training.

4      Q.  But you personally did not ask for any

5  training to be done for IPOs specific to Senate Bill

6  590?

7      A.  I did not.

8      Q.  Why not?

9      A.  At the time when this all came down, for

10 me, it was a change that I thought, one, it would

11 minimally affect us operationally, because there wasn't

12 a lot of numbers; and two, we're being asked to conduct

13 a parole hearing for an offender that couldn't have a

14 hearing previously.

15          So my first upshot of this was that that

16 person is now eligible for parole.  You know.  So we'll

17 get them into the queue, and we'll conduct a parole

18 hearing with a document that we already use.  And use

19 what we're mandated to use.  That's where the task

20 force goes into play, and ensures that we're

21 implementing it the way that the court or the law that

22 changed it says we need to implement it.

23          But at the upshot, you're not talking about

24 a bunch of offenders.  Probably less than 50.  When you

25 consider that we conduct almost 12,000 hearings, that's

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 122 of 244

1    not a lot of hearings to get prepared for.  So we

2    already conducted hearings on people that were under

3    18, not just under this catch mitt.  These folks are

4    now free to have a hearing.  So we go out and conduct a

5    hearing.

6              As to the other nuances consistent to the

7    statute, we would at least make sure we were being

8    fully compliant.  That's where Kelly, working with the

9    general counsel, and Julie working with our lawyers, to

10   make sure that we are at least minimally meeting those

11   needs.

12        Q.   One of the elements that's laid out in part

13   of 590 that the board is required to consider is the

14   defendant's age, maturity, and intellectual capacity,

15   and mental and emotional health and development at the

16   time of the offense.

17             How is the board equipped to assess all of

18   those factors in these cases?

19        A.   That's a very good question, because

20   they're not clinicians.  You have people appointed to

21   the board that don't have specialized training to be

22   board members.

23             If I look at the current makeup of the

24   board, there was one person from the department, that

25   was me, that had any training related to offenders.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 123 of 244

1          So it's difficult to be asked to play

2     clinician when you're not, because that's what that's

3     asking for.  For you to make a clinical assessment, and

4     you're a parole board member, and you're not a

5     clinician.

6          If there are reports that are available,

7     you can read and attempt to interpret it.  If you have

8     a question about it, you can have your analyst probe

9     that for you.

10          But at the end of the day, when you're

11    reading those reports that are clinical in nature that

12    are in some files, if you're unclear, you do what you

13    can to become clear.  And that's ask questions with

14    your analyst to clarify it.

15          Otherwise you're asking nonclinical people

16    to make a clinical assessment, and that's tough.

17    That's my answer on that.  It's not what you were

18    looking for, I'm sure.

19          The reality is that there are sheriffs on

20    the parole board.  They're not counselors.  They're not

21    psychologists.  But they've gone through some training.

22    They've got the training of the repetition and the

23    experience and the reputation of hearings and

24    conducting them.

25          There are reports available in the file

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 124 of 244

Page 125


from psychologists.  There's a piece of the report

2  about the mental health aspect that's discussed.  And

3  discusses any potential concerns in terms of their

4  mental health that's there for you.

5          If you want to probe that deeper, then I

6  certainly have the ability to have your analyst follow

7  up on that if you want to.  But then beyond that

8  though, if your science background isn't clinical in

9  nature, then it just isn't.  So you're thin to try to

10  make some kind of clinical determination with somebody

11  that's in front of you.

12      Q.   Many of the current board members,

13  currently and historically, are former representatives,

14  too, correct?

15      A.   That is correct.

16      Q.   By and large they're just not qualified to

17  be making this kind of clinical evaluation as you just

18  pointed out, correct?

19      A.   Well, I'm not going to go as far as to say

20  that.  I think people come to these jobs with a wealth

21  of knowledge and understanding of the areas.  You glean

22  some things.  Some folks can be a bit more

23  sophisticated in understanding of that.

24          But if you want a clinical assessment,

25  which I think that's how that's framed there, those

Pohlman USA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 125 of 244

1 folks aren't going to be able to.  Reasonable people

2 can make some assessment by either reading or

3 reviewing, and go from there with it.

4          I think that's what those members attempt

5 to do, when they're coming to the point of discussing

6 about someone, and questions of psychology or pathology

7 come up, I think you do the very best you can.  If you

8 need clarification, you have the ability to get

9 clarification.

10      Q.   And you testified you only conducted one of

11 these Senate Bill 590 hearings, correct?

12      A.   I believe, yes.

13      Q.   How many of them have you voted on?

14      A.   I don't have that number.  There haven't

15 been that many.  The way that it works is that a

16 file -- unless I sat in on that hearing -- beyond that,

17 the files will go to all of the board.  And once

18 there's four votes one direction, the chair may never

19 see that file.

20          So once there are four votes the process

21 begins to make notification of the decision.  If you

22 have a that panel votes one way, and the next three

23 folks voted the same, you would have -- if it was a

24 seven-member board, you'd have at least three people

25 that didn't see that file.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 126 of 244

1      Q.    So all the Senate Bill 590 hearings are

2   majority board decisions, correct?

3      **A.    Correct.**

4      Q.    They're not full board decisions?

5      **A.    Yes.**

6      Q.    Once a majority decision reaches the file

7   it stops moving at that point, correct?

8      **A.    Yes.  Because -- yes.**

9      Q.    And earlier you testified about these

10  executive sessions where you might discuss longer-term

11  sentences, where they decided to grant, and might bring

12  it up for group discussion, do you recall any of the

13  executive sessions having any discussions about these

14  juvenile offenders impacted by Senate Bill 590?

15     **A.    No, I sure don't.**

16     Q.    And all of these Senate Bill 590 hearings

17  are by the panel, not the full board, correct?

18     **A.    Yeah.  I think they're the exact same with**

19  **a panel hearing.**

20     Q.    And so aside from the one board member

21  who's present on that panel, the other board members

22  that vote on that file have not met personally with the

23  inmate, correct?

24     **A.    Yes.**

25     Q.    Are board members required to review parole

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 127 of 244

1  files before they note their vote?  Cast their vote?

2       A.   Okay.  What do you mean "review the file?"

3       Q.   Is there a procedure, or operational memo,

4  or directive that requires board members to review

5  parole files prior to voting on a case?

6       A.   If you're not at the panel hearing, where

7  you know you were given the file.  The other files

8  are those conducted by other panels that are put on

9  your bookshelf.

10           The members review each of those files

11 prior to their voting on them.  And then they move it

12 along to the very next member.  That's the process.

13      Q.   And how do you know that's the process?  Is

14 that written down somewhere as a directive?

15      A.   I can't say it's written down.  I don't

16 know that to be the case.

17           I can only tell you that when a panel comes

18 back from a hearing, the parole board analyst takes

19 those files and moves them to the board member that

20 would be in line next.  Those files work their way down

21 to each member to review the individual files however

22 they like, and then vote on the file after they

23 reviewed it on the board action sheet.  And if it's not

24 final, they move it to the next person in line.

25      Q.   And the line succession is people sitting

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 128 of 244

1    in the office, correct?

2          **A.   You either go this direction or that**

3    **direction.  You move every six months.  I think they**

4    **change directions.**

5          Q.   Either clockwise or counterclockwise?

6          **A.   Yes.  Every six months.**

7          Q.   And as with all the other hearings, are

8    these Senate Bill 590 hearings recorded?

9          **A.   Yeah.  It's treated like any parole**

10   **hearing.**

11         Q.   And how long are the recordings kept?

12         **A.   I believe they're kept one year.**

13         Q.   Can you talk me through exactly when the

14   initial vote occurs?

15              So, let's say that interview portion with

16   the inmate is concluded, they're removed from the room,

17   what does the panel do next?

18         **A.   The panel sits and deliberates over what**

19   **they want to do.  And you may have three folks of three**

20   **different mindsets.**

21              **I know the inference might be that because**

22   **you have a member there that he guides what's going to**

23   **happen.  Well, that just isn't the case.  You have some**

24   **very sharp people, if you're a smart member, that you**

25   **should be listening to as well.  The district**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 129 of 244

1 administrator.  And the parole board analyst,

2 understand, you know, this process as well as anybody.

3 Or maybe better than most.

4          And the group deliberates on a date, and

5 then they may agree.  There are certainly split

6 decisions.  And if there's a split decision between an

7 analyst and a board member, it comes to the full board

8 for review.  Most cases do anyway.

9          But you'll see a date put down on the board

10 action sheet.  Those are the files that are then

11 brought back to the office; that are then placed in

12 succession to the next person that would be reviewing

13 them.  The next member that would be reviewing them and

14 so forth.

15          The vote occasion immediately after the

16 hearing.  The initial vote.

17     Q.    Understood.  And as with any other hearing,

18 the prosecutor is permitted to attend, correct?

19     A.    What do you mean "as with any other

20 hearing?"

21     Q.    As with any other regular parole hearing?

22 In SB 590 hearings, the prosecutor is permitted to

23 attend.

24     A.    As a delegate.  If he wants to be a

25 delegate.  I don't see that happening.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 130 of 244

1    Q.   So the prosecutor's not permitted to appear

2    as the inmate's delegate?

3         **A.   Well, I mean, what I'm saying is, that**

4    **aside from victim's hearings, aside from the victim**

5    **hearing, I've not had a prosecutor at a hearing that**

6    **I've ever been at.  And they're certainly not going to**

7    **appear as the delegate on behalf of the offender.**

8         Q.   But they're permitted to attend, correct?

9    If the prosecutor wanted to attend a SB 590 hearing,

10   they could?

11        **A.   I believe they can.**

12        Q.   And the victims service office, or a

13   representative of the victim, is permitted to attend?

14        **A.   Whoever in the statute says can attend can**

15   **attend.**

16        Q.   But are there any other exceptions as to

17   who can attend these SB 590 hearings versus who can

18   attend a regular or victim's hearing?

19        **A.   Exceptions?  I don't think so.  Other than**

20   **what's in the statute.  Not that I'm aware of.**

21        Q.   Does the statute talk about who can attend

22   and participate in the hearings?

23        **A.   Again, I would say I don't recall fully**

24   **what the statute says on that.**

25                **(Deposition Exhibit No. 7 was marked for**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 131 of 244

1  **identification.)**

2  BY MS. BREIHAN:

3       Q.   I'm going to show you Exhibit 7.  It's

4  Bates-stamped AGO1508.

5            Do you recognize this document, sir?

6       **A.   I see it's to me.  I'm trying to recall the**

7  **case specifically.  It's just not jumping out at me.**

8  **If you're getting at what did I decide, I'm not sure**

9  **yet.**

10      Q.   Let's take it one step at a time.

11           This appears to be an email from

12  Kimberly Evans to you dated October 7th, 2016, correct?

13      **A.   Correct.**

14      Q.   And the subline is ████████████████████,

15  ████████, correct?

16      **A.   Correct.**

17      Q.   And it looks like she's asking for an

18  accommodation so that the mother of the victim may

19  attend, along with the mother's sister, and the

20  ██████████████████████████████.

21           Is that a fair summary of the email?

22      **A.   That's what it says.**

23      Q.   And Kimberly Evans is the victims services

24  director with the Department of Corrections, correct?

25      **A.   Correct.**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 132 of 244

1        Q.   Do you recall whether you allowed this

2    accommodation for three people to represent the victim

3    at Mr. Richardson's parole hearing?

4        A.   I don't recall what I said decisionally

5    (sic).  I don't specifically recall the case.  And I

6    don't believe that we talked about it in my office.

7             So this was an email correspondence.  I'm

8    not sure if that was a response by email from me or if

9    I wrote something to her.  I don't recollect it.

10   Unless you have something that I can look at.

11       Q.   I wish I did.

12       A.   Okay.  I mean, when I see I get an email,

13   as opposed to her having walked down the hall, tells me

14   that I may have responded by email.  Or we may have

15   discussed it at some point.  But it doesn't jump out to

16   me as to what I said anyway.

17       Q.   If it springs back to mind before the end

18   of the day, let me know.

19            You testified about this board action sheet

20   the panel uses to indicate its initial vote.  I'll show

21   you Exhibit 7.  It's Bates-stamped AGO60 through 61.

22            (An off-the-record discussion was held.)

23            (Deposition Exhibit No. 8 was marked for

24   identification.)

25   BY MS. BREIHAN:

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 133 of 244

1      Q.   Is this the board action sheet?

2      **A.   It is.**

3      Q.   And this form is used in every parole

4  hearing, based on your experience; is that correct?

5      **A.   Yes.**

6      Q.   Are you aware of whether there was any sort

7  of supplement made to this board action sheet for these

8  Senate Bill 590 hearings?

9      **A.   Something that's additional?  I think there**

10  **may be a five-point questionnaire that maybe had been**

11  **attached for those cases, I believe.  Like I said, I**

12  **believe I sat on one, so I think I saw that one time.**

13      **(Deposition Exhibit No. 9 was marked for**

14  **identification.)**

15      Q.   I'll show you Exhibit 9.  It's

16  Bates-stamped AGO28.

17      **A.   Yeah.  I've seen this before.**

18      Q.   Is this the five-bullet point supplement to

19  the board action sheet?

20      **A.   Yes.**

21      Q.   And is this Exhibit 9 used for every SB 590

22  hearing?

23      **A.   I believe that it is.  And attached to the**

24  **board action sheet, I believe.**

25      Q.   Okay.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 134 of 244

1    **A.    Or to the back of it.**

2    Q.    And who's responsible for filling out the

3    lines on this Exhibit 9?

4    **A.    Should be the parole board member in**

5    **attendance.  If there's a question that you don't fully**

6    **understand, maybe the analyst will help you understand**

7    **it better.**

8    Q.    And when does the parole board member fill

9    this sheet out?  Before or after the hearing?

10   **A.    I doubt that it was during the hearing**

11   **because you're probably asking questions.  So it may**

12   **have been after the hearing.**

13   **I can't answer for anyone else.  I'm**

14   **guessing that if I did one of these it was after the**

15   **hearing -- immediately after the hearing -- so you**

16   **didn't forget anything.**

17   Q.    Going back to Exhibit 8, the two-page board

18   action sheet, is some of this information filled out

19   before you cast the initial vote at the parole hearing?

20   **A.    There's some stuff that's up top, like the**

21   **salient factor.  But nothing like in these boxes is**

22   **filled out.  Usually.**

23   Q.    So nothing from the hearing panel comments

24   is filled out?

25   **A.    You mean before a hearing?**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 135 of 244

1      Q.    Correct.

2      A.    No.  This is reserved for when you conduct

3  the hearing, then someone on that panel can make

4  comments in that box.

5            Now, if you're asking me has anyone ever

6  not done that, or looked at that and made a comment

7  down there as a note to themselves, that's a question,

8  perhaps.

9            But ordinarily it's there so if you want to

10  make sure the point is noted for someone else seeing it

11  after you -- because I've written in that box before,

12  "This guy had an excellent interview -- if someone saw

13  that, they may see that, and they may take note of it.

14  Or not at all.  Anyone can make comments in this box,

15  including the analysts or district administrator.

16      Q.    There's a box designated final decision.

17  Do you see that?

18      A.    Yes.

19      Q.    And within that there are two boxes to be

20  checked either appealable or non-appealable.

21            When is a parole board's final decision

22  appealable?

23      A.    I'm not a hundred percent on that.  Most of

24  the parole board's actions is not appealable.  So

25  there's a very limited number of occasions when it is

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 136 of 244

1    appealable.

2          Q.   Are parole board decisions subject to

3    review by the courts?

4          A.   I imagine anything can be reviewed by a

5    court.

6          Q.   Have you ever had a decision that you voted

7    on or rendered that was viewed by a court?

8          A.   I don't recall anything like that.  You

9    mean ruled by the court?  Overturned by the court?

10         Q.   Or considered on the merits at all?

11         A.   There have been suits by offenders against

12   the parole board, and there's been court action that

13   told us we need to do something different in our

14   operation.  Kind of like we're doing today.  A few

15   occasions in my tenure.

16              I don't think I recall a decision that we

17   made and reached, and the guy had a release date or not

18   and the court changed that date.  I don't recall

19   something like that.

20         Q.   Does the inmate get to see this board

21   action sheet?

22         A.   No.

23         Q.   Does the inmate get to see the worksheet

24   that we marked as Exhibit 9?

25         A.   I don't believe they do.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 137 of 244

1      Q.    Does the inmate get to see the prehearing

2   worksheet that the IPO uses?

3      **A.    They're probably looking at it when they're**

4   **using it.  I was an IPO for seven years.  I don't know**

5   **if we had worksheets back then or not.  They can see**

6   **what you're looking at.  If they want to.  I don't know**

7   **the answer to that question.  They may glean something**

8   **from it when they're looking at it if that's what it**

9   **is.**

10      Q.    Does the inmate get a copy of their

11   prehearing report?

12      **A.    No.**

13      Q.    Does the inmate get a copy of the recording

14   of their parole hearing?

15      **A.    No.**

16      Q.    What information is shared with a

17   prosecutor in advance of a hearing?

18      **A.    Nothing, other than the fact that there's a**

19   **hearing date.  At least I've never had a discussion**

20   **with a prosecutor about anything relative.**

21           **I guess I don't understand your question.**

22           **Are you saying they're asking a member,**

23   **what do you think's going to happen?  What's your**

24   **question?**

25      Q.    My question is what information does the

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 138 of 244

1  parole board or parole staff give to a prosecutor in

2  advance of a parole hearing?

3       A.   The prosecutor can get information from

4  victims services and the district offices on things

5  like when the hearings going to occur.

6            But speaking to the parole board, it's not

7  ever happened for me.  And I don't think very many

8  members have had any kind of discussion with a

9  prosecutor about a hearing before the hearing goes on.

10  You'd want to stay away from that.  If it was me, I

11  would.

12       Q.   And what information does the victims

13  services office have access to?

14       A.   They have access there to the file.  I

15  think the general file, that they can work off of it

16  they need to get prepped for whatever their process is.

17            I believe they do have access to either the

18  file or parts of the file.  I'm just not a hundred

19  percent sure on that question.

20       Q.   And do you know what information the

21  victims services office shares from the parole file

22  with the prosecutor?

23       A.   I could never answer that question.

24       Q.   Who could?

25       A.   That would be Kim Evans.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 139 of 244

1      Q.    Do you know who ███████████ is?

2      A.    Who?

3      Q.    ███████████?

4      A.    I don't believe I know that person.

5      Q.    Do you recall maybe conducting his parole

6   hearing in March of this year?

7      A.    I don't remember that.

8      Q.    Well, I will show you, perhaps, something

9   that will refresh your memory.

10     A.    Okay.

11           (Deposition Exhibit No. 10 was marked for

12   identification.)

13   BY MS. BREIHAN:

14     Q.    I'll mark it Exhibit 10.  I'll try to

15   direct you to specific pages AGO2720 through 2996.

16           I will represent to you this was produced

17   by your attorneys as Mr. ████████ parole file.

18           If you would, just look at the very first

19   page.

20     A.    This page?

21     Q.    Does this sheet refresh your recollection

22   about whether you conducted Mr. ██████████' hearing

23   on March 9th, 2016?

24     A.    It says I was there.

25     Q.    Do you recall being there?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 140 of 244

1    A.    No.

2    Q.    Do you recall doing anything to prepare for

3    Mr. ▮▮▮▮▮▮ parole hearing?

4    **A.    If it -- if it was a victim's case, I would**

5    **have had the report prior to the hearing.  If it wasn't**

6    **a victim's case, then I doubt I got anything before the**

7    **hearing.**

8    Q.    Can you tell from the first page of this?

9    **A.    It looks like it was a victim's case.**

10   Q.    And, again, you can tell where I'm going

11   with my questions, but if you could wait for me to

12   finish them it would be helpful.

13   **A.    Sure.**

14   Q.    What indicates to you this was a victim's

15   case?

16   **A.    I just saw Kimberly Evans' name down there**

17   **in attendance.**

18   Q.    And looks like the St. Louis circuit

19   attorney was present as well, correct?

20   **A.    Yes.**

21   Q.    So you would have reviewed this entire

22   parole hearing prior to that date?

23   **A.    I would have reviewed the report prior to**

24   **the hearing.  And I would have had the file access**

25   **during the hearing.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 141 of 244

1    Q.    So you wouldn't have reviewed the whole

2  file?

3        **A.    I didn't have the entire file in my**

4  **possession, that I recall, prior to the hearing.  I**

5  **can't say that a hundred percent.  But that's the**

6  **likely answer.**

7        Q.    So at least to the best of your memory, the

8  only thing that you reviewed prior to Mr. ███████'

9  hearing on March 9th, 2017, was the prehearing report

10 prepared by the IPO, correct?

11       **A.    To my best recollection, I know minimally I**

12 **had that prior to the hearing.**

13            **As to the file, it may have been there, I**

14 **just don't know.**

15       Q.    And would you have reviewed the rest of the

16 file prior to casting your vote in Mr. ███████ case?

17       **A.    I would have been -- in this case, I would**

18 **have reviewed -- I would have had time to have reviewed**

19 **this, and parts of the file prior to the vote, and**

20 **prior to the interview.**

21       Q.    Well, you testified that you only recall

22 seeing the prehearing report prior to the interview.

23       **A.    The file would have been available to me**

24 **before the offender came in that morning.  Because the**

25 **files come down, and then they're at the institution,**

Pohlman USA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 142 of 244

1 they're placed on the desk with the reports beside

2 them.  I had the report from the day before.

3          And then your question was, did I see that

4 file before as well, and I don't recall that.  I do

5 know that the file would have been at the hearing.  And

6 I would have had an opportunity, prior to interviewing

7 him, to have reviewed the file with the report.

8          Because you don't always start out with a

9 victim's case.  You want to get those cases at the very

10 top of the hearing.  But folks may come from a very far

11 distance, and they can't be there that early, so you'll

12 do other hearings before that.  In that case, you have

13 more time to review both documents, the report, and

14 that file.

15          I don't know where the case fell that

16 morning on the docket.

17     Q.   Is there any record that you can look at

18 that would tell you where the case fell on the docket?

19     A.   The docket itself -- sometimes folks don't

20 know that.  There are many occasions where people are

21 delayed for many reasons, and they say, "I'm not going

22 to be there for another hour."  Things like that

23 happen.

24          I can't tell you exactly in what order.  I

25 know the effort is to get those done.  We get those

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 143 of 244

1    done when the victims say they can be there.  If it's

2    11, then that's when we schedule the hearing.

3              The victims unit would know that.  And when

4    it occurred might be another thing, depending on the

5    institution and any issues that day.

6              As to the scheduling, the victims unit

7    would likely have that in their records.  As to when it

8    occurred, if you had a DA that was actually writing

9    down the times, that they went by their name, then you

10   might -- will know in what order that they finally had

11   the hearing conducted.

12        Q.   The prehearing report, looks like it starts

13   on page Bates-stamped 2844.

14             Do you know what I mean by Bates-stamped?

15        A.   You said dates?

16        Q.   Bates.  The number in the middle of the

17   bottom of the page, AGO --

18        A.   I'm looking at 2844 right now.

19        Q.   Okay.  Is this the prehearing report for

20   Mr. ██████████████?

21        A.   Yes.

22        Q.   It looks like it's 13 pages in total?

23        A.   Okay.

24        Q.   2844 through 2856.

25             Is this the sort of standard form for

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 144 of 244

1    prehearing reports that you've seen in your experience?

2         A.   Yes.

3         Q.   So it looks like it was prepared by

4    Jessica Blieseth.

5              Do you know who Ms. Blieseth is?

6         A.   **Jessica Blieseth is an IPO at the Jefferson**

7    **City Correctional Center.  She's at one of the local**

8    **institutions.**

9         Q.   Do you recall discussing this prehearing

10   report with Ms. Blieseth at any point in time?

11        A.   **No.**

12        Q.   Let's look at the first page here.  In the

13   middle of the page, there's some bolded language

14   minimum eligible date, minimum mandatory prison term?

15        A.   **I'm sorry.  What page?**

16        Q.   The very first page, 2844.

17        A.   **Okay.**

18        Q.   Do you see the place I'm referring to?

19        A.   **Under criminal history?**

20        Q.   Above that.  Minimum eligibility date,

21   salient factor score?

22        A.   **Right.**

23        Q.   There's a whole lot of blanks there, right?

24        A.   **Yes.**

25        Q.   Why isn't there anything there for minimum

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 145 of 244

1  eligibility date?

2      A.   Because with a life sentence -- that's only

3  referenced when there's other than a life sentence.  If

4  it's a term sentence, then you'll have some numbers

5  there.  If it's a life sentence, this is always 999999.

6           Under the guideline date, credit range.

7  The max date is unknown because it's life.

8      Q.   But in these cases, the Senate Bill 590s,

9  essentially it says that these individuals are eligible

10  for parole after 25 years, correct?

11      A.   I believe that's one of the requirements.

12      Q.   Wouldn't have that impacted the

13  generated -- generated a minimum eligibility date?

14      A.   Not with a life sentence structure, no.

15      Q.   Because you don't ever have to let the

16  people out?

17      A.   No, that's not why.  I mean, there's no

18  calculation to work from with a life sentence date.

19      Q.   Why is there nothing here, or an n/a here

20  for salient factor score?

21      A.   I am not sure.  I don't know if when they

22  came with that classification if the salient factor

23  score was necessary since the person was never going to

24  be seen for a parole hearing.

25           I can't answer that question.  That's my

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 146 of 244

1    sense of that anyway.

2            Q.   When we were talking earlier about that

3    memo, or an email from Ms. Dills that talked about the

4    validated risk assessment tools used in these hearings,

5    you said that was the salient factor score, correct?

6            A.   Yes.

7            Q.   And that that's used in every hearing,

8    according to your testimony today, correct?

9            A.   I believe that it is.

10           Q.   But it doesn't look like it was used in

11   Mr. ██████ case, was it?

12           A.   Then I would certainly stand corrected

13   then.

14           Q.   But would you expect it to be generated and

15   included in the prehearing report in order to assist

16   the board in making its decision?

17           A.   I've never been asked that question before.

18   I've only seen one of these before.  I can't answer why

19   there isn't a salient factor score there.  I don't know

20   why the decision was made on that.

21           Q.   Did you ask Ms. Blieseth?

22           A.   No.  But I don't believe she would have

23   been at the hearing.  I don't believe.

24           Q.   You could have picked up the phone and

25   called her, couldn't you?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 147 of 244

1      A.   Certainly, I could have done that, yes.   I
2  guess that's something that did not necessarily jump
3  out at me at that time.
4      Q.   So I want to talk about some parts of her
5  report and how it weighed in your decision.
6           And on page four of her report, it's
7  Bates-stamped 2847.
8           Which is easier for you, if I reference the
9  page number at the top or bottom?
10          The report has its own page number, and
11 then there's some sort of handwritten page number, and
12 then a computer-generated one.
13     A.   The 2844?
14     Q.   2847 is the page I'm looking at.   There's a
15 section here that talks about substance abuse
16 history/treatment.
17     A.   Okay.
18     Q.   And part of this section of the report
19 discusses Mr. ████████ exposure to drug use early on.
20          Do you recall that part of the report?
21     A.   Well, I see it in the report.   As I said
22 earlier, I don't specifically remember the interview
23 with this offender.   But I see this in the report and
24 I'm certain I would have considered it or discussed it.
25     Q.   So you would have considered and weighed

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 148 of 244

1   that information in making your decision?

2       A.    It would be a part of -- I'm certain I

3   would have looked at that and reviewed it with the

4   offender if there were issues in part of my

5   decision-making I'm sure.

6       Q.    And would that have been reflected in the

7   board action sheet on the third page of the board

8   action sheet?

9       A.    The third page?

10      Q.    There's the supplement, Exhibit 9, to the

11  board action sheet?

12      A.    Right.

13      Q.    So you just testified that you would have

14  considered and weighed Mr. ████████ exposure to drug

15  use early on in making your decision.

16           My question is, would that be reflected in

17  the board action sheet, either the two pages that's

18  Exhibit 8, or the one-page addition that's Exhibit 9?

19      A.    You know, I don't know.  You're wanting me

20  to recall something that I can't recall.

21           I mean, what I will tell you is that

22  generally this is one of the areas that you would look

23  at if there was any history.  And I'm trying to locate

24  his SACA score on this case.  He received three on his

25  SACA score.  Middle line.  So it's something that you

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 149 of 244

1   would look at in terms of his use.

2            Line two was part of the commission of the

3   crime.  Was he on drugs or on alcohol during the

4   commission of the crime.  And, if so, then what things

5   has this person done to offset that while he's here.

6   Those are the variables that I'd be looking at on a

7   case like that.

8            You have to keep in mind now this part

9   is -- a good part of this is all self-report.  It's the

10  offender telling us something that could be the truth

11  or not.  So, I mean, you just have to -- you have to

12  decide how you're going to give weight to that.

13       Q.   And you didn't conduct the prehearing

14  interview, correct?

15       A.   I don't know that I did without seeing the

16  board action sheet.

17       Q.   The prehearing interview, is that --

18       A.   Oh, no.

19       Q.   So you didn't have a chance to assess

20  Mr. ███████' credibility to his IPO about his drug use,

21  for example, starting at the age of 14, correct?

22       A.   That's correct.

23       Q.   If you want to see the board action

24  sheet -- it's not a memory test -- I mean, if you want

25  to look at it, you can pull it out from that stack

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 150 of 244

1   there.  It's numbered AGO2835 through 37.

2         So back to my question:  Where is your

3   consideration of Mr. ████████' exposure to drug use

4   early on reflected in the board action sheet?

5         A.   I said that's if I gave it any weight.

6   Okay?  And I want you to keep in mind that area, as

7   I -- I referenced multiple times, it's an area of

8   self-report.  And, you know, how I review a SACA score,

9   it's not coming from a clinician.  It's coming from the

10  offender himself.  Telling me something that is either

11  truthful or not.  I gave it so much weight.

12         And if there's not something there that's

13  really become a red flag for me, I'm not going to draw

14  from that, that I should break something out and write

15  something on that sheet about it.

16         It sounds like he was using some drugs.  He

17  was rated a three on the SACA score.  And that's right

18  in the middle, one through five.  So he's middle of the

19  road in terms of that use.

20         If he's a five, you know, I guess we're

21  talking about some more discussion.  But there's

22  nothing about that that's going to make me leap to

23  having to denote something on that board action sheet.

24  And it's not going to be denoted there, and likely

25  won't be denoted someplace else, unless it specifically

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 151 of 244

1   **asks me to do that.**

2          Q.   Is it your testimony today Mr. ████ '

3   exposure to drug use was not a factor that you

4   considered and weighed in making your determination?

5               MR. SPILLANE:  Before you answer that, I'll

6   object to the question.  You can answer after my

7   objection.  He's already said he has no specific

8   recollection of why he decided that.

9               Subject to that, you can answer her

10  question.

11              THE WITNESS:  No, I don't.  He beat me to

12  the punch.

13  BY MS. BREIHAN:

14         Q.   He told you what to say, yeah.

15         A.   **That's what I was going to say.  I don't**

16  **have any recollection.**

17         Q.   You testified that if it were a factor that

18  you weighed and considered you would have put it on

19  board action sheet, or this page with the five bullet

20  points, correct?

21         A.   **If I felt it deserved the weight to be**

22  **considered in that manner, I guess I would have, yes.**

23         Q.   So why don't you take a minute and look at

24  the board action sheet, and then this five bullet point

25  sheet, and let me know if it mentions at all

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 152 of 244

1    Mr. ████████' exposure to drug use at an early age.

2         **A.    (The witness complied.)**

3              **Is your question anything referencing**

4    **substance abuse in here?**

5         Q.    ████████████████████████████████████

6    ████████████████████████.

7         **A.    I don't think I see that.  Other than the**

8    **fact that I do see the SACA three down here.**

9         Q.    You're looking at the top of the first page

10   of the board action sheet?

11        **A.    No, under four.  I see SACA three.**

12        Q.    Could you tell us what that stands for?

13        **A.    I wish that I could.**

14        Q.    Okay.

15             THE REPORTER:  What is that acronym?

16             MS. BREIHAN:  S-A-C-A.

17   BY MS. BREIHAN:

18        Q.    Can you tell us what that acronym is?

19   S-A-C-A?

20        **A.    I wish I could.  It's the acronym that that**

21   **defines what the offender's self-reported drug,**

22   **substance abuse is.  I don't know what it specifically**

23   **stands for.**

24        Q.    If you look on page 2848, it could help you

25   out in help for clarification for the court reporter.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 153 of 244

1           In the prehearing report, where it

2  indicates what Mr. Roberts' SACA score was.

3       A.   Okay.  I'm looking at it.  It shows he was

4  a three showing mild dependence.

5       Q.   And it says that Roberts was administered

6  the substance abuse classification analysis, correct?

7       A.   That would be the SACA.  There we go.

8       Q.   Back to this prehearing report that

9  Ms. Blieseth prepared.  If you go to page 2852, there's

10  a short section captioned education.

11       A.   Okay.

12       Q.   It indicates that Mr. ███████ only

13  completed the tenth grade; do you see that?

14       A.   Yes.

15       Q.   And it indicates that he was not in school

16  at the time of his arrest, too.

17           Did you consider and weigh that information

18  in making your decision?

19       A.   That he wasn't in school or didn't complete

20  school.

21       Q.   Yes.

22       A.   I mean, I don't recall if I gave that any

23  additional weight.  A lot of these offenders that come

24  before the parole board are not E-1s.  They're without

25  high school or without a GED.  A lot of them will get

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 154 of 244

1    their GED while they're confined.

2        Q.    What does the E-1 classification mean?

3        A.    It means he has at least his GED or high

4    school equivalency.

5        Q.    And that's as he sits there at the time of

6    his prehearing interview, correct?

7        A.    Yes.  Which would tell you a positive.

8        Q.    What about the time the offense occurred?

9    Did you give any consideration into the education that

10   the individual had received up to that point in time?

11       A.    I can't sit here and tell you that I recall

12   if that met some threshold for me or not.  I can't

13   recall that.

14       Q.    Is it indicated at all in the board action

15   sheet, or the five bullet-point sheet as to whether you

16   would have considered his lack of education at the time

17   of the offense, and, if so, how you would have weighed

18   that?

19       A.    I mean, I don't -- I don't see something

20   broken out.  I think there's a reference to his HSE in

21   No. 1.

22       Q.    Does that stand for high school

23   equivalency?

24       A.    That means he got it, which is a positive.

25            I think you end up leaning on what he got,

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 155 of 244

1    which was the positive, as opposed to -- well, when he

2    committed this crime.  I mean, he hadn't completed his

3    high school education yet.

4            And I certainly don't know that that jumped

5    out at me.  There might have been more variables I was

6    giving more weight to.

7        Q.   But certainly one of the factors the board

8    is supposed to consider under the statutes is the

9    defendant's maturity, intellectual capacity and

10   development at the time of the offense, correct?

11       A.   Correct.

12       Q.   Not just what education they have at the

13   time of their prehearing interview is conducted,

14   correct?

15       A.   Correct.

16       Q.   And in a couple places in this prehearing

17   report, most notably, perhaps, on 2854, Ms. Blieseth

18   notes that Mr. ██████' father was extremely physically

19   and verbally abusive to Mr. ██████.  And also to his

20   mother.  And that ██████████' father had a drug

21   problem.

22       A.   2854?

23       Q.   If you look at the top of the page,

24   social/family history section.

25       A.   Okay.  I'm looking at it.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 156 of 244

1      Q.    It says, ███████ also reported that his

2   father was extremely physically and verbally abusive to

3   him and his mother."

4           Did you consider and weigh that information

5   in making your decision?

6      **A.    I mean, you know, first, I can't recall**

7   **that would have given -- I would have given that**

8   **significant weight.**

9           **The second part of that is that is the**

10  **offender self-reporting that.  It's not from a**

11  **clinician or a clinical person.  You know, I just can't**

12  **tell you that the information in that paragraph, you**

13  **know, gave me some sense of weight to consider his case**

14  **differently, I guess is how I would put it.**

15     Q.   Is it fair to say, then, the only parts of

16  this prehearing report that aren't -- as you've

17  referred to them as self-reported -- are the official

18  facts of the crime and the institutional record?

19          Seems like the bulk of this report is based

20  on what the inmate shares during the prehearing

21  interview, correct?

22     **A.    That is correct.**

23     Q.   So do you think that Mr. ███████ was lying

24  about being physically and verbally abused by his

25  father growing up?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 157 of 244

1          A.    I mean, no, I've never said that.

2               And I think, you know, even while it's

3     self-report, that does not delineate that it's

4     something to be considered.  It's just simply a fact.

5     It's just a fact in the case.  That's all.

6               And a lot of these offenders, you look at

7     their background, you know, it may come out of that

8     unfortunate upbringing.

9               Now, in this case -- and I don't recall,

10    because he's the one that would be telling us about

11    that at the hearing.  If it was something that I gave

12    significant weight to, I just can't answer that

13    question.

14               I'm not saying he's not telling the truth.

15    I'm just saying it's another fact and that it's a

16    self-report.  And beyond that, it's very unfortunate,

17    you know, when you read that, with those folks.

18               But beyond that, did I give it some

19    additional weight?  I mean, I don't know when I talked

20    to him or how he discussed it if I gave it any

21    significant weight.  I think there are times that you

22    do.  It's usually the offender talking about it as

23    opposed to you reading it.

24         Q.   Did you ask him about it during his

25    hearing?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 158 of 244

 1      **A.    Oh, gosh, I just don't recall.**

 2      Q.    And you didn't review the recording of his

 3  hearing before your deposition today?

 4      **A.    I did not.**

 5      Q.    Did you indicate on the board action sheet,

 6  or the five-bullet point sheet attached to it, whether

 7  and how, if at all, you considered the abuse he

 8  suffered at the hand of his father as a child?

 9      **A.    Say that again.**

10          MS. BREIHAN:  Can you read it back?

11          (Whereupon, the last question was read back

12  by the reporter.)

13          THE WITNESS:  I mean, there's nothing in

14  this document that would bring that to your attention.

15          And my guess is, because it's not one of

16  the five questions, you know, I mean, it's not

17  referenced as a question to reference or document.  Not

18  that you shouldn't still notice it if it's important to

19  you, but it's not one of the five questions that you're

20  being asked to provide information on.

21  BY MS. BREIHAN:

22      Q.    So is it your understanding, then, that

23  these five questions that are set forth in this

24  Exhibit 9 are the only factors that you as a board were

25  statutorily required to consider?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 159 of 244

1          A.    No.  I think these are in addition to

2    everything else in this hearing.

3                 I mean, these are things that you want to

4    be sure you noted.  But there are other aspects of the

5    hearing that you look at, and that you have discussions

6    with the offender, in addition to these things.

7          Q.    Senate Bill 590 actually explicitly states

8    the board is to consider the defendant's background,

9    including their home, family life, and community

10   environment at the time of the offense, correct?

11                MR. SPILLANE:  Object to her testifying as

12   to what the bill says.

13                But subject to that, you may answer.

14                THE WITNESS:  Okay.  Could you ask that

15   again?

16   BY MS. BREIHAN:

17         Q.    Senate Bill 590 requires the board to

18   consider the defendant's background, including their

19   family, home and environment at the time of the

20   offense, correct?

21         A.    That's correct.

22         Q.    Look at page 2855.

23                The first full sentence at the top of the

24   page indicates that Mr. ███████ acknowledged during his

25   prehearing interview with Ms. Blieseth knowing right

Pohlman USA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 160 of 244

1   from wrong; however, said he never once took into

2   consideration what the consequences of his actions

3   would be.

4              Did Mr. ████████' impulsivity and

5   recklessness at the time of the offense as indicated

6   here factor into your decision at his hearing?

7         **A.   I just -- I mean, I just don't recall that**

8   **it did.  I mean, I just don't recall that.**

9         Q.   Do you see --

10        **A.   Or if I would have even framed it that way.**

11        Q.   How would you --

12        **A.   Like, the impulsivity.  I mean, I don't**

13  **know that I would have considered it that way.  I don't**

14  **remember that.  I just don't recall that.**

15        Q.   Well, you look at the board action sheet

16  and the five-bullet point sheet attached to it, and let

17  me know if anywhere in there you've indicated that you

18  considered and weighed Mr. ████████ impulsivity and

19  recklessness in making your decision.

20        **A.   I mean, I don't see that in here.  But with**

21  **all due candor, that does that mean that because it was**

22  **not written here that it was not considered.**

23        Q.   Do you recall considering and weighing that

24  in making your decision?

25        **A.   I just can't tell you that I specifically**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 161 of 244

1   recall that.  But --

2       Q.   Do you know how old Mr. ███████ was at the

3   time of the underlying offense?

4       A.   I mean, I could look.  If you could tell me

5   where I can find it.

6       Q.   It should be on the very first page of the

7   prehearing report.

8       A.   Okay.

9       Q.   It indicates he was 17 at the time of the

10  offense?

11      A.   Okay.

12      Q.   Did you consider and weigh the fact that

13  Mr. ██████ was a juvenile at the time of the offense

14  in making your decision?

15      A.   Let me first tell you that I can't tell you

16  that I recall that I did that.

17           But at the same time, though, I mean, I

18  think that you may -- you may know someone's youth at

19  the time of the commission of a crime.  I mean, as to

20  whether -- you know, we delineated on that point as a

21  panel, I mean, I just don't recollect it.  He's 17.  He

22  was young.  And he wasn't mature.  I don't recall

23  discussions like that.

24      Q.   In your opinion is the defendant's age at

25  the time of the offense an important factor to consider

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 162 of 244

1    in making a parole determination?

2         A.   I think it's one of the many factors that

3    you can consider.

4         Q.   Is it an important one?

5         A.   I think it's one of the factors that you

6    can consider.  As to whether it's more important than

7    anything else, or the crime itself, I mean, I can't say

8    that.  I just think it factors into the other things

9    that you take a look at.

10        Q.   And how does it factor into the other

11   things you take a look at?

12        A.   Well, I mean, you look at it and you say

13   that the person was, you know, young when they

14   committed the crime.  He was 17 when he committed the

15   crime.

16             I'm not a clinician.  I don't know if the

17   guy knew right from wrong.  And I'm not here to figure

18   that part out.  You know, that's really not my job as

19   the, you know, on the board.

20             But from the standpoint of age being a huge

21   driving factor in my decision, I think I can say that I

22   don't think that it was.  I just don't recollect that

23   it was or wasn't.  It would be one of the other ones

24   that I may have considered.

25        Q.   I want you to turn to the page in this

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 163 of 244

1    Exhibit 10 that's Bates-stamped 2870.  It looks like

2    this is a Diagnostic Center report.

3         **A.    Okay.  2970, medical and healthcare needs?**

4         Q.    Yeah.  If you go up above Mr. ███████'

5    name, it says Missouri Department of Corrections

6    classification and diagnostic center report.

7         **A.    Okay.**

8         Q.    Do you recognize this report?

9         **A.    I'm sure I've seen these, I guess.**

10        Q.    It looks like it was completed in December

11   of 1989.

12             Do you recall specifically reviewing this

13   at any point before casting your vote in Mr. ███████

14   case?

15        **A.    I can't.  I mean, I can't tell you that I,**

16   **a hundred percent, reviewed this.  I'm just not able to**

17   **tell you that I saw that document.  But if it was there**

18   **in the file, there's a good chance I saw that document**

19   **that day.**

20        Q.    Okay.  Turn to 2872 under educational needs

21   section of this diagnostic center report.

22        **A.    Yeah.**

23        Q.    It indicates that Mr. ██████' functional

24   grade level is six.  So a young middle-schooler,

25   correct?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 164 of 244

1      A.    Yes, it does say that.

2      Q.    And it says that his IQ is low-average,

3  correct?

4      A.    Yes.

5      Q.    Did that impact how you approached your

6  interview with Mr. ████████?

7      A.    I think the only place that that might come

8  into play with a board member, who is a non-clinical

9  person, would be if during the questions, he was

10  unresponsive or in questions his responses he was

11  making no sense.

12            If he was able to articulate and answer to

13  you that made some kind of cogent sense, this may not

14  be something that you search out or seek out to see if,

15  you know, why he might be sort of unresponsive.

16            And since I don't recall how he responded

17  during the interview -- I mean, a lot of offenders come

18  in at that number or lower.  I mean, they just do.

19            Most have a pretty -- are pretty adept at

20  testifying at the hearing.  What their concerns are.

21  Whatever their account is.  Whatever their future

22  achievements, whatever they want them to be.  Or to

23  discuss what they've already achieved.

24            But as to whether, you know, I would have

25  considered it, I mean, I'm not sure.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 165 of 244

1          But if he would have been not responding to

2     us in a way that allowed us to engage, if I would have

3     thought there was some issue there, you know, I may

4     have sought that out.  I just don't know.

5          Q.   So it only would have been a concern if it

6     impeded his ability to understand your questions; is

7     that what you're saying?

8          A.   Yeah.  Because if he wouldn't have been

9     able to understand the hearing process, that's a

10    problem.

11         I mean, I think, you know, you have that

12    whenever you see someone that's seemingly unresponsive,

13    or it looks like something else is going on and he's

14    not making eye contact with you, he doesn't understand

15    any of your questions, I think you sort of know that

16    when you get that in front of you.

17         If the person was able to give you his

18    name, remember his number, and talk about his case and

19    what he did, what his account was, and everything else

20    as you go through the process, you're probably not

21    going to -- you may not look at that with significant

22    weight anyway.  And I don't know that I did or that I

23    didn't.

24         Q.   What about any impact it might have on the

25    inmate's susceptibility to suggestive questions, or

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 166 of 244

1  aggressive interview technique, is that a consideration

2  at all?

3       A.   I'm not sure that I understand your

4  question.

5       Q.   You didn't adjust your interview in

6  technique at all to have a certain style to, you know,

7  to accommodate a lower IQ that an inmate might have?

8       A.   You know, sometimes during these hearings,

9  you know, what could be -- what you may call lower IQ,

10 and you think that's what it might be, it might be

11 someone that's pretty doggone nervous and their

12 responses are seemingly short.

13            I think you kind of know when you got that,

14 and you do all you can to put the offender at ease

15 during the process.

16            I think it's important that the offender

17 gets an opportunity to tell us of his account, and

18 where he's at in his incarceration, and what he sees

19 his future to be.

20       Q.   Are you aware that my office, the MacArthur

21 Justice Center in St. Louis, filed materials in support

22 of Mr. ██████████' request for parole release?

23       A.   I've heard of your group.  But not specific

24 cases.  Other than the fact that I know that we're here

25 on at least four of these cases.  This may be one of

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 167 of 244

1    them.

2              But, yeah, that you guys have been

3    supporting these offenders that fall under this

4    juvenile without.

5         Q.   Okay.  What did you hear specifically about

6    the MacArthur Justice Center?

7         A.   Other than the fact that you guys were in

8    support of these offenders.  And that -- I mean, not a

9    lot, at least not for me, not a lot.

10        Q.   Okay.  Do you recall reviewing the

11   materials that we provided in support of

12   Mr. ██████?

13        A.   You'd have to show it to me.

14        Q.   Sure.

15             It looks like some of it is here in the

16   file.  On page 2888.  The first letter from us.

17        A.   If this information is in support of his

18   release, there's a part of the file that any letters of

19   support, or things of that nature, I mean, that's stuff

20   that you do and look at.  Just like you look at letters

21   that are in opposition to release.  You know, you do,

22   you know, review that information.  You know, for the

23   hearing when you have the file.

24             So -- and I think that's pretty routine,

25   board member to board member, that you do pay attention

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 168 of 244

1    to letters of opposition.  Because we also note, you

2    know, "Here's letters of support for you on your

3    behalf."  And so you go through those.  Some folks do.

4    Not everybody does.  But you let them know that

5    somebody offered you employment.  Or that there are

6    letters of support from your family members.  There are

7    letters of support from your organization.

8         Q.   One of the things that we submitted is a

9    forensic psychological evaluation that starts on page

10   2935.

11        A.   Okay.

12        Q.   Do you recognize this forensic

13   psychological evaluation on Mr. ██████?

14        A.   I mean, it's just not flying off the page

15   that I've seen it before.  But if it was in the file

16   before the hearing, there's a good chance that I did,

17   along with these other letters of support of the

18   offender.

19        Q.   And if you look at the last paragraph on

20   page 2946, Dr. Kraushaar, who is --

21        A.   What page?

22        Q.   2946.  This evaluation was conducted by

23   Dr. Brooke Kraushaar.  And she concludes, among other

24   things, that Mr. ██████ has no current problems with

25   impulsivity, aggression, or behavioral disconstraint.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 169 of 244

1 And she also notes that his last conduct violation for

2 fighting was 15 years ago.

3      **A.   This packet is out of order.  I'm sorry.**

4 **You were saying?**

5      Q.   So in the last paragraph on this page --

6      **A.   Okay.**

7      Q.   Dr. Kraushaar indicates that after

8 conducting an assessment, that Mr. ████ shows no

9 current problems with impulsivity, aggression or

10 behavioral discontainment and his last conduct

11 violation for fighting was 15 years ago.

12      Did you consider and weigh that

13 professional clinical opinion in arriving at your

14 decision?

15      **A.   Certainly -- certainly may have.  If I saw**

16 **it and reviewed it, I certainly may have.  I know that**

17 **the noted behavior, I would have noted that in other**

18 **aspects of the report as well.**

19      **As to whether I saw this and it leaped out**

20 **at me, or that I recall seeing it, I just can't, a**

21 **hundred percent, say that.  Certainly it's information**

22 **that you would consider.  There's no question about**

23 **that.**

24      Q.   You've talked -- testified a lot today

25 about restraints on the board of their ability to

Pohlman USA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 170 of 244

1    assess these cases because of, you know, lack of

2    clinical experience, and lack of resources to obtain

3    outside clinical opinions on these cases, correct?

4        **A.   I said that the parole board are not made**

5    **up of clinicians.  And I also said that that does not**

6    **mean -- however, they can't make a reasonable**

7    **assessment of what's in front of them.  Like reading**

8    **something like that.  I mean, that's what I said.**

9        Q.   So here's an example of an opinion by a

10   professional --

11       **A.   Yes.**

12       Q.   -- clinician who conducted a thorough

13   assessment, multiple assessments of Mr. ███████, and

14   concluded that his criminal conduct is more likely a

15   product of adolescence, rather than bad character, and

16   he was at a low risk to re-offend.

17            I would think that that would weigh pretty

18   significantly in you making your decision as to whether

19   to grant Mr. ███████ parole; did it not?

20       **A.   It did not transfer to the weight,**

21   **necessarily, for me to write down a date.  And I guess**

22   **nor did it for at least three other members.**

23       Q.   And do you indicate anywhere on the board

24   action sheet, or on the five-bullet point page attached

25   thereto, that you considered and weighed this expert

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 171 of 244

1  report?

2      A.   It's not on the board action sheet.  And I

3  don't see here about the -- the only thing that I see

4  that makes reference to any kind of pathology is where

5  it references that he's an MH2.  Which doesn't always

6  strike a red flag for the board.  It doesn't mean that

7  you can't consider it.  There is a reference to him

8  being an MH2 on this document, but nothing about that

9  physician's assessment.

10      Q.   And that MH2 would have come from the IPO's

11  prehearing report, correct?

12      A.   Well, I mean, the MH2 is something that the

13  IPO is reporting from psychologist staff that assess

14  and rate him.  The IPOs don't rate those offenders.  If

15  that's a mental health score, then the mental health

16  staff are providing that rating at the institution.

17      Q.   Corizon employees?

18      A.   Yes.  With the new contract I believe it is

19  Corizon.

20      Q.   Did the mental health staff conduct an

21  evaluation for the purposes of preparing an inmate for

22  a hearing?

23      A.   I believe that they do that as a part of

24  the diagnostic process.

25      Q.   When the inmate is first committed?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 172 of 244

1      A.   When they first come in, their M score, MA

2  score, their SACA, their education scores, those are

3  all things that begin to occur at certain times after

4  the offender comes to the prison.

5      Q.   So for ████ that would have been in 1989?

6      A.   Yes.  Could have been.  And, you know, for

7  there to have been a different score, and I'm not an

8  expert in their arena.

9           My guess is that if there was not some

10  behavior that would drive you to that, or that

11  offender, on his own, would have put in an MSR, a

12  request to see a mental health person -- which they can

13  do on their own and they will be seen -- if there are

14  no factors behaviorally that changed that initial

15  assessment, chances are, it's not going to change

16  again.  Unless there's some behavior, I guess, that

17  occurs that puts him in front of the psychology folks

18  at the prison.  But it is referenced here, though, on

19  that.

20      Q.   So even if their mental health improves

21  over time, unless that inmate asks to see mental health

22  staff, that MH score is not going to change; is that

23  what you're saying?

24      A.   You'd have to -- I do not feel comfortable

25  answering that question for the mental health staff.  I

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 173 of 244

1  don't know what their -- I mean, I don't know what

2  their protocols are for -- unlike with the salient

3  factor instrument, things occur.  Things become

4  positive or negative, and then that document changes.

5           As to the inmate's MH, MH2 is not

6  considered a very high level education.  I think most

7  inmates come in as MH 1s and 2s.  The number you pay

8  attention to are at three and above.

9       Q.   Okay.  Can you tell from the prehearing

10  report, or any of the materials you've got in front of

11  you today, when that mental health score was calculated

12  for Mr. ██████?

13       A.   Unless you saw the institutional face

14  sheet, or the initial document, I mean, I just couldn't

15  tell you.

16           And, again, my guess is at some point

17  during the diagnostic process he would have seen

18  someone in psych services who would have made that

19  assessment on him.

20       Q.   Doesn't it matter to you, though, that that

21  potentially could have been conducted almost 28 years

22  before you saw this guy for a parole hearing?

23       A.   When I look at him being MH2, and not had

24  any behavioral issues for 15 years, that part isn't

25  going to actually jump off the page at me.  Because

Pohlman USA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 174 of 244

1 behaviorally, he's sound.  He's acting right.  You

2 know, he's doing what he's supposed to be doing in

3 prison, and that's not getting in trouble or getting

4 violations.  I mean, that's the expectation.  That is

5 what the offender is doing.

6            So if he is not behaviorally acting

7 out -- because if he were, I think you might look

8 deeper for cause, and the why part.  And maybe that

9 could be spelled out in the mental health -- MHPs.

10 Where there might be an elevation because he did

11 something, or tried to harm himself.

12            But in this case, if he was an MH2 coming

13 in, and he's only shown good behavior, then there's

14 nothing that immediately makes you want to, you know,

15 jumps out and says this guy's got some mental health

16 concerns that I need to dig deeper into.

17            The fact of the good behavior, from one

18 standpoint, sort of begins to block that part out just

19 a little bit because he's doing okay.  Okay?  It

20 doesn't mean that there aren't issues that could have

21 been of concern then.  But even then, though, he was

22 rated a two.  And while I don't think that they

23 successively, you know, rate these guys, unless there's

24 a reason to, because in this case, if they did -- I

25 don't know if they do -- if he's not been a problem for

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 175 of 244

1   15 years, the score may actually go down to a one.

2        Q.   So in looking at this board action sheet

3   for ████, can you tell from the sheet how you ended

4   up voting in his case?

5        A.   Well, I mean there are no notes.  We would

6   have had a deliberation about it, with myself, the

7   analyst, and whoever the third member was.  Having not

8   recalled that deliberation and discussion -- I mean,

9   there's a discussion after every hearing about where's

10  everybody at on this case.  And not everybody is always

11  at the same place on these cases.

12            And I just don't recall the deliberation

13  and there's no notes for me to fall back on.

14       Q.   Did you grant Mr. ████ an outdate?

15       A.   He was set for another hearing.

16       Q.   He was denied parole?

17       A.   Yes.

18       Q.   With a four-year setback, correct?

19       A.   Correct.

20       Q.   And there are no notes on this board action

21  sheet for the future board to look at in 2021, when

22  considering whether Mr. ████ now, at that point in

23  time, should be released to society; is that correct?

24       A.   That is correct.

25       Q.   And then in Ms. Blieseth's prehearing

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 176 of 244

1  report she actually recommends a five-year setback for

2  Mr. ███████.

3         Do you recall seeing that?

4         A.    I don't recall seeing that.  But I

5  certainly trust if you say that's the case.  The parole

6  board doesn't always agree with those recommendations.

7  Good or bad.

8         Q.    Do you recall having any discussions with

9  any of the panel members about the recommendation in

10  the prehearing report versus your final decision?

11         A.    No, I don't recall that.  But it would not

12  be unusual for someone, me, or the analyst, when I see

13  Jessica Blieseth's a five-year setback here, you know,

14  what's everybody think about that.  That could have

15  been a part about of the discussion.

16         At any rate, the panel disagreed with that

17  recommendation and reduced that to four years.

18         Q.    And how did you determine to give a

19  four-year setback versus three years or two years?

20         A.    It would have been the -- just simply where

21  the three members, after deliberation, got to.

22  Couldn't get to a five, and couldn't get to a release

23  date, so you look at the things that are in between

24  that.  And so then it's two, three or four.  Or you

25  could have done one.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 177 of 244

1    **And the panel obviously decided that he'll**
2    **do a four-year setback out of five.  Which, even though**
3    **it's seen as a negative, it's not a five-year setback.**
4    Q.   And so what's the difference?  I mean, what
5    criteria made the difference for you between giving a
6    five versus a four?
7    **A.   I -- I mean, I can't recall why we got to a**
8    **four versus a five.**
9    Q.   And then this box where it says decision
10   and remarks/initial member, is that your handwriting
11   and initials?
12   **A.   That first box is for the parole board**
13   **member at the hearing.**
14   Q.   Is that your handwriting and your initials
15   in that box?
16   **A.   Yes, it is.**
17   Q.   Can you tell from this sheet who else voted
18   on Mr.███████' case?
19   **A.   I can't.  Not by those initials, no.**
20   Q.   It's a little difficult to read.  If you
21   look on the very first page of this Exhibit 10, it
22   seems to indicate who voted from the board.  ███████
23   ████████████████████████████.  Does that
24   refresh your recollection?
25   **A.   No.  I would have been the first member to**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 178 of 244

1    see it.  And unless I had an interest in pulling back

2    and seeing this, I wouldn't know what she voted, what

3    this person voted.  Unless I had a flag to an analyst

4    to bring it back to me when it's been final, which I

5    did not do, you know, and don't with any routine, do

6    that at all, I would not have ever known how she voted.

7              And it's not routine that she comes down,

8    or that he comes down, or that he comes down and says,

9    hey, Ellis, I voted this way on that case that you did.

10   It just doesn't.

11        Q.   Do you recall having any discussions with

12   ████████████████████████████████████████████ about

13   Mr. ███████████ parole consideration?

14        A.   No, I don't.

15             MS. BREIHAN:  Let's take a break.

16             (A break was taken.)

17   BY MS. BREIHAN:

18        Q.   I know that you testified you don't have a

19   lot of specific recollection about Mr. ███████████ hearing

20   on March 9th, 2017, but I'm hoping to ask you some more

21   questions about that.

22             Do you recall the prosecutor or the circuit

23   attorney speaking at ███████████ hearing?

24        A.   Is that your question?  Do I recall him?

25        Q.   Her.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 179 of 244

1      **A.    Her?  No, I don't.**

2      Q.    First page of Exhibit 10, which seems to

3  indicate others in attendance, one of the individuals

4  in attendance ████████████████████████████████████

5  ██████

6      **A.    Okay.**

7      Q.    Does that ring any bells?

8      **A.    Not for me.**

9      Q.    I'm going to show you an exhibit that

10 perhaps you'll need more time to look at.  My apologies

11 for not getting this to you before today.  But this is

12 a transcript of Mr. ████████ hearing, which I'll mark

13 as 11.  And if we need to take a break for him to do

14 that, we can do that.

15         I'm hoping this can refresh your

16 recollection whether ████████████████ spoke at

17 ████████████' parole hearing on March 7th, 2017.

18         (Deposition Exhibit No. 11 was marked for

19 identification.)

20         THE WITNESS:  Do you want me to go to a

21 particular page where that's at?

22 BY MS. BREIHAN:

23     Q.    I'll assist you.  You can look at page four

24 of the transcript.  There's back and forth between a

25 panel member and the ████████████████.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 180 of 244

1        MS. BREIHAN:  So I can explain to counsel

2   what we've done here, since the audio recordings were

3   produced to us, they were designated as confidential.

4   But this sheet that I identified who was at the

5   hearing, was highly confidential.  So what we did was,

6   we had personal identifiers removed for these

7   individuals, and had a key sheet prepared that's highly

8   confidential.  So we can keep -- refer to them with

9   confidential versus highly confidential designations.

10       I know we have some objections that we

11  served, as to these objections; so who hopefully

12  treating them as confidential and highly confidential

13  throughout this deposition, it is not intended to waive

14  any of those objections.

15       And I have the key sheet here that will

16  tell us who panel member No. 1 is, and who circuit

17  attorney is, for purposes of our reference here today.

18       So panel member No. 1 is ███████████.

19       And then circuit attorney is Mary Pat Carl.

20  BY MS. BREIHAN:

21       Q.   And you can look at the first few pages

22  here of the transcript.  Hopefully that will be enough

23  to refresh your recollection as to whether or not

24  ███████  was allowed to give a statement at

25  Mr. ███████  parole hearing.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 181 of 244

1      A.    Well, I mean, she was asked did she want to

2  make a statement.  And she said, "I usually do."  I'm

3  assuming without the offender being present.  She said,

4  "I usually do."  It really doesn't matter to me.

5            And I think she explains she does, if

6  they're present, she gets sidetracked.

7            MR. SPILLANE:  I'm going to object because

8  I don't know if you're just reading or if you're

9  remembering.

10           THE WITNESS:  I'm reading.  I don't

11 remember her, or what she said at the hearing, at all.

12 I'm just going by what's in this document.

13           I think you want me to look at it and see

14 if it shakes my memory at all.

15           It looks like -- I'm reading this.  I don't

16 recollect this.  But she made her statement without the

17 offender being present.

18           MR. CRANE:  Do you want him to review it?

19           MS. BREIHAN:  I'm asking what he remembers.

20 BY MS. BREIHAN:

21      Q.    But I guess my question is to you whether

22 you permitted ███████████████ to make a statement

23 outside of Mr. ██████ presence during his parole

24 hearing on March 9, 2017.

25      A.    It looks like that occurred.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 182 of 244

1    Q.   Okay.  And she ended up making a statement

2    ████████████████████████████████████████████

3    ███████████ .

4         Is that consistent with your recollection?

5    A.   **This was documented, but I don't recall**

6    **that she said that.**

7    Q.   ██████    ████████████████████████████

8    ████████████████████████████████████████████

9    ████████████████████████████████████████

10   ████████████████████████████████████████████████

11   ██████████████████████████████

12   A.   **Page 14?**

13   Q.   Page 14, lines four and five.

14   A.   **Okay.**

15   Q.   ████████████████████████████████████████

16   ████████████████████████████████████████████

17   ████████████████████

18   A.   **No, I don't.  It doesn't mean that she**

19   **didn't pass something to the panel.**

20   Q.   If she had given something in writing to

21   the panel that day, would it have been placed in

22   Mr. █████████  parole file?

23   A.   **It very well would have been.**

24        MS. BREIHAN:  Counsel, I didn't see

25   anything from her in the parole file.  I'd ask you to

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 183 of 244

1  double check, and to the extent anything exists to that

2  effect, to produce it.

3  BY MS. BREIHAN:

4       Q.   Do you have any recollection as you sit

5  ███████████████████████████████████████████████

6  ███████████████████████

7       **A.   I just don't recall him.  What he looks**

8  **like.  I don't think I'd recognize him if he passed me**

9  **on the street.**

10       Q.   If pictures -- if you're suggesting

11  pictures might help jog your memory, there are

12  photographs in Exhibit 10 of ███████ at varying ages.

13  The quality, I'll admit, is not the greatest because

14  they're black and white photocopies.

15       **A.   Well, I seen one picture of, my guess --**

16            MR. SPILLANE:  Which page?

17            MS. BREIHAN:  2907, 08, 10.  I think the

18  most recent one is 2913.  It's a photograph from 2000.

19            THE WITNESS:  This is him and his mother.

20  BY MS. BREIHAN:

21       Q.   Do you recall his mother being at the

22  hearing?

23       **A.   I don't recall seeing her.  If it was**

24  **indicated, I'm sure she was.  I mean, I have conducted**

25  **many hearings since ███████.  And I've seen many files**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 184 of 244

1  since ████.  I just don't recollect these folks.  From

2  the picture anyway.

3      Q.    How many hearings would you say you

4  conducted since March?

5      A.    I don't have a clue on that, other than we

6  do three or four hearings, three or four days,

7  sometimes five a week.  Most dockets ten, 14 -- until

8  they were elevated again -- to 18 or more, after I

9  stepped down.

10          So, I mean, it's a number of hearings, but

11  there are many other files to review.  I just don't

12  have a recollection of the hearing.

13      Q.    I understand.  I'll just ask you some -- a

14  few other questions.

15          On page 39 of the transcript, starting

16  at --

17      A.    39?

18      Q.    Yes.  You're asking Mr. ████████about his

19  ICV class, and whether he took it again in 2009.

20          Do you see about line ten what I'm

21  referring to?

22          And Mr. ███████ asks if he can look in his

23  file to confirm, correct?

24      A.    Yes.

25      Q.    Did you let him look at his parole file?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 185 of 244

1     A.    No.   We would never do that.   Chances are,
2     by "the file" he means the one he brought to the
3     hearing.   A lot of times they'll bring their file with
4     them, of their certificates, and things like that.   And
5     he might have wanted to look at his own file if he had
6     one.   He'd never have been allowed to look at the
7     parole file.
8          So when I see that as an answer, and it is
9     not an unusual for an offender that is actually, you
10    know, has some accomplishments, that they bring an
11    envelope or a file with them with those documents in
12    the file.   And they get nervous and forget some of
13    those dates.   And certainly he can look at his own file
14    if he wants to.
15    Q.    What if there was an error in the parole
16    file?   How would the inmate learn about that if they're
17    never able to look at it themselves?
18    A.    What do you mean if there was an error?
19    Q.    What if there's a wrong fact in the parole
20    file, or miscalculation, or mischaracterization of the
21    underlying offense?
22    A.    There are many occasions -- not that there
23    are errors -- but there are many occasions, when you're
24    talking with an offender, he'll go, "No, I don't think
25    that's how that was."  Or, "No, I didn't have a

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 186 of 244

1 conviction. I wasn't in California that year." And

2 that can happen.

3              And so if it was me, I'll have the analyst

4 note it. Or the DA. And we go back and we check those

5 things out. And then we'll tell the offender. We

6 don't question that he's wrong. If he knows something

7 that appears to be an error, through our discussion,

8 through that report, we note it.

9              Because there's sometimes wrong information

10 from the records office that the offender is on top of

11 with his case. And we note it. And tell them that

12 we'll check it out and we'll have someone get back to

13 him if that information was in fact incorrect.

14      Q.   On page 46 of the transcript, it looks like

15 when you're wrapping up the interview portion with

16 Mr. ████████, and you're talking about whether you would

17 give him an outdate, and if he were to --

18      A.   What line?

19      Q.   Just toward the top of the page, "If you

20 were to be reconsidered." You say, "The parole board

21 is in the press in a big way."

22              Is that a consideration then that you make

23 when determining whether to grant parole, is what the

24 press might look like with the board?

25      A.   Okay. Let me read this.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 187 of 244

1             Yeah.  The only point, and that's not an

2    unusual point, when we're looking at a release of an

3    offender with a serious offense, part of the honest

4    conversation is, you know, the parole board takes on a

5    risk at releasing anybody, even the most mild person,

6    because they can go out and commit crimes too.

7             But if you have someone that has a

8    significant issue, and then you decide to release them,

9    I mean, you can bet your shoes that the parole board

10   will be put through great scrutiny.  We take very

11   seriously these cases with regard to release when they

12   are offenses of this nature.  When it involves murder

13   or things of that nature.

14             That's what that discussion was about.  Not

15   the parole board is scared to release somebody with a

16   life sentence, because we do it all the time.

17             But that's what that discussion is

18   indicative of.  And it's not the first time that it

19   gets said at a hearing.  It's an honest part of

20   the -- the offenders want to know what his chances are.

21   You know, in talking with him candidly, you know,

22   offenders may do everything right prior to a hearing to

23   be considered.  The parole board, nonetheless, still

24   takes on a huge responsibility to release when you've

25   got a case of that nature.  Because the first thing

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 188 of 244

1    that gets said is, what were you guys thinking?

2              We're not afraid to make that decision.

3    Because we have in the past.  Just understand that

4    that's one of the considerations the parole board

5    always thinks about.  You have to think about the risk

6    of release, and to make sure he's really ready to be

7    released.  And you do that drawing upon your own

8    individual thoughts on the case.  And as do the either

9    board members.  Just like when they've chosen to

10   release people life sentences.  When we take on that

11   risk, we obviously give the date out.  That's what that

12   discussion was about.

13        Q.    And then you told Mr. ███████ that his only

14   way out of prison is the parole board and nothing else?

15        A.    That's a true statement.

16        Q.    Why would you be telling him that?

17        A.    Because the only way that a person with a

18   life sentence will be released is through the parole

19   board.

20              So I think some things are lost in a

21   transcript.  But it's sort of like texting.  The

22   reflection is not right.

23              If you don't get an answer that satisfies

24   you, if you don't get a release date, man, continue to

25   do what you're doing, because your only way out of

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 189 of 244

1  prison is through the parole board.  Folks can get

2  upset, and mad, and then they give away all they've

3  done thus far.  They still need the parole board to get

4  out.  And it's a factual, true statement.

5       Q.   Page 47 of the transcript, line 15, you

6  tell Mr. ████████ that people go to the full board to

7  make a decision on it.

8            Did Mr. ████████' case go to the full board

9  for a decision?

10      A.   Yes.  This type of case would go to the

11  parole board.

12           And by that, by definition is, is when

13  there's been a decision made, when you have four

14  members that have voted one direction, and you have a

15  decision made.  But in other words, there was access to

16  more than just that panel hearing.  It's going to go to

17  other members of the parole board, not just this group.

18  Some members think it's the three other ones that are

19  making the decision, and it's not that case at all.

20           They need to know that the decision will

21  take some time.  It goes to the full board in terms of

22  the vote.  Whether it becomes four-zero, four-two, or

23  four-three, it goes to the entire board for a

24  consideration of a release date.

25      Q.   So looking back at the board action sheet,

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 190 of 244

1    2835, does it reflect that the full board voted on

2    Mr. ████████' case?

3         A.   It reflects that there was a decision.  And

4    it went to the full board.

5              After it left the panel hearing, the next

6    person that saw it means it was going to the full

7    board.  Now, you'd have another vote there.  You know,

8    sometimes -- and many times it gets to the chair's

9    office to break a three-three split, for example.  And

10   there are splits that occur.

11             But in this case, you had four members that

12   all voted the same way.  So then the decision was done,

13   and that was access to the full board.

14        Q.   What's -- I thought this was majority

15   board?

16        A.   It's a majority board decision.

17        Q.   So not a full board vote, not every single

18   board member voted on his case, did they?

19        A.   Well, no, they didn't, but ...

20        Q.   I just was hoping, for the record, you

21   could help decipher some of the handwriting on this

22   five bullet point sheet.

23        A.   Okay.  Well, you just read what's written.

24   And then what's handwritten and point it.

25             Looks like there's reference to the HSE.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 191 of 244

1          MR. SPILLANE:  Could I stop you, sir?  I

2    think she wants you to read the question and then read

3    the text.

4    BY MS. BREIHAN:

5          Q.   First of all, this is your handwriting,

6    correct, on this sheet?

7          **A.   No, this is not mine.  This would likely**

8    **have been the analyst's.**

9          Q.   Okay.  I thought your testimony earlier was

10   that the board member fills out this sheet?

11         **A.   Or the analyst.**

12         Q.   So then, yeah, I mean, you don't have to

13   read the bolded type print, but if you can try to read

14   the handwritten portion.

15         **A.   Mine is way worse than this.**

16         Q.   That's saying something.

17         **A.   I'm just trying to be honest with you.**

18   **But, no, this is -- which is why I was trying to read**

19   **it very closely -- this is likely Mr. ████████**

20   **handwriting.**

21         Q.   ████████████?

22         **A.   Yes.  And it would not be unusual for an**

23   **analyst to write the information out and then have the**

24   **parole board members review it, and make sure that's**

25   **what you wanna say.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 192 of 244

1       Now, I guess what would be helpful in these

2   documents, it might not be nice to have a signature

3   line down there so you can determine, you know, who

4   wrote it.  Or who's saying, or who's authenticating it.

5       Q.   So obtain Hs he, correct?

6       A.   Yes.

7       Q.   Just the handwriting?

8       A.   Yes.  This makes reference to he's obtained

9   his HSE.  And looks like he's -- I believe that word is

10  he's completed programs.  Long work history within

11  DOC is the last part of that.  So then on No. 2 two, he

12  improved his conduct.  Work history with DOC.  It says

13  he's -- he accepts responsibility, is the last two

14  words.  And something having to do with his job

15  assignments.  But I think his history shows he was a

16  good worker in prison.  I'm not sure exactly what that

17  last word on that top line is.

18      Q.   Point 3?

19      A.   Yeah.  Admits he was shooter.  Accepts

20  responsibility.  Took 23 years to admit he was the

21  shooter.  I don't know what that last word is.

22      Q.   Do you recall whether you reviewed any

23  clemency application materials in Mr. ▮▮▮▮▮ parole

24  file?

25      A.   Gosh, I don't know.  We've seen thousands

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 193 of 244

1  of clemency requests come through that office.

2      Q.   The reason I ask is, I think this says

3  files for clemency?

4      A.   Yeah, okay.

5      Q.   I'm wondering why that would be a

6  noteworthy thing?

7      A.   I don't know.

8      Q.   Because all these little scribbles here

9  indicate some sort of fact, but they don't seem to

10  indicate any weight or significance that was given by

11  any of the panel members to these facts; is that

12  correct?

13      A.   There's no reference to W-E-I-G-H-T being

14  given to any of these five different components.

15      Q.   So point 4?

16      A.   It has to do with his conduct violations.

17  Initially.  And then looks like none since 2009.

18          It says four CDVs.  And I just cannot read

19  that last word.  On that first line.  On the second

20  line, three dangerous contrabands.  One sexual

21  misconduct.

22          Two, looks like he was in possession of a

23  weapon.  Three, he's worked in a factory.  Restorative

24  justice.  Looks like they could be talking about some

25  program completions.  And then his MH and sex scores

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 194 of 244

1 are referenced.

2     Q.   And it doesn't indicate here, does it, when

3 these conduct violations occurred or the pattern of

4 violations over time?

5     A.   No.  The only place you can draw a

6 conclusion to pattern is after 2009 he got zero.  And

7 that's significant to consider.

8          And that's not unusual for folks that come

9 into the prison with a life sentence.  They have

10 adjustment problems.

11          If the guy was getting some violations, and

12 bad reactions, dangerous contraband, which are weapons,

13 which are a significant threat to staff and other

14 offenders.  It looks like drugs.  And a bunch of

15 violations.  And then in 2009, he just quit.  Cold

16 turkey.  He just went the other direction.  And it

17 looks like he started to see the light.  And had no

18 violations since then.

19          That turnaround, you know, almost plays as

20 good as if the guy never got any violations at all.  I

21 mean, just depending on how you wanna look at it.

22          Question No. 5, on his behalf there's

23 family support.  He does have goals.  HP.  Home plan is

24 to his mother.  So he has support and a plan out there.

25          A reference to sequence three.  Possession

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 195 of 244

1  of drugs.  He got a violation for having five balloons

2  of what would appear to have been some drug in 1995.

3          But, so that's what's on that sheet that I

4  can make out.

5      Q.   So was that 22 years before his parole

6  hearing?

7      A.   Yes.

8      Q.   And then if you could look at page 2836,

9  it's the back of the board action sheet, this appears

10  to be the reasons that the board would indicate for its

11  decision.  Is that accurate description of this portion

12  of the board action sheet?

13      A.   Yes.

14      Q.   And what's the reason indicated for

15  Mr. ████████  decision?

16      A.   It says circumstances surrounding the

17  present offense.

18      Q.   There's nothing checked here that indicates

19  that the panel or the board felt that there was a

20  reasonable probability that he couldn't remain at

21  liberty without violating the law again, correct?

22      A.   Correct.

23      (Deposition Exhibit No. 12 was marked for

24  identification.)

25  BY MS. BREIHAN:

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 196 of 244

1      Q.   I'll hand you what I've marked as

2   Exhibit 12.

3           Do you recognize this document, sir?

4      **A.   This would have been his decision after the**

5   **hearing.**

6           **And these aren't brought back around to the**

7   **parole board to look at.  I'm seeing this for the first**

8   **time.**

9      Q.   And this -- do you know who prepares this

10  decision?

11     **A.   It would be one of the sections that**

12  **prepares the decision for the parole board.**

13     Q.   So you don't know who?

14     **A.   Not specifically who.**

15     Q.   ████████████████████████████████████████████

16  ████████████████████████████████████████████████████████

17  ████████████████████

18     **A.   Correct.**

19     Q.   Also tells him the decision is not subject

20  to appeal, correct?

21     **A.   Correct.**

22     Q.   And it also tells him that release at this

23  time would depreciate the seriousness of the present

24  offense, correct?

25     **A.   Correct.**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 197 of 244

1    Q.   Do you feel this is sufficient explanation

2    to Mr. ███████ about why his request for parole release

3    was denied?

4    **A.   You know, for our process, as it currently**

5    **is, my answer is yes.  I speak to the significance of**

6    **the offense, and explain that your release at this time**

7    **would depreciate that.**

8    Q.   But you testified earlier today that the

9    facts of the crime and the inmate's criminal history

10   are static, they will never change, so --

11   **A.   That is true.**

12   Q.   So in 2021, when Mr. ███████ sees the

13   parole board again, the circumstances of the present

14   offense are going to remain as they were in 2017,

15   correct?

16   **A.   That's a true statement.**

17   Q.   Does this parole denial notice provide, in

18   your opinion, sufficient guidance to the parole board

19   four years from now at a reconsideration hearing in

20   assessing whether Mr. ███████ has sufficiently changed

21   from 2017 such that he should be paroled?

22   **A.   There's a point where an offender is**

23   **serving time for those kind of sentence structures, for**

24   **those kinds of horrific offenses, and I mentioned it**

25   **before, but that retributive time is still being**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 198 of 244

1    considered.

2              When you have an offender that is behaving

3    appropriately -- because that's what they're expected

4    to do, okay?  So I want to really clarify that.  Being

5    violation free isn't something that you stand up and

6    applaud.  You're expected to actually be violation free

7    every day you're in prison and not violate rules.

8              So he's followed that, and doing what he

9    needs to do to sway, at some point, for parole board

10   members, to vote on his behalf.  And he'll have to

11   continue to do that.

12             And that would be the reference we were

13   talking about earlier.  His crime is always going to be

14   his crime.  It's always going to be what it is.  And

15   every member will look at it and consider it a certain

16   way.

17             Just like in four years you may have a

18   different group altogether that looks at it again.

19   That's the other part of this.  But it speaks to the

20   offense as still being very significant, and that

21   because of that, your release would depreciate that

22   seriousness at this time.

23        Q.   You used the term horrific offenses.  Are

24   you thinking about murder cases in particular?

25        A.   No, there are case, other than murder

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 199 of 244

1   cases, that are really bad cases.  In my view.

2          Q.   But would you consider every murder case to

3   fall into that category case in your mind as horrific

4   offenses?

5          A.   Murder cases are bad, okay?  Because

6   someone's life was taken.  And do you consider or can

7   consider how that person's life was taken?  Can you

8   consider that?  Certainly you can.

9               You know, someone being shot, versus being

10  stabbed a hundred times, and is still living, and then

11  dying, that's bad.  But that's up to each individual

12  person that's reviewing a case.

13              Every murder is a bad case, okay?  It can

14  be a very, very, very horrific case given how the

15  victim was murdered.

16         Q.   Do you recall how the victim in

17  Mr. _____ case was killed?

18         A.   No, I really don't.

19         Q.   And does this decision give any guidance to

20  Mr. _____ about what he needs to do in order to

21  increase his chances for release at his reconsideration

22  hearing in 2021?

23         A.   No, it doesn't.

24         Q.   And do you recall, way back when we started

25  today, when we were talking about an email from Kelly

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 200 of 244

1    Dills to Jay Boresi, that she copied you on.  And she

2    said the board was likely to cite institutional

3    adjustment, or that they wouldn't be able to remain at

4    liberty without violating the law; do you recall that

5    testimony?

6         **A.    Yes.**

7         Q.   And clearly the board is denying on

8    circumstances of the offense, correct?

9         **A.    Yes.**

10        Q.   And they did it for ███████████, too,

11   correct?

12        **A.    Yes.**

13        Q.   And they did it for Theron Roland, too,

14   correct?

15        **A.    Yes.**

16        Q.   And they did it for ████████████, too,

17   correct?

18        **A.    Yes.**

19        Q.   And they did it for █████████████, too,

20   correct?

21        **A.    Yes.**

22             MR. CRANE:  I'll object, and I'd like the

23   record to reflect the witness is not testifying from

24   his own memory, but was handed a sheet that he read off

25   of.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 201 of 244

1   BY MS. BREIHAN:

2         Q.    Do you have any reason to doubt the

3   authenticity of the parole decision notices that I just

4   passed to you?

5         **A.    No.**

6         Q.    Okay.  Are all parole board decisions, in

7   your experience, generated and conveyed to an inmate on

8   this same form?

9         **A.    Um, yes, that it is true.**

10        Q.    Okay.  And Mr. Ralph McElroy was also

11  denied based, in part, on circumstances of the offense,

12  correct?

13        **A.    Yes.**

14        Q.    And ████████████ was also denied, in

15  part, based on circumstances of the offense, correct?

16        **A.    Yes.**

17        Q.    And ██████████ was denied based on the

18  circumstances of the offense, at least in part,

19  correct?

20        **A.    Yes.**

21        Q.    And ██████████ was denied in part based on

22  circumstances of the offense, correct?

23        **A.    Yes.**

24        Q.    And ████████████ was denied based in part

25  based upon the circumstances of the offense, correct?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 202 of 244

1      A.    Yes.

2      Q.    And ████████████ was denied based in part on

3  the circumstances of offense, wasn't he?

4      A.    Yes.

5      Q.    And ████████████ was denied in part based

6  on the circumstances of the an offense, correct?

7      A.    Yes.

8      Q.    And ████████████, was he denied based on

9  circumstances of the offense?

10     A.    Yes.

11     Q.    Okay.  Well, take a closer look at that

12  sheet, because I was confused at that on first glance

13  as well.

14     A.    (The witness complied.)

15           Depreciate the circumstances surrounding

16  the present offense.

17     Q.    If you look at paragraph three on

18  Mr. ████████████, "You have been given parole

19  consideration."  Or it gives him an outdate, doesn't

20  it, is my point?

21     A.    Yes.

22     Q.    So why would the board be saying that

23  release would depreciate the seriousness of the offense

24  when giving someone an outdate?

25     A.    I can't answer that.  You'd have to speak

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 203 of 244

1  to who referenced that.

2         I don't have a good answer for that, other

3  than the fact that this offender -- unless you have the

4  others -- is one of four, under this category, that was

5  in effect released by the parole board.  So it's not a

6  hundred percent that they're just all not released.

7  Some, four, in fact, have been released.

8         Q.   So they've been released already from

9  custody?

10        A.   I mean, they have an outdate.

11        Q.   And can that outdate be taken away or

12  moved?

13        A.   Yes.

14        Q.   Okay.

15        A.   Due to behavior, yes, absolutely.

16        Q.   And the board's discretion?

17        A.   If there are behavior issues.  And prior to

18  release, there's always a nine-month review prior to a

19  release date.  And if, since that hearing, there are

20  any behavioral issues, the parole board would certainly

21  consider extending or pulling that date altogether.

22        Q.   You testified at the beginning of the day

23  that part of your responsibilities as chair of the

24  board was discipline for non-gubernatorial

25  appointments, correct?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 204 of 244

1    A.   Yes.

2    Q.   Have you ever had occasion to discipline

3  parole staff for unprofessional or unethical conduct?

4    A.   I'm sure that I have.

5    Q.   Can you recall any specific instances where

6  you did?

7    A.   By name?

8    Q.   Yes.

9    A.   I'm sure that can be captured pretty

10  easily.  I don't recall the last person that I

11  disciplined.  But if you have something for me to

12  respond to that I've written or done, I'm happy to

13  review it.

14    Q.   What about ██████████?  Are you aware of

15  any unethical conduct in which he engaged?

16    A.   Yes.  Actually he was disciplined, yes.

17    Q.   Tell me about that.

18    A.   He was disciplined for unprofessional

19  conduct while -- during a parole hearing.

20    Q.   More than one parole hearing, correct?

21    A.   That is true.

22    Q.   And he was part of the game-playing scandal

23  with Don Ruzicka; is that correct?

24    A.   That is correct.

25    Q.   So how did you first hear about that

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 205 of 244

1  misconduct?

2        A.   It was brought to my attention after I had

3  returned from a leave from -- leave, on funeral leave.

4  And I must admit, I was astonished at what I was being

5  told.

6        Q.   And -- I'm sorry, go ahead.

7        A.   And then I initiated an investigation.

8  Immediately.

9        Q.   Did you ask Kelly Dills and Pam Rogers to

10  review certain audio recordings?

11        A.   They had already started that before I got

12  back.

13        Q.   And other than their review of hearings for

14  purposes of this investigation, is there any process in

15  place, then or now, to your knowledge, for reviewing

16  hearings to make sure that this kind of unethical or

17  unprofessional conduct was happening?

18        A.   I can't tell you that there is a process

19  where someone sits down and listens at a hearing to

20  check the conduct of folks.  If Central Office sat in

21  on a hearing no one's going to do anything like that.  I

22  mean, they just aren't.  It can occur under any

23  circumstances when you have someone they go unchecked

24  and, you know, this happens.

25               The only other occasion is when we get

Pohlman USA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 206 of 244

1   complaints from individuals that have been at hearings,

2   offenders or family members that have come to a

3   hearing, like a delegate.  Not usually a victim's case.

4   And if we got those kinds of complaints, Kelly Dills

5   was always directed to go review the tape and listen to

6   the hearing and see if there was anything to it.

7       Q.   Do you recall having any conversations with

8   Director Lombardi about the misconduct by Ruzicka and

9   ███████

10      A.   Other than sending it up the chain of

11  command -- Mr. Lombardi would still be in my chain of

12  command operationally -- so if there were an issue, not

13  only would it go to him, but it would also go to the

14  Governor's office.  Or he could take it to the

15  Governor's office depending on how he wants to handle

16  it.

17      Q.   You didn't have the power to reprimand

18  Ruzicka, correct?

19      A.   I did not.  The line staff, I do.

20      Q.   Were you involved in any discussion with

21  the Governor's office on appropriate action to take

22  against Ruzicka once this misconduct was surfaced?

23      A.   Other than -- to answer your question, no,

24  I didn't go sit in the Governor's office and discuss

25  this issue.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 207 of 244

1          I did send them the full investigation

2     after I requested it through the Inspector General's

3     office, immediately, the same day it was brought to my

4     attention, and then to Mr. Lombardi, who also said,

5     yes, go forth.

6          And the investigation was completed.  And

7     then it was forwarded up the chain of command

8     accordingly.  Not only to me, but to Mr. Lombardi, and

9     also over to the Governor's office.  And I believe the

10    department of general counsel got a copy of it.

11        Q.   And I think you testified you didn't go

12    over and sit down in the Governor's office.  To be

13    clear, I'm talking about a phone call, an email, talk

14    on the street, any conversation with anyone in the

15    Governor's office about the report?

16        A.   No.

17        Q.   What conversations did you have with

18    Director Lombardi after the report was completed?

19        A.   I mean, I don't recall specific discussions

20    with him afterwards.  The only thing that was in play

21    to consider, I mean, there was no question about the

22    behavior.  The next question was, you know, how would

23    those above me respond to it.

24        I mean, I didn't have the opportunity to

25    address that.  I did what I could at my level by --

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 208 of 244

1    **once it became clear to me what was happening, I pulled**

2    **him off of the calendar.**

3         Q.    Meaning he wasn't conducting parole

4    hearings what the investigation was ongoing?

5         **A.    Exactly.  And that took a while.**

6         Q.    And he was still getting paid?

7         **A.    Yes.**

8         Q.    And then shortly after, within a month

9    after the hearing was held, he started conducting

10   hearings again, correct?

11        **A.    I don't think it was a month.  I think he**

12   **was off the calendar for closer to a month and a half**

13   **or more.  I don't know the exact amount.  It was a good**

14   **while.**

15        Q.    So what, if any disciplinary action, was

16   taken against Ruzicka after the report was finalized in

17   November of 2016?

18        **A.    Well, there was none taken by the**

19   **Governor's office, and they were the ones that could.**

20   **I couldn't do anything.  He was not in my chain of**

21   **command.**

22        Q.    And did you review the Inspector General's

23   report, I assume?

24        **A.    Yes.**

25        Q.    And you saw where Ruzicka said that the

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 209 of 244

1  games were exercises to improve listening skills; did

2  you agree with that?

3       A.   No.  Unequivocally, no.  And he shared that

4  with me when I and Julie sat down with him, or I and

5  Kelly, I'm not sure it was who was with me.  To hear

6  his response once the investigation was completed.  And

7  that's exactly what he said to me.  And I'll admit I --

8  I didn't know what to expect at his response, but it

9  certainly wasn't that.

10      Q.   Why wasn't the report made public?

11      A.   That wasn't my call.

12      Q.   Whose call was it?

13      A.   Well, I mean, as a board member, that issue

14  is passed off to the Governor's office.  To people that

15  are above me.  I mean, I have no calculation to discern

16  what should happen to him, or anything that relates to

17  it; he doesn't work for me.

18      Q.   He's a member of the board that you're the

19  chairman of?

20      A.   He is a member of the board.

21      Q.   And he's conducting parole hearings when

22  you were the chair?

23      A.   I can never deny that, unfortunately, and

24  that's true.

25      Q.   And he, in fact, was conducting SB 590

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 210 of 244

1  hearings, correct?

2      **A.   I don't know that to be the case.**

3      Q.   He was certainly voting on them as well --

4  at least from the documents you've got in front of

5  you -- he voted on Mr. █████████ case, correct?

6      **A.   Correct.**

7      Q.   Do you think the report should have been

8  made public when he was finalized?

9           MR. SPILLANE:  I'm going to object to

10 relevance.

11          You can answer.

12          THE WITNESS:  Um, that parole board's body

13 of work has always been protected by statute.  So

14 that's where I would have landed at with this issue.

15 And then it wasn't my decision to make that decision.

16 I mean, it wasn't my decision to make that call no

17 matter what I might have thought.

18 BY MS. BREIHAN:

19      Q.   And I think you're referring to the statute

20 that says that parole records are closed --

21      **A.   Correct.**

22      Q.   -- but may be open to inmates in the

23 board's discretion, correct?

24      **A.   Correct.**

25      Q.   In your experience, has the board ever

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 211 of 244

1   exercised that discretion and give an inmate access to

2   his parole file without the court ordering to do so?

3        **A.   Not with out my tenure.**

4        Q.   How was ████████ disciplined in the

5   wake of this scandal?

6        **A.   He received a suspension.**

7        Q.   With pay?

8        **A.   Without pay.**

9        Q.   For how long?

10       **A.   I believe it was for two days.**

11       Q.   Did he have to receive my sort of training

12  in order to resume this position?

13       **A.   I can't answer that.  I'm sure Kelly Dills**

14  **can answer that.  She was very involved in that process**

15  **with him, before, during and after the discipline of**

16  **him.**

17       Q.   Are you aware that some time in June of

18  this year our office made the report public?

19       **A.   Yes.**

20       Q.   How'd you come to hear about that?

21       **A.   I think was in the paper.  I'm not sure who**

22  **called me and said something, but it got to my**

23  **attention at some point.  Like it did everybody else.**

24       Q.   And what was the reaction among the parole

25  board and staff?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 212 of 244

1        A.   I can't answer what the reaction was to

2   other staff.

3             And as to the board, I -- there are folks

4   on the board that were close to Don Ruzicka.  I was not

5   one of those people.  So I can't tell you how they

6   really reacted to that or what they thought any of

7   that.

8             But I do believe that over time, I think

9   that people's view would have had to have changed since

10  the behavior was absolutely -- I mean, there's no way

11  I'll ever defend that behavior for anyone.  It was

12  completely inappropriate.

13       Q.   But did they share any opinions with you

14  about what they thought of it?

15       A.   There were a couple of folks that did

16  approach me.  And they were stunned to see it.

17  Because, I mean, it was kept away from the parole

18  board, except for the one member that did report the

19  matter, which is in the report.  Or you can figure out

20  who that is.  And I don't know who that person may have

21  spoken to that were on the board.  A lot of those folks

22  were close.

23       Q.   You're talking about Kenny Jones?

24       A.   Yes.  But I was approached be one member

25  who was stunned to see it.  They were surprised because

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 213 of 244

1    it was kept a secret, you know.

2            I mean, it's nothing that you'd ever want

3    to brag about with anybody.  And if you understood the

4    process the way I think I do, and regard the process

5    the way I do, in my 37 years, I was very unhappy

6    camper.

7        Q.   And I think you mentioned that if maybe

8    there was someone from central office or higher-ups who

9    were sitting in on a hearing that kind of conduct

10   wasn't gonna happen.

11       A.   Well, it's not gonna happen.  I can't say

12   unless you're stupid, because I believe that the

13   actions were stupid.  Just very candidly speaking.

14           There were many things, but because of our

15   process -- and this is no way to excuse anything,

16   because I'm not, I'm on the opposite side of this

17   issue -- that was terrible.  It was completely

18   inappropriate.

19           But because those decisions go to a -- to

20   the full board, that one person, no matter what their

21   behavior was, could not have by themselves, if they

22   would have been voting the way that they were behaving,

23   created an absolute outcome.  Because there's at least

24   three other folks that would have to vote that way, or

25   see that vote and say, well, that makes no sense.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 214 of 244

1  So I'm comfortable in the fact that while

2  that behavior went on, that that person, or those

3  persons that Ruzicka conducted hearings on or voted on,

4  unless he was walking around saying, "do this," which I

5  don't believe that occurred at all, then I'm satisfied

6  that his one vote did not influence the outcome for

7  other people.

8  His behavior was unacceptable.

9  Q.  How often does it happen, in your

10  experience, that board members voting on this board

11  action sheet disagree with a decision noted by the

12  initial member?

13  A.  Oh, it happens a lot.

14  Yeah, you know, I think you would see many

15  more times there would be five or six names on that in

16  those voting blocks.  So I think it happens -- it

17  happens I think more than it doesn't happen, is my view

18  on that.

19  Your view, whatever it is, is your view,

20  and you put down your vote.

21  Q.  And why are these decisions not appealable

22  to the full board?

23  A.  It has been the board policy.  And that may

24  not be a great answer, but that's been our process,

25  before I came, and since I've been there.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 215 of 244

1    Q.   So other than this misconduct by

2   Ruzicka and ████, which is detailed in Amy Roderick's

3   November 2016 report, are you aware of any other

4   unprofessional conduct at parole hearings during your

5   tenure as board chair or a member?

6        **A.   At hearings, no.  That's what was so**

7   **stunning, is that this was at hearings.**

8             **No.  It was always my view that people were**

9   **known.  That's why we took them to training.  This is a**

10  **very sacred process.  I held it as such.  And I just**

11  **found it unimaginable when I was called and told this.**

12  **I had to come and listen myself.**

13       Q.   Did it place any bigger concerns about

14  transparency of the board?

15            I mean, you seemed to suggest today

16  yourself, if there were someone else in the room or

17  some oversight this behavior might not have been able

18  to occur.

19       **A.   You know, for everything that you look at**

20  **and say there could be a game, believe me, there's a**

21  **lot.**

22            **Because when it comes to the parole board,**

23  **if we had open board, a transparent board, like some**

24  **states do, and many other states don't, I have no doubt**

25  **in my mind -- I'm not there any longer -- but I have no**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 216 of 244

1  doubt, and I was very firm on it -- that it needed to

2  be a closed process.  Because once you start

3  letting -- like some other states do -- anyone attend a

4  parole hearing, those are platforms that can be easily

5  politicized.  One.  And two, people decide, if you have

6  a case like this case, and your intent was to vote a

7  release date, I believe people are going to be

8  influenced by someone looking at them, when they have

9  to openly vote for this really bad guy, in terms of

10 just the case, okay, and put a date down.

11             I think that would be unduly influence, and

12 I don't think you could be as objective as you need to

13 be, or as independent.

14             It's always been my position, if we had

15 open hearings, I believe that you would see an

16 explosion of the inmate population.  I think that you

17 would see fewer releases.  Because I think people would

18 be afraid, in very bad cases, to vote objectively.  I

19 think they'd be influenced by the group that might be

20 looking at them.

21             As a parole board, you make half the room

22 unhappy.  You never make everybody happy at a parole

23 hearing.  You cut a release date.  Victims are unhappy.

24 If you don't, the offender and his family are unhappy.

25 If those folks are sitting in that room with you -- who

PohlmanUSA Court Reporting
(877) 421-0099     www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 217 of 244

1    knows who might be in there -- some folks may not have

2    the full heart to vote their full conscience.

3        Q.   Have you discussed this case with anybody

4    besides your lawyers here today?

5        A.   I haven't discussed it with anybody.  On

6    purpose.

7        Q.   Why is that?

8        A.   Because I really don't want to know what

9    other people have to say, to be frank with you.

10           Two, I want to get the questions as they're

11   fresh to me for the first time, so that I can react

12   like I think I should be reacting.  That's always by

13   design for me.

14       Q.   Has anyone within the Department of

15   Corrections or the Division of Probation and Parole

16   told you that they disapprove of how the board has

17   handled these SB 590 hearings?

18       A.   I've not had anybody approach me and tell

19   me that.

20       Q.   Have you heard anybody else telling anybody

21   else that?

22       A.   I don't recall that.

23       Q.   I think you mentioned back when you were

24   working to get videoconference hearings implemented in

25   Probation and Parole that there was a task force

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 218 of 244

1    created; is that correct?

2         A.    Yes.

3         Q.    Was there ever any talk, by you or others,

4    about creating a task force for taking on how to

5    implement SB 590?

6         A.    I can't say that it was a task force in the

7    same style that we created the committee for

8    video parole hearings.

9              But Kelly Dills, along with a few other

10   folks, took the lead in looking at the bill, the

11   statute, what it said we need to do.  You know, so I

12   mean, so that in and of itself, is something of a

13   committee in with her working with the attorneys and

14   other folks.  I mean, it wasn't her by herself, it was

15   several individuals.  And whether it was an announced

16   committee or not, you know, we need to get that done

17   expeditiously.

18             With the videoconferencing, we had time

19   to -- we had a year to get that done.

20        Q.    Is Kelly Dills an attorney?

21        A.    She talks like one, but she's not one.

22        Q.    She's not gone to law school, to your

23   knowledge?

24        A.    I don't know that.  I know that myself or

25   Julie always made Kelly the connection when it came to

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 219 of 244

1   issues with the statute.  Her and Steve Mueller, sort

2   of as a team, were our statute folks.  And would work

3   with either the general counsel, the AG's office, the

4   lawyers, to give the -- help give the parole board some

5   direction.

6              MS. BREIHAN:  Give me five minutes to look

7   over my notes.

8              (A break was taken.)

9   BY MS. BREIHAN:

10       Q.    Back on the record.

11             I have few questions to clarify.

12             We were talking a little bit here and there

13  about a majority board decision versus a full board

14  decision, correct?

15       A.    Yes.

16       Q.    And then all the SB 590 hearings are

17  majority board decisions, correct?

18       A.    Yes.

19       Q.    Are there any instances where a case is a

20  majority board decision and it's somehow removed to a

21  full board decision?

22       A.    I think that a majority board decision, and

23  a full board decision, that's semantics.  I mean, when

24  it goes beyond the panel member, it is going to the

25  full board.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 220 of 244

1           Now, it's the terminology, more than

2   anything else, when you say "majority board."  Because

3   they are one in the same.  Majority board, full board,

4   the inference is that some cases can be finalized at

5   that panel hearing.  And if it is not finalized at the

6   panel hearing, most of our cases go to the rest of the

7   members to get a majority vote.

8           So it's a terminology thing as much as

9   anything else.  They should probably say that beyond

10  this panel, it will go to the full board.  And never

11  say the word "majority board," because, quite frankly,

12  they're one in the same.  They're not two different

13  kinds of decisional outcomes.

14      Q.   But there are, certainly in Mr. █████████'

15  case, where it's majority decision, but the full board

16  does not vote, meaning not every single member of the

17  parole board votes on the case, correct?

18      A.   That's true.

19      Q.   Are there ever instances where, other than

20  when there's perhaps a tie among other members, that

21  the full board member, every board member, is required

22  to vote on a case?

23      A.   Well, when there's a tie, all but one have.

24  The only person remaining is the -- usually the parole

25  board chairman gets the split.  Unless he voted, and

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 221 of 244

1 someone was gone sick, or whatever. They get back,

2 it's waiting on their desk to put a vote in.

3          So, no, it don't go back around. It goes

4 to whoever hasn't voted yet, and then that person will

5 final the vote. This will be the last vote. They'll

6 vote a date or a hearing. It will be final.

7      Q.   So circumstances other than that

8 three-three split, are there ever categorically cases

9 that require a vote by the entire board?

10      A.   The only thing that requires a vote by the

11 entire board, no matter what the number is, are

12 clemencies. We're the middle piece to clemencies. And

13 you may have four folks that want to vote a certain

14 way, and one that doesn't. Well, they're all still

15 recorded.

16          But to my knowledge, other than clemencies,

17 the term "full board," I think that's when it's

18 applicable. Beyond that, when it leaves a the panel,

19 it goes to the rest of the board till there's a

20 majority decision.

21          That's the best way to delineate that.

22      Q.   And I might have already asked this

23 question today, but I want to confirm, do you recall

24 any discussions during executive sessions at board

25 meetings about any of these juvenile offenders who were

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 222 of 244

1  eligible under SB590?

2       A.   I'm not saying it couldn't have occurred.

3  We could have had training, and gone to that meeting to

4  review a file, and someone had said something about it.

5  But I don't recall that.  I'm not saying that that

6  couldn't have occurred.

7       Q.   I can only ask you to tell me what you know

8  and what you remember.

9       A.   Yeah.

10      Q.   And are you aware that a delegate has a

11  right to request a meeting with the board outside of a

12  parole hearing?

13      A.   They can request it.  That does not mean

14  that that request will be honored.  And those requests

15  do come in sometimes.  And those do not always float

16  through the parole chairman's office.

17           Some of these folks contact the members

18  individually.  And there may have been folks that may

19  have sat down with a board member before.  It's not

20  vetted through the chair's office.  That's the best way

21  I can answer that.

22           I know the requests have been made.  Some

23  are honored.  Most are not.

24      Q.   How do you determine -- or how is it

25  determined whether or not those requests would be

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 223 of 244

1 honored?

2      A.   **You'd have to ask the people that are**

3 **saying yes to it.**

4      Q.   And that's the parole board member,

5 whomever is contacted by the delegate, making that

6 decision?

7      A.   **That member.**

8      Q.   So hypothetically, if Gary Dusenberg gets a

9 call or an email from a delegate and says, "I want to

10 meet with you," it's up to Mr. Dusenberg whether or not

11 to have that meeting?

12      A.   **That would be correct.**

13      Q.   Have you personally ever received, as a

14 chair or a member, a request for a sit-down with a

15 delegate?

16      A.   **I recall sitting down with a delegate when**

17 **I first came to the board.  I was brand new to the**

18 **board.**

19           **So the chair, and I think two other folks**

20 **sat in.  That was my first week.  They just knew my**

21 **name from the prison side of things.**

22           **But I was uncomfortable sitting down**

23 **because there was nobody else doing it.  That was it.**

24 **I didn't take those meetings.**

25           **And as chair, as chair, I don't think I**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 224 of 244

1    took any of those meetings.

2         Q.   Did you receive requests for those

3    meetings?

4         A.   I'm sure that I did.  You know, folks can

5    go online and see your name, pick your name, and call

6    you.  Or they'll call the front desk.  "So who's there?

7    If Mr. Dusenberg isn't there, is anyone there?"  They

8    shouldn't say who's there, but sometimes they do.  If

9    it came through my office, my secretary knew to shut

10   that down.

11        Q.   So you instructed your secretary to not

12   take any requests for sit-downs?

13        A.   I just didn't -- I just didn't take them.

14        Q.   Do parole staff receive any training on

15   motivational interviewing?

16        A.   Yes.

17        Q.   What does that mean, motivational

18   interviewing?

19        A.   Well, you -- it's the interview.  It's the

20   acronym I was going to mention to you, after I learned

21   that he saw what it was.

22             Motivation interviewing, it's a way -- a

23   technique for how you go about talking to an offender,

24   to get him out of the yes/no responses, so that you can

25   have an engagement in your discussion to pull him out.

PohlmanUSA Court Reporting
(877) 421-0099     www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 225 of 244

1  To understand that the best approach to go to, and not

2  keep it all just criminal justice.

3          There are other things that you look at

4  with MI, you know, that help you have a more full

5  interaction with the offender.  And we, in fact, had

6  the MI people come over to the board to conduct an MI

7  training with the parole board.

8      Q.   When was that MI training?

9      A.   It was some time in the last three years.

10     Q.   What do you mean by "my people?"

11     A.   Whoever conducts the training for

12  motivational interviewing at Probation and Parole.

13     Q.   So DOC employees?

14     A.   I believe it was Probation and Parole

15  employees.

16     Q.   It's not some outside consultant or

17  organization?

18     A.   No.  No.  This is our staff.  We have

19  training staff, that are Probation and Parole training

20  staff, that conduct MI training.  So I'm sure that they

21  would have reached out to those folks to come over to

22  the board to conduct that training.

23          I know we had that at least once.  Maybe it

24  was more than once.

25     Q.   Do you know the names of any of the staff

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 226 of 244

1 members in the training group?

2      A.   That conducted the training?

3      Q.   Or just make up that training office?

4      A.   No.  But it would have been -- Kelly Dills,

5 or someone out of her office, would have reached out to

6 training.  Because the parole board has requested that

7 MI training be conducted.  So then at the next board

8 meeting, there were folks to conduct that MI training.

9      Q.   So what are some motivational interview

10 techniques?

11      A.   I'm not sure if I'm going to be working off

12 of what their training piece is, but I do know that you

13 need to make an offender comfortable at a hearing.

14           A lot of offenders come in, it's like a job

15 interview, you can see they're very uncomfortable.  And

16 I think you do what you can to try to make them feel

17 comfortable when you see that.

18           And then you do your best not ask yes or no

19 questions.  Ask questions that, you know, offer more of

20 an opportunity for the offender to talk about.

21           I'm not an MI expert, okay?  They would

22 better respond to your question.  But it's techniques

23 on how to conduct a better Q and A with offenders.  And

24 in our case, doing parole hearings.

25      Q.   And how do you make them comfortable when

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 227 of 244

1  you're asking them very detailed questions about the

2  facts of their underlying crime?

3      **A.   I think when I see someone uncomfortable, I**

4  **think you try to do what you can to make it -- to**

5  **lighten it up somehow at a regular hearing.  Because**

6  **you do want them to have a good exchange.**

7           **And you're going to talk about, in some**

8  **cases, some really tough things.  They're able to**

9  **articulate better when they're not as nervous or**

10 **uncomfortable.**

11     Q.   I mean, these hearings are high-stress

12 situations; is that fair to say?

13     **A.   That's a very fair statement.**

14     Q.   Especially for the men and women impacted

15 by this change in the law who never thought they'd be

16 before the parole board, correct?

17     **A.   Correct.**

18     Q.   And today I noticed you've been using

19 masculine pronouns in referring to inmates impacted by

20 SB590, but there are female --

21     **A.   I'm sorry, what?**

22     Q.   Using masculine pronouns.

23     **A.   Okay.**

24     Q.   But there are female inmates who are

25 impacted by SB590 as well, correct?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 228 of 244

1    **A.    Sure.    Absolutely.**

2    Q.    But the majority of the impacted inmates

3    are men?

4    **A.    That's the bigger population that is**

5    **served, so there's a higher number of male offenders.**

6    Q.    And the majority of the JL WOP population

7    is actually men of color, correct?

8    **A.    That may very well be.  I don't have that**

9    **number in front of me.**

10    MS. BREIHAN:  I don't have any other

11    questions at this time.

12    CROSS-EXAMINATION BY MR. SPILLANE:

13    Q.    I'm Mike Spillane.  I have a few questions.

14    Counsel, at the beginning, asked you

15    questions about you being quote, demoted, unquote.

16    Were you demoted from being chairman of the parole

17    board.

18    **A.    No.  It's common for folks to believe that.**

19    **When there's a new Governor in, just like when I came**

20    **in, there was a sitting chairman there.  And I was**

21    **appointed as chair.  And I worked for him -- worked**

22    **with him for six months.  It's just a part of the**

23    **business.**

24    **When there's a new Governor, he's going to**

25    **want his new team.  You know that when you're in that**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 229 of 244

1    job.  And I wasn't demoted.  They appointed a new

2    chairperson, Kenny Jones.

3              And I had just actually been reappointed to

4    the board to six years the year before on my second

5    term.  And it's part of the business.

6              Some folks could look at it and say that's

7    a demotion.  The reality of it is that over the course

8    of my career, I served seven years, which was the

9    second longest serving stay for a chairman in our

10   80-year history.  And I was very proud of that.

11             But I also understand when a Governor wants

12   to make his changes, bring his team in, I'm all for

13   that, too.

14             I worked with the new chair.  And our team.

15   And went back to the board as a member, which is a

16   great job.  And tried to be an effective team member

17   while I was still there.  I knew that '17 was my last

18   year.  When you're starting your 38th year, it's time.

19             There was not a demotion involved.

20        Q.   I'm going to ask you to look at the

21   document AGO2835, which you've been asked a lot of

22   questions about, and it's identified as a board action

23   sheet.  And it looks to me like there are seven boxes

24   that have markings in them.

25             Is the marking in all the boxes simply a

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 230 of 244

1    reference to a date for a new hearing?

2         **A.    Yes.**

3         Q.    So there aren't any reasons why that you

4    considered, r didn't consider them for parole marked in

5    those boxes; is that true?

6         **A.    That's true.**

7         Q.    Would there normally be such reasons marked

8    in those boxes?

9         **A.    No.**

10         Q.    Okay.  Another thins you were asked about,

11    the next page in that 2836, it is reasons for decision

12    above the guidelines.

13              And, first of all, are there guidelines

14    that are involved in a life sentence?

15         **A.    No.**

16         Q.    Okay.

17         **A.    Only on term sentences.**

18         Q.    Okay.  But if there was a guideline

19    sentence you'd have to have a reason for going above

20    the guidelines under the regs; is that accurate?

21         **A.    Yes.**

22         Q.    So that doesn't really apply here; is that

23    fair?

24         **A.    That is correct.**

25         Q.    And you only have two options there,

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 231 of 244

1  release at this time would depreciate the seriousness

2  of the present offense, or there does not appear to be

3  a reasonable possibility at this time that the offender

4  would live and remain at liberty without again

5  violating the law.

6          Are those the only two things you can

7  choose for a notification on a parole consideration

8  hearing?

9      A.    Yes.

10     Q.    You have to choose one of the boxes?

11     A.    At least one.

12     Q.    Does the board action sheet, or which one

13 of those boxes you checked, reflect everything that

14 you've considered in deciding whether to grant or deny

15 parole?

16     A.    No.  Not everything is placed in writing in

17 a document like that.

18          You know, there are a lot of things

19 discussed at a hearing, over the course of the hearing

20 time, that aren't somehow reduced to writing that you

21 do actually consider.  But at the same time, though,

22 unless it's something absolutely a huge red flag, or

23 something that you found to just be important enough to

24 note in this box up here.  And anyone can do that,

25 including this panel, or any of these members, and none

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 232 of 244

1  chose to.  And neither did I.

2       Q.   And that was the hearing panel comments box

3  that you pointed at, and there's nothing in that on the

4  one I was showing.

5       A.   That's correct.

6       Q.   Let me ask you about 2837, which is the

7  five questions.

8            Do these five questions reflect everything

9  that you consider in a JL WOP parole hearing?

10      A.   That would be the same answer that I just

11 referenced.  A lot of things are discussed that are not

12 replicated on that particular sheet or that document

13 that do occur at a parole hearing.

14      Q.   Let me ask you this:  Are what is written

15 in response to these five questions aimed specifically

16 at what is viewed as being responsive to these five

17 questions?

18      A.   Just like if there was seven questions, and

19 one was about mental health, there would be an answer

20 down there.  More specific to it, probably.

21           It wouldn't necessarily mean because it's

22 on there that it has huge weight.  But it may be there

23 and be answered.  It doesn't mean that it wasn't

24 considered.

25           And I know in this case, I know if there

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 233 of 244

1  was an MH, anything, it would have been reviewed at and

2  looked at.  Maybe not have risen to be put in the box

3  over here.  Or someone writing on the bottom down here,

4  that there was a MH considered, although MH2 is

5  referenced on that document.

6         Q.   Let me ask you this:  As I understood your

7  response on direct examination, you go through the

8  prehearing report and consider all of the things that

9  are in the report; is that a fair summation of your

10  testimony?

11         If it's not, tell me.

12         A.   Yes.  You make every effort.  Those reports

13  are put together by staff really at the issuance of --

14  the executive staffing on the board side.  So you want

15  that document to be a useful tool.  You want to have

16  the things in it that you believe you will ask

17  questions about.

18         If you look at that document, and look at

19  it ten years ago or five years ago, it looks different.

20  It will continue to change as things change.

21         You want to have the document there so you

22  can review the things that are there.  You give a

23  little weight differently to the things that are there,

24  depending on whose asking the questions, and what your

25  sense of the review is.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 234 of 244

1          MR. SPILLANE:  I don't have any further

2     questions.

3          MS. BREIHAN:  A few follow up on redirect.

4     REDIRECT EXAMINATION BY MS. BREIHAN:

5          Q.   To clarify, it was not a demotion, it was a

6     change of the guard; is that fair to say?

7          **A.   I wasn't offended.**

8          Q.   Thank you.

9          It sounds like new Governor, new

10    leadership?

11         **A.   Throughout the state, yeah.**

12         Q.   It's just a matter of politics?

13         **A.   Yes.**

14         Q.   You also mentioned that your stay as chair

15    was the second longest in Missouri history, correct?

16         **A.   I believe that it was.  In our modern**

17    **history, there's only two.  One 14 years, and then**

18    **myself.**

19         **When I say modern history, when you go back**

20    **to the '40s maybe, the'50s, there may have been another**

21    **person that served more than four years.**

22         **But in modern times, since Cranston**

23    **Mitchell, I know I'm the second longest serving chair.**

24    **And he served 14 years as chair.  And there have been**

25    **many chairs since he served.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 235 of 244

1      Q.    And you mentioned working amicably with

2    Mr. Jones as the new chair before your retirement in

3    September?

4      A.    Yes.

5      Q.    Other than a disagreement in, perhaps, the

6    cap on how many hearings the board should be hearing on

7    a weekly basis, correct?

8      A.    That's a fair way to characterize that.

9            It might have been more than a little

10   disagreement, because I was very invested in this

11   piece.  And in my opinion, I thought that -- my concern

12   always was it's -- I didn't finish that answer, I

13   didn't get to follow up on that.

14           So at some point if you're ever asked, so

15   how the heck do you guys do 25 hearings.  I said you

16   can never have a good answer for that, in my opinion.

17   And I can step into the other shoes of a question-asker

18   pretty easily.  So that's one aspect of that.  It's

19   hard to defend.

20           The most important part is that, to me, you

21   can't deliver.  Which is supposed to be delivering in

22   terms of good decision-making.  And it's just my

23   opinion.  I don't think everyone thought my way about

24   that.  And I don't think Kenny did.

25           And the evidence of that is that when he

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 236 of 244

1   replaced me, it was elevated back to 18.  I still have

2   the same questions for anyone, that how do you actually

3   defend that decision.  It's easier to do 14 in a day

4   than 18.  And my son can calculate that number.

5        Q.   So other than --

6        A.   I said that as nice as I possibly could, by

7   the way.

8        Q.   Other than the difference in opinion about

9   cap -- hearing caps, did you and Mr. Jones disagree on

10  anything else related to parole hearings?

11       A.   The process?  No.  Not that I recall.

12       Q.   Do you recall having any discussions with

13  him about these SB 590 hearings when he became chair?

14       A.   No.

15       Q.   And you just testified a moment ago that

16  the information in this board action sheet, 2835 and

17  2837, does not reflect everything that you considered

18  in making a parole decision; is that a fair summary of

19  your testimony a moment ago?

20       A.   Yes.

21       Q.   And so there are instances, like

22  Mr. ████████ case, where he's denied parole and granted

23  a reconsideration hearing four years down the road,

24  correct?

25       A.   Yes.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 237 of 244

1      Q.   And that hearing may well be before a panel

2  composed of totally different people, correct?

3      **A.   That's a possibility.**

4      Q.   In Mr. ███████ case, it's a certainty,

5  because you're no longer on the board, correct?

6      **A.   Yes.  In terms of me, yes.**

7      Q.   So there's going to be a new board member

8  certainly, and likely a new panel sitting down with

9  Mr. ███████, and looking at his parole file, hopefully,

10 in making a decision in 2021, correct?

11     **A.   Well, I would say that's possible.  But**

12 **given the fact that five members were reappointed to**

13 **six-year terms at one time in 2016, which was unheard**

14 **of, if the other four stay their six-year term, then**

15 **they likely would be there when he comes up again.**

16     Q.   Well, here's who voted on Mr. ███████

17 case:  You, No longer a member.  Don Ruzicka, no longer

18 a member.  And that just leaves Jennifer Zamkus and

19 Gary Dusenberg --

20     **A.   Yes.**

21     Q.   -- neither of whom met Mr. ███████

22 correct?

23     **A.   Correct.  And Martin Rucker, who was**

24 **appointed to a six-year term, and Jimmy Wells.**

25     Q.   And neither of them participated in

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 238 of 244

1    Mr. ██████' hearing or voted on his case?

2         A.    No, I don't believe so.

3         Q.    So how is the board or panel in 2021

4    supposed to look at these notes on the board action

5    sheet, and the five bullet point sheet, and be able to

6    understand how you arrived at your decision, how you

7    weighed these factors, if it doesn't reflect everything

8    that you considered in making your decision?

9         A.    I think the same way that people are

10   currently on the board arrive at a decision, when they

11   see the last board action sheet and there are no

12   comments.

13            I think you look at the file.  You have to

14   begin to make your own decision about what's important

15   in the case.

16            And then a lot really does transpire in

17   that interaction at that parole hearing.  It's

18   extremely important.

19            I always sit at zero when I go into a

20   hearing.  I don't care how bad the case is.  I think

21   it's important that you be sitting at zero, at neutral,

22   until I go into a hearing and hear what this person has

23   to say.  And I don't care how bad the cases are.  And

24   I've seen bad cases over my time.

25            And through the course of that interview,

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 239 of 244

1 you'll start to get moved one way or the other. Not

2 because of what someone on the panel may have opined to

3 me. Although, that can occur. But that offender, it's

4 his or her hearing. And what they say from an

5 engagement standpoint is extremely important to what

6 I'm looking at.

7 Q. If it's their hearing, why don't they get

8 to go first?

9 A. What do you mean?

10 Q. Why don't they get to speak first at their

11 own hearing?

12 A. Well, the process is what the process is.

13 I mean, people can look at other operations, and have a

14 question like what you just said, cause it looks like

15 it makes good sense to you to do that, but this is our

16 process.

17 Q. I understand it is the process, and I'm

18 trying to understand why it is.

19 Has there been critical thought to the

20 order in which these hearings are conducted?

21 A. I don't -- for my view, I like the way the

22 process works, in terms of how we conduct the hearing.

23 The offender -- while I say it's the offender's

24 hearing -- so then you must be talking about a victim's

25 case.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 240 of 244

1              The victim, statutorily, has a right in

2    that hearing as well.  How we conduct the hearing, and,

3    in my opinion, has worked.

4              You could always look at another way of

5    conducting the hearing, I guess.  Maybe someone will do

6    that.  But at least during my stay, and my

7    predecessors, and for 70 years, it's sort of the way

8    the process has been.  And I think it's because it's

9    worked.  Just my one narrow view on it.

10         Q.   It's the inmate's hearing, but they don't

11   get a copy of the recording of the hearing?

12         A.   The inmate has a right to that hearing.

13   They don't own the work of the board.

14         Q.   And they're not given any reasoning for the

15   board's decision other than what's in that single

16   parole decision notice that we've marked as Exhibit 12?

17         A.   That it is the decision.

18         Q.   Okay.  And it's the inmate's hearing, but

19   they're not entitled to look at the parole file which

20   includes evidence that was given to the board or panel

21   in opposition to their release, correct?

22         A.   That is correct.

23         Q.   And it's the inmate's hearing, but they

24   don't have the right to have an attorney present, do

25   they?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 241 of 244

1    A.    That's also correct.

2    Q.    And it's the inmate's hearing, but they

3 only get one delegate to come with them to the hearing,

4 correct?

5    A.    That is also correct.

6    Q.    And that delegate's only allowed to talk

7 about the home plan, correct?

8    **A.    Well, they can talk about whatever is**

9 **important for that offender.  It can be the home plan.**

10 **A variety of different things.  It's what compels them**

11 **to be there that day.  It's not just about -- I mean,**

12 **there aren't limitations on what the delegate can talk**

13 **about.**

14    Q.    There aren't limitations on what a delegate

15 can talk about?

16    **A.    Not that I'm aware of.**

17    **If they want to start litigate the case, we**

18 **don't do that.  We don't do that with anybody.**

19    Q.    Except the prosecutors?

20    **A.    Well, I would tell you that that's not my**

21 **view.  I think that if I'm conducting the hearing, and**

22 **I feel like I'm in court, I'm going to put the brakes**

23 **on it.  To anybody.  Including the prosecutor.**

24    MS. BREIHAN:  I don't have any further

25 questions.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 242 of 244

1            MR. SPILLANE:  Do you want to waive

2    signature, sir?

3            THE WITNESS:  I'll waive signature.

4                 *    *    *    *    *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 243 of 244

1                    CERTIFICATE OF REPORTER

2            I, Kim D. Murphy, Certified Court Reporter,

3     for the State of Missouri, do hereby certify that the

4     witness whose testimony appears in the foregoing

5     deposition was duly sworn by me; that the testimony of

6     said witness was taken by me to the best of my ability

7     and thereafter reduced to typewriting under my

8     direction; that I am neither counsel for, related to,

9     nor employed by any of the parties to the action in

10    which this deposition was taken, and further that I am

11    not a relative or employee of any attorney or counsel

12    employed by the parties thereto, nor financially or

13    otherwise interested in the outcome of the action.

14

15

16

17

18            _____

19                    Kim D. Murphy, CCR

20

21

22

23

24

25

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-5   Filed 06/12/18   Page 244 of 244