IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

NORMAN BROWN, et al,              )
                                 )
          Plaintiffs,            )
                                 )
     vs.                         )  Case No. 17-CV-4082
                                 )
ANNE L. PRECYTHE, et             )
al,                              )
                                 )
          Defendants.            )


     CONFIDENTIAL DEPOSITION OF JENNIFER ZAMKUS,

produced, sworn and examined on the 13th day of

December, 2017, between the hours of nine o'clock in

the forenoon and six o'clock in the afternoon of that

day, at the offices of Husch Blackwell, LLP,

235 E. High Street, Jefferson City, Missouri, before

Kim D. Murphy, Certified Court Reporter, within and for

the State of Missouri.

1            A P P E A R A N C E S

2

        For the Plaintiffs:
3
            HUSCH BLACKWELL, LLP
4           By:  Jordan Ault
            235 E. High Street
5           Jefferson City, MO  65101
            573-635-9118
6           Jordan.Ault@huschblackwell.com

7

8       For the Defendants:

9           MISSOURI ATTORNEY GENERAL
            By:  Michael Spillane
10          and Andrew Crane
            221 West High Street
11          Jefferson City, MO  65101
            Michael.Spillane@ago.mo.gov

12

13
                I N D E X
14
    Direct Examination by Mr. Ault                    4
15

16

17

18

19

20

21

22

23

24

25

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 2 of 128

1          DEPOSITION EXHIBIT INDEX

2     ID                                    MARKED

3     1:    AGO0096-0098                    9

4     2:    AGO1451                         32

5     3:    AGO3584-3593                    49

6     4:    AG00028                         67

7     5:    AG01714-1716                    70

8     6:    AGO1606-1608                    79

9     7:    AGO60061                        81

10    8:    AGO1758                         82

11

12

13

14    Court Reporter:
      Kim D. Murphy, CCR
15

16

17

18

19

20

21

22

23

24

25

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 3 of 128

1       IT IS HEREBY STIPULATED AND AGREED, by and

2  between counsel for the Plaintiffs and counsel for the

3  Defendants, that this deposition may be taken in

4  shorthand by Kim D. Murphy, CCR, and afterwards

5  transcribed into typewriting; and the signature of the

6  witness is expressly waived.

7              *   *   *   *   *

8            JENNIFER ZAMKUS,

9  of lawful age, produced, sworn and examined on behalf

10  of the Plaintiffs, deposes and says:

11          DIRECT EXAMINATION

12  QUESTIONS BY AULT:

13     Q.   Well, good morning, Ms. Zamkus.

14     **A.   Good morning.**

15     Q.   Am I saying that right?

16     **A.   Yes.**

17     Q.   Okay.  My name is Jordan Ault.  I represent

18  the Plaintiffs in this action.  And as I mentioned, I'm

19  a member of a group of attorneys.  I am the newest of

20  the group of attorneys, so we'll get through this as

21  best we can.

22       But I'll be basically asking you some

23  questions today to learn a little bit about your role

24  on the parole board, the processes and procedures that

25  you go through, and there will be a few specific

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 4 of 128

1    documents that I'll pull out and will want to talk with

2    you.

3        **A.    Okay.**

4        Q.    Before we begin, can you state your name,

5    state and spell your name for the record.

6        **A.    Jennifer Zamkus.  J-e-n-n-i-f-e-r,**

7    **Z-a-m-k-u-s.**

8        Q.    And have you ever been deposed like this in

9    the past?

10       **A.    I have.**

11       Q.    How many times?

12       **A.    A handful.**

13       Q.    Okay.  And have you testified at trial in

14   the past?

15       **A.    I have.  Not in this role.**

16       Q.    I appreciate that.

17            I know this isn't your first time, but I

18   still would like to go through a few of the ground

19   rules.  I'll go through them quickly since you've been

20   through this.

21            The court reporter is to my right, to your

22   left, and she will be taking down everything that I ask

23   and everything that you answer.  Because of that, it's

24   important that we not talk over each other.  I know

25   that happens normally in conversation, but if you could

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 5 of 128

1    ask allow me to finish a question before you answer,

2    I'd appreciate that.  I'll do my best to extend the

3    same courtesy to you.  I have a tendency to talk a

4    little fast, so feel free to yell at me.

5          Your answers must be audible.  The record

6    won't -- the record looks a little muddy if the court

7    reporter takes down nods of the head.

8          The biggest instruction I give is, if I ask

9    a bad question -- and I'm sure I will ask a bad

10    question -- and you don't understand it, stop and let

11    me know, and I'll do my best to ask it in a better way.

12    But if I ask a question that you answer, it will be

13    understood that you understood what I was asking; is

14    that fair?

15        **A.**   **Yes.**

16        Q.   I don't think this will be a full day, but

17    we're on your schedule.  I like to take a break every

18    hour, but if you ever need a break, just let me know.

19          Is there any reason why you can't testify

20    honestly today?

21        **A.**   **There is not.**

22        Q.   Any reason why your memory might be clouded

23    today?

24        **A.**   **No.**

25        Q.   Other than your attorneys -- and I should

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 6 of 128

1  preface that -- at no point in the deposition today do

2  I want to know about any conversations that you have

3  had with your counsel.  I want to make that clear.

4        Other than conversations you've had with

5  your counsel, is there anything that you've done to

6  prepare for the deposition today?

7        **A.    I looked at the specific cases to see if I**

8  **voted on them.  That's it.**

9        Q.    When you say "specific cases," do you mean

10 the individual plaintiffs in this action?

11       **A.    Yes.**

12       Q.    And had you voted on any of them?

13       **A.    On two of them.**

14       Q.    Out of curiosity, do you recall which two

15 you voted on?

16       **A.    I do not.**

17       Q.    Did you oversee any of the parole hearings

18 for the individual plaintiffs in this case?

19       **A.    I did not.**

20       Q.    I thought that was the case, but I wanted

21 to be sure.

22       Other than that, have you reviewed any

23 documents to prepare for the deposition today?

24       **A.    I have not.**

25       Q.    And did you bring any documents with you?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 7 of 128

1      A.   I did not.

2      Q.   Anyone else that you spoke with other than

3  your attorneys about the deposition today?

4      A.   Other than I'm leaving for a deposition,

5  no.

6      Q.   What is your date of birth?

7      A.   September 2nd, 1971.

8      Q.   Do you go by any name other than Jennifer?

9      A.   Jen.

10     Q.   And you live here in Jefferson City, I

11  assume?

12     A.   I do.

13     Q.   And are you currently married?

14     A.   I am.

15     Q.   And your spouse's name?

16     A.   Jason Zamkus.

17     Q.   Okay.  And your spouse's occupation?

18     A.   He is an attorney-lobbyist.

19     Q.   A few questions that I ask everyone -- and

20  I apologize, they're somewhat personal -- have you ever

21  pled guilty of or pled guilty a felony?

22     A.   I have not.

23     Q.   Have you ever been convicted or pled guilty

24  of a crime that involved fraud or dishonesty?

25     A.   No.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 8 of 128

1      Q.   It's always easier when those are the
2   answers.
3          **A.   No.**
4      Q.   I'm going to ask the court reporter to mark
5   this as Exhibit 1.
6          (Deposition Exhibit No. 1 was marked for
7   identification.)
8   BY MR. AULT:
9      Q.   I've handed you a document that was
10  produced in this case.
11         Do you recognize this document?
12         **A.   I do.**
13     Q.   I assume this is your resume or CV; is that
14  true?
15         **A.   Yes.**
16     Q.   It is it up to date?
17         **A.   It is not.**
18     Q.   Do you recall when you prepared this
19  resumé?
20         **A.   I prepared this resumé when I was seeking**
21  **the appointment to become a parole board member.**
22     Q.   That would be?
23         **A.   I mean, I updated this resumé.  I mean, I**
24  **prepared it.  It's been a working document over the**
25  **years.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 9 of 128

1      Q.    Fair enough.   Fair to say this version

2    would be from some time in 2015?

3           **A.    2014.**

4      Q.    I want to get a little bit --

5           **A.    No, you're right, 2015 is correct.   Yes.**

6      Q.    I want to get a little bit into your

7    background.

8           I assume you graduated high school.

9           **A.    I did.**

10     Q.    Was that here in Jefferson City?

11          **A.    Farmington.**

12     Q.    And then you served in the United States

13   Air Force from 1989 to 1993?

14          **A.    Yes.**

15     Q.    And you continued in the Air National Guard

16   through the 1990s, correct?

17          **A.    Correct.**

18     Q.    Thank you very much for your service.

19          **A.    Thank you.**

20     Q.    I assume you attended Lincoln University

21   while you were serving in the National Guard; is that

22   correct?

23          **A.    Yes.**

24     Q.    You received a Bachelor's of Science in

25   criminal justice?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 10 of 128

1    A.    I did.

2    Q.    And you continued to get your Master's

3    degree from Lincoln University, correct?

4    **A.    I did.  I did a portion of that through**

5    **CMSU.  I don't know what it's called now.  It was**

6    **called CMSU back then, through Warrensburg.  The**

7    **criminal justice portion was through CMSU.**

8    Q.    I was going to ask, did you receive two

9    separate Master's degrees in sociology and criminal

10   justice?  Or just one degree?

11   **A.    It was one degree.**

12   Q.    Can you tell me about the course of study

13   in your Master's degree?

14   **A.    The criminal justice portion, it was**

15   **criminal justice administration, so it looked into some**

16   **civil law.  Criminal.**

17   **The sociology was a little bit more about**

18   **research.  How to conduct research.  Make sure that**

19   **you're considering, kinds of, all factors in the**

20   **research.**

21   Q.    Just a few questions about that, during

22   that course of study was there any focus on psychology?

23   **A.    No.**

24   Q.    Any focus on adolescent development or

25   child psychology in any way?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL    Document 134-6    Filed 06/12/18    Page 11 of 128

1          **A.    No.**

2          Q.    Since you received your Master's degree

3     from Lincoln University, and the other institution that

4     you mentioned, have you sought any other formal

5     education?  Any other degrees, for example?

6          **A.    No.**

7          Q.    Any special certifications or licenses in

8     your work?

9          **A.    No.**

10          Q.    So looking back to your resumé, after you

11    received your Master's degree, you went to work for the

12    Missouri Department of Corrections, correct?

13          **A.    Correct.**

14          Q.    What was your role -- it looks like you had

15    a few roles, so let's go through them.

16               The first seems to be correctional services

17    trainee and Probation and Parole Officer I.

18          **A.    Yes.**

19          Q.    How long did you hold that position?

20          **A.    For about two or three years, I'd say.**

21          Q.    As the probation and parole officer I, did

22    you participate in any parole hearings?

23          **A.    Rarely.  Only as observation.**

24               **Now, I held -- I was both an institutional**

25    **parole officer and then a field officer here in**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 12 of 128

1    Jefferson City, so when you're a field officer you

2    don't get involved in parole hearings.

3         Q.   What is the job of a field officer?

4         A.   That's the person who works with the

5    offender in the community to help make sure that they

6    have the resources they need to be successful in the

7    community; to help report back to either the board or

8    the court as to how the offender is doing in the

9    community; if they're violating conditions, then what's

10   the next step.

11        Q.   Okay.  So I assume you're working with

12   individuals after they've been incarcerated and after

13   they're released?

14        A.   Yes.

15        Q.   I appreciate that clarification.

16             You then went on to hold the position of

17   Investigator II?

18        A.   Yes.

19        Q.   What did you do in that role?

20        A.   I investigated criminal investigations

21   within the institution.  Whether it was weapons, drug

22   offenses, murder.

23             And then we also do death investigations.

24        Q.   I assume those investigations all involved

25   offenders that were housed in the correctional centers,

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 13 of 128

1 correct?

2 **A.  Correct.  Well, and they also involved**

3 **staff.  If staff was having a relationship with an**

4 **offender that is also a criminal violation.**

5 Q.  That's fair.  That makes sense.

6 And then from there you went on to work as

7 a corrections caseworker, correct?

8 **A.  Correct.**

9 Q.  What did you do in that role?

10 **A.  I reviewed conduct violations.  If an**

11 **offender violates an institutional rule, then a**

12 **correctional officer writes a conduct violation, it's**

13 **sent to the caseworker, the caseworker determines**

14 **whether or not what sanctions they get.  If they get a**

15 **segregation restriction, what have you.**

16 **I completed classification reviews of**

17 **offenders to make sure that they were at the**

18 **appropriate correctional facility.  You know, if**

19 **there's a change in the offender status, maybe they get**

20 **a new charge, that's going to increase their**

21 **classification level.**

22 **I completed work release, reviews,**

23 **recommending for or against work release.**

24 Q.  Okay.  That's helpful.  I appreciate that.

25 Through your roles as either as

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 14 of 128

1    Investigator II or corrections caseworker, did you have

2    any role in probation -- I'm sorry -- in parole

3    hearings?

4         **A.    I did not.**

5         Q.    In 2005 you left the Department of

6    Corrections to begin working for Department of Social

7    Services, correct?

8         **A.    Correct.**

9         Q.    It looks like your role there was more in

10   human relations?

11        **A.    It was.**

12        Q.    And then you returned to the Department of

13   Corrections in 2014, correct?

14        **A.    Correct.**

15        Q.    And from 2014 to 2015 your role was the

16   human resources director for the Department of

17   Corrections, correct?

18        **A.    Yes.**

19        Q.    Who did you report to in that role?

20        **A.    Carrie Collins.**

21        Q.    And what role did Ms. Collins have?

22        **A.    She's the division director for the**

23   **division of human services.**

24        Q.    I assume in your position of human

25   resources director you were not involved in parole

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 15 of 128

1 hearings, or in that process in any way?

2       **A.   No.**

3       Q.   From there -- well, let me ask this:  Do

4 you still hold that job?

5       **A.   I do not.**

6       Q.   So --

7       **A.   I had to resign from that position to get**

8 **my appointment.**

9       Q.   So your position currently with the

10 Probation and Parole board is the only employment that

11 you hold?

12       **A.   It is.**

13       Q.   Okay.  How long have you held the position

14 with Probation and Parole?

15       **A.   Since November of 2015.**

16       Q.   Was there some type of application process

17 that you went through?

18       I understand it was an appointment, but

19 what did that process look like?

20       **A.   There's an online application that you have**

21 **to complete, through the governor's office, that you**

22 **have to fill out.  Fill out the rest of their**

23 **application.  Background information.  They do a**

24 **background investigation.**

25       Q.   So this -- I assume you went through that

Pohlman USA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 16 of 128

1  application process, correct?

2      A.   I did.

3      Q.   This was a position that you sought?

4      A.   I did.

5      Q.   In November of 2015, or just before or just

6  after that, did you receive any training to prepare you

7  for your new position on the board?

8      A.   As soon as I got on the board, I started

9  meeting with the chairman, the board operations

10  manager, and they sat down and reviewed policy and

11  procedure with me.  Reviewed the tools, the risk

12  assessment tools that we use.

13          Reviewed files.  You know, went through

14  each type of file.  I had to do observation for -- I

15  think it was either for two or three weeks, with each

16  of the different board members and the board chairman,

17  of parole hearings, and kind of the motivational

18  interviewing.

19          We also received training on the risk

20  assessment tools, the salient factor score.

21          During board meetings I know we received a

22  couple of additional trainings.  I can't think of them.

23          And then shortly after I came onto the

24  board, I went to Colorado to the National Institute of

25  Corrections for new parole board member training where

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 17 of 128

1   we received training about evidence-based practices,

2   making informed and ethical decisions, the role of

3   parole.  It was a week-long training.  There was all

4   kinds of different topics covered.

5        Q.   I appreciate that.  It sounds like it was a

6   busy few weeks for you.

7             Who was the chairperson of the board at the

8   time?

9        A.   Ellis McSwain.

10       Q.   And who was the -- I think you said board

11  operations manager?

12       A.   Kelly Dills.

13       Q.   You mentioned a few terms such as salient

14  factor scores that I'll get into later.  But a few

15  questions, you said that you spent two to three weeks

16  observing each of the board members; is that correct?

17       A.   Correct.

18       Q.   So I assume that means that you would

19  attend parole hearings with each of the board members

20  during this training?

21       A.    I did.  And during a portion of that, once

22  I'd been there a little bit, they started having me do

23  hearings and provided me feedback.

24       Q.   Okay.  You mentioned the term motivational

25  interviewing.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 18 of 128

1    A.   Yes.

2    Q.   You don't need to get too in-depth, but can

3  you give me the elevator speech of what motivational

4  interviewing means?

5    A.   It's working with the offender.  Asking

6  questions in a way that they see where their need for

7  change is.  They recognize that.

8         Instead of, I mean, if you sit there and

9  lecture to an offender during a parole hearing, it's

10 going to go in one ear and out the other.  You want

11 them to be a part of seeing the positives and the

12 negatives, recognizing that.

13        Because so many of these guys and gals come

14 in not liking themselves, and having positives.  But

15 you're having to ask them things that they're

16 embarrassed about.  So you want them to see both of it,

17 and not bleed their heart, but make them motivated for

18 change.  You know, it shouldn't be an interrogation, so

19 to speak.

20   Q.   That makes a lot of sense.  I've seen the

21 term in the documents I've reviewed in this case.

22        Have all the correct board members gone

23 through training related to motivational interviewing?

24   A.   I think so.  But I can't speak definitively

25 about that.  I know the board members, prior to my

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 19 of 128

1    arrival, did.  I think Gary would have, because Gary

2    and I came in together.

3            Paul would not because he's brand new.

4        Q.    Gary is Gary Dusenberg, right?

5        A.    Yes.

6        Q.    And Paul's last name?

7        A.    Fitzwater.

8        Q.    Thank you.

9            The other term I want to ask about is

10   evidence-based practices.  And I see a loft references

11   to that in the documents that have been produced.

12           Can you give me a short explanation for

13   what that term means?

14       A.    Well, it's kind of like our salient factor

15   score.  When it was developed, it looked at research

16   that points to factors that can suggest risk or not

17   risk.  So we're not just pulling things out of the air,

18   so to speak.  We're actually looking at factors that

19   evidence has supported this adjust risk or not.

20       Q.    I see.  When you say risk, I assume you

21   mean the risk that an offender would pose if released

22   from incarceration back into society?

23       A.    Correct.

24       Q.    You had some legal studies, it sounds like,

25   in getting your Master's degree, correct?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 20 of 128

1     **A.     Correct.**

2     Q.     Since you joined the board, has there been

3   any specific training regarding either constitutional

4   law, or state statutes, or anything like that?

5     **A.     Well, when I returned to corrections, of**

6   **course I had some initial constitutional law training.**

7   **You know, we review state statutes when they come in.**

8   **I wouldn't say we're trained on them.  You need to read**

9   **them and ask questions if we don't understand them.**

10    Q.     Have you received any training related to

11  adolescent development or adolescent psychology?

12    **A.     I have not.**

13    Q.     Do you hold a title on the board currently?

14    **A.     I do.**

15    Q.     And what is that?

16    **A.     Vice-chairman.**

17    Q.     And when did you rise to the position of

18  vice-chair?

19    **A.     Oh, goodness.  That, I think it would be**

20  **around May.**

21    Q.     May of 2017?

22    **A.     Yes.  It's been very recent.  It might have**

23  **been even -- yeah, I'm thinking around May.**

24    Q.     Do you have any additional duties in the

25  position of vice-chair?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 21 of 128

1    A.    Not really.  I'm more there as a backup.

2  When Ken, our current chair is gone, if he's on

3  vacation, or has to be out for an extended period of

4  time, then I'm available there to sign personnel

5  decisions, make decisions regarding adjustments on

6  calendars.

7    Q.    That makes sense.  I assume, based on that,

8  you haven't had any specific training related to your

9  position as vice-chair?

10    A.    No.

11    Q.    Do you continue to receive ongoing training

12  in your position as a board member?

13    A.    I do.

14    Q.    Can you describe that?

15    A.    It's training that we sign up for.  You

16  know, I've gone to the Missouri Reentry conference that

17  had different sessions on reentry and community

18  partnerships.

19         I went to the American Corrections

20  Association conference that talked a lot about -- this

21  year, the big topic was addressing opioid addiction,

22  which, obviously, that's everywhere.

23         And, of course, I have regular departmental

24  training.  You know, our civil rights and diversity

25  updates.  I've had some additional -- I think I'm at,

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 22 of 128

1 like, 48 hours for the year.

2      Q.   Okay.  Is there a mandatory amount of hours

3 per year that board members have to receive in

4 training?

5      A.   There's -- it was recently increased by the

6 department director.  All employees have to receive

7 40 hours.  I'm not sure what it was prior to that.

8 I've always pretty much received 40.  I generally -- I

9 used to do training, I used to be in HR, so I'm very

10 pro training.

11      Q.   And it holds a special place in your heart?

12      A.   Yes.

13      Q.   And I have some older materials, but you

14 seem to top the list as the person that was receiving

15 the most.

16           Have you received any board training

17 specifically related to juvenile life without parole

18 issues, such as Senate Bill 590, or recent Supreme

19 Court cases?

20      A.   I wouldn't say training.  We, of course,

21 reviewed the statute.  Reviewed the information.

22 Reviewed the additional factors that we needed to begin

23 considering in considering for juvenile life without

24 parole offenders.

25      Q.   How often does the parole board meet?  The

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 23 of 128

1 entire board?

2     **A.    Generally, once a month.  There's been a**

3 **rare occasion that we haven't been able to, but we**

4 **generally meet at least once a month.  Sometimes twice,**

5 **if we have an additional training schedule.  That's**

6 **also rare.**

7     Q.   You're officed here in Jefferson City,

8 correct?

9     **A.    Correct.**

10     Q.   Out kind of by Chick-fil-A, right?

11     **A.    Right.**

12     Q.   I was trying to figure out where your

13 office was.

14     **A.    It's right behind that strip mall.**

15     Q.   Do all the board members have offices in

16 that building?

17     **A.    They do.**

18     Q.   And is that where these monthly meetings

19 take place?

20     **A.    That is.**

21     Q.   At the monthly meetings, I assume all board

22 members attend unless they're on vacation or whatever?

23     **A.    Correct.**

24     Q.   Does anyone else attend the monthly board

25 meetings?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 24 of 128

1     A.    The parole board analysts do.  And usually

2  the institutional regional administrator, Michelle

3  Kasak.  Because she works with our Probation and Parole

4  staff that work inside the institutions.

5          Occasionally we'll have the chief state

6  supervisor if there's something new to present.  But

7  she'll only be there for a portion of the meeting.  And

8  of course we have our board secretary.  The secretary

9  isn't the appropriate title anymore.  You know what I'm

10 talking about.  She takes our meeting minutes.

11     Q.    I do.  Most of the board members still

12 refer it to the secretary.

13     A.    I used to be a secretary so I don't take

14 offense to it.

15     Q.    How many board members are currently

16 serving?

17     A.    Six.

18     Q.    How many parole analysts are employed by

19 the Department of Corrections; if you know?

20     A.    Well, I can count real quick.  I think

21 there's six analysts, and then there's a lead analyst,

22 who kind of has the role of board operations manager

23 now.  That's Steve Mueller.

24     Q.    Okay.  And we spoke with Mr. Mueller a few

25 weeks ago.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 25 of 128

1          Do all of the parole board analysts attend

2     the board meetings?

3          **A.    They do.**

4          Q.    You mentioned the institutional regional

5     administrator.

6          **A.    Yes.**

7          Q.    What are the roles of that position?

8          **A.    Well, she manages all the staff inside the**

9     **institutions.  So the whole state she's responsible**

10    **for.**

11         **She communicates any updates to the --**

12    **she's there to provide them assistance if there's an**

13    **issue within the prison.  You know, like, for example,**

14    **you have an offender who just -- we just got notified**

15    **that he's got jail credit time, so that moves up his**

16    **conditional release date, and he should have already**

17    **been out.  So she'll have to deal with situations like**

18    **that.**

19         **Now, the reason we have her there is**

20    **because when we make any changes, or we have any issues**

21    **with her staff, then she's there to be able to go back**

22    **and communicate it, because her staff directly supports**

23    **the job of the board.**

24         Q.    I understand.  Sounds like a big job.

25         How long do these board meetings typically

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 26 of 128

1  last.

2      A.   Oh, I can't say there's a typical.  I mean,

3  it might be an hour.  If we have training it might be

4  seven hours.

5      Q.   Fair to say some board meetings you're

6  discussing what's going on and some there's specific

7  training scheduled?

8      A.   Correct.  And we try to do a little bit of

9  training.  Even if it's something from the community to

10  come in and talk to us about something new they're

11  working on.  Like, we had a KC NoVA come in.  I don't

12  know if you heard of KC NoVA.  They came in and did a

13  presentation.  And so we try to have something like

14  that at every board meeting.

15      Q.   Okay.  You said it's the board secretary,

16  or whatever the correct term is, keeps minutes from the

17  meetings?

18      A.   Yes.

19      Q.   Are the meetings recorded?

20      A.   No.  I mean, outside of her taking meeting

21  minutes.

22      Q.   And those minutes, are they then

23  distributed to the board members at the following the

24  meeting?

25      A.   They are.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 27 of 128

1      Q.   Are there -- I understand that there's a

2  main parole board office here in Jefferson City -- are

3  there also field offices throughout the state?

4      **A.   Yes.**

5      Q.   And who is in those field offices?

6      **A.   That's our Probation & Parole staff who**

7  **supervise offenders in the community.**

8      Q.   I'd like to talk about some of the U.S.

9  Supreme Court cases.

10      Are you familiar with the case Miller

11  versus Alabama?

12      **A.   No.**

13      Q.   Are you familiar with a case Montgomery

14  versus Louisiana?

15      **A.   I know I reviewed it, but to tell you about**

16  **it right now, I could not.**

17      Q.   During any of the training sessions, or, I

18  guess really in any other aspect of your job, are you

19  presented with legal decisions, either from the

20  Missouri Supreme Court, or the United States Supreme

21  Court, or other courts, and are expected to read those

22  decisions?

23      **A.   Occasionally we receive emails, yeah.  And**

24  **we should be reading our emails.  It's not very often,**

25  **but we did receive emails with regard to the cases**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL  Document 134-6  Filed 06/12/18  Page 28 of 128

1    involved in the juvenile life without parole.  And I

2    reviewed them back then.  I haven't since.

3         Q.   It's been a while?

4         **A.   It has.**

5         Q.   And I assume there is a -- the Missouri

6    Department of Corrections has legal counsel, correct?

7         **A.   Yes.**

8         Q.   And I assume sometimes you turn to that

9    legal counsel for an explanation of the decisions that

10   are handed down; is that right?

11        **A.   Not individual board members.  The board as**

12   **a whole would.  And that would generally be either**

13   **through the chairman or through Steve Mueller.**

14        Q.   Are you familiar with what we've referred

15   to as Senate Bill 590 or Missouri Senate Bill 590?

16        **A.   Again, I reviewed it.**

17        Q.   Generally you're aware, though, that it has

18   an impact on juvenile life without parole offenders,

19   correct?

20        **A.   Correct.**

21        Q.   Are you familiar with factors that it sets

22   forth to be considered during a parole hearing?

23        **A.   Yes.**

24        Q.   Did you personally provide any input to the

25   Legislature as a draft of Senate Bill 590?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 29 of 128

1        **A.    I did not.**

2        Q.    Do you know whether anyone on the parole

3    board was involved in lobbying, or in some other

4    capacity, to provide input to the Legislature relating

5    to Senate Bill 590.

6        **A.    No.  And I think that probably would have**

7    **occurred before my time on the parole board if it would**

8    **have happened.**

9        Q.    Understood.  I know you said you received

10   some emails that would have contained the Supreme Court

11   decision that I talked about.

12            Do you recall any specific training related

13   to those cases?

14       **A.    No.**

15       Q.    Do you recall any specific training related

16   to SB 590?

17       **A.    No.  Outside of our discussions in the**

18   **board meeting, making sure that we were all aware of**

19   **the factors that needed to be considered, discussing --**

20   **making sure that we document those factors, no.**

21       Q.    And I want to dig into that a little bit.

22            So you recall during these monthly board

23   meetings discussions about Senate Bill 590?

24       **A.    I do.**

25       Q.    Who presented that?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 30 of 128

1      **A.    It might have been Kelly Dills.**

2      Q.    And I should back up.  One of the

3   instructions that I failed to give you at the beginning

4   of the deposition.  Some of that's questions go back

5   years.  And if you don't know the answer, "I don't

6   know" is a perfectly acceptable answer.  I'm not going

7   to push you on anything that you don't remember.

8      **A.    Generally our board meetings are pretty**

9   **relaxed.  We're all kind of talking and chatting.**

10     Q.    Do you recall, for example, did Ms. Dills,

11  or whoever that presented this, was it a single

12  presentation?  Or was it a topic that was brought up

13  again over and over at multiple meetings?

14     **A.    I know we discussed it at least at a couple**

15  **of meetings.  I couldn't tell you specifically how**

16  **many.**

17     Q.    And it sounds like you discussed the

18  factors that were included in Senate Bill 590?

19     **A.    Yes.**

20     Q.    And you discussed, I think you said,

21  questions that you would need to ask to address those

22  factors?

23     **A.    Not specific questions, but making sure**

24  **that we covered questions that would get us to that**

25  **information.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 31 of 128

1      Q.   I see.  Did you review any documents

2   related to Senate Bill 590?

3      **A.   Outside of the email that they sent that**

4   **had the senate bill, we reviewed that.  And I thought**

5   **they sent -- or maybe there was just a link to the**

6   **cases that were involved.**

7      Q.   Let me clarify my question a little bit.  I

8   think I asked a bad question.

9           After Senate Bill 590, did the paperwork or

10   the forms that you used in your role as a parole board

11   member change to address the new factors?

12      **A.   Oh, okay.  Yeah.  We developed a form to**

13   **document the information that addressed those factors.**

14   **Like, efforts towards rehabilitation, so that we could**

15   **document that on the form.**

16      Q.   I see.  I'm going to hand you a document

17   and ask that it be marked as Zamkus Exhibit 2.

18           (Deposition Exhibit No. 2 was marked for

19   identification.)

20   BY MR. AULT:

21      Q.   Does this document look familiar?

22      **A.   It does not.**

23      Q.   I'll represent that we received a number of

24   documents that were produced that appear to be memos

25   that were posted at different correctional

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 32 of 128

1    institutions.

2       **A.**   **Okay.**

3       Q.   Like, for example, this document says to

4    all JCCC offenders.

5        What does JCCC stand for?

6       **A.**   **Jefferson City Correctional Center.**

7       Q.   I assumed that was the case.

8        And it appears to be a memo to offenders

9    involving Senate Bill 590. Did you have any role in

10   drafting the language for this document?

11       **A.**   **No, I did not.**

12       Q.   Do you recall any discussion about this

13   documents or similar documents being posted in

14   correctional centers?

15       **A.**   **I knew that the information had been posted**

16   **in correctional centers that juvenile life without**

17   **parole offenders were now eligible for parole hearings.**

18   **I didn't know any specifics.**

19       Q.   You didn't have any role in the publication

20   of that information in the correctional centers?

21       **A.**   **No. And a parole board member wouldn't.**

22   **This would be, you know, the correctional centers is**

23   **under a different division. This would be the Division**

24   **of Adult Institutions. And they would take care of**

25   **communicating in the manner that they normally would**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 33 of 128

1 **communicate any other changes.**

2     Q.   That is helpful.  Thank you.

3          I'd like to shift the focus a little bit

4 now to actually discuss the parole hearings themselves.

5 What I'd like to do is start with some broader

6 questions, and have you walk me through the process,

7 and then probably circle back and dig into some more

8 specific questions about certain aspects of process if

9 that works for you.

10    **A.   It does.**

11    Q.   I understand this is a broad question, but

12 generally when you are assigned to a parole hearing,

13 how do you prepare for that hearing?

14    **A.   Well, I'll just say on a typical hearing,**

15 **we receive a hearing docket.**

16         **Let me back up.  We have a calendar.  A**

17 **monthly calendar.  That's how we know where we're**

18 **going.  Our analyst actually provides the monthly**

19 **docket.  They print out the monthly docket.  They have**

20 **all the files.**

21         **And so as soon as we get in the room we**

22 **start reviewing files in order.**

23    Q.   When you say "get in the room," would that

24 be the room in specific correctional centers that you

25 are going to?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 34 of 128

1     A.   It depends.  We do both video parole

2   hearings and hearings onsite.  So "in the room" would

3   be either at the correctional facility, or out in one

4   of our hearing rooms in Central Office.

5     Q.   Okay.

6     A.   One of the two buildings.

7     Q.   The video hearings that you do, if you are

8   conducting a hearing by video, are you in the parole

9   board office building here in Jefferson City?

10    A.   We have hearing rooms, either at our main

11  building.  And we also have, across the street, we have

12  another building where our command center is and

13  there's a hearing room there.

14    Q.   Okay.  How often in a given week or month

15  do you travel to correctional centers for these

16  hearings?

17    A.   It just depends.  Sometimes it's once a

18  week.  If we have a trip, it might be two or three days

19  that week.  It depends.  You know, it changes.  Because

20  it's up to the offender whether or not they get an

21  in-person hearing.

22    Q.   Generally, can you give me a percentage of

23  the number of hearings that you do via videoconference

24  rather than doing life hearings?

25    A.   I wouldn't know a percentage.  It's greatly

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 35 of 128

1  reduced how many live hearings we do.  The offenders

2  have gotten pretty comfortable with video parole

3  hearings.

4      Q.   Okay.  I made the drive to Farmington and

5  back yesterday.

6      A.   Yes.

7      Q.   So I admire you for making that drive

8  multiple times.  It is not fun to make it there and

9  back in a day.

10          So when you say the analyst provides the

11  information, it's either going to be in the room where

12  the hearing takes place in the room at the correctional

13  center or the command center at your office building?

14      A.   Right.  Now, with cases where we have

15  victims present, I actually get the information prior.

16      Q.   Okay.  If a victim is present when do you

17  receive the information for the hearing?

18      A.   Generally, a week prior.  Sometimes even

19  longer.  And occasionally victims won't want to be

20  present, but they'll want to give their statement to a

21  parole board member.  So I might get the file sooner

22  because I have to call them.

23      Q.   Are there some times that you meet in

24  person, or via phone with a victim, or a victim's

25  representative, prior to a hearing taking place?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 36 of 128

1          A.    You can.  Both.  I never had a victim ask

2    to see me in person prior.  I have spoken on the phone

3    with a victim before.

4          Q.    So in those situations where a victim is

5    present you receive the information in advance?

6          A.    Yes.

7          Q.    Understanding that schedules change

8    sometimes, do you always endeavor to review that parole

9    file prior to the hearing?

10          A.    I do.

11          Q.    And in situations where there is no victim

12    present, your first exposure to the parole file for

13    that hearing is the morning of the hearing, correct?

14          A.    It is.

15          Q.    And I'll just ask about you, do you set

16    aside time at the beginning of the day to review all of

17    the parole files before the hearings?

18          A.    I don't review them all at the beginning of

19    the day.  I review them as we go along with each case.

20    That way it's fresh in my mind.  And I have my computer

21    there so I can look up, if I have questions, or want

22    some additional information, I can use my computer.

23          Q.    And what information can you access from

24    your computer?

25          A.    All kinds of information.  If the person

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 37 of 128

1  was on probation, I can access their field officer's

2  road notes.  See if they had dirty urinalysis.  If they

3  were arrested.

4        Inside the prison, I can access their

5  conduct violations.  Their classification score.  Where

6  they're located.  Their work.  Any presentence

7  information.

8        Q.   The information that you've just described

9  that you can access on the computer that you have, is

10 most or all that information also included in the

11 parole file that you get?

12       A.   Well, it's -- our parole report is more of

13 a summary of it.  You know.  Like, if someone had a

14 violation while they were on supervision, well, it's

15 going to talk about how they did in the community.  But

16 you can actually go into the road notes and find out

17 more about how they did.  What their attitude was.

18 Because you can't put all of that into a report.

19       Q.   Right.  What generally is included in a

20 prehearing report that you get?

21       A.   Okay.  Of course you're going to have

22 sentencing information, county information, date of

23 offense, sentencing date.  Pre-sentence offense.  If

24 they were given the opportunity at probation.  What

25 they did while on probation.  Why their probation

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 38 of 128

1  failed.

2           Any other opportunities they were given.

3  'Cause sometimes these individuals are given two or

4  three different opportunities of probation.

5           You're given juvenile history.  Most often

6  that's self-reported.

7           You're given their adult criminal history.

8  Any sex-offending history, and analysis of any at

9  assaultive or aggressive behaviors.

10          A statement about the offender's view

11  towards authority and law enforcement.

12          Their medical needs.  Their mental health

13  needs.  Their substance abuse history.

14          Their criminogenic needs, as far as do they

15  have issues with their social life.  Or, you know, kind

16  of what they like to do in the community when they're

17  incarcerated.

18          Their conduct.  Any programs.  Their family

19  history.  Any current family community support.  Their

20  home plan.  Their employment plan.

21          And I'm sure I've left something out.

22     Q.   That was surprisingly thorough.  You've

23  seen a few of these, I assume?

24     A.   I used to write them.

25     Q.   And that gets me to a question:  Who puts

Pohlman USA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 39 of 128

1   these together?

2          A.    The institutional parole officer.  The

3   **Probation and Parole officers I and II's that actually**

4   **work within the correctional facility.**

5          Q.    And I assume that's the institutional

6   parole office?  I see IPO quite a bit?

7          A.    **Yes.**

8          Q.    What's the difference between an IPO I and

9   an IPO II?

10         A.    **Probably just length of time in the**

11  **position.**

12         Q.    So an IPO starts as I and graduates up to

13  II?

14         A.    **I think that's how it works.**

15               **It was kind of, like, when you saw my**

16  **resumé where I was corrections services training two,**

17  **you had to do that automatically for a year, and then**

18  **you went to Probation and Parole officer I.**

19         Q.    Okay.  I couldn't figure out if you

20  progressed from one to two.  I probably could have put

21  it together on my own.  I appreciate that.

22               Sometimes do the prehearing reports have a

23  victim impact statement?

24         A.    **Yes.  It's usually an older statement.**

25  **It's usually taken from the presentencing information.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 40 of 128

1    Or they call it presentencing information.  Now they

2    call it sentencing and recommendation report.  PSI or

3    SAR.  It's the same thing.

4         Q.   What steps does an IPO take to prepare the

5    prehearing report?

6         A.   Well, they, of course, should review the

7    file.  And their file is going to have everything in

8    it.

9              It's going to have the information from the

10   prison, as well as sentencing and judgment, anything

11   that comes from the courts, as well as anything that

12   comes from Probation and Parole.

13             So they should review all that information

14   in preparing for the prehearing interview.  They have a

15   worksheet that they will go over.  And some of that

16   information on the worksheet will come from file

17   material, will come from the computer, but they also

18   have an interview.

19             And they're supposed to be doing

20   motivational interviewing as well with the offender.

21             They should also be contacting other staff

22   within the institution to see how the offender is

23   actually doing.  Because we don't want to just go on

24   conduct violations.  You know, because there are

25   different reasons for why someone's either gotten

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 41 of 128

1    conduct violations, and they're not really doing that

2    bad.  Or why they haven't gotten any conduct

3    violations, but yet they are doing that bad.  So we

4    want a real review of how they are doing inside.

5         Q.   That makes sense.  Like you said, you have

6    prepared these before?

7         A.   I have.

8         Q.   How long does that process take?

9    Understanding that no two offenders are probably

10   identical.

11        A.   Well, yeah.  And you have to remember, it's

12   been probably 20 years since I did that.  And there has

13   been a lot of changes since that time.  I mean, even

14   the worksheet that the Probation and Parole officers

15   use are substantially longer than what I used back

16   then.

17        Q.   Okay.

18        A.   Your type of offense.  Your offender is

19   going to dictate how long it is.

20             For example, out at Jefferson City

21   Correctional Center, they generally have a lower

22   caseload, because it takes longer to prepare one of

23   those reports, because you're dealing with offenders

24   who have a long history.  You know.  And you're often

25   dealing with more serious offenses.  You know,

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 42 of 128

1   murder-second, murder-first.  You know, so it takes

2   much longer to prepare a hearing like that.

3             Whereas if you're at Algoa, you know, you

4   might be dealing with a parole violator.  It doesn't

5   take much time to prepare that report.  'Cause you've

6   already got the report pretty much prepared.  You're

7   just looking to update their information, what they did

8   while they were on parole.

9        Q.   Okay.  One of the things you mentioned in

10  the report was juvenile history.  Where does that come

11  from?

12       A.   It's generally self-reported.  Occasionally

13  we receive it from other states.

14       Q.   And guess I should be clear, when we talk

15  about juvenile history, are you talking about criminal

16  history as a juvenile?

17       A.   Yes.  We generally ask them if they had any

18  issues in school.  Truancy, that kind of thing.  If

19  they spent any time in the Division of Youth Services.

20  If so, why.  It's not specific dates, specific amount

21  of time, anything like that.  It's just seeing whether

22  or not their concerns started as a juvenile.

23       Q.   I understand.

24            If an individual had an issue, say if they

25  were target of abuse as a child, would that information

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 43 of 128

1   we included if that was self-reported?

2       **A.**   **Yes.**  **That's going to be included in a**

3   **different section.**  **It's generally in the mental health**

4   **section or the social and family history.**

5       Q.   We've seen a few of these.  And I don't

6   necessarily need to show them to you or mark them as

7   exhibits, it's just some general questions.

8           I saw a section for recidivity.  Do you

9   know where that information comes from?  Or how that

10   information is developed?

11       **A.**   **Part of that information comes from looking**

12   **at the types of crime that they've committed.**  **Their**

13   **conduct in the institution.**

14           **You might have someone who's in for**

15   **property crimes, but keeps getting involved in assaults**

16   **in the institution.**

17           **Some of it is there are questions in the**

18   **interview to address that.**  **And we -- the staff**

19   **directly asks offenders if they feel they have an issue**

20   **with anger.**  **How they view law enforcement.**  **Because**

21   **that often goes towards aggressiveness.**

22       Q.   You mentioned conduct violations, and those

23   are included in the prehearing report?

24       **A.**   **Yes.**

25       Q.   And I assume they play some role in the

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 44 of 128

1  decision you make?

2      **A.   They do.**

3      Q.   Do you ever investigate a conduct

4  investigation and figure out why the violation took

5  place?

6      **A.   We'll talk to the offender as well.  I**

7  **often, if I have a question about a conduct violation,**

8  **I'll go into the computer and look.  Because I have**

9  **access to the whole conduct violation.  From when the**

10 **offender was initially interviewed, what their**

11 **statement was at that time, what their statement was**

12 **during the disciplinary hearing.**

13          **So I'll go in and look at that if I have a**

14 **question.  And then we'll obviously ask the offender.**

15     Q.   So that may be something that's not

16 included in the prehearing report but you have access

17 to in the computer?

18     **A.   Yes.**

19     Q.   When you walk in, is the prehearing report

20 the only information that is physically handed to you

21 for the hearing?

22     **A.   It depends on the file.  How long we've had**

23 **the file.  We're transitioning our files to paperless**

24 **files.  We have something called File Down, that we're**

25 **trying to transition to, where everything's going to be**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 45 of 128

1   in that.  Our goal is to have everything in that.  Even

2   our voting in that.

3           Most often, I will at least have sentencing

4   and judgment documents.  The prehearing report.  Any

5   prior board action taken.  Any revocation orders.  A

6   face sheet.  And a face sheet is -- that kind of tells

7   all about the offender in the institution, and then

8   tells their sentencing information.

9       Q.   Okay.  That's helpful.  I've seen

10  references to something called restorative justice

11  comparative hours.  What does that mean?

12      A.   We have many restorative justice programs

13  in our facilities.  And all of them are a little

14  different.  Defendants get hours for the activities

15  they participate in.  Programs they participate in.

16  Actions they've taken to help kind of provide

17  restoration to the community.

18          They can be developing coloring books for

19  children.  They could be working in community gardens.

20  Some of the hours in Puppies in Parole count towards

21  restorative justice.  There's a number of things.

22  Knitting.  They do knitting activities.  They do a lot

23  of great activities inside the institution.

24      Q.   So basically that shows that they're using

25  their time for something productive?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 46 of 128

1          A.    Yes.

2          Q.    Or to improve themselves?

3          A.    Correct.  And we generally ask them what

4   their specific activity was.

5          Q.    Do all prehearing reports contain a

6   recommendation?

7          A.    They do.

8          Q.    And who completes the recommendation?

9          A.    The institutional parole officer who

10  developed the report.

11         Q.    Do you ever -- strike that.

12               Does the institutional parole office that

13  developed the report, are they present at the parole

14  hearings?

15         A.    Occasionally.  The only time they would be

16  present is if there's victims.  And that's because we

17  need them to be able to assist in escorting the

18  victims, in setting between the victims and the

19  offender, and that kind of thing.

20         Q.    Is there ever a situation where you

21  disagree with the decision recommendation by the IPO?

22         A.    Yes.

23         Q.    When that happens, do you ever speak with

24  the IPO about the recommendation?

25         A.    I have once or twice.  Usually, I don't.  I

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 47 of 128

1    mean, usually we look at their recommendation.  We

2    consider their recommendation.  But mainly we're going

3    off what we would normally consider.  And what, you

4    know, we have a different frame than the institutional

5    parole officer.

6         Q.   Right.  The institutional parole officer

7    is, basically their job is to provide you with

8    information to make your decision, correct?

9         A.   Correct.

10        Q.   And then you consider very different

11   factors in making your decision?

12        A.   We consider some of the same factors.  But

13   overall we're considering if we release this

14   individual, you know, what is their risk to re-offend?

15   Are they -- do they appear to be prepared for

16   supervision in the community?

17        Q.   Let me ask a few more questions about

18   prehearing reports and we'll be at a good place for a

19   break.

20             Do you always read the prehearing reports

21   prior to the actual hearings?

22        A.   I do.

23        Q.   Do you ever discuss the prehearing reports

24   with other board members or other individuals that are

25   present at the hearing?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 48 of 128

1      A.   Yes.

2      Q.   And what does that look like?  What -- you

3  tell me.  Why do you have those discussions?

4      A.   We'll point out information in there

5  occasionally.  You know, if there's a factor that is

6  leaning us to a certain decision, we might discuss

7  that.  You know, if the offender's behavior was really

8  violent, we might discuss that.  If we have concerns

9  about their mental health, we might discuss that.

10     Q.   Do the offenders have access to the

11 prehearing reports?

12     A.   They do not.

13     Q.   So the offenders never see their prehearing

14 reports?

15     A.   They do not.

16          MR. AULT:  We've been going about an hour.

17 Do you want to take maybe a short five to 10-minute

18 break?

19          (A break was taken.)

20          (Deposition Exhibit No. 3 was marked for

21 identification.)

22 BY MR. AULT:

23     Q.   Ms. Zamkus, have you seen this document

24 before?

25     A.   I have.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 49 of 128

1   Q. Can you tell me what it is?

2   **A.** **Our policy and procedure on prehearing**

3 **reports.**

4   Q. Fair to say that this would be the policy

5 that governs everything that goes into the prehearing

6 reports that we just spoke about?

7   **A.** **Yes.**

8   Q. Okay.  Who creates this manual?

9   **A.** **I know that there's a work group who**

10 **creates the manual.  But there's a lot of different**

11 **ways that updates and changes can come into it.**

12   Q. I have one question.  If you look at the

13 second page, Section H -- and I'm just not familiar

14 with this terminology where it says, "guideline

15 matrixes" -- can you describe what that means?

16   **A.** **There are grids that -- several different**

17 **grids actually used -- to come up with guideline dates.**

18 **And I'll back up in a minute here.**

19    **The grids will look at the type of offense,**

20 **you know, A, B, C, D.  E now.  And then they'll look at**

21 **the salient factor score.  So it would have different**

22 **ranges.**

23    **So, like, based on someone with a good**

24 **salient factor score, with a C felony, who got a**

25 **ten-year sentence, this was -- this would be their**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 50 of 128

1  guideline date.

2         Now, what a guideline date is, is a number

3  of months that we've come up with.  That typically

4  someone with this background, this information, doing

5  this specific way in the institution, this type of

6  sentence, this is when we might consider releasing

7  them.  We don't have to.  It's just a guideline.

8         Then we have guideline ranges which are

9  also included one that matrixes.  It's low to a high

10  range.

11         And these dates are also dates that have

12  research.  Our research unit, the department's research

13  unit comes into play with helping us analyze those, and

14  provide statistics, and that kind of thing.

15      Q.   That's a very good explanation.  I

16  appreciate that.  So basically these guideline dates

17  are suggestions, but offenders can be released before

18  or after those dates based on other factors?

19      A.   Correct.

20      Q.   We've talked about salient scores.  Do you

21  know how a salient score is -- or salient factor score,

22  how it is created?

23      A.   Part of it is just the institutional parole

24  officer reviewing their file.  Because some of that

25  stuff is just age of the offender.  You can get that

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 51 of 128

1  from the file.

2          Some of the other stuff is actually talking

3  to the offender.  Because you have, like, escape

4  history in there.  Vocational training in there.

5          Q.    Okay.

6          A.    So it's a combination of file review and

7  discussion with the offender.

8          Q.    Is that salient factor score included in

9  the prehearing reports?

10         A.    It is.

11         Q.    It is a numerical value on a certain range?

12         A.    It is.

13         Q.    Do you know what the range is?

14         A.    Oh, goodness.  Not off the top of my head.

15  Anything negative, obviously, is not a good salient

16  factor score.  We go from a negative score to a

17  positive score.  So, like, a zero would be an average

18  score.

19         Q.    Okay.  So I want to make sure I understand.

20  A negative score would probably harm the offender's

21  chance of getting parole, a positive score might make

22  it more likely?

23         A.    It won't harm their chances.  A negative

24  score is going to give them a worse guideline date.

25         Q.    That makes sense.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 52 of 128

1          How much weight do you give to the salient

2 factor score in preparing or conducting a parole

3 hearing?

4       **A.   I definitely look at it, review it.**

5 **Because it is one of those evidence-based rules that we**

6 **have developed.  I don't go by it a hundred percent.**

7 **You know.  You can consider different factors.  You**

8 **know.**

9       Q.   That makes sense.

10          Was there any change or amendment to

11 prehearing reports to integrate the factors set forth

12 in Senate Bill 590?

13       **A.   There was.**

14       Q.   And can you describe those changes?

15       **A.   You know, I couldn't speak directly to**

16 **those changes.  It would have to be our institutional**

17 **regional administrator to speak more to those.  The**

18 **analysts and the institutional RA worked one that**

19 **closer.**

20       Q.   Who holds the title of institutional

21 regional administrator?

22       **A.   Michelle Kasak.**

23       Q.   How do you spell her last name?

24       **A.   K-a-s-a-k.**

25          **And you'll find she's extremely**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 53 of 128

1    knowledgeable.  She was my mentor when I was an intern

2    years ago.

3          Q.    What is the Diagnostic Center report?

4          A.    That is a report that is completed at the

5    diagnostic centers when an offender initially gets

6    incarcerated.  It's completed by a corrections

7    caseworker.  And it's all under the Division of Adult

8    Institutions.

9                So the Division of Probation and Parole has

10   nothing to do with that report other than the

11   opportunity to review it.

12         Q.    So in the parole hearing process there is

13   one board member that conducts each hearing, correct?

14         A.    We don't conduct each and every hearing.

15   There's three members present.  There's a panel -- a

16   hearing panel.  And the hearing panel is made up of a

17   parole hearing analyst, the local supervisor, and the

18   parole board member.  And we rotate doing interviews.

19         Q.    The three members rotate during the

20   interviews?

21         A.    We do.

22         Q.    So there is a parole board member at every

23   hearing?

24         A.    Correct.

25         Q.    But it is not necessarily the parole board

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL    Document 134-6    Filed 06/12/18    Page 54 of 128

1  member that will be leading the hearing, for lack of a

2  better word?

3       **A.   Correct.  Now, traditionally if it's a**

4  **victims case, the parole board member leads the**

5  **hearing.  Not always.  If you have two or three victims**

6  **cases in a day you ask the analyst to lead one.**

7       Q.   Following a hearing that you have appeared

8  at or led, do you have -- ever have more in informal

9  discussions with board members after the hearing about

10  a decision to make on a specific case?

11       **A.   Occasionally.  It's pretty rare.  But you**

12  **might.  It may be, you have an offender who has a**

13  **horrible offense, but they presented themselves very**

14  **well; they've done a lot in the institution; and you've**

15  **given them a release date.  And you want to say why?**

16       MR. SPILLANE:  It's not really an

17  objection, but I'm going to ask a clarification

18  question.  You said did she discuss it with other board

19  members.  I don't know if you meant other board

20  members, or other board members of the panel?

21  BY MR. AULT:

22       Q.   Specifically other board members.

23       For example, other members that would not

24  have been present during the parole hearing?

25       **A.   Yes.**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL  Document 134-6  Filed 06/12/18  Page 55 of 128

1       Q.    And that was your answer understanding the

2  question?

3       **A.    Yes.**

4       Q.    Are there situations where a board member

5  who is on a panel makes a certain suggestion, and the

6  rest of the board doesn't follow suit and wants to do

7  something else?

8       **A.    Yes.  And we've always been told to vote**

9  **your conscience.  You know, that's the reason for a**

10 **parole board.  If we're all going to get together and**

11 **decide that we need to go with one decision, then why**

12 **have all of us voting?**

13      Q.    So it's not a situation where every

14 decision made by the parole board is a unanimous

15 decision?

16      **A.    No.**

17      Q.    Is that fair?

18      **A.    No.  We have to have a majority.**

19      Q.    Gotcha.

20      **A.    But we often disagree with each other.**

21      Q.    Let me ask, my understanding, there are

22 some cases that require a full board vote and some that

23 do not; is that correct?

24      **A.    Well, give your definition of a full board.**

25      Q.    Well, why don't you tell me, how is a final

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 56 of 128

1  decision made.  Who is it that makes the final

2  decision?  And does it change from offender to

3  offender?

4        A.   Well, we need to clarify what types of

5  decisions.  Because we make all kinds of decisions

6  outside of parole hearings.

7             Now, if we're just looking at just parole

8  hearings, I can tell you.

9        Q.   Okay.

10        A.   Parole hearings, it's going to be based on

11  the type of offense, the length of offense, and the

12  hearing panel.

13             For example, with the exception of drugs,

14  any case, ten years or more, has to be a majority

15  board.  And that's not a full board.  It's a majority

16  board.  So it depends on the number of board members

17  you have.

18             So like right now, with six board members,

19  majority board is four.  And obviously if we disagree,

20  then generally it ends up being a full board.

21             A or B offenses have to be majority board.

22             Any offenses involving death or children

23  have to be majority board.

24             If the panel members split, and it could be

25  a two-year C or D, but if we split, then it's going to

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 57 of 128

1   **be a full board -- a majority board.**

2       Q.   The juvenile life without parole cases, I

3   assume are all majority board decisions?

4       **A.   They are.**

5       Q.   So a majority board decision, tell me how

6   that works.  The hearing panel is going to be made of

7   three individuals, including a board member?

8       **A.   Yes.**

9       Q.   The information from that hearing then

10  is -- certain information from that hearing is shared

11  with the full board, correct?

12      **A.   Correct.**

13      Q.   And them a vote takes place?

14      **A.   Correct.  And we have access to the**

15  **recordings as well.**

16      Q.   And we'll get into that a little bit more

17  later.

18           I believe you said that you've not

19  conducted any hearings for juvenile life without parole

20  cases?

21      **A.   No.  I have not conducted the ones**

22  **identified in this information.**

23      Q.   I see.  I think you said that you voted on

24  two of them, correct?

25      **A.   Correct.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 58 of 128

1    Q.   I guess my question is, why are there some

2   that you voted on and some that you did not vote on?

3    **A.   Because the order of the rotation.**

4    Q.   I see.  So --

5    **A.   You don't want the same board member voting**

6   **all the time.**

7    Q.   I understand.  And I understand that

8   there's a rotation from board member to board member

9   that changes periodically, correct?

10    **A.   Right.**

11    Q.   Let me make sure I have this

12   straight, and tell me if I'm wrong.  The file goes from

13   board member to board member to vote.  And as soon as a

14   majority is reached, is the vote then complete?

15    **A.   It is.**

16    Q.   So that could explain why you didn't vote

17   of some of them?

18    **A.   Yes.**

19    Q.   Thank you.  I was scratching my head over

20   that.

21          Does your preparation -- strike that.

22          Since you have not conducted any juvenile

23   life without parole cases --

24          MR. SPILLANE:  I'm going to kind of object

25   to the question.  I don't think she said she hasn't

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 59 of 128

1 conducted any juvenile life's without, just not these

2 four.

3 BY MR. AULT:

4     Q.   I understand.

5         And let me be clear.  Setting aside these

6 four, looking at the boarder picture, have you

7 conducted any hearings that were juvenile life without

8 parole or Senate Bill 590 hearings?

9     **A.   I have.**

10     Q.   Did your preparation for those hearings

11 differ from your preparation from what I would describe

12 as a more traditional hearing?

13     **A.   No.  They were both victims cases, so I**

14 **received the information prior.**

15         **Well, actually, I have to change that**

16 **answer.  We received a large packet of information**

17 **prior to the hearings from the offender's support**

18 **people.  Attorneys.  And I did review all of that**

19 **prior.  And we often don't receive that large of a**

20 **package prior, so it is a little different.**

21     Q.   So your review was the same, but the amount

22 of information that you had in front of you was larger;

23 is that fair?

24     **A.   Yeah.**

25     Q.   How many of these SB 590 hearings have you

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 60 of 128

1  conducted?

2      A.  I think it's just been two.  Don't quote me

3  one that.  Don't type me to that.  I'm pretty sure it's

4  just been two.

5      Q.  And, Counsel, thanking for clarifying that.

6  I would have walked right past that.

7          I'd like to go through all the roles in a

8  parole hearing, who is there, what their roles are.

9          So it's kind of the next step of the

10 deposition.

11     A.  Okay.

12     Q.  We've talked a little bit about IPOs.  Is

13 there any educational training requirement for IPOs?

14     A.  They have a pretty significant requirement.

15 I'd have to look at the job specification to tell you

16 what the education requirement is.  I would say most of

17 them have a Bachelor's degree.  I can't say all of them

18 do.

19         They receive -- institutional IPOs actually

20 receive departmental training on institutional

21 procedure, constitutional law, interacting with

22 offenders.  You know, all of that departmental policy

23 and procedure.

24         Then they received some additional

25 probation and parole officer training.  I can't tell

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 61 of 128

1   you how long that is.  When I was an IPO, it was three

2   weeks.  It could be longer.  I don't know.

3           They receive training on what goes into a

4   report.  Salient factor scoring.  Motivational

5   interviewing.

6       Q.   How to create the reports?

7       A.   All of that information.

8           They have regular training throughout the

9   year.

10          They have to do defensive tactics.

11          If they carry a firearm, they have to do

12  firearms training.  They have a large training

13  requirement.  And actually Michelle Kasak, again, can

14  speak to that.

15      Q.   I believe you said IPOs, they don't serve

16  on the three-member panel for parole hearings?

17      A.   They do not.

18      Q.   They may be involved if a victim or a

19  victim's representative is present?

20      A.   Correct.

21      Q.   Do they have any role, for example, do they

22  speak in the hearing?  Or offer any --

23      A.   They do not.

24      Q.   -- information?

25          Are you aware of any feedback, or questions

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 62 of 128

1   or concerns from IPOs relating to the factors set forth

2   in Senate Bill 590?

3        **A.    I am not.**

4        Q.    Where are parole files for juvenile life

5   without parole offenders kept?

6             Are there hard copies?  Or are they

7   electronic?

8        **A.    There's electronic.**

9             **As far as the hard copies, that would**

10  **probably be a better question for Steve Mueller.**

11       Q.    Okay.  Are parole files for offenders that

12  are sentenced to life without parole kept in a -- in

13  some way that's different than offenders who aren't

14  sentenced to life without parole?

15       **A.    Not that I'm aware of.  I think that files**

16  **are all placed in the same location.**

17            **The reason I said that, as far as**

18  **Steve Mueller, I know that he's had to grab the files,**

19  **and what have you, for releasing information and**

20  **preparing for this case.  So, but, outside of that, no,**

21  **all our files would be the same no matter what the**

22  **sentence is.**

23       Q.    And I guess just to be clear, if, for

24  example, an individual is sentenced to life without

25  parole, I assume that person does not have a parole

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 63 of 128

1 hearing; is that correct?

2      **A.  They do not have a parole hearing, but they**

3 **will have a file.  Because we do have -- we have to**

4 **look at the sentence and judgment paperwork to make**

5 **sure that --**

6      Q.  And that file would be kept the same as

7 somebody who is not sentenced to a life without parole?

8      **A.  Right.**

9      Q.  What sorts of documents are provided in the

10 parole files themselves?

11      **A.  Well, that's kind of a hard question**

12 **because of the transition between paper files and the**

13 **electronic.**

14        **If I -- the electronic, you know, we've**

15 **scanned all the paper files into File Bound.  So what**

16 **we have now is kind of called mini files, because**

17 **you're supposed to be working off the File Bound.**

18        **Well, in File Bound, what traditionally was**

19 **in our files before File Bound are the same.  You'd**

20 **have the face sheet.  You'd have any sentencing and**

21 **recommendation, or presentence report.**

22        **For some of our older cases, we actually**

23 **have some psychiatric reports, from time to time, that**

24 **came with sentencing documents.**

25        **We get the S & J's.  Any parole hearing**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 64 of 128

1   reports.  Any special reports.

2           If they were on probation, any other field

3   reports.  Victims' information, as well as their

4   delegate information.  You know, 'cause victims can

5   write in, but also their community support.  Their

6   family and friends can write in.  So we have a section

7   on that.

8       Q.   And that's what I was going to get at.  If

9   a victim or victim's representative makes a statement,

10  that would be included in the parole file?

11      A.   Right.

12      Q.   And, for example, I think some of the

13  parole files had poems that were written by family

14  members of the victims.  Anything like that that is

15  shared would go in the parole file, correct?

16      A.   Correct.

17      Q.   And would the same be true for information

18  provided by an offender?

19      A.   Yes.

20      Q.   And offender's family, for example?

21      A.   Yes.  And an offender.  Offenders write the

22  parole board from time to time.  So their information.

23           There's a section for victims.  There's a

24  section for the offender.  And for the offender's

25  family.  So if a family member has written into, you

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 65 of 128

1    **know, say we support release.  If an employer, anyone**

2    **writes in, that is maintained in the file.**

3         Q.   That's helpful.  I appreciate that

4    explanation.

5              Who's in charge of maintaining the file; if

6    you know?

7         **A.   I do not.**

8         Q.   Are all board members able to access the

9    parole files?

10        **A.   We are.**

11        Q.   Is there anyone else, outside of board

12   members, that has access to the files?

13        **A.   Parole analysts would.  Institutional**

14   **parole staff would.**

15        Q.   I assume -- let me just ask:  Does an

16   offender ever have access to a parole file?

17        **A.   They do not.**

18        Q.   Are you aware of any cases where an error

19   was in a parole file?

20        **A.   I have not.  I'm not saying it doesn't**

21   **happen; I'm just not aware.**

22        Q.   Can a victim or a victim's representative

23   access the parole file?

24        **A.   They cannot.**

25        Q.   And I assume the same would be true for an

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 66 of 128

1  offender's family or someone supporting the offender?

2      **A.  Correct.  They cannot.**

3          **(Deposition Exhibit No. 4 was marked for**

4  **identification.)**

5  BY MR. AULT:

6      Q.  Have you seen this document before?

7      **A.  I have.**

8      Q.  And what is this?

9      **A.  These are the additional factors to be**

10 **considered for juvenile life without parole, and this**

11 **is where we document those factors.**

12     Q.  Okay.  When you say "additional factors,"

13 is it your understanding that these are the factors set

14 forth in Senate Bill 590?

15     **A.  Correct.**

16     Q.  Do you know who prepared this document?

17     **A.  I think I know.  Actually, I'm just going**

18 **to say no.  Because I have an idea, but ...**

19     Q.  Okay.  Did you receive in any instructions

20 or guidelines when this document was created about how

21 to use it?

22     **A.  Just a general discussion that we were**

23 **going to document these factors so that we were making**

24 **sure that we were considering these factors and**

25 **providing meaningful hearings and meaningful**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 67 of 128

1    opportunities for juvenile life without.

2         Q.   In the juvenile life without parole

3    hearings that you conducted, did you complete this

4    sheet?

5         A.   I might have marked on it.  But it was --

6    it is generally completed between the board member and

7    the analyst.

8         Q.   Okay.  So someone likely completed this

9    sheet?

10        A.   Correct.  And it's often we work together

11   to make sure that we don't miss anything.

12        Q.   Are there any other documents like this

13   that you are, or other members of the panel have

14   started to use, since Senate Bill 590?

15        A.   No.

16        Q.   Is there a corresponding list of questions

17   to ask, for example, related to these factors?

18        A.   No.

19        Q.   Did you receive any training on questions

20   to ask, or certain methods that you could use to elicit

21   this information during a hearing?

22        A.   Not specific to juveniles life without.

23   Some of these things we could consider for everyone.

24   What rehabilitation programs.  What accountability.

25   Their conduct.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 68 of 128

1          And so we, you know, that was part of our

2   motivational interviewing, asking open-ended questions,

3   so that we can elicit whether or not they accept

4   accountability.  So it wasn't specific to juveniles

5   life without parole.  Does that answer --

6          Q.   It does.  That's helpful.

7          I guess the information that goes on here,

8   the information that you're eliciting, I assume some of

9   that comes from the prehearing report?

10         A.   Yes.

11         Q.   Do you also endeavor to ask questions of

12  the offender relating to these factors during the

13  hearing?

14         A.   Yes.

15         Q.   When an offender that is a juvenile life

16  without parole offender -- strike that.

17         Did those individuals have to apply for a

18  hearing after Senate Bill 590 was passed?

19         A.   I don't know the answer to that one.

20         Q.   Okay.

21         A.   I thought it was -- I thought it was

22  automatic, but I don't know the answer.

23         Q.   That's fair.  And I'm sure there are other

24  people we could talk to get a better answer for that.

25         A.   Yeah.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 69 of 128

1          (Deposition Exhibit No. 5 was marked for

2   identification.)

3   BY MR. AULT:

4       Q.   Do you recognize this document?

5       A.   I do.

6       Q.   And what is it?

7       A.   It's -- I don't know where it was created,

8   but it was a document that talked about parole hearing

9   procedures.

10      Q.   Do you know why it was created?  Was it

11  created as an educational tool, or training tool for

12  board members?  Or was it created for another party?

13      A.   I don't know.

14      Q.   I will represent that we've -- it seems

15  like we've seen a few versions of this document.  And I

16  know at one time a version was sent to Mae Quinn, who

17  was one of the attorneys for the plaintiffs in this

18  action.

19           Did you have any role in creating this

20  document?

21      A.   No.

22      Q.   Okay.

23      A.   It was sent to me.  I recall reviewing it.

24  I recall seeing a draft review.  But I wasn't a part of

25  actually preparing it.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 70 of 128

1     Q.   If you look on the second page, I guess the

2   fourth bullet down.  It begins:  The offender's

3   delegate offer a statement.

4          Do you see that?

5     A.   Yes.

6     Q.   And the bullet reads, "The offender's

7   delegate may offer a statement on behalf of the

8   offender, ask questions, and provide additional

9   information that may be requested by the hearing

10  panel."

11         I just wanted to follow up one that.  Do

12  offender's delegates ever ask questions during a

13  hearing?

14    **A.   Occasionally.**

15    Q.   What type of questions?

16    **A.   Questions about acceptable home plans.**

17  **Questions about what the offender can and can't do when**

18  **they're released.  Not very often.  Sometimes how long**

19  **is it gonna take to find out.  But, no, they don't**

20  **usually ask a lot of questions.**

21    Q.   It's typically related to a home plan or

22  something that would take place after release?

23    **A.   Yes.**

24    Q.   I know one of the issues that has been

25  raised in this litigation, or in corresponding

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 71 of 128

1  litigation, was about the right of an offender's

2  delegate to ask questions, or correct the record that

3  is shared.

4          Has that ever happened during any of the

5  hearings that you have overseen?

6      **A.   No.**

7      Q.   Do you know whether it would be proper to

8  do that?

9      **A.   Generally, a delegate, no.  It -- it**

10  **depends on what they're correcting.  I mean, that's**

11  **just open ended.  You know.  If they're saying, no, he**

12  **didn't actually flunk out of school at the eleventh**

13  **grade, it was the ninth grade, sure.  It just depends.**

14      Q.   I've listened to a couple of the audio

15  recordings of parole hearings --

16      **A.   Yes.**

17      Q.   -- in this case.  And it seems to me that

18  different board members generally follow the same

19  structure, but they each handle a parole hearing

20  slightly different.

21      **A.   Yes.**

22      Q.   Would you agree with that?

23      **A.   Yes.**

24      Q.   And would you agree that different board

25  members have the right to do so, so as long as they're

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 72 of 128

1  staying within the statutes?  For example, that they

2  each may ask questions a little differently or may work

3  through the process differently?

4      **A.   Yes.**

5      Q.   If you look the second full black dot

6  there, "The hearing panel makes a recommendation after

7  the hearing."

8          Do you see that?

9      **A.   Yes.**

10      Q.   The next statement says, "This

11  recommendation, a recording of the hearing, notes

12  taken, and the supporting exhibits from all parties are

13  provided to the rest of the board to use to come to a

14  majority decision."

15      **A.   Yes.**

16      Q.   Am I understanding correctly that what's

17  set forth there are the documents that are shared with

18  the board members who have to make a majority board

19  vote on the decision?

20      **A.   Yes.**

21      Q.   In situations like that, when you are asked

22  to make a vote on a hearing that you did not conduct or

23  attend, do you typically endeavor to review all of

24  those materials?

25      **A.   Yes.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 73 of 128

1    Q.   Do you listen to the recording of the

2  hearing?

3    **A.   Very occasionally.**

4    Q.   Maybe if it's a close call, or something

5  like that, you need more information?

6    **A.   Right.  If I'm struggling with a decision.**

7    Q.   But you don't listen to every recording?

8    **A.   No.**

9    Q.   I imagine that would be fairly time

10 consuming?

11   **A.   Correct.**

12   Q.   And there's no statute or regulation that

13 says that you have to listen to every recording?

14   **A.   No.**

15   Q.   If you look at the third page, the sixth

16 column, it says, "This will not be a retrial of the

17 crime."

18   **A.   Correct.**

19   Q.   Do you know what that means?

20   **A.   Generally, we're looking to see how much**

21 **responsibility or acceptance the offender is going to**

22 **give us.  But we're not going to go into all the**

23 **different evidence that was presented and argue that**

24 **back and forth.  We want to know what actually**

25 **happened.  And we want the offender to take**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 74 of 128

1  responsibility for it.

2      Q.   That makes sense.  There are some times

3  where an offender maintains innocence, correct?

4      A.   Correct.

5      Q.   In a situation like that, is that held

6  against the individual?

7      A.   It's considered.  I mean, we have to look

8  at the fact that they were either found guilty in trial

9  or they pled guilty.  And we have offenders who plead

10  guilty and still maintain innocence.  So we have to

11  look at they were found guilty of this offense.

12          And so, again, we're not retrying the

13  offense.  We're looking to see, they were found guilty,

14  are they going to take responsibility for the offense,

15  and can we parole them.  It's not to say that if

16  someone completely maintains innocence that we wouldn't

17  parole them.  I mean, we have before.  And we would.

18      Q.   Okay.  Well, if I can direct your attention

19  to the previous exhibit, No. 4, the five factors from

20  Senate Bill 590.

21      A.   Yes.

22      Q.   I've always been somewhat curious, and

23  maybe you can help.  The third factor, "Evidence that

24  the person has accepted accountability for the offense

25  or offenses.  Except in cases where the person has

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 75 of 128

1  maintained his or her innocence."

2        I'm not sure how to ask the question.  To

3  me, that reads that board members should consider the

4  acceptance of accountability, but that it should not be

5  considered if the person maintains that he or she is

6  innocent.

7        Would you agree with that statement?  Or

8  how do you consider it in making your decisions?

9     **A.**  **That's my -- my interpretation is all of**

10  **that should be considered.**

11     Q.  And I guess that's what I'm trying to get

12  at.

13        Are there situations, particularly with

14  juvenile life without parole offenders, where the

15  offender may say, maintain innocence, "I did not do

16  it."  And that you would consider that?

17        Let me rephrase that.  You would hold that

18  against the offender in some way in making a decision

19  about release?

20     **A.**  **I just don't know how to respond to that.**

21  **Because it would depend on the case.  It would probably**

22  **depend on the official version.  The information that**

23  **we had.**

24        **I mean, if you had a witness that was**

25  **there, and saw the individual shoot someone, you're**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 76 of 128

1   probably going to give a different weight.  There's

2   just too many factors that depend.

3       Q.   It sounds like what you're saying is that

4   if an offender maintains innocence, but if your review

5   of the underlying crime, the evidence that was

6   presented at trial would lead you to believe that the

7   offender was not innocent, you may consider that?

8       A.   You may consider that.  That wouldn't keep

9   you from a parole date.

10      Q.   Okay.  I appreciate that.  Thank you.

11           This may be difficult to answer.  Can you

12  give me a ballpark of how many hearings you complete in

13  an average week?

14      A.   Maybe around 40.  It is difficult, because

15  it depends on the time of month, what have you.

16      Q.   Sure.

17      A.   There's actually a chart that shows the

18  hearings we do.  And the parole decisions.  I mean,

19  hearings aren't the only aspect of our job.

20      Q.   I assume that the length that each hearing

21  lasts depends on a variety of factors, correct?

22      A.   It does.

23      Q.   Can you give me an estimate of the length

24  of time that hearings may last?

25      A.   It can be anywhere from five minutes to an

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 77 of 128

1  hour.  I mean, occasionally we have an offender come in

2  and tell you not-so-nice-language and leave.  So, I

3  mean, it could last five minutes, or it could last an

4  hour or more.

5       Q.   I assume those are the quiet ones?

6       A.   Yeah.

7       Q.   Are there limits on the number of hearings

8  that you as a board member can participate in in a

9  given day or in a given week?

10      A.   No.  There's a number that we try not to go

11 above.  And that changed recently.  I think it's

12 either -- well, I don't know.  Steve Mueller could tell

13 you.

14           There's a number that we try not to go

15 above so that we can make sure that we have plenty of

16 time throughout the day.

17      Q.   Let's talk about the in-person parole

18 hearings.  They're recorded, correct?

19      A.   They are.

20      Q.   Just audio recorded?

21      A.   Correct.

22      Q.   For the hearings that are done remotely, is

23 there video that's recorded as well?

24      A.   No.

25      Q.   Just audio for those as well?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 78 of 128

1    **A.    Correct.**

2    Q.    And all those audio recordings are saved by

3    the parole board?  Or --

4    **A.    The analyst, yes.**

5    Q.    We talked a little bit about the protocol

6    for parole hearings.

7         Is there a separate protocol that sets

8    forth juvenile life without parole or SB 590 hearings?

9    **A.    No.**

10        MR. AULT:  I'd like to mark this next

11   document as Zamkus 6.

12        (Deposition Exhibit No. 6 was marked for

13   identification.)

14   BY MR. AULT:

15   Q.    And this document is titled analyst meeting

16   minutes.

17        Do you see that.

18   **A.    I do.**

19   Q.    What is an analyst meeting?

20   **A.    It's a meeting held with all the parole**

21   **analysts where they can discuss process and procedure.**

22   **They discuss sometimes more of the technical aspects**

23   **than we do in the parole board meeting.**

24   Q.    Do board members attend analysts' meetings?

25   **A.    On occasion.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 79 of 128

1        Q.    I don't think you were there, but Mr.

2    Dusenberg was there on this one?

3        **A.    Yes.**

4        Q.    On the first bullet point, if you look

5    two-thirds down, prerelease worksheet.  It says, "A

6    prerelease worksheet will be completed for all other

7    offenders."  I just wasn't sure what that referred to;

8    do you know?

9        **A.    It's a worksheet that was developed.  And I**

10    **can't tell you the specific time frames.  There's a**

11    **certain amount of time, prior to an offender's**

12    **release -- it used to be 14 months, again, don't quote**

13    **me on that, because I haven't been an IPO for many**

14    **years.  It looks at the offender's home plan.**

15             **It looks at -- they update the salient**

16    **factor score to see if it's gotten better or worse.**

17             **They look at any programs completed.  Any**

18    **conduct violations.  It actually is something that is**

19    **done often to see if we want to let the person out**

20    **earlier.**

21        Q.    Is there a different form used for juvenile

22    life without parole offenders?

23        **A.    No.  They would go through the same process**

24    **prior to release.**

25             **It's also a process to make sure if you --**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 80 of 128

1  sometimes we give someone a release date, and they

2  really act out, and, you know, get violations for using

3  drugs, or what have you.  Then we have to reconsider

4  their parole date.  I mean, it can be a positive or a

5  negative, but it would be the same for all offenders.

6      Q.  That document represents something with the

7  initials BAS.  I assume that's a board action sheet?

8      A.  Yes.

9      Q.  And I have copy I'd like to mark.

10      (Deposition Exhibit No. 7 was marked for

11  identification.)

12  BY MR. AULT:

13      Q.  Is this is a board action sheet?

14      A.  It is.

15      Q.  Who completes the board action sheet?

16      A.  It depends.  I mean, generally, the person

17  doing the interview starts out with it.  But any of the

18  hearing panel can add comments to it.  We all can mark

19  boxes on the bottom.

20          Once we've made our recommendation or our

21  decision, this form goes to the other board members on

22  majority cases, and then they can also add comments to

23  this form.

24      Q.  And their comments, I assume, go in the

25  boxes where it says member 2, and 3, and so on?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 81 of 128

1    A.    Not necessarily.  Their decision will go in

2  those boxes, but sometimes they write up here under:

3  Hearing panel.

4    Q.    I understand.  So what would a board member

5  write in a box to indicate their decision?

6    A.    It depends.  I mean, sometimes you write

7  that the person interviewed very well.  Or you write

8  that the person took no accountability whatsoever.  But

9  it just depends.

10    Q.    Okay.  And then I assume this board action

11  sheet is used to determine or to make a final

12  determination about release or grant parole?

13    A.    To document it.

14    Q.    That's a better term.

15         One other document I'd like to show you

16  we'll mark as Zamkus 8.

17         (Deposition Exhibit No. 8 was marked for

18  identification.)

19  BY MR. AULT:

20    Q.    And I just wanted to show this to you,

21  partly because it has your name on it.  It looks like

22  an email from you from May of this year --

23    A.    Uh-huh.

24    Q.    -- to Michelle Kasak.  We've spoken about

25  her earlier, correct?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 82 of 128

1    A.    Correct.  I recall it.

2    Q.    Okay.  It looks like there are two

3  documents that were attached to the email.  One titled

4  of questions to ask during an interview, and one titled

5  parole hearing protocol May 26th, 2017.  And those are

6  the filings listed on the email itself.

7          Let me just ask this:  Do you know why you

8  sent this email to Ms. Kasak and Mr. Mueller?

9    **A.    I think it was aimed at helping provide**

10 **consistency in helping as to training.  You know, that**

11 **was part of what I tried to do with the board as the**

12 **vice-chair.  It's not an assigned responsibility, but**

13 **given my background, I do try and help other board**

14 **members.**

15   Q.    The second page that says questions to ask

16 during an interview, to assess barriers and strengths.

17 Do you use a script like this when you are conducting a

18 hearing?

19   **A.    I do not.  And this one I did not develop.**

20   Q.    It looks like in the email you actually

21 said some of these questions might not be too relevant?

22   **A.    Correct.**

23   Q.    The fourth and fifth pages, parole hearing

24 protocol, did you prepare this document?

25   **A.    I didn't prepare it from scratch.  None of**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 83 of 128

1  this stuff would I have prepared from scratch.  It

2  would be stuff that I would be offering input into.

3            And to tell you what I specifically did,

4  unless I have it in tracking somewhere, which, I mean,

5  you would have that, I don't.  In fact, I was looking

6  for this document recently and couldn't find it.

7       Q.   There you go.  Happy to help.  I didn't

8  have a lot of questions about it.

9            I'd like to move on to talk about

10  delegates.

11            How many delegates are allowed for an

12  offender at a hearing?

13       A.   One.

14       Q.   Does anyone communicate with the delegates

15  before a hearing?

16       A.   I don't know the answer to that.

17       Q.   Do you, as the board member, ever

18  communicate with delegates prior to a hearing?

19       A.   Occasionally they'll call in, if they're

20  not be able to be present, and want to speak to the

21  board member, just like with a victim.

22       Q.   Are the delegates for the offender limited

23  in the topics that they can discuss during a hearing?

24       A.   We like them to stick to any changes

25  they've seen in the offender.  You know, progress made.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 84 of 128

1    And their future plan.

2              I mean, 'cause they're there to show the

3    support that the offender has to help them be

4    successful upon release.

5              And can I correct one thing?  They're

6    allowed to have one delegate present, but they're

7    allowed to have anyone write in information or contact

8    us.

9        Q.   And the information that individuals write

10   in on their behalf would go in the parole file?

11       A.   Correct.

12       Q.   The delegate that's actually present, like

13   you said, oftentimes offers information about future

14   plans, and I assume that would include employment or

15   housing?

16       A.   Yes.  And any kind of interior outer

17   controls at the home.  You know, if the person has

18   problems, they'll often say, "This is a sober living

19   environment.  We won't allow drugs in our home."  That

20   kind of information.

21       Q.   I understand.  You mentioned they can stick

22   to changes seen in the offender or progress made?

23       A.   Yes.

24       Q.   I just want to inquire about that,

25   particularly with a juvenile life without parole

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 85 of 128

1  offenders.

2         From the hearings that I've seen, a lot of

3  these individuals have pretty sobering backstories, you

4  know, as children.  Would you allow a delegate to talk

5  about the backstory?  And, for example, to talk about

6  abuse that occurred as a juvenile?

7         **A.   We often do.  Not too far, because we'd**

8  **have the offender talk to us about that, and that's**

9  **their information to share.**

10        **You know, an offender may have their own**

11  **reasons for not wanting to share.  We generally aren't**

12  **going to cut them off.  I mean, if we see an offender**

13  **kind of looking at them, we might.  But, yeah,**

14  **we -- we'll give them some area to talk there.**

15        Q.   That makes sense.

16        **A.   We try not to be, like, heartless.  You**

17  **know.  And that goes to our thought process as well.**

18        Q.   I know there are procedures -- and we don't

19  need to mark them and go through them -- but there are

20  procedures that specify the role of the delegate and

21  who can serve as a delegate, correct?

22        **A.   Yes.**

23        Q.   And are any of those statutory?  Are there

24  state statutes that spell out the role of a delegate?

25        **A.   I don't know the answer to that.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 86 of 128

1    Q.   Is the delegate allowed to bring anything

2  with him or her to the hearing?

3    **A.   No.  Generally, they're not.  Sometimes**

4  **they bring a prepared letter, or prepared letters from**

5  **other family members.**

6    **There's restrictions.  This isn't by**

7  **Division of Probation and Parole; this is by the**

8  **Division of Adult Institutions.  For safety, there are**

9  **restrictions of what people can bring in and can't.**

10    Q.   I understand.  I've walked into

11  correctional centers with my cell phone and made the

12  cold walk back to the car more than once.

13    Are delegates allowed to take notes during

14  parole hearings?

15    **A.   They are now, yes.**

16    Q.   Has there been a change in policy?

17    **A.   There has.  It was generally our**

18  **understanding that these were closed, confidential**

19  **meetings.  And so I think there was an occasion, once**

20  **or twice, where a delegate was not allowed to take**

21  **notes.  I have reminded delegates myself before that it**

22  **is a closed, confidential meeting and those notes are**

23  **for their work purposes only.**

24    Q.   Okay.  It may have been my co-counsel that

25  were involved in some of those.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 87 of 128

1    A.   But generally most delegates don't come in

2 wanting to take notes anyway.  I mean, I don't know

3 that we've ever had that question posed before, and so

4 that's why it had to be discussed and determined.

5    Q.   Can attorneys or defense attorneys can

6 serve as a delegate for an offender?

7    A.   They can.

8    Q.   Are defense attorneys treated any

9 differently, or are there any special rules that apply

10 to defense attorneys --

11    A.   No.

12    Q.   -- as a delegate?

13    A.   No.

14    Q.   They'd be treated the same as any other

15 delegate?

16    A.   Correct.  They're expected to make a

17 presentation just like the other delegates would be.

18    Q.   Okay.  I asked some questions earlier about

19 the ability of an offender or a delegate to make a

20 statement to correct something that's on the record.

21         I guess my question, is it up to the board

22 member, or whoever it is that's conducting the hearing,

23 to determine what to allow?  What's out of bounds, as

24 far as that goes?

25    A.   We try to have consistency.  But you can't

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 88 of 128

1    plan for every instance.

2          Q.    Particularly with attorneys is my guess?

3          A.    Right.

4          Q.    Do you ever have individuals, other than

5    the offenders themselves, or offender's delegates, that

6    follow up with the board after a hearing?

7          A.    We do.  Well, and there are times when an

8    offender will tell us something's not correct, and we

9    will ask the IPO to research it.  Or ask the relevant

10   party.

11          But, yeah, the same goes for a victim.

12   Anyone can provide a written statement to us after the

13   hearing.  Because once the hearing is complete, the

14   record's complete.  The victims, we don't even let them

15   continue at that point.  If they hear something they

16   don't like or they disagree with they're instructed to

17   put it in writing.

18          Q.    Okay.  And if someone writes, be it an

19   offender, delegate, a victim, a prosecutor, that

20   information would go in the parole file, correct?

21          A.    It would.  And it would be shared with the

22   board members that made the decision.  So if you have

23   seen a file, and something was written in and you see

24   initials from the board members, that's what happened.

25          MR. AULT:  Let's take another break.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 89 of 128

1          (A break was taken.)

2     BY MR. AULT:

3          Q.   Ms. Zamkus, we've talked about a few of the

4     other rules.

5               Prosecutors oftentimes attend parole

6     hearings, correct.

7          **A.   I wouldn't say often.  Handful of times.**

8     **On occasion.**

9          Q.   They have the right to do so?

10         **A.   They do.**

11         Q.   Do you know who, if anyone, communicates

12    with the prosecutors prior to the hearing?

13         **A.   I would say that would be the office of**

14    **victims services.**

15         Q.   Do you know if any information is shared

16    with prosecutors, like the parole file or prehearing

17    report?

18         **A.   That would not be shared with them.   I**

19    **can't say what would be though.  But we don't share**

20    **that parole file with anyone.**

21         Q.   Okay.  When prosecutors do attend the

22    hearings, what is their role?

23         **A.   They're allowed to speak about the offense**

24    **and whether they oppose or support release.**

25         Q.   Okay.  Let me make sure I have that clear.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 90 of 128

1          The prosecutor can state during the hearing

2   whether the prosecutor believes release is appropriate,

3   or whether they would --

4          **A.    Yes.**

5          Q.    -- oppose release?

6          **A.    Yes.  All parties are allowed to do that.**

7          Q.    Okay.  My guess is prosecutors mainly offer

8   testimony about the underlying crime; is that correct?

9          **A.    You know, it's hard for me to answer,**

10  **because I think I've only had a prosecutor in once or**

11  **twice.**

12          **The only time that I had a prosecutor, and**

13  **that comes to mind, they described the offender within**

14  **the community.  The offender's activities.  The**

15  **offender's reputation.  And the impact to the community**

16  **when the offender was in the community.  And then spoke**

17  **about their desire for the offender not to be released**

18  **back into the community.**

19          Q.    I understand.  Victims or victim's family

20  members are allowed to attend parole hearings, correct?

21          **A.    They are.**

22          Q.    Does that happen very often?

23          **A.    Sometimes it seems like it's a lot.  And**

24  **sometimes it's not.  Like, I've had two this week.  But**

25  **then I might go a month without one.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 91 of 128

1     Q.  Based on my review of the hearing

2  transcripts or recordings it seems that victims or

3  victim's representatives get the opportunity to go

4  first?

5     **A.**  **They do.**

6     Q.  And --

7     **A.**  **Because they're not part of the hearing,**

8  **they -- they're role is to make a statement.  And they**

9  **may be able to observe the hearing if they want to.**

10  **But once the hearing starts, their part is done.**

11     Q.  I understand.  So the victim or the family

12  member comes in and makes a statement, and they can

13  make that statement to the hearing panel, correct?

14     **A.**  **Correct.**

15     Q.  Is that statement made while the offender

16  is in the room?

17     **A.**  **It depends on what they feel comfortable**

18  **with.  It's in the statute that they're allowed to make**

19  **the statement with or without the offender present.  If**

20  **we're onsite, they can actually have a partition put up**

21  **in the room.  And then they're allowed to stay for the**

22  **hearing or leave --**

23     Q.  Okay.

24     **A.**  **-- at the time of the hearing.**

25     Q.  The victim isn't allowed to address the

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 92 of 128

1   offender directly, are they?

2       **A.  No.  And they're given specific**

3   **instructions on that.**

4       Q.  And the reverse is also true, that the

5   offender can't speak to the victim or the victim's

6   family?

7       **A.  Correct.**

8       Q.  After the victim's statement is concluded,

9   if they elect to stay for the rest of the hearing, they

10  don't participate in that hearing in any way, do they?

11       **A.  No.  And we've occasionally had where**

12  **they've get a little overboard on shaking their head or**

13  **rolling their eyes and we'll instruct them not to.**

14       Q.  Okay.  If the victim or victim's family

15  elects to, say, send in something, write something

16  about the hearing, they have the ability to do that and

17  it would be included in the parole file, correct?

18       **A.  Yes.**

19       Q.  The same as an offender or the offender's

20  family could do so?

21       **A.  Correct.**

22       Q.  I see references to a victim advocate.

23       **A.  Yes.**

24       Q.  Does that ring a bell?

25       **A.  That's someone who works for the office of**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 93 of 128

1  victims services.  Well, no.  Actually, the victim

2  advocate works for the prosecuting attorney's office.

3  The victims services is there to support the function

4  of the board mand make sure that the victims are

5  notified, all of the documentation is uploaded into the

6  file.  They're actually clerical staff.

7        Q.   So it's more an administrative role?

8        A.   Correct.

9        Q.   That the victim gets where he or she needs

10  to be and has the information she or she needs?

11        A.   And we work with them, because we let them

12  know our expectations of the victims when they're in

13  the room and we want them to communicate those

14  expectations prior to the victim getting there.

15        Q.   What happens at the conclusion of a parole

16  hearing?

17        A.   I can talk to you what happens for me.

18        Q.   Yeah.

19        A.   For me, the victim statement is made.  I'll

20  do the parole hearing.  I'll give the delegate an

21  opportunity to make a statement.

22             I'll offer the parole -- the other panel

23  members an opportunity to make a statement or ask any

24  questions.  And once everyone's got their statements

25  made, questions answered, I conclude it.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 94 of 128

```
1              The delegate and offender are taken out

2    first.  The victims are taken out next.

3              Occasionally, the victims will try to make

4    a statement at that point.  I won't let them.  Because

5    the record's complete.

6              And that's, you know, that's why I tell

7    them, if you want to add something, you need to send in

8    a document so that that can be added to the record for

9    everyone to review.

10        Q.   So that agenda, would that be the same for

11   SB 590 hearings?

12        A.   Yes.

13        Q.   As for more traditional hearings?

14        A.   Yes.

15        Q.   So there isn't a change in the agenda just

16   because it's a Senate Bill 590 hearing?

17        A.   Correct.

18        Q.   How is the decision of the board conveyed

19   to the offender?

20        A.   We actually, our parole file and decision

21   is given to a caseload manager, who then enters it into

22   the computer.

23              Once that decision is finalized, an analyst

24   reviews it, makes sure it was correctly entered into

25   the computer.  And once that's done, the decision's
```

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 95 of 128

1    finalized.

2            It electronically goes to whatever

3    institution the offender's at.  And the offender is

4    called up into the institutional parole officer's

5    office, and the IPO is to deliver that personally to

6    the offender.

7        Q.   When the IPO meets with the offender

8    afterwards, if the news is not good news, let's say for

9    the offender, can the IPO have a conversation about the

10   hearing?  Maybe what the offender could have improved

11   upon?  Maybe the IPO's suggestion for why a decision

12   was a certain way?

13       A.   Limited.  Because they're not in the parole

14   hearing.  And they don't necessarily know.  But a lot

15   of times you have an idea of what the issue is.  Like,

16   you've prepared the report, you've, you know, seen all

17   the conduct violations.  And when you talk to the

18   offender you say, "Look, I'm not sure."  But, you know,

19   "I'm pretty sure that you need to quit getting

20   violations and you need to get involved in more

21   programs."

22       Q.   And that makes sense because the IPO does

23   the prehearing report?

24       A.   Correct.

25       Q.   Does the offender know the recommendation

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 96 of 128

1    that the IPO makes in the prehearing report?

2         **A.    They do not.**

3         Q.    Does an offender have any right to appeal

4    the decision of the parole board?

5         **A.    It depends on different factors.  Type of**

6    **case.  Length of case.  Whether or not it was a**

7    **majority board decision.  That should all be laid out**

8    **in policy and procedure.**

9         Q.    How long does it usually take?  Let's talk

10   about a situation where there is a majority board

11   decision, how long does it typically take from the date

12   of the hearing, to the decision when -- to the date

13   that the decision is conveyed to the inmate?

14        **A.    We estimate it to be six to eight weeks.**

15   **Right now we're -- we've got six members so it's sooner**

16   **than that.**

17        Q.    Is the process for reaching a decision

18   among the board members different in juvenile life

19   without parole cases as it is in traditional cases?

20        **A.    Only in that we review and consider the**

21   **additional factors.  But, no, the actual process is not**

22   **any different.**

23        Q.    Okay.  Do board members ever, for example,

24   have a meeting, formal or informal, to discuss a

25   certain case?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 97 of 128

1    A.    Occasionally.  I mean, if you're really

2   struggling with one.  For example, if it would have

3   involved a death -- I can't tell you if it was

4   manslaughter, or murder, or what have you -- but I felt

5   like the offender had done really well in certain

6   areas.  And I wanted to give him a date and I was

7   really struggling with it.  So I communicated that to

8   my fellow board members, that I really wanted them to

9   look at it, and vote their conscience.

10          Because we have this discussion, it's not

11  to say, "Do what I want you to do."  It's to say, you

12  know, "Back me up here and really consider this.

13  Because I'm struggling with the decision."

14          I mean, these aren't always easy decisions.

15  I mean, when someone's taken a life, and you're letting

16  them out into the community, it's not always an easy

17  decision to make.

18      Q.   It's a lot on your shoulders for sure.

19      A.   Yeah.

20      Q.   There's never a point, though, where the

21  board would vote all at once by a show of hands or

22  anything like that?

23      A.   No.  And we don't ask each other what your

24  decision was.  Now, obviously we're going to see it on

25  the board action sheet.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 98 of 128

1    But, like, that case I just told you about,

2  I don't know whether they gave them a date or not.  It

3  went to my fellow board members.

4    Now, I could go look it up.  I'm busy

5  enough that I don't go look it up.  But we don't follow

6  up to see, because we don't want anyone to feel

7  pressure.  I mean, this is really a system of checks

8  and balances.  This is really a system to make sure

9  that we're making good, informed, thoughtful,

10  meaningful decisions.

11    Q.    In a majority board decision --

12    A.    Yes.

13    Q.    -- we've talked about the materials that go

14  before a board member that has to make that decision.

15    Do those board members also have access to

16  the computers to pull anything else they need to make

17  the decision?

18    A.    Yeah.  We all have laptops.  We can pull

19  any information.  If someone doesn't know how to do it

20  the analyst is always there to help us.

21    Q.    But the board members making the decision

22  have access to the same information as the board member

23  that actually sat in the hearing?

24    A.    Yes.

25    Q.    Are there any other screening instruments

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 99 of 128

1  used in making decisions that we haven't also

2  discussed?

3      A.   Yes.   There is the substance abuse

4  assessment.   It's called a SACA score.

5           There is, for women, they have a GRA.   It's

6  gender -- I can't tell you what it stands for.   It's an

7  assessment that looks at the different risks factors.

8           For sex offenders we have some other tools

9  that we use.

10          And then the Division of Adult Institutions

11  has some even more assessments that they utilize.

12     Q.   You mentioned, older cases, there may be a

13  psych evaluation?

14     A.   Yes.

15     Q.    Is there ever a mental health assessment

16  that is performed prior to a parole hearing?

17     A.   Well, I mean, not because of the parole

18  hearing?   But, yes, our mental health -- we call them

19  mental health III and above -- those are the people

20  that are actively seeing mental help.

21          They are going to have a sheet in File

22  Bound that says what they're currently working on.

23  What their treatment goals are.   We don't have

24  anything, like, protected health information, like,

25  what their medication is.   Now we put that in the

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 100 of 128

1   **report, but that's also self-reported by the offender.**

2          Q.   Okay.  Are there ever situations when --

3   let me strike that.

4          I know that we talked earlier to a

5   reference about hearings are not an opportunity to

6   relitigate or retry a case.

7          **A.   Correct.**

8          Q.   Is there ever a situation where someone, an

9   eyewitness, for example, or a family member may try to

10  present information in writing to the board?

11         For example, if an eye witness comes

12  forward after someone's been convicted?

13         **A.   I don't know that that's ever occurred.**

14  **I'm not saying that it hasn't; I just don't know.**

15         Q.   You haven't -- you don't at least recall it

16  happening in any of your hearings?

17         **A.   No.**

18         Q.   In the victim statements, oftentimes, from

19  what I have reviewed, they make a statement about their

20  desire not to allow this individual back into the

21  community, for personal reasons, or for reasons of

22  community safety.

23         **A.   Not always.**

24         Q.   Okay.

25         **A.   We occasionally have victims who say I**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 101 of 128

1  **think this person should be given another chance.**

2  Q.  Okay.  Regardless of the victim's view, do

3  those statements of the victims or victim's families

4  play a role in your decisions?

5  **A.  We consider community opposition, yes.**

6  Q.  Would the same be true for statements made

7  by prosecutors or law enforcement?

8  **A.  We put that all together as community**

9  **opposition.  Yeah.  We consider it.  But we give**

10 **decisions even when we have community opposition.**

11 Q.  I've seen a few statements, at least on

12 the --

13 **A.  The board action sheet.**

14 Q.  -- the BAS, that there are a number of

15 reasons for why parole may be denied, or why release

16 may be denied, and one of them are circumstances of the

17 offense.  What does that mean?

18 **A.  Um, it means that it's a particularly**

19 **violent -- it can be a number of things.  But generally**

20 **points to being a particularly violent offense, or an**

21 **offense that harmed a lot of people.**

22 Q.  Okay.  Do you ever consider how much an

23 offender has matured and changed from the time of the

24 offense to the time of the hearing?

25 **A.  We do.  And sometimes even delegates speak**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 102 of 128

1    to that.  And we consider that as well.

2        Q.   What kind of role does the educational

3    programming -- I know there was a term we used earlier

4    about positive activities that an offender takes while

5    incarcerated -- what role does that play?

6        A.   That plays a pretty large role for most of

7    us.

8             Because, you know, an offender can do time

9    a couple of different ways.  They can do it just like

10   they did it when they were in the community.  Or they

11   can try and use their time wisely.  We give a lot of

12   consideration to that.

13            You know, did they get their education

14   while they're in there?  Are they taking advantage of

15   the program opportunities?  Are they doing more than

16   just hanging out with the guys in the housing unit?

17   Are they getting involved in restorative justice?  Are

18   they doing a job?

19            We have some -- especially your life

20   without people -- they've been on jobs for 15,

21   20 years, and have a great work history.  We consider

22   all of that.  And we do put a lot of weight into that.

23   Because that speaks to a person's motivation, internal

24   motivation, and change.

25        Q.   I wanted to ask about how that plays into

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 103 of 128

1   decisions on juvenile life without parole offenders.

2   Because, obviously, they've spent a significant period

3   of time incarcerated, understanding that they would

4   have no chance of release, and that all changed by the

5   decision of the Supreme Court.

6           Have you discussed, among board members or

7   anyone else, the role that those educational

8   programming, or opportunities that took place before

9   they learned that they were eligible for parole, how

10  would that factor in?

11      **A.   We find that a little impressive.  We've**

12  **commented on that before.  That wouldn't even be just**

13  **juvenile life without parole.  We have some offenders**

14  **who, through the appeal process, you know, adult**

15  **offenders, through the appeal process, who now are, you**

16  **know, didn't think they were ever gonna get out and now**

17  **can get out.**

18          **If we've seen that they were working**

19  **programs, and staying out of trouble, and being**

20  **productive, knowing that they would never get out,**

21  **yeah, we find that impressive.**

22      Q.   One of the issues that's filled out is

23  attitude.  Obviously, you can -- it's subjective.  You

24  can tell something about a person's attitude during the

25  hearing.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 104 of 128

1          Are there other factors that are taken into

2 account to determine the attitude of the offender?

3     A.   Well, I mean, programming is one factor

4 that speaks to their attitude.

5          The contact that the institutional parole

6 officer makes with staff.  And occasionally we'll get

7 letters from staff as well.  I forgot about that.

8 That's part of the file.  Especially work supervisors

9 will send us letters.

10          The fact that someone's on work release, or

11 they've held a premium job for a number of years, that

12 all goes to attitude.

13     Q.   There's a lot of discussion about risk,

14 whether an offender's high-risk or low-risk.  This may

15 be repetitive.  What do you consider in making that

16 determination?

17     A.   A number of different ones.  You know, how

18 they -- if they've had supervision in the past.  How

19 well they did on it.

20          Their prior criminal history.  You know, if

21 they just committed crime after crime, that's going to

22 talk about risk.

23          Their age at the time.  You know, I mean,

24 research shows that some of your older individuals kind

25 of just age out of the committing crimes.  Not always.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 105 of 128

1    We know older individuals who commit crimes.  But

2    research shows they're a little lower.

3              We consider, of course, their behavior in

4    the institution.  I mean, if they're still committing

5    crime in the institution, I mean, they're at risk to

6    re-offend.

7              We look at their community support.

8    Because if you don't have support, it's going to be

9    harder for you to be successful in the community.

10         Q.   I know you have a background in sociology.

11   Is that ever something you consider?  For example, the

12   neighborhood, the geographic location of where the

13   individual's going to be living?  Whether it's high

14   crime or not?

15         A.   Not really.  Because, you know,

16   unfortunately a lot of our offenders come from those

17   neighborhoods.  We can't really hold it against them if

18   they're going back into those neighborhoods.

19              We do try to motivate them, to be prepared

20   for what they're going to see when they get back in

21   that neighborhood.  To start thinking about how they're

22   going to respond to their friends when they want to

23   come and party with them because they just got

24   released.

25              But, I mean, if we considered that, we

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 106 of 128

1    **wouldn't let a lot of people out.**

2          Q.   Understood.

3          Do you ever look at changed circumstances?

4    For example, if a juvenile who grew up in a high-crime

5    area, or grew up in an abusive environment, does that

6    kind of background -- the background that the

7    individual had during their childhood -- have an impact

8    on your determination of whether they are of low risk?

9    Or, conversely, whether you think they're high risk?

10         **A.   I mean, we consider that as far as what led**

11    **them to where they are in life.  You know.  We consider**

12    **more, though, what their circumstances are going to be**

13    **upon release.**

14         **Are they going back into this abusive**

15    **environment?  Have they dealt with their abuse?  Have**

16    **they talked to mental health while they've been**

17    **incarcerated?  Have they done some of the programs**

18    **aimed at addressing their poor decision-making in the**

19    **past?**

20         **I mean, I can't say that we don't consider**

21    **how they grew up, where they grew up, what they went**

22    **through.  We're all human.  And we wouldn't be doing**

23    **this job if we didn't care about people and believe in**

24    **their ability to change.  So, yeah.  I mean, yeah, we**

25    **consider it.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 107 of 128

1    Q.   I appreciate that.  I've seen references to

2    setback dates.

3         What is a setback date?

4    **A.   That's a rehearing.  That's a denial of**

5    **parole and a rehearing.  The offenders call it a**

6    **setback.**

7    Q.   So if you have a hearing, and the

8    offender's denied parole, is a rehearing automatically

9    scheduled?

10   **A.   Yes.**

11   Q.   And does the time period between the

12   current hearing and the rehearing change?

13   **A.   It can.**

14   Q.   And what is that based upon?

15   **A.   Different factors.  I mean, if we have an**

16   **offender that is nowhere near ready for parole, we're**

17   **probably going to give him a five-year rehearing.**

18   **But if we have an offender who we're right**

19   **on the cusp, we're thinking they're getting close, you**

20   **might set them for two or three years.**

21   **We sometimes even have offenders who have a**

22   **five-year sentence that we'll set for a re-hear.  In**

23   **that instance what we're looking for to see is that,**

24   **generally, it's an offender who has had really poor**

25   **conduct, and we want to give them an opportunity to**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 108 of 128

1  improve their conduct.  To see if we can give them a

2  better release date.

3      Q.   So sometimes the -- there is not a set

4  rehearing date based on any state regulations or

5  statutes?

6      A.   No.  We can't go out any further than five

7  years.

8      Q.   Okay.  Is it typically the board member

9  that attends the hearing that makes a recommendation

10  for the rehearing date?

11      A.   Yes.  Just like a release date.  You know,

12  we -- the hearing panel makes a recommendation.  We can

13  agree or disagree one that.  And it goes to the other

14  board members, and they can agree or disagree on that.

15      Q.   For example, if the hearing body came back

16  and said five years, you, as another board member, may

17  be able to say, "I agree with your decision about no

18  parole, but let's make it three years or four years?"

19      A.   Correct.

20      Q.   And, conversely, you could say no, make it

21  five?

22      A.   Correct.  And we do that.  We all have

23  different backgrounds.  And we look at different

24  things.  So that's why we have a board.

25      Q.   If an offender has questions or concerns

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 109 of 128

1  about the parole process, what can they do to express

2  those concerns, if you know?

3       **A.    What do you mean?  Like, if they had**

4  **questions or concerns about how the parole hearing was**

5  **handled?**

6       Q.    Yeah.  Say if they for whatever reason

7  thought they didn't get a fair hearing, what would they

8  do?

9       **A.    They could talk to the institutional parole**

10 **officer.**

11            **They could talk to the institutional**

12 **supervisor.**

13            **They can't send correspondence directly to**

14 **the board.  Their friends and family sometimes contact**

15 **us.**

16      Q.    And whether they're sending correspondence,

17 or friends and family are doing so, that's going to go

18 into the parole file, correct?

19      **A.    It will.**

20      Q.    And do those pieces of correspondence ever

21 get back to the board members that voted?

22      **A.    On occasion.  Sometimes they're handled**

23 **directly by a supervisor or our board operations**

24 **manager.**

25      Q.    Okay.  I've seen reference to an office

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 110 of 128

1    called constituents services.

2          A.    Yes.

3          Q.    What is that?

4          **A.    That's an office within our department.  I**

5    **think it's actually under the department director.**

6    **It's for anyone that can call about concerns.  About**

7    **anything.  It can be concerns about a parole hearing.**

8    **Concerns about the offender's medical.**

9          Q.    Okay.  The board members themselves, you

10   don't serve in the constituent services office?

11         **A.    No.**

12         Q.    That was a bad question.  I think I

13   got -- it's essentially seems like more almost --

14   customer service sounds like a bad way to describe

15   it -- but they're working with individuals that have

16   concerns?

17         **A.    Yes.  And they're trying to make sure that**

18   **they get those concerns answered back to.  Or at least**

19   **get -- sometimes they do the research and give the**

20   **answer back directly.  Or sometimes they just get the**

21   **person referred to the right area.**

22         Q.    One or two things I want to conclude with,

23   and these may be more tender subjects.  But one is the

24   background involving Mr. Ruziscka.

25         **A.    Yes.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 111 of 128

1      Q.   I assume you're aware of his resignation,

2  and what I assume are the reasons behind his

3  resignation?

4      **A.   Yes.**

5      Q.   And I assume you don't know the reasons

6  behind his resignation, but you're aware of the

7  investigation that was done?

8      **A.   Yes.**

9      Q.   Did you play a role in that investigation?

10     **A.   I did not.**

11     Q.   Were you ever interviewed related to

12  the -- related to the investigation of inappropriate

13  activity?

14     **A.   I was not.**

15     Q.   Are you aware of any investigations that

16  have been -- or allegations that have been made about

17  you in your capacity as a board member?  Or any

18  investigations?

19          MR. SPILLANE:  I'm going to object.

20          If you have something more specific, I'll

21  let her answer.

22  BY MR. AULT:

23     Q.   The reason that I ask is, there was a

24  document that was produced about an issue that had been

25  raised about your role as a board member, and so I

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 112 of 128

1 needed to at least ask about that.

2         Are you aware of that?

3     **A.**   **I am not aware of that.  I was not aware of**

4 **that before today.**

5     Q.   Okay.  There hasn't been any interview or

6 you haven't been involved in an investigation or

7 anything like that?

8     **A.**   **I have not.**

9         MR. AULT:  Let me look at my notes.

10         (A break was taken.)

11         MR. AULT:  I think that's all I've got.

12         MR. SPILLANE:  I don't think we have

13 anything.

14         MR. AULT:  Thank you very much.

15         MR. SPILLANE:  You can read the deposition,

16 and if you believe there are any errors, you can send

17 in an errata sheet, or you can simply waive signature,

18 say that you don't want to look through it for

19 typographical errors or what have you.

20         THE WITNESS:  Okay.  I'll waive.

21         (Signature waived.)

22

23

24

25

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 113 of 128

1                    CERTIFICATE OF REPORTER

2

3          I, Kim D. Murphy, Certified Court Reporter,

4     for the State of Missouri, do hereby certify that the

5     witness whose testimony appears in the foregoing

6     deposition was duly sworn by me; that the testimony of

7     said witness was taken by me to the best of my ability

8     and thereafter reduced to typewriting under my

9     direction; that I am neither counsel for, related to,

10    nor employed by any of the parties to the action in

11    which this deposition was taken, and further that I am

12    not a relative or employee of any attorney or counsel

13    employed by the parties thereto, nor financially or

14    otherwise interested in the outcome of the action.

15

16

17

18

19                    _____

20                    Kim D. Murphy, CCR

21

22

23

24

25

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 114 of 128

## A

**ability** 88:19
93:16 107:24
114:7
**able** 24:3 26:21
47:17 66:8
84:20 92:9
109:17
**abuse** 39:13
43:25 86:6
100:3 107:15
**abusive** 107:5,14
**accept** 69:3
**acceptable** 31:6
71:16
**acceptance** 74:21
76:4
**accepted** 75:24
**access** 37:23
38:1,4,9 45:9
45:16 49:10
58:14 66:8,12
66:16,23 99:15
99:22
**account** 105:2
**accountability**
68:24 69:4
75:24 76:4
82:8
**act** 81:2
**action** 4:18 7:10
46:5 70:18
81:7,13,15
82:10 98:25
102:13 114:10
114:14
**Actions** 46:16
**actively** 100:20
**activities** 46:14
46:22,23 91:14
103:4
**activity** 47:4
112:13
**actual** 48:21
97:21
**add** 81:18,22
95:7
**added** 95:8
**addiction** 22:21
**additional** 17:22
21:24 22:25
23:22 24:5
37:22 61:24
67:9,12 71:8
97:21
**address** 31:21
32:11 44:18
92:25
**addressed** 32:13
**addressing** 22:21

107:18
**adjust** 20:19
**adjustments** 22:5
**administration**
11:15
**administrative**
94:7
**administrator**
25:2 26:5
53:17,21
**admire** 36:7
**adolescent** 11:24
21:11,11
**adult** 33:24 39:7
54:7 87:8
100:10 104:14
**advance** 37:5
**advantage** 103:14
**advocate** 93:22
94:2
**afternoon** 1:14
**AG00028** 3:6
**AG01714-1716** 3:7
**age** 4:9 51:25
105:23,25
**agenda** 95:10,15
**aggressive** 39:9
**aggressiveness**
44:21
**ago** 25:25 54:2
**AG00096-0098** 3:3
**AG01451** 3:4
**AG01606-1608** 3:5
**AG01758** 3:10
**AG03584-3593** 3:5
**AG060061** 3:9
**agree** 72:22,24
76:7 109:13,14
109:17
**AGREED** 4:1
**aimed** 83:9
107:18
**air** 10:13,15
20:17
**al** 1:4,8
**Alabama** 28:11
**Algoa** 43:3
**allegations**
112:16
**allow** 6:1 85:19
86:4 88:23
101:20
**allowed** 84:11
85:6,7 87:1,13
87:20 90:23
91:6,20 92:18
92:21,25
**amendment** 53:10
**American** 22:19
**amount** 23:2

**analysis** 39:8
**analyst** 25:21
34:18 36:10
54:17 55:6
68:7 79:4,15
79:19 95:23
99:20
**analysts** 25:1,18
25:21 26:1
53:18 66:13
79:21
**analysts'** 79:24
**analyze** 51:13
**Andrew** 2:10
**anger** 44:20
**ANNE** 1:7
**answer** 5:23 6:1
6:12 31:5,6
56:1 60:16
69:5,19,22,24
77:11 84:16
86:25 91:9
111:20 112:21
**answered** 94:25
111:18
**answers** 6:5 9:2
**anymore** 25:9
**anyway** 88:2
**apologize** 8:20
**appeal** 97:3
104:14,15
**appear** 32:24
48:15
**appeared** 55:7
**appears** 33:8
114:5
**application**
16:16,20,23
17:1
**apply** 69:17 88:9
**appointment** 9:21
16:8,18
**appreciate** 5:16
6:2 13:15
14:24 18:5
40:21 51:16
66:3 77:10
108:1
**appropriate**
14:18 25:9
91:2
**area** 86:14 107:5
111:21
**areas** 98:6
**argue** 74:23
**arrested** 38:3
**arrival** 20:1
**aside** 37:16 60:5

**43:20** 60:21
80:11
**analysis** 39:8
**asked** 32:8 73:21
88:18
**asking** 4:22 6:13
19:5 69:2
**asks** 44:19
**aspect** 28:18
77:19
**aspects** 34:8
79:22
**assaultive** 39:9
**assaults** 44:15
**assess** 83:16
**assessment** 17:12
17:20 100:4,7
100:15
**assessments**
100:11
**assigned** 34:12
83:12
**assist** 47:17
**assistance** 26:12
**Association**
22:20
**assume** 8:11 9:13
10:8,20 13:11
13:24 15:24
16:25 18:18
20:20 22:7
24:21 29:5,8
39:23 40:5
44:25 58:3
63:25 66:15,25
69:8 77:20
78:5 81:7,24
82:10 85:14
112:1,2,5
**assumed** 33:7
**attached** 83:3
**attend** 18:19
24:22,24 26:1
73:23 79:24
90:5,21 91:20
**attended** 10:20
**attends** 109:9
**attention** 75:18
**attitude** 38:17
104:23,24
105:2,4,12
**attorney** 2:9
114:12
**attorney's** 94:2
**attorney-lob...**
8:18
**attorneys** 4:19
4:20 6:25 8:3
60:18 70:17
88:5,5,8,10
89:2
**audible** 6:5
**audio** 72:14

78:20,25 79:2
**Ault** 2:4,14 4:12
4:17 9:8 32:20
49:16,22 55:21
60:3 67:5 70:3
79:10,14 81:12
82:19 89:25
90:2 112:22
113:9,11,14
**authority** 39:11
**automatic** 69:22
**automatically**
40:17 108:8
**available** 22:4
**average** 52:17
77:13
**aware** 29:17
30:18 62:25
63:15 66:18,21
112:1,6,15
113:2,3,3

## B

**B** 50:20 57:21
**Bachelor's** 10:24
61:17
**back** 11:6 12:10
13:7 20:22
26:21 29:2
31:2,4 34:7,16
36:5,9 42:15
50:18 74:24
87:12 91:18
98:12 101:20
106:18,20
107:14 109:15
110:21 111:18
111:20
**background** 10:7
16:23,24 51:4
83:13 106:10
107:6,6 111:24
**backgrounds**
109:23
**backstories** 86:3
**backstory** 86:5
**backup** 22:1
**bad** 6:9,9 32:8
42:2,3 111:12
111:14
**balances** 99:8
**ballpark** 77:12
**barriers** 83:16
**BAS** 81:7 102:14
**based** 22:7 50:23
51:18 57:10
92:1 108:14
109:4
**basically** 4:22
46:24 48:7

Pohlman USA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 115 of 128

51:16
**beginning** 31:3
37:16,18
**begins** 71:2
**behalf** 4:9 71:7
85:10
**behavior** 49:7
106:3
**behaviors** 39:9
**believe** 58:18
62:15 77:6
107:23 113:16
**believes** 91:2
**bell** 93:24
**best** 4:21 6:2,11
114:7
**better** 6:11 55:2
63:10 69:24
80:16 82:14
109:2
**big** 22:21 26:24
**biggest** 6:8
**bill** 23:18 29:15
29:15,25 30:5
30:23 31:18
32:2,4,9 33:9
53:12 60:8
63:2 67:14
68:14 69:18
75:20 95:16
**birth** 8:6
**bit** 4:23 10:4,6
11:17 18:22
27:8 30:21
32:7 34:3 40:6
58:16 61:12
79:5
**black** 73:5
**Blackwell** 1:15
2:3
**bleed** 19:17
**board** 4:24 9:21
13:7 16:10
17:7,8,9,16,16
17:21,24,25
18:7,10,16,19
19:22,25 21:2
21:13 22:12
23:3,16,25
24:1,15,21,24
25:1,8,11,15
25:22 26:1,2
26:23,25 27:5
27:14,15,23
28:2 29:11,11
30:3,7,18,22
31:8 32:10
33:21 35:9
36:21 46:5
48:24 54:13,18

54:22,25 55:4
55:9,18,19,20
55:22 56:4,6
56:10,14,22,24
57:15,15,16,16
57:18,19,20,21
57:23 58:1,1,3
58:5,7,11 59:5
59:8,8,13,13
65:22 66:8,11
68:6 70:12
72:18,24 73:13
73:18,18 76:3
78:8 79:3,23
79:24 81:7,13
81:15,21 82:4
82:10 83:11,13
84:17,21 88:21
89:6,22,24
94:4 95:18
97:4,7,10,18
97:23 98:8,21
98:25 99:3,11
99:14,15,21,22
101:10 102:13
104:6 109:8,14
109:16,24
110:14,21,23
111:9 112:17
112:25
**boarder** 60:6
**body** 109:15
**books** 46:18
**bottom** 81:19
**Bound** 64:15,17
64:18,19
100:22
**bounds** 88:23
**box** 82:5
**boxes** 81:19,25
82:2
**brand** 20:3
**break** 6:17,18
48:19 49:18,19
89:25 90:1
113:10
**bring** 7:25 87:1
87:4,9
**broad** 34:11
**broader** 34:5
**brought** 31:12
**BROWN** 1:4
**building** 24:16
35:9,11,12
36:13
**buildings** 35:6
**bullet** 71:2,6
80:4
**busy** 18:6 99:4

----

**C**

**C** 2:1 50:20,24
57:25
**calendar** 34:16
34:17
**calendars** 22:6
**call** 36:22 41:1
41:2 74:4
84:19 100:18
108:5 111:6
**called** 11:5,6
45:24 46:10
64:16 96:4
100:4 111:1
**capacity** 30:4
112:17
**car** 87:12
**care** 33:24
107:23
**Carrie** 15:20
**carry** 62:11
**case** 1:6 7:18,20
9:10 19:21
28:10,13 33:7
37:19 55:4,10
57:14 63:20
72:17 76:21
97:6,6,25 99:1
101:6
**caseload** 42:22
95:21
**cases** 7:7,9
23:19 28:9,25
30:13 32:6
36:14 55:6
56:22 58:2,20
59:23 60:13
64:22 66:18
75:25 81:22
97:19,19
100:12
**caseworker** 14:7
14:13,13 15:1
54:7
**cause** 39:3 43:5
65:4 85:2
**CCR** 3:14 4:4
114:20
**cell** 87:11
**center** 33:6
35:12 36:13,13
42:21 54:3
**centers** 13:25
33:14,16,20,22
34:24 35:15
54:5 87:11
**Central** 1:2 35:4
**certain** 34:8
49:6 52:11
56:5 58:10

68:20 80:11
96:12 97:25
98:5
**CERTIFICATE**
114:1
**certifications**
12:7
**Certified** 1:17
114:3
**certify** 114:4
**chair** 22:2
**chairman** 17:9,16
29:13
**chairperson** 18:7
**chance** 52:21
102:1 104:4
**chances** 52:23
**change** 14:19
19:7,18 32:11
37:7 53:10
57:2 60:15
87:16 95:15
103:24 107:24
108:12
**changed** 78:11
102:23 104:4
107:3
**changes** 26:20
34:1 35:19
42:13 50:11
53:14,16 59:9
84:24 85:22
**charge** 14:20
66:5
**chart** 77:17
**chatting** 31:9
**checks** 99:7
**Chick-fil-A**
24:10
**chief** 25:5
**child** 11:25
43:25
**childhood** 107:7
**children** 46:19
57:22 86:4
**circle** 34:7
**circumstances**
102:16 107:3
107:12
**City** 1:16 2:5,15
8:10 10:10
13:1 24:7 28:2
33:6 35:9
42:20
**civil** 11:16
22:24
**clarification**
13:15 55:17
**clarify** 32:7
57:4

**clarifying** 61:5
**classification**
14:16,21 38:5
**clear** 7:3 43:14
60:5 63:23
90:25
**clerical** 94:6
**close** 74:4
108:19
**closed** 87:18,22
**closer** 53:19
**clouded** 6:22
**CMSU** 11:5,6,7
**co-counsel** 87:24
**cold** 87:12
**Collins** 15:20,21
**Colorado** 17:24
**coloring** 46:18
**column** 74:16
**combination** 52:6
**come** 19:13 21:7
27:10,11 41:16
41:17 43:10
50:11,17 51:3
73:13 78:1
88:1 106:16,23
**comes** 41:11,12
44:9,11 51:13
69:9 91:13
92:12 101:11
**comfortable** 36:2
92:17
**command** 35:12
36:13
**commented** 104:12
**comments** 81:18
81:22,24
**commit** 106:1
**committed** 44:12
105:21
**committing**
105:25 106:4
**communicate**
26:22 34:1
84:14,18 94:13
**communicated**
98:7
**communicates**
26:11 90:11
**communicating**
33:25
**community** 13:5,7
13:9 22:17
27:9 28:7
38:15 39:16,19
46:17,19 48:16
65:5 91:14,15
91:16,18 98:16
101:21,22
102:5,8,10

*PohlmanUSA Court Reporting*
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 116 of 128

103:10 106:7,9
**comparative**
46:11
**complete** 16:21
59:14 68:3
77:12 89:13,14
95:5
**completed** 14:16
14:22 54:4,6
68:6,8 80:6,17
**completely** 75:16
**completes** 47:8
81:15
**computer** 37:20
37:22,24 38:9
41:17 45:8,17
95:22,25
**computers** 99:16
**concerns** 43:22
49:8 63:1
109:25 110:2,4
111:6,7,8,16
111:18
**conclude** 94:25
111:22
**concluded** 93:8
**conclusion** 94:15
**conditional**
26:16
**conditions** 13:9
**conduct** 11:18
14:10,12 38:5
39:18 41:24
42:1,2 44:13
44:22 45:3,7,9
54:14 68:25
73:22 80:18
96:17 108:25
109:1
**conducted** 58:19
58:21 59:22
60:1,7 61:1
68:3
**conducting** 35:8
53:2 83:17
88:22
**conducts** 54:13
**conference** 22:16
22:20
**confidential**
1:11 87:18,22
**conscience** 56:9
98:9
**consider** 48:2,3
48:10,12 51:6
53:7 68:23
76:3,8,16 77:7
77:8 97:20
98:12 102:5,9
102:22 103:1

103:21 105:15
106:3,11
107:10,11,20
107:25
**consideration**
103:12
**considered** 29:22
30:19 67:10
75:7 76:5,10
106:25
**considering**
11:19 23:23,23
48:13 67:24
**consistency**
83:10 88:25
**constituent**
111:10
**constituents**
111:1
**constitutional**
21:3,6 61:21
**consuming** 74:10
**contact** 85:7
105:5 110:14
**contacting** 41:21
**contain** 47:5
**contained** 30:10
**continue** 22:11
89:15
**continued** 10:15
11:2
**controls** 85:17
**conversation**
5:25 96:9
**conversations**
7:2,4
**conversely** 107:9
109:20
**conveyed** 95:18
97:13
**convicted** 8:23
101:12
**copies** 63:6,9
**copy** 81:9
**correct** 10:5,16
10:17,22 11:3
12:12,13 14:1
14:2,7,8 15:7
15:8,13,14,17
17:1 18:16,17
19:22 20:23,25
21:1 24:8,9,23
27:8,16 29:6
29:19,20 37:13
47:3 48:8,9
51:19 54:13,24
55:3 56:23
58:11,12,14,24
58:25 59:9
62:20 64:1

65:15,16 67:2
67:15 68:10
72:2 74:11,18
75:3,4 77:21
78:18,21 79:1
82:25 83:1,22
85:5,11 86:21
88:16,20 89:8
89:20 90:6
91:8,20 92:13
92:14 93:7,17
93:21 94:8
95:17 96:24
101:7 109:19
109:22 110:18
**correcting** 72:10
**correctional**
12:16 13:25
14:12,18 32:25
33:6,14,16,20
33:22 34:24
35:3,15 36:12
40:4 42:21
87:11
**corrections**
12:12 14:7
15:1,6,13,17
17:25 21:5
22:19 25:19
29:6 40:16
54:6
**correctly** 73:16
95:24
**correspondence**
110:13,16,20
**corresponding**
68:16 71:25
**counsel** 4:2,2
7:3,5 29:6,9
61:5 114:9,12
**count** 25:20
46:20
**county** 38:22
**couple** 17:22
31:14 72:14
103:9
**course** 11:12,22
21:6 22:23
23:20 25:8
38:21 41:6
106:3
**court** 1:1,17
3:14 5:21 6:6
9:4 13:8 23:19
28:9,20,21
30:10 104:5
114:3
**courtesy** 6:3
**courts** 28:21
41:11

**covered** 18:4
31:24
**Crane** 2:10
**create** 62:6
**created** 51:22
67:20 70:7,10
70:11,12
**creates** 50:8,10
**creating** 70:19
**credit** 26:15
**crime** 8:24 44:12
74:17 77:5
91:8 105:21,21
106:5,14
**crimes** 44:15
105:25 106:1
**criminal** 10:25
11:7,9,14,15
11:16 13:20
14:4 39:7
43:15 105:20
**criminogenic**
39:14
**curiosity** 7:14
**curious** 75:22
**current** 22:2
39:19 108:12
**currently** 8:13
16:9 21:13
25:15 100:22
**cusp** 108:19
**customer** 111:14
**cut** 86:12
**CV** 9:13

**D**

**D** 1:17 2:13 3:14
4:4 50:20
57:25 114:3,20
**date** 8:6 9:16
26:16 38:22,23
51:1,2 52:24
55:15 77:9
81:1,4 97:11
97:12 98:6
99:2 108:3
109:2,4,10,11
**dates** 43:20
50:17 51:11,11
51:16,18 108:2
**day** 1:12,15 6:16
36:9 37:16,19
55:6 78:9,16
**days** 35:18
**deal** 26:17
**dealing** 42:23,25
43:4
**dealt** 107:15
**death** 13:23
57:22 98:3

**December** 1:13
**decide** 56:11
**decision** 30:11
45:1 47:21
48:8,11 49:6
55:10 56:11,14
56:15 57:1,2
58:5 73:14,19
74:6 76:18
81:21 82:1,5
89:22 95:18,20
95:23 96:11
97:4,7,11,12
97:13,17 98:13
98:17,24 99:11
99:14,17,21
104:5 109:17
**decision's** 95:25
**decision-making**
107:18
**decisions** 18:2
22:5,5 28:19
28:22 29:9
57:5,5 58:3
76:8 77:18
98:14 99:10
100:1 102:4,10
104:1
**Defendants** 1:9
2:8 4:3 46:14
**defense** 88:5,8
88:10
**defensive** 62:10
**definitely** 53:4
**definition** 56:24
**definitively**
19:24
**degree** 11:3,10
11:11,13 12:2
12:11 20:25
61:17
**degrees** 11:9
12:5
**delegate** 65:4
71:3,7 72:2,9
85:6,12 86:4
86:20,21,24
87:1,20 88:6
88:12,15,19
89:19 94:20
95:1
**delegates** 71:12
84:10,11,14,18
84:22 87:13,21
88:1,17 89:5
102:25
**deliver** 96:5
**denial** 108:4
**denied** 102:15,16
108:8

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 117 of 128

**department** 12:12
15:5,6,12,16
23:6 25:19
29:6 111:4,5
**department's**
51:12
**departmental**
22:23 61:20,22
**depend** 76:21,22
77:2
**depends** 35:1,17
35:19 45:22
57:16 72:10,13
77:15,21 81:16
82:6,9 92:17
97:5
**deposed** 5:8
**deposes** 4:10
**deposition** 1:11
3:1 4:3 7:1,6
7:23 8:3,4 9:6
31:4 32:18
49:20 61:10
67:3 70:1
79:12 81:10
82:17 113:15
114:6,11
**describe** 22:14
50:15 53:14
60:11 111:14
**described** 38:8
91:13
**desire** 91:17
101:20
**determination**
82:12 105:16
107:8
**determine** 82:11
88:23 105:2
**determined** 88:4
**determines** 14:13
**develop** 83:19
**developed** 20:15
32:12 44:10
47:10,13 53:6
80:9
**developing** 46:18
**development**
11:24 21:11
**diagnostic** 54:3
54:5
**dictate** 42:19
**differ** 60:11
**difference** 40:8
**different** 17:16
18:4 22:17
32:25 33:23
39:4 41:25
44:3 46:14
48:4,10 50:10

50:16,21 53:7
60:20 63:13
72:18,20,24
74:23 77:1
80:21 97:5,18
97:22 100:7
103:9 105:17
108:15 109:23
109:23
**differently** 73:2
73:3 88:9
**difficult** 77:11
77:14
**dig** 30:21 34:7
**Dills** 18:12 31:1
31:10
**direct** 2:14 4:11
75:18
**direction** 114:9
**directly** 26:22
44:19 53:15
93:1 110:13,23
111:20
**director** 15:16
15:22,25 23:6
111:5
**dirty** 38:2
**disagree** 47:21
56:20 57:19
89:16 109:13
109:14
**disciplinary**
45:12
**discuss** 34:4
48:23 49:6,8,9
55:18 79:21,22
84:23 97:24
**discussed** 31:14
31:17,20 88:4
100:2 104:6
**discussing** 27:6
30:19
**discussion** 33:12
52:7 67:22
98:10 105:13
**discussions**
30:17,23 49:3
55:9
**dishonesty** 8:24
**distributed**
27:23
**DISTRICT** 1:1,1
**diversity** 22:24
**division** 1:2
15:22,23 33:23
33:23 43:19
54:7,9 87:7,8
100:10
**docket** 34:15,19
34:19

**document** 9:9,11
9:24 30:20
32:13,15,16,21
33:3,10 49:23
67:6,11,16,20
67:23 70:4,8
70:15,20 79:11
79:15 81:6
82:13,15 83:24
84:6 95:8
112:24
**documentation**
94:5
**documents** 5:1
7:23,25 19:21
20:11 32:1,24
33:13,13 46:4
64:9,24 68:12
73:17 83:3
**doing** 13:8 35:24
41:19,23 42:1
42:3,4 51:4
54:18 81:17
103:15,18
107:22 110:17
**dot** 73:5
**draft** 29:25
70:24
**drafting** 33:10
**drive** 36:4,7
**drug** 13:21
**drugs** 57:13 81:3
85:19
**duly** 114:6
**Dusenberg** 20:4
80:2
**duties** 21:24

**E**
**E** 1:16 2:1,1,4
2:13 50:20
**ear** 19:10
**earlier** 80:20
82:25 88:18
101:4 103:3
**easier** 9:1
**easy** 98:14,16
**education** 12:5
61:16 103:13
**educational**
61:13 70:11
103:2 104:7
**efforts** 32:14
**eight** 97:14
**either** 13:7
14:25 17:15
21:3 28:19
29:12 35:3,10
36:11 41:25
75:8 78:12

**elect** 93:9
**electronic** 63:7
63:8 64:13,14
**electronically**
96:2
**elects** 93:15
**elevator** 19:3
**eleventh** 72:12
**elicit** 68:20
69:3
**eliciting** 69:8
**eligible** 33:17
104:9
**Ellis** 18:9
**email** 32:3 82:22
83:3,6,8,20
**emails** 28:23,24
28:25 30:10
**embarrassed**
19:16
**employed** 25:18
114:10,13
**employee** 114:12
**employees** 23:6
**employer** 66:1
**employment** 16:10
39:20 85:14
**endeavor** 37:8
69:11 73:23
**ended** 72:11
**ends** 57:20
**enforcement**
39:11 44:20
102:7
**entered** 95:24
**enters** 95:21
**entire** 24:1
**environment**
85:19 107:5,15
**errata** 113:17
**error** 66:18
**errors** 113:16,19
**escape** 52:3
**escorting** 47:17
**especially**
103:19 105:8
**essentially**
111:13
**estimate** 77:23
97:14
**et** 1:4,7
**ethical** 18:2
**evaluation**
100:13
**everyone's** 94:24
**everything's**
45:25
**evidence** 20:19
74:23 75:23
77:5

**evidence-based**
18:1 20:10
53:5
**Examination** 2:14
4:11
**examined** 1:12
4:9
**example** 12:5
26:13 31:10
33:3 42:20
55:23 57:13
62:21 63:24
65:12,20 68:17
73:1 86:5
97:23 98:2
101:9,11
106:11 107:4
109:15
**exception** 57:13
**exhibit** 3:1 9:5
9:6 32:17,18
49:20 67:3
70:1 75:19
79:12 81:10
82:17
**exhibits** 44:7
73:12
**expectations**
94:12,14
**expected** 28:21
88:16
**explain** 59:16
**explanation**
20:12 29:9
51:15 66:4
**exposure** 37:12
**express** 110:1
**expressly** 4:6
**extend** 6:2
**extended** 22:3
**extremely** 53:25
**eye** 101:11
**eyes** 93:13
**eyewitness** 101:9

**F**
**face** 46:6,6
64:20
**facilities** 46:13
**facility** 14:18
35:3 40:4
**fact** 75:8 84:5
105:10
**factor** 17:20
18:14 20:14
49:5 50:21,24
51:21 52:8,16
53:2 62:4
75:23 80:16
104:10 105:3

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 118 of 128

**factors** 11:19
20:16,18 23:22
29:21 30:19,20
31:18,22 32:11
32:13 48:11,12
51:18 53:7,11
63:1 67:9,11
67:12,13,23,24
68:17 69:12
75:19 77:2,21
97:5,21 100:7
105:1 108:15
**failed** 31:3 39:1
**fair** 6:14 10:1,1
14:5 27:5 50:4
56:17 60:23
69:23 110:7
**fairly** 74:9
**familiar** 28:10
28:13 29:14,21
32:21 50:13
**families** 102:3
**family** 39:18,19
44:4 65:6,13
65:20,25,25
67:1 87:5
91:19 92:11
93:6,14,20
101:9 110:14
110:17
**far** 39:14 63:9
63:17 86:7
88:24 107:10
**Farmington** 10:11
36:4
**fast** 6:4
**feedback** 18:23
62:25
**feel** 6:4 44:19
92:17 99:6
**fellow** 98:8 99:3
**felony** 8:21
50:24
**felt** 98:4
**field** 12:25 13:1
13:3 28:3,5
38:1 65:2
**fifth** 83:23
**figure** 24:12
40:19 45:4
**file** 17:14 36:21
37:9,12 38:11
41:7,7,16
45:22,23,24
51:24 52:1,6
59:12 64:3,6
64:15,17,18,19
65:10,15 66:2
66:5,16,19,23
85:10 89:20,23

90:16,20 93:17
94:6 95:20
100:21 105:8
110:18
**files** 17:13
34:20,22 37:17
45:23,24 63:4
63:11,15,18,21
64:10,12,15,16
64:19 65:13
66:9,12
**filings** 83:6
**fill** 16:22,22
**filled** 104:22
**final** 56:25 57:1
82:11
**finalized** 95:23
96:1
**financially**
114:13
**find** 38:16 53:25
71:19 84:6
104:11,21
**finish** 6:1
**firearm** 62:11
**firearms** 62:12
**first** 5:17 12:16
37:12 80:4
92:4 95:2
**Fitzwater** 20:7
**five** 49:17 75:19
77:25 78:3
109:6,16,21
**five-year** 108:17
108:22
**flunk** 72:12
**focus** 11:22,24
34:3
**follow** 56:6
71:11 72:18
89:6 99:5
**following** 27:23
55:7
**Force** 10:13
**foregoing** 114:5
**forenoon** 1:14
**forgot** 105:7
**form** 32:12,15
80:21 81:21,23
**formal** 12:4
97:24
**forms** 32:10
**forth** 29:22
53:11 63:1
67:14 73:17
74:24 79:8
**forward** 101:12
**found** 75:8,11,13
**four** 57:19 60:2
60:6 109:18

**fourth** 71:2
83:23
**frame** 48:4
**frames** 80:10
**fraud** 8:24
**free** 6:4
**fresh** 37:20
**friends** 65:6
106:22 110:14
110:17
**front** 60:22
**full** 6:16 56:22
56:24 57:15,20
58:1,11 73:5
**fun** 36:8
**function** 94:3
**further** 109:6
114:11
**future** 85:1,13

___

**G**

**gals** 19:13
**gardens** 46:19
**Gary** 20:1,1,4,4
**gender** 100:6
**general** 2:9 44:7
67:22
**generally** 23:8
24:2,4 29:12
29:17 31:8
34:12 35:22
36:18 38:19
42:21 43:12,17
44:3 47:3
57:20 68:6
72:9,18 74:20
81:16 86:11
87:3,17 88:1
102:19 108:24
**geographic**
106:12
**getting** 20:25
44:15 52:21
94:14 96:19
103:17 108:19
**give** 6:8 19:3
20:12 31:3
35:22 36:20
52:24 53:1
56:24 74:22
77:1,12,23
81:1 86:14
94:20 98:6
102:9 103:11
108:17,25
109:1 111:19
**given** 35:14
38:24 39:2,3,5
39:7 55:15
78:9,9 83:13

93:2 95:21
102:1
**go** 4:25 5:18,19
8:8 12:15
19:10 26:21
31:4 37:19
38:16 41:15,23
45:8,13 52:16
53:6 56:11
61:7 65:15
74:22 78:10,14
80:23 81:24
82:1 84:7
85:10 86:19
89:20 91:25
92:3 99:4,5,13
109:6 110:17
**goal** 46:1
**goals** 100:23
**goes** 44:21 50:5
59:12 62:3
69:7 81:21
86:17 88:24
89:11 96:2
105:12 109:13
**going** 9:4 11:8
14:20 19:10
27:6 31:6
32:16 34:18,25
36:11 38:15,21
41:7,9 42:19
44:2 45:25
48:2 49:16
52:24 55:17
56:10 57:10,25
58:6 59:24
65:8 67:17,23
74:21,22 75:14
77:1 86:12
98:24 100:21
105:21 106:8
106:13,18,20
106:22 107:12
107:14 108:17
110:17 112:19
**gonna** 71:19
104:16
**good** 4:13,14
48:18 50:23
51:15 52:15
96:8 99:9
**goodness** 21:19
52:14
**Gotcha** 56:19
**gotten** 36:2
41:25 42:2
80:16
**governor's** 16:21
**governs** 50:5
**GRA** 100:5

**grab** 63:18
**grade** 72:13,13
**graduated** 10:8
**graduates** 40:12
**grant** 82:12
**great** 46:23
103:21
**greatly** 35:25
**grew** 107:4,5,21
107:21
**grids** 50:16,17
50:19
**ground** 5:18
**group** 4:19,20
50:9
**Guard** 10:15,21
**guess** 28:18
43:14 59:1
63:23 69:7
71:1 76:11
88:21 89:2
91:7
**guideline** 50:14
50:17 51:1,2,7
51:8,16 52:24
**guidelines** 67:20
**guilty** 8:21,21
8:23 75:8,9,10
75:11,13
**guys** 19:13
103:16

___

**H**

**H** 50:13
**hand** 32:16
**handed** 9:9 29:10
45:20
**handful** 5:12
90:7
**handle** 72:19
**handled** 110:5,22
**hands** 98:21
**hanging** 103:16
**happen** 66:21
91:22
**happened** 30:8
72:4 74:25
89:24
**happening** 101:16
**happens** 5:25
47:23 94:15,17
**Happy** 84:7
**hard** 63:6,9
64:11 91:9
**harder** 106:9
**harm** 52:20,23
**harmed** 102:21
**head** 6:7 52:14
59:19 93:12
**health** 39:12

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 119 of 128

44:3 49:9
100:15,18,19
100:24 107:16
**hear** 89:15
**heard** 27:12
**hearing** 19:9
  29:22 34:12,13
  34:14,15 35:4
  35:8,10,13,21
  36:12,17,25
  37:9,13,13
  43:2 45:12,21
  48:25 53:3
  54:12,13,14,16
  54:16,17,23
  55:1,5,7,9,24
  57:12 58:6,9
  58:10 60:12
  61:8 62:22
  64:1,2,25
  68:21 69:13,18
  70:8 71:9,13
  72:19 73:6,7
  73:11,22 74:2
  77:20 81:18
  82:3 83:5,18
  83:23 84:12,15
  84:18,23 87:2
  88:22 89:6,13
  89:13 90:12
  91:1 92:1,7,9
  92:10,13,22,24
  93:9,10,16
  94:16,20 95:16
  96:10,14 97:12
  99:23 100:16
  100:18 102:24
  104:25 108:7
  108:12 109:9
  109:12,15
  110:4,7 111:7
**hearings** 7:17
  12:22 13:2
  15:3 16:1
  17:17 18:19,23
  33:17 34:4
  35:2,2,7,16,23
  35:24 36:1,3
  37:17 47:14
  48:21 57:6,8
  57:10 58:19
  60:7,8,10,17
  60:25 62:16
  67:25 68:3
  72:5,15 77:12
  77:18,19,24
  78:7,18,22
  79:6,8 86:2
  87:14 90:6,22
  91:20 95:11,13

101:5,16
**heart** 19:17
  23:11
**heartless** 86:16
**held** 12:24 16:13
  75:5 79:20
  105:11
**help** 13:5,7
  46:16 75:23
  83:13 84:7
  85:3 99:20
  100:20
**helpful** 14:24
  34:2 46:9 66:3
  69:6
**helping** 51:13
  83:9,10
**high** 1:16 2:4,10
  10:8 51:9
  106:13 107:9
**high-crime** 107:4
**high-risk** 105:14
**history** 39:5,7,8
  39:13,19 42:24
  43:10,15,16
  44:4 52:4
  103:21 105:20
**hold** 12:19 13:16
  16:4,11 21:13
  76:17 106:17
**holds** 23:11
  53:20
**home** 39:20 71:16
  71:21 80:14
  85:17,19
**honestly** 6:20
**horrible** 55:13
**hour** 6:18 27:3
  49:16 78:1,4
**hours** 1:13 23:1
  23:2,7 27:4
  46:11,14,20
**housed** 13:25
**housing** 85:15
  103:16
**HR** 23:9
**human** 15:10,16
  15:23,24
  107:22
**hundred** 53:6
**Husch** 1:15 2:3

———— I ————
**ID** 3:2
**idea** 67:18 96:15
**identical** 42:10
**identification**
  9:7 32:19
  49:21 67:4
  70:2 79:13

81:11 82:18
**identified** 58:22
**II** 13:17 15:1
  40:9,13
**II's** 40:3
**III** 100:19
**imagine** 74:9
**impact** 29:18
  40:23 91:15
  107:7
**important** 5:24
**impressive**
  104:11,21
**improve** 47:2
  109:1
**improved** 96:10
**in-depth** 19:2
**in-person** 35:21
  78:17
**inappropriate**
  112:12
**incarcerated**
  13:12 39:17
  54:6 103:5
  104:3 107:17
**incarceration**
  20:22
**include** 85:14
**included** 31:18
  38:10,19 44:1
  44:2,23 45:16
  51:9 52:8
  65:10 93:17
**including** 58:7
**increase** 14:20
**increased** 23:5
**INDEX** 3:1
**indicate** 82:5
**individual** 7:10
  7:18 29:11
  43:24 48:14
  63:24 75:6
  76:25 101:20
  107:7
**individual's**
  106:13
**individuals**
  13:12 39:3
  48:24 58:7
  69:17 85:9
  86:3 89:4
  105:24 106:1
  111:15
**informal** 55:8
  97:24
**information**
  16:23 23:21
  31:25 32:13
  33:15,20 36:11
  36:15,17 37:5

37:22,23,25
  38:7,8,10,22
  38:22 40:25
  41:1,9,13,16
  43:7,25 44:9
  44:10,11 45:20
  46:8 48:8 49:4
  51:4 58:9,10
  58:22 60:14,16
  60:22 62:7,24
  63:19 65:3,4
  65:17,22 68:21
  69:7,8 71:9
  74:5 76:22
  85:7,9,13,20
  86:9 89:20
  90:15 94:10
  99:19,22
  100:24 101:10
**informed** 18:2
  99:9
**initial** 21:6
**initially** 45:10
  54:5
**initials** 81:7
  89:24
**inmate** 97:13
**innocence** 75:3
  75:10,16 76:1
  76:15 77:4
**innocent** 76:6
  77:7
**input** 29:24 30:4
  84:2
**inquire** 85:24
**inside** 25:4 26:8
  38:4 42:4
  46:23
**instance** 89:1
  108:23
**Institute** 17:24
**institution** 12:3
  13:21 41:22
  44:13,16 46:7
  46:23 51:5
  55:14 96:3
  106:4,5
**institutional**
  12:24 14:11
  25:2 26:4 40:2
  40:5 47:9,12
  48:4,6 51:23
  53:16,18,20
  61:19,20 66:13
  96:4 105:5
  110:9,11
**institutions**
  25:4 26:9 33:1
  33:24 54:8
  87:8 100:10

**instruct** 93:13
**instructed** 89:16
**instruction** 6:8
**instructions**
  31:3 67:19
  93:3
**instruments**
  99:25
**integrate** 53:11
**interacting**
  61:21
**interested**
  114:14
**interior** 85:16
**intern** 54:1
**internal** 103:23
**interpretation**
  76:9
**interrogation**
  19:18
**interview** 41:14
  41:18 44:18
  81:17 83:4,16
  113:5
**interviewed**
  45:10 82:7
  112:11
**interviewing**
  17:18 18:25
  19:4,23 41:20
  62:5 69:2
**interviews** 54:18
  54:20
**investigate** 45:3
**investigated**
  13:20
**investigation**
  16:24 45:4
  112:7,9,12
  113:6
**investigations**
  13:20,23,24
  112:15,18
**Investigator**
  13:17 15:1
**involved** 8:24
  13:2,24 14:2
  15:25 29:1
  30:3 32:6
  44:15 62:18
  87:25 96:20
  98:3 103:17
  113:6
**involving** 33:9
  57:22 111:24
**IPO** 40:6,8,9,12
  41:4 47:21,24
  62:1 80:13
  89:9 96:5,7,9
  96:22 97:1

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 120 of 128

**IPO's** 96:11
**IPOs** 61:12,13,19
  62:15 63:1
**issue** 26:13
  43:24 44:19
  96:15 112:24
**issues** 23:18
  26:20 39:15
  43:18 71:24
  104:22

**J**

**J's** 64:25
**J-e-n-n-i-f-e-r**
  5:6
**jail** 26:15
**Jason** 8:11
**JCCC** 33:4,5
**Jefferson** 1:16
  2:5,11 8:10
  10:10 13:1
  24:7 28:2 33:6
  35:9 42:20
**Jen** 8:9
**Jennifer** 1:11
  4:8 5:6 8:8
**job** 13:3 16:4
  26:23,24 28:18
  48:7 61:15
  77:19 103:18
  105:11 107:23
**jobs** 103:20
**joined** 21:2
**Jordan** 2:4 4:17
**Jordan.Ault@...**
  2:6
**judgment** 41:10
  46:4 64:4
**justice** 10:25
  11:7,10,14,15
  46:10,12,21
  103:17
**juvenile** 23:17
  23:23 29:1,18
  33:16 39:5
  43:10,15,16,22
  58:2,19 59:22
  60:1,7 63:4
  67:10 68:1,2
  69:15 76:14
  79:8 80:21
  85:25 86:6
  97:18 104:1,13
  107:4
**juveniles** 68:22
  69:4

**K**

**K-a-s-a-k** 53:24
**Kasak** 25:3 53:22

  62:13 82:24
  83:8
**KC** 27:11,12
**keep** 77:8
**keeps** 27:16
  44:15
**Kelly** 18:12 31:1
**Ken** 22:2
**kept** 63:5,12
  64:6
**Kim** 1:17 3:14
  4:4 114:3,20
**kind** 17:17 20:14
  24:10 25:22
  31:9 39:15
  40:15 43:18
  46:6,16 47:19
  51:14 59:24
  61:9 64:11,16
  85:16,20 86:13
  103:2 105:24
  107:6
**kinds** 11:19 18:4
  37:25 57:5
**knew** 33:15
**knitting** 46:22
  46:22
**know** 5:17,24
  6:11,18 7:2
  11:5 14:18
  17:13,21 19:18
  19:25 21:7
  22:16,24 25:9
  25:19 26:13
  27:12 28:15
  30:2,9 31:5,6
  31:14 33:18,22
  34:17 35:19,25
  38:13 39:15
  41:24 42:24,25
  43:1,3 44:9
  48:4,14 49:5,7
  50:9,20 51:21
  52:13 53:7,8
  53:15 55:19
  56:9 61:22
  62:2 63:18
  64:14 65:4
  66:1,6 67:16
  67:17 69:1,19
  69:22 70:7,10
  70:13,16 71:24
  72:7,11 74:19
  74:24 76:20
  78:12 80:8
  81:2 83:7,10
  84:16,25 85:17
  86:4,10,17,18
  86:25 88:2
  90:11,15 91:9

  94:12 95:6
  96:14,16,18,25
  98:12 99:2,19
  101:4,13,14
  103:3,8,13
  104:14,16
  105:17,20,23
  106:1,10,15
  107:11 109:11
  110:2 112:5
**knowing** 104:20
**knowledgeable**
  54:1

**L**

**L** 1:7
**lack** 55:1
**laid** 97:7
**language** 33:10
**laptops** 99:18
**large** 60:16,19
  62:12 103:6
**larger** 60:22
**lasts** 77:21
**law** 11:16 21:4,6
  39:11 44:20
  61:21 102:7
**lawful** 4:9
**lead** 25:21 55:6
  77:6
**leading** 55:1
**leads** 55:4
**leaning** 49:6
**learn** 4:23
**learned** 104:9
**leave** 78:2 92:22
**leaving** 8:4
**lecture** 19:9
**led** 55:8 107:10
**left** 5:22 15:5
  39:21
**legal** 20:24
  28:19 29:6,9
**Legislature**
  29:25 30:4
**length** 40:10
  57:11 77:20,23
  97:6
**let's** 12:15
  78:17 89:25
  96:8 97:9
  109:18
**letter** 87:4
**letters** 87:4
  105:7,9
**letting** 98:15
**level** 14:21
**licenses** 12:7
**life** 23:17,23
  29:1,18 33:16

  35:24 39:15
  58:2,19 59:23
  60:7 63:4,12
  63:14,24 64:7
  67:10 68:1,2
  68:22 69:5,15
  76:14 79:8
  80:22 85:25
  97:18 98:15
  103:19 104:1
  104:13 107:11
**life's** 60:1
**liking** 19:14
**limited** 84:22
  96:13
**limits** 78:7
**Lincoln** 10:20
  11:3 12:3
**link** 32:5
**list** 23:14 68:16
**listed** 83:6
**listen** 74:1,7,13
**listened** 72:14
**litigation** 71:25
  72:1
**little** 4:23 6:4
  6:6 10:4,6
  11:17 18:22
  27:8 30:21
  32:7 34:3
  46:13 58:16
  60:20 61:12
  73:2 79:5
  93:12 104:11
  106:2
**live** 8:10 36:1
**living** 85:18
  106:13
**LLP** 1:15 2:3
**lobbying** 30:3
**local** 54:17
**located** 38:6
**location** 63:16
  106:12
**loft** 20:10
**long** 12:19 16:13
  26:25 42:8,19
  42:24 45:22
  62:1 71:18
  72:25 97:9,11
**longer** 36:19
  42:15,22 43:2
  62:2
**look** 16:19 32:21
  37:21 45:8,13
  48:1 49:2
  50:12,19,20
  53:4 61:15
  64:4 71:1 73:5
  74:15 75:7,11

  80:4,17 96:18
  98:9 99:4,5
  106:7 107:3
  109:23 113:9
  113:18
**looked** 7:7 11:15
  20:15
**looking** 12:10
  20:18 43:7
  44:11 57:7
  60:6 74:20
  75:13 84:5
  86:13 108:23
**looks** 6:6 12:14
  15:9 80:14,15
  82:21 83:2,20
  100:7
**lot** 19:20 22:20
  42:13 46:22
  50:10 55:14
  71:20 84:8
  86:2 91:23
  96:14 98:18
  102:21 103:11
  103:22 105:13
  106:16 107:1
**Louisiana** 28:14
**low** 51:9 107:8
**low-risk** 105:14
**lower** 42:21
  106:2

**M**

**Mae** 70:16
**main** 28:2 35:10
**maintain** 75:10
  76:15
**maintained** 66:2
  76:1
**maintaining** 66:5
**maintains** 75:3
  75:16 76:5
  77:4
**majority** 56:18
  57:14,15,19,21
  57:23 58:1,3,5
  59:14 73:14,18
  81:22 97:7,10
  99:11
**making** 18:2
  30:18,20 31:23
  36:7 48:11
  67:23 76:8,18
  99:9,21 100:1
  105:15
**mall** 24:14
**manager** 17:10
  18:11 25:22
  95:21 110:24
**manages** 26:8

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 121 of 128

**mand** 94:4
**mandatory** 23:2
**manner** 33:25
**manslaughter**
  98:4
**manual** 50:8,10
**mark** 9:4 44:6
  79:10 81:9,18
  82:16 86:19
**marked** 3:2 9:6
  32:17,18 49:20
  67:3 68:5 70:1
  79:12 81:10
  82:17
**married** 8:13
**Master's** 11:2,9
  11:13 12:2,11
  20:25
**material** 41:17
**materials** 23:13
  73:24 99:13
**matrixes** 50:15
  51:9
**matter** 63:21
**matured** 102:23
**McSwain** 18:9
**mean** 7:9 9:23,23
  19:8 20:21
  27:2,20 42:13
  46:11 48:1
  72:10 75:7,17
  76:24 77:18
  78:1,3 81:4,16
  82:6 84:4 85:2
  86:12 88:2
  98:1,14,15
  99:7 100:17
  102:17 105:3
  105:23 106:4,5
  106:25 107:10
  107:20,24
  108:15 110:3
**meaningful** 67:25
  67:25 99:10
**means** 18:18 19:4
  20:13 50:15
  74:19 102:18
**meant** 55:19
**medical** 39:12
  111:8
**medication**
  100:25
**meet** 23:25 24:4
  36:23
**meeting** 17:9
  25:7,10 27:14
  27:20,24 30:18
  79:15,19,20,23
  87:22 97:24
**meetings** 17:21

24:18,21,25
  26:2,25 27:5
  27:17,19 30:23
  31:8,13,15
  79:24 87:19
**meets** 96:7
**member** 4:19 9:21
  17:25 22:12
  32:11 33:21
  36:21 54:13,18
  54:22 55:1,4
  56:4 58:7 59:5
  59:8,8,13,13
  65:25 68:6
  78:8 81:25
  82:4 84:17,21
  88:22 92:12
  99:14,22 101:9
  109:8,16
  112:17,25
**members** 17:16
  18:16,19 19:22
  19:25 23:3
  24:15,22 25:11
  25:15 27:23
  29:11 48:24
  54:15,19 55:9
  55:19,20,20,22
  55:23 57:16,18
  57:24 65:14
  66:8,12 68:13
  70:12 72:18,25
  73:18 76:3
  79:24 81:21
  83:14 87:5
  89:22,24 91:20
  94:23 97:15,18
  97:23 98:8
  99:3,15,21
  104:6 109:14
  110:21 111:9
**memo** 33:8
**memory** 6:22
**memos** 32:24
**mental** 39:12
  44:3 49:9
  100:15,18,19
  100:20 107:16
**mentioned** 4:18
  12:4 18:13,24
  26:4 43:9
  44:22 85:21
  100:12
**mentor** 54:1
**methods** 68:20
**Michael** 2:9
**Michael.Spil...**
  2:11
**Michelle** 25:2
  53:22 62:13

82:24
**Miller** 28:10
**mind** 37:20 91:13
**mini** 64:16
**minute** 50:18
**minutes** 25:10
  27:16,21,22
  77:25 78:3
  79:16
**Missouri** 1:1,16
  1:18 2:9 12:12
  22:16 28:20
  29:5,15 114:4
**MO** 2:5,11
**Montgomery** 28:13
**month** 24:2,4
  35:14 77:15
  91:25
**monthly** 24:18,21
  24:24 30:22
  34:17,18,19
**months** 51:3
  80:12
**morning** 4:13,14
  37:13
**motivate** 106:19
**motivated** 19:17
**motivation**
  103:23,24
**motivational**
  17:17 18:24
  19:3,23 41:20
  62:4 69:2
**move** 84:9
**moves** 26:15
**muddy** 6:6
**Mueller** 25:23,24
  29:13 63:10,18
  78:12 83:8
**multiple** 31:13
  36:8
**murder** 13:22
  98:4
**murder-first**
  43:1
**murder-second**
  43:1
**Murphy** 1:17 3:14
  4:4 114:3,20

---
**N**
---
**N** 2:1,13
**name** 4:17 5:4,5
  8:8,15 20:6
  53:23 82:21
**National** 10:15
  10:21 17:24
**near** 108:16
**necessarily** 44:6
  54:25 82:1

96:14
**need** 6:18 13:6
  19:2,6 21:8
  31:21 44:6
  47:17 56:11
  57:4 74:5
  86:19 95:7
  96:19,20 99:16
**needed** 23:22
  30:19 113:1
**needs** 39:12,13
  39:14 94:9,10
**negative** 52:15
  52:16,20,23
  81:5
**negatives** 19:12
**neighborhood**
  106:12,21
**neighborhoods**
  106:17,18
**neither** 114:9
**never** 37:1 49:13
  98:20 104:20
**new** 14:20 17:7
  17:25 20:3
  25:6 27:10
  32:11
**newest** 4:19
**news** 96:8,8
**nine** 1:13
**ninth** 72:13
**nods** 6:7
**normally** 5:25
  33:25 48:3
**NORMAN** 1:4
**not-so-nice-...**
  78:2
**notes** 38:2,16
  73:11 87:13,21
  87:22 88:2
  113:9
**notified** 26:14
  94:5
**NoVA** 27:11,12
**November** 16:15
  17:5
**number** 32:23
  35:23 46:21
  51:2 57:16
  78:7,10,14
  102:14,19
  105:11,17
**numerical** 52:11

---
**O**
---
**o'clock** 1:13,14
**object** 59:24
  112:19
**objection** 55:17
**observation**

12:23 17:14
**observe** 92:9
**observing** 18:16
**obviously** 22:22
  45:14 52:15
  57:19 98:24
  104:2,23
**occasion** 24:3
  79:25 87:19
  90:8 110:22
**occasionally**
  25:5 28:23
  36:19 43:12
  47:15 49:5
  55:11 71:14
  74:3 78:1
  84:19 93:11
  95:3 98:1
  101:25 105:6
**occupation** 8:17
**occurred** 30:7
  86:6 101:13
**offender** 13:5,8
  14:4,11,19
  19:5,9 20:21
  26:14 35:20
  41:20,22 42:18
  45:6,10,14
  46:7 47:19
  51:25 52:3,7
  54:5 55:12
  57:2,3 65:18
  65:21,24 66:16
  67:1 69:12,15
  69:16 71:8,17
  74:21,25 75:3
  76:15,18 77:4
  77:7 78:1
  84:12,22,25
  85:3,22 86:8
  86:10,12 88:6
  88:19 89:8,19
  91:13,16,17
  92:15,19 93:1
  93:5,19 95:1
  95:19 96:3,6,7
  96:9,10,18,25
  97:3 98:5
  101:1 102:23
  103:4,8 105:2
  108:16,18,24
  109:25
**offender's** 39:10
  49:7 52:20
  60:17 65:20,24
  67:1 71:2,6,12
  72:1 80:11,14
  89:5 91:14,15
  93:19 96:3
  105:14 108:8

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 122 of 128

111:8
**offenders** 13:25
14:17 23:24
28:7 29:18
33:4,8,17 36:1
42:9,23 44:19
49:10,13 51:17
61:22 63:5,11
63:13 65:21
75:9 76:14
80:7,22 81:5
86:1 89:5
100:8 104:1,13
104:15 106:16
108:5,21
**offense** 25:14
38:23,23 42:18
50:19 55:13
57:11,11 75:11
75:13,14,24
90:23 102:17
102:20,21,24
**offenses** 13:22
42:25 57:21,22
75:25
**offer** 62:22 71:3
71:7 91:7
94:22
**offering** 84:2
**offers** 85:13
**office** 16:21
24:13 28:2
35:4,9 36:13
40:6 47:12
90:13 93:25
94:2 96:5
110:25 111:4
111:10
**officed** 24:7
**officer** 12:17,21
12:25,25 13:1
13:3 14:12
40:2,18 47:9
48:5,6 51:24
61:25 105:6
110:10
**officer's** 38:1
96:4
**officers** 40:3
42:14
**offices** 1:15
24:15 28:3,5
**official** 76:22
**oftentimes** 85:13
90:5 101:18
**Oh** 21:19 27:2
32:12 52:14
**okay** 4:17 5:3,13
8:17 13:11
14:24 16:13

18:24 23:2
25:24 27:15
32:12 33:2
35:5,14 36:4
36:16 38:21
40:19 42:17
43:9 46:9 50:8
52:5,19 57:9
61:11 63:11
67:12,19 68:8
69:20 70:22
75:18 77:10
82:10 83:2
87:24 88:18
89:18 90:21,25
91:7 92:23
93:14 97:23
101:2,24 102:2
102:22 109:8
110:25 111:9
113:5,20
**older** 23:13
40:24 64:22
100:12 105:24
106:1
**once** 18:21 24:2
24:4 35:17
47:25 81:20
87:12,19 89:13
91:10 92:10
94:24 95:23,25
98:21
**ones** 58:21 78:5
105:17
**ongoing** 22:11
**online** 16:20
**onsite** 35:2
92:20
**open** 72:11
**open-ended** 69:2
**operations** 17:9
18:11 25:22
110:23
**opioid** 22:21
**opportunities**
39:2,4 68:1
103:15 104:8
**opportunity**
38:24 54:11
92:3 94:21,23
101:5 108:25
**oppose** 90:24
91:5
**opposition** 102:5
102:9,10
**order** 34:22 59:3
**orders** 46:5
**outcome** 114:14
**outer** 85:16
**outside** 27:20

30:17 32:3
57:6 63:20
66:11
**overall** 48:13
**overboard** 93:12
**oversee** 7:17
**overseen** 72:5

---
**P**
---

**P** 2:1,1
**package** 60:20
**packet** 60:16
**page** 50:13 71:1
74:15 83:15
**pages** 83:23
**panel** 54:15,16
54:16 55:20
56:5 57:12,24
58:6 62:16
68:13 71:10
73:6 81:18
82:3 92:13
94:22 109:12
**paper** 64:12,15
**paperless** 45:23
**paperwork** 32:9
64:4
**parole** 4:24 7:17
9:21 12:17,21
12:22,25 13:2
15:2,25 16:10
16:14 17:17,25
18:3,19 19:9
23:17,24,25
25:1,3,18 26:1
28:2,6 29:1,18
29:22 30:2,7
32:10 33:17,17
33:21 34:4,12
35:1,8 36:2,21
37:8,12,17
38:11,12 40:2
40:3,6,18
41:12 42:14
43:4,8 46:20
47:9,12,13
48:5,6 51:23
52:21 53:2
54:9,12,17,18
54:22,25 55:4
55:24 56:10,14
57:6,7,10 58:2
58:19 59:23
60:8 61:8,25
62:16 63:4,5
63:11,12,14,25
63:25 64:2,7
64:10,25 65:10
65:13,15,22
66:9,13,14,16

66:19,23 67:10
68:2 69:5,16
70:8 72:15,19
75:15,17 76:14
77:9,18 78:17
79:3,6,8,20,23
80:22 81:4
82:12 83:5,23
85:10,25 87:7
87:14 89:20
90:5,16,20
91:20 93:17
94:15,20,22
95:20 96:4,13
97:4,19 100:16
100:17 102:15
104:1,9,13
105:5 108:5,8
108:16 109:18
110:1,4,9,18
111:7
**part** 19:11 44:11
51:23 69:1
70:24 83:11
92:7,10 105:8
**participate**
12:22 46:15,15
78:8 93:10
**particularly**
76:13 85:25
89:2 102:18,20
**parties** 73:12
91:6 114:10,13
**partition** 92:20
**partly** 82:21
**partnerships**
22:18
**party** 70:12
89:10 106:23
**passed** 69:18
**Paul** 20:3
**Paul's** 20:6
**people** 60:18
69:24 87:9
100:19 102:21
103:20 107:1
107:23
**percent** 53:6
**percentage** 35:22
35:25
**perfectly** 31:6
**performed** 100:16
**period** 22:3
104:2 108:11
**periodically**
59:9
**person** 13:4
23:14 36:24
37:2,25 63:25
75:24,25 76:5

80:19 81:16
82:7,8 85:17
102:1 111:21
**person's** 103:23
104:24
**personal** 8:20
101:21
**personally** 29:24
96:5
**personnel** 22:4
**phone** 36:24 37:2
87:11
**physically** 45:20
**picture** 60:6
**pieces** 110:20
**place** 23:11
24:19 36:12,25
45:5 48:18
58:13 71:22
104:8
**placed** 63:16
**plaintiffs** 1:5
2:2 4:2,10,18
7:10,18 70:17
**plan** 39:20,20
71:21 80:14
85:1 89:1
**plans** 71:16
85:14
**play** 44:25 51:13
102:4 103:5
112:9
**plays** 103:6,25
**plead** 75:9
**pled** 8:21,21,23
75:9
**plenty** 78:15
**poems** 65:13
**point** 7:1 49:4
80:4 89:15
95:4 98:20
**points** 20:16
102:20
**policy** 17:10
50:2,4 61:22
87:16 97:8
**poor** 107:18
108:24
**portion** 11:4,7
11:14 18:21
25:7
**pose** 20:21
**posed** 88:3
**position** 12:19
13:16 15:24
16:7,9,13 17:3
17:7 21:17,25
22:9,12 26:7
40:11
**positive** 52:17

Pohlman USA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 123 of 128

52:21 81:4
103:4
**positives** 19:11
19:14
**posted** 32:25
33:13,15
**practices** 18:1
20:10
**Pre-sentence**
38:23
**PRECYTHE** 1:7
**preface** 7:1
**prehearing** 38:20
40:22 41:5,14
44:23 45:16,19
46:4 47:5
48:18,20,23
49:11,13 50:2
50:5 52:9
53:11 69:9
90:16 96:23
97:1
**premium** 105:11
**preparation**
59:21 60:10,11
**prepare** 7:6,23
17:6 34:13
41:4 42:22
43:2,5 83:24
83:25
**prepared** 9:18,20
9:24 42:6 43:6
48:15 67:16
84:1 87:4,4
96:16 106:19
**preparing** 41:14
53:2 63:20
70:25
**prerelease** 80:5
80:6
**present** 25:6
36:15,16,20
37:5,12 47:13
47:16 48:25
54:15 55:24
62:19 84:20
85:6,12 92:19
101:10
**presentation**
27:13 31:12
88:17
**presented** 28:19
30:25 31:11
55:13 74:23
77:6
**presentence** 38:6
64:21
**presentencing**
40:25 41:1
**pressure** 99:7

**pretty** 23:8 31:8
36:2 43:6
55:11 61:3,14
86:3 96:19
103:6
**previous** 75:19
**print** 34:19
**prior** 19:25 23:7
36:15,18,25
37:2,9 46:5
48:21 60:14,17
60:19,20 80:11
80:24 84:18
90:12 94:14
100:16 105:20
**prison** 26:13
38:4 41:10
**pro** 23:10
**probably** 30:6
34:7 40:10,20
42:9,12 52:20
63:10 76:21
77:1 108:17
**probation** 12:17
12:21 15:2
16:10,14 25:3
28:6 38:1,24
38:25,25 39:4
40:3,18 41:12
42:14 54:9
61:25 65:2
87:7
**problems** 85:18
**procedure** 17:11
50:2 61:21,23
79:21 97:8
**procedures** 4:24
70:9 86:18,20
**process** 16:1,16
16:19 17:1
34:6,8 42:8
54:12 73:3
79:21 80:23,25
86:17 97:17,21
104:14,15
110:1
**processes** 4:24
**produced** 1:12
4:9 9:10 20:11
32:24 112:24
**productive** 46:25
104:20
**program** 103:15
**programming**
103:3 104:8
105:3
**programs** 39:18
46:12,15 68:24
80:17 96:21
104:19 107:17

**progress** 84:25
85:22
**progressed** 40:20
**proper** 72:7
**property** 44:15
**prosecuting** 94:2
**prosecutor** 89:19
91:1,2,10,12
**prosecutors** 90:5
90:12,16,21
91:7 102:7
**protected** 100:24
**protocol** 79:5,7
83:5,24
**provide** 26:12
29:24 30:4
46:16 48:7
51:14 71:8
83:9 89:12
**provided** 18:23
64:9 65:18
73:13
**provides** 34:18
36:10
**providing** 67:25
**PSI** 41:2
**psych** 100:13
**psychiatric**
64:23
**psychology** 11:22
11:25 21:11
**publication**
33:19
**pull** 5:1 99:16
99:18
**pulling** 20:17
**Puppies** 46:20
**purposes** 87:23
**push** 31:7
**put** 38:18 40:20
89:17 92:20
100:25 102:8
103:22
**puts** 39:25

**Q**

**question** 6:1,9
6:10,12 32:7,8
34:11 39:25
45:7,14 50:12
55:18 56:2
59:1,25 63:10
64:11 76:2
88:3,21 111:12
**questions** 4:12
4:23 8:19
11:21 18:15
19:6 21:9 31:4
31:21,23,24
34:6,8 37:21

44:7,17 48:17
62:25 68:16,19
69:2,11 71:8
71:12,15,16,17
71:20 72:2
73:2 83:4,15
83:21 84:8
88:18 94:24,25
109:25 110:4
**quick** 25:20
**quickly** 5:19
**quiet** 78:5
**Quinn** 70:16
**quit** 96:19
**quite** 40:6
**quote** 61:2 80:12

**R**

**R** 2:1
**RA** 53:18
**raised** 71:25
112:25
**range** 51:10
52:11,13
**ranges** 50:22
51:8
**rare** 24:3,6
55:11
**Rarely** 12:23
**re-hear** 108:22
**re-offend** 48:14
106:6
**reached** 59:14
**reaching** 97:17
**read** 21:8 28:21
48:20 113:15
**reading** 28:24
**reads** 71:6 76:3
**ready** 108:16
**real** 25:20 42:4
**really** 22:1
28:18 42:1
49:7 55:16
81:2 98:1,5,7
98:8,12 99:7,8
106:15,17
108:24
**reason** 6:19,22
26:19 56:9
63:17 110:6
112:23
**reasons** 41:25
86:11 101:21
101:21 102:15
112:2,5
**recall** 7:14 9:18
30:12,15,22
31:10 33:12
70:23,24 83:1
101:15

**receive** 11:8
17:6 22:11
23:3,6 28:23
28:25 34:15
36:17 37:5
43:13 60:19
61:19,20 62:3
67:19 68:19
**received** 10:24
12:2,11 17:19
17:21 18:1
21:10 23:8,16
30:9 32:23
60:14,16 61:24
**receiving** 23:14
**recidivity** 44:8
**recognize** 9:11
19:7 70:4
**recognizing**
19:12
**recommendation**
41:2 47:6,8,21
47:24 48:1,2
64:21 73:6,11
81:20 96:25
109:9,12
**recommending**
14:23
**reconsider** 81:3
**record** 5:5 6:5,6
72:2 88:20
95:8
**record's** 89:14
95:5
**recorded** 27:19
78:18,20,23
**recording** 73:11
74:1,7,13
**recordings** 58:15
72:15 79:2
92:2
**reduced** 36:1
114:8
**reentry** 22:16,17
**refer** 25:12
**reference** 101:5
110:25
**references** 20:10
46:10 93:22
108:1
**referred** 29:14
80:7 111:21
**regard** 28:25
**regarding** 21:3
22:5
**Regardless** 102:2
**regional** 25:2
26:4 53:17,21
**regular** 22:23
62:8

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 124 of 128

**regulation** 74:12
**regulations** 109:4
**rehabilitation** 32:14 68:24
**rehearing** 108:4 108:5,8,12,17 109:4,10
**related** 19:23 21:10 22:8 23:17 30:12,15 32:2 68:17 71:21 112:11 112:12 114:9
**relating** 30:4 63:1 69:12
**relations** 15:10
**relationship** 14:3
**relative** 114:12
**relaxed** 31:9
**release** 14:22,23 26:16 48:13 55:15 66:1 71:22 76:19 80:12,24 81:1 82:12 85:4 90:24 91:2,5 102:15 104:4 105:10 107:13 109:2,11
**released** 13:13 20:21 51:17 71:18 91:17 106:24
**releasing** 51:6 63:19
**relevant** 83:21 89:9
**relitigate** 101:6
**remember** 31:7 42:11
**reminded** 87:21
**remotely** 78:22
**repetitive** 105:15
**rephrase** 76:17
**report** 13:7 15:19 38:12,18 38:20 41:2,5 43:5,6,10 44:23 45:16,19 46:4 47:10,13 54:3,4,10 62:4 64:21 69:9 90:17 96:16,23 97:1 101:1
**reporter** 1:17 3:14 5:21 6:7 9:4 114:1,3

**reports** 40:22 42:23 47:5 48:18,20,23 49:11,14 50:3 50:6 52:9 53:11 62:6 64:23 65:1,1,3
**represent** 4:17 32:23 70:14
**representative** 36:25 62:19 65:9 66:22
**representatives** 92:3
**represents** 81:6
**reputation** 91:15
**requested** 71:9
**require** 56:22
**requirement** 61:13,14,16 62:13
**research** 11:18 11:18,20 20:15 51:12,12,12 89:9 105:24 106:2 111:19
**resign** 16:7
**resignation** 112:1,3,6
**resources** 13:6 15:16,25
**respond** 76:20 106:22
**responsibility** 74:21 75:1,14 83:12
**responsible** 26:9
**rest** 16:22 56:6 73:13 93:9
**restoration** 46:17
**restorative** 46:10,12,21 103:17
**restriction** 14:15
**restrictions** 87:6,9
**resume** 9:13
**resumé** 9:19,20 9:23 12:10 40:16
**retrial** 74:16
**retry** 101:6
**retrying** 75:12
**returned** 15:12 21:5
**reverse** 93:4
**review** 21:7 32:1 37:8,16,18,19

41:6,13 42:4 52:6 53:4 54:11 60:18,21 70:24 73:23 77:4 92:1 95:9 97:20
**reviewed** 7:22 14:10 17:10,11 17:13 19:21 23:21,21,22 28:15 29:2,16 32:4 101:19
**reviewing** 34:22 51:24 70:23
**reviews** 14:16,22 95:24
**revocation** 46:5
**right** 4:15 5:21 10:5 20:4 24:10,11,14 28:16 29:10 36:14 38:19 48:6 57:18 59:10 61:6 64:8 65:11 72:1,25 74:6 89:3 90:9 97:3 97:15 108:18 111:21
**rights** 22:24
**ring** 93:24
**rise** 21:17
**risk** 17:11,19 20:16,17,19,20 20:21 48:14 105:13,22 106:5 107:8,9
**risks** 100:7
**road** 38:2,16
**role** 4:23 5:15 12:14 13:19 14:9 15:2,9,15 15:19,21 18:2 25:22 32:10 33:9,19 44:25 62:21 70:19 86:20,24 90:22 92:8 94:7 102:4 103:2,5 103:6 104:7 112:9,25
**roles** 12:15 14:25 26:7 61:7,8
**rolling** 93:13
**room** 34:21,23,24 35:2,13 36:11 36:12 92:16,21 94:13
**rooms** 35:4,10

**rotate** 54:18,19
**rotation** 59:3,8
**rule** 14:11
**rules** 5:19 53:5 88:9 90:4
**Ruziscka** 111:24

---
**S**

**S** 2:1 64:25
**SACA** 100:4
**safety** 87:8 101:22
**salient** 17:20 18:13 20:14 50:21,24 51:20 51:21,21 52:8 52:15 53:1 62:4 80:15
**sanctions** 14:14
**SAR** 41:3
**sat** 17:10 99:23
**saved** 79:2
**saw** 40:15 44:8 76:25
**saying** 4:15 66:20 72:11 77:3 101:14
**says** 4:10 33:3 50:14 73:10 74:13,16 80:5 81:25 83:15 100:22
**SB** 30:16 60:25 79:8 95:11
**scanned** 64:15
**schedule** 6:17 24:5
**scheduled** 27:7 108:9
**schedules** 37:7
**school** 10:8 43:18 72:12
**Science** 10:24
**score** 17:20 20:15 38:5 50:21,24 51:21 51:21 52:8,16 52:16,17,18,20 52:21,24 53:2 80:16 100:4
**scores** 18:14 51:20
**scoring** 62:4
**scratch** 83:25 84:1
**scratching** 59:19
**screening** 99:25
**script** 83:17
**second** 50:13 71:1 73:5

83:15
**secretary** 25:8,8 25:12,13 27:15
**section** 44:3,4,8 50:13 65:6,23 65:24
**see** 7:7 19:6,16 20:10,20 32:1 32:16 37:2 38:2 40:6 41:22 49:13 58:23 59:4 71:4 73:8 74:20 75:13 79:17 80:16,19 86:12 89:23 93:22 98:24 99:6 106:20 108:23 109:1
**seeing** 19:11 43:21 70:24 100:20
**seeking** 9:20
**seen** 19:20 39:23 44:5 46:9 49:23 67:6 70:15 84:25 85:22 86:2 89:23 96:16 102:11 104:18 108:1 110:25
**segregation** 14:15
**self-reported** 39:6 43:12 44:1 101:1
**senate** 23:18 29:15,15,25 30:5,23 31:18 32:2,4,9 33:9 53:12 60:8 63:2 67:14 68:14 69:18 75:20 95:16
**send** 93:15 95:7 105:9 110:13 113:16
**sending** 110:16
**sense** 14:5 19:20 22:7 42:5 52:25 53:9 75:2 86:15 96:22
**sent** 14:13 32:3 32:5 70:16,23 83:8
**sentence** 50:25 51:6 63:22 64:4 108:22
**sentenced** 63:12

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 125 of 128

63:14,24 64:7
**sentencing** 38:22
38:23 41:2,10
46:3,8 64:20
64:24
**separate** 11:9
79:7
**September** 8:7
**serious** 42:25
**serve** 62:15
86:21 88:6
111:10
**served** 10:12
**service** 10:18
111:14
**services** 12:16
15:7,23 40:16
43:19 90:14
94:1,3 111:1
111:10
**serving** 10:21
25:16
**sessions** 22:17
28:17
**set** 37:15 53:11
63:1 67:13
73:17 108:20
108:22 109:3
**setback** 108:2,3
108:6
**sets** 29:21 79:7
**setting** 47:18
60:5
**seven** 27:4
**sex** 100:8
**sex-offending**
39:8
**shaking** 93:12
**share** 86:9,11
90:19
**shared** 58:10
65:15 72:3
73:17 89:21
90:15,18
**she'll** 25:7
26:17
**sheet** 46:6,6
64:20 68:4,9
81:7,13,15
82:11 98:25
100:21 102:13
113:17
**shift** 34:3
**shoot** 76:25
**short** 20:12
49:17
**shorthand** 4:4
**shortly** 17:23
**shoulders** 98:18
**show** 44:6 82:15

82:20 85:2
98:21
**shows** 46:24
77:17 105:24
106:2
**sign** 22:4,15
**signature** 4:5
113:17,21
**significant**
61:14 104:2
**similar** 33:13
**simply** 113:17
**single** 31:11
**sit** 19:8
**situation** 47:20
56:13 75:5
97:10 101:8
**situations** 26:17
37:4,11 56:4
73:21 76:13
101:2
**six** 1:14 25:17
25:21 57:18
97:14,15
**sixth** 74:15
**slightly** 72:20
**sober** 85:18
**sobering** 86:3
**social** 15:6
39:15 44:4
**society** 20:22
**sociology** 11:9
11:17 106:10
**somebody** 64:7
**someone's** 41:25
98:15 101:12
105:10
**something's** 89:8
**somewhat** 8:20
75:22
**soon** 17:8 34:21
59:13
**sooner** 36:21
97:15
**sorry** 15:2
**sorts** 64:9
**sought** 12:4 17:3
**sounds** 18:5
20:24 26:24
31:17 77:3
111:14
**speak** 19:19,24
20:18 47:23
53:15,17 62:14
62:22 84:20
90:23 93:5
102:25
**speaks** 103:23
105:4
**special** 12:7

23:11 65:1
88:9
**specific** 4:25
7:7,9 21:3
22:8 27:6
30:12,15 31:23
34:8,24 43:20
43:20 47:4
51:5 55:10
68:22 69:4
80:10 93:2
112:20
**specifically**
23:17 31:15
55:22 84:3
**specification**
61:15
**specifics** 33:18
**specify** 86:20
**speech** 19:3
**spell** 5:5 53:23
86:24
**spent** 18:15
43:19 104:2
**Spillane** 2:9
55:16 59:24
112:19 113:12
113:15
**split** 57:24,25
**spoke** 8:2 25:24
50:6 91:16
**spoken** 37:2
82:24
**spouse's** 8:15,17
**staff** 14:3,3
25:4 26:8,21
26:22 28:6
41:21 44:18
66:14 94:6
105:6,7
**stand** 33:5
**stands** 100:6
**start** 34:5,22
106:21
**started** 17:8
18:22 43:22
68:14
**starts** 40:12
81:17 92:10
**state** 1:18 5:4,5
21:4,7 25:5
26:9 28:3
86:24 91:1
109:4 114:4
**statement** 36:20
39:10 40:23,24
45:11,11 65:9
71:3,7 73:10
76:7 88:20
89:12 92:8,12

92:13,15,19
93:8 94:19,21
94:23 95:4
101:19
**statements** 94:24
101:18 102:3,6
102:11
**states** 1:1 10:12
28:20 43:13
**statistics** 51:14
**status** 14:19
**statute** 23:21
74:12 92:18
**statutes** 21:4,7
73:1 86:24
109:5
**statutory** 86:23
**stay** 92:21 93:9
**staying** 73:1
104:19
**step** 13:10 61:9
**steps** 41:4
**Steve** 25:23
29:13 63:10,18
78:12
**stick** 84:24
85:21
**STIPULATED** 4:1
**stop** 6:10
**straight** 59:12
**street** 1:16 2:4
2:10 35:11
**strengths** 83:16
**strike** 47:11
59:21 69:16
101:3
**strip** 24:14
**structure** 72:19
**struggling** 74:6
98:2,7,13
**studies** 20:24
**study** 11:12,22
**stuff** 51:25 52:2
84:1,2
**subjective**
104:23
**subjects** 111:23
**substance** 39:13
100:3
**substantially**
42:15
**successful** 13:6
85:4 106:9
**suggest** 20:16
**suggestion** 56:5
96:11
**suggestions**
51:17
**suit** 56:6
**summary** 38:13

**supervise** 28:7
**supervision**
38:14 48:16
105:18
**supervisor** 25:6
54:17 110:12
110:23
**supervisors**
105:8
**support** 39:19
60:17 65:5
66:1 85:3
90:24 94:3
106:7,8
**supported** 20:19
**supporting** 67:1
73:12
**supports** 26:22
**supposed** 41:19
64:17
**Supreme** 23:18
28:9,20,20
30:10 104:5
**sure** 6:9 7:21
11:18 13:5
14:17 23:7
30:18,20 31:23
39:21 52:19
59:11 61:3
64:5 67:24
68:11 69:23
72:13 76:2
77:16 78:15
80:7,25 90:25
94:4 95:24
96:18,19 98:18
99:8 111:17
**surprisingly**
39:22
**sworn** 1:12 4:9
114:6
**system** 99:7,8

**T**

**tactics** 62:10
**take** 6:17 24:19
25:13 33:24
41:4 42:8 43:5
49:17 71:19,22
74:25 75:14
87:13,20 88:2
89:25 97:9,11
**taken** 4:3 40:25
46:5,16 49:19
73:12 90:1
95:1,2 98:15
105:1 113:10
114:7,11
**takes** 6:7 25:10
36:12 42:22

Pohlman USA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 126 of 128

43:1 58:13 103:4
**talk** 5:1,24 6:3 27:10 28:8 38:15 43:14 45:6 69:24 78:17 84:9 86:4,5,8,14 94:17 96:17 97:9 105:22 110:9,11
**talked** 22:20 30:11 51:20 61:12 70:8 79:5 90:3 99:13 101:4 107:16
**talking** 25:10 31:9 43:15 52:2
**target** 43:25
**technical** 79:22
**tell** 11:12 28:15 31:15 49:3 50:1 56:25 57:8 58:5 59:12 61:15,25 78:2,12 80:10 84:3 89:8 95:6 98:3 100:6 104:24
**tells** 46:6,8
**ten** 57:14
**ten-year** 50:25
**tendency** 6:3
**tender** 111:23
**term** 18:24 19:21 20:9,13 27:16 82:14 103:3
**terminology** 50:14
**terms** 18:13
**testified** 5:13
**testify** 6:19
**testimony** 91:8 114:5,6
**Thank** 10:18,19 20:8 34:2 59:19 77:10 113:14
**thanking** 61:5
**thereto** 114:13
**They'd** 88:14
**thing** 41:3 43:18 47:19 51:14 85:5
**things** 19:15 20:17 43:9 46:21 68:23 102:19 109:24

111:22
**think** 6:16 17:15 17:22 18:10 19:24 20:1 21:19 22:25 25:20 30:6 31:20 32:8 40:14 58:23 59:25 61:2 63:15 65:12 67:17 78:11 80:1 83:9 87:19 91:10 102:1 104:16 107:9 111:5,12 113:11,12
**thinking** 21:23 106:21 108:19
**third** 74:15 75:23
**thorough** 39:22
**thought** 7:20 32:4 69:21,21 86:17 110:7
**thoughtful** 99:9
**three** 12:20 17:15 18:15 35:18 39:4 54:15,19 55:5 58:7 62:1 108:20 109:18
**three-member** 62:16
**time** 5:17 10:2 18:8 22:4 26:15 30:7 37:16 40:10 42:13 43:5,19 43:21 45:11 46:25 47:15 59:6 64:23,23 65:22,22 70:16 74:9 77:15,24 78:16 80:10,11 91:12 92:24 102:23,24 103:8,11 104:3 105:23 108:11
**times** 5:11 36:8 36:23 75:2 89:7 90:7 96:15
**title** 21:13 25:9 53:20
**titled** 79:15 83:3,4
**today** 4:23 6:20 6:23 7:1,6,23 8:3 113:4
**told** 56:8 99:1

**tool** 70:11,11
**tools** 17:11,12 17:20 100:8
**top** 23:14 52:14
**topic** 22:21 31:12
**topics** 18:4 84:23
**tracking** 84:4
**traditional** 60:12 95:13 97:19
**traditionally** 55:3 64:18
**trained** 21:8
**trainee** 12:17
**training** 17:6,19 17:25 18:1,3 18:20 19:23 21:3,6,10 22:8 22:11,15,24 23:4,9,10,16 23:20 24:5 27:3,7,9 28:17 30:12,15 40:16 52:4 61:13,20 61:25 62:3,8 62:12,12 68:19 70:11 83:10
**trainings** 17:22
**transcribed** 4:5
**transcripts** 92:2
**transition** 45:25 64:12
**transitioning** 45:23
**travel** 35:15
**treated** 88:8,14
**treatment** 100:23
**trial** 5:13 75:8 77:6
**tried** 83:11
**trip** 35:18
**trouble** 104:19
**Truancy** 43:18
**true** 9:14 65:17 66:25 93:4 102:6
**try** 27:8,13 78:10,14 83:13 86:16 88:25 95:3 101:9 103:11 106:19
**trying** 24:12 45:25 76:11 111:17
**turn** 29:8
**twice** 24:4 47:25 87:20 91:11
**two** 7:13,14 11:8

12:20 17:15 18:15 35:6,18 39:3 40:16,20 42:9 55:5 58:24 61:2,4 83:2 91:24 108:20 111:22
**two-thirds** 80:5
**two-year** 57:25
**type** 16:16 17:14 42:18 50:19 51:5 57:11 61:3 71:15 97:5
**types** 44:12 57:4
**typewriting** 4:5 114:8
**typical** 27:2 34:14
**typically** 26:25 51:3 71:21 73:23 97:11 109:8
**typographical** 113:19

**U**

**U.S** 28:8
**Uh-huh** 82:23
**Um** 102:18
**unanimous** 56:14
**underlying** 77:5 91:8
**understand** 6:10 16:18 21:9 26:24 28:1 34:11 43:23 52:19 59:7,7 60:4 82:4 85:21 87:10 91:19 92:11
**understanding** 37:7 42:9 56:1 56:21 67:13 73:16 87:18 104:3
**understood** 6:13 6:13 30:9 107:2
**unfortunately** 106:16
**unit** 51:12,13 103:16
**United** 1:1 10:12 28:20
**University** 10:20 11:3 12:3
**update** 43:7 80:15
**updated** 9:23

**updates** 22:25 26:11 50:11
**uploaded** 94:5
**urinalysis** 38:2
**use** 17:12 37:22 42:15 67:21 68:14,20 73:13 83:17 100:9 103:11
**usually** 25:1 40:24,25 47:25 48:1 71:20 97:9
**utilize** 100:11

**V**

**vacation** 22:3 24:22
**value** 52:11
**variety** 77:21
**version** 10:1 70:16 76:22
**versions** 70:15
**versus** 28:11,14
**vice-chair** 21:18 21:25 22:9 83:12
**Vice-chairman** 21:16
**victim** 36:16,24 37:1,3,4,11 40:23 62:18 65:9 66:22 84:21 89:11,19 92:11,25 93:5 93:14,22 94:1 94:9,14,19 101:18
**victim's** 36:24 62:19 65:9 66:22 91:19 92:3 93:5,8,14 102:2,3
**victims** 36:15,19 47:16,18,18 55:4,5 60:13 65:4,14,23 89:14 90:14 91:19 92:2 94:1,3,4,12 95:2,3 101:25 102:3
**Victims'** 65:3
**video** 35:1,7,8 36:2 78:23
**videoconference** 35:23
**view** 39:10 44:20 102:2
**violates** 14:11

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-6   Filed 06/12/18   Page 127 of 128

**violating** 13:9
**violation** 14:4
  14:12 38:14
  45:4,7,9
**violations** 14:10
  38:5 41:24
  42:1,3 44:22
  80:18 81:2
  96:17,20
**violator** 43:4
**violent** 49:8
  102:19,20
**Vocational** 52:4
**vote** 56:8,22
  58:13 59:2,13
  59:14,16 73:19
  73:22 98:9,21
**voted** 7:8,12,15
  58:23 59:2
  110:21
**voting** 46:2
  56:12 59:5
**vs** 1:6

---
**W**
**waive** 113:17,20
**waived** 4:6
  113:21
**walk** 34:6 45:19
  87:12
**walked** 61:6
  87:10
**want** 5:1 7:2,3
  10:4,6 19:10
  19:16 20:9
  30:21 36:19,20
  37:21 41:23
  42:4 49:17
  52:19 55:15
  59:5 74:24,25
  80:19 84:20
  85:24 92:9
  94:13 95:7
  98:11 99:6
  106:22 108:25
  111:22 113:18
**wanted** 7:20
  71:11 82:20
  98:6,8 103:25
**wanting** 86:11
  88:2
**wants** 56:6
**Warrensburg** 11:6
**wasn't** 69:4
  70:24 80:7
**way** 6:11 11:25
  16:1 19:6
  37:20 51:5
  63:13 76:18
  93:10 96:12

111:14
**ways** 50:11 103:9
**we'll** 4:20 25:5
  45:6,14 48:18
  49:4 58:16
  82:16 86:14
  93:13 105:6
  108:22
**we're** 6:17 20:17
  20:18 21:8
  31:9 34:17
  45:23,24 48:2
  48:13 56:10
  57:7 74:20,22
  75:12,13 92:20
  97:15 98:24
  99:9 107:22
  108:16,18,19
  108:23
**we've** 29:14 44:5
  45:22 49:16
  51:3,20 56:18
  61:12 64:14
  70:14,15 81:20
  82:24 88:3
  90:3 93:11
  97:15 99:13
  104:11,18
**weapons** 13:21
**week** 35:14,18,19
  36:18 77:13
  78:9 91:24
**week-long** 18:3
**weeks** 17:15 18:6
  18:15 25:25
  62:2 97:14
**weight** 53:1 77:1
  103:22
**went** 12:11 13:16
  14:6 16:17,25
  17:13,24 22:19
  40:18 99:3
  107:21
**West** 2:10
**WESTERN** 1:1
**whatsoever** 82:8
**wisely** 103:11
**witness** 4:6
  76:24 101:11
  113:20 114:5,7
**women** 100:5
**word** 55:2
**work** 12:8,11
  14:6,22,23
  25:4 38:6 40:4
  50:9 68:10
  73:2 87:23
  94:11 103:21
  105:8,10
**worked** 53:18

**working** 9:24
  13:11 15:6
  19:5 27:11
  46:19 64:17
  100:22 104:18
  111:15
**works** 13:4 25:3
  34:9 40:14
  58:6 93:25
  94:2
**worksheet** 41:15
  41:16 42:14
  80:5,6,9
**worse** 52:24
  80:16
**wouldn't** 21:8
  23:20 33:21
  35:25 75:16
  77:8 90:7
  104:12 107:1
  107:22
**write** 39:24 65:5
  65:6,21 82:2,5
  82:6,7 85:7,9
  93:15
**writes** 14:12
  66:2 89:18
**writing** 89:17
  101:10
**written** 65:13,25
  89:12,23
**wrong** 59:12

---
**X**
**X** 2:13

---
**Y**
**yeah** 21:23 28:23
  32:12 42:11
  60:24 69:25
  78:6 86:13
  89:11 94:18
  98:19 99:18
  102:9 104:21
  107:24,24
  110:6
**year** 22:21 23:1
  23:3 40:17
  62:9 82:22
**years** 9:25 12:20
  31:5 42:12
  54:2 57:14
  80:14 103:21
  105:11 108:20
  109:7,16,18,18
**yell** 6:4
**yesterday** 36:5
**Youth** 43:19

---
**Z**

**Z-a-m-k-u-s** 5:7
**Zamkus** 1:11 4:8
  4:13 5:6 8:16
  32:17 49:23
  79:11 82:16
  90:3
**zero** 52:17

---
**0**

---
**1**
**1** 3:3 9:5,6
**10-minute** 49:17
**13th** 1:12
**14** 80:12
**15** 103:20
**17-CV-4082** 1:6
**1971** 8:7
**1989** 10:13
**1990s** 10:16
**1993** 10:13

---
**2**
**2** 3:4 32:17,18
  81:25
**20** 42:12 103:21
**2005** 15:5
**2014** 10:3 15:13
  15:15
**2015** 10:2,5
  15:15 16:15
  17:5
**2017** 1:13 21:21
  83:5
**221** 2:10
**235** 1:16 2:4
**26th** 83:5
**2nd** 8:7

---
**3**
**3** 3:5 49:20
  81:25
**32** 3:4

---
**4**
**4** 2:14 3:6 67:3
  75:19
**40** 23:7,8 77:14
**48** 23:1
**49** 3:5

---
**5**
**5** 3:7 70:1
**573-635-9118** 2:5
**590** 23:18 29:15
  29:15,25 30:5
  30:16,23 31:18
  32:2,9 33:9
  53:12 60:8,25

63:2 67:14
  68:14 69:18
  75:20 79:8
  95:11,16

---
**6**
**6** 3:8 79:11,12
**65101** 2:5,11
**67** 3:6

---
**7**
**7** 3:9 81:10
**70** 3:7
**79** 3:8

---
**8**
**8** 3:10 82:16,17
**81** 3:9
**82** 3:10

---
**9**
**9** 3:3

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL    Document 134-6    Filed 06/12/18    Page 128 of 128