IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION


NORMAN BROWN, et al,          )
                             )
        Plaintiffs,           )
                             )
    vs.                       ) Case No. 17-CV-4082
                             )
ANNE L. PRECYTHE, et          )
al,                          )
                             )
        Defendants.           )


VOLUME I

    CONFIDENTIAL DEPOSITION OF JESSICA BLIESATH,

produced, sworn and examined on the 21st day of

December, 2017, between the hours of eight o'clock in

the forenoon and six o'clock in the afternoon of that

day, at the Missouri Attorney General's Office,

Broadway State Office Building, Jefferson City,

Missouri, before Kim D. Murphy, Certified Court

Reporter, within and for the State of Missouri.

1                    A P P E A R A N C E S

2

              For the Plaintiffs:
3
                   MACARTHUR JUSTICE CENTER
4                  By:  Amy Breihan
                   3115 S. Grand
5                  Suite 300
                   St. Louis, MO  63118
6                  314-254-8540

7
              For the Defendants:
8
                   MISSOURI ATTORNEY GENERAL
9                  By:  Michael Spillane
                   and Andrew Crane
10                 P.O. Box 899
                   Jefferson City, MO  65102
11                 Michael.Spillane@ago.mo.gov

12

13                      I N D E X

14   Direct Examination by Ms. Breihan               4

15

16

17

18

19

20

21

22

23

24

25

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 2 of 87

1                    DEPOSITION EXHIBIT INDEX

2     ID                                              MARKED

3     1:    Subpoena                                     4

4

      2:    Resumé                                       13
5
      3:    Training record                             14
6
      4:    Worksheet                                   25
7
      5:    Information request                         43
8
      6:    Sidney Roberts' prehearing report           55
9

10

11

12

13

14    Court Reporter:
      Kim D. Murphy, CCR
15

16

17

18

19

20

21

22

23

24

25

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 3 of 87

1        IT IS HEREBY STIPULATED AND AGREED, by and

2   between counsel for the Plaintiffs and counsel for the

3   Defendants that this deposition may be taken in

4   shorthand by Kim D. Murphy, CCR, and afterwards

5   transcribed into typewriting; and the signature of the

6   witness is expressly waived.

7                    *   *   *   *   *

8                  JESSICA BLIESATH,

9   of lawful age, produced, sworn and examined on behalf

10  of the Plaintiffs, deposes and says:

11                  DIRECT EXAMINATION

12  QUESTIONS BY MS. BREIHAN:

13      Q.   Good afternoon.

14      **A.   Hi.**

15      Q.   Could you state and spell your name for the

16  record, please.

17      **A.   My name is Jessica Bliesath.**

18           **Do you need me to spell my first name, too?**

19      Q.   Just your last name.

20      **A.   B-l-i-e-s-a-t-h.**

21      Q.   And you understand that you're here for the

22  deposition today, correct?

23      **A.   Correct.**

24           **(Deposition Exhibit No. 1 was marked for**

25  **identification.)**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 4 of 87

1    BY MS. BREIHAN:

2         Q.   I'm going to hand you what I'm going to

3    mark as Exhibit 1.  It's a copy of a subpoena.

4              Have you seen this before today?

5         **A.   No.**

6         Q.   No.  Okay.

7              If you turn to the last page of this

8    document there's eight bullet points of requests for

9    various records, documents, notes, et cetera.

10             Do you recall seeing these requests before

11   today?

12        **A.   Just a verbal of things to provide.**

13        Q.   Okay.

14        **A.   I didn't see the physical document, but,**

15   **yes, I was aware of the request.**

16        Q.   And throughout today, I'm going to be

17   asking you questions.  And my goal is not to ask

18   questions about -- or not to try to get into

19   confidential communications you had with your attorneys

20   who are here today.

21             You're represented by counsel here today,

22   correct?

23        **A.   Yes.**

24        Q.   To the extent you had confidential

25   communications with them about this case, you know, I'm

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 5 of 87

1   not -- my intent is not to ask questions about that.

2       **A.   Okay.**

3       Q.   But you did produce documents in response

4   to the subpoena, correct?

5       **A.   Yes.**

6       Q.   And those documents have been produced by

7   your attorneys?

8       **A.   Yes.**

9       Q.   And they've been Bates-stamped by your

10  attorneys Bliesath 1 through 51.

11       Have you ever been deposed before?

12       **A.   No.**

13       Q.   I'm sure your attorneys did a wonderful job

14  of preparing you for today, but I'll just go ahead and

15  walk through a couple of ground rules.

16       I see Mr. Crane shrug over there.  Just so

17  we're on the same page, my job -- I represent the

18  plaintiffs.  My job is to ask some questions that are

19  relevant to the lawsuit that we have pending, and then

20  your job is to answer them truthfully to the best of

21  your ability.

22       You just took an oath, so you're testifying

23  under the penalty of perjury just like you were in

24  court; do you understand that?

25       **A.   Yes.**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 6 of 87

1       Q.   And everything you're saying is being

2  written down today.  So it's important to keep your

3  answers verbal.  The court reporter can't take down

4  head nods, or uh-huh's or huh-huh's.  Just try to keep

5  your answers verbal, please.

6       **A.   Okay.**

7       Q.   Sometimes, as you get comfortable, that

8  might happen.  We'll try to remind you, or your

9  attorney will remind you.

10          We should also try not to speak over one

11  another.

12          There will be times where you know where

13  I'm going with a question.  And just human nature, you

14  start to answer it already.  If you could, just try to

15  wait till I'm done with a question.  I'll try to wait

16  before I ask another question until you answer.

17      **A.   Okay.**

18      Q.   If you don't understand a question I ask,

19  just let me know.  I'll try to clarify it for you.  And

20  if you don't hear a question, also let me know, I'll

21  repeat it, or the reporter can read it back, okay?

22      **A.   Okay.**

23      Q.   If you answer a question, I'm going to

24  assume you understood it, okay?

25      **A.   Absolutely.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 7 of 87

1      Q.   If you need any breaks -- I don't think
2  we'll be going too long for today, given it's already
3  late in the day -- but if you do need a break, just let
4  us know.  I'd just ask that you answer the question
5  before you break, okay?
6      **A.   Sure.**
7      Q.   So what did you do to prep for today's
8  deposition?
9      **A.   I fulfilled the requests that were given.**
10 **And reread the hearing report that I wrote.  And**
11 **reviewed the complaint.**
12     Q.   And you mentioned a hearing report that you
13 wrote.
14          What are you referring to there?
15     **A.   This document you guys should have copies**
16 **of.**
17     Q.   And that's the prehearing report for
18 Sidney Roberts, correct?
19     **A.   Correct.**
20     Q.   And you say you authored that?
21     **A.   Yes.**
22     Q.   You also reviewed the complaint?
23     **A.   Yeah.**
24     Q.   Did you review any other documents?
25     **A.   Not other than what I printed out to**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 8 of 87

1    **provide. And I didn't thoroughly read through each of**

2    **those documents. I just looked for relative documents**

3    **and sent them.**

4          Q.   I understand.

5          Did you speak with anyone other than your

6    attorneys to prepare for today?

7          **A.   Legal counsel, Department of Corrections.**

8    **But that was just to confirm what I could provide and**

9    **not provide.**

10          Q.   So are there documents that were responsive

11    to those requests in the subpoena but that you did not

12    produce?

13          **A.   No. It was just mainly the prehearing**

14    **report. We didn't know if it was already made**

15    **available or not.**

16          Q.   Did you do anything else to prepare for

17    today other than what you've just testified to?

18          **A.   No.**

19          Q.   It looks like one of the records that you

20    produced is a copy of your resumé that's been marked as

21    Bliesath 50 through 51, correct?

22          **A.   Yes. That's my most recent one. I didn't**

23    **adjust it to present day.**

24          Q.   Do you know about when it was last updated?

25          **A.   2014, probably.**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 9 of 87

1    Q.   It also looks like you were seeking

2    employment with the federal government?

3    **A.   Yeah.   I had applied as a United States**

4    **probation officer.**

5    Q.   What's your highest level of education?

6    **A.   I have a master's degree in sociology and**

7    **criminal justice.**

8    Q.   And you obtained that in 2013; is that

9    correct?

10    **A.   I believe so, yes.   December of '13.**

11    Q.   In conjunction with you obtaining your

12    master's degree from Lincoln University, did you take

13    any courses in child psychology?

14    **A.   I would have to review my transcripts, but**

15    **I don't recall.   We did juvenile justice, was one of**

16    **them, I believe.   Or it was a juvenile course.   I don't**

17    **remember the exact name of the course.**

18         **But without reviewing the exact course**

19    **titles, I don't recall the exact classes.**

20    Q.   Okay.   So do you recall taking any classes

21    on adolescent development?

22    **A.   I don't recall, no.**

23    Q.   Do you recall taking any classes, in

24    getting your master's, on evidence-based penological

25    practices?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 10 of 87

1        A.    I don't recall that specific terms being

2    used in the course titles, but I can obtain those if I

3    need to.  It's been a little while.  I don't remember

4    the exact course titles.

5        Q.    And what does that phrase mean to you,

6    evidence-based penological practices?

7        A.    To me, it would mean based on a series of,

8    you know, evidence -- evidence or circumstances or

9    something or basing a decision off of the evidence

10   that's presented in front of you.

11             That's what it would mean to me.

12       Q.    Something more than just like a gut

13   feeling?

14       A.    Right.

15       Q.    And you mentioned that one of the sort of

16   areas or perhaps courses that you remember taking while

17   getting your master's degree was on the topic of

18   juvenile justice, correct?

19       A.    Either in my master's program or my

20   bachelor's program.

21       Q.    What do you recall from that?

22       A.    I don't.  It would be limited.  If it was

23   during my bachelor's studies, that would have been even

24   longer ago.  So I don't know specifically what I recall

25   from that class.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 11 of 87

1          Q.   Got it.

2               Are you familiar with the U.S. Supreme

3     Court Decision Miller versus Alabama?

4          **A.   Only limited.**

5          Q.   That decision came down in June of 2012, so

6     it looks like while you were getting your master's.

7               Do you recall any discussion during your

8     coursework at Lincoln University when obtaining your

9     master's about Miller versus Alabama?

10         **A.   I do not.**

11         Q.   And do you have any professional

12    certifications or licenses?

13         **A.   I was certified to -- let me look at my**

14    **training records.  I believe I sent them over.  I did**

15    **do a certification in anger management instruction.**

16         Q.   So Bliesath 40 through 49?

17              MR. CRANE:  I'll give you my copy.

18              THE WITNESS:  Outside of the general

19    training that's listed on here, I think the only

20    certification would be as an anger management

21    instructor.  A certified anger management instructor.

22    BY MS. BLIESATH:

23         Q.   And what did you have to do to obtain

24    certification as an anger management instructor?

25         **A.   We attended a training course, an**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 12 of 87

1   **instructional course, through the Department.**

2       Q.   So that was put on by the department's

3   internal training staff?

4       **A.   I think it was somebody through Department**

5   **of Mental Health, if I remember correctly.**

6       Q.   I want to turn back to your resumé.  Looks

7   like in 2007, after you graduated with your bachelor's,

8   you started working as a probation and parole officer,

9   correct?

10       **A.   I worked first as an office support**

11   **assistant.  And then six months later as a Probation**

12   **and Parole officer.**

13       Q.   And just for ease of reference in the

14   record, I'm going to mark your resumé as Exhibit 2.

15       (Deposition Exhibit No. 2 was marked for

16   identification.)

17   BY MS. BREIHAN:

18       Q.   So Exhibit 2 is Bliesath 50 and 51.

19       Your first position with the Division of

20   Probation and Parole was essentially as a receptionist,

21   correct?

22       **A.   Correct.**

23       Q.   Was that here in the Central Office?

24       **A.   It was at the District 27 Probation and**

25   **Parole office, which is local to Jefferson City, but**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 13 of 87

1    not Central Office.

2         Q.   Understand.

3              And then after six months you became a

4    state Probation and Parole officer II, correct?

5         A.   A I and then a II.  It's like a step.

6         Q.   Step-up?

7         A.   Like, you're a probation officer I for a

8    period of time, and then you become -- after your

9    probationary period and such you become a II.

10        Q.   How long were you a probation and parole

11   officer I?

12        A.   I don't recall the exact time frame.  But I

13   want to say it was possibly between nine and -- nine or

14   18 months.  It's a step process.  It would be in

15   our -- in the department's records.

16        Q.   Did you receive any training when you first

17   started as a probation and parole officer I?

18        A.   Whatever is listed on our -- on my training

19   records would be -- that were relative to the

20   dates would be the trainings that we were given.

21        Q.   Do you recall what training you received?

22        A.   I don't recall without being able to look

23   at it.

24              (Deposition Exhibit No. 3 was marked for

25   identification.)

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 14 of 87

1 BY MS. BREIHAN:

2     Q.   Okay. So this document I will mark as

3 Exhibit 3, Bliesath 40 through 49.

4     So this is a -- looks like a training

5 record for you from when you first started with

6 Probation and Parole through the current date, correct?

7     **A.   Yes.**

8     Q.   So this would contain any training that you

9 received over your tenure with Probation and Parole,

10 correct?

11     **A.   It should, yes.**

12     Q.   And how did you generate or obtain this

13 report before today?

14     **A.   I contacted our training representative and**

15 **indicated I needed a copy of my full training record.**

16     Q.   Who's your training representative?

17     **A.   I emailed Shelly Graph. She's our -- the**

18 **person we're supposed to contact. I assumed she could**

19 **provide this for me.**

20     Q.   As a probation and parole officer, is

21 there, like, an annual training requirement you have to

22 meet?

23     **A.   We have to meet the departmental's**

24 **40 hours. When I first started it was 40 hours of**

25 **continual training. Then it went to 30 hours. And**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 15 of 87

1   then it went back to 40 hours annually.

2       Q.   And is there any sort of requirement

3   regarding what portion of that needs to be spent on

4   certain topics or issues?

5       A.   No.   There is mandatory training.   We do

6   mandatory safety training.   And discrimination,

7   harassment, and retaliation training every year.

8       Q.   So does the mandatory training count toward

9   the 40 hours?

10      A.   I believe so, yes.

11      Q.   And then whatever is left over that, after

12  that mandatory training, is it up to you to decide what

13  you want to attend to satisfy that 40-hour requirement?

14      A.   Yes.   Unless somebody requests we go to

15  something specific.

16      Q.   Has that happened in the last five years?

17      A.   No.

18      Q.   Is there ever a time where you have asked

19  to receive training on a certain issue and been told

20  you're not allowed to do that?

21      A.   No.

22      Q.   Has there ever been a time where you asked

23  to participate in a certain workshop training or

24  session you told you can't because of monetary

25  resources?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 16 of 87

1      A.    Not that I recall, no.

2      Q.    So you're currently a probation and parole

3   officer II?

4      A.    Yes.

5      Q.    Can you describe -- you've been

6   that -- let's do the math.  If you started as a

7   P & P I in 2007, you were there nine to 18 months, so

8   by 2009 you were a P & P II, correct?

9      A.    Yes.

10      Q.    Am I using the right acronyms?

11      A.    We just use PO.  It's different everywhere.

12      Q.    Okay.  So can you describe for me what your

13   duties are as a PO II?

14      A.    I'll refer to my resumé.

15            Main functions are to interview and assess

16   incarcerated offenders, and assist the parole board

17   when they're eligible for release in obtaining a viable

18   home plan.  And making certain they understand what's

19   required of them while on supervision in the community.

20      Q.    Okay.  So how do you assist in making and

21   maintaining a viable home plan?

22      A.    When we work towards home plans -- some

23   offenders provide us with home plans.  And I'll discuss

24   with them if they feel as though that's a good place

25   for them to go.  Their own personal opinions on that.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 17 of 87

 1          And then as long as they would meet the

 2    criteria that, you know, we would have set in place,

 3    which would be that, obviously, they know the person,

 4    you know, whatever is physical there.  You know,

 5    there's no drugs or alcohol in the home.  No weapons in

 6    the home.  Then we move on from that point.

 7          If they do not have a home plan, then we

 8    assist with providing them applications to various

 9    places.  I'll have them send the applications back to

10    me, and I'll fax them or email them to the facilities

11    so they don't have to use resources they may not have,

12    stamps, or something like that.

13          Then we'll assist with home plans in that

14    fashion only.  We've made phone contacts with people.

15    Whatever their needs are, we do our best to meet those

16    for home plans.

17     Q.   Your resumé states that you do case

18    management on an as-needed basis.  What does that

19    entail?

20     A.   I would say that would be outside of, you

21    know, we have phone calls that we get from other

22    people, employees in the department, like, at our

23    facilities that may have questions, or may have issues

24    that they want, you know, our feedback on.

25          It could be various things.  It's not very

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 18 of 87

1    specific.  It could be a range of things.

2         Q.   Then it states you also interview and

3    assess inmates for purposes of parole consideration;

4    is that fair?

5         A.   Yeah.

6         Q.   What percentage of your time do you spend

7    interviewing and assessing inmates for purposes of

8    parole consideration?

9         A.   We do file preparation before we meet with

10   the offenders.  And generally my interviews could last

11   anywhere from one to two hours.

12        Q.   So what percentage of your time on a weekly

13   basis would you say is spent doing file preparation

14   before you meet with an inmate?

15        A.   For one specific offender?  Or just in

16   general?

17        Q.   Cumulatively.

18        A.   I would say 80 percent of our job, our

19   time, is spent doing file preparations, interviewing

20   and typing the hearing reports.

21        Q.   Okay.

22        A.   And the interview process, 80 percent of

23   our time.

24        Q.   Who's your current supervisor?

25        A.   Scott Berkbigler.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 19 of 87

1    Q.    And what's his title?

2    **A.    District administrator II.**

3    Q.    Is he also stationed at Jefferson City

4    Correctional Center?

5    **A.    Yes, he is.**

6    Q.    Are there any other institutional -- strike

7    that.

8          So your resumé describes you as a state

9    probation and parole officer II.  Is that also referred

10   to as an institutional parole officer?

11   **A.    It is the same thing.  We are just housed**

12   **in the institution, whereas we have counterparts in the**

13   **field office.  So we're all the same job title, just**

14   **different locations.**

15   Q.    Are there other institutional parole

16   officers at Jefferson City Correctional Center?

17   **A.    Yes.  One other.**

18   Q.    Who's that?

19   **A.    Brad Denton.**

20   Q.    And how do you and Mr. Denton determine who

21   works with which inmates?

22   **A.    We have -- our caseloads are divided by**

23   **their DOC numbers.  The last digit of the DOC number**

24   **determines whose caseload.**

25   Q.    So, for example, he takes even or odd?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 20 of 87

1    A.   I have 1 through 4, and he has 5 through 9.

2  The last digit.

3    Q.   So you had mentioned that part of what you

4  do, 80 percent of your time is spent doing file prep

5  before interviewing an offender, or typing up the

6  prehearing report, correct?

7    A.   Uh-huh.

8    Q.   Can you walk me through what file prep you

9  do before meeting with an inmate?

10   A.   Sure.  We get their actual classification

11 file.  Some of our offenders have cases that are

12 obviously a lot older than the systems that we work

13 with.  And so there will be hard copy documents that

14 may not by in our system.  So we utilize those.

15        We go through the classification files.

16 Again, if there's limited information on the cases,

17 we'll Google search it and find lawsuits and such that

18 have case information.  Or newspapers.

19        We also utilize our system, the records

20 that are in our systems.  Case.net we use also.  And

21 then our interview with the offenders.

22   Q.   So the file prep, that's putting together a

23 parole file for an inmate, what are you doing?  What

24 are you preparing?  What's the file you're preparing?

25   A.   The prehearing report.  We -- basically

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 21 of 87

1   it's -- we go into an interview with knowledge of who

2   we're talking to.  And the information that we have.

3   And then we utilize that while we're interviewing the

4   offender.

5        Q.   So you're gathering information during this

6   file prep stage in order to guide or assist in the

7   prehearing interview; is that correct?

8        A.   Correct.

9        Q.   And do you refer to this file as, like, the

10  prehearing file or anything like that?

11       A.   No.  I don't know what you mean by that.

12       Q.   I didn't know if there was a term for it.

13       A.   We have a worksheet that we utilize.

14       Q.   Okay.

15       A.   It's basically meant -- it's a guide for us

16  to utilize.

17       Q.   Before you get to the worksheet, I just

18  want to focus on the prep stage, as you talked about

19  gathering the classification file, maybe doing a Google

20  search, accessing Case.net, and you pull that

21  information and you have that in a file in front of

22  you, correct?

23       A.   Not necessarily in a file, no.

24       Q.   So what do you do with that information

25  once you gather it?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 22 of 87

1    A.   Me, I will sometimes handwrite it.  Like,

2    information.  Or print it out, and it will just be like

3    this in a packet.  I don't physically place it in a

4    file and label and keep the file.  It's not -- it's

5    not -- it would be more so like a referral.

6    Q.   So if you print or handwrite any notes

7    during this file prep stage what do you do with those

8    notes?

9    A.   We have -- we were not given any

10   instructions prior to this.  I would generally keep

11   mine for approximately two months.  And that would be

12   in the event that there were questions about the

13   prehearing report, or at the time of the hearing, that

14   they needed us to refer back to something.  And then

15   beyond that we shred the document.

16        We have since then been instructed not to

17   do so.  Recently.  We just take that information on the

18   worksheet and put it in the prehearing report.

19   Q.   So other than the classification file, a

20   Google search or Case.net, do you go anywhere else to

21   prepare for the prehearing interview?

22   A.   The records that are in our system also.

23   There's some stuff in OPT II, MO-CIS, and FileBound

24   that is also accessible to us.

25   Q.   Are their files from OPT II, MO-CIS, or

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 23 of 87

1  FileBound that are not in the classification file?

2       A.   Sometimes.  Usually depends on the age of

3  the document.

4       Q.   So what kind of things might be in MO-CIS,

5  OPT II or FileBound?

6       A.   Since a lot of it is entered by people,

7  like, MO-CIS, we may find certificates that the

8  offenders have earned that may or may not be elsewhere.

9  Unfortunately we can find things in different areas.

10       Sometimes it's cross-posted.  It just

11  depends.  It would be a variety of things.

12       Q.   But there's no centralized program or

13  database where you could find everything essentially

14  that you're looking for on this inmate?

15       A.   Sometimes there is and sometimes there is

16  not.  Like I said, it depends on -- generally it

17  depends on how long the offender's been incarcerated.

18  Because previously, our system, our system only goes

19  back so far for, like, the digital copies.  And so

20  there may be things that are in FileBound, for

21  instance, that are not in our current system.

22       Sometimes they are in the classification

23  file also.  But that's not necessarily a guarantee.

24  That's why we look in all the locations.

25       Q.   So it's your practice in every instance to

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 24 of 87

1    look in the classification file, MO-CIS, OPT II, and

2    FileBound?

3         **A.   Yes.**

4         Q.   And would you make a note when you'd done

5    that so you know for reference sake?

6         **A.   Not necessarily.  No.  I've done it for so**

7    **long it's just practice for me.  I just do it each**

8    **time.**

9              **(Deposition Exhibit No. 4 was marked for**

10   **identification.)**

11   BY MS. BREIHAN:

12        Q.   And you talked about a worksheet.  I'll go

13   ahead and give you what I've marked as Exhibit 4.

14             Is this the worksheet that you use to

15   conduct the prehearing interview?

16        **A.   Correct.**

17             MR. CRANE:  I object for the record.  It's

18   not clear if you mean every prehearing report or only

19   certain prehearing reports.

20             MS. BREIHAN:  Got it.

21             Unless you're instructing her not to

22   answer, I would ask that you not make speaking

23   objections.  And if you're confused by a question, just

24   let me know.

25             So in light of your counsel's objection, do

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 25 of 87

1  you need to clarify your response to that question at

2  all?

3          THE WITNESS:  Yes.  This is the worksheet

4  that we utilize for offenders that are juveniles

5  serving life without sentences.

6  BY MS. BREIHAN:

7      Q.   How is it different from a non-juvenile

8  life without prehearing interview?

9      **A.   Without having the exact other worksheet in**

10 **front of me, I can't speak of specifics, other than the**

11 **information on this worksheet specifically addressed**

12 **the statute information.  And it looks like what would**

13 **be, like, the highlighted sections touching on their**

14 **age and maturity and such.**

15     Q.   And what is your understanding of why

16 there's this worksheet for juvenile offenders serving

17 life without parole?

18     **A.   It would be based off of the bill that was**

19 **passed.  And taking note of the age of the offender at**

20 **the time of the offense.  And the different factors**

21 **that are being considered.**

22     Q.   What's the bill you're referring to?

23     **A.   Senate Bill 590.**

24     Q.   And what's your understanding of

25 Senate Bill 590?  What's the impact of that bill?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 26 of 87

1      **A.     Can you clarify that?**

2      Q.    What's your understanding of what it did?

3   What the bill did or said?

4      **A.     It acknowledged that these were juvenile**

5   **offenders at the time they committed their offenses.**

6   **And now they are being considered for release, based on**

7   **the fact that they were juveniles at the time, because**

8   **of their maturity and so forth.**

9      Q.    And do you recall discussing Senate Bill

10  590 with anybody, whether it was other parole officers

11  or anyone else?

12     **A.     Only through the email correspondence that**

13  **we were provided.**

14     Q.    You're talking about the emails you brought

15  with you today?

16     **A.     Yeah.**

17     Q.    Do you recall when you first saw this

18  Exhibit 4, this juvenile life without parole worksheet?

19     **A.     Do I recall when I first saw it?**

20     Q.    Yes.

21     **A.     It would be following the notification that**

22  **these offenders would about able to petition for a**

23  **hearing and such.**

24          **I don't recall the exact date, no.**

25     Q.    I think there's an email that you brought

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 27 of 87

1  with you today that might refresh your recollection.

2  So it looks like there's an August 24th,

3  2016 email from Michelle Kasak to a bunch of

4  individuals, including Scott Berkbigler, attached to

5  this worksheet, and then Scott forwarded it to you and

6  Brad Denton on that same date.

7  Do you see that email?

8  **A.    Yes.**

9  Q.   Does that refresh your memory about when

10  you would have first seen this worksheet?

11  **A.    Yes.   Approximately August 2016.**

12  Q.   Did you discuss this worksheet with

13  Scott Berkbigler?

14  **A.    I don't recall having a conversation, no.**

15  Q.   Did you discuss it with Brad Denton?

16  **A.    We didn't probably discuss it until we had**

17  **our first occurrence.**

18  Q.   Your first hearing?

19  **A.    Yeah.**

20  Q.   Where you needed to use it?

21  **A.    Yeah.   I don't recall having a lengthy**

22  **conversation with him about it, no.**

23  Q.   What do you recall from that conversation?

24  **A.    Just that we have to use a specific**

25  **worksheet for the completion of it.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 28 of 87

1      Q.   Did you ever receive any training on how to

2  use this worksheet?

3      **A.   No.  Not to my knowledge.**

4      Q.   Did you ever have any questions on how to

5  use this worksheet?

6      **A.   No.**

7      Q.   Do you know, who's Michelle Kasak?

8      **A.   She is our regional administrator.**

9      Q.   Would she be Mr. Berkbigler's supervisor?

10     **A.   Correct.**

11     Q.   Do you know who created this worksheet?

12     **A.   I do not.**

13     Q.   And this is the worksheet you use every

14 time you conduct a prehearing interview with a juvenile

15 serving life without parole; is that correct?

16     **A.   Correct.**

17     Q.   Other than this worksheet, do you have any

18 written guidance on how to conduct those prehearing

19 interviews?

20     **A.   For those specific offenders?**

21     Q.   Yes.

22     **A.   No.**

23     Q.   Did you use this worksheet -- you already

24 testified today that you prepared the prehearing report

25 for Sidney Roberts, correct?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 29 of 87

1    **A.    I don't know that we specifically pointed**

2    **that out, but, yes, I did do his prehearing report.**

3    Q.    And do you recall having a prehearing

4    interview with Sidney Roberts?

5    **A.    Yes.**

6    Q.    Did you use this juvenile life without

7    parole, PHR worksheet, during your prehearing interview

8    with Mr. Roberts?

9    **A.    Yes.**

10    Q.    Was it your practice at the time when you

11    were doing a prehearing interview, and using this

12    worksheet, to make notes on the worksheet itself?

13    **A.    Yes.**

14    Q.    Would you also make notes separately?

15    **A.    Not generally, no.**

16    Q.    And what would you do with your notes on

17    the worksheet after the interview with the inmates?

18    **A.    We then would put it into the hearing**

19    **report.**

20    Q.    And then once you drafted the prehearing

21    report, what would you do with the worksheet?

22    **A.    With the worksheet, we -- I keep mine for**

23    **approximately two months and then I dispose of them.**

24    **There's never been an instance where we had to refer**

25    **back to them.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 30 of 87

1      Q.   Did you ever give an inmate a copy of the

2  worksheet?

3      **A.   No.**

4      Q.   And then after you use your draft for the

5  prehearing report, what happens to the draft of the

6  prehearing report?

7      **A.   It's turned in to our supervisor for**

8  **review.**

9      Q.   And that's Scott Berkbigler?

10     **A.   Yes.**

11     Q.   And he reviews it?

12     **A.   Correct.**

13     Q.   And gets back to you?

14     **A.   Yes.**

15     Q.   And do you recall him reviewing

16  Sidney Roberts' prehearing report that you drafted?

17     **A.   Not specifically.  But he would have had to**

18  **if it was finalized.**

19     Q.   Do you recall him having any changes or

20  edits to the draft?

21     **A.   No.**

22     Q.   How common is it for him to have changes or

23  edits to prehearing reports that you draft?

24     **A.   Not very often.**

25     Q.   And so after Mr. Berkbigler reviews a

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 31 of 87

1    prehearing report you drafted, what happens next to the

2    report?

3          A.    It's given to our clerical staff and they

4    final form the report.

5          Q.    What does that mean?

6          A.    Just takes a draft and makes it a final

7    document.  This document.

8          Q.    And then what happens with the report once

9    it's in final form?

10         A.    It waits there.  I mean, nothing happens to

11   it until the actual hearing.

12         Q.    So it stays --

13         A.    It's printed and signed and stays in the

14   file.

15         Q.    So it stays at the institution until the

16   parole hearing?

17         A.    It's not really a physical -- I mean,

18   there's a physical copy of the report, but the report

19   is accessible in OPT II in the computer system.

20         Q.    Okay.  An unsigned copy could be available

21   in the system, in OPT II, correct?

22         A.    Yes.

23         Q.    Would it be available in FileBound?

24         A.    I'm not certain on that.

25         Q.    Would it be available in MO-CIS?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 32 of 87

1      A.    No.

2      Q.    Would it be available in the inmate's

3   classification file before the hearing?

4      A.    No.  I'm not sure with FileBound.  I know

5   for certain not the others.

6      Q.    When you're doing your file prep, when you

7   actually interview the offender, do you calculate a

8   salient factor score?

9      A.    We calculate salient factor scores for the

10  majority of offenders, but not all.

11     Q.    What is a salient factor score?

12     A.    What is it?

13     Q.    Uh-huh.  What is it?  What does that mean?

14     A.    It utilizes -- it's an actual score.  I

15  think the range is negative -- I wanna say -- I'm not

16  sure of the exact lowest range -- up to, like, a

17  positive 9 or 10, or something like that.  And it's a

18  risk assessment based off of various different

19  variables.  I don't know all.  I think it's, like,

20  13 or 14 variables.

21     Q.    And what is it meant -- you said it is

22  meant to assess risk?

23     A.    Yes.

24     Q.    Risk to re-offend if the inmate were

25  released; is that fair?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 33 of 87

1          A.    I don't know about re-offending.  It's just

2     a -- the different factors.  I don't know exactly what

3     the risk they're stating is being determined, whether

4     it's re-offending or other things.

5               But it's, like, their age, and substance

6     abuse history, and recidivist-related crimes.  Things

7     like that.

8          Q.    And you said that you use the salient

9     factor score for the majority of inmates, but not all

10    of this them, correct?

11         A.    That's correct.

12         Q.    Which inmates do you not use the salient

13    factor score them for?

14         A.    Offenders serving 30 years -- over

15    30 years.

16         Q.    And why is that?

17         A.    It's our policy.  I don't have the specific

18    why to that.  I do not know.

19         Q.    No one's explained that to you?

20         A.    No.  I mean, it's just stated that if they

21    are serving a term of over 30 years a salient factor

22    score is not calculated.

23         Q.    Have you ever asked anyone why that is?

24         A.    No.

25         Q.    Aside from the salient factor score, are

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 34 of 87

1  there any other risk assessment tools that you use in

2  your job as a P oh?

3      **A.   No not as an institutional parole officer,**

4  **no.**

5      Q.   Are there risk assessment tools that a

6  parole officer might use out in the field?

7      **A.   To my understanding, yes.**

8      Q.   But there's not any other risk assessment

9  tools that are used when you're evaluating someone for

10  release, correct?

11      **A.   Correct.**

12      Q.   And because of all the juvenile offenders

13  impacted by Senate Bill 590 serving life without

14  parole, I assume, then, the salient factor is not used

15  for them, correct?

16      **A.   That is correct.**

17      Q.   So what risk assessment tool is used to

18  evaluate the juvenile life without parole inmates for

19  release?

20      **A.   I'm not aware of a specific tool.**

21      Q.   What evidence-based practices are used to

22  assess their readiness for release?

23      **A.   We utilize whatever is noted in the**

24  **worksheet as far as program participation.   Conduct.**

25  **And things of that nature.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 35 of 87

1    Q.   When you met with Mr. Roberts for his

2  prehearing interview was that the first time you'd ever

3  met with him?

4       **A.   I believe so, yes.**

5       Q.   And how long did you meet with him?

6       **A.   I don't recall the exact time, but**

7  **generally my interviews take one to two hours.  Some**

8  **longer, some shorter.**

9       Q.   And aside from what's in the worksheet, is

10 there anything else that you talk with the inmate about

11 during that prehearing interview?

12      **A.   If they have questions, I'll answer their**

13 **questions to the best of my ability.**

14      Q.   Do you talk to an inmate at any point in

15 time about whether or not they are hearing -- their

16 hearing will be in person or whether by video

17 conference?

18      **A.   No.  Our hearings are all held in person.**

19 **It's not like that at every facility, but it is at**

20 **ours.**

21      Q.   So inmates at Jefferson City Correctional

22 Center do not have an option to have their hearing by

23 video conference?

24      **A.   Yeah.  Ours are all done in person.  I**

25 **believe it's a location thing.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 36 of 87

1       Q.   Because you're probably the closest --

2       **A.   We're centrally located.**

3       Q.   Do you talk with an inmate during that

4  prehearing interview about the option to have a

5  delegate at the hearing?

6       **A.   Yes.**

7       Q.   What do you tell an inmate?

8       **A.   They're allowed to have one person there**

9  **on -- to spoke on their behalf at hearings.**

10      Q.   Do you tell them anything else?

11      **A.   Only if they have questions about it.**

12      Q.   And what's your understanding of the role

13  of this one-person delegate?

14      **A.   It is a support person for the offender.**

15      Q.   Are there restrictions, to your knowledge,

16  on what that delegate can speak about at the hearing?

17      **A.   At the hearing, we've been instructed what**

18  **support they can provide to the offender upon their**

19  **release.**

20      Q.   Instructed by whom?

21      **A.   Supervisory staff.  I mean, that's just the**

22  **understanding we've been told the delegate's role is.**

23      Q.   Do you remember who specifically told you

24  that?

25      **A.   I do not.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 37 of 87

1    Q.   Or when?

2    **A.   (The witness shook her head.)**

3    Q.   It's just sort of an understood custom and

4    practice that the delegate should only be speaking

5    about support upon release?

6    **A.   Yes.**

7    Q.   Have you talked with an inmate about

8    whether or not an attorney can appear as a delegate?

9    **A.   If they would ask me that, then, yes, I**

10   **would have addressed that.**

11   Q.   And what would you have told them?

12   **A.   If that's who they would like to have at**

13   **their hearing they can do that.**

14   Q.   Would you have told them it would be held

15   against them?

16   **A.   No.**

17   Q.   Would you have told them that there would

18   be restrictions on what the attorney would be allowed

19   to say?

20   **A.   I would just tell them that they would**

21   **be -- their role in the hearing is to verbalize what**

22   **support would be available to you upon your release.**

23   Q.   How many of these juvenile life without

24   prehearing interviews have you conducted?

25   **A.   I don't know the exact number I've done.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 38 of 87

1    But I can look at the names and tell you.

2              I believe I've done four.

3         Q.   Okay.  And could you just tell me who?

4         A.   ████████████   ████████████.  Sidney

5    Roberts.  And ████████████, I believe, are the only

6    four I've done.  I would have to double check that, but

7    I believe those are the only four I've done.

8         Q.   Can you remember when you did Jerry

9    Goforth's interview?

10        A.   I do not recall.

11        Q.   Was it summer or winter?

12        A.   I don't remember.  I just know that he was

13   not eligible for release due to a conflicting sentence.

14        Q.   What does that mean?

15        A.   He had incurred an offense while he was

16   incarcerated that had mandatory requirements outside of

17   this lawsuit, or this -- the Senate bill changes.

18        Q.   So what's your understanding of who, under

19   Senate Bill 590, was eligible for parole review?

20        A.   You mean, like, as in the ones that have

21   served 25 years and have petitioned the court?

22        Q.   That's your understanding?

23        A.   Yeah.  And were under the age of 18.

24        Q.   At the time of the offense, correct?

25        A.   Correct.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 39 of 87

1    Q.    Mr. ████ had served 25 years or more in

2    prison at the time you interviewed him?

3    A.    **Correct.**

4    Q.    But he wasn't eligible for release?

5    A.    **Based off of something different.**

6    Q.    Based off of some other sentence he had

7    received?

8    A.    **Correct.**

9    Q.    Even though he was a juvenile at the time

10   of his offense?

11   A.    **He still had his hearing, yes.**

12   Q.    He still had his hearing?

13   A.    **Yeah, he did.**

14   Q.    Why?

15   A.    **Because he petitioned the court and was**

16   **eligible for such.**

17   Q.    Right.

18         What's the point of having a hearing if

19   you're not even eligible for release?

20   A.    **That was his choice.**

21   Q.    When did you do Michael Vincent's hearing?

22   A.    **I don't recall the exact time period.**

23   Q.    When did you do Mr. ████ ' hearing?

24   A.    **September of this year.  He had a hearing**

25   **in October.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 40 of 87

1      Q.   And when did you do Sidney Roberts'

2   hearing?

3      **A.   Um, February of 2017.  I believe his**

4   **hearing was in March.  March of 2017 was his hearing.**

5   **And I did his stuff prior to that.  A month prior.**

6      Q.   Now, you talked about the file prep.  We

7   talked about some of the documents you looked at, the

8   Google, Case.net, FileBound, MO-CIS, or OPT II; do you

9   speak with the inmate's caseworker?

10     **A.   We do, yeah.**

11     Q.   You do?

12     **A.   That would be the collateral contacts.**

13     Q.   That's noted in the report?

14     **A.   Uh-huh.**

15     Q.   Do you speak with the inmate's

16  supervisor --

17     **A.   Yes.**

18     Q.   -- on the job, if they're working?

19     **A.   Yeah.  If they have a job.**

20     Q.   Do you speak with any, like, COs on the

21  housing unit where the inmate lives?

22     **A.   Usually the offender will send us people**

23  **they have a rapport with and we speak to them.**

24     Q.   Let's talk about the prehearing worksheet

25  in more detail.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 41 of 87

1           This is sort of the guidance -- the only

2    guidance for your prehearing interview for JL WOPers.

3    I'm just going to focus now on the highlighted bolded

4    font which seems to be specific.

5           **A.    On which page?**

6           Q.    The second page.

7           **A.    Okay.**

8           Q.    The extent of the defendant's participation

9    in the offenses.  Looks like the first highlighted

10   language.

11          How do you assess the extent of the

12   defendant's participation in the crime?

13          **A.    It is based off of the information that we**

14   **have available to us, as well as their**

15   **verbal recollection.**

16          Q.    What information do you mean?

17          **A.    What do you mean?**

18          Q.    You said it's "based off of the information

19   we have?"

20          **A.    Like the police reports.  Stuff related to**

21   **the present offense.  And then asking the offender**

22   **himself, what was your role in that offense.**

23          Q.    And where do you get the police reports

24   from?

25          **A.    Generally it's in FileBound or in their**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 42 of 87

1    classification file.

2         Q.    "Official" according to whom?

3         A.    It would be the police report.  Generally

4    the police report is in one of our documents at our

5    request for such.

6         Q.    Now, the information you have when you

7    begin the file prep for these JL WOP cases, is that

8    different from a non-parolable case?

9         A.    Not necessarily no.

10         Q.    Even though some of these men and women

11    have been serving, you know, 30 years, so that their

12    materials are very old, they still have the same amount

13    and kind of material?

14         A.    Usually, yeah.

15         Q.    And would you, if necessary, submit an

16    information request to a field officer for details

17    about the offense?

18         A.    Yes.  If it's not available.

19              (Deposition Exhibit No. 5 was marked for

20    identification.)

21    BY MS. BREIHAN:

22         Q.    Okay.  I'll show you what I've marked as

23    Exhibit 5.

24              Is this one of those information requests

25    to a field officer.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 43 of 87

1    **A.    Yes.   This is the response.   Yeah.**

2    Q.    And so this is one place where you would

3    get what you referred to as the official version of the

4    offense, correct?

5    **A.    Yes.**

6    Q.    And this is Bates-stamped 0278 through

7    0279.

8          The second factor on this worksheet is the

9    degree of the defendant's culpability in light of his

10   or her age at the time of their offense.

11         How would you assess the defendant's

12   culpability in light of their age?

13   **A.    Can you be more specific?**

14   Q.    Well, I assume when you sit down with an

15   inmate, and you're going through this worksheet, do you

16   go through line by line?

17   **A.    Yeah.   Not necessarily.   A lot of times**

18   **that stuff is discussed within conversation with the**

19   **offender.   And when they speak of their participation.**

20   **And then they can also -- then they generally will**

21   **speak of, like, their role in the offense.   And so that**

22   **kind of is captured there.**

23   Q.    What specific questions might you ask to

24   try to get a firm understanding of their culpability in

25   light of their age?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 44 of 87

1        A.   I don't recall an exact question that I

2   asked.

3        Q.   The next bolded and highlighted language is

4   the defendant's age, maturity, intellectual capacity,

5   and mental and emotional health and development at the

6   time of the offense.

7             How do you assess that?

8        A.   Well, of course we ask them their age.  And

9   then, you know, a lot of times what's discussed then

10  is, you know, what kind of life were they living at the

11  time.  You know, were you living in a home with your

12  parents?  You know.  Stuff like that.  Were you on any

13  mental health medications?  And things of that nature.

14       Q.   And how do you assess the defendant's

15  intellectual capacity was at the time of the offense?

16       A.   I don't recall an exact question or series

17  of questions that I would use for that.

18       Q.   Are there any records that you would look

19  at that would tell you what the defendant's

20  intellectual capacity at the time of the offense was?

21       A.   Not on every single case.  I have had some

22  of these cases where there were evaluations that were

23  completed that were available.

24       Q.   Now, at the end of all this you make a

25  recommendation in your report, correct?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 45 of 87

1      **A.     Uh-huh.**

2      Q.    About whether or not to grant release, and

3      if you deny it, how far to set the inmate back,

4      correct?

5      **A.     Yeah.**

6      Q.    So how does these factors impact your

7      ultimate recommendation?

8      **A.     I don't -- I don't know.  With this**

9      **case -- with these cases, I generally look at,**

10     **obviously, their age at the time of the offense.  And**

11     **through the conversation with the offender, what their**

12     **understanding was of consequence, and, you know, like**

13     **the finality of their decisions.**

14          **And then based of how they conduct**

15     **themselves now is what I would base my recommendation**

16     **on.  Partially.  Not totally.**

17     Q.    So how would it impact your decision if

18     you're dealing with an inmate who had a low-average IQ

19     level at the time of the offense?

20     **A.     I would think that that plays a role in it,**

21     **yes.**

22     Q.    What role?

23     **A.     I think it's a factor.  And I think that**

24     **goes back to understanding the consequences for your**

25     **actions.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 46 of 87

1    Q.   And we kind of got sidetracked; how do you

2    assess mental and emotional health at the time of the

3    offense?

4    **A.   Essentially what we would ask them, what**

5    **were you going through during that time of your life?**

6    **Because since we don't have that documented, we have to**

7    **get that information from them.**

8    Q.   What do you mean you don't have that

9    documented?

10   **A.   Meaning it's not something I can refer back**

11   **to on every single case so we get it from asking**

12   **questions.**

13   Q.   Do you recall in any of the four prehearing

14   interviews you conducted whether there were any expert

15   records or psychology evaluations from when those men

16   went to trial?

17   **A.   There were on some, yes.**

18   Q.   Who?

19   **A.   I don't recall all of them.**

20   ████████████**, his did.  I don't know about**

21   **the others, though.  I can't remember.  It's been a**

22   **while.**

23   Q.   How many prehearing interviews do you do on

24   a weekly basis would you say?

25   **A.   It varies.  Approximately ten to 12 a**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 47 of 87

1    month.  And that's not every month.

2         Q.   In getting your master's or bachelor's, did

3    you take any courses in psychology?

4         A.   Yes.  Psychology, yes.

5         Q.   What courses did you take?

6         A.   Without having any transcripts, I don't

7    recall the exact courses.

8         Q.   Fair to say that you don't recall anything

9    specific from those courses either?

10        A.   No.

11        Q.   How did you assess effective familial

12   pressure or peer pressure on the defendant's actions?

13        A.   By asking him.

14        Q.   Ask him what?

15        A.   I don't have the exact questions.  Again,

16   really, it would be if they were involved in

17   gang-related activities.  Or if their families were

18   involved in such.  What their role was in that.  Or

19   that's generally what I would use.

20        Q.   What if an inmate is not competent to

21   answer them, then how would you assess them?

22        A.   I've not been met with that so I don't

23   know.

24        Q.   Have you received training on how to handle

25   that situation?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 48 of 87

1        A.    No.

2        Q.    How do you assess the likelihood for

3    rehabilitation of the defendant?

4        **A.    In what regard?**

5        Q.    Do you consider when conducting this

6    prehearing report whether the inmate has a strong

7    likelihood for rehabilitation?

8        **A.    Yes, I would think it's based off of their**

9    **program participation, and, you know, the positive**

10   **rehabilitative efforts they've made when they've been**

11   **incarcerated.  Good adjustment.**

12       Q.    Anything else?

13       **A.    I can't think of anything specifically, but**

14   **I'm sure there's others.**

15       Q.    What does good adjustment mean?

16       **A.    If they have what we would consider good**

17   **institutional adjustment.  Their conduct violations.**

18       Q.    So number of conduct violations?

19       **A.    Could be number.  Severity.**

20       Q.    So someone serving 25 years in prison, how

21   many conduct violations would they have to have before

22   they're no longer considered having a good adjustment?

23       **A.    There's not a set number.**

24       Q.    There's no standard?

25       **A.    It's not like there's a chart anywhere that**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 49 of 87

1   says if they have 25 or less they're this or not.

2       Q.   You also mentioned program participation as

3   being the other element in assessing likelihood for

4   rehabilitation.

5            Do the programs that are offered, do they

6   vary from institution to institution?

7       A.   I believe so, yes.

8       Q.   Do you know whether there's any sort of

9   priority for certain inmates to receive trainings or

10  courses?

11      A.   I don't know that, no.

12      Q.   Are you aware of whether inmates serving

13  life without parole sentences might be sort of the

14  bottom of the list?

15      A.   I don't believe so.

16      Q.   Okay.

17      A.   I've not been told that.

18      Q.   Do you take into consideration access to

19  programming and evaluating that?

20      A.   Yes.  We know there's a wait list and

21  things like that.  Limited opportunities.

22      Q.   How do you assess subsequent growth and

23  increased maturity since the offense?

24      A.   I would have to say it's -- the majority is

25  done so through conversation with the offender.  And,

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 50 of 87

1 you know, you can see patterns of behavior through

2 their conduct violations and their rehabilitative

3 efforts over the course of the years that they're

4 there.

5      Q.   And when you're evaluating something like

6 an inmate's institutional record, do you look at that

7 differently when that person is a juvenile offender,

8 now being an adult, but was under 18 at the time of the

9 crime, as opposed to someone who was an adult at the

10 time of their crime?

11      A.   I do a little bit, yes.

12      Q.   How so?

13      A.   Um, I do it as more of an empathetic

14 approach.  That I can at least acknowledge that coming

15 in as a juvenile with a sentence structure of life

16 without could be extremely overwhelming, and trigger

17 certain behaviors, so I understand that.

18      Q.   And I'm sure --

19      A.   I can say that I should.  I can't say I

20 understand; I haven't been there.

21      Q.   And juvenile offenders are most likely to

22 be preyed upon, correct?

23      A.   I don't know that for certain, but I would

24 say it's a possibility, yes.

25      Q.   Do you review any sort of medical records

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 51 of 87

1  or mental health records in preparing your prehearing

2  report?

3      A.   We do, of course, have access to -- a

4  mental health memo is provided to us if they received

5  mental health services.

6      Q.   So aside from a mental health memo being

7  provided to you, do you review any other mental health

8  records before doing the prehearing report?

9      A.   If they're receiving current services we

10 have access to the memo they provide to us at the time

11 of the hearing.

12          If there's any record of mental health

13 services that's in the file, then, yes, we would have

14 that.

15     Q.   Do you review any medical records, other

16 than mental health records, in preparing the prehearing

17 report?

18     A.   We generally -- no.  We have access to

19 their medications that they're prescribed.  If they

20 have any illness or anything like that they generally

21 report it to us.

22     Q.   Do you have access to their education

23 records?

24     A.   I believe what we have is limited.  But I

25 think they do have.  We do have access to, like, their

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 52 of 87

1    IQ score.  I don't know when that would have been done.

2    I believe they do it when they come in.  I'm not a

3    hundred percent sure on that though.

4         Q.  You don't conduct an IQ test in conjunction

5    with your prehearing report, do you?

6         A.  No.

7         Q.  So if there was an IQ score it's likely

8    from when they were committed to the Department of

9    Corrections, correct?

10        A.  Or if there was something else throughout

11   their incarceration that they would have needed one for

12   something.  Whether they did testing or something, I

13   don't know the circumstances of what would trigger one

14   of those to be done.

15        Q.  Do you know what a SACA score is?

16        A.  Yeah.

17        Q.  What's that?

18        A.  It's based off of -- it's a substance

19   abuse-related score that's based off of different

20   factors regarding their history of abuse with drugs and

21   alcohol.

22        Q.  Is that something you calculate?

23        A.  We do calculate that, yes.

24        Q.  And do you calculate that before or during

25   this prehearing interview process?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 53 of 87

1    A.   I generally will review it if there's

2 something in the computer beforehand; otherwise, it's

3 conducted at the time of the hearing interview, or

4 post-hearing interview.

5    Q.   So if there's --

6    A.   I don't do mine before.

7    Q.   Understood.  So if there's a SACA already

8 in the record you don't calculate it again?

9    A.   Yes, we do.  I'm just saying I don't use

10 the one that's already there.  If there was one in

11 there from a previous reviewer, I would recalculate it.

12    Q.   And how, if at all, do you change your

13 approach during this prehearing interview if you're

14 dealing with an inmate who has a low IQ?

15    A.   I would say just the form of questioning.

16 That, I've not been met with somebody that has been so

17 low functioning that it's -- needed intervention from

18 an exterior source or anything like that.  So ...

19    Q.   Do you check their IQ score or educational

20 records before the interview so you know whether or not

21 they're going to need assistance?

22    A.   Yes.  We're aware of their educational

23 level, yeah.

24    Q.   And you haven't encountered an instance

25 where you felt like that outside assistance was

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 54 of 87

1   necessary?

2          A.    No.

3          Q.    And you said their educational score, are

4   you talking about the E-score?

5          A.    Their E-score.  And then also through file

6   preparation, I can see when they last reported dropping

7   out of school, or getting kicked out of school, or what

8   they've completed educational-wise.

9          Q.    And how does that impact your

10  recommendation?

11         A.    The recommendation as the report?

12         Q.    Uh-huh.

13         A.    Their educational level, I would say it's a

14  factor.  But I would say, yeah, it's a factor in the

15  decision.  I don't know the weight of that specific

16  factor.

17                (Deposition Exhibit No. 6 was marked for

18  identification.)

19  BY MS. BREIHAN:

20         Q.    I'm going to hand you what I've marked as

21  Exhibit 6.  It's Bates-stamped AGO26844 through 2856.

22                Do you recognize this document?

23         A.    Yes.

24         Q.    What is it?

25         A.    Mr. Roberts' prehearing report.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 55 of 87

1      Q.    This is the report that you prepared and

2   Mr. Berkbigler approved?

3      **A.    That's correct.**

4      Q.    Do you recall the date that you prepared

5   this report?

6      **A.    I would say on or around February 14th of**

7   **2000 -- that should say 2017.**

8      Q.    So it says 2014?

9      **A.    Yeah.  It's a typo.  Should be 2017.  On**

10  **the last page.  It was created 2-14-17.**

11     Q.    It doesn't indicate any minimum eligibility

12  date; why is that?

13     **A.    It is noted.  Should be.  The one I have is**

14  **dated 2-14-17.  It's finalized on a different day.**

15     Q.    My question was why is the minimum

16  eligibility date blank?

17     **A.    That, I cannot answer.  It should reflect**

18  **the 25-year minimum.**

19            **I was seeing if it was noted elsewhere.**

20     Q.    And there is no salient factor score listed

21  because Mr. Roberts is serving life without parole?

22     **A.    Yes.**

23     Q.    And, to your knowledge, his sentence hasn't

24  changed, correct?

25     **A.    That's correct.**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 56 of 87

1      Q.    Why is there no guideline date or guideline

2  range indicated here?

3      **A.    That is generated from the salient factor**

4  **score.**

5      Q.    Again, it's because it's inapplicable?

6      **A.    Right.  And they would have already passed**

7  **anyways if they were calculated.  For his sentence**

8  **structure if they were to calculate something like that**

9  **those dates have already passed.**

10     Q.    Because he'd already served 25 years?

11     **A.    Yeah.  That would have went beyond the**

12  **guideline calculations.**

13     Q.    So I think we marked as Exhibit 5 this

14  investigation reply from 2007 (sic) which contains a

15  summary of the circumstances of the underlying offense.

16     **A.    Right.**

17     Q.    And if you look at the first section on

18  your report, which is criminal history, and this

19  subsection of present offense, it looks like it's

20  basically copy and pasted from that investigation

21  reply; is that fair?

22     **A.    The majority of, yes.  I generally**

23  **don't -- I try not to copy and paste.  I'll retype it.**

24  **But, yeah.**

25     Q.    Did you do anything to fact-check the

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 57 of 87

1    summary of the underlying offense against this

2    investigation reply that's marked as Exhibit 5?

3           **A.    No.**

4           Q.    Did you send an updated information request

5    out to the field to get an updated summary of the

6    offense?

7           **A.    No.**

8           Q.    And on the third page of your report it

9    lists a co-defendant as ███████████; do you see that?

10          **A.    Uh-huh.**

11          Q.    What's a co-defendant mean to you?

12          **A.    That is another person that was a**

13   **participant in the said events.**

14          Q.    And where would you have gotten

15   ███████████?

16          **A.    I believe Sidney Roberts gave it to me.**

17          Q.    Do you recall talking to Mr. Roberts about

18   the underlying offense?

19          **A.    Uh-huh.  I mean, not -- it's been a while.**

20   **By reading it I can vaguely remember some things.**

21          Q.    Do you recall generally it was essentially

22   a fight started by the victim one night outside of a

23   liquor store?

24          **A.    Uh-huh.**

25          Q.    And the fight seemed to escalate with

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 58 of 87

1    ██████████████ eventually providing a gun and beating

2    the victim with a gun, correct?

3        **A.    According to our records, the witness**

4    **identified Roberts as the suspect who had taken the gun**

5    **from** ████████ **, or from** ████████████ **hand, and pulled the**

6    **trigger five times.**

7        Q.   So if you look on the second page of your

8    report, starts on 9-21-88, that paragraph.

9        **A.   Mm-hmm.**

10       Q.   It says that, "Mr. Roberts walked over to

11   an adjacent vacant lot and picked up a beer bottle.

12   And while he was doing this, ████████ was beating and

13   kicking the victim, and then ████████ pulled a gun from

14   his waistband."

15       **A.   Correct.**

16       Q.   Okay.  Did it matter to you at all that the

17   victim was the one who initiated the altercation that

18   night?

19       **A.   What do you mean did it matter to me?**

20       Q.   Well, part of what you're doing is trying

21   to assess a number of factors, including Mr. Roberts'

22   culpability, his role in the offense, what, you know,

23   whether his youth had any impact on that.  And so I

24   assume that a lot of the interview discusses the

25   circumstances of the offense, correct?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 59 of 87

1    **A.    Correct.**

2    Q.    And so in doing that assessment of the

3    various factors that you're required to do under 590,

4    did you give any consideration to the fact that the

5    victim initiated the altercation that night?

6    **A.    I don't know specifically what**

7    **consideration I would have given that.**

8    **We aren't, you know, we don't retry the**

9    **case with the offender through discussion.  So I don't**

10   **know exactly.  I can't tell you what my measure of**

11   **consideration would have went into the victim's role in**

12   **that offense.**

13   Q.    Did you give any consideration to the fact

14   that it was ███████████ who provided the weapon that

15   night and not Mr. Roberts?

16   **A.    Um, I can't say, again, what level of -- I**

17   **would have given to ███████████ being as Roberts**

18   **admitted to firing the firearm.**

19   Q.    Did you give any consideration to the role

20   of the other people there that night?

21   **A.    I think I was aware of the fact that, yes,**

22   **Roberts had indicated -- yes -- yes, there were others**

23   **that were present.**

24   Q.    And one of the things on this worksheet

25   that's highlighted in bold is the effect of peer

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 60 of 87

1    pressure on the defendant's actions?

2        **A.   Correct.**

3        Q.   So I'm just trying to understand how you

4    considered and weighed, if at all, the fact there were

5    other people present, the victim initiated the

6    altercation, and David Walters was the one that

7    provided a gun that night.

8        **A.   I would say, yes, it was taken into**

9    **consideration that Mr. Roberts did not have the firearm**

10   **to begin with.**

11        **Now, what, he never indicated what his**

12   **co-defendant was verbalizing to him, so I don't know**

13   **the level of verbal peer pressure that was there at the**

14   **time.**

15        Q.   Did you ask Sidney about that?

16        **A.   Whether or not** ██████████ **was**

17   **verbalizing instructions to him?**

18        Q.   Or whether there was verbal peer pressure,

19   as you termed it?

20        **A.   No.  He did not mention it.  Generally,**

21   **like I said, they will generally tell us.**

22        Q.   And you use the words "verbal peer

23   pressure."  Is there other kinds of peer pressure?

24        **A.   I'm sure there is.**

25        Q.   You seem to make the distinction.  Can you

Pohlman USA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 61 of 87

1    explain what the distinction is?

2          **A.    Someone verbalizing him to, "Here, shoot**

3    **him."**

4                **I'm sure there is some unspoken pressures**

5    **that maybe somebody was feeling, but I don't know that**

6    **for certain.**

7          Q.   And why was Senate Bill 590 instructing

8    you, and other IPOs, to consider the effective peer

9    pressure on the defendant's actions in these juvenile

10   offender cases?

11         **A.    Why was it?**

12         Q.   Why is that important?

13         **A.    I would say because it's very likely that**

14   **peer pressure could be a factor.**

15         Q.   Any other reason?

16         **A.    No, not specifically, I guess.   No.**

17         Q.   Do you remember asking Sidney questions

18   about his home life growing up?

19         **A.    Yes.   I believe so.**

20         Q.   Do you remember him telling you that his

21   father was verbally and physically abusive toward both

22   him and his mother?

23         **A.    I will need to look at it.**

24                **(The witness reading document.)**

25                **Yes.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 62 of 87

1       Q.    So you recall Sidney telling you that 

2       ████████ was verbally and physically abusive and was

3   addicted to crack cocaine?

4       A.    Yes.

5       Q.    How did that impact your recommendation in

6   this case?

7       A.    As far as a specific impact, I would say it

8   was a factor that was considered.  I don't know that it

9   would have been a huge factor in my recommendation.

10      Q.    Is there anything that would have been a

11  huge factor in your recommendation?

12      A.    In the actual recommendation, I would

13  state -- I would think that everything that is

14  discussed throughout our interview with Mr. Roberts and

15  in the report is something that is taken into

16  consideration.  And so it's difficult to say how much

17  each piece plays, as far as, like, you know, on a

18  percent of 1 to 100, how much each piece carries.

19            I would say they're all considered.  And

20  you know, is part of it.  But I can't say that one has

21  this much more weight over the next one versus the

22  following.

23      Q.    Okay.  And you indicate that Sidney was not

24  involved in a gang, correct?

25      A.    That is what he told me, correct.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 63 of 87

1        Q.    Do you have reason to believe otherwise?

2        **A.    No.**

3        Q.    You do indicate he liked to go roller

4   skating with friends.

5              Are you suggesting in your report that that

6   was some sort of gang he was in?

7        **A.    No.**

8              MR. SPILLANE:  I'm going to object to the

9   argumentative form of the question.

10             You may answer.

11  BY MS. BREIHAN:

12       Q.    You can answer.

13       **A.    Can you say it again?**

14       Q.    Sure.

15             You indicate in your report that

16  Sidney would go roller skating with friends.

17             Are you suggesting there that was some sort

18  of gang he was running with?

19       **A.    No.  He reported that.**

20       Q.    He reported what?

21       **A.    He said he and some other kids from the**

22  **neighborhood would be a dancing group and were**

23  **roller skating.**

24       Q.    So I guess my question is, why would you

25  include that in the same sentence when you're talking

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 64 of 87

1   about gang affiliation?

2       A.   That's what he reported.  "Were you

3   involved in a gang?"  "No."  "However, he acknowledged

4   that he and some kids from the neighborhood were a

5   dancing group and would go roller skating."

6            Those were his words.  Not mine.

7       Q.   One of the things that you talked about was

8   considering his age at the time of the offense,

9   correct?

10      A.   Mm-hmm.

11      Q.   Do you consider at all that the age of the

12  person you're interviewing, at that time, at the time

13  of the interview?

14      A.   You mean the fact that he's now in his

15  forties versus the 15-year-old self?

16      Q.   Yeah.

17      A.   I would say the thought process related to

18  the present offense, and into his institutional time,

19  yes.  But if we're looking at his rehabilitative

20  efforts, then you have to look at it since the time of

21  the events.

22      Q.   What about risk to re-offend, are you aware

23  of any pattern or trend in risk to re-offend and how it

24  might vary over age?

25      A.   Based off my experience, I would say

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 65 of 87

1  there's really not a definite, you know, an age where,

2  you know, if someone is older they will never re-offend

3  versus someone who is younger.

4          Based on what I've experienced, there's not

5  a set -- is that what you're trying to say?  Is there a

6  certain age that exists that we don't think it would

7  ever happen again?

8      Q.   No.  My question is, is there a trend of

9  risk to re-offend over a person's life?

10         So does a 50-year-old person released from

11 prison pose the same risk to re-offend, all else being

12 equal, as a 20-year-old being released from prison?

13     A.   I can't say that.

14     Q.   How old are you today?

15     A.   I'm 33.

16     Q.   Would you say that you were a little bit

17 more impulsive when you were 16 years old than you are

18 today?

19     A.   I don't know what my impulsivity has to do

20 with this, but, no.  Me personally, no, I do not.

21     Q.   Okay.  And you note some of the conduct

22 violations that he received during his incarceration,

23 correct?

24     A.   In which section?

25     Q.   Looks like in aggressivity but also in

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 66 of 87

1    institutional status.

2         A.    In the aggressivity section I would note

3    the offenses that were assault-related or aggressive in

4    nature.   And then the following would be his conduct as

5    a whole.

6         Q.    Got it.   Thank you.

7              So looks like the last conduct violation

8    you indicate that was aggressive in nature was in 2008?

9         A.    I believe so, yes.

10        Q.    So he'd gone nine years without an

11   assault-related conducted violation?

12        A.    That's correct.

13        Q.    But you indicate that his adjustment was

14   only fair.   Why would that be the case?

15        A.    I indicated, "He received the following

16   violations overall.   Based on the volume of his

17   violations his adjustment would be considered fair."

18             For me, that would be taking into

19   consideration the amount, and the fact that he had not

20   had any in the eight years that you mentioned.

21        Q.    Do you remember how many conduct violations

22   he had over his 28-and-a-half years in prison at the

23   time that you met with him?

24        A.    I would have written the number down, but I

25   don't have it noted in his hearing.   I could count them

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 67 of 87

1   for you.

2       Q.   But the ones listed on page 6 through 9 of

3   the report, that's every single conduct violation he

4   received?

5       **A.   It should be, yes.**

6       Q.   I think it's 33 or 34 conduct violations.

7           Would you consider that to be a lot for

8   someone who was incarcerated for 29 years and

9   incarcerated at a young age?

10      **A.   I don't know that there's an actual number,**

11  **a scale, number scale, what's a lot or not a lot.  But**

12  **I've seen worse.  And I've seen better.**

13      Q.   That much is clear.  I'm just trying to get

14  an idea, to the extent I can get inside your head, to

15  understand how you assess that.  If you look at the

16  record and you say, "Oh, he's got 33 violations," what

17  does that mean to you?

18      **A.   I think quantity-wise the number is not as**

19  **important as is to the nature of the violations.  So I**

20  **would say that was probably what titled to fair rather**

21  **than good.**

22      Q.   Does it matter at all to you the trend over

23  time of those conduct violations?

24      **A.   Meaning his improvement?**

25      Q.   Meaning, for example, I think nearly

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 68 of 87

1  two-thirds of every violation Sidney received was when

2  he was in his twenties, in the 1990s, when he was much

3  younger, when prison was a different place; did that

4  make any difference to you?

5      A.   I would say that he had -- yes, he had

6  violations in the '90s.  But his violations -- I mean,

7  they were similar in the two-thousands as they were in

8  the '90s.

9      Q.   What do you mean they were similar?

10     A.   The violations were similar in nature, up

11  to 2008, as they were in the 1990s.  So I don't know

12  that that would be -- yes, he had violations early on.

13  I understand that.  But those behaviors continued up

14  until much more recent than the 1990s.

15     Q.   So how long, in your opinion, would

16  somebody have to go without an assault-based conduct

17  violation in order to have a good adjustment?

18     A.   Um, I think I acknowledge that his

19  adjustment was improved.  And, again, you know, I noted

20  in my report that the reason that I considered it to be

21  fair is because of the nature of the violations.

22          And he acknowledged he had poor coping

23  skills at the time that he was receiving these

24  violations.

25     Q.   Yeah.  I understand the part of the nature

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 69 of 87

1  of the violations.  But you already testified the last

2  time he received an assault was nine years before your

3  prehearing interview, correct?

4      **A.    Yes.**

5      Q.    So how long would he have to go without one

6  of those assault-based violations in order to have

7  better than fair institutional adjustment?

8      **A.    I don't know that there's a time period on**

9  **that.  Again, there's not a scale for that.  Or a**

10 **chart.**

11     Q.    On page nine you talk about Sidney working

12 in the clothing factory, and prior to that in food

13 service, correct?

14     **A.    Mm-hmm.**

15     Q.    Do you recall speaking with Sidney's

16 supervisor at the clothing factory?

17     **A.    On page 10, it indicates it included**

18 **"multiple letters of support from various staff**

19 **members.  The majority were from his work supervisor**

20 **noting his employability and hard work."**

21          **If he provided letters to us, I may not**

22 **have had physical phone notification to them if he**

23 **submitted support letters to us.**

24     Q.    So do you recall speaking with Sidney's

25 supervisor at the clothing factory?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 70 of 87

1    A.    Not via phone.  I could have.  I don't

2    recall though.

3    Q.    Do you recall speaking with Sidney's

4    supervisors in food service?

5    A.    I do not recall speaking to them.

6    Q.    And then in the education section it says

7    E-1.  What does E-1 indicate?

8    A.    He is educationally prepared.

9    Q.    What does that mean?

10   A.    He has a high school equivalency or

11   something greater than such.

12   Q.    It doesn't indicate his IQ level, does it?

13   A.    No.

14   Q.    It does indicate he completed the tenth

15   grade?

16   A.    That's what he reported to me, yes.

17   Q.    Did you check the records to confirm that?

18   A.    If we had them available to us.

19   Q.    Do you recall if you checked the records?

20   A.    I cannot recall.

21   Q.    Do you recall seeing any diagnostic report

22   that was completed around the time that Sidney was

23   first committed to the Department of Corrections in the

24   80's?

25   A.    It's very possible, but I don't recall

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 71 of 87

1  **specifically.**

2      Q.   Do you recall seeing a report that

3  indicated that functionally, when he was committed to

4  the Department of Corrections, that he was at a

5  sixth-grade level?

6      **A.   I don't recall.**

7      Q.   Would that have any impact in your

8  recommendation and report?

9      **A.   Again, it's another factor that would be**

10  **part of the record, yes.**

11      Q.   Would it have any impact in your

12  recommendation in your report?

13      **A.   Specifically, I can't state what -- I can't**

14  **state how much of an impact it would have made, being**

15  **he is educationally prepared at this point.  It would**

16  **not be considered a liability for future.**

17      Q.   Well, there's sort of two things going on,

18  right?  I mean, you're doing an assessment as to the

19  person you see before you that day, correct?

20      **A.   Right.**

21      Q.   But in these hearings you're also doing an

22  assessment of what they were like 25 or 30 years ago,

23  too, correct?

24      **A.   Right.**

25      Q.   And so part of that is evaluating, among

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 72 of 87

1   many other their things, their intellectual capacity at

2   the time of the offense, right?

3        **A.   Right.**

4        Q.   And so if he was not in school, had just

5   completed tenth grade, and was at a sixth-grade

6   comprehension level, how would you weigh that factor in

7   assessing his intellectual capacity at the time of the

8   offense?

9        **A.   It may have been in the report just in that**

10  **specific location.**

11       Q.   What kind of evaluation would you give it,

12  if you saw that information, the sixth-grade

13  comprehension level?

14          What's your thought process as far as

15  assessing the circumstances of the offense in light of

16  that information?

17       **A.   I mean, if we're talking about the**

18  **educational section of this report, then we may or may**

19  **not get into that part of it.  This is more of a layout**

20  **of his educational background, not what you're speaking**

21  **of.**

22       Q.   So where in this report, then, does it

23  indicate an assessment of his intellectual capacity at

24  the time of the underlying offense?

25       **A.   It would have to be through discussion with**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 73 of 87

1  him.  And in the assessment recommendations sections.

2          My report looks different than yours.

3          Can you state your question again?

4          MS. BREIHAN:  Can you read it back, please.

5          (Whereupon, the last answer was read back

6  by the reporter.)

7          THE WITNESS:  I don't know that it states

8  specifically, without sitting here reading the actual

9  report word for word.

10         MR. SPILLANE:  Can we go off the record

11 before you ask another question?

12         (An off-the-record discussion was held.)

13 BY MS. BREIHAN:

14     Q.  So in the report it doesn't reference his

15 intellectual capacity at the time of the offense?

16     A.  Other than what he would have reported to

17 me, no.

18     Q.  Which is in this education section on page

19 nine of the report?

20     A.  Or when we talked about the social stuff

21 with his family, and things of that nature, his

22 involvement with extra-curriculars.

23     Q.  So let's go to the assessments

24 recommendation the very bottom of page 11, AGO8254.

25         You indicate that this Sidney's first

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 74 of 87

1  felony incarceration, correct?

2      **A.    Yes.**

3      Q.    A 45-year-old man.  He was sentenced for an

4  offense that he committed when he was 17 years old,

5  correct?

6      **A.    Mm-hmm.**

7      Q.    He accepts full responsibility for the

8  offense, correct?

9      **A.    Yes.**

10     Q.    And he acknowledges knowing right from

11 wrong; however, he said he never once took into

12 consideration what the consequences of his actions

13 would be.

14            Why were you noting that?  Why was that of

15 importance to you?

16     **A.    He acknowledged that.  That's why.**

17     Q.    So you just wrote down everything that he

18 said?

19     **A.    As much as -- yeah, when discussing that.**

20 **He stated that he knew right from wrong.  But, again,**

21 **he said that, you know, when you're 17, he didn't**

22 **understand the full consequences of his actions.**

23            **Those would be his --**

24     Q.    This is the assessment and recommendation

25 by you, correct?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 75 of 87

1      **A.    Right.**

2      Q.    So I assume that some of what he said

3   you're putting through a filter to figure out what's

4   important for making your recommendation, correct?

5      **A.    I would say that's fair.**

6      Q.    So it's safe to assume then, that this

7   observation, that while Sidney might not have known

8   right from wrong, he didn't take into account the

9   consequences of his actions.  That was important to you

10  in some way, correct?

11     **A.    Yes.**

12     Q.    What role did it play in your decision?

13  How much weight did you give that?

14     **A.    I would say that's a pretty significant**

15  **piece of it.**

16     Q.    And can you elaborate?  Does it weight in

17  favor of giving him an outdate or weigh in giving him a

18  setback?

19     **A.    I think it's a piece of it.  I can't say**

20  **that that solely would be something that would, yes,**

21  **absolute, or, no, absolute.  I can't say that.**

22     Q.    I'm not asking you to.  I don't think that

23  your testimony here today would indicate that that was

24  the deciding factor.

25            But if you had a scale, and one side of the

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 76 of 87

1  scale was, "I'm going to give him a recommendation for

2  release," and the other side was "I'm going to

3  recommend for a reconsideration hearing," and you have

4  a little chunk that represents that fact, that he knew

5  right from wrong, but didn't think about the

6  consequences, what side of the scale would you put that

7  on?

8      **A.   That would lean more toward taking into**

9  **consideration that information.  I can't say that it**

10  **would be -- I can't put an exact value on it, other**

11  **than it is something that I did take into consideration**

12  **when making my recommendation.**

13      Q.  But you can't say today how you took it

14  into consideration?

15      **A.   What -- I feel like you're wanting me to**

16  **say that that has to be, you know, whatever titled the**

17  **scale.  And I can't say absolutely that because he**

18  **acknowledged that he may not have understood the**

19  **consequences, that that was an absolute one way or the**

20  **other.**

21      Q.  I'm not asking you to say how it tilted the

22  scale.  I mean, you thought about this.

23      **A.   It was a factor, yes.**

24      Q.  Right.

25      So was it a factor in favor of his release?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 77 of 87

1  Or in favor of a reconsideration?

2      **A.   It wasn't a factor that acted alone.**

3      Q.   I understand that.  Part of the formula in

4  your head, right?

5      **A.   Right.**

6      Q.   So did it weight in favor of

7  reconsideration, or in favor of release, understanding

8  it was not the only factor for your decision and

9  understanding it did not operate alone?

10     **A.   Then I don't think that that question**

11 **applies to that then.**

12     Q.   So how did you come to your decision about

13 whether to recommend a reconsideration or release?

14     **A.   Whenever I would go into a decision-making**

15 **process, my assessment is just my professional**

16 **assessment.  It is just a -- taking all of these**

17 **factors into consideration.  And providing it to the**

18 **parole board so they can make an informed decision.**

19          **So it is a factor, but I also then have to**

20 **take into consideration everything else that's part of**

21 **the file into consideration.**

22     Q.   Right.

23     **A.   So it is important, yes.  But, I mean, I**

24 **feel like you're wanting me to say that it went one way**

25 **versus the other.  But I can't say that that piece was**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 78 of 87

1    the tilt one way or the other.

2              It's not a very clear question.  I

3    understand what you're saying.  It's not a simple, I

4    guess, as that, one way versus the other.

5         Q.   When you're making your professional

6    assessment, do you make a pro and con list in your

7    head, or on paper, "Well, he has this going for him,

8    but he's got risks and maybe he shouldn't be released?"

9         A.   Yes.

10        Q.   So you sort of compartmentalize in your

11   head factors that you glean from your interview, from

12   your preparation for the interview, factors that might

13   weigh in favor of giving him an outdate, he's taken a

14   program, or has been without a conduct violation for

15   eight years?

16        A.   Okay.

17        Q.   And you might consider factors that might

18   weigh in favor of giving him a reconsideration, what

19   you might have termed as fair, and not good,

20   institutional adjustment, correct?

21        A.   Okay.

22        Q.   Is that correct?

23        A.   Yes.

24        Q.   Okay.  I'm trying to get an idea of the

25   pros and cons list, where, the fact that he as a kid

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 79 of 87

1  didn't take into consideration the consequences of his

2  actions, where it lands on the pros and cons list.

3      **A.   I would say the fact that he can**

4  **acknowledge his responsibility in the offense, that**

5  **would be a pro, yes.**

6      Q.   And then you talk about the -- that he

7  appears to have lived a life as a person with no hope

8  of a future release.

9          Do you see that?

10     **A.   Mm-hmm.**

11     Q.   What does that mean?

12     **A.   That would come from my conversation with**

13  **Mr. Roberts.  Like we spoke previously about that**

14  **feeling of being young and coming into the institution**

15  **with a life without parole sentence.  So that sentence**

16  **would have came from my conversation with him regarding**

17  **how he felt when he came into prison.**

18     Q.   And you indicate that Roberts shared he

19  felt he needed to carry a weapon sometimes for

20  protection, correct?

21     **A.   He reported that, yes.**

22     Q.   Did that have any impact in how you viewed

23  the conduct violations?

24     **A.   That can be interpreted two ways.  I would**

25  **think you'd have to assess his needs for protection,**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 80 of 87

1   what was -- why did he feel he needed protection.

2          Q.   Did you ask him about that?

3          A.   I did.  I believe I noted it.  He

4   attributed poor coping skills.

5               And then he then also reported that if he

6   felt things were off or things felt off he would carry

7   a weapon.

8               So, I mean, also, you know, the

9   institutional rules indicate that you're not to have

10  dangerous contraband or weapons regardless of what was

11  going on with him personally at that time.

12         Q.   I understand.  I'm just wondering if there

13  were any mitigating factors that you might have

14  considered.  "Oh, he's small in stature and he was a

15  kid."  And so maybe he was more prone to harassment, or

16  assault, or to be attacked by other inmates.

17              Would that mitigate at all the fact that he

18  was carrying a weapon from time to time?

19         A.   Perhaps if they had occurred when he was

20  very young or early on in his sentence structure.  But

21  this continued for Mr. Roberts.  It was a pattern of

22   behavior for him.  This wasn't something that just

23  happened in his first few years of incarceration.

24              In fact, he didn't get a violation for a

25  weapons offense until 2000.  So that would not apply in

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 81 of 87

1   his case.  He could have had weapons prior to such, but

2   it was not documented.  So the theory when he was

3   coming in and having those weapons, I mean, his

4   violation for a homemade weapon didn't occur until

5   2000.  He's much older at that time.

6          Q.   How old was he in 2000?

7          A.   I'd have to look.  I don't have that off

8   the top of my head.  His demographics information is

9   not on the hearing itself.  It's on the offender face

10  sheet.

11         Q.   You also refer to this diagnostic center

12  report completed in December of 1989, which indicates

13  by whomever authored the report, that "Sidney appears

14  to be an immature young man, fairly self-centered, who

15  showed no remorse for his actions and denied being

16  guilty of the underlying offense."

17              Is that report something, and that opinion

18  that I just read, something that you considered and

19  weighed in making are your recommendation?

20         A.   I would say it's a part of it, noting what

21  his behaviors or state of mind was when he came in.

22  The report would have been something that occurred at

23  the time of his reception.  So I would think that would

24  be a correlation to when he first came in.

25              So I would say, yes, that's part of it, to

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 82 of 87

1    show where he has grown in some areas and not grown in

2    others.

3         Q.   And you indicated elsewhere that he did

4    show remorse for his actions?

5         A.   Yes.

6         Q.   And he did admit guilt?

7         A.   Yes.

8         Q.   Did he still appear to be a self-centered

9    immature young man?

10        A.   I don't recall specifically, but, no, it

11   doesn't stand out to me that he had any ...

12        Q.   ██████    ████████████████████████████████

██   ████████████████████████████████████

██        ██    ██████

██        ██    ████████████████████████████████████████

██        ██    ██████████████████████████████████

██   ██████████████████████████

██                ██████████████████████████████████████

██   ████████████████████████████████████████████

██   ████████████████████

██                ████████████████████████████████████████

██   ██████████████████████████████████████

██   ████████████████████████████████████████

██   ██████████

██                ████████████████    ████████████████████

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 83 of 87



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21 .

22    Q.   And the felony charge is the possession of

23  drugs in a correctional facility in 1996, correct?

24    **A.   Correct.**

25    Q.   And he completed that sentence in 2001,

*PohlmanUSA Court Reporting*
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 84 of 87

1  correct?

2        A.    **Correct.**

3        Q.    Do you recall the circumstances of that

4  offense?

5        A.    **I believe it was -- Roberts produced**

6  **through a bowel movement five balloons containing**

7  **marijuana.**

8        Q.    You're reading from the report?

9        A.    **Yeah.**

10       Q.    Do you remember why he had the marijuana on

11  him?

12       A.    **It would have only been what he reported to**

13  **me.**

14       Q.    To support his family, correct?

15       A.    **That may have been.  If it's in the report,**

16  **that's what he told me then.**

17       Q.    Did you tell Mr. Roberts what your

18  recommendation was?

19       A.    **No.**

20       Q.    Why not?

21       A.    **We are not required to give our**

22  **recommendations.  It's a security issue.**

23       Q.    Are you allowed to give them a

24  recommendation?

25       A.    **I don't.  We don't practice that.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 85 of 87

1      Q.   Why do you not practice that?  Is there a

2  written policy against providing the recommendation to

3  the inmate?

4      **A.   I don't know that for certain.**

5      Q.   Did Mr. Roberts ask what your

6  recommendation was?

7      **A.   He may have.  I don't recall.**

8      Q.   Do you give a copy of the prehearing report

9  to the inmate?

10     **A.   No.**

11     Q.   Why not?

12     **A.   Our policy does not allow that.**

13     Q.   There's a written policy?

14     **A.   I believe so.**

15     Q.   Did Mr. Roberts ever ask --

16          MS. BREIHAN:  I'm going to suggest we stop.

17  And I still have questions, but I think it may go just

18  a little over 15 minutes.  For the sake of the

19  reporter's fingers and brain, and my brain, we're going

20  to stop.

21          Are you good with that, ma'am?

22          THE WITNESS:  Sure.

23          (Volume I concluded.)

24

25

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 86 of 87

1                    CERTIFICATE OF REPORTER

2

3         I, Kim D. Murphy, Certified Court Reporter,

4   for the State of Missouri, do hereby certify that the

5   witness whose testimony appears in the foregoing

6   deposition was duly sworn by me; that the testimony of

7   said witness was taken by me to the best of my ability

8   and thereafter reduced to typewriting under my

9   direction; that I am neither counsel for, related to,

10  nor employed by any of the parties to the action in

11  which this deposition was taken, and further that I am

12  not a relative or employee of any attorney or counsel

13  employed by the parties thereto, nor financially or

14  otherwise interested in the outcome of the action.

15

16

17

18

19         _____

20         Kim D. Murphy, CCR

21

22

23

24

25

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-7   Filed 06/12/18   Page 87 of 87