IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION


NORMAN BROWN, et al.          )
                             )
         Plaintiffs,         )
                             )
     vs.                     ) Case No. 17-CV-4082
                             )
ANNE L. PRECYTHE, et         )
al.,                         )
                             )
         Defendants.         )


VOLUME II

    CONFIDENTIAL DEPOSITION OF JESSICA BLIESATH,

produced, sworn and examined on the 28th day of

December, 2017, between the hours of eight o'clock in

the forenoon and six o'clock in the afternoon of that

day, at the Missouri Attorney General's Office,

Broadway State Office Building, Jefferson City,

Missouri, before Kim D. Murphy, Certified Court

Reporter, within and for the State of Missouri.

1              A P P E A R A N C E S

2

            For the Plaintiffs:
3
                MACARTHUR JUSTICE CENTER
4               By:  Amy Breihan
                3115 S. Grand
5               Suite 300
                St. Louis, MO  63118
6

7
            For the Defendants:
8
                MISSOURI ATTORNEY GENERAL
9               By:  Michael Spillane
                and Andrew Crane
10              221 West High Street
                Jefferson City, MO  65101
11

12

13                  I N D E X

14   Direct Examination by Ms. Breihan            4
     Cross-Examination by Mr. Spillane            83
15   Redirect Examination by Ms. Breihan          85

16

17

18

19

20

21

22

23

24

25

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 2 of 88

1                    DEPOSITION EXHIBIT INDEX

2     ID                                      MARKED

3     7:   AGO33                                18

4     8:   AGO03584 through 3593                24

5     9:   AGO02857 through 2869                30

6     10:  AGO31                                48

7     11:  AGO2482 through 2843                 54

8     12:  April 14, 2017 correspondence        56

9     13:  AGO34                                60

10    14:  AGO2964 through 2966                 68

11    15:  Parole decision of Mr. Clemmons      75

12

13

14
      Court Reporter:
15    Kim D. Murphy, CCR

16

17

18

19

20

21

22

23

24

25

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 3 of 88

1    IT IS HEREBY STIPULATED AND AGREED, by and

2  between counsel for the Plaintiffs and counsel for the

3  Defendants, that this deposition may be taken in

4  shorthand by Kim D. Murphy, CCR, and afterwards

5  transcribed into typewriting; and the signature of the

6  witness is expressly waived.

7                    *   *   *   *   *

8                    JESSICA BLIESATH,

9  of lawful age, produced, being previously sworn and

10  examined on behalf of the Plaintiffs, deposes and says:

11                 DIRECT EXAMINATION

12  QUESTIONS BY MS. BREIHAN:

13      Q.   Good to see you again.

14      **A.   Good to see you, too.**

15      Q.   It's been about a week since you first have

16  been testifying in this case.

17           Have you done anything between last week

18  and today to prepare for your deposition?

19      **A.   No.**

20      Q.   You didn't speak to anyone other than your

21  attorneys?

22      **A.   No.**

23      Q.   Between the two?

24      **A.   No.**

25      Q.   Okay.  Have you done any prehearing

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 4 of 88

1   interviews for juveniles serving life without parole

2   since then?

3        **A.   No.**

4        Q.   So I want to -- I'll try not to duplicate a

5   lot of questions from last week, but I want to go back

6   to some of the things you were testifying about.

7             One of the things you were talking about

8   was preparing a file before your prehearing interview;

9   do you remember that?

10       **A.   Yes.**

11       Q.   And you mentioned culling information from

12  the classification file, Case.net, MO-CIS, OPT II,

13  FileBound, and then doing Google searches; is that a

14  fair assessment?

15       **A.   Yes.**

16       Q.   What information or documents do you

17  typically pull from a classification file in doing that

18  file prep?

19       **A.   I mean, I don't know all specifically, but**

20  **generally there are diagnostic reports that are in the**

21  **file.**

22            **I'm trying to think of some of the document**

23  **names.**

24            **There could be evaluations, depending how**

25  **long the offender has been incarcerated.  Sometimes**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 5 of 88

1    years ago, they did, like, the psych evals at

2    sentencing and things like that.  There may be copies

3    in those.  For some people.  Not all.

4              They have certificates in there that we can

5    write down their certificates.  And date of receipts.

6              I'm trying to think.  It could be anything.

7              We verify family members off their visiting

8    lists and visiting applications.

9              Copies of their conduct violations are in

10   there.

11             And I would say generally it varies, but

12   that's the majority of it.

13             There's other things that are in there that

14   the classified side uses that we don't.

15       Q.   So these diagnostic reports you mentioned,

16   those are complete when the individual's committed to

17   the Department of Corrections?

18       A.   Yeah.  I don't know if they actually still

19   do them currently.  They probably do, like, a similar

20   form now.  But the term "diagnostic report," I think,

21   is actually older.  So these would be older reports.

22       Q.   Like, how old?

23       A.   It just depends.  Like I said, I don't know

24   what they call them now.  I'm not familiar.  But like I

25   said, those, generally when we find a diagnostic

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 6 of 88

1  report, they're usually aged a bit from their original

2  reception.

3      Q.   What kind of information are you getting

4  from the diagnostic reports that's relevant to your

5  preparation and for your rehearing interview?

6      A.   Me personally, the dealing particular

7  report I use because they list their family members,

8  gives their family members, their children, and then it

9  will give -- it does not normally give an official

10  version.  It will usually say, "An official version was

11  unavailable at that time, but subject stated," da, da,

12  da, for what he's incarcerated for.

13          Normally, I would utilize this information

14  regarding the present offense and the family

15  information.  And it gives -- it's very -- it's very

16  plain.  It says, you know, history of drug or alcohol

17  use, yes or no, and then it says if it's checked yes,

18  please explain.  And it will just be brief.

19      Q.   So there's not a lot --

20      A.   Marijuana, alcohol.  It's more of a form

21  versus a report.  If that make sense.

22      Q.   There's not a lot of detail?

23      A.   Right.  It's more of a snapshot, I guess,

24  would be a better term.

25      Q.   Other than family members, or the account

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 7 of 88

1  of the present offense, is there anything that you

2  might get from the diagnostic form regarding the

3  prehearing interview?

4      **A.   It would be a case-by-case basis.  If**

5  **there's information on the form that I feel would be**

6  **relevant, then I would use it.  If not, then, like I**

7  **said, it's really -- it would depend on who physically**

8  **filled out the form, whether or not they were very**

9  **thorough or not.**

10     Q.   And what about the psych evals, you said

11  that sometimes they would be available at sentencing?

12     **A.   That would be if the judge ordered them or**

13  **whatever.**

14     Q.   Are there any other psych evals, other than

15  ones done in trial court, that are -- that you use for

16  this file prep?

17     **A.   If they're available, yes.**

18     Q.   Do you know in the juvenile life without

19  parole context whether any psych evals have been

20  available?

21     **A.   I have, yes.**

22     Q.   In which cases?

23     **A.   I know ███████████ for sure.  Other than**

24  **his ...  the only reason I say that, I did his most**

25  **recently.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 8 of 88

1    There could have been on the others and I

2  don't recall exactly who.  But I know for sure him,

3  because I just did his within the last few months.

4    Q.   And you also mentioned Case.net was another

5  source that you might use to prepare the file for the

6  prehearing interview.  What kind of materials or

7  information are you looking to get from Case.net?

8    A.   Misdemeanor convictions.

9    Q.   Anything else?

10   A.   Or, if they have other -- I mean, there's

11  also obviously felony information on Case.net.  If

12  there's protection orders, we can generally see that on

13  Case.net.

14    I would say that's the majority of them.

15   Q.   Are there instances where you go on

16  Case.net and materials and information are just not

17  available because of the age of the cases?

18   A.   I have had instances like that, yes.

19  They'll say you have to contact the court directly.  Or

20  it just doesn't recognize the case number.

21   Q.   Do you contact the court to get documents,

22  too?

23   A.   If it's outside of the present offense,

24  then not generally.  If it has to do with the present

25  offense, then we would obviously have to get the

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 9 of 88

1    information.

2          A lot of times if it's misdemeanor

3    convictions, we -- if we didn't have the information

4    due to the age of the offense, we would just note that

5    in the report.

6          Q.   Do you remember pulling any documents from

7    Case.net for any of the JL WOPers?

8          A.   No.  That's probably because of the age

9    they wouldn't have anything in there.  Unless it

10   occurred post this, their current offense, like, their

11   original offense.

12         Q.   So unless they picked up a charge while

13   they were incarcerated?

14         A.   Right.  And that would generally be

15   available in our system versus Case.net.

16         Q.   Can you give me an idea of what documents

17   you pull from MO-CIS in doing your file prep?

18         A.   I use it for, like, family.  Again, family

19   contacts.  And program participation.  They'll have

20   listings in their tab.

21         Have you heard that term?  It's a

22   transition of accountability plan.

23         Q.   Yeah.

24         A.   They'll have entries within that document

25   that we can verify programs.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 10 of 88

1          But MO-CIS, that's generally home plan

2   information.  We enter our home plan information there.

3   That pretty much covers it.  It's very limited.

4   There's not a lot within that system.

5          Q.   What about OPT II?  What kind of

6   information or documents do you pull from OPT II?

7          A.   That's our main source of information.

8   That's where we get all of the -- all of the

9   department-generated documents.  So if they had

10  violation reports, listings of conduct violations,

11  their statuses.  Their classification.  That's, like,

12  the main hub of information.

13         Q.   Does it have any information about medical

14  or mental health?

15         A.    It will have their medications listed.

16  Their medication listing.  And it just has their

17  classification of their mental health and medical

18  scores.

19         Q.   Does it have anything else, other than

20  conduct violation reports and classifications, medical,

21  or medication listing, anything else?

22         A.   Do you have a specific document?  Like I

23  said, it's -- it's like the mainframe of everything

24  that we.

25         Q.   I'm just trying to get a sense of what you

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 11 of 88

1    pull from there in doing your file prep.  Like, what

2    you say is important, relevant, from that system?

3         **A.    That is going to be -- it's hard to**

4    **describe, because it's where we get all the information**

5    **from.  That's where I type my report out of it, is that**

6    **program.**

7         Q.    Your prehearing report you type in OPT II?

8         **A.    Yeah.**

9         Q.    So it's just -- you're just not able to

10    answer more specifically what kinds of documents or

11    information you pull from OPT II in doing these

12    prehearing file preps?

13         **A.    Well, other than, like I said, it's -- we**

14    **take all these other things and put them all together.**

15    **But conduct violation information.  Their criminal**

16    **history.  That would be listed in there.**

17              **It kind of doubles up with everything.  We**

18    **use it to compare things or things that needs to**

19    **corrected.  So I don't know that there's anything else**

20    **specifically that.**

21              **If they had, you know, if they were on**

22    **supervision at any point in time -- but that wouldn't**

23    **apply to these guys -- if they were on supervision at**

24    **any point in time, we would read their violation**

25    **reports on there.  Their field violation reports.  Any**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 12 of 88

1   sentencing documents that were available in that

2   system, we can pull from there.

3         Like the SAR, or presentence investigation,

4   if it was completed by us, then we would have it in

5   there.  After that program came online, though.  That's

6   just it, if not, it would be in FileBound.

7       Q.   Okay.  So tell me about FileBound, what

8   kinds of document or information do you get from

9   FileBound in doing your file prep for the prehearing

10  interviews?

11       A.   Sentence and judgment paperwork.  And any

12  pre-OPT II documents, if available.

13       Q.   So when did Missouri Department of

14  Corrections start using OPT II?

15       A.   I don't recall the exact date.  But I wanna

16  say the late 1990s.  1995.  Between '95 and '98 maybe.

17  Something like that.  It was before my time, so I'm not

18  sure.

19       Q.   Safe to say, for at least the JL WOPers

20  that you encountered, that they were incarcerated for

21  many, many years before OPT II was used?

22       A.   Yes.  The majority of information, if

23  available, would be in FileBound.

24       Q.   So other than the sentence and judgment and

25  pre-OPT II documents, are you able to identify more

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 13 of 88

1  specifically what kinds of information or documents you

2  would pull from FileBound when doing your prehearing

3  prep?

4      A.   I look at their support letters that are in

5  there.  And then we also add -- like, if we receive

6  support letters for them, we add them.  I don't

7  personally do it, but or secretary adds them to the

8  system.

9           But other than just the predated

10 information, there's nothing else in there that would

11 be useful.  And the predated information is very broad,

12 but that could be those sentencing reports that were

13 pre-OPT II.  Any evaluations that were pre-OPT II.  And

14 anything that may be, like, in the file at central

15 office versus the file at the institution.

16      Q.   So when are sentencing reports prepared?

17      A.   Following their -- either finding of guilt

18 or plea.

19      Q.   And are they prepared in all instances?

20      A.   I don't believe so.  That's based off of

21 the judge.

22      Q.   Are you aware of whether they're prepared

23 where the sentence is mandatory?

24      A.   I think there are some, yes.  I know they

25 were for -- you mean like a life without?  Is that what

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 14 of 88

1  you're referencing?

2      Q.    Yeah.  So the plaintiffs in this case all

3  have a life without parole sentence that was imposed

4  mandatorily; there was no other sentencing option for

5  first-degree murder --

6      A.    Right.

7      Q.    -- that was constitutional.

8           And so my question is, in an instance like

9  that, when there's no choice about sentencing, is a

10 sentencing report still prepared?

11     A.    I don't -- I'm not aware.  I can't speak

12 on -- that would be if a judge would order it or not.

13 That's outside of our agencies.

14     Q.    Do you recall seeing any sentencing reports

15 in the, four, I think, JL WOPers that you did the

16 prehearing reports for?

17     A.    Yeah.  I'm trying to think.  I believe

18 Mr. ██████████  had one.

19           And, again I keep -- I don't like to keep

20 referring back to it every time, but that's the most

21 recent one.  And they may be titled something -- you

22 know, it may be a presentencing investigation versus

23 the sentencing report.  Because PSI was prior to the

24 sentencing assessment report.  They're a similar

25 document, just a different name.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 15 of 88

1          Without looking at their file, I couldn't

2    say for sure.

3          Q.    And then the other source of information

4    for your prep is Google searching, correct?

5          A.    If it would be something that we could

6    find, like a newspaper article.  These classes are

7    difficult because they're so old.  But sometimes there

8    are newspaper articles or appeals from various filings

9    that we can resource.

10          Q.    So that was sort of getting to my question,

11    what kind of sources are you going to when you're

12    doing, like, an Internet research?

13          A.    That's what it would be.  If there were

14    newspaper articles from that particular search, or if

15    there were appeals or something that was filed that we

16    could get information.

17          Q.    Are you getting information from Wikipedia?

18          A.    No.

19          Q.    Or, like, individual blog websites?

20          A.    No.

21          Q.    Things like that?

22          A.    No.

23          Q.    And is this information-culling part of the

24    prehearing interview prep, is that the same process you

25    go through for every individual that you work with?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 16 of 88

1      A.   Yes.

2      Q.   And any notes that you have from that prep

3   for the prehearing interview you testified that you

4   shred after a couple of months, I think?

5      **A.   Yeah.  I keep it for at least 60 days.  And**

6   **then generally they're just shredded after that.**

7   **They're just worksheets.**

8      Q.   But I think you testified that they're

9   there -- the worksheets we marked as Exhibit 4 last

10  time -- but then also you might have handwritten notes

11  or printouts from doing the file prep, correct?

12     **A.   It's possible.  But I generally -- the**

13  **majority of my work is done on that worksheet.  Like, I**

14  **may have a copy of the violation report that's**

15  **highlighted or something like that.  But beyond that,**

16  **no.**

17     Q.   And even in the JL WOP cases, you still, up

18  until December, you would just keep it 60 days or so

19  and then shred it?

20     **A.   Yeah.  All the same.**

21     Q.   Were you ever told to stop shredding your

22  notes or those prehearing worksheets?

23     **A.   Shortly before this.**

24     Q.   Before your deposition?

25     **A.   Yeah.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 17 of 88

1      Q.   But do you know when this case was filed?

2      **A.   It's been a while.  But I'm not --**

3      Q.   I'm taxing my memory, but I think it was

4  filed back in May of this year.

5           Did anyone tell you in May or June of this

6  year to stop shredding your notes or your worksheets?

7      **A.   No.**

8           **(Deposition Exhibit No. 7 was marked for**

9  **identification.)**

10  BY MS. BREIHAN:

11     Q.   I'm going to hand you what I've marked as

12  Exhibit 7.  It's Bates No. 33.

13          Do you recognize this document?

14     **A.   Uh-huh.**

15     Q.   And what is it?

16     **A.   An email that was forwarded to me.**

17     Q.   It looks like an email forwarded to you by

18  Scott Berkbigler on December 14, 2017, correct?

19     **A.   Yes.**

20     Q.   Do you recall receiving this email?

21     **A.   Mm-hmm.**

22     Q.   And did you discuss it with anyone?

23     **A.   No.**

24     Q.   You didn't have any questions about why

25  Michelle Kasak was telling all the DA's to let their

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 18 of 88

1   cites with JL WOP cases not to shred the prehearing

2   worksheet?

3        **A.   No.  I assumed it was because my worksheet**

4   **was requested and I didn't have it.  So I just --**

5        Q.   Okay.

6        **A.   I don't think -- I didn't think anything**

7   **beyond that.**

8        Q.   Okay.  Have you conducted any prehearing

9   interviews for JL WOPers since December 14th?

10       **A.   No.**

11       Q.   Who's present during the prehearing

12  interviews?

13       **A.   Myself and the offender.**

14       Q.   No one else?

15       **A.   Huh-uh.**

16       Q.   And during that process, do you give an

17  inmate any advice about the upcoming hearing?

18       **A.   If they have questions, I'll answer their**

19  **questions.**

20       Q.   But you don't give them advice about how to

21  conduct themselves, or --

22       **A.   If it's general conversation, there's a**

23  **possibility that I would.  I mean, I don't know that I**

24  **would call it advice.  It's more so if they have a**

25  **response -- if I have a response to their question.  If**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 19 of 88

1  it comes out in the form of advice, I guess you could

2  assume it would be advice, but it's generally a

3  response to their question.

4       Q.   I'd imagine that a typical question might

5  be how's the hearing gonna go?  What's it gonna be

6  like?  Do you get questions like that?

7       A.   Yeah.

8       Q.   And what do you tell them?

9       A.   I explain to them it's a panel of three

10 people.  And they'll ask you a series of questions.

11 One person will generally conduct the majority of the

12 interview.  And if the others have any questions, they

13 will be given that opportunity.

14      Q.   Anything else?

15      A.   Not -- again, not unless they're asking

16 something more specific.  That's the format of a

17 hearing, how I would explain it to them.

18      Q.   And in the prehearing worksheet

19 that' you walk through with the inmate before their

20 parole hearing, it talks about your assessment and

21 recommendation, Section B of the report, summarizing

22 their strengths and weaknesses utilizing the seven

23 critical criminogenic needs?

24      A.   Uh-huh.

25      Q.   What are those seven critical criminogenic

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 20 of 88

1   needs?

2          A.   Associates, recreation, family, attitude,

3   education, substance abuse, and employment.

4          Q.   And it looks like you're reading that from

5   the Exhibit 4?

6          A.   Correct.

7          Q.   Can you explain to me more descriptively

8   what those mean?

9          A.   We look at those as areas that they're

10  either -- if there's concerns associated to those

11  things.  Or if that's one of their positive -- I don't

12  want to say qualities, attributes, whatever -- needing

13  less attention.

14              So some things may not truly be a present

15  need, or have a greater need than one of the others.

16  And really we address the majority of those throughout

17  the entire report as well in each of their respective

18  sections.

19         Q.   Okay.  And below that there are a few

20  highlighted sentences.  Bolded sentences.  One says,

21  "The degree of the defendant's culpability in light of

22  his or her age and role in the offense."  And then

23  there's a parenthetical, "Does the official

24  version/police record/offender make note of being a

25  leader or follower in the present offense."

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 21 of 88

1          What if the official version of the police

2    record and the inmate's version of the story are all

3    different in that regard?

4         A.   I would note the differences that they

5    stated.

6         Q.   Do you fact-check any of those accounts of

7    the crime?

8         A.   You mean the official record?  Or his

9    information that he provides -- he or she provides?

10        Q.   Any of it.

11             So if you have what you're referring to as

12    an official version of the crime, and what the inmate's

13    telling you, and if they differ, do you fact-check one

14    against the other or against some other resource?

15        A.   No.  We would use our official document

16    versus what they state and note the differences if they

17    were present.  Like, if the offender noted something

18    that was not accurate, or he had a different version of

19    it, then we would note that.

20        Q.   But you don't do any sort of analysis or

21    weighing of the differences, you're just simply noting

22    that there is a difference?

23        A.   Right.

24        Q.   How many of these prehearing reports have

25    you done since you've been an IPO?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 22 of 88

1       A.    The juveniles?  Or all?

2       Q.    All.

3       A.    I think I'm on my eleventh year as an

4    officer.  We probably range, I'd say, probably between

5    a thousand and 1200 reports.

6       Q.    And you've already testified you've done

7    four for JL WOPers, correct?

8       A.    I believe that's the correct number.

9       Q.    How long does it take for you to complete a

10   prehearing report?

11      A.    It varies.  There's no set amount of time.

12   If somebody has more case material, it will take

13   longer, obviously, to prepare it and type it.  We can

14   dictate if we chose to -- I don't -- but it varies.

15      Q.    On average, how long does it take?  I'm not

16   asking you to include the time you do your interview

17   with the inmate, but just typing up the report, how

18   long does that take?

19      A.    Just to type it?

20      Q.    Yeah.  On average.

21      A.    Maybe an hour to two hours.  Assuming I

22   don't have tons of interruptions.

23      Q.    Does that happen a lot, that you get

24   interrupted in your work?

25      A.    Not generally.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 23 of 88

1          Q.   Are you aware of any written policy and

2    procedure on how you're supposed to be preparing these

3    prehearing reports?

4          **A.   There's a format within policy.  But other**

5    **than that ...**

6               **(Deposition Exhibit No. 8 was marked for**

7    **identification.)**

8    BY MS. BREIHAN:

9          Q.   I'll show you what I've marked as

10   Exhibit 8.  And let me know if the format you're

11   referring to is within this procedure number P64.1.

12               This is the document Bates-stamped AGO03584

13   through 3593.

14         **A.   Yes.  This is what the worksheet is.**

15         Q.   And you're talking on paragraph 3C?

16         **A.   Correct.**

17         Q.   And you follow the same format for every

18   prehearing report you do regardless of whether the

19   inmate is serving juvenile life without parole or not,

20   correct?

21         **A.   Correct.**

22         Q.   Are there any other policies and procedures

23   that you're aware of, other than this Exhibit 8, that

24   governs you or guides you in writing the prehearing

25   report?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 24 of 88

1        **A.    No.**

2        Q.    What is a criminogenic behavior research

3    summary?

4        **A.    That was the listing of their criminal**

5    **history.**

6        Q.    And what's the gender response assessment

7    tool?

8        **A.    There is not a male offender component at**

9    **this point.  It's something that's utilized on the**

10   **female institution side and the female supervision**

11   **side.**

12       **I'm not -- I don't have enough information**

13   **on it to -- there's not a -- male, I think there's**

14   **something that's coming out for the male component, but**

15   **we've not received any information on it.**

16       Q.    You work in all-male prison, correct?

17       **A.    Correct.**

18       Q.    Do you know why there would be an

19   assessment tool that is specifically geared toward

20   female inmates?

21       **A.    I do not.**

22       Q.    And what are the guideline matrixes?

23       **A.    Which section are you looking at?**

24       Q.    I'm looking in the definition sections.

25       **A.    Okay.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 25 of 88

1     Q.    These are terms that are used throughout

2     the policy and procedure.

3     **A.    That's the dates that are determined by the**

4     **salient factor score calculations.**

5     Q.    And the salient factor score is not used in

6     the JL WOP cases, correct?

7     **A.    Correct.**

8     Q.    So there's no guideline matrixes for the

9     JL WOP decisions, correct?

10    **A.    Correct.**

11    Q.    And last week you testified that you're

12    doing a professional assessment during the prehearing

13    process, correct?  I think that was the term you used,

14    "professional assessment?"

15    **A.    Correct.**

16    Q.    What are you assessing?

17    **A.    You mean, within -- what we use is based**

18    **off of the information that's provided and what we note**

19    **at the time of our interview.  And the information's**

20    **given to us.  They're kind of like their assets and**

21    **their liabilities.  And that would be their assessment.**

22    **The assessment of them.**

23    Q.    Okay.  So you're assessing their assets and

24    their liabilities, correct?

25    **A.    Right.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 26 of 88

1      Q.   Anything else?

2      A.   I mean, is there a specific reference that

3  you're --

4      Q.   I'm just trying to understand what you

5  meant by doing a professional assessment.

6      A.   Based off of what the offender has reported

7  to us, like I said, versus what we have available.

8           And we can also, I've also gauged, like,

9  especially with the juvenile cases, you know, their

10  behaviors at the beginning of their sentences versus

11  now.  That has also been something that I've personally

12  taken into consideration.

13           And so, I mean, really it's kind of a broad

14  range, but it can be anything to -- that would appear

15  pertinent to the case.  Or I guess the case as a whole,

16  not specifically the present offense.

17      Q.   You said you'd take into consideration the

18  inmate's behavior from the start of the sentence until

19  now?

20      A.   Yeah.

21      Q.   How do you do that?

22      A.   It's noting improvements or lack thereof.

23      Q.   So just by looking at their conduct

24  violations over time?

25      A.   Right.  Their conduct violations.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 27 of 88

1  Generally, you can see the trend when they start to

2  improve.  And a lot of times that will mirror, like,

3  their program participation.  If they start

4  participation in more programs, generally their

5  conduct -- you can see the shift in behavior, is the

6  best way to describe it.

7      Q.  And so the professional assessment you do

8  is assessing an inmate's assets and liabilities,

9  correct?

10     A.  Correct.

11     Q.  What's your methodology for doing that?

12     A.  Can you be more specific?

13     Q.  What's your approach, and what variables do

14 you consider, and what weight do you give those

15 variables?

16     A.  It's really case by case.  It's hard to

17 speak very generally.

18         If you have a -- do you have a specific

19 example?  Because it's -- I mean, without having it --

20 because obviously some people have more liabilities

21 than assets, and/or assets than liabilities.  So

22 it's --

23     Q.  If there's not, you know, some sort of

24 documented formula or methodology that you apply, and

25 if it's just a subjective case-by case-decision, and

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 28 of 88

1  that's what it is, I just want to make sure I

2  understand what you're testifying to.

3  　　　　A.　　I don't go into my reports with a set "this

4  is how," you know, your every single response, because

5  it's all different.　Each offender is very different.

6  　　　　　　　To allow myself -- I'm rational and I'm

7  open-minded.　I allow each case to be its own.　So

8  while I conduct everything the same from beginning to

9  end, my assessment of somebody is going to be different

10 for each person.　You know, how, the outcome of that.

11 　　　　Q.　　Do you use any sort of clinical tools in

12 conducting your professional assessment?

13 　　　　A.　　No other than what -- I mean -- no.

14 　　　　Q.　　No.　Okay.

15 　　　　　　　Do you know what the Minnesota Multifaceted

16 Personality Inventory for Structured Form is?

17 　　　　A.　　No.

18 　　　　Q.　　Have you heard of the HCR 20?

19 　　　　A.　　Nope.

20 　　　　Q.　　What about the Harris Psychopathy

21 Checklist?

22 　　　　A.　　No.

23 　　　　Q.　　Last week we used as -- Exhibit No. 6 --

24 the prehearing report.　I think you mentioned there was

25 an error in date in that report.

PohlmanUSA Court Reporting
(877) 421-0099　www.PohlmanUSA.com
Case 2:17-cv-04082-NKL　Document 134-8　Filed 06/12/18　Page 29 of 88

1          So I'll show you what I've marked

2     Exhibit 9, and let me know if this is the corrected

3     updated version of that report.

4          This is AGO02857 through 2869.

5          (Deposition Exhibit No. 9 was marked for

6     identification.)

7          THE WITNESS:  Yes.

8     BY MS. BREIHAN:

9          Q.   This is the corrected version?

10         **A.   Uh-huh.**

11         Q.   And so this reflects it was corrected by

12    you?

13         **A.   Yes.**

14         Q.   And if you look on the very last page,

15    there's a line for signature by both you and

16    Mr. Berkbigler?

17         **A.   Correct.**

18         Q.   Would you typically sign these reports once

19    they were finalized?

20         **A.   Yes.**

21         Q.   So there should be a signed copy in the

22    inmate's parole file?

23         **A.   That's correct.**

24         Q.   Multiple times last week when we were

25    discussing what was in the prehearing report, you would

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 30 of 88

1    qualify statements in the report by saying something

2    like -- something to the effect, "well, that's what he

3    told me," referring to Sidney Roberts.

4            Do you recall some of that testimony?

5        A.    His report of information?

6        Q.    Uh-huh.

7        A.    Yes.

8        Q.    Why is it that you would qualify it in that

9    way?

10       A.    Because if it's not information that was

11   provided by me, or a document, I would want that noted.

12       Q.    Do you ever assess or verify information

13   that an inmate shares with you that becomes part of

14   your report?

15       A.    If it has to do -- if it's something that I

16   can verify, there have been instances where I've done

17   that before.  But if not, then, no.

18       Q.    And how would you do that, if you were able

19   to verify it?

20       A.    If I was told -- the best example I could

21   give is a conduct violation.  If I was told that it

22   should have been expunged, then I would then go through

23   the proper channels about contacting somebody about

24   that.

25            But if it's the offenders account of

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 31 of 88

1  something, then that's their -- they're entitled to

2  that account.  So I would put that in there.

3       Q.   Do you ever check, for example, their

4  description of the underlying offense against the trial

5  transcript?

6       A.   No.

7       Q.   Would you ever check it against police

8  reports?

9       A.   Yes.  If we had that.  We have our official

10  version.  Is that what you mean?  Versus like the --

11       Q.   I mean, like, actual police reports?

12       A.   If they are not in our file material as

13  part of the official report, then, no, we would not

14  have that.

15       Q.   Because I think Exhibit 5 is what you might

16  be referring to.

17       A.   Right.

18       Q.   I'm talking about an official version.

19       A.   Right.

20       Q.   And this is the response to a board

21  information request in 2007, correct?

22       A.   Yes.

23       Q.   Do you know why this was being requested in

24  2007?

25       A.   I would -- why I was requesting it in 2007,

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 32 of 88

1    I'm not sure.

2              I can tell you generally, whenever they

3    come into the institution, and there's not a police

4    report, they will request one at that time.  Or an

5    official version.  And then the request goes to the

6    field office.  The field office obtains the police

7    report, and then completes this report based off the

8    police report.

9         Q.   But you're not saying Sidney Roberts was

10   admitted into the Department of Corrections in 2007,

11   right?

12        A.   No.  That's why I don't understand.  I

13   don't know why it was requested.  Unless they were -- I

14   don't know.  I can't speak on that.

15        Q.   Would you review -- have reviewed -- we can

16   talk about Mr. Roberts in particular -- his state

17   habeas petition?

18        A.   I don't recall specifically.

19        Q.   What about his federal habeas petition?

20        A.   I don't recall specifically.

21        Q.   Is this something that you would generally

22   look for?

23        A.   If it -- if it was available to us, there's

24   a possibility.  If it was not available, then, no.

25        Q.   Do you know what PACER is?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 33 of 88

1    A.    What is it?

2    Q.    PACER.  It's an acronym.  You mentioned

3 using Case.net.  And that's the state courts website

4 for records and case-related documents?

5    A.    Right.

6    Q.    There's sort of a similar system for the

7 federal system that's referred to as PACER.

8    A.    I don't even know if we have access to it.

9 Is it for the general public?

10   Q.    That's why I was asking if you had access

11 to it.

12   A.    Case.net is for the general public.

13   Q.    Are you able to download documents from

14 Case.net?

15   A.    No.

16   Q.    But you're able to open them up --

17   A.    It's not really --

18   Q.    -- with a viewer?

19   A.    Yeah.  Like, you can click on it.  It's

20 not -- I guess if you printed it it would be a

21 document.  But it's just a -- it's not, no.

22   Q.    I guess I'm -- I'll ask it this way:  If

23 you go into -- for example, let's say you had the case

24 number for Mr. Roberts' petition for Writ of Habeas

25 Corpus with the Missouri Supreme Court, and you typed

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 34 of 88

1  it into Case.net, would you be -- get access to where

2  there are hyperlink that you can view in a viewer?

3      **A.    No.**

4      Q.    So even if you're going onto Case.net,

5  you're not able to see the actual documents within the

6  case?

7      **A.    That's right.  It's just data entry,**

8  **basically.**

9      Q.    Not high-level information?

10     **A.    Yes.**

11     Q.    Did you speak with his attorney at all?

12     **A.    Not to my knowledge.  It's possible.  Only**

13 **if they would to have contacted me.**

14     Q.    You don't remember talking to him?

15     **A.    I don't know if we actually spoke on the**

16 **phone or not.  If we did, it would have been about him**

17 **specifically, or about the process.**

18     Q.    One of the things I brought up last week

19 was this part in the report -- I think it's on page six

20 of the report -- it talks about Sidney being in a group

21 of kids that go roller skating.

22          So it's in the same paragraph where you're

23 talking about gang affiliation, correct.

24     **A.    Right.  Correct.**

25     Q.    You've had training on gang identification,

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 35 of 88

1   correct?

2       **A.    Uh-huh.**

3       Q.   Do you feel equipped to being able to

4   identify whether an inmate is or is not in a gang?

5       **A.    I would wouldn't say conclusively.  If they**

6   **have what would be considered gang-related tattoos, or**

7   **they've been verified through other Intel, security**

8   **threat group Intel, then, yes.**

9       Q.   And is that -- if they had gang-related

10  tattoos, or were identified through Intel as having

11  gang affiliations, is that something you would note in

12  your prehearing report?

13      **A.    Yes.**

14      Q.   You would note the absence of that as well?

15      **A.    Yeah.  If there is no mention of it, then I**

16  **would say, yes, there's no -- not necessarily**

17  **specifically that information -- but if they were to**

18  **state, you know, if I asked them, "Are you affiliated**

19  **with a gang, past or present?"  "No." "Subject denied**

20  **gang affiliation."**

21          **I don't know.  "Roberts would deny gang**

22  **affiliation."**

23      Q.   Do you feel like you have the resources you

24  need to make an assessment about whether an inmate is

25  or is not in a gang?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 36 of 88

1    **A.    Yes.**

2    Q.    And to verify when an inmate tells you they

3    are or not in a gang, you have information available to

4    verify that?

5    **A.    That they're not in a gang?**

6    Q.    Yeah.  So here, for example, "Sidney denied

7    being affiliated with a gang."

8    **A.    Right.**

9    Q.    But then you go on to say, "However, he

10   said he and some kids from the neighborhood" s-o when

11   he was just a kid -- "were a dancing group and would go

12   roller skating."  So it seems you're not saying

13   anything there about whether is or is not in a gang?

14   **A.    Right.  I noted that he was denying being**

15   **affiliated with a gang.  And then he further reported**

16   **the rest of the information.**

17   Q.    So my question is, did you have the

18   resources you needed to verify whether or not Sidney

19   was in a gang?

20   **A.    No.  I guess I didn't feel as though it**

21   **was -- generally if they tell me that they're not**

22   **gang-affiliated, it stops at that and I move on.**

23   Q.    Okay.

24   **A.    If they further want to discuss it, then**

25   **that's fine, they can.  But, I mean, I can check the**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 37 of 88

1   **security threat group listings if they, you know, if**

2   **it's available.  But beyond that, no.**

3        Q.   And then starting at the bottom of page ten

4   there's your section on his social and family history.

5   And it says that Sidney was born and raised in

6   St. Louis, Missouri by his parents.

7             Do you see where I'm at?

8        A.   **Mm-hmm.**

9        Q.   It doesn't mention what neighborhood in

10  St. Louis he grew up in, does it?

11       A.   **I don't believe so, no.**

12       Q.   Does it mention whether he lived in a

13  segregated neighborhood?

14       A.   **It would have to be information that he**

15  **provided to me.  So if he did not provide that then no,**

16  **I didn't have it.**

17       Q.   Did you ask any follow-up questions about

18  where he lived in St. Louis?

19       A.   **No.  I said where we you born and raised.**

20  **Or where did you recall spending the majority of your**

21  **life.  St. Louis.  That's all he provided.**

22       Q.   Did you ask whether he lived in a poor

23  neighborhood?

24       A.   **No.**

25       Q.   Did you ask whether he lived in a

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 38 of 88

1  high-crime area?

2      A.   I recall maybe him mentioning that.  But I

3  don't -- I don't remember asking that specifically, no.

4      Q.   And it's not noted in your report, is it?

5      A.   No.

6      Q.   Did any of that matter?  Whether Sidney

7  grew up in a segregated low-income high-crime area?

8      A.   I mean, I guess it could have played a part

9  in it.  But it doesn't -- I guess for the purposes of

10  this section, that -- unless he would provided that

11  specific information, I wouldn't have it.  So ...

12      Q.   I understand that.  I understand that part

13  of your testimony.  I want to know if it matters to

14  your assessment whether Sidney grew up in a low-income

15  high-crime neighborhood.

16      A.   I mean, it would matter, yes.  But if he

17  doesn't give that information to me, then I can't --

18  I'm not familiar with, you know, every neighborhood in

19  St. Louis.  So I can't speak, you know, without him

20  discussing that information, or being open to

21  discussing that information, then I wouldn't have that.

22      Q.   Did you ever ask Sidney questions that he

23  refused to answer?

24      A.   I don't recall, no.

25      Q.   He's a pretty cooperative, talkative guy?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 39 of 88

1    **A.    Yes.**

2          Q.    Did you ask him any deeper questions about

3    the community in which he grew up?

4    **A.    Not other than if he were to have disclosed**

5    **it, no.**

6          Q.    And it mentions that his parents divorced

7    and Sidney lived with his mother, correct?

8    **A.    Yes.**

9          Q.    Doesn't mention that he bounced around from

10   house to house before he settled down with his mother,

11   correct?

12   **A.    Can you say that one more time?**

13         Q.    The report doesn't mention that Sidney

14   bounced around from house to house before eventually

15   settling in with his mother after his parents' divorce,

16   correct?

17   **A.    No.**

18         Q.    ███████████████████████████████████████

19   ██████████████████████████████████████████████,

20   ███████?

21   **A.    Not if he would not have given that**

22   **information.**

23         Q.    But does your report mention it?

24   **A.    ████████████████████████    ████████████████**

25   **████████████████████████████████.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 40 of 88

1    Q.   If you look on page 11 of the report.

2    A.   Okay.

3    Q.   It says --

4    A.   Yes.

5    Q.   -- "his mother suffered from a crack

6  cocaine addiction; however, he said she's now clean and

7  doing very well?"

8    A.   I didn't read that far down.

9         Yes, that's correct.

10   Q.   Did you ask any questions about his

11 mother's cocaine addiction?

12   A.   Not specifically.

13   Q.   You didn't ask about how long it went on or

14 how it impacted him?

15   A.   No.

16   Q.   And it also mentions, in passing, that

17 Sidney's father was extremely physical and verbally

18 abusive?

19   A.   Correct.

20   Q.   Doesn't mention that he would abuse him,

21 Sidney, in front of Sidney's friends, does it?

22   A.   No.  If he did not report that to me, then,

23 no.

24   Q.   And you didn't ask follow-up questions

25 about that, about the abuse?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 41 of 88

1      A.   We ask, you know, what was he subjected to.

2  And if -- if he provides me a vague response, sometimes

3  some people don't -- aren't comfortable with discussing

4  it further.

5           I'm generally a very easy person to talk

6  to.  And if I feel like they're being kind of resistant

7  to something, I may not press it.

8      Q.   So is it your testimony that Sidney was

9  resistant to sharing more details?

10     A.   I'm just speaking generally, not just to

11 Mr. Roberts.

12     Q.   This report doesn't talk about the time

13 that Sidney's father beat him with a belt so hard that

14 it left a welt on him?

15     A.   No.

16     Q.   This report doesn't talk about Sidney's

17 father threatened his mother with a gun in front of

18 him, does it?

19     A.   No.

20     Q.   Does any of that abuse or unstable, you

21 know, childhood, or mother's drug addiction for well

22 over a decade, matter to your professional assessment?

23     A.   It could possibly.  But we're assessing

24 their -- you know, that is a part of it.  But I

25 guess -- I see what you're saying -- but I guess when

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 42 of 88

1  we look at that we are providing the information to the

2  board to allow them to make that decision.  And we are

3  assessing their, you know, potential, like, leading

4  into a release.  Not that it doesn't matter; it does.

5  But it -- I guess, unless they provide something like

6  that, it's hard to put a, like, a weight factor on

7  that.

8        Q.   So --

9        A.   I'm not saying it's not important.

10       Q.   You mentioned when you described to the

11 inmate what the hearing's going to be like, you tell

12 them it's a three-panel hearing, correct?

13       A.   Right.

14       Q.   With just one board member on that hearing,

15 correct?

16       A.   Right.

17       Q.   So even those these are majority-board

18 decisions, only you and that panel actually get to sit

19 down and talk to the inmate before a decision is made,

20 correct?

21       A.   Correct.

22       Q.   And you're preparing this report to give

23 information for the board to help them make their

24 decision, correct?

25       A.   Right.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 43 of 88

1      Q.    So it's important what information goes

2  into or doesn't go into this report, correct?

3      **A.    I would agree, yeah.**

4      Q.    And you have to make a call about what

5  information you think is important to include in the

6  report, correct?

7      **A.    Right.**

8      Q.    But it doesn't contain information about,

9  you know, his childhood and his community in any

10  detail, correct?

11      **A.    Not in great detail, no.**

12      Q.    What are Sidney's criminogenic risks and

13  needs?

14      **A.    Without sitting here and going through this**

15  **entire report ... do you have a different way you**

16  **wanna --**

17      Q.    No.  Is there somewhere in the report where

18  they're summarized or identified?

19      **A.    Like I said, a lot of them are addressed**

20  **throughout the bodies of the reports in their**

21  **respective sections.**

22              **There's a reference in the report -- let me**

23  **find it real quick -- regarding his -- what we referred**

24  **to as, like, a driver, I believe.  "The driver appears**

25  **to be his attitude."  And that would be towards, you**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 44 of 88

1    know, it doesn't mean, like, he had a bad attitude.

2    It's like his approach to ways of thinking.

3         Q.   I don't understand.  What does that mean?

4         A.   What part?

5         Q.   Well, let's take it part by part.  What is

6    a driver?  What does that mean?

7         A.   They -- it is whatever criminogenic need

8    would be determined as their greatest area of need.

9         Q.   So your statement --

10        A.   And since we are not -- I'm trying to think

11   of the term I'm looking for here.

12              Since we are not, you know, psychologists

13   or psychiatrists, it is what we feel that our -- based

14   off of our experience and our knowledge, what we

15   suspect would be his driver.  We're not saying this is

16   definite 100 percent.  But based off of the information

17   that we have available to us, this is what it would

18   appear to be.

19        Q.   Can you point me to where in the report it

20   says his driver is his attitude?

21        A.   Page 12.  Towards the bottom.

22        Q.   Okay.  So if I understand you correctly,

23   you're saying that by noting "his driver appears to be

24   his attitude," you're indicating that his attitude is

25   his greatest criminogenic need?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 45 of 88

1          A.    That's -- yeah.  Correct.

2          Q.    And what does he need to do to improve or

3     address that need?

4          A.    I don't think it's -- I don't think

5     it's -- it's not like -- like I said, it's not like I'm

6     saying he has a bad attitude, because he didn't.

7                Like, our conversation with him -- my

8     conversation with him -- was not a poor conversation.

9     It would be if I had -- I can get a copy of the

10    criminogenic needs for you that shows the, you know,

11    like, key points and the -- I don't have it with me,

12    but I can get it if you'd like a copy of it.

13         Q.    Sure.  That would be great.  You can give

14    it to your attorneys, so they can give it to us, if it

15    hasn't already been produced.  I'm just trying to

16    understand what you mean by his attitude.

17         A.    Like I said, it's -- I don't want to say --

18    it's hard to explain.  But it's, like, their -- the way

19    I look at it.  'Cause it's not very specifically

20    identified.

21                And so when I look at someone's attitude, I

22    look at their approach, like, decision-making process.

23    And what goes into their decision-making.  And since we

24    have information that's based off of the time since

25    they've been incarcerated, that's generally where I

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 46 of 88

1  look.

2       Q.   And you come to the conclusion in your

3  report that you think that Sidney would continue to be

4  a risk to the community if he were released, correct?

5       **A.   Yes.  I think that's what it says in here.**

6       Q.   How did you come to that conclusion?

7       **A.   Do you want me to read the section that we**

8  **have?**

9       Q.   If you can just tell me.  I mean, I guess

10 if you don't remember you can read it.

11      **A.   I think my biggest concern was his**

12 **adjustment and the nature of the violations that he was**

13 **receiving.**

14      Q.   Anything else that you considered in coming

15 to your conclusion that Sidney would continue to be a

16 risk to the community if he were released?

17      **A.   Possibly his program participation.**

18      Q.   What do you mean by that?

19      **A.   It's stated that he participated in**

20 **programming; however, it appears he has completed the**

21 **same programs on more than one occasion.  And I noted**

22 **that while this was still positive involvement, he**

23 **failed to expand his involvement to other programming.**

24      Q.   Anything else?

25      **A.   I noted the new felony offense that**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 47 of 88

1  occurred while he was incarcerated.  I believe that's

2  it specifically.

3       Q.   Now, at one point you had some questions,

4  didn't you, about the recommendation section of your

5  JL WOP prehearing reports?

6       A.   I had a question?

7       Q.   Do you remember that?

8       A.   I don't recall.  What question did I have?

9       Q.   I'll show you Exhibit 10.

10      (Deposition Exhibit No. 10 was marked for

11  identification.)

12  BY MS. BREIHAN:

13      A.   It's Bliesath 31.

14      Do you recognize this email?

15      A.   Yes.

16      Q.   And what is it?

17      A.   It was an email sent to Kelly Dills and my

18  supervisor regarding the recommendations section for

19  the hearing.

20      Q.   Okay.  So why were you sending this

21  question to Kelly Dills?

22      A.   Because of the way the statute -- the

23  statute or the bill read -- it was unclear whether or

24  not we were supposed to make a recommendation.  'Cause

25  it states they can petition at 25 years and then again

Pohlman USA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 48 of 88

1    at 35 years.  And the parole board's decision-making

2    doesn't span ten years.

3              So I wanted a clarification whether or not

4    we were supposed to make a recommendation prior to the

5    ten-year re-filing of the petition.

6         Q.   Why didn't you just direct that question to

7    your supervisor Scott Berkbigler?

8         A.   He probably told me to ask somebody in our

9    central office.  If I had to guess.  I don't recall

10   specifically.

11        Q.   Do you remember talking to him about this?

12        A.   Probably to the extent of this right here,

13   just asking him if we were supposed to make a

14   recommendation.  And he would have said, well, why

15   don't you contact the next person.

16        Q.   And you were told by Ms. Dills to just

17   treat the recommendation as you would with any other

18   offender, correct?

19        A.   Correct.

20        Q.   Did you ever ask Ms. Dills any other

21   questions about these JL WOP parole hearings?

22        A.   It's possible.  If I would have, it would

23   have been via the email.  If it's not in there, then,

24   no.

25        Q.   Okay.  Have you ever attended a parole

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 49 of 88

1    hearing?

2         **A.    Uh-huh.**

3         Q.    You have?

4         **A.    Yes.**

5         Q.    Do you do that regularly?

6         **A.    No.**

7         Q.    When you do, what's your role?

8         **A.    If I'm present at a hearing, it is as an**

9    **escort for the victims section, or the victims that**

10   **would attend the hearing, or the victims'**

11   **representatives.**

12        Q.    Did you attend Sidney Roberts' parole

13   hearing?

14        **A.    I did.**

15        Q.    You did.  Okay.

16              Who else was present?

17        **A.    I believe our victims services coordinator**

18   **was present.  A representative for the victims' side of**

19   **the hearing.  And Mr. Roberts.  And his mother, I**

20   **believe.  And I think you mentioned that his mother was**

21   **there.  I think I recall her being there.**

22        Q.    Do you know who was there from the victims

23   services office?

24        **A.    Kim Evans, I believe.**

25        Q.    And do you know who was there for the

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 50 of 88

1 ███████████

2          A.    ████████████████████████████████

3 ███████████████████████████████████.

4          Q.    What was your role at Sidney Roberts'

5 parole hearing?

6          A.    **An escort for the victim's representation.**

7          Q.    For Ms. Evans?

8          A.    **Yeah.  Like, we just literally have to**

9 **escort them in the facility.  And we don't -- that's**

10 **pretty much our role.**

11          Q.    But then you stay for the hearing itself,

12 too?

13          A.    **Right.**

14          Q.    Do you recall what happened at the parole

15 hearing?

16          A.    **Part of it.**

17          Q.    Tell me everything that you remember about

18 Sidney Roberts' parole hearing.

19          A.    **It ran the same as any other parole**

20 **hearing.**

21                **They do introductions.  The victim's**

22 **portion is held at the beginning of the hearing.**

23 **Mr. Roberts and his delegate.  And then the hearing is**

24 **closed.  And we leave.**

25          Q.    So was Sidney present for the victim's part

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 51 of 88

1   of the -- at the very beginning of the hearing?

2        A.   I don't recall.  Possibly.  I don't

3   remember.

4        Q.   ████████████████████████████████

5   █████████████████████████████████████████?

6        A.   Yes.

7        Q.   And you were present for the entire

8   hearing?

9        A.   Yes.

10       Q.   At what point did you leave the room?

11       A.   Generally, the offender would leave and

12  then we get up and leave.

13       Q.   Did you hear any conversation between any

14  panel members after Sidney left the room?

15       A.   No.  They don't talk when we're in there.

16       Q.   Did you engage in any discussion with

17  anyone on the panel at any point in time about Sidney's

18  case?

19       A.   No.

20       Q.   They didn't ask you any questions?

21       A.   I don't recall any, no.  It's not general

22  practice, so, no.

23       Q.   Were you present when the hearing panel

24  voted?

25       A.   No.

Pohlman USA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 52 of 88

1    Q.   Did you listen to the audio recording of

2    Sidney's hearing at any point?

3        **A.   No.  We don't have access to that.**

4    Q.   What do you mean by that?

5        **A.   We don't have -- we don't have the ability**

6    **to do that.  I don't.  I have never had the need to,**

7    **either.**

8    Q.   Have you spoken to anybody, other than your

9    attorneys, about Sidney Roberts' parole hearing?

10       **A.   No.**

11   Q.   And Sidney was denied parole, correct?

12       **A.   Yes.**

13   Q.   How did you learn about the decision?

14       **A.   It is given to us through the -- through**

15   **our system.**

16   Q.   The OPT II?

17       **A.   Yes.**

18   Q.   And did you deliver the decision to Sidney?

19       **A.   It was either delivered to him via**

20   **institutional mail or given to him.**

21   Q.   Do you recall giving it to him personally?

22       **A.   I don't recall giving it to him personally.**

23   **Sometimes, if were not there, though, the other officer**

24   **may do it.  Or may not.  It just depends.**

25   Q.   Before I move on, do you recall anything

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 53 of 88

1  more specific about what the prosecuting attorney said

2  at Sidney Roberts' hearing?

3          **A.   I don't recall, no.**

4          Q.   Do you recall anything specific about what

5  Sidney Roberts himself said at his parole hearing?

6          **A.   Not specifically.  I mean, it's been a**

7  **little while.  No.**

8          Q.   Do you recall anything specific about what

9  Sidney's mother said at his hearing?

10         **A.   I do not recall, no.**

11                **(Deposition Exhibit No. 11 was marked for**

12  **identification.)**

13 BY MS. BREIHAN:

14         Q.   I'm going to show you what I've marked as

15 Exhibit No. 11.  It's AGO2482 and 2843.

16              Do you recognize this?

17         **A.   I recognize the document.  They look all**

18  **the same.**

19         Q.   This is the standard form for parole

20 decisions?

21         **A.   Yeah.**

22         Q.   But you have not seen Sidney Roberts?

23         **A.   No, I have; yes.**

24         Q.   So you've seen this document before today?

25         **A.   Yes.**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 54 of 88

1    Q.    So who actually generates this piece of

2  paper?

3    **A.    Central office.  I don't know who**

4  **specifically at central office, but central office does**

5  **it.**

6    Q.    And the lines on the bottom of the first

7  page are meant to give the inmate an explanation for

8  the reasons of the board's decision, correct?

9    **A.    Yes.**

10    Q.    And so on Mr. Roberts' form, it says that

11  "release at this time would depreciate the seriousness

12  of the present offense based on, A, circumstances

13  surrounding the present offense," correct?

14    **A.    That's what it states, yes.**

15    Q.    And he gets a four-year setback it looks

16  like?

17    **A.    Correct.**

18    Q.    Now, in your report, I think you

19  recommended a five-year setback, didn't you?

20    **A.    I believe so, yes.**

21    Q.    Yeah.  It looks like on your prehearing

22  report you recommend ████████████████████████████

23  ████████████.

24    **A.    Correct.**

25    Q.    Did you ever discuss with anyone why the

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 55 of 88

1  board went with a four-year setback as opposed to a

2  five-year setback?

3      **A.   No.**

4      Q.   And you can't remember whether you

5  delivered this to Sidney?

6      **A.   I don't recall, no.**

7      Q.   Did he ever have any questions about the

8  decision?

9      **A.   He sent one letter of correspondence, I**

10 **believe, which I provided.**

11          **(Deposition Exhibit No. 12 was marked for**

12 **identification.)**

13 BY MS. BREIHAN:

14     Q.   I'll hand you what I've marked as

15 Exhibit 12.

16          Is this the correspondence you just

17 referred to?

18     **A.   Yes.**

19     Q.   It looks like it's dated April 14, 2017,

20 correct?

21     **A.   Correct.**

22     Q.   Do you remember when you received this?

23     **A.   I don't know.  It would have been whenever**

24 **the date of my response was.**

25     Q.   You responded the very same day?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 56 of 88

1      A.   I don't know if he wrote it on the 14th.
2  It probably took a day or two to go through the
3  internal mail system to get to me.  I don't know the
4  exact time frame, though, if it was a weekend, or I had
5  a thousand other things to do.
6      Q.   And this is a document that you produced in
7  response to the subpoena that the plaintiffs served in
8  this case, correct?
9      A.   Correct.  "Any correspondence" is what I
10  was told.
11      Q.   Understood.
12           Where was this kept?
13      A.   In my -- a box with correspondence in it.
14      Q.   Just for each inmate?  Or general
15  correspondence?
16      A.   If I receive a letter from an offender that
17  I provide a response to, I keep them attached to each
18  other and in a box.
19      Q.   Okay.  And how long do you keep those
20  letters?
21      A.   It just -- I don't -- there's no specific
22  time frame.  I probably have them for a while.
23      Q.   And do you recall what the kind of the gist
24  of the letter was?
25      A.   Sidney's letter?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 57 of 88

1      Q.    Yeah.  Without looking, do you remember?

2  If not, then you can read through it.

3      **A.    It would have just been why the decision**

4  **was made.  Why his decision was made a certain way.**

5      Q.    Sidney's telling you he doesn't understand

6  the decision, correct?

7      **A.    Right.**

8      Q.    And he says that actually you had told him

9  that because of the juvenile life without ruling that

10  the board could not use seriousness of the offense to

11  deny him release on parole, correct?

12      **A.    It was my understanding that that could not**

13  **be the sole reason.**

14      Q.    And what was your understanding based on?

15      **A.    The senate bill.  The verbiage in the bill**

16  **or the statute.  Whatever the -- whatever it is.  The**

17  **formal stuff on the --  I believe it's the bill.  It's**

18  **in the statute noting what goes into the decision.**

19      Q.    So you're saying based off of your reading

20  of Senate Bill 590, it's your understanding that the

21  board couldn't use seriousness of the offense to deny

22  parole for a juvenile life without?

23      **A.    Not solely.  But it could still be a**

24  **factor, but it should not operate alone.**

25      Q.    Were you basing that understanding off of

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 58 of 88

1  conversations with anyone?  Or solely your reading of

2  the bill?

3      A.  No.  My interpretation of such.

4      Q.  But that's the only reason that's stated in

5  support of the board's decision, the notice that we

6  marked as Exhibit 11, correct?

7      A.  Right.

8      Q.  So what was your reaction when you received

9  this letter from Sidney, and his questions about the

10  setback, and the basis for the board's decision?

11      A.  It's difficult to interpret someone else's

12  decision and what goes into their thought process.

13          The only thing I could do is -- what I did

14  do -- which is try to explain to him that while that

15  may be the only thing check-marked right there, that

16  anything that's discussed throughout the entire hearing

17  would be information that's used to make a decision.

18          So I was trying to explain to him that, you

19  know, I can assure you -- and I think those are the

20  words I put in my response to him -- that that is not

21  the only thing used to make a decision.  Only because

22  it is a total, you know, process.  It's the minute the

23  hearing starts, to the minute that it closes, all of

24  that information, to include the file information, is

25  used to in the decision-making process.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 59 of 88

1      Q.   So you don't think that this Exhibit 11 is

2  a complete explanation for the board's decision?

3      **A.   Could they have put additional things on**

4  **there?  Yes.**

5      Q.   It sounds like it's incomplete.  Because

6  you told Sidney, and testifying today, that this is not

7  the only reason for the board's decision?

8      **A.   I did not make the decision.  I cannot**

9  **state whether this form is complete or incomplete.**

10     **Do I feel as though it should have**

11 **additional reasons marked?  Yes.  But that is solely my**

12 **opinion.  That is not -- I'm not -- I don't have the**

13 **ability to say if their form is complete or incomplete.**

14     Q.   Sidney tells you he wants to appeal the

15 decision?

16     **A.   Right.**

17     Q.   And he asks to speak with you about it,

18 right?

19     **A.   He may have asked that, yes.**

20     Q.   Did you speak with him about his concerns?

21     **A.   I don't know that I spoke to him, no.  I**

22 **may have just sent him my response.  And generally if**

23 **they respond back, that's when we'll try to resolve it**

24 **other ways.**

25     **(Deposition Exhibit No. 13 was marked for**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 60 of 88

1    **identification.)**

2    BY MS. BREIHAN:

3          Q.   I'll hand you what I've marked as

4    Exhibit 13.  It's Bliesath 34.

5               Is this your response to Sidney that you

6    were talking about?

7          **A.   Yes.**

8          Q.   And it's dated April 18th, 2017, correct?

9          **A.   Correct.**

10         Q.   Would that have been the date that you sent

11   it to him?

12         **A.   Yes.**

13         Q.   I think you testified a moment ago that you

14   responded the same day that you received the letter?

15         **A.   It would have been in or around that time**

16   **period.**

17         Q.   And in here you tell him that the comment

18   on the form represents just one reason why the board

19   made its decision, but you assure Mr. Roberts it's not

20   the sole reason that he received reconsideration versus

21   a release date, correct?

22         **A.   Right.**

23         Q.   How do you know that this is not the sole

24   reason for the board's decision?

25         **A.   Like I just said, I think the way I maybe**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 61 of 88

1  explained it to him was interpreted differently, but I

2  meant as a hearing, in its entirety, everything is --

3  is -- goes into the decision-making process.

4          If it was based solely on just the

5  circumstances of the offense, then you would go into

6  the hearing, you would discuss the present offense, and

7  then it would be over, and then you would leave.  You

8  would dismiss all parties.

9          But they spend the entire tire time

10 discussing.  And since I was present for his hearing, I

11 know that they spent additional time in the hearing

12 discussing more than just the present offense.

13         So should they have maybe noted additional

14 items on there?  Possibly.  That's not my decision.

15 But I can -- you know, especially having been at his

16 hearing -- you know, I look at anything that's

17 discussed during a hearing goes into a decision-making

18 process.  So that's -- that's what I was referring to.

19 It maybe didn't come out so eloquently on paper, but

20 that's what I was referring to.

21    Q.   So are you aware of what options the board

22 has for explanation for its decision?

23    A.   I don't know that.  I don't know the

24 specific things, no.

25    Q.   Do you know whether institutional

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 62 of 88

1  adjustment is a reason that the board can cite?

2      **A.    I do know that is one of them.  Right.**

3      Q.    And you said you were present at his

4  hearing and you know they talked more about his crime?

5      **A.    Yes.**

6      Q.    A few minutes ago you said you don't

7  remember what was said at his hearing.

8      **A.    Well, I know at hearings -- in his hearing,**

9  **I don't remember the specific words, but I know that**

10 **there was more than just the present offense discussed.**

11 **I've never been at a hearing where only the crime**

12 **itself was discussed and nothing further.  That's never**

13 **happened, to my knowledge.**

14     Q.    So did you discuss, when you got Sidney's

15 letter, did you call anyone on the parole board to ask

16 them about how they made their decision?

17     **A.    No.**

18     Q.    Did you speak to an analyst about why they

19 made this decision?

20     **A.    No.**

21     Q.    Who was the -- who was the district

22 administrator on Sidney's hearing panel?

23     **A.**    ███████████████████

   ██    ██    ███████████████

25     **A.    Yeah.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 63 of 88

1      Q.   Did you speak to Mr. ███████ about

2 Sidney's question and the basis for the board's

3 decision?

4      **A.   No.**

5      Q.   Did I read somewhere in the parole file, or

6 the steps we were talking about earlier, where it said

7 the board's decision was also noted on these other

8 factors that are not noted in Exhibit 11?

9      **A.   No.**

10      Q.   So it's just based of an assumption without

11 you having verified it with the board or the hearing

12 panel?

13      **A.   It was based off of my experience in that**

14 **setting.  Not just his specific hearing, but in**

15 **general.  I mean, we complete a report based off**

16 **of -- you know, I mean this is a 13-page report off of**

17 **numerous different portions or sections.  And to say**

18 **that it was only based off of this, like I said, should**

19 **there have been additional things possibly checked on**

20 **there?  Sure.  But that's not my call.  I can't make**

21 **that decision.**

22      Q.   And you weren't present for the vote by the

23 board or the panel?

24      **A.   That's correct.  No, I was not present.**

25      Q.   And you weren't present for any

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 64 of 88

1 deliberations by the panel or the board in his case,

2 correct?

3     A.    That's correct.

4     Q.    You also note in your letter to Sidney that

5 their decision, due to the fact that they gave him four

6 versus five-year setback, in your opinion, indicates

7 that they are aware of Sidney's efforts and would like

8 to continue seeing improved behavior and

9 accomplishments.

10          How do you know that?

11     A.    I don't know that specifically.  Like I

12 said, I'm just giving them, you know, based off of what

13 I've seen in 11 years, and circumstances, you know,

14 that are similar, is that, obviously, they thought

15 there was something there.

16          Again, this is just my opinion, of noting

17 his improvements and such, versus giving him a five,

18 they gave him a four.  And, again, that's -- that is,

19 to me, them being aware of those efforts.

20     Q.    So one of the ways that Sidney could

21 continue improving his behavior and accomplishments is

22 expanding his program participation, correct?

23     A.    Sure.  Maintaining his good adjustment.

24 Expanding his programming.  Just anything really.

25     Q.    But there's no direction from the board in

PohlmanUSA Court Reporting
(877) 421-0099     www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 65 of 88

1  Exhibit 11 about participating in certain programs,

2  or --

3         **A.    No.**

4         Q.    Okay.  And are you ever given an

5  explanation by the panel or the board about why a

6  specific setback was chosen?

7         **A.    No.**

8         Q.    Is the inmate ever given an explanation

9  about that?

10        **A.    Other than my personal assessment of it,**

11 **my -- based off of my experience, that's the only thing**

12 **I can give them.  And sometimes that helps them**

13 **understand it better and sometimes it doesn't.  I just**

14 **give them what I think, essentially.  It may or not**

15 **have happened.**

16        Q.    So what does it mean when someone is denied

17 parole based on circumstances surrounding the present

18 offense?

19        **A.    What do you mean what does it mean?**

20        Q.    Well --

21        **A.    To me, that's --**

22        Q.    What does that mean to you?  How do you

23 interpret that?

24        **A.    Based off of the circumstances surrounding**

25 **the offense, or, like, the nature of the offense, that**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 66 of 88

1    that's why parole was denied at the time.

2          Q.    'Cause the crime is serious, and that's why

3    they --

4          A.    Possibly, yeah.

5          Q.    Okay.  What else might it mean?

6          A.    To me, it's pretty cut and dry.  I mean, if

7    they have additional thoughts behind it, I don't know

8    if they're taking it further --

9          Q.    Well --

10         A.    -- in the explanation.  But to me, it would

11   just mean that due to the nature and the circumstances

12   of the offense, but ...

13         Q.    And in his letter Sidney expresses some

14   confusion about this, right?  And that the

15   circumstances of his offense are never going to change?

16         A.    Correct.  I agree.

17         Q.    So how could Sidney ever be eligible for

18   his parole if the only reason cited for denial is a

19   factor that will never change?

20         A.    And that's -- that's not a question for me.

21   That has nothing to do with me.

22         Q.    You don't know that?

23         A.    I can't speak on that.  All I can do is

24   encourage additional positive, you know, reinforcement

25   on what could be done.  I can't say that -- I can't,

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 67 of 88

1   I guess, speak on behalf of the board.  It's not my

2   place.

3              (Deposition Exhibit No. 14 was marked for

4   identification.)

5   BY MS. BREIHAN:

6        Q.   I'll hand you what I've marked as

7   Exhibit 14.  It's AGO2964 through 2966.

8              Do you recognize this document?

9        A.   No.

10       Q.   Have you ever seen this before today?

11       A.   I don't recall.  It's possible, but I don't

12   remember it, no.

13       Q.   It appears to be a letter from Sidney to

14   you.  And it's stamped as having been received by the

15   Board of Probation and Parole on December 16, 2016.  It

16   looks like on the last page it's copied to Kelly Dills.

17              Do you see that?

18       A.   Yeah.  That stamp is not my office.

19       Q.   Sure.  But it's directed to you with a

20   carbon copy to Kelly Dills, correct?

21       A.   Right.

22       Q.   You don't recall receiving this?

23       A.   I don't.  I could have though and I don't

24   recall.

25       Q.   Is it every day that there's a comment that

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 68 of 88

1   you would receive, a document like this, an indication

2   of rights, before an inmate's parole hearing?

3        **A.   No.  I mean, say that again.**

4        Q.   Is it common that you would receive a

5   document like this?

6        **A.   No.**

7        Q.   So since you don't recall this document,

8   safe to say you don't remember having any conversations

9   with anyone about it?

10       **A.   No.**

11       Q.   Have you received any training specific to

12   juvenile offenders?

13       **A.   I think we discussed last week, not -- no,**

14   **I don't work with juvenile offenders, so ...**

15       Q.   Sidney Roberts is a juvenile offender?

16       **A.   He committed his offense as a juvenile.  I**

17   **mean, I work at an all-male institution where**

18   **everyone's 18 years of age or older.**

19       Q.   Right.

20       So have you received any training for

21   working with adult males who were serving time for

22   offenses that they committed when they were under 18?

23       **A.   No.**

24       Q.   Have you ever received any training in how

25   to conduct these JL WOP prehearing interviews or

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL  Document 134-8  Filed 06/12/18  Page 69 of 88

1   hearings themselves?

2        **A.    No.  Other than the worksheet that we have.**

3        Q.    But that's not training, is it?

4        **A.    No.  It's just a guide.  A worksheet.**

5        Q.    Have you received any training in child

6   psychology or adolescent development?

7        **A.    No.**

8        Q.    Have you ever asked for any such training?

9        **A.    No.**

10       Q.    And, to your knowledge, has anyone

11  recommended that you or other parole staff receive such

12  training?

13       **A.    No.**

14       Q.    So last week we marked as Exhibit 3, your

15  training record.  I just have a couple of quick

16  questions about some of the training courses.

17            One is on page three, it's the SFS scoring,

18  in September of 2016.  The salient factor score.

19       **A.    The one that says --**

20       Q.    IPO specific?

21       **A.    Okay.**

22       Q.    What did that training entail?

23       **A.    I don't recall specifically.  It would have**

24  **to do something with the calculation of the salient**

25  **factor scores though.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 70 of 88

1      Q.    And what about right below it, the

2  criminogenic behavior, two refreshers.  What did that

3  entail?

4      **A.    The reading of the criminogenic histories.**

5      Q.    What do you mean?  It taught you how to

6  read them?

7      **A.    It goes over, like, reading and entering**

8  **the criminogenic history information.**

9      Q.    And what did it teach you about doing that?

10     **A.    What do you mean?**

11          **It's like -- it's like a data entry.  Or,**

12  **like, if you -- when you print out someone criminogenic**

13  **history, and, like, out of MO-CIC, it just shows you**

14  **how to break down that information.  And if it's not**

15  **something that's Department of Corrections-related,**

16  **like, they're currently incarcerated for it, then we**

17  **would go over then how to enter it into our system.**

18     Q.    So it was more like technical data entry

19  training?

20     **A.    Yeah.**

21     Q.    Okay.  And then on the next page there's a

22  program from December 2015 on advanced motivational

23  interviewing.

24          On the very bottom of the page,

25  December 2016.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 71 of 88

1      A.   Yes.

2      Q.   What did that training entail?

3      A.   I don't recall specifically.  I don't

4   recall specifically.  It looks like it was probably an

5   online course, if I had to guess.

6      Q.   How can you tell that?

7      A.   I'm only saying that based off of the time.

8   The allotment of hours.  I would assume that was an

9   online course.

10     Q.   You testified that you also conducted

11  prehearing interviews with ███████████████████

12  ███████ , and ████████████████ , correct?

13     A.   I believe those.  I don't know about any

14  other ones though.

15     Q.   You said you recalled Mr. █████████ because

16  it was the most recent, correct?

17     A.   Yes.

18     Q.   And you interviewed him in September of

19  this year; is that correct?

20     A.   Yes.

21     Q.   Do you remember the date of your interview?

22     A.   I do not.

23     Q.   What was your recommendation and assessment

24  for Mr. ██████████ ?

25     A.   Is that --

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 72 of 88

1    MR. CRANE:  If you know.

2    MR. SPILLANE:  If you don't know --

3    ████████████    ████████████████████

     ████████████████████

     ██ ████████████:

6    ██ ████████████████████████████████

7    ██

8    ██ ████████████████████  ██████████

     ████████████████████.

10   Q.  ████████████████████████

     ██████

     ██ ████████████████████████████████

     ████████████████████  ████████████

     ████████████████████████████

     ████████████  ████████████████████

16   ████████████████████.

17   Q.  Do you know whether he was granted parole?

18   A.  He was not.

19   Q.  Were you at Mr. ████████' parole hearing?

20   A.  I don't think I was, no.

21   Q.  Okay.

22   A.  His victims -- he had victims present, but

23   they did not wish to stay for his portion.  So at that

24   point, we leave.  Like I said, we're just escorts for

25   the victims.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 73 of 88

1       Q.   So you were present for the victims'

2  portion, but not his?

3       **A.   Correct.**

4       Q.   What do you recall from the victims'

5  portion of Mr. Clemmons hearing?

6       **A.   I don't remember specifically, but it was**

7  **nothing out of the ordinary.**

8       Q.   Did they talk about the facts of the crime?

9       **A.   I don't believe it was discussed in, like,**

10  **great detail, no.**

11       Q.   What did they talk about?

12       **A.   I think it was the victim's mother that was**

13  **present.  I think she just discussed her recollection**

14  **of the events.  And then there was prosecution**

15  **representation there as well.  And they provided a**

16  **document to the panel.**

17       Q.   A written document?

18       **A.   Something.  I don't remember what it was**

19  **exactly, but, yes.**

20       Q.   So Mr. █████████ had no way of knowing that

21  victims' representatives or the prosecutor were present

22  at his hearing because they left before he came in?

23       **A.   Correct.  I don't know if he knows or not.**

24  **We don't disclose that information due to the interest**

25  **of the victim.  If it he got wind of it somehow, I**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 74 of 88

1    mean, I don't know.

2         Q.   Okay.  I'll hand you what I've marked as

3    Exhibit 14.

4              (Deposition Exhibit No. 14 was marked for

5    identification.)

6              (Remarked as Exhibit 15.)

7    BY MS. BREIHAN:

8         Q.   Have you seen this two-page document

9    before?

10        A.   I have, yes.

11        Q.   And this is the parole decision notice for

12   ███████  ████████, correct?

13        A.   Correct.

14        Q.   And he was given a four-year setback,

15   correct?

16        A.   That's correct.

17        Q.   Based solely on the circumstances

18   surrounding the present offense, correct?

19        A.   That's what it notes, yes.

20        Q.   So, again, as Mr. Roberts' case, this is

21   the only reason for their decision?

22        A.   I can't speak on that.  I would like to

23   think no.

24        Q.   Did ██. ████████ have any questions to you

25   about the board's decision?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 75 of 88

1      A.   He did.  He sent me a letter and I
2  responded to him.

3      Q.   What did he ask you?

4      A.   Um, I don't remember specifically, but it
5  was something about an understanding of why the
6  decision was made.

7           And I probably gave him a similar response
8  that I did with Mr. Roberts.  I was possibly a little
9  more confused as well, as far as why the decision was
10 made.

11     Q.   What more could, I guess, what more could
12 Mr. ███████    do?

13     A.   I would agree with that.  I don't --

14          MR. CRANE:  I'll just object to this line
15 of questions as to relevance, but you can answer.

16          MS. BREIHAN:  You already answered.  Your
17 objection's noted.

18 BY MS. BREIHAN:

19     Q.   What about Mr. ███████, when did you
20 interview him?

21     A.   I don't recall the exact.  He was one of
22 the earlier ones.

23     Q.   So in 2016 some time?

24     A.   Yes.

25     Q.   And what was your recommendation for

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 76 of 88



1    Mr. ████ ?

2         A.    ████████████████████

3    ████████████ .

4         Q.    ████████████ ?

5         A.    ████████████████████

6    ████████████ .

7         Q.    ████████████████

8    ████

9         A.    ██████

10        Q.    ████████████████

11   ██████

12        █    ██████    ████████████ .

13        █    ██████████ ?

14        █    ██████

15        █    ████████████████

16   ████████████

17        █    ████████████    ████████

18   ██████    ████████████████

19   ████████████████

20   ██████ .

21        █    ████████████

22   ████████ ?

23        █    ██████    █████ .

24        █    ████████

25        A. ██████    ████████████

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 77 of 88

1  ███████████████████████████████████

2  ██ ██████████████████████████.

3  ██  ██  ████████████████████████

4  ██ ███████████████████████?

5  ██  ██  █████████

6       Q.    And in your opinion that complies with the

7  senate bill, and the Miller/Montgomery, and the idea

8  that juveniles should be given a meaningful and

9  realistic opportunity for release?

10      **A.    I can't really speak on that.  I just go**

11 **off what's required based off our policies and**

12 **procedures, and the statutory requirements for the**

13 **crimes that are there, so ...**

14      Q.    Were you present for Mr. Goforth's hearing?

15      **A.    I don't recall.  I don't think I was**

16 **though.**

17      Q.    What about Mr. -- I'm sorry, do you

18 remember what the decision was by the board in

19 Mr. ███████ case?

20      **A.    I think they put him on a schedule based**

21 **off of that consecutive requirement.**

22      Q.    Okay.  And what about ████████████ , when

23 did you interview Mr. ████████?

24      **A.    I think he was the first one that I did.**

25 **And that would have been even earlier than in 2016.  I**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 78 of 88

1    think it was one of the first petitions that they

2    actually had.

3           Q.   And what was your recommendation for

4    Mr. Vincent?

5           A.   I don't recall.  I would have to say --

6                MR. SPILLANE:  If you don't remember, don't

7    guess.

8    ███████████████     ███████████████     █████████████

9    ████████████████████████████     █████████████████████

10   █████████████

11   ███████████████

12   ██    █████     █████████     █████████████████████████

13   ██    █████████████████████████████████████

14         ████     ██████████████████████████.

15          Q.   And when was Mr. ██████████ parole hearing?

16          A.   It would have been approximately a month

17   after our interview with him.  I don't recall.

18          Q.   Some time in 2016?

19          A.   Yeah.

20          Q.   Were you present for his parole hearing?

21          A.   I don't recall.  If there was victims

22   present, then I would have been.

23          Q.   And what was the decision in Mr. ██████████

24   case?

25          A.   I believe he received a reconsideration

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 79 of 88

1  **hearing.**

2      Q.   Do you remember if he received a five-year

3  setback?

4      **A.   I don't remember.  I don't recall.**

5      Q.   Do you remember the reason was for the

6  board's decision was?

7      **A.   I don't.**

8      Q.   Were you present during any meetings when

9  Senate Bill 590 was discussed?

10     **A.   No.**

11     Q.   And you read the bill yourself?

12     **A.   Uh-huh.  Yes.**

13     Q.   Were you present during any meetings when

14  Miller versus Alabama was discussed?

15     **A.   No.**

16     Q.   Were you present during any meetings when

17  Montgomery versus Louisiana was discussed?

18     **A.   No.**

19     Q.   Were you present during any meetings, or

20  just catch-all conversations, when this lawsuit was

21  discussed?

22     **A.   No.**

23     Q.   Have you talked, discussed this lawsuit,

24  with anyone other than your attorneys?

25     **A.   Only other than our legal counsel to make**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 80 of 88

1   **sure what I could bring with me.  But that would be it.**

2   **I was told you guys already had copies of everything.**

3        Q.   Are you aware of language in the Miller or

4   Montgomery Supreme Court decisions that say life

5   without parole should be reserved only for the rarest

6   of juvenile offenders whose crime reflects irreparable

7   corruption?

8            MR. SPILLANE:  I'm gonna object to the

9   question because it's already been asked and answered

10  that she hasn't heard of those cases.

11           But you can answer.

12           MS. BREIHAN:  It was a different question.

13           MR. SPILLANE:  I disagree.

14  BY MS. BREIHAN:

15       Q.   You can answer.

16       **A.   Can you repeat it again?**

17       Q.   Yeah.

18           Are you aware of language in the Miller or

19  Montgomery decisions that life without parole should be

20  reserved for the rarest of juvenile offenders whose

21  crimes reflect irreparable corruption?

22       **A.   If that is mentioned in the senate bill,**

23  **then I would've -- if it would have made a note of**

24  **that, I don't recall.  The verbiage sounds familiar,**

25  **but if it was within the other document.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 81 of 88

1      Q.    So only if it's mentioned in the 590?

2      **A.    Yes.**

3      Q.    What does irreparable corruption mean to

4  you?

5            MR. SPILLANE:    Again, I'm going to object,

6  but you may answer.

7            THE WITNESS:    I would rather not answer.

8  BY MS. BREIHAN:

9      Q.    Okay.  Do you not know?

10     **A.    I don't -- I can't give a specific example**

11 **as to what that would be that I would think would be**

12 **specific.  You know.**

13     Q.    Okay.  Do you have a general answer about

14 what irreparable corruption means?

15     **A.    I mean, no.**

16     Q.    Or what it means for somebody to be

17 irreparably corrupt or permanently incorrigible?

18     **A.    I mean, I understand that.  I don't know**

19 **what a good example of that would be.**

20          **It could be -- and that's very vague to me.**

21 **I mean, it's specific, but yet it's broad.**

22          **So, I mean, we're not assessing the**

23 **juvenile.  You know, he was -- they were juveniles when**

24 **they committed the offense, but we're looking at also**

25 **their, you know, their adjustment and growth since that**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 82 of 88

1    **time period.**

2         Q.   But Senate Bill 590, when it talks

3    about -- when it talks about the inmate's right to

4    petition the board, it's talking about a review of the

5    sentence, right?

6         **A.   The review of the sentence itself?**

7         Q.   It says they may petition the board for

8    review of their sentence, correct?

9              I wish I had the bill with me today.  I

10   don't think I do.

11             Do you remember that language in the bill?

12        **A.   Not specifically.**

13             MS. BREIHAN:  I don't have any further

14   questions.

15   CROSS-EXAMINATION BY MR. SPILLANE:

16        Q.   How long have you been an institutional

17   parole officer?

18        **A.   I'm on my eleventh year, so ten years**

19   **completed.**

20        Q.   During that eleven years, have you ever

21   seen a case where a person was initially denied, and

22   the notice said it was based on the seriousness and

23   circumstances of the offense, and they were later

24   granted parole?

25        **A.   Yes.  I may not have been present for the**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 83 of 88

1   **initial denial, but then I was present for the granting**

2   **of a release date.**

3       Q.   In your experience, about what percentage

4   of people -- if you don't know, don't answer -- that

5   are eligible for parole eventually receive parole?

6       **A.   I don't know an exact percentage, other**

7   **than, you know, they state that 95 percent of those**

8   **that are incarcerated at some point in time will be**

9   **released.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 84 of 88

1 ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆ ▆▆▆▆▆▆▆▆▆

▆     Q.   ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆          **A.   I would say yes, the main thing would be**

11 **the fact of his adjustment, his conduct violations, the**

12 **nature of such.**

13          Q.   And that would be carrying a weapon.  And

14 you also mentioned that he resorts to or thought of

15 violence.

16          Could you tell me a little bit about that?

17          **A.   That is what I would connect to the**

18 **necessity of having a weapon on your person.**

19          MR. SPILLANE:  I have no more questions.

20          MS. BREIHAN:  Just a couple follow-ups.

21 REDIRECT EXAMINATION BY MS. BREIHAN:

22          Q.   You testified that you don't know

23 specifically how many people are eventually released on

24 parole, but you think 95 percent of the prison

25 population will be released?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 85 of 88

1      **A.   I think that's what they've kind of always**

2   **said to us.**

3      Q.   Do you know what percentage of individuals

4   who are parole-eligible are given an outdate after

5   their first hearing?

6      **A.   I don't know.**

7      Q.   Do you know how many people serving life

8   with parole are released on parole after their first

9   consideration hearing?

10     **A.   I do not know.**

11     Q.   And I assume the same answer would be for

12  the percentage of people who are released at their

13  second hearing?

14     **A.   I don't know.  Yeah.**

15     Q.   Who would know that data?

16     **A.   I don't know.  I don't know who you'd have**

17  **to talk to about that.  I know I'm not privy to that**

18  **information.  Unless I kept my one statistical data,**

19  **which I don't know.**

20     Q.   But all four of individuals for whom you

21  did prehearing reports were denied parole, correct?

22     **A.   Correct.**

23         MS. BREIHAN:  Nothing further.

24         MR. SPILLANE:  Nothing further.

25         I'm going to ask about signature.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 86 of 88

1          Do you want to read it for typos or do you

2     want to let it go the way it is?

3               (An off-the-record discussion was held.)

4               THE WITNESS:  I'll waive.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PohlmanUSA Court Reporting
(877) 421-0099     www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 87 of 88

1                    CERTIFICATE OF REPORTER

2              I, Kim D. Murphy, Certified Court Reporter,

3     for the State of Missouri, do hereby certify that the

4     witness whose testimony appears in the foregoing

5     deposition was duly sworn by me; that the testimony of

6     said witness was taken by me to the best of my ability

7     and thereafter reduced to typewriting under my

8     direction; that I am neither counsel for, related to,

9     nor employed by any of the parties to the action in

10    which this deposition was taken, and further that I am

11    not a relative or employee of any attorney or counsel

12    employed by the parties thereto, nor financially or

13    otherwise interested in the outcome of the action.

14

15

16

17

18              _____

19                    Kim D. Murphy, CCR

20

21

22

23

24

25

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-8   Filed 06/12/18   Page 88 of 88