IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION


NORMAN BROWN, et al,              )
                                 )
        Plaintiffs,              )
                                 )
    vs.                          ) Case No. 17-CV-4082
                                 )
ANNE L. PRECYTHE, et             )
al,                              )
                                 )
        Defendants.              )


    CONFIDENTIAL DEPOSITION OF KELLY DILLS,

a Defendant, produced, sworn and examined on the

6th day of December, 2017, between the hours of

ten o'clock in the forenoon and four o'clock in the

afternoon of that day, at the offices of the

Missouri Attorney General's Office, Broadway State

Office Building, Sixth Floor, Jefferson City, Missouri,

before Kim D. Murphy, Certified Court Reporter, within

and for the State of Missouri.

1                       A P P E A R A N C E S

2

              For the Plaintiffs:
3
                     MACARTHUR JUSTICE CENTER
4                    By:  Amy Breihan
                     3115 S. Grand
5                    Suite 300
                     St. Louis, MO  63118
6                    314-254-8540

7
              For the Defendants:
8
                     MISSOURI ATTORNEY GENERAL
9                    By:  Michael Spillane
                          Andrew Crane
10                   Broadway State Office Building
                     221 W. High Street
11                   Jefferson City, MO  65101

12

13                       I N D E X

14   Direct Examination by Ms. Breihan              5
     Cross-Examination by Mr. Spillane             209
15   Redirect Examination by Mr. Crane             211
     Redirect Examination by Ms. Breihan           211
16   Recross-Examination by Mr. Spillane           215

17

18

19

20

21

22

23

24

25

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 2 of 216

1            DEPOSITION EXHIBIT INDEX

2    ID                                        MARKED

3    1:   Subpoena                              7

4    2:   CV of Kelly Dills                     9

5    3:   1-1-2017 Policy and Procedure         22

6    4:   Bates stamps AGO003456-3554           28

7    5:   Bates stamps AGO00485-487             46

8    6:   Bates stamps AGO001142-AG01144        52

9    7:   Bates stamp AGO0001269                56

10   8:   Bates stamp AG00001273-1275           62

11   9:   Bates stamps AGO001276-1278           73

12   10:  Bates stamp AGO003584-3593            80

13   11:  Bates stamp AGO0000060-61             85

14   12:  Drawing                               104

15   13:  Bates stamp AGO0001324                111

16   14:  Bates stamp AGO0001444-1445           114

17   15:  Bates stamp AGO0001456-1477           116

18   16:  4-27-17 email string                  116

19   17:  Bates stamp AGO0001590                121

20   18:  Bates stamp AGO0001409-1412           124

21   19:  Bates stamp AGO0000022-24             126

22   20:  Bates stamp AGO0001309-1310           128

23   21:  Bates stamp AGO0001479-1480           134

24   22:  Bates stamp AGO0001162                137

25   23:  Bates stamp AGO0000030-41             140

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 3 of 216

1               DEPOSITION EXHIBIT INDEX (Continued)

2      ID                                              MARKED

3      24:   Senate Bill 590                            144

4      25:   Bates stamp AGO003205-3209                 148

5      26:   Bates stamp AGO0001492-1493                151

6      27:   Bates stamp AGO0001611-1612                153

7      28:   Bates stamp AGO0000028                     154

8      29:   Bates stamp AGO0001605-1608                157

9      30:   Exhibit 7 to Complaint                     160

10     31:   Bates stamp AGO0002835-2837                162

11     32:   Bates stamp AGO0000450-452                 166

12     33:   Bates stamp AGO0000414-416                 170

13     34:   Bates stamp Dills000045-51                 173

14     35:   Bates stamp AGO0001200-1203                178

15     36:   Bates stamp AGO0001223-224                 180

16     37:   Bates stamp AGO0001547-1575                183

17     38:   Bates stamp AGO0001486-1487                190

18     39:   Bates stamp AGO0000595-602                 200

19     40:   Bates stamp AGO0000611-618                 202

20

21
       Court Reporter:
22     Kim D. Murphy, CCR

23

24

25

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 4 of 216

1    IT IS HEREBY STIPULATED AND AGREED, by and

2    between counsel for the Plaintiffs and counsel for the

3    Defendants that this deposition may be taken in

4    shorthand by Kim D. Murphy, CCR, and afterwards

5    transcribed into typewriting; and the signature of the

6    witness is expressly waived.

7                    *    *    *    *    *

8                    KELLY DILLS,

9    of lawful age, produced, sworn and examined on behalf

10   of the Plaintiffs, deposes and says:

11                   DIRECT EXAMINATION

12   QUESTIONS BY MS. BREIHAN:

13        Q.    Good morning.

14              Can you please state your name for the

15   record.

16        **A.    Kelly Dills.**

17        Q.    Ms. Dills, you're here for your deposition

18   today, correct?

19        **A.    Correct.**

20        Q.    And we met a little bit ago.  I'm

21   Amy Breihan, one of the attorneys for the plaintiffs in

22   this case.

23              Have you ever been deposed before?

24        **A.    No.**

25        Q.    Okay.  So I'm sure your attorneys did a

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 5 of 216

1  fabulous job preparing you, but I'll run through some

2  ground rules.

3            As you know, your testimony here today is

4  under oath.  So your job today is just to tell the

5  truth to the best of your ability and my job is to ask

6  questions.  If you can, try to answer verbally rather

7  than with ahead nod or even uh-huh or huh-uh.  Because

8  that's just hard for the court reporter to take down.

9  She's going to be writing doing everything that

10  everyone says today.

11           Do you understand.

12       **A.    Yes.**

13       Q.    We'll do our best not to speak over each

14  other.  Sometimes I might ask a question, and you'll

15  know where I'm doing with the question, but please let

16  me finish, and I'll do my best to let you finish and

17  not ask over you; does that sound fair?

18       **A.    Yes.**

19       Q.    If I ask a question that doesn't make sense

20  to you, or you didn't hear me, please just let me know

21  and we can either have the court report read it back,

22  or I can rephrase the question so it's more

23  comprehensible, okay?

24       **A.    Okay.**

25       Q.    If you answer a question, I'm going to

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 6 of 216

1    assume that you understood the question; is that fair?

2        **A.    Yes.**

3        Q.    And finally breaks.  We can take a break as

4    needed.  The only caveat to that is if I have a

5    question pending I'd ask that you answer it before we

6    take a break.

7        **A.    All right.**

8        Q.    If you need a break, just let your

9    attorneys know, or let me know, and we'll accommodate

10   you, okay?

11           I'm going to hand you what I've marked as

12   Exhibit 1.

13           (Deposition Exhibit No. 1 was marked for

14   identification.)

15   BY MS. BREIHAN:

16       Q.    I've got a copy for your attorneys as well.

17           Do you recognize this document, Ms. Dills?

18       **A.    Yes.**

19       Q.    And what is it?

20       **A.    It's a subpoena.**

21       Q.    You've seen this subpoena before today?

22       **A.    Yes.**

23       Q.    And if you go to Exhibit A of the subpoena,

24   which is sort of the third page of this packet of

25   documents, there are a series of defined terms, and

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 7 of 216

1    then eight separate requests for documents.

2          Do you see what I'm referring to?

3    **A.   Yes.**

4    Q.   Did you take any steps to search for

5    documents that might be responsive to these eight

6    requests?

7    **A.   Yes.**

8    Q.   And what did you do?

9    **A.   I did a keyword search of my email for the**

10   **juvenile life without paroles for each of the**

11   **defendants, or, I guess, the plaintiffs that were**

12   **listed.**

13         **And then I did a search of my computer**

14   **drive, which is like the hard drive, where we store**

15   **documents.**

16   Q.   And just to clarify, the plaintiffs in this

17   case are Mr. Roland, Mr. Brown, and Mr. McElray,

18   and Mr. Roberts, correct?

19   **A.   I don't know if it's Roberts or McRoberts.**

20   Q.   Roberts.

21   **A.   Okay.**

22   Q.   So I just want to confirm I understand.

23         So you did a search for each of their last

24   names?

25   **A.   Yes, I did.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 8 of 216

1          Q.   Did you also do a keyword search for the

2     acronym JL WOP?

3          **A.   Yes.**

4          Q.   And did you do anything else other than a

5     keyword search and looking on your drive?

6          **A.   No.**

7          Q.   Did you speak with anyone, other than your

8     attorneys which are here today, about responding to

9     this subpoena?

10         **A.   No.**

11         Q.   And did you bring documents with you today

12    that are responsive to this?

13         **A.   Yes, I did.**

14         Q.   Could I have those?

15              MR. CRANE:  Are they an identical stack?

16    Our printer's not the greatest.

17              MS. BREIHAN:  Looks like we Dills 1 through

18    194.

19              MR. CRANE:  That should be right.

20    BY MS. BREIHAN:

21         Q.   I'll take a look at most of these later,

22    but I noticed the first pages looked like a resume for

23    you; is that correct?

24         **A.   Correct.**

25         Q.   We talked about trying to get everyone out

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 9 of 216

1   of here by five for other commitments.  One way to

2   speed that along is to mark this as an exhibit.  I'll

3   do that now.

4           You said you have a copy in there?

5       **A.   Yes.**

6           MS. BREIHAN:  Can we mark that one so I

7   have a copy for my reference?

8           MR. CRANE:  Sure.

9           MS. BREIHAN:  These are not Bates-stamped?

10          MR. SPILLANE:  I have a Bates-stamped copy.

11  BY MS. BREIHAN:

12      Q.   I'll mark Exhibit 1 today as Dills 1 and

13  Dills 2.

14          And, Ms. Dills, this is a copy of your

15  resume, correct?

16      **A.   Correct.**

17      Q.   Is this an up-to-date copy?

18      **A.   Yes.**

19      Q.   And it shows that you're currently the

20  operations manager for the Central Office for the Board

21  of Probation and Parole, correct?

22      **A.   Yes.**

23      Q.   And that for about four years you were the

24  board operations director for the Board of Probation

25  and Parole, correct?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 10 of 216

1    A.   Yes.

2    Q.   We'll come back to that in a minute.

3         Aside from doing the search for documents

4    in response to the subpoena, which we already talked

5    about, what else did you do to prepare for your

6    deposition today?

7    A.   **Had conversations with my counsel.**

8    Q.   Anything else?

9    A.   **No.**

10   Q.   Did you review any documents before today?

11   A.   **The ones that I located, yes.**

12   Q.   But none other than the ones that you

13   produced for me today?

14   A.   **Correct.**

15   Q.   Okay.  So what's the highest level of

16   education you received?

17   A.   **Bachelor's.**

18   Q.   And that's in criminal justice, correct?

19   A.   **Yes.**

20   Q.   And then since your graduation in '89,

21   you've been employed with the Missouri Board of

22   Probation and Parole consistently, correct?

23   A.   **Yes.**

24   Q.   Pretty significant experience, I'm sure, in

25   institutional knowledge you have about the Board of

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 11 of 216

1    Probation and Parole in Missouri?

2        **A.    Yes.**

3        Q.    Can you talk about what your job duties and

4    responsibilities currently are as operations manager in

5    the Central Office?

6        **A.    I work for the chief state supervisor, and**

7    **I'm responsible for our community corrections unit,**

8    **which includes the interstate compact unit, residential**

9    **facility contract management, and a command center,**

10   **which is charged with electronic monitoring of all**

11   **offenders in the state.**

12       Q.    So in that position are you involved at all

13   in supervision of people who are on probation and

14   parole?

15       **A.    No.**

16       Q.    Are you involved in hearings for

17   revocations of parole?

18       **A.    No.**

19       Q.    And are you involved currently at all in

20   parole grant reviews?

21       **A.    No.**

22       Q.    Can you, going backwards, can you tell me

23   about your duties and responsibilities when you were

24   the board operations director?

25       **A.    Supervision of the parole analysts and the**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 12 of 216

1    board operations clerical staff.

2         Q.   Anything else?

3         A.   Those were the general duties.

4         Q.   Your resume also says that your duties

5    included interpreting statute, case law, and procedure

6    developments, correct?

7         A.   Correct.

8         Q.   During your coursework at St. Louis

9    University in the 80's, did you take any legal courses?

10        A.   Yes.

11        Q.   What legal courses did you take?

12        A.   Well, I don't exactly remember.  But I did

13   take -- it was undergrad and law.  So it was kind of a

14   dual -- I don't exactly remember what it was in.

15        Q.   Since graduating with your Bachelor's have

16   you taken any coursework on constitutional law or

17   Missouri state law?

18        A.   No.

19        Q.   And have you received -- strike that.

20             When you were board operations director, or

21   in the years preceding, did you receive any training

22   from the Missouri Department of Corrections or the

23   Board of Probation and Parole, regarding the law, or

24   legal interpretation of statute or case law?

25        A.   Yes.  We generally have training on legal

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 13 of 216

1  issues in Probation and Parole.

2       Q.   And what does that consist of?

3       A.   A professor from the University -- Central

4  Missouri in Warrensburg, comes down.  And I believe

5  it's a required training for supervisors.  And they

6  train us on preliminary hearings, some due process, and

7  just general discussion.

8            Some on discipline as it relates to

9  employees.

10      Q.   Do you know that professor's name?

11      A.   Dane Miller.

12      Q.   Dane?

13      A.   Dane.

14      Q.   When was the last time that you attended

15 that training?

16      A.   Probably early 2000's.

17      Q.   Is that provided on a regular basis then?

18      A.   It's usually a one-time training.

19      Q.   And you mentioned that it covers

20 due process issues, correct?

21      A.   Correct.

22      Q.   What do you remember from the due-process

23 coursework provided by Professor Miller?

24      A.   Basically what we have outlined in our

25 procedure with regard to giving an offender, whether

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 14 of 216

1  they're incarcerated or under supervision, notice of

2  what their violations are, the opportunity to be heard

3  by a hearing officer if we arrest them, and then right

4  to counsel in some instances.

5          Q.   And in what instances does an inmate have a

6  right to counsel in the parole and probation process?

7          A.   I believe they only have the right to

8  counsel if they are unable to assist in presenting

9  their own case or in cross-examining witnesses in cases

10  of revocation.

11          Q.   I guess the due process sort of topics you

12  just talked about sounded like maybe uniquely to

13  revocation; am I understanding correctly?

14          A.   Correct.

15          Q.   Do you recall anything you learned about

16  due process with respect to the parole grants review

17  process?

18          A.   No.

19          Q.   And so when you were getting your

20  Bachelor's at SLU, did you take any coursework on

21  adolescent development or psychology?

22          A.   Just general psychology.

23          Q.   Just a general studies kind of course?

24          A.   Yes.

25          Q.   In your capacity as board operations

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 15 of 216

1   director, were you ever responsible or involved in

2   drafting proposed legislation or just interpreting it?

3        **A.**   **Drafting.**

4        Q.   And under what circumstances would you be

5   involved in drafting proposed legislation?

6        **A.**   **If the department had an initiative that**

7   **they thought would help us do business better, then**

8   **certain ideas or concepts would be assigned for**

9   **different people to write up.  And then we would send**

10   **them through the department director, through the**

11   **process, through OA.**

12        Q.   What's OA?

13        **A.**   **Office of Administration.**

14        Q.   Were you ever involved in drafting proposed

15   legislation related to juvenile offenders?

16        **A.**   **No.**

17        Q.   And throughout today, I might use the

18   acronym JL WOP, you understand that's the punitive

19   class that's involved in this lawsuit?

20        **A.**   **Yes.**

21        Q.   Were you involved in drafting proposed

22   legislation related to JL WOP?

23        **A.**   **No.**

24        Q.   Were you ever involved in reviewing or

25   analyzing proposed legislation related to JL WOP?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 16 of 216

1      **A.    Yes.**

2      Q.    Do you remember the Senate House bills that

3   you were specifically involved in in reviewing or

4   analyzing?

5      **A.    I remember several.  I wouldn't be able to**

6   **point to one specifically.**

7      Q.    When you were board operations director, I

8   assume that you as part of that job attended

9   administrative meetings regularly; is that fair to say?

10     **A.    Yes.**

11     Q.    And board meetings?

12     **A.    Yes.**

13     Q.    And meetings with parole analysts?

14     **A.    Yes.**

15     Q.    Did you attend any other regular

16  administrative meetings in your capacity as board

17  operations director?

18     **A.    Probation and Parole administrators' team**

19  **meeting.**

20     Q.    And how often would the Probation and

21  Parole administrators' team meeting occur?

22     **A.    Monthly.**

23     Q.    How often would the board meetings occur?

24     **A.    Generally, once a month.**

25     Q.    And what about the analysts meeting; how

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 17 of 216

1  often did they occur?

2      **A.    Once a month.**

3      Q.    And aside from -- well, strike that.

4            Who generally would be present at these

5  monthly board meetings?

6      **A.    The board members.  The chairman of the**

7  **board's executive assistant.  The parole analyst.  And**

8  **the institutional regional administrator.  And special**

9  **guests.**

10     Q.    Who determines who can be a special guest

11 at the board meetings?

12     **A.    The chairman.**

13     Q.    And who typically are the special guests?

14           Are there other Board of Probation and

15 Parole employees?

16           Are they legislators?

17           Who are they?

18     **A.    They're generally trainers who are**

19 **providing training to the board on topics.  Or other**

20 **Department of Corrections staff to try to educate board**

21 **members about programs that inmates attend.**

22     Q.    Anybody else?

23     **A.    Not that I can recall.**

24     Q.    And then who would generally attend the

25 monthly parole analyst meeting?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 18 of 216

1        A.    The parole analysts.  The institutional

2    regional administrator.  And any institutional chief

3    administrative officer, meeting the supervisors of the

4    institutional parole offices were invited to attend.

5        Q.    Anyone else?

6        A.    No.

7        Q.    During the time that you were board

8    operations director, who was the board -- the chair's

9    executive assistant?

10        A.    Linda Welch.  And then Pam Rogers.

11        Q.    And who was the board chair during your

12    tenure as board operations director?

13        A.    Ellis McSwain and Kenny Jones.

14        Q.    When did Kenny Jones become chair?

15        A.    In February of 2017.

16        Q.    And then you were transferred to the

17    operations manager position shortly thereafter; is that

18    fair to say?

19        A.    Yes.

20        Q.    Sort of a changing of the guard occurred,

21    it seems, in February or spring of 2017?

22        A.    Yes.

23        Q.    And who was the institutional regional

24    administrator during your tenure as board operations

25    director?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 19 of 216

1       A.    Mike Weber.  And then Michelle Kasak.

2       Q.    Do you recall when Ms. Kasak sort of took

3  over in that role?

4       A.    Probably 2014.

5       Q.    When you were board operations director,

6  you mentioned you supervised the parole analysts and

7  board operations clerical support, correct?

8       A.    Yes.

9       Q.    Did you supervise anyone else?

10      A.    No.

11      Q.    And who was your direct supervisor?

12      A.    Ellis McSwain.

13      Q.    And then for a short period, Mr. Jones,

14  correct?

15      A.    Correct.

16      Q.    Do you have any professional certifications

17  or licenses that are not listed on your resume?

18      A.    No.

19      Q.    The amended initial disclosures that the

20  defendants in this case served identify you as the

21  operations manager.  And they indicate that you are

22  likely to have information about the policies and

23  procedures of the Missouri Board of Probation and

24  Parole, especially technical analysis of parole issues.

25            Is that a fair assessment of the

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 20 of 216

1  information that you might have relating to this case?

2        A.    Yes.

3        Q.    Can you tell me what that phrase means,

4  "technical analysis of parole issues?"

5        **A.    As board operations director, and even in**

6  **my current role, I mean, you're constantly examining**

7  **policy procedure in light of new legislation.**

8              **For example, I was in charge for the**

9  **department of changing all the policies and procedures**

10 **when the criminal code became effective in 2017, in**

11 **making sure that all of our applicable computer systems**

12 **could accept new charge codes, changed all the**

13 **policies, both departmentally and divisionally.**

14       Q.    So is it fair to say that your job, both

15 when you're board operations director and currently,

16 was to keep your finger on the pulse of evolution in

17 the law and make sure that the Board of Probation and

18 Parole was in compliance with current a law?

19             Is that fair to say?

20       **A.    Correct.**

21       Q.    So what rules, or what law, what sources of

22 law govern what the parole board does every day?

23       **A.    I don't understand.**

24       Q.    You talked about policies and procedures,

25 right?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 21 of 216

1     **A.   Yes.**

2     Q.   That's sort of one source of rules or

3 requirements that govern the work that the board and

4 parole staff do every day; is that fair to say?

5     **A.   Yes.**

6     Q.   Are there any other documents or laws that

7 in your experience and opinion govern the work that the

8 parole board does and the parole analysts do every day?

9     **A.   The Code of State Regulations and our**

10 **administrative rules.**

11     Q.   Anything else?

12     **A.   No.**

13     Q.   When you refer to the administrative rules,

14 are you talking about the Blue Book?  Or is that

15 something different?

16     **A.   No, I'm not talking about the Code of State**

17 **Regulations.**

18     Q.   Okay.  You're familiar with the -- this

19 Blue Book, correct?

20     **A.   Yes.**

21     Q.   And I can mark it as Exhibit 3 so that

22 we're all referring to the same thing.

23     (Deposition Exhibit No. 3 was marked for

24 identification.)

25 BY MS. BREIHAN:

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 22 of 216

1            The Blue Book here that we've marked as

2     Exhibit 3, that governs or controls the parole staff?

3          **A.    The Blue Book is reflective of board**

4     **practice and policy.**

5          Q.    Okay.

6          **A.    And it's published to assist offenders in**

7     **understanding kind of the parole system in Missouri.**

8          Q.    Okay.  So I just want to make sure I

9     understand.

10           The Blue Book is really more a guide for

11    inmates; it's not necessarily a guide for board members

12    or parole analysts; is that correct.

13         **A.    Correct.**

14         Q.    So generally speaking, parole board member

15    analysts don't really refer to this Blue Book when

16    they're carrying out their job duties, at least to your

17    knowledge?

18         **A.    No.**

19         Q.    Do you know who's responsible for putting

20    the Blue Book together?

21         **A.    As an agency we have sort of have a**

22    **committee that reviews all the administrative rules.**

23    **The Blue Book.**

24           **We have also a White Book.  We have a Green**

25    **Book.  And we have an Orange Book.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 23 of 216

1          **And so it's generally whoever is considered**
2  **the subject matter expert in that area, and then I'm**
3  **responsible for the final review before publication.**
4          Q.   When you say subject matter in the area,
5  are you talking about, like, there's somebody, or some
6  people who have subject matter in procedures governing
7  parole grants?
8          **A.   Yes.**
9          Q.   And who would that be?
10         **A.   The parole analysts group.**
11         Q.   So the parole analysts are subject matter
12 experts in parole grant reviews?
13         **A.   Yes.**
14         Q.   And what makes them the subject matter
15 experts?
16         **A.   Experience.   Knowledge.**
17         Q.   Anything else?
18         **A.   No.**
19         Q.   Do you know what the hiring criteria is for
20 a parole analyst?
21         **A.   Yes.**
22         Q.   What is it?
23         **A.   You have to have a certain level of**
24 **experience and history with Probation and Parole.**
25         Q.   Is that, like, a certain number of years?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 24 of 216

1          A.    Certain number of years.  A Bachelor's

2    degree.  And I believe that you have to be the level of

3    at least a unit supervisor or above for two years.

4          Q.    Is there any specific subject that's

5    required?  Or just a Bachelor's degree period?

6          A.    I believe the Bachelor's degree has to be

7    in a related field to be hired even in Probation and

8    Parole at a certain level.

9          Q.    So what would be considered a related

10   field?

11         A.    Criminal justice.  Sociology.  Psychology.

12         Q.    And do you know how many parole analysts

13   have psychology degrees?

14         A.    No.

15         Q.    Do any parole analysts currently employed

16   by the board have advanced degrees beyond a Bachelor's?

17         A.    I don't know.

18         Q.    Does anyone you know of when you were board

19   operations director?

20         A.    I don't know.  I didn't hire many of those

21   staff.

22         Q.    So who else would -- so who else would be

23   on the committee for reviewing the administrative

24   rules, or the Blue Book, keeping those up to date?

25         A.    If there were significant changes they

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 25 of 216

1  **would be presented to the board at a board for voting**

2  **and approval.**

3      Q.   But you don't know the names -- if you look

4  at the first page of Exhibit 3, it says January 1st,

5  2017 -- which indicates to me it was updated the

6  beginning of this year.

7          Is that your understanding of what that

8  notation means?

9      **A.   Yes.**

10     Q.   Do you know the names of specific people

11 who were involved with updating this booklet?

12     **A.   Yes.**

13     Q.   Who?

14     **A.   Myself.  Steve Mueller.  Matt Kimsey.**

15 **Robin Warder.  Brian George.  Mike Davis.  Rick**

16 **Kuttenkuler.**

17     Q.   Do you know how to spell his last name?

18     **A.   K-u-t-t-e-n-k-u-l-e-r.**

19     Q.   Anyone else responsible for revising the

20 Blue Book then?

21     **A.   Not that I remember.  Other than**

22 **administrative support staff.**

23     Q.   Could you just walk me through what the

24 process was that you and the others you just named

25 undertook to revise the Blue Book?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 26 of 216

1    **A.   We went through each section, made sure the**

2    **wording was accurate, looked for things that were**

3    **obsolete or areas that needed to be added.**

4        Q.   And you said one of the things you did was

5    made sure wording was accurate.

6             What were you cross-referencing the Blue

7    Book to in order to make sure it was accurate?

8        **A.   Current practice.**

9        Q.   Is there a document that summarizes that

10   that you'd be comparing it to?

11       **A.   Just board decisions as reflected in their**

12   **meeting minutes.**

13       Q.   Okay.  So you would be making sure that

14   wording in the Blue Book was accurate as compared to

15   board meeting minutes; is that correct?

16       **A.   Or policy and procedure.**

17       Q.   When you and the others updated the Blue

18   Book in early 2017, did you incorporate any specific

19   provisions regarding JL WOP parole hearings or

20   Senate Bill 590?

21       **A.   I believe we did.**

22       Q.   Could show me where that is?

23       **A.   (The witness indicated.)  On page ten,**

24   **number 20, item D.**

25       Q.   And 20, it says, "Certain offenders who

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 27 of 216

1    were under the age of 18 at the time of the offense may

2    petition the board after serving 25 years in accordance

3    with 558.047 RSMo.  Parole consideration will be

4    determined by the board on an individual basis."

5            Is that language that you drafted?  Or

6    someone else drafted to put in there?

7        A.    I don't remember.

8        Q.    Aside from this reference on page ten to

9    Missouri statute, is there any other language in this

10   Exhibit 3 that references or refers to JL WOP or

11   Senate Bill 590?

12       A.    Not that I know of.

13             (Deposition Exhibit No. 4 was marked for

14   identification.)

15   BY MS. BREIHAN:

16       Q.    I'll hand you what I've marked as

17   Exhibit 4.

18             We've been talking or referencing policies

19   and procedures.  And is this a table of contents for

20   the policies and procedures that you've been sort of

21   referring to in passing?

22       A.    It's a table of contents for the divisional

23   manual for the Probation and Parole.

24       Q.    So are there any policies and procedures

25   which relate to parole review, which would be found

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 28 of 216

1    somewhere else, other than in this divisional manual?

2         A.   No.

3         Q.   And can you identify for me which of these

4    procedures relate specifically to parole review?

5         A.   Chapter 6.

6         Q.   Any other chapters or specific policies or

7    procedures other than what's here in chapter six?

8         A.   Not that relate to parole review.

9         Q.   Are there any procedures in the divisional

10   manual which specifically mentioned JL WOP?

11        A.   Not to my knowledge.

12        Q.   Are there any that specifically mentioned

13   youthful offenders?

14        A.   Not to my knowledge.

15        Q.   And just so we understand going forward, by

16   youthful offenders I mean individuals who were

17   under 18 at the time of the underlying offense.

18             Are there any specific procedures that

19   relate to Senate Bill 590?

20        A.   No.

21        Q.   And who is responsible for drafting these

22   procedures?

23             Is it that same committee that you talked

24   about?

25        A.   It's a divisional manual worker committee.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 29 of 216

1    Q.   Do you know, who was that work group

2    committee during the time that you were board

3    operations director?

4    **A.   Over 20 people.**

5    Q.   Okay.

6    **A.   I wouldn't be able to give you their names.**

7    Q.   Okay.  Do you remember any names?

8    **A.   I believe that they -- the chair of that**

9    **group was Mary Beth Stewart.**

10   Q.   And who's Ms. Stewart?

11   **A.   At that time, she was a district**

12   **administrator in the Springfield region.**

13   Q.   What's a district administrator do?

14   **A.   Supervises the field Probation and Parole**

15   **office.**

16   Q.   And I should have asked this question

17   earlier, but the names you mentioned earlier for the

18   committee that you and Mr. Mueller were on that was

19   responsible for revising the Blue Book, are those other

20   individuals all parole analysts?

21   **A.   Yes.**

22   Q.   Other than Mary Beth Stewart, do you

23   remember anyone else that was on the divisional manual

24   work group committee?

25   **A.   The Chapter 6 committee specific to**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 30 of 216

1    institutional procedures have a subgroup that consisted

2    of Mike Davis, Matt Kimsey.  I'm not sure if

3    Michelle Kasak was a part of that group or not.  And

4    Tina Princler.

5         Q.   What's Ms. Princler's title?

6         A.   She is a district administrator II at the

7    Moberly Correctional Center.

8         Q.   Were there any lawyers on either of these

9    committees?

10        A.   Not on the committee.

11        Q.   What was the process?

12             Let's focus on the Blue Book.  The

13   committee you were a part of after you and the others

14   sort of did your work to prepared revisions to the Blue

15   Book, what would happen next?

16        A.   Well, the first thing that happens is the

17   administrative rules are amended.

18             And then we worked on the Blue Book, which

19   is kind of -- I don't know what you would call

20   it -- but it's referred to in those administrative

21   rules.  And both of those are approved by Department of

22   Corrections' legal counsel and the department director.

23        Q.   So it's your understanding then that the

24   revisions that you contributed to the Blue Book were

25   made after the administrative rules themselves had been

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 31 of 216

1  amended?

2      **A.   It's part of the process.  They go hand in**

3  **hand.**

4      Q.   Were you responsible -- strike that.

5      Did you participate at all in revising the

6  administrative rules?

7      **A.   Yes.**

8      Q.   And who else was involved in that process?

9      **A.   Matt Kimsey.  Steve Mueller.  And legal**

10  **counsel.**

11      Q.   No board members?

12      **A.   No.**

13      Q.   And is it the same process for approval of

14  the administrative rules for the Blue Book, where it

15  goes to DOC legal counsel, and then the department

16  director?

17      **A.   Yes.**

18      Q.   And who would the legal counsel that looked

19  at it?

20      **A.   Jay Boresi.**

21      Q.   Was he actually in that working group that

22  worked on revising the administrative rules?

23      **A.   He was not in the working group.  He was on**

24  **a criminal code revision team.**

25      Q.   Who was the legal counsel on that work

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 32 of 216

1  group?

2       A.   He wasn't on the work group.

3       Q.   I'm sorry.  I thought -- then we should

4  clarify.

5       A.   He was not on the group -- work group.  He

6  had approval of the final product after the work group.

7  I mean, he would have had input along the way in the

8  process as we sent drafts.

9       Q.   But the ones who were actually doing the

10  drafts were you, Kimsey, and Mueller, correct?

11       A.   Correct.

12       Q.   Mr. Kimsey doesn't have a law degree?

13       A.   No.

14       Q.   Do you know what his experience is?

15       A.   He's been a field Probation and Parole

16  officer, a field unit supervisor, an institutional

17  parole supervisor, and a parole analyst.

18       Q.   So other than the administrative rules,

19  which you said in your mind are the same as the state

20  regs, and the procedure, divisional manual, which we

21  marked as Exhibit 4, are there any other sources of

22  authority that govern the board or parole staff's work

23  every day?

24       A.   Operational memos issued by the chairman.

25       Q.   Okay.  And what would those typically

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 33 of 216

1  relate to?

2      A.   They relate to what constitutes a majority

3  board.

4           They could relate to day-to-day operations,

5  such as the maximum number of hearings that should be

6  conducted in a day.

7      Q.   Anything else?

8      A.   I suppose there could be a memo issued for

9  any reason.

10     Q.   That may come up again later today, but

11  aside from the Blue Book, the divisional manual, the

12  administrative rules, and operational manuals, are

13  there any other sources that would govern the board?

14     A.   Not outside of statute.

15     Q.   Or the Constitution, correct?

16     A.   Correct.

17     Q.   When you first started with the Department

18  of Corrections, what training did you receive?

19     A.   Training in policy, procedure.  Such as, I

20  mean, basically training on what's in the manual.  How

21  to write reports.  How to interact with offenders.

22     Q.   Anything else?

23     A.   Well, you could take each one of the

24  sections of the manual, and we were trained on that.

25  How to conduct urinalysis tests.  Use of force.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 34 of 216

1    Q.   But anything else, aside from what's in the

2  manual, did you receive training on?

3        **A.   Not that I remember.**

4    Q.   Did you receive any additional or

5  specialized training when you became board operations

6  director?

7        **A.   Other than attending conferences through**

8  **APAI, which is the Association of Paroling Authorities**

9  **International, no.**

10   Q.   How often would you attend APAI

11  conferences?

12       **A.   Once a year.**

13   Q.   Do you still attend them?

14       **A.   No.**

15   Q.   When's the last time you attended?

16       **A.   2015.**

17   Q.   Would anyone else from the parole board

18  attend those as well?

19       **A.   Usually the entire board, except for one**

20  **member would stay behind, would attend.**

21   Q.   Have you received any training in

22  motivational interviewing with your many years with the

23  Department of Corrections?

24       **A.   Yes.**

25   Q.   When did you receive that training?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 35 of 216

1      A.   I don't remember.  It's been several years

2   ago that I had the initial training.

3           And then we held a training for the board,

4   when I was board operations director, on motivational

5   interviewing during parole hearings.

6      Q.   Do you remember when that was that you held

7   that for the board?

8      A.   No.

9      Q.   Have you ever received any formal

10  training -- I'm talking about during your time as board

11  operations director, or before or since -- have you

12  ever received any training in adolescent development?

13     A.   Through the juvenile -- well, not through

14  my employment with the state.

15     Q.   Okay.  Did you have other employment other

16  than employment with the State?

17     A.   I did an internship for St. Louis County

18  Justice -- the Juvenile Justice Center.

19     Q.   Is that when you were in college?

20     A.   Yes.

21     Q.   So aside from that internship, have you

22  received any training on adolescent development?

23     A.   No.

24     Q.   And that internship would have been in the

25  1980s?  Early '80s, right?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 36 of 216

1          **A.    Yes.**

2          Q.    Have you received any training while

3    employed with the Department of Corrections in child

4    psychology?

5          **A.    No.**

6          Q.    Have you received any training while

7    employed by the Department of Corrections on

8    evidence-based penal practices?

9          **A.    Yes.**

10         Q.    And what training have you received on that

11   topic?

12         **A.    A general course is offered through the**

13   **Department of Corrections.**

14              **I believe -- I don't remember the**

15   **year -- but it's when we started the reentry unit, and**

16   **we did training in evidence-based practices,**

17   **criminogenic needs, and case management.**

18         Q.    And can you explain to me just generally

19   what evidence-based penological practices means?

20              What that phrase means to you?

21         **A.    What it means to me is that you follow what**

22   **works.  Meaning that, when I think about supervision,**

23   **or even the custody of offenders, you should have a**

24   **system set up that assesses them upfront, targets**

25   **interventions, and holds them accountable through a**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 37 of 216

1    system of sanctions and incentives.

2        Q.   And so how does that -- how does that

3    relate to reviewing somebody for release on parole?

4        A.   In my opinion, when you're interviewing or

5    reviewing a case for readiness for release, you need to

6    look at not only their background and accountability

7    for their own actions, but also be looking at risk to

8    the community, what needs they have, what needs they've

9    addressed, and the ones that they haven't, you should

10   use to set special conditions.

11       Q.   And you talked about assessing risk to the

12   community.

13            Have you received any training on the use

14   of risk assessment tools in parole review?

15       A.   Through the Department of Corrections, and

16   through independent research on different tools,

17   attendance at APAI conferences, attendance at other

18   conferences.

19       Q.   What training -- we'll go through

20   those -- what training has MDOC provided to you for

21   risk assessment tools?

22       A.   The initial Probation and Parole officer

23   training.

24       Q.   And so that would have been when you first

25   started in 1989?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 38 of 216

1    A.   Yes.

2         And when I became an IPO, there was IPO

3    specific training on the tools that they use.  And that

4    would have been in 1996.

5         And then we've had various consultants, or

6    our research department, validate the tools that we've

7    had for -- to do presentations on risk measures using

8    our own population.

9    Q.   Do you remember the names of any of the

10   consultants you just referred to?

11   A.   No.

12   Q.   And you mentioned in '96, when you became

13   an IPO, you received training on the tools they used.

14        Does the tools that the IPOs use have any

15   sort of name?

16   A.   Salient factor score.

17   Q.   Has that changed at all since 1996?

18   A.   Yes.

19   Q.   How has it changed?

20   A.   The variables have changed since 1996.

21        In 2005, I believe it was revised to

22   reflect different variables and to re-weight some of

23   the other variables.

24   Q.   Were you involved in that process at all?

25   A.   No.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 39 of 216

1      Q.   And who would have been?

2      **A.   I don't know.**

3      Q.   Who would know the answer to that question?

4      **A.   Steve Mueller.**

5      Q.   Why would he know?

6      **A.   He worked at Central Office at that time**

7   **period and may have been involved.**

8             **It was likely the analysts group at that**

9   **time.**

10     Q.   And other than the changes in 2005, do you

11  know, have there been any other changes to the salient

12  factor score since then?

13     **A.   Not outside of revalidation of the tool.**

14     Q.   And who conducted that revalidation?

15     **A.   The department's research and evaluation**

16  **section.**

17     Q.   Do you know the last time that a

18  revalidation was done?

19     **A.   It was under my tenure as board operations**

20  **director; although I don't recall the specific time**

21  **frame.**

22     Q.   Do you know if it was within the last five

23  years?

24     **A.   Yes.**

25     Q.   You also mentioned having done independent

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 40 of 216

1    research about risk assessment tools, correct?

2        A.    Yes.

3        Q.    What independent research did you do?

4        A.    Well, I've been on committees that, and I'm

5    currently on a committee, to adopt a new risk

6    assessment case management system for the department.

7             And so we've had presentations from the

8    company -- I can't think of the name of it off the top

9    of my head -- that sells the level of service, case

10   management inventory product.

11            And then the University of Cincinnati, the

12   Ohio Risk Assessment Instrument.  As well as the Strong

13   Stable Static 99, which is some of those are specific

14   to sex offenders and not general risks.

15       Q.    Does the Department of Corrections use

16   either of those, the Ohio or the Strong Stable Static

17   99?

18       A.    They use the Stable and the Static 99.

19   They're in the process of reviewing several instruments

20   and choosing one to use department-wide.

21       Q.    Why are they doing that?

22       A.    I believe they -- that through a current

23   initiative with the new director, the belief is that

24   there are better tools out there that more accurately

25   reflect the risks that we need to predict.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 41 of 216

1       Q.   So the current tools aren't working well

2  enough, in the new director's opinion, it sounds like?

3       MR. SPILLANE:  I'll object to the question

4  as to leading as to the form of the question.

5  BY MS. BREIHAN:

6       Q.   You can answer.

7       **A.   The current instrument does not measure the**

8  **risk that is most important, in the director's opinion,**

9  **I believe.**

10      Q.   Have you had -- we're talking about

11  Anne Precythe, right?

12      **A.   Yes.**

13      Q.   Have you had conversations with

14  Director Precythe about the risk assessment tool that

15  the department's currently using?

16      **A.   No.  I've had conversations with the**

17  **counsel of state governments.  Who's currently**

18  **providing technical assistance to the department and**

19  **the state.**

20      Q.   Who is the counsel of state governance have

21  you spoken to about that?

22      **A.   Ben Sheeler.  Andy Barbie.**

23      Q.   Anyone else?

24      **A.   Rachel Drueghammer.  And Bree Derrik.**

25      Q.   And then you mentioned also that you

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 42 of 216

1    learned about risk assessment tools through APAI and

2    other conferences, correct?

3          **A.    Correct.**

4          Q.    Are there certain risks assessment tools

5    for certain types of inmate?  Or is it kind of one size

6    fits all?

7          **A.    Well, there's several assessment tools,**

8    **throughout the department that assess, depending on**

9    **where they're at in the system.**

10         Q.    So you talked about the salient factor

11   score.

12                What other risk assessment tools are there?

13         **A.    We have a field risk reduction instrument,**

14   **which is used to determine level of supervision.**

15                **There's an institutional classification**

16   **analysis, which is used to determine custody level.**

17                **There are substance abuse screening scales.**

18                **A gender responsive assessment.**

19         Q.    Anything else?

20         **A.    And then assessments on sexual offenders.**

21   **Mental health may have some screening that they use,**

22   **and assessment tests, which may or may not be**

23   **available.**

24         Q.    So one of the tools that you talked about

25   is gender-specific, correct?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 43 of 216

1          A.   Yes.

2          Q.   And is that because female -- females come

3    to crime differently than male offenders?

4          A.   Yes.

5          Q.   So there are different circumstances and

6    variables that need to be taken into account when

7    assessing the risk of a female offender versus a male

8    offender, correct?

9          A.   Correct.

10         Q.   Does the Department of Corrections use any

11   specific assessment tool that is crafted specifically

12   for juvenile offenders?

13         A.   I don't know.

14         Q.   What does ADHR mean; do you know?

15         A.   Addressing discrimination, harassment, and

16   retaliation.

17         Q.   So is that some of the training that you

18   received during your employment with DOC as well?

19         A.   Yes.

20         Q.   Have you ever used the term "verbal judo?"

21         A.   Yes.

22         Q.   What does that mean in the context of

23   parole hearings?

24         A.   In the context of parole hearings?

25         Q.   Uh-huh.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 44 of 216

1        A.    I don't know that it would be applicable.

2        Q.    I guess outside of that context, what does

3   it mean to you?

4        A.    To me, it's a way of communicating with an

5   offender, or someone who is being disruptive or

6   difficult, in sort of defusing and de-escalating and

7   redirecting the conversation.

8        Q.    Is that something you received training on?

9        A.    A long time ago.

10        Q.    Did the Board of Probation and Parole have

11   any annual training requirement for board members or

12   analysts?

13        A.    I believe that they are required to attend

14   certain trainings that are mandatory for all department

15   staff, such as the ADHR.

16              Prison rape elimination training.

17              There may be some others, but I don't

18   remember what-all is actually mandatory training.

19        Q.    Is there, like, an hours requirement or

20   anything like that?

21        A.    There are for general staff in the

22   Department of Corrections.

23        Q.    And what's the hours requirement for

24   general staff?

25        A.    Forty hours.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 45 of 216

1    Q.   And does that apply to the board members,
2    too?
3         **A.   I don't know.**
4         Q.   Does that 40-hour requirement apply to
5    parole analysts?
6         **A.   Yes.**
7         Q.   Does it apply to IPOs?
8         **A.   Yes.**
9         Q.   Have you personally conducted any training
10   for the board of parole analysts?
11        **A.   Not personally.**
12        Q.   But one of your -- fair to say that one of
13   your responsibilities when you were board operations
14   director was hunting down or organizing training
15   opportunities for the board or analysts, correct?
16        **A.   Yes.**
17        Q.   I'll hand you what I've marked as
18   Exhibit 5.
19             (Deposition Exhibit No. 5 was marked for
20   identification.)
21   BY MS. BREIHAN:
22        Q.   This is Bates-stamped AGO485 through 487.
23             Do you recognize this?  And it's
24   double-sided.
25             Do you recognize this document, ma'am?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 46 of 216

1        A.    Yes.

2        Q.    And this a -- looks like it's an email from

3    you to Mr. McSwain in October of 2013, correct?

4        A.    Yes.

5        Q.    And the subject is training proposal?

6        A.    Yes.

7        Q.    And attached to it was this memorandum that

8    you prepared to Mr. McSwain regarding board member

9    analyst training proposal, correct?

10       A.    Yes.

11       Q.    Why were you preparing this memo about

12   training proposals?

13       A.    When I took the position as board

14   operations director, there were many new

15   annually-appointed board members who were not

16   corrections practitioners, and they came from different

17   disciplines, and I believed it would enhance their

18   abilities to conduct parole hearings if they

19   participated in some training to learn more about the

20   criminal justice-involved population.

21       Q.    And who's Jim Wiseman?

22       A.    The chief of staff training for the

23   Department of Corrections.

24       Q.    And is it fair to say that Mr. McSwain

25   asked you to meet with Jim to develop a training

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 47 of 216

1    program because of the new members without sufficient

2    correctional experience?

3        **A.    Yes.**

4        Q.    And did Mr. McSwain respond to this

5    October 2013 memorandum?

6        **A.    Not in writing.**

7        Q.    But he did respond to you?

8        **A.    (The witness nodded her head.)**

9        Q.    Did he implement any of your proposals?

10       **A.    He was supportive.  We did develop a**

11   **motivational interviewing training which was presented**

12   **to the board.**

13            **We typically had used kind of the guests**

14   **coming in and talking about, you know, their subject**

15   **matter, or whatever, to inform the board.**

16            **I mean, I can recall that we had MSOP**

17   **staff, which is the Missouri Sex Offender Program, come**

18   **in and describe the program, and what the program was**

19   **supposed to do to reduce risk of future sexual**

20   **offending.**

21            **The chief of substance abuse talked about**

22   **institutional and community treatment.**

23            **We had training on the salient factor score**

24   **itself and how to score it.**

25       Q.    Did Mr. McSwain ever implement an executive

Pohlman USA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 48 of 216

1  ethics training like you recommended in this memo?

2      **A.    He did not.**

3      Q.   And what about the National Parole Resource

4  Center Board Self-Assessment Training; did he implement

5  that?

6      **A.    No.**

7      Q.   Has the parole board ever received any

8  training, either formally or through presentations by

9  special guests, about adolescent development?

10     **A.    Not that I know of.**

11     Q.   Has parole staff received any such

12  training?

13     **A.    Not that I know of.**

14     Q.   Has the board received any training on

15  child psychology?

16     **A.    Not that I know of.**

17     Q.   What about parole staff, have they received

18  any such training?

19     **A.    Not that I know of.**

20     Q.   And given your involvement in organizing

21  training, it's fair to say that if they had during your

22  tenure as board operations director you would have

23  known about it?

24     **A.    Yes.**

25     Q.   Has the board received any training

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 49 of 216

1    regarding JL WOP or on Miller versus Alabama?

2         **A.**   **I don't know.**

3         Q.   Has the parole board received any such

4    training?

5         **A.**   **No.**

6         Q.   To your knowledge, has a board member ever

7    requested training in any of those three topics I just

8    mentioned?

9         **A.**   **No.**

10        Q.   Has parole staff ever requested that?

11       **A.**   **No.**

12        Q.   Have you?

13       **A.**   **No.**

14        Q.   Why not?

15       **A.**   **Why did I not receive training; is that**

16    **your question?**

17        Q.   Uh-huh.

18       **A.**   **Juvenile life without parole wasn't a**

19    **factor until the Governor signed the law into effect.**

20        Q.   We talked a little bit earlier about you

21    sort of keeping your finger on the pulse of developing

22    law, correct?

23       **A.**   **Uh-huh.**

24        Q.   You're familiar with the Miller versus

25    Alabama decision, right?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 50 of 216

1      **A.    Yes.**

2      Q.    And what's your understanding of what that

3   decision says or means?

4      **A.    I couldn't tell you off the top of my head.**

5   **I've been away from it a little while.**

6      Q.    Fair enough.

7      **A.    I had a file that had all of the decisions**

8   **in them, and I would review, and keep points, but I**

9   **didn't study for today.**

10      Q.    Sure.

11            Do you remember when that decision came

12   down?

13      **A.    No.**

14      Q.    And do you know, are you familiar with the

15   Montgomery versus Louisiana decision?

16      **A.    I've heard of it.**

17      Q.    Do you remember when that decision came

18   down?

19      **A.    After the Miller decision.**

20      Q.    But you don't remember a year?

21      **A.    No. I don't remember the year.**

22      Q.    So you said there wasn't really -- JL WOP

23   wasn't an issue until the Governor passed the bill, and

24   you're talking about Senate Bill 590, correct?

25      **A.    Correct.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 51 of 216

1    Q.   Before then the department of the Board of

2    Probation and Parole wasn't concerned about parole

3    review for inmates serving life without parole

4    sentences?

5         **A.   Correct.**

6    Q.   And you mentioned you had a file with all

7    the decisions, relevant decisions, Miller, Montgomery

8    in it, you just don't have it with you today, correct?

9         **A.   Correct.  I don't even know if I kept it**

10   **under my control, or if I gave it to Steve when we**

11   **switched duties.**

12   Q.   Would that file have any notes about your

13   interpretation of either decision?

14        **A.   No.**

15   Q.   Would it have any communications with

16   anyone about those decisions?

17        **A.   No.  Maybe highlighted, underlined, but**

18   **that would be it.**

19        **(Deposition Exhibit No. 6 was marked for**

20   **identification.)**

21   BY MS. BREIHAN:

22   Q.   I'll hand you what I've marked as

23   Exhibit 6.

24        This might refresh your recollection about

25   when the Montgomery decision came down.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 52 of 216

1          It appears that pretty immediately after

2     learning of the decision you forwarded it to legal for

3     review, correct?

4          **A.    Yes.**

5          Q.    Why did you do that?

6          **A.    For them to inform the board what we needed**

7     **to do, if anything.   Or if there was any application to**

8     **the board and their practices.**

9          Q.    And this was several month before the

10    Governor signed Senate Bill 590?

11         **A.    Yes.**

12         Q.    But you already thought it was necessary

13    for the board to take some response in light of the

14    opinion?

15         **A.    We had already reviewed several pieces of**

16    **legislation by that time.   So it was an indicator that**

17    **Missouri law could be changing, and that we needed to**

18    **have some thoughts in place about how we would**

19    **implement whatever statute was enacted.**

20         Q.    Did you ever receive a response from legal

21    about the review of the Montgomery decision?

22         **A.    I don't know.   Not in a legal, formal**

23    **opinion that I could recall.**

24         Q.    Did you have a further discussion with

25    Mr. McSwain, or any other board members, about the

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 53 of 216

1    decision?

2          **A.    No.**

3          Q.    And what actions did you take after

4    Montgomery, but before Senate Bill 590 was signed into

5    law, to address JL WOP within the Division of Probation

6    and Parole?

7          **A.    None.**

8          Q.    None?

9          **A.    Other than review of the legislation that**

10   **was coming down the pike.**

11         MS. BREIHAN:  Can we just take a quick

12   five-minute break?

13         (A break was taken.)

14         MS. BREIHAN:  Back on the record.

15   BY MS. BREIHAN:

16         Q.    You had mentioned that one of your duties

17   and responsibilities was reviewing proposed

18   legislation, and you did that in the context of

19   juveniles life without parole, correct?

20         **A.    Yes.**

21         Q.    And who would typically ask you to do these

22   legislative reviews?

23         **A.    It's on behalf of the department, our**

24   **budget and planning unit sends them to designated staff**

25   **in the Department of Corrections to look at fiscal**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 54 of 216

1   impact on each division.  Or to point out any

2   difficulties in implementation that we saw.  Or in

3   conflict with another statute that might be

4   problematic.

5       Q.   And who in the budget and planning group

6   would typically reach out to you to do a legislative

7   review?

8       A.   It depends on whoever the fiscal note

9   coordinator is.

10      Q.   And there was an assumption worked into

11  that question.  So would they reach out directly to

12  you?  Or would it go through Mr. McSwain or somebody

13  else?

14      A.   It would be directly to me.  Or whoever was

15  assigned at that point in time.

16           I didn't do it from the very start.  I

17  think I started doing them maybe in 2015.

18      Q.   Is there any reason why you didn't start

19  them right away?

20      A.   When I started as board operations

21  director?

22      Q.   Yes.

23      A.   They were assigned to somebody else.

24      Q.   Who was it assigned to?

25      A.   Cora Haines.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 55 of 216

1    Q.   And what was her title at the time?

2    **A.   Program compliance specialist.**

3    Q.   Is she still with the Department of

4  Corrections?

5    **A.   Yes.  For a minute.  She's getting ready to**

6  **transfer to a district office in Farmington.**

7         **(Deposition Exhibit No. 7 was marked for**

8  **identification.)**

9  BY MS. BREIHAN:

10    Q.   I'll hand you Exhibit 7.  Single sheet,

11  front and back, marked AGO169 through 170.

12        Do you recognize this document?

13    **A.   Yes.**

14    Q.   And it looks like it's an email chain; is

15  that fair to say?

16    **A.   Yes.**

17    Q.   Mr. McSwain forwarded you an email from

18  Jeff, initially on May 24, 2016, asking for you to

19  review and comment on his behalf, correct?

20    **A.   It looks like it was sent to Julie Kempker**

21  **and then I was copied.**

22    Q.   Okay.  So Mr. McSwain receives a request

23  from Jeff Earl to review Senate Bill 590, and he then

24  forwards it to Julie Kempker, and she forwards it to

25  you?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 56 of 216

1      A.   Yes.

2      Q.   And who's she?

3      A.   The state supervisor of Probation and

4  Parole.

5      Q.   Would she be doing legislative reviews?

6      A.   Well, Julie Kempker, myself, and

7  Peg McClure, the assistant division director, kind of

8  have those combined, shared duties.  Although it's my

9  primary responsibility, they're kind of backups.  Or if

10  she sees something that I missed, she may comment or

11  add to.

12     Q.   And you're talking in present tense?  Do

13  you still do legislative reviews for the board?

14     A.   Yes.  For the division.  Not just the

15  board.

16     Q.   The Division of Probation and Parole?

17     A.   Yes.

18     Q.   So did you have any conversations with

19  Mr. McSwain or Ms. Kempker about this request for a

20  bill review?

21     A.   I don't remember.

22     Q.   Are you familiar with Senate Bill 590?

23     A.   Yes.

24     Q.   And do you remember reviewing it when it

25  was still proposed legislation, before it was signed

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 57 of 216

1    into law?

2         **A.   Yes.**

3         Q.   Did you have any opinion about some of the

4    questions Mr. Earl asked here?

5              We can take it one by one.  He asked:  Do

6    you feel that the board is able to accurately make a

7    judgment on these juvenile cases?

8              What is your answer to that question?

9         **A.   It was my opinion at the time, and it's**

10   **still my opinion, that the way the statute is worded,**

11   **and given the resources that the board has, it is very**

12   **difficult.**

13        Q.   Okay.  And what about the wording of the

14   statute makes it difficult for the board to accurately

15   make a judgment on these juvenile life without parole

16   cases?

17        **A.   Well, calling it a review of the sentence**

18   **is not something that's entrusted to a board to do.**

19   **It's typically a court that would review a sentence.**

20        Q.   So in your opinion, the phrase "review of

21   sentence" meant something different than just a typical

22   parole review, or review for release, something like

23   that?

24             Is that fair to it say?

25        **A.   Yes.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 58 of 216

1      Q.    And what in your mind is the distinction

2  between those two different phrases?

3      **A.    Well, a review of a sentence, to me, is a**

4  **determination on whether or not the sentence was**

5  **appropriate, as opposed to an evaluation of an offender**

6  **for his readiness for parole.**

7      Q.    So is it your opinion, then, that because

8  of the wording in the statute, the board was supposed

9  to be reviewing whether the life without parole

10  sentence was appropriate for the juvenile offenders,

11  rather than whether they were ready for release without

12  being a risk to themselves or others?

13      **A.    No.  I believe the board's function, based**

14  **upon the senate bill and the statute, was still to**

15  **determine readiness for release.**

16      Q.    So the board isn't doing a review of the

17  sentence?

18      **A.    No.**

19      Q.    They're doing --

20      **A.    They're doing a parole consideration**

21  **hearing.**

22      Q.    Aside from that phrase "review of their

23  sentence" -- and that might not be the exact

24  wording -- but aside from that phrase, are there any

25  other issues in the wording that, in your opinion,

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 59 of 216

1  would make it difficult for the board to accurately

2  make a judgment on these cases?

3       **A.    The individual elements that were outlined**

4  **in the statute are fairly subjective, in my opinion,**

5  **and difficult to evaluate.**

6       Q.    Anything else in the wording of the bill

7  itself that makes it difficult for the board to

8  accurately make a judgment on these cases?

9       **A.    Not that I can remember.  Like I said, I've**

10  **been away from it for a while.**

11       Q.    And at some point we'll get out the bill

12  itself, and it will make it a little bit easier to talk

13  about these things concretely.

14            You also mentioned one thing that would

15  make it hard for the board to accurately make a

16  judgment on these cases was lack of resources; is that

17  correct?

18       **A.    Uh-huh.**

19       Q.    Can you talk about what you mean by that?

20       **A.    The Department of Corrections doesn't have**

21  **access to be able to do in-depth psychiatric or**

22  **psychological evaluations on offenders, or to refer**

23  **offenders, unless they are severely mentally ill.**

24            **I don't know how the board -- I don't even**

25  **know if there would be a resource to gauge maturity**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 60 of 216

1  **level at the time the offense was committed.**

2         **So a concern in terms of resources was**

3  **whether or not we would even have access to any of the**

4  **information at the time of conviction that may be**

5  **helpful to gauge progress in any of those areas.**

6         Q.   You talk about not having resources for

7  in-depth psychological or psychiatric evaluation; is

8  that something, in your mind, that would be necessary

9  in order to make an accurate judgment on these cases?

10        **A.   Not necessarily.**

11        Q.   And aside from the difficulty in having

12 access to materials to measure maturity at the time of

13 the underlying offense, or an independent evaluation

14 done of inmates eligible now for parole under the

15 change in the law, are there any other specific

16 resource-based issues that you saw that would impede

17 the board's ability to make an accurate judgment on

18 these cases?

19        **A.   No.**

20        Q.   Has the Department of Corrections or the

21 division done anything to address either of these

22 resource-based issues?

23        **A.   Outside of providing kind of some guides**

24 **for IPOs to use to get at some of the elements, and**

25 **creating a documentation sheet for the analysts and the**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 61 of 216

1  **board to use to make sure that they were asking**

2  **questions that could get some of those factors, no.**

3          **(Deposition Exhibit No. 8 was marked for**

4  **identification.)**

5  BY MS. BREIHAN:

6          Q.   I'll show you what I've marked as

7  Exhibit 8.  I'll give you time to look at it.

8          Do you recognize this email and memo?

9          **A.   Yes.**

10         Q.   And it looks like the first -- this is

11 Exhibit 8, and it's Bates-labeled AGO1273 through 1275.

12         The first page looks like an email from

13 you, to Mr. McSwain and Julie Kempker, on May 26th,

14 2016, correct?

15         **A.   Yes.**

16         Q.   And the subject line is SB 590, JL WOP

17 analysis?

18         **A.   Correct.**

19         Q.   So it looks like you're sending a memo in

20 response to Mr. Earl's request for a review of Senate

21 Bill 590, correct?

22         **A.   Yes.**

23         Q.   And then the memo is the second and third

24 page of this exhibit.

25         Did you prepare this memo?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 62 of 216

1    **A.    Yes.**

2       Q.    So at some point between Exhibit 7, the

3    email from McSwain to Kempker, and this memo,

4    Exhibit 8, you had a conversation with McSwain or

5    Kempker about you taking it over the bill review?

6       **A.    I don't remember, but it was likely if I**

7    **completed the memo.**

8       Q.    And who did you talk to in conducting this

9    analysis of Senate Bill 590?

10      **A.    Jay Boresi.**

11      Q.    Anyone else?

12      **A.    Probably Steve Mueller.**

13      Q.    Anyone else?

14      **A.    Not that I can remember.**

15      Q.    And how many times did you talk to

16   Mr. Boresi about review of Senate Bill 590?

17      **A.    I don't remember.**

18      Q.    Do you remember what he told you about his

19   opinion of the bill?

20      **A.    I don't believe that he had an opinion of**

21   **the bill.**

22         **I think what I talked to him more about is,**

23   **do we have a parallel process already in place that we**

24   **could use as a model in conducting parole hearings**

25   **where additional elements are required to be captured**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 63 of 216

1    or considered.

2          Q.   And what did he tell you?

3          A.   He agreed with me, that following the

4    practice that was implemented following a court order

5    on females who had domestic violence background, and

6    had committed murders, would be a good practice.

7          Q.   And we see illusions, on the second page of

8    the memo, the first full paragraph says, "The board

9    does have a precedent for evaluating the statutory

10   element that refers to the level of maturity or mental

11   status at the time of the offense," correct?

12         A.   Uh-huh.   Yes.

13         Q.   And then you talk about in response, "The

14   court orders on females who were convicted of capital

15   murder, who were victims of domestic violence, the

16   board relied upon witness statements, medical and

17   mental health records, and the offender's own testimony

18   to assess maturity factors that could potentially

19   influence the offender at the time of the offense,"

20   correct?

21         A.   Yes.

22         Q.   I don't think I lived in Missouri when this

23   domestic violence parole review kind of process was

24   underway.

25              Could you explain to me a little bit of the

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 64 of 216

1  context behind that?

2      A.   I don't know the context.  I just know that

3  there were court rulings that these women were now able

4  to be considered parole-eligible if we could determine

5  that there was domestic violence in their background.

6          And I may have that wrong.

7          And then through other court decisions, it

8  kind of ordered the board to consider additional

9  factors when evaluating those women for parole.

10     Q.   And you said the board relied upon witness

11 statements.

12         Where did it obtain these witness

13 statements?

14     A.   It didn't seek to obtain them.  We required

15 the IPO to go back to the court and obtain transcripts,

16 if they could, or other materials.

17         We kind of worked through our field office

18 and said:  Go back and see what you can find on these

19 cases.  Because in many instances our agency hadn't

20 been involved prior to entry.  There was no presentence

21 investigation.  So there was nothing.

22         There was kind of a barebones commitment

23 report that described the circumstances of the offense

24 and nothing else.

25         So it was through the institutional parole

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 65 of 216

1 staff, or it may have been in information that either

2 the offender, or an offender's delegate may have

3 presented at the time of the hearing, or prior to the

4 hearing.

5          In some instances the women had sought

6 clemency, and so we had information in the clemency

7 investigation that we could use.

8          As well as developed a set -- I think they

9 did, anyway, I didn't have female offenders in my

10 prison at the time, nor did I participate in any of

11 those hearings -- but I believe there were a set of

12 questions that they developed, and separate sections in

13 the prehearing report, to address domestic violence

14 issues and victimization.

15     Q.    So aside from testimony that the inmate or

16 their delegate might have offered, or what might be

17 available from a clemency investigation or trial

18 transcript, were witness statements obtained in any

19 other manner?

20     A.    Not independently by the board.  We just

21 used whatever material might have been available at the

22 time the crime was committed.  Or any trial.

23     Q.    And what about medical and mental health

24 records, where would the board or parole staff obtain

25 those?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 66 of 216

1    A.   They would obtain those from Department of

2  Corrections' contracted medical or mental health staff.

3    Q.   Anywhere else?

4    A.   Not that they would have sought.

5    Q.   So it's clear you saw some parallels with

6  the domestic violence situation and with the JL WOP

7  situation, correct?

8    A.   Yes.

9    Q.   Were there any changes in the

10 justifications for denial that the board was permitted

11 to identify in the domestic violence context?

12   A.   No.

13   Q.   They weren't prohibited from denying based

14 on circumstances of the offense?

15   A.   For which?

16   Q.   For the domestic violence?

17   A.   Yes, they were prohibited by court order.

18 In some of the cases, maybe not all of them.  I don't

19 remember.

20        It seems like we did that, and then the

21 court said, no, you can't use that.  Go back and give a

22 different reason.  Or maybe even conduct another

23 hearing.  That's been a long time ago, but I remember

24 that being an issue.

25   Q.   The next paragraph of your memo states,

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 67 of 216

1  "That risk reduction is assessed using the validated

2  tool."

3            What tool are you referring to there?

4        A.   The salient factor score.

5        Q.   So is the salient factor score used to

6  assess the -- to conduct a risk assessment of juvenile

7  offenders serving life without parole?

8        A.   It's used to assess all offenders that are

9  under consideration for parole.

10        Q.   And who actually calculates, computes that

11  score?

12        A.   The IPO.

13        Q.   Working backwards, go back to the first

14  page of that memo that you prepared on May 26th, 2016.

15  You outline five bullet points of factors that the

16  board must consider during these Senate Bill 590

17  hearings.

18            Where did you get those five bullet points

19  from?

20        A.   From the proposed legislation.  The bill.

21  Itself.

22        Q.   Are these five bullet points the only

23  additional factors that the board must consider when

24  conducting the Senate Bill 590 hearings?

25        A.   No.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 68 of 216

1    Q.   And there are other factors outlined in

2  565.033, correct?

3        **A.   Yes.**

4    Q.   And then you say also, "In addition to the

5  factors considered by the court at the time punishment

6  is determined."

7        Does that mean that in addition to the

8  factors considered at the time of sentencing?

9        **A.   Yes.**

10   Q.   Do you understand that the plaintiffs in

11  this case received mandatory life without parole

12  sentences?

13       **A.   Yes.**

14   Q.   Do you understand the implications that

15  would have, about whether or not a separate sentencing

16  hearing and mitigation stage of the trial would be

17  held?

18       **A.   Say that again, please.**

19   Q.   Do you understand that the implications of

20  a mandatory sentence, and how that would impact whether

21  a separate sentencing hearing would be held where

22  mitigation evidence could be presented?

23       **A.   I still don't understand your question.**

24   Q.   Well, what's your understanding of how a

25  trial proceeds generally?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 69 of 216

1           After -- let's say a jury finds an

2      individual guilty of a crime.  What's your

3      understanding of what happens next?

4           **A.   Either a judge or a jury pronounces**

5      **sentence.**

6           Q.   And is it your understanding that there is

7      additional evidence adduced at the time that relates to

8      the appropriate sentence?

9           **A.   There could be.**

10          Q.   Do you know if that was done in the case of

11     these juvenile offenders serving life without parole?

12          **A.   No.**

13          Q.   And you indicate that, "Through existing

14     procedure and practice, the items above are presented

15     during the parole consideration process to a degree."

16          How are they not presented during parole

17     consideration process?

18          **A.   Where are you at on the memo?**

19          Q.   The first sentence after the bullet points.

20          **A.   Well, do you want me to go through each one**

21     **or just in general?**

22          Q.   If that's easiest, sure.

23          **A.   In general, the department, through their**

24     **classification and their assessment, and looking at the**

25     **circumstances of the offense and institutional conduct**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 70 of 216

1  through the parole -- pre-parole hearing interview, and

2  the interview with the offender themselves, I think you

3  can determine many of those factors.

4      Q.  So where do you see gaps?

5      A.  The gap in bullet 2, in being able to grow

6  and increase maturity at the time of the offense, one

7  of the factors you might look toward is institutional

8  adjustment and accountability.  But I don't know that

9  you would know whether or not the person at the time

10 that the crime was committed was immature or

11 overly mature for their age.

12     Q.  And what steps did you take to sort of try

13 to fill that gap or implement a process that would fill

14 that gap that you identified?

15     A.  Well, we looked at our current hearing

16 report, and looked at different questions that you

17 could ask, during either the pre-parole hearing

18 interview, or during the parole hearing itself, to try

19 to make that determination.  Or get a sense from the

20 offender kind of where they were at the time that they

21 committed the crime.

22     Q.  So just continuing or preparing a sort of

23 script for IPOs to follow during prehearing interviews;

24 is that a fair summary of what you just said?

25     A.  We added to our interview an assessment

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 71 of 216

1  **worksheet that's used in preparing a parole hearing.**

2  **It's kind of their interview guide.**

3     Q.   Were IPOs, prior to that, already using a

4  worksheet when conducting prehearing interviews?

5     **A.   Yes.**

6     Q.   And then it was supplemented or modified in

7  some way?

8     **A.   Yes.**

9     Q.   Prior to Senate Bill 590 being proposed and

10 passed, how did the board assess mental status and

11 maturity level?

12    **A.   Prior to the bill?**

13    Q.   Uh-huh.

14    **A.   They would use the same factors.  They**

15 **would look at institutional conduct.  Any formalized**

16 **assessments that were available.**

17    Q.   Anything else?

18    **A.   Not that I can think of.**

19    Q.   So you said when you were doing this review

20 of Senate Bill 590 you talked to Jay Boresi and

21 Steve Mueller, correct?

22    **A.   Yes.**

23    Q.   Did Mr. Mueller agree with your evaluation

24 of the bill?

25    **A.   I don't know if he did or didn't.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 72 of 216

1      Q.   Well, what did you -- what did you talk to

2  him about in the context of this legislative review?

3      **A.   We talked about how you would**

4  **implement -- what you would do if there were multiple**

5  **sentences?**

6          **What are steps that the board or the IPOs**

7  **could take during the interviews to ask certain**

8  **questions to try to meet what is outlined in statute?**

9      Q.   And what did he say?

10     **A.   I don't remember a conversation.  I mean, I**

11 **think we generally agreed.**

12     Q.   Did you consult anybody else about what

13 questions might be appropriate or necessary to ask in

14 order to set out the information required by the

15 statute?

16     **A.   Not at this time.**

17     Q.   But at some other point in time you did?

18     **A.   I believe we had a discussion at the**

19 **analysts group about it.**

20     Q.   And this memo was forwarded on to Mr. Earl,

21 correct?

22     **A.   I don't know if it was or wasn't.  Probably**

23 **so.**

24          **(Deposition Exhibit No. 9 was marked for**

25 **identification.)**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 73 of 216

1   BY MS. BREIHAN:

2          Q.   I'll show you what I've marked as

3   Exhibit 9.

4          So does -- do you recognize this Exhibit 9

5   that's been Bates-stamped AGO1276 to 1278?

6          **A.   Yes.**

7          Q.   Does this refresh your recollection whether

8   the memo you prepared regarding an analysis of

9   Senate Bill 590 was forwarded to Jeff Earl?

10         **A.   Yes.**

11         Q.   Did Mr. McSwain or Julie Kempker make any

12   revisions before it was forwarded to Mr. Earl?

13         **A.   I don't remember.**

14         Q.   Well, if we can take time and compare

15   Exhibit 8 and Exhibit 9 line by line, it doesn't appear

16   to me there were any changes.

17         **A.   I don't remember there being any changes.**

18   **I mean, I wouldn't thought there would be.**

19         Q.   They generally relied on your analysis and

20   judgment?

21         **A.   Yes.**

22         Q.   Before we go on, I want to pull the lens

23   back a little bit and talk to you about what the parole

24   interview process for the typical adult offender.   So

25   not necessarily for any juvenile offenders who's

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 74 of 216

1  impacted by the Miller versus Alabama decision and

2  Senate Bill 590.

3          Are you generally familiar with how the

4  board conducts parole review hearings?

5      **A.   Yes.**

6      Q.   Can you walk me through the process,

7  starting from when eligibility is determined, through

8  when notice of a decision is conveyed to an inmate?

9      **A.   Sure.**

10         **Upon arrival at the Department of**

11  **Corrections, the face sheet is forwarded to Probation**

12  **and Parole.  The parole analyst looks at the sentence**

13  **structure.  Determines a hearing date.  And a notice is**

14  **sent to the offender.  Usually within 60 to 90 days.**

15  **Telling them the month and the year that they will**

16  **appear before the board.**

17         **If there are special sentencing**

18  **considerations, such as a parole ineligibility for a**

19  **number of years, or a certain percentage that they must**

20  **serve, the analyst generally cites the statute at the**

21  **bottom of the notice and tells them why the hearing is**

22  **not, quote/unquote, according to the published hearing**

23  **schedule, because it's outside of those -- of that**

24  **matrix.**

25         **So, for example, for low-level felonies, a**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 75 of 216

1    three-year sentence is heard in three months.  Four

2    years, four months.  But if you have a parole

3    restriction or parole ineligibility, you fall off of

4    that schedule, and you fall into a different set of

5    circumstances.

6              So after that offender receives the notice,

7    once his hearing is close, within probably two months,

8    they'll get the specific day that their hearing will be

9    scheduled.  And that's -- that's not based on an

10   analyst's action, it's based on we set a calendar of

11   hearings throughout the month at the various

12   institutions, and then the institutional staff just

13   fill up the days.

14             After -- about a month beforehand, the IPO

15   meets with an offender, prepares the prehearing report,

16   does the risk instrument.  The day of the hearing, the

17   offender appears, is explained the process.  If there

18   are delegates or victims, they're advised of their role

19   during the hearing.  And then the board uses generally

20   the hearing report to script the questions.

21             That report covers the official version of

22   the offense, the offender's version of the offense, any

23   court records, such as were they on supervision prior

24   or not.  If they were on supervision, any violations or

25   positive behavior that was exhibited during that time

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 76 of 216

1  of supervision.

2              The arrest and criminal history is

3  discussed with the offender.  And anything that's

4  significant or looks to be a pattern is generally

5  talked about.

6              Or if they are more serious offenses, they

7  question them about those.

8              Any detainers or pending charges are

9  discussed.

10             Then we kind of go into discussing

11 substance abuse, mental health, aggressive behavior,

12 institutional conduct, education, work history, any

13 programs or restorative justice they've been involved

14 in.

15             Their family support.  Their community

16 plan.  A lot of that social history kind of

17 information.  Medical, mental health needs.  Any

18 assessments.  Any need for future treatment.

19             A lot of board members -- and most talk

20 about kind of motivation.  Like, what motivated someone

21 to commit a crime, or what was going on in their life

22 at that point in time, and how they saw themselves at

23 this point in time, and maybe what decisions would be

24 different in the future.

25             They then usually go over the eligibility

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 77 of 216

1  dates, like the minimum eligibility date.  And then the

2  longest date that the board can hold them, which is

3  either a conditional release date or a maximum

4  release date.

5          Talk about special conditions that they

6  might consider, and try to gauge from the offender kind

7  of their buy-in, and what they're willing to do, and

8  how they think they might do that upon release.

9          Then following the conclusion of the

10  hearing, the panel makes a recommendation.  And

11  depending on the type of offense and offense class, the

12  decision -- and the type of decision, that may be final

13  at the hearing panel level, or it may be referred to

14  majority board.

15          If it's referred to majority board, it

16  follows a workflow, wherein the file is passed until

17  majority is reached.

18          And once that decision is finalized, the

19  clerical staff prepare the notice, sends it

20  electronically to the institution, and the IPO delivers

21  it personally.

22      Q.   And you've personally participated in

23  parole hearings, correct?

24      A.   Yes.

25      Q.   So you know about this process, not only

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 78 of 216

1  from your years as parole operations director or board

2  operations director, but also as parole officer on the

3  ground?

4      A.   Yes.

5      Q.   So the eligibility determination, is that

6  made upon arrival upon admission to the Department of

7  Corrections?  The numbers crunching about when an

8  inmate is eligible for their first parole?

9      **A.   It's done by a parole analyst after we**

10 **receive the face sheet and the sentencing documents.**

11     Q.   So if an inmate is committed to the

12 Department of Corrections and is serving a

13 non-parolable sentence, is there any sort of tracking

14 by the Division of Probation and Parole?

15     **A.   It depends.  On whether or not there would**

16 **be a period of supervised release.  So a parole**

17 **ineligible sentence could have a conditional release**

18 **term, and so we would track those.  Not for any review**

19 **by the board, but to make sure that the transition to**

20 **the field is smooth, and that we investigate home**

21 **plans, and get them on field supervision.**

22     Q.   So for someone serving a life without

23 parole sentence I assume that would not be done; is

24 that fair to say?

25     **A.   They would receive a decision telling them**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 79 of 216

1    that because they're not eligible for parole, their

2    release date is set at their maximum release date, and

3    there would be no further review.

4        Q.   So what's the maximum release date for

5    someone serving life without parole?

6        A.   They would just say that they're -- if it

7    it's a life without, they would just state that because

8    you've been convicted of this, and you're not eligible

9    for parole.  I mean, they wouldn't give a date in those

10   instances.

11       Q.   So those inmates serving life without

12   parole would not be tracked by the Division of

13   Probation and Parole, correct?

14       A.   No.

15       Q.   And you talked about the prehearing

16   interview that's conducted by the IPO, correct?

17       A.   Yes.

18       Q.   And that interview is governed, in part, at

19   least, by the OPP policy and procedure, correct?

20       A.   Yes.

21            (Deposition Exhibit No. 10 was marked for

22   identification.)

23   BY MS. BREIHAN:

24       Q.   I'll hand you Exhibit 10.

25            Do you recognize this document?  Take as

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 80 of 216

1   much as you need to flip through it.

2          It's AGO003584 through 3593.

3      **A.   Yes.**

4      Q.   And what is this?

5      **A.   This is the prehearing report procedure.**

6      Q.   Do you know when this was last updated?

7      **A.   No.   The date that you have.   I'm not sure**

8   **if there's a more recent revision.**

9      Q.   You left as the board operations director

10  position April 2017, correct?

11     **A.   Yes.**

12     Q.   Prior to your transition away from that

13  position, to your knowledge, has this procedure been

14  changed?

15     **A.   I believe that -- well, let me tell you a**

16  **little bit about just the process.**

17          **There may be revisions to this document**

18  **that are just not published.   And so it would be my**

19  **opinion that this procedure probably was looked at in**

20  **conjunction with changes to the criminal code.   And**

21  **whether or not those are in process, or have been**

22  **updated, I do not know.**

23     Q.   Well, I trust that your counsel will

24  produce any, to the extent that they are implemented,

25  as revised.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 81 of 216

1            And you talked about a worksheet that the

2  IPO uses to guide the prehearing interview, correct?

3       **A.   Yes.**

4       Q.   Is that the interview and assessment

5  worksheet that's referred to as an attachment on the

6  very last page of this exhibit?

7       **A.   Yes.**

8       Q.   And then what happens to that worksheet

9  after it's completed by the IPO during the prehearing

10  interview?

11      **A.   It's probably only kept until the hearing**

12  **is over.  And then it might be shredded.**

13           **We don't keep files on institutional**

14  **offenders in an institutional parole office.  It**

15  **wouldn't generally be forwarded from one IPO to the**

16  **next if they transferred.  It's just used for the**

17  **preparation for the report, and available when the**

18  **supervisor's reviewing that.  But it's not retained as**

19  **an official document.**

20      Q.   Okay.  So is it correct to say that the IPO

21  conducts the interview, fills out the worksheet, and

22  then produces a draft of the report, along with the

23  worksheet to his or her supervisor for review?

24      **A.   Yes.**

25      Q.   And then what happens to the report after

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 82 of 216

1  it's approved by the IPOs supervisor?

2      **A.   It's copied or sent to the board to be**

3  **available for the hearing.**

4      Q.   And it becomes a part of the inmate's

5  parole file, correct?

6      **A.   Yes.**

7      Q.   Does the inmate ever get to see that

8  report?

9      **A.   No.**

10     Q.   Does the inmate ever get to see the

11 worksheet that is used to generate that report?

12     **A.   No.**

13     Q.   And what else is in an inmate's parole

14 report file besides this prehearing report?

15     **A.   The Central Office parole file.**

16     Q.   Is there another parole file?

17     **A.   Well, if he's under field supervision,**

18 **there's a field supervision file, which is different.**

19     Q.   And just, I mean, throughout today, I'm

20 really talking about inmates who are currently

21 incarcerated that are being reviewed for release.

22         So, I don't know, I assume they would not

23 have a field supervision file?

24     **A.   If they were under supervision, the field**

25 **reports would have been forwarded to their confined**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 83 of 216

1    **file.**

2        Q.   If they are under supervision prior to

3    incarceration?

4        **A.   Yes.**

5        Q.   Do you know if any of these kids were under

6    supervision by the Department of Corrections prior to

7    being incarcerated for their current sentences?

8        **A.   No.**

9        Q.   So we're just talking about the central

10   parole file.

11           What is in that other than the prehearing

12   report?

13       **A.   In the file we have the sentence and**

14   **judgment paperwork.**

15           **We'd have the adult face sheet.**

16           **We would have the diagnostic assessment**

17   **instrument information.**

18           **You would have conduct violation reports.**

19           **Any special reports prepared by an IPO.**

20   **Any assessments that were done.**

21           **The victim profile information is put in**

22   **that file, because we share our files with our victims**

23   **services coordinator so notifications can occur.**

24           **If there are -- if there's correspondence,**

25   **either generally in support, or in opposition, that's**

Pohlman USA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 84 of 216

1    kept in the file.

2           Any offender notices that are generated are

3    kept in that file.

4           And the board action sheet.

5           (Deposition Exhibit No. 11 was marked for

6    identification.)

7    BY MS. BREIHAN:

8        Q.   I'll show you Exhibit 11.  It's

9    Bates-stamped AGO00060 and 61.

10          Is this the board action sheet you're

11   referring to?

12       A.   Yes.

13       Q.   And this board action sheet is used in

14   every single parole review hearing that the board

15   conducts?

16       A.   Yes.

17       Q.   You talk about assessments as one of the

18   things that might be the central parole file.

19          What do you mean by assessments?

20       A.   If there was field materials, such as

21   things gathered during a sentencing report, or a

22   presentence investigation, any assessments done by

23   outside people that added to that assessment, it would

24   have likely ended up in our file as well.

25          If there were any institutional assessments

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 85 of 216

1   conducted, most of them are electronic, but mental

2   health will fill out a summary.  The mental health

3   staff at the prison will fill out a summary for us, if

4   someone is a medium to high classification on the

5   mental health scale, giving us a diagnosis, a treatment

6   plan, and noting any medications.

7         And medical will do the same thing.  Kind

8   of give us -- not a specific diagnosis -- but will tell

9   us the medications an offender might be taking.  We

10   don't get access to the medical diagnosis, but we can

11   usually figure out what they're for.

12      Q.   Is the inmate given notice that their

13   medical and mental health information is being shared

14   with the board parole staff?

15      A.   Yes.

16      Q.   When are they given notice of that?

17      A.   They're given notice by the medical or

18   mental health people.  And I believe they sign a

19   release.

20      Q.   And you said you share the file with the

21   victims services office?

22      A.   Yes.

23      Q.   Is the victims services office, are they

24   like a division of the Division of Probation and

25   Parole?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 86 of 216

1    **A.    They're under the office of the director**

2    **for the department.**

3       Q.    Is the inmate given notice when their file

4    is shared with the victims services office?

5       **A.    No.**

6       Q.    Who else has access to the central parole

7    file?

8       **A.    No one.**

9       Q.    So the --

10      **A.    I guess the Attorney General's Office.**

11          MR. CRANE:    Only on occasion.

12   BY MS. BREIHAN:

13      Q.    So the only individuals who have access to

14   the central parole file are board members, parole

15   analysts, and the victims services office?

16      **A.    And the clerical staff that -- in support.**

17      Q.    Sure.    The inmates don't have access to

18   their own parole file?

19      **A.    No.**

20      Q.    Does the prosecutor, for the underlying

21   offense, have access to the parole file?

22      **A.    No.**

23      Q.    Is information generally shared from the

24   parole file with the prosecutor's office?

25      **A.    No.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 87 of 216

1    Q.   Is information generally shared from the

2  parole file with the victims or victim's

3  representatives?

4      **A.   No.**

5      Q.   And you mentioned that hearings are

6  scheduled by institutional staff, correct?  Like, the

7  specific dates?

8      **A.   Yes.**

9      Q.   Are hearings conducted by the entire board?

10  Do they all sit down and interview them in person?

11     **A.   No.**

12     Q.   They're conducted by a panel, correct?

13     **A.   Correct.**

14     Q.   Of three people?

15     **A.   Yes.**

16     Q.   Consisting of just one board member?

17     **A.   Yes.**

18     Q.   Who else sits on the panel?

19     **A.   The parole analyst.  And the institutional**

20  **supervisor.**

21     Q.   Has there, to your knowledge, ever been a

22  hearing conducted by the entire board?

23     **A.   Not by the entire board.  There's been a**

24  **panel consisting of -- solely of board members in the**

25  **past.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 88 of 216

1      Q.    Under what circumstances did that occur?

2      **A.    I believe it was a television documentary.**

3      **I bet you weren't expecting that one.**

4      Q.    Do you know when that was?

5      **A.    Oh, gosh, no.  I don't remember.  It was a**

6   **very long time ago.**

7      Q.    Does the board -- is that the only time, to

8   your knowledge, that the board has permitted, like,

9   media, at a parole hearing?

10     **A.    I don't know.  I mean, I can't say for**

11  **certain.**

12     Q.    So the only time that there was a panel

13  existing of exclusively board members is when there was

14  a documentary shot in the room, correct?

15     **A.    That's the only one I have knowledge of.**

16     Q.    Do you know, generally speaking, how many

17  of these parole hearings are conducted in person as

18  opposed to by videoconference?

19     **A.    No.  I don't know the exact number.**

20     Q.    If you had to guess, what would you say?

21     **A.    I would say that approximately 60 percent**

22  **are by video, and 40 percent are in person.**

23     Q.    And have you noticed a trend at all over

24  time with regard to how many are conducted by

25  videoconference?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 89 of 216

1       **A.    Absolutely.**

2       Q.    What's the trend that you've noticed?

3       **A.    The trend has been as we have expanded**

4  **videoconferencing.  More hearings are held through**

5  **video than in person.**

6       Q.    Probably makes it easier to schedule more

7  hearings that way; is that correct?

8       **A.    Yes.**

9       Q.    And saves some money, not having to travel

10  across the state, correct?

11      **A.    I think that they likely have better**

12  **decisions, because you're not having to travel every**

13  **day, and that you can -- you're not looking to get on**

14  **the road.**

15      Q.    So you think that the -- just the sort of

16  wear and tear of being on the road could impair panel

17  members' or board members' judgment?

18      **A.    Not judgment.  I think fatigue.**

19      Q.    Who decides whether a hearing's going to be

20  in person or by video?

21      **A.    Ultimately, the offender.  Or the victim**

22  **sometimes.  If the victim opposes, you know, the video.**

23  **Those are the only two parties.**

24      Q.    So if a -- hypothetically, an inmate wants

25  to have his hearing by video, but the victim wants it

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 90 of 216

1    in person, what happens?

2         **A.    The hearing will be held in person.**

3         Q.    Against the inmate's objection?

4         **A.    Yes.**

5         Q.    And the purpose of the parole hearing is to

6    review an inmate's readiness for release, right?

7         **A.    Yes.**

8         Q.    What happens if the victim wants it by

9    video and the inmate wants it in person?

10        **A.    We'll have it in person.**

11        Q.    Are there any circumstances under which, in

12   your opinion, a parole hearing should be conducted in

13   person rather than by video?

14        **A.    Yes.  If the offender does not seem capable**

15   **of understanding how he's going to communicate with the**

16   **board through a TV screen.  And I would be talking**

17   **either developmentally disabled offenders, or mentally**

18   **ill offenders, it would be in the best interest to**

19   **conduct those onsite.**

20        Q.    And so who's tasked with making that

21   assessment about an inmate, as to whether or not they

22   are competent or able-bodied enough to be able to

23   conduct their hearing by videoconference?

24        **A.    Usually it's in consultation with mental**

25   **health staff at the facility.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 91 of 216

1          And oftentimes the mental health person at

2     the facility will ask to be at the hearing to assist

3     the offender and keeping focus on the reason that

4     they're there.

5          Q.   So it's the -- the IPO's supposed to

6     consult with mental health staff if there's a concern?

7          A.   Yes.

8          Q.   What's the average duration of a parole

9     review hearing?

10          A.   I don't know the average.  To be exact.

11          Q.   And I think earlier in the day you talked

12     about maybe a cap on the number of hearings scheduled?

13          A.   Yes.

14          Q.   Is that, like, a monthly cap?  Or a weekly

15     cap?

16          A.   It's a daily.

17          Q.   Daily?

18          A.   Per facility.

19          Q.   What's the daily per-facility cap?

20          A.   I believe it is now 18 per day.

21          Q.   And that's changed over time?

22          A.   Yes.

23          Q.   What was it before it was 18?

24          A.   It was 14.

25          Q.   And when did it change to 18?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 92 of 216

1      **A.    When Chairman Jones made that action.**

2      Q.    So Chairman Jones raised it from 14 to 18?

3      **A.    Yes.**

4      Q.    So that would have been within the last

5  year?

6      **A.    Yes.**

7      Q.    That seems like a lot of hearings to

8  conduct in a day.

9           In your opinion, is that a -- would that

10 provide adequate time to conduct hearings for an inmate

11 to determine whether they're ready to be released from

12 prison?

13     **A.    I think 14 is too many.**

14     Q.    So where does this number come from?  Is

15 there a best practice standard out there, X number of

16 hearings?

17     **A.    I don't know if there is or isn't.  I think**

18 **it probably depends on each board, and how they conduct**

19 **hearings, and what components exist.**

20          **I know for our practices, just in looking**

21 **at how good are you at number 1 versus number 15, it**

22 **was Chairman McSwain's belief that limiting the cap**

23 **would promote better decision-making and more**

24 **flexibility in the day and in the schedule.**

25     Q.    So that the fatigue you mentioned sort of

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 93 of 216

1  comes into play, again, when you're talking about doing

2  18 hearings, or even 14 hearings a day, correct?

3        **A.    In my opinion, yes.**

4        Q.    And who can appear at a hearing?

5              We talked about mental health staff, if

6  it's appropriate, in their opinion, to assist with a

7  cognitively disabled or limited inmate.

8              We talked about the inmate themselves and

9  their delegate.

10             Who else has a right to be present at a

11 parole hearing?

12       **A.    The victim of the offense.**

13             **Law enforcement that investigated.**

14             **And the prosecuting attorney.  Or custody**

15 **staff, if there's a need.**

16       Q.    And how often, in your experience, do

17 prosecutors show up at parole hearings generally?

18       **A.    I really don't know.  My tenure was at a**

19 **very minimum security facility that didn't hold**

20 **generally high-profile offenses.  And if it did, they**

21 **already had their parole consideration hearing at the**

22 **higher custody facility, so it didn't happen when I was**

23 **at Tipton.**

24       Q.    Fair enough.

25             How are victims or victims representatives

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 94 of 216

1    involved in the process of parole review?

2        A.    I don't know what you mean.

3        Q.    Are there any restrictions on victims'

4    rights?  Victims' ability to speak at a hearing, for

5    example?

6        A.    The only restrictions that the board

7    imposes is that they not address the offender or the

8    offender's delegate directly during the hearing.

9        Q.    Are they allowed to bring a support person,

10   or anyone else, along with them?

11       A.    Yes.  Statutorily.

12       Q.    Is there any, like, limitation on the

13   number of victims or victim's representatives that can

14   participate in the hearing?

15       A.    Well, the restriction is embedded in

16   statute, in that they have to meet the definition of a

17   victim, and each can have a support person.  But you

18   know, if it was, for instance, one murder victim that

19   had 13 brothers, all 13 brothers have the right to

20   attend.

21       Q.    But if it's one victim, and their friend

22   and their friend's cousin, it would be improper for all

23   three to attend?

24       A.    There should only be one support person.

25       Q.    And, similarly, the inmate only gets one

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 95 of 216

1   support person, correct?

2       **A.   Correct.**

3       Q.   Have there been any exceptions to that one

4   support person limit on the victim's side?

5       **A.   I wouldn't know of a specific instance.**

6       Q.   Do you know any exceptions to the one

7   delegate limit on the inmate's side?

8       **A.   Not that I know of.**

9       Q.   Back to the role of the victim; are they

10  allowed to take notes during the hearing?

11      **A.   I've never seen it happen.**

12      Q.   Do they -- they have been permitted to

13  bring in materials to read from, for example, correct?

14      **A.   Yes.**

15      Q.   Are they provided with information about

16  the inmate by the Division of Probation and Parole?

17      **A.   During the hearing they hear the testimony**

18  **and the questions that are answered.  Prior to, they're**

19  **given no more information than the general public.**

20      Q.   Well, except that they're told about when

21  the hearing is; right?

22      **A.   Yes.**

23      Q.   And they have some contact with the victims

24  services office?

25      **A.   Correct.**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 96 of 216

1       Q.   Do you know what kind of communication

2  occurs between the victims services office and the

3  victims?

4       **A.   Not specifically.  I think it's general**

5  **instruction about the process.**

6       Q.   Do you know whether, beyond sort of general

7  notice or instruction about the process, whether the

8  victims services office ever prepares the victim's

9  response for the hearing?

10      **A.   What do you mean by "prepare?"**

11      Q.   I don't know.  I've seen that term used, to

12  be honest with you, and I'm wondering what it means.

13  If you don't know, that's fair enough.

14      **A.   I wouldn't know specifically, other than**

15  **the preparation is focused on what they statutorily**

16  **have a right to provide.**

17          **And, you know, maybe counseling them you**

18  **can't yell at the offender.  You can't scream at the**

19  **board.  General conduct.  The expectation of how they**

20  **present their testimony.**

21      Q.   And the prosecutor also you mentioned has a

22  right to be present at the hearing.

23          Does the division of Probation and Parole

24  provide them any information about the inmate prior to

25  the hearing.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL  Document 134-9  Filed 06/12/18  Page 97 of 216

1     A.    No.

2     Q.    And what is their role intended to be at

3    these parole review hearings?

4     A.    **They're able to offer opposition.**

5     Q.    Opposition to release?

6     A.    **To release.**

7     Q.    What about the role of the inmate's

8    delegate; what's that role supposed to be?

9     A.    **Well, I don't know what it's supposed to**

10    **be.  I look for it to be someone who can offer some**

11    **insight into the offender in general.  How they came to**

12    **commit a crime.  What supports they're going to offer**

13    **in the future.**

14          **And how they believe that this person**

15    **has -- I don't want to use the word changed, like**

16    **there's a magic wand -- but able to be a successful**

17    **productive member of the community.**

18          **That's what I would look for in a delegate.**

19    Q.    And your initial reaction was you don't

20    know what the delegate's role is supposed to be.

21          Is there any sort of rule or regulation

22    that defines what the delegate's role is?

23    A.    **Not really.**

24    Q.    Does the Blue Book talk about that at all?

25    A.    **It might.  I don't recall the specific**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 98 of 216

1  language.  It might say, more or less, who is

2  appropriate or not as a delegate.

3      Q.   May a delegate speak to the hearing panel?

4      A.   They're usually allowed to make a statement

5  at the conclusion of the offender's portion of the

6  interview.

7      Q.   Are they allowed to ask questions of the

8  panel?

9      A.   It depends on the individual board member

10  or the person conducting the hearing.  Not during the

11  offender's portion, they are not.

12      Q.   So whether or not a delegate can ask

13  questions just depends on who's conducting the hearing?

14      A.   Yes.

15      Q.   There's no uniform rule about the delegate

16  being permitted to ask questions?

17      A.   There is no uniform rule.

18      Q.   Well, I'm confused.  Because if we look at

19  the Blue Book, Exhibit 3, it talks a little bit about

20  the role of a delegate at a parole hearing, and you

21  testified earlier that the Blue Book is meant to be a

22  guide for an inmate.

23          So if I were having a hearing, and I wanted

24  to know who my delegate could be, I might go to page

25  six in the Blue Book, and the Blue Book says that the

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 99 of 216

1    offender's delegate may offer a statement on behalf of

2    the offender, ask questions and provide additional

3    information that may be requested by the hearing panel.

4    And they may also elect to write or telephone the

5    board, or meet with the board member at Central Office.

6            So after reading that, is this inaccurate?

7    That they can ask questions in all instances?

8            Or maybe this is sort of refreshing your

9    understanding and recollection about what the delegate

10   is permitted to do at hearings?

11        **A.   I believe most of the panel members**

12   **generally ask the delegate if they have any questions.**

13        **I'm not sure that all of the members ask**

14   **that question.  I don't think if a delegate would get**

15   **asked a question that they'd say:  Don't talk to us,**

16   **you're done making your statement.  But I wouldn't know**

17   **that.  I'm not on every panel.**

18        Q.   Have you sat in on any of the JL WOP

19   hearings?

20        **A.   No.**

21        Q.   Have you reviewed any of the recordings of

22   the hearings?

23        **A.   No.**

24        Q.   The only recordings, I guess you reviewed,

25   were in connection with the investigation into Ruzicka

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 100 of 216

1    and Mr. ████, correct?

2         **A.   That's not the only recordings I reviewed.**

3         Q.   In, like, the last few years, are those the

4    only ones you've reviewed?

5         **A.   No.**

6         Q.   Are delegates allowed to take notes during

7    the hearing?

8         **A.   No.  I don't even think -- I don't believe**

9    **they're allowed to bring items to take notes in.**

10         Q.   They're not allowed to bring any outside

11   items in?

12         **A.   I don't know.  They weren't when I was**

13   **conducting hearings.**

14         Q.   And then you also talked, when you were

15   going through the process, very helpfully about how a

16   vote might occur, that if there's a panel

17   recommendation at the conclusion of the hearing,

18   correct?

19         **A.   Yes.**

20         Q.   And then depending on the level of the

21   offense it might be sent up for a majority vote board?

22         **A.   Depending on the level of the offense and**

23   **the type of decision.**

24         Q.   So under what level of offenses or types of

25   decisions would warrant a majority board vote?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 101 of 216

1    A.   A decision is -- it's complicated.  So I'm

2  going to give you what I can remember without it being

3  in front of me.

4        I believe that a majority board decision is

5  required in all offenses above Class C.  In all

6  offenses, all drug offenses that are Class B, that are

7  of eight years or longer.  All decisions above or below

8  the board's time-to-serve guidelines.

9    Q.   Do you remember any others?

10   A.   Yeah.  I was going slow 'cause you were

11 writing.

12        Hearing panel decisions that are

13 not -- where they don't all agree.  Where there's not

14 consensus.  And in any case that the board wants to

15 refer it to the majority.

16   Q.   So the very last one you mentioned, any

17 case that the board wants to refer it, is that decision

18 made before the hearing?

19   A.   No.  That would be made by the member

20 themselves.  To refer.  And that's any decision.  If a

21 board member looks at it and says, I want to send this

22 through majority, they have the option to do that.

23   Q.   So setting aside those circumstances on the

24 non-consensus panel, just the classification of

25 offense, why is it that those specific kinds of

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 102 of 216

1    classification of offenses are required to have a

2    majority board decision?

3         **A.    I don't know the why.**

4         Q.    And then you said it works through sort of

5    a workflow.

6              How is the order of the flow of the vote

7    determined?

8         **A.    By their office placement.**

9         Q.    What does that mean?

10        **A.    That means -- I'm going to have a hard time**

11   **not using my hands -- meaning that if you start at one**

12   **office, you normally pass it to the office next to you,**

13   **and then the office next to you, and the office next to**

14   **you; except for there are some occasions when you skip;**

15   **such as if someone is team three that week, meaning**

16   **that they're in the office doing file reviews, so when**

17   **you come back from hearings, if team three is No. 2,**

18   **you skip that person.  I don't know why.**

19              **And then every January and July, they**

20   **reverse the order, so it goes the other way down the**

21   **hallway.**

22        Q.    Would you be willing to draw it for me?

23        **A.    Yes.**

24        Q.    Would you be willing to draw me a map of

25   the office placement and who sits where?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 103 of 216

1          A.    I'm going to think how long I've been in

2     that hallway and if I know where they're sitting.

3               (The witness complied.)

4               MS. BREIHAN:  I'll mark this as Exhibit 12.

5               (Deposition Exhibit No. 12 was marked for

6     identification.)

7     BY MS. BREIHAN:

8          Q.    Okay.  So hypothetically, based on this,

9     let's say Ms. Zamkus conducts a hearing, and it's a

10    majority board vote.  Then depending on whether it goes

11    clockwise or counterclockwise, it depends on if it goes

12    to Fitzwater and Jones and so on?

13         A.    Correct.  But it would not go to the chair

14    unless there is a tie.

15         Q.    Okay.  So the chair does not vote, even if

16    it's a majority decision, unless there's a tie?

17               What if the charges the one that conducted

18    the hearing?

19         A.    Then he passes in whatever direction that

20    they're going.  He would still vote.

21         Q.    So the chair only votes if he conducted the

22    hearing, or if there's a tie amongst the rest of the

23    board members, correct?

24         A.    Correct.

25         Q.    But, I guess -- okay.  Since there's a

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 104 of 216

1  vacancy right now there probably wouldn't be a tie

2  situation?

3         A.   He would vote on cases if we needed to

4  finalize a decision.

5              You know, oftentimes, it might not follow

6  the path, because whatever date might be chosen is

7  coming upon us very quickly, say, within 30 to 60 days.

8  And in that case, you know, the members generally are

9  aware, and they'll walk it to whoever's there to get it

10 finalized as fast as they can.

11        Q.   Do you know how it's determined who gets to

12 sit where?  Like, the offices, how decisions are being

13 made?

14        A.   I guess it's just seniority, probably.

15 I mean, I didn't ever have the -- all we had is

16 vacancies and stable when I was the board operations

17 director.

18             I mean, I guess when Paul came, he got to

19 choose whether he wanted this office, or this office.

20 And then Gary was in this office.  And when there was a

21 vacancy, he moved to this office.

22        Q.   Aside from passing the physical file, are

23 there any, like, in person, or over-the-phone

24 deliberations between board members, or the panel and

25 board members, about a decision, whether to grant

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 105 of 216

1  parole?

2      A.   I believe they talk to one another and talk

3  about the hearing.

4         They try to make notes on the board action

5  sheets so the next person voting has a good idea of the

6  impressions that the hearing panel had.

7         In some instances, the board member may

8  choose to hold the file back, and bring it to what's

9  called executive board, which takes place after the

10  agenda of the board meeting.  And it's only board

11  members, and no other staff, and they'll kind of stack

12  cases, and talk about them and vote afterwards.

13      Q.   Okay.  And this board action sheet we've

14  marked today as Exhibit 11, so the notes that you're

15  referring to that the panel might make that would help

16  guide other board members' votes, that's this little

17  box on the first page that says:  Hearing panel

18  comment?

19      A.   Yes.

20      Q.   Is the hearing panel, are they required to

21  review the parole file prior to the hearing?

22      A.   No.

23      Q.   Do they generally?

24      A.   No.

25      Q.   Are the board members who vote required to

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 106 of 216

1   review the parole file at any time?

2       **A.   What do you mean?**

3       Q.   So --

4       **A.   When they're making a decision, and they**

5   **pass that file, they should review the parole file, as**

6   **well as the report in front of them.**

7       Q.   Do they generally review the whole parole

8   file?

9       **A.   I don't know.**

10      Q.   You worked pretty closely with Mr. McSwain

11  for many years?

12      **A.   Yes.**

13      Q.   Do you know what his practice was, whether

14  he reviewed the full parole file before voting?

15      **A.   I believe he did.**

16      Q.   And then how is a decision conveyed to an

17  inmate?

18          How are they told they're being released or

19  not?

20      **A.   After the offender notice is prepared, it's**

21  **electronically sent to the institutional parole office.**

22  **Printed out.  And then it should be personally**

23  **delivered by an institutional parole officer, if safety**

24  **permits, and discussed with them.**

25      Q.   And the same sort of notice form is used in

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 107 of 216

1    all instances; is that correct?

2        A.   It's electronic.  It's

3    **electronic-generated, once the decision's entered in**

4    **our offender database.**

5        Q.   So, yes?

6        **A.   Yes.**

7        Q.   Does an inmate have a right to appeal the

8    board's decision?

9        **A.   In some cases.**

10       Q.   And what cases do they have a right to

11   appeal?

12       **A.   They have a right to appeal the hearing**

13   **panel decisions to deny parole.**

14       Q.   Any other circumstance that they have a

15   right to appeal?

16       **A.   Not that I can remember.  They can't appeal**

17   **majority board decisions.**

18       Q.   And you said that the salient factor score

19   is used for every inmate who's up for parole review,

20   correct?

21       **A.   Yes.**

22       Q.   So now that we've talked about the general

23   sort of parole review process, I'd like to ask you

24   about the parole review process for hearings under

25   Senate Bill 590.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 108 of 216

1         You understand I'm referring to the parole

2   hearings conducted pursuant to the change in the law?

3         A.   Yes.

4         Q.   So can you walk me through what the process

5   is, similarly, from start to finish, for handling a

6   parole review under the new implementation of

7   Senate Bill 590?

8         **A.   I couldn't tell you the process right now**

9   **because I'm not involved in the process right now.**

10        Q.   You were involved in implementing the

11  process?

12        **A.   Yes.**

13        Q.   And in analyzing the bill, correct?

14        **A.   Yes.**

15        Q.   So is it just that you don't remember?  Or

16  do you think it's changed since you left?

17        **A.   I've never personally been involved in one**

18  **of the hearings.**

19        Q.   Okay.  So are there any guidelines or

20  procedures, or, like, worksheets that are supposed to

21  help guide individuals --

22        **A.   Yes.**

23        Q.   -- through the process?

24        **A.   Yes.**

25        Q.   So even though you have not participated

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 109 of 216

1  personally in a hearing, do you have a general

2  understanding of what the process is for inmates being

3  funneled through this parole review process?

4      A.   Yes.

5      Q.   Can you describe that for me?

6      A.   The offender sends in a petition to our

7  Central Office, and then the petition is reviewed by

8  the lead parole analyst, who makes sure that they

9  qualify.

10          If they qualify, the hearing is scheduled,

11  and victims services is notified so they can begin

12  finding the victim.  Because many of these people were

13  not registered.  The hearing is usually scheduled

14  within 90 days.

15          And then the IPO delivers the notice.

16  Conducts the prehearing interview.  The hearing's held.

17          The IPO is expected to use the additional

18  questions in that prehearing worksheet.

19          The analysts group created kind of a

20  trailer to the board action sheet, to document those

21  additional elements, whether they found them, didn't

22  find them, or not, during the hearing.

23          I don't believe that it is -- other than

24  the additional elements -- that it's substantially

25  different from any other parole consideration hearing.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 110 of 216

1  Q.  And you had talked about how the JL WOP

2  wasn't an issue until Senate Bill 590 was passed, which

3  implemented parole review for a certain subsection of

4  juvenile life without parole inmates, correct?

5  **A.  Yes.**

6  **(Deposition Exhibit No. 13 was marked for**

7  **identification.)**

8  BY MS. BREIHAN:

9  Q.  I'm going to hand you what I've marked as

10  Exhibit 13.

11  This Bates-stamped AGO1324.

12  Do you recognize this email?

13  **A.  Yes.**

14  Q.  And, again, this looks like an email chain.

15  The first part of the chain is an email from

16  Kimberly Evans to Ellis McSwain on March 23rd, 2016,

17  correct?

18  **A.  Yes.**

19  Q.  Who's Kimberly Evans?

20  **A.  The victims services coordinator.**

21  Q.  And the subject is juvenile life without.

22  She's asks:  What is the status on these cases?  Have

23  we started setting up parole hearings?

24  And Mr. McSwain forwards -- responds and

25  copies you, correct?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 111 of 216

1      **A.    Yes.**

2      Q.    And says that Kim should get with you on

3  this as she is looking into same.

4           What did he mean by that?

5      **A.    I believe that Kim had been in contact with**

6  **the Attorney General's Office, and believed, based upon**

7  **maybe some court action, that we were going to start**

8  **hearing these cases that we'd been ordered to, when, in**

9  **fact, that wasn't the case.  That's what I believe her**

10  **intention was.**

11      Q.    So Mr. McSwain correct when he said you

12  were already looking into this issue of parole hearings

13  for juveniles live without?

14      **A.    I don't know what he would have meant by**

15  **looking into.  Other than we were aware it was an issue**

16  **in courts and in pending legislation.**

17      Q.    Were you aware of an order of the Missouri

18  Supreme Court in March of 2016 in any juvenile life

19  without parole cases?

20      **A.    No.**

21      Q.    Were you, in fact, working on designing or

22  implementing a process for parole review for this

23  population of inmates in March of 2016?

24      **A.    Not that I remember.  Not that early.**

25      Q.    When did you start?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 112 of 216

1          Do you remember the month?

2     **A.    I thought it was April or May.**

3     Q.    So that would have been before the bill was

4  signed into law; is that correct?

5     **A.    I don't know if we would have worked on the**

6  **process.**

7          **I think in responding to legislation and**

8  **talking with our legislative liaison about how this**

9  **might go, you know, we wanted to be ready to implement**

10  **as soon as the legislation was in effect.**

11     Q.    Do you know how inmates were informed about

12  the passage of SB 590 and what it might mean for them?

13     **A.    There may have been a memo sent to wardens,**

14  **or communication drafted through the institutional**

15  **regional administrator, to them.**

16     Q.    Were you involved in that process at all?

17     **A.    Notification to the offenders?  No.**

18     Q.    Were you involved at all in preparing the

19  form memo that would go to wardens to notify inmates

20  about this process?

21     **A.    No.  Other than maybe it being shared with**

22  **me, but I did not write it.**

23     Q.    Do you know who did write it?

24     **A.    I think it was Michelle Kasak.**

25     Q.    Did you ever prepare a memo that sort of

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 113 of 216

1  summarized the juvenile life without parole panel

2  review process that you recall?

3       **A.    I drafted one on behalf of Chairman McSwain**

4  **that he eventually sent out.**

5       Q.    And do you know if that was ever shared

6  with inmates?

7       **A.    I don't know.**

8       Q.    Did you ever express any concerns about it

9  being shared with inmates?  As it might give the

10  appearance of fishing for parole?

11      **A.    I don't know.**

12           **(Deposition Exhibit No. 14 was marked for**

13  **identification.)**

14  BY MS. BREIHAN:

15      Q.    I'll show you what I've marked as

16  Exhibit 14.  This is Bates-stamped AGO1444 and 1445.

17           Do you recognize this document?

18      **A.    Yes.**

19      Q.    And what is it?

20      **A.    A forwarded email trail.**

21      Q.    Okay.  And it looks like the subject line

22  is juvenile life without parole process?

23      **A.    Mm-hmm.**

24      Q.    And Mr. Cassidy; who's that?

25      **A.    Jay Cassidy was a warden.**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 114 of 216

1      Q.   Do you know --

2      A.   I think he was asking -- now I recall the

3  gist of this conversation.  And was he was asking how

4  were the offenders going to be notified.  And then the

5  chairman asked me.  And I said I don't want them to

6  distribute the memo, because it appears, to me, that we

7  would be giving legal advice to an inmate.  And that's

8  not the job of the parole board.

9      Q.   But your email doesn't say anything about a

10 concern about giving legal advice, does it?

11     A.   No.

12     Q.   It talks about a concern about having an

13 appearance of fishing for parole, right?

14     A.   Yes.

15     Q.   Why would that be a problem?

16     A.   Well, the board doesn't go looking for

17 people to parole, so to speak.  They conduct

18 consideration hearings when people are eligible.

19          And in this instance, it's not the board's

20 job to automatically schedule a hearing now that

21 they've become eligible.  It's the offenders'

22 obligation to file a petition if they choose to be

23 considered.

24     Q.   And in all other instances, the general

25 process we talked about, the board does generally

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 115 of 216

1  schedule them?

2      **A.   Yes.  And most others.  Other than for**

3  **conditional release extensions, there is a process**

4  **whereby offenders can petition the board for**

5  **reconsideration.**

6              **(Deposition Exhibit No. 15 was marked for**

7  **identification.)**

8  BY MS. BREIHAN:

9      Q.   We talked earlier about revisions to the

10  administrative rules or the regulations.

11              I'm going to hand you what I've marked as

12  Exhibit 15.  It's Bates-stamped 1456 through 1467.

13              Do you recognize the first page of this?

14  Looks like an email from you.

15      **A.   Mm-hmm.**

16      Q.   And it's regarding proposed rule changes,

17  as well as the Blue Book, which is incorporated in the

18  rule, correct?

19      **A.   Right.**

20      Q.   Are there any changes to the regulations

21  here -- not the Blue Book, but the regulations -- that

22  reflect the passage of Senate Bill 590?

23      **A.   Not in the state regs itself that I'm**

24  **finding.**

25              **(Deposition Exhibit No. 16 was marked for**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 116 of 216

1    **identification.)**

2    BY MS. BREIHAN:

3         Q.   I'll show you Exhibit 16.

4              It was attached as an exhibit in the

5    complaint in this case.

6              Have you looked at the complaint that was

7    filed in this case?

8         **A.   No.  I mean, not in its entirety.**

9         Q.   Did you look at parts of it?

10        **A.   Parts of it.**

11        Q.   When?

12        **A.   Probably when it was posted on your**

13   **website.**

14        Q.   Okay.

15        **A.   On the MacArthur Foundation website.**

16        Q.   And I didn't realize you frequent our

17   website.  Do you keep up to date?

18        **A.   I don't frequent it.**

19        Q.   So you read about the -- you read the part

20   of the complaint when it was posted on our website,

21   correct?

22        **A.   Yes.**

23        Q.   Do you remember when it was?

24        **A.   No.**

25        Q.   Do you remember what prompted you to go to

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 117 of 216

1    our website to look at it?

2         A.    **An article in the Post-Dispatch.**

3         Q.    Aside from that instance, have you looked

4    or read the complaint on any other occasion?

5         A.    **Not that I can remember.**

6         Q.    Getting back to this Exhibit '16, have you

7    seen this before today?

8         A.    **No.**

9         Q.    As of April 27th, 2017, were you still the

10   board operations director?

11        A.    **As of April?  I don't recall the exact**

12   **date.  I don't believe I was at that time.**

13        Q.    Well, you'll see that the second through

14   fourteen pages of this exhibit are purported parole

15   hearing procedures that were forwarded to our office by

16   Director Anne Precythe.

17              Have you ever seen these parole hearing

18   procedures before?

19        A.    **No.**

20        Q.    And you can take the time to look through

21   them.  It might be necessary to answer my next

22   question, and whether these procedure are consistent

23   with the administrative rules, Blue Book, and any other

24   authority that governs the parole hearing process.

25        A.    **In general, yes.  I don't know where this**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 118 of 216

1    came from.  To me, it almost looks like something by

2    victims services, who don't dictate what happens in our

3    hearings.

4                    I couldn't tell you.

5         Q.   Why does it look to you something developed

6    by victims services?

7         A.   Because it looks, to me, that it's giving

8    some instruction about how they should conduct

9    themselves during a hearing.

10        Q.   How victims should conduct themselves?

11        A.   Or delegates.

12        Q.   And it's telling -- it's telling my office,

13   and my colleague, Mae Quinn, that we're not allowed to

14   take notes during the hearing, correct?

15                   That very first bullet point on the first

16   page of the attachment?

17        A.   Yes.

18        Q.   And tells us a number of other things, but

19   also there's to be no contact made directly or

20   indirectly with the victims except through the office

21   of victims services, correct?

22        A.   Yes.

23        Q.   Is there a policy, procedure, or rule,

24   regulation, that you can point to that says that

25   inmates, delegates, or their attorneys are not allowed

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 119 of 216

1    to have any contact with victims?

2    **A.    I don't know where that would be in**

3    **writing.**

4    Q.    Other than this letter from the director to

5    our office?

6    **A.    No.**

7    Q.    So we talked about how, unlike in most

8    general circumstances where hearings are automatically

9    set based on a calculation of eligibility, in the

10   juvenile life without parole context the inmate has to

11   petition for a hearing, correct?

12   **A.    Correct.**

13   Q.    When are they eligible to petition for a

14   hearing?

15   **A.    After they've served 25 years of the**

16   **sentence that is life without.**

17   Q.    Sounds like that's an important distinction

18   to you.  Not just 25 years on the sentence of life

19   without?

20   **A.    Yes.**

21   Q.    What's the distinction you're making there?

22   **A.    I believe that's what it says in the**

23   **statute.**

24   Q.    And the lead parole analyst determines

25   eligibility, correct?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 120 of 216

1    A.    Yes.

2    Q.    And that's Steven Mueller?

3    A.    Yes.

4    Q.    Has the board ever held a Senate Bill 590

5    hearing for someone that was not eligible for parole?

6    A.    I don't know.

7    Q.    Do you know who Walter Eden is?

8    A.    No.

9          (Deposition Exhibit No. 17 was marked for

10   identification.)

11   BY MR. BREIHAN:

12   Q.    I will show you what I've marked as

13   Exhibit 17.

14         It's Bates-stamped AGO1590.

15         Do you recognize this email?

16   A.    Yes.

17   Q.    Does this refresh your memory about an

18   inmate named ██████████?

19   A.    Not really.

20   Q.    I know it's been some time.

21   A.    I think this is one where we ended up

22   trying to seek official documentation of his correct

23   date of birth.

24   Q.    It looks like Charlie Baker is reaching out

25   to you in January of 2017, after having conducted a

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 121 of 216

1 parole hearing for Mr. ███ on January 3rd, 2017,

2 correct?

3      **A.   Uh-huh.**

4      Q.   And that there was some question whether he

5 was 17 or 18 at the time of the underlying offense,

6 correct?

7      **A.   Yes.**

8      Q.   Did the board ever determine when his

9 actual date of birth was?

10      **A.   I don't know if they did or didn't.**

11      Q.   But they hadn't determined it before his

12 hearing, that much is clear, correct?

13      **A.   What they relied on was the adult face**

14 **sheet prepared by Institutions.**

15      Q.   And the face sheet had two unverified dates

16 of birth?

17      **A.   Yes.**

18      Q.   So there was an error on the face sheet

19 that the board relied upon, correct?

20      **A.   Yes.**

21      Q.   And why was Mr. Baker asking you for this

22 information?

23      **A.   I believe that he was requesting sort of**

24 **permission to withhold the decision pending**

25 **verification of a true birth date, just as his**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 122 of 216

1    **supervisor.**

2        Q.   Would you have personally been the one to

3    confirm the date of birth?

4        **A.   No.**

5        Q.   What would you have done to confirm that?

6        **A.   I would have relied on, probably, our**

7    **institutional records staff to seek some independent**

8    **verification of which was the correct date of birth,**

9    **either through Vital Records.  I don't know how they do**

10   **that in the institution.**

11       Q.   And then he closes, it says, "The panel is

12   requesting assistance in verifying the date of birth."

13            And it looks like the other individuals on

14   the email are Martin Rucker, who's a board member,

15   correct?

16       **A.   Yes.**

17       Q.   And Kimberly Evans, victims services; does

18   Ms. Evans serve on hearing panels?

19       **A.   No.**

20       Q.   Do you have any idea why she would be

21   copied on this email that's on behalf of the hearing

22   panel seeking clarification?

23       **A.   No.  I can assume that they represented**

24   **victims at that particular hearing.**

25       Q.   Do you know if she's participated in every

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 123 of 216

1   Senate Bill 590 hearing?

2          **A.    No.**

3                 **(A break was taken.)**

4                 MS. BREIHAN:  Back on the record.

5                 (Deposition Exhibit No. 18 was marked for

6   identification.)

7   BY MS. BREIHAN:

8          Q.   I'll hand you another document.

9   Exhibit 18.

10                This document is Bates-stamped AGO1409

11   through 1412.

12                Go ahead and take your time to review it.

13   Let me know if you recognize this.

14          **A.   (The witness complied.**

15          **Yes.**

16          Q.   And what is it?

17          **A.    It's a memo I drafted with the chairman,**

18   **and on behalf of the chairman, to describe the process**

19   **for how we would schedule juveniles without who**

20   **petitioned the board for parole consideration.**

21          Q.   And it looks like a sample petition for

22   parole consideration?

23          **A.   Yeah.**

24          Q.   Did you draft that petition as well?

25          **A.    Steve and I together did.  I'm not sure who**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 124 of 216

1    **actually did the typing.**

2         Q.   And you mean Steve Mueller?

3         **A.   Yes.**

4         Q.   And was this process that's outlined in

5    your memo approved by the director?

6         **A.   Yes.**

7         Q.   And you called it your OA moment ago?

8         **A.   I wrote it.**

9         Q.   It seems Mr. McSwain relies on you for

10   drafting memorandum like this even if it was on his

11   behalf; is that fair to say?

12        **A.   For some things.**

13        Q.   So on July 29th, 2016, you send this memo

14   to Mr. McSwain, final draft of the memo, along with the

15   draft petition.

16             And you already mentioned he signs off on

17   it, correct?  Approves the process that you suggested,

18   correct?

19        **A.   Yes.**

20        Q.   And then a final draft of that same memo is

21   distributed to the board members, and wardens, and

22   institutional parole supervisors, correct?

23        **A.   Yes.**

24        Q.   I'll hand you that as well.  It's been

25   marked as Exhibit 19.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 125 of 216

1          (Deposition Exhibit No. 19 was marked for

2     identification.)

3          And it's Bates-stamped AGO022 through 24.

4          And this, just as you described, outlines

5     the process for petitioning the parole board for review

6     of sentences under Senate Bill 590, correct?

7          **A.    Yes.**

8          Q.    And this is the same memo that you prepared

9     and sent to Mr. McSwain for approval?

10         **A.    Yes.**

11         Q.    And then it says that, "Until such time as

12    procedure in the Code of State Regulations are revised,

13    this memorandum should serve as guidance on this

14    process," correct?

15         **A.    Yes.**

16         Q.    And we already talked about earlier the

17    state regulation revisions that you and others did in

18    August of 2016, that they did not address the Senate

19    Bill 590 hearings, correct?

20         **A.    The Blue Book did.**

21         Q.    The Blue Book did in that one paragraph,

22    correct?

23         **A.    Yes.**

24         Q.    But the regulations didn't?

25         **A.    No.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 126 of 216

1    Q.    The Blue Book is really meant for inmates,

2    not for analysts or IPOs, correct?

3    **A.    Yes.**

4    Q.    And you mentioned that hearings in this

5    memo that we've marked as Exhibit 19, that hearings

6    will be scheduled within 90 days of processing the

7    petition, in part to allow a thorough investigation to

8    be completed, correct?

9    **A.    Yes.**

10    Q.    What do you mean there by "a thorough

11    investigation?"

12    **A.    Well, we weren't sure, as I described**

13    **earlier, if we would have any file material related to**

14    **circumstances of the offense.**

15    **And so not knowing if we were going to have**

16    **to send field Probation and Parole staff to**

17    **prosecutor's offices to go dig through boxes to find**

18    **materials for people who we never knew we were going to**

19    **have to consider for parole, we wanted to allow time**

20    **for that to occur, if we needed to send a request to**

21    **the field to find information.**

22    Q.    And in the past, you had shared a concern

23    with the board and with Jeff Earl about the ability to

24    be able to get those materials in order to conduct this

25    review, correct?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 127 of 216

1    A.   Yes.

2    Q.   And you also shared those concerns with

3  Jay Boresi and DOC legal, correct?

4    A.   Yes.

5         **(Deposition Exhibit No. 20 was marked for**

6  **identification.)**

7  BY MS. BREIHAN:

8    Q.   I'll hand you Exhibit 20.

9         This is AGO1309 through 1310.

10         Do you recognize this document, ma'am?

11    A.   Yes.

12    Q.   This is an email chain including an email

13  you sent to Jay Boresi on July 18th, 2016?

14    A.   Yes.

15    Q.   And it seems to sort of parallel the memo

16  that we've marked as Exhibit 19, which talks about the

17  suggested process for handling juvenile life without

18  parole?

19    A.   Yes.

20    Q.   It talks about the need to conduct a

21  thorough investigation.  And the concern that the

22  agency will have no prior file materials.  And that

23  given the age of the offenses, the materials may be

24  difficult to obtain, correct?

25    A.   Yes.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 128 of 216

1     Q.   You also indicate that the board will be

2  unlikely to consider parole if unable to ascertain

3  progress and growth since the occurrence of the crime.

4              What do you mean by that?

5              And where I'm looking is the last full

6  paragraph on this first page.

7     A.   Well, if there were -- if there's no file

8  material to describe the circumstances of the offense,

9  or you don't have, you know, an arrest report, or

10  thorough investigative reports, I believe it would be

11  difficult for a board to determine, just through

12  question and answer, how the offender came to be led

13  into committing the crime.  Such as, you know, was he

14  the ring leader or the follower?

15              I mean, the subsequent growth throughout

16  would be measured by program participation, and things

17  like attitude, that you would gain more through

18  interview and some assessment.

19     Q.   And you mentioned under certain

20  circumstances, if an inmate had a certain mental health

21  score, there might be a summary from mental health

22  records?

23     A.   Yes.

24     Q.   Is there any sort of summary for mental

25  health, or a psychology eval provided by mental health

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 129 of 216

1  providers in the Department of Corrections, about the

2  inmate's progress and growth since they were first

3  incarcerated?

4      A.   I don't know if there is or not.  The

5  institution that I worked at did not have offenders who

6  had significant mental health histories.

7      Q.   The implication of this sentence seems to

8  be that growth and progress over time are significant

9  factors to be considered by the board in these cases;

10  is that correct?

11      A.   Yes.  They would be in any case.

12      Q.   So no different in this case than the

13  others is what you're saying?

14      A.   Right.  You want to see progress toward the

15  positive reduction of conduct violations, improvement

16  of the behavior as they approach release.

17      Q.   And then the last sentence on this first

18  page, which continues on to the second, could you read

19  that aloud for me?

20      A.   "If release is denied, the board will

21  likely cite poor institutional adjustment, or the

22  determination that it is unlikely the offender be able

23  to remain at liberty without violating the law, as

24  opposed to seriousness or circumstances surrounding the

25  present offense."

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 130 of 216

1      Q.   Why is what?

2      **A.   Why is what?  Ultimately, it was not true.**

3      Q.   What do you mean?

4      **A.   I mean, in my discussions with legal**

5      **counsel, we had initially discussed not using**

6      **circumstances or seriousness of the offense, which**

7      **parallel what we did with the domestic violence**

8      **females.  That's not the course that the board opted to**

9      **go.**

10     Q.   Yeah.  And why did they decide not to go

11     that direction?

12     **A.   I don't know.**

13     Q.   You weren't part of those discussions?

14     **A.   I was part of the discussion with the**

15     **analysts group only, who didn't believe that we should**

16     **cite different reasons for different groups of**

17     **offenders; that we ought to be consistent; and if we**

18     **really were denying based upon the seriousness, the**

19     **record should reflect that.**

20     Q.   Fair to say that it was your opinion, at

21     least as of July 18th, 2016, that for this specific

22     population of inmates, circumstances of the offense

23     should not be the deciding factor?

24     **A.   Not the deciding.**

25     Q.   But it was your opinion that they should

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 131 of 216

1    not be denied on circumstances of the offense?

2         **A.   Correct.**

3         Q.   Did the parole analysts with whom you

4    discussed that position agree with you?

5         **A.   No.**

6         Q.   Did they all disagree with you?

7         **A.   For the most part.**

8         Q.   Because they didn't feel you should use

9    different reasons for different inmates, correct?

10         **A.   Correct.**

11         Q.   And at some point the decision was made to

12    treat them the same as other inmates with respect to

13    the basis for denial, correct?

14         **A.   I don't know that it was a decision, so**

15    **much as it was, if they didn't agree, and agree that we**

16    **ought to treat them the same, then we're not doing**

17    **anything differently.**

18         Q.   I'm sorry, could you explain that to me?

19         **A.   Because the analysts didn't agree with me,**

20    **it didn't become a new issue.**

21         Q.   Okay.

22         **A.   And whether they had individual discussions**

23    **with the board, as they were conducting hearings and**

24    **marking reasons for denial of parole or not, I don't**

25    **know.**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 132 of 216

1          **I don't remember ever talking about it at a**

2   **board hearing.  Or a board meeting.**

3          Q.   Do you know whether the board had any

4   deliberation or discussion about whether to sort of

5   adopt your perspective about not using circumstances of

6   the offense as a basis for denial?

7          **A.   I don't remember any discussions.  I just**

8   **remember it as the analysts meeting.**

9          Q.   What analysts meeting, do you remember,

10  that it was discussed?

11         **A.   Likely would have been in August.**

12         Q.   At the end of your August 1st memo,

13  Exhibit 19, you indicate that any questions about this

14  JL WOP hearing process can be made directly to you?

15         **A.   Yes.**

16         Q.   Did you receive any questions from parole

17  staff about the JL WOP parole hearing process?

18         **A.   Not really.  I mean, other than discourse**

19  **about the hearing report, and is this appropriate to**

20  **put in, is this not.  The development of the trailer to**

21  **the board action sheet to document additional factors.**

22         **I mean, I don't recall anything specific.**

23         Q.   You just mentioned, perhaps, that there

24  were discussions about what might be appropriate to put

25  in a prehearing report; did I hear you correctly?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 133 of 216

1          **A.    Yes.**

2          Q.    So did you have conversations with

3     institutional parole officers or their supervisors

4     about what to information to include in prehearing

5     reports for JL WOPers?

6          **A.    No.   Just what the institutional regional**

7     **administrator as part of our discussions in developing**

8     **the process.**

9          Q.    Understood.   So not with respect to

10    specific inmates?

11         **A.    No.   No.**

12         Q.    Okay.   Thank you.

13              I'm going to hand you what I've marked as

14    Exhibit 21.

15              (Deposition Exhibit No. 21 was marked for

16    identification.)

17    BY MS. BREIHAN:

18         Q.    This is Bates-stamped AGO 1479 and 1480.

19              Do you recognize this email chain?

20         **A.    Yes.**

21         Q.    And it looks like David Owen emailed you

22    and Mr. McSwain, Ms. Kempker, and Ms. McClure on

23    August 24, 2016, regarding Senate Bill 590, correct?

24         **A.    Yes.**

25         Q.    Who's David Owen?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 134 of 216

1       A.    Public information officer.

2       Q.    And why was he sending you these questions

3  and proposed response?

4       A.    Well, I imagine because he got a request.

5       Q.    And you respond with one revision, correct?

6       A.    Yes.

7       Q.    What's the change that you recommended be

8  made to his proposed response?

9       A.    To clarify that it was our intention to

10  implement and to allow offenders to be heard after

11  they've served 25 years of the specific sentence that

12  was juvenile life without, not just 25 years of

13  incarceration.

14       Q.    And why is that an important distinction,

15  as you say here in your email, back to Mr. Owen?

16       A.    That's how we interpreted the statute.

17       Q.    But what difference would it make, I

18  suppose?

19       A.    Well, if you haven't started serving the

20  sentence, then you haven't started serving the

21  sentence.

22       Q.    So if an inmate had another sentence that

23  ran consecutively that preceded the life without, and

24  that hasn't run yet, they might not be eligible after

25  having 25 years?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 135 of 216

1     **A.   Correct.  That's how we interpreted it.**

2     Q.   And if an inmate had two active life

3 without parole sentences, and they were impacted by

4 Senate Bill 590, would they be required to serve

5 50 years then before they were eligible?

6     **A.   I don't remember that exactly.  I believe**

7 **we would hear them on the first, but deny release**

8 **because they hadn't met the eligibility on the second.**

9     Q.   And in your opinion that would comply with

10 Miller versus Alabama?

11     **A.   It would comply with the Missouri law.**

12     Q.   That doesn't answer my question.

13     **A.   I don't know.  I'm not a lawyer.  I was**

14 **following the statute as written for Missouri.**

15     Q.   I understand you're not a lawyer, but you

16 were responsible, at least in part, for analyzing,

17 interpreting and implementing Senate Bill 590, correct?

18     **A.   Correct.**

19     Q.   Did you field any questions from inmates

20 about the hearing process under SB 590?

21     **A.   I don't remember.**

22     Q.   Do you recall fielding any questions from

23 attorneys about the hearing process?

24     **A.   Yes.**

25     Q.   Who do you recall fielding questions from?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 136 of 216

1    **A.    I would have no idea of their names.**

2    Q.    How many different attorneys did you speak

3    with who had questions about the hearing process?

4    **A.    Probably at least four.**

5    Q.    Do you recall if there were any men you

6    spoke with, male attorneys you spoke with, about the

7    hearing process?

8    **A.    Yes.**

9    Q.    Did you speak with Kent Gibson about the

10   hearing process?

11   **A.    Possibly.**

12   Q.    Jim Woersch?

13   **A.    Not familiar with that name.**

14   Q.    I'll hand you Exhibit 22.  It's

15   Bates-stamped AGO1162.

16          (Deposition Exhibit No. 22 was marked for

17   identification.)

18   BY MS. BREIHAN:

19   Q.    Do you recognize this email?

20   **A.    Yes.**

21   Q.    Looks like an email from you to Mr. Owen

22   again dated October 21st, 2016, correct?

23   **A.    Yes.**

24   Q.    Can you tell me what this email is about?

25   **A.    It was about conversations that I had had**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 137 of 216

1    with Mae Quinn about the hearing process.

2         She was very, very demanding, and very

3    argumentative with me about the process, and how it did

4    not seem to meet the Miller ruling.

5         And I believe she had also been in contact

6    with our PIO, or with the media about our process, and

7    so I was giving him a heads up in case it was something

8    he needed to defend.

9    Q.   And you say:  Just letting you know in case

10   I'm quoted in the Post-Dispatch, correct?

11   A.   Exactly.

12   Q.   Did you have concerns about that?

13   A.   Yes, I did.

14   Q.   And what was that based on?

15   A.   It was based on Ms. Quinn becoming

16   increasingly argumentative and very hostile when we

17   were trying to be very open and answer her questions

18   about the process.

19   Q.   What did she do that was hostile?

20   A.   In -- I can recall phone conversations

21   where she was just very disparaging to me, in my

22   opinion.  And I felt threatened by her.  Not in a

23   physical sense, or in a fear sense, but she was very

24   intimidating.

25   Q.   You felt threatened because she disagreed

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 138 of 216

1    with your interpretation of what the process was going

2    to be?  Or should be?

3         A.    Yes.

4         Q.    This is a true and accurate copy of the

5    email that you sent to Mr. Owen on October 24th, 2016,

6    correct?

7         A.    **I believe so.**

8         Q.    Do you recall any conversations with

9    Mae Quinn, other than the one that's described in this

10   email?

11        A.    **There were more than one phone**

12   **conversations that we had.**

13        Q.    How many phone conversations did you have

14   with Ms. Quinn?

15        A.    **I don't know the number.**

16        Q.    Do you recall what was said by you during

17   any of those phone conversations?  Other than the one

18   that is described in Exhibit 22?

19        A.    **Not specifically.**

20        Q.    Do you recall generally?

21        A.    **Generally, it seemed to me, that we talked**

22   **about the process.  She would argue that they had more**

23   **rights than -- than I did.  I mean, we fundamentally**

24   **did not agree.**

25               **You know, she was, I think, trying to**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 139 of 216

1    convince me that they should have access to the full

2    file.  And that they should be able to cross-examine

3    the board and the victim.  And that was just not the

4    board's process at the time.

5                (Deposition Exhibit No. 23 was marked for

6    identification.)

7    BY MS. BREIHAN:

8        Q.   We've talked in passing about this

9    worksheet that is used during the prehearing

10   interviews.

11               I'll show you Exhibit 23.  It's AGO30

12   through 41.

13               Is this the worksheet that you've been

14   referring to that's used by IPOs during prehearing

15   interviews with juvenile life offenders serving life

16   without parole sentences?

17       A.   I believe so.

18       Q.   Is this used in every prehearing interview

19   between an IPO and a juvenile offender eligible for

20   parole review under 590?

21       A.   I don't know the answer to that.

22       Q.   Is it expected to be used?

23       A.   It would be expected.

24       Q.   And IPOs are instructed to use this during

25   their prehearing interviews with JL WOPers, correct?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 140 of 216

1      **A.    Yes.**

2      Q.    I think you mentioned that there, in this

3   worksheet, specific questions that IPOs were scripted

4   or instructed to ask of the inmate in order to gather

5   information responsive to the specific elements in

6   Senate Bill 590; is that correct?

7      **A.    I don't know about specific questions, but**

8   **just general areas, or areas where they would look for**

9   **the information.**

10     Q.    At the top it says, "Senate Bill 590 places

11  specific areas of consideration for the parole board.

12  Those considerations are highlighted and should be

13  included in the report," correct?

14     **A.    Yes.**

15     Q.    And I know this is a black and white copy,

16  but I think you can tell where the highlighted language

17  appears, correct?

18     **A.    Yes.**

19     Q.    And who prepared this worksheet?

20     **A.    Michelle Kasak.**

21     Q.    Were you involved at all with drafting it?

22     **A.    No.**

23     Q.    Were you involved at all in approving it?

24     **A.    Not approval.  I mean, other than, does**

25  **this look okay?  It's her staff.  Not mine.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 141 of 216

1     Q.    The information that's garnered during the

2   prehearing interview is used to prepare the prehearing

3   report, correct?

4     **A.    Yes.**

5     Q.    And you testified earlier that prehearing

6   report guides the hearing itself, correct?

7     **A.    Yes.**

8     Q.    And then the hearing, in theory, the

9   information gathered there, and the report, form the

10  basis for the board's decision ultimately, correct?

11    **A.    Yes.**

12    Q.    So this prehearing interview is a pretty

13  critical stage in the game; is that fair to say?

14    **A.    Yes.**

15    Q.    Who then, if anyone, other than

16  Michelle Kasak, reviewed and approved this juvenile

17  life without PHR worksheet?

18    **A.    I don't know if the analysts looked at it,**

19  **or gave her feedback, or not.**

20    Q.    Do you know if any board member reviewed

21  and approved this worksheet?

22    **A.    No, I don't know that.**

23    Q.    Do you know if DOC legal approved this

24  worksheet?

25    **A.    I don't know the answer to that.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 142 of 216

1    Q.   Within here it refers to board information

2   requests.

3         What's a board information request?

4    **A.   Where are you specifically at?**

5    Q.   Are you generally familiar with a board

6   information request?

7    **A.   It's on page two, at the top, under present**

8   **offense.**

9         **A board information request is an**

10  **investigation request from either Central Office, or to**

11  **a field office, to gather information on circumstances**

12  **of the offense, prior record, or other information that**

13  **may be held more locally by a prosecutor or a police**

14  **department.**

15   Q.   When a board information request is made is

16  it made in writing?

17   **A.   It's made electronically through our**

18  **offender database.**

19   Q.   Is a copy of that kept in the

20  Central Office parole file?

21   **A.   No.  It's just in the electronic database.**

22  **The reply would be.**

23   Q.   So the response to a board information

24  request is kept in the parole file, correct?

25   **A.   Yes.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 143 of 216

1      Q.   And is the inmate allowed to see the

2   response to the board information request?

3      **A.   No.**

4      Q.   It looks like to me -- and I can show you a

5   copy of the bill -- but the highlighted language is

6   copy and pasted from a portion of the statute; is that

7   fair to say?

8      **A.   That's fair.**

9      Q.   And it's actually just the language from

10  558.047.  And I'll give you a copy of Senate Bill 590

11  as Exhibit 24, so you're not having to operate from

12  memory here.

13          So it looks like the highlighted language

14  that's in this worksheet is copy and pasted from

15  558.047, correct?

16          (Deposition Exhibit No. 24 was marked for

17  identification.)

18          THE WITNESS:  Yes.

19  BY MS. BREIHAN:

20      Q.   And doesn't contain any specific questions

21  for the IPO to ask in order to gather this information,

22  correct?

23      **A.   No.**

24      Q.   And there are certain portions of this

25  worksheet where there are specific questions written

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 144 of 216

1  out.  For example, in assessing aggressivity, or

2  substance abuse issues, mental health issues, correct?

3       **A.  Yes.**

4       Q.  But there's no guidance beyond copying the

5  statutory language here to IPOs about what questions to

6  ask the inmate in order to assess these characteristics

7  or these elements, correct?

8       **A.  I see three.**

9       Q.  These un-bolded questions?

10      **A.  Yes.**

11      Q.  And those are part of the standard

12 worksheet, correct?

13      **A.  I don't know if they are or they aren't.**

14      Q.  Other than these three:  Does the offender

15 justify or make excuses for their actions?  What level

16 of victim empathy does the offender demonstrate?  What

17 is the third question?

18      **A.  The motivation.**

19      Q.  What's the motivation for committing the

20 offense?

21           Other than those, there's no specific

22 questions to guide the IPO in assessing statutory

23 elements, correct?

24      **A.  No.**

25      Q.  And are the elements in 565.033 in this

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 145 of 216

1   worksheet?

2       **A.**   **To some extent.**

3       Q.   Can you show me where?

4       **A.**   **I would think the nature and circumstances**

5   **of the offense.**

6          **Degree of culpability.**

7          **Subdivision 4, the defendant's background,**

8   **including his family home and community home**

9   **environment.**

10         **Six, the extent of the defendant's**

11  **participation.**

12        **Eight, prior criminal history.**

13      Q.   Does the worksheet talk at all about, or

14  ask the IPO to gather information about the affective

15  characteristics attributable to the inmate's youth on

16  his or her judgment?

17      **A.**   **No.**

18      Q.   Does it talk at all about the weight that

19  should be assigned to any of the elements?

20      **A.**   **No.**

21      Q.   And this worksheet's not mentioned at all

22  in the procedure number P6-4.1, which we previously

23  marked as Exhibit 10, is it?

24      **A.**   **No.**

25      Q.   And as you testified to, earlier today,

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 146 of 216

1   these worksheets, once completed, are not typically

2   kept?  They might be shredded at this point, correct?

3        **A.    Correct.**

4        Q.    Were institutional parole officers provided

5   any training on this modified worksheet?

6        **A.    I don't know.**

7        Q.    Who would know the answer to that question?

8        **A.    Michelle Kasak.**

9        Q.    Does anybody other than the victims

10  services office have contact with victims or victim's

11  representatives prior to hearings?

12       **A.    Are you asking from our department?**

13       Q.    Anyone within the Division of Probation and

14  Parole?

15       **A.    Contact with victims is made at other**

16  **points, but not during the parole consideration**

17  **process.  Unless the victim elects to not attend the**

18  **hearing, and wishes to phone the board, or have a**

19  **meeting with the board in advance.**

20       Q.    To your knowledge, has that happened in any

21  of these juvenile life without parole cases?

22       **A.    I don't know.**

23       Q.    Have you had any contact directly with

24  victims, or victim's representatives, in the context of

25  these juvenile life without parole hearings?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 147 of 216

1      A.   Not that I can remember.  Unless it might

2  have been an advocate from a prosecutor's office.

3           MS. BREIHAN:  I'm going to show her a

4  highly confidential document.

5      Q.   Are you aware there's a protective order in

6  this case.

7      A.   I don't even know what you're talking

8  about.

9           MR. CRANE:  Let's take a break.

10           (A break was taken.)

11           (Deposition Exhibit No. 25 was marked for

12  identification.)

13           MS. BREIHAN:  During the break, counsel

14  showed Ms. Dills a copy of the protective order in this

15  case, and she has signed an acknowledgment and

16  agreement to be bound.

17           I will just state for the record that we

18  are still reviewing the designations in the more recent

19  November 13th and 16th productions by the defendants in

20  this case, and we'll be challenging some of the

21  designations.  And treating them as highly

22  confidential, or confidential as designated today, is

23  not intended to be a waiver to any future challenge

24  regarding the designation of those documents.

25  BY MS. BREIHAN:

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 148 of 216

1                I will show you what I've marked as

2  Exhibit 25.  This is Bates-stamped AGO03205 through

3  3209.

4  ████████████████████████████████

  █ ████████████████████████████████

  █ ████████████████████████████████████

  █ ████████████████████████████████████

8  ██████

9      ██   ██.

10     ██  ████████████████████?

11     ██   ██.

12     ██  ██████████████

 █ ██████████████████████████████

14 ████████

15     **A.   Not specifically.**

16     Q.   Your letter indicates that the board has

17 determined that Mr. Brown's earliest possible release

18 date, based upon his sentence structure, is

19 January 28th, 2025, correct?

20     **A.   Yes.**

21     Q.   Where did you get that information from?

22     **A.   I believe that I obtained the information**

23 **from his file, after we received a petition, and the**

24 **lead parole analyst had looked it over and scheduled**

25 **the hearing.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 149 of 216

1      Q.    And you also say, "Following the May 2017

2   parole consideration hearing, the parole board will

3   schedule a reconsideration hearing two years prior to

4   the minimum eligibility date," correct?

5      **A.    Yes.**

6      Q.    Is that just a general practice?  Or was

7   that a special decision being made for Mr. Brown's

8   case?

9      **A.    I don't remember in this specific instance.**

10  **Generally, offenders are scheduled two years prior to**

11  **the minimum eligibility date.**

12     Q.    Do you know whether Mr. Brown's

13  reconsideration hearing was scheduled two years prior

14  to his minimum eligibility date?

15     **A.    No, I don't know that.**

16     Q.    In the hearings themselves, is there any

17  sort of script that's used by the panel to run the

18  hearings?

19     **A.    What do you mean "any sort of script?"**

20     Q.    Is there --

21     **A.    Not, like, an interview guide, or a set of**

22  **questions to answer.**

23          **I was not involved in the preparation, but**

24  **I believe there is a handout that may have circulated**

25  **among the members that outlines the elements that they**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 150 of 216

1  should cover.

2      Q.   And then there's that board action sheet,

3  which we discussed earlier today, the two-page board

4  action sheet that's used during the hearing as well,

5  correct?

6      A.   Well, it's not used during the hearing.

7  It's used to record decisions of the board and

8  impressions.

9      Q.   So the board action sheet, Exhibit 11, is

10  completed after the hearing?

11      A.   Yes.  Well, it's started before the

12  hearing, by the IPO, as part of the preparation.

13      Q.   So what part of exhibit 11 does the IPO

14  fill out?

15      A.   Name, DOC number, the guideline dates, or

16  the MPT are generated from what's entered into various

17  screens in the offender database.  So that's the only

18  portion.

19      Q.   MPT is minimum prison term?

20      A.   Yes, ma'am.

21          (Deposition Exhibit No. 26 was marked for

22  identification.)

23  BY MS. BREIHAN:

24      Q.   I'll show you Exhibit 26.  It's

25  Bates-stamped AGO1492 through 1493.

Pohlman USA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 151 of 216

1          Were you present at this September 19, 2016

2   board meeting?

3          A.   Yes.

4          Q.   And do you recognize this agenda for that

5   meeting?

6          A.   I do.

7          Q.   Looks like you were planning to present or

8   discuss elements of deliberation for juvenile life

9   without hearings, correct?

10         A.   Yes.

11         Q.   Do you remember what you discussed during

12  that board meeting on that topic?

13         **A.   I don't recall specifically what we**

14  **discussed.**

15         **I mean, it was likely, in looking at the**

16  **elements, and showing them the additional areas on the**

17  **prehearing report, I mean, I really don't remember that**

18  **discussion.  I don't think it was so much a**

19  **presentation.  At the board meetings, if there's a**

20  **topic that wants to be discussed, their name gets**

21  **behind it.  Whether or not they lead that discussion.**

22         Q.   So this may be an indication that you

23  presented on this topic or you raised it as an issue to

24  be discussed, correct?

25         A.   Yes.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 152 of 216

1    Q.   Do you remember which of those it was?

2    **A.   No. I really don't.**

3    Q.   And what do you mean by elements of

4  deliberation?  The factors that are listed of 558.047?

5    **A.   Elements of deliberation, yes, it would**

6  **include those, as well as page two of the board action**

7  **sheet, when you reflect reasons for decisions either**

8  **being outside the guideline or denial of parole.**

9        **(Deposition Exhibit No. 27 was marked for**

10  **identification.)**

11  BY MS. BREIHAN:

12    Q.   I'll show you the minutes from the meeting.

13  Exhibit 27.  Bates-stamped AGO1611 to 1612.

14        Does this refresh your recollection about

15  what you might have discussed regarding elements of

16  deliberation in juvenile life without hearings?

17    **A.   Yes.**

18    Q.   And is this the summary under bullet point

19  3, a fair summary, to the best of your recollection.

20  About what was discussed on that topic?

21    **A.   The best as I can recall.**

22    Q.   And you indicate that Michelle Kasak and

23  her staff created a worksheet to explain the elements

24  required for consideration during deliberation,

25  correct?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 153 of 216

1    A.   Yes.

2    Q.   And that you're working with Kim Evans to

3    make sure notifications are being made.  I'm assuming

4    victims and representatives?

5    A.   Yes.  And prosecutors.

6         (Deposition Exhibit No. 28 was marked for

7    identification.)

8    BY MS. BREIHAN:

9    Q.   I'm showing you what's been marked Exhibit

10    28.  It's AGO28.

11         Is this a worksheet that Michelle Kasak and

12    her staff created explaining the elements required for

13    consideration during deliberation?

14    A.   No.  I believe that that worksheet was

15    Exhibit 23.

16    Q.   The juvenile life without PHR worksheet?

17    A.   Yes.

18    Q.   I guess I'm confused.  I thought

19    deliberation was by the panel or the board; is that not

20    correct?

21    A.   I don't think the minutes accurately

22    reflect the discussion.

23         Michelle created a prehearing worksheet, to

24    capture elements which would then be put in a report,

25    that the board could then use that information during

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 154 of 216

1  the hearing and during deliberation.

2        Q.   Do you know if Michelle Kasak and her staff

3  are the ones that designed this Exhibit 28?

4        **A.   No.  I don't know that.**

5        Q.   Who designed this Exhibit 28?

6        **A.   I believe that Steve Mueller and the**

7  **analysts group developed this worksheet.**

8        Q.   If you compare it to the language in Senate

9  Bill 590, it appears to be a copy and paste of the five

10  bullet points that are listed under 558.047, correct?

11        **A.   The bullets are.  That's not the purpose of**

12  **this.**

13        Q.   What's not the purpose of this?

14        **A.   The purpose of this was not to guide and**

15  **ask questions.**

16             **The purpose of this was to document, under**

17  **each of the elements in the statute, what evidence you**

18  **found, either in the report or through the hearing, to**

19  **substantiate your determination of whether or not --**

20  **for example, in number one, there was efforts made**

21  **toward rehabilitation or not.**

22        Q.   So who actually completes this form?

23        **A.   I believe the parole analyst is completing**

24  **it at the hearings.  But I can't be positive.**

25        Q.   Is it completed immediately following

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 155 of 216

1  conclusion of the hearing?

2      A.   I would hope that it's being completed

3  during the hearing, as those elements may be brought

4  out, that they're being documented as they're being

5  discussed.

6      Q.   And this same form is used during every

7  juvenile life without parole hearing under Senate Bill

8  590, correct?

9      A.   I don't know.

10     Q.   After it's completed, do you know what

11 happens to this form?

12     A.   It's retained.

13          Well, it would be attached to the board

14 action sheet for other members to look at as they were

15 voting on the case.  And then it would be retained in

16 the file with the board action sheet.

17     Q.   And in the juvenile life without context,

18 the voting, does it occur in the same way that you

19 described earlier, where it's passed from board member

20 to board member?

21     A.   Yes.  Unless it was a case that the board

22 wanted to bring to executive board and talk about it.

23     Q.   Do you know if that happened with any of

24 the juvenile live without cases?

25     A.   I don't know that because that's a closed

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 156 of 216

1  **meeting.**

2          **(Deposition Exhibit No. 29 was marked for**

3  **identification.)**

4  BY MS. BREIHAN:

5          Q.   I'll show you what I'm marking as

6  Exhibit 29.  It's Bates-stamped AGO1605 through 1608.

7  It looks like the minutes from the analysts meeting on

8  December 23rd, 2016.

9          Do you remember being present at that

10  meeting?

11          **A.   Yes.**

12          Q.   Do you recall a discussion about juvenile

13  life without parole?

14          **A.   Not specifically.**

15          Q.   And you can take the time you need.

16          **A.   We had a lot of discussions.**

17          Q.   You can take the time you need to review

18  the section, that starts at the bottom of the first

19  page and into the second, regarding the juvenile life

20  without parole.  If you need to refresh your memory.

21          As of December 23, 2016, do you know how

22  many Senate Bill 590 hearings the board had conducted?

23          **A.   Not off the top of my head.**

24          Q.   Do you know if it had made any decisions on

25  the juvenile life without parole cases?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 157 of 216

1          A.    I don't remember.

2          Q.    There's a question in here I hope you can

3     clarify for me.  It's a question that was actually

4     raised during this discussion.  "If there are no

5     guidelines for the offender, does there need to be a

6     reason marked on the second sheet of the BAS?"

7               I assume that means board action sheet?

8          A.    Yes.

9          Q.    Can you tell me what specifically they're

10    talking about there?

11              If you need to refer back to Exhibit 11,

12    you can do so.

13         A.    Well, the reasons on page two of the board

14    action sheet, the second page, it has a section for why

15    a reason might be outside the guidelines.  Well, if

16    there are no guidelines, then why do you have to

17    justify a decision outside of them?

18              So I -- we just had discussion in general

19    on whether or not you needed to mark a box.  Because in

20    these cases, there was -- you technically wouldn't have

21    to fill out the board action sheet completely and

22    correctly.

23         Q.    So what are the guidelines that are being

24    referred to during this discussion?

25         A.    They are in the appendixes of the

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 158 of 216

1    **Blue Book. Time-to-serve guidelines, which are a range**

2    **of months based upon your salient factor score, class**

3    **of offense, and offense grouping.**

4        Q.   And why were those guidelines not used for

5    juvenile life without parole?

6        **A.   Because the board doesn't use guidelines**

7    **for sentences of 30 years or more.**

8        Q.   But they still use the salient factor score

9    that you testified to earlier today?

10       **A.   Yes.**

11       Q.   And you also indicate that, "the worksheet

12    filled out during the hearing provides enough

13    reasonings for denial of parole beyond the reasons

14    recorded on the offender notice."

15          What are you referring to by the worksheet

16    filled out during the hearing?  The two-page board

17    action sheet?

18       **A.   No.  I'm referring to the Exhibit 28.**

19       Q.   So in your opinion, then, the information

20    in this that would be filled out in Exhibit 28, and the

21    notice to the inmate regarding the decision, would

22    provide enough reasoning for the denial of parole,

23    correct?

24       **A.   Well, I think the discussion was more that**

25    **there was no statutory requirement to give a specific**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 159 of 216

1 **reason for denial of parole; that it was up to the**

2 **panel to determine what reason and how much detail they**

3 **wanted to give.**

4     Q.  And you felt, though, that the information

5 in Exhibit 28, and the notice to the inmate, was enough

6 information to support any denial for parole; is that

7 correct?

8     **A.  Yes.**

9     **(Deposition Exhibit No. 30 was marked for**

10 **identification.)**

11 BY MS. BREIHAN:

12     Q.  I'll show you Exhibit 30.  This was

13 Exhibit 7 to our complaint.  I don't know if you got

14 this far when you got on our website.

15     I'll represent to you these are notices

16 that our clients, and others, received after parole

17 consideration.

18     Are these the notice sheets that go to an

19 inmate after they've had a SB 590 hearing?

20     **A.  Yes.**

21     Q.  And it looks like the reasons for the

22 decision are provided in those lines on the bottom of

23 the page, correct?

24     **A.  Yes.**

25     Q.  So turning to the second page, Sidney

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL  Document 134-9  Filed 06/12/18  Page 160 of 216

1  Roberts, it says, "the reasons for the action taken

2  are" -- and we'll ignore that line that says it's not

3  subject to appeal -- "release at this time would

4  depreciate the seriousness of the present offense,

5  based on A, circumstances surrounding the present

6  offense."

7          Did I read that correctly?

8      **A.   Yes.**

9      Q.   In your opinion, that's enough of a basis

10  of denying parole to Mr. Sidney -- or Mr. Roberts,

11  correct?

12          MR. SPILLANE:  I'll object to the form of

13  the question.  I think it mischaracterizes her earlier

14  testimony.

15          But subject to that, you may answer.

16          THE WITNESS:  I believe that what is on the

17  board action sheet is transcribed onto the notice.  And

18  in reading the statute, I don't believe that we are

19  required to give any other reason.

20  BY MS. BREIHAN:

21      Q.   I understand you don't think there's any

22  statutory reason to add any additional language to the

23  notice.  I understand that's what you're saying.

24          My question is, do you think that this

25  notice here to Mr. Roberts provides enough reasoning

Pohlman USA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 161 of 216

1    for denial of parole?

2        **A.    Yes.**

3        Q.    When you indicated that you shared this

4    during this analysts meeting on December 23, 2015, did

5    anyone disagree with you?

6        **A.    No, I don't think so.**

7            **(Deposition Exhibit No. 31 was marked for**

8    **identification.)**

9    BY MS. BREIHAN:

10       Q.    I'll show you Exhibit 31.  It's

11   Bates-stamped AGO2835 through 2837.

12           Have you seen this board action sheet for

13   Mr. Roberts before today?

14       **A.    No.**

15       Q.    Have you seen a completed board action

16   sheet for any of the juvenile life withouts?

17       **A.    No.**

18       Q.    No.

19           Can you show me where on these three pages

20   it's indicated the reason for denying Mr. Roberts'

21   parole?

22       **A.    The reason?**

23       Q.    Yeah.  I'm looking at this.

24       **A.    If you look at page two, the reasons for**

25   **decisions above guideline, 1A is checked.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 162 of 216

1    Q.   Is there anywhere elsewhere it indicates

2    the reason that he's denied?

3    **A.   No.**

4    Q.   And there are no notations in the hearing

5    panel comments section of the first page, correct?

6    **A.   Correct.**

7    Q.   Is that typical, in your experience?

8    **A.   I think it varies, depending on who's**

9    **conducting the hearing, and who is on the panel.**

10   **I always made it a point to make comments,**

11   **because I believed that not only did it guide future**

12   **decisions, but as an institutional parole supervisor,**

13   **the IPO gets a copy of this, and that should help them**

14   **talk to the offender and deliver that decision,**

15   **especially when it's adverse.**

16   Q.   That makes sense, especially if there seems

17   to be turnover on the board from time to time, correct?

18   **A.   Yes.**

19   Q.   Can you tell from this board action sheet

20   who the board member was on Mr. Roberts' hearing panel?

21   **A.   Yes.**

22   Q.   Who was it?

23   **A.   ███████████.**

24   Q.   So you were an institutional parole officer

25   once.  If this came to you, and Mr. Roberts came to

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 163 of 216

1   your office and said, "I was denied.  What can I do to

2   increase my chances of a grant?  What can I do to prove

3   I'm ready for release next time?"  What would you tell

4   Mr. Roberts?

5        A.   Those are difficult conversations to have.

6   And I've sometimes had them for my officers, having sat

7   on the panel, and been part of the deliberation.

8             And without divulging how the panel came to

9   their conclusion, you know, sometimes, I believe that

10  there is kind of an -- I don't want to say a window of

11  release -- but I think there is.

12            And I think it's for most, either life

13  sentences, or life without that then become

14  board-eligible or extremely long sentences, when

15  there's a death involved, and it's a murder-first or

16  second-degree, you know, sometimes that window is

17  between 25 and 30 years.  And sometimes, based upon,

18  you know, even though an offender might have done

19  everything possible, the board's comfort level isn't

20  quite there yet.

21            And so the hearing might be an opportunity

22  to provide some further motivation, and some future

23  things that that individual could do for the next

24  go around.

25            And I don't know that there's a magic

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 164 of 216

1    number for them.  And sometimes it is difficult to say

2    to an offender:  Look, based on the details and the

3    heinous nature of your offense, or the brutalness, the

4    board may not get over that and decide to parole you.

5         Q.   Are there ever reasons for a board's

6    decision to deny parole which are not conveyed in this

7    notice to the inmate, a group of which we've marked as

8    Exhibit 30?

9         A.   What do you mean?

10        Q.   So going back to Mr. Roberts' denial notice

11   that he received, it says he's denied based on the

12   circumstances of the offense.

13             Are there ever instances where the board

14   is -- has other reasons for its decision that are not

15   listed in this notice to the inmate?

16        A.   No.

17        Q.   The notice should contain the -- every

18   reason why the board has denied parole.

19             If there were issues with institutional

20   behavior, that should be indicated there as well,

21   correct?

22        A.   Yes.  I think that's how they crafted the

23   board action sheet.  If you're going to deny or go

24   outside of a guideline, or above decisions, it needs to

25   be on the sheet, or you don't use it.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 165 of 216

1    Q.    You talked about a magic window.

2    A.    **I don't know if it's magic.**

3    Q.    It might feel magical to some inmates.

4          (Deposition Exhibit No. 32 was marked for

5    identification.)

6    BY MS. BREIHAN:

7          I'll show you Exhibit 32.  It's been

8    Bates-stamped AGO0450 to 453.

9          Do you recognize this?

10   A.    **Yes.**

11   Q.    Okay.  It looks like it's a research memo

12   prepared by Dr. Cristine Spinka, correct?

13   A.    **Yes.**

14   Q.    And who is Dr. Spinka?

15   A.    **She was a research analyst for the**

16   **Department of Corrections.**

17   Q.    She's no longer with the DOC?

18   A.    **No.**

19   Q.    Do you know where she is?

20   A.    **Health and Human Services.**

21   Q.    And looks like this memo relates to life

22   without parole hearing and release data, correct?

23   A.    **Yes.**

24   Q.    Do you know why she was preparing this

25   memo?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 166 of 216

1      A.    I believe at my request, based upon a data

2   request from the Sentencing Project.  And maybe the

3   Marshal Group.  I can't remember specifically.

4      Q.    And it looks like, among other things,

5   Dr. Spinka includes parole hearing data for life

6   sentences with possibility of parole?

7      A.    Correct.

8      Q.    And on the second page of the memo, it

9   indicates by year, the average number of years served

10  before parole for first and second-degree murder,

11  correct?

12     A.    Yes.

13     Q.    And it looks like between 1991 and 2013,

14  the average number of years served before parole is

15  21.05, correct?

16     A.    Yes.

17     Q.    Has anyone ever said anything to you about

18  the number of years that the Department of Corrections

19  is expecting juvenile offenders to serve before they're

20  going to be released on parole under Senate Bill 590?

21     A.    No.

22     Q.    Have you heard any rumors among staff about

23  whether they might sort of be holding them for some

24  magical term of years?

25     A.    No.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 167 of 216

1      Q.   I got sidetracked.  Exhibit 29,

2  January 6th -- no, December 23rd analysts meeting.  I

3  want to go back to that to wrap that up.

4           During this juvenile life without

5  discussion, these minutes indicate that analysts were

6  reminded that if an offender has an attorney as their

7  delegate, they should be advised of their role during

8  the hearing as a delegate, and no special allowances

9  should be extended beyond what is offered to any

10 delegate appearing before the panel.

11          Do you recall a discussion during this

12 meeting about the role of the delegate and when an

13 attorney acts as a delegate?

14      **A.   Yes.**

15      Q.   And what do you recall from that

16 discussion?

17      **A.   I recall it had been discussed, either with**

18 **the chairman, or the board in general, because I think**

19 **we had had some requests, and we maybe even received**

20 **your request in petitions for a number of things.  And**

21 **that would substantially change the protocol from the**

22 **hearing from what the board established.**

23          **And so we've had to do the same thing with**

24 **victims.  Because board members would take liberties,**

25 **and, you know, allow a support person to give**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 168 of 216

1    testimony, when that's not their right.

2              So in order to be consistent, we kind of

3    looked at both parties' roles, and said, you know,

4    here's the purpose, here's what they're there for, it's

5    not, you know, an evidentiary.  We're not going to

6    cross-examine people and have a true, you know, rehash

7    all the evidence kind of discussion.

8              It was just if they're there as a delegate,

9    and they want to provide information in support of a

10   parole release, they certainly can do so.

11        Q.   At the same time, one of the primary

12   sources of materials for the board, at least in these

13   juvenile life without cases, is trial testimony?

14        A.   Yes.

15        Q.   And trial records, correct?

16        A.   Yes.

17        Q.   And prosecutors are invited to attend the

18   hearings, correct?

19        A.   Yes.

20        Q.   And at times, you may or may not be

21   aware -- strike that.

22              At times, are you aware of prosecutors

23   arguing about facts of the case at these juvenile life

24   without hearings?

25        A.   I'm not aware of that.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 169 of 216

1          Q.   So after this analysts hearing, there was

2     also a board meeting where juvenile life without parole

3     was discussed.

4               (Deposition Exhibit No. 33 was marked for

5     identification.)

6          Q.   This is No. 33.  It's Bates-stamped

7     as AGO414 through 416.

8               Do you recall being present at the

9     January 6th, 2017 board meeting?

10         **A.   Yes.**

11         Q.   Do you recall having a discussion at the

12    about juvenile life without paroles?

13         **A.   Yes.**

14         Q.   And you -- looks like you requested a

15    debriefing on any cases that the board analysts had

16    heard to date, correct?

17         **A.   Yes.**

18         Q.   Why were you asking for a debriefing?

19         **A.   Because not all the members had conducted**

20    **that type of hearing yet.  And I think it is always**

21    **important, and you can learn from others' experiences**

22    **by just talking through what might have happened at**

23    **similar hearings.**

24         Q.   And it looks like Mr. Wells debriefed a

25    case -- that the minutes here indicated -- that

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 170 of 216

1    the case included a defense attorney's difference of

2    opinion.

3                Do you recall any specifics that Mr. Wells

4    shared about that case?

5        **A.    I don't remember the specifics.**

6        Q.    Mr. Mueller -- the minutes indicates --

7    also shared that he spoke with Carolyn Colter, of the

8    AG's office.  And that he was advised by her to conduct

9    hearings as normal, with the additional criteria

10    outlined in 558.447, correct?

11        **A.    Yes.**

12        Q.    Do you recall anything specific about the

13    discussion on that topic?

14        **A.    Yes.  It was as a result of your**

15    **organization's petitions to deviate from our normal**

16    **protocol.**

17        Q.    So you recall receiving petitions from --

18        **A.    They're probably in here.**

19        Q.    -- from the MacArthur Center?

20        **A.    Yes.**

21        Q.    Let's see.  You indicated that it was in

22    the materials that you brought today?

23        **A.    I believe it is.**

24        Q.    Did you receive petitions like that from

25    any other attorneys?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 171 of 216

1      A.    No, I don't think that we did.

2      Q.    What was the reaction in the division when

3   you received that petition?

4      A.    Well, the reaction was that you were

5   requesting information that is normally considered

6   closed by the board, and not open for inspection to the

7   offender.  And to me, appeared to be in violation of

8   victims' rights by statute.

9      Q.    What specifically that we requested

10  appeared to be a violation of victims' rights?

11     A.    I'm not looking at that now.

12           Hold on.

13     Q.    I think one of the --

14     A.    Here it is.

15     Q.    The document that was referenced is

16  Bates-stamped Dills 45 through Dills 51; is that right?

17           It looks like Mae Quinn sent a memo to

18  you-all that included as an attachment a request

19  related to a parole hearing for Norman Brown?

20     A.    Yes.

21     Q.    Do you recall receiving this?  This

22  request?

23     A.    Yes.

24     Q.    And what did you do when you received it?

25     A.    We started gathering the materials.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 172 of 216

1      Q.   Did you ever respond to Ms. Quinn regarding

2  the various requests?

3      **A.   I don't remember if I did or not.**

4      Q.   Did you discuss these requests with any

5  board member or a parole analyst?

6      **A.   Probably.**

7      Q.   Do you have -- what specifically do you

8  recall discussing?

9      **A.   I don't even know what document --**

10     Q.   I was referring to what's marked as

11  Dills 45 through 51.

12          Why don't we pull it out and we can mark it

13  as Exhibit 34.

14          (Deposition Exhibit No. 34 was marked for

15  identification.)

16          THE WITNESS:  What's your question now?

17          MS. BREIHAN:  Let's take the first

18  question.

19          Could you read it back, please?

20          (Whereupon, the last question was read back

21  by the reporter.)

22  BY MS. BREIHAN:

23     Q.   Do you recall discussing Exhibit 34 with

24  any board member or analyst?

25     **A.   Not with a board member.  Possibly with an**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 173 of 216

1   analyst.  But it would not have been my responsibility

2   at that point in time.

3       Q.   At that point in time you had transitioned

4   over to community corrections?

5       A.   Yes.

6       Q.   So whose responsibility was it to respond

7   to this request -- this lists of requests?

8       A.   Um, it would have been Steve Mueller.  I

9   believe he probably would have communicated through our

10  general counsel's office though.

11      Q.   Do you recall having any discussions with

12  Steve Mueller about this?

13      A.   I don't recall specifically, no.

14      Q.   And I think you testified earlier that a

15  petition submitted by our office raised concerns about

16  violating victims' rights.

17           Do I understand what your testimony was?

18      A.   Yes.

19      Q.   Was it this petition you were thinking of?

20      A.   No.  It was earlier petitions.

21      Q.   Understood.

22           Do you remember the inmate's name, by

23  chance.

24      A.   I thought I had included one in here, in

25  this packet of information.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 174 of 216

1      Q.   Maybe we can take a break and we can ask

2  follow-up questions.  But in the interest of time, we

3  can return to our discussion of Exhibit 33, which is

4  the minutes from the board meeting on January 6th,

5  2017.

6           Turn back to 33 for me.  We were walking

7  through that document.  And we sort of got segued or

8  sidelined on Mr. Mueller's discussions.

9           Looks like Gary Dusenberg and Charlie Baker

10 shared details as to what is referred to as a heinous

11 case.

12          Do you remember what case that is?

13     **A.   I don't remember specifically.**

14     Q.   Do you remember any of the details of that

15 conversation?

16     **A.   No.**

17     Q.   It looks like the majority board gave that

18 person a release date, correct?

19     **A.   Yes.**

20     Q.   And then the last couple sentences of that

21 section, you asked, was everyone satisfied with the

22 information provided in the prehearing reports,

23 correct?

24     **A.   Yes.**

25     Q.   And everyone seems pretty happy with the

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 175 of 216

1    information in those reports, correct?

2         **A.    Yes.**

3         Q.    Did anyone at this meeting, or outside the

4    meeting, ever express to you concerns or

5    dissatisfaction with the information in those

6    prehearing reports?

7         **A.    No.**

8         Q.    And did you ever personally review any of

9    the prehearing reports?

10        **A.    No.**

11        Q.    And the action item here indicates that

12   Rick Kuttenkuler will advise the File Bound group to

13   attach the JL WOP requests to the board action sheet

14   for filing purposes.

15             What is that?  What is File Bound?

16        **A.    It's our digital virtual file system.**

17   **Where all documents are kept.**

18        Q.    Fair to say that the central parole file is

19   stored in a hard copy and electronically?

20        **A.    No, that's not accurate.  It's stored in**

21   **its entirety digitally.  The only thing that's retained**

22   **in the hard copy file are the sentencing documents, the**

23   **board action sheet, and victim profile.**

24        Q.    So the hard copy file that gets passed

25   around is not the complete parole file; is that right?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 176 of 216

1      **A.    Right.**

2      Q.   What happens if, hypothetically, the

3  MacArthur Justice Center submits multiple pages of

4  letters and materials in support of an inmate's request

5  for release on parole in advance of a hearing under

6  SB 590, would that letter be in that hard copy file

7  that's passed around?

8      **A.   Yes.  Any material that is currently being**

9  **considered on any report, any ancillary, we attach it**

10  **to the hard file.**

11      Q.   Understood.

12          And then at some point at this meeting on

13  January 6th, you ask about training, any other areas of

14  interest for training.

15          I'm looking at page two of three.  And

16  there is some suggestions about team building, and a

17  couple conferences are mentioned, correct?

18      **A.   Yes.**

19      Q.   No one asked about or suggested training

20  regarding adolescent development?

21      **A.   No.**

22      Q.   Or child psychology?

23      **A.   No.**

24      Q.   Or Senate Bill 590?

25      **A.   No.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 177 of 216

1      Q.   Do you remember if any such training was

2   ever requested outside of this January 6th, meeting?

3      **A.   No.**

4      Q.   Do you recall a training being offered, or

5   an invitation being extended, by the Campaign for Fair

6   Sentencing of Youth?

7      **A.   Kind of rings a bell with me, but I can't**

8   **recall specifically.**

9           **(Deposition Exhibit No. 35 was marked for**

10   **identification.)**

11   BY MS. BREIHAN:

12      Q.   I will show you what I've marked as

13   Exhibit 35.  This is Bates-stamped AGO1200 through

14   1203.

15           Does this refresh your recollection?

16      **A.   Vaguely.**

17      Q.   Looks like Nicola Nable-Juris reaches out

18   to Jennifer Zamkus, to invite Ms. Zamkus to the annual

19   conference in Washington D.C., and Ms. Zamkus forwards

20   this to you, and to Mr. McSwain, with a -- basically a

21   request for guidance on how to respond, correct?

22      **A.   Uh-huh.**

23      Q.   And you step in, and offer to respond on

24   her behalf, indicating that the chairman prefers to

25   limit participation with groups or organizations that

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 178 of 216

1    might call into question our impartiality, correct?

2         A.   Yes.

3         Q.   Are you familiar with the Campaign for Fair

4    Sentencing of Youth?

5         A.   No.

6         Q.   Do you think that an organization that

7    advocates for fair sentencing is inconsistent with the

8    board's mission and would call into question their

9    impartiality?

10        A.   Potentially.

11        Q.   Did you end up responding to Ms.

12   Nable-Juris?

13        A.   I don't remember if I did or not.

14             MS. BREIHAN:  Let's take a quick break.

15             (A break was taken.)

16   BY MS. BREIHAN:

17        Q.   So we had talked generally a while back

18   about how the majority of general hearings are

19   conducted by videoconference rather than in person.

20             Do you remember that testimony?

21        A.   Yes.

22        Q.   And there seems to be a trend in recent

23   years for videoconferencing?

24        A.   Yes.

25        Q.   Do you know, with respect to the Senate

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 179 of 216

1   Bill 590 hearings, approximately what percent of those

2   have been conducted by videoconference rather than in

3   person?

4        **A.   No, I don't.**

5        Q.   And you also talked about how there might

6   be times, because of an offender's mental health or

7   function ability, that a video hearing might be

8   inappropriate, correct?

9        **A.   Correct.**

10       **(Deposition Exhibit No. 36 was marked for**

11  **identification.)**

12  BY MS. BREIHAN:

13       Q.   I'm going to hand you Exhibit 36.  It's

14  Bates-stamped AGO1223 through 1224.  It's a memo that

15  you, and/or Mr. McSwain prepared, in 2015.

16       Do you recognize this?

17       **A.   Yes.**

18       Q.   Is this a memo that you wrote?

19       **A.   Yes.**

20       Q.   And this talks, among other things, about

21  implementing videoconferencing, and instances where

22  hearings might by preference be conducted in person

23  rather than in video, correct?

24       **A.   Yes.  It was both ways:  What do you need**

25  **to take into consideration to have the best possible**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 180 of 216

1    **hearing.**

2         Q.   And your first sentence in the second

3    paragraph here says that, "Not all inmates pose the

4    same level of risk, or require the same level of board

5    review, or benefits from the same type of hearing."

6              What do you mean by "same level of board

7    review?"

8              What are the different levels of board

9    review?

10             I realize that's a compound question so

11   I'll rephrase it.

12             What are the different levels that you're

13   referring to?

14        **A.   One board member decision, versus majority**

15   **board, versus full board.**

16        Q.   So panel, versus majority, versus full

17   board?

18        **A.   Yes.  There are some board decisions that**

19   **are not made by panels.**

20        Q.   Are there -- in what context?  Or under

21   what circumstances are parole decisions made by only

22   one board member and not a panel?

23        **A.   File review.**

24        Q.   What's that mean?

25        **A.   There are other decisions that a board**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 181 of 216

1 makes outside of parole consideration for an offender,

2 and they're not conducted through a hearing.  It's

3 through a file review.

4      Q.   But all the SB 590 hearings are majority

5 board decisions, correct?

6      A.   Correct.

7      Q.   Not full board decisions?

8      A.   No.  They can be.

9      Q.   If there's a tie, or --

10      A.   Or if the board member wants to refer it to

11 a full board.  They have the option, not only in the

12 lower level case to refer something to majority, but

13 they can refer to full.

14      Q.   Do you know if that's occurred in the

15 juvenile life withouts context?

16      A.   No.

17      Q.   And then you talk about they might not all

18 benefit from the same types of hearings.

19           What different types of hearings are there?

20      A.   A video or in-person hearing.

21      Q.   Any other type of hearing that you were

22 thinking about when you were preparing this memo?

23      A.   No.  It was specific to those two.

24      Q.   And we talked about earlier -- you talked

25 about earlier today that the assessment of whether an

Pohlman USA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 182 of 216

1  inmate would be better served for an in-person hearing,

2  rather than videoconferencing because of the cognitive

3  limitations and the like, would be made by the

4  institutional parole officer in conjunction with mental

5  health professionals, correct?

6        **A.    Yes.**

7        Q.    Do you know who ███████████ is?

8        **A.    I recall the name.**

9        Q.    Do you recall receiving any correspondence

10  from Mae Quinn, from my office, regarding Mr. ████████?

11        **A.    Yes.**

12            **(Deposition Exhibit No. 37 was marked for**

13  **identification.)**

14  BY MS. BREIHAN:

15        Q.    I'm going to show you one of those

16  correspondence.  It's marked as Exhibit 37.  It's

17  Bates-stamped AGO1574 through 1575.

18            This might be included with what you

19  brought with you today.

20        **A.    Probably.**

21        Q.    Do you recognize this email correspondence?

22        **A.    Yes.**

23        Q.    And you indicate that this email is about

24  ████████████ who has had a parole hearing

25  December 2016, correct?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 183 of 216

1      **A.   Yes.**

2      Q.   And you indicate that he already signed the

3    video consent form, correct?

4      **A.   Yes.**

5      Q.   How did you know that?

6      **A.   Well, he wouldn't have been put on the**

7    **video docket had he not signed the consent form,**

8    **because it's forwarded to our office.**

9      Q.   And so who made the assessment about his

10   cognitive ability and determined that he could proceed

11   with a video hearing rather than an in-person hearing?

12     **A.   I'm assuming the IPO.  I wouldn't know**

13   **specifically.**

14     Q.   Have you been tracking the outcomes on

15   these Senate Bill 590 hearings?

16     **A.   Not now.**

17     Q.   Not now that you're in community

18   corrections?

19     **A.   Correct.**

20     Q.   One of the documents that you brought with

21   you today, that's Bates-stamped Dills 40, is a request

22   from Jasmine Willet, on your behalf, to David Owen

23   about the JL WOP requests.

24          And he's sending data about how many

25   petitions have been received, how many hearings have

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 184 of 216

1    been held, how many release dates have been granted.

2             Why would you have been corresponding with

3    the public information office in July of 2017 about the

4    JL WOP hearings if you were no longer involved in that

5    process?

6        A.    Likely because Steve Mueller wasn't there.

7    He might have attempted to contact him first.

8        Q.    What do you mean Steve Mueller wasn't

9    there?

10       A.    Like, out of the office.  David would call,

11   whoever he would call, because he needed the

12   information upfront.  And he got whoever he got, and he

13   would follow up with an email request.

14       Q.    But you still had access to that

15   information --

16       A.    Yes.

17       Q.    -- even if you weren't involved in it

18   day-to-day?

19       A.    Yes.

20       Q.    Do you know, then, as you sit here today,

21   approximately what percentage of those who received

22   hearings under SB 590 have been granted outdates?

23       A.    No.

24       Q.    Do you know, as you sit here today, the

25   average setback for inmates who received SB 590

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 185 of 216

1    hearings, but were denied immediate release?

2         A.    No.

3         Q.    How does the board determine the

4    appropriate setback if they're denying parole in the

5    JL WOP context?

6         A.    There's no set -- I mean, generally

7    if -- the longest you can set someone out is five

8    years.  And then any number of years from that.

9    Generally, once you get them on the cycle, you only

10   lower the cycle, you don't extend the cycle.  But

11   there's no criteria.

12        Q.    And when the board decides to give an

13   outdate, are there criteria for determining how far in

14   the future that outdate will be?

15        A.    Not on cases over 30 years.  I mean,

16   generally, the policy is that you need to set it within

17   five years or you need to rehear.  So you wouldn't go

18   longer than the five-year term.

19        Q.    And is the inmate told at any point why

20   they were given a particular setback?

21        A.    The same as they would be given -- they

22   wouldn't be told the particulars.  They would just be

23   told why they were given the setback and denied parole.

24             If there were comments on the board action

25   sheet that you could refer to, or a decision marked, or

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 186 of 216

1 **reason marked, such as poor institutional adjustment,**

2 **that's pretty much a heads-up that you need to clean up**

3 **your conduct.**

4     Q.  But we talked earlier about Mr. Roberts,

5 the notice to him that indicated he was denied parole

6 based on circumstances of the offense.

7     Do you recall that?

8     **A.  Yes.**

9     Q.  And he was given a setback -- I believe it

10 was four years.

11     He -- on that same notice he received,

12 which is page two of Exhibit 30, he wasn't provided any

13 explanation with regard to why he received a

14 four-year setback, as opposed to a one year or two-year

15 setback, correct?

16     **A.  Correct.**

17     Q.  And everyone that has that had these

18 hearings under SB 590, they've been incarcerated for at

19 least 25 years, correct?

20     **A.  Yes.**

21     Q.  Are you still in contact with any current

22 or former board members?

23     **A.  What do you mean?  I work with them.**

24     Q.  On a regular basis?

25     When's the last time you talked with Don

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL  Document 134-9  Filed 06/12/18  Page 187 of 216

1    Ruzicka?

2         A.    **Oh, probably not since May or so.**

3         Q.    He recently retired from the board,

4    correct?

5         A.    **Correct.**

6         Q.    Do you know the circumstances under which

7    he left?

8         A.    **Yeah.**

9         Q.    And what are they?

10        A.    **After the media released the contents of an**

11   **investigation, he decided to resign and retire.**

12        Q.    And you're referring to the investigation

13   by Amy Rogers, the Inspector General, regarding his

14   conduct at parole hearings?

15        A.    **Yes.**

16        Q.    When did you first come to learn of

17   Mr. Ruzicka's misconduct at parole hearings?

18        A.    **I don't recall the exact date in my head.**

19   **But it was in, I think, June or July of 2016 when it**

20   **was reported to me.**

21        Q.    And who reported it to you?

22        A.    **Kenny Jones.**

23        Q.    Do you recall what he said?

24        A.    **Yes.**

25        Q.    What did he say?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 188 of 216

1      A.   Well, he started in a roundabout manner

2  saying, "I don't know if this is some new motivational

3  interviewing technique, but you know how you get a song

4  stuck in your head?"

5           And this is over the telephone.  And I

6  said, "I don't know what you're talking about."

7           And he said, "You know, or, like, dressing

8  all in black.  You know, things like that."  You know,

9  "You keep saying I think things are not right."

10          And I finally said, "Well, could you cut to

11  the chase and tell me what's going on?"

12          And he said, "I think that things are

13  occurring, that are not professional, with Don and

14  Brian, dressing alike, and saying things in parole

15  hearings that were inappropriate."

16      Q.   And what did you say in response to that?

17      A.   I said, "Thank you for reporting it.  I'll

18  take care of it."

19      Q.   And that was the end of the call?

20      A.   Yes.  With him.  And I said, "Don't discuss

21  it with the analyst that's in your car right now" --

22  because I knew they were on the way to a hearing --

23  "and don't talk about it any further."

24      Q.   Do you know which analyst was in the car

25  with Mr. Jones during that call?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 189 of 216

1        **A.    Yes.**

2        Q.    Who was it?

3        **A.    Mike Davis.**

4        Q.    And then what did you do after your

5    conversation with Mr. Jones?

6        **A.    I reported it to Julie Kempker, the chief**

7    **state supervisor, because Chairman McSwain was out on**

8    **bereavement leave.**

9        Q.    And did you prepare a memo to Mr. McSwain

10   regarding the conduct that you had learned about?

11       **A.    Yes, I did.**

12       **(Deposition Exhibit No. 38 was marked for**

13   **identification.)**

14   BY MS. BREIHAN:

15       Q.    I'll hand you what's marked as Exhibit 38.

16   It's Bates-stamped AGO 1486 through 1488.

17            Is this a copy of the memorandum that you

18   prepared regarding the misconduct by Mr. Ruzicka and

19   Mr. George?

20       **A.    Yes.**

21       Q.    Do you know what happened after you

22   prepared this memorandum?

23       **A.    A request for investigation was requested**

24   **to the Attorney General's Office, after conversations**

25   **were had with the Governor's office, if a board member**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 190 of 216

1    could or could not even be investigated.

2         Q.   Were you part of those conversations with

3    the Governor's office?

4         A.   No.

5         Q.   Who was?

6         A.   I would assume Director Lombardi and Ellis

7    McSwain.  Potentially.  Or general counsel.  I don't

8    know.

9         Q.   And there was an investigation eventually

10   conducted by the Inspector General, correct?

11        A.   Yes.

12        Q.   What did that investigation reveal; do you

13   know?

14        A.   Yes.

15        Q.   What did that investigation reveal; do you

16   know?

17        A.   It revealed instances of both parties

18   inserting nonsensical words, song titles, and other --

19   and trying to kind of playing a game with a point

20   system by those two.

21        Q.   By those two you mean?

22        A.   Don Ruzicka and ██████████.

23        Q.   And ██████████ is a parole analyst and is

24   still employed by the Division of Probation and Parole,

25   correct?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 191 of 216

1      **A.   Yes.**

2      Q.   And he's still conducting hearings on a

3  regular basis?

4      **A.   Yes.**

5      Q.   What repercussions did he face for his

6  participation in this game?

7      **A.   He was subject to disciplinary action.  I**

8  **believe he was suspended.**

9      Q.   With pay?

10     **A.   No.**

11     Q.   Do you know how long he was suspended?

12     **A.   No.  I don't remember.**

13     Q.   Do you remember the substance of your

14  conversation with Mr. Mueller about this game-playing?

15     **A.   Yes.**

16     Q.   What did he share with you?

17     **A.   Well, I mean, I had just asked him, had**

18  **there been instances of this occurring in the past, and**

19  **how did it get dealt with?**

20          **You know, it was new to me.  I never, ever,**

21  **in my wildest dreams would have thought someone would**

22  **take liberty with an offender's situation and play**

23  **games.**

24          **And so, you know, he said, "Well, there**

25  **might have been, like, maybe you want to -- the word of**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 192 of 216

1    the day, or how many times somebody said something."

2    But it wasn't planned.  It was more like listening.

3    Like, how many times did you hear an offender say this?

4    Or that?  I.

5              Mean, I can't recall specifically, but it

6    was nothing to the degree of what we had already

7    uncovered, based on listening to tapes.

8         Q.   How many tapes did you listen to?

9         A.   I don't even remember.  I mean, hundreds

10   probably.

11        Q.   Who else listened to them?

12        A.   Pam Rogers.

13        Q.   Anyone else?

14        A.   No.

15        Q.   And as part of her investigation,

16   Amy Rogers, the Inspector General, listened to tapes as

17   well, too?

18        A.   Yes.  The ones where we had found instances

19   were the ones that we had given to her.

20        Q.   How did you decide which tapes to review?

21        A.   We looked at the hearing calendar and

22   picked all of the times -- I don't remember the time

23   frame that we went back on, just off the top of my

24   head -- but every time that they were together, we

25   listened to those dockets.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 193 of 216

1      Q.    Was it every time they'd been together for

2  a year?  Less than a year?

3      **A.    I don't remember.  It wasn't more than a**

4  **year.**

5      Q.    Have you read the Attorney General's

6  report?

7      **A.    Yes.**

8      Q.    Have you had any conversations with any

9  board member about that investigation or the report

10  that Amy Rogers prepared?

11      **A.    Not in detail.**

12      Q.    When did you first read the report?

13            Because it was prepared in November of

14  2016, correct?

15      **A.    Yes.**

16      Q.    When did you first read it?

17      **A.    It was at some point in November when it**

18  **was given to me so that I could initiate the**

19  **disciplinary proceedings against them.**

20      Q.    And who was responsible for initiating the

21  disciplinary proceedings against Mr. Ruzicka?

22      **A.    The Governor's office.**

23      Q.    Were you a part of that discussion at all?

24      **A.    No.  Not a part of it.**

25      Q.    Sounds like your answer is qualified

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 194 of 216

1  somewhat.

2  **A.   I overheard a discussion between the**

3  **chairman and general counsel.**

4       Q.   And what did you hear?

5            MR. CRANE:  Hold on.

6            Was it a conversation in which the chairman

7  was seeking legal advice from the general counsel's

8  office about what to do in this situation?

9            THE WITNESS:  I believe he was being

10 instructed on what he could not do.

11           MR. CRANE:  So he was asking what the legal

12 ramifications might be?

13           THE WITNESS:  Yes.

14           MR. CRANE:  I'm going to object that the

15 answer is probably attorney-client privilege.

16           MS. BREIHAN:  Okay.  We will be taking his

17 deposition in a couple weeks.  We'll take it up, if

18 necessary.

19 BY MS. BREIHAN:

20      Q.   Other than the discussion that you

21 overheard, were you privy to any other discussions

22 about what, if any disciplinary action to take against

23 Mr. Ruzicka, for his participation in these games?

24      **A.   No.**

25      Q.   What was the general response among the

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 195 of 216

1  analysts when this investigation was completed in

2  November of 2016?

3      **A.    I don't know that the analysts, in general,**

4  **had -- I don't think they knew it was going on, because**

5  **disciplinary proceedings are confidential.**

6          **And so, you know, while I think they knew**

7  **something had happened, and then, I think, that**

8  **following the investigation, and many of them being**

9  **interviewed as a part of the investigation to see if**

10 **they, or other people participated, they were**

11 **both -- they were pretty appalled that that kind of**

12 **behavior had taken place.**

13     Q.   Was there any sort of training provided to

14 the analysts or the board members afterward about

15 ethics or professional conduct?

16     **A.    Not to my knowledge.**

17         **I mean, I think that ▇▇▇▇▇▇▇▇ was**

18 **required to go through an ethics training through the**

19 **Department of Corrections.  I think it was encouraged**

20 **to done.  But whether or not they attended, I don't**

21 **know.**

22     Q.   And aside from an instance like that, where

23 an investigation could be requested from the

24 Attorney General's Office, is there any sort of

25 oversight as to what kind of conduct takes place on the

Pohlman USA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 196 of 216

1 part of the panel during these parole hearings?

2      A.    Not in a proactive way.

3            I mean, there would be some occasions, when

4 I had the time, where I would go audit hearings and

5 listen.

6            But generally it was fueled by a complaint.

7 Whether that be from our own staff based upon a comment

8 that someone made.

9            It could have been a board member, based

10 upon a comment that an institutional supervisor raised.

11            Many times it was the offender's family who

12 complained.

13            So we would listen, and review the tape,

14 and provide some coaching, if necessary.

15      Q.    And you testified earlier that this

16 was -- this investigative report was eventually made

17 public, correct?

18      A.    Yes.

19      Q.    I'd imagine that you in the Division of and

20 Probation and Parole received a number of complaints or

21 inquiries, after that information was made public; is

22 that fair?

23      A.    I don't know.  I wasn't in that position.

24      Q.    But you were still staying on top of the

25 issue, weren't you?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 197 of 216

1    A.    I mean, I knew it had been released.  I

2  wasn't tracking how many phone calls that we got about

3  the issue.

4    Q.    And you weren't reviewing any hearing

5  complaints at that point?

6    A.    No.

7    Q.    But you were forwarding news articles to

8  Ellis McSwain?

9    A.    Yes.

10   Q.    Why would you be doing that?

11   A.    Because it's what we feared.  We always

12  knew the other shoe was gonna drop.

13        I mean, the right thing to do, is after he

14  was caught, Don Ruzicka should have resigned.

15        And, no, it wouldn't have made it better,

16  but it would have been, to me, the right way to make

17  amends.

18   Q.    Do you know why he didn't do that?

19   A.    No, I don't know.

20   Q.    Did you have any discussions with anyone on

21  the board or parole staff about making the Inspector

22  General report public before June of 2016?

23   A.    About making it public?

24   Q.    Yes.

25   A.    I wasn't involved.  No.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 198 of 216

1      Q.   You didn't encourage anyone, for example,

2  to -- sounds like you thought it should have been, you

3  know, transparent from the get-go, right?

4      **A.   Yes.**

5      Q.   Did you encourage anyone on the board,

6  or -- to make that -- make a public statement about

7  what had happened?

8      **A.   Not that I can remember.**

9      Q.   Are you aware of any other unprofessional

10 conduct that occurred at hearings, other than what's

11 detailed in Amy Roger's report?

12     **A.   Yes.**

13     Q.   What conduct are you aware of that you feel

14 is unprofessional?

15     **A.   Just certain words sometimes can be viewed**

16 **as derogatory.  Or sometimes certain phrases.  But**

17 **outside of that, I mean, nothing that is patterns or**

18 **sustained misconduct.**

19     Q.   Can you give me an example of one of the

20 derogatory words or phrases that you're thinking of?

21     **A.   I think there was one reference to a board**

22 **member making a comment after a hearing, "I sure hope**

23 **that guy doesn't go out and be a terrorist."**

24          **And we had an observer in the room that**

25 **took offense of that based upon his ethnic origin.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 199 of 216

1      Q.   Do you know which board member made that

2  comment?

3      **A.   Gary Dutzenberg.**

4      Q.   And he still sits on the board, correct?

5      **A.   Yes.**

6      Q.   Are there any other derogatory words or

7  phrases that come to mind?

8      **A.   No.  Not off the top of my head.  More**

9  **often than not, the complaints were unsubstantiated.**

10      Q.   Complaints from inmates?

11      **A.   Or even from staff.  That maybe -- it has**

12  **been a sensitive time for our department.  And so staff**

13  **have kind of felt that, lately, they need to report**

14  **everything.**

15      Q.   What do you mean it's been a sensitive time

16  for the department?

17      **A.   Well, the Department of Corrections has**

18  **been slammed in the news media for sexual harassment**

19  **lawsuits from former employees and current employees.**

20      Q.   Do you think the criticism of the

21  department is unwarranted?

22      **A.   No.**

23      **(Deposition Exhibit No. 39 was marked for**

24  **identification.)**

25  BY MS. BREIHAN:

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 200 of 216

1      Q.   I'll hand you what I've been marked as

2  Exhibit 39.  AGO 595 through 602.

3           Do you recognize this email?

4      A.   Yes.

5      Q.   Looks like an email from you to Mr. McSwain

6  on July 13th, 2015, correct?

7      A.   Yes.

8      Q.   And you're forwarding an article by the

9  Marshal Project, correct?

10     A.   Yes.

11     Q.   And you say "some not so very nice

12 commentary from a former employee?"

13     A.   Correct.

14     Q.   Who are you referring to there?

15     A.   I'm not sure specifically in this article,

16 having not read it in a couple of years, but I would

17 assume it was the former parole analyst, Richard Lee,

18 and possibly a former board staff person by the name of

19 Jan Barton.

20     Q.   She was your predecessor, right?

21     A.   Yes.

22     Q.   Did you -- your time at the Department of

23 Corrections overlap at all?

24     A.   Yes.

25     Q.   Did you ever get to work closely with

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 201 of 216

1   Ms. Barton?

2       **A.    Yes.**

3       Q.    In what capacity?

4       **A.    She supervised the analysts group.**

5           **I supervised institutional regions.**

6   **Whenever we had to roll out new initiatives, it was**

7   **very important that we worked together and develop**

8   **processes that satisfied both groups.**

9       Q.    Did you ever work with Cranston Mitchell?

10      **A.    Yes.**

11      Q.    Did you ever work with him while you

12  were --

13      **A.    Not closely.**

14          **(Deposition Exhibit No. 40 was marked for**

15  **identification.)**

16  BY MS. BREIHAN:

17      Q.    It looks like you forwarded this email to

18  Mr. McSwain, this article, on two occasions.

19          I'll show you the other.  It's marked now

20  as Exhibit 40.  It's Bates-stamped AGO611 through 618.

21          Looks like Ms. Kempker sends it to you, and

22  you respond, and there's conversation about the article

23  having been discussed with the director that morning.

24          Is that referring to Director Lombardi?

25      **A.    I would assume so.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 202 of 216

1          Q.   Do you remember having a discussion with

2    Mr. Lombardi about this article?

3          **A.   No.  The context would have been Julie**

4    **sending it to Ellis.  And the comments would have been**

5    **at a DOC executive staff meeting, which they would have**

6    **sat in on with him.**

7          Q.   So Mr. McSwain would have been privy to

8    that conversation, but not you?

9          **A.   Correct.**

10         Q.   Did he share with you what the director

11   said about this article?

12         **A.   No.**

13         Q.   Did Ms. Kempker share that with you?

14         **A.   No.**

15         Q.   And it refers to quotes by Janet Barton,

16   correct?

17         **A.   Yes.**

18         Q.   If we look on the page that's Bates-stamped

19   612, toward the very end of that page, there's a quote

20   by Ms. Barton, it refers to the Missouri parole process

21   as "close to the extreme," correct?

22         **A.   Yes.**

23         Q.   Would you agree with that statement?

24         **A.   Yes.**

25         Q.   She's also quoted later in the

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 203 of 216

1 article -- if you go to the page that's Bates-stamped

2 616, toward the bottom -- Ms. Barton talks a little bit

3 about the voting process.  And that "board members

4 might not even look at the case or read the file before

5 they decide the case, they just go based on what others

6 say."

7          Based on your experience, is that true?

8      A.    I don't believe that's true.

9      Q.    She also says that, "forms always, or

10 almost always, indicate that release would depreciate

11 the seriousness of the present offense, but that's not

12 always the truth."

13          Is that fair to say?

14      A.    I don't believe so.

15      Q.    Which part of that do you disagree with?

16          Do you agree that in most cases when parole

17 consideration is denied it's denied based on the

18 circumstances of the offense?

19      A.    Yes, I do.

20      Q.    Do you agree with her statement that reason

21 given was not always the truth?

22      A.    No, I don't agree.

23      Q.    Did you have any conversations with anyone

24 in the Division of Probation and Parole regarding this

25 article?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 204 of 216

1        A.    Probably.

2        Q.    Do you recall, who do you recall discussing

3   this article with?

4        A.    Probably with Steve Mueller.

5        Q.    And what did you say to Mr. Mueller about

6   this article?

7        A.    I think we were surprised that someone

8   would slam the system that they worked to build.

9        Q.    So Ms. Barton helped to build the Missouri

10  parole system?

11       A.    I mean, she was a key element in developing

12  policies and procedures.

13              She developed the board action sheet, in

14  conjunction with members.  And so if she was so opposed

15  to the way that they did business, she should have done

16  something to change it.  Or suggested it.

17       Q.    And you even have indicated to our office,

18  and others, that these records are closed records,

19  right?

20       A.    Yes.

21       Q.    And that's why inmates can't see their own

22  parole files?

23       A.    Yes.

24       Q.    And is that a matter of internal policy and

25  procedure?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 205 of 216

1       A.   Well, I believe it's a matter of statute.

2       Q.   So in your capacity as board operations

3   director, would you have been able to change that, to

4   your knowledge?

5       A.   No.  Not on my own.  I don't believe you

6   can change the amount of information that we could

7   give.

8       Q.   I'm sorry, can repeat that?

9       A.   I said I don't think I could have changed

10  the amount of information that would was allowed to be

11  shared with an inmate.

12      Q.   Do you know how many hearings, on average,

13  the parole board conducts per year?

14      A.   About 11,800.

15      Q.   Do you have any sort of sense of the

16  average time between when the parole hearing is

17  conducted and when a decision is made?

18      A.   I think the average time, when we

19  calculated it, was about three weeks.  But sometimes

20  longer.  It depends on how many have to vote.

21      Q.   Do you recall when this lawsuit was filed?

22      A.   I could guess.

23      Q.   I don't want you to guess.

24      A.   I mean, I wanna say between December,

25  January.  Am I way off?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL    Document 134-9    Filed 06/12/18    Page 206 of 216

1    Q.   It was in May of this year.

2    **A.   Oh.   There must have been some other things**

3  **that you filed.**

4         MR. CRANE:  There are other lawsuits filed,

5  both by them and other attorneys.

6         THE WITNESS:  Yes, I know.

7   BY MS. BREIHAN:

8    Q.   Since this lawsuit was filed -- and I know

9  that you transitioned out from your position as board

10  operations director -- but, to your knowledge, have

11  there been any discussions by the board of parole

12  analysts about training for handling these juvenile

13  life without hearings specifically?

14    **A.   I don't know.**

15    Q.   Was this transition out from the board

16  operations director position voluntary?

17    **A.   Yes.**

18    Q.   Why did you want to switch?

19    **A.   Well, actually, it had been in the works**

20  **since probably November or December of last year.**

21         **And we had submitted a proposal -- Julie**

22  **did -- and had it for me to move out from under the**

23  **parole board chairman, and to start engaging myself**

24  **with field operations, because that was seeming to**

25  **take -- working on all of her stuff, like the earned**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 207 of 216

1    compliance credits, most of my time.

2           The deputy department director would not

3    let us proceed, likely because they knew a new director

4    was coming onboard, and she may not agree.  So she

5    would want to undo whatever we did.

6         Q.   Why did you want to make this move to

7    community corrections?

8         A.   Well, I was hopeful, that in the end, it

9    would result to a pay increase, by taking over some

10   large units from the assistant division director.

11          I think that Julie had envisioned in her

12   mind that she sort of had two assistant directors,

13   instead of one.  And now we're transitioning, the way

14   we wanted it to be all along, needing more help.

15        Q.   Do you know if there are plans to fill that

16   board operations director position that was left?

17        A.   I don't believe so.

18        Q.   So who is responsible for supervising the

19   analysts now?

20        A.   Steve Mueller.

21        Q.   And who's responsible for conducting

22   legislative reviews and behalf of the board?

23        A.   I would assume he would be.

24        Q.   Does he have any legal training?

25        A.   No.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 208 of 216

1      MS. BREIHAN:  I think that's all I have.

2      MR. SPILLANE:  I have some questions.

3  CROSS-EXAMINATION BY MR. SPILLANE:

4      Q.   The first thing I'm going to do, ma'am, is

5  hand you -- this is the 12-23-16 board minutes.  And I

6  was wondering if you could read the part that I made a

7  geometric shape around.

8      **A.   Okay.  "If the decision is to re-hear a**

9  **JL WOP offender, circumstances may be marked.  Kelly**

10 **indicated that the worksheet filled out during the**

11 **hearing provides enough reasoning for denial of parole**

12 **beyond the reasons reported on the offender notice."**

13     Q.   And that's what I wanted to hear.

14          Now, the worksheet, is that Exhibit 28,

15 which we talked about earlier?

16     **A.   Yes.**

17     Q.   Now, if I understand that correctly --

18 correct me if I'm wrong -- the notice given to the

19 inmate will not always include all the reasons that

20 were considered or used in denying parole, correct?

21     **A.   Correct.**

22     Q.   Exhibit 28 may include reasons that support

23 the denial of parole?

24     **A.   Or the release.**

25     Q.   Or the release?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 209 of 216

1      A.    Yes.

2      Q.    Now, you talked earlier about there being

3   no legal requirement for putting any reasons on the

4   notice to the inmate?

5      A.    Correct.

6      Q.    Please explain why that is.

7           MS. BREIHAN:  I'll object it calls for a

8   legal conclusion.

9           MR. SPILLANE:  It's not like you haven't

10  asked her for a hundred of them.

11          THE WITNESS:  Well, in my opinion, we're

12  required to furnish an offender with the decision, but

13  not the reason for the decision.

14  BY MR. SPILLANE:

15     Q.    And is there a requirement that you give a

16  reason if it is above or below the guideline level in

17  the notice?

18          If you don't know, that's fine.

19     A.    I don't know.  What I'm saying about the

20  legal requirement, to give them a reason, I'm talking

21  about specific to this statute.  Not in general.

22     Q.    Okay.  I'm going to ask you to fill out.

23          So as I understand what you're saying,

24  specific to this statute, as in other cases, the notice

25  to them may not include all of the reasons that parole

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 210 of 216

1 was denied; that may be included in the board action

2 sheet, or No. 28, which was attached to the board

3 action sheet?

4   **A. Correct.**

5    MR. SPILLANE:  Let me ask Mr. Crane:  Do

6 you have any questions that I forgot to ask?

7    MR. CRANE:  I have one question.

8 CROSS-EXAMINATION BY MR. CRANE:

9   Q. We talked earlier -- I don't know if we

10 need to reference specific documents -- but you wrote

11 in a memo that there may be a gap in determining

12 offender maturity at the time of their offense?

13   **A. Yes.**

14   Q. Could that gap be filled by information

15 that offenders would submit?

16   **A. Yes.**

17   Q. Okay.

18    MR. SPILLANE:  No further questions.

19    MS. BREIHAN:  I do have some questions.

20 REDIRECT EXAMINATION BY MS. BREIHAN:

21   Q. You mentioned, on the topic of what

22 materials might be available in these JL WOP parole

23 files to assess maturity or mental competency at the

24 time of the offense, you mentioned that there are these

25 barebones commitment reports, right?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 211 of 216

1    A.    Yes.

2    Q.    Can you talk to me about what kind of

3  assessment is done at the time of commitment as to what

4  might relate to maturity or mental ability of an

5  inmate?

6    A.    I wouldn't be able to speak about that as

7  an expert.

8         I mean, just generally knowing they

9  classify offenders sometimes by the level of aggression

10 they appear to exhibit.

11        So you wouldn't put probably a very meek

12 person in with a very strong, dominant personality,

13 because the risk of being victimized is greater.  So

14 you might look at some of those assessments to gauge.

15        Sometimes it was the caseworker, who

16 initially interviewed, who says this person appears to

17 be impulsive, a thrill-seeker, kind of -- I mean, it

18 wasn't a formal assessment.  It was more observation.

19    Q.    Do you know if there's an educational

20 screening done at the time of commitment to assess IQ,

21 or cognitive or learning disabilities?

22    A.    Yes, there are.  Our education department

23 does testing upon entry and that information's

24 available.

25    Q.    Is that redone periodically throughout the

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 212 of 216

1  inmate's incarceration?

2        **A.   I don't know if they retest, but they would**

3  **place them -- either in educational programming, and**

4  **you would hope that that would improve.**

5        Q.   And do you know whether the same kinds of

6  educational programs are offered at the facility

7  regardless of the security level of that facility?

8        **A.   I can't answer as an expert on that.  But I**

9  **believe that the educational resources are probably not**

10 **available at every facility.  And, in fact, that**

11 **someone who did not have the possibility of parole may**

12 **not be able to obtain a seat.**

13       Q.   So how, then, does that impact the analysis

14 of one of these juvenile life without parole inmate's

15 institutional records, where perhaps they've

16 not -- they don't have quite an extensive history of

17 taking certain courses in large part because those

18 weren't available to them?  Is that taken into

19 consideration?

20       **A.   Yes.  They're not punished for being where**

21 **they're at for lack of opportunity.**

22       Q.   And what about -- one of the factors that

23 seems to be considered is the inmate's institutional

24 record, correct?

25       **A.   Yes.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 213 of 216

1          Q.   And how is that assessed?

2          A.   I don't know how it is for the other board

3   members or panel members, but I would expect that there

4   might have been conduct violations early on in an

5   incarceration for one of these individuals who would

6   have been protecting themselves.

7               I understand what happens in a prison to

8   young males.  And especially when you take them into a

9   maximum security prison.  I would hope as they learn to

10  adjust and participate in programming, and become less

11  impulsive, that their conduct should improve.  And so

12  what you're looking for is kind of a decrease as they

13  age.

14               Certainly you're looking for -- the minor

15  violations aren't as big of a deal.  You're looking for

16  major violence, sexual offending-type things.

17         Q.   And how would you interpret, in this life

18  without context, if an inmate's institutional record

19  didn't involve vocational courses or work experience

20  until after 2012 when the Miller decision came down,

21  and there might have been some hope of potential

22  release that wasn't there before, would that be held

23  against an inmate?

24         A.   I would think it would be held for them.

25  You know, I get that they probably didn't have any hope

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 214 of 216

1  or reason to change, prior to the law being put into

2  effect.  That's just my opinion.

3          I would think if you do see light at the

4  end of the tunnel, and think there may be, you would

5  want to better yourself, so that you would be a good

6  candidate.

7      Q.   And how are actual innocence claims handled

8  during hearings and deliberations of parole grants?

9      A.   I don't know that I have much experience

10  with that, with actual offenders who appear that are

11  appealing their case because they are claiming

12  innocence.  So I couldn't answer that.

13          MS. BREIHAN:  I have no further questions.

14  RECROSS-EXAMINATION BY MR. SPILLANE:

15      Q.   Did I understand your answer to be that

16  institutional records may give the board some guidance

17  to maturation rehabilitation and growth since the time

18  of the offense?

19      A.   They may.

20          MR. SPILLANE:  Thank you.

21          MR. CRANE:  Do you want to waive signature

22  or review it?

23          THE WITNESS:  I don't need to see this.

24          (Signature waived.)

25

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 215 of 216

1                    CERTIFICATE OF REPORTER

2

3            I, Kim D. Murphy, Certified Court Reporter,

4    for the State of Missouri, do hereby certify that the

5    witness whose testimony appears in the foregoing

6    deposition was duly sworn by me; that the testimony of

7    said witness was taken by me to the best of my ability

8    and thereafter reduced to typewriting under my

9    direction; that I am neither counsel for, related to,

10   nor employed by any of the parties to the action in

11   which this deposition was taken, and further that I am

12   not a relative or employee of any attorney or counsel

13   employed by the parties thereto, nor financially or

14   otherwise interested in the outcome of the action.

15

16

17

18

19            _____

20                 Kim D. Murphy, CCR

21

22

23

24

25

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-9   Filed 06/12/18   Page 216 of 216