

**PohlmanUSA®**
Court Reporting and
Litigation Services

---

Michelle Kasak

January 24, 2018

---

Norman Brown, et al.

vs.

Anne L. Precythe, et al.

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION


NORMAN BROWN, et al,          )
                             )
        Plaintiffs,          )
                             )
    vs.                      ) Case No. 17-CV-4082
                             )
ANNE L. PRECYTHE, et         )
al,                          )
                             )
        Defendants.          )


    CONFIDENTIAL DEPOSITION OF MICHELLE KASAK,

produced, sworn and examined on the 24th day of

January, 2018, between the hours of eight o'clock in

the forenoon and six o'clock in the afternoon of that

day, at the Missouri Attorney General's Office,

Broadway State Office Building, Jefferson City,

Missouri, before Kim D. Murphy, Certified Court

Reporter, within and for the State of Missouri.

```
 1                A P P E A R A N C E S

 2
            For the Plaintiffs:
 3
                HUSCH BLACKWELL, LLP
 4              By:  Sarah L. Zimmerman
                and Jordan Ault
 5              190 Carondelet Plaza
                Suite 600
 6              St. Louis, MO  63105
                314-345-6248
 7              Sarah.zimmerman@huschblackwell.com

 8

 9          For the Defendants:

10              MISSOURI ATTORNEY GENERAL
                By:  Michael Spillane
11              and Andrew Crane
                Broadway State Office Building
12              221 W. High Street
                Jefferson City, MO  65101
13              Michael.Spillane@ago.mo.gov

14

15                   I N D E X

16   Direct Examination by Ms. Zimmerman          4

17

18

19

20

21

22

23

24

25
```

```
 1                  DEPOSITION EXHIBIT INDEX

 2    ID                                        MARKED

 3    1:   Resume                                  26

 4    2:   Training attended                       38

 5    3:   SB 590                                  46

 6    4:   Email string                            47

 7    5:   Email string                            81

 8    6:   Email                                   85

 9    7:   Memo                                    90

10    8:   Memo                                    90

11    9:   Email string                            91

12    10:  Email                                   93

13    11:  Email                                   97

14    12:  BAS                                    100

15    13:  Meeting minutes                        100

16    14:  Procedures                             102

17    15:  Table of Contents                      103

18    16:  Policy and Procedure manual            107

19    17:  Email string                           109

20    18:  Employee Performance Log               115

21

22

23
      Court Reporter:
24    Kim D. Murphy, CCR

25
```

1          IT IS HEREBY STIPULATED AND AGREED, by and

2    between counsel for the Plaintiffs and counsel for the

3    Defendants that this deposition may be taken in

4    shorthand by Kim D. Murphy, CCR, and afterwards

5    transcribed into typewriting; and the signature of the

6    witness is expressly waived.

7                    *    *    *    *    *

8                    MICHELLE KASAK,

9    of lawful age, produced, sworn and examined on behalf

10   of the Plaintiffs, deposes and says:

11                   DIRECT EXAMINATION

12   QUESTIONS BY MS. ZIMMERMAN:

13        Q.   Could you please tell us your full name.

14        **A.   Kathleen Michelle Kasak.**

15        Q.   Ms. Kasak, my name is Sara Zimmerman.  I

16   introduced myself to you a few minutes ago before the

17   deposition started.  I'm the attorney for Mr. Brown,

18   Mr. McElroy, Mr. Roland and Mr. Roberts.

19             Do you understand that?

20        **A.   Yes.**

21        Q.   We're going to take your deposition today

22   in a lawsuit that my clients filed against members of

23   the parole board?

24             Do you understand that?

25        **A.   Yes.**

1       Q.   Can you tell me your date of birth?

2       **A.   7-29-67.**

3       Q.   And your current address?

4       **A.   ████████████████████████████,**

5       ████.

6       Q.   Have you ever given a deposition before?

7       **A.   No.**

8       Q.   Are you currently employed by the Missouri

9    Department of Corrections?

10      **A.   Yes.**

11      Q.   So Mr. Crane and Mr. Spillane may have

12   explained this to you, but there are some grounds I'm

13   going to cover that we need to follow to have a clear

14   record of what happens here today.

15           I'm going to ask you questions, and it's

16   your job to provide truthful complete and responsive

17   answers.

18           Will you do that today?

19      **A.   Yes.**

20      Q.   The court reporter is taking down

21   everything we say.  It's important that you provide

22   verbal responses, okay?

23      **A.   Yes.**

24      Q.   And we can't talk over each other, okay?

25      **A.   Yes.  I understand.**

1      Q.   We also need you to only answer the
2  questions that you understand, okay?
3      **A.   Yes.**
4      Q.   If you don't understand one of my
5  questions, please stop me.  I will repeat it, rephrase
6  it, anything I can do to make sure it's clear.
7           Do you understand that?
8      **A.   Yes.**
9      Q.   If I ask you a question and you answer the
10 question, I'm going to assume that you understood it,
11 correct?
12     **A.   Yes.**
13     Q.   Anything about your physical, emotional or
14 mental condition that would prevent you from
15 understanding my questions?
16     **A.   No.**
17     Q.   Anything that will prevent you from
18 providing complete, truthful and responsive answers
19 today?
20     **A.   No.**
21     Q.   If you need a break, we can take one, so
22 long as there's not a question pending, all right?
23     **A.   Okay.**
24     Q.   Did you review any documents in preparation
25 for your deposition today?

```
1          A.    Yes.

2          Q.    What documents did you review?

3          A.    What Andrew sent me.  The subpoena.  The

4    materials that I sent him electronically.

5          Q.    Anything else?

6          A.    No.

7          Q.    And we discussed this earlier, but you

8    brought some documents with you in response to the

9    subpoena, correct?

10         A.    Yes.

11         Q.    How did you locate these documents?

12         A.    I had them stored electronically.

13         Q.    In your email?

14         A.    No.  In my computer on my personal drive.

15         Q.    Are you currently married?

16         A.    No.

17         Q.    Have you ever been convicted or pled guilty

18   to any felony?

19         A.    No.

20         Q.    Have you ever been convicted or pled guilty

21   to any misdemeanor involving fraud or dishonesty?

22         A.    No.

23         Q.    Have you ever sued anyone in the past?

24         A.    No.

25         Q.    Have you ever been sued in the past?
```

```
 1        A.    No.

 2        Q.    Did you attend high school?

 3        A.    Yes.

 4        Q.    Which one?

 5        A.    Linn, Missouri.  Linn High School.

 6        Q.    Did you graduate?

 7        A.    Yes.

 8        Q.    What year?

 9        A.    '85.

10        Q.    Did you attend college or university after

11   that?

12        A.    Yes.

13        Q.    Which one?

14        A.    I went to State Fair Community College in

15   Sedalia, and CMSU -- that's what it was called then --

16   in Warrensburg.

17        Q.    And what did you study?

18        A.    Criminal justice.

19        Q.    Did you study anything else?  Any minors?

20        A.    No.

21        Q.    Did you graduate?

22        A.    Yes.

23        Q.    What year?

24        A.    I got my master's in '91.  I believe.

25        Q.    So you got a criminal justice bachelor's?
```

```
 1            A.    Uh-huh.  And then my master's in CJ

 2    administration.

 3            Q.    And where did you get your master's degree

 4    from?

 5            A.    CMSU.

 6            Q.    Did any of your areas of study focus on

 7    psychology?

 8            A.    Yes, I had psychology classes.

 9            Q.    How about on adolescent development?

10            A.    No.

11            Q.    Have you received any other formal

12    education beyond these degrees?

13            A.    No.

14            Q.    Have you ever served in the military?

15            A.    No.

16            Q.    After college, where did you work?

17            A.    For the State Social Services, Child

18    Support Enforcement.

19            Q.    Was that your job title?

20            A.    Child support enforcement technician.

21            Q.    And what were your job responsibilities in

22    that role?

23            A.    Locating non-paying parents.  Setting them

24    up with payment plans to pay their arrearages and

25    current child support.
```

```
 1        Q.   And after that position, where did you work
 2   after that?
 3        A.   I came to work for the Department of
 4   Corrections where I'm at now.
 5        Q.   And when did you start at the Department of
 6   Corrections?
 7        A.   In 1994.
 8        Q.   So you were at the Social Services position
 9   until 1994?
10        A.   '89 to '94.
11        Q.   And what was your job title when you
12   started at the Department of Corrections?
13        A.   Probation and parole officer.
14        Q.   And as the probation and parole officer,
15   what were your job responsibilities?
16        A.   I was an institutional probation and parole
17   officer.  So I provided reports to the parole board,
18   assessed offenders for release.  And updated the board
19   on offenders' progress and programming.  Prepared
20   offenders for release.
21        Q.   What do you mean by programming?  Were you
22   responsible for implementing program?
23        A.   No.
24        Q.   Or creating programming?
25        A.   No.  No.  I reported to the board what
```

1    programming the offenders completed, participated in,

2    to prepare them for their release.

3         Q.   Was there any experience or other

4    requirements for your position as an IPO?

5         A.   Other than the training provided by our

6    department, no.

7         Q.   And what training was provided?

8         A.   Four weeks of training by our training

9    academy.

10        Q.   And what kind of things are taught in that

11   training academy?

12        A.   Substance abuse issues.

13             Sex offender.  You know, issues that

14   offenders may have.

15             Report writing.

16             Constitutional law.

17             Interviewing skills.

18             Offender staff relations.  So they know how

19   to communicate with offenders.

20             The assessment tools that we used then,

21   24 years ago.  Assessment -- I'm sure there's more.  I

22   can't remember every class.

23        Q.   But generally it was to provide tools for

24   you to be able to do your job and interact with

25   offenders?

```
 1          A.    Yes.

 2          Q.    And complete reports?

 3          A.    Uh-huh.  Correct.

 4          Q.    And do you recall who your supervisor was

 5    when you were an IPO?

 6          A.    When I first started at the Boonville

 7    Correctional Center it was John Boyden.

 8          Q.    And what was his job title?

 9          A.    District administrator.

10          Q.    And after your position as an IPO, did you

11    change job titles within the Department of Corrections?

12          A.    Yes.  I did.

13          Q.    And what was your next job position?

14          A.    Oh, regional training coordinator.

15          Q.    And what were your job responsibilities as

16    a regional training coordinator?

17          A.    I coordinated all the training for the

18    institutional parole officers, and I facilitated

19    training for all the institutional parole officer

20    around the state, and insured that they completed

21    training, the required training.

22          Q.    Was there required training beyond the

23    four-week academy that we just discussed?

24          A.    Yes.  Institutional parole officers go to

25    an additional three-day training.  More hands-on skills
```

1    for what they do, the types of reports they do.

2         Q.    And do they do that once?  Or is that

3    annual?

4         A.    Currently, we do that twice a year.

5         Q.    So each IPO has to attend twice a year?

6         A.    No.  Only when they're new.  It's just part

7    of the new staff training basically, yeah.  We try to

8    get the newer ones in.  We only have a class because

9    there's not enough people really to conduct it twice a

10   year.

11        Q.    And when you moved into this new position

12   did you have to attend any additional training?

13        A.    Yes.  Trainer skills development is one.

14   If you're going to be delivering training to staff.

15        Q.    So beyond coordinating the trainings, were

16   you actually conducting these trainings?

17        A.    Yes.

18        Q.    All of them?

19        A.    Pretty much.

20        Q.    And you conducted these trainings just

21   based on your experience as an IPO; is that correct?

22        A.    Policy.  What policy dictated.

23        Q.    And how did you determine that?

24        A.    I used the policy for when reports were due

25   to tell the -- what's to be included in a report.  Our

1    **assessment tools.  That came strictly from policy and**

2    **procedure.**

3        Q.   So you were providing guidance based on the

4    policies and procedures?

5        A.   **Yes, correct.**

6        Q.   And as regional training coordinator who

7    was your supervisor?

8        A.   **Vickie Meiers.**

9        Q.   And what was her job title?

10       A.   **What mine is now, regional administrator.**

11       Q.   Did you have any other positions between

12   being a regional training coordinator and being the

13   regional administrator?

14       A.   **Yes.  Several.**

15       Q.   So after you're regional training

16   coordinator, what was your next position?

17       A.   **Unit supervisor.**

18       Q.   And what were your job responsibilities as

19   unit supervisor?

20       A.   **I conducted audits for both institutional**

21   **parole officers and field probation and parole**

22   **officers.  Quality assurance.  Basically, compliance of**

23   **policy.**

24       Q.   And so what exactly were you auditing?

25       A.   **That reports were being done in a timely**

1    manner.  The elements required in the reports were

2    there.

3         Q.   Were you assessing whether or not the

4    information in there was accurate or complete based on

5    the documents provided, or interviews with offenders?

6         A.   Probably more timelines.  There were

7    timelines that were followed.  Looking at particular

8    components that needed to be in the reports.

9              But can you repeat the last part of your

10   question?

11        Q.   Sure.  Let me rephrase.

12             So the audits were more focused on the form

13   of the report?

14        A.   Yes.  Correct.

15        Q.   They were not focused on the substance of

16   the report?

17        A.   Correct, yes.

18        Q.   Aside from conducting these audits, did you

19   have any other responsibilities as unit supervisor?

20        A.   Yes.  Fiscal notes.  Administrative

21   rulemaking.  And I monitored several different grants

22   and compliance.

23        Q.   And so I believe the first thing you said

24   was fiscal notes?

25        A.   Yes.  I reviewed fiscal notes and

1  determined the impact to our division so we'd be able

2  to respond to those, the fiscal notes.

3       Q.   And you're going to have to bring me up to

4  speed; what's a fiscal note?

5       A.   Oh.  Well, legislative -- the Legislature

6  makes, you know, they propose changes.  And those would

7  be sent -- they're sent to the different departments to

8  show them the impact.  Like, would there be a fiscal

9  impact from those.

10      Q.   And so you were reviewing them before they

11 became law or after?

12      A.   Yes.  Before.  Correct.

13      Q.   And you also mentioned that you were

14 involved with administrative rulemaking?

15      A.   (The witness nodded her head.)

16      Q.   Could you describe what that entailed?

17      A.   Some of our policies and procedures are

18 also administrative rules with the State.  So with

19 policy revisions, I made updates to our administrative

20 rules.  Our department's administrative rules so they

21 would be consistent.

22      Q.   Consistent with?

23      A.   The policy revisions.  Basically, I just --

24 if policy is revised, and I knew it impacted an

25 administrative rule, then I would make those changes.

    1          Q.    So there's a distinction between certain
    2    internal policies --
    3          **A.    Yes.  Uh-huh.**
    4          Q.    -- procedures, and the administrative
    5    rules?
    6          **A.    Right.  Not all of our policies and**
    7    **procedures are administrative rules.  Only certain**
    8    **ones.**
    9          Q.    So if I understand the translation, if a
   10    change was made on some of those internal policies and
   11    procedures, you would then take a look at the
   12    administrative rules and change them accordingly?
   13          **A.    Yes.**
   14          Q.    Not vice versa?
   15          **A.    Yes.**
   16          Q.    You also worked with grants?
   17          **A.    Yes.**
   18          Q.    Applying for them?
   19          **A.    In that position there were some training**
   20    **grants that I monitored the compliance.  We were given**
   21    **money for training, so I monitored the compliance to**
   22    **make sure we were following all the rules of the**
   23    **grants.**
   24          Q.    And I know you said your position was
   25    called unit supervisor?

```
 1          A.   Yes.

 2          Q.   What was the -- what was the unit?  Was

 3     that a geographical unit?

 4               Was it the entire state you were

 5     responsible for?

 6          A.   It was a statewide program, yes.  So it's

 7     not really -- that's just the working title.  I was

 8     really special projects coordinator.  But the unit

 9     supervisor was the merit title.  I guess that's how you

10     would say it.

11          Q.   Okay.  I just wanted to make sure I

12     understood kind of what your scope was.

13               And going back a little bit, when you were

14     discussing audits, you mentioned that you would audit

15     IPOs and --

16          A.   Field officers.  Yeah.  Field probation and

17     parole officers.

18          Q.   What's the distinction between those two?

19          A.   The institutional parole officer works

20     inside a prison.  And the field probation and parole

21     officer works in the field office in the community.

22          Q.   And so the IPO will be dealing with

23     offenders currently within --

24          A.   Inside the prison.  Yes.  They work -- they

25     just work with the -- the field works with the
```

1  offenders in the community.

2       Q.   That have been released?

3       A.   Correct.  On either probation or parole.

4       Q.   So we discussed your job responsibilities

5  including audits, fiscal notes, review fiscal notes,

6  administrative rulemaking, and reviewing grants.

7            Did you have any other job

8  responsibilities?

9       A.   If so, I cannot remember them all.  I

10  probably did, but I don't remember them all.  This is

11  the main -- these are the main components of the job.

12       Q.   And after your position as unit supervisor,

13  what was your next position within the Department of

14  Corrections?

15       A.   The emergency preparedness and workplace

16  violence prevention coordinator for the department.

17       Q.   And what were your job responsibilities in

18  that position?

19       A.   I was responsible for creating emergency

20  procedures for the department for all the prisons and

21  the parole offices.

22       Q.   Was this a pretty significant departure

23  from what you were doing previously?

24       A.   Yes.

25       Q.   And in this position were you no longer

 1   heavily involved in the parole process?

 2        **A.   Yes.  Had nothing to do with that.**

 3   **Correct.  Yes.**

 4        Q.   Did you receive any additional training

 5   when you moved into that position?

 6        **A.   Yes.**

 7        Q.   And what did that training entail?

 8        **A.   The national incident management system**

 9   **training.  There's a lot of training involved about**

10   **emergency preparedness and how to conduct emergency**

11   **scenarios.  There's a criteria for each emergency plan.**

12   **Yeah, so there was a lot of training.**

13        Q.   And who was your supervisor when you were

14   in this role?

15        **A.   The department director, George Lombardi.**

16        Q.   And after you worked in the emergency

17   preparedness workplace violence prevention coordinator

18   position, what was your next role in the Department of

19   Corrections?

20        **A.   The victims service coordinator for the**

21   **department.**

22        Q.   And what were your job responsibilities in

23   that position?

24        **A.   I worked with crime victims, alerting them**

25   **of the offender's parole hearing.**

1          I went to the executions and I stayed

2   with -- I basically was support for the victim's family

3   members through that whole process.

4          But we were -- our unit, there was a unit,

5   we were responsible for notifying family members of

6   victims of parole hearing dates so they could attend

7   release dates.  Execution dates.

8          Basically providing support to the victims

9   of crime of those that were incarcerated within the

10  Department of Corrections.

11       Q.   When you say you provided support, aside

12  from notifying victims of when certain dates, hearings

13  were coming, what does "support" mean?

14       A.   I would go to parole hearings with the

15  victims to be there for support.  Because it's very

16  traumatic for them.

17          So I was -- if they had any questions, I

18  was there to answer.  Make them feel at ease.  Try to

19  just make the process less impactful.  Because they

20  were going into a prison.  It was really -- it was hard

21  on them.

22          And the same with the executions.  I mean,

23  you sat there during the execution and observed it, and

24  you were there to help them through it.

25       Q.   Was it your role to provide any guidance

1  about the process?

2      **A.   Yes.  Prepare them for both of those**

3  **things, the parole hearing, what was gonna happen**

4  **during the parole hearing.**

5      Q.   So by "prepare" do you mean just advise

6  them of what the steps were?  What was gonna happen?

7      **A.   Yes.  Uh-huh.  Exactly.  And they**

8  **would -- I would tell them that they could speak to the**

9  **parole board with the offender present.  What my staff**

10  **do now.  Without the offender.  'Cause they have those**

11  **options.**

12      Q.   Has that always been the policy?

13      **A.   Yes.  As far as I know.**

14      Q.   Are there -- under this role as victims

15  service coordinator, were you subject to certain rules

16  or regulations?

17      **A.   We could not divulge anything that was**

18  **confidential.  We could only provide public**

19  **information.**

20      Q.   So, for example, you can't share an

21  offender's parole file with the victim?

22      **A.   Correct.  Right.  They would not -- they**

23  **are not privy to any information that anybody else**

24  **would be.**

25      Q.   And are you required by statute to notify

1    victims?

2            **A.    Yes.**

3            Q.    How does one identify as a victim, for

4    example, in a murder case?

5            **A.    Well, the prosecuting attorney's office**

6    **notifies us if there are victims and then we put them**

7    **into a database.**

8            Q.    So --

9            **A.    Early in that stage, they let them know if**

10   **they want to be made aware of hearing dates.  Not all**

11   **of them do.  Some of them want to put it behind them.**

12   **So they notify us and then we enter them into a**

13   **database.**

14           Q.    So it's the victim's decision --

15           **A.    Yes.**

16           Q.    -- whether or not --

17           **A.    Uh-huh.  Yeah.  They -- it's up to them if**

18   **they want to be notified and how they want to be**

19   **notified.  Correct.  Yes.**

20           Q.    And who was your supervisor when you were

21   in the victims service coordinator role?

22           **A.    Dave Rost, the deputy director of**

23   **corrections.**

24           Q.    In this role did you travel to different

25   institutions?  Or did you have a certain geographical?

          1          A.    Every prison.

          2          Q.    Did you have to undergo any additional

          3    training when you took that role?

          4          A.    Formalized training, no.  I attended

          5    conferences.  I'm trying to remember.  No.

          6          Q.    Was there any other informal training aside

          7    from the conferences?

          8          A.    On-the-job training from my predecessor and

          9    the people that were already working in that unit.

         10          Q.    As the coordinator, are you the head of the

         11    victims services?

         12          A.    I was, yes.  Uh-huh.

         13          Q.    Did you have any supervisory role of other

         14    victims service --

         15          A.    Yes.

         16          Q.    -- coordinators?

         17          A.    Yes.

         18          Q.    What would the title be?

         19          A.    They were actually clerical administrative

         20    office support assistants.  This is terrible.

         21                Victim representatives.  I mean, our unit

         22    was the victims services unit.  I was the coordinator,

         23    and then there were four victim representatives in the

         24    unit.

         25          Q.    And those representatives would also attend

1    parole hearings with victims and offer support?

2         **A.    Yes.  Yes.  Yes.  I attended the more high**

3    **profile, make the ones that there -- I thought there**

4    **might be more potential issues.  We could have maybe 15**

5    **victims attend a hearing.  Victim's family members.**

6         Q.    So any number of victims are welcome to

7    attend --

8         **A.    Yes.  Uh-huh.**

9         Q.    -- a parole hearing?

10        **A.    Correct.**

11        Q.    And after your position as victims service

12   coordinator, what was your next position?

13        **A.    Probation and parole regional**

14   **administrator.**

15        Q.    Is that your current position?

16        **A.    Yes.**

17        Q.    And how did you get this position?

18             Did you apply?  Interview?

19        **A.    Yes, I interviewed for it.  Yes.**

20        Q.    And what were the requirements for this

21   position?

22        **A.    I am -- I don't remember 100 percent what**

23   **the job opportunity says.  Possibly four years of**

24   **supervisory experience.**

25        Q.    Within the department?

```
 1          A.   Yes.  Within the Department of Corrections.
 2    I can't remember the exact job qualifications.
 3          Q.   Is there a job description somewhere for
 4    your role?
 5          A.   Yes.
 6          Q.   And where would that be contained or
 7    reflected?
 8          A.   I'm sure I have that.  Personnel would have
 9    that information.
10          Q.   And when did you start this current role?
11          A.   In December 2013.
12          Q.   Are you getting that date from your resumé?
13          A.   Yes.
14          Q.   I'm going to hand this to the court
15    reporter to mark as Exhibit 1.
16               (Deposition Exhibit No. 1 was marked for
17    identification.)
18    BY MS. ZIMMERMAN:
19          Q.   And this is your resumé?
20          A.   Yes.
21          Q.   And we've been going through that?
22          A.   Correct.
23          Q.   What are your duties in this probation and
24    parole regional administrator position?
25          A.   I oversee the 21 parole offices in each of
```

1    the prisons in the state.

2         Q.   So you oversee both the institutional

3    parole offices and the field offices?

4         A.   No.  I'm just over the parole offices in

5    each of the prisons.

6         Q.   Is there a similar position that covers the

7    field offices?

8         A.   Yes.  They're geographically -- there's one

9    for all the field community probation parole officers,

10   like the southwest part of the state, southeast, but my

11   position is the whole state, just all of the

12   institutional parole officers.

13             Because the job is different from the field

14   probation and parole officers.  They have a unique

15   position.  So I'm over all of them until February 1st.

16        Q.   And what happens February 1st?

17        A.   They are going to be supervised by my

18   field -- the field regional administrators.  They're

19   just going to be absorbed so they can work closer

20   together with reentry services.

21             We've done this before.  It was like this

22   before.  Several years ago.  That they

23   actually -- they're just going to report to somebody

24   different.  Their job remains the same.  They'll just

25   report to a different regional administrator.

```
 1          Q.   And about how long ago was the recent
 2    system changed?
 3          A.   It's not effective until February 1st.
 4          Q.   So you mentioned this was previously the
 5    system in place.  The IPOs would report to?
 6          A.   Oh, when did that happen?  You
 7    mean -- that's when I was not with Probation and
 8    Parole.  That's when I was in one of the department
 9    roles.  So I'm -- I would be guessing.  I don't
10    remember what year.  It was when I was not with
11    Probation and Parole.
12          Q.   So just to clarify, within your work at the
13    Department of Corrections, you've had several roles
14    that are probation and parole related?
15          A.   Yes.  And department.  Right.  Because
16    we're a division.  Probation and Parole is a division.
17    So, yes, I worked at this divisional level, the
18    department level.
19          Q.   And so your current role is --
20          A.   The divisional level, yes.
21          Q.   Whereas your role in victims services and
22    emergency preparedness --
23          A.   Was department.
24          Q.   Aside from overseeing the institutional
25    parole offices for now, what are your other job
```

1　responsibilities?

2　　　　**A.　That is what I do.　I oversee all the --**

3　**any aspect of any issues that could possibly occur in**

4　**an institutional parole office.**

5　　　　Q.　Does that include establishing policies and

6　procedures for those IPOs?

7　　　　**A.　Yes.　I am involved in developing and**

8　**revising policy and procedure, and deciphering that to**

9　**my staff, which is probably about 40 percent of what I**

10　**did.**

11　　　　Q.　So revising --

12　　　　**A.　Yes.　And then distributing the information**

13　**to my 21 offices.　It's just institutional parole**

14　**offices.　That's how to hire somebody, discipline, any**

15　**possible administrative issue that any type of office**

16　**would have.**

17　　　　Q.　But some of the policies and procedures, do

18　you have to deal with the substance of the IPOs' work?

19　　　　**A.　Yes.　Correct.**

20　　　　Q.　So are you responsible for the policies of

21　how a hearing is conducted?

22　　　　**A.　No.**

23　　　　Q.　Are you responsible for the prehearing?

24　　　　**A.　Yes.　The prehearing report.　Well, I don't**

25　**decide what goes in the prehearing report.　I make sure**

1    that my staff include all the elements that the board

2    has decided that they want in the report.

3         Q.   So is that similar to the audit function

4    that you had in one of your previous positions, where

5    you're focused more on the form --

6         A.   Yes.

7         Q.   -- as opposed to the substance?

8         A.   When I audited --

9         Q.   That was probably a poor question.

10        A.   When I audited I was looking for specific

11   elements in the reports.  Home plan information.

12   Education information.  The elements that are in the

13   prehearing report procedure that should go into the

14   prehearing report.

15        Q.   So aside from kind of the policy and

16   procedure aspect, what else is involved in overseeing

17   the IPOs?

18        A.   I manage the budget for my region.

19             I monitor the work units, the work

20   produced.

21             I determine if there's positions needed at

22   the offices.

23             Any purchases come through me.

24             Training.  If they want to attend a

25   training, that comes through me.

1          Any issue that a warden might have with my

2    staff comes through me.  Vice versa.

3          Q.   Do you directly deal with the institutional

4    parole officers or is there any position in between?

5          A.   Yeah.  There are layers.  I supervise four

6    DA IIs, district administrator IIs.  There's four

7    zones.  So I directly supervise the four DA IIs.

8          And then they each supervise approximately

9    five sites within their zone as well as their own.

10          And some of the sites -- each parole office

11    has a supervisor.  We call it a chief administrative

12    officer.  Although I do not provide direct supervision

13    to the CAOs, I do communicate with them on a regular

14    basis as far as new procedures, protocols.

15          Q.   So in your supervisory capacity would most

16    of your communications be with the DA IIs and IPOs?

17          A.   Yes.  Correct.  I would expect my

18    supervisors to talk to their staff.

19          Q.   Are there any rules or regulations that you

20    have to follow in this position?

21          A.   Yes.  There's a lot.

22          Q.   Are there parole and probation --

23          A.   Yes.

24          Q.   -- regulations?

25          A.   Uh-huh.  I mean, Department of Corrections'

1   policy.  We have to abide by the department's policy

2   and procedures.  And probation and parole's policy and

3   procedures.  There's a lot of procedures.

4        Q.   So going back a bit to what we talked

5   about, your roles were in overseeing the parole -- the

6   institutional parole offices.  About how much time

7   would you say you allocate between those

8   responsibilities?

9             I can rephrase if that will help.

10       A.   Okay.

11       Q.   Would you say you spend more of your time

12  drafting and revising policies, or communicating and

13  training the officers and --

14       A.   Communicating and training is what I spend

15  the majority of my time doing.  Answering email.  I

16  cannot keep up with my email in one day.

17       Q.   I understand that.

18       A.   There's 21 sites asking me what to do every

19  day.  How to hire somebody.  How to discipline

20  somebody.

21            Yes.  How -- how to do a log note.

22            Why won't the warden fix the mold issue in

23  the office.

24            Discipline issues.  I spend a lot of time

25  supporting, encouraging my supervisors.

1    Q.   So as far as the institutional parole

2    officers, are you kind of the final decisionmaker on

3    how those are run and how they're conducting their

4    jobs?

5         **A.   You could say that, yes.  I mean, not**

6    **everything gets to my level necessarily.  But, yes, I**

7    **mean, it's my -- they have to just -- if they want to**

8    **hire somebody everything comes through me from all of**

9    **those offices.**

10        **Like, if they can't fill a position, I tell**

11   **them if they can or if they can't.  I approve anybody**

12   **that is hired.**

13        **All the discipline comes through me.**

14        **If they can buy a stapler, it comes through**

15   **me.**

16        Q.   How about the substance of the interactions

17   with the offenders, do you kind of set the procedures

18   and protocols for how that interaction takes place?

19        **A.   Well, there's expectations that they use,**

20   **motivational interviewing skills, and treat the**

21   **offenders with dignity and respect.  I mean, that's our**

22   **mission and vision and values.  I hold them accountable**

23   **to that.**

24        **If I would find out that they weren't doing**

25   **that then I would certainly have a discussion with**

1   them.

2           I mean, there are expectations and they're

3   held responsible for those.  And they learn those in

4   training, in new staff training.  And they're -- those

5   things are in policy and procedure.  There's a code of

6   conduct.

7       Q.   As the probation and parole regional

8   administrator, do you attend parole board meetings?

9       A.   Yes.

10      Q.   Do you attend all parole board meetings?

11      A.   Most of them that are open to other people

12  other than the parole board.

13      Q.   So some are closed just to parole board

14  members?

15      A.   Yes.

16      Q.   What is your role in those meetings?

17      A.   To represent my staff, who work for the

18  parole board, who prepare the reports for them, so they

19  can make informed decisions and release dates.

20      Q.   So will you be responsible for kind of

21  communicating what's in a specific report or is your

22  role there more general?

23      A.   General.

24      Q.   Do you go over topics or trainings?

25      A.   Yes.

1        Q.   Are you ever involved in voting?

2        **A.**   **No.**

3        Q.   Have you ever attended a parole board

4 meeting where the board is discussing or considering a

5 specific offender's parole release?

6        **A.**   **No.**

7        Q.   Who do you currently report to?

8        **A.**   **Julie Kempker, the chief state supervisor.**

9 **And the parole board chairman, Kenny Jones.**

10       Q.   And what's the role of the chief state

11 supervisor?

12       **A.**   **She oversees the regional administrators.**

13 **What I do.  She deals with the everyday probation and**

14 **parole issues.**

15          **Where the chairman is, like, the Appointing**

16 **Authority, he signs off on discipline, hiring for**

17 **certain positions, where the chief state supervisor**

18 **director provides direct oversight over the regional**

19 **administrators.**

20       Q.   When you say the regional administrators,

21 there's you, who does the institutions, and then there

22 are other regional administrators for the field office?

23       **A.**   **Yes, correct.**

24       Q.   Does Ms. Kempker also report to

25 Kenny Jones?

```
 1          A.   Yes.
 2          Q.   Do you have any interactions personally
 3    with offenders in this role?
 4          A.   No.
 5          Q.   Is there anything about your job
 6    responsibilities as a probation and parole regional
 7    administrator that we haven't discussed?
 8          A.   There might be other things I do, but I
 9    don't remember everything right now.
10          Q.   But we talked about your main job
11    responsibilities?
12          A.   Correct.  Yes.
13          Q.   Have we discussed all the positions that
14    you've had as a Department of Corrections' employee?
15          A.   Yes.  Well, I did forget one thing.  When I
16    was the -- well, I said I was the workplace violence
17    prevention coordinator.  I didn't really talk about
18    that.
19               But I was -- I also did that with the
20    emergency.  And so it was in that role I oversee all
21    the peer-action care team members over the whole state.
22               And basically what those people do are
23    provide support to other staff if they've had a
24    traumatic experience.  It was a program, like a
25    peer support program, and I oversaw that as well.
```

```
 1          Q.   And that was your workplace violence
 2    coordinator role?
 3          A.   Yes.
 4          Q.   Anything else?
 5          A.   I think that's it.
 6          Q.   Forgive me if I asked you this question:
 7    Did you receive any formal training when you started as
 8    the probation and parole regional administrator?
 9          A.   Yes.  And you did not ask me that.  I went
10    to executive excellence training.  National Institute
11    of Corrections puts that on.  It was two weeks in
12    length, and it was in Colorado.
13               And the other was on-the-job training
14    informal.
15          Q.   For the executive excellence training, what
16    types of topics did that cover?
17          A.   Leadership training.  Primarily.
18          Q.   Was there any legal training?
19          A.   No.
20          Q.   Anything about how to implement policies
21    and procedures?
22          A.   No.
23          Q.   Anything about any psychology-type courses?
24          A.   No.
25          Q.   Or topics that covered juvenile development
```

1    or adolescence?

2         A.   No.

3         Q.   Have you received any training while at the

4    Department of Corrections on motivational interviewing?

5         A.   Yes.

6         Q.   When would that have been?

7         A.   Oh, I have this highlighted.

8    December 29th, 2016.  And April 28th, 2014.

9         Q.   I'm going to hand the document to the court

10   reporter to mark as Exhibit 2.

11              (Deposition Exhibit No. 2 was marked for

12   identification.)

13   BY MS. ZIMMERMAN:

14        Q.   So this document that the court reporter

15   just marked as Exhibit 2, is this your training

16   history?

17        A.   The last four years.  Just since I've been

18   in this position.

19        Q.   And who puts on these trainings?

20        A.   Some of them are provided by our

21   department's training academy.  Some were conferences.

22        Q.   Were any of these trainings specific to

23   Senate Bill 590?

24        A.   No.

25        Q.   Or to juvenile life without parole

1    offenders?

2         A.   No.

3         Q.   Have you received any formal training at

4    Department of Corrections on adolescent development?

5         A.   No.

6         Q.   Child psychology?

7         A.   No.

8         Q.   Risk assessment tools?

9         A.   Yes.

10        Q.   And what kind of training did you have on

11   risk assessment tools?

12        A.   Well, I do the training on salient factor

13   score, so I'm considered a subject matter expert in

14   that.

15        Q.   So what is the salient factor score?

16        A.   It's a tool that we use to help the parole

17   board determine parole guidelines.  It's just a tool to

18   help identify risk and need of the offender.

19        Q.   What risk of the offender?

20        A.   It looks at conduct violations.  Substance

21   abuse issues.  Program completion.  Among other

22   variables, both statics and dynamic.

23             It's a tool that we feel like has been

24   validated to help determine possible risk of the

25   offender.

1           And that's how we apply the parole

2   guidelines.  We use this tool.  And depending on their

3   score, and sentence, length, type of sentence, we have

4   parole guidelines that the parole board uses for

5   release dates.

6        Q.   So this score considers all the factors you

7   just described?

8        A.   More, but I don't have all of them

9   memorized.

10       Q.   Sure.

11            And then it provides a -- some type of

12   score as to the offenders risk of re-offending?

13       A.   Correct.

14       Q.   Is that correct?  Is that used in all

15   parole hearings for all offenders?

16       A.   Yes.

17       Q.   Including juvenile life without parole

18   offenders?

19       A.   Yes.

20       Q.   Have you received any formal training at

21   the Department of Corrections on the law?

22       A.   Constitutional law.  Missouri statutes.

23   Regulations.  Yes.

24       Q.   Can you describe those?  What you were

25   trained on?

1          A.   I believe it was constitutional law.   And

2     it would have been in 1994.

3          Q.   So just at that initial four-week training?

4          A.   Yes.

5          Q.   So you mentioned that you're a salient

6     factors expert -- subject matter expert?

7          A.   Yes, you could say that.

8          Q.   So you conduct training on the salient

9     factor score?

10         A.   I have.

11         Q.   Who do you provide those trainings for?

12         A.   The last time I did it it was for the

13    parole board.  And I just explained the variables, just

14    to make sure that they had a good understanding --

15    because there were several new board members -- of the

16    different things that my staff look at when they score

17    the tool.

18         Q.   Are there any other topics that you conduct

19    trainings on?

20         A.   Not formally.

21         Q.   Informally?

22         A.   Well, I train my staff every single day on

23    different issues.  I don't conduct formal training at

24    our training academy as part of my job duties.

25         Q.   Do you coordinate or arrange for other

1   trainings?

2          A.   Yes.  If I see there's a need in my region

3   for a training.

4              I have a regional training coordinator,

5   which is what I used to do, and she will coordinate the

6   training, find somebody to do the training, or do the

7   training herself.  If I see a need arises for some type

8   of training, that there's a lesson plan.  We have to

9   have lesson plans to conduct training in our

10  department.  There has to be an approved lesson plan.

11  Which I have for all of the trainings that we provide.

12         Q.   So you can't just host a training?

13         A.   Yes.  Correct.

14         Q.   It has to be approved what you're going to

15  be going over?

16         A.   Yes.  Yes.  It's very -- there's a lesson

17  plan form and a curriculum.

18             Our training academy is very particular.

19  So basically if there's a lesson plan, anybody can use

20  that lesson plan and train on it.

21         Q.   So in your current role most of the

22  training responsibility falls to the --

23         A.   Regional training coordinator.  And the

24  training academy, correct.

25         Q.   Do you know if the parole board has

1   received any training regarding adolescent development?

2        **A.   I don't know.**

3        Q.   Or the district administrators?

4        **A.   I don't believe so.**

5        Q.   Or the IPOs?

6        **A.   No.**

7        Q.   Has the parole board received any training

8   regarding juvenile life without parole sentences or

9   Miller versus Alabama?

10        **A.   I don't know.**

11        Q.   What about the district administrators?

12        **A.   No.**

13        Q.   The IPOs?

14        **A.   No.**

15        Q.   Has the parole board received any training

16   regarding child psychology?

17        **A.   I don't know.**

18        Q.   Have the district administrators?

19        **A.   Not that I'm aware of.  Not anything formal**

20   **that I'm aware of.  I mean, not my district**

21   **administrators.**

22        **Other than if they attended -- you can**

23   **attend a training outside the department.  Or we've had**

24   **specialized trainings where we bring outside trainers**

25   **in.  Has that occurred on that topic?  Possibly.  But**

PohlmanUSA Court Reporting
(877) 421-0099    PohlmanUSA.com
Case 2:17-cv-04082-NKL  Document 134-10  Filed 06/12/18  Page 44 of 122

1    there's not a formal lesson plan on that that our

2    academy does.

3         Q.   As far as you know the IPOs also haven't

4    received any formalized training on child psychology?

5         A.   No.

6         Q.   Do the IPOs have required hours of

7    training?

8         A.   Yes.

9         Q.   Is that per year?

10        A.   Forty hours per year.

11        Q.   And the district administrators?

12        A.   Same.

13        Q.   The parole board?

14        A.   Yes.  The same.

15        Q.   Are there required topics that they cover

16   each year or just any lesson plan?

17        A.   Any training.  Supervisors within that

18   40 hours have to have 16 hours of management training.

19   Sixteen of it has to be management training if you're a

20   supervisor.

21        Q.   And so that means the training would be

22   more focused on --

23        A.   -- on the leadership.

24        Q.   -- not the administrative, not the

25   substance of the parole procedures?

```
 1        A.   Right.  Not everyday operations, correct.

 2        Q.   Have the IPOs received any training

 3   regarding Senate Bill 590?

 4        A.   No.

 5        Q.   When I refer to Senate Bill 590, do you

 6   know what I'm talking about?

 7        A.   Yes.

 8        Q.   Have the district administrators received

 9   any training regarding Senate Bill 590?

10        A.   No.

11        Q.   The parole board?

12        A.   I don't know.

13             I would like to take a break.

14             (A break was taken.)

15   BY MS. ZIMMERMAN:

16        Q.   Are you familiar with Miller versus

17   Alabama?

18        A.   No.

19        Q.   Are you familiar with Montgomery versus

20   Louisiana?

21        A.   No.

22        Q.   Are you aware of litigation by

23   Missouri offenders subject to those two cases?

24        A.   I'm only familiar with this, what this is

25   about.  I'm not familiar with any other litigation.
```

```
 1          Q.   So you're familiar -- are you familiar with
 2   Senate Bill 590?
 3          A.   Yes.
 4          Q.   Have you read it?
 5          A.   In 2016.
 6          Q.   When it first came out?
 7          A.   Correct.
 8               (Deposition Exhibit No. 3 was marked for
 9   identification.)
10   BY MS. ZIMMERMAN:
11          Q.   I'm handing you what's been marked as
12   Exhibit No. 3.
13               Are you familiar with that document?
14          A.   Yes.
15          Q.   Are you aware of what it provides?
16          A.   Yes.
17          Q.   Are you familiar with the factors that it
18   sets forth to be considered during a parole hearing?
19          A.   Yes.
20          Q.   So what is your understanding of what
21   Senate Bill 590 provides?
22          A.   Well, it's what I used to incorporate the
23   elements into the parole hearing worksheet used for the
24   juvenile life without parole hearings.
25               I used -- I just used this senate bill, and
```

1    I went through the elements, and I identified the

2    elements that were not in the worksheet for my

3    institutional parole officers to ask and assess during

4    the prehearing interview.

5           So I basically -- I just took this, and

6    any -- if that element was not in this worksheet, I

7    added it to the worksheet.

8           Q.   So maybe what we'll do, we'll skip ahead to

9    the worksheet that you were discussing.

10          A.   Okay.  I mean, I understand that this

11   allows the offenders to petition the board for a parole

12   hearing if they were a juvenile.

13          (Deposition Exhibit No. 4 was marked for

14   identification.)

15   BY MS. ZIMMERMAN:

16          Q.   So I'm handing you what's been marked as

17   Exhibit 4.

18          Is this the -- if you kind over flip a page

19   or two, is this the worksheet that you were referring

20   to?

21          A.   Yes.  Uh-huh.

22          Q.   And describe what this worksheet is?

23          A.   Yes.  I took the prehearing worksheet that

24   we used for all parole hearings, and added the elements

25   that were not in the current one we use for parole

1    hearings just for these juvenile life without hearings.

2    If that makes sense.

3             I just took the worksheet that I've -- that

4    the IPOs, by procedure use now for pre-hearings --

5    prehearing reports.  And I just added the elements that

6    weren't addressed already into the worksheet.

7         Q.   So the original worksheet that is used in

8    all --

9         A.   Right.

10        Q.   -- parole hearings or parole interviews?

11        A.   Yes.

12        Q.   Did you create that worksheet?

13        A.   I had -- I was involved in the creation of

14   it, yes, 24 years ago.  And it's just evolved over

15   time.  And I've been involved at different times.

16        Q.   And who is involved in creating and

17   updating that worksheet?

18        A.   I have an institutional parole officer

19   training committee in our region and they help update

20   the worksheet as well.

21        Q.   You said in our region?

22        A.   My institutional parole region.  Because

23   we're considered a region.  So it's all the IPOs.

24             This training committee, they also --

25   they're the ones that conduct the new institutional

1    parole officer training I was talking about, the

2    three-day training.

3              So we've incorporated different components

4    over the years if policy changes.  Or maybe when I'm

5    looking at various reports, I'll see that maybe

6    something needs to be clarified in this worksheet that

7    they should ask the offenders that might help them do

8    their job.  Because they go through this when they're

9    interviewing the offender before the hearing.  This

10   reminds them what to ask, basically.  It's a tool.

11        Q.   Are the questions on that worksheet

12   mandatory?

13        A.   They are mandatory, yes, on this juvenile

14   life without worksheet.

15        Q.   But not necessarily on the regular

16   worksheet, for lack of a better word?

17        A.   Yes.  They're mandatory.

18        Q.   Are IPOs trained on how to use this

19   worksheet?

20        A.   Yes.

21        Q.   And are they trained to ask every single

22   question on there?

23        A.   If it's applicable.  Some of these

24   questions may not be totally applicable.

25        Q.   And how is that determination made?

1          A.    Well, if they say they do not have a

2    substance abuse problem, they would not ask them what

3    drugs they used, when they used it.  On page five, as

4    you can see, there's a whole chart.

5          Q.    And so if it was determined that someone

6    did not have a substance abuse issue that chart would

7    probably not get filled in?

8          A.    Correct.  And then on page six there's a

9    lot of different questions that may not be asked

10   depending on their use of substances.

11         Q.    And so that is left up to the IPO

12   conducting the hearing?

13         A.    Yes.

14         Q.    And are they trained on how to exercise

15   that discretion?

16         A.    Yes.  We spend almost an entire day on

17   interviewing and using this worksheet in our new IPO

18   training.

19         Q.    Can the IPOs ask questions that are not

20   contained on this worksheet?

21         A.    Yes.

22         Q.    Is that also left to their discretion?

23         A.    Yes.

24         Q.    Is it suggested that they ask questions

25   outside of this worksheet?

1          A.   It would depend.  If there's something --

2    if there are some significant issues with domestic

3    violence, sex-offending behavior, conduct violations,

4    there may be more probing questions to give a thorough

5    assessment.

6               So if there's an area that they need to

7    expand on for the parole board to make a decision in

8    those cases it would be encouraged.

9               Part of motivational interviewing skills.

10   But, yes, they can ask additional questions if it's

11   appropriate.  They're not supposed to be answering

12   questions that would not be appropriate.

13        Q.   So would you say generally the main -- or

14   all the topics that would be covered in a prehearing

15   interview are contained in this worksheet?

16        A.   Yes.

17        Q.   Questions that would be asked outside of

18   this worksheet would be more in-depth probing questions

19   on these topics?

20        A.   Yes.  Correct.

21        Q.   And does all of that hold true for the

22   juvenile life without parole prehearing worksheet?

23        A.   Yes.

24        Q.   Were the IPOs trained on how to complete

25   that worksheet?

1         A.    They were sent the worksheet.  I emailed

2    the worksheet to them.  I'm -- the worksheet was sent

3    to the supervisors with my expectation that they would

4    have explained the additional elements in this

5    particular worksheet, and I highlighted those for their

6    staff to be aware of.

7         Q.    Do you know if that truly occurred in all

8    of the institutions?

9         A.    No.  I am assuming that it did.  I hope

10   that it did.

11        Q.    But you can't say positively that it

12   occurred, that that type of training and guidance was

13   given in every institution?

14        A.    Correct.

15        Q.    So is it possible that an IPO would not be

16   aware of the mandatory questions they had to ask in the

17   juvenile life without parole worksheet?

18        A.    No.  Because they're on the sheet that

19   they're supposed to ask.  I mean, they are provided for

20   them.  Unless they didn't see it or forgot about it.

21   But it outlines what they're supposed to ask.

22             I would hope that they use the worksheet

23   and spell out every word to the offenders, but I can't

24   state that every one of them did.  I don't know of any

25   case that they did not.

1        Q.   And is this worksheet only filled out based

2  on the interview with the offender?

3        **A.   Yes.**

4        Q.   So other information or documents from the

5  parole file would not make their way into the

6  worksheet, correct?

7        **A.   What do you mean by documents?**

8        Q.   So, for example, I know that in the

9  prehearing report there will be an official version of

10  the present offense that would not be reflected in this

11  worksheet.  This worksheet would reflect the offender's

12  description of the present offense; is that right?

13        **A.   No.  This -- this is the same as the other**

14  **worksheet.  They're going to report the same**

15  **circumstances of the offense that they would in a**

16  **normal hearing.**

17        Q.   Let me clarify my question for you.  So

18  this worksheet eventually becomes a prehearing report;

19  is that correct?

20        **A.   Correct.**

21        Q.   And that report will contain information

22  from other documents in the parole file; is that

23  correct?

24        **A.   Correct.**

25        Q.   Whereas this worksheet will not reflect

1  information aside from what occurs in the interview;

2  is that correct?

3      A.    Well, this is what they use to interview

4  the offender.  Then they type a report up.  So when

5  they type the report up, they'll see the official

6  circumstances, if there are any, in other documentation

7  in the file.  This is just an interview worksheet.

8      Q.    And that is what I was getting at.

9      A.    I'm sorry.

10     Q.    As they're going through, are they looking

11  at an official record, you know, of conduct violations?

12  Or just based on the conversation?

13     A.    No, they should be looking at everything.

14  When they pull the offender in to interview him, yes,

15  they should have all of that information.

16         They should have scoured the file before

17  they talk to the offender.  And they should know

18  everything going on, every conduct violation, they

19  should know that.

20     Q.    Is the material in that file shared with

21  the offender?

22     A.    No.

23     Q.    So they wouldn't be bringing those

24  documents with them to the interview?

25     A.    No.  No.  I mean, they should know.  They

1    should have known, probably, you know, taken notes.

2              No, they're not shown to the offender.  But

3    they have should have done their homework and looked

4    everything up before they talked to the offender.

5         Q.   Are the IPOs expected to take notes

6    directly in this document?

7         A.   As long as they ask every question, I guess

8    they could put it on another piece of paper.  It

9    wouldn't have to be on this one.  But they're going to

10   have to use all of these questions.

11        Q.   So do you anticipate this is enough space

12   for the notes taken during the interview?

13        A.   Probably not.  It's already 13 pages.  It

14   may not be enough space.  They may have to use

15   additional paper.

16        Q.   Because of the amount of information

17   they're supposed to be collecting?

18        A.   Right.  Yes.

19        Q.   Going back, when we were discussing the

20   creation of these worksheets, you mentioned an IPO

21   training committee.  Who else is on that committee?

22        A.   Anita Vandoren.

23              Other -- it's other -- my staff.  Just

24   there are supervisors and officers.  Probation and

25   parole officers.  And any regional training

```
 1    coordinator.

 2              Do you want their names?

 3        Q.   I don't need their names.  I'm more

 4    interested in the positions that are involved.

 5        A.   Oh, okay.

 6        Q.   If that makes sense.

 7        A.   Yes.  My regional training coordinator.

 8              I have a couple supervisors on the

 9    committee.  And POs, probation and parole officers, on

10    this committee.

11        Q.   Would those IPOs?

12        A.   Yes.  Yes.  Only IPOs.  Correct.

13        Q.   Did that same committee make the

14    revisions --

15        A.   No.

16        Q.   -- pursuant to Senate Bill 590?

17        A.   No.

18        Q.   Was that just you?

19        A.   No.  Myself and Aaron Jarrett.

20        Q.   And who is Aaron Jarrett?

21        A.   He's a unit supervisor at South Central

22    Correctional Center.  And I chose him because of our

23    work units.

24              I have various sites that have those cases.

25    And I was looking for some help.  Somebody that I
```

1    thought could help me put all this in the worksheet.

2              And I looked at our work units, and I felt

3    like, depending on the workload at Licking, in Licking,

4    Missouri, that he would have the time to help me with

5    that.

6              And that was the only reason I selected

7    him.  He didn't have more experience than any other.  I

8    just looked at all my sites that have those types of

9    cases and thought that he could help me.  And he has

10   been on the training committee.  He's not currently.

11        Q.   So he was not chosen because of any

12   particular expertise?

13        A.   No.

14        Q.   It was because he had time?

15        A.   I felt that he had the time to do that,

16   yes, 'cause he has three employees.

17        Q.   And so how did you go about revising the

18   worksheet?

19        A.   I sent him the worksheet.  This work -- the

20   regular worksheet for -- which he has already.  But I

21   sent this to him.  And I sent the Senate Bill 590.  And

22   highlighted the elements that needed to be included in

23   the worksheet.  And asked him to incorporate those

24   elements in the appropriate section of the worksheet.

25        Q.   And in looking at Exhibit 3, the

1    Senate Bill 590, can you identify where -- what those

2    elements are that you highlighted for him to add to the

3    worksheet?

4         **A.   You mean in the worksheet itself?**

5         Q.   Um, first of all, in the bill, and then

6    we'll go through the worksheet and see where you added

7    them.

8         **A.   No, I don't know off the top of my head.**

9    **I'd have to go through it all.**

10        Q.   If you would look at page two, section

11   five.  You'll see numbers 1 through 5.

12        **A.   Okay.  Yes.  Like No. 1, efforts made**

13   **towards -- okay.  I see those in here.**

14        Q.   Were those the factors that you asked him

15   to include in the worksheet?

16        **A.   Yes.  But some of these were already in the**

17   **worksheet.  Like, the person's institutional record**

18   **during incarceration.  We already had that in the**

19   **worksheet.**

20             **So the elements that I did not feel were**

21   **adequately addressed in the worksheet I added.  And I**

22   **actually have them highlighted in the worksheet.**

23        Q.   So the highlights reflect the additions

24   that were made?

25        **A.   Yes.  Correct.**

 1          Q.   Do you know how Mr. Jarrett went about

 2    adding these to the worksheet?

 3          **A.   Well, I asked him to take each element and**

 4    **review it to make sure that if we didn't cover it that**

 5    **it be included.  And putting it in the section that it**

 6    **was most applicable.  For example, under present**

 7    **offense, we added the extent of the defendant's**

 8    **participation in the offense.**

 9          Q.   As far as you're aware, did he mostly take

10    the language from Senate Bill 590 and insert it into

11    the worksheet in the various places where it made

12    sense?

13          **A.   Yes.  And I reviewed it.  Two years ago.**

14          Q.   Did the two of you discuss how these new

15    elements or factors should be analyzed or discussed

16    with the offender?

17          **A.   Yes.**

18          Q.   Can you describe a little bit about what

19    you talked about?

20          **A.   I elaborated on each element.  And what**

21    **information we should be reporting to the probation and**

22    **parole board.**

23          Q.   So, for example, if you look on page two of

24    the worksheet, where it says the defendant's age,

25    maturity, intellectual capacity, and mental and

1    emotional health and development at the time of the

2    offense, how did you envision that that is assessed in

3    this interview?

4         **A.    One would be if we had official**

5    **circumstances of the offense.  Such as a police report,**

6    **a PSI, presentence investigation.  Some of the**

7    **information may be included in one of those reports.**

8    **And then the officer.  We'd probe into those elements.**

9         Q.    What types of things do you think the

10   officer would ask about to get an understanding of that

11   particular element?

12        **A.    If there was information about their**

13   **maturity, possibly, or intellectual capacity at that**

14   **time, in the police report.  Or a presentence**

15   **investigation.  Or any file material that was**

16   **available.**

17             **There are cases -- and I have this in the**

18   **worksheet.  The medications may have been in one of**

19   **those reports or case reference material.  Or if**

20   **there's an official diagnosis, or their IQ at that**

21   **time.  And your questioning of the offender.**

22        Q.    So on that last piece, the questioning of

23   the offender, what types of questions could an IPO ask

24   that would indicate the offender's maturity at the time

25   of the offense?

```
 1                    (Mr. Ault left the deposition.)

 2                    THE WITNESS:  I think just talking to them,

 3       they may have a better understanding of that.  Just in

 4       the interviewing of the offender.  And talk about their

 5       participation in the offense.  If they admitted to the

 6       crime.  What their role was.

 7                    Are they experts in that?  No.  No.

 8       They're not.

 9       BY MS. ZIMMERMAN:

10            Q.   So for that piece that we've been looking

11       at, there's no specific questions regarding that

12       element that you had in mind --

13            A.   No.

14            Q.   -- in putting this together?

15            A.   No.  When they first come in the department

16       they have an IQ test.  That's all in the file material

17       at the time they were received.

18            Q.   Is that the Diagnostic Center report?

19            A.   Yes.  So my staff have all that.  They

20       would know any diagnosis.  Any medications.  Their IQ.

21       They would know if there was abuse 'cause they're gonna

22       ask them about that.

23                    Their childhood.  They're going to ask them

24       everything about that, and if there was a poor

25       upbringing.  They'll know that in their other questions
```

1    throughout the report in the family section.

2         Q.   And you're saying they'll know about that

3    from the Diagnostic Center report?

4         A.   No.  Well, no.  They would know that in the

5    interview with the offender, because they would ask

6    them that, "was there any abuse growing up?"

7         Q.   Were the IPOs trained on how to assess

8    whether an offender's accepted accountability?

9         A.   No.  There's not formalized training.

10   Other than motivational interviewing.  Just interview

11   skills, and coming out and asking them if they -- what

12   their participation was in the crime.  What their role

13   was.

14              They could come out and ask them if they

15   accepted responsibility.  What they -- what it is that

16   they thought they did wrong.  Or vice versa.

17        Q.   And if the offender is asserting innocence,

18   how is that handled?

19        A.   That would be acknowledged and they would

20   continue the questioning.

21              They may ask them if they didn't do it,

22   then what other role -- if there was another

23   role that they played in the crime.

24              They're not the police.  And they're

25   interrogating them.  This is an assessment, you know,

1    to prepare their report to the board.

2         Q.   So Mr. Jarrett made -- was the one that

3    made the changes to the worksheet, correct?

4         A.   Yes.

5         Q.   And you reviewed those changes?

6         A.   Correct.

7         Q.   Did you make any changes from his changes?

8         A.   I don't remember that.  I may have.  I'm

9    pretty particular.  I may have added something in a

10   different section, but I really don't recall.  But I

11   did review it.

12        Q.   Is the highlighted version what was sent

13   to --

14        A.   Yes.

15        Q.   -- the IPOs?

16        A.   Correct.  Uh-huh.

17        Q.   So they were aware of what the changes were

18   specific to juvenile life without parole hearings?

19        A.   Yes.

20        Q.   Were they educated on Senate Bill 590?

21        A.   Educated as they were sent the bill.  And

22   they were given a summary of the elements that needed

23   to be considered by the board at the time of the

24   hearing.

25        Q.   Aside from considering additional elements,

1    were they instructed to conduct this interview any

2    different than a normal interview?

3         A.    No.

4         Q.    So they were asked just to ask a few more

5    questions; is that accurate?

6         A.    Yes.  Correct.

7         Q.    And instances where the worksheet doesn't

8    spell out a question, is it up to the IPO to formulate

9    their own question that gets at that issue?

10        A.    Yes.

11        Q.    So, for example, on page seven, where

12   you'll see the highlights that say efforts made toward

13   rehabilitation --

14        A.    Uh-huh.

15        Q.    It would be up to the individual IPO to ask

16   questions to better understand efforts made toward

17   rehabilitation?

18        A.    Yes.

19        Q.    Compared to page eight, where there are

20   specific questions laid out formally?

21        A.    Yes.  The subject matter is a little

22   different.  Education is a little bit different than

23   mental health.  I mean, education is more yes or no,

24   what they have done, what they haven't done.  What

25   they're on the waiting list to do.  What they're

1   interested in.

2        Q.   Is programming provided at all based on the

3   type of sentence an offender has?

4             For example, are certain offenders not

5   eligible for certain programs.

6        **A.   Every prison has different programs.**

7   **They're put on a waiting list.  I don't think anyone's**

8   **necessarily excluded, but I'm sure there are some, like**

9   **vocational-type programs that there's certain criteria**

10  **for that that not every offender would be eligible for.**

11            **Maybe if there's a parenting class, no,**

12  **there's no -- there's no eligibility requirements for**

13  **that.**

14            **Or acre management.  They could just sign**

15  **up for that.  Like, heavy equipment operation, yes,**

16  **there's going to be.  So it depends on what the topic**

17  **is.  What the -- and there are long waiting lists, and**

18  **they're not all able to enter and complete a program.**

19  **And I'm sure that's based on the need, depending on**

20  **what the class is, at some of the sites.**

21       Q.   And some of that is institution based?

22       **A.   Right.  It's totally based at each site,**

23  **correct.**

24       Q.   I notice that on pages 9 and 11 categories:

25  Transition supervision plan and the other home

 1    assessment plan.

 2         A.   Yes.  So on my transition supervision plan,

 3    is that where you're starting?

 4         Q.   Yes.  And then on 11 is home plan

 5    assessment.

 6         A.   Okay.

 7         Q.   How do those categories differ?

 8         A.   Well, the transition supervision plan is

 9    more broad.  What's their goals -- goals upon release.

10    That's -- it's more discussion about assessing

11    their motivation, their goals upon reentry, in terms of

12    long-term and short-term goals.

13              Whereas home plan assessment is strictly,

14    you know, the home plan that they're going to -- are

15    you going to your mom's?  Have you -- were you there

16    before?  Can she provide you support?  You know, what

17    does she do?

18              The home plan assessment is more specific

19    about the physical location and the support that

20    they're going to receive.  Or lack thereof.  The

21    relationship of the person that they're going to live

22    with.

23              Does that make sense?

24         Q.   It does.

25         A.   Okay.

1        Q.  So am I correct that the very last section

2  on page 12 is assessment and recommendation?

3        A.  Yes.  That's where they -- it's like a

4  summary of the whole document.  And they highlight

5  significant assets and liabilities of the offender.

6        Q.  And that's spelled out in the prehearing

7  report?

8        A.  Yes.  You mean in the assessment and

9  recommendation?  Yes, they should be highlighting any

10  areas of particular -- if there's any risk, you know,

11  that they need to bring forth to the attention of the

12  parole board.  It's a good place to include that

13  information in the assessment and recommendation.

14           Like, their overall assessment of the

15  person.  Their assets and liabilities, and what they're

16  recommending as special conditions, and a release date

17  for the offender.  They would highlight all those

18  things there.  Formulate a summary, so to speak.

19        Q.  Are they -- are the IPOs trained on how to

20  weigh and balance these factors to make an assessment?

21        A.  We are training on that right now, as a

22  matter of fact, yes.  I have another committee working

23  on samples of good assessments and recommendations, and

24  things to take in consideration when writing that

25  portion of the report.

1          Yes.  This is a work in progress.  We're
2     always enhancing the quality of our reports for the
3     parole board.
4          Q.   Is there a general understanding provided
5     that, you know, if you answer this question yes, it's a
6     positive, if you answer this question no, it's a
7     negative, without numerically doing so to balance the
8     responses they get in the interview to determine a
9     recommendation?
10          A.   No.  They report their assets and
11     liabilities, both.  Strengths and weaknesses, both.  I
12     mean, they don't necessarily -- they're reporting the
13     facts.
14          Q.   They're reporting the facts and they're
15     also --
16          A.   -- making a professional assessment, yes.
17     They're making a professional assessment about their
18     behavior while they're -- they've been
19     institutionalized.
20          There could program completion.  They're
21     looking at the whole picture.  They're looking at
22     everything, to get the opinion -- the best assessment
23     they can.  I mean, they should be noting the positives
24     as well as any negatives.
25          Q.   So how do they determine what is a positive

1    versus what is a negative?

2         A.    Strengths would be -- they have been

3    trained that strengths would include education.  A good

4    family support.  Lack of substance use.  Program

5    completion.  Receiving minimal to no conduct violations

6    would be a strength.

7              I'm sure that they have received that

8    training in the training that they go to, and I can't

9    think of the name of the class.  They understand what

10   their strengths and weaknesses would be.

11        Q.   Is the offender told what the

12   recommendation is going to be?

13        A.    No.

14        Q.   Would it be a problem if they were?

15        A.    I have -- just had a staff member that was

16   assaulted.  I believe that would be a problem.  They

17   work in the housing units with the inmates.

18        Q.   I guess my question was more would it be a

19   violation of some procedure if an IPO told the offender

20   what their recommendation was going to be?

21        A.    It's not the practice that we share -- that

22   the IPO share the recommendation with the offender.

23   That is not the direction they've been given.

24              They've been given direction not to share

25   what their particular recommendation is with the

1    offender.  They may not know what their recommendation

2    is going to be during the interview with the offender.

3    It's based on a lot of -- when I was an IPO, I didn't

4    know what I was going to recommend during the

5    interview.  Especially -- these are serious cases.  And

6    so I would hope that they put a lot of thought into it

7    and that they wouldn't know that at that particular

8    time yet.

9        Q.   So you mentioned that you know the IPOs

10   have been given direction, that that's not the

11   procedure.  Aside from formalized trainings that we've

12   discussed, how are directions like that given to the

13   IPOs across the state?

14       A.   Memos.  Emails.  Meetings.  Meeting

15   minutes.  If something isn't spelled out in procedure,

16   then we operate off of memos and emails.  Office

17   training.  Just business practices of an office.

18            When they're being trained, they're told

19   that, after they complete new staff training, then they

20   have on-the-job training.  And mentoring and coaching

21   with different assigned staff.  And their supervisor.

22   And those -- anything that's not clarified in policy

23   and procedure would be -- they would be -- would

24   receive that direction then.

25       Q.   Is direction always given to all the sites?

1   Or are there times when maybe you receive an email

2   question and you're just kind of clarifying something

3   for one group or another group?

4        A.   Both.  I may just -- yes, I may just answer

5   one person's question.  When I answer their question, I

6   might reply to everybody so they all know if they had

7   this question, here's the answer.

8             Or any direction that -- any new direction,

9   or any direction that needs to be -- information that

10  needs to be distributed I distribute to all the

11  supervisors.

12       Q.   Would you say that one of your

13  responsibilities is ensuring kind of consistency of

14  direction and of procedure?

15       A.   Yes.

16       Q.   Across all of the sites?

17       A.   Yes.  That's what I've been working on for

18  the last four years.

19       Q.   So turning back to the elements in

20  Senate Bill 590 that we looked at earlier.  As we kind

21  of noted the first one was efforts toward

22  rehabilitation; is that correct?

23       A.   Yes.

24       Q.   So could you point out for me in the

25  worksheet where efforts toward rehabilitation is

1    assessed?

2        A.    Well, first of all, I would hope that the

3    officer looks at the totality of any strength that the

4    offender has.  Good conduct would definitely be an

5    effort towards rehabilitation.  And I see that we did

6    have that in the worksheet.

7              Any programs that they've completed would

8    be an effort towards successful release.

9    Rehabilitation.

10       Q.   Aside from that kind of conduct education

11   programs session, page seven, is there anywhere else in

12   this worksheet that instructs the IPOs to consider

13   efforts towards rehabilitation?

14       A.    It's not highlighted.  That phrase isn't

15   highlighted under transition supervision plan, but that

16   would be part of it.

17             If they're looking at their goals, they

18   have goals.  If they thought about their goals, that

19   would definitely be efforts towards rehabilitation.

20             Recreation could be.

21             If they're spending their free time reading

22   on educational topics that they're interested in.

23             Employment upon release, that could be one.

24   It's not spelled out in the prehearing worksheet, if

25   that's what you're asking me.

1        Q.   And then the next factor is generally

2   related to subsequent growth and increased maturity.

3             Is that an accurate direction?

4        **A.   Yes.**

5        Q.   So where in the worksheet would those

6   elements be identified or asked about?

7        **A.   Other than where it's highlighted on page**

8   **two, I would hope that the IPO is using the**

9   **same -- taking the same things in consideration for**

10  **growth and maturity as efforts toward rehabilitation.**

11           **Really, they're both connected.  The same**

12  **thing, what they're doing to better themselves,**

13  **education, their conduct.  How they spend their free**

14  **time.  Their thoughts about the future.  Their home**

15  **plan.  What they've done to obtain a home plan.**

16       Q.   How is accepting accountability except

17  where innocence is maintained, where is that reflected

18  in the worksheet?

19       **A.   Page two under present offense.  The extent**

20  **of their participation in the offense.  And then their**

21  **culpability.  Their role in the offense.  All the**

22  **highlighted questions under the present offense, I**

23  **think, would help them.**

24       Q.   And I believe we discussed earlier that the

25  institutional record was something that was already

1   included in the regular worksheet?

2        **A.   Yes.**

3        Q.   And how about the final Senate Bill 590

4   factor that relates to the risk to society, how is that

5   assessed in this worksheet?

6        **A.   I think that is every element that is**

7   **highlighted in the assessment and recommendation, page**

8   **12, of the worksheet.**

9        Q.   And we discussed this off the record, but

10  is the salient facto score used for juvenile life

11  without parole offenders?

12       **A.   No.**

13       Q.   So what -- so this worksheet is used in the

14  interview with the offender, correct?

15       **A.   Yes.**

16       Q.   And what happens after the interview is

17  complete?

18       **A.   They prepare their parole hearing report.**

19       Q.   And is that based, on part, on this

20  worksheet?

21       **A.   Yes.  It's totally based on the worksheet.**

22  **And the conduct violations, and other documents that**

23  **they we have.  Like, the official circumstances of the**

24  **present offense, victim's impact statements in the**

25  **file.**

```
 1          Q.   And -- sorry.
 2          A.   Just any other -- any information that's in
 3     their file, including their interview, would be
 4     included in the final parole hearing report.
 5          Q.   And after the report is complete, what
 6     happens to this worksheet?
 7          A.   It's destroyed.  Not -- yes.  It's
 8     destroyed.  Because they have taken all of their notes
 9     and typed them into a report.
10          Q.   Is there any check or audit, that all the
11     information that's captured in the worksheet during the
12     interview ends up in the report?
13          A.   The supervisor has to sign off on the
14     report and they turn in their worksheet with the
15     report.
16          Q.   And so the supervisor, are they instructed
17     to check the worksheet against the report?
18          A.   They're instructed to make sure the
19     elements are in the prehearing report from this
20     worksheet.
21          Q.   But you're not sure if they actually do the
22     comparison?
23          A.   Correct.
24          Q.   Aside from the supervisor, is this
25     worksheet reviewed by anyone else?
```

```
 1          A.    No.

 2          Q.    The parole board members don't see this

 3   worksheet?

 4          A.    No.

 5          Q.    Or the parole analysts?

 6          A.    No.

 7          Q.    Is this worksheet shared with the offender?

 8          A.    No.

 9          Q.    Were you directed by someone to make the

10   juvenile life without parole changes to the worksheet?

11          A.    Yes.

12          Q.    And who did those -- who did that request

13   come from?

14          A.    Ellis McSwain, the parole board chairman at

15   the time.  And Kelly Dills, the board operations

16   manager at the time.

17          Q.    And did they give you any guidance about

18   how to make those changes?

19          A.    No.  They just told me to make sure that

20   the information outlined these elements outlined in

21   this Senate Bill 590 were included in the reports for

22   the board.  Incorporating them into our existing

23   worksheet appeared to be the best way to do that

24   because they're used to this already.  So ...

25          Q.    I believe we discussed this a little bit
```

1  earlier.  But are the topics in this worksheet required

2  to be included in this worksheet or asked about during

3  the interview?  In a regular hearing?

4      **A.   Everything accept the he will moments for**

5  **the juvenile life without.**

6      Q.   Is there some, like, rules or regulations

7  or instructions from the parole board about what needs

8  to be included in this worksheet?

9      **A.   Well, the parole board establishes what**

10  **they want in the reports.  And if it's something -- if**

11  **they want something new added to the report then I**

12  **would add it to the worksheet.  Other wise they**

13  **wouldn't know to put it in there.  They determine, the**

14  **board determines what they want in there reports.  And**

15  **so I try to provide my staff the tools in order to be**

16  **able to provide the most accurate information to the**

17  **board.**

18      Q.   How far in advance do these interviews take

19  place?

20      **A.   It could -- a month.  I'd like them to**

21  **start getting read for their January docket in**

22  **December.**

23      Q.   And who you long after an interview is a

24  report usually completed?

25      **A.   I'd imagine they start typing it hopefully**

1    right away while it's still fresh in their mind.  It

2    might be that day.  The next several days.  It could be

3    a situation where the hearing's the next day.  There's

4    a lot of hearings and some places it's a lot of work.

5    I mean, some places, the officers, it could be 25 a

6    month.  Not these types of cases, but the more

7    high-risk, higher custody level prisons, they have

8    less.

9         Q.   Do you ever attend parole hearings?

10        A.   Yes.

11        Q.   In your current position?

12        A.   Yes.  I don't conduct them, but I observe

13   them because I supervise the people that sit on the

14   panel.  It's a board member, an analyst, and then the

15   parole supervisor.  And I supervise all the parole

16   supervisors, so I periodically observe hearings.

17        Q.   And what is the purpose of your

18   observation?

19        A.   To ensure that the supervisor is using the

20   motivational interviewing techniques in conducting

21   themselves appropriately.

22        Q.   But you said you never --

23        A.   Conduct them --

24        Q.   -- conduct them, right?

25        A.   No.

```
 1        Q.   Does your role in hearings, like -- strike
 2   that.
 3             Have you ever attended a juvenile life
 4   without parole hearing?
 5        A.   No.
 6        Q.   Are you responsible for the policies or
 7   procedures of how a parole hearing is conducted?
 8        A.   No.
 9        Q.   Do you implement the policies and
10   procedures on how a hearing is conducted?
11        A.   No.
12        Q.   Would you describe your role relative to
13   the hearing itself as simply supervising what the
14   supervisor is doing during the hearing?
15        A.   I don't have a role in that.  It's
16   the --  I really don't have a role in training them on
17   how to conduct the hearing, per se.  I can provide
18   feedback to motivational interviewing techniques and
19   skills, which I've done.
20             There are -- they learn how to conduct
21   appeal hearings by observing the parole board member
22   and the parole analyst.
23        Q.   So what about the kind of policies and
24   procedures surrounding the circumstances of the
25   hearing?
```

```
 1              Let me give you an example.  So, for
 2    example, are you at all involved in who can attend a
 3    hearing as a delegate?
 4         A.   No.  I'm not involved in that.  I know
 5    that, you know, what's been outlined.  What we've been
 6    told.  Who can attend.  Who can't.
 7         Q.   So you're not -- you don't play a role in
 8    making those --
 9         A.   Those decisions --
10         Q.   -- right?
11         A.   No.
12         Q.   So you're not deciding the policy?
13         A.   No.
14         Q.   But would you say you are -- you advise on
15    its implementation?
16         A.   I have to be aware.  My staff has to be
17    aware.  Because they need to know who is going to be
18    coming, entering the prison.  Like, delegates,
19    and we have to be aware of what the parole board
20    protocol -- parole hearing protocol is.
21              So implementing, yes.  We know who can be a
22    delegate, who, you know, that it could be an attorney,
23    so, then, yes, we need to let the warden know on the
24    prison side who's going to be entering, who can enter
25    the prison.
```

```
 1              (Deposition Exhibit No. 5 was marked for

 2   identification.)

 3   BY MS. ZIMMERMAN:

 4        Q.   The court reporter has just handed you

 5   Exhibit No. 5.

 6              Do you recognize this document?

 7        A.   Yes.

 8        Q.   So if you look at page two of the board

 9   minutes attached to the email -- I'm sorry -- let me

10   back up.

11              So what is it that you're looking at.

12        A.   Oh, I'm looking at page one because I spent

13   so much time on this.  Okay.  What page do you want me

14   to look at?

15        Q.   So this is an email with attached board

16   minutes; is that correct?

17        A.   Yes.

18        Q.   So then if you look at page two of the

19   board minutes, under No. 4 --

20        A.   Okay.

21        Q.   -- it discusses delegates at hearings and

22   consistency.

23        A.   Uh-huh.

24        Q.   You'll see the action item is for

25   Jennifer Zamkus and Steve Mueller to discuss with you
```

1    approvals, roles, clearance for parole hearings; is

2    that correct?

3         **A.    Yes.**

4         Q.    And so I guess I'm just curious, you know,

5    what is your role?

6              Or why was this delegate issue brought to

7    you, and how does your position play into the delegate

8    issue?

9         **A.    Well, I think there were some hearings that**

10   **people showed up at the prison and they weren't an**

11   **approved visitor.**

12             **And so I go to all the wardens' meetings.**

13   **And so they wanted me to find out.  And that's why we**

14   **had to establish criteria.**

15             **First of all, we thought all the prisons**

16   **should be consistent.  And I found that some prisons**

17   **were letting delegates in that were not an approved**

18   **visitor, and vice versa.  And so I talked to the**

19   **wardens about consistency in that area.**

20        Q.    Was this delegate issue related to juvenile

21   life without hearings or parole hearings in general?

22        **A.    I mean, this isn't anything new.  There's**

23   **21 sites with hearings.  So I don't -- I don't know**

24   **that it was only juvenile life without.**

25             **I mean, we have people show up as**

1    delegates, and, I mean, that's probably not -- that

2    happens occasionally, that they haven't been approved,

3    I'm sure, on a regular basis, probably.

4         Q.   So if issue occurs during the hearing, or

5    related to a hearing like this delegate issue that an

6    IPO has to deal with, those are then brought to your

7    attention; is that correct?

8         A.   Not necessarily.  They wouldn't all come to

9    my level.  They would take care of it there at the

10   prison.

11        If their protocol was that they didn't

12   allow somebody in that wasn't approved, then that

13   would -- it may come to me, it may not, to talk to the

14   warden about.

15        That's all they know, that could be all

16   that they know that occurs at their site.

17        Q.   So there may be some issues that are not

18   consistently addressed across all the sites?

19        A.   Oh, definitely; yes.

20        Q.   Including issues with juvenile life without

21   parole hearings?

22        A.   Well, there may be inconsistencies between

23   all the sites, like this one, that they wouldn't allow

24   somebody in that hasn't been approved.  And it's not

25   against policy.  I mean, each warden establishes their

1  own policy.  Not every policy.  But they have

2  discretion on their entrance protocols.

3           I -- this -- we just wanted to -- we just

4  thought it would be better that all the institutions

5  would be on the same page, and people weren't telling

6  people different things.  'Cause offenders transfer

7  from site to site.

8           It was agreed that they would do their

9  records check when they got there, that they didn't

10  necessarily have to be approved ahead of time.  But I

11  don't enforce -- I mean, I'm not over the wardens, so I

12  can only make suggestions at our meetings.

13       Q.   Do you have any control over the -- the

14  parole board members docket of hearings?

15       A.   No.

16       Q.   Who does control that?

17       A.   How many hearings are on a docket?

18       Q.   Uh-huh.

19       A.   In general?

20       Q.   Yes, in general.

21       A.   The parole board chairman dictates that.

22       Q.   And then who sets the specific schedule?

23       A.   Right now it's Robin Worder, parole

24  analyst.

25       Q.   Is there a reason that you would be asked

1   to limit a docket to only have one juvenile life

2   without parole hearing per day?

3       A.   No.  Those types of things are never

4   discussed with me.  I mean, why there was only -- why

5   that decision was made?  Or --

6            (Deposition Exhibit No. 6 was marked for

7   identification.)

8   BY MS. ZIMMERMAN:

9       Q.   I'm going to hand you what has been marked

10  as Exhibit 6.

11      A.   Okay.

12      Q.   Are you familiar with this?

13      A.   Yes.

14      Q.   Can you tell me what you're looking at?

15      A.   An email from Steve Mueller to me telling

16  me that -- or asking me to request that my staff try to

17  limit one juvenile life without hearing, if possible.

18            So I'm assuming that I sent this out to my

19  staff.  I didn't make this decision, but I would

20  then -- what I would normally do -- and I don't have

21  the emails -- ask my staff to do this, to abide by it,

22  if it's possible.

23      Q.   So based on our earlier discussion it

24  strikes me that this doesn't necessarily fall under

25  your purview.  So I guess I'm curious if you have any

1    understanding why his request was sent to you.

2         A.   Oh.  Well, so I could tell my staff.  Is

3    that what you mean?  'Cause I'm the -- I supervise all

4    the parole offices.

5              And this direction was -- well, asking us

6    if they could to try to -- when they're working with

7    their docket, try to limit it to one per day.  I

8    understand why, because they are complex.

9              Well, they're all complex and

10   time-consuming, but I'm assuming with these additional

11   factors they felt like they would take longer.  And a

12   lot of the sites do just have one in-person day, so it

13   may not always be possible.

14             Did I answer your question?

15        Q.   You did.

16             So just to make sure that I understand

17   that, you don't play a role in drafting any procedures

18   as to how the parole hearing --

19        A.   Is conducted, yes.

20             I don't -- well, I don't supervise the

21   board or the analysts, so I don't have any input into

22   how they conduct the hearing.

23        Q.   So your interaction would be more if

24   policies and procedures about the parole hearing were

25   changed that affected your staff --

```
 1          A.    Right.

 2          Q.    -- then you would communicate those

 3    changes --

 4          A.    Right.

 5          Q.    -- or just forward on new procedures?

 6          A.    Yes.  My staff doesn't play the lead role

 7    at the hearings.

 8          Q.    Have we discussed every way in which you

 9    play a part or role in parole hearings?

10          A.    I think so.

11          Q.    And in juvenile life without parole

12    hearings?

13          A.    Yes.

14          Q.    So I'm going to go back to when we were

15    discussing -- we were discussing Miller versus Alabama

16    and 590.  I'm going to go back to where we were.

17                So did you have any involvement with the

18    drafting of Senate Bill 590?

19          A.    No.

20          Q.    Did you receive any training or attend any

21    seminars regarding the requirements of Miller,

22    Montgomery, or similar cases?

23          A.    No.

24          Q.    Aside from the worksheet and the work that

25    you did updating that, what steps did you take to
```

1 ensure compliance by your staff with these cases and

2 with Senate Bill 590?

3     **A.    I looked at -- I reviewed the first couple**

4 **of prehearing reports.  The first that we had of these**

5 **I reviewed, because I needed to send samples out.  So I**

6 **looked at the first couple that were completed by my**

7 **staff and then used them as samples for other staff.**

8     Q.   So you took on the task of ensuring that,

9 basically, that the worksheet was working?

10     **A.   Yes.  Correct.**

11     Q.   And that the elements that needed to be

12 included were included in the reports?

13     **A.   Yes.**

14     Q.   But it was just at the beginning?

15     **A.   Correct.**

16     Q.   Like a kind of QC?

17     **A.   Yes.**

18     Q.   Are you aware of any third parties offering

19 training to the parole board or its employees on these

20 cases or Senate Bill 590?

21     **A.   No.**

22     Q.   And did you receive any training or attend

23 any seminars regarding the requirements of Senate Bill

24 590?

25     **A.   No.**

1          Q.   Is it your understanding that Senate Bill

2     590 was signed into law in July of 2016?

3          **A.   Yes.**

4          Q.   Did the parole board put in place a process

5     for handling hearings under Senate Bill 590?

6          **A.   Other than just what elements they needed**

7     **to take in consideration, my only role would be**

8     **attending meetings, and if there was discussion about**

9     **those things, 'cause I attend the analyst meetings,**

10    **too.**

11         Q.   Would you agree that Senate Bill 590 opened

12    up a new class of offenders eligible for parole

13    hearings?

14         **A.   Yes.**

15         Q.   And that these offenders then needed to be

16    notified of what the process was regarding their parole

17    hearings?

18         **A.   Yes.**

19         Q.   Were you involved in communicating that

20    process to the offenders?

21         **A.   My involvement was emailing this memo to my**

22    **staff, authored by Ellis McSwain, the parole board**

23    **chairman.  It was actually sent by his office to my**

24    **supervisors.**

25               **(Deposition Exhibit No. 7 was marked for**

1    **identification.)**

2    BY MS. ZIMMERMAN:

3        Q.    It the document I just handed you -- or the

4    court reporter handed you, Exhibit 7 -- the memo that

5    you were talking about?

6        **A.    It looks like a version of it.  The one I**

7    **have is dated July 29th, but this is dated August 1st.**

8            MS. ZIMMERMAN:  Can we go ahead and mark

9    the July 29th version.

10           THE WITNESS:  They look the same.

11           (Deposition Exhibit No. 8 was marked for

12   identification.)

13   BY MS. ZIMMERMAN:

14       Q.    So can you describe what this memo is?

15       **A.    It was notification from the parole chair**

16   **to the board members, all the wardens, and my staff, my**

17   **supervisors, of Senate Bill 590.  And giving them**

18   **direction on how offenders would go about petitioning**

19   **the board.**

20       Q.    So this memo notifies the probation and

21   parole staff?

22       **A.    Well, the supervisors, yes, staff.**

23       Q.    As to what the juvenile life without parole

24   process is going to look like?

25       **A.    Yes.**

```
 1          Q.   Did you prepare this memo?

 2          A.   No.

 3          Q.   Do you know who did?

 4          A.   Well, it says it's from the chairman.

 5          Q.   Was this memo provided to all levels of

 6   probation and parole staff?

 7          A.   I would certainly hope so; yes.

 8          Q.   Was it provided to offenders?

 9          A.   Yes.  I believe.  I'm trying to -- I had

10   some other emails -- I believe this is the document we

11   used and we posted it in the housing units at the

12   prisons.

13          Q.   This memo?  Let me show you --  we'll mark

14   this Exhibit 9.

15              (Deposition Exhibit No. 9 was marked for

16   identification.)

17   BY MS. ZIMMERMAN:

18          Q.   So if you could take a look at what the

19   court reporter has marked as Exhibit 9, can you tell me

20   what this document is?

21              Are you familiar with this document?

22          A.   Oh, yes.  This is from the warden.

23              I thought I -- did you make copies of

24   everything?  'Cause I thought I had some more emails,

25   in my bag, that I brought, in the stuff that I brought.
```

1          MR. CRANE:  I will say that there were four

2     emails that were forwarded to me that I withheld as

3     documents that you sent to me.

4          THE WITNESS:  Oh, okay.

5          Yes.  I recognize this.

6          This warden took it upon himself to send

7     something to the offender population at JCCC.  And then

8     this was sent out to give direction to the other

9     wardens, that this was something that they could use so

10    they wouldn't have to create a document to post in the

11    housing units and the offender library providing them

12    instruction.

13    BY MS. ZIMMERMAN:

14         Q.   So to clarify, the memo that we looked at

15    that is marked 7 and 8 --

16         **A.   Yes.**

17         Q.   -- that is a memo prepared by the chairman

18    directing the parole -- the Division of Probation and

19    Parole about this new process?

20         **A.   Yes.**

21         Q.   Whereas, this memo that we're looking at in

22    Exhibit 9 --

23         **A.   Yes.**

24         Q.   -- is something that was posted?

25         **A.   Posted, yes.**

```
 1          Q.   And who prepared this document?

 2          A.   Jay Cassidy.  He's the warden at JCCC.

 3          Q.   Based on this memo, did you prepare

 4   additional memos that were posted at other

 5   institutions?

 6          A.   I did not.

 7          Q.   You did not work with Kelly Dills to

 8   prepare any memos to notify offenders?

 9          A.   I don't remember.  I mean, I remember this.

10   I remember this warden's memo.  And I thought, well,

11   it's a good sample, everybody else could post this same

12   thing.  It would give them an idea.  Because we knew

13   that the inmate population had to be notified in some

14   way.

15               But I don't remember what else.  That's why

16   at first I thought maybe that's what this was.

17               (Deposition Exhibit No. 10 was marked for

18   identification.)

19   BY MS. ZIMMERMAN:

20          Q.   Are you familiar with this document?

21          A.   Yes.  I see this email came from me.

22               I don't remember doing all this.  I didn't

23   have this saved.

24               There's another memo.

25          Q.   Yeah.
```

```
 1        A.   So I'm assuming I must have used a little
 2   bit of all this.
 3        Q.   So I was specifically curious about the
 4   decision referenced in here to not mention petitions in
 5   the memo.
 6             Do you recall making that decision?
 7        A.   I'm trying to remember.
 8             I'm assuming there must have been a lot of
 9   confusion about the petitions.  And I'm assuming I must
10   have thought it was easier just to say -- or, you know,
11   let the offenders know that if they had a sentence like
12   this that they should just contact their IPO who could
13   explain everything in detail to them about, you know,
14   what they needed to do.
15             I'm -- I -- I'm just assuming.  I don't
16   remember the exact conversations.  But there must have
17   been a lot of confusion about this.  About who did what
18   with the petitions.  And that I felt like it would just
19   be easier that they contact their IPO who could give
20   them direction.
21             Because there's usually a lot of issues
22   with that, like, with case management, and the DAI
23   staff not really understanding.  They could confuse the
24   issue even more.
25             I don't remember exactly.  I'm assuming
```

1    this.  Because a lot of times they'll ask case managers

2    things, and they don't give them the right information,

3    and then -- well, that's kind of what happened.  You

4    know, that happens a lot.  And then my staff has to

5    clarify.

6         Q.  So you wanted to be able to -- well, never

7    mind.

8              Is it your understanding that Senate Bill

9    590 requires offenders to petition for a parole

10   hearing?

11        A.  Yes.

12        Q.  Is that different than how typical parole

13   hearings work?

14        A.  Yes.

15             Yeah, I do remember there were a lot of

16   questions from my staff about this.

17             And then I thought there was another email

18   that I had sent that said, "This is just a sample.  It

19   doesn't have to be this particular one."

20             MR. CRANE:  Can we go off the record for a

21   second?

22             (An off-the-record discussion was held.)

23   BY MS. ZIMMERMAN:

24        Q.  So I know your recollection at this time is

25   a little vague, but as far as you remember it, the

1    parole board chairman notified everyone of these

2    changes in that memo that we looked at; is that

3    correct?

4         **A.   Yes.**

5         Q.   And Jay Cassidy, one of the wardens at an

6    institution posted a memo about the process in his

7    institution, correct?

8         **A.   Yes.**

9         Q.   And you and Kelly worked up a similar memo

10   to be posted at other institutions; is that correct?

11        **A.   Yes.**

12        Q.   And those memos posted in the institutions

13   were to notify the offenders about this new process,

14   and if they qualified --

15        **A.   If they're qualified.**

16        Q.   -- to reach out to their IPOs?

17        **A.   Correct.**

18        Q.   And what was the reaction to this sharing

19   of information?

20        **A.   From who?  Sorry.**

21        Q.   So did you get feedback from the IPOs as to

22   what they were supposed to do with their training?

23        **A.   Oh, yes.  Well, I'm sure there were a lot**

24   **of questions.  And so I sent several emails out**

25   **clarifying.  And I sent an email with the list of the**

1    offenders that met the eligibility.  Or at least were

2    sentenced under those parameters.  And I have that.  I

3    sent that out.

4          Q.   Was that included when you sent out the

5    worksheet?

6               Does that sound familiar?

7          A.   Yes.  Uh-huh.

8          Q.   So part of this process we discussed is

9    that offenders have to petition for a parole hearing?

10         A.   Correct.

11         Q.   Is there a form petition that they can use?

12         A.   Yes.

13         Q.   If you look at the Exhibit No. 7.

14         A.   Yes.

15         Q.   Page three, is that the form of the

16   petition?

17         A.   Yes.

18         Q.   Did you create that?

19         A.   I did not.

20         Q.   Do you know who did?

21         A.   No.  I can assume.  I'm assuming that

22   Kelly Dills did.  But I'm not ...  I hope I didn't.

23              (Deposition Exhibit No. 11 was marked for

24   identification.)

25   BY MS. ZIMMERMAN:

         1          Q.    Are offenders required to use that

         2    petition?

         3          A.    No.

         4          Q.    The court reporter has just handed you

         5    what's been marked at Exhibit 11.

         6                Are you familiar with that document?

         7          A.    Yes.

         8          Q.    Is this the email you referenced earlier

         9    that indicates this is not the petition --

        10          A.    Yes.

        11          Q.    -- required to be used?

        12          A.    Uh-huh.

        13          Q.    What date was this email sent?

        14          A.    December 6th, 2016.

        15          Q.    By this point had offenders already filed

        16    petitions for parole hearings?

        17          A.    I'm assuming so.

        18          Q.    But at this point you were still finalizing

        19    some of the procedures in how to do the petitions?

        20          A.    Yes.  Because my email providing the

        21    worksheet was dated -- or was in August, so ...

        22          Q.    If an offender does not use this form

        23    petition, how do they know what needs to be included in

        24    their petition?

        25          A.    Does the memo that I sent out, the ones

1   that were posted in the housing units?  I don't have

2   that with me.  I don't know if it says --

3          Q.   I also don't have it with me.

4               If that information is not contained in

5   that memo, do you know, are you aware of how that

6   information would be communicated to the offenders?

7          A.   The only way would be my staff.

8          Q.   Were the IPOs given any formal training on

9   this new process?

10         A.   No.

11         Q.   So at this point we've discussed the

12  petition, correct?

13         A.   Yes.

14         Q.   And the prehearing worksheet?

15         A.   Yes.

16         Q.   And your role in the in parole hearings,

17  correct?

18         A.   Yes.

19         Q.   After the hearing, are you aware of how the

20  board votes on whether to release an offender?

21         A.   No.  I'm not involved in those discussions.

22  I don't vote.  I've never voted.  I'm not part of a

23  panel that votes.

24         Q.   Are you familiar with what's called a board

25  action sheet?

1          A.    Uh-huh.  Yes, I am.

2          Q.    Is that used to help with the

3    decision-making for parole board members?

4          A.    It's where they document their decision.

5    Their individual decisions.

6          Q.    Are you aware of anything being done

7    differently with regards to the board action sheet and

8    the documenting of decisions for juvenile life without

9    parole hearings?

10          A.    You mean would the documentation be any

11    different on those board action sheets?

12               I know there have been discussions, but I

13    don't know -- I do not -- I don't remember.  I don't

14    know.

15               (Deposition Exhibit No. 12 was marked for

16    identification.)

17    BY MS. ZIMMERMAN:

18          Q.    The court reporter has just handed you

19    what's been marked as Exhibit 12.

20               Are you familiar with this document?

21          A.    No, I don't remember seeing this.

22               (Deposition Exhibit No. 13 was marked for

23    identification.)

24    BY MS. ZIMMERMAN:

25          Q.    You should now be looking at what's been

1    marked as Exhibit 13.

2              If you take a look on the first page,

3    No. 3, do you see the sentence that reads, "She advised

4    that Michelle Kasak and her staff created a worksheet

5    to explain the elements required for consideration

6    during deliberation?"

7              Do you know what worksheet she's referring

8    to?

9         **A.   I'm assuming the parole hearing worksheet.**

10        Q.   So that is not referring to Exhibit 12?

11   You're not familiar with that?

12        **A.   No.  I don't remember that.  I'm assuming**

13   **that it means the interview and assessment worksheet.**

14   **This isn't -- this doesn't look like -- this looks like**

15   **a worksheet for the board and not my staff.**

16        Q.   Okay.  So safe to say you did not -- you

17   don't believe you created Exhibit 12?

18        **A.   No.**

19        Q.   And do you know who did?

20        **A.   No.**

21        Q.   So I want to shift gears a little bit, and

22   discuss the policies and procedures related to parole

23   hearings both in general and JL WOPs specific.

24        **A.   Okay.**

25        Q.   You mentioned earlier that your current

1   position, in part, includes creating and revising

2   policies and procedures; is that correct?

3        **A.   Correct.**

4        **(Deposition Exhibit No. 14 was marked for**

5   **identification.)**

6   BY MS. ZIMMERMAN:

7        Q.   I'm handing you what's been marked as

8   Exhibit 14.

9        **A.   The Blue Book.**

10       Q.   Yes.  Are you familiar with this document?

11       **A.   Yes.**

12       Q.   What's the purpose of this document?

13       **A.   This is what's provided to the offenders so**

14   **they understand the hearing process.  The decisions.**

15   **It's basically all about the parole process, when**

16   **they're in the institution, and the protocols, and ...**

17       Q.   So is this document -- would you describe

18   it as offender based?

19       **A.   Yes.**

20       Q.   It's not the procedures that staff

21   necessarily has to engage in?

22       **A.   Right.**

23       Q.   Did you draft --

24       **A.   No.**

25       Q.   You weren't involved at all with its

PohlmanUSA Court Reporting
(877) 421-0099    PohlmanUSA.com
Case 2:17-cv-04082-NKL  Document 134-10  Filed 06/12/18  Page 103 of 122

1    preparation?

2         A.   In the past, I have looked at this.  I have

3    maybe made suggestions on something that needed to be

4    updated, but I wasn't responsible for making the

5    updates.

6              (Deposition Exhibit No. 15 was marked for

7    identification.)

8    BY MS. ZIMMERMAN:

9         Q.   I'm now handing you what's been marked as

10   Exhibit 15.

11              Are you familiar with this document?

12        A.   Yes.

13        Q.   Can you describe what this is.

14        A.   It's our table of contents for Probation

15   and Parole procedures.  The procedures that govern

16   Probation and Parole within the department.

17        Q.   And so what's the purpose of this document?

18        A.   This provides direction and instruction to

19   Probation and Parole staff on how to conduct their

20   duties.

21        Q.   So as compared to the Blue Book, this is

22   more staff --

23        A.   Yes.  This is for staff.  This is all our

24   Probation and Parole policies and procedures.

25        Q.   Is this an all-inclusive document?  For

```
 1    example, if a staff member needs guidance on how to do

 2    their job --

 3          A.   Yes.

 4          Q.   -- would they look here?

 5               Or are there other places they would look

 6    as well?

 7          A.   No, they would look here.  My staff look at

 8    chapter 6.  All of chapter 6 applies to my staff.

 9               Other than memos or emails, chapter 6

10    governs what we do, what the institutional parole

11    offices do.

12          Q.   Did you draft any of the -- either this

13    table of contents or the policies contained in this

14    document?

15          A.   Not the table of contents, but I have made

16    suggestions to some of them in chapter 6.

17          Q.   But you're not on any type of committee?

18          A.   The manual work group does that, and I am

19    not on that group.  I can make suggestions.

20          Q.   Have you even been on the manual work

21    group?

22          A.   No.  I review it to make comments.  But we

23    all are.  I mean, they're sent out for anybody to make

24    comments and then they're finalized with they manual

25    work group.
```

        1         Q.   And when you make comments on proposed

        2    revisions, is that based on anything in particular?

        3         **A.   Well, there could be some terminology in**

        4    **the policy that's not correct.  So it's based on**

        5    **business practices, how we do things in our offices.**

        6         Q.   Are you familiar with how frequently these

        7    policies are updated?

        8         **A.   Yes.**

        9         Q.   Is there a policy in place for how often

       10    they need to be updated?

       11         **A.   No.**

       12         Q.   Are they only updated when something

       13    changes?

       14         **A.   Yes.**

       15         Q.   Are all changes in the parole procedures

       16    reflected in these policies?

       17         **A.   No.**

       18         Q.   So when you said earlier if an IPO was

       19    wondering how to do some part of their job, if they

       20    were to look in these policies, it may not be the most

       21    current version of how they're supposed to do their

       22    job?

       23         **A.   Correct.**

       24         Q.   Are you aware of any juvenile life without

       25    parole processes included in these procedures?

1          A.    No.  I don't remember.  I don't

2     specifically remember making any changes myself.

3          Q.    So as far as you are aware, if an IPO had

4     questions about how to conduct a juvenile life without

5     parole hearing, or was trying to identify what the

6     process is, what's different, where would they look for

7     those answers?

8          A.    They would have to talk to their supervisor

9     who, hopefully, would be able to explain that to them.

10               Because these aren't done at every site.  I

11    feel like the sites that do them have a pretty good

12    understanding of what they should be doing, 'cause

13    they -- they're doing them more now on a more regular

14    basis.

15               So they would consult with their

16    supervisor, and I would hope their supervisor, if they

17    saw that they had one of these on their caseload, that

18    they would provide them the instruction then.

19          Q.    So you made that comment that you have the

20    impression that they have a good idea of what they're

21    doing with these procedures now, correct?

22          A.    Yes.

23          Q.    And that's based on having conducted

24    multiples of these at this point?

25          A.    Yes.  And getting feedback from the board.

1     I mean, if they don't have something in the report, the

2     board analysts tell them?

3          Q.   So the board member can provide feedback on

4     the report if something's missing?

5          A.   Yes.  And they do.

6          Q.   Are you aware of that happening in juvenile

7     life without parole instances?

8          A.   Not specifically, no.  I have not been made

9     aware of that that I know of.

10              (Deposition Exhibit No. 16 was marked for

11     identification.)

12     BY MS. ZIMMERMAN:

13          Q.   I'm showing you what's been marked as

14     Exhibit 16.

15              Are you familiar with this policy?

16          A.   Yes.

17          Q.   Can you tell me what this policy is about?

18          A.   It provides instruction to the

19     institutional parole officer on what goes into a

20     prehearing report.  The elements that need to be

21     included in each section.

22          Q.   To your knowledge, is this the most recent

23     version of this policy?

24          A.   I believe it's in Thursday's draft version.

25     But it's a long process to update our policies and

1    procedures.

2         Q.   About how long would you say it takes?

3         A.   **Well, now they have to go through legal.**

4         Q.   Was that not always the case?

5         A.   **No.  For a short time, no.  So that really**

6    **bogged down the process, because we don't have a lot of**

7    **people in our legal unit.**

8         Q.   When did that change?

9         A.   **It could take months.  Oh, not recently.  I**

10   **don't know, a couple months ago maybe.**

11        Q.   And prior to that legal was not reviewing

12   every policy revision?

13        A.   **Correct.**

14        Q.   Were they reviewing any policy revisions?

15        A.   **I think some departmental procedures,**

16   **institutional services procedures, like, Division of**

17   **Adult Institutions.  I'm really not sure what they**

18   **reviewed, and what they didn't, between all of our**

19   **divisions.**

20        Q.   In the exhibit in front of you, No. 16, is

21   there anywhere in that policy that provides guidance on

22   juvenile life without parole prehearing report

23   requirements?

24        A.   **No.**

25             **(Deposition Exhibit No. 17 was marked for**

1    **identification.)**

2    BY MS. ZIMMERMAN:

3         Q.   I'm going to hand you what's been marked as

4    Exhibit 17.

5              Do you recognize this?

6         **A.   Yes.**

7         Q.   Can you describe what it is?

8         **A.   It's possible questions the panel could ask**

9    **the offender during the hearing.  And then just general**

10   **overview of the protocol.**

11        Q.   What was the purpose of this document?

12        **A.   To give staff more direction on -- new**

13   **board members, to give new board members direction on**

14   **what types of questions to ask.  Because there's not**

15   **a -- there's not a script.**

16             **So this was -- this has -- I mean, this has**

17   **been around for a long time.  Versions of this, for a**

18   **very long time, to give the new board members and**

19   **analysts, and new supervisors, my staff, to help them**

20   **know what type of things to ask.  And then what to say**

21   **at the beginning of the hearing.  You know.**

22        Q.   So you mentioned that this has been around

23   for a while, correct?

24        **A.   Versions of it.  'Cause when I first got**

25   **this job, I saw -- I shared this with some supervisors**

1    to help them with what questions to ask.

2         Q.    So this is not specific to juvenile life

3    without parole hearings?

4         A.    No.  Actually, I found -- what I'm talking

5    about -- I found in my predecessor's stuff, and I only

6    had a hard copy.  I found it in a file somewhere, and I

7    actually had the board secretary -- the chairman's

8    secretary type them out.  'Cause I thought it should be

9    electronic.  That way, I could share it with my staff.

10        Q.    If you'll look at the page labeled parole

11   hearing protocol, it's dated May 2017, correct?

12        A.    Yes.

13        Q.    Do you know if changes were made on that

14   date compared to prior versions?

15        A.    Yes, I'm sure there were.  I'm sure -- it

16   was a pretty outdated document that I originally had,

17   so I'm assuming there were questions added.

18        Q.    Did you make those changes?

19        A.    I may have made suggestions.  And I'm

20   looking to see if I remember any of them.  If I did, it

21   was just to give my staff direction, provide them

22   direction on how to conduct a hearing.

23        Q.    Are these -- on the questions specifically,

24   are these required questions for a hearing?

25        A.    No. Huh-uh, they are not.

```
1          Q.   How about the protocol, is that the
2   required format?
3          A.   I believe so.
4          Q.   So it's more than just a suggested way to
5   conduct the hearing?
6          A.   Yes.  Correct.  Or the questions are
7   suggestions.
8          Q.   Does the protocol leave some discretion to
9   the parole board members in how they conduct their
10  hearing?
11         A.   I believe that they need to cover every one
12  of these things.
13         Q.   But, like you said, there's no script?
14         A.   Right.
15         Q.   So we discussed that part of your position
16  is creating and revising procedures and policies.  We
17  looked at the table of contents for some of those
18  policies and procedures, and you indicated that you're
19  not on the committee that drafts those, correct?
20         A.   Right.
21         Q.   Are there other policies that you have
22  drafted that relate to juvenile life without parole
23  hearings that we haven't discussed?
24         A.   Not that I know of.
25         Q.   When you indicated that part of your job
```

1    responsibility was creating and revising these policies

2    and procedures, was that more written policies and

3    procedures?

4              Or you determined kind of unwritten

5    practices around these more formal policies and

6    procedures?

7              Or both?

8        A.    Both.  Well, for example, when the board

9    makes a decision, on what type of report is required,

10   any decisions that are made by the board, I feel like

11   it's my responsibility to then make those changes to

12   the policy that affect our staff.

13             And so I would make that proposal to that

14   group, to our policy group.  Anything -- well, there's

15   a representative in my region.  Every region has a

16   representative on that committee.

17             And so when the board makes a decision

18   something, I look to see if we address that in policy

19   anywhere, or if we need to.  And then I usually reach

20   out to my region's rep -- representative -- that's on

21   the manual committee.  And say "This needs to be

22   changed the next time you update this procedure."  Or,

23   depending on the change.

24       Q.    Would you say that your recommendations are

25   based on what the parole board has told you changes

 1   are?

 2          A.   Yes.

 3          Q.   They are less -- unless you have decided

 4   the change needs to be made and recommended it to the

 5   committee?

 6          A.   Right.  It's changes that the board has

 7   made.  Like, maybe format in reports and different

 8   things.

 9          Q.   ████████████████████████████████████.

10          A.   Yes.

11          Q.   Is part of your responsibility disciplining

12   him if issues arise?

13          A.   He has -- he has a direct supervisor.

14   ████████████  is his direct supervisor.  She's the

15   DA II.  But like with any other of my staff, if

16   something comes straight to my attention, and I'm

17   involved with it, then I may do the discipline, yes.

18   Instead of having the person that doesn't -- hasn't

19   been directly involved with the information, yes, I do

20   that.

21          Q.   Are you aware of a complaint to the Office

22   of Professional Standards against him?

23          A.   Yes.

24          Q.   Was the issue reported directly to you?

25          A.   Well, a letter was written.

1          Q.   And you reviewed that letter?

2          **A.   Yes.**

3               **Are you talking about the letter from**

4     **Norman Brown?**

5          Q.   Yes.

6          **A.   Yes.  The one dated May 10th, 2017?**

7               **Or the one dated June 13th, 2017?**

8               **Or the email to the director?**

9          Q.   I was -- now I'm curious.  I was referring

10    to the email directly to the director.

11         **A.   Oh, okay, yes, I have that.  Okay.  And so**

12    **then the director submitted it for investigation, and**

13    **it was returned for the supervisor to handle.**

14         Q.   And how was it handled?

15         **A.   I entered a negative log entry.**

16         Q.   What does that mean?

17         **A.   Well, I discussed the issue with him.  He**

18    **denied it.  And I explained how, if this happened, that**

19    **it was not appropriate, of course.  But he denied that**

20    **it happened.**

21              **The offender said that he said something to**

22    **him, but he denied the allegation.**

23         Q.   Is that something that you brought with you

24    in response to the subpoena?

25         **A.   Yes.**

```
 1            Q.   Would you mind handing it to me to mark?

 2            A.   Sure.

 3                 (Deposition Exhibit No. 18 was marked for

 4       identification.)

 5                 THE WITNESS:  I think there's two different

 6       things.

 7       BY MS. ZIMMERMAN:

 8            Q.   So aside from this incident occurring in

 9       July, was there another?

10            A.   Yeah.  Were you talking about the incident

11       in May?

12            Q.   What is the incident in May?

13            A.   In May, he wrote a letter.  I'm assuming it

14       went to the parole board.  It did.  Mr. Brown a letter

15       on May 10th.  And the chairman referred it to me, as a

16       supervisor, to handle.

17                 And so I responded saying that I discussed

18       it with him, as I did, and he denied the allegations.

19       And I had ████ do a memo in response to that.

20            Q.   Would you provide me with those materials

21       so I can mark them?

22            A.   Yes.  I think this is everything.

23                 (Deposition Exhibit No. 19-21 was marked

24       for identification.)

25       BY MR. ZIMMERMAN:
```

1       Q.  So can you describe what the complaint is

2  that is referenced in these Exhibits 19 through 21?

3       **A.  On May 10th, Offender Brown alleged that**

4  **██████████ was talking to him in front of other**

5  **offenders.  He felt like he was discussing his case**

6  **openly in front of other offenders.**

7       Q.  Did this result in any discipline of

8  **███████████**?

9       **A.  No.  I discussed it with Aaron, and he**

10  **provided me with a memo explaining -- or not explaining**

11  **what happened -- but explaining any conversation that**

12  **he had with Offender Brown, Mr. ████████ said that he**

13  **spoke with him in person each time, but not in front of**

14  **other people.**

15         **He says at so point did the discussion have**

16  **to do with anything with regard to Brown's hearing or**

17  **attorney.**

18         **He denied it.  So I discussed it with him.**

19  **And let him know that that behavior would not be**

20  **appropriate.**

21       Q.  Are you aware of any misconduct happening

22  during parole hearings?

23       **A.  Misconduct of my staff during parole**

24  **hearings?  No.  No.**

25         **(An off-the-record discussion was held.)**

PohlmanUSA Court Reporting
(877) 421-0099    PohlmanUSA.com
Case 2:17-cv-04082-NKL  Document 134-10  Filed 06/12/18  Page 117 of 122

```
 1              MR. CRANE:  Let's go back on the record.
 2  BY MS. ZIMMERMAN:
 3       Q.   Do you want to amend your answer to whether
 4  you're aware of any misconduct about parole hearings?
 5       A.   Yes.
 6       Q.   What are you aware of?
 7       A.   There was a situation where a board member
 8  and analyst may have been discussing things or talking
 9  about things that they shouldn't.
10       Q.   And how did you become aware of that?
11       A.   It was happening in front of my staff.  But
12  my staff -- all my staff didn't know what was going on.
13       Q.   So it's not that your staff reported it to
14  you?
15       A.   No, they didn't report it to me.  And they
16  all didn't know it was going on.
17       Q.   So --
18       A.   But it came to light because they were
19  present and they were questioned about it by
20  investigators.
21       Q.   Is that when you became aware of what was
22  happening, during the investigation?
23       A.   Uh-huh.  Yes.
24       Q.   Were you questioned as part of the
25  investigation?
```

```
 1          A.    No, I was not.

 2          Q.    And you didn't have any other information

 3    about what was happening?

 4          A.    No.  I -- I mean, I read the investigative

 5    report after it was concluded, because my staff were

 6    part of the investigation.

 7                But, no, I had no idea.  And some of them

 8    didn't.  They were oblivious to it.  And some knew but

 9    were afraid to say anything.

10          Q.    Are you aware of any other misconduct at

11    parole hearings?

12          A.    Not by my staff.  And I don't -- hmm ...

13    I'm trying to remember if there's anything.

14                There was an incident -- but I don't

15    remember all the details -- of one of the board members

16    making a comment in front of a new field probation and

17    parole officer, because they observe hearings as part

18    of their new staff checklist.  I don't remember what

19    the comment was.

20          Q.    Was it an offensive comment of some type?

21          A.    Yes.  I believe the person took it as that.

22          Q.    Do you know who made the comment?

23          A.    It was a male board member.  But I'm trying

24    to remember.  I'm gonna say it was -- was it Gary?  I'm

25    thinking maybe Gary Dusenberg.
```

1          Q.   So aside from the misconduct we talked

2     about where there was an investigation, and the comment

3     by Gary Dusenberg, are you aware of any other

4     misconduct in parole hearings?

5          A.   I have had my staff tell me things that

6     they may not think was appropriate, or felt comfortable

7     with, and I report all of those.

8               And if there's any issues they pull the

9     tapes and listen to them.  Steve Mueller, or

10    Kelly Dills, and the chairman.  But everything, to my

11    knowledge, has been un founded.  I don't know what

12    happens with it after that.  But if I -- my staff tell

13    me anything, I always -- I always forward the

14    information.

15              And to my knowledge, nothing's been -- and

16    I wouldn't even know if there was an investigation.

17    And who's to say it was misconduct.  Eating Kruncher's

18    potato chips is not appropriate probably, but it's not

19    misconduct.

20         Q.   So that was going to be my next question:

21    Can you give me examples of what kind of things raised

22    concerns that your staff were bringing to your

23    attention?

24         A.   That.

25         Q.   Anything else you remember?

```
 1        A.    Their style of interviewing.

 2        Q.    By "style" you mean --

 3        A.    Not misconduct.  Just --

 4        Q.    Maybe a more aggressive style?

 5        A.    No.  Maybe just asking the same question

 6   over and over again.

 7        Q.    I can see how that would be frustrating.

 8        A.    I don't recall anything else that rose to

 9   the level of misconduct that I've reported.

10            And then when I report it, I don't know

11   exactly what happens.  And I honestly -- I don't even

12   remember why I knew about the one I mentioned earlier,

13   who brought it to my attention in the first place.

14        Q.    So unless it has to do with discipline on

15   your staff you wouldn't be involved?

16        A.    I would never be involved.  Right.  And

17   that's kind of why I almost forgot about the other

18   thing.  Because it wasn't -- it's not anything that

19   they did.

20            MS. ZIMMERMAN:  Let's go off the record

21   real fast so I can look at my notes.

22            (An off-the-record discussion was held.)

23   BY MS. ZIMMERMAN:

24        Q.    A couple more questions to wrap it up.

25            Are there any written juvenile life without
```

1  parole policies that you've drafted that we have not

2  discussed today?

3      A.   No.

4      Q.   Have you made any recommendations to the

5  manual work group for juvenile life without parole

6  policies that should be included in that large

7  handbook?

8      A.   I have not.

9      Q.   Are there any unwritten procedures or

10 practices that you were involved in developing related

11 to juvenile life without parole hearings that we have

12 not discussed today?

13     A.   No.

14          MS. ZIMMERMAN:  That's all I've got.

15          MR. SPILLANE:  I have nothing.

16          MR. CRANE:  I do not.

17          MR. SPILLANE:  About signature, you have

18 the option of reading this and making sure that there

19 were no typographical errors and then signing it.  Or,

20 you can just trust the reporter got it down and we can

21 waive signature.

22          That's your call.  The normal practice has

23 been to waive signature, but it's up to you.

24          THE WITNESS:  Yeah, I will waive.

25