

**PohlmanUSA®**
Court Reporting and
Litigation Services

---

Don Ruzicka

February 8, 2018

---

Norman Brown, et al.

vs.

Anne L. Precythe, et al.

Case 2:17-cv-04082-NKL   Document 134-11   Filed 06/12/18   Page 1 of 49

IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF MISSOURI

CENTRAL DIVISION


NORMAN BROWN, et al.,              )

                                   ) Case No. 17-cv-4082

        Plaintiffs,                )

                                   )

        vs.                        )

                                   )

ANNE L. PRECYTHE, et al.,          )

                                   )

        Defendants.                )



DEPOSITION OF DON RUZICKA

TAKEN ON BEHALF OF PLAINTIFFS

February 8, 2018

```
 1                   I N D E X

 2   EXAMINATIONS

 3        Direct Examination by Mr. Ault              5

 4        Cross-Examination by Mr. Spillane          46

 5

 6   EXHIBIT INSTRUCTIONS

 7        (Attach original exhibits to original deposition.)

 8

 9   EXHIBITS                                    MARKED

10   Exhibit 1     Personal Resume Don Ruzicka 9

11   Exhibit 2     Questionnaire 16

12   Exhibit 3     Board Action Sheet 19

13   Exhibit 4     Board Action Sheet 35

14   Exhibit 5     Information for Release Consideration

15                 Form 37

16   Exhibit 6     Pre-Hearing Report 38

17

18   SIGNATURE INSTRUCTIONS

19        (Signature waived.)

20

21

22

23

24

25
```

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                   WESTERN DISTRICT OF MISSOURI

 3                         CENTRAL DIVISION

 4

 5  NORMAN BROWN, et al.,            )

 6                                   ) Case No. 17-cv-4082

 7       Plaintiffs,                 )

 8                                   )

 9       vs.                         )

10                                   )

11  ANNE L. PRECYTHE, et al.,        )

12                                   )

13       Defendants.                 )

14

15

16       DEPOSITION OF WITNESS, DON RUZICKA, produced,

17  sworn, and examined on February 8, 2018, between the

18  hours of 1:00 p.m. and 2:30 p.m. of that day at the law

19  offices of Husch Blackwell LLP, 235 East High Street,

20  Jefferson City, Missouri, before Beverly Jean Bentch,

21  CCR No. 640, within the State of Missouri, in a certain

22  cause now pending in the United States District Court,

23  Western District of Missouri, Central Division, wherein

24  Norman Brown, et al. are Plaintiffs and Anne L.

25  Precythe, et al. are Defendants.
```

```
 1              A P P E A R A N C E S

 2   FOR THE PLAINTIFFS:

 3         JORDAN T. AULT

 4         Attorney at Law

 5         HUSCH BLACKWELL LLP

 6         235 East High Street

 7         P.O. Box 1251

 8         Jefferson City, Missouri 65101

 9         573.635.9118

10

11   FOR THE DEFENDANTS:

12         MIKE SPILLANE

13         Assistant Attorney General

14         221 West High Street

15         P.O. Box 899

16         Jefferson City, Missouri 65101

17         573.751.1307

18

19   CERTIFIED COURT REPORTER:

20         Beverly Jean Bentch, CCR No. 640

21

22

23

24

25
```

```
 1              IT IS HEREBY STIPULATED AND AGREED by and

 2   between counsel for the Plaintiffs and counsel for the

 3   Defendants that this deposition may be taken by Beverly

 4   Jean Bentch, a Certified Court Reporter, CCR No. 640,

 5   thereafter transcribed into typewriting, with the

 6   signature of the witness being expressly waived.

 7                        DON RUZICKA,

 8   of lawful age, having been produced, sworn, and examined

 9   on the part of the Plaintiffs, testified as follows:

10   DIRECT EXAMINATION BY MR. AULT:

11       Q.   All right, sir.  Can you please state and

12   spell your name for the record?

13       A.   Don Ruzicka, R-u-z-i-c-k-a.

14       Q.   All right.  And Mr. Ruzicka, you understand

15   you're here for a deposition today?

16       A.   Yes.

17       Q.   Before we begin, I want to make clear I

18   represent the four plaintiffs.  I'm co-counsel for four

19   individuals that were sentenced to life without parole

20   for crimes that they allegedly committed as juveniles.

21   Do you understand that?

22       A.   Yes.

23       Q.   Okay.  And you understand that you were named

24   as a defendant in the action based on your former role

25   as a member of the Missouri Parole Board, correct?
```

1      **A.    Yes.**

2      Q.    Okay.  Have you been deposed in the past?

3      **A.    No.**

4      Q.    Okay.  Since this is your first time, I'll run

5   through the ground rules before we begin to make sure

6   everyone is on the same page.  Essentially it's similar

7   to an interview.  I'll ask questions.  Mr. Spillane may

8   have some questions as well.  Your job is to answer

9   truthfully to the best of your ability based on your

10  knowledge.  We don't want you to guess.  It is, as you

11  know, under oath and everything is being taken down by

12  the court reporter seated to your right.

13           So it's important that you answer verbally.

14  The record won't show nods of the head or if you're

15  gesturing or anything like that.

16     **A.    Okay.**

17     Q.    It's important that we not speak over each

18  other.  There will be times where I'll ask a question

19  and you know where I'm going.  If you can allow me to

20  finish my question before you answer, it will make

21  things a lot easier.  I'll try to extend the same

22  courtesy to you.

23           I will ask some bad questions I'm sure.  If I

24  ask a question and you don't understand what I mean, let

25  me know and I'll repeat it or ask the court reporter to

1    read it back.  If you answer a question, we'll assume

2    that you understood.  Is that fair?

3         **A.    Yes.**

4         Q.    All right.  I don't expect it to be a long

5    deposition, as I said, but we're on your schedule.  If

6    you want to take one or more breaks, just let us know.

7         **A.    Okay.**

8         Q.    Before I move forward, I want to make clear I

9    don't want to know of any discussions that you've had

10   with your attorneys, with the Attorney General's Office

11   or any other attorneys that may be representing you.

12   Other than conversations with your counsel, did you do

13   anything else to prepare for the deposition today?

14        **A.    I looked over the complaint and the**

15   **interrogatories.**

16        Q.    Okay.  Did you speak with -- Other than your

17   counsel, did you speak with anyone to prepare for the

18   deposition?

19        **A.    No.  I just stopped by to meet Mike today.**

20        Q.    Okay.  Other than the complaint and discovery

21   interrogatories, things like that, did you review any

22   other documents or transcripts or anything like that?

23        **A.    No.**

24        Q.    Have you read transcripts of the other

25   depositions that have taken place in this case?

 1       A.   No.

 2       Q.   Sir, what is your highest level of education?

 3       A.   **Bachelor's Degree in Wildlife Conservation and**

 4  **Management.**

 5       Q.   Where was that degree from?

 6       A.   **SMS.  Now it's MSU.  It's Southwest Missouri**

 7  **State or was, with the name change.**

 8       Q.   Took me a few --

 9       A.   **Springfield, Missouri.**

10       Q.   Took me a few years after moving to Missouri

11  to figure out what the heck happened there.

12       A.   **We only have one college in Springfield.**

13  **Well, there's many.**

14       Q.   And you received a bachelor's degree; is that

15  correct?

16       A.   **Yes.**

17       Q.   And what year was that?

18       A.   **I believe it was '78.  It was '78 or '79.**

19       Q.   Okay.

20       A.   **1978 or '79.**

21       Q.   Other than your Bachelor's Degree in Wildlife

22  Conservation and Management --

23       A.   **Uh-huh.**

24       Q.   I believe I said that correctly.

25       A.   **Yes.**

 1      Q.   -- did you go on to receive any higher

 2   education, master's degree or anything like that?

 3      **A.   No.**

 4      Q.   During your time at Southwest Missouri State,

 5   did you take any classes related to the law?

 6      **A.   No.**

 7      Q.   Did you take any psychology classes?

 8      **A.   No.**

 9      Q.   Did you take any classes that touched on child

10   psychology or adolescent development?

11      **A.   I don't believe so.**

12      Q.   Okay.  I'd like to talk a little bit about

13   your work history.  It may be easiest to work through a

14   resume that was provided to us.  If I could ask the

15   court reporter to mark this as Ruzicka 1.

16           (RUZICKA DEPOSITION EXHIBIT 1 WAS MARKED FOR

17   IDENTIFICATION.)

18   BY MR. AULT:

19      Q.   Sir, this appears to be a Personal Resume that

20   you prepared looks to be dated in December of 2012, so a

21   few years old.  Does this look familiar?

22      **A.   Yes.**

23      Q.   Okay.  Is it fair to say that this would be

24   correct as of December of 2012?

25      **A.   Yes.**

1    Q.   Okay.  I just want to touch on a few things.

2    It looks like for about 27 years from 1979 to 2006 you

3    worked as a conservation agent for the Missouri

4    Department of Conservation; is that correct?

5        **A.   Yes.**

6        Q.   I want to make sure I understand.  Tell me a

7    little bit about what you did as a conservation agent.

8        **A.   They're the law enforcement body of the**

9    **Missouri State Department of Conservation.  So with the**

10   **law enforcement authority which grew through the years**

11   **and evolved and changed, we had full police powers.  But**

12   **we weren't only just enforcing the wildlife laws and**

13   **other laws of the state, we also conducted public**

14   **meetings, we did radio shows, went into schools, we**

15   **taught hunter safety.  Just a whole variety.  We**

16   **investigated pollution investigations and just a variety**

17   **of things.**

18       Q.   I appreciate that.  That's helpful.  You got

19   to what I was inquiring about which was whether --

20       **A.   I didn't look -- I'm sorry.**

21       Q.   I was curious as to whether there was a law

22   enforcement component to that.  It sounds like there

23   was?

24       **A.   Yes.**

25       Q.   In 2007, you became a state representative for

1    the State of Missouri, correct?

2        **A.    Yes.**

3        Q.    And it looks like you stopped working for the

4    Missouri Department of Conservation about the time of

5    your election; is that right?

6        **A.    Yes.**

7        Q.    All right.  You served in the State House from

8    2007 to 2012, right?

9        **A.    Yes.**

10       Q.    Three full terms?

11       **A.    I was actually about a week or two shy of --**

12   **since you said three full terms.  Really kind of was but**

13   **it wasn't.**

14       Q.    I understand.  And you -- Am I correct that

15   you left that role to take a position on the Parole

16   Board?

17       **A.    Yes.**

18       Q.    Okay.  During the years between 2007 and 2012,

19   did you serve on any committees that would impact the

20   work of the Parole Board?

21       **A.    I was on the law enforcement public safety**

22   **committee for awhile, but I don't -- I can't recall**

23   **anything that related I mean right now offhand to the**

24   **Parole Board.**

25       Q.    Do you recall being involved in drafting any

1  legislation that would impact the work of the Parole

2  Board?

3      A.   I don't believe so.  Just making sure that I

4  did have some law enforcement type legislation, but I

5  don't think it would have related to the Parole Board.

6  Here again, that's been a few years, some water under

7  the bridge.

8      Q.   Sure.  I understand that.  I understand asking

9  you about specific legislation over a five or six-year

10  legislative career may be kind of difficult but I

11  appreciate that response.  A few other things I wanted

12  to touch on.  Looks like the third page of your resume

13  there's a number at the bottom right that ends in 108.

14  From 2008 to 2009, there's employment listed for Exit

15  123.  Do you see that?

16      A.   Yes.

17      Q.   What is Exit 123?

18      A.   It's real estate related.  I just can't recall

19  it.

20      Q.   Okay.  You were also working as a real estate

21  agent, correct?

22      A.   Yes.  While I was a conservation agent, I also

23  obtained my real estate license.

24      Q.   Okay.  I just wasn't quite sure what that was

25  and wanted to follow up.  What I'd like to do is talk a

1    little bit about Senate Bill 590 and some of the other

2    Supreme Court cases and the impact that they have on

3    juvenile life without parole individuals in general,

4    training that you might have had, things like that, and

5    then talk specifically about some of the hearings that

6    you would -- at least one of the hearings that you would

7    have presided over.

8          Are you familiar with the Supreme Court

9    decision in Miller vs. Alabama?

10    **A.  No.**

11    Q.  Okay.  You don't recall reading that case?

12    **A.  I don't recall reading that.**

13    Q.  Okay.  Do you recall reading a case -- or a

14    decision in the case of Montgomery vs. Louisiana?

15    **A.  No.**

16    Q.  Do you recall any training or discussion with

17    members of the Parole Board involving either of those

18    cases?

19    **A.  Unless they came up when we talked about**

20    **Senate Bill 580.**

21    Q.  Okay.  There's actually -- I think the bill

22    that you're talking about is Senate Bill 590.

23    **A.  I said 580.**

24    Q.  Close enough.

25    **A.  Yeah.**

Pohlman USA Court Reporting
(877) 421-0099    PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-11   Filed 06/12/18   Page 14 of 49

1    Q.    Are you familiar with Senate Bill 590?

2    **A.    Well, to the best of my knowledge, I dealt**

3    **with the juvenile hearings that after, the juveniles**

4    **with life without parole, they could petition to have a**

5    **parole hearing after 25 years.**

6    Q.    Uh-huh.  Did you ever get a chance to read

7    Senate Bill 590?

8    **A.    I believe I did.**

9    Q.    Okay.  We don't have to go through all of the

10   language of Senate Bill 590.  I will tell you that

11   there's a section that says in a parole review hearing

12   under this section the board shall consider in addition

13   to factors listed in Section 565.033 and then it lists a

14   number of factors to consider in juvenile life without

15   parole cases.  Do you recall any training or discussion

16   about additional factors that needed to be considered in

17   the juvenile life without parole hearings?

18   **A.    There was some discussion.  I thought there**

19   **was some questions that had to be addressed, but usually**

20   **the analyst is the one that filled the sheet out.**

21   Q.    Okay.  So is it fair to say, and I don't want

22   to put words in your mouth, but what I'm understanding

23   is you understand from Senate Bill 590 that there were

24   some additional questions that needed to be asked of

25   juvenile life parole individuals, correct?

1    **A.    Correct.**

2    Q.    And that oftentimes it was the analyst that

3    would ask those questions and fill out a sheet related

4    to those factors?

5    **A.    I believe so.**

6    Q.    Okay.  Do you recall any training at board

7    meetings or anything else about those factors in Senate

8    Bill 590?

9    **A.    I don't remember any.**

10    Q.    Okay.  After Senate Bill 590 was passed and

11    enacted, was there a change in how you handled or

12    oversaw hearings for juvenile life without parole

13    individuals?  For example, did you ask any different

14    questions during hearings or conduct them in a different

15    manner?

16    **A.    I only did the one and I don't recall any.**

17    Q.    Okay.  Do you recall any training or

18    discussion about how to weigh the factors spelled out in

19    Senate Bill 590 or how those factors should impact your

20    decision?

21    **A.    I don't remember.**

22    Q.    Typically after a hearing the board would

23    complete what's called a Board Action Sheet, right?

24    **A.    Yes.**

25            MR. AULT:  I'm going to ask the court reporter

1    to mark this as Ruzicka 2.

2            (RUZICKA DEPOSITION EXHIBIT 2 WAS MARKED FOR

3    IDENTIFICATION.)

4    BY MR. AULT:

5        Q.    So this has been marked on the bottom right

6    AGO28.  Does this document look familiar to you?

7        **A.    Yes.  This looks like the sheet that had to be**

8    **filled out with a juvenile hearing.**

9        Q.    Okay.  And I believe you said that you

10   personally oversaw one juvenile hearing under Senate

11   Bill 590?

12       **A.    Yeah.  The life without parole.  I mean that's**

13   **one because it was brought -- I mean it's brought to my**

14   **attention in this case.  I believe that's it.**

15       Q.    Okay.  In that case -- well, strike that.

16   I'll get to the specific case in a little bit.  Is it

17   your understanding, though, that this sheet went into

18   effect after Senate Bill 590 was enacted?

19       **A.    Yeah.  This sheet went into effect after.**

20       Q.    Okay.  You mentioned one hearing that you

21   conducted of a juvenile life without parole under Senate

22   Bill 590 and I believe Norman Brown was the name of the

23   offender in that case.  Did you change the way that you

24   prepared for that hearing?  For example, did you

25   consider any other sources or documents or do anything

1  different than you would in preparing for any other

2  run-of-the-mill hearings?

3      **A.   I don't recall any.  I was trying to think if,**

4  **it's been so long, if I reviewed the case before we went**

5  **there.**

6      Q.   Do you recall voting on juvenile life without

7  parole cases for which the hearings were conducted under

8  Senate Bill 590?

9      **A.   Yes.  Specifically which ones but I knew I**

10  **had.**

11      Q.   Okay.  In voting on those cases, did you

12  consider any documents or factors that you wouldn't

13  consider in other cases that weren't being conducted

14  pursuant to Senate Bill 590?

15      **A.   Say that again.**

16      Q.   Let me try it a different way.  So you recall

17  voting in some -- you recall voting related to some

18  individuals that were juvenile life without parole

19  individuals, correct?

20      **A.   Yes.**

21      Q.   Did you undertake any different strategy

22  before voting in those cases?  For example, were there

23  additional things that you considered before voting or

24  additional questions that you asked?

25      **A.   No.  I mean the report or the file that we**

1    **would review had what I considered all the information**

2    **in it to make my decision.  If I had a question of**

3    **something, I would go speak to the, you know, the board**

4    **member or analyst that was on the panel.**

5        Q.   You have the benefit of I think being the last

6    deposition in this case for now.  So we've already

7    established a lot of facts about how the votes took

8    place and things like that.  So I won't go through all

9    of that with you.

10           I would like to ask do you recall in any

11   juvenile life without parole cases speaking to other

12   board members or analysts that were on the panel before

13   casting your vote?

14       **A.   I thought there was maybe one or two but here**

15   **again to be specific, you know, I'm just thinking that I**

16   **had spoken or asked, you know, a question about the case**

17   **or what was going on, something like that.**

18       Q.   Okay.  But as you sit here today, you don't

19   recall any specific questions that you would have asked

20   or anything like that?

21       **A.   No.**

22       Q.   Okay.  There are -- We have Board Action

23   Sheets for three of the named plaintiffs in this case

24   and it looks like you may have voted on them.  Let me go

25   ahead and mark one as an exhibit.  We may not need to go

1   through all three.  So I'll ask the court reporter to

2   mark this as Ruzicka 3.

3           (RUZICKA DEPOSITION EXHIBIT 3 WAS MARKED FOR

4   IDENTIFICATION.)

5   BY MR. AULT:

6       Q.   Sir, does this appear to be a Board Action

7   Sheet that the Probation Board would typically use

8   following hearings?

9       **A.   Yes.**

10      Q.   Now, if you look, there are about six boxes in

11  the middle of the page that have some initials and I'm

12  looking at the bottom left.  There's one that appears to

13  be DWR.  Is that you?

14      **A.   DTR.**

15      Q.   DTR.  My apologies.

16      **A.   No, that's fine.**

17      Q.   So fair to say looking at this, this is a

18  Board Action Sheet for ███████████.  You would have

19  reviewed the file in this case and issued your ruling or

20  vote here on the Board Action Sheet, correct?

21      **A.   Yes.**

22      Q.   That would be your initials there, DTR?

23      **A.   Yes.**

24      Q.   Do you recall anything about Mr. ██████████

25  file or anything that you considered in making this

1  decision?

2      A.   You mean now?

3      Q.   As you sit here today.

4      A.   No.

5      Q.   Okay.  So fair to say that you clearly know

6  how you voted in this case but you don't have a specific

7  recollection of this file or what you would have

8  considered before making your vote in this file?

9      A.   The information that's in the file that I

10 reviewed at the time like the file would be here today I

11 would review what's in the file, ask any questions if I

12 had of the board member or panel and then make my vote.

13     Q.   Okay.  In a case like this, how long would

14 that typically take to review a file?  Are we talking a

15 matter of minutes or hours or somewhere in between?

16     A.   You're talking this file or anyone in

17 particular?  There's such a range.

18     Q.   Well, if you know about this file, that would

19 be helpful.

20     A.   No, I wouldn't, you know, how many files we do

21 in a year and how long ago this has been.  I'm trying to

22 think here to give you an estimate.  This is an

23 estimate.

24     Q.   Sure.

25     A.   15 minutes.

1    Q.   Okay.  And as we said before, in a case like

2    this you'd review the file that was in front of you.  Do

3    you recall anything different, for example, being in the

4    file of a juvenile life without parole case versus other

5    cases or did they look pretty similar?

6        **A.   I don't remember.**

7    Q.   Okay.  There are two other Board Action Sheets

8    for the named plaintiffs in this case, one for ████████

9    ████████ , one for ██████████████ .  I know you voted in

10   both of those cases.  Do either of those ring a bell as

11   files that you have any specific recollection of?

12       **A.   No.**

13   Q.   Okay.

14       **A.   There have been files, and I don't know here**

15   **again specific to say if they were juvenile, but there**

16   **would be some on my desk that I would review and I'd**

17   **leave it to the next day and I'd pick up again --**

18   Q.   Okay.

19       **A.   -- and review it again.  They were not easy**

20   **decisions.**

21   Q.   Yeah.  I understand.  I guess what I'd like to

22   know either Mr. ████████ is the Board Action Sheet in

23   front of you, Mr. ████████ , Mr. ████████ .  As you sit here

24   today, you don't have any specific recollection of what

25   you would have considered in any of those three specific

1    cases?

2         A.   I would have looked at it with the information

3    that's provided in the file.

4         Q.   Fair enough.  I want to be clear I'm not

5    saying this to be tricky.  I know you're handling a

6    tremendous number of these.  I'm more just asking in

7    case there was anything that stuck out in your mind as

8    you sit here today that you recall about any of those

9    three files.

10        A.   It's been so long ago I don't recall anything.

11        Q.   That's fair.  Prior to a vote on one of these

12   juvenile life without parole cases, was there any kind

13   of a meeting with the board or any other kind of

14   communication about these specific individuals?

15        A.   There was talk just, I don't think these

16   specific individuals, but I thought of the juvenile

17   parole hearing cases we were going to start having them.

18        Q.   But you don't recall any specific discussions,

19   for example, discussion at a board meeting about

20   individual cases, individual juvenile without parole

21   cases?

22        A.   No, I don't recall any.

23        Q.   Okay.  I believe the juvenile life without

24   parole hearing over which you presided was an individual

25   named ███████████ who is one of the named plaintiffs in

1   this case.  And that hearing took place on ▬▬▬▬

2   ▬▬▬▬▬▬▬.  Do you recall do you have a

3   recollection of that hearing?

4        **A.  A little.**

5        Q.   Okay.  And you recall being the board member

6   presiding over the hearing, correct?

7        **A.   Yes.**

8        Q.   Okay.  Before that hearing, what steps did you

9   take to prepare?

10       **A.   Reviewed the file because as I said earlier I**

11  **thought I reviewed the file at the office, but I know I**

12  **definitely reviewed the file as I always do at the**

13  **facility.**

14       Q.   Anything else that you recall other than

15  reviewing the file?

16       **A.   No.  You mean as far as getting ready to do**

17  **the hearing?**

18       Q.   I guess let me be more specific.  If this was

19  the first juvenile life without parole hearing that you

20  were conducting pursuant to Senate Bill 590, did you

21  have any conversations with anyone to say hey, for

22  example, this is my first one of these hearings, is

23  there anything that I need to do differently or anything

24  that I should consider leading up to the hearing itself?

25       **A.   I think there was some discussion with the**

1    **analyst.**

2       Q.    Okay.  I won't go through and mark all of

3    these documents unless we need to, but it looks like at

4    that hearing you were present as a board member.  There

5    was also a parole analyst and a parole supervisor at

6    South Central Correctional Center.  Does that sound

7    right?

8       **A.    Yes.**

9       Q.    I show that the victim and a support for the

10   victim and the prosecuting attorney were present.  Do

11   you recall that?

12      **A.    Yes.**

13      Q.    The victim service coordinator was present and

14   then also a legal representative for Mr. ███████ by the

15   name of Mae Quinn.  Do you recall Ms. Quinn?

16      **A.    Yes.**

17      Q.    Okay.  And I should say that Ms. Quinn was

18   co-counsel on this case until recently.  She moved back

19   out to the east coast.  Did you have any -- Did you

20   personally have any conversations with Ms. Quinn before

21   or after the hearing?

22      **A.    I don't believe so other than since the inmate**

23   **had a delegate would have instructed them or whoever,**

24   **you know, that they're there, you know, as support and**

25   **as we interview that they face us and no one be looking**

1    back and forth if that's what you say conversation.

2    That's just my normal instructional beginning.

3        Q.   Gotcha.  That would be an instruction that you

4    give to any delegate that was present; is that fair?

5        A.   Well, those are, yeah, on the victims' cases.

6        Q.   I'm sorry.  Go ahead.

7        A.   Those instructions on the victim cases because

8    you do have the inmate and then you do have the victim.

9        Q.   I understand.  So there are certain

10   instructions that you give when a victim is present that

11   wouldn't be necessary in other cases; is that fair?

12       A.   Yes, because there wouldn't be anyone for them

13   to look at or stare over at.

14       Q.   My understanding is during these hearings the

15   offender is permitted a single delegate; is that

16   correct?

17       A.   Yes.

18       Q.   And if that delegate -- strike that.  The

19   delegate can be a legal representative, correct?

20       A.   That's correct.

21       Q.   But if the offender brings a legal

22   representative, they're not permitted a second delegate;

23   is that your understanding?

24       A.   Yes, it's just one.

25       Q.   And I will say the audio recording of that

1    hearing was produced in this case.  So I've had a chance

2    to review that.  I note that you started by giving

3    instructions to the victim and the prosecutor and you

4    mentioned that a delegate would be present and that the

5    delegate was limited to comments of support.  Is that

6    similar to instructions you gave in all cases?

7        **A.    Yes.**

8        Q.    Okay.  At that hearing, the hearing lasted I

9    think it was an hour and one minute.  It's my

10   understanding that that was probably a lengthier hearing

11   than the average.  Is that fair?

12       **A.    Average compared to you mean an average**

13   **hearing like a drug or a bad check?**

14       Q.    Well, you tell me.  Can you give me an average

15   of how long parole hearings typically lasted or did it

16   vary significantly?

17       **A.    It varied.  I mean probably 15 to 20 minutes**

18   **could be an average up to I think I even had one two**

19   **hours.**

20       Q.    So there's a wide variety?

21       **A.    Yeah.  Each case is different and it depends**

22   **on the number of victims that speak.  I mean if they're,**

23   **I forgot the word, approved, you know, if they have**

24   **something to say, we give them time to speak.**

25       Q.    Is there any limit put on victims, for

1  example, how long they're able to speak during hearings?

2    **A.    A limit?  I never heard of one.**

3    Q.    Okay.  I noted in this case that the victim

4  spoke for over 15 minutes.  Is there any limitation on

5  what a victim or a victim's representative is allowed to

6  discuss or bring up during a hearing?

7    **A.    What do you mean a victim's representative?**

8    Q.    For example, if a victim is deceased and they

9  have a family member come speak, maybe they are

10  considered just a victim, but I guess my question is the

11  same, is there any limitation on issues or topics that

12  they can discuss during the hearing?

13    **A.    Well, yeah, we want them to stay focused on,**

14  **you know, the information at hand.**

15    Q.    In this hearing, the victim who gave the

16  statement specifically talked about reading Miller vs.

17  Alabama and Montgomery vs. Louisiana.  Are there any

18  limits to having victims make legal arguments during

19  their statements?

20    **A.    Say that again.**

21    Q.    Are there any limitations placed on a victim's

22  ability to advance a legal argument during a hearing?

23  For example, cite to statutes or cite to case law during

24  a hearing?

25    **A.    I don't think so.  I think it's just left up**

1    what the board member like I said stays on track.

2        Q.    I note that the victim in this hearing stated

3    that the offender had, to use her terminology, a long

4    adolescent history of crime.  Do you ever follow up on

5    statements like that that are made to try to verify the

6    statements?

7        A.    That should be something that's in the report.

8        Q.    Okay.  Do you -- You tell me, how much weight

9    do you typically give to victim statements or how do you

10   consider them in making your decision?

11       A.    That's hard to judge.

12       Q.    And I appreciate that.  I understand that all

13   of these cases are going to be kind of different.  There

14   was a statement made in this case by the victim about

15   the offender's mother and she said that she recalls the

16   mother being contacted by the police, asked to come down

17   to the incarceration facility and she refused at first.

18   I just wonder statements like that, is there ever an

19   attempt to follow up on statements made by an offender

20   or say even a prosecuting attorney that aren't in the

21   record or aren't supported by documents in the record?

22       A.    I've never -- Here again, what they say I look

23   at what I have.  Here again, I look at what I have in

24   the file as far as their history, their background,

25   prior arrests.

1     Q.   So if there's any disparity, for example,

2  between what's in the file and what a victim or a

3  prosecuting attorney would say, you would typically base

4  your decision on the documents in front of you and

5  what's in the file; is that fair?

6     **A.   Say that again.**

7     Q.   If there was a case, for example, where a

8  victim made a statement about the underlying trial or

9  the underlying crime and it conflicts with what's in the

10  file in front of you, would you typically provide more

11  weight and make your decision based on what's in the

12  file?

13     **A.   Well, what I have in the file is the official**

14  **police report or record.**

15     Q.   Okay.  During this hearing at one point the

16  victim stated that the offender's prison record, to use

17  her language, is not unblemished.  Do you -- strike

18  that.

19           Are offenders' prison records typically made

20  available to victims prior to a hearing?

21     **A.   Are their prison records?  I don't think so.**

22     Q.   Okay.  I was just curious because I reviewed

23  that and I wasn't sure how a victim would know about an

24  offender's prison records.  Do you have any sense of how

25  that would occur or do you know how it occurred in this

PohlmanUSA Court Reporting
(877) 421-0099    PohlmanUSA.com
Case 2:17-cv-04082-NKL  Document 134-11  Filed 06/12/18  Page 30 of 49

1  case?

2      **A.   No.**

3      Q.   Okay.  Because my understanding is typically

4  prison records are not made public; is that correct?

5      **A.   Yeah.**

6          THE WITNESS:  Did I answer that?

7          THE COURT REPORTER:  You said yeah.

8          THE WITNESS:  I'm sorry.  If you want to --

9  BY MR. AULT:

10     Q.   Let's try it again.  It's my understanding

11 that prison records of offenders are not generally

12 available to the public; is that fair?

13     **A.   I believe that's correct.**

14     Q.   Fair to say though in this case if a victim

15 made or when the victim made a statement about the

16 offender's prison records, you don't know how she knew

17 about those prison records; is that fair?

18     **A.   Well, that's her statement.  Here again, I**

19 **have all the information in the file for that hearing**

20 **that's been provided to me.  So I know what's in, you**

21 **know, what his history is or what he's done as far as**

22 **violations or conduct.**

23     Q.   Okay.  And you don't know whether she knew

24 about those violations or conduct or not or if she did

25 know, how she got it or anything related to that?

1      A.   That's her statement.

2      Q.   Okay.  The prosecuting attorney spoke after

3  the victim.  Is it common for a prosecuting attorney to

4  have the option to speak during a parole hearing?

5      A.   I think the prosecutors and law enforcement

6  have the opportunity to speak.

7      Q.   The prosecuting attorney during his statement

8  said that he was providing you with written materials.

9  If a prosecuting attorney or law enforcement showed up

10  at a hearing and provided you with written materials,

11  are those things that you would take and add to the file

12  or what would you do with those?

13      A.   I believe we would, but I'm uncertain if it

14  had to go through somebody else or be sent in.

15      Q.   That wouldn't be your job as the board member

16  to do that, correct?

17      A.   I don't remember.

18      Q.   Okay.  I reviewed a copy of what the

19  prosecuting attorney provided and I'll note that he

20  attached photographs of the crime scene and diagrams of

21  the crime scene.  Is that type of material typically

22  included in a file?

23      A.   Some files it's already in there.

24      Q.   Okay.  So it wouldn't be unusual to open a

25  file and see evidence from the underlying crime?

 1      **A.    Yes.**

 2      Q.    Okay.  I was curious about another thing.  In

 3   the materials that the prosecuting attorney submitted,

 4   there was a list of the offender's conduct violations

 5   from when he was incarcerated that include other

 6   inmates' names and other inmates' numbers.  Do you know

 7   whether this information is provided to prosecuting

 8   attorneys?

 9      **A.    No, I have no idea.**

10      Q.    Okay.  So like I said, I listened to the

11   hearing and I think it's 61 minutes long, just over an

12   hour.  By my calculation about 40 minutes of that hour

13   involve discussion of the underlying offense, the

14   underlying crime.  And then about 20 minutes is devoted

15   to the offender's statements, discussions about, for

16   example, his behavior while he was incarcerated.  I'm

17   curious whether that breakdown is typical that the

18   majority of a hearing focuses on the underlying offense

19   rather than behavior and courses that the offender may

20   have taken.  Does that sound pretty common to you?

21      **A.    Every case is different.**

22      Q.    Okay.  In the training that you've received

23   for how to conduct these hearings, is there any kind of

24   suggestion made as to the percent of time that should

25   focus on the underlying crime?

 1      **A.   Say that again.**

 2      Q.   For example, is there training saying if you

 3 are overseeing one of these hearings you should spend X

 4 amount of time discussing the underlying crime or X

 5 amount of time discussing their conduct and courses

 6 they've taken and a home plan for when they get out?  Is

 7 there any kind of suggestion about how that breakdown

 8 should take place?

 9      **A.   I don't remember any.**

10      Q.   Okay.  Do you recall during Mr. ███████

11 hearing asking any questions about the factors set forth

12 in Senate Bill 590?

13      **A.   Here again, yeah, I don't remember.**

14      Q.   Toward the end of the hearing there was some

15 discussion about Mr. Brown's minimum eligibility date

16 and whether it had been calculated correctly.  Do you

17 remember that issue coming up in this hearing?

18      **A.   Vaguely but no details.**

19      Q.   Okay.  Would it be your job as the board

20 member to calculate that minimum eligibility date or

21 would that have been done by someone else?

22      **A.   Someone else.**

23      Q.   Okay.  So would it be fair to say that you got

24 told you're doing this hearing on this date, here's the

25 file, but you weren't the one that set up the hearing or

1  calculated the minimum eligibility date or anything like
2  that?
3        **A.   No, we don't do that.**
4        Q.   That would be left to another staff member
5  that's not a board member, fair?
6        **A.   Yes.**
7        Q.   Okay.  During the hearing Ms. Quinn who is
8  Mr. ███ delegate asked to speak about the minimum
9  eligibility date and you wouldn't permit her.  Is there
10 a reason that you didn't allow her to speak on the
11 minimum eligibility?
12       **A.   Yeah, because as is stated from the beginning**
13 **to clarify to the delegate that they're there for, you**
14 **know, to lend support as far as like if we want to hear**
15 **home plan or job, what they're going to provide, how**
16 **they can assist him when they're out, that type of**
17 **information.**
18       Q.   On the recording after Mr. ███ left and his
19 delegate left, there was some continued discussion about
20 the minimum eligibility date.  Do you recall any
21 discussion about Mr. ███ case that took place after
22 he left the hearing room?  I know that's asking you to
23 go back several months.
24       **A.   No.  After we complete the hearing, yeah, I**
25 **don't remember.**

```
 1      Q.   I'll note that after Mr. ████ left the
 2  hearing the prosecuting attorney remained in the room
 3  and he said I don't know if this is appropriate, just
 4  based on your question I wanted to hand you this.  This
 5  is a transcript of a statement.  And it appears to me --
 6  I'm not sure that he handed you a transcript of a
 7  statement from perhaps prior to the original trial.  I'm
 8  not sure.  Do you remember what he handed you?
 9      A.   No.
10      Q.   Is it uncommon for a prosecuting attorney to
11  continue to discuss the case after the offender leaves
12  the hearing?
13      A.   We usually don't have many prosecutors.  So I
14  wouldn't know to say that that's uncommon or not.
15           MR. AULT:  Okay.  Probably have another 20 or
16  30 minutes.  Should we finish it up or would you like to
17  take a break?
18           MR. SPILLANE:  Whatever you want to do, sir.
19           THE WITNESS:  Let's keep rolling.
20           MR. AULT:  All right.  I will ask the court
21  reporter to mark this next exhibit.
22           (RUZICKA DEPOSITION EXHIBIT 4 WAS MARKED FOR
23  IDENTIFICATION.)
24  BY MR. AULT:
25      Q.   Now if you take a look at this, the second
```

```
 1    page appears to be the Board Action Sheet for ███████
 2    ██████; is that right?
 3         A.   Yes.
 4         Q.   And it looks like in the box that says
 5    decision and remarks initial member, is that your
 6    initials there, DTR?
 7         A.   Yes.
 8         Q.   So the deny and rehear ████████ would have
 9    been the decision that you reached after the hearing; is
10    that fair?
11         A.   Yes.
12         Q.   And it looks like all the other individuals
13    that signed agreed deny and rehear ██████████, correct?
14         A.   Yes.  Say the others voted to or initialed to
15    rehear?
16         Q.   Uh-huh.
17         A.   Yes.
18         Q.   The box just above the box that you initialed
19    that says hearing panel comments, did you write that or
20    was that written by someone else?
21         A.   It was written by someone else.
22         Q.   Okay.  And if you look at the last page has
23    some information about who else was present.  Was that
24    also written by someone else?
25         A.   Yes.
```

1      Q.  Okay.  If you can turn back to the first page.

2  At the bottom it says AGO3139.  It looks like this was a

3  form similar to what we looked at earlier in the

4  deposition which sets forth the factors under Senate

5  Bill 590; is that correct?

6      **A.  Yes.**

7      Q.  Do you fill out the information after these

8  five factors or is that someone else's handwriting?

9      **A.  That's someone else's handwriting.**

10      Q.  Do you know who filled it out?

11      **A.  I would believe it's the analyst.**

12      Q.  When you initialed this with your

13  recommendation of deny and rehear, was it already filled

14  out?

15      **A.  I don't remember.**

16      Q.  Okay.  Do you recall whether any other members

17  of the board came to you with discussion or questions

18  about how to vote on Mr. ▉▉▉▉ hearing?

19      **A.  I don't remember.**

20      MR. AULT:  Okay.  I'll ask the court reporter

21  to mark this as Ruzicka Exhibit 5.

22      (RUZICKA DEPOSITION EXHIBIT 5 WAS MARKED FOR

23  IDENTIFICATION.)

24  BY MR. AULT:

25      Q.  Do you recognize if not this specific document

PohlmanUSA Court Reporting
(877) 421-0099    PohlmanUSA.com
Case 2:17-cv-04082-NKL  Document 134-11  Filed 06/12/18  Page 38 of 49

1  at least this form?

2       **A.   Yes.**

3       Q.   What is this?

4       **A.   Information for Release Consideration.**

5       Q.   Okay.  It's my understanding that this

6  information is given to the offender following the

7  hearing; is that correct?

8       **A.   They get some type of notice.**

9       Q.   Okay.  As a board member, you're not the one

10  that delivers the notice, correct?

11       **A.   No.**

12       Q.   Okay.  Fair enough.  If you look at the

13  bottom, it says the reasons for this action taken are

14  release at this time would depreciate the seriousness of

15  the present offense based on:  A) Circumstances

16  surrounding the present offense.  What does that mean?

17       **A.   It was a serious offense.**

18       Q.   Okay.  Are there any other -- Is there any

19  other information given to the offender about why the

20  board reached the decision it reached?

21       **A.   I don't know.**

22            MR. AULT:  Okay.  Okay.  I'll ask the court

23  reporter to mark this as Ruzicka 6.

24            (RUZICKA DEPOSITION EXHIBIT 6 WAS MARKED FOR

25  IDENTIFICATION.)

```
 1   BY MR. AULT:

 2        Q.   Do you recognize this form document?

 3        A.   Yes, as a Pre-Hearing Report.

 4        Q.   Okay.  It shows that this Pre-Hearing Report

 5   is for Mr. ███████████, correct?

 6        A.   Yes.

 7        Q.   All right.  Was it your custom as a member of

 8   the board to review the Pre-Hearing report before the

 9   hearing took place?

10        A.   Could you repeat that again?

11        Q.   As a member of the board, would you always

12   review the Pre-Hearing Report before conducting a parole

13   hearing?

14        A.   Yes.

15        Q.   Okay.  If you look on the third page of the

16   report, the first full paragraph, about right in the

17   middle there's a sentence that begins file material does

18   not contain any information relating to Brown's

19   intellectual capacity or mental and emotional

20   development at the time of the offense.  Do you see

21   that?

22        A.   Sorry.  Are you on the third page?

23        Q.   Yeah, page 3.

24        A.   Okay.  Which paragraph again?

25        Q.   The first full paragraph.  The second.
```

1    **A.    The official version?**

2         Q.    Yes.  So about halfway down do you see there's

3    a sentence that begins file material right in the

4    middle?

5    **A.    Yes.**

6         Q.    Okay.  So I'll read that again.  File material

7    does not contain any information relating to Brown's

8    intellectual capacity or mental and emotional

9    development at the time of the offense.  Did you ask or

10   do you recall asking during the hearing any questions

11   about Mr. ███████ intellectual or mental capacity at the

12   time that the event took place when he was a juvenile?

13   **A.    No.  I really wouldn't have any idea.**

14        Q.    Okay.  I won't mark it as an exhibit.  We can

15   if needed, but there was a diagnostic center report in

16   the file that said that Mr. ███████ functional grade

17   level was not tested when he was admitted and an IQ

18   score was not tested when he was admitted.  Do you ever

19   consider factors such as a juvenile's mental capacity or

20   IQ or emotional development in making a decision in a

21   parole hearing?

22   **A.    Here again, every case is different.**

23        Q.    In this case do you recall asking any

24   questions to try to determine Mr. ███████ --

25   **A.    I have no idea.  This has been so long ago I**

1    **have no idea what I would have asked.**

2        Q.   Okay.  The last issue I wanted to discuss

3    involved an investigation report that was provided to us

4    by the Attorney General's Office involving a game or

5    contest that allegedly took place during some of your

6    parole hearings.  Do you know what I'm talking about?

7        **A.   Yes.**

8        Q.   The report identifies -- Well, first of all,

9    have you seen, and I'll be done in just a few minutes, I

10   just have a few questions on this.  Have you seen the

11   report or read the underlying report?

12       **A.   Which report?**

13       Q.   An investigation report.  It looks like it

14   might have been completed by Amy Roderick?

15       **A.   Yes.**

16       Q.   Are you familiar with that report?

17       **A.   Yes.**

18       Q.   Okay.  I don't really -- I don't intend to

19   mark it as an exhibit.  I just wanted to know whether

20   you were familiar with it.  The report identifies I

21   think it's 15 hearings that were reviewed in which

22   certain words were said involving you and an individual

23   named ███████████.  Remind me what was ████████████

24   position?

25       **A.   Analyst.**

```
 1        Q.   Did you ever participate in this game or this
 2   contest with any analyst other than Mr. ████?
 3        A.   No.
 4        Q.   Just the two of you?
 5        A.   (The witness nodded his head.)
 6        Q.   Okay.  In the report that was conducted, you
 7   said that you incorporated words in song titles to
 8   assist with the full body of the complete interview.
 9   What did you mean by that?
10        A.   Say that again.
11        Q.   You were asked about incorporating words in
12   song titles and you said that you did so to assist with
13   the full body of the complete interview, and I was
14   curious what you meant by that, if you recall?
15        A.   I don't recall.
16        Q.   Okay.  During an interview, I assume it was
17   with Ms. Roderick, you were asked about how you
18   conducted hearings.  You said that you follow the
19   hearing form and ask the questions on the form.  Is
20   there a hearing form with questions that you typically
21   use during hearings?
22        A.   No.  Here again trying to -- Probably what I
23   meant is the file maybe instead of, what was the word
24   you used, the hearing form.  There's no hearing form
25   other than the form we go through.  To say this would be
```

 1  the form and we would outline and go through it to ask

 2  our questions off of.

 3      Q.   That's what I wanted to be clear about.

 4  There's not a script or a list of questions that you're

 5  required to ask in every hearing, is there?

 6      A.   No.

 7      Q.   In a follow up letter to Ms. Roderick you

 8  state that you review the evidence based tools looking

 9  at the guideline and ranges to make your best decision

10  ensuring public safety.  Can you tell me what evidence

11  based tools you used?

12      A.   Well, that's the -- Here again, that comes out

13  of here information where variation in age and

14  schooling.  There's a lot of factors, age and schooling

15  and conduct, criminal history to say that's put in a

16  formula to give us guidelines and ranges.

17      Q.   Other individuals that we spoke to talked

18  about a salient factor score.

19      A.   Yes.

20      Q.   Is that an example of an evidence based tool

21  that you use?

22      A.   Here again, I've been gone, retired eight

23  months.  Yes, there's a salient factor score.  There's a

24  drug score, SACA since you brought that up.  S-A-C-A.

25  It's a drug range.

1     Q.   After this report was finalized, I believe it

2  was in November of 2016, were there any repercussions or

3  discipline or anything like that?

4     **A.   No.**

5     Q.   You remained on the board and continued to

6  conduct hearings, right?

7     **A.   Yes.**

8     Q.   Okay.

9     **A.   Well, you say -- After that, yeah, I went back**

10  **to hearings.  During the investigation I was in the**

11  **office --**

12     Q.   Okay.

13     **A.   -- reviewing those files that are office**

14  **related.**

15     Q.   Okay.  And then after the investigation you

16  continued going out to the facilities and conducting

17  hearings?

18     **A.   Yes.**

19     Q.   Okay.  I want to make clear were you involved

20  in any kind of game or contest during Mr. Brown's

21  hearing that you conducted?

22     **A.   No.**

23     Q.   Have you ever been involved in a game or

24  contest like that during hearings involving -- strike

25  that.  As far as you know, Mr. ███████ hearing was the

PohlmanUSA Court Reporting
(877) 421-0099    PohlmanUSA.com
Case 2:17-cv-04082-NKL  Document 134-11  Filed 06/12/18  Page 45 of 49

1    only Senate Bill 590 hearing that you conducted,

2    correct?

3         **A.    I believe that's the only one.**

4         Q.    You're not aware of any other Senate Bill 590

5    hearings that you would have conducted in which you were

6    involved in a game or contest of any kind?

7         **A.    No.**

8         Q.    Your attorneys or the Attorney General's

9    Office provided us with notes from a phone call with a

10   Missouri state senator that raised some issues about

11   your conduct and asked if it had an impact on the

12   hearing involving Mr. ███.  Were you aware of that

13   phone call?

14        **A.    No.**

15        Q.    You didn't have any interviews or you didn't

16   talk to anybody about that phone call after it took

17   place?

18        **A.    No.**

19        Q.    Are you aware of any instances of

20   unprofessional or unethical conduct by board members

21   during hearings?

22        **A.    No.**

23        Q.    Has anyone from the Department of Corrections

24   or the board ever specifically told you that they

25   disapproved of how you handled any Senate Bill 590

1  hearings which in this case would just be Mr. 

2  hearing?

3      **A.    No.**

4      Q.    Other than the discussion that we're having in

5  the deposition today, have you had any other discussions

6  other than with your attorney about Mr. ████ hearing?

7      **A.    No.**

8          MR. AULT:  Okay.  Sir, I believe those are all

9  the questions that I have.

10         MR. SPILLANE:  I have maybe two or three

11  questions, take a couple of minutes.

12  CROSS-EXAMINATION BY MR. SPILLANE:

13     Q.    When someone is denied based on the

14  circumstances of the offense, does that mean that they

15  will never be paroled?

16     **A.    No.**

17     Q.    Have you been involved in cases where someone

18  was denied based on the circumstances of their offense

19  and they were later paroled?

20     **A.    Denied and later paroled?**

21     Q.    Yes.

22     **A.    Yes.**

23     Q.    Denied based on the circumstances of the

24  offense and then later paroled?

25     **A.    Yes.**

```
 1        Q.   When you consider either as a member of the
 2   majority board or as a panelist sitting on a hearing
 3   whether or not to parole an individual, do you consider
 4   everything in the Pre-Hearing Report?
 5        A.   Yes.
 6             MR. SPILLANE:  Those are all the questions I
 7   have.  Thank you.
 8             MR. AULT:  I don't have anything further.
 9   Mr. Ruzicka, thank you very much for your time.
10             THE WITNESS:  You're welcome.
11             MR. SPILLANE:  Thank you.  We appreciate it.
12             MR. AULT:  We can go off the record.
13             THE COURT REPORTER:  Do you want to tell him
14   about his signature?
15             MR. SPILLANE:  If you want to check it and
16   make sure there are no typographical errors and then
17   sign it, you may, or you may waive signature and trust
18   that the reporter took down everything correctly.
19   Normally everyone has waived.  And I assume you're going
20   to do a fine job.
21             THE COURT REPORTER:  So do you waive?
22             THE WITNESS:  Yes.
23             MR. SPILLANE:  Right.  That's your decision.
24             THE WITNESS:  Yes.
25             (Signature waived.)
```

```
 1                    CERTIFICATE OF REPORTER

 2

 3          I, Beverly Jean Bentch, CCR No. 640, within the

 4     State of Missouri, do hereby certify that the witness

 5     whose testimony appears in the foregoing deposition was

 6     duly sworn by me; that the testimony of said witness was

 7     taken by me to the best of my ability and thereafter

 8     reduced to typewriting under my direction; that I am

 9     neither counsel for, related to, nor employed by any of

10     the parties to the action in which this deposition was

11     taken, and further, that I am not a relative or employee

12     of any attorney or counsel employed by the parties

13     thereto, nor financially or otherwise interested in the

14     outcome of the action.

15

16                    _____

                      Beverly Jean Bentch, CCR No. 640
17

18

19

20

21

22

23

24

25
```