

**Pohlman**USA®
Court Reporting and
Litigation Services

---

Brian George

January 26, 2018

---

Norman Brown, et al.

vs.

Anne L. Precythe, et al.

IN THE UNITED STATES DISTRICT COURT

   WESTERN DISTRICT OF MISSOURI

      CENTRAL DIVISION


NORMAN BROWN, et al.,     )
               )
Plaintiffs,      )
               )
vs.               )  Case No. 17-cv-4082
               )
ANNE L. PRECYTHE, et al.,  )
               )
Defendants.      )


    DEPOSITION OF BRIAN GEORGE


  Taken on behalf of Plaintiffs

1                       I N D E X

2    EXAMINATIONS                                      Page

3    Direct Examination by Ms. Jones                     6

4    Cross-Examination by Mr. Spillane                 144

5

6    EXHIBIT INSTRUCTIONS

7    Original exhibits were retained by the court
     reporter and will be copied and attached to
8    copies of the transcript.

9

10                          EXHIBITS
                                     Page
11
     Exhibit 1                                          48
12
          1-page document Bates labeled AGO-28
13
     Exhibit 2                                          54
14
          Document Bates labeled AGO-30 through 40
15
     Exhibit 3                                          80
16
          Board action sheet, Bates labeled AGO-60
17        through 61

18   Exhibit 4                                          91

19        Panel members and others attending the
          hearing of Ralph McElroy on 12/13/16,
20        Bates labeled AGO-2332

21   Exhibit 5                                          93

22        Transcript from the Ralph McElroy hearing

23   Exhibit 6                                          93

24        Key sheet for Exhibit 5

25

```
 1   Exhibit 7                                          95

 2        Ralph McElroy's PHR, Bates labeled
          AGO-2447 through 2454
 3
     Exhibit 8                                          99
 4
          Senate Bill 590
 5
     Exhibit 9                                         108
 6
          Letter of support from Paul Witherspoon
 7        for Ralph McElroy, Bates labeled AGO-2482
          and 2483
 8
     Exhibit 10                                        117
 9
          Parole decision for Ralph McElroy, Bates
10        labeled AGO-2444 and 2445

11   Exhibit 11                                        122

12        Letter of support from Jack Morgan for
          Sidney Roberts, Bates labeled AGO-1998
13
     Exhibit 12                                        142
14
          18-page Inspector General's Investigation
15        Report

16   Exhibit 13                                        143

17        3-page memo from Kelly Dills to Julie
          Kempker, dated 11/15/16
18

19

20

21

22

23

24

25
```

1              IN THE UNITED STATES DISTRICT COURT

2                  WESTERN DISTRICT OF MISSOURI

3                        CENTRAL DIVISION

4
     NORMAN BROWN, et al.,         )
5                                  )
           Plaintiffs,             )
6                                  )
     vs.                           )    Case No. 17-cv-4082
7                                  )
     ANNE L. PRECYTHE, et al.,     )
8                                  )
           Defendants.             )
9

10

11              DEPOSITION OF WITNESS, BRIAN GEORGE,

12   produced, sworn and examined on January 26, 2018, between

13   the hours of 9:50 a.m. and 1:50 p.m. of that day at the

14   offices of the Missouri Attorney General, 221 West High

15   Street, 4th Floor, Jefferson City, Missouri, before

16   Angie D. Threlkeld, Certified Court Reporter, CCR No.

17   1382, in a certain cause now pending in the United States

18   District Court, Western District of Missouri, Central

19   Division, wherein Norman Brown, et al. are the Plaintiffs

20   and Anne L. Precythe, et al. are the Defendants.

21

22

23

24

25

```
 1                    APPEARANCES

 2   FOR THE PLAINTIFFS:

 3   MS. DENYSE L. JONES

 4   Husch Blackwell

 5   190 Carondelet Plaza

 6   Suite 600

 7   St. Louis, Missouri 63105

 8   314.480.1956

 9   denyse.jones@huschblackwell.com

10

11   FOR THE DEFENDANTS:

12   MR. MICHAEL J. SPILLANE

13   MR. ANDREW J. CRANE

14   Attorney General's Office

15   221 West High Street

16   Jefferson City, Missouri 65101

17   573.751.1307

18   573.751.0264

19   mike.spillane@ago.mo.gov

20   andrew.crane@ago.mo.gov

21

22   CERTIFIED COURT REPORTER:

23   Angie D. Threlkeld, CCR NO. 1382

24

25
```

 1          IT IS HEREBY STIPULATED AND AGREED by and

 2     between counsel for the Plaintiffs and counsel for the

 3     Defendants that this deposition may be taken by Angie D.

 4     Threlkeld, a Certified Court Reporter, CCR No. 1382,

 5     thereafter transcribed into typing, with the signature of

 6     the witness being expressly waived.

 7                    BRIAN GEORGE,

 8        of lawful age, having been produced, sworn, and

 9     examined on behalf of the part of the Plaintiffs,

10     testified as follows:

11     DIRECT EXAMINATION BY MS. JONES:

12        Q.    Can you state your name for the court

13     reporter.

14        **A.    Oh, sorry.  Brian George.**

15        Q.    And what is your current position?

16        **A.    Parole hearing analyst.**

17        Q.    With?

18        **A.    Probation and Parole.**

19        Q.    Okay.  Have you ever been deposed before?

20        **A.    No, ma'am.**

21        Q.    So I'm sure your attorney -- or the attorney

22     went over this with you.  But you realize you're under

23     oath; correct?

24        **A.    Yes.**

25        Q.    And that all your answers have to be in

1  words, like you have been doing --

2      A.     Yes.

3      Q.     -- so the court reporter can transcribe that.

4  And it might get hard, but like we shouldn't be talking

5  over each other.  So every once in a while if that starts

6  happening, I might remind you of that so she can have a

7  clear record.  Okay?

8      A.     Okay.

9      Q.     And is there any reason why you can't testify

10  fully and truthfully today?

11      A.     No.

12      Q.     What did you do to prepare for today's

13  deposition?

14      A.     **I spoke with Jay Boresi after he had sent me**

15  **an email, and he told me to search my email folder for**

16  **any of these offenders and any of the juvenile life**

17  **without parole search.  And I also searched my personal**

18  **drive on my computer.**

19      Q.     Was that in order to respond to the subpoena

20  for you to produce documents?

21      A.     **Yes, ma'am.**

22      Q.     Okay.  Did you do anything specifically to

23  prepare for you to give testimony today?

24      A.     **The only thing I got as far as the testimony**

25  **today was an email from Mr. Crane.**

```
 1              MR. CRANE:  You don't have to talk about

 2  communications between us.

 3              THE WITNESS:  Oh.

 4  BY MS. JONES:

 5      Q.    Did you review any documents?  I know you

 6  searched for them to produce.  Did you review those

 7  documents?

 8      A.    I just printed them up and put them in a

 9  folder.  There was no review.

10      Q.    Okay.  I'm just trying to get a sense of if

11  you did anything other than talking to counsel to prepare

12  for today's deposition.

13      A.    No, ma'am.

14      Q.    Okay.  What is your birthday?

15      A.    11-1-69.

16      Q.    And where do you currently reside?

17      A.    Home address?

18      Q.    Yes.

19      A.    ████████████████████████████████

20      Q.    Are you married?

21      A.    Yes.

22      Q.    What is your wife's name?

23      A.    Roberta.

24      Q.    And what -- I'm sorry.

25      A.    Roberta George.
```

```
 1      Q.      And what does she do for a living?

 2      A.      She's an office support assistant at Fulton

 3   Reception and Diagnostic Center.

 4      Q.      Have you ever been sued before?

 5      A.      Once --

 6      Q.      And what --

 7      A.      -- for a hospital bill.

 8      Q.      Where did you go to high school?

 9      A.      Bunceton, Missouri.

10      Q.      Say that again.

11      A.      Bunceton, Missouri.

12      Q.      When did you graduate?

13      A.      1988.

14      Q.      Did you go to college after you graduated?

15      A.      I went for one year.

16      Q.      Where did you go?

17      A.      State Fair Community College.

18      Q.      What kind of classes did you take?

19      A.      General classes my first year.

20      Q.      Okay.  Was that the end of your formal

21   education?

22      A.      No, ma'am.

23      Q.      Okay.  What did you do next, as far as your

24   education?

25      A.      As far -- I don't remember what year I went
```

1   back, but I went back to complete my associate's degree.

2       Q.      From State Fair Community College?

3       A.      Yes, ma'am.

4       Q.      And what was your associate degree in?

5       A.      Criminal justice.

6       Q.      Do you remember what year you graduated?

7       A.      No, ma'am.

8       Q.      Okay.  Was it in the '90s?

9       A.      Yes.

10      Q.      Okay.  Did you take any, like, psychology

11  classes, if you recall?

12      A.      General psychology and general sociology.

13      Q.      Did it include childhood or adolescent

14  psychology?

15      A.      I do not recall.

16      Q.      Any formal education beyond your associate

17  degree?

18      A.      Yes.

19      Q.      What was that?

20      A.      I went to Columbia College in Columbia,

21  Missouri.

22      Q.      Did you earn a degree?

23      A.      Yes.

24      Q.      What degree?

25      A.      A bachelor of arts.

```
 1      Q.      Did you have a concentration or...

 2      A.      Criminal justice administration.

 3      Q.      What year was that?

 4      A.      That would be in the '90s also.

 5      Q.      Did you have any psychology classes?

 6      A.      I do not recall.

 7      Q.      Have you had any other formal training beyond

 8  your bachelor's degree?

 9      A.      No, ma'am.

10      Q.      Have you ever served in the military?

11      A.      Yes, ma'am.

12      Q.      What branch?

13      A.      Army National Guard.

14      Q.      What years?

15      A.      It's on my resume.

16      Q.      Okay.

17              MR. CRANE:  Sorry.

18              MS. JONES:  That's okay.

19  BY MS. JONES:

20      Q.      How long were you -- how long did you serve?

21      A.      Approximately 14 years.

22      Q.      Where were you stationed?

23      A.      With the National Guard, I was here in

24  Missouri.

25      Q.      Okay.  And when were you discharged or when
```

```
 1    was your end of service?
 2         A.      That's on my --
 3         Q.      Okay.
 4         A.      -- resume, as far as my dates of service.
 5         Q.      So I want you to walk me through your
 6    employment post-college.  What was your first job?
 7         A.      Corrections officer at FRDC.
 8         Q.      Where did you say?
 9         A.      Fulton Reception and Diagnostic Center.
10    Sorry.
11         Q.      Do you remember the year?
12         A.      I actually have those written down.
13         Q.      Okay.
14         A.      As a CO 1 from January 23rd of '96 to
15    May 19th of '97.
16         Q.      And what was after that?
17         A.      I became a probation and parole assistant --
18         Q.      Okay.
19         A.      -- at Probation and Parole Central Office in
20    the command center.
21         Q.      Okay.  What years?
22         A.      From 5-19-97 to 11-3-97.
23         Q.      Okay.  What was next?
24         A.      Okay.  FRDC.  I went back to Fulton Reception
25    and Diagnostic Center.  Sorry, I keep doing that.
```

1    11-3-97 to 5-23 of 2000 I was a probation and parole

2    officer.

3        Q.    And then what?

4        A.    And then I went to department -- Probation

5    and Parole Central Office as a PO 1 to help develop the

6    booking unit.  It was a reservation system for the courts

7    and board for treatment placements.  And I worked in that

8    unit from 5-23-2000 to 7-1 of 2001.

9        Q.    What was next?

10       A.    I transferred to District 21, Branson,

11   Missouri, as a probation and parole officer.  And I was

12   there from 7-1 of 2001 to January 1st of 2002.

13       Q.    What was next?

14       A.    And from that point I went back to the

15   booking unit at Probation and Parole Central Office from

16   1-1 of '02 to 6-29 of '03.

17       Q.    And then?

18       A.    I became a unit sup-- a unit supervisor at

19   Probation and Parole Central Office over the command

20   center.  And the dates on that was from 9-16 of '03 to

21   12-24 of '06.

22       Q.    Okay.

23       A.    And from that point I got a promotion at

24   Probation and Parole Central Office as a probation and

25   parole administrator from 12-24 of '06 to 11-18 of '07,

1    when I became a parole analyst at Probation and Parole

2    Central Office.

3         Q.    So you've been there about, what, ten years?

4    You've been a parole analyst about ten years?

5         A.    From 11-18-07 to present.

6         Q.    Okay.  What are your current

7    responsibilities?

8         A.    As a parole hearing analyst sitting on the

9    parole hearing panel, I'm assigned institutions that I

10   receive special reports, as far as treatment completions,

11   any program completions, negative conduct.  I also

12   receive the Missouri Sex Offender Program completion

13   reports or negative termination reports.  I also set

14   parole hearings on the new guys coming into -- and women

15   coming into the reception centers.  And of course

16   handling any phone communication or email communication

17   and assisting other analysts as needed.

18        Q.    So when you say you receive special reports

19   on completion of treatment of a sexual offender --

20        A.    Um-hum.

21        Q.    -- what else does that entail?  Like after

22   you receive the report, what do you do with that?

23        A.    Oh, okay.  Sorry.  We -- I look at the report

24   and then prepare a board action sheet to send through the

25   parole board.

1    Q.    So I may be jumping out of order, but with

2    the board action sheet, under what circumstances are

3    those filled out?

4    **A.    The board action sheet of, course, for my**

5    **parole hearing.  Any action that we're going to take, as**

6    **far as --**

7    Q.    Okay.

8    **A.    -- any -- any action that needs, you know, to**

9    **be addressed.**

10    Q.    So if there was a completion of treatment,

11    you would fill out a board action sheet.  What purpose

12    would that serve in that situation?

13    **A.    To -- if there's room for advancement of the**

14    **release date to the treatment completion.  And then also**

15    **to remove the stipulation of treatment, because we're not**

16    **allowed to remove stipulations or add stipulations**

17    **without a board member --**

18    Q.    Okay.

19    **A.    -- except for education and completion of**

20    **ang-- I believe anger management.**

21    Q.    Okay.

22    **A.    There's certain scenarios that we're allowed**

23    **to, but there's not very many.**

24    Q.    You also said you assist other analysts?

25    **A.    That would be if I had my work caught up, I**

1  would go in to see if they needed assistance.

2        Q.     So like with workload?

3        A.     Workload.

4        Q.     Okay.  What percentage of your time do you

5  spend attending hearings, parole hearings?

6        A.     Normally half a day, from 8:30 to whenever we

7  complete.  But normally it's -- with the hearings, it's

8  normally about half a day.

9        Q.     Is that every day?

10        A.     Three to four to sometimes five days a week.

11  It just depends on our hearing dockets and what I'm

12  scheduled.  I don't do the scheduling.  I just get what

13  my hearing schedule is for that week.

14        Q.     So if we were to consider your total time as

15  a parole analyst, would you say 60 percent of your time

16  or 40 percent of your time is in hearings?

17        A.     I would say 60 percent.

18        Q.     Okay.  Who do you report to?

19        A.     Steve Mueller.

20        Q.     How long have you reported to him?

21        A.     Since Kelly Dills changed jobs.  I'm not

22  exactly sure of the date.

23        Q.     What position is that that Steve Mueller,

24  formally Kelly Dills, holds?

25        A.     I honestly don't know his job title.

```
 1      Q.    Have you always reported to that position as
 2  a parole analyst?
 3      A.    Yes, ma'am.
 4      Q.    Was Kelly Dills the first person holding that
 5  position when you arrived?
 6      A.    No.  It was initially Jan Barton.
 7      Q.    Does that get us -- well, I'm sorry.  I'm
 8  trying to get a sense of over the last five years or so
 9  who all you reported to.
10      A.    Um-hum.
11      Q.    So Steve Mueller, Kelly Dills.  Anyone else
12  in that, like, the last five years?
13      A.    I don't remember when Jan Barton retired --
14      Q.    Okay.
15      A.    -- to be -- to know if that was within the
16  five years.
17      Q.    So are those the only three then, Jan Barton,
18  Kelly Dills, Steve Mueller?
19      A.    Yes, ma'am.
20      Q.    Okay.  What type of training did you receive
21  as a parole analyst?
22      A.    There really wasn't any training attended.
23  It was observation of parole hearings with another
24  analyst, not really being a voting member, but observing.
25      Q.    How long did you observe?
```

1    A.    Three -- three sets of parole hearings.  Not
2  three hearings, but three hearing days, whatever was on
3  the docket for that day.
4    Q.    Were those half days?
5    A.    I do not recall.
6    Q.    Okay.  Did you have any written materials to
7  rely on to do the parole hearings?
8    A.    I had the case referral policy.
9    Q.    Did anyone go over that with you?
10    A.    Yes.  Initially when I started, Jim Hogg was
11  the most senior analyst, and he would assist with -- with
12  any questions.
13    Q.    How many parole analysts are there currently?
14    A.    As far as hearing analysts, there's five.
15  And on the verification side there's two.  And I don't
16  know if Steve Mueller still has part of a caseload or not
17  or if his was split between the two.  I don't deal with
18  the parole-violator side.
19    Q.    Do you all meet as a department?
20    A.    As like probation and parole, the board
21  meetings.  And that's the board and analysts.
22    Q.    So the analysts don't have like a separate
23  meeting; they meet with the board?
24    A.    No, the analysts have a separate meeting too.
25    Q.    Okay.

```
 1        A.       I'm sorry, I misunderstood your question.

 2        Q.       Not a problem.  How often do the analysts

 3   meet?

 4        A.       Normally once a month.

 5        Q.       Does that include both revocation and the

 6   hearing analysts or...

 7        A.       Yes.

 8        Q.       Okay.  What do you all discuss?

 9        A.       There's an agenda that's prepared by, well,

10   now Steve Mueller, and we discuss whatever agenda items

11   are on that agenda.

12        Q.       What types of things would be discussed?

13                 MR. CRANE:  Just one second.  I want you to

14   know that he, Mr. George, brought a bunch of parole

15   analyst meeting minutes.  Those would be in documents.

16   So if you want to look at those as part of this line of

17   questioning, hopefully that's coming along shortly.

18                 MS. JONES:  Okay.  Well, I kind of want to

19   get this big picture of his --

20                 MR. CRANE:  I just wanted to let you know.

21                 MS. JONES:  I appreciate it.

22   BY MS. JONES:

23        Q.       Are you talking about specific hearings,

24   specific offenders, policies?  Like I'm just trying to

25   get a sense of like what is the purpose of the meeting?
```

```
 1      A.      It's not -- we don't discuss specific

 2   offenders.  I know that juvenile life without parole,

 3   there was a couple, you know, talking about the

 4   statute --

 5      Q.      Um-hum.

 6      A.      -- you know, and the form they prepared.  I

 7   think there was mention of the lawsuit at one of the

 8   meetings.

 9      Q.      Can you think of any other -- because I'm

10   trying -- you say you all meet once a month and...

11      A.      Yeah, it's more general.  Whatever issues

12   Steve thinks that we need to discuss.

13      Q.      About how long do the meetings last?

14      A.      They can be an hour or two.

15      Q.      So how are the analysts' meetings different

16   from the meetings with the board and the analysts?

17      A.      If something needs to -- or Steve or anybody

18   in the analyst group thinks things need to be brought to

19   the board for approval, then it -- we bring it to the

20   board meeting, because the board and analysts meet

21   together.

22      Q.      Who sets the agenda for those meetings?

23      A.      There is usually an email from the chairman's

24   secretary.  I'm trying to think of her name right now.

25   Pam.  I can't think of her last name.
```

```
 1                    MR. SPILLANE:  Can I tell him?

 2                    MS. JONES:  Yeah.

 3                    MR. SPILLANE:  I think it's Pam Rogers.

 4                    THE WITNESS:  Okay.  Thank you.  Pam Rogers,

 5      if there's any agenda items.

 6      BY MS. JONES:

 7          Q.     Can you think of the types of things that are

 8      covered in those meetings in general?  I mean, I get

 9      sometimes you're saying the analysts need approval for

10      certain things.

11          A.     Um-hum.

12          Q.     Are there any discussions about any specific

13      offenders in those meetings?

14          A.     If there's discussions as far as specific

15      offenders, that's usually in the board's closed session,

16      and we're not in that portion.

17          Q.     Okay.

18          A.     When the board has their closed meetings, all

19      the analysts are out.

20          Q.     Um-hum.  Okay.  Can you think of anything

21      else you all might discuss?

22          A.     I have some board meeting stuff too.

23          Q.     Do you recall whether there was any

24      discussion about the juvenile life without parole

25      offenders in those meetings?
```

    1        A.      Yes.

    2        Q.      Okay.

    3        A.      Yes.  And I should have the meeting minutes

    4    associated with that.

    5        Q.      Do you have any independent recollection of

    6    what was discussed about juvenile life without parole?

    7        A.      Initially it was the state statute, the form.

    8    And I believe Steve the last time updated the board on

    9    the -- what the percentage was, as far as set for release

   10    and rehear.

   11        Q.      Have you read the state statute for these

   12    individuals, juvenile life without parole?

   13        A.      Yes, I have a highlighted copy that I keep in

   14    my computer bay.

   15        Q.      Do you refer to it?

   16        A.      Yes.  It's -- I provided it to you today.

   17        Q.      Okay.  How often do you refer to it?

   18        A.      Initially, you know, we read it over.  And

   19    then I keep it just in case I need to refer to it.

   20        Q.      When was the last time you referred to it?

   21        A.      I don't recall.

   22        Q.      I'm trying to get a sense of is this a

   23    regular thing, like weekly, monthly, quarterly, or

   24    occasionally when an issue's come up?

   25        A.      Occasionally.

1    Q.    Okay.  Do your meetings, either the analysts'
2  meetings or the board's and analysts' meetings, cover
3  development and changes of a law in general?
4    **A.    No, ma'am, I do not -- do not know.**
5    Q.    Would you say you all, meaning analysts,
6  receive any training on how to apply the statute in
7  parole hearings?
8    **A.    The only instruction that we got was the form**
9  **had to be filled out, the additional form.  But as far as**
10 **examples, no.**
11   Q.    Were you comfortable with the level of
12 instruction you all received to apply the statute?
13   **A.    I felt comfortable enough to, you know, fill**
14 **the form.  But it probably would have been better to have**
15 **a little bit more, you know, discussion or direction,**
16 **yes.**
17   Q.    Do you recall any discussions amongst the
18 analysts or maybe the analysts and the board hear-- the
19 parole board members when this first came out kind of
20 talking about what was required and what you all were
21 going to be doing in the hearings?
22   **A.    Other than the analyst group meeting where,**
23 **you know, that this -- that additional form had to be**
24 **filled out.  But I don't recall any specifics.**
25   Q.    Okay.  Was there any level of concern amongst

1    the analysts with the ability to comply with the statute?

2        A.    I don't believe so.

3        Q.    Was there any discussion about childhood

4    psychology or adolescent development during this time

5    period?

6        A.    No, ma'am.

7        Q.    Do you have any direct reports?  Does anybody

8    report to you?

9        A.    No, ma'am.

10       Q.    So you were saying that you spend about a

11   half a day in parole hearings three to five days a week;

12   correct?

13       A.    Yes, ma'am.

14       Q.    How many hearings is typically scheduled in a

15   half day?

16       A.    14.

17       Q.    So would that be 14 in four hours?

18       A.    Four to five hours.

19       Q.    Do you travel for these hearings?

20       A.    Not very often anymore, due to the video.  We

21   may have one to two travel days a month.

22       Q.    How long has that been the case, that the

23   majority of the hearings are via video?

24       A.    That's within the last five years.

25       Q.    You talked about having reviewed the Missouri

1   statute with respect to the juvenile life without parole

2   members.  Have you read any of the cases -- any of the

3   case law that that statute arose from?

4       **A.      No, ma'am.**

5       Q.      Are you familiar with the Miller versus

6   Alabama case?

7       **A.      No, ma'am.**

8       Q.      What's your understanding of the statute?

9   What does the statute provide?

10      **A.      It took [sic] the juveniles that were**

11  **sentenced to life without parole an opportunity to get**

12  **parole.**

13      Q.      Do you recall what factors are to be

14  considered in order for them to -- you know, during their

15  parole hearing?

16      **A.      It's on the form that I've provided.**

17      Q.      Do you have any independent recollection of

18  what those factors are?

19      **A.      Maturity and growth.  Their conduct as far**

20  **as, you know, what are they doing to better themselves.**

21  **I believe the support.  Their culpability or -- in the**

22  **crime.  That's about it.**

23      Q.      Do you recall whether the circumstances of

24  their youth is a factor?

25      **A.      I believe that was a factor, I don't know if**

1    that was on sentencing, but their culpability or their

2    age.

3         Q.    When you say you believe that was on

4    sentencing, as opposed to during the parole hearing

5    process, is a factor that --

6         A.    Well, age I -- I don't know.

7         Q.    Okay.  No, that's fair enough.  I just want

8    to make sure I understand.

9         A.    Yeah.

10        Q.    So I want to kind of walk through the

11   different roles various positions have in the parole

12   process and start with the IPOs.  Do you have a sense of

13   what their role is in preparing for the parole hearing or

14   the actual parole hearing?

15        A.    I have not been an IPO for a number of years.

16   So I would just assume that they interview the subject

17   that's going to have a parole hearing and prepare a

18   report to the board, a prehearing report.

19        Q.    The parole analysts, I know they are on the

20   panels for parole hearings.

21        A.    Yes, ma'am.

22        Q.    Is there any other responsibility they have,

23   you all have, in the process?

24        A.    As far as different from preparing the

25   special -- the reports from the institution or are you

1    talking about the parole hearing?

2       Q.    Well, I'm talking about from the time an

3    offender gets a hearing scheduled to the time they get a

4    letter saying release or denied, what is the parole

5    analysts' involvement in that process?

6       A.    Okay.  We get the files for the hearings

7    usually for the next week on Thursday or Friday at the

8    latest.  And if there are any victims scheduled, we would

9    get a notice from the Victims Unit.  And then copy that

10   prehearing report for the board member to review before

11   the hearing.  Then our responsibility's to, of course,

12   bring the files.  And if we're by video, we connect with

13   the institution.  Or travel.  If it's in person, we

14   travel to the institution.

15      Q.    Anything else that you can think of?

16      A.    Oh, and then whatever the docket is, you

17   know, usually the district administrator at the

18   institution determines who we see and in what order.

19      Q.    Okay.

20      A.    And then we review files.  And if it's

21   a victim --

22      Q.    Are you talking about during the hearing or

23   are we after the hearing now, when you say we review

24   files?

25      A.    The report that was provided, the prehearing

1  report.

2      Q.    Okay.  So is this the day of the hearing that

3  we're on now?

4      **A.    Yes, ma'am.**

5      Q.    Okay.

6      **A.    Review our hearing file for that hearing.**

7  **And then each one of us takes turns interviewing.**

8      Q.    Now, your -- when you say each one of us

9  takes turn interviewing, on a given panel there's only

10  one parole analyst; correct?

11     **A.    One parole analyst, one institutional**

12  **district administrator or unit supervisor, and a board**

13  **member.**

14     Q.    Okay.  Right.  So now that the interview is

15  over -- because we're going to spend some time talking

16  about the actual hearings.  Is there any other

17  responsibilities a parole analyst has after the hearing

18  is concluded?  So saying now the video is turned off --

19     **A.    Okay.**

20     Q.    -- now what, if anything, do parole analysts

21  do?

22     **A.    We discuss the vote, and each -- each person**

23  **would put their vote.  And then there is certain cases**

24  **that the panel can final, and there's certain cases that**

25  **have to go back to all the parole board to get a majority**

1  decision.

2    Q.    What kind of cases can the panel final?

3    **A.    I believe it is in here.  That way I can be**

4  **specific.**

5          MR. CRANE:  There are the originals back too.

6          THE WITNESS:  Oh, did I take your copies?

7          MR. SPILLANE:  No.

8          MR. CRANE:  It's for you.  There are page

9  numbers on them.  So if you find what you're looking for,

10  you can tell her where to find it.

11          THE WITNESS:  Okay.  Okay.  I'm looking at

12  case referral policy.

13  BY MS. JONES:

14    Q.    So this is 107.  Okay.

15    **A.    In parole hearings unanimous panel decisions**

16  **within guidelines for C and D felonies, Class A and B**

17  **felonies for drug cases less than 15 years.  We're**

18  **setting a reconsideration hearing, below or within**

19  **guidelines are final.  All other decisions are majority**

20  **board.**

21    Q.    Okay.  So we were walking through all the

22  things the parole analyst does after the video is turned

23  off; and we got to deliberate, vote, final certain cases.

24  Is there anything else parole analysts do?

25    **A.    We discuss as a group conditions for release**

1    on the ones we give a release date.  And then once the
2    hearings are over that day, the ones that have met the
3    criteria to be finaled by the panel go to the caseload
4    managers to prepare notices.
5         Q.    All right.
6         A.    And the majority board files would go to the
7    next board member in rotation.
8         Q.    All right.  So do you physically do that
9    part, when you say --
10        A.    Set the files on the other board member's
11   shelf, yes.
12        Q.    So after you set a file on a -- the next
13   board member's shelf, do you have any other role?
14        A.    I do not have any other role until the
15   decision's made and the notice is prepared, just to
16   review if it reflects what the board voted.
17        Q.    All right.  Is that it?
18        A.    That is it, ma'am.
19        Q.    Okay.  What role does the victim advocate
20   play or have in this process?
21        A.    I do not know what cases have to be notified
22   by the Victims Unit.  The Victims Unit is separate from
23   us.  But whatever cases require victim notification, they
24   take care of notifying and scheduling if they're going to
25   be in attendance or just want a phone call from the board

1    member.  We're instructed on the time that they're going

2    to be -- be there for the hearing that day.

3         Q.    What role do prosecutors have?

4         A.    That, again, is notified through the Victims

5    Unit.  I believe law enforcement can be notified too.

6    And I have no part in any of that, except for just

7    getting that notice from the Victims Unit.

8         Q.    What about the delegates for the offenders?

9         A.    I do not know that there's going to be

10   delegates until we either connect by video and the

11   district administrator or unit sup notifies us that

12   there's delegates in what cases or, if we're in person,

13   they'll notify us in person when we arrive.

14        Q.    What role does defense counsel have?

15        A.    As far as -- what's the reference?

16        Q.    From the time that the inmate or the offender

17   gets a hearing until the time a decision is made, are you

18   aware of any specific role that defense counsel has?

19        A.    No, ma'am.

20        Q.    Okay.  Do you know how an offender goes about

21   requesting a parole hearing?

22        A.    As far as with the juvenile lifers or in

23   general?

24        Q.    I'm going to ask you to compare the two to

25   see if the juvenile life without parole offenders do

1    anything any differently.  So...

2         **A.    Initially everybody that's eligible for a**

3    **parole hearing, they're scheduled when they arrive at**

4    **diagnostic.  And I believe -- I had no part in it, but I**

5    **believe there is a petition on the juvenile lifers that**

6    **they've petitioned.  But I've never seen one of the**

7    **petitions.**

8         Q.    So that's before you get involved?

9         **A.    Um-hum.**

10        Q.    Okay.  I want to go back to something you

11   said before when you were walking through the role of

12   parole analyst.

13        **A.    Okay.**

14        Q.    You said you get the files for the hearing a

15   week -- the Thursday or Friday before the upcoming week

16   of hearings?

17        **A.    Yes, ma'am.**

18        Q.    When you say you get the files, what file are

19   you referring to?

20        **A.    The parole file.**

21        Q.    Okay.  Do you review anything in the parole

22   file before the hearing?

23        **A.    No, ma'am.**

24        Q.    It's just a matter of you being able to bring

25   it to the actual hearings and make the copies of the PHR

1    for the other board members on the panel?

2    **A.       On a video hearing the copies are already**

3    **made.**

4    Q.       Okay.

5    **A.       And on the video the DA has already made**

6    **their copy.**

7    Q.       So going back to, you know, the inmate

8    requesting a parole hearing, you mentioned that a

9    juvenile life without parole offender will file a

10   petition but that you are not really a part of that

11   process; correct?

12   **A.       No, ma'am.**

13   Q.       So you don't know how much time lapses

14   between the request and the actual...

15   **A.       No, ma'am.**

16   Q.       Are you aware under what circumstances a

17   parole hearing would be in person versus video?

18   **A.       No, ma'am.**

19   Q.       Do you have any opinion on whether the

20   hearings are more effective or impactful in person versus

21   video?

22   **A.       Initially when video came about, I thought**

23   **there would be a difference, but I don't really see much**

24   **difference.**

25   Q.       Do you have a preference?

1    A.    I do not, ma'am.

2    Q.    Is it fair to say that for your first five

3    years as a parole analyst, the majority of the hearings

4    were in person?

5    A.    Yes, ma'am.

6    Q.    Do you know how an inmate would go about

7    requesting an in-person hearing?

8    A.    No, ma'am.

9    Q.    So I want to move on a little bit to how you

10    individually prepare for a hearing.  So as I understand,

11    you get the files before, you know, Thursday, Friday

12    before; but you don't do anything with the files until

13    the day of the hearing?

14    A.    Yes, ma'am.

15    Q.    Okay.  So can you walk me through how you

16    prepare for a hearing?

17    A.    Well, once we know the order, the ones that I

18    have, I will review the prehearing report before my

19    interview.

20    Q.    How is the order determined?

21    A.    That's usually by the supervisor at the

22    institution, unless there's a victim case, and those are

23    specifically the board member.

24    Q.    So let's say you arrive or the video starts

25    and you have 14; right?  So you just take every third?

1   Is it random how --

2       **A.      It's random --**

3       Q.      -- you get the ones assigned to you that you

4   will be conducting?

5       **A.      It's random.**

6       Q.      Okay.  So there's no criteria that's

7   considered in assigning?  For example, with the juvenile

8   life without parole, they don't say this must be

9   conducted by a board member?

10      **A.      I believe so far all those cases have been**

11  **conducted by a board member.**

12      Q.      Okay.  And that's intentional?

13      **A.      I do not -- do not know the approval process**

14  **of that.  But I do know that so far the board members**

15  **have been the ones that conducted them.  I wasn't privy**

16  **to any conversations.**

17      Q.      But for the juvenile life without parole

18  hearings you've participated in, do you recall whether

19  they just pulled those out and said, board member, you're

20  going to conduct these?

21      **A.      No.  I believe they determine that ahead of**

22  **time.  I don't -- I don't recall.**

23      Q.      Okay.  And maybe I'm not following you.  So

24  I'm starting with you all get there and you're about to

25  start the hearings.

1       **A.      Um-hum.**

2       Q.      Okay?  And you just had the list.  Who

3    decides who's going to conduct which panel, which

4    hearing?

5       **A.      Usually it's the district administrator.  But**

6    **I believe the juvenile lifers, the board has pretty much**

7    **looked at those.  Much as like the victims, they do those**

8    **cases.**

9       Q.      Okay.  Well, let me back into it this way:

10   When you all get the list of offenders, is it already

11   designated who's going to conduct which hearing?

12      **A.      No, ma'am.**

13      Q.      So the panel members determine who are going

14   to conduct these hearings?

15      **A.      In the case of a victim or as far as I know**

16   **the juvenile lifers, the board members have determined**

17   **that they're conducting those.  But as far as any general**

18   **just normal hearing docket...**

19      Q.      Okay.  So -- but they are -- it's not as if

20   you only hear juvenile life without parole on a given

21   day; correct?

22      **A.      That is true.**

23      Q.      So on a given day you could have two juvenile

24   life without paroles and then the rest are not juvenile

25   life without paroles?

```
 1        A.       That is --

 2        Q.       How are those other ones, the nonjuvenile

 3   life without parole, assigned to a panel member for

 4   conducting that given hearing?

 5        A.       The district -- the supervisor at that

 6   institution.

 7        Q.       Okay.  Who is a member of the panel?

 8        A.       Yes.

 9        Q.       Okay.  So that is the individual who decides

10   who's going to conduct the hearing?

11        A.       Except for in a case of a victim, where the

12   board members already had that file.

13        Q.       Right.  And, you know, not to beat a dead

14   horse, but, you know --

15        A.       Yeah.

16        Q.       -- the way we started out was is this random

17   or not.  And I thought you testified it was random.  But

18   now you're saying that certain types of hearings are

19   assigned to certain individuals --

20        A.       That's correct.

21        Q.       -- correct?

22        A.       Yes.

23        Q.       So what is the random part?

24        A.       The rest of the hearing docket.

25        Q.       Okay.
```

```
 1          A.      Sorry.

 2          Q.      No, I'm --

 3          A.      Thank you for pointing that out.

 4          Q.      So when you prepare for the hearing, does

 5     that consist of just reviewing the parole file?

 6          A.      Yes.

 7          Q.      Okay.  There's nothing else that you all do

 8     to prepare for a hearing?

 9          A.      No, ma'am.

10          Q.      How much time do you spend reviewing a file?

11          A.      I can just give you approximate time.  10 to

12     15 minutes.

13          Q.      Is that only for the files of the offenders

14     where you're conducting the hearing?

15          A.      Yes, ma'am.

16          Q.      So do you review the files of the other

17     individuals?  For example, a juvenile life without

18     parole, do you review that file too?

19          A.      I will stop what I'm doing as a board

20     member's interviewing and listen to the hearing, because

21     that additional information has got to be filled out.

22          Q.      Okay.  But with regards to the physical file,

23     do you read the physical file?

24          A.      No, ma'am.

25          Q.      So when you're reviewing the file of those
```

1    individuals where you're conducting the hearing, do you

2    read the entire file?

3         **A.    No, ma'am.**

4         Q.    What do you read?

5         **A.    It's the prehearing report that's completed**

6    **by the institution.**

7         Q.    Is that the only thing you review?

8         **A.    I look at prior board action sheets in the**

9    **file.  Maybe the past board member had instructed the**

10   **client to be involved in some programs or without**

11   **conduct.  Just to see how they progressed since that**

12   **point.**

13        Q.    Do you read like letters of support?

14        **A.    Yes, ma'am.**

15        Q.    So I'm trying to get a sense of everything

16   that you read in the file.  Because you said you didn't

17   read the entire file; correct?

18        **A.    That is true.**

19        Q.    All right.  So the PHR, the board action

20   sheet, letters of support, you're saying?

21        **A.    Letters of support.  It could be letters of**

22   **opposition.**

23        Q.    Is there anything in the file you skip over?

24        **A.    I usually don't look at the face sheet,**

25   **because the sentence structure is on the prehearing**

1    report.  And, actually, our files do not contain too much

2    anymore, because everything's scanned and in File Bound,

3    as far as the parole file.

4        Q.    But the parole file is the only thing you

5    review to prepare for hearings; correct?

6        A.    Yes, ma'am.

7        Q.    Okay.  So when you say materials are scanned

8    in, do you review those materials that are scanned in?

9    Like are they not in the file, the physical parole file?

10       A.    They're not in the physical parole file.

11   They're in the File Bound system.

12       Q.    So what kind of -- are you saying file down?

13       A.    File Bound.

14       Q.    Bound.  Okay.  What is in File Bound that is

15   not in the physical parole file?

16       A.    I cannot -- I could not list everything

17   that's in File Bound.

18       Q.    Can you give me any examples?  Not that it

19   has to be a complete list, but anything come to mind?

20       A.    Op 2 documents.

21       Q.    Say that again.

22       A.    Op -- our computer system documents.

23       Q.    What does that mean?

24       A.    I don't know what Op 2 stands for.

25       Q.    What type of information is on that document?

1     A.     Op 2's just the system that all our reports

2  are done in; special reports, face sheets, notices.

3     Q.     Is it duplicative of anything that's in the

4  parole file?

5     A.     Everything that is in Op 2 is in that File

6  Bound system.

7     Q.     But is that reflected in the physical file,

8  in anywhere?

9     A.     I believe there's a sheet saying what forms

10  are available in File Bound.

11     Q.     Do you have access to File Bound during the

12  parole hearing?

13     A.     Yes, ma'am.

14     Q.     Under what circumstances would you access

15  File Bound during a parole hearing?

16     A.     Normally if the offender states that there's

17  a letter of support from somebody, I will see if it came

18  in and was scanned in.

19     Q.     But is that something that would be in the

20  parole file?

21     A.     If it was received at the -- if we're by

22  video, the district administrator may have the hard copy

23  of it, but they have scanned it into File Bound where we

24  can access it.

25     Q.     Okay.  Can you think of anything else you

1    might access during a hearing?

2        A.    To look and see if there's any conduct

3    violations that occurred between when the officer did the

4    report.

5        Q.    Do you have a sense of how much time expires

6    between completion of the report and the hearing?

7        A.    No, ma'am.

8        Q.    Are we talking months or like days?

9        A.    I do not know, ma'am.

10       Q.    You don't have an idea when the parole

11   hearing report's completed?

12       A.    I don't pay attention as far as when it was

13   completed and when the hearing was set, no, ma'am.

14       Q.    So we were talking before about whether or

15   not you reviewed the full file.  And initially you said

16   you did not; am I correct?

17       A.    That's correct.

18       Q.    Okay.  But then you gave an example of like

19   the face sheet is something you wouldn't look at;

20   correct?  So I'm trying to get a sense of what percentage

21   of the file are you looking at?

22       A.    The main thing is if he had mentioned that

23   there was support and to see if we had a copy of that

24   support letter.

25       Q.    And you estimated that you spend 10 to

1  15 minutes reviewing a file?

2  **A.    Yes, ma'am.**

3  Q.    Are there circumstances when it takes longer

4  than that?

5  **A.    That's the normal for me.  Somebody else may**

6  **be different, but that's my normal.**

7  Q.    So after you review the file for the hearing

8  you're going to conduct, is there any discussion with the

9  other panel members?

10  **A.    Not until after the hearing.**

11  Q.    Okay.  With respect to the juvenile life

12  without parole hearings where the board member's

13  conducting it, is there any discussion with the rest of

14  the panel about that particular offender?

15  **A.    Before the hearing?  No.**

16  Q.    Okay.  So a hearing could just start cold,

17  you not having any idea the circumstances of the offender

18  that you're about to hear their hearing on?

19  **A.    That is true.**

20  Q.    Okay.  Do you feel like you're able to make

21  an informed decision, after sitting through a hearing on

22  a juvenile life without parole offender, without having

23  reviewed the file?

24  **A.    That is more why I stop and listen to the**

25  **hearing.  And --**

```
1        Q.     Are -- I'm sorry.
2        A.     And we're provided a copy of the report also.
3        Q.     Do you read the report?
4        A.     I go through the report as board members
5    interview.
6        Q.     So you're reading and listening at the same
7    time?
8        A.     Yes, ma'am.
9        Q.     Okay.  Do you review the letters of support?
10       A.     Yes, ma'am.
11       Q.     So you're doing this all while the hearing is
12   being conducted?
13       A.     Yes, ma'am.
14       Q.     Okay.
15       A.     I'm not being able to read the whole thing;
16   but if we needed additional time after the hearing, I
17   will continue.
18       Q.     Do you know who all is given access to the
19   parole file?
20       A.     I do not, ma'am.
21       Q.     Do you know whether or not the offender is
22   given access to the file?
23       A.     I believe not, but I'm not a hundred percent.
24       Q.     Has an offender ever asked you about contents
25   in his file or...
```

```
 1        A.      Not me personally.

 2        Q.      Oh, during a hearing that you've participated

 3   on?

 4        A.      No, ma'am.

 5        Q.      Is the offender informed of everything?  Like

 6   if there were letters of opposition, is the offender

 7   informed that there's letters of opposition in his file?

 8        A.      I do not recall.

 9        Q.      So we kind of already talked about what is

10   included in the parole file.

11        A.      Um-hum.

12        Q.      Okay.

13        A.      Yes.  Sorry.

14        Q.      Are there certain things that are required to

15   be in every parole file?

16        A.      I do not know, ma'am.

17        Q.      Do you know, when the file is updated, is

18   the -- well, let me restate this, based on what you said

19   earlier.  Do you know if anything goes in the file after

20   the PHR is completed?

21        A.      I do not know, ma'am.

22        Q.      Do you think that's possible?

23        A.      I do not know.

24        Q.      But you'll check File Bound if an offender

25   says something that makes you think that --
```

    1       A.      If the -- if he mentions there was a letter
    2  of support that we do not have, I will check and let him
    3  know if we had received it.
    4       Q.      How will he know whether or not you have the
    5  letter of support?  Do you all say we have letters of
    6  support from these five people?
    7       A.      I write down the names of support of who
    8  wrote letters.
    9       Q.      Okay.
   10       A.      And I let him know.  Me personally now.  I
   11  cannot speak for everybody.  Me personally, I will write
   12  down the names of the people that wrote support letters
   13  on my interviews.
   14       Q.      Okay.  And you will inform the offender of
   15  that?
   16       A.      Yes.
   17       Q.      Okay.  And so if he says you're missing one,
   18  that's when you'll check File Bound?
   19       A.      Yes.
   20       Q.      So it has to be prompted by something that's
   21  said during the hearing for you to check File Bound for
   22  that?
   23       A.      Yes.
   24       Q.      Do you know if there's anything specific to
   25  juvenile life without parole offenders that must be in

1    their parole file?

2        A.    I do not, no, ma'am, except for the

3    additional information that's got to be with the board

4    action sheet of those -- I got a copy of it right here.

5        Q.    So --

6        A.    That you know what that form is.

7        Q.    So I guess a juvenile life without parole

8    offender could have board action sheets in his file?

9        A.    If he --

10       Q.    For the first hearing.  I'm sorry, at the

11   time of his first parole hearing, he could have board

12   action sheets?

13       A.    Yes.

14       Q.    Okay.

15       A.    But before then I would -- I would assume

16   not, because they were never scheduled for a parole

17   hearing.

18       Q.    Okay.  So I just want to make sure we've gone

19   over everything you think needs to be in the parole file

20   of a juvenile life without parole offender.

21       A.    Was that a question?

22       Q.    Well, can you restate that, what you said?

23   Is there any specific documentation that's in their file?

24       A.    That is additional to the normal?

25       Q.    Yes.

```
 1      A.      Yes.  And that is the -- let me find it.

 2      Q.      Okay.

 3      A.      Take me a minute.

 4      Q.      That's okay.

 5              MR. SPILLANE:  Can we go off for a second?

 6              (Off the record.)

 7              (Exhibit 1 marked for identification.)

 8  BY MS. JONES:

 9      Q.      All right.  Sir, I'm going to hand you what's

10  been marked as Exhibit 1, which is Bates number AGO-28,

11  which is also somewhere in the documents that Brian has

12  produced today.  That is the sheet you're referring to

13  that is unique to JLWOP offenders?

14      A.      Yes.

15      Q.      Okay.  Can you think of anything else?

16      A.      No, ma'am.

17      Q.      Okay.  What is this form?

18      A.      It's a form that we were given in an analyst

19  meeting and also the board meeting.  I --

20      Q.      When is it -- I'm sorry?

21      A.      I did not develop the form.

22      Q.      When is it completed?

23      A.      At the time of the hearing.

24      Q.      So as the interview is going on or after the

25  interview is completed, that form is...
```

```
 1      A.      During the interview.  And also if the board
 2   member wanted to add any additional, the analysts submit
 3   notes.
 4      Q.      Okay.  Who fills out that form?
 5      A.      The parole hearing analyst.
 6      Q.      Is it always the parole hearing analyst?
 7      A.      Unless a board member wants to add some
 8   additional notes.
 9      Q.      So it doesn't -- it's not dependent on who's
10   conducting the hearing, because the board -- the board
11   member's going to be conducting the hearing; correct?
12      A.      Um-hum.
13      Q.      So the analyst is the one that completes
14   the --
15      A.      Yes.
16      Q.      -- form?
17      A.      Yes, ma'am.  And then I let the board member
18   review it.
19      Q.      Okay.
20      A.      And then it's provided to -- within that
21   packet for the other board members to review.
22      Q.      Okay.  So is there anything that's in the
23   file -- and I get that might be in the file, but it's not
24   filled out until the actual hearing; right?
25      A.      Yes, ma'am.
```

1       Q.      Is there anything that's in the file that is

2  filled out about juvenile life without parole offenders

3  that you review?

4       **A.      No, ma'am.**

5       Q.      Okay.  Is it your understanding that these

6  are the only factors you all are to require -- or to

7  consider for juvenile life without parole?

8       **A.      These were additional factors.**

9       Q.      Right.  Are these the only additional factors

10 for --

11      **A.      Yes, ma'am.**

12      Q.      -- them?  Okay.  Have you compared this

13 worksheet to the statute?

14      **A.      I received both the statute and that on the**

15 **same day.**

16      Q.      Okay.  Did you compare the factors on this

17 sheet to the statute?

18      **A.      No, ma'am.**

19      Q.      Okay.  So you don't know whether or not this

20 sheet covers all the factors listed in the statute?

21      **A.      I believe that it does.  I mean, if -- I'm**

22 **not sure who developed it, but...**

23      Q.      What's the basis of that belief?

24      **A.      Trust in my supervisor.**

25      Q.      Okay.  Have you ever been reviewing a parole

1    file and observed any errors in it?

2        A.    Yes.

3        Q.    What type of errors?

4        A.    Could be a date calculation or they had a

5    typo.

6        Q.    Okay.  Do you -- what do you do when you

7    observe those errors?

8        A.    I address it with the institutional

9    supervisor to get it corrected.

10        Q.    Okay.

11        A.    Because normally they can get it corrected

12    while we're there.  That way the error does not -- I

13    mean, we will correct the error.  But if we can get it

14    corrected before we leave, then to have the right

15    information.

16        Q.    Do you know what is covered in the parole

17    hearing report?

18        A.    The -- of course the sentencing.  What -- the

19    crime.  The date calculations completed by the

20    institution, parole officer.  The circumstances of the

21    offense.  Usually it has the after circumstances, the

22    offender's statement as far as that crime.  There's

23    victim information.  I'm sorry.

24        Q.    You can keep going.

25        A.    I'm sorry.

```
 1        Q.     I'm sorry.  I'm sorry.

 2        A.     I thought you needed a minute.  Sorry about

 3   that.  Substance abuse history.  I may get a little out

 4   of order here, but -- as far as -- we'll get to the

 5   institution, as far as what their medical/mental health

 6   score, their conduct, their participation in programs, if

 7   they have their education or not, if they're working on

 8   their education.  It will also go into their home plan,

 9   their support, their -- a little bit on their family

10   history, employment opportunities.  And, of course, any

11   participation that they've done, program completions,

12   when they completed the programs, or their work

13   assignment.  I'm a little out of order.

14        Q.     No, that's --

15        A.     I'm just trying to recall.

16        Q.     No, I wasn't necessarily wanting -- needing

17   it in order.  But, you know, that's pretty good.

18        A.     And then of course the officer's assessment.

19   Me per-- just me personally, I don't look at the

20   officer's assessment till after the hearing; and I

21   usually don't judge my decision off the officer's

22   assessment or recommendation.

23        Q.     Why?

24        A.     Because we'll discuss it as a panel.  Some --

25   I'm trying to think how to word it.  Some people
```

1    interview a lot better than they read.  You know, you --

2        Q.    Um-hum.

3        A.    As far as just personal.

4        Q.    Okay.

5        A.    You know, you just kind of get a feeling

6    that -- that's the only thing I can say.  I don't know

7    what...

8        Q.    Do you have a sense of how often you agree

9    with the IPO's assessment or recommendation, let's say?

10       A.    It would be a guess.

11       Q.    Okay.

12       A.    If you're fine with a guess.

13       Q.    Well, an estimate, yeah.  I mean, what you

14   believe.  I mean, I'm just trying to get a sense of if

15   it's rare or not rare.

16       A.    Oh, it would probably be in the 75 percent,

17   80 percent.

18       Q.    That you would agree with -- okay -- with

19   them.  Okay.

20       A.    That the date I had in mind matched what they

21   had recommended.

22       Q.    Okay.  Do you know how the IPO -- they're the

23   ones who complete the report; correct?

24       A.    Yes, ma'am.

25       Q.    Okay.  Do you know how they gather the

```
 1   information?
 2       A.    I do not know.  It's been a number of years.
 3             (Exhibit 2 marked for identification.)
 4   BY MS. JONES:
 5       Q.    So I'm going to hand you an exhibit that's
 6   Bates labeled AGO-30.
 7       A.    Okay.
 8       Q.    That's marked Exhibit 2.
 9       A.    Okay.
10       Q.    Have you seen that document before?
11       A.    No, ma'am.
12       Q.    Okay.  So you don't know whether or not
13   that's the form that IPOs use to complete the PHR?
14       A.    No, ma'am.
15       Q.    Okay.
16       A.    This is the first time I've ever seen this
17   form.
18       Q.    Okay.  So then it's fair to say you've never
19   seen one of those forms completed?
20       A.    No, ma'am.
21       Q.    Okay.
22       A.    Is this a copy for me?
23       Q.    No, that -- I mean, it's going to go with the
24   court reporter, be a part of the --
25       A.    Okay.
```

1      Q.      We will note that you have not seen it.

2              MR. SPILLANE:  Off the record.

3              (Off the record.)

4    BY MS. JONES:

5      Q.      Do parole analysts have any role in the IPO

6    completing the parole -- the PHR?

7      **A.      No, ma'am.**

8      Q.      Okay.  Aggressivity is included in the PHR;

9    right?  And if you don't recall, we're going to go

10   through a PHR at some point, and we can talk about it at

11   that point.  But I didn't know if you recalled that

12   specifically being something that's covered in a PHR?

13     **A.      I would assume there's an**

14   **assaultive/aggressive history, I believe.**

15     Q.      So what's your understanding of what that

16   represents?

17     **A.      As far as history of assaultive-type**

18   **behavior.**

19     Q.      So does that relate to their, like, history

20   while incarcerated, like if they've had any violations

21   involving aggressive behavior or...

22     **A.      I think it's arrest record.**

23     Q.      Arrest record?

24     **A.      Um-hum.**

25     Q.      Okay.  Anything else?

1    **A.      I do not know.**

2    Q.      Okay.  And when you say arrest record, that's

3  separate from their institutional behavior?

4    **A.      Yes, ma'am.**

5    Q.      Okay.  Are you familiar with the salient

6  factor score?

7    **A.      I have not done any salient factor score**

8  **in -- since I was an IPO at FRDC.**

9    Q.      But you have an understanding of what that

10  is?

11    **A.      I do not know all the criteria in it, no.**

12    Q.      Fair enough.  But what's your understanding

13  of what the salient factor score is?

14    **A.      It's a score to determine as far as guideline**

15  **dates.**

16    Q.      Is that used for juvenile life without parole

17  offenders?

18    **A.      I do not know.**

19    Q.      So now it's time for the hearing, and I want

20  to walk through the different phases of the hearing.  So

21  the camera turns on, and what do you see?  Is anybody in

22  the room?

23    **A.      Normally the district -- the supervisor at**

24  **that institution.**

25    Q.      Okay.  What is the supervisor there to do?

1      A.     To let us know the order.

2      Q.     What else?

3      A.     Let us know the offenders are there or we're

4      still waiting.  Let us know if there's delegates.

5      Q.     So each offender has a separate time;

6      correct?  It's not as if all 14 are scheduled for the

7      same time and they're all --

8      A.     I do not know.

9      Q.     Okay.  So you don't -- and so you don't know

10     if all the delegates would show up at the same time?

11     A.     I do not know.

12     Q.     Okay.  Okay.  So the supervisor is on the

13     screen just kind of giving you the run of what's going to

14     happen today.  And now it's time for the first hearing to

15     start.  Who do they bring in?

16     A.     Well, after the file is reviewed by whoever's

17     starting the first person, they'll bring in the first --

18     the first offender for his hearing.

19     Q.     Okay.  So --

20     A.     And if he has a delegate, we'll wait till

21     they both come in together.

22     Q.     Is the prosecutor there?  Like let's say this

23     is a -- this is a hearing with a prosecutor attending and

24     a victim attending.  Like are they in the room at the

25     time the offender and their delegate is brought in?  Like

1    I'm trying to get a sense of does it start before

2    everybody is in the room?

3         **A.    Normally if there's a victim, normally if**

4    **there's a prosecutor, that could be the victim's**

5    **representative from the Victims Unit comes in with them.**

6    **The board member would explain the process.  And I**

7    **believe they're given a choice to give their statement**

8    **with the offender present or without the offender.**

9    **But -- and if they give their statement without the**

10   **offender present, the board will let the offender know**

11   **that there was a statement made prior to their arrival.**

12        Q.    Um-hum.  Do the prosecutors speak before the

13   inmate is brought in?

14        **A.    I do not recall if it was before or during.**

15        Q.    How often do prosecutors attend?

16        **A.    Not very often.**

17        Q.    So like less than 25 percent, roughly?

18        **A.    Rough estimate.**

19        Q.    Okay.

20             MR. SPILLANE:  Could I ask for a

21   clarification?  Because I'm not sure I understood what

22   percentage, when she asked you a question.

23   BY MS. JONES:

24        Q.    About how -- what is the percentage of

25   attendance for prosecutors?

1      A.      It's not very many, but I couldn't -- I don't
2  have an exact number or...
3      Q.      Okay.  Less than half?
4      A.      Probably less than a quarter, but that's just
5  a guess.
6      Q.      Fair enough.  So I'm just trying to get a
7  sense of when they do attend, do they speak?
8      A.      They have the option to speak.
9      Q.      Okay.  Do you have a sense of whether or not
10  they do?
11      A.      I'm not part of every hearing panel, so I'm
12  not --
13      Q.      I'm just talking about the panels you're on.
14  Right now I'm just talking about what you have witnessed.
15      A.      Um-hum.  Um-hum.  I believe they have spoken.
16      Q.      Okay.  And do you have a recollection of
17  whether or not the offender is present when the
18  prosecutor is speaking?
19      A.      I believe on the cases I have been on, yes.
20      Q.      Can you think of a circumstance why that may
21  not be the case, meaning why would a prosecutor speak
22  outside the presence of an inmate?
23      A.      I do not know.
24      Q.      Do you know if there's an official protocol
25  for that?

```
 1        A.      I do not know.

 2        Q.      Is there any limitation on what a victim or

 3   prosecutor can say to the panel?

 4        A.      Could you rephrase it a little?  I'm not

 5   quite...

 6        Q.      Do you all listen to anything they want to

 7   say or are there certain things that are off limits?  For

 8   example, can a prosecutor try to introduce some kind of

 9   new evidence of guilt?

10        A.      No, ma'am.

11        Q.      Okay.  Is there any limitations on what an

12   offender or an offender's delegate can say?

13        A.      No, ma'am.

14        Q.      Okay.  Is there any time limitation?

15        A.      No, ma'am.

16        Q.      Do you have a sense of about how long a

17   hearing is?

18        A.      On average it's 15, 20 minutes.

19        Q.      Is that the same for a juvenile life without

20   parole hearing?

21        A.      I don't believe so.

22        Q.      Okay.  What's the average time on those?

23        A.      I would just be guessing, because I don't

24   know.  45 minutes.

25        Q.      Okay.  So it's significantly longer than the
```

1    typical --

2         A.      Yes, ma'am.

3         Q.      -- or let me say the nonjuvenile life without

4    parole hearing?

5         A.      But it's the same as a victim case.  There's

6    a -- I mean, it's -- not juvenile life.  A victim case,

7    they normally take an extended amount of time too.

8         Q.      Okay.  So are those the only two types of

9    parole hearings that take approximately 45 minutes?

10        A.      There's -- there's really not a time frame on

11   hearings.  They take what they take.  But, I mean, yes,

12   average.

13        Q.      Right.  No, I understand that.  But I'm

14   trying just to get a sense of -- you say on average

15   there's 15 minutes, but there's exceptions --

16        A.      Yes.

17        Q.      -- meaning for the juvenile life without

18   parole, the victim cases.  I'm just wondering if there's

19   any other type that fall into that exception?

20        A.      There's no types, but some hearings do.

21        Q.      Okay.  Yeah, I get that --

22        A.      A general hearing could last -- yeah.

23        Q.      -- 15 minutes is just an estimate.

24        A.      Yeah.

25        Q.      Some could go over, but...

```
 1      A.      Yes.

 2      Q.      What criteria do you use in determining

 3  whether or not to recommend release or rehearing?

 4      A.      There's really no criteria.  It's just if --

 5  if I feel that somebody's prepared for release, I'll --

 6  and they're within their -- if we can reach a release

 7  date, I'll recommend a release date.

 8      Q.      So what do you look for to determine whether

 9  or not somebody's prepared for release?

10      A.      I look at -- now, this is just me personally.

11      Q.      Yes.

12      A.      I can't speak for anybody else on the panel.

13  I'd look for, you know, their culpability in the crime,

14  you know, how they presented that.  I'd look at what

15  they've been doing with their time while they've been

16  incarcerated.  I mean, a lot of people -- them having a

17  home plan and support, a lot of people don't have that,

18  you know, that they have to work on developing a home

19  plan, once they have a release date.  So that doesn't

20  factor into it, you know, because a lot of them have lost

21  contact with family and stuff, so...

22      Q.      So that is not --

23      A.      No.

24      Q.      -- a key factor in your decision making?

25      A.      No.  No.  And restored to justice for me.
```

 1    I'd like to see restored to justice hours.  But that's

 2    not a -- you know, if somebody has zero, that's not going

 3    to keep me from giving a release date.

 4        Q.    Um-hum.  Anything else?

 5        A.    And if they have a good plan.  You know, like

 6    if they -- some people really sit down and think about

 7    when they get out, this is going to be my step when I get

 8    out, this is going to be where I want to be at this point

 9    in my life after release.

10        Q.    Is -- do you have any different or additional

11    factors for juvenile life without parole?

12        A.    No, ma'am.

13        Q.    So do you use any, like, evidence-based

14    practices to determine whether to release an offender?

15        A.    Could you -- I'm --

16        Q.    Anything objective?  Like we were talking

17    about the salient score earlier.

18        A.    Yes, I mean, as far as the guidelines of

19    what -- you know, to determine a release date?

20        Q.    Well, whether or not to release; right?  So

21    I'm just saying is there anything objective that you look

22    at in making that decision?  We went through, you know,

23    the factors you look for.  But is there anything

24    objective that you consider or use to make that decision?

25        A.    Well, in some cases, due to a person's

1    commitment counts, they're not eligible for release till

2    a certain date, that we have to go --

3        Q.    Right.  And I think that's a little

4    different, talking about eligibility.  So, like, assuming

5    they are eligible, are there any objective things you

6    look at?  I mean, and maybe the answer is no.  But I just

7    wanted to specifically ask:  Are you aware of any

8    evidence based, which I'm referring to as kind of

9    objective criteria, to make your decision, your

10   recommendation on whether or not to release?

11       A.    No.

12       Q.    Okay.  Do you factor in recidivism or like if

13   they are what you consider to be low risk, high risk?

14   Like do you consider that in determining whether to

15   release?

16       A.    Me personally, no.

17       Q.    Do you take notes during hearings?

18       A.    The only notes that would be taken, if any,

19   is on the board action sheet or this additional form.

20       Q.    Okay.  So you don't have like a notepad where

21   you're taking down notes?  Okay.

22       A.    No, ma'am.

23       Q.    Have you ever taken notes?

24       A.    During a parole hearing?

25       Q.    Yes.

```
1      A.      No, ma'am.

2      Q.      Are you aware of others taking notes?

3      A.      I do not know, ma'am.

4      Q.      Okay.

5      A.      I haven't seen a panel I've been on note

6   taking.

7      Q.      Okay.  So we talked about what's marked as

8   Exhibit 1 being filled out during the hearing; correct?

9      A.      Yes, ma'am.

10     Q.      Are there any other forms that are filled out

11  during the hearing?

12     A.      Just the board action sheet.

13     Q.      And that's during the hearing, as opposed to

14  after the hearing?

15     A.      Oh, I'm sorry.  It would be after the

16  hearing, the board action sheet.

17     Q.      Are there any other forms that are filled out

18  during or after, like while the panel is still together?

19     A.      No, ma'am.

20     Q.      Do you know whether the parole hearings are

21  recorded?

22     A.      Yes, ma'am.

23     Q.      Okay.  Do you know how they record it?

24     A.      By computer with a microphone.

25     Q.      Have you ever gone back to listen to a
```

1   hearing?

2       A.      **I have not personally gone back to listen to**

3   **a hearing.**

4       Q.      Would you ever have a need to do that?

5       A.      **No, ma'am.**

6       Q.      Do you know if there are specific protocols

7   for hearings for juvenile life without parole offenders?

8       A.      **No, ma'am.**

9       Q.      Do you notice anything different during --

10  between how they're conducted, a juvenile life without

11  parole versus a nonjuvenile life without parole?  Are you

12  aware of any differences in how they're conducted?

13      A.      **No, ma'am.**

14      Q.      Since the new statute came down and these

15  juvenile life without parole offender hearings have been

16  happening, have there been any changes in how those

17  hearings are conducted?

18      A.      **No, ma'am.**

19      Q.      How many delegates can an inmate have at a

20  hearing?

21      A.      **One.**

22      Q.      Do you know why one?

23      A.      **I do not know, ma'am.**

24      Q.      You don't learn that there's a delegate until

25  the day of; correct?  I believe that's what you testified

1    to earlier.

2        **A.        Yeah.**

3        Q.        Okay.   Does the panel give any instructions

4    to the delegate?

5        **A.        Usually we have the offender introduce them**

6    **at the beginning.   And normally it's, you know, to let**

7    **them know that, you know, we're going to interview, you**

8    **know, the offender first and then give them an**

9    **opportunity at the end to make a statement of support.**

10       Q.        Anything else?

11       **A.        No, ma'am.**

12       Q.        When does a delegate enter the room?

13       **A.        With the -- with the offender, depending on**

14   **the institution.   Some institutions the offenders come**

15   **one way and the delegates come another.   But we try to**

16   **get them to come in at the same time.**

17       Q.        Are they instructed not to speak to anyone,

18   like to the victim or...

19       **A.        If there's a victim in the room, I believe**

20   **the board member, you know, states that, you know, no**

21   **glancing down or statements made directly.**

22       Q.        Do delegates get the opportunity to ask the

23   panel questions?

24       **A.        If they have a question, I don't have a**

25   **problem answering it.**

```
 1      Q.     Can the delegate bring anything into the
 2  hearing?
 3      A.     I've had them bring in additional letters of
 4  support or maybe a letter from a potential employer
 5  offering a job.
 6             MS. JONES:  And we've been going for a while.
 7  I don't know if you need a break.
 8             MR. SPILLANE:  Would you like a break, ma'am?
 9             COURT REPORTER:  I'm fine.
10             MR. SPILLANE:  Would you like a break, sir?
11             THE WITNESS:  I'm fine.
12             MR. SPILLANE:  I'm fine.  It's up to you.
13             MS. JONES:  We'll keep going for now.
14             THE WITNESS:  Whenever you're ready for a
15  break, just...
16  BY MS. JONES:
17      Q.     Okay.  So you were talking about the
18  different things a delegate can bring into the room,
19  letters of support, a letter regarding employment.
20      A.     Um-hum.
21      Q.     Anything else you can think of?
22      A.     Those are the common ones that I recall.  I
23  have not had any other type.  I'm just giving you the
24  information that I've seen.
25      Q.     Are there any time limits placed on how long
```

1    a delegate can speak?

2        **A.        There's no time limit.**

3        Q.        How often does defense counsel attend a

4    parole hearing?

5        **A.        As far as the offender's defense attorney**

6    **during his trial or what?**

7        Q.        Anybody at the parole hearing that's

8    representing the inmate at the time, not necessarily from

9    the trial.

10       **A.        Not very often.**

11       Q.        What's --

12       **A.        Not saying we have not had attorneys, but**

13   **it's not very often.**

14       Q.        Do you know what capacity they appear in?  Do

15   they appear as defense counsel?

16       **A.        They appear as a delegate.**

17       Q.        So it's your under-- is it your understanding

18   that they're not like there in a legal capacity?

19       **A.        That is my understanding.**

20       Q.        Do you have any -- what's your position on

21   that, that they -- that the offenders don't have defense

22   counsel during a parole hearing?  Do you have any

23   thoughts on that?

24       **A.        I've never really thought about it.**

25       Q.        Okay.  So is it fair to say that, because a

1  defense attorney is treated as a delegate during the

2  parole hearing, that what we just talked to with respect

3  to delegates applies to defense counsel appearing in that

4  role, with respect to they can discuss anything they

5  want, they can say anything they want in support of the

6  offender, since they're speaking on their behalf?

7      **A.      I do not know the limitations or who sets the**

8  **limitations, so --**

9      Q.      No, I understand that.  But I'm saying like

10  we -- you know, we spent some time talking about the role

11  of delegates during.

12      **A.      Um-hum.**

13      Q.      And so now we're talking about defense

14  counsel.  But you're saying defense counsel serves the

15  role of delegates?

16      **A.      That's -- that's the way I believe it has**

17  **been.**

18      Q.      Okay.

19      **A.      Not saying it won't change.**

20      Q.      Fair enough.  I'm just -- you know, I was

21  trying to short circuit it and say like do defense

22  counsel receive the same treatment as delegates because

23  they're there as delegates?

24      **A.      That is true that they're treated the same,**

25  **yes.**

1      Q.      Okay.  So if defense counsel had a question

2   for the panel, the panel would answer it, your panel?

3      **A.      I would try.**

4      Q.      Okay.  I believe you testified earlier that

5   the parole analysts don't have contact with the

6   prosecutors in advance of the hearing; that's the Office

7   of Victim Services --

8      **A.      Um-hum.**

9      Q.      -- correct?  So what instructions are given

10  to the prosecutor at the outset of a parole hearing?  Now

11  it's the actual parole hearing.  Do you all give the

12  prosecutors any instructions?

13     **A.      I do not.  I don't know what instructions**

14  **that -- when they meet with the Victim Services --**

15     Q.      Okay.

16     **A.      -- I do not know what instructions they're**

17  **given.**

18     Q.      Because you testified about the instructions

19  that are given to the delegate, correct, that --

20     **A.      Um-hum.**

21     Q.      Okay.  Are there any -- there's no other

22  person that you give instruction to?

23     **A.      I do not give instruction.  The board member**

24  **will let the victims know, if they give their statement**

25  **beforehand, they can either leave or stay for the**

1  offender portion.  But once their statement is done,

2  their portion is done.

3      Q.    Right.

4      A.    If they get up and leave the room, they're

5  not allowed back into the room.

6      Q.    Okay.

7      A.    But as far as -- that's the only instructions

8  that I hear.

9      Q.    Okay.  So just victim and delegate?

10     A.    Yes.

11     Q.    The prosecutor is there in the capacity as a

12  prosecutor though; correct?

13     A.    On the victim sheets they are listed as the

14  prosecutor of whatever county.

15     Q.    Is there any limitations on what the

16  prosecutor can say during a hearing?

17     A.    I do not know what limitations they're

18  instructed.

19     Q.    Have you ever witnessed a prosecutor trying

20  to offer new evidence?

21     A.    No, ma'am.

22     Q.    Do you recall any occasion during which the

23  panel spoke with the prosecutor outside the presence of

24  an offender?

25     A.    I do not know.

1      Q.      Is the prosecutor given the opportunity to
2    rebut statements made by a delegate or an offender or
3    statements in a letter of support?
4      **A.      There's no statements as far as -- because**
5    **they're told at the beginning, you know, they can either**
6    **give their statement beforehand or with the offender**
7    **present.  But there's no statements afterwards.**
8      Q.      Okay.  Are you aware of a prosecutor sending
9    in any kind of correspondence?
10     **A.      I'm not aware.**
11     Q.      Okay.  Are you aware of a prosecutor -- do
12   you know whether or not a prosecutor sees the parole file
13   before the hearing?
14     **A.      I do not believe they do.**
15     Q.      So do you know whether or not the prosecutor
16   sees the letters of support that are in an offender's
17   file?
18     **A.      I do not know.**
19     Q.      So you have no experience or you've never had
20   a situation where you saw a prosecutor try to rebut
21   something that was in a written letter of support?
22     **A.      I have not.**
23     Q.      Okay.  And, again, just to be clear, they
24   don't speak after the offender and delegate speak during
25   the hearings?  So the order would be, like, victim,

```
 1   prosecutor --
 2        A.      Interview.
 3        Q.      -- interview, delegate?
 4        A.      Um-hum.
 5        Q.      Okay.
 6        A.      Sorry.  Yes.
 7        Q.      Have you been on panels where a victim
 8   advocate appeared?  So it was not the actual victim, but
 9   a victim advocate?
10        A.      I believe in the case of a juvenile victim --
11        Q.      Okay.  Do victim --
12        A.      -- that they designate a custodian,
13   parent/custodian.
14        Q.      So do they have the same role as victim?
15        A.      They're speaking on the victim's behalf.
16        Q.      Okay.  Are there ever victim advocates that
17   are there with a victim, meaning can a victim bring
18   someone in with them?
19        A.      They can bring a support person, but they're
20   not allowed to speak.
21        Q.      Are there many parole hearings where there's
22   no one representing the victim?
23        A.      What do you mean?
24        Q.      Like is there -- are there hearings where
25   it's just the offender and a delegate or just the
```

```
 1   offender?

 2        A.     Yes.

 3        Q.     Okay.

 4        A.     Yes.

 5        Q.     So like what percentage of those -- what

 6   percentage of the hearings are just offender and --

 7   and/or delegate, meaning no one there from the victim

 8   side?

 9        A.     It would just be a guess on my part.  But is

10   it fine to guess?

11               MR. SPILLANE:  If you have an estimate based

12   on something, please.

13               THE WITNESS:  I don't have an estimate on

14   anything.  It would just be a guess.

15   BY MS. JONES:

16        Q.     Well, I mean, we've had some estimates this

17   morning already.

18        A.     Yeah.

19        Q.     And I get it.

20        A.     Okay.  I --

21        Q.     I'm just trying to say is it half or most of

22   them a victim is there or not?  You know, just trying to

23   get a --

24        A.     No, I would say 85 percent of the time or

25   90 percent of the time there's the offender and his
```

1    delegate.

2        Q.    Okay.  Just trying to get a sense.

3        **A.    Okay.  I just wanted to make sure I**

4    **understood.**

5        Q.    Are analysts provided any training or tools

6    to specifically -- that are specifically tailored to

7    consider the factors set forth in the statute for

8    juvenile life without parole offenders?

9        **A.    No, ma'am.**

10       Q.    And do you feel like you are qualified to do

11   the analysis set forth in the statute?

12       **A.    I believe I am, ma'am.**

13       Q.    What is the basis of that?

14       **A.    My time as an analyst and my years with the**

15   **department.**

16       Q.    But it's fair to say it's not based on any

17   specific specialized training?

18       **A.    No, ma'am.**

19       Q.    Okay.  And I believe we talked earlier about

20   meetings that the department has and also meet-- oh, that

21   the analysts have and then meetings the analysts have

22   with board members, and that juvenile life without parole

23   came up when the statute first came out; correct?

24       **A.    Yes, ma'am.**

25       Q.    Okay.  But that that is not something that is

1    discussed on any kind of regular basis during these

2    department-type meetings?

3         A.    Of what I've attended, no.

4         Q.    Okay.  Have you had conversations with other

5    analysts about JLWOP hearings?

6              And what I'm -- I'm referring to the juvenile

7    life without parole, J-L-W-O-P, just for shorthand.

8              So have you had conversations with other

9    hearing analysts about JLWOP hearings?

10        A.    Not that I recall, except for, you know,

11   during a, you know, analyst meeting or something.  But

12   specifics, no.

13        Q.    So now the hearing is done and the panel is

14   still there.  Can you walk me through what happens until

15   the next hearing starts?

16        A.    We discuss the hearing, and the board

17   member -- usually the person that had done the hearing

18   kind of gives their idea of what they want to do.  And as

19   far as these -- we're talking about the juvenile life

20   hearings; right?

21        Q.    Yes.

22        A.    Okay.  Well, those would all be majority

23   decisions.  But the other panel members can either agree

24   or disagree with the board member and write their own

25   decision in there.  But with majority board, it's -- it

1   goes through the board members.

2       Q.      So do you have an understanding of what the

3   significance is of an analyst's recommendation on those

4   majority matters?

5       A.      As far as an analyst's recommendation, it's

6   really -- it's majority board.  Our vote and the district

7   administrator votes really don't count for much.

8       Q.      Okay.  Right.  I can appreciate that.  But

9   I'm just saying do you have any idea of what they count

10  for, if anything, do you know?

11      A.      I do not know what their -- if they take any

12  factor into their decision on what we vote in those

13  cases.

14      Q.      Have you ever talked to a board member about

15  one of the JLWOP hearings you sat on in order to assist

16  him or her in voting?

17      A.      As far as the discussion outside the hearing?

18      Q.      Right.  So now -- now it's the next day,

19  let's say, and a panel -- and the file is placed on their

20  shelf and they have to vote.  Has anyone ever come to you

21  to discuss what happened in a hearing, you know?

22      A.      No, ma'am.

23      Q.      Okay.

24      A.      They would -- I would assume if there was a

25  discussion -- it's just assumption -- they would talk to

1    the board member.

2         Q.    Okay.  I think you covered earlier after the

3    hearing ended you would take the file and put it on the

4    next voting member's shelf --

5         A.    Uh-huh.

6         Q.    -- right?

7         A.    Yes.

8         Q.    And then after the decision comes down, you

9    would make sure that it's consistent with what the vote

10   was --

11        A.    What the majority board voted.

12        Q.    And then you're done with the file at that

13   point?

14        A.    Yes, ma'am.

15        Q.    Okay.  Have you had situations over your

16   ten-year period that you've been an analyst where you've

17   seen -- you've been on the panel for an offender more

18   than once?

19        A.    The only way I'd know that, if I go back and

20   look at the board action sheet.  As far as me seeing the

21   person and knowing I was, no.

22        Q.    So as far as you know, there's not any effort

23   to have, you know, people who were on a prior panel be on

24   the same panel; it's completely random each new time?

25        A.    It is random.

1              **(Exhibit 3 marked for identification.)**

2    BY MS. JONES:

3        Q.    Okay.  So I'm going to hand you a document

4    marked Exhibit 3, which is Bates number AGO-60, which is

5    a blank board action sheet.  This is the form you were

6    referring to earlier, board action sheet?

7        **A.    Yes, ma'am.**

8        Q.    Okay.  On the second page, reasons for

9    decision above guidelines.  In Section 1 they have as an

10   option circumstances surrounding the present offense.

11   What does that mean?  What do you understand that to

12   mean?

13       **A.    It is basically the police report at the time**

14   **that the crime happened.**

15       Q.    That's it?

16       **A.    It's the -- it's the -- yes.**

17       Q.    Okay.  So as far as you understand, it

18   doesn't take into consideration anything about the

19   offender, right, as far as the circumstances of their

20   youth, their maturity, but rather the specifics of the

21   offense?

22       **A.    I would agree with the specifics of the**

23   **offense.**

24       Q.    Okay.  And is it fair to say that that, based

25   on how you define it, is kind of set in stone; right?  I

1    mean, the circumstances of the offense are what they are;

2    they don't change over time?

3         **A.    Yes.**

4         Q.    Okay.  Are comments -- I mean, on page 1 of

5    this form, there's a section for panel comments; correct?

6         **A.    Yes, ma'am.**

7         Q.    So what type of things would be included

8    there?

9         **A.    Some board members will make comments or --**

10   **well, anybody can make whatever comment they want on**

11   **there for the other members to see.**

12        Q.    Who are the comments for?

13        **A.    The panel members to make additional notes**

14   **that they want to raise to the other board members**

15   **reviewing the file.**

16        Q.    Okay.  So this is speaking to the people who

17   are going to be voting?  You know what I'm saying?  Like

18   are they making comments here with their target audience

19   being the other board members who are going to be voting?

20        **A.    I believe so, ma'am.**

21        Q.    Okay.  And who fills out this form?  Is it

22   the board member on the panel or could it be you as an

23   analyst on the panel?

24        **A.    As far as -- usually it's the person doing**

25   **the interview.**

1    Q.    Okay.

2    **A.    Now sometimes like an institutional**

3 **supervisor will miss marking a condition or something,**

4 **and we'll ask them about it.**

5    Q.    Have you ever seen a scenario where

6 additional pages were attached to have more -- to be able

7 to write more comments?

8    **A.    No, ma'am.**

9    Q.    Okay.  So normally this is -- the extent of

10 the comments will fit in that box?

11   **A.    Yes, ma'am.**

12   Q.    Okay.  And sorry if I'm repetitive.  Can you

13 recall the types of things that would be in here?  Like

14 would it be something specific to what happened during

15 the hearing, like during the interview versus something

16 that's just in the file that the next voting member could

17 read on their own?  Like I'm trying to get a sense of

18 like what is this box designed to do?  Like it --

19   **A.    Excellent interview or, you know --**

20   Q.    Okay.

21   **A.    -- just -- most generally I'd say positive**

22 **comments.**

23   Q.    About the interview?

24   **A.    Yes.**

25   Q.    Okay.  As opposed to something in the file?

1      A.      Yes.  I mean, it's that panel member that

2   interviewed the guy just thought this person had a great

3   interview.

4      Q.      Okay.  If you saw great interview, what would

5   that mean to you?  And you weren't in there, but you just

6   saw somebody wrote great interview, does that have any

7   real significance to you?

8      A.      I'm not really a voting member on that.  But,

9   yes, I would look back and say -- if I looked at it and

10  say, well, they must have stood out, something they did.

11     Q.      Would you agree that great interview is a

12  subjective term?

13     A.      Yes.

14     Q.      Okay.  And that what you might consider a

15  great interview somebody else might not consider a great

16  interview?

17     A.      That is true.

18     Q.      Okay.  So I understand that you don't vote,

19  right; that the board is the ones that vote?  But I'm

20  just trying to get a sense of what do you -- what does it

21  mean to you when you see great interview?

22     A.      To that person that did the interview, they

23  thought it was great.

24     Q.      Define great in context of interviews.

25     A.      I do not know why they wrote it -- I mean, as

1    far as --

2        Q.    I understand that.  I'm trying to get a sense

3    of what do you understand the word great to mean in

4    context of an interview.

5        A.    They were well prepared.  They spoke well.

6    They had certificates of completions.

7        Q.    And do you ever see those types of comments

8    on the board action sheet or is it more conclusory like

9    great?

10        A.    I've seen more conclusionary.

11        Q.    Okay.  How do you go about setting like the

12    rehearing date?

13        A.    That is usually a discussion as far as the

14    panel on -- in some cases the board can go one year.  In

15    some cases they have to do two or more.  But...

16        Q.    So I'm trying to get a sense of how this

17    conversation happens.  You're saying there's a

18    discussion.  So there's going to be a rehearing.  Do you

19    say should it be one year?  Should it be two years?

20    Should it be three years?  Like how does -- do you

21    start -- does the nature of the offense, anything

22    specific about the hearing or in the PHR that says we

23    start in this range, three years, five years?

24        A.    There's nothing in there that's --

25        Q.    Okay.  So how do you all go about, from the

1   panels you are on, deciding the rehearing date?

2      **A.    It's a discussion between the three panel**

3   **members.**

4      Q.    What factors are you considering?

5      **A.    If the board or whoever interviewed determine**

6   **that he needs to work on conduct or more program**

7   **participation or...**

8      Q.    Okay.  So what I'm hearing you say is you

9   factor in what improvements you want to see before the

10  next hearing, and then you say this many years to

11  accomplish that?  I could be completely misrepresenting

12  what you said.  I'm trying to get an understanding of you

13  look at what programs you want them to complete, what

14  behaviors you want to see, and then how does that tie

15  into a given amount of years?

16     **A.    I -- there is no factor to determine if he**

17  **does this, we're going to hear in this time.  There's no**

18  **factors.  It's -- what's the word?**

19     Q.    Okay.  So there's no reason why you would

20  give somebody five years versus three years?

21     **A.    Me personally, no.**

22     Q.    Do you know whether a panel member or a

23  parole board member reads the parole file before voting?

24     **A.    Do you mean after the hearing?**

25     Q.    Right.  So now it's after the hearing and you

1   place the file on the next voting member's shelf.  Do you

2   know -- how do you know whether or not a panel member --

3   I'm sorry, a parole board member has read the file?

4       **A.      I do not know.**

5       Q.      Okay.  Do you -- and I think you said, like,

6   you don't necessarily move it from shelf to shelf.  So a

7   voting member would vote, and then they would move it to

8   the next shelf; right?

9       **A.      Yes, ma'am.**

10      Q.      Okay.  Do you know how long after the hearing

11  a decision is made?

12      **A.      No, ma'am.**

13      Q.      Do you all tell the offenders a time period

14  they'll be hearing from the board?

15      **A.      Approximately six to eight weeks.**

16      Q.      Okay.  On this board action sheet, which is

17  Exhibit 3, and they list the reasons why the release

18  won't be granted, like what is the -- is there a main one

19  that's usually marked?

20      **A.      I could just say in most incidents it's**

21  **either Section 1 or Section 2.**

22      Q.      Within Section 1 or Section 2?  I mean,

23  because those are the only options, so within those two

24  are there certain ones that are usually marked?

25      **A.      That I have seen?**

```
 1      Q.     Yes.

 2      A.     In Section 1 it would be A, C, D, possibly E.

 3   And then in Section 2 it could be -- I can slow down if

 4   you --

 5      Q.     Oh, no, you're fine.

 6      A.     It could -- well, Section A could be about

 7   any of -- any of those, except for I have never used G or

 8   H or E.

 9      Q.     So I'm going to ask you again to estimate of

10   these factors how often are you seeing circumstances

11   surrounding the present offense marked?

12      A.     That would just be another guess.

13      Q.     Yep, I understand.

14             MR. SPILLANE:  Let me ask you real quick in

15   here, is this a guess based on your memory or are you

16   just guessing?

17             THE WITNESS:  Just guessing.

18             MR. SPILLANE:  Then I'm going to object.

19   BY MS. JONES:

20      Q.     No, based your experience.  I mean, how many

21   panels have you sat on?

22      A.     I couldn't tell you how many panels I've sat

23   on.

24      Q.     Thousands?

25      A.     Yes.
```

1    Q.    Okay.  So based on your experience, how often

2  is A marked?

3    **A.    A lot.**

4    Q.    Would you say more than half?

5    **A.    Yes.**

6    Q.    Okay.  How much information is provided to an

7  offender regarding the denial of a release?

8    **A.    I do not know.**

9    Q.    Have you seen the forms that they receive?

10   **A.    The notice?**

11   Q.    Um-hum.

12   **A.    Yes.**

13   Q.    Okay.

14   **A.    Because when we were discussing earlier the**

15   **end stage to reflect the board vote.  But as far as what**

16   **the officer discusses with them, I don't know.**

17   Q.    So do you have a sense of what the procedure

18  is for notifying the offender of the decision, meaning do

19  they get something other than the notice of the decision?

20   **A.    I believe that the officer speaks to them.**

21   **But I'm not sure as far as -- once the notice leaves,**

22   **I -- you know.**

23   Q.    So what's the basis of your belief the

24  officer speaks to them?  You mean the IPO?

25   **A.    Yes.**

1      Q.      And when you say speak to them, speak to them

2   about what?  Like here's the notice of the decision, you

3   were denied, versus this is why you were denied?

4      **A.      I do not know.**

5      Q.      Are there protocols that set forth what's

6   supposed to happen as far as informing the inmate on the

7   decision?

8      **A.      I do not know.**

9      Q.      Okay.  So the notice that they -- that they

10  receive that you are aware of that they receive, right,

11  does it contain anything other than one of these with

12  respect to the reason for denial?

13     **A.      No.**

14     Q.      Okay.  Do you think that that is sufficient

15  explanation to an inmate as to why they were denied?

16     **A.      I do not know.**

17     Q.      You don't have an opinion?

18     **A.      No.**

19             MS. JONES:  Can we take a break?

20             MR. SPILLANE:  Sure.

21             (Off the record.)

22  BY MS. JONES:

23     Q.      Do you have an idea of how many JLWOP

24  hearings you've participated on?

25     **A.      I do not know.**

```
 1      Q.      But you have participated on some?

 2      A.      Yes.

 3      Q.      Do you recall any of the offenders?

 4      A.      No, ma'am.

 5      Q.      Do you recall how you voted?

 6      A.      No, ma'am.

 7      Q.      Are you aware that you were on a panel for

 8  Ralph McElroy?

 9      A.      Once I had a copy requesting about today.

10      Q.      Okay.  So you know he's a named plaintiff in

11  this case?

12      A.      Yes.

13      Q.      Okay.  Did you review any of his files for

14  today?

15      A.      The only thing I looked at was when Jay, is

16  it Boresi, the attorney, said to look for the names --

17      Q.      Okay.  So the --

18      A.      -- and the JLWOP.

19      Q.      Okay.  So, again, like we were talking about

20  earlier, you collected documents, but you didn't

21  necessarily review them for today's testimony?

22      A.      No, ma'am.

23      Q.      Okay.  Do you have any independent

24  recollection of ███████████████████████████

25      A.      No, ma'am.
```

 1     Q.    And so is it fair to say you don't recall who
 2  else was on that panel with you?
 3     **A.    I looked it up.  It was either** ███████████
 4  **or** ███████████**, I believe.**
 5     Q.    So you did look at something in preparation
 6  for the hearing -- today's testimony?
 7     **A.    Yeah, those -- those offenders and their**
 8  **numbers.  I was curious.**
 9     Q.    Okay.  So when you say you looked up the
10  offenders, what did you look up?
11     **A.    I looked up their name and DOC number in File**
12  **Bound just to know which ones I was on the hearing panel.**
13     Q.    So when you say you looked it up on File
14  Bound, did you look at any other documents on File Bound?
15     **A.    Just the board action sheets to know which**
16  **ones I was a panel member on.**
17     Q.    So that's the extent of your preparation?
18  Okay.
19     **A.    Yes, ma'am.**
20     Q.    So you recall -- and I will confirm that
21  ███████████ is one of the members that was on the panel.
22     **A.    Yes, ma'am.**
23     Q.    We're on Exhibit 4, which is AGO-2332 --
24          (Exhibit 4 marked for identification.)
25  BY MS. JONES:

```
 1        Q.      -- which is the list of people who were on
 2   the panel, attended and voted.  So does that refresh your
 3   recollection as to who was on the panel?
 4        A.      Well, I knew ███████████.  I didn't know
 5   it was ███████████.  I do not recall the others in
 6   attendance or the board members who voted.  But now that
 7   I have it in front of me, yes.
 8        Q.      Okay.  So you testified earlier that the
 9   preparation is to review the parole file; correct?
10   That's how you all prepare for your hearing is to review
11   the parole file?
12        A.      At the day of the hearing?
13        Q.      Yes.
14        A.      Yes.
15        Q.      And because this is a JLWOP, you did not
16   review that parole file before the interview started;
17   correct?
18        A.      No, ma'am.
19        Q.      But it's your practice, as you testified
20   earlier, to review the file during the interview;
21   correct --
22        A.      As --
23        Q.      -- for the JLWOP?
24        A.      For victim cases or JLWOP.
25        Q.      Okay.  Okay.  Fair enough.  And right now
```

1  we're focusing on ████████████ hearing.  So because

2  you don't have any specific recollection as to that

3  hearing date, I just want to confirm what your process

4  was for JLWOP hearings, and then ask if you have any

5  reason to believe that wasn't the process for ████

6  ████████ hearing.

7      **A.**    **Okay, ma'am.**

8      Q.    Okay.  So is it fair to say that you followed

9  your normal process for JLWOP hearings on ████████████?

10     **A.**    **Yes, ma'am.**

11     Q.    Okay.  If I were to represent, and I am going

12 to represent, that his hearing started before Mr. ████████

13 and the delegate was brought into the room, meaning that

14 the circuit attorney made a statement prior to

15 Mr. ████████ being brought in the room, would that be

16 surprising to you?

17     **A.**    **I do not remember.**

18         MS. JONES:  Okay.  So I'm going to mark --

19 what are we on, 5?

20         (Exhibit 5 marked for identification.)

21 BY MS. JONES:

22     Q.    -- as Exhibit 5 the transcript hearing from

23 ████████████.  It does not have Bates numbers.  And then

24 as Exhibit 6, the key sheet --

25         (Exhibit 6 marked for identification.)

 1   BY MS. JONES:

 2       Q.      -- which does not have exhibit [sic] numbers,

 3   which tells you who the individuals are in the

 4   transcript, because the transcript does not use names.

 5   So I'm using this to kind of refresh your recollection as

 6   to what happened at that hearing and question you about

 7   that.

 8             All right.  And you'll note that you are

 9   considered Panel Member Number 2 in the transcript, based

10   on the key sheet, which is this exhibit.  So you'll see

11   Panel 1 was Dusenberg, and then you were 2.  The IPO was

12   Valerie Hoveck, and the circuit attorney is Kelly Moyich,

13   M-O-Y-I-C-H.

14             So it looks like ███████████████ --

15   which is these page numbers up top.

16       **A.      Okay.**

17       Q.      So page 4 shows ████████████████ is

18   present.  Do you see that, you know, they are talking to

19   her?

20       **A.      Yes, ma'am.**

21       Q.      And you see on page 7 ████████████████████

22   makes a statement?  She goes over --

23       **A.      Yes, ma'am.**

24       Q.      -- the details of the offense, the

25   conviction, that they oppose it?

 1      **A.      Okay.  Yes.**

 2      Q.      And you see this happens before the inmate is

 3   brought in, which on page 9 we see that the inmate was

 4   brought in, like on -- like line 8.  So you see these

 5   numbers running down, those are the line numbers.  So

 6   page 9, like line 8:  Why don't you bring the offender

 7   in; he has a delegate with him, I understand.

 8      **A.      Okay.**

 9      Q.      So you see that the prosecutor made a

10   statement -- ███████████████  made a statement prior

11   to --

12      **A.      Okay.**

13      Q.      Is there -- does this refresh your

14   recollection at all?

15      **A.      No, ma'am.**

16      Q.      Okay.  So do you have any understanding of

17   why the prosecutor would have been allowed to make this

18   statement prior to the inmate being brought in?

19      **A.      I do not.**

20      Q.      So we're going to mark as Exhibit 7 his --

21   Ralph McElroy's PHR, which is Bates number AGO-2447.

22              (Exhibit 7 marked for identification.)

23   BY MS. JONES:

24      Q.      So Exhibit 7 is AGO-2447.  That is his PHR.

25   Do you recall seeing this?

 1      A.     I had to have seen it, but I don't recall at

 2  this moment.

 3      Q.     Do you recall that Mr. ████████ maintained his

 4  innocence of the crime he was convicted of?

 5      A.     I do not.

 6      Q.     Okay.  Well, I'll represent that he does.

 7  And it's set forth in the PHR and the transcript.  I

 8  don't know if you want to see that specifically or if you

 9  will take my representation.  But if you want to spend a

10  few minutes looking at it, feel free.  But I'm going to

11  ask you a few questions about that.

12      A.     That is fine, ma'am.

13      Q.     Okay.  Does a decision to maintain innocence

14  impact whether or not you grant or recommend release?

15      A.     For me personally?

16      Q.     Yes.

17      A.     No.

18      Q.     How do you -- why not?

19      A.     If somebody took a case to trial court, as I

20  noticed just now that he did, or if they pled guilty, it

21  kind of makes a determination on me.  If he pled guilty,

22  he said he's guilty.  If he took it to trial court, he

23  maintained his innocence up to the point where a jury of

24  his peers or a judge found him guilty.

25      Q.     So you -- in those situations you're not

1    looking for the offender to admit responsibility?

2         **A.     Me personally, no.**

3         Q.     Okay.  How often do you get individuals who

4    maintain their innocence in parole hearings?

5         **A.     Not that often.**

6         Q.     Throughout this report it notes that he does

7    not maintain -- that he maintains his innocence and that

8    that was used -- the way it reads, that that was used

9    against him in this PHR.  But, you know, just to confirm,

10   you're saying that you don't hold that against an inmate;

11   correct?

12        **A.     I do not.**

13        Q.     Okay.  And whether or not the IPO, the person

14   who filled this out, uses that against him, meaning that

15   that factors into the recommendation to deny release,

16   that has no impact on you?

17        **A.     No, ma'am.**

18        Q.     Okay.  In the transcript on page 16, at page

19   11, Panel Number 1 -- I mean at line 11, Panel Number

20   1 --

21        **A.     Oh, I'm sorry.  Okay.**

22        Q.     -- which is ▮▮▮▮▮▮▮▮▮▮ , says:  You

23   brought up the fact apparently that you were physically,

24   mentally, sexually abused growing up, but you stated you

25   did not commit the current offense, so it had no bearing

1   on your parole release.  Do you agree with that

2   statement?

3       **A.      I do not recall the statement.**

4       Q.      Okay.  I understand that.  But the essence of

5   the statement is that he's saying that the childhood

6   abuses that Mr. ████ endured has no bearing on whether

7   or not he should be released for parole, because he

8   maintains his innocence.  Is that how you read that

9   statement?

10      **A.      That Mr. ████ said?**

11      Q.      Um-hum.

12      **A.      I agree with you.**

13      Q.      Do you believe that statement is correct?

14      **A.      In ████ opinion it might have**

15  **been, but...**

16      Q.      Not in Gary Dusenberg's opinion, but in

17  what's required under the statute?

18      **A.      Can I look at this form?**

19      Q.      You can look at that form.

20      **A.      Thank you.  Exhibit --**

21      Q.      1.

22      **A.      -- 1.  Well, according to number 3, evidence**

23  **that a person accepted accountability for the offense or**

24  **offenses, except in the case where the person has**

25  **maintained his or her innocence.  So that would not.**

1          **(Exhibit 8 marked for identification.)**

2     BY MS. JONES:

3          Q.     So I'm going to hand you the new statute,

4     which I'm going to call this document Senate Bill 590.

5     And it's Statute 565.033, which starts on page 7, which

6     sets forth factors that are going to be considered by the

7     parole board in determining whether or not to grant

8     release for a JLWOP inmate.  And the factors kind of

9     start -- like are on line 12 of it -- well, I guess not

10    line 12.

11              MR. SPILLANE:  I'm going to object to the

12    question.  You may answer it.  But it looks to me like

13    this statute talks about factors for sentencing as

14    opposed to parole.

15              MS. JONES:  Okay.  Well, if you want to walk

16    through the -- are you saying that these aren't the

17    Miller factors?

18              MR. SPILLANE:  No, I'm saying the way you

19    phrased the question, the way I understood it, was these

20    were factors to be considered in parole, which I think

21    are under 588.047.  The plain language of 565.033 says:

22    A person found guilty of murder in the first degree, who

23    was under the age of 18 at the time of the offense, shall

24    be sentenced to a term of life imprisonment without

25    eligibility for parole, as provided.  And it gives a

1  statute number, and then it lists those factors under

2  that.  And then under 2 it says:  When assessing

3  punishment.

4            MS. JONES:  Okay.

5            MR. SPILLANE:  So that's why I objected to

6  your question, because I didn't think it accurately

7  reflected what the statute says.

8            MS. JONES:  So on page 1 of the document, at

9  Section 558.047 where they talk about a person sentenced

10  to a term of imprisonment for life without parole prior

11  to August 28, 2016, which would you agree are the

12  offenders sentenced to JLWOP, the JLWOP offenders we're

13  talking about, any person sentenced to a life without --

14            MR. SPILLANE:  I don't want to debate you.

15  That's my objection.

16            MS. JONES:  And then when you go to Section 4

17  of this on the next page:  The parole board shall hold a

18  hearing and determine if a defendant shall be granted for

19  parole -- I'm sorry, the next, in Subsection 5:  In a

20  parole review hearing, the board shall consider, in

21  addition to the factors listed in Section 565.033 --

22  which is where we started, which was 565.033, which is on

23  page 7.

24            MR. SPILLANE:  Yeah, I don't read that the

25  same way you do.  But that's where we're at.  He can

 1    answer the question.

 2                    MS. JONES:  Okay.

 3                    MR. CRANE:  She didn't finish the question

 4    though.

 5                    MR. SPILLANE:  I'm sorry, please repeat the

 6    question.

 7    BY MS. JONES:

 8        Q.    Well, we are on this exhibit to talk about

 9    the factors listed in 565.033, which start on line 12,

10    which the line numbering starts again, once you get to

11    this section of Statute 565.  You see how it starts 69 to

12    87; then it goes 2 to 17?

13        **A.    Yes.**

14        Q.    Okay.  So you see the factors start on line

15    12 and carry over to page 8 through line 33?  So those

16    are the factors I'm referring to as the JLWOP factors,

17    which you have been referring to Exhibit 1 as the JLWOP

18    factors.

19        **A.    Yes, ma'am.**

20        Q.    Okay.  So if you could take a moment to read

21    those ten factors.  Okay.  And so factors like 3, 4, and

22    7 deal with the personal circumstances of the defendant;

23    would you agree?  3, 4, and 7?

24        **A.    And what was the question?**

25        Q.    Those deal with the personal circumstances of

1 the defendant?

2    **A.    Yes.**

3    Q.    Okay.  So going back to the transcript on

4 page 16, when Mr. Dusenberg states that the physical,

5 mental, and sexual abuse have no bearing on parole

6 release because he maintains his innocence, do you think

7 that that statement is consistent with what these factors

8 say you're supposed to consider?

9    **A.    I did not see these factors until -- these.**

10 **I don't really read them into our form.**

11    Q.    So you're saying that your form is what is

12 gospel; that is all that you all need to consider in

13 determining --

14    **A.    I'm not saying it's not all that we need to**

15 **consider.  It's just that I did not realize about these**

16 **other --**

17    Q.    Okay.  But you said you have a copy of the

18 statute?

19    **A.    I have -- it's -- I can find what I provided.**

20 **I did not have this, the Senate bill.  I had a --**

21           MR. CRANE:  It's Bates 74 and 5.

22           MS. JONES:  Okay.  Yeah, right.  Well, if you

23 look at 75...

24           THE WITNESS:  Where is my --

25           MR. SPILLANE:  Right here, I think.

1          THE WITNESS:  Yeah, but there's a -- this is

2   not the...

3          MR. CRANE:  I think we're missing something,

4   aren't you?

5          THE WITNESS:  Yes.

6   BY MS. JONES:

7      Q.    Well, 75 is the page that has the ten factors

8   on it, Section 565?

9      **A.    But I've never highlighted that.  I just --**

10  **let me find the one that...**

11         MS. JONES:  Maybe what was in front of 74.

12         MR. CRANE:  Yes, looks that way.

13         THE WITNESS:  It was (indicating).

14         MR. SPILLANE:  Yeah.

15         MR. CRANE:  You can show it to her.

16         THE WITNESS:  Oh, no, that's fine.  I just --

17         MS. JONES:  Okay.  But --

18         MR. CRANE:  I think you got a copy of both.

19         MS. JONES:  Yeah, the front page looks

20  like -- so you think that that's in here?

21         MR. CRANE:  Hum.

22         MS. JONES:  You think that this (indicating)

23  is in what you gave us?

24         MR. CRANE:  It looks like it miscopied also.

25         MS. JONES:  Okay.

1          MR. CRANE:  There's only the second page of

2    that.

3          MS. JONES:  Right.  Yeah.  So...

4          MR. CRANE:  Yeah, yeah, which is 74.  But I'm

5    going to go through after this and make sure this is

6    consistent with all the originals.

7          MS. JONES:  Yep.  Okay.

8          THE WITNESS:  But this is what we were given.

9    BY MS. JONES:

10     Q.    Right.  But you also see that 75 is in your

11   records too; right?

12     **A.    And I don't know if that was just printed**

13   **out.  But that is the copy of what I --**

14     Q.    Well, it looks like it was printed out on

15   August -- I mean, November of 2016.  You see the date at

16   the --

17          MR. CRANE:  Yeah, it says the second one --

18   the second page of what you had is the factors that she's

19   talking about --

20          THE WITNESS:  Oh, okay.

21          MR. CRANE:  -- the Senate bill.

22          THE WITNESS:  Okay.

23          MR. CRANE:  But you're right that you hadn't

24   highlighted or marked up that part.

25          THE WITNESS:  No, I had not.

```
 1              MS. JONES:  Right.  But it looks like you got
 2   those -- like page 74 looks like it's the end of 558.047;
 3   right?
 4              MR. CRANE:  That's right.  It's the backside
 5   of that page.
 6   BY MS. JONES:
 7      Q.    Right.  But they were both printed on the
 8   same --
 9      A.    Okay.  And this one I have not reviewed.
10      Q.    Okay.
11      A.    The highlighted one was my -- what was
12   reviewed.  Sorry.
13      Q.    I got paper everywhere.  Okay.  So where the
14   question started, right, is we were comparing what
15   Mr. ██████ said to what's required under the statute.
16   And ██ were pointing to Exhibit 1 as what you all are to
17   reconsider in those JLWOP hearings; right?
18      A.    Yes, ma'am.
19      Q.    All right.  And so I was trying to point to
20   the statute as to what was required --
21      A.    Yes, ma'am.
22      Q.    -- okay, and ask you whether or not
23   Mr. ████████ statement was consistent with what we
24   just read in the statute, those factors, in particular
25   factors 3, 4, and 7, which deal with the personal
```

1    circumstances of a defendant?

2         A.     And you're just asking my opinion?

3         Q.     Right.  I mean, do you read that statement to

4    be consistent with the factors that the statute says

5    should be re -- considered?

6         A.     That these additional factors are included

7    into our Exhibit 1?

8         Q.     I'm not talking about Exhibit 1; right?  So

9    Exhibit 1 I get is the worksheet you all were given to

10   fill out.

11        A.     Yes.

12        Q.     But it's my understanding that the worksheet

13   was to be based on the statute, what's required under the

14   law; right?  So instead of looking at Exhibit 1, I was

15   giving you the law to see if you agreed with the

16   statement that ███████ made is consistent with what the

17   law requires, as you understand it?

18             MR. SPILLANE:  Now I'm going to object to the

19   question as calling for a legal conclusion.  But subject

20   to that, you may answer, sir.

21   BY MS. JONES:

22        Q.     Well, I'll respond by saying that you all are

23   conducting these parole hearings and you are supposed to

24   be complying with what the statute said.  And I'm trying

25   to get an understanding if you understand what the

1    statute requires and if you all are applying it?

2       A.      I did not understand this portion of the

3    statute.

4       Q.      Okay.  Fair enough.  When was -- so when you

5    testified earlier that you read the statute --

6       A.      I was --

7       Q.      -- you were specifically referring to Section

8    558.047, which was the highlight -- your highlighted copy

9    of the statute is what you were referring to?

10      A.      Yes, ma'am.

11      Q.      Which was 558.047.  Okay.  We all agree that

12   that's the statute ███ referring to?

13      A.      Yes.

14      Q.      Okay.  And it was not referring to this

15   statute, which was 558 --

16      A.      No, ma'am.

17      Q.      -- .03 -- okay.

18      A.      Okay.  Sorry.  Took me awhile to get there.

19      Q.      No.  We got there.  Do you recall reading any

20   of the letters of support for Mr. McElroy?

21      A.      I do not recall, ma'am.

22      Q.      Okay.  So I'm going to go back to the

23   prehearing report, which is Exhibit 7.  If -- hum.  Well,

24   you're saying you don't have a recollection of whether or

25   not you read his report -- his letters of support;

1    correct?

2         **A.      That is true, ma'am.**

3         Q.      Okay.  And you also testified, and correct me

4    if I'm wrong, but that you accepted him at his word when

5    he maintained his innocence; correct?

6         **A.      That is me personally.**

7         Q.      Yeah, just talking about you personally.  I'm

8    going to mark as Exhibit 9 --

9              (Exhibit 9 marked for identification.)

10   BY MS. JONES:

11        Q.      -- Bates number AGO-2482, which is a letter

12   of support from ████████████.  If you could briefly

13   scan this, I'm going to ask if having the benefit of

14   reviewing this today refreshes your recollection about

15   reading this letter at the time of hearing.  Does that

16   refresh your recollection at all?

17        **A.      Yes, I recall reading this letter.**

18        Q.      Okay.  So you think that you would have read

19   the actual letter during the hearing?

20        **A.      Yes, ma'am.**

21        Q.      Okay.  What makes it -- what about the letter

22   refreshes your recollection, like what stands out?

23        **A.      The military.**

24        Q.      So when you receive letters from -- letters

25   of support from military members, that --

1      **A.      That's what specifically in this one that**

2  **I --**

3      Q.      Okay.  So it wasn't necessarily the fact just

4  that he was?

5      **A.      No.  You asked me what -- it was the military**

6  **portion.**

7      Q.      Okay.  Do you find the letter credible?  I

8  mean, so he's --

9      **A.      He signed it and his statements he believes**

10  **are what occurred.**

11      Q.      Okay.  So when you say you find it memorable

12  that he was in the military, that's kind of like

13  secondary to the purpose of the letter; right?  The

14  purpose of the letter is to say that he was there and

15  that it supports ██████████ innocence claim; right?  Is

16  that what stood out at all or just the fact that the

17  author was in the military?

18      **A.      You asked me what refreshed my memory, and I**

19  **was giving you the specific what --**

20      Q.      I understand that.  So I guess what I'm

21  trying to understand is that is it just the fact that you

22  got a letter from somebody that's in the military is what

23  stood out for you, regardless of what the content was?

24      **A.      That's what jogged my memory in this case.**

25      Q.      Okay.  So is there something -- any

1 additional weight you give letters that are written by

2 members of the military?

3     **A.**     **No, ma'am.**

4     Q.     Okay.  So earlier we were talking about

5 aggressivity and whether or not that's included on the --

6 in the PHR.  Do you recall that?

7     **A.**     **Yes, ma'am.**

8     Q.     Okay.  So if you go back to the PHR, which is

9 Exhibit 7, at what's Bates numbered 2449, which is at the

10 bottom of the page, which is like the third page, you see

11 the term aggressivity at the bottom?

12     **A.**     **Yes, ma'am.**

13     Q.     Okay.  Earlier I believe you testified, and

14 correct me if I'm wrong, that you thought aggressivity

15 related to the record at the -- at the time of the

16 offense?

17     **A.**     **I believe history of arrest record.**

18     Q.     Okay.  It looks like, if you read those few

19 lines under that section, it's talking about, in addition

20 to trouble before the current offense, talks about

21 conduct violations; correct?

22     **A.**     **I see that in this aggressivity section.**

23 **Sorry, hard for me to pronounce.**

24     Q.     No, I get it.  So I'm just trying to see if

25 that, you know, refreshes your recollection or gives you

1   a different understanding of what the term aggressivity

2   means?

3        **A.       It appears like, looking at this section now,**

4   **that it incurs possible history and possible conduct**

5   **violations.**

6        Q.     Is that a factor you consider in determining

7   whether or not to release or recommend release?

8        **A.       It is one of the contributing factors.**

9        Q.     That you consider, that you give weight?

10       **A.       Yes.**

11       Q.     Okay.  Does the reason for the aggressive

12   behavior matter for you?

13       **A.       I have looked at it as there's a conduct**

14   **violation written and there -- it was held up as a**

15   **conduct violation; that I believe they're given a certain**

16   **period of time where they can grieve a conduct violation**

17   **and it can be expunged.**

18       Q.     Okay.  Does the reason he gave have any

19   impact on the fact that he's been labeled aggressive,

20   meaning he cited self-defense as a reason for the --

21       **A.       I do not recall.**

22       Q.     No, I get that.  But I'm asking you does the

23   reason for the conduct violations matter in whether or

24   not you agree with the label of aggressiveness?

25       **A.       I was not there when the conduct violation**

1    was written.  I'm not sure --

2         Q.    I get that.

3         A.    -- how to answer that.

4         Q.    I get that.  But this is what you are relying

5    on in determining whether or not to grant release;

6    correct?

7         A.    Yes, ma'am.

8         Q.    Okay.  And so they labeled him as aggressive

9    in here based on conduct violations.  I'm asking you

10   whether or not you agree with that and, second, whether

11   or not his explanation for the conduct violation has any

12   impact on your agreement or disagreement with that label?

13        A.    I would say -- what was the first question

14   again?  I'm sorry.

15             MS. JONES:  Can you read it back?

16             (Whereupon, the requested portion was read

17   back by the court reporter.)

18             THE WITNESS:  I would say yes on the first

19   part.

20   BY MS. JONES:

21        Q.    You agree with the label?

22        A.    I -- yes.

23        Q.    Okay.  Does his explanation of self-defense

24   have any bearing on your labeling of him aggressive?

25        A.    No.

1      Q.     Why not?

2      **A.     The grievance process.**

3      Q.     Okay.  Because --

4      **A.     If it would have been grieved and expunged.**

5      Q.     Okay.  That's the only -- is that the only

6    instance wherein someone's defense for behavior would

7    impact your decision is if they aggrieved it and they won

8    their agrievement and got it expunged?

9      **A.     It would never be part of the record, if it**

10   **was expunged.**

11     Q.     Okay.  But that's not the question.  Is that

12   the only circumstances under which you would conceivably

13   say I believe their defense?

14     **A.     I'm thinking.  Sorry for delay.**

15     Q.     No.  Feel free.  I don't...

16     **A.     I do not know.**

17     Q.     Okay.  Do you recall whether or not there was

18   any questioning about his social and family history?

19     **A.     I do not.**

20     Q.     Is that something that's typically asked in

21   JLWOP hearings?

22     **A.     As far as his social?  His parents?**

23     Q.     Social, um-hum.

24     **A.     His --**

25     Q.     His childhood and the issues he was facing,

1    the obstacles he had to overcome, his family life,

2    whether there was abuse.

3        A.    I believe that his social and family

4    history...

5        Q.    Is that something you would question him

6    about?

7        A.    That I would?

8        Q.    During the panel that the offender would be

9    questioned about those things?

10       A.    He could be.

11       Q.    Is it -- that's what I'm saying, is it the

12   practice during the -- during these hearings to ask him

13   about that?

14       A.    As me as a panel member, yes, I could, if I

15   was doing the interview.

16       Q.    I'm not asking about what you could.  I get

17   that.  I can appreciate that.

18       A.    Okay.

19       Q.    This is another one of those situations where

20   I'm like is this the normal practice to ask offenders,

21   JLWOP offenders, about their family and social history

22   when they were -- before they were incarcerated?

23       A.    I've only -- I would assume that the PO and

24   whatever is in here is what the board member would

25   specify to.  Now, I'm not sure why, if there was

1  **additional information, it wasn't in the report.**

2      Q.    I'm not saying whether or not there's any

3  additional information or not.  I'm saying is that

4  something that you would ask him about, that you would

5  have a discussion, that you would engage him about?

6  Separate and apart from what's written in the report,

7  would you talk to him about that?

8      **A.    Yes, I could.**

9      Q.    I'm not asking about if you could.  I'm

10  saying do you all do that?  Is that a normal practice?

11      **A.    I...**

12      Q.    You don't recall?

13      **A.    I don't recall.**

14      Q.    That's -- that is a fair answer.

15      **A.    Okay.**

16      Q.    I'm just trying to understand --

17      **A.    Yeah.**

18      Q.    -- what -- if there is a normal practice,

19  what it is.  So if it's none --

20      **A.    Yeah, I don't recall.**

21      Q.    -- that is a -- that is a legitimate answer.

22      **A.    Okay.**

23      Q.    Okay.  Is there anything that would make a

24  particular delegate stand out for you?  Do you often have

25  delegates who fly in for hearings?

1    **A.    Not that often, ma'am.**

2    Q.    Okay.  Is that something that might stand out

3    if it happened?

4    **A.    As far as me remembering the delegate**

5    **personally, no.**

6    Q.    Okay.  But that they had a delegate that flew

7    in?

8    **A.    Okay.**

9    Q.    Is that something that would stand out for

10   you?

11   **A.    After a certain amount of time, I don't know**

12   **if it would.**

13   Q.    Okay.  And I'm asking you this, because you

14   don't remember this specifically; right?  You don't

15   remember his hearing specifically?

16   **A.    No, ma'am.**

17   Q.    And so I'm like are there certain things

18   about this hearing that would stand out for you?  That's

19   what I'm asking.

20   **A.    Okay.**

21   Q.    You're saying that that is not necessarily

22   the case?

23   **A.    No, ma'am.**

24   Q.    Okay.  You stated that having a home plan --

25   well, let me ask you to restate.  We were talking about

1    what factors you consider in determining to release.  And

2    you said home plan, they could come up with that, you

3    know, after the decision was made.  So that's not

4    necessarily something that you rely on in making the

5    decision; is that correct?

6         **A.    That is correct.**

7         Q.    Okay.  So whether or not an offender, in

8    particular ███████████, has a home plan, the fact that

9    he had one, would that have any additional weight in

10   granting release or recommending release?

11        **A.    No, ma'am.**

12        Q.    Okay.

13              (Exhibit 10 marked for identification.)

14   BY MS. JONES:

15        Q.    Exhibit 10 is Bates labeled AGO-2444, which

16   is the decision for Mr. ██████.  You'll see that in the

17   narrative section they have the release at this time --

18   the decision is not subject to appeal; and the reason for

19   the action, which is, you know, denial:  Circumstances

20   surrounding the present offense.  Do you have any idea

21   what that means as it relates to Mr. ██████?

22        **A.    The current offense that he's incarcerated in**

23   **on, and I would assume treatment received while he was**

24   **incarcerated.  But I don't -- I'm just...**

25        Q.    Okay.  With respect to the circumstances

1    surrounding the present offense, is there anything he

2    could do in advance of the next hearing that could change

3    the circumstances surrounding the present offense?

4    **A.     No.**

5    Q.     They also mark poor institutional adjustment;

6    correct?

7    **A.     That is correct.**

8    Q.     Okay.  Is there anything he could do in order

9    for that to not be a basis for denial?

10   **A.     Yes.**

11   Q.     Okay.  What would that look like?

12   **A.     Minimal conduct violations or none.**

13   Q.     Over a five-year period, right, because that

14   seems to be the setback?

15   **A.     That is correct.**

16   Q.     So in -- his hearing was December of '16,

17   December of '16, and he had not had -- he had had -- you

18   know, Dusenberg notes that he had good conduct since

19   2012, which what, is like four years, 2012 to 2016?

20   **A.     That is -- sounds correct.**

21   Q.     Okay.  Would you consider that to be good

22   conduct, if he had minimum violations in a four-year

23   period?

24   **A.     I think at the time of the hearing was**

25   **looking at the totality of conduct violations in...**

```
 1        Q.      Um-hum.
 2        A.      But, yes, if his next hearing is...
 3        Q.      How was it determined that he would get a
 4   five-year setback?
 5        A.      How was it determined?
 6        Q.      Um-hum.  I mean, I understand the panel
 7   determined it.  But I'm like how did they -- you all get
 8   to five years?
 9        A.      I do not recall.
10        Q.      So we spent some time earlier talking about
11   looking at the actual statute and the ten factors set
12   forth in Section 565.033.  Do you feel like you have the
13   skill set required to assess those factors?  If you're
14   looking at the exhibit, it starts on page 7 --
15        A.      Thank you.
16        Q.      -- with the number up at the top.
17        A.      Thank you.  Well, I have to admit I'm not a
18   psychology or sociology major.  But I'm hoping with my
19   experience that I could judge those factors.
20        Q.      And your experience sitting on parole panels?
21        A.      DOC experience as a whole.
22        Q.      Okay.
23        A.      Starting with custody.
24        Q.      So can you tell me what experiences you have
25   specifically that you think qualify you to do -- to
```

1   consider those factors?

2       **A.      Well, in custody I dealt with all different**

3   **age groups of offenders.**

4       Q.      When you say dealt with...

5       **A.      You know, I was -- as a correction officer,**

6   **you -- you're in the same living environment with the**

7   **offenders.  It's been a long time since I've been a**

8   **corrections officer, though.  But I'm just --**

9       Q.      Right.  But did you do any kind of counseling

10  or, you know, ther-- like I'm trying to think -- ask

11  you --

12      **A.      No.**

13      Q.      -- like what specifically you did that you

14  think --

15      **A.      I'm just --**

16      Q.      -- is an experience that enables you to judge

17  these factors?

18      **A.      I cannot nail down --**

19      Q.      Okay.

20      **A.      -- the specific.**

21      Q.      Okay.  But you're saying your time in DOC as

22  a whole, right, and that you -- when you were in custody

23  dealing with people of all ages?  When you say all ages,

24  juveniles too or adults?

25      **A.      At the reception center they did have a --**

1  that's been a long time ago.  I'd just be making it up.

2  So --

3      Q.    So you don't have any specific recollection

4  of dealing with juveniles?

5      A.    No.

6      Q.    Okay.  So I'm moving to the ███████████

7  hearing.  Do you have any specific recollection about

8  Sidney Roberts?

9      A.    No, ma'am.

10     Q.    Okay.  Do you recall, as you were preparing

11  for today, including gathering documents, who was on the

12  panel with you on that one?

13     A.    ███████████?

14     Q.    Um-hum.

15     A.    Okay.

16     Q.    That's correct.  Okay.  Is there any reason

17  to believe that the typical protocol in conducting JLWOP

18  hearings, including you reading the file while the board

19  member conducted the panel, that -- is there any reason

20  to believe that didn't happen for Mr. ████████?

21     A.    No.

22     Q.    Okay.  Because, again, you don't have any

23  specific recollection about him?

24     A.    No, ma'am.

25     Q.    Okay.

```
 1                    (Exhibit 11 marked for identification.)

 2   BY MS. JONES:

 3        Q.      All right.  I'm going to mark this as Exhibit

 4   11, which is AGO-1998, which is a letter of support for

 5   Mr. Roberts.

 6        A.      Thank you.

 7        Q.      I'm going to ask you to review that letter.

 8        A.      I do not recall this letter.

 9        Q.      Okay.  You see it was written by a retired

10   chief petty officer from the U.S. Navy?

11        A.      Yes.

12        Q.      Okay.  And so nothing about that makes this

13   particular letter stand out for you?

14        A.      No, ma'am.

15        Q.      ████   ████████████████████
```





















[redacted]

[redacted]

Case 2:17-cv-04082-NKL Document 134-12 Filed 06/12/18 Page 125 of 146

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

███ ████████

███    ███    █████████████████████

███ ███████████

███    ███    █████

███    ███    █████████████████████

███ ██████████████████████████.

7      Q.     Okay.  So did you receive any training?

8      **A.     There is a list of training that -- I was not**

9  **mandated to attend any training, but I took it upon**

10  **myself to attend training the last year.**

11     Q.     Okay.  And so I'm looking at George 15, which

12  is the training transcript.

13     **A.     For last year.**

14     Q.     Is this what you're referring to, for 2017?

15     **A.     Yes, ma'am.**

16     Q.     Okay.  So the training includes sexual and

17  other harassment issues, crisis intervention, a new

18  direction; security awareness, cognitive restructuring,

19  evidence-based practices, professional interaction and

20  principles of conduct, transparent leadership, building

21  mindful resilience, discrimination, harassment, and

22  retaliation.  Is it fair to say that some of these dealt

23  with professional conduct?

24     **A.     Yes, ma'am.**

25     Q.     Okay.  But not all of them; correct?

```
 1      A.      Yes.

 2      Q.      Okay.  But you took all of these kind of as a

 3  result of that occurrence just to --

 4      A.      I took that upon myself.

 5      Q.      Okay.  So this -- are these classes you would

 6  have taken had that issue not occurred?

 7      A.      Not --

 8      Q.      So is it --

 9      A.      -- all of them.

10      Q.      Okay.  Some of them, but not all of them?

11      A.      Yes.

12      Q.      Okay.  So I'm trying to get a sense are any

13  of these like regularly scheduled?  Like, for example,

14  the evidence-based practices?

15      A.      If I can --

16      Q.      Yes.

17      A.      I'm sorry, if we can look at it together.

18  This shows the amount of hours.

19      Q.      Okay.

20      A.      And then like anything 8 hours, 8 hours,

21  these two 4s, I took those upon myself to sign up for.

22      Q.      Okay.

23      A.      Some -- like the six-hour, that's, I

24  believe --

25      Q.      So the six hours was sexual and other
```

1    harassment issues.  And I'm just trying to get it for the

2    record.

3    **A.**    **I do not recall if I signed up for that one**

4    **or if it was part of other training.**

5    Q.    Okay.  So the 8-hour one, which is

6    professional interaction and principles of conduct, you

7    signed up --

8    **A.**    **I signed --**

9    Q.    -- for that?

10    **A.**    **-- up for that one.**

11    Q.    And --

12    **A.**    **Building --**

13    Q.    -- building mindful resilience?

14    **A.**    **And the two 4-hour blocks were one day.**

15    Q.    Okay.

16    **A.**    **I believe they should be, yes.**

17    Q.    Yes.  Cognitive restructuring and

18    evidence-based principles, those are the ones you signed

19    up for?

20    **A.**    **Yes.**

21

[redacted]





[redacted] [redacted]
[redacted] [redacted] [redacted]
[redacted]
[redacted]
[redacted] [redacted] [redacted]
[redacted] [redacted]
[redacted] [redacted] [redacted]
[redacted]
[redacted] [redacted]
[redacted] [redacted] [redacted]
[redacted] [redacted]
[redacted] [redacted] [redacted]
[redacted]
[redacted] [redacted]
[redacted] [redacted] [redacted]
[redacted]
[redacted] [redacted]
[redacted] [redacted]
[redacted]
[redacted]
[redacted] [redacted] [redacted]
[redacted]
[redacted] [redacted] [redacted]
[redacted]
[redacted] [redacted]

```
 1      Q.      Okay.
 2      A.      I do not have any documentation regarding
 3  that.
 4      Q.      Okay.  So let's go through the documents, and
 5  then I'm going to take a look at my notes and see if
 6  we're done.
 7              MR. CRANE:  Sure.
 8              THE WITNESS:  Yeah.
 9              MR. CRANE:  Here, I'll give you a set of
10  notes.  There are definitely three pages that didn't get
11  copied, but we'll straighten that out and email it over.
12              MS. JONES:  I'm more concerned about
13  collection versus what you're going to produce, because I
14  understand you're going to produce.
15  BY MS. JONES:
16      Q.      So those are going to go to her.
17      A.      Oh, okay.  Sorry.
18      Q.      But we'll deal with that in a minute.
19      A.      Okay.
20      Q.      So we have the subpoena that sets forth what
21  was requested.  And so when you received -- how did you
22  receive the subpoena?
23      A.      When I got back from a day after my grandma's
24  funeral, it was on my desk.
25      Q.      Okay.  Did anybody talk to you about it?
```

```
 1        A.      I opened it.

 2        Q.      Okay.

 3        A.      And then I asked, I believe Pam Rogers,

 4   because there was a check associated with it.  And I know

 5   that we did not cash the checks, that it had to go to...

 6        Q.      Did it come to you unopened?  It was on your

 7   desk in a sealed envelope; you opened it?  Okay.

 8        A.      Yes, ma'am.

 9        Q.      Okay.  So how did you go about gathering

10   documents?

11        A.      I talked to Jay Boresi, the department's

12   attorney.  I think I'm saying his name right.

13                MR. SPILLANE:  Yes, sir.

14                THE WITNESS:  Okay.  And he told me to do a

15   search on my email under the clients' names and the JL...

16   BY MS. JONES:

17        Q.      JLWOP.

18        A.      JLWOP.  There, thank you.  I always wondered

19   how to say that one quickly.  So I did that search in my

20   email, and then I also did a search on my G drive --

21   that's my personal folder in the computer -- and printed

22   off the related documents out of that.

23        Q.      Did you have any physical files?

24        A.      Physical?

25        Q.      Like print?  Like did you have paper in a
```

1    file folder in a desk drawer that you searched for

2    documents?

3         **A.      I searched -- which I gave you the copy of**

4    **our -- my highlighted copy.**

5         Q.     Um-hum.

6         **A.      And then the form that was attached.  Then I**

7    **also looked for notes from board meetings, handwritten**

8    **notes from board meetings or analysts' meetings that had**

9    **any mention of the -- I'm going to say it wrong, the**

10   **juvenile life without parole.**

11        Q.     Yeah.

12        **A.      There.**

13        Q.     Okay.  So I believe you were saying

14   earlier -- well, you did say earlier that it did include

15   documents, communications related to the game issue?

16        **A.      Um-hum.**

17        Q.     Okay.  Because it specifically talks about

18   asking for documents related to the allegations in the

19   complaint.  So for you, you understood that to be the

20   JLWOP, the specific offenders, and the misconduct?

21        **A.      Yes.**

22        Q.     Okay.  So those were the three types of

23   documents you were looking for?

24        **A.      Um-hum.**

25        Q.     Okay.  And you searched your email, your

1   electronic files, and your physical files?

2   **A.**    **Yes.**

3   Q.    Okay.  And just kind of going through this

4   big picture, it looks like what you produced are meeting

5   agendas and minutes --

6   **A.**    **Um-hum.**

7   Q.    -- right?  Including ones with your

8   handwritten [sic] on it?

9   **A.**    **Yes.**

10   Q.    And those were the only ones that dealt with

11   JLWOP?

12   **A.**    **Yes.**

13   Q.    Okay.  And then your training certificate.

14   There's some emails in here.

15   **A.**    **That would have came out of that search of my**

16   **emails.**

17   Q.    Um-hum.  Your statutes that you have

18   highlighted?

19   **A.**    **Yeah, I made a copy of my highlighted one to**

20   **keep.  And then a copy of the stuff that we use, the blue**

21   **book and --**

22   Q.    Okay.

23   **A.**    **-- case referral policy, there's some in**

24   **there.**

25   Q.    Executive order, Missouri Department of

Corrections Department Manual from 2010, and then Department Manual from 2016. Okay. This is the memo about the misconduct, and then the letter about the [redacted]



19          MS. JONES:  I'm going to close right now.  I

20    don't know if you all have any cross, but I want to

21    double-check and make sure we cover everything.

22          MR. SPILLANE:  I have a couple.

23          MS. JONES:  I'll let you do that, and then

24    we'll go from there.

25    CROSS-EXAMINATION BY MR. SPILLANE:

```
 1      Q.     Hi, I'm Mike Spillane from the Attorney
 2  General's office.  We met earlier.  I was going to ask
 3  you to clarify a little bit about what you think about
 4  when the members of the panel are deciding how far in the
 5  future a setback should be, because I wasn't sure I
 6  understood your answer before.  So what factors do you
 7  think about when you're deciding how far to set back a
 8  case for rehearing?
 9      A.     It's a combination of things throughout the
10  hearing, as far as, you know, where they're at conduct
11  wise, program wise, if the board member feels that they
12  need to attend ICVC before, you know, program
13  participation.
14      Q.     What's ICVC?
15      A.     Impact on crime victims.
16      Q.     Okay.
17      A.     Maybe anger management.
18      Q.     All right.  And you answered some questions
19  earlier about circumstances surrounding the offense as a
20  reason for denial.  And I think you indicated those
21  circumstances never change; is that accurate?
22      A.     Yes.
23      Q.     Is it common to have offenders that are
24  denied for circumstances surrounding the offense at one
25  hearing be granted a release date at a later hearing?
```

1          **A.      Yes.**

2          Q.      How common is that?

3          **A.      I have to -- it would be a guess.**

4          Q.      Well, if you -- does it frequently happen?

5     Let me ask you it that way.

6          **A.      It happens.**

7               MR. SPILLANE:  Okay.  Those are the only

8     questions I had.  Did you have any questions, Mr. Crane,

9     that I should ask?

10              MR. CRANE:  I have nothing.

11              MR. SPILLANE:  She may have some recross.  I

12    don't know -- redirect.

13              MS. JONES:  Can we just go off the record for

14    a minute?

15              (Off the record.)

16              MS. JONES:  No further questions.

17              (Off the record.)

18              (Signature waived.)

19

20

21

22

23

24

25