

## PohlmanUSA®
### Court Reporting and Litigation Services

---

Martin Rucker

January 19, 2018

---

Norman Brown, et al.

vs.

Anne L. Precythe, et al.

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION


NORMAN BROWN, et al.,      )
                           )
        Plaintiffs,        )
                           )
     vs.                   ) Case No. 17-CV-4082
                           )
ANNE L. PRECYTHE, et       )
al.,                       )
                           )
        Defendants.        )


     CONFIDENTIAL DEPOSITION OF MARTIN RUCKER,

produced, sworn and examined on the 19th day of

January, 2018, between the hours of eight o'clock in

the forenoon and six o'clock in the afternoon of that

day, at the Missouri Attorney General's Office,

Broadway State Office Building, Jefferson City,

Missouri, before Kim D. Murphy, Certified Court

Reporter, within and for the State of Missouri.

1                    A P P E A R A N C E S

2

              For the Plaintiffs:
3
                    THE MACARTHUR JUSTICE CENTER
4                   By:  Amy Breihan
                    3115 S. Grand
5                   Suite 300
                    St. Louis, MO  63118
6

7
              For the Defendants:
8
                    MISSOURI ATTORNEY GENERAL
9                   By:  Michael Spillane and Andrew Crane
                    Broadway State Office Building
10                  221 West High Street
                    Jefferson City, MO  65101
11

12

13                      I N D E X

14  Direct Examination by Ms. Breihan              4
    Cross-Examination by Mr. Crane                 112
15  Redirect Examination by Ms. Breihan            112

16

17

18

19

20

21

22

23

24

25

```
 1                  DEPOSITION EXHIBIT INDEX

 2      ID                                        MARKED

 3      1:   SB 590                                  31

 4      2:   AGO60 and 61                            49

 5      3:   AGO28                                   53

 6      4:   Board decision, Re:  Clements           69

 7      5:   Board decision, Re:  Bradshaw           72

 8      6:   AGO184 through 237                      74

 9      7:   AGO181                                  74

10      8:   AGO2626 through 2635                    88

11      9:   AGO2617 through 2619                    90

12      10:  AGO2624-25                              94

13      11:  Parole decision, Re:  Eden             106

14

15

16

17

18

19

20

21      Court Reporter:
        Kim D. Murphy, CCR
22

23

24

25
```

```
 1        IT IS HEREBY STIPULATED AND AGREED, by and

 2   between counsel for the Plaintiffs and counsel for the

 3   Defendants that this deposition may be taken in

 4   shorthand by Kim D. Murphy, CCR, and afterwards

 5   transcribed into typewriting; and the signature of the

 6   witness is expressly waived.

 7                    *    *    *    *    *

 8                    MARTIN RUCKER,

 9   of lawful age, produced, sworn and examined on behalf

10   of the Plaintiffs, deposes and says:

11                 DIRECT EXAMINATION

12   BY MS. BREIHAN:

13        Q.   Good morning.

14             Can you please state your name for the

15   record, sir.

16        A.   My name is Martin D. Rucker, ma'am.

17        Q.   My name is Amy Breihan.  We met a few

18   moments ago.  I represent the Plaintiffs in this case.

19        A.   Okay.

20        Q.   You understand you're here for a deposition

21   today, correct?

22        A.   Yes, ma'am.

23        Q.   Have you ever been deposed before?

24        A.   No, ma'am, I have not.

25        Q.   Well, then I'll walk through a couple
```

1  ground rules so we're on the same page.

2         The court reporter is going to be taking

3  down everything that's said today, so it's important to

4  verbalize your answers.  It can be tempting to nod

5  your head, or say uh-huh or huh-uh.

6        **A.   Yes, ma'am.**

7        Q.   The other thing, we'll try not to talk over

8  one another.  I may ask questions, and you know where

9  I'm going with the question, and you might want to jump

10  in with an answer.  I'll ask for you to wait to answer

11  the question --

12        **A.   Okay.**

13        Q.   -- and I'll do the same thing before I ask

14  my next question.

15        **A.   Okay.**

16        Q.   If you don't understand a question I ask,

17  it's confusing, you don't hear it, let me know.  I'll

18  repeat it, rephrase it, have the court reporter read it

19  back.  Just speak up.

20         And if you answer a question, I'll assume

21  you understood and heard it, okay.

22        **A.   Okay.**

23        Q.   If you need a break today, just let me

24  know, or let your counsel know.  We'll try to break

25  about every hour or so just to get up and stretch our

PohlmanUSA Court Reporting
(877) 421-0099    PohlmanUSA.com
Case 2:17-cv-04082-NKL  Document 134-13  Filed 06/12/18  Page 6 of 116

1    legs.  The caveat is if there's a question pending, I'd

2    ask that you answer it before we take a break.

3          A.   **Okay.**

4          Q.   How did you prepare for today's deposition?

5          A.   **I got up and took a shower.  And came on**

6    **over here.**

7          Q.   Did you meet with anybody to prepare for

8    today?

9          A.   **No, I did not.**

10         Q.   Did you review any documents to prepare for

11   today?

12         A.   **No, I did not.**

13         Q.   Okay.

14         A.   **I take that back.  Yes, I did.  I have some**

15   **transcripts, I guess, of some of the questions that was**

16   **asked earlier.**

17         Q.   And you're referring to -- looks like a

18   stack of paper you have in front of you?

19         A.   **Yeah.  It's some questions I guess you guys**

20   **requested before.**

21              MR. CRANE:  It's some Interrogatory

22   Responses.

23   BY MS. BREIHAN:

24         Q.   Can I see what you got in front of you?

25         A.   **No.  Why?**

```
 1        Q.   You used that document to prepare for your
 2   deposition today; yes?
 3        A.   I would -- yeah, I guess so.
 4        Q.   And you'll be relying on what you read or
 5   reviewed in that document to answer questions that you
 6   read today?
 7        A.   Actually, no, because I didn't really get a
 8   chance to read it.
 9        Q.   But you brought it with you?
10        A.   Yeah.  'Cause it was still there in my
11   house.
12        Q.   Okay.  Is there a reason you're not
13   agreeing to let me see it?
14        A.   Can you tell me why you want to see it?
15        Q.   Sure.  Because you reviewed it before today
16   and you brought it with you, so I'd like to see what
17   you brought with you.
18        A.   Is that imperative that it happens?
19             MS. BREIHAN:  Unless -- Counselor?  Unless
20   you're holding on to some sort of privilege.
21             MR. SPILLANE:  This is stuff that they
22   already have.
23             This is just the Interrogatories you asked
24   him about before.
25             MS. BREIHAN:  The Defendants' Responses to
```

1    the Second Set of Interrogatories.  I just wanted to

2    know what it was.

3              MR. SPILLANE:  Yeah.  They've already got

4    that.

5    BY MS. BREIHAN:

6         Q.   My job today is to ask questions, and your

7    job is to answer them truthfully.

8         A.   **Yes, ma'am.**

9         Q.   This will go easier if we stick to our

10   jobs.

11        A.   **I'm sure it's the only glitch we'll have.**

12        Q.   I hope so.

13             I want to talk about your educational

14   history if we can.  I don't think we've been provided

15   with a copy of your resumé; otherwise, I'd try to skip

16   over these questions.

17        A.   **I didn't bring one either, ma'am.**

18        Q.   We can ask you.

19             So what's the highest level of education

20   you've obtained?

21        A.   **Well, let's see.  Graduated from high**

22   **school, and I went to college for two years in Wyoming,**

23   **and then I went to college for another two years at**

24   **Missouri Western State.**

25        Q.   Did you graduate from Missouri Western

```
 1   State?

 2          A.   No, ma'am, I did not.

 3          Q.   So do you have a college degree?

 4          A.   I would say no.

 5          Q.   So what was the name of the college you

 6   went to for two years in Wyoming?

 7          A.   Central Wyoming College.

 8          Q.   What were you studying there?

 9          A.   Accounting.

10          Q.   And at some point you left and went to

11   Missouri Western State, correct?

12          A.   Yes.

13          Q.   Did you transfer immediately?  Or was there

14   some sort of gap in between those?

15          A.   There was a gap.  I went to work.  I had a

16   family.

17          Q.   How long of a gap was there between your

18   time at Central Wyoming and Missouri Western State?

19          A.   I can't really say.

20          Q.   More than five years?

21          A.   Probably about five years.

22          Q.   And do you remember what year it was that

23   you started at Missouri Western State?

24          A.   No, I really don't.

25          Q.   What were you studying at Missouri Western
```

1    State?

2           A.    Business management.

3           Q.    And why didn't you complete your degree?

4           A.    Um, I was given the opportunity to go into

5    management for the company I was working for.  Didn't

6    seem like a good idea, so I gave it up.

7           Q.    Okay.  So where were you working at the

8    time that you were taking classes at Missouri Western

9    State?

10          A.    Silvey Containers Corporation.

11          Q.    Were you working full-time and taking

12   classes part-time?

13          A.    Uh-huh.

14          Q.    So what did do you after you stopped taking

15   courses at Missouri Western State?

16          A.    Just worked.

17          Q.    At the Silvey Container Company?

18          A.    Yeah.  I worked there for 33 years.

19          Q.    When did you stop working there?

20          A.    When I came to -- when I took this job here

21   full-time.

22          Q.    And by "this job," you mean the position

23   with the parole board?

24          A.    Probation and Parole; yes, ma'am.

25          Q.    Did you take any classes, either at Central

1  Wyoming or Missouri Western State, about child

2  psychology?

3       **A.   No.**

4       Q.   Did you take any classes at either school,

5  Central Wyoming or Missouri Western State, about

6  adolescent development?

7       **A.   No.**

8       Q.   Did you take any classes at either of those

9  colleges about the law or legal studies?

10      **A.   Just political science at Central Wyoming.**

11      Q.   And what decade were you taking political

12  science courses?

13      **A.   In the 70s.**

14      Q.   Do you have any professional licenses or

15  certifications?

16      **A.   No, I don't think so.**

17      Q.   Are you a member of any professional

18  organizations?

19      **A.   Parole board.**

20      Q.   Outside of your employment, for example,

21  the American Correctional Association, or some sort of

22  organization like that?

23      **A.   Um, I've been to those types of conferences**

24  **on this job, but I don't know.  As far as -- I'm not a**

25  **dues-paying member or anything like that.**

1        Q.   And we can talk about the conferences that
2   you mentioned a little bit later.
3             So you mentioned that you were with a
4   container company for 33 years before you joined the
5   Missouri Board of Probation and Parole, correct?
6        **A.   Yes.**
7        Q.   When did you join probation and parole?
8        **A.   After I completed my term -- my three terms**
9   **of state rep.**
10       Q.   Okay.  When were you -- were you a state
11  rep while you were working with the container company?
12       **A.   Yes, I was.**
13       Q.   During what years were you a state
14  representative?
15       **A.   From '04 to '10.**
16       Q.   What political party were you?
17       **A.   Democrat.**
18       Q.   And what district did you represent?
19       **A.   Twenty-nine.**
20       Q.   And then after your third term as a state
21  representative what did you do for work?
22       **A.   Ran for the Senate.**
23       Q.   I assume that was not a successful run?
24       **A.   Exactly.  I also was still working at**
25  **Silvey Containers.**

```
 1         Q.   And then what happened after your run for
 2    the Senate?
 3         A.   I was appointed to this position.
 4         Q.   As a member?
 5         A.   I lost.  That's what happened.  After I
 6    tried to get in the Senate.
 7         Q.   Did you lose in the primary or the --
 8         A.   I lost in the general.
 9         Q.   And after that, the run for Senate, you
10    were appointed to the Board of Probation and Parole?
11         A.   Yes.
12         Q.   Do you recall when you applied for the
13    position with the board?
14         A.   I don't remember the exact date.
15         Q.   Do you remember the year?
16         A.   The year?
17         Q.   Yeah.
18         A.   2011.
19         Q.   And were you appointed that same year?
20         A.   Yes, I was.
21         Q.   Can you tell me a little bit about the
22    application process for the position with the board?
23         A.   I was appointed.  By the Governor.  And
24    then I had to get -- what's the word I'm looking for --
25    get a sponsorship from my Senator.
```

1      Q.   Do you remember anything else about the

2  application process?

3      A.   Not offhand, I don't.

4      Q.   Who is the senator that sponsored you?

5      A.   Robert Schaaf.

6      Q.   He's still a senator, isn't he?

7      A.   Uh-huh.

8           Let's see.  I had to go over the background

9  checks.  That was a lot of ancillary things that you,

10  you know, you do.  So you don't really think about them

11  as part of the process.  You don't really think about

12  that.

13      Q.   When you were a state representative were

14  you on any sort of committees?

15      A.   Is that a real question?

16      Q.   Yeah.

17      A.   Every state rep's on a committee.

18      Q.   What committees were you on?

19      A.   Education.

20      Q.   Any others?

21      A.   Senior citizen advocacy.

22           I was chairman of the Black Caucus.

23           I was on an agriculture committee.

24           I was on the budget committee.

25           I'm sure there's more, but I can't think of

1    them all.  I was there for six years.  I had a lot of

2    things going on.  But those are the ones I can think of

3    right now.

4         Q.   Were you on any committees that related to

5    corrections in the State of Missouri?

6         A.   No, I was not.

7         Q.   When you joined the board in 2011, did you

8    have to go through any sort of formal training?

9         A.   It was -- I went to Colorado.

10        Q.   What training did you attend in Colorado?

11        A.   NIC.

12        Q.   Do you know what that stands for?

13        A.   I want to say National Institute of

14   Corrections.  I'm not positive if that's exactly what

15   it is, but that's what I equate it to.

16        Q.   And what do you remember from that training

17   in Colorado in 2011?

18        A.   Courses in motivational interviewing.

19             Learning different types of -- the

20   different states -- 'cause there were several states

21   that were represented.  Learning how different states

22   do parole hearings.

23             That's what I took away from it.  Is how to

24   conduct my business.  Different laws in different

25   states.  You know.  Those types of things.

1      Q.   What is motivational interviewing?  Can you
2 explain that to me?
3      **A.   Trying to -- not trying to -- interviewing**
4 **someone in a positive light instead of a negative**
5 **light.**
6           **Not focusing on everything they've done in**
7 **the past that's wrong.**
8           **Trying to focus more on how we're going to**
9 **go forward.  How we're going to be a productive**
10 **citizen.  What do they think.  What does that**
11 **individual feel like they need, and what can be done to**
12 **help them be successful whenever they're released from**
13 **prison.**
14           **That's what's I called motivational**
15 **interviewing.**
16      Q.   And then you said the other thing you
17 remember from that training in Colorado was learning
18 about how different states conduct parole hearings,
19 correct?
20      **A.   Yeah.**
21      Q.   Do you recall what you learned about how
22 Missouri does or does not differ in conducting parole
23 hearings?
24      **A.   What I learned was Missouri at that**
25 **particular time was the model state at that time.  A**

1  lot of states were modeling the way of Missouri.  And

2  probation and parole was conducted in a way that other

3  states were modeling, and that's what I was told.

4        Q.   Do you know if that's still the case?

5        A.   I have not done research to find out

6  whether or not that's true or not.

7        Q.   Has anyone told you whether or not that's

8  still the case?

9        A.   I have not inquired.

10       Q.   But nobody told you?

11       A.   Not that I can recall.

12       Q.   So what exactly do you remember about this

13 concept of Missouri being a model state in 2011?

14       A.   One of the things that we do, that a lot of

15 other states were not doing, was making sure that there

16 was a lot of information available to parole board

17 members to conduct their parole hearings.  There were a

18 lot of eyes in the process to make sure that as few

19 amount of mistakes could be made.

20       Q.   Do you know how Missouri compared or

21 compares to other states with respect to what kind of

22 information the inmate has access to --

23       A.   No, ma'am, I do not.

24       Q.   -- during the parole process?

25            Do you know how Missouri compares or

1   compared with other states with respect to whether

2   hearings were in front of a panel or the entire board?

3       **A.   I do not.**

4       Q.   Do you know how Missouri compares or

5   compared to other states with respect to how

6   transparent or open to the public proceedings are?

7       **A.   I do not, ma'am.**

8       Q.   Did you take -- receive any training in

9   Colorado, or since then, on adolescent development?

10      **A.   No, ma'am.**

11      Q.   Did you receive any training in Colorado,

12  or since then, on child psychology?

13      **A.   No, ma'am.**

14      Q.   What about on evidence-based penological

15  practices?

16      **A.   Yeah.  I've had some of that training in**

17  **Daytona, Florida.  And Columbus, Ohio.**

18      Q.   Any other trainings on evidence-based

19  penological practices other than in Daytona and in

20  Columbus?

21      **A.   We'll occasionally have some training**

22  **within our office from some of our staff.  When new**

23  **things come up or just a refresher course occasionally.**

24      Q.   And would that take place during a board

25  meeting, or outside of the board meeting, or both?

1    A.   It would be the same day as a board
2  meeting.  The board meeting days were open dates, so if
3  we had to be there all day for the meeting, we would
4  be.
5    Q.   And by "there" you mean the Central Office
6  here in Jefferson City?
7    A.   Central Office, uh-huh.
8    Q.   When was that training in Daytona, Florida?
9    A.   I'm terrible on dates.
10   Q.   If you remember the year.
11   A.   I'm trying to think of the year.  It was
12  within the last couple of years.
13   Q.   And what about the training in Columbus; do
14  you remember when that was?
15   A.   It was the year before that.
16   Q.   The year before Daytona?
17   A.   It was a couple years in a row.  I might
18  have them backwards.  I'm not sure which one's which.
19   Q.   Is there any sort of record of these
20  conferences or trainings you attended?
21   A.   I don't have it, but I'm sure there is
22  somewhere, because the department went.  Most of the
23  board members went.
24   Q.   Who would we talk to within probation and
25  parole about trainings you've taken or conferences

1    you've attended?

2         A.   That's not my purview, ma'am.  I wouldn't

3    know.  I would imagine the chairman.  I don't know.

4         Q.   Is there any sort of annual training

5    requirement that you have to satisfy?

6         A.   We have 40 hours of training required of

7    each board member each year.

8         Q.   Does it have to be any certain kind of

9    training or can it be on any issue?

10        A.   There's different -- it doesn't have to be

11   exact.  We have to take advantage of opportunities to

12   be trained and there's a lot of different things to be

13   trained upon.

14        Q.   And how do you report your compliance with

15   that 40 hours?

16        A.   We fill out a survey at the end, fill out a

17   questionnaire, and it goes to the custodian of records.

18        Q.   Do you know who that is?

19        A.   No.  It's not my job to know that, ma'am.

20   I just fill it out and hit the send button.

21        Q.   Has there ever been a time where someone

22   has talked to you about not complying with that

23   40 hours?

24        A.   Yes.  The chairman reminds me occasionally.

25   Would remind us if we were or not caught up.

1          Q.    Has that happened to you?  Where the
2     chairman's recommended you that you haven't met your
3     40 hours yet?
4          **A.    Yeah.  It has.**
5          Q.    Okay.  Tell me about that.  When does that
6     happen?
7          **A.    I still had to do my harassment training**
8     **for, you know, for my job.  That's a state requirement.**
9     **For everybody.  And I just hadn't finished it yet, and**
10    **he let me know that I hadn't finished it, so I had to**
11    **get that done by the end of the year.**
12         Q.    And that's a recent thing?
13         **A.    Uh-huh.**
14         Q.    From 2017?
15         **A.    Uh-huh.**
16         Q.    Did you do it?
17         **A.    Uh-huh.  Of course I did it.**
18         Q.    So what do you remember from the training
19    in Daytona, Florida?
20         **A.    Are you talking about, like, evidence-based**
21    **practices?**
22         Q.    Well, let's start there.
23         **A.    Ma'am, that was three or four years ago and**
24    **I just do my job now.**
25               **I'm not trying to talk over you.  I mean,**

1    there's a lot of things I remember just by doing them.

2    I don't say, "Oh, I remember this in Daytona, so I do

3    this, and I don't remember this in Ohio and I do this."

4              The things that I remember are that as a

5    parole board member that I need to treat people with

6    respect.  Because I ask for them to treat me with

7    respect.  And I do that, and I try to talk to them as

8    human beings.  And I ask them to do the same.

9              And along the way -- I've been doing this

10   since 2011 -- and along the way you get better at your

11   interview process.  And as you do that, you remember

12   little bits of pieces and things that you might have

13   heard when you were going to training.

14             A lot of training, as you know, it's the

15   same type of training, it's just a reinforcement

16   training, unless there's something new on the block.

17             And so basically what I did learn, I

18   learned some evidence-based practices, things to look

19   for in testimony.  And some of these things I already

20   knew, but it's just a reinforcement type of thing.

21        Q.   What do you mean by things to look for in

22   testimony?

23        A.   Whether or not -- to try and get a feel for

24   how a person is feeling at that time.  Whether they're

25   uneasy.

1        So I try -- so, you know, kind of recognize

2   different signs, like fidgeting, those types of things.

3   I learned that when I first came on, so ...

4        Q.   So more non-verbal cues?

5        A.   Non-verbal cues.  We learned about -- like

6   I said, I can't remember exactly which one it was --

7   but one of them we learned about fatigue from the board

8   members and doing hearings.

9        We talked about how many hearings in a day

10  is too many hearings.  And those types of things like

11  that.

12       Just trying to make sure that you have a

13  fair and impartial hearing from the beginning of the

14  day to the end of the day.

15       Q.   And, you know, I might ask you questions

16  like, "Tell me everything you remember from the

17  training," and it might seem like a ridiculous question

18  to you --

19       A.   No, I don't think it is.  I'm sorry.  I'm

20  talking over you.

21       Q.   You know, the answer might be that you

22  don't remember.  And if that's the case, then, you

23  know, that's a truthful answer and that's fine.

24       A.   Okay.

25       Q.   So I'm not trying to --

1      A.   I don't want you to think I'm trying to

2  evade your question.

3      Q.   No.  It's a fair response if it's truthful.

4      A.   Okay.

5      Q.   Is it fair to say that you can't recall, as

6  you sit here today, any specific trainings that you

7  received from the Daytona or Columbus trainings that we

8  talked about?

9      A.   Yes, ma'am, that's a fair assumption.

10     Q.   Can you describe for me what penological --

11 evidence-based penological practices, what that phrase

12 means to you?

13     A.   That means to me that somebody's done the

14 research on whatever issue that we're talking about at

15 a particular time.  And it has to deal with the

16 Department of Corrections, and determines that a

17 certain number -- which is that all our life's deals

18 with numbers -- a certain number says this is how long,

19 or this is what should take place in the Department of

20 Corrections, as far as being in prison.  Being on

21 parole.  You know, being on probation.  Those types of

22 things.

23     Q.   So is it fair to say that the practice

24 that's evidenced-based relies on data and research in

25 order to make a decision or determination?

1          A.    I would imagine so.

2          Q.    Is that your understanding?  I don't want

3    to misrepresent your testimony.  I'm just trying to

4    understand what your understanding is.

5          A.    Yes, ma'am.

6          Q.    Does it involve the use of risk-assessment

7    tools or standards like that?

8          A.    In a lot of cases I believe so.

9          Q.    Are there cases where it doesn't?

10         A.    I can't say that, no.

11         Q.    Would you say it's generally the best

12   practice if -- generally the best practice to use a

13   risk assessment in making an evidence-based decision?

14         A.    General best practice, yes.

15         Q.    And you mentioned when I asked about

16   professional organizations, attending conferences, are

17   there conferences that you attended other than the

18   Colorado, Daytona and Columbus trainings?

19         A.    Not that I can remember.

20         Q.    So you've been a board member since 2011,

21   correct?

22         A.    Yes.

23         Q.    What are your general duties of the

24   Missouri board?

25         A.    I conduct parole hearings.

```
 1          Q.   Anything else?

 2          A.   I conduct parole hearings.  That's it.

 3          Q.   That's it.  Okay.

 4               And you conduct different kinds of parole

 5    hearings, correct?

 6          A.   Yes, ma'am.

 7          Q.   So there might be parole grant hearings, or

 8    parole revocation hearings, correct?

 9          A.   Uh-huh.  I also review files.

10          Q.   Do you also vote on decisions to --

11          A.   Yes, ma'am.

12          Q.   -- to grant or revoke?

13               Do you attend administrative meetings of

14    parole staff on a regular basis?

15          A.   Monthly.

16          Q.   Are there ever instances where you do not

17    attend those meetings?

18          A.   Yeah.  There's been an instance or two I

19    haven't.

20          Q.   Do you consult -- strike that.

21               Are there any rules that you use in your

22    job to guide the work that you do?

23          A.   The rule I have is, for myself, is to make

24    the very best decision with the very best information

25    that I have.
```

```
 1          Q.   Are you familiar with internal policies and
 2     procedures regarding the parole review process?
 3          A.   I would imagine so.  As far as I know, yes.
 4          Q.   Do you know what the blue book is?
 5          A.   I've seen the blue book.
 6          Q.   Are you familiar with what it is?
 7          A.   The blue book.  The red book.  The green
 8     book.  The yellow book.
 9          Q.   What's the blue book?
10          A.   I've seen them all.  I can't tell you.
11          Q.   Okay.  Do you know what the red book is?
12          A.   Seen them all.  I can't tell you what they
13     are.  I don't deal with them.
14          Q.   You don't deal with them.  Okay.
15               What about the Code of State Regulations;
16     do you ever review state regulations to the extent that
17     they impact the work that you do as a board member?
18          A.   State regulations as pertaining to what?
19     There's a lot of state regulations.
20               What are you talking about?
21          Q.   I'm talking about state regs that talk to
22     the parole board, or parole decisions; do you ever
23     review those?
24          A.   Probably do once a year.
25          Q.   Are you sure?  You said "probably do."
```

```
 1          A.   I'm not sure exactly what you're asking
 2    there, so I guess I could say I don't know.
 3          Q.   I mean, as a state representative I'm sure
 4    you're familiar with Missouri statutes and laws?
 5          A.   Okay.  Yes.
 6          Q.   What it means, and then regulations?
 7          A.   Yes, ma'am.  I see what you're saying now.
 8          Q.   I'm sorry.
 9          A.   I was trying --
10          Q.   I'm sorry if it's a confusing question.
11          A.   I thought it was, and then I thought it
12    wasn't, and then it was again.  I'm just trying to make
13    sure.
14          Q.   So we're on the same page now, I'm talking
15    about written law, statutory regulations that help
16    enforce those statutes --
17          A.   Yes.
18          Q.   -- and whether you review those to the
19    extent they impact your work as a parole board member?
20          A.   Yes, ma'am.
21          Q.   What kind of things are discussed generally
22    at these monthly board meetings that you participate
23    in?
24          A.   Anything that has to do with the parole
25    board at that particular time.  Each month there's a
```

 1    different topic.

 2              We talk about cases that stand out.

 3              We talk about decision-making.

 4              We talk about -- we talk about case law if

 5    it has to be discussed.

 6              We also have presenters occasionally.

 7        Q.   Anything else?

 8        A.   No.

 9        Q.   So you said that one of the things you

10    might do with those meetings is discuss cases that

11    stand out?

12        A.   Uh-huh.

13        Q.   Can you tell me about that?  What those

14    discussions are like?

15              Are you deliberating before a decision is

16    made --

17        A.   No.

18        Q.   -- or debriefing after a decision?

19        A.   Debriefing after a decision.

20        Q.   Are there ever instances where you discuss

21    with other board members in a meeting, whether it's a

22    board meeting or executive session of the board

23    meeting, deliberate how to vote as a board?

24        A.   Oh, no, we don't deliberate on how to vote.

25        Q.   You-all vote individually and separately,

1    correct?

2          A.   Yes, ma'am.

3          Q.   And you also said at the meetings you might

4    discuss case law if it has to be discussed.

5               What instances, under which case law, court

6    opinions or decisions, have to be discussed at a board

7    meeting.

8          A.   I can't remember.  There hasn't been that

9    many.

10         Q.   Who makes that decision?

11         A.   Board chairman.

12         Q.   And the current chairman is Kenny Jones,

13   correct?

14         A.   Yes.

15         Q.   Do you remember discussing a case

16   Miller versus Alabama during any of those meetings?

17         A.   No, ma'am.

18         Q.   Have you heard of that case name before?

19         A.   What is it?

20         Q.   Miller versus Alabama.

21         A.   No, ma'am, I don't remember that.

22         Q.   Do you remember discussing a case called

23   Montgomery versus Louisiana at any of those meetings?

24         A.   No, I do not.

25         Q.   Have you heard of that case name before?

```
1          A.   No, ma'am.

2          Q.   Do you recall discussing Senate Bill 590 at

3    any of those hearings?

4          A.   I don't know.  What is 590?

5          Q.   I'll show it to you.

6          A.   Just tell me what it pertains to.

7          Q.   I'll show it to you so you can look at it

8    yourself so I don't have to explain it.

9               I'll mark this as Exhibit 1.

10              (Deposition Exhibit No. 1 was marked for

11   identification.)

12   BY MS. BREIHAN:

13         Q.   This is a copy of Senate Bill 590 which was

14   passed in 2016.

15              Have you seen this before?

16         A.   Oh, yeah.

17         Q.   You have?

18         A.   Yes.

19         Q.   Take your time to look through the whole

20   thing if you want.  I don't want to rush you.

21              Do you recall when the first time was that

22   you saw --

23         A.   No, ma'am I do not.

24         Q.   Do you recall having any discussions at

25   board meetings about this Senate Bill 590 that we
```

1    marked as Exhibit 1?

2           **A.   Yes, ma'am.**

3           Q.   What do you recall from those discussions?

4           **A.   That this bill had passed, and the law had**

5    **changed, and that we would also now have a new group of**

6    **offenders that we would have parole hearings with.**

7    **Which would take us -- give us an opportunity to, I**

8    **guess -- I guess you could say opportunity to hear some**

9    **offenders that we normally would not hear.**

10          Q.   Do you remember anything else from that

11   discussion?

12          **A.   No.  Not really.**

13          Q.   And was that discussed just at one meeting?

14   Or did --

15          **A.   It might have come up again in another**

16   **meeting.**

17          **But we had one meeting when this was to let**

18   **everyone know it was gonna happen.**

19          Q.   And who else was present during that

20   meeting?

21          **A.   The rest of the board.**

22          Q.   Anyone else?

23          **A.   The board and staff of probation and**

24   **parole.**

25          Q.   Would that staff include parole analysts?

```
 1          A.   Yes.

 2          Q.   And then the chair's administrative

 3     assistant or secretary?

 4          A.   Uh-huh.

 5          Q.   Were any institutional parole officers

 6     present?

 7          A.   No.

 8          Q.   Were any district administrators present?

 9          A.   No.  Not that I recall.

10          Q.   And after you were informed that there was

11     a change in the law, such that a new class or new group

12     of inmates were parole eligible, do you recall any

13     subsequent questions about the change in the law and

14     how to implement the change in the law?

15          A.   Yeah.  We had another discussion, I'm sure,

16     on how we would -- how we would conduct the parole

17     hearings.  Because it was -- it was a different class

18     of offender that we needed to be aware of.

19               Also, that the offenders were all juvenile

20     without lifers.  I mean, explaining to us who they

21     were.

22          Q.   So is it your understanding that

23     Senate Bill 590, at least in part, made parole eligible

24     for individuals who were sentenced to mandatory life

25     without parole for crimes committed or allegedly
```

1   committed when they were under 18?

2          **A.   Under 18, that's right.**

3          Q.   So tell me about those discussions, about

4   how to handle hearings for this new class of parole

5   eligible inmates?

6          **A.   How to handle them?**

7          Q.   I think that's what you said.  I'm sorry if

8   I --

9          **A.   Oh, okay.  That's all that was said to us.**

10  **That we were going to have them.  And that we would**

11  **have information -- make sure that we had all the**

12  **information that was available for us.  Because up to**

13  **that point in time there was not much information.**

14        **That was one of the questions, was, you**

15  **know, information that -- they'd never had a parole**

16  **hearing before, so we were going to have to make sure**

17  **that we had all the information that we needed to make**

18  **a conscious, good decision for release.**

19        Q.   And what steps were taken to ensure that

20  you had enough information to make a decision in these

21  cases?

22        **A.   The same steps that have always been taken.**

23        Q.   What are those?

24        **A.   The information was gathered about the**

25  **cases, and compiled in a prehearing report for the**

1    **board, so that we would know what we're looking at**

2    **during the interview.**

3         Q.   Anything else?

4         **A.   No.**

5         Q.   The prehearing report, that's prepared by

6    the institutional parole officer, correct?

7         **A.   Uh-huh.**

8         Q.   Did Senate Bill 590 being passed, did that

9    impact how you conducted hearings?

10        **A.   No.  Just increased the docket.  But as far**

11    **as how I'm going to conduct a hearing, not -- well, let**

12    **me take that back.**

13         **There was another part of preparation.**

14    **We had an extra information sheet that we collected,**

15    **certain information at the board -- at the hearing**

16    **because they were juveniles.**

17         **And I can't tell you what was on those**

18    **sheets off the top of my head.  But just a little bit**

19    **more in-depth information to make sure that we covered**

20    **things that should be covered.**

21         Q.   So aside from this extra sheet you're

22    describing, you conducted these juvenile life without

23    hearings just as any other parole hearing?

24         **A.   Yes, ma'am.**

25         Q.   Did it impact your deliberation or

PohlmanUSA Court Reporting
(877) 421-0099    PohlmanUSA.com
Case 2:17-cv-04082-NKL  Document 134-13  Filed 06/12/18  Page 36 of 116

1    decision-making process?

2              Not necessarily how you ran the hearing, or

3    how you came to a decision, did Senate Bill 590 impact

4    that in any way?

5         A.   Not really.

6         Q.   What is your criteria for making a decision

7    as to whether or not to grant an inmate parole?

8         A.   You mean what do I take into consideration?

9         Q.   Uh-huh.  Yes.

10        A.   I take into consideration the crime itself.

11             I take into consideration how they've

12   been -- not necessarily in this order, okay?

13        Q.   I understand.

14        A.   In order.  I'm sorry.

15             I take consideration of the crime that was

16   committed.

17             The victim's opposition.  The positives.

18             I'm looking for how they're doing since

19   they've been incarcerated.

20             Have they made any plans for the future.

21             What their conduct is like within the

22   institution during their incarceration.

23             How our conversation is.  Is our

24   conversation adversarial?  Or are we having a

25   conversation like you and I are having?

1          **There's probably some other things, but I**

2   **can't think of any.**

3         Q.   I'd imagine that some of these

4   conversations at their parole hearing are pretty

5   difficult; is that fair to say?

6         By "difficult," I mean, you're discussing

7   some sensitive information, correct?

8         **A.   Yes, ma'am.**

9         Q.   And these inmates we're talking about here

10  today, in particular, had no anticipation of being

11  parole eligible?

12        **A.   Correct.**

13        Q.   And they grew up behind bars, correct?

14        **A.   Uh-huh.**

15        Q.   A lot of the men you're seeing under the

16  change of the law were arrested when they were kids and

17  now are adults?

18        **A.   Uh-huh.**

19        Q.   When you talk about how they've been, you

20  mentioned conduct in prison.  I assume that means

21  conduct violations, correct?

22        **A.   Uh-huh.**

23        Q.   Are you looking at the number, the type,

24  pattern?  Tell me how you assess conduct violations in

25  your decision-making.

1      A.   The number.  I look at the number.  The

2   severity.  Which is minor or major.  When they had

3   them.  You know, you might not have had one for three

4   years or something.  I don't know.  The frequency, I

5   guess that's the word I'm looking for.

6           Pattern.  Frequency.  Severity.  That's all

7   I can think of right now.

8      Q.   Is there anything else you look at?  I'm

9   trying to unpack that criteria in how they've been.

10  What that means, other than conduct violations.

11     A.   Oh, conduct violations.  How they get along

12  with other inmates.  Because usually there is a

13  comments section from staff that says this person is --

14  sticks to himself.  Stays out of trouble.  Is

15  respectful.  Those types of things.

16     Q.   Anything else?

17     A.   I think that's it.

18     Q.   Do you consider their medical or mental

19  health at all?

20     A.   Oh, yes, ma'am.

21     Q.   How does that weigh into your

22  decision-making?

23     A.   How does it weigh into my decision-making?

24          I guess I could say that if a person is

25  MR3, which I know is towards the top of the scale on

1    mental health needs, that person's -- the way I would

2    look at that person is that there are things that are

3    going on with them that they can't control.

4              And so then as far as making a decision,

5    when looking at their conduct violations, you have to

6    take in consideration their stability, mental

7    stability.

8         Q.   Do you know how the MH score is calculated?

9         A.   No, ma'am, I do not.

10        Q.   The prehearing report also contains an

11   educational score, correct?

12        A.   Yes, ma'am.

13        Q.   Does that weigh into your decision-making

14   as well?

15        A.   Not really.  Because if you go to prison

16   and you're 16, there's no way you can graduate from

17   high school.

18             Now, it does have a score that does emulate

19   that you got your GED or high school equivalency in

20   there.  I like that.  I mean, I don't hold it against

21   them for not finishing school, I just encourage them to

22   do it.

23        Q.   And are you generally aware of what kind of

24   programs, educational or otherwise, are provided --

25        A.   In most cases, uh-huh.

```
 1          Q.   And I know you know where I'm going with
 2    the question.  Please, just let me finish.
 3          A.   I thought you was.  I'm sorry.  Go ahead.
 4          Q.   It's okay.
 5               Do you know whether the availability of
 6    such programs varies from institution to institution?
 7          A.   Are you done?
 8          Q.   Yes.
 9          A.   Yes, ma'am, I do.
10          Q.   Does it, in fact -- does it, in fact, vary
11    from institution to institution what courses are
12    available to inmates?
13          A.   Yes, ma'am.  As far as I know.
14          Q.   Is there any sort of priority among inmates
15    as to who can enroll in such programs?
16          A.   I think so.
17          Q.   So fair to say that somebody who is a life
18    without parole sentence is probably low on the totem
19    pole for getting access to vocational or educational
20    courses?
21          A.   Sometimes, yes, ma'am.
22          Q.   And then what's the standard that you
23    consider when you're making your decision?
24          A.   I don't understand the question.
25          Q.   Is there any sort of benchmark?
```

1          We talked about the factors that you

2   consider; is there any sort of benchmark that you weigh

3   those up to determine whether or not to grant an inmate

4   parole.

5          **A.   No, ma'am.  I take each case individually.**

6          Q.   How many parole hearings do you personally

7   conduct on a monthly bases would you say?

8          **A.   I have no idea.**

9          Q.   No idea?

10         **A.   A lot.**

11         Q.   Too many to count.

12             Do you know how many you do on a weekly

13   basis?

14         **A.   Forty to fifty.**

15         Q.   And those are in person and by

16   videoconference, correct?

17         **A.   Uh-huh.**

18             THE REPORTER:  Yes?

19             THE WITNESS:  Yes.

20   BY MS. BREIHAN:

21         Q.   Do you conduct them at facilities across

22   the entire State of Missouri?

23         **A.   Yes, ma'am.**

24         Q.   And of the 40 to 50 a week that you conduct

25   personally, approximately what percentage of those are

 1   by videoconference versus in person would you say?

 2          A.   I have no idea.

 3          Q.   How do you prepare for a parole hearing?

 4          A.   Go through the reports that were given to

 5   me by analysts.

 6          Q.   By "reports," do you mean the prehearing

 7   reports?

 8          A.   Prehearing reports, yes, ma'am.

 9          Q.   Do you generally review prehearing reports

10   before you sit down with an inmate at their hearing?

11          A.   Yes, ma'am.

12          Q.   Do you review any other materials before

13   you sit down for the hearing?

14          A.   Sometimes, yes.

15          Q.   Are there certain circumstances under which

16   you would make an effort to review additional materials

17   before a parole hearing?

18          A.   Time constraints.

19          Q.   And the report, as I understand it, is put

20   into a parole file, correct?

21          A.   Yes, ma'am.

22          Q.   What else is in that parole file generally?

23          A.   Prehearing report.  Police report.  And

24   board action reports from previous hearings.

25          Q.   Anything else?

1          A.   Yeah.   There's a lot of stuff in there.

2          Q.   There might be letters of support from

3     people?

4          A.   Letters of support.

5               Reports of -- from inside the institution

6     on their medical history.

7               Educational history.

8               There's a lot of stuff in there.  I can't

9     name it all.

10         Q.   Do you review that entire parole file

11    before a hearing?

12         A.   I try.

13         Q.   For these juvenile life without parole

14    hearings, do you always review the entire parole

15    hearing before the hearing?

16         A.   Not all the time.

17         Q.   Do you review -- in these juvenile life

18    without parole cases, do you review the entire parole

19    file before making your decision?

20         A.   Yes, ma'am.

21         Q.   And how do you generally run a parole

22    hearing?

23         A.   I don't understand that question.

24         Q.   Sure.  Let me rephrase it.

25               If you had to write sort of a process that

1  you intend to follow in going through parole hearings,

2  what would that look like?

3       **A.   You mean, like, introduce ourself and all**

4  **that?**

5       Q.   Yeah.  I'm talking at the highest level.

6  For example, what's the first thing you do?

7            If there's a parole hearing, and there is a

8  victim's advocate representative there, or a victim's

9  family there, and the prosecuting attorney, and the

10 inmate, let's assume, how do you go about starting the

11 hearing?  Who speaks first?  What happens after that?

12      **A.   Okay.  That's where I wanted to go.**

13 **Because you didn't say anything about a victim.**

14           **So if we have a parole hearing, you have an**

15 **opportunity to talk to victims first in most cases.  To**

16 **let them know that they can't interrupt your interview**

17 **with the offender.  Find out if they want to speak**

18 **while the offender's in the room.  Or speak while he is**

19 **not in the room.**

20           **Find out how many victims want to speak.**

21 **And then you go through that process of whatever they**

22 **want to do.  Whether they want to speak with them or**

23 **without them.**

24           **Then you also -- then when you bring in an**

25 **offender, you tell him the same -- pretty much the same**

1    thing that you told the victims.  That there's

2    victims -- if you're doing it on video, it's a little

3    bit different.  On video, I'll go over the video first.

4    On the video I will tell the offender that there's a

5    representative for the victim.  'Cause he has the right

6    to know someone else is in there.  Or at least I think

7    he does, so I tell them.

8            I tell him if they're going to speak while

9    they're there, not to speak or interrupt or react to

10   anything that he's gonna say, which is the same

11   instructions that I gave to them.

12           And then I ask him to wait for our

13   interview, and I'll allow the victims to speak first if

14   they're going to speak with him in there.

15           If they've already spoken, I'll see if he

16   has an advocate.  I speak with him and give him the

17   same instructions.  I ask him to sit back, and then I

18   interview the offender.

19           And then I'll ask my colleagues if they

20   have any questions or comments.  Sometimes I'll even

21   stop during the middle of my interview with them and

22   make sure that there's not any burning questions on

23   their mind.

24           Because sometimes it's kind of hard to wait

25   till the end of the interview for your turn.  I'd

1    rather that we talk when we're -- things are fresh.

2         And then after we're finished interviewing

3    with him or her, whoever it might be, I give the

4    delegate who is with the offender, give them an

5    opportunity to speak.  Tell them that I appreciate them

6    being there, and ask for their -- any kind of

7    commentary they have, support for the offender, once

8    he's released from the institution.

9         Q.   And then after the delegate speaks do you

10   conclude the hearing?

11        A.   Yes, I conclude the hearing.

12             Well, after the delegate speaks, I come

13   back to the offender and let the offender know what the

14   time frame and process is to get him an answer back

15   from the board.

16             That's about all I have to say after

17   they're done talking.

18        Q.   And so you mentioned at the outset that you

19   determine how many of the victims want to speak.

20   Meaning that there are instances where there might be

21   more than one victim or representative in the room; is

22   that correct?

23        A.   Yes.

24        Q.   Is there any limitation that you know of --

25        A.   Not that I know of.

```
 1          Q.   Let me start over.
 2               Is there any limitation that you know of on
 3   the number of victims or victim's representatives that
 4   can appear at the parole hearing?
 5          A.   Not that I know of.
 6          Q.   Is there any limitation on the number of
 7   delegates that the inmate may have with them?
 8          A.   I believe there is.
 9          Q.   What is that cap?
10          A.   I believe it's one.
11          Q.   And are there any other individuals allowed
12   to attend besides parole victims, their representatives
13   and their delegate?
14          A.   Not that I know of.
15          Q.   Is law enforcement allowed to attend?
16          A.   Yes, ma'am.
17          Q.   Are prosecuting attorneys allowed to
18   attend?
19          A.   Yes, ma'am.
20          Q.   When do you give law enforcement or
21   prosecuting attorneys a chance to speak if they want
22   to?
23          A.   At the same time or during the process with
24   the victims.
25          Q.   And do you allow law enforcement, if they
```

1  wish to speak, to speak outside the presence of the

2  inmate?

3        **A.    Pardon?**

4        Q.    Do you allow law enforcement to speak

5  outside the presence of the inmate?

6        **A.    Yes, ma'am.**

7        Q.    And do prosecuting attorneys, if they're

8  present and want to speak to you, do you allow them to

9  speak outside the presence of the inmate?

10       **A.    Yes, ma'am.**

11       Q.    And you also mentioned that you might give

12  an opportunity to your colleagues to ask questions.

13             Are you referring to the other members of

14  the hearing panel?

15       **A.    Yes.**

16       Q.    And the hearing panel consists of a board

17  member, a parole staff, and a parole analyst; is that

18  correct?

19       **A.    Yes, ma'am.**

20       Q.    So who generally leads these Senate Bill

21  590 hearings?  Who on the panel leads them?

22       **A.    The parole board member.**

23       Q.    Every time that's how it's supposed to be

24  done?

25       **A.    Yes, ma'am.**

```
 1        Q.   And when do you make a decision on a
 2   hearing that you have run?
 3        A.   Usually after the hearing is over with.
 4        Q.   That same day?
 5        A.   That day, uh-huh.
 6        Q.   Any sort of deliberation before the panel
 7   before the decision is made?
 8        A.   Uh-huh.
 9        Q.   There is?
10        A.   Uh-huh.
11        Q.   And then you put -- do you put your answer
12   down on the board action sheet, once you made your
13   decision, whether to grant parole or give an inmate a
14   setback?
15        A.   Yes, we do.
16        Q.   I'll hand you what's marked as Exhibit 2.
17             (Deposition Exhibit No. 2 was marked for
18   identification.)
19   BY MS. BREIHAN:
20        Q.   It's Bates-stamped AGO60 and 61.
21        A.   Thank you.
22        Q.   Is this the board action sheet that we're
23   talking about?
24        A.   Yes, ma'am.
25        Q.   So continuing our hypothetical, if this is
```

1    a hearing that you ran, where on here would you

2    indicate your decision?

3         **A.    The decision, 1.**

4         Q.    Okay.  So the decision and remarks/initial

5    member.

6              Is that what you're talking about?  The top

7    left box?

8         **A.    Yes.**

9         Q.    And then above that there's a box that is

10   called hearing panel comments; do you see that?

11        **A.    Yes.**

12        Q.    Who, if anyone, would write inside that box

13   for hearing panel comments?

14        **A.    The board member and the analyst.**

15        Q.    And what would you typically write or note

16   in that box?

17        **A.    Things like good interview.  Good insight.**

18   **Good home plan.**

19             **Maybe something pertaining to the case like**

20   **"was not the shooter."**

21             **I guess I don't remember right offhand.**

22   **Just something that might have been something -- a**

23   **highlight for me or a panel member.**

24        Q.    And what's the purpose of making those

25   notes of highlights in this hearing panel comments

1  section of the board action sheet?

2  **A.   Giving the other board members the**

3  **opportunity to vote on that particular case.  So**

4  **insight on what we saw or heard in the hearing.**

5  **Because we were the ones in the hearing,**

6  **they weren't in the hearing.  All that they're getting**

7  **is the information from this.**

8  Q.   And am I correct that all these juvenile

9  life without hearings, are they majority board

10  decisions?

11  **A.   Every one.**

12  Q.   So that means they need four consistent

13  decisions from board members in order to have a

14  majority reached, correct?

15  **A.   Yes, four.  I'm sorry.**

16  Q.   But the inmate, as you pointed out, only

17  gets to meet with, personally, with one of the board

18  members, correct?

19  **A.   Yes, ma'am.**

20  Q.   And so these hearing panel comments

21  indicate highlights that could assist other board

22  members who weren't in the room in voting.

23  Could they also be used if the inmate's

24  given a setback, and they have a reconsideration

25  hearing, to help the board down the line to make an

1   assessment as to whether the inmate at that point

2   should be given appeal?

3         A.    I would guess so; yes, ma'am.

4         Q.    And in your experience, have you ever been

5   in a reconsideration hearing and relied upon previous

6   panel's comments on this board action sheet in making

7   your decision?

8         A.    Yes, ma'am.

9               MS. BREIHAN:  We've being going about an

10  hour.

11              Let's take a five-minute break.

12              (A break was taken.)

13              MS. BREIHAN:  Back on the record.

14  BY MS. BREIHAN:

15        Q.    I just have a few more questions about this

16  board action sheet, Exhibit 2.

17              The second page here, is this where you

18  would indicate the reason for your decision for each

19  case?

20        A.    Yes, ma'am.

21        Q.    And it looks like there's a series of boxes

22  with sort of pre-typed basis for decisions, like

23  circumstances surrounding the present offense, correct?

24        A.    Uh-huh.

25        Q.    And there's also blanks where you can

1  hand-write in different reasons for your decision?

2       **A.   Yeah.   A reason that one of these boxes**

3  **doesn't, basically, clarify for us.**

4       Q.   Are there ever instances where you would do

5  that?  Where would you check 1G, other, and you would

6  write in a different --

7       **A.   Yes, ma'am, I'm sure we have.**

8       Q.   Have you done that in these juvenile life

9  without cases?

10      **A.   Not that I know of.**

11      Q.   And on the very bottom, it says specifics

12  of witness testimony.  What's that part of this form

13  intended for?

14      **A.   I couldn't tell you, ma'am.  I've never**

15  **filled that out.**

16      Q.   Okay.  And other than the delegate, there

17  aren't any witnesses that are allowed at a parole

18  hearing for an inmate, correct?

19      **A.   Exactly.**

20      Q.   You also mentioned earlier that there was a

21  third sheet or an extra sheet that you used for

22  hearings in these juvenile life without cases, correct?

23      **A.   Uh-huh.**

24      Q.   I'll hand you Exhibit 3, which is AGO 28.

25           (Deposition Exhibit No. 3 was marked for

```
 1   identification.)

 2   BY MS. BREIHAN:

 3       Q.   Is this the third sheet you're talking

 4   about?

 5       A.   Yes, ma'am, it is.

 6       Q.   And who would typically fill out this

 7   Exhibit 3?

 8       A.   The analyst.

 9       Q.   The parole analyst?

10       A.   Parole analyst.

11       Q.   And when would they do that?

12       A.   As we were going along as we were doing the

13   hearing.

14            Typically -- well, I don't think there's a

15   typical way.  I think what you do is -- because I am

16   designated in most cases to do the hearing -- while I'm

17   conducting the hearing, as these observations are made,

18   he would fill it in.

19            Sometimes, like I said earlier, it's kind

20   of hard to wait till the very end of a hearing.  'Cause

21   a hearing like that can last 50 minutes to an hour.

22   Just because you're trying to get everybody involved in

23   the conversation.  And to wait an hour before you

24   answer some of these questions, you might have

25   forgotten them.
```

1          There might have been a point that came

2     about that was a really good point in someone's favor.

3     And you might have forgot to write it down.  If you

4     didn't write it down right then, then you might have

5     forgotten they said it, and vice versa.

6          Q.   But you don't use this Exhibit 3 during the

7     hearing to guide specific questions for each of these

8     factors, do you?

9          A.   No, I do not.

10         Q.   Do you ever, after a hearing, go back and

11    listen to a recording before making a decision?  If

12    you're the one leading the hearing itself?

13         A.   I can say that I've only done that, I

14    think, twice since I've been on the board, go back and

15    listen.  Because I'm the one doing the hearing.

16         Q.   What about when you're a voting member, but

17    you weren't on the hearing panel?  Do you listen to a

18    recording of that hearing before you make that

19    decision?

20         A.   Not generally.

21         Q.   Have you ever done that in these juvenile

22    life without cases?

23         A.   No, ma'am, I have not.

24         Q.   How many of these juvenile life without

25    parole hearings, or Senate Bill 590 hearings, have you

1  personally led?

2      **A.   Ma'am, I don't know.  I don't even know how**

3  **many there are.**

4      Q.   Okay.

5      **A.   So I can't say.**

6      Q.   Do you think if I mentioned some names

7  maybe it will ring a bell?

8      **A.   No, ma'am.  The only -- I got one name:**

9  █████.

10      Q.   Ed Ramsey?

11      **A.   (The witness nodded his head.)**

12      Q.   Why does ███████ name stick out in your

13  mind?

14      **A.   Because it's the first one I did.**

15      Q.   And he got a grant, too; is that correct?

16      **A.   Yes, he did.**

17      Q.   Do you recall Ed Ramsey's hearing in

18  December of 2016?

19      **A.   I don't remember the date, but I remember**

20  **the name.**

21      Q.   Okay.  Do you remember who was present at

22  that hearing?

23      **A.   As far as victims you mean?**

24      Q.   Well, first of all, let me back up.

25           Was that a videoconference hearing or in

1   person?

2          **A.   It was video.**

3          Q.   And where were you physically for that

4   hearing then?  Were you here?

5          **A.   Jefferson City.**

6          Q.   Okay.  And who else was in Jefferson City

7   with you for that hearing?

8          **A.   I had an analyst.  I can't remember which**

9   **one it was.**

10         Q.   When there's a videoconference hearing, you

11  and the analyst are in Jeff City, and the third panel

12  member is at the institution with the inmate, correct?

13         **A.   Yes.**

14         Q.   Do you remember who from Mr. █████

15  hearing was present at the prison facility?

16         **A.   No, I do not.**

17         Q.   Do you remember what facility Mr. █████

18  was at the time of his hearing?

19         **A.   No, I do not.**

20         Q.   Do you remember there being any family

21  members of the victim present at Jefferson City --

22         **A.   Yes, ma'am.**

23         Q.   -- at Central Office?

24         Do you remember the prosecuting attorney

25  being present in Jeff City?

```
 1          A.    I believe so.

 2          Q.    Is that unusual to have a prosecutor --

 3          A.    No, ma'am.

 4          Q.    -- at a parole hearing?

 5                Do you remember who Mr. ███████ delegate

 6    was?

 7          A.    No, ma'am, I do not.  I believe it was a

 8    lawyer, I think.

 9          Q.    Kent Gibson ring a bell?

10          A.    (The witness shrugged.)

11          Q.    Do you remember what time of day the

12    hearing was?  Whether it was morning or afternoon?

13          A.    It would have been the morning.  We try to

14    do victims' cases as early in the morning as we can.

15          Q.    Why is that?

16          A.    Probably -- well, in a lot of cases, when

17    you have victims' cases, you have people coming from

18    other places.  And you try and get them in early so

19    they're not on the highway at night.  Just try to take

20    into consideration their time.

21                Just like -- and I -- I believe that if

22    that's the first case of the day that you're at your

23    sharpest.  So you're going to be more inclined to be

24    focused on -- not that I'm not ever focused, I'm always

25    focused on what I'm doing -- but I believe earlier in
```

1    the morning your first focus is going to be, you

2    know --

3         Q.   You had mention the phrase "board fatigue,"

4    I think, earlier on?

5         A.   Yeah.

6         Q.   Meaning that if you do a lot of hearings

7    you can lose focus?

8         A.   If you do it at the end of the day, just

9    might be -- you know, you might miss some things that

10   you're not -- that you wouldn't miss earlier.

11        Q.   And then at Mr. ██████ hearing, did

12   you -- do you remember how the hearing proceeded?

13             Did you walk through the prehearing report

14   and conduct it that way?

15        A.   No.  I didn't do anything any different

16   with Mr. Ramsey than I would any other case, other than

17   collect the extra information.  And I talked to him

18   like he was an offender in prison for murder who had an

19   opportunity at parole, just like any other prisoner in

20   there for murder who had an opportunity for parole.

21        Q.   So is he just wanting to get an

22   understanding of how, if at all, you used the

23   prehearing report during the hearing?

24        A.   The prehearing report is in my hands.  And

25   I go through the information in the prehearing report

1    with the offender.  Just to a point to where it becomes

2    like a conversation.

3              This is my style.  Where it comes to a

4    conversation between you and I on, you know, what do

5    you like to do?  What were you doing that day?  How did

6    you get caught up in it?

7              Sometimes I use the vernacular that they

8    would use in their neighborhood, because many of them

9    are African-Americans, like I am.  The majority of them

10   grew up in the projects, just like I did.  So I feel

11   that we can have a conversation.  It's just a

12   conversation sometimes.

13             I'm more interested in the person.  I mean,

14   I'm not discounting the crime, but I'm trying to

15   understand the person a little.

16        Q.   Do you remember, in Mr. ███████ hearing,

17   do you remember whether the victim's family members

18   were allowed to speak at the hearing?

19        A.   Yes.  Yes, ma'am, they did speak.  They

20   spoke before -- I believe they spoke before he came in.

21        Q.   Okay.  What about the prosecutor who was

22   present, were they allowed to speak at the hearing?

23        A.   I believe they spoke before.  I believe

24   everyone spoke before the offender came into the room.

25        Q.   So who else other than the victim's family

1    members and the prosecutor spoke?

2          **A.    That's all I can recall.**

3          Q.    Was Mr. ███████ ever provided a transcript

4    or recording of what those people said outside of his

5    presence?

6          **A.    That's not my job, ma'am.  I would not**

7    **know.**

8          Q.    Do you know whether inmates have access to

9    their parole files?

10         **A.    Do not know, ma'am.**

11         Q.    And then was Mr. ███████ allowed to give a

12   statement?

13               I understand that part of it's a

14   conversation of where he answers your questions; is he

15   allowed to give a statement.

16         **A.    Always.  They get a chance to make that**

17   **statement last.  And so the way I see it, that last**

18   **statement is the one that you're gonna remember.**

19         Q.    And do you remember Mr. Ramsey trying to

20   talk about his youth, and issues from being a victim of

21   assault?

22         **A.    Victim of assault?**

23         Q.    Personally, yes.  Do you remember him

24   talking about that?

25         **A.    I can't say that I do.**

```
 1        Q.   Do you remember cutting him off from
 2   talking at any point?
 3        A.   Not that I recall.  No, I do not.
 4        Q.   And do you remember allowing the delegate
 5   to speak toward the end of the hearing in Mr. ████
 6   case?
 7        A.   Yes.  Yes, ma'am.
 8        Q.   Do you remember -- strike that.
 9             Are you aware of any limitations on what a
10   delegate can bring into a hearing?  What physically
11   they can bring in with them?
12        A.   There are limitations; yes, ma'am.  'Cause
13   it's not a court.  It's not a court.  I mean, at one
14   time -- I don't know if it's still the same, I think
15   there are some things that have been changed -- but
16   when I first came on the board, the delegates are not
17   allowed to take notes.
18             They're not -- well, actually, I don't
19   think they were allowed to bring much of anything, to
20   be honest.
21             But notepads to take notes is about the
22   only thing that's ever been involved with.  So I don't
23   know exactly what they can or cannot bring, and I
24   believe the institution has a lot to do with that also.
25        Q.   So in what respect were you involved with
```

1    the delegate's ability to bring in a notepad to take

2    notes at the hearing?

3        A.   When I was on the board, I was informed of

4    what could be brought in and whatnot, and I just stayed

5    with that.

6        Q.   Is there any sort of written policy or

7    procedure you're aware of that says delegates cannot

8    take notes during a parole hearing?

9        A.   I don't know about that right now.

10       Q.   Are there the same limitations on a

11   prosecuting attorney?

12            Are they allowed to take notes during

13   hearings?

14       A.   I don't think so.  I mean, I've never seen

15   them take notes.

16       Q.   Are prosecuting attorneys allowed to bring

17   in legal materials to parole hearings?

18       A.   Usually a statement.  Uh-huh.

19       Q.   Do you remember whether there was any

20   conversation or deliberation amongst the panel after

21   Plaintiff ████████ hearing had concluded, but before

22   you voted?

23       A.   Of course.

24       Q.   What do you recall from that discussion?

25       A.   That it was a very good hearing, and he

1    was -- he conducted himself very well.

2         Just talked about his conduct.  His conduct

3    was very good.

4         The comments made from staff that he was

5    not a problem inmate.  That he'd been -- he was very

6    helpful, actually.  He was a tutor and doing things to

7    get on with his life.

8         And when you take those into consideration,

9    you think this guy is probably gonna be able to make it

10   when he gets out.  He's been in prison a long time.

11   Twenty five years or more.

12        Q.   You mentioned because of that you thought

13   there would be a good chance he might be able to make

14   it is what you said?

15        A.   Survive.  Uh-huh.

16        Q.   So am I correct that what you're trying to

17   do in these hearings is determine whether there is a

18   reasonable probability that the inmate can be released

19   without being a harm or detriment to the community or

20   themselves?

21        A.   Yeah.  That's what we do.

22        Q.   And how do you assess whether there's a

23   reasonable probability?

24        How do you make that determination?

25        A.   By paying attention in the hearing.

1    Listening to what he has to say.  Going over the

2    material that we have in the prehearing report.  And

3    human nature.

4            Q.   How did you vote in Mr. ████ case?

5            A.   How did I vote?  I'm pretty sure I voted to

6    release him.

7            Q.   Do you remember what the outdate was that

8    you suggested?

9            A.   No, ma'am, I do not.

10           Q.   Do you recall what the institutional parole

11   officer's recommendation was?

12           A.   I do not.

13           Q.   Do you remember if the other panel members

14   agreed with you in your vote?

15           A.   I believe so.  I believe they did.  We all

16   agreed.

17           Q.   In instances like Mr. ████, where he's

18   granted parole, how do you determine how far out to set

19   the release date?

20           A.   There's a lot of things you take into

21   consideration.

22                In this particular case -- or I should say

23   these particular cases -- you'd be fooling yourself if

24   you think you could let a guy out in six months, who's

25   been locked up for 25 years with no hope, and all the

1   sudden you're just going to release him to the streets.

2   So I think what you do is you try and determine if that

3   person can be released first.

4           Once you do that, you determine -- you try

5   and give them a little bit of time to learn to -- to

6   get a transition plan together.  Because at that

7   particular time, he doesn't have a transition plan; he

8   didn't think he was gonna go home.  Ever.  And it's not

9   my job to set someone up to fail.  And I don't want to

10  do that.

11          And so I would rather give him a little

12  more time in the institution to gather himself, get his

13  home plan together, get maybe leads for a job.  Just

14  get his mind right to say, hey, look, you know, I've

15  never seen a cell phone before.

16          These are new life skills he's gonna have

17  to learn.  You know, just -- I think through the

18  interview process, what you try to determine is whether

19  or not that person -- like I said -- first, is ready to

20  go home, is a risk to the public safety, and then is he

21  a risk to himself.

22          'Cause you know, like I do, society is

23  cruel.  And I don't want that kid to get out -- he's

24  not a kid anymore -- but he was kid when he came in.

25  And so a lot of his thought process when he gets out,

1    it's the institutionalized process.  His thoughts.

2    It's not going to be that way on the street.

3         Q.   What does that mean by "institutionalized

4    thought process?"

5         A.   It's all institutionalized.  It's about

6    following the rules.  Survival.  Life is all

7    structured.  What I do in the streets, everything is

8    not structured.  You gotta make some decisions on your

9    own.  You gotta make the right decision or you're

10   coming back to prison.

11             Because society doesn't think you should

12   get out anyway.  And now that you have that

13   opportunity, I feel like it's my job to do my very best

14   that you can get out and be successful.  I don't want

15   you to come back, regardless of what you did.

16        Q.   Do you know generally what the

17   re-incarceration rate is for juvenile offenders after

18   serving 25 or 30 years --

19        A.   I'm sorry, I don't.

20             I talked over you.  I'm sorry.

21        Q.   I'm just asking if you know what the

22   re-incarceration rate is for juvenile offenders who are

23   released from prison after serving lengthy sentences?

24        A.   No, ma'am, I do not.

25        Q.   Do you know what the re-incarceration rate

1    for inmates released on parole for more serious crimes

2    that resulted in death versus lower-level felonies?

3         **A.   No, I don't know what the rate is.  I know**

4    **that I've heard figures over the years that I've been**

5    **on this job.**

6         Q.   Do you remember conducting a hearing in

7    October of last year for ███████████?

8         **A.   Ronald Clements.  I know that name, but I**

9    **can't recall the hearing, ma'am.**

10          **Is that another juvenile?**

11        Q.   It is.

12        **A.   It is.**

13        Q.   Before I jump into that -- I'm sorry -- the

14    same day that you conducted Mr. ██████ hearing you

15    conducted another one of these juvenile life without

16    hearings?

17        **A.   I did two in one day?**

18        Q.   You seem surprised to hear that.

19        **A.   Oh, wow.  I know I did two in one day.  I**

20    **didn't realize it was that -- that particular day.  And**

21    **I don't remember -- I don't remember any of the other**

22    **ones.  Not like I do Mr. Ramsey, because I would say**

23    **Mr. Ramsey impressed me.**

24        Q.   So the name ██████████; does that

25    ring any bells?

```
 1          A.   It does not ring a bell.

 2          Q.   Do you recall anything from

 3   Mr. Richardson's hearing?

 4          A.   No, ma'am, I do not.

 5          Q.   Do you recall the decision you made in his

 6   case?

 7          A.   No, ma'am.

 8          Q.   So back to Mr. ███████ -- and my apologies

 9   for jumping around there -- do you recall anything from

10   Mr. ███████' hearing in October of last year?

11          A.   No, ma'am, I do not.

12          Q.   Do you recall how you voted in that case?

13          A.   No, ma'am.

14          Q.   I'll show you what I've marked as

15   Exhibit 4.

16               (Deposition Exhibit No. 4 was marked for

17   identification.)

18   BY MS. BREIHAN:

19          Q.   Do you recognize this document, sir?

20          A.   No, I don't.  I do not.

21          Q.   Have you ever seen this form before?

22          A.   Not with ███████████' name, I have not.

23          Q.   But this is the standard form used to

24   communicate a board's decision to an inmate; is that a

25   fair description?
```

1          A.   Yes, ma'am.

2          Q.   And as you indicated, it looks like this is

3    for Mr. ███████ , correct?

4          A.   Yes.  His name is at the top.

5          Q.   Does this refresh your memory about how --

6          A.   No, ma'am, I do not.

7          Q.   -- let me finish the question.

8          A.   Sorry.

9          Q.   Does this refresh your memory about how you

10   voted, or the board's decision, in Mr. ███████ ' case?

11         A.   No, it does not.  Because he got a -- oh, I

12   see.  Whatever date is on here does not necessarily

13   reflect my date.  This reflects the end date of the

14   majority of the board.

15         Q.   I understand.

16              So this sheet indicates Mr. ███████ will

17   be scheduled for a reconsideration hearing in

18   ███████ of ████ , correct?

19         A.   Yes, ma'am.

20         Q.   And you're saying it's possible that you

21   voted for a 2022 or a 2020 reconsideration hearing,

22   correct?

23         A.   It's very possible.

24         Q.   Okay.  And then the reasons stated on this

25   form for the decision is that release at this time

1    would depreciate the seriousness of the present

2    offense, based upon circumstances surrounding the

3    present offense.

4             Do you see that?

5        **A.   Yes, ma'am, I do.**

6        Q.   What does that mean?

7        **A.   I don't know, ma'am.  I did not put it**

8    **there.**

9        Q.   Have you ever made a decision where you

10   checked "circumstances surrounding the present offense"

11   as the basis for your decision?

12       **A.   Yes, I believe I have.**

13       Q.   So what does that mean to you, "the

14   circumstances surrounding the present offense"

15   justifies denial of parole?

16       **A.   That probably the crime itself was taken in**

17   **consideration, more so than other cases, or whatever.**

18       Q.   Do you remember conducting a hearing for a

19   man named ██████████████████?

20       **A.   No, ma'am, I do not.**

21       Q.   Do you remember conducting a hearing for a

22   man named ████████████████?

23       **A.   No, ma'am.**

24       Q.   It would have been in person in

25   Potosi Correctional Center in March of last year.

```
 1          A.   Are we talking about just juveniles?

 2          Q.   Yes.  Life without hearings.

 3          A.   It was at Potosi?

 4          Q.   Yes.  In March of 2017.

 5          A.   No, ma'am, I don't remember that.  I don't

 6   go there very often.

 7          Q.   And so safe to say you don't remember

 8   asking Mr. ████████ about the circumstances of his

 9   underlying offense?

10          A.   No, ma'am, I do not.

11          Q.   And do you remember how you voted in

12   Mr. Bradshaw's case?

13          A.   No, ma'am, I do not.

14               (Deposition Exhibit No. 5 was marked for

15   identification.)

16   BY MS. BREIHAN:

17          Q.   I'll show you an exhibit that might refresh

18   your memory.

19               This is that same sheet.  Same form we were

20   just looking at but for ████████████.

21          A.   Okay.

22          Q.   And this indicates that he was also given a

23   four-year setback due to circumstances of the offense,

24   correct?

25          A.   That's what it looks like, yes, ma'am.
```

1      Q.   Does that refresh your memory at all about

2   how you voted in this case, or why you would have voted

3   that way?

4           **A.   No, ma'am, it does not.**

5      Q.   Do you take any notes, handwritten notes or

6   otherwise, during parole hearings that you might refer

7   to at any point in making your decision?

8           **A.   Not generally.**

9      Q.   And in these juvenile life without parole

10  hearings, do you ever remember taking handwritten

11  notes?

12          **A.   No, ma'am, we use that extra sheet.**

13     Q.   Exhibit 3?

14          **A.   Yes, ma'am.**

15     Q.   But --

16          **A.   No other notes other than that.**

17     Q.   Does the name ▮▮▮▮▮▮▮▮▮ or ▮▮▮▮▮▮▮▮▮

18  ring a bell?

19          **A.   No, ma'am, it does not.**

20     Q.   This would have been a hearing that you

21  conducted in January of last year.

22          **A.   I did personally?**

23     Q.   Yes.  By videoconference.

24          **A.   Okay.**

25     Q.   With ▮▮▮▮▮▮▮▮.

1      **A.   Okay.**

2      Q.   Not coming back to you at all?

3      **A.   Not the hearing itself, no.**

4      Q.   Are there any other details that you recall

5  from Mr. Roland's case?

6      **A.   No, ma'am.**

7      Q.   We actually have a transcript of the

8  hearing.

9      **A.   Okay.**

10       MS. BREIHAN:  Let's mark that as Exhibit 6.

11       MR. CRANE:  My copy is missing page 28.

12       MR. SPILLANE:  Mine is missing 28 on it,

13  too.

14       (An off-the-record discussion was held.)

15       (Deposition Exhibit No. 6 was marked for

16  identification.)

17       MS. BREIHAN:  Back on the record.

18  BY MS. BREIHAN:

19      Q.   Here's a copy of the transcript of the

20  audio.  Its Bates-stamped Plaintiffs' 184 through 237.

21       And I'm also going to hand you Exhibit 7

22  that I'll mark as Plaintiffs' 181.

23       (Deposition Exhibit No. 7 was marked for

24  identification.)

25  BY MS. BREIHAN:

```
 1        Q.   You'll see that the names in that
 2   transcript are redacted for confidentiality purposes.
 3   And this Exhibit 7 is a key sheet that will tell you
 4   which name applies to which person speaking.
 5        A.   Okay.
 6        Q.   So we don't -- I don't intend to have you
 7   walk through this transcript line by line.
 8        A.   Okay.
 9        Q.   We'd be here for a long time doing that.
10   If you want to take a look at the first few pages, I
11   have some questions about how the hearing proceeded in
12   Mr. Roland's case.
13             And it looks like the first person who
14   spoke at his hearing was a representative for the
15   victim's family.
16        A.   Okay.  Whose hearing is this one?
17        Q.   ████████████.  He's one of the Plaintiffs in
18   this case.
19        A.   Okay.  Let's see.  This is the case where
20   the three young men killed a young boy and threw him in
21   a well; is that correct?
22        Q.   So you're remembering some of the facts of
23   the crime?
24        A.   Yes.
25        Q.   Okay.  And you see that Mr. ██████ had two
```

 1    co-defendants, ███████████ and ███████████, also

 2    serving juvenile life without parole?

 3         **A.    Okay.**

 4         Q.    Does that refresh your memory?

 5         **A.    Just a little bit.**

 6         Q.    What do you recall about Mr. ███████s

 7    hearing?

 8         **A.    That we talked about the crime.**

 9         Q.    At length; is that fair to say?

10         **A.    Yeah.**

11         Q.    In fact, the majority of the time speaking

12    with him you were asking him questions about the crime;

13    is that correct?

14         **A.    Yes, ma'am.**

15         Q.    Do you recall if anyone was allowed to

16    speak outside of Mr. ████████ presence before his part

17    of the hearing started?

18         **A.    I was thinking that his mother was there,**

19    **but it doesn't looks like his mother spoke.  I mean, it**

20    **escapes me.  You're talking about for the victim?**

21         Q.    The victim's mother?

22         **A.    Yeah.**

23         Q.    If you want to look at this section,

24    page 6, it should refresh your memory about the

25    victim's advocate speaking for a few minutes before the

 1    prosecutor then.

 2         **A.   What page are you talking about?**

 3         Q.   Just look at page six, I think.

 4              MR. CRANE:  Do you have a full page six?

 5    There's only one line that we have.

 6              THE WITNESS:  Six don't have anything on

 7    it.

 8              MR. SPILLANE:  It may not be in the

 9    original.

10              MS. BREIHAN:  Off the record.

11              (An off-the-record discussion was held.)

12              MS. BREIHAN:  Back on the record.

13    BY MS. BREIHAN.

14         Q.   So during the break.  Mr. Crane was kind

15    enough to make a photocopy of page six of the

16    transcript from my copy so you should have that in

17    front of you.  It has a couple of my handwritten notes

18    that you can ignore.

19              But does this transcript on page six

20    refresh your recollection whether or not the victim's

21    advocate was allowed to speak before Mr. Roland was

22    brought into the room?

23         **A.   Is there a question?**

24         Q.   Yes.  Does it refresh your memory?

25         **A.   Looks like there were.**

1        Q.   She was permitted to speak before

2  Mr. Roland was in the room, correct?

3        **A.   Yes.  Victims have that option, ma'am.**

4        Q.   I understand.

5        And she asks -- on the bottom of page seven

6  of the transcript -- that along with the victim's

7  family and the community that Mr. Roland not be

8  released on parole, correct?

9        **A.   Okay.**

10       Q.   Is that correct?

11       **A.   On page seven?  I'm on page eight.  Sorry.**

12  **Yes.**

13       Q.   And then the next person to speak at the

14  hearing is the prosecuting attorney, correct?

15       **A.   Yes.**

16       Q.   And do you remember what generally the

17  prosecuting attorney spoke about at Mr. █████████

18  hearing?

19       **A.   No, ma'am, I do not.**

20       Q.   Do you remember her going into a detailed

21  account of the underlying offense?

22       **A.   Not at this time, no.**

23       Q.   Well, you can look.  It starts on page

24  eight.  The prosecuting attorney, she was in law school

25  in '87 when the crime was committed, but reviewed the

PohlmanUSA Court Reporting
(877) 421-0099    PohlmanUSA.com
Case 2:17-cv-04082-NKL  Document 134-13  Filed 06/12/18  Page 79 of 116

1   file and spoke to the people that prosecuted it.

2           And then it goes into the statement about

3   the offense.

4       A.   Okay.

5       Q.   And she spoke outside of Mr. ███████

6   presence, too, correct?

7       A.   Yes, ma'am.

8       Q.   And she -- strike that.

9           She also provided some materials to the

10  board.

11          Do you remember that?

12      A.   No, ma'am, I do not.  It would be in the

13  file, though, if she did.

14      Q.   So if a prosecuting attorney provides

15  something to the board, either before a hearing or at a

16  hearing, it's kept within the parole file?

17      A.   Yes, ma'am.

18      Q.   Do you remember there being any

19  video footage or video statements in this case?

20      A.   Other than the video itself that we're

21  having a hearing?

22      Q.   Not the videoconference, but a

23  video-recorded statement?

24      A.   I don't remember that.

25      Q.   If a CD with a video-recorded statement had

1    been provided to you would you have reviewed it before

2    voting?

3         **A.    Would I have?  It's according to what was**

4    **on it, ma'am.  I'd have to determine what was on it.**

5         Q.    If you look on the bottom of page ten on to

6    page 11, the prosecutor indicates that she's provided a

7    DVD that Mr. ███████ appears in.  It's a walkthrough of

8    the scene of the crime and she had it burned on a DVD

9    for you.  And she says it's at the very back of your

10   materials.

11        Do you remember what other materials she

12   submitted to you that day?

13        **A.    No, ma'am, I do not.**

14        Q.    Do you remember reviewing that video of

15   that walkthrough at the crime scene?

16        **A.    No, ma'am, I do not.**

17        Q.    Other than the victim advocate and the

18   prosecuting attorney, was anyone else permitted to make

19   a statement outside of Mr. ███████ presence that you

20   remember?

21        **A.    Not that I remember.**

22        Q.    And then on page 15, before Mr. ███████

23   brought in, the panel member two, who's ███████████,

24   asks if he can see the packet.

25        Do you recall what he's referring to by

```
 1   "the packet" there?
 2        A.   Um, no, I don't know what it is.  I'm not
 3   going to speculate.
 4        Q.   So at that point, then, in the hearing,
 5   Mr. Roland was brought in, correct?
 6        A.   Yes, ma'am.
 7        Q.   Do you remember whether he had a delegate
 8   with him?
 9        A.   No, I do not.
10        Q.   And you had a conversation with Mr. █████
11   that you already testified about, about the
12   circumstances of the offense, correct?
13        A.   Uh-huh, yes, ma'am.
14        Q.   Thank you.
15             We've talked about prehearing reports
16   prepared by institutional parole officers.
17        A.   Yes, ma'am.
18        Q.   Do you know where IPOs get information that
19   they plug into that report?
20        A.   From many different places, I believe,
21   ma'am.
22             Police reports.
23             Other interviews.
24             Institutional reports dealing with the
25   inmate while they are incarcerated.
```

1          **Parole records, I believe.**

2          Q.   Do you ever fact-check what's in the

3     report?

4          **A.   No, ma'am.**

5          Q.   For example, the police report?

6          **A.   No, I do not.**

7          Q.   So Mr. ██████ and his delegate enter into

8     the room.

9               If you look on page 17, you sort of walk

10    through how the hearing is going to proceed.

11              In the middle of the page there -- you're

12    panel member 1, by the way.

13         **A.   Yes, ma'am.**

14         Q.   And you tell the delegate, which is

15    Mr. ██████ sister, that you'll give her the

16    opportunity, when you're finished, to speak on his

17    behalf.

18              But you also say that what you need to know

19    from her is what kind of support she can provide him

20    upon release; is that correct?

21         **A.   Yes, ma'am.**

22         Q.   Are there -- is there some sort of policy

23    or procedure that limits the scope of what a delegate

24    can talk about at a hearing?

25         **A.   No, ma'am.  But my thing is, I don't need**

1   to know that he's your bouncing baby brother.  That's

2   not what this case is about.

3            I'm trying to determine what kind of

4   support, how successful he's going to be when we

5   release him.  So I say, "What I really need to know is

6   what kind of support system you have for him?"

7            I don't limit them to only that

8   conversation, but I want to make sure that they

9   understand that I do need to have that kind of

10  information.

11       Q.   But on this Exhibit 3, in the list of five

12  factors that you are supposed to be considering in

13  these hearings, one of them is the subsequent growth

14  and the increased maturity since the offense occurred,

15  correct?

16       A.   Which number?

17       Q.   No. 2.

18       A.   Yes, ma'am.

19       Q.   So wouldn't a delegate possibly have

20  relevant information about who that inmate was at the

21  time of the offense and how they have matured over

22  time?

23       A.   Uh-huh.

24       Q.   Yes?

25       A.   Um, yes.

1          Q.   But you're saying you don't want to hear

2     from them any information about who, for example,

3     Mr. Roland was when he was a teenager leading up to the

4     underlying offense?

5          **A.   I'm not saying that, ma'am.  I'm saying**

6     **that I want to hear what kind of support you're gonna**

7     **have for him when he's released.**

8          Q.   Okay.

9          **A.   I do not limit them to just that**

10    **conversation.**

11             **I guess what I'm saying is, I want to make**

12    **sure you give me that kind of information if you can.**

13         Q.   And do you remember giving the delegate in

14    Mr. ███████ case an opportunity to speak at the end?

15         **A.   I don't remember it, but I know I did it.**

16         Q.   If you look at page 42 of the transcript,

17    line 16, around about there, you say to the delegate

18    "What would you like to say today?"

19             And she asks, "Can I say anything in

20    regards to the whole case?"

21             And you cut her off, it appears, correct?

22         **A.   Yes, ma'am.**

23         Q.   And you tell her, "We're not going to retry

24    the case.  I just want to know what kind of support you

25    have for him," correct?

1      **A.   Yeah.**

2          Q.   And she talks about where she lives, and

3      what her living situation is, and that he would plan to

4      live with her were he released, correct?

5      **A.   Uh-huh.**

6          Q.   Did you ask her any questions, dig any

7      deeper, about her living situation?

8      **A.   No, ma'am.  She's not on trial.  I try not**

9      **to make her feel uncomfortable with being there.   I**

10     **want her to tell me -- feel free to tell me what she**

11     **wants to tell me about the information we need to**

12     **release.**

13         Q.   Sure.  I think one of the things you talked

14     about in making your decision was it's important to

15     assess, can this person, if released, land on their

16     feet and stay out of trouble, correct?

17     **A.   Yes, ma'am.**

18         Q.   I would imagine having a stable home plan

19     and transition plan would be pretty critical to success

20     outside of prison; is that fair to say?

21     **A.   I would think so, ma'am.**

22         Q.   But you didn't think it was important

23     enough to dig in and ask her some more questions about

24     what opportunities for support, or work that might be

25     available to him if he were released, to her?

1          A.   Not from her, ma'am, but from him.  His

2     testimony, I asked him if he has a home plan, and he

3     probably mentioned that his sister, or someone, would

4     be there for him.  That type of thing.

5               So if he told me that, ma'am, I would not

6     try to -- she was there when he said it, so I would not

7     try to make her feel as though he was lying on her.

8               I'm not trying to make her feel

9     uncomfortable in that hearing because I know she's

10    there to support him.

11         Q.   I understand.

12              Would you have reviewed any materials in

13    the parole files for either of Mr. Roland's

14    co-defendants before making your decision?

15         A.   No.  Not other than if we've already done

16    their hearing and I had the knowledge from their

17    hearing.

18         Q.   Did you tell the -- you told the delegate

19    that "we're not going to retry the case?"

20         A.   Yes, ma'am.

21         Q.   Did you tell that to the prosecuting

22    attorney, too?

23         A.   Probably not.  I don't remember that.

24         Q.   Is that something that you typically say to

25    victims or victim's advocates before a hearing or

 1  during a hearing?

 2      **A.   I will say that if I feel that's what's**

 3  **warranted at the time.**

 4          **I have said that in the past to the**

 5  **prosecuting attorneys also.**

 6      Q.   In any of those juvenile life without

 7  parole cases have you said that?

 8      **A.   Probably just this one.**

 9      Q.   Do you recall asking Mr. ███████ any

10  questions about his adolescence?

11      **A.   I don't recall that.**

12      Q.   Do you recall asking him any questions

13  about his home environment growing up?

14      **A.   I would think so.**

15      Q.   Do you recall anything from any

16  conversations you would have had with the panel, after

17  the hearing had concluded, but before you voted?

18      **A.   No, ma'am.**

19      Q.   It looks like the last thing you said on

20  the record on page 47 is "Wow."

21          Do you have any -- strike that.

22          Can you tell me what was going on in your

23  mind when Mr. ████████ hearing concluded and you said

24  that?

25      **A.   Um, no, I can't.  I mean, I don't know what**

1    I was thinking at that time.

2         Q.   Do you remember how you voted in his case?

3         A.   No, I do not.

4         Q.   Do you remember what the institutional

5    parole officer's recommendation was?

6         A.   No, ma'am, I do not.

7         Q.   How much weight as a board member typically

8    do you give an IPO's recommendation?

9         A.   It's just like the other three panel

10   members, take -- everybody's vote is taken in

11   consideration.

12        Q.   But ultimately the decision is up to you

13   about whether or not to -- strike that.

14             I mean, the other hearing panel members,

15   their vote doesn't count toward the majority, correct?

16        A.   Towards majority, no.

17        Q.   And the IPO doesn't get a vote in the board

18   action sheet, do they?

19        A.   No.

20             (Deposition Exhibit No. 8 was marked for

21   identification.)

22   BY MS. BREIHAN:

23        Q.   I'll show you what I've marked as

24   Exhibit 8.

25             This is Bates-stamped AGO2626 through 2635.

```
 1              Do you recognize this document, sir?
 2         A.   Kind of.  Yes, ma'am.
 3         Q.   The form is familiar to you?
 4         A.   Yes, ma'am.
 5         Q.   And this is the prehearing report for
 6    Mr. ██████?
 7         A.   Okay.
 8         Q.   If you look on the very last page there is
 9    a section called assessment and recommendation by the
10    institutional parole officer, who, in this case, it
11    looks like would have been either ████████████ or
12    ██████████████, correct?
13         A.   Yes, ma'am.
14         Q.   And it says that, "Due to the seriousness
15    of the present offense, she recommends that Mr. ████████
16    be scheduled for a reconsideration hearing in ████ of
17    ██████?"
18         A.   Yes, ma'am.
19         Q.   "At which time he'll have served 35 years
20    towards his life without parole sentence?"
21         A.   Yes, ma'am.
22         Q.   Is there a maximum setback that you can
23    give an inmate for a reconsideration hearing?
24         A.   As per board policy, yes, there is.
25         Q.   And what is that?
```

```
 1          A.   Five years.

 2          Q.   So even if you didn't want to give

 3   Mr. ████   an outdate, the furthest you could setback

 4   his reconsideration hearing would have been five years

 5   from his hearing in January of '17, correct?

 6          A.   Yes, ma'am.

 7          Q.   Doing the math, so that would have been

 8   January of 2022, correct?

 9          A.   Yes, ma'am.

10          Q.   So May 2023 is beyond the permissible

11   length at which you can set a reconsideration hearing,

12   correct?

13          A.   Yes, ma'am.

14          Q.   Did you have any discussions with anybody,

15   whether it was Ms. ████  , or anyone else on the

16   panel, about this proposed six, six and a half year

17   setback date?

18          A.   No, ma'am.

19          Q.   Was there any significance in your mind to

20   the fact that she was pointing out that by 2023 he

21   would have served 35 years towards his life without

22   sentence?

23          A.   No, ma'am.

24               (Deposition Exhibit No. 9 was marked for

25   identification.)
```

```
 1   BY MS. BREIHAN:

 2        Q.   I'll show you what I've marked as

 3   Exhibit 9.it's Bates-stamped AGO2617 through 2619.

 4             Do you recognize this document?

 5        A.   Yes, ma'am.

 6        Q.   Does this refresh your memory about how you

 7   would have voted in Mr. ▮▮▮▮▮▮  case?

 8        A.   Yes, ma'am.  It is my signature.

 9        Q.   And where do you see your signature?

10        A.   In the right-hand -- looking at the

11   sheet -- right-hand corner in the bottom.

12             Oh.  Up here at -- I'm sorry -- at initial

13   member.

14        Q.   Okay.  So decision remark/member, that's

15   where you wrote in?

16        A.   Yes.

17        Q.   And you wrote re-hear --

18   ▮▮▮   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19        Q.   So you were voting for a five-year setback

20   for Mr. ▮▮▮▮ , correct?

21        A.   Yes, ma'am.

22        Q.   And why were you recommending a five-year

23   setback for him?

24        A.   At that particular time that's what I felt

25   was necessary.
```

1          Q.   Do you remember specifically why?

2          **A.   No, I do not.  Not at this time.**

3          Q.   If you review the hearing panel comments in

4     the box above your vote, does that give you any insight

5     as to why you made the decision you made?

6          **A.   Could be a couple of things.  Seriousness**

7     **of the crime.  And victim opposition.  Those are things**

8     **I can think of off the top of my head.**

9          Q.   Is it safe to say that all of these

10    juvenile life without entail serious crimes?

11         **A.   Pardon?**

12         Q.   Safe to say that all these juvenile life

13    without entail serious crimes?

14              They're all murder cases, correct?

15         **A.   Oh, yes, ma'am.**

16         Q.   Do you know what percentage of these

17    juvenile life without parole considerations have victim

18    opposition?

19         **A.   No, ma'am, I do you not.**

20         Q.   Does the second page of this board action

21    sheet we've marked as Exhibit 9 give you any further

22    insight into why you would have made the decision to

23    give Mr. ███████ a five-year setback?

24         **A.   Circumstances surrounding the present**

25    **offense.**

```
 1         Q.   So what does that mean in Mr. ██████
 2    case?
 3         A.   It was pre-meditated, from what we got from
 4    the hearing.  Premeditated.
 5         Q.   Is that different than other first-degree
 6    murder cases?
 7         A.   Well, yes, I would think so.
 8         Q.   And it looks like the two other panel
 9    members there that day agreed with you, correct?
10         A.   Yes, ma'am.
11         Q.   Do you remember anything from your
12    discussion with them about their votes?
13         A.   No, ma'am.
14         Q.   Do you recognize the signatures of the
15    other members?
16         A.   Yes, ma'am.
17         Q.   Whose signature is in box No. 2?
18         A.   ██████████.
19         Q.   And whose signature is in box No. 3?
20         A.   ██████████.
21         Q.   Mr. ██████ is no longer on the board, is
22    he?
23         A.   Correct.
24         Q.   Whose signature is in box 4?
25         A.   ███████████.
```

```
1          Q.   Do you recall having any discussions with
2    ████████   or  ████████████   or  ██████████████   about
3    Mr. ████████   case?
4          A.   No, ma'am.
5               (Deposition Exhibit No. 10 was marked for
6    identification.)
7    BY MS. BREIHAN:
8          Q.   I'll hand you what I've marked as Exhibit
9    10.  This is Bates-stamped 2624 through 25.
10              This is another decision notice, like the
11   two we've previously seen that indicate, as we saw in
12   the board action sheet, that Mr. ████████   is getting a
13   five-year setback because of the circumstances of the
14   present offense, correct?
15         A.   Okay.
16         Q.   Is that correct?
17         A.   Yes, ma'am.
18         Q.   Are there any other reasons for your
19   decision, other than what's noted in the board action
20   sheet that we've marked as Exhibit 9, or the notice
21   that the inmate received that we've marked as
22   Exhibit 10?
23         A.   Are there any other what, ma'am?
24         Q.   Any other reasons for your decision other
25   than what's indicated in Exhibit 9 or Exhibit 10?
```

    1         A.    Without seeing the parole prehearing

    2    report ...  let's see.

    3              Are there any other decisions that made me

    4    come to this decision?

    5         Q.    Any other reasons for your decision?

    6         A.    For this decision?  This particular

    7    decision?

    8         Q.    Yes.

    9              In Mr. ██████ case in particular, other

   10    than what's indicated in the board action sheet that

   11    we've marked as Exhibit 9 or the decision notice we've

   12    marked as Exhibit 10?

   13         A.    I don't believe so, ma'am.

   14         Q.    One of the options for the basis of the

   15    decision was community opposition, correct?

   16         A.    On what page?

   17         Q.    I'm sorry.  Exhibit 9.  Just the second

   18    page of the board action sheet where you check a box

   19    for the reason for a decision.

   20         A.    What was it, ma'am?

   21         Q.    One of the basis for a decision on parole?

   22         A.    Oh.

   23         Q.    How do you determine whether there's

   24    community opposition in a case?

   25         A.    Correspondence with the parole -- or

1    probation and parole prior to the hearing, or during

2    the hearing.

3         Q.   Does that correspondence come from victims

4    or victim's family?

5         A.   Yes, ma'am.

6         Q.   What if there are letters of support from

7    the community?

8         A.   That's taken into consideration also,

9    ma'am.

10        Q.   Toward the end of your hearing with

11   Mr. █████ you talk about some of the conditions that

12   he might be subject to if he were paroled, correct?

13        A.   Okay.

14        Q.   Including, I think, a substance abuse

15   program and taking anger management.

16        A.   Anger management.  No contact with victim's

17   family.  Substance abuse program.  And no drinking.

18        Q.   Are those listed -- those conditions listed

19   anywhere other than the board action sheet or the

20   notice to Mr. █████ of its decision?

21        A.   I do not know, ma'am.  I do not send that

22   out.

23        Q.   You can take a look if you want.

24        A.   So are you saying do I see it anywhere on

25   here?

```
1              I do not.

2         Q.   On Exhibit 9?

3         A.   Oh, I'm looking at Exhibit 10.  So 9 you're

4    saying -- your question is again, ma'am?

5         Q.   Do you see any of those conditions listed

6    in the board action sheet?

7         A.   Oh.  No, ma'am.

8         Q.   And they're not conveyed to the inmate in

9    the decision notice either, are they?

10        A.   No, ma'am.  Would you like to know why?

11        Q.   Sure.

12        A.   Because these are conditions upon your

13   release.  And he did not get a release date.

14        Q.   So if someone got a release date then their

15   conditions would be noted on the notice?

16        A.   They should be, ma'am.  At least I assume

17   that they are.

18        Q.   Does the board provide any sort of feedback

19   to the inmate about what to do, what courses to take,

20   or to better their chances?

21        A.   Yes, ma'am, we try to.

22        Q.   And how do you do that?

23        A.   Verbally.  What programs that I am familiar

24   with that would put him in a position to -- as I always

25   say -- hit the ground running when they're released.
```

1        I offer some suggestions that they might

2   want to take those courses that might better prepare

3   them for release.

4        Q.   If you look at the transcript of

5   Mr. ████████ hearing.

6        A.   Exhibit 6?

7        Q.   Yes.  Look at page 44.  It looks like

8   you're wrapping things up and giving some closing

9   remarks.

10       A.   Okay.

11       Q.   And on line 19 of page 44, you tell him

12  that he's a big risk for the parole board for safety

13  concerns.

14            What are you basing that statement on?

15       A.   The crime itself, ma'am.

16       Q.   What -- does it matter at all that

17  Mr. █████ at the time of this hearing hadn't had a

18  single conduct violation in 15 years?

19       A.   Yes, it does.

20       Q.   How long would someone have to go conduct

21  violation free to no longer be considered a big risk to

22  the general public?

23       A.   Conduct violations do not in itself

24  determine whether or not a person is a risk or not.

25       Q.   So you mentioned the crime itself?

```
 1            A.    Yes, ma'am.

 2            Q.    That's one thing that is never going to

 3     change, correct?

 4            A.    Of course.

 5            Q.    So --

 6            A.    Unless you do it again.

 7            Q.    In four years, when Mr. ███ has his

 8     reconsideration hearing, the circumstances of his

 9     offense are going to be just as they were when he sat

10     before you in 2017, correct?

11            A.    Yes.

12            Q.    And it was a videoconference, so he sat

13     before you virtually.

14            A.    Okay.

15            Q.    So if he's a big risk to the public because

16     of the circumstances of offense, how is that risk ever

17     going to be eliminated or reduced if the circumstances

18     of the offense never change?

19            A.    The risk, I believe, will be

20     examined -- what will be examined, I believe by the

21     parole board, is that -- how did he -- how did he

22     accept the fact that he didn't get a release date right

23     away.

24                  If he continued to do what he's doing now,

25     you know, like you're saying, no conduct violations,
```

1  good citizen in prison, those types of things, then I
2  think you would think that he would not be a risk
3  anymore.
4          You gotta understand that the guy's been in
5  prison for 25 years.  And that's all he knows now.  And
6  for the next five years, knowing that he has an
7  opportunity to get out, how is he going to react to
8  that.
9          Is he going to continue the things that
10 he's supposed to do to show good face that he's ready
11 to go home?  Or is he gonna regress because he didn't
12 get out?
13         Well, he never had a chance to get out in
14 the first place because he was a life without parole.
15     Q.   So are you giving him a setback to test
16 whether he can stay out of trouble for another five
17 years?
18     A.   Not necessarily to test.  But maybe to -- I
19 won't say it's a test.  It's not the correct word to
20 put it.
21         Victim's opposition played a big part in
22 it, I believe.
23         At some point in time you're gonna have to
24 let him out anyway.  You would think.  Either that or
25 you're going to keep him for the rest of his life.

1          **And I think in all honesty, as a human**
2    **being, I just have to get to the point where I can take**
3    **all the information I have and feel like he's not an**
4    **issue anymore.**
5          **That's the honest to God answer right**
6    **there.**
7          Q.   So it's possible, I suppose, that a
8    different board member sitting in your seat that day,
9    because of their background and experience and
10   expertise, might have perceived the interview
11   differently and thought he was ready for release?
12         **A.   Anything's possible.  We don't all agree.**
13   **You have to understand, there's seven different**
14   **personalities on the board.**
15         Q.   Six right now, correct?
16         **A.   Supposed to be seven.**
17         Q.   So the Miller decision I asked you about
18   when we started today, Miller versus Alabama, that was
19   a Supreme Court decision in 2012 which said that
20   mandatory life without parole is unconstitutional for
21   juvenile offenders.
22         **A.   Okay.**
23         Q.   And that's what started this process.
24         **A.   590?**
25         Q.   Yes.  And so did you take a look in

 1   particular at his conduct since 2012 when there was,

 2   you know, a change in the law that --

 3        A.   I'm sure I did.

 4        Q.   In fact, the notes in the board action

 5   sheet and third page do indicate that he hasn't had any

 6   conduct violations since '01.  Been in honor dorm for

 7   over 13 years.

 8             It says that in three different places on

 9   this third page of Exhibit 9, correct?

10        A.   Yes, ma'am, I see that.

11        Q.   And on the first page in the hearing panel

12   box it indicates also that he's done well since 2001?

13        A.   Yes, ma'am.  I see that.

14        Q.   And accepts responsibility.

15             Is that an important part of the

16   decision-making process?

17        A.   It is part of it; yes, ma'am.

18        Q.   What about if an inmate has an actual

19   innocence claim?

20        A.   A what?

21        Q.   An innocence claim?

22        A.   What is that?  Oh, claiming that he never

23   did it?

24        Q.   Yeah.

25             Does that change how you would evaluate

1    whether or not they take responsibility for a crime?

2         **A.   Not without hearing his explanation.**

3         Q.   Are you saying you try to make an

4    assessment of the validity of the innocence claim?

5         **A.   Yes, ma'am.   Each case is case by case.**

6         Q.   And you also tell Mr. ███████   just before

7    that, that -- you try to explain a little bit about the

8    structure of the penal system -- and you say he has an

9    opportunity to be paroled.

10             What does that mean from your perspective,

11   to have an opportunity to be paroled?

12        **A.   I believe when I was talking to him at that**

13   **particular time, I was, you know, letting him know that**

14   **he still has a chance -- he does have a chance to be**

15   **paroled where he didn't have before.**

16             **Just part of the process of that**

17   **conversation of why he was there that day, instead of a**

18   **little while earlier, he wouldn't have had that**

19   **opportunity to be there.**

20        Q.   Do you know whether or not there's a

21   requirement to release on parole these inmates impacted

22   by Senate Bill 590?

23        **A.   There is no requirement.**

24             **There's no requirement on the juvenile life**

25   **without parole for murder than there is any other**

 1    person that was on first-degree murder.

 2         Q.    In fact, the prosecutor at the hearing

 3    asked that he never be released from prison, correct?

 4         A.    You hear that.  Yes, ma'am.

 5         Q.    Do you hear that a lot?

 6         A.    You hear that a lot from victim's

 7    opposition.  But that doesn't mean that that's what

 8    happens.  Whether it's juvenile life without or not.

 9         Q.    What evidence did you consider when you

10    were weighing Mr. ███████ age, maturity, intellectual

11    capacity at the time of the underlying offense?

12         A.    All of it.  Everything that was in the

13    report I took into consideration.

14         Q.    Anything outside of the report that you

15    considered toward those?

16         A.    I don't remember anything else.  Other than

17    victim's opposition.

18         Q.    And would that be the same answer for any

19    of the other factors that are --

20         A.    Yes, ma'am.

21         Q.    -- that are listed on this third sheet of

22    Exhibit 9?

23         A.    Yes, ma'am.

24         Q.    Are there any other factors like those

25    listed on this third page that you consider in these

1   juvenile hearings that you don't in a standard hearing?

2   Or on this extra sheet here?

3        **A.   No.  This is basically everything we do**

4   **with most cases, only we document it more so it shows**

5   **you-all that we do do that.**

6        Q.   Did you receive any training on how to use

7   this third sheet of Exhibit 9?

8        **A.   Well, we were -- we just kind of went over**

9   **it, if you call that training.  I guess you could say**

10   **yes.  I guess I could say yes.**

11           **We had the conversation.  All the things**

12   **that we need to look for, which were things that we**

13   **already look for, but we need to not document them.**

14        Q.   When did you have that conversation?

15        **A.   Right after the bill was passed and we knew**

16   **that we were going to have this as part of our**

17   **caseload.**

18        Q.   And who was sort of explaining what you

19   needed to look for and document?

20        **A.   I believe at that time it was Ms. Dills.**

21   **Kelly Dills.**

22        Q.   She was the board operations manager at one

23   point?

24        **A.   At that time, yes.**

25        Q.   Who's the current board operations manager?

PohlmanUSA Court Reporting
(877) 421-0099    PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-13   Filed 06/12/18   Page 106 of 116

1          A.   Mr. Mueller, I believe.

2          Q.   Do you remember conducting a

3   videoconference parole hearing for ███████████?

4          A.   No, ma'am.

5          Q.   Do you remember conducting a hearing under

6   Senate Bill 590 for somebody who you later found out

7   was actually over 18 at the time of the underlying

8   offense?

9          A.   Yes, ma'am.

10         Q.   And you didn't realize that until after the

11  hearing had been conducted; is that correct?

12         **A.   We didn't confirm it until after the**

13  **hearing was conducted.  We realized that during the**

14  **hearing, there was some things that didn't seem to add**

15  **up, and we checked it after the hearing to make sure**

16  **that he was eligible.**

17         Q.   So after the hearing, before you gave him a

18  decision, you checked his age, correct?

19         **A.   Yes, ma'am.**

20         Q.   And realized that his age indicated in the

21  prehearing report was wrong?

22         **A.   Wrong.**

23         Q.   Okay.  I'll show you what I've marked as

24  Exhibit 11.

25              (Deposition Exhibit No. 11 was marked for

```
1   identification.)
2   BY MS. BREIHAN:
3        Q.   This is the parole decision notice for
4   Mr. ████
5             And it indicates that he was given a
6   reconsideration hearing in 2022, correct?
7        A.   Yes, it does.
8        Q.   If he wasn't under the purview of
9   Senate Bill 590, and serving life without parole, why
10  would he be given a reconsideration hearing?
11       A.   I believe, ma'am, that that was not known
12  for sure when this went through.
13            Because if I can remember right, we did not
14  find out all the information until a few days
15  afterwards.
16            I have absolutely nothing to do with this
17  sheet here, so I don't know when that went out.
18       Q.   Who generates this sheet; do you know?
19       A.   No, ma'am, I do not.
20       Q.   Do you know what information they were
21  relying upon when generating this?
22       A.   I do not.
23       Q.   It seems like they're pulling, at least the
24  reasons for the decision on the bottom directly from
25  the board action sheet; is that fair to say?
```

```
 1          A.   I would say so.

 2          Q.   Do you know whether the board plans to hear

 3    Mr. ████ in 2022?

 4          A.   No, we won't hear it.  If he's ineligible,

 5    we won't hear him.

 6          Q.   Do you know whether the board, or his IPO,

 7    sent him any subsequent notice explaining that to him?

 8          A.   I do not know.

 9          Q.   I think I already asked you if you

10    remembered anything about ██████████' hearing in

11    June of 2017.

12          A.   I do not, ma'am.

13          Q.   We had mentioned ███  ██████ name as

14    voting on Mr. ███████ case --

15          A.   Okay.

16          Q.   -- and that Mr. ██████ is no longer with

17    the board, correct?

18          A.   Yes, ma'am.

19          Q.   Are you aware of the circumstances under

20    which he resigned or retired from the board?

21          A.   Not fully.  Only what I've seen in the

22    media.

23          Q.   And what have you seen in the media?

24          A.   That he resigned.  That he was -- that he

25    resigned because -- inappropriate parole hearings,
```

 1   **basically.**

 2        Q.   Did you -- when did you first learn about

 3   that misconduct during parole hearings?

 4        **A.   When I was on vacation and I saw it on**

 5   **television.**

 6        Q.   So that was in June of last year?

 7        **A.   Yes, ma'am.**

 8        Q.   So before June of last year you had no idea

 9   that this was happening in hearings?

10        **A.   I didn't have any clue what was going on.**

11        Q.   Do you know who else was involved?

12        **A.   No, ma'am.**

13        Q.   Have you asked anybody --

14        **A.   No.**

15        Q.   -- about what happened?

16        **A.   No, ma'am.**

17        Q.   Are you aware of any other instances of

18   unprofessional or unethical conduct by parole staff

19   during hearings or otherwise?

20        **A.   No, ma'am.**

21        Q.   Do you recall making a joke during

22   ███████████████   hearing about him being homosexual?

23        **A.   No, ma'am, I do not.**

24        Q.   If that had occurred, would you consider

25   that to be an unprofessional statement, to joke about

1  an inmate's sexuality?

2       **A.    Probably.  Especially -- I would think is**

3  **was unprofessional.**

4            **I wouldn't think I would do that, but I**

5  **can't say that I didn't, because I don't remember the**

6  **hearing.**

7       Q.    Have you discussed this lawsuit with anyone

8  other than your attorneys who are here today?

9       **A.    Oh, no.**

10       Q.    Has anyone within the Department of

11  Corrections or Probation and Parole told you that they

12  disapprove of how the board has handled these

13  Senate Bill 590 hearings?

14       **A.    No, ma'am.**

15       Q.    And have you had any training since

16  Senate Bill 590 was implemented on how to run these

17  juvenile offender hearings, other than what we just

18  talked about, walking through the factors?

19       **A.    Talk about any special training other than**

20  **from what I already do?**

21       Q.    Yes.

22       **A.    No, ma'am.**

23       Q.    Do you use any risk assessment tools in

24  these cases?

25       **A.    Just the ones that I know already.  I mean,**

1    that I already -- the information that's given to me

2    has the risk assessment included in the parole hearings

3    in most cases.

4         Q.   In the prehearing report?

5         A.   Yes.  I'm sorry.

6         Q.   So what risk assessment tools does the

7    board or parole staff use for these?

8         A.   We use age.  Conduct violations.

9              As I said before, I don't remember all of

10   it.  Just nothing different than what I said earlier.

11        Q.   Do you know what a risk assessment tool is?

12        A.   Uh-huh.

13        Q.   What is a risk assessment tool?

14        A.   A measurement of different factors that go

15   into trying to determine whether someone is a good risk

16   or a bad risk to be released.  It's usually data.

17        Q.   And your testimony is that there are risk

18   assessment tools that are reflected in the prehearing

19   report?

20        A.   Yes, ma'am, I would think so.

21             MS. BREIHAN:  If we can take a break.

22             (A break was taken.)

23             MS. BREIHAN:  I have no further questions.

24             MR. CRANE:  We just have a couple of

25   questions.

1    CROSS-EXAMINATION BY MR. CRANE:

2        Q.    Mr. Rucker, if an inmate submitted

3    something to the board in writing, or a representative

4    for the inmate did and it was in their parole file,

5    would you read it and consider it?

6        **A.    Yes, sir.**

7        Q.    And if you deny an inmate release for

8    circumstances surrounding the offense, in your mind

9    does that mean they can never be released?

10        **A.    Absolutely not.**

11        Q.    All right.

12              MR. CRANE:  That's all I had.

13   REDIRECT EXAMINATION BY MS. BREIHAN:

14        Q.    You said you -- just a few follow-up

15   questions.

16              You said you conduct 40 to 50 hearings

17   every week?

18        **A.    I think so.**

19        Q.    But you find time to vote on files and also

20   review files before voting, too?

21        **A.    Yes, ma'am.  You don't know me.  I work**

22   **till five, six, seven o'clock at night.  When some have**

23   **gone home, I'm still in my office.**

24        Q.    Other board members might be cutting out

25   early, but not you?

1      A.   Not very many.  The majority of us are
2 there till 6 o'clock in the evening.
3      Q.   How big, on average, is a parole file?  How
4 many pages would you say?
5      A.   I'm sorry.  My average what?
6      Q.   Parole file.
7      A.   Parole file?  Um, let's see.  Maybe about
8 like that. (Indicating.)
9      Q.   Half-an-inch thick?
10      A.   Yeah.
11      Q.   Fifty sheets of paper or so?
12      A.   Yeah.
13      Q.   Do you recall reviewing any expert reports
14 in any of the juvenile life without cases?
15      A.   Um, I don't know if you'd call them expert
16 reports or not.
17           I've received some information in the past
18 in a packet, an outside entity sending us a packet --
19 probably from you-all -- in the past.
20           When we were first getting started we used
21 to receive some packets on certain cases, on cases as
22 they were coming up, just ahead of that time, so we
23 could look at them.  Uh-huh.  So I guess I could say
24 yes.
25      Q.   Do you remember within those packets

1    reviewing any evaluations by a psychologist or a

2    psychiatrist?

3          **A.    Psychologist.  Psychiatrist.  Information**

4    **on their home life growing up.**

5          **Those things I can remember right off the**

6    **top of my head, yes.**

7          Q.    The parole staff doesn't have a

8    psychologist or psychiatrist on hand to do evaluations

9    on these juvenile life without cases, correct?

10         **A.    Not that I know of.**

11         Q.    So what weight, if any, did you give any

12   reports, or reports by psychologists, on these juvenile

13   life without cases?

14         **A.    Well, you can't unsee something.  So when**

15   **you read it, read those reports, and you see different**

16   **things that pertain to the case, you tend to keep it in**

17   **the back of your mind, so to speak.  So as you do your**

18   **hearing, it may -- something may come to the forefront**

19   **that reminds you of that.**

20         Q.    But given that person's expertise and

21   degree, would you give it any special weight or

22   significance?

23         If, for example, the individual did a

24   forensic evaluation, and concluded that the inmate

25   could be released without being a risk to themselves or

1    others?

2           A.    **Yes, I could do that.**

3           Q.    Is that something you did do in these

4    cases?

5           A.    **I can't say that I did or didn't.**

6                 MS. BREIHAN:  Nothing further.

7                 MR. CRANE:  Nothing further.

8                 THE WITNESS:  I just want you to know

9    everything was open and honest.

10                MS. BREIHAN:  Thank you for your time

11   today.

12                MR. SPILLANE:  Sir, I think the reporter is

13   going to ask you if you want to review the deposition

14   for errors and sign it, or you can waive and just trust

15   that she took down everything correctly.

16                Normally, they waive.  Because the only

17   thing you could fix is typographical errors.  And I

18   think she does a pretty good job.  It's your ultimate

19   decision, but I know of no to reason to review it

20   unless you want to.

21                THE WITNESS:  No reason to review it.

22

23

24

25