IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION


NORMAN BROWN, et al,           )
                               )
          Plaintiffs,          )
                               )
      vs.                      ) Case No. 17-CV-4082
                               )
ANNE L. PRECYTHE, et           )
al,                            )
                               )
          Defendants.          )


          CONFIDENTIAL DEPOSITION OF GARY DUSENBERG,

produced, sworn and examined on the 21st day of

December, 2017, between the hours of ten o'clock in the

forenoon and six o'clock in the afternoon of that day,

at the offices of Missouri Attorney General's Office,

Broadway State Office Building, Jefferson City,

Missouri, before Kim D. Murphy, Certified Court

Reporter, within and for the State of Missouri.

```
 1              A P P E A R A N C E S

 2

            For the Plaintiffs:
 3
                HUSCH BLACKWELL, LLP
 4              By:  Denyse L. Jones
                190 Carondelet Plaza
 5              Suite 600
                St. Louis, MO  63105
 6              314-480-1500
                Denyse.Jones@Huschblackwell.com
 7
            and
 8
                MACARTHUR JUSTICE CENTER
 9              By:  Amy Breihan
                3115 S. Grand
10              Suite 300
                St. Louis, MO 63118
11              314-254-8540

12
            For the Defendants:
13
                MISSOURI ATTORNEY GENERAL
14              By:  Michael Spillane
                and Andrew Crane
15              221 West High Street
                Jefferson City, MO  65101
16              Michael.Spillane@ago.mo.gov

17

18              I N D E X

19  Direct Examination by Ms. Jones          4
    Cross-Examination by Mr. Spillane       246
20

21

22

23

24

25
```

Pohlman USA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 2 of 258

```
1                    DEPOSITION EXHIBIT INDEX

2     ID                                          MARKED

3     1:    AGO2437                                  80

4     2:    AGO29 through 42                         89

5     3:    AGO385 through 387                       90

6     4:    AGO2435 through 2436                    138

7     5:    Senate Bill 590                         149

8     6:    Transcript                              192

9     7:    Key Sheet No. 2                         193

10    8:    AGO002447 through 2454                  199

11    9:    AGO002482                               210

12    10:   AGO002476                               225

13    11:   AGO002479 through 81                    225

14    12:   AGO002444 to 4445                       234

15    13:   AGO94 through 95                        242

16

17
      Court Reporter:
18    Kim D. Murphy, CCR

19

20

21

22

23

24

25
```

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 3 of 258

1          IT IS HEREBY STIPULATED AND AGREED, by and

2    between counsel for the Plaintiffs and counsel for the

3    Defendants that this deposition may be taken in

4    shorthand by Kim D. Murphy, CCR, and afterwards

5    transcribed into typewriting; and the signature of the

6    witness is expressly reserved.

7                    *    *    *    *    *

8                    GARY DUSENBERG,

9    of lawful age, produced, sworn and examined on behalf

10   of the Plaintiffs, deposes and says:

11          MS. JONES:  I'm Denyse Jones for the

12   Plaintiffs with Husch Blackwell.

13          MS. BREIHAN:  Amy Breihan with MacArthur

14   Justice Center for the Plaintiffs.

15          MR. SPILLANE:  Mike Spillane from the

16   Attorney General's Office for the Defendants.

17                 DIRECT EXAMINATION

18   QUESTIONS BY MS. JONES:

19       Q.   Please state your name.

20       **A.   Gary Dusenberg.**

21       Q.   And what is your title?

22       **A.   I'm a member of the Missouri Probation and**

23   **Parole Board.**

24       Q.   Have you ever been deposed before?

25       **A.   Yes.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 4 of 258

1    Q.   So you know that we need to have words for

2  our answers so the court reporter can capture that.

3        A.   Correct.

4    Q.   And that we are not going to speak over

5  each other so that she can get a complete and accurate

6  record today, correct?

7        A.   Correct.

8    Q.   Is there any reason why you're not able to

9  testify fully and honestly today?

10       A.   No.

11   Q.   What did you do to prepare for the

12  deposition today?

13       A.   I just heard about that I had to be here,

14  and I looked over a few of the documents involving the

15  case to kind of refresh my memory.

16   Q.   Okay.  Did you review the complaint?

17       A.   The complaint?

18   Q.   Yeah, the lawsuit that we filed?

19       A.   No.

20   Q.   Okay.

21       A.   I didn't read it word for word, but I read

22  it generally.

23   Q.   About how much time did you spend

24  preparing?

25       A.   Not even a half hour probably.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 5 of 258

1      Q.   Have you been following the case since it
2 was filed?

3      **A.   Not really.**

4      Q.   What's your date of birth?

5      **A.   7-5-1946.**

6      Q.   And what city do you reside in?

7      **A.   Blue Springs, Missouri.**

8      Q.   Are you married?

9      **A.   Yes.**

10      Q.   What's your wife's name?

11      **A.   Donna.**

12      Q.   And what does she do for a living?

13      **A.   She's retired.**

14      Q.   Have you ever been sued before?

15      **A.   No.**

16      Q.   Okay.  Where did you go to high school?

17      **A.   Warren County R-III High School in**
18 **Warrenton, Missouri.**

19      Q.   When did you graduate?

20      **A.   1964.**

21      Q.   Did you go to college?

22      **A.   Yes.**

23      Q.   Where did you go to college?

24      **A.   I went to -- I have a master's degree at**
25 **UMKC and a bachelor's degree at Central Missouri**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 6 of 258

1    University.

2         Q.   When did you get your master's degree?

3         A.   Late '70s.  I'd say about '78 or '79.  I'm

4    not sure about the exact date.

5         Q.   And what was that degree in?

6         A.   Criminal justice administration.

7         Q.   Do you remember any of the coursework you

8    completed?

9         A.   To be honest with you, no.  Not by name.

10        Q.   Fair enough.

11             Did it have any psychology classes

12   involved?

13        A.   I think there was one psychology class, but

14   don't hold me to that.

15        Q.   Okay.  Anything dealing with adolescent or

16   child psychology?

17        A.   Not that I recall.

18        Q.   Okay.  Have you had any further training in

19   the criminal justice area since you completed your

20   master's degree?

21        A.   Other than my experience on the Highway

22   Patrol.

23        Q.   Can you tell us a little bit about that.

24        A.   I sent 30 years on the Highway -- 26 years

25   and retired 30 years service on the Highway Patrol

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 7 of 258

1 working out in the field in various positions.

2      Q.   And when did you retire?

3      A.   From the Highway Patrol?

4      Q.   Yeah.

5      A.   1998.

6      Q.   And what were your responsibilities at the

7 Highway Patrol?

8      A.   Well, I was a road officer.  At the end of

9 my career, I was a supervisor in the gaming division in

10 Riverside, Missouri.

11        The last four and a half, five years, I

12 spent in the gaming division.

13      Q.   Did you have additional training in the

14 criminal justice area while you were at the Missouri

15 Highway Patrol?

16      A.   Lots of different courses and programs.

17 Probably too numerous to mention --

18      Q.   Okay.

19      A.   -- through the years.

20      Q.   Okay.  Have you served any time in the

21 military?

22      A.   Yes, ma'am.

23      Q.   Can you tell us about that.

24      A.   I spent 3 years, 11 months and 19 days in

25 the United States Marine Corps in Vietnam.  Served two

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 8 of 258

1    terms in Vietnam; had various positions at bases in the

2    United States.

3         Q.   And when did you complete your service?

4         A.   November 20th, 1969.

5         Q.   What did you do upon completion of your

6    military service?

7         A.   What did I do upon completion of my

8    military service?  I came back and -- back home.  I was

9    first in California.  I was going to go to the Los

10   Angeles Police Department at the academy.

11             Decided to come back home.  And home for a

12   while, went to Virginia and worked for the federal

13   government out there as a GSA until I was accepted to

14   the Missouri Highway Patrol, and then I came back here.

15             And also worked at Avis Rent a Car for a

16   while in Washington D.C.

17        Q.   So when you retired from the Highway Patrol

18   office, did you do anything else?

19        A.   Well, yeah.  I was a manager of an A & W

20   Drive-In in Kirksville for a short period of time,

21   about a year.  Then I went to Virginia.

22        Q.   Okay.  So you're talking about

23   before the --

24        A.   Before the Highway Patrol.

25        Q.   Okay.  All right.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 9 of 258

1       **A.   Yes, ma'am.**

2       Q.   So after the Highway Patrol, what year did

3  you retire?

4       **A.   1998.  For two years -- for about**

5  **approximately two years I was retired.  Then I was**

6  **elected to the Missouri House of Representatives.  And**

7  **I served eight years there.**

8       Q.   So that brings us to 2010?

9       **A.   Yes.**

10      Q.   Okay.

11      **A.   That was my last year there.  I was elected**

12  **in 2002.  And I was out because of term limits.**

13      Q.   Were you involved in any committees while

14  you were in that office involving the Department of

15  Corrections or criminal justice?

16      **A.   No.  I was the chairman of Homeland**

17  **Security, which really would be the closest thing to**

18  **Department of Justice, I guess.**

19      Q.   And how long were you chairman of Homeland

20  Security?

21      **A.   Either two or four years.  I'm not certain.**

22  **At least two.**

23      Q.   Did you run for any other office after you

24  termed out of that?

25      **A.   I ran for Missouri Senate, and I lost a**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14  Filed 06/12/18  Page 10 of 258

1   three-way race, primary.

2       Q.   So have you been retired full-time since

3   2010?

4       A.   I'm sorry?

5       Q.   Have you been retired full-time since that

6   point in time?

7       A.   I did some -- in between that, being

8   appointed to the board, I did some drug testing for a

9   firm out of Kansas City for the -- with the colleges

10  and the Kansas City Chiefs.

11      Q.   When you say "drug testing, can you

12  explain what you --

13      A.   We would go like to the Kansas City Chiefs

14  and do random drug tests on the players, urinalysis,

15  urine tests, basically.  And I also did several

16  colleges in the central part of the United States.  I

17  was trying to think of the name of the company that I

18  worked for, and I can't think of it.

19      Q.   Okay.

20      A.   But if it comes to me, I'll tell you.

21      Q.   You said you did that for how long?

22      A.   Drug-Free Sports is the company.

23      Q.   Okay.

24      A.   Approximately two years, part-time.

25      Q.   And when did you stop doing that?

PohlmanUSA Court Reporting
(877) 421-0099     www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 11 of 258

1    A.    When I was appointed to Probation and

2   Parole, which was two years and 26 days ago.

3    Q.    So how did you become interested in that

4   position on the Board of Probation and Parole?

5    A.    Well, I've always -- was interested in the

6   criminal justice system.  I always kind of wanted to

7   see how the other side worked.  You know, I did

8   enforcement for 30 years, almost 30 years.  Actually,

9   26 years and 8 months.  I retired with 30 years of

10  service.

11   Q.    So is this an appointment that you sought

12  out prior to 2015 or 2014?

13   A.    I don't know when I first -- I don't

14  think -- I don't think I submitted my application to

15  the Governor's office.  I can't answer that for sure.

16  I don't think I submitted -- what is it, 2000- --

17  probably three years ago I submitted my application.

18  Three or four years ago.

19   Q.    And your interest in criminal justice is

20  what prompted you to do that?

21   A.    Correct.

22   Q.    Did you feel like you possessed a certain

23  skill set that would make you a good board member?

24   A.    I think that time on the Highway Patrol is

25  a lot -- the main reason.  I've always had an interest

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 12 of 258

1  in public service is the main reason.  Throughout my

2  life, you can see from my record.

3       Q.   So are there certain skill sets that you

4  think you use in this position on the board that you

5  acquired from the Highway Patrol?

6       A.   How to deal with individuals and interview

7  and talk to individuals.  I did a lot of interviewing.

8  Both my time on the road, obviously, my time at the

9  gaming commission.

10      Q.   Any other skill set you think transferred?

11      A.   Just my -- like I said, my willingness to

12 be a public servant.  I think it's important.

13      Q.   Can you walk us through the appointment

14 process?

15      A.   From?

16      Q.   From the point --

17      A.   Well, I made an application.  I put my

18 application in -- I'm going to say it was

19 probably -- it was probably six years ago the first

20 time I applied; four years prior to being appointed.

21 Approximately.  I'm not sure about those dates.

22      Q.   So let me follow up.  So you applied before

23 and didn't get the appointment?

24      A.   Well, I don't know how that works.  I mean,

25 everybody, they apply.  I mean, I know I wasn't

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 13 of 258

1 interviewed until I got it. I was never interviewed

2 though for it.

3      Q. So you said you first applied about six

4 years ago?

5      A. I think, approximately. I've been on there

6 2 years and 26 days. And I'm thinking three to four

7 years prior to that, that I first applied.

8      Q. Was it for a specific vacancy at the time

9 that you applied?

10      A. Well, there might have been a vacancy. I'm

11 not sure if there was.

12      Q. Okay. So you don't know?

13      A. It was on file. You can always put your

14 application on file should a vacancy come up.

15      Q. So it's not as if you were going for a

16 specific vacancy --

17      A. No.

18      Q. -- when you filed it?

19      A. No.

20      Q. You just put in your application and when a

21 vacancy became opened, that's when you were considered?

22      A. Right. Right. Yes, ma'am.

23      Q. So you were appointed by Governor Nixon?

24      A. Correct.

25      Q. Do you remember the date?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 14 of 258

1          A.    November 25th, 2015.

2          Q.    And when did you start formally?

3          A.    December 9th of 2015, but I was appointed

4    on the 25th of November.

5          Q.    What are you duties in this position?

6          A.    Well, obviously we go from institution to

7    institution and hold parole hearings or conditional

8    release hearings.  Interview offenders.  And make a

9    decision as to a release date for them.  Either prior

10   to their CR date, their conditional release date, or

11   after conditional release date, which we have to

12   let them -- that's the longest we can hold them should

13   we choose to do so.

14              Otherwise, they can be paroled before that

15   date obviously, but oftentimes if they have

16   institutional problems, it -- all depends upon each

17   case.  They're all different.

18         Q.    When you say "interview offenders," are you

19   referring to the parole hearings or something other

20   than parole hearings?

21         A.    No, the parole hearings.

22         Q.    Do you have any other duties in this

23   position?

24         A.    For the most part, no.  I mean, that's

25   generally our job.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 15 of 258

1      Q.   Well --

2      A.   We review other additional files in other

3 cases that other parole members here -- not all of

4 them, but a good percentage of them.

5      Q.   Okay.

6      A.   Some of them can be completed that day,

7 depending upon the dates involved and things of that

8 nature.  It doesn't have to be reviewed by the whole

9 board.

10     Q.   So do you review files that you don't

11 either sit on the hearing for or vote on?

12     A.   After the hearing, I could review some.  It

13 requires a full board to hear it.

14     Q.   Okay.

15     A.   Prior to the hearing, I never see those

16 files.  Rarely.  Rarely do I ever see those files until

17 that day.

18     Q.   So I'm just trying to get an understanding

19 of the universe of files that you would review.  It

20 would either be in connection with the hearing that

21 you're going to be conducting or voting?

22     A.   Correct, when it's been heard --

23     Q.   Okay.

24     A.   -- already, correct.  By some other member.

25     Q.   But it's not as if you review all parole

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 16 of 258

1  files?

2      A.   No.  We review the majority of them though.

3  Some of them can be settled that day, depending upon

4  the dates and things of that nature.

5      Q.   And when you talk about some require the

6  full board to vote on, do you have an idea of what

7  percentage that would be?

8      A.   Not really.  But I'm gonna guess -- I've

9  never been asked that question before.  Probably

10  75 percent of them.  That's a guess on my part.

11      Q.   Let's back up.  Do you have a sense of how

12  many parole hearings there are annually?  And you could

13  ballpark it.

14      A.   No, I never really thought about that

15  before.  But I'd say there's 15- -- between all -- for

16  the whole board?

17      Q.   Yeah.

18      A.   I'd say 15- to 20,000 hearings, I guess.

19  I'm guessing around 15,000.

20      Q.   And you think --

21      A.   Probably a hundred a month.  Yeah, I'm

22  guessing around 15,000.

23      Q.   Okay.

24      A.   That's my guess.  I don't know.

25      Q.   I understand -- I understand it's just your

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 17 of 258

1   guess.

2              And do you think about 75 percent of 15,000

3   require a full board?

4        **A.    That's a guess on my part, too, yes, ma'am.**

5        Q.   Would you say it's definitely more than

6   half of them that require a full board?

7        **A.    Yes, ma'am.**

8        Q.   Okay.  And what circumstances would warrant

9   a full board vote?

10       **A.    Well, any violent crimes, and any parole**

11  **violator.  Those are the two most prominent ones.**

12  **Anybody that comes back as a parole violator, it has to**

13  **go back to the full board.**

14       Q.   So this would be a scenario where someone

15  is trying to get paroled out again, but has a history

16  of violations?

17       **A.    Correct.  And that doesn't necessarily have**

18  **to be violent crimes, parole violators.**

19       Q.   Are there any other circumstances

20  warranting a full board vote other than those two?

21       **A.    There probably is, but I can't tell you off**

22  **the top of my head.  We deal with a lot of different**

23  **cases.  A lot of times it depends upon the time frame**

24  **involved.**

25       Q.   And when you talk about a majority of the

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 18 of 258

1  board, what are you referring to?  Majority of the

2  board versus a full board?

3       **A.   It has to be four.  It has to be at least**

4  **four, because the board consists of seven members.  The**

5  **majority would be four, majority vote.**

6       Q.   Okay.  So all seven board members would

7  vote.  It takes four to make a decision?

8       **A.   Yes, ma'am.  Actually, we only have six**

9  **board members right now, but it still takes four.  If**

10  **there's any ties, it goes to the board chairman.  He's**

11  **one of the six right now.  Six total.**

12       Q.   So when you say "any ties" -- so does the

13  board chairman vote twice?

14       **A.   No.  We have five plus the chairman right**

15  **now on the board.**

16       Q.   Okay.

17       **A.   So it has to be the majority.**

18       Q.   Four of the five have to vote?

19       **A.   The majority of the board, yeah, right.**

20       Q.   The majority of the positions regardless of

21  the vacancies?

22       **A.   Correct.**

23       Q.   So just to tie that off, there's only

24  two --

25       **A.   If there's any ties, the chairman has to**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 19 of 258

1  break them.  'Cause some people -- you could actually

2  abstain.  There's reasons for board members abstaining

3  if they have a -- you know, if they know the person

4  involved on a personal basis or -- I mean, there's some

5  abstentions along the way.

6        Q.   Okay.  But it would seem like in that

7  scenario, you're not going to get to the majority of

8  four, right, to make a decision.  If you have five and

9  there's a tie, there's only two.

10        A.   You lost me now.

11        Q.   Well, you know, this is just trying to

12  understand the circumstances under which the chair

13  would need to vote.  In this scenario --

14        A.   The chair breaks any ties.

15        Q.   Okay.

16        A.   I'll leave it at that.

17        Q.   Okay.  But it still needs to be a total of

18  four votes in order for --

19        A.   I don't disagree with that.  Right.

20        Q.   Okay.  So you said that your

21  responsibilities primarily, but not exclusively, are

22  related to parole hearings and voting on parole, you

23  know --

24        A.   Primarily, yes, ma'am.

25        Q.   In when you say "primarily," what -- give

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 20 of 258

1   me a percentage of your time that you spend on those

2   activities.

3       A.   Ninety percent probably.  That's a good

4   percentage of the majority of it.

5       Q.   How much of your time is administrative or

6   training type activities?

7       A.   Well, we have training throughout the year.

8   And I never really thought -- probably -- at least the

9   other ten percent of that would probably be training

10  I'd say.

11      Q.   Okay.

12      A.   We had training online quite a bit.  And

13  like last year, I went to Colorado for their academy,

14  to spend a week there.  I think it was last year or the

15  year before last.

16      Q.   Okay.  And we'll walk through your training

17  in a minute.

18           So 90 percent of your time is either doing

19  parole hearings or --

20      A.   That's a guess on my part.

21      Q.   I understand.  I just want to make sure

22  we're on the same page here today.

23      A.   We're pretty busy, I'll put it that way.

24      Q.   So about how many parole hearings are held

25  in a day?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 21 of 258

1    A.    How many are held in a day?   That varies

2  from institution to institution.   We don't hear every

3  institution every day.   I think some days -- on -- from

4  one individual, or for the whole board?

5    Q.    Well, for you?

6    A.    On average?

7    Q.    Uh-huh.

8    A.    Probably 10 or 12.   Twelve probably is a

9  good average.   I'm guessing.   Sometimes we'll have six.

10  Sometimes we could have 14.   Depends upon the

11  institution we're at.

12    Q.    And what causes that variability?

13    A.    The institution.   That's the way the

14  schedule's set up.   I get a schedule, where I'm

15  supposed to be, when I'm supposed to be there and the

16  number of hearings and --

17    Q.    So --

18    A.    That -- that -- I'm not exactly sure how

19  they set that up, but it comes from the institution

20  when those folks are available.

21    Q.    So does that mean if it's a day where

22  there's six hearings, that there's more downtime,

23  because they're not scheduling as many?

24    A.    What do you mean by "downtime?"

25    Q.    So I envision a few different scenarios as

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 22 of 258

1   to why you would only have six is, on average, you get

2   half up to 12.

3         **A.   Uh-huh.**

4         Q.   Is it the length of any given hearing may

5   be longer?

6         **A.   That could be.**

7         Q.   Or is it because they're not just

8   scheduling that many?  You know, so maybe you get done

9   earlier when you go to a specific institution because

10  they're not scheduling as many?

11        **A.   They're not scheduling as many.  Whatever**

12  **they schedule, we do.**

13        Q.   Is there an average time period that a

14  particular hearing lasts?

15        **A.   It generally depends upon the case.  But**

16  **I'd say most -- generally 20 minutes -- at least**

17  **20 minutes to a half hour, or sometimes longer.**

18        Q.   So walk me through a day, generally

19  speaking, where you're hearing parole hearings.  If the

20  hearings are lasting 20 minutes to an hour, let's say,

21  are you having time in between to review records before

22  or after?

23        **A.   What happens is that, when we go to the**

24  **institution, if I'm the board member, I would sit in**

25  **the middle and the analyst sits to the left or right**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 23 of 258

1  and then somebody at the institution would be on the

2  board, district administrator, generally.  Could be

3  somebody else, but most generally it's the district

4  administrator of the institution.

5           And if we've got eight hearings, I've not

6  seen those files before until the analyst takes them

7  out of their briefcase, okay.

8           There's one rarity that I can remember

9  where I saw the file, because I had some questions

10  about it, and I'd never run into it before.  And that's

11  the only one I can remember personally.

12       Q.    Uh-huh.

13       A.    But I do not see those files until they're

14  brought out on the table that day.  And then whoever's

15  at the institution decides who's going to hear -- they

16  usually have it set up as to who's going to hear

17  what -- what -- it's usually alphabetically to tell you

18  truth.

19       Q.    Uh-huh.

20       A.    And she or he passes them out.  And we go

21  from there.  We take about 20 minutes, whatever time

22  you want, whatever time you feel is necessary, to

23  review your first case.  And then go from there.

24           And then usually while you're -- like, if

25  would do the first case, the analyst, whoever's next,

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 24 of 258

1   would be reviewing their case while we're talking with

2   the offender.

3        Q.   Okay.  You lost me a little bit.

4             So do you-all act as a panel?

5        A.   Yes, ma'am.

6        Q.   So when you say if you reviewed one, then

7   the analyst could be reviewing the next one?

8        A.   Usually, they are -- they could have --

9   they could have -- usually somebody at the institution

10  could have done their first -- read their first case

11  beforehand to kind of get a jump on things.

12       Q.   Okay.  So are you referring -- wait, you

13  have the files in front of you; when you get done, then

14  you literally give it to the next person --

15       A.   No.

16       Q.   -- so they can review the file?

17       A.   No.  If I have a file --

18       Q.   Uh-huh.

19       A.   -- I'm assigned a file, it's usually going

20  to have -- alphabetical order at the institution,

21  whoever's over at the institution.  We take the files

22  that -- " we" being myself and the analyst have the

23  files.  Obviously they have a copy at the institution

24  already.  But we take the files with us to the

25  institution.  Okay.  "We" being the analyst, myself --

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 25 of 258

1    I always have an analyst with me.

2         Q.   Uh-huh.

3         A.   And then the -- usually the person at the

4    institution has it set up alphabetically.  Not always.

5    It could be different -- reasons to change that.  But

6    usually we review those alphabetically.  And she'll

7    say, like, "Mr. Dusenberg, you have Alford.  And, Mr.

8    Jones, you have what the next one is."  Not always

9    though.

10        Q.   So what does being assigned a file mean?

11        A.   Being assigned a file?

12        Q.   Uh-huh.

13        A.   That's yours to review at the hearing.

14        Q.   But does the hearing occur as a panel, as

15   opposed --

16        A.   Yes.

17        Q.   -- to you individually, right?

18        A.   No.  I mean, the -- I would do the main

19   questioning in the interview.  And at that time, the

20   other two parties could either jump in with questions

21   or comments or they could wait till the end of the

22   interview to ask questions.

23        Q.   So what you're saying is that there's a

24   lead person --

25        A.   Correct.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 26 of 258

1    Q.    -- per hearing, and that lead person

2    reviews the file first?

3         **A.    Right.**

4    Q.    Okay.

5         **A.    They're responsible for the interview,**

6    **basically.**

7         Q.    But when the interview is happening,

8    you-all are doing it as a panel?

9         **A.    You're usually working and listening and**

10   **studying what's being said at that hearing, and you're**

11   **working on the next file that you may have.**

12        Q.    Okay.

13        **A.    Does that make sense?**

14        Q.    Yes.

15        **A.    Okay.**

16        Q.    Okay.  So I'm still trying to walk through

17   what a typical day is like when you're having parole

18   hearings.  You have to travel occasionally, correct?

19        **A.    Yes, ma'am.**

20        Q.    All right.  So does the travel occur the

21   day of a set of hearings or do you --

22        **A.    It depends upon where the institution is.**

23   **Usually if we have to go down to Charleston or**

24   **Farmington, it's an overnight --**

25        Q.    Uh-huh.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 27 of 258

1       A.   -- trip.  Or if we go to St. Joe, up in

2   that area, it might be more than one institution.

3   Cameron and St. Joe, we'll stay overnight and do

4   hearings the next day at one of those -- at another

5   institution.

6       Q.   Okay.

7       A.   That's the only main travel you do.  Years

8   ago they did a lot of traveling.  Now we have video

9   hearings, so --

10      Q.   Okay.

11      A.   -- travel is not as extent -- as long.

12      Q.   And about what time does the day conclude?

13      A.   Depends upon the length of the hearings.

14      Q.   Is there, like, an average ending time at

15  5:00 or --

16      A.   I'd say we get done by -- average?  3:30,

17  4:00 --

18      Q.   Okay.

19      A.   -- approximately.

20      Q.   It's not like you're having hearings at 7

21  o'clock?

22      A.   No, ma'am.

23      Q.   And on those days that you are traveling,

24  do you drive back after you finish the day of hearings?

25      A.   If it's drivable distance or we stay over.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 28 of 258

1     Q.   Okay.

2     **A.   Yes, ma'am.**

3     Q.   So how many days in a month are you

4 conducting hearings?

5     **A.   Myself, individually?**

6     Q.   Or you're participating on a hearing -- on

7 a panel?

8     **A.   Probably on average, 20 days of the month.**

9 **Four to five days a week.  Sometimes we don't have them**

10 **on Friday.  Sometimes we do.**

11     Q.   Is there a particular reason why you would

12 not have hearings on a given day?

13     **A.   Some --**

14     Q.   Are there, like, training days or --

15     **A.   Training days.  And then some of the**

16 **institutions have visitors' day, which is usually on a**

17 **Friday.  That's why we don't have as many on Fridays.**

18     Q.   Uh-huh.

19     **A.   However, we do have them on Fridays, but**

20 **that's the main reason we would not, because of**

21 **visitation day.**

22     Q.   And what percentage of your hearings that

23 you are on the panel are in person versus video?

24     **A.   Well, I never thought about that.  It's**

25 **pretty high on video now.  I'd probably say 60, 65**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 29 of 258

1   percent of them are video now. That's just a guess on

2   my part. I have no idea. Never thought about it.

3       Q. Has that changed since you started in

4   December of '15?

5       A. It's increased -- video hearings have

6   increased, yes.

7       Q. What would you say it was at when you

8   started?

9       A. I can't answer that. I don't know.

10      Q. Do you think it's more than doubled like

11   from -- over the two-year period?

12      A. Video hearings?

13      Q. Yes.

14      A. You know, I don't know for sure. I don't

15   think so. But I don't know for sure. I don't think

16   it's doubled. I know it's increased, but I don't think

17   it's doubled.

18      Q. Okay. Do you know why there's been an

19   increase?

20      A. Well, obviously they've gotten the

21   equipment at some of the institutions that didn't have

22   it before and we were able to do more video hearings is

23   one of the reasons.

24      Q. Can you think of any others?

25      A. I think initially whenever video hearings

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 30 of 258

1  came about, it's my understanding it was to save money

2  for the state, the traveling, things of that nature.

3      Q.   Do you know when they started video

4  hearings?

5      A.   No, ma'am.

6      Q.   Is there a difference in the hearing that's

7  in person versus video?

8      A.   I personally don't think so.  I mean, I

9  feel like I'm in the room with the individual.

10 Hopefully they feel the same way.  And obviously

11 there's a difference, in the fact that it is a video

12 hearing, but as far as the person-to-person thing, I

13 don't think so.

14     Q.   You don't feel like you're missing anything

15 by doing it --

16     A.   I personally don't.  I think maybe -- I

17 can't speak for the other board members.

18     Q.   So when you do a video panel, are just the

19 panel members in the room?  Like, so how is that set

20 up?

21     A.   Well, if we were doing them like at --

22 well, for example, if we were doing them at

23 Chillicothe, which is the ladies' prison, the district

24 administrator would be there at the prison.  She would

25 be the third member of the panel.  Then myself and an

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 31 of 258

1    analyst assigned to me for that week would be at the --

2    in the hearing room at Jefferson City at our office.

3         Q.   Okay.

4         A.   That would be the three of us.

5         Q.   Okay.  Do -- and I'm jumping a little out

6    of order.

7         A.   That's all right.

8         Q.   And I apologize, so there may be some

9    duplications, but do the panel members speak to each

10   other or have any discussion about an inmate prior to

11   the hearing?

12        A.   Well, casual comments.  I mean, we don't --

13   you know, like, somebody at the institution may have

14   said, we've had a lot of trouble with this person, you

15   know, or he's -- he or she is a spitter, and they may

16   have a mask on or --

17        Q.   Okay.

18        A.   -- stuff like that.  But we don't talk

19   about -- I don't know what your reference is.

20        Q.   Is there any substantive comments or

21   conversation about things that you might notice in a

22   file or somebody who's reviewing a file might say, oh,

23   this is his history or this is -- I don't know.  These

24   are the findings that the IPO made.  Like, is there any

25   substantive conversation about --

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 32 of 258

1      A.    The person itself?  The --

2      Q.    Yes.

3      A.    -- offender itself?

4      Q.    Correct.

5      A.    Not normally.

6      Q.    Okay.

7      A.    Unless, like I said, some of those

8  instances where they're known to spit on people or --

9      Q.    Uh-huh.

10     A.    For safety reasons, they may let us know at

11 the institution.  Or just general stuff like that.  Or

12 this guy might be a lot of problem, because he's in

13 ad-seg, administrative segregation or -- just for your

14 information.

15     Q.    So do you have any -- I guess let me back

16 up.

17           So the panel members are not all in the

18 same room.  Is there any --

19     A.    At the video hearings?

20     Q.    Yes.

21     A.    Correct.

22     Q.    Correct.

23           Do you feel like there's anything lost by

24 not having all the panel members in the same room?

25     A.    Me, personally, no.  I can't speak for

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 33 of 258

1  every board member.

2        Q.   Okay.  Have you heard any complaints about

3  that?

4        A.   I think some of the analysts that's been

5  around for years, to be honest with you, feel like they

6  would rather hear them in person.

7        Q.   Okay.

8        A.   But that's my -- that's what I grasp from

9  what they say.

10       Q.   Can you think of anything specifically that

11  was said that made you think that?

12       A.   They just like -- some of them have been

13  doing it for 20-some years.  The analyst, they've been

14  around a long time.

15            To be honest with you, I think they like to

16  travel to the institution and see the people in person,

17  but -- that's the only complaints I've heard about it.

18  If you want to call it a complaint.  It's just talking

19  in passing.  You know, office talk.

20       Q.   Do video hearings allow you to hear more in

21  a given day, or there's no difference regardless of

22  video?

23       A.   No, whatever is assigned is assigned for

24  that day, no matter what.

25       Q.   Who makes a decision whether or not a

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 34 of 258

1  hearing will be via video or in person?  Is it the

2  institution or is it the inmate?

3       A.   If they have -- if they have the facilities

4  and the equipment to do the video, most of them will do

5  it, because they have the equipment there.  I mean,

6  it's a given that -- it's usually a given.  Sometimes

7  we have to travel there; if an offender will not waiver

8  a video hearing, we have to go there in person.

9            They have that right, the way the law is

10 set up right now, to not do a video hearing.  So we

11 have to go there in person.  Most of the -- the

12 majority of them -- I don't know the percentage -- but

13 the majority of them waiver the hearing and do the

14 video.  But you always have a few that do not.

15      Q.   So when they -- when an inmate makes a

16 petition for a hearing, at what point do they say, I

17 want it to be in person or I waive that right?

18      A.   You know, I really don't know to tell you

19 the truth.  That's done at the institution.  When they

20 waiver the hearings, I can't -- I can't answer that.

21      Q.   Okay.  Do you have -- or does the hearing

22 panel have any indication whether or not, oh, well,

23 we're here because this inmate wouldn't waive the

24 video?

25      A.   Well, I would learn that from an analyst.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 35 of 258

1    They would be the first ones to find out probably.

2    Whether they would be the first ones.  We're going down

3    there or wherever, because they didn't waiver.

4         Q.   Okay.  And so then I would imagine if

5    you're going down because someone didn't waive that

6    right, then all the hearings for that day would be in

7    person, because you're going to be down there anyway?

8         A.   Correct, correct.

9         Q.   Is that viewed negatively, if an inmate --

10        A.   No.  That's their right to do that.  That's

11   part of the job.  They have the right to waiver, and we

12   accept that.

13        Q.   Okay.

14        A.   Or not waiver.

15        Q.   And, again, you're saying you have no role

16   in --

17        A.   There's no hostility over it --

18        Q.   Okay.

19        A.   -- that they did that, if that's what

20   you're asking me.  I personally think the law needs to

21   be changed, but that's me personally.

22        Q.   Be changed to all video?

23        A.   To where they can't waiver, yeah.

24        Q.   So you're saying you think the law should

25   be that they all have to be via video?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 36 of 258

1       A.   Well, the way the law is set up, I just --

2       Q.   Why?

3       A.   Well, for one thing, expense, what we just

4   talked about, to go someplace.  We've done -- I've gone

5   to hear one person and -- drive to Farmington to hear

6   one person and drive back.

7       Q.   Uh-huh.  That's the reason why you think

8   they should all be via video?

9       A.   That's not the main reason, but that is a

10  reason.  I mean --

11      Q.   So what's --

12      A.   I think you're wasting the panel's time and

13  doing a lot of other hearings someplace else possibly

14  on that day than driving clear to Farmington or

15  Sikeston, anyplace down south there in the bootheel,

16  and having a hearing for one person, you know.

17      Q.   So how --

18      A.   But I accept it.  I mean, I think that's

19  the way the law is.  But if it was me, we do it.

20      Q.   So how often does it happen where you're

21  going to a facility just to hear one hearing?

22      A.   Not that often.  I can't give you -- I

23  don't know a number.

24      Q.   Is it a handful a year?  Or a handful a

25  month?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 37 of 258

1    A.    A handful a year.  Not that many of them.

2    Q.    So we were talking about what a typical day

3    looks like when you're having a hearing.  Do you

4    typically do voting on the days that you are hearing --

5    A.    We do the voting immediately after the

6    hearing.  As soon as the defendant leaves the room, we

7    talk about and discuss it.  And everybody discusses the

8    matter.  And we come up with a date.  And we feel -- we

9    all talk about it in detail as to why we feel the way

10   we do.  And we don't have to -- we don't have to agree

11   on the same date.  We can split it.  That's one of

12   those that would go to the full board.  And that

13   happens.

14   Q.    But isn't it true, and correct me if I'm

15   wrong, that the -- only board members vote on whether

16   or not to release?

17   A.    The person at the -- right, at the end.  In

18   the end, the scenario you're talking about, only the

19   board members, yes.

20   Q.    Okay.  So --

21   A.    But they may agree with the -- excuse me, I

22   don't mean to interrupt you.

23   Q.    Go ahead.

24   A.    They may -- the other board members may

25   agree with the analyst and the person at the

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 38 of 258

1    institution rather than agree with me.

2         Q.   Okay.

3         **A.   I mean, that's when they have to read the**

4    **file and come up with their date.**

5         Q.   Okay.

6         **A.   I mean, everybody has their reasons on**

7    **their dates.**

8         Q.   I'm trying to get an idea of the timing of

9    this.  So the panel votes and then other board members

10   have to vote as to whether or not -- when does that

11   second voting piece happen?  When the other board

12   members, who are not on the panel, vote?

13        **A.   The files are taken back to the office by**

14   **the analyst from that institution that we left that**

15   **day.  And they put them in their perspective -- where**

16   **they need to go.  If they need to go to the next member**

17   **of the board, they put them -- they put them on the**

18   **next member of the board's shelf, if it's a split.**

19        Q.   Okay.  So --

20        **A.   Or it could be for anything.**

21        Q.   How do they decide who's voting on what?

22   Right?  So let's say you did -- heard a hearing from

23   Mr. Smith today.

24        **A.   Yes.**

25        Q.   And you need at least two other board

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 39 of 258

1    members to vote on that, correct?

2         A.    Correct.  So the file goes back to the

3    office from the institution with us.  Myself and the

4    analyst, we hand carry it back to the office.

5         Q.    Uh-huh.

6         A.    And the analyst takes it.  I don't --

7    usually I'm done with it then.  And the analyst takes

8    it.  There's a rotation of board members.

9         Q.    Uh-huh.

10         A.    And the next board member -- now it's going

11    west.  I call it west, but we split it every six

12    months.  It goes opposite directions towards what --

13    the ones that have to be reviewed.

14              So right now mine goes to the board member

15    Fitzwater.  It goes to the left.  And in January,

16    they'll switch, and it will go to the right.  My

17    hearings will go to the right.

18         Q.    So --

19         A.    And it also applies to them also.

20         Q.    So that typically the same couple -- the

21    same additional board members are voting on the

22    hearings you conducted?

23         A.    Well, the first one now, Mr. Fitzwater,

24    votes first.

25         Q.    Okay.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 40 of 258

1      A.   Or the ones I've done since he came.   He

2  hasn't been there very long.   Four months maybe.

3      Q.   So you're saying that there's a rotation,

4  right?

5      A.   Yes, ma'am.

6      Q.   So they bring the files back, and then

7  whoever is to the west of you, would vote?

8      A.   Uh-huh.

9      Q.   So is that in every situation for that

10 six-month period that that's the rotation?   That all

11 the ones that you hear go to the west?

12     A.   Correct.

13     Q.   So we --

14     A.   For six months.   And then they switch them

15 to the next -- to the right.

16     Q.   Okay.

17     A.   East.

18     Q.   Understood.

19          I guess I was just trying to get a sense --

20     A.   Everybody has their own shelf.   Each board

21 member has their own shelf.

22     Q.   Okay.

23     A.   And the analyst places the files on their

24 shelves.

25     Q.   Okay.   So you-all kind of vote together as

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 41 of 258

1  a block then, right?  I mean, as a group, because of

2  the rotation.  So for six months --

3       A.   Well, when they -- I don't know what you

4  mean by a group.

5       Q.   Well, not together.  But, like, the board

6  voting members on a given file are the same --

7       A.   Uh-huh.  Yes, ma'am.

8       Q.   -- because of how the rotation is.  It's

9  not around --

10      A.   For six months.

11      Q.   Correct.

12      A.   Yeah.

13      Q.   Okay.

14      A.   That's the way they do it now.

15      Q.   Okay.

16      A.   Since I've been there.

17      Q.   Okay.  And is the rotation, like, in order

18  of seniority or --

19      A.   No -- you know, I can't answer that.  I

20  never thought about -- I don't think so.

21      Q.   So it's not as if in 2018 or 2019 the

22  rotation could be --

23      A.   No.

24      Q.   -- somehow different?  If those two people

25  to your west and to your east are still there, then it

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 42 of 258

1    will be those people again year over year?

2          **A.    It may not.  It may not be the same.**

3          Q.    So do you know -- so you don't know --

4          **A.    It switches every six months.  I told you**

5    **that.**

6          Q.    Correct.  But then at some point it will be

7    back to where it was, right?

8          **A.    Right, correct.**

9          Q.    All right.

10         **A.    After six months.**

11         Q.    Okay.

12         **A.    Uh-huh.**

13         Q.    And so I guess my question would be; those

14   would be the same people --

15         **A.    Correct.**

16         Q.    -- that you'd be voting with?

17         **A.    Right.**

18         Q.    Okay.

19         **A.    Normally -- I mean, unless something**

20   **happens that they switch the shelves around.  That's**

21   **the way it is now.**

22         Q.    So who are the two to your west now?

23         **A.    Mr. Fitzwater and Ms. Zamkus.  Then on**

24   **further down is Mr. Rucker.**

25         Q.    Well, hold on.  So --

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 43 of 258

 1      A.   My files go --

 2      Q.   In this current scenario, the two to your

 3  west would be Fitzwater --

 4      A.   It could go that far down.

 5      Q.   I mean, if it's a full board, right?

 6      A.   Correct.

 7      Q.   If it's not the full board, it would be

 8  Fitzwater and Zamkus?

 9      A.   Zamkus.

10      Q.   Zamkus.  Okay.  Okay.  And then who are the

11  two on your east?

12      A.   You got me thinking now.

13           Mr. Wells is the only one on my east right

14  now, because -- and the chairman has a shelf on down,

15  the last shelf.  But he may not see any of those -- he

16  may not see any of them.  Just the ones that he has to

17  vote on goes on his shelf, the chairman.

18      Q.   And so when does -- the six-month period,

19  is it like January to June 30th?

20      A.   I think that's -- I think it changes on

21  January 6th or it changes on January 1st.

22      Q.   Okay.

23      A.   We change some arrows up the top of the

24  bookcases --

25      Q.   Okay.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 44 of 258

1      A.    -- so we know what direction we're going.

2      Q.    So do you have any communication or contact

3   with those other two board members who are voting on

4   the file after the hearing?

5      A.    Not normally.  I mean, sometimes they --

6   you know, if there's a date that might have been -- one

7   of them picks up that might have been written down

8   wrong, you know, they might bring it back and say, did

9   you mean this date or something; which could be a human

10  error.

11     Q.    The rehearing date?  When you say the date

12  might be wrong?

13     A.    Well, not necessarily a rehearing date.

14  There might not be a rehearing.  I mean --

15     Q.    Uh-huh.

16     A.    I mean, everyone -- humans make errors.

17     Q.    Yeah.

18     A.    You know.

19     Q.    Okay.

20     A.    Sometimes a correction -- you see so many

21  numbers; they get transposed.

22     Q.    Uh-huh.

23     A.    You know, and every once in a while, you'll

24  have -- they'll bring it back -- one may bring it back

25  and say, did you mean this, or did you mean this?  You

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 45 of 258

1  know, that's the one time, usually.

2      Q.   Okay.  So absent some kind of perceived

3  error on the form, there's not conversation or --

4      A.   No.  Sometimes, I'll tell you, that we get

5  files back that -- people with violent crimes, that

6  we've given them a release date, and we try to explain

7  to them why we do that.  Because normally, I guess the

8  best way to put it, if you looked the case in general,

9  the person would probably think, why are you letting

10  this person out.

11      Q.   Uh-huh.

12      A.   And if we found a good reason to let them

13  out, sometimes we may hand carry that to the board

14  member.  And it doesn't mean they have to vote that

15  way.

16      Q.   Uh-huh.

17      A.   And tell them why we did what we did.  Do

18  you understand what I'm saying?

19      Q.   Uh-huh.

20      A.   If you have a violent offender and the

21  average person would probably say, why in the world

22  would you ever let this person out of prison, you know,

23  maybe -- not this one.  And they -- we'll take it and

24  try to explain it to them why I felt that this person

25  deserved a release date.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 46 of 258

1      Q.   Is that --

2      **A.   That's not too often.**

3      Q.   Okay.  Would that not otherwise be

4  documented in the file or?

5      **A.   Well, if you read -- yeah.  Usually there's**

6  **notes on that, but not always.  It kind of adds -- adds**

7  **a personal touch to it, as to why you voted the way you**

8  **did or why you decided what you did on very serious --**

9  **usually very serious violent crimes.**

10     Q.   Okay.

11     **A.   You know, it doesn't happen very often, you**

12  **know.**

13     Q.   Do folks --

14     **A.   We do have a heart.**

15     Q.   Uh-huh.

16     **A.   Compassion with people.**

17     Q.   Understood.

18          Are there ever scenarios where that -- that

19  voting member would go to the hearing member and ask

20  questions about a file?

21     **A.   Yeah, I think, in that instance, what I**

22  **just told you about.**

23     Q.   Uh-huh.  But that's a rare occasion?

24     **A.   Right.  It doesn't happen too often.**

25     Q.   Do --

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 47 of 258

1        **A.   I'm just being upfront with you about it.**

2  **I think you want me to be honest, right?**

3        Q.   Yes.  Yes.  I'm just trying to understand

4  how it works.

5              So the voting member, do they have any

6  obligation to review the transcript or the audio of the

7  hearing?

8        **A.   Say that again.**

9        Q.   So now the files come back and it's going

10  to Fitzwater to vote on.

11        **A.   Right.**

12        Q.   He wasn't at the hearing.  Does he have any

13  obligation to review the hearing, audio, you know, the

14  audio of the hearing or any transcript of the hearing?

15  What does --

16        **A.   No, he does not have any -- the audio of**

17  **the -- no.  He generally just -- I mean, they can if**

18  **they request it.**

19        Q.   Uh-huh.

20        **A.   Any of us can.  But generally he or she**

21  **just reviews the file, the information in front of**

22  **them.  They can request the audio or they can --**

23        Q.   Are you aware of any times that the audio

24  was requested?

25        **A.   Me, personally?  I don't think so, no.**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL  Document 134-14  Filed 06/12/18  Page 48 of 258

1    Q.   So when they review the file, I guess the

2   file is placed there in their cubbyhole?

3        **A.   Yeah.  Their shelves.**

4    Q.   Shelves.  Sorry.  And they review it and

5   then they just make their vote on the form --

6        **A.   Correct.**

7    Q.   -- and then put it into the --

8        **A.   Board action sheet.**

9    Q.   Yes.  And then they put it in the next

10  shelf --

11       **A.   Yes, ma'am.**

12   Q.   -- for the next person to vote?

13       **A.   Yes, ma'am.**

14   Q.   Okay.  And how long does that process take

15  normally?

16       **A.   Well, it depends upon the schedule of the**

17  **board members, how soon they're able to work on their**

18  **files.  I mean, it could vary.  That's all I can tell**

19  **you.  I mean, there might be a board member that's on**

20  **vacation for a week, and they get piled up on them.**

21   Q.   Well, especially because there's, like --

22  15 of you individually are hearing --

23       **A.   Yeah.  There's a lot of files.  I'll just**

24  **put it that way.  They never go away.  So --**

25   Q.   So do you have a sense of how -- well, let

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 49 of 258

1    me rephrase that.

2              How much time do you spend on reviewing a

3    file?

4         A.    From another board member?

5         Q.    Yeah.

6         A.    As much as I feel is necessary.   I

7    generally read them all.

8         Q.    When you say "read them all," do you mean

9    every page?

10        A.    Entirely.

11        Q.    Every page?

12        A.    The majority of them.   I won't say every

13   page.

14        Q.    Okay.

15        A.    But I know -- at this point in time, I've

16   been there 2 years and 26 days.   At this point in time,

17   I know what to look for in these files generally.   But

18   the violent crime ones, I read them all.

19        Q.    Okay.

20        A.    But I read all of them, but some -- some of

21   them, I hit the high spots.

22        Q.    Okay.

23        A.    You know what I'm saying?   The crime itself

24   and --

25        Q.    So for the particular types of cases at

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 50 of 258

1  issue in this case, the juvenile life without parole

2  cases --

3       A.   I would read them all.

4       Q.   Okay.

5       A.   And I read the one case that you're here

6  about in its entirety --

7       Q.   Okay.

8       A.   -- at some point in time.  I think it was

9  back in May.

10       Q.   Okay.

11       A.   Whatever it was, if I remember right.

12       Q.   How much time do you spend on reviewing

13  that file when you're voting?  I mean, you said you

14  review it all, but I'm trying to get a sense of, is

15  that hours?  Is that --

16       A.   On one file?

17       Q.   Yeah.

18       A.   Well, it depends on the severity of the

19  case and how long of -- how big the file actually is.

20       Q.   For these individuals, juvenile life

21  without parole?

22       A.   Well, I probably spent a good half-hour or

23  better on that -- on the particular case that you're

24  involved with, on that one.

25       Q.   And this isn't when you're voting on it?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 51 of 258

1    When you're the voting --

2         **A.    I didn't vote on the case that you're --**

3    **the Brown case.  If that's what you're asking me.  I**

4    **mean, I --**

5         Q.   No.

6         **A.    I didn't do the hearing.  I voted on it.**

7         Q.   I understand that.  I'm not talking about

8    any specific case.  I'm just saying, when you were

9    voting on a juvenile life without parole case, trying

10   to get a sense of how much time you spend, and you said

11   about 30 minutes?

12        **A.    At least.**

13        Q.   Okay.

14        **A.    I think they're serious matters.  Very**

15   **serious.**

16        Q.   And you said you read every page?

17             MR. SPILLANE:  I'll ask for a verbal

18   answer.  I'm not sure that you got a yes or no.

19             (Whereupon, Reporter read pending

20   question.)

21        **A.    In the particular cases you're talking**

22   **about?**

23   BY MS. JONES:

24        Q.   The juvenile life without parole?

25        **A.    I have.  The ones that I've seen.  There**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 52 of 258

1    hasn't been that many of them.

2         Q.   Do you ever ask any questions of those at

3    the hearing, about those cases?

4         A.   Juvenile life cases?  I have not.

5         Q.   Okay.  So I'm going to switch gears for a

6    second and ask you about any training you received for

7    your role on the board.  Can you walk us through the

8    training you've received?

9         A.   Well, we have -- we have online training

10   and different -- different courses.

11        Q.   So let's start when you first started in

12   December of '15.

13        A.   Uh-huh.

14        Q.   Was there any overall training about the

15   roles, responsibilities, how you go about conducting

16   parole hearings?

17        A.   Well, it was explained to me by Mr. Ellis,

18   who was the chairman at the time, the procedures and

19   what went on.  And how the process worked.  We probably

20   spent a couple hours in his office approximately.  And

21   how the process worked.  And most of them would be

22   starting out on-the-job training, reviewing hearings;

23   things of that nature.  And then you'd jump in and get

24   your feet wet.

25        Q.   Were you given any written materials to

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 53 of 258

1    refer to?

2         A.   Yeah.  Different -- there's different

3    scenarios that come up, like a good time credit.  I

4    mean, I was given the forms to kind of -- guidelines as

5    to how good time credit worked.  And there's different

6    scenarios where I received individual sheets of paper

7    that could come up on different cases to study.

8         Q.   Can you -- and I know you're not going to

9    remember all of them.

10        A.   I don't.  I'll be honest with you.

11        Q.   Okay.  So can you remember something other

12   than good time credit?

13        A.   Well, as to -- each of the files are

14   tabbed.  They have a different colored tab on them.

15        Q.   Are you talking about parole files?

16        A.   Yes.

17        Q.   Okay.

18        A.   Offenders' files.  When you get them on

19   your shelves, they have a red tab or an orange tab or a

20   green tab or -- or they don't have any tabs at all.

21             I was given the sheet handout as to what

22   each one of those tabs meant.

23        Q.   Okay.

24        A.   Which I studied and grasped as to what was

25   going on with each file, when they had one of those

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 54 of 258

1    tabs on them.

2         Q.   Any other written materials you can recall?

3         A.   I'm sure there was some, but not that I can

4    recall.

5         Q.   Do you refer to any written --

6         A.   They're kind of like -- I want to call them

7    cheat sheets, but sheets that you might need to --

8    along the way, as to why certain things are the way

9    they are.

10        Q.   Okay.  So then you said you got on-the-job

11   training?

12        A.   Lots of that.  I think I -- I don't

13   remember.  A couple weeks of reviewing parole hearings.

14        Q.   So you --

15        A.   At least a week.  Maybe two.

16        Q.   So you observed hearings before you started

17   participating on a panel?

18        A.   Yes, ma'am.

19        Q.   Okay.  At what point did you start

20   conducting?

21        A.   Maybe within a week or two, I think.

22        Q.   Within a week or two of starting or within

23   a week or two after --

24        A.   After --

25        Q.   -- observing?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 55 of 258

1      A.      -- observing.

2      Q.      Okay.  And how long was that observation

3  period, do you think?

4      A.      About a week or two.  I'm not sure about

5  that.  I'm not going to tell you something I don't

6  know.  No more than two weeks.  I'll put it that way.

7      Q.      Okay.  Did you receive --

8      A.      Which would actually be, you know, eight

9  days maybe, even though I had a four day -- you know.

10      Q.      Okay.

11      A.      I'm just being upfront with you.

12      Q.      Did you receive any, like, formal training,

13  where there's a presentation being made?

14      A.      No.  I guess that depends upon your

15  definition of formal.  I'd say no.

16      Q.      I'm saying something other than you being

17  in with the chairman or supervisor going over things,

18  and other than on-the-job training, was there any other

19  types of training, be it going to a seminar or, you

20  know --

21      A.      I went to Colorado to the academy there for

22  a week.

23      Q.      When --

24      A.      National Corrections Institute I think it

25  is.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 56 of 258

1          Q.    I'm sorry for cutting you off.

2                You said a Colorado academy?

3          A.    I forget.  It's National Corrections

4    Institute.  Maybe that -- I'm not -- I'm not sure on

5    that.  They have an academy in Colorado -- in Colorado,

6    Denver.  I spent a week out there.  That was about six

7    months after I got -- six to eight months after I got

8    on the board I'm thinking.  And I'm not sure about that

9    date.  But I'm thinking it was -- I'm thinking it was

10   in the first year.

11         Q.    Who all from the board attended that

12   academy?

13         A.    Ms. Zamkus.  We were the only two at that

14   time.

15         Q.    The only --

16         A.    Zamkus.  Excuse me.  We were appointed at

17   the same time.

18         Q.    Okay.

19         A.    So we both went to that.

20         Q.    So is that something that all board members

21   go to when they first are hired?

22         A.    I think that's correct.  But don't hold me

23   to that.

24         Q.    Okay.

25         A.    And then a lot of times it depends upon the

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 57 of 258

1  financial situation of the department, whether they can

2  afford to send somebody.

3       Q.    So what was covered at that academy?

4       A.    Lots of things had a -- you know, I mean, I

5  could go into the whole gamut of things, you know.

6  There's people there from all over the United States;

7  Tennessee to Massachusetts to California, from

8  different parole board members were there for the

9  training.  Covered everything from hearings to -- about

10 every aspect.  And there was scenarios, different

11 scenarios on -- and the classrooms and there was

12 different things and training.

13      Q.    So there was a --

14      A.    Discussion groups.

15      Q.    So there was a lecture component?

16      A.    Right.

17      Q.    A practical component where you actually

18 were --

19      A.    In groups --

20      Q.    Okay.

21      A.    -- correct.

22      Q.    Did it revolve around how to conduct

23 hearings?

24      A.    For -- some of it did.  I'm not going to

25 say all of it did.  Percentage-wise, I don't -- I

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 58 of 258

1    couldn't give you a percentage.

2         Q.   Can you think of other topics that were

3    covered?

4         A.   Well, just how it was handled in various

5    states, parole boards, how they conducted their

6    business.  To give everybody an idea of what went on

7    from state to state.  Lots of states are different; do

8    it in a different manner.

9         Q.   Can you think of anything else?

10        A.   Not off the top of my head.

11        Q.   Can you think of any other formal type

12   training that you attended?

13        A.   No.  But I have a lifetime experience on

14   the Highway Patrol interviewing, which I think is

15   important when you talk to an offender.  To draw the

16   information out of them that you need to draw out of

17   them to make an evaluation or a judgment of them, you

18   know.

19              I've done a lot of interviewing.  From

20   criminal cases on the Highway Patrol to on the gaming

21   commission, a lot of interviewing.  We actually

22   interviewed the people that they hired.  We had to go

23   through us to interview them, at the boats.

24        Q.   Uh-huh.

25        A.   They could either be hired or they couldn't

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 59 of 258

1  because of their records or not.  And that went through

2  us.

3              I don't know if they still use that

4  procedure or not.  We were just starting then.  But we

5  interviewed all the employees.

6        Q.   Did you get any training on the law?

7        A.   The law --

8        Q.   Missouri law, as it affected the parole

9  hearings?

10       A.   Other than how the parole board is

11  comprised regarding the parole board itself, I wouldn't

12  call it training.  I took it upon myself to look at all

13  the statutes and stuff.

14       Q.   Okay.  So we're talking about the different

15  types of training that you received.  You had kind of

16  some from your supervisor, the chairman.  You had

17  on-the-job training.  You had some formal training,

18  namely the Colorado academy, or the National

19  Corrections Institute.  You did some self-learning,

20  correct?

21       A.   Correct.

22       Q.   So just focusing on the formal training

23  that was delivered to members of the board, I'm trying

24  to understand if there was anything else that you can

25  recall.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 60 of 258

1          Did you-all get any formal training about

2     the new Senate Bill 590 when that came out?

3          **A.     When it came into effect, we were aware of**

4     **it -- made aware of it and got a copy of it.  I think**

5     **it was passed out to the board members.**

6          Q.   Did anybody present to the board, you know,

7     what 590 meant?

8          **A.     Directly having a meeting with somebody, I**

9     **don't recall that.  I'm not going to say we did not, it**

10    **didn't happen.  I don't recall it.**

11         Q.   Are you familiar with the case of

12    Miller versus Alabama?

13         **A.     Not in detail.**

14         Q.   The U.S. Supreme Court case back in 2012

15    that --

16         **A.     About the life without paroles?**

17         Q.   Uh-huh.  So what is your understanding of

18    that case?

19         **A.     Well, it's my understanding that they're**

20    **entitled to -- they -- the offenders are now entitled**

21    **to a hearing.**

22         Q.   Do you understand --

23         **A.     That's the main crux of it.**

24         Q.   Do you understand why?

25         **A.     I probably heard it before.  I don't know**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 61 of 258

1   **if I could tell you.**

2       Q.   Are you familiar with the case providing

3   that only the rarest juvenile offenders whose crimes

4   reflect permanent incorrigibility should be eligible

5   for life without parole?

6       **A.   I don't know if I -- I probably read that,**

7   **but I don't know.  I guess I am aware of it, but now**

8   **that you brought it up...**

9       Q.   What does that -- what do you understand

10  that to mean?

11      **A.   Read that again, please.**

12      Q.   Only the rarest juvenile offenders, those

13  whose crimes reflect permanent incorrigibility, are

14  eligible for life without parole?

15      **A.   Just what it says.  Only the rarest.**

16      Q.   Okay.  Meaning that only a --

17      **A.   Life without -- those with life without**

18  **parole when they were juvenile offenders.**

19      Q.   So that should not be a common or the norm?

20      **A.   Correct.**

21      Q.   That that would be only reserved for the

22  select few that are particularly --

23      **A.   I agree with you.**

24      Q.   Okay.  Have you heard of the Montgomery

25  case?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 62 of 258

1      A.   No.  Not off the top of my head, no.

2      Q.   So when did you first become aware of

3   Senate Bill 590?

4      A.   Probably about two and half -- two years

5   ago.  Right after I came to the parole board.

6      Q.   So you came in December of '15?

7      A.   November -- well, I was actually there in

8   November.  The day after Thanksgiving.

9      Q.   Okay.  So do you know when Senate Bill 590

10   came out?

11      A.   The exact date it was passed into law?

12      Q.   Not the exact date, but like when it was --

13      A.   No, I don't -- no, I don't know what date.

14      Q.   So do you know -- did you learn --

15      A.   I think was two years ago.  A little over

16   two years ago.  That's my guess.

17      Q.   Were you aware of it before it became

18   effective?

19      A.   No.

20      Q.   Okay.

21      A.   No.

22      Q.   Were you aware or had any knowledge when it

23   was in the process of being drafted?

24      A.   No.

25      Q.   So you had no role in that part?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 63 of 258

1        A.    No, ma'am.

2        Q.    Are you aware of any board members having

3   any role in the drafting of it?

4        A.    Not to my knowledge.

5        Q.    And so you became aware of when it became

6   effective?

7        A.    Correct.

8        Q.    Okay.  And how did you become aware of it?

9        A.    I think actually one of the analysts told

10  me.  Mr. Baker.

11       Q.    So --

12       A.    He made me aware of it in passing by his

13  office, and we kind of sat down and chatted about it

14  for a minute.  He kind of told me what it was.  But we

15  had a copy of it passed around, like I said before.

16       Q.    So did the board members -- the board, as a

17  unit, talk about it, Senate Bill 590, and what it

18  meant?

19       A.    I think we've had discussions in the board

20  room over -- yeah.  Generally what -- I mean, it wasn't

21  a formal meeting about it, but we all ended up talking

22  about it.

23       Q.    So was it ever explained to you-all what it

24  meant?

25       A.    Yes.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 64 of 258

1       Q.   Okay.  And who did that?

2       **A.   I did that by reading it.  Like I said, it**

3  **was passed out.**

4       Q.   No -- I understand that you read it.  But

5  I'm saying -- I'm trying to understand if anyone came

6  and talk to you-all and explained it, or if the

7  chairman talked to you-all about it?

8       **A.   I think Mr. -- I don't think we had a**

9  **formal meeting.  Don't hold me to that.  I think**

10  **Mr. Ellis (sic) made us aware of the -- of that new**

11  **law.**

12       Q.   Okay.  Was there any concern about it?

13       **A.   The only concern is we do what was right by**

14  **the law.  Abide by the law.**

15       Q.   So did the board feel like it fully

16  understood what 590 required?

17       **A.   I -- generally, I think -- I can't speak**

18  **for every board member.**

19       Q.   Uh-huh.

20       **A.   But I read it and I grasped what it is.**

21  **Those particular offenders have the opportunity and the**

22  **right to have a hearing, you know.**

23       Q.   Did you understand what you were supposed

24  to consider in that hearing?

25       **A.   Well, there's several different factors.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 65 of 258

1  When I read -- when I read about it, no.  Not at that

2  time, I didn't.  But I've learned since then, there's

3  certain things that we take into consideration.

4        Q.   And how did you learn that?

5        A.   We had a sheet passed out or somebody --

6  somehow we acquired a sheet through the -- probably the

7  lead analyst, I'm guessing, to make sure certain areas

8  were covered regarding the offender.

9        Q.   Is there anything else that informed your

10  understanding of what was required by 590, other than

11  that sheet and you reading the legislation?

12        A.   Not that I can remember.  I'm not sure

13  though.  Not that I can remember.

14        Q.   And there was no formal training that the

15  board received on 590?

16        A.   I guess it depends upon your definition of

17  formal.  I remember us all gathering at one time and

18  talking about it in the board room.  That's when we

19  saw -- we had a copy of the statute and discussed it in

20  general terms.

21        Q.   So do you recall what you-all were

22  discussing?

23        A.   What was -- what was required of the board

24  regarding the new senate bill.

25        Q.   Were any concerns expressed about the

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 66 of 258

1   ability to do that?

2        **A.   No.  Concerns?  I don't understand what you**

3   **mean.  There was no concerns about it.  I mean, it's**

4   **the law and we had to -- we follow the law.**

5        Q.   Right.  I understand that.  But like as far

6   concerns about ability to do it, the ability to

7   understand --

8        **A.   No.**

9        Q.   -- certain factors that were supposed to be

10  considered?

11       **A.   No, I don't think so.**

12       Q.   You, personally, did not have any concerns

13  about things --

14       **A.   No, ma'am.**

15       Q.   And is that based upon anything in

16  particular?

17       **A.   No.  Based on the fact that it's the law**

18  **and we're required to do it.  And I follow through with**

19  **the law and accept it for what it is and it's the law,**

20  **and I personally feel we do it all right.**

21       Q.   What steps are you aware of that the board

22  had taken to ensure that it is complying with the law?

23  That you-all are complying with what 590 requires?

24       **A.   Well, I was -- well, there's three or four**

25  **different things that we try to get covered in the**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 67 of 258

1  hearing in regards to those particular type of

2  offenders.

3           I think I've only personally had one that I

4  actually conducted the hearing myself.  And to tell you

5  the truth, I can't remember the gentleman's name.  I

6  don't know what case that was.

7           But we looked at each case with certain --

8  you know, have they been rehabilitated?  Have they

9  matured since they've been in prison?  What's their

10 conduct while they're in prison?  What's the risk of

11 releasing them?  There's probably another one.  I think

12 there's four or five altogether.  But all those things.

13          We deal all about risk.  The parole board

14 does.  I think you probably understand that.  To the

15 community.

16      Q.   So I want to talk a little bit about the

17 parole hearing.

18      A.   Yes, ma'am.

19      Q.   Do you have any idea of how an inmate goes

20 about requesting a hearing?

21      A.   I do not.  I don't know all the details of

22 it.

23      Q.   Do you know how much time elapses between

24 the time he requests the parole hearing and that

25 petition is processed and then the time of the actual

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 68 of 258

1  hearing?

2      A.   I think -- no, I don't.  But I think that

3  can vary under different circumstances.

4      Q.   Do you know if there's, like, a maximum

5  time period?

6      A.   I don't know.

7      Q.   And you said -- and correct me if I'm

8  wrong -- that the first time you review a parole

9  hearing -- I mean, a parole file for a hearing that

10 you're conducting, is the day of, correct?

11     A.   Yes, ma'am.

12     Q.   When you're actually in the room, either in

13 the video conference room or at the facility where it's

14 an in-person, correct?

15     A.   Correct.  And I said it was a rarity, that

16 I think one time I went and looked at a file, because a

17 victim's witness could not be there.  And I had to find

18 the file and put the phone conversation I had down in

19 that file, so it'd be part of the file, because the

20 victim could not show up.  So I had to look at that

21 file beforehand to make sure I had the right one.

22     Q.   So --

23     A.   But it's very rare.

24     Q.   Okay.  In that particular instance, you

25 said you had a phone call with the victim?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 69 of 258

1          A.   With the victim of the crime, right.  That

2     she could not make it.  I talked to her on the phone,

3     and she expressed her concerns about the offender.  She

4     couldn't make it to the -- she could not make it to the

5     hearing that day.

6          Q.   And did you --

7          A.   I made notes from the conversation and put

8     them in the file so the other board members would know.

9          Q.   Did you review that file before you spoke

10    to that victim or --

11         A.   No.  I got a note from the victim's witness

12    section, that the lady wanted me to call her.

13         Q.   Okay.

14         A.   And that was a hearing I was going to have

15    the next day.  So I had a conversation with the lady,

16    took notes, made notes on the sheet that was given to

17    me from the victim's unit.  I put it into the file.  So

18    I had to go find the file to do that for the next day.

19         Q.   And did you review that file then or --

20         A.   No.  I made sure I had the right file.

21         Q.   Okay.  So what's typically included in the

22    parole file?

23         A.   Well, obviously there's a board action

24    sheet.  And there's a prehearing report.

25         Q.   So when you say -- I'm sorry to cut you

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 70 of 258

1  off, but when you say "a board action sheet," do you

2  mean just a form?

3       A.   Yes, ma'am.

4       Q.   Okay.  Sorry to cut you off.

5       A.   A prehearing report from the district

6  administrator or parole officer.  Their history.

7  Criminal record.  Salient factor score.  Sheet,

8  usually.  What else...there's a lot of things in there.

9  Those are the main ones, the ones I just gave you.

10  There's a lot of information on all those sheets, you

11  know.

12       Q.   Uh-huh.

13       A.   And actually in that report, as to their

14  education and health and things of that nature.

15       Q.   Do you know when a parole file is created?

16       A.   When it is actually created?

17       Q.   Uh-huh.

18       A.   The folder itself is made up?  I can't

19  answer that.  I don't know.

20       Q.   So there are -- obviously are people who

21  come into the system with a parolable offense, which is

22  a different situation from our guys who had life

23  without parole?

24       A.   Yes, ma'am.

25       Q.   Are you aware of any difference between the

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 71 of 258

1   time that someone who entered the system with a

2   parolable offense, their parole file was created,

3   versus the time when the juvenile life without parole

4   individual's parole file was created?

5        **A.   I do not.**

6        Q.   Are you aware of different contents being

7   kept in one file, the parolable offense file, versus

8   the non-parolable offense?

9        **A.   No.  I don't know how that worked.**

10       Q.   Have you noticed any differences between

11   those two types of files?

12       **A.   Well, I think I've only seen two, the life**

13   **without parole ones.**

14       Q.   Uh-huh.

15       **A.   But I did not notice any difference.**

16       Q.   Do the couple, handful of life without

17   parole files you've seen, did they have --

18       **A.   I'm talking about actually seeing -- myself**

19   **seeing the files.**

20       Q.   I understood.  Yes.

21          Did those include, like, court documents?

22       **A.   Oh, yeah, you're right.  That's another**

23   **thing that's usually in there, the judgment, the court**

24   **judgments are usually in those files too.  That's one I**

25   **didn't mention.**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 72 of 258

1    Q.   Are there any other court documents that

2  could be in a parole file?

3    A.   If there's an order for restitution in some

4  cases.  That could be in there, now that you mentioned

5  it.  There's a lot of papers in one of those files.

6    Q.   Uh-huh.

7    A.   That's the other one I didn't think of.  If

8  the Court's mandated paying somebody back their losses,

9  you know, restitution.

10   Q.   Have you ever seen, like, a trial

11  transcript in a file?

12   A.   The actual transcript of the trial?

13   Q.   Transcript of the trial.

14   A.   Uh-huh.  I don't think so.  I'm not going

15  to say yes or no, but I don't believe so.  I don't

16  recall seeing one.  It's not the norm, I'll put it that

17  way.

18   Q.   Okay.  So other than the judgment and

19  order, or the order of restitution, are you aware of

20  any other court documents that might be in the file?

21   A.   Not off the top of my head.

22   Q.   Okay.  Do you know if parole files for

23  parolable offenders, at the outset, are those files

24  regularly updated?

25   A.   Yeah, they are.  If somebody's out on --

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 73 of 258

1  actually out on -- if they've been released on parole

2  and something happens out in the field, where they're

3  arrested or anything, there's a sheet on the front that

4  kind of gives you guidelines as to what -- on the face

5  sheet.  The face sheet is also in there by the way.

6  There's so many files in there.  I couldn't think of

7  all of them.

8        The Department of Corrections has a sheet

9  up there that keeps you updated as to what's occurred

10 while they're out on parole or whatever.

11      Q.   Is there any documents that you're aware of

12 that an IPO or someone at the institution would be

13 keeping track of or give an inmate, because they have a

14 parolable offense?

15      A.   Could you repeat that, please?

16      Q.   I'm trying to get a sense of an individual

17 with a parolable offense.  Are there certain forms that

18 are being filled out while they're serving their time

19 that will be -- that will find their way into their

20 file?

21      A.   I understand.  If they have disciplinary

22 problems at the institution or something.

23      Q.   So would it be a document that's just

24 recording problems?  Or would it be more detailed about

25 things to do to correct behavior?  Or plans for them to

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 74 of 258

1  reach or attain certain goals?

2       A.   I'm trying to visualize that.  Usually if

3  they commit some kind of disciplinary problems, conduct

4  violations within the institution, there's a record of

5  that made by the institution in there.  And it's --

6  actually, it's sent back to the headquarters to go in

7  their file at some point in time.  Back to the office,

8  to go in their file at some point in time.

9            And sometimes there'll be comments that

10  they need to do this or that to rectify their problem,

11  you know, their disciplinary problem.

12       Q.   Have you seen that type of documentation in

13  one of the juvenile life without parole files?

14       A.   Not that I can recall, but I don't know.  I

15  don't remember.

16       Q.   Do you have any sense of whether there's

17  anything missing from a juvenile life without parole

18  file?

19       A.   I don't understand.  What do you mean by

20  "missing?"

21       Q.   Well, I'm saying, like, compared to someone

22  who came into the system with a parolable offense; do

23  their files look any different?

24       A.   For the most part, I don't think so.

25  Generally speaking.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 75 of 258

1      Q.    You can't identify anything in particular

2  that would be different from one versus the other?

3      **A.    No.  No, ma'am.  Not that I'm aware of.**

4      Q.    And I believe you said you don't know when

5  a parole file is created, correct?

6      **A.    Not for certain, no.**

7      Q.    Okay.  I'm trying to get a sense of where

8  those files are maintained; do you have any idea?

9      **A.    They're maintained in the office, you know.**

10 **I mean, they come from the --**

11     Q.    From the institution?  Where they're being

12 housed?

13     **A.    I don't know where they originate at, if**

14 **that's what you're asking me.  Who originates the file**

15 **physically?  I can't answer that.**

16     Q.    Okay.

17     **A.    I would say it's someone in the general**

18 **office, but I do not know.**

19     Q.    Okay.  So you don't know whether or not

20 that file would move from facility to facility if they

21 got transferred?

22     **A.    Well, if there's a -- they have a -- I**

23 **don't know.**

24     Q.    Fair enough.

25     **A.    I'm not going to tell you something I don't**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 76 of 258

1    know.

2         Q.    So are the documents maintained in

3    electronic format?

4         A.    Some of them are.  Most of them, I think,

5    now.

6         Q.    So if you wanted to access somebody's

7    parole file today --

8         A.    Uh-huh.

9         Q.    -- is it possible for you to pull it up,

10   you know, through the board's computer system?

11        A.    Yes.  There's different -- there is

12   different places have you to go to get all the -- our

13   computer systems are not -- everything's not in one

14   place.  There's two or three different systems you have

15   to go to.  And the only one I ever use is FileBound.

16   I've not -- I don't use the other ones.

17        Q.    So what --

18        A.    Because I don't know how to use them.

19        Q.    So what's available through FileBound?

20        A.    Generally the -- generally the -- for the

21   most part, the history of the individual that you would

22   find in their file; for the most part.

23        Q.    What about the --

24        A.    I don't use it a lot.

25        Q.    What about the prehearing report?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 77 of 258

1      A.    That would be in some -- I've seen it in

2   some FileBound reports.  Probably in all of them.

3      Q.    What about letters of recommendation?

4      A.    Some of those are in there.

5      Q.    Meaning, some of them are not?

6      A.    Whatever is there is there.  I'm just

7   saying generally -- some of the files I've seen have

8   them and some don't.

9      Q.    How do you know you have the complete file?

10     A.    Well, I don't guess.  I would know that for

11  sure.

12     Q.    So the only way --

13     A.    Whatever is there, is there.

14     Q.    The only way you know you have the complete

15  file is when somebody gives you the physical file and

16  says, here's this individual's file?

17     A.    Correct.

18     Q.    And you don't know who maintains that

19  physical file?

20     A.    Well, it's maintained at the office.  I

21  mean --

22     Q.    When you say "the office, you mean --

23     A.    Probation and Parole office.

24     Q.    Okay.

25     A.    The actual physical file.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 78 of 258

1      Q.   Right.  I'm just trying to get an

2   understanding, because I imagine that letters of

3   recommendation could be coming to the facility.

4          **A.   And they get them back.  If something comes**

5   **to the facility, they send those to be indoctrinated**

6   **with the file to come into the office.  They go into**

7   **the file.  I've seen that happen several times.  If**

8   **they're sent to the institution, they forward them to**

9   **the office.**

10             **And it's understandable they send them to**

11  **the institution.  It's usually the only place they're**

12  **aware of, you know.  I mean, unless they do some**

13  **investigating as to a different address.**

14     Q.   Is there anything in the juvenile life

15  without parole files that deals specifically with

16  Senate Bill 590?

17         **A.   Not to my knowledge.  But the one that I**

18  **conducted personally, I tell them or ask them, why**

19  **they're having a hearing today.  Because of Senate Bill**

20  **...  and they usually say, yes, they're aware of it.  I**

21  **go, "Do you understand why you're having a hearing**

22  **today?  Because of Senate Bill" ...**

23     Q.   Right.  And what I was getting at, was

24  there anything in the file that deals specifically with

25  the factors that 590 says you're supposed to consider?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 79 of 258

1      A.   Other than that little sheet that we have

2   in there.  Usually the analyst has it.  He takes

3   possession of it -- he or she -- to make sure that we

4   cover the five -- four or five points that are on

5   there, that come out at a hearing.

6           MS. JONES:  I'm going to mark an exhibit.

7           (Deposition Exhibit No. 1 was marked for

8   identification.)

9   BY MS. JONES:

10      Q.   When you talk about the worksheet that's in

11  the file that deals with the 590 factors, is that the

12  sheet you're referring to (indicating?)

13      A.   That's the one I couldn't remember a while

14  ago, that the offender's accepted accountability for

15  the offense.  That's the one I did not mention a while

16  ago.  All the rest of them are on here.  Yes.

17      Q.   So that's the worksheet in the file that --

18      A.   Either I or the analyst has.

19      Q.   Okay.

20      A.   The analyst usually maintains that to make

21  sure that we cover that area.  Or they'll ask the

22  questions that didn't come out in the hearing that

23  might be on there.

24      Q.   Okay.  So are you aware of anything else in

25  the parole file that deals with the Senate Bill 590

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 80 of 258

1   factors?

2        A.   Not to my knowledge.  I'm not going to say

3   there isn't, but not to my knowledge.

4        Q.   Have you ever found any errors in a parole

5   file?

6        A.   Have I ever found any errors in a parole

7   file personally?

8        Q.   Yes.

9        A.   Occasionally there might be a typo of some

10  nature as to release date or guideline dates or

11  something that you pick up on pretty easily.  That you

12  know that they can't be that way, and you deal with the

13  analyst and we'll get it straightened out.  But most of

14  it is just typos.

15       Q.   Are you aware of anybody else on the board

16  identifying errors in a parole file?

17       A.   Not to my knowledge.

18       Q.   Can the inmate see his parole file?

19       A.   Not during their hearing.  I mean, we've

20  never -- not to my knowledge.  I don't think they have

21  the right to see it.  I mean, at that particular time,

22  they don't have the right to see it.

23            I've never conducted a hearing where I've

24  showed them their file.  If that's what you're asking

25  me.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 81 of 258

1          Q.   Yes.

2               And you're not aware of them having access

3     to their file otherwise?

4          **A.   Well, I don't know.**

5          Q.   Okay.  So you just know that they don't get

6     it during the hearing?

7          **A.   Correct.**

8          Q.   Do you know why that is?

9          **A.   No, not really.  We just don't give them**

10    **access -- we don't put the file there too and let them**

11    **look through the file or hand files to them.  I mean,**

12    **we're using the file to interview them with.  We do not**

13    **give them the file physically.**

14         Q.   Has anyone, any inmate ever asked to see

15    their file?

16         **A.   Not at any hearings that I've held.**

17         Q.   Are you aware of any inmates asking to see

18    their file?

19         **A.   No.**

20         Q.   Are you aware of any board policy that says

21    they can't see their file?

22         **A.   No.  That's a good question.  I never**

23    **thought about it before.**

24         Q.   Do you know whether an inmate's attorney

25    can see the parole file?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 82 of 258

1      A.   I don't know.  I don't why they wouldn't be
2  able to, but I don't know the answer to that.
3      Q.   You have never --
4      A.   I've never encountered that --
5      Q.   Okay.
6      A.   -- particular situation.
7      Q.   Does the prosecutor in the case or -- you
8  know, from the jurisdiction, get to see the parole
9  file?
10     A.   I've not had that happen.  You mean they
11 were actually at the hearing?  A prosecutor?
12     Q.   Uh-huh.
13     A.   I did have -- I did have one -- I've only
14 had one hearing, in over two years, where a prosecutor
15 was actually there, a federal prosecutor.  And he did
16 not see the parole file.  Or ask to see it.
17     Q.   Can the victim or the victim's
18 representative --
19     A.   No.
20     Q.   -- see the file?
21     A.   I've never done had -- I've never done
22 that, where I've let them look at it.
23     Q.   Okay.
24     A.   It's never happened to my knowledge.  I'll
25 put it that way.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 83 of 258

1      Q.   What about the victim's advocate, do they

2  get to see the parole file?

3      **A.   No.  Not at any hearings I've conducted.**

4      Q.   So you're not aware of anyone, other than

5  board members, analysts, or the IPO, the individuals

6  who were at the facility, having access to the parole

7  file?

8      **A.   That's all I'm aware of.  There could be**

9  **other people though.**

10     Q.   Fair enough.

11          And you're not aware of any specific policy

12 dealing with that?

13     **A.   No.  And there could be one that I've not**

14 **made -- been made aware of or know of, but I don't**

15 **know.**

16     Q.   So you talked about a prehearing report

17 being in the file, correct?

18     **A.   Uh-huh, yes, ma'am.**

19     Q.   So do you recall generally what's in a

20 prehearing report?

21     **A.   Well, what the person's been charged with**

22 **and the sentence.  And the report -- police report**

23 **that -- whether it came from the parole officer or the**

24 **district administrator, the report taken from the**

25 **police reports, as to how their crime occurred and what**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 84 of 258

1    happened and the particular crimes involved.  And then

2    how they were arrested and why they were arrested.  And

3    just a general -- that report is just general

4    information about why the person is there.  What

5    happened.  What was the crime.  And what they were

6    sentenced to and whether they pled guilty or not.

7    Pretty general information about the case overall.

8         Q.   Does it include anything about -- from the

9    victims?

10        A.   Only in the report, what their response was

11   to the crime, whether they admitted to it.  Or comments

12   they made during the crime.

13             The victim?

14        Q.   Yes.

15        A.   I apologize.

16        Q.   Okay.

17        A.   Would you say that again then?

18        Q.   Does the prehearing report have any --

19        A.   There's a victim's section.

20        Q.   Okay.

21        A.   Is that what you're asking?

22        Q.   Yeah.  Okay.

23        A.   As to what affect it had on the victim,

24   yes, ma'am.  There's a lot of information in that

25   report.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 85 of 258

1    Q.   And earlier you spoke about a salient

2    factor score.  Is that something that's in the

3    prehearing report, too?

4         A.   It's a separate -- it's a separate sheet.

5    But there is a place on the prehearing report I think

6    where it may -- it may say what their salient factor

7    score is.  Minus four, minus three or whatever.

8         Q.   What's a salient factor?

9         A.   Well, it's based on 14 different -- 14

10   different subjects, I guess you wanna say.  And there's

11   a way by -- each one of these numbers have a certain

12   weight.  It's a formula where they derive at this point

13   a particular factor number.  You know, dealing with

14   age, the crime.  There's 14 different factors.  I don't

15   know them all off the top of my head.

16        Q.   And what does it --

17        A.   It gives you an idea -- to me, personally,

18   it gives me an idea of whether the offender has a --

19   would have a tendency to -- to do crime again,

20   basically.

21        Q.   Okay.

22        A.   And if you get one -- somebody down there

23   that's minus five or six or something, with this

24   factor -- and I don't know who developed the factor to

25   be honest with you, would give one the tendency to

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 86 of 258

1  believe they have -- they have the tendency to repeat

2  crime.  I think there's some talk of doing away with

3  that in recent times.  But that's what it is now.

4          Q.   Do you know who calculates the salient

5  factor score?

6          A.   I do not.

7          Q.   Is it anybody from the board?

8          A.   No.  I'm pretty sure of that.  I'm not

9  aware of it.  If it is, no.  I'll say no.

10         Q.   Is it likely the IPO?

11         A.   I don't know.

12         Q.   Do you know if they have to conduct an

13  interview with the person in order to calculate that?

14         A.   I don't know.

15         Q.   Do you know if the salient factor score is

16  used for juvenile life without parole offenders?

17         A.   I don't recall.

18         Q.   So you don't know if there was one used or

19  one provided for the juvenile life parole offender

20  hearings that you conducted or voted on?

21         A.   I don't remember.  There could have been.

22  I don't remember that.

23         Q.   So who prepares the prehearing report?

24         A.   The prehearing report?

25         Q.   Uh-huh.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 87 of 258

1    **A.    Usually the parole officer and the district**

2   **administrator.  They compile all the criminal**

3   **information and put it all in the report.  And go from**

4   **there.**

5        Q.   And when you say "parole officer," are you

6   referring to the IPO?

7        **A.    Institutional parole officer, yeah.**

8        Q.   Are you aware of what type of training, you

9   know, the IPO receives in order to do those reports?

10       **A.    No.**

11       Q.   Do you know how they collect that

12  information?

13       **A.    I would assume -- you should never assume,**

14  **but from various existing reports that they have access**

15  **to.  Court documents.  And they had police reports, and**

16  **things of that nature.**

17       Q.   Are you aware of any forms that they use to

18  gather the information to do that report?

19       **A.    The IPOs and those folks?**

20       Q.   Uh-huh.

21       **A.    No.  Actual forms, no.**

22       Q.   So I'm going to mark an exhibit.  This will

23  be No. 2, which is Bates labeled AGO29 through 42.

24  It's an email, and it includes an attachment.  And it's

25  called the juvenile life without parole -- life without

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 88 of 258

1  PHR worksheet.

2          (Deposition Exhibit No. 2 was marked for

3  identification.)

4  BY MS. JONES:

5      Q.   Have you seen that document before?

6      **A.   I do not believe I've seen this before.**

7      Q.   Okay.

8      **A.   This one page (indicating), right?**

9      Q.   No.

10     **A.   The whole thing?**

11     Q.   Yeah.

12     **A.   Okay.**

13     Q.   Does this cover the topics that you are

14 used to seeing in a prehearing report?

15     **A.   For the most part, from what I've seen --**

16     Q.   Uh-huh.

17     **A.   -- it covers most of the recidivity.  Yes,**

18 **ma'am.**

19     Q.   Okay.  But you haven't seen --

20     **A.   But I've not actually seen this I don't**

21 **think.  I mean --**

22     Q.   Okay.  Fair enough.

23     **A.   -- that I can recall.**

24     Q.   Okay.  And that was my question, had you

25 seen that report before.  Okay.  All right.  That's

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 89 of 258

1    all.

2          A.    But some of the things that are in here are

3    in the prehearing report obviously.

4          Q.    Okay.

5          A.    The arrest and convictions and so forth.

6    Several things are in there.

7                MS. JONES:  We can take a break.

8                (A break was taken.)

9    BY MS. JONES:

10         Q.    So earlier -- and I want to revisit

11   something.  Earlier we were talking about the average

12   number of parole hearings that could be held in a given

13   day.  And you estimated around 6 to 12?

14         A.    For one person?

15         Q.    Yeah.

16         A.    Approximately.  It used to be a lot more.

17                (Deposition Exhibit No. 3 was marked for

18   identification.)

19   BY MS. JONES:

20         Q.    Okay.  I'm going to mark this as Exhibit 3,

21   which is AGO385 to 387.  And it is board meeting

22   minutes from May 1st of this year.  And you'll note

23   that it says you were present.

24                Do you recall being present at that

25   meeting?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 90 of 258

1          **A.    (No response.)**

2          Q.    Okay.  And in particular, I'm going to

3     direct you to number 7, topic 7, which is on the last

4     page of 387 about raising the caps of hearings.

5          **A.    My name is on it.  I assume I was at the**

6     **meeting.  I don't remember in particular.**

7                **No. 7?**

8          Q.    Correct.

9          **A.    Yes.  I remember that now.  Now that I saw**

10    **that, I seconded that motion.**

11         Q.    Okay.  So does that refresh your

12    recollection or have any impact on your estimate of up

13    to 12 hearings?  And, again, I know you said it was an

14    estimate.

15         **A.    I think we capped them at 15.**

16         Q.    Okay.  So --

17         **A.    Supposedly.  That didn't always work that**

18    **way though.**

19         Q.    Okay.  But the low and medium

20    classification institutions can have 18 hearings, and

21    the high level will remain at 15?

22         **A.    Yes, ma'am.**

23         Q.    Do you know if that's being done currently?

24    Is that pilot program in place?

25         **A.    I think they're trying to do it.  The board**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 91 of 258

1  chairman, they're trying to do that, and whoever sets

2  those hearings is trying to abide by this.

3          Q.    Okay.

4          A.    But it's not that easy.  It doesn't always

5  happen that way.

6          Q.    Okay.  Have you ever --

7          A.    For a lot of different reasons.

8          Q.    Understood.

9          A.    Yes, I do remember this, ma'am.

10         Q.    Okay.  Have you ever had a day with 18

11 hearings?

12         A.    Since I've been on the board?

13         Q.    Yes.

14         A.    Yes.

15         Q.    You have?

16         A.    Yes.

17         Q.    Okay.

18         A.    Not very many.

19         Q.    Okay.

20         A.    I can't give you a number.

21         Q.    Okay.  Thank you.

22               And then we were also talking about certain

23 parole hearings or that inmates require a full hearing

24 or a vote from the full panel, correct?

25         A.    Yes, ma'am.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 92 of 258

1    Q.    Okay.  And that means that at least four

2  members would have to vote to allow a release, correct?

3        **A.    Yes, ma'am.**

4    Q.    Do all members on the board actually vote,

5  or does the vote end once you get to the fourth vote in

6  favor of parole?

7        **A.    Well, you can finalize it.  You can**

8  **finalize a release date if you've got enough votes.**

9    Q.    Okay.  So --

10       **A.    I can finalize it, the final decision, if**

11  **there's enough votes.**

12   Q.    So what I'm trying to understand is the

13  file goes from person to person, right?

14       **A.    Yes, ma'am.**

15   Q.    So there's one vote at a time.  So if the

16  first four board members who are voting all vote the

17  same way, so you get to four --

18       **A.    No need for me to vote.**

19   Q.    Okay.  So then that's where it ends, right?

20       **A.    The fourth person can finalize the release**

21  **date.  Does that answer your question?**

22   Q.    Yes.  Thanks.

23       So before the break, we left off going over

24  the prehearing report.  And I believe you stated that

25  you had not seen that prehearing worksheet that the

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 93 of 258

1    IPOs use in completing the prehearing report, correct?

2        **A.   Correct.  But all those elements are in the**

3    **report that we normally see.**

4        Q.   So is it fair to say that you haven't seen

5    the guidelines that the IPOs use to prepare that

6    report?

7        **A.   That's fair, yes.**

8        Q.   Are you familiar or aware of any other,

9    like, risk assessments that are performed on an inmate

10   in, you know, this parole process, you know, to

11   determine whether or not they are of high-risk,

12   low-risk, to returning to society?

13       **A.   Not off the top of my head, no.  Maybe I**

14   **don't understand your question.**

15       Q.   Well, one of the things we talked about was

16   the salient factor score and how that --

17       **A.   Determined by 14 factors.**

18       Q.   Uh-huh.

19       **A.   Correct.**

20       Q.   Are there any other risk assessment tools

21   that you are aware of that are used during the parole

22   evaluation process?

23       **A.   Not that I'm aware of.  I think they're**

24   **sometimes given drug -- drug assessments are given at**

25   **some of the institutions.  But you don't really base**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 94 of 258

1  that -- that's whether they should be treated or not.

2         Q.   Yeah, okay.

3         A.   But, no.  To answer your question, that's

4  all I know of.

5         Q.   Do you know who would know whether or not

6  other risk assessments are used?

7         A.   Not for sure, no.

8         Q.   So I want to talk a little bit about some

9  of the different roles that are involved in preparing

10 for a parole hearing.  We spent a little time talking

11 about IPOs.

12              Do you know what an IPO's responsibilities

13 are in general?

14       A.   The definition of what their

15 responsibilities are?

16       Q.   Your definition.

17       A.   They're the main parole officer at the

18 institution, you know.

19       Q.   And what are their roles and

20 responsibilities?

21       A.   Well, I can't give you an exact on that.

22       Q.   What's their role in context of the parole

23 hearing?

24       A.   Well, they help -- they help prepare that

25 prehearing report would be the best way I could say

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 95 of 258

1  that.  Actually day-to-day inside the institution, I'm

2  not -- I couldn't give you a guess on that.

3      Q.    Fair enough.

4            So I'm just going to focus it on, in

5  context of the parole hearing.  And you're saying that

6  they -- the prehearing report, preparation of the

7  prehearing report?

8      A.    Correct.

9      Q.    And I believe we covered this, but is it

10  your understanding that they actually interview the

11  inmate?

12     A.    I think they do.

13     Q.    Okay.  Do you have any sense of time -- any

14  sense of how much time they spend with the inmate to do

15  that?

16     A.    I do not.

17     Q.    Are you aware of anyone else in the process

18  who has direct contact with the inmate prior to the

19  parole hearing to gather information that you-all

20  consider?

21     A.    Am I aware of anyone else at the

22  institution?

23     Q.    Well, are you aware of anyone else who has

24  any direct contact who provides information to the

25  board to consider?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 96 of 258

1          A.    No, I do not.

2          Q.    Okay.

3          A.    There could be a caseworker involved there

4     someplace.  I don't know.

5          Q.    Okay.  The board members don't have contact

6     before the hearing?

7          A.    No.

8          Q.    The parole analysts, do they have contact

9     before the hearing?

10         A.    With the offender?

11         Q.    Yes.

12         A.    No.  Not to my knowledge.

13         Q.    Are you aware of any IPOs having any

14    concerns about gathering information for the 590

15    factors?

16         A.    No.

17         Q.    Do IPOs participate in the actual hearing?

18         A.    Usually it's the district administrator.

19         Q.    Are you aware of any times an IPO --

20         A.    Not to my knowledge.  I'll put it that way.

21         Q.    Do you ever talk to an IPO about ...

22         A.    Me, personally?

23         Q.    Yes.

24         A.    I mean, I may have talked to some casually,

25    but not directly about a case or anything.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 97 of 258

1          Q.   And that's what I'm referring to;

2     specifically about a case.

3          A.   No.

4          Q.   And is that --

5          A.   I have never done that.

6          Q.   Okay.  Are you aware of any other board

7     members doing that?

8          A.   Not to my knowledge.

9          Q.   Is there a policy that says -- that governs

10    that?

11         A.   Not that I'm aware of.

12         Q.   What is the parole analyst's

13    responsibilities in connection with the parole hearing?

14         A.   They're also to do -- they also do the

15    interview.  Participate in the interview.  They would

16    be one of the lead interviewers.

17         Q.   The hearing panel?

18         A.   Right.  Part of the panel.

19         Q.   Okay.

20         A.   So they actually -- they're actually the

21    first -- the lead person on that particular hearing.

22    They do the hearing.

23              But their main thing -- the main reason

24    they're there is they're quite helpful in analyzing the

25    ranges and guidelines as to how long we can or cannot

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 98 of 258

1  keep an offender.  They're very -- that's their

2  expertise, I guess.  Analysts -- it's pretty

3  complicated, as to what the crime is, you know, and

4  different levels of crimes, and how far the guidelines

5  can go or can't go, when they have to serve 40 percent

6  or 50 percent or 80 percent.  There's a lot of factors,

7  but they analyze the whole situation, as far as the

8  sentencing and the guidelines.

9       Q.   Do you have those type of factors with the

10  juvenile life without parole individuals?

11      A.   I think it's on the sheet, if I remember

12  right.

13           Maybe I don't understand your question.

14      Q.   So you were saying before that they helped

15  analyze the range and guidelines as for when, I guess,

16  certain offenders are eligible for release?

17      A.   Well, I don't think -- since this came

18  about, I don't think that was ever there before in the

19  report, the guidelines; because it's a life sentence.

20  Of course, if they had done, like, an ACA that was also

21  involved or a --

22      Q.   Uh-huh.

23      A.   They probably already served the time for

24  that length of period they'd been there.  That might

25  be.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 99 of 258

1    Q.   Okay.  Right.  And I guess that's what I'm

2  getting at.  I'm trying to get at, are there -- are

3  the -- the juvenile life without parole cases are a

4  little different; are they less complicated because

5  they have --

6       A.   The guidelines don't exist --

7       Q.   Right.  Okay.

8       A.   -- for the most part.  Well, they don't

9  exist, you know.  They're there for life, the way it's

10  set up, until this came about.

11       Q.   How do -- how does an analyst's

12  responsibilities differ from a board member's

13  responsibilities?

14       A.   Well, they're pretty much the same for the

15  most part, as far as interviewing the offender.

16       Q.   Uh-huh.

17       A.   Obviously a lot of them have a lot more

18  experience than any of the board members, as far as

19  that goes, because they're career people with the

20  Department of Corrections.  And not all -- obviously

21  not all parole members are.

22            So they have more experience --

23       Q.   Uh-huh.

24       A.   -- at the hearings probably than about any

25  parole board member, the way the system is set up.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 100 of 258

1     Q.   Do they get the parole file at the same

2  time as the board members get the parole file for being

3  on the panel?

4     **A.   They usually get them the day before.  One**

5  **of the clerks at the office brings it to them the day**

6  **before, a couple days before.  And put them in their**

7  **office, the actual files that we're going to hear.  Put**

8  **them in the briefcase the day we leave in the morning**

9  **or where we're going or to the room we're going to.**

10    Q.   Are you aware of the analysts reviewing the

11 file before the day of the hearing?

12    **A.   Not to my knowledge.  I'm not going to say**

13 **they haven't.  I don't know.**

14    Q.   Fair enough.

15         The parole analysts only, I guess, review

16 the files for the panels that they sit on, correct?

17 They don't vote on the other parole files?

18    **A.   No.  But they make -- they make**

19 **recommendations.  Like if somebody does something to**

20 **advance their date --**

21    Q.   Uh-huh.

22    **A.   -- we cancel and release.  They'll tell us**

23 **why the recommendations are, and we either go along**

24 **with it or we don't.  That's in the office itself.**

25 **They see those quite often.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 101 of 258

1        **Our office is an extension.  Somebody with**

2   **bad behavior.**

3        Q.   Okay.  So from the point in time that

4   there's a hearing --

5        **A.   Yes, ma'am.**

6        Q.   -- right -- and now the hearing's been

7   held.  They come back.  You all vote.  And for the

8   board members, it goes from shelf to shelf for all the

9   people to vote on it, right?

10       **A.   Correct.**

11       Q.   I guess I'm trying to understand after the

12  parole hearing, does an analyst have any further

13  responsibilities on particular parole -- inmates who've

14  had parole hearings?

15       **A.   I think they probably take those files back**

16  **from that day and review them, make sure everything's**

17  **correct as to what went on, and then pass it on to the**

18  **next board member.**

19       Q.   Well, do they make any recommendations on

20  files that they didn't sit in on the hearing?

21       **A.   The only example would be what I just told**

22  **you.  If there's an early release or somebody is**

23  **being -- conduct problem, there's an extension.**

24       Q.   Okay.

25       **A.   They put that -- we have an ASAP shelf and**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 102 of 258

1    they put them up usually for us to take care of.

2    Depending upon the date -- the dates involved.

3            Q.    Do you know whether or not the analysts

4    have contact with the IPOs?

5            A.    I'm sure they do by phone, I would guess.

6    Well, I know they do.   If they want to call them, they

7    can.

8            Q.    Do you know if it's related to, like, those

9    guidelines and range issues or --

10           A.    I can't answer that.

11           Q.    You don't.

12           A.    I know that some of the analysts get a lot

13   of phone calls about various cases for various reasons.

14           Q.    Do you have any idea if they have any

15   conversations about the Miller factors or the 590

16   factors?

17           A.    I mean, I doubt it.   I don't know.   I don't

18   know.

19           Q.    So after an inmate submits a petition for a

20   parole hearing, do you know what happens next?   Like,

21   do you know who actually determines when the hearing

22   will occur?

23           A.    I do not, for sure.

24           Q.    Do you know who receives notice that a

25   parole hearing has been set?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 103 of 258

1          A.    Well, obviously the offender will at some

2    point in time.

3          Q.    Do the victims receive a notice?

4          A.    They probably do through the victims' unit.

5    Through the victims' advocate unit, I would say.  I'm

6    almost certain of that.

7          Q.    So the parole board would send out a notice

8    to the victim advocate group, who would in turn notify

9    the victim?

10         A.    Somebody gives that information to the

11   victims' advocate group that somebody is coming up for

12   a parole hearing.  I don't know for sure, so I don't

13   want to tell you something I don't know.  But somewhere

14   there's a hearing set for the violator.  And if there's

15   a victim involved, the victim's advocate unit gets

16   involved and she's to contact the victims to see if

17   they want to come and participate in the hearing.  Have

18   their peace to say.  Whatever they want to say about

19   the offender.  But I don't know the exact process.

20         Q.    Okay.  So we talked about the

21   victim being -- victim, victim advocate being notified,

22   the inmate, and then the prosecutor's notified?

23         A.    Not in every case I don't think.

24         Q.    Do you --

25         A.    I don't know that for a fact.  They may be

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 104 of 258

1  **sent a letter that there's going to be a hearing, but I**
2  **don't know.**

3       Q.   Do you know whether or not defense counsel
4  for the inmate receives notification from the board?

5       **A.   I do not.**

6       Q.   So are hearings assigned to you on a
7  rotation?

8       **A.   What do you mean by "a rotation?"**

9       Q.   So when we were talking earlier, I thought
10 that's what came out.

11            So, like, you know, if today somebody gets
12 set for a hearing in two months, how do they decide
13 who's going to be on the panel?

14      **A.   I don't know.**

15      Q.   Okay.  So you -- you get files.  You get
16 files.

17      **A.   I don't get -- I get the files when I get**
18 **to the hearings.**

19      Q.   Yeah, right.  That's --

20      **A.   I don't know who sent them.**

21      Q.   Okay.  So do you know --

22      **A.   I don't know who -- I don't know how they**
23 **determine who's going to be the parole officer or the**
24 **parole --**

25      Q.   So do you know, like, okay, on Wednesday,

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 105 of 258

1   next Wednesday, I'm going to have ten hearings.  Do you

2   have the names of the people?

3        **A.**   **I don't have the names.  I have a schedule**

4   **with the number of hearings.**

5        Q.   Okay.  How is an analyst assigned to --

6        **A.**   **They're usually -- generally, since I've**

7   **been there, it looks to me like they stay with one**

8   **parole board member a week at a time, through one full**

9   **week of hearings --**

10        Q.   Okay.

11        **A.**   **-- generally.**

12        Q.   So how many -- do you how many parole

13   analysts there are?

14        **A.**   **If you give me a minute, I can tell you.  I**

15   **can visualize it.  There's probably ten in the office.**

16   **Ten or eleven --**

17        Q.   Okay.

18        **A.**   **-- analysts.  But only five of those**

19   **actually go to the hearings.  The other ones do special**

20   **out-of-state stuff on the -- the other analysts on the**

21   **other side of the room, on the other side of the**

22   **hallway --**

23        Q.   Okay.

24        **A.**   **-- they do, like, interstate stuff and**

25   **parole violator stuff and things of that nature.  They**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 106 of 258

1  all have a certain assignment.

2       Q.   Okay.

3       A.   There's like ten that goes -- ten or eleven

4  actually called analysts, but there's only five -- and

5  I want to make sure that's right -- five -- five, I

6  think, that actually go out to parole hearings with the

7  board.

8       Q.   Okay.

9       A.   And sometimes, if one of them is sick or

10 something or something unusual happens, those other

11 analyst folks will fill in.

12      Q.   Okay.  But on average you're saying you

13 work with a given analyst for a week at a time?

14      A.   Normally speaking.  Normally.

15      Q.   Okay.  Do the panel members take notes

16 during the parole hearing?

17      A.   Sometimes.  Sometimes I do.  Not always.

18 Usually I work off the report.  Anything I want to

19 discuss or talk about, I usually highlight it with a

20 yellow highlighter or pencil, if something jumps out at

21 me.

22      Q.   So is there something in particular that

23 would make you take notes?

24      A.   Well, yeah.  Well, I don't -- sometimes I

25 take notes.  I don't know.  I can't tell you why.  If

Pohlman USA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 107 of 258

1  something's said that I feel is important that I want

2  to go visit -- revisit, you know, about.

3      Q.   What do you do with your notes after the

4  hearing?

5      A.   Usually wad them up and throw them in the

6  trash can.  They don't usually go in the file, if

7  that's what you're asking me.

8      Q.   Do any panel members complete a form during

9  the hearing?

10     A.   Complete a form?

11     Q.   So, for example, we were talking about

12 Exhibit 1.

13     A.   Oh, the -- with the five points on it?

14     Q.   Yes.

15     A.   Some of the analysts -- the analyst usually

16 handles this sheet (indicating) --

17     Q.   Okay.

18     A.   -- for the most part.  In my hearings --

19     Q.   Uh-huh.

20     A.   -- that I do anyhow.  I can't speak for

21 everybody.  They usually take notes on this sheet, or

22 fill it out sometimes during the hearing.

23     Q.   Okay.

24     A.   Or they may wait till the end, you know.

25     Q.   So it's a matter of preference?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 108 of 258

1      A.    Yeah.   It depends upon the analyst.

2      Q.    Okay.   And is it your sense that if they do

3  it after the hearing, it's immediately after the

4  hearing?

5      A.    Yes, ma'am.

6      Q.    Okay.   Is it done before --

7      A.    I mean, they may.   They may bring -- I

8  don't know.   They could bring the files back to the

9  office and maybe they forgot to put something on there

10 they felt like they should have.

11     Q.    Okay.   So do -- in your hearings, you say

12 the analyst handles it.   Do you -- do you review it to

13 say, yes, I agree with --

14     A.    Well, I make sure that most of those -- all

15 of those areas have been covered.

16     Q.    Okay.

17     A.    Feel comfortable about all those areas

18 having been covered.   And usually the analyst will let

19 me know if they -- I've only done, like, two, I think.

20     Q.    Uh-huh.

21     A.    Maybe three.   But I think I've only been

22 involved in two.   You probably know.   But usually I let

23 the analyst handle it.

24     Q.    Okay.

25     A.    And we review it.   You know, make sure

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 109 of 258

1    everything's been covered.

2        Q.    Okay.  And you do it that day?

3        A.    Normally --

4        Q.    Okay.

5        A.    -- I would say.

6        Q.    Do you-all use computers during the

7    hearings?

8        A.    I do not.  I'm not an IT guy.  I mean, the

9    analyst does.  Some of the analysts use it.  A couple

10   of the parole board hearings use -- two or three, I

11   think, probably use computers to check on road notes.

12   There's a file in our road notes as to the behavior of

13   the person inside the institution and things of that

14   nature.

15       Q.    Is that something that's in that parole

16   file?  Those notes that they're referring to on the

17   computer, is it also in their file?

18       A.    I cannot answer that.

19       Q.    Is that -- are those --

20       A.    It's probably in there if I was guessing.

21   If it's a conduct violation of some sort.

22       Q.    Are those notes that you review?

23       A.    The road notes that the -- I don't --

24   sometimes I'll look over at them when I realize they

25   had some, what you call road notes, up on the screen,

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 110 of 258

1      just see what it is.

2            Q.   All right.  Well --

3            A.   It's usually nothing that would affect the

4      hearing.  I'll just put it that way.  In my opinion.

5            Q.   Let me make sure I understand what road

6      notes are.  Is that -- is that something that the

7      analyst is writing during the hearing?

8            A.   No, it's --

9            Q.   Or is it something that --

10           A.   It's already in the computer.

11           Q.   Okay.

12           A.   From the institution.

13           Q.   Okay.

14           A.   Things that have occurred.

15           Q.   And you don't know whether or not that's

16     also in the physical file that's in front of you during

17     that panel hearing?

18           A.   Correct.  Some of it could be.  Some of it

19     might not be.  I'm assuming it was -- if something

20     occurred after that report was typed up --

21           Q.   Uh-huh.

22           A.   -- it could be in the road notes in the

23     computer.  I call them road notes.  That's what they go

24     to.

25           Q.   And is it based on conduct violations?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 111 of 258

1          A.    From my understanding, mainly that's all I

2     saw in there.

3          Q.    So you haven't seen any other topics

4     that --

5          A.    I have, you know, and I can't tell you

6     exactly what they were.  It might be pertaining to

7     detainers or something that have been issued or

8     something.  I'm not sure about that.

9          Q.    So is that something that the parole

10    analyst would know about?

11         A.    They have access to the road notes.

12         Q.    Do you have access to it?

13         A.    I have access to it.  I don't use it.

14         Q.    You've never used it?

15         A.    Other than -- except for glancing over --

16         Q.    Right.  Individually pull it up?

17         A.    No.

18         Q.    So most -- are all hearings recorded, do

19    you know?  Parole hearings?

20         A.    Yes.

21         Q.    Do you know how long those recordings are

22    retained?

23         A.    You know, I think -- I don't want to answer

24    that.  I want to say -- I want to say 90 days, but I

25    don't -- maybe -- I want to say six months.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 112 of 258

1       Q.   Have you ever gone back and listened to

2  them?

3       A.   Me, personally?

4       Q.   Yes.

5       A.   I think I sat in a hearing -- or a meeting

6  one time where notes were played back.  And I can't

7  even tell you what it was about.  Or a hearing was

8  played back.  And I can't even tell you what it was

9  about.  I just happened to walk into the room and they

10 were, you know.  I can't even tell you when it was or

11 who was in the room.  But I remember one time for some

12 reason I went back and listened to something.  Nothing

13 that I was familiar with.  I'll just put it that way.

14      Q.   And is it fair to say that you're

15 estimating the maximum retention period is six months?

16      A.   That's my -- that's -- for some reason I've

17 heard that in the office; that they're held for six

18 months.

19      Q.   Who would know that?

20      A.   Steve Mueller would, the analyst -- lead

21 analyst.  I'm sure.  And then I don't know for -- for

22 some reason I got it stuck in my mind, 6 months or

23 90 days.

24      Q.   Okay.

25      A.   Either three months or six months.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 113 of 258

1    Q.   And I guess what I'm getting at, is it like
2    still available after five years?  After two years?
3    Like, for example, if somebody gets a rehearing date in
4    two years or three -- five years down the line, would
5    their audio from -- the first audio still be available?
6    **A.   After five years?**
7    Q.   Uh-huh.
8    **A.   I don't know for a fact, but I doubt it.**
9    Q.   Okay.  And I believe we talked earlier.
10   You were saying that the average lengths are about
11   20 minutes?
12   **A.   Twenty minutes to thirty minutes.  Twenty**
13   **minutes, I'm guessing, average.**
14   Q.   Okay.
15   **A.   A good 20 minutes.**
16   Q.   What about hearings for the juvenile life
17   without --
18   **A.   They're longer.**
19   Q.   Okay.
20   **A.   They should be.**
21   Q.   And then you don't have a sense of range
22   one that?
23   **A.   Forty-five minutes to -- I'm guessing,**
24   **average, 45 minutes.**
25   Q.   Okay.  Do you notice -- are you aware of

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 114 of 258

1  any difference between a parole hearing for an

2  originally parolable offense versus a juvenile life

3  without parole people?

4      A.  Generally speaking, no.  But I think, to be

5  honest with you, that we pay a lot of attention to it.

6  We want to give the offender the benefit of the doubt

7  in anything.  Nothing else for all the time they've

8  served, you know.  And we give them the benefit of the

9  doubt.  We give them our, you know, upfront attention

10 and want to hear what they have to say.  But generally

11 it's conducted in the same manner.

12     Q.  Okay.  I know you said you don't recall

13 specifically how many hearings you conducted on those

14 individuals.  Do you recall how many times you voted on

15 any of them?

16     A.  Juvenile --

17     Q.  Juvenile life without parole individuals?

18     A.  Obviously, the Brown case.  I voted on

19 that.  And then I heard one other one.  Those two --

20 three -- it couldn't -- I don't know.  I'm going to

21 guess three or four, but I don't know, okay.

22     Q.  Do you ever recall voting to grant release?

23     A.  I do not, but I want to think there was a

24 time I did.  I don't recall.

25     Q.  Are there any specific protocols in place?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 115 of 258

1          A.    As a matter of fact, can I embellish on

2    that a little bit?

3          Q.    Yes.

4          A.    I think that the one that I did -- I can't

5    remember the offender's name.

6          Q.    Is it ███████?  Does that sound familiar?

7          A.    Yeah.  We actually gave him a date if I

8    remember right.  Don't hold me to that.  I think

9    that's -- we hear so many cases.

10         Q.    I understand.  And I'm not trying to hold

11   you, you know --

12         A.    But I think on the one that I conducted, I

13   think we gave him a date.  If I remember right.  But

14   I'm not certain.

15         Q.    So are there any, like, protocols, either

16   oral or written, that you-all have for these 590

17   hearings?

18         A.    No.  Mainly to cover those five basic --

19         Q.    Uh-huh.

20         A.    -- that we get that involved in a hearing

21   somehow.  That comes out in the hearing someway.  So we

22   have -- we're able to answer those questions, I guess.

23         Q.    So --

24         A.    Those issues.

25         Q.    -- is that the only difference between an

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 116 of 258

1   originally parolable offense hearing and the 590

2   hearing, is this?

3       **A.   For the most part, yes.**

4       Q.   Okay.  And when you say "for the most

5   part," you mean, yes, you can't --

6       **A.   Yes.**

7       Q.   -- think of any other things?

8       **A.   I can't think of anything else.**

9       Q.   Okay.  And have there been any changes to

10   the way these 590 hearings have occurred since you-all

11   started having them?

12       **A.   Not to my knowledge.  We treat them just as**

13   **any other offender.  I just want to tell you that.  We**

14   **treat them just like any other offender.  With**

15   **professionalism and treating -- we give them the**

16   **benefit of any doubts, as we should; because that's**

17   **what the law is.**

18       Q.   Uh-huh.

19       **A.   They get a fair hearing.**

20       Q.   How many delegates can an inmate have at a

21   hearing?

22       **A.   One.**

23       Q.   Do they have to advise who the delegate is

24   going to be --

25       **A.   Yes.**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 117 of 258

1    Q.    -- in advance of the hearing?

2

3         A.    Yes, ma'am.  I'm not sure what the protocol

4    is on that, but they have to.

5         Q.    Do you know if a delegate is given any

6    specific instructions about what they can and cannot do

7    at the hearing?

8         A.    Well, the only thing I know about that part

9    of it is, when they come to the institution, there's a

10   dress code that they have to have when they come into

11   the institution to go to the hearings.  It's all -- no

12   matter if -- there's a dress code before they can

13   actually go into the hearings.

14            That's the only thing I'm aware of off the

15   top of my head.  I mean, if they -- I don't want to go

16   into a description or anything, but they have a certain

17   dress code they have to abide by before they let them

18   go back to -- to the hearing.  And there may be other

19   factors, too, that I'm not aware of.

20        Q.    So we're at the hearing at the facility, an

21   in-person hearing?

22        A.    Yes, ma'am.

23        Q.    At what point is the delegate allowed in

24   the room?

25        A.    Well, they come in initially.  We give the

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 118 of 258

1  offender the opportunity to introduce them to the

2  panel.

3      Q.   So they come in --

4      A.   Into the hearing room.  They're there when

5  the offender comes in.  Or shortly thereafter.  Or

6  sometimes shortly before.  They usually get there about

7  the same time.

8      Q.   Are any instructions given to the delegate

9  in the hearing?

10     A.   We just tell them that -- welcome them to

11  the hearing and tell them that -- obviously that your

12  family member -- whatever their name is -- is at the

13  parole hearing.  We'll talk with them first.

14          At the end of that period of time, we'll

15  give you an option to speak on their behalf if you

16  choose to do to -- to do so, excuse me.  It's not

17  mandatory.  If you don't want to say anything, you

18  don't have to.  But just the fact that you are here, we

19  know that he or she has support out in the community.

20  It's very important to us.

21          That's pretty well word by word.  I've done

22  enough of them already.

23  BY MS. JONES:

24     Q.   So the content of their comments, is that

25  limited in any way?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 119 of 258

1    A.   No.   I mean, we -- no.   I've never limited

2  anybody.   But usually they don't speak that long.   Five

3  to ten minutes at the most probably.   I haven't had

4  anybody that's been that long.   It's usually short

5  comments on what they can do for them, help them out in

6  the community.

7    Q.   So with respect to the 590 hearings --

8  that's what I'll call them.

9    A.   Okay.

10    Q.   Can they talk about the Miller factors?

11  Those factors if they want to?

12    A.   That particular case?

13    Q.   You know, these --

14    A.   No, I think -- to answer your question,

15  they're just like any other delegate.   We want to draw

16  from them how they're going to help the offender once

17  they get released out in the community.

18    Q.   Okay.

19    A.   What they're going to do for them.

20    Q.   Okay.   So just to make sure I'm

21  understanding; if a delegate wanted to talk about the

22  circumstances of the offender's childhood, you know,

23  being subject to abuse or the growth that they've

24  season, the maturity that they've seen from that period

25  till now, are they allowed to talk about those things?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 120 of 258

1          A.   Yes, they're allowed.

2          Q.   Can the delegate ask questions of the

3     board -- of the panel members?

4          A.   No.  That's -- generally, no.  I mean,

5     we'll answer any question they have if we can.  We just

6     won't shut them off --

7          Q.   Uh-huh.

8          A.   -- you know, if it's just a casual

9     question.  But we don't let them -- let them talk to

10    each member on the panel individually or, you know,

11    interrogate them I guess is the best way to put it.

12    But we'll answer any questions they have that we can to

13    our knowledge, you know.

14         Q.   If a delegate thinks that something has

15    been said that's incorrect during the hearing, are they

16    allowed to, you know, to voice that?

17         A.   Yeah.  I would say yes.

18         Q.   Okay.

19         A.   Yes.

20         Q.   Has that happened before that you can

21    recall?

22         A.   Not that I can recall.  As far as one of

23    these 590 cases you're calling them; is that what

24    you're talking about?

25         Q.   Well, in general and then specific to 590.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 121 of 258

1  So in any parole hearing, are you aware of a delegate

2  pointing out an error?

3       A.   They've probably done it just out of the

4  blue.  They thought of something.  And we accept that.

5  I mean...

6       Q.   Okay.

7       A.   We give everybody a fair chance to speak.

8  Within reason.  Within reason.  I mean, you know...

9       Q.   I mean, can you -- can you recall a

10  circumstance where it was unreasonable, where you did

11  have to cut somebody off?

12       A.   Well, sometimes they'll jump in while we're

13  talking to the offender and try to make a point.  And

14  we'll tell them, we'll give you an opportunity --

15  excuse me, ma'am, or sir, you'll have an opportunity to

16  speak as soon as we finish talking to the offender.

17       Q.   Okay.

18       A.   Or your son or, whatever, your daughter.

19  We'll give you an option to speak.  Just sit back

20  and -- we usually tell them to sit back and relax and

21  listen to the hearing.  At the end of that period of

22  time, you'll have an opportunity to speak.

23       Q.   Okay.  Can you recall any other time you

24  had to cut them off?

25       A.   Just somebody would jump in, say something,

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 122 of 258

1  and I would -- you can tell it's about a -- "we'll give

2  you an opportunity to talk about that a little later."

3  It's probably happened minimal.  Minimal.

4       Q.   Okay.

5       A.   I can't give you a number.

6       Q.   But you cannot recall a time where you cut

7  somebody off 'cause they were talking too long?

8       A.   A delegate?

9       Q.   Yes.

10       A.   For talking too long?  Not to my knowledge.

11       Q.   So if a delegate wanted to talk for an

12  hour, would that be allowed?

13       A.   I doubt it.  I mean, there's got to be some

14  reasonableness about it, you know.

15       Q.   Uh-huh.

16       A.   I've never had that problem personally.

17       Q.   Can the delegate bring anything into the

18  hearing?

19       A.   I think I've had delegates bring in

20  pictures of a person in their childhood or something

21  like that.  And we'll look at it and give it back to

22  them right away.

23       Q.   Okay.

24       A.   I guess it depends on what you mean, bring

25  anything to the -- I mean, I'm sure -- something

Pohlman USA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 123 of 258

1   reasonable, I'm sure.  I'll just put it that way.

2         Q.    Okay.  So if they brought something that --

3         A.    Maybe they want to bring in their diplomas

4   and show them to the board.  We'll look at them and

5   hand them back to them.  Usually the offender has a lot

6   of those things available, diplomas or programs that

7   they completed or something of that nature.

8         Q.    So can a delegate bring in something that

9   they want the panel to consider that's not already in

10  the file?

11        A.    They could bring in letters from friends

12  and neighbors or -- that we'll put in.

13        Q.    Okay.

14        A.    We usually ask them if it's the only copy

15  they have, and they've usually made a copy of it.  And

16  we put it in the file.  I think I've had that happen

17  once or twice.

18        Q.    So how often do defense attorneys attend

19  these parole hearings?

20        A.    Very rarely since I've been on the board.

21        Q.    Okay.

22        A.    I don't think any of them hearings I've

23  heard there's been one there though that I'm aware of,

24  an actual defense attorney.  There could have been one.

25  But not more than a handful.  I'll just put it that

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 124 of 258

1  way.

2      Q.   Does anyone communicate with the defense

3  attorneys prior to the hearing?

4      **A.   Like anyone?**

5      Q.   On the panel?

6      **A.   No.**

7      Q.   When is the defense attorney allowed to

8  enter into the room?

9      **A.   Well, if he's been -- comments as a**

10  **delegate for the offender, if he's been okayed or**

11  **certified or whatever, verified to come in, I'm sure he**

12  **or she can come in.**

13      Q.   So they only come in as a delegate, not as

14  their counsel?

15      **A.   Correct.**

16      Q.   Is that what you're saying?

17      **A.   Correct.  My understanding of the way it**

18  **is -- I've not had that happen.  Just that one time I**

19  **had that federal attorney, the U.S. District Attorney**

20  **from the eastern part of the state came in to a murder**

21  **thing.**

22      Q.   Uh-huh.

23      **A.   And we took testimony from him.  That's the**

24  **only attorney, I think -- actual attorney that I'm**

25  **aware of that I've conducted with -- only hearing I'm**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 125 of 258

1   aware of, and the one time that there was an attorney

2   involved was that one particular time.

3       Q.   Just to confirm, they're not there in any

4   legal capacity, correct?  They're there as a delegate?

5       A.   Yes.  To my understanding.  I mean, I

6   understand the difference.  But usually they're just

7   there as a delegate.

8       Q.   And so --

9       A.   But I've never had any other than that one.

10      Q.   Okay.  And we just walked through, like,

11  what the delegate is allowed or not allowed to do.

12  That would also apply to the defense counsel who's --

13      A.   There as a delegate, right.

14      Q.   Who communicates with the prosecutors

15  before the hearing?

16      A.   Usually the person that wrote the report,

17  the prehearing report.  Or persons.  They'll contact --

18  from my understanding, they'll -- they can contact the

19  prosecuting attorney.

20      Q.   When does the panel --

21      A.   If there's going to be a hearing.  I assume

22  they do that.  I don't know that for a fact.

23      Q.   Okay.

24      A.   I told you that earlier I think.

25      Q.   When does the panel learn that the

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 126 of 258

1    prosecutor is going to attend a hearing?

2         A.   It would be the day -- well, you would

3    get -- it would be the day of the hearing actually.

4         Q.   Okay.

5         A.   Normally.  Unless there's some unusual

6    circumstances.

7         Q.   So at what point in the process is the

8    prosecutor allowed in the room?

9         A.   It would be just like any other delegate.

10        Q.   The prosecutor?

11        A.   Oh, the prosecutor?

12        Q.   Yeah.

13        A.   I've never had a prosecutor come to my

14   hearing.  Other than that one attorney.  I'm never --

15   you know, I'm not sure about that.

16             Usually, I think, they're -- somehow

17   they're notified there's going to be a hearing, but

18   usually they don't come to the -- I think it's --

19   normally the prosecutors don't come to the hearings.

20   In the particular county where the offense occurred or

21   something like that?

22        Q.   Uh-huh.

23        A.   Very rarely, I think, does the prosecutor

24   or his assistant come to a hearing.  Although, it --

25   wait a minute.  I did have -- I did have one other

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 127 of 258

1  case.  Yeah, we have so many cases.  Yeah, I did have

2  one other case where a couple of assistant prosecutors

3  came in, as the victim's advocate, along with them.

4  And they were also allowed to speak.  I forgot about

5  that, as to why they did not want the person released.

6       Q.   Okay.  Is that otherwise reflected in the

7  parole file?

8       A.   No.  I don't think so.  If there's a -- if

9  somebody's out on parole and they have a continuance,

10  they're already out on parole, they have a continuance

11  and their parole is revoked and they come back, and

12  when they have a hearing, sometimes the -- whoever

13  writes the reports, the IPO or parole officer,

14  whatever, will contact the sheriff for the county, the

15  prosecuting attorney and see if they oppose the release

16  of this person.

17            That's about the only time I can think that

18  the prosecutors -- other than that one hearing I just

19  told you about.  They don't get involved a lot; let's

20  put it that way.  The prosecuting attorneys.

21       Q.   But the prosecuting attorney is always

22  notified?

23       A.   I think so.  I'm not going to say that.

24       Q.   Okay.

25       A.   As I said earlier, I don't know how -- I'm

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 128 of 258

1    sure they are, but I don't know how that process works.

2         Q.   I'm trying to get a sense of how often you

3    know what the prosecutor's recommendation is with

4    respect to parole.  Is it rare that you have a

5    recommendation one way or the other either for or

6    against?

7         A.   Regarding the parole hearing at hand?

8         Q.   Yes.  Regarding whether or not to release

9    the inmate on parole?

10        A.   Usually the only time we, the parole

11   board -- when they come back on parole violations and

12   re-incarcerated, the person that writes the report will

13   contact the county prosecutor.  Sometimes they don't

14   get an answer back, as to whether they oppose or --

15   release of the person or are okay with it.  Either the

16   county prosecutor or the sheriff of the county where

17   the crime occurred.  That's usually just on parole

18   revocation -- parole violators.  They don't make any

19   recommendations in our normal reports; normal hearings.

20        Q.   So on the 590 hearings, you are -- if

21   you're saying it's not normal for the prosecutor to

22   make a --

23        A.   I don't believe that was in their hearings

24   that I -- the two or three that I participated in.  But

25   I'm not going to tell you for sure if -- whether the PA

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 129 of 258

1   made a recommendation or not.

2       Q.   Are you aware of a scenario or a situation

3   in which the prosecutor is allowed to speak to the

4   panel before the inmate arrives?

5       A.   No.  Me personally?  No.

6       Q.   In those few situations where a prosecutor

7   is there that you recall, generally, are prosecutors

8   given the opportunity to rebut things that they hear

9   the inmates say during the parole hearing?

10      A.   No.  'Cause like I said, I don't think I've

11  had a hearing where an actual -- although what they

12  say, they're the -- other than that one, the two lady

13  prosecutors.  They can't say anything.  They make a

14  statement first; the victim's advocate.  And these two

15  particular ladies were assistant prosecutors.  We let

16  them talk first.  And then we brought in the -- they

17  chose to do it that way.  Then we brought in the

18  offender and talked to the -- did the interview with

19  the offender.  And they didn't get to speak after that.

20      Q.   Are there any policies or procedures in

21  place that deal with those sorts of things?

22      A.   Yeah, I think there is, as to -- as to

23  parole officers?  Attorneys -- prosecuting attorneys?

24      Q.   Right.  Yes.  About the ability to rebut --

25      A.   I'm not aware of any if there is.  I

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 130 of 258

1    don't -- I don't know.  I've not seen them written down

2    on paper that I'm aware of.  There could be some

3    guidelines.  I've not been involved with that many of

4    them to be honest with you, where the prosecuting

5    attorney is there.

6          Q.    So talk a little bit about the victims,

7    when they attend parole hearings.

8          A.    Uh-huh.

9          Q.    Does the panel talk to them separate and

10   apart from the inmate?

11         A.    They can -- they can decide -- they, the

12   victim, can decide before the hearing whether they want

13   to speak with the offender there or whether they want

14   to speak with the offender not present.  They have that

15   choice.

16         Q.    Uh-huh.

17         A.    And they can stay for the offender's

18   hearing if they choose to do so, or they can leave

19   right after they speak.

20         Q.    Okay.

21         A.    Does that makes sense.

22         Q.    Yes.

23         A.    And if they choose to speak without the

24   offender there, then obviously that's what happened.

25   They make their statements to the board.  The

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 131 of 258

1 offender's not in the room or at the facility,

2 depending on whether there's a video or not.  And then

3 they can't say anything after that.  They leave -- if

4 they leave the hearing room at that point in time, they

5 cannot return to the hearing room.

6          And they can stay, as I indicated, while we

7 interview the offender.  If they choose to do so.  But

8 they can't say anything.  And I tell them, you can't

9 make any statements or holler something out that you

10 don't agree with.  You may hear something that you

11 don't agree with, but that's the way it is.  And you

12 can't make any statements beyond what you just made in

13 regard to this offense -- an offender.

14      Q.   What if they make their statement with the

15 offender in the room?  Can they direct any comments to

16 the offender?

17      **A.   No.  They're not supposed to.**

18      Q.   When --

19      **A.   Directly to the offender.  You know, like,**

20 **whatever.  I hope you rot in hell or whatever.**

21      Q.   Uh-huh.

22      **A.   They cannot do that.**

23      Q.   When they make a statement before the

24 inmate comes in, is the inmate told what the victim

25 said?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 132 of 258

1       A.   No.  I tell -- or I think we all do.  At

2   least I do.  I tell -- the first thing I tell the

3   offender, just for your information, we do have some

4   victim's witnesses in the room.  They know it -- they

5   know it upfront.

6       Q.   But they don't know whether or not they

7   spoke, let alone what they said?

8       A.   They don't know what they said.  And they

9   don't know who they are for the -- they probably have a

10  good idea who they might be, but they don't see them.

11      Q.   Is the number of victims or, I guess,

12  family members of victims, limited?

13      A.   There is a limit there.  And I can't tell

14  you exactly what that is.  You'd have to talk to the

15  lady in the victim's unit.  I think there is a limit.

16      Q.   Can it be --

17      A.   We're pretty -- we're pretty liberal on

18  that.  I'll just put it that way.  In my opinion.

19      Q.   So it can be more than one?

20      A.   Yes, ma'am.

21      Q.   Can it be more than five?  Have you seen

22  that?

23      A.   I've not seen more than -- I don't think

24  I've seen more than five.

25      Q.   Okay.  So somewhere between one and five?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 133 of 258

1      A.    I'm guessing.

2      Q.    What's the role of a victim advocate at a

3  hearing?

4      **A.    The victim's advocate?**

5      Q.    Uh-huh.

6      **A.    Is to obviously speak on behalf of the**

7  **victim.  Speak on behalf of the victim.**

8      Q.    So do they always -- do --

9      **A.    If they choose to do so.**

10      Q.    Okay.  So there are occasions where the

11  victim's advocate is just there to observe?

12      **A.    No.  I've never held a hearing where --**

13  **they usually have something to say, you know.  Some of**

14  **them get so emotional, they can't say.  They don't**

15  **talk.  They get so emotional.**

16      Q.    And we're talking about victim's advocates,

17  right?

18      **A.    Right.**

19            MR. SPILLANE:  I'm going to ask a question,

20  because I'm not sure with whether you're talking about

21  the same thing that he is.

22            MS. JONES:  Okay.

23            MR. SPILLANE:  Are you asking about the

24  person from victim's services or a person that

25  accompanies the victim, like a friend?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 134 of 258

1              THE WITNESS:  Exactly.

2              MS. JONES:  Thank you.

3    BY MS. JONES:

4         Q.   I asked -- I'm talking about former.  So we

5    spoke before about the victims and their support system

6    that they bring.

7         **A.   They can bring one supporter with them.**

8         Q.   Okay.

9         **A.   Is that your question?**

10        Q.   No.  Now I'm talking about the victim's

11   advocate, who's, I guess, associated with the

12   department.

13        **A.   There's one of those in there.**

14        Q.   And I'm trying to understand what role that

15   person plays.

16        **A.   Just -- just to --**

17        Q.   Observe?

18        **A.   -- observe and comfort the victims,**

19   **basically.  If they should be crying or something, they**

20   **get them tissues.  They're there to support them in**

21   **some ways.**

22        Q.   Do they ever speak to the panel?

23        **A.   "They" being?**

24        Q.   The victim's advocate.

25        **A.   No.  That works with Probation and Parole**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 135 of 258

1   you're talking about?

2         Q.   Uh-huh.

3         A.   **The person?**

4         Q.   Yes.

5         A.   **No.**

6         Q.   Are they --

7         A.   **Excuse me.  Do they ever speak to the panel**

8   **while the hearing's going on?**

9         Q.   Correct.

10        A.   **No.**

11        Q.   Like, do they present to the panel?

12        A.   **No.**

13        Q.   Do they ever attend in lieu of a victim?

14        A.   **No.  Not that I'm aware of.**

15        Q.   So is it required --

16        A.   **Somebody from the victim's advocate unit?**

17        Q.   Yes.

18        A.   **No, not that I'm aware of.**

19             **Usually if the victim can't be there, like**

20  **the example I gave you earlier, we'll give the**

21  **information to the parole board member and we'll call**

22  **them and talk with them on the phone and make notes and**

23  **put it in the file.**

24        Q.   So --

25        A.   **We choose to do so.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 136 of 258

1    Q.   -- is there any kind of requirement that

2    either the victim or victim advocate must be present

3    for a parole hearing?

4        **A.   Is there a requirement whether the victim**

5    **or a victim's advocate?  If there's a victim, then**

6    **usually there's a victim's advocate with them.  I guess**

7    **I don't understand your question.  I'm sorry.**

8        Q.   So in order to have a parole hearing, the

9    inmate has to be there, right?

10       **A.   Right.**

11       Q.   Okay.  So now I think does -- does somebody

12   from the victim or victim advocate -- must someone from

13   that side be at the hearing as well?

14       **A.   They don't have to be there.  I mean, if**

15   **there's a victim there, there'll be a victim's advocate**

16   **from the -- that unit with that person.**

17       Q.   But -- okay.  So then that's when I'll ask,

18   is there ever a scenario where there's a victim

19   advocate without a victim?

20       **A.   Not to my knowledge.  I've never had that**

21   **happen.  I doubt it.  Well, I'll take that back.  I**

22   **think that has happened, for logistical reasons maybe,**

23   **if nothing else.  I don't know what the policy is on**

24   **that for sure.  Where I've had a victim in there and**

25   **I've gotten information from the victim advocate unit,**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 137 of 258

1    normally there's a victim advocate there.  I'll just

2    put it that way.

3              It would be unusual that there isn't, but I

4    think perhaps I've had that happen.  But I don't know

5    that for a fact.

6         Q.   Okay.  So --

7         A.   I'm not going to lie to you.

8         Q.   I appreciate that.

9              So there can -- there's normally someone

10   from the victim advocate's office there --

11        A.   With them.

12        Q.   Okay.

13        A.   Right.

14        Q.   Okay.

15        A.   Yes, ma'am.  Normally.

16        Q.   And they would have coordinated with them

17   in advance, so it's likely that if they knew a victim

18   wasn't coming, that someone from the victim's advocate

19   office would not be there?

20        A.   Right.

21        Q.   Okay.

22        A.   Okay.  I'm sorry.  I misunderstood.

23        Q.   No.  It happens.

24              (Deposition Exhibit No. 4 was marked for

25   identification.)

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 138 of 258

1  BY MS. JONES:

2        Q.   So Exhibit 4 is AGO002435 to 2436, which is

3  a board action sheet.

4        **A.   Yes, ma'am.**

5        Q.   You're familiar with this document?

6        **A.   Yes, ma'am, very much.**

7        Q.   Okay.

8        **A.   This one has my initials on it.  Did you**

9  **pick this out just for me?**

10       Q.   I did.

11             So is this a form that was created by the

12  board?  Do you know?

13       **A.   I would assume so, yes, ma'am.  It's been**

14  **there ever since I've been there.**

15       Q.   And you note there's a place on here for a

16  salient factor score, correct?

17       **A.   (No response.)**

18       Q.   Up at the top, like, so they have --

19       **A.   Oh, yes.**

20       Q.   Is there a reason why --

21       **A.   I have no idea.**

22       Q.   Okay.

23       **A.   I knew that was going to be your next**

24  **question.**

25       Q.   So just for the record, I was going to ask,

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 139 of 258

1  is there a reason why that's not filled out and --

2      **A.   I can -- I can only assume that it's**

3  **because this is a -- one of the offenders that we're**

4  **talking about.  ▄▄▄▄▄▄.  That they did not do it**

5  **because of his life sentence.  It probably -- I don't**

6  **know why.  I'm guessing that's why it doesn't have a**

7  **factor score.**

8      Q.   But doesn't the salient factor score, like,

9  predict, you know, how well they would do if released?

10      **A.   I don't disagree with you.  But I don't**

11  **know why there's not a score there.**

12      Q.   Okay.  Do you know when those scores are

13  calculated?  So for the individuals who do get a score,

14  do you know when that score is calculated?

15      **A.   Not -- not -- no, I do not.**

16      Q.   Okay.  So when is this form filled out?

17      **A.   This form here (indicating)?**

18      Q.   Yes.

19      **A.   At the hearing, for the most part.**

20      Q.   Who fills out this form?

21      **A.   I would say -- I can't recognize the**

22  **initials there.  One of the -- well, obviously I**

23  **initialed here (indicating).  Whoever else initialed**

24  **their places on here.  And the top three lines was**

25  **filled out by -- this was the person at the**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 140 of 258

1  institution, the one on the right.  In the middle was

2  the analyst at the top row.  And I initialed the one on

3  the left side for re-hear.  And then it went to the

4  board.  And the next one to hear it was ████████,

5  ████████████████, and ████████████, who's now the

6  ████████.  And we had four.  So he did the final at the

7  bottom to reset a hearing at 12 of 2021.

8      Q.    Okay.  So this was completed -- this

9  started to be filled out after the hearing, right?

10 Like, immediately --

11     A.    I can tell you what was done at the

12 hearing.  Is that what you want to know?

13     Q.    Yes.

14     A.    The top three rows was done at the hearing.

15     Q.    Okay.

16     A.    I wrote in the conduct not good at the top,

17 in the comments.  And the other ones would have been

18 done once it was passed on back at the office.  And at

19 that time Ruzicka would have been the one I passed it

20 to.  Or an analyst actually passed it to him.  They

21 take them back.  The analyst handles them.  Passed it

22 him, and it went on down the line.

23     Q.    Okay.  So in the section called "hearing

24 panel comments" --

25     A.    Uh-huh.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 141 of 258

1    Q.    -- what is that designed to capture?

2    **A.    Anything you can think is not good or**

3    **anything that is good.**

4    Q.    So is it --

5    **A.    That was my -- I put down "conduct not**

6    **good."  And then, I don't have the -- it's been so long**

7    **ago, I forgot.  When was this?  December 16th.  I don't**

8    **remember the specifics of why I put down "conduct not**

9    **good."  But if I put it down, I can tell you the**

10   **conduct was not good.**

11   Q.    Is it designed to capture the basis for the

12   vote that the panel is making?

13   **A.    This particular area (indicating)?**

14   Q.    Uh-huh.

15   **A.    No.**

16   Q.    Right, so --

17   **A.    Generally speaking, no.**

18   Q.    So I guess I'm trying to get a sense of, is

19   there any guidance as to what is supposed to be --

20   **A.    No --**

21   Q.    -- completed?

22   **A.    -- I think about whatever any panelist**

23   **choses -- chooses to put in there.  And generally, not**

24   **always, but the analyst does a lot more writing than we**

25   **do.  For various reasons.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 142 of 258

1    Q.    And so I'm trying -- what I'm trying to

2    understand is like, what is this communicating to the

3    next board member who wasn't at the panel, who's voting

4    on it, right?

5    **A.    That the gentleman has a problem with**

6    **conduct while incarcerated.**

7    Q.    So is this in any way supposed to be

8    exhaustive of what you've learned about the inmate in

9    the hearing?

10    **A.    No.  I mean, that's not my total overall**

11    **take about the person.  But I would say his conduct was**

12    **not good at the time, and I made a notation of it.  And**

13    **the other parole board members can take into**

14    **consideration that if they want to, or they don't have**

15    **to.**

16    Q.    I'm trying to get a sense of, like, why you

17    would write that.

18            For example, if you hear a lot about a home

19    plan, a family home plan and that's exceptionable,

20    what --

21    **A.    And I've probably written -- I've probably**

22    **written reports before where I put that down, where**

23    **they have a good home plan or a good interview.  When**

24    **things are good, I put down good things.  If they're**

25    **not, I put down things that are not particularly good.**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 143 of 258

1    Q.   So is this to suggest that there was

2   nothing good from the hearing that come out when you

3   completed it?

4    A.   No, no.  Because they would --

5   they'll read -- they should read the report theirself

6   (sic), and they can make their own analysis of it.

7    Q.   Well, the report, right, is different from

8   the actual interview with the panel.

9    A.   Right.

10    Q.   Right.  So is this --

11    A.   I'm not -- I'm telling the other panel

12   members that the person did not have good conduct while

13   incarcerated is what I'm doing.

14    Q.   Okay.

15    A.   And they can take it as they so choose --

16   desire to -- as they choose to do.  Or they can read

17   the report and maybe consider it different.  They may

18   think the conduct is good.  But I did not at the time.

19    Q.   So is it fair to say that you use this box

20   to indicate something that you determined was

21   noteworthy?

22    A.   Jumped out -- jumped out -- jumped out at

23   me in the hearing.

24    Q.   Okay.  So it's not used to be complete?

25    A.   No.  No.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 144 of 258

1       Q.   It's not used to point out any specific

2  factor.  It's just something that jumped out at you?

3       A.   Yeah.  And I don't remember -- I don't

4  remember what --

5       Q.   That's fair.  And I'm just trying to get an

6  understanding of how this box is used and what it is

7  communicating to the next person.

8       A.   If I got one like this and I was the next

9  parole board member, I would go back.  I would read the

10 report and look at his conduct and see how many conduct

11 violations that he or she may have had and why that

12 comment was made.  And if I made it, I can tell you it

13 was probably with good reason.  His conduct was

14 probably terrible.  But I don't know.

15      Q.   Uh-huh.

16      A.   I mean, without going back and looking for

17 that report.

18      Q.   Do you --

19      A.   But they don't have to use that information

20 if they don't want to.  They can make their own

21 assumptions from the report.

22      Q.   How do you use that information when you

23 are -- when this ends up on your shelf and you have

24 to --

25      A.   Well, I would probably read the whole

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 145 of 258

1    report and go look at the -- what -- what kind of

2    conduct it is, and how many violations.  And obviously

3    the offender's not doing the correct things while

4    incarcerated.

5         Q.   So would that signal something to you as

6    far as, like --

7         A.   I would read the --

8         Q.   -- to give this additional weight?

9         A.   Ma'am?

10        Q.   Would this -- would a comment in this box

11   signal that that should be given some additional

12   weight, because that's the only thing that was written

13   in there?

14        A.   I think that everybody else should look at

15   it.  If can't -- if they cannot abide by the rules and

16   regulations while incarcerated, it would be hard for me

17   to expect them to do that on the streets.

18        Q.   Are these filled out the same for the 590

19   individuals versus individuals who are originally

20   parolable?

21        A.   Yeah.  They're all the same.

22        Q.   So --

23        A.   It's -- this is the same form.  Is that

24   your question?

25        Q.   Well, I mean, I get that it's the same

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 146 of 258

1   form.  Where I'm going was, is there any attempt to

2   address Miller factors on this form that are supposed

3   to be required under 590?

4          **A.   By Miller factors, you mean --**

5          Q.   The fact -- the fact -- these factors

6   (indicating)?

7          **A.   The juvenile without parole?**

8          Q.   Yes.

9          **A.   Oh, that's a separate sheet.  I mean --**

10         Q.   No, I -- I understand that.  But I'm just

11  saying, is -- this is from the hearing panel comments

12  (indicating).

13         **A.   Right.**

14         Q.   Which this is, I guess, filled out by the

15  analyst, right?

16         **A.   Normally.**

17         Q.   Okay.  So both of these things --

18         **A.   Are together in the file.**

19         Q.   -- are together.

20         **A.   Can be observed by whoever reads the file.**

21         Q.   Uh-huh.

22              Is it your understanding that this --

23  what's been marked as Exhibit 1, which is Bates number

24  AGO243, is it your understanding that these are all of

25  the Miller factors that the panel needs to consider in

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 147 of 258

1  determining whether or not to release one of the

2  juveniles for parole?

3       **A.   These four?  Five, I mean?**

4       Q.   Correct.

5       **A.   Well, it's a part of the process.  I don't**

6  **know if it's -- you know, we use that in determination**

7  **obviously.**

8       Q.   Right.  I'm --

9       **A.   I guess I don't understand what you're**

10  **asking me.**

11       Q.   So is it your understanding that Senate

12  Bill 590 mandates the parole board to consider certain

13  factors when deciding whether or not one of the

14  juvenile life without parole individuals should be

15  released?

16       **A.   These five factors.**

17       Q.   Separate and apart from that.  I'm saying

18  what 590 --

19       **A.   We consider all of this.**

20       Q.   Right.  But is this everything that they're

21  supposed to consider?

22       **A.   I don't know if it's everything.  It's**

23  **everything that -- obviously on the form that we comply**

24  **with.**

25       Q.   Is this -- are these the only factors

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 148 of 258

1   you-all consider when doing the 590 analysis?

2          A.   Well, no, there's other -- I mean, we

3   consider a lot of things.  Overall.

4          Q.   Okay.

5          A.   I guess you've lost me.  We consider a lot

6   of other things besides just these.  I mean, I put good

7   conduct -- conduct not good.  If I can speak to this.

8   If you look at No. 4.  Is this -- I don't know if it's

9   the same case or not.  It doesn't matter.  This person

10  had 24 conduct violations in a short period of time it

11  looks like.  I don't know if it coordinates with this

12  one or not.  I would assume it does, but I don't know.

13  So that's probably why that was brought up.

14              (Deposition Exhibit No. 5 was marked for

15  identification.)

16  BY MS. JONES:

17         Q.   So we've placed in front of you Senate Bill

18  590, right?  And you'll note that on the second page

19  starting around Line 5, it lists five factors that are

20  supposed to be considered.  Do you see that?

21         A.   Yes, ma'am.

22         Q.   Okay.  But then it also requires factors

23  listed on page -- starting on page seven.

24         A.   Okay.

25         Q.   Starting at line 12.  Continuing to the

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 149 of 258

1    next page.

2            A.    **Yeah, I see it.**

3            Q.    There's an additional ten factors, right --

4            A.    **Uh-huh.**

5            Q.    -- do you see that?

6                  Are you aware that those are factors that

7    are supposed to be considered?

8            A.    **Yes, ma'am.**

9            Q.    Okay.  Is it --

10           A.    **These first five obviously came out of the**

11   **Senate bill correct.**

12           Q.    This is all Senate Bill 590.

13           A.    **Right, uh-huh.**

14           Q.    Okay.  And so the question I was asking --

15           A.    **Do we take into consideration these other**

16   **factors?**

17           Q.    That's essentially what I was getting at.

18   And the way I was doing it was saying, is this sheet

19   the only sheet you refer to when you're trying to

20   ensure compliance with Senate Bill 590?

21           A.    **At the hearing.  But we also take into**

22   **consideration obviously some of these other factors**

23   **involved in that too.**

24           Q.    Where is that reflected?

25           A.    **Right here.  (The witness indicated.)  I**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 150 of 258

1    mean, we take into consideration, you know, the

2    defendants participate in the offense. All these

3    things are taken into consideration during the hearing.

4    Maybe not directly.

5         Q.   When you say "not directly," how else would

6    it be taken --

7         A.   I mean, it usually comes out in the

8    hearing. Most all of this stuff, now that I get to

9    reading it, you know.

10        Q.   Okay.

11        A.   Most all of these -- what's it, nine of

12   them -- eight, nine of them?

13        Q.   Ten --

14        A.   They generally all come out at some point

15   in time during the hearing.

16        Q.   Okay.

17        A.   One way or another.

18        Q.   Okay. So --

19        A.   When we talk to them, you know, if they had

20   a bad childhood, brought up -- you know, that's one

21   example.

22        Q.   Okay.

23        A.   You had a rough life, you know, growing up.

24   We understand that. And it's unfortunate and -- it is

25   unfortunate, by the way.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 151 of 258

 1              But at some point in time, all these are

 2    more than likely covered in the hearing --

 3         Q.   And --

 4         A.   -- even though they're not laid out on this

 5    particular sheet.

 6         Q.   Okay.  Is it memorialized in a writing

 7    anywhere else?

 8         A.   These nine (indicating).

 9         Q.   What you learned about those nine factors

10    at the hearing.

11         A.   Is it in a -- is it on a sheet like this

12    (indicating?)  Not to my knowledge.

13         Q.   Anything that is put on paper and then

14    given to the next member who's voting?

15         A.   Not to my knowledge.  These nine -- these

16    nine particular ones.

17         Q.   Okay.  And how does one -- like, for

18    example, No. 3, the defendant's age, maturity,

19    intellectual capacity, mental and emotional health and

20    development at the time of the offense; how do you get

21    at that?

22         A.   You can usually tell by talking with an

23    offender.  Usually we also have -- you can usually tell

24    if they've matured during their time while they're

25    incarcerated just by talking with them in their -- in

Pohlman USA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 152 of 258

1  their capacity, intellectually and this indicates.  And

2  sometimes the mental issue comes in.  Some of them may

3  be -- we have different mental levels; one through

4  four.

5        You can usually get this from the defendant

6  by talking to them.  Or offender.  Excuse me.

7        Q.   No. 3 three deals with those "at the time

8  of the offense," right?

9        A.   Yes.

10       Q.   So you would have -- you would have to ask

11  them or get information about their childhood

12  that -- at that time when the offense was committed,

13  correct?

14       A.   Uh-huh.

15       Q.   Okay.

16       A.   And that happens.

17       Q.   And you -- and that happens.

18       A.   That happens.  I mean, I'm not going to say

19  it happens 100 percent of the time, but 99 percent of

20  the time it does, you know.

21       Q.   Uh-huh.

22       A.   Not be -- some reason -- like I said,

23  humans make errors, you know.  It might have been

24  overlooked.  But generally all of this information

25  comes out for the most part during the hearing.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 153 of 258

1      Q.    Do you ask questions specifically designed

2   to get at that information?

3      **A.    Sometimes.**

4      Q.    Okay.  Can you give me an example of a

5   question you would ask?

6      **A.    In regard to one of these factors?**

7      Q.    No. 3?

8      **A.    No. 3.  Well --**

9      Q.    I mean, other than obviously how old are

10   you.  I mean, that's kind of objective.

11          But their maturity and their intellectual

12   capacity, mental and emotional health at the time that

13   they committed the offense.  How do you -- how do you

14   get --

15      **A.    It's hard to explain that.  But you can**

16   **generally tell by talking with an offender as to, you**

17   **know, how these -- how these things relate to what's**

18   **going on.**

19          **This has a subsection.  I can just tell you**

20   **that these factors do come out, in No. 3, you know.**

21          **You talk to them about how old were you at**

22   **the age -- when the crime was committed.  They**

23   **obviously tell you that.**

24          **Were you still in school?  Do you feel like**

25   **you were, you know, getting the right -- learning the**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 154 of 258

1  right habits growing up at home?

2        Did you have a mother and father with you?

3  How far did you get in school?

4        Intellectual capacity.  You can usually

5  tell by talking to the folks.

6        And if they had any problems emotionally

7  while they're growing up.  There's a whole bunch of

8  things.  All that, for the most part, comes out.

9        Q.   So are those questions that you typically

10  ask?

11        A.   Just about in every hearing, you know.

12  Just about -- besides these (indicating.)  You know,

13  you go over their childhood.  How far they went in

14  school.  And why they dropped out of school.  All kinds

15  of things.  You can bring a lot of this stuff out.

16        Q.   Earlier we were talking about the training

17  that you received, and you said you hadn't received --

18  you can't remember any training about psychology?

19        A.   Other than college.  I think I had a

20  college course or something in college.

21        Q.   Have you had any --

22        A.   I believe.  It's been a long time ago.

23        Q.   Have you had any training about childhood

24  psychology?

25        A.   Not specifically, I don't think.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 155 of 258

1    The one -- if I can go to No. 6, the extent

2  of defendant's participation in the offense.  The

3  reports bring that out.  And we discuss all that with

4  them.  I think all this stuff is -- when I say the

5  amount -- all this stuff, in one way or another, comes

6  out in some shape or form during a hearing.

7         Q.   The effects of familial pressure or peer

8  pressure on the defendant's actions, that normally

9  comes out?

10        A.   Which one is that?

11        Q.   Seven?

12        A.   Yeah.  That comes out.  Sometimes they

13  don't participate directly in a crime.

14             Yeah, that comes out.  I think all this

15  stuff comes out at some point in time in the hearing.

16        Q.   What about No. 9, the effects of

17  characteristics attributable to the defendant's youth

18  or the defendant's judgment?

19        A.   I think that probably comes out, too.

20        Q.   How?

21        A.   Well, the fact is that you were young, you

22  know.  I don't know.  It all comes out when you

23  interview someone.  They were young at the time.  And I

24  get all that.  And they may not have been using their

25  best judgment at the time.  And usually that's brought

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 156 of 258

1  up in some -- you know, in the ones that I've

2  conducted.  You probably wasn't thinking right when you

3  did that.  Is it because of your age, perhaps, you

4  know.

5       Q.   Well, do you get into specific

6  characteristics about the specific inmate?  Right?  Not

7  just, well, you were young, therefore...

8       A.   We go over the ramifications of the case.

9  What occurred.

10       Q.   Well, I understand that.  As far as, like,

11  the nature of the offense.  But I'm talking about the

12  nature that that child's life, up until that point in

13  time, the familial pressure, the -- any abuse that they

14  endured, the maturity, does that come out?

15       A.   I think it does overall, speaking --

16  speaking in general terms.  I really do.

17       Q.   Okay.

18       A.   About all of those.

19       Q.   Okay.  So we were looking at Exhibit 5.  So

20  on the second page --

21       A.   Of Exhibit 5?

22       Q.   Yeah.  Where it's marked, like, reasons for

23  decision above guidelines.

24       A.   Where we at here?  I can't --

25       Q.   Um, it --

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 157 of 258

 1          A.    Oh, on the other sheet.   I was on the wrong

 2    one.   Circumstances surrounding the present offense.

 3          Q.    Like who --

 4          A.    Who checked that?

 5          Q.    Yeah.

 6          A.    I can tell you who checked -- I did not

 7    check that personally.   That was checked by the

 8    analyst.

 9          Q.    At what point in time was that checked?

10          A.    At the hearing, more than likely.

11          Q.    Okay.  So --

12          A.    I'm trying figure out who the analyst was,

13    but I can't tell you.

14          Q.    So I'm trying to understand, like, the

15    board members are the ones whose vote count, correct?

16          A.    Uh-huh.  I mean, we conferred on that.  I

17    mean, he or she would say, we're going to check "A" as

18    the present offense.  Is that okay with everybody?

19          Q.    When you say "we conferred," you're talking

20    about the panelists?

21          A.    The analyst and the other analyst.

22          Q.    Right, but --

23          A.    The -- go ahead.

24          Q.    I'm sorry.  When the other two members

25    vote, █████████████, right, when they got this

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 158 of 258

1  sheet, were those two marked "circumstances surrounding

2  the present offense" and "poor institutional

3  adjustment," were those two marked when they got --

4      **A.    They should have been.**

5      Q.    Okay.  And --

6      **A.    I'm sure they were.**

7      Q.    And are they voting to say yes, they agree

8  with everything?  They -- they agree that those are the

9  reasons --

10     **A.    I can't put myself in their minds and their**

11  **head.  I assume that --**

12     Q.    And that's what I'm trying to understand.

13  Like, when their vote -- is everybody agreeing on the

14  reason why it's being denied?

15     **A.    I would say yes.**

16     Q.    When you get a form from a panel that you

17  weren't on to vote and that's filled out, are you

18  looking at this second page to see what was marked in

19  determining whether or not you agree?

20     **A.    Yes.**

21     Q.    Okay.  Are there occasions when you don't

22  agree?

23     **A.    There's not been many.  I'll just put it**

24  **that way.  Because I can go back and look at the report**

25  **and understand why they've been checked.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL    Document 134-14    Filed 06/12/18    Page 159 of 258

1    Q.   You talked a little bit about post-hearing,

2  how the panel members have a conversation about the

3  hearing; is that correct?

4    **A.   Yes, ma'am.**

5    Q.   About how long do you-all talk about the

6  hearing?

7    **A.   Right after the immediate hearing?**

8    Q.   Uh-huh.

9    **A.   Not very long.  Probably no more than ten**

10 **minutes.  Five -- I guess, average, five minutes.**

11   Q.   And for the juvenile --

12   **A.   For the most part, yeah.**

13   Q.   And for the 590 hearings?

14   **A.   Longer.**

15   Q.   What do you talk about?

16   **A.   We talk about the case and the conduct, and**

17 **everything in general involving the offender.**

18   Q.   Do you-all go over the factors?  The Miller

19 factors?

20   **A.   On these, yes.  We make sure they've been**

21 **covered.  We feel comfortable that we've covered them**

22 **in the hearing.**

23   Q.   Right.  And, again, that's making sure

24 these -- the factors on Exhibit 1 have been covered?

25   **A.   Yes, ma'am.**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 160 of 258

1      Q.    Do you -- do all the people who are

2   voting -- so if I understand you correct -- you get the

3   parole file the first time when you show up at the

4   hearing, correct?

5      **A.    Yes, ma'am.**

6      Q.    And you review the ones that you're

7   leading.  And then at some point, you give it to the

8   next person on the panel?

9      **A.    No.  We have an extra copy for each person.**

10     Q.    Oh, okay.  Okay.  So do all of the people

11  on the panel review the entire parole file before they

12  vote?

13     **A.    They won't have the actual hard file, but**

14  **they'll have the prehearing report.**

15     Q.    Okay.

16     **A.    And if they want to look through that file,**

17  **they can obviously.  Whoever is doing the interview has**

18  **the hard file.  What I mean by the --**

19     Q.    Okay.  So when you say they all have a

20  copy, you're just talking about a copy of the

21  prehearing report?

22     **A.    Prehearing report.**

23     Q.    What about letters of recommendation?

24     **A.    And they would have that too.  Or be made**

25  **aware of it.  If it's in the -- usually whoever is**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 161 of 258

1  conducting the hearing would say there's letters on

2  behalf of the offender from Joe Blow and Susie Smith.

3      Q.   So my question is, before the panel members

4  vote on that BAS, have they read the entire parole

5  file?

6      A.   Everything that's in there?

7      Q.   Yes.

8      A.   In the folder part?

9      Q.   The entire file -- you know, I don't want

10 to split hairs, right.  Because I know that they could

11 be thick, right?  They can have -- they have far more

12 in there than just the parole hearing report.

13     A.   Right.

14     Q.   Okay.  So I want -- my question is, have

15 they read the whole file before they vote?

16     A.   They've read the prehearing report and any

17 information they want to take from the file; they take

18 the file and look at it theirselves.  There's a lot of

19 stuff in there.

20     Q.   Right.  But the prehearing report --

21     A.   I'm not going to say they read every

22 document in there.

23     Q.   The prehearing report doesn't itemize

24 everything in the parole file, correct?

25     A.   No.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 162 of 258

1     Q.   So --

2     **A.**   **Not every document.**

3     Q.   How would an individual analyst on a panel

4 know that there's 12 letters of recommendation in a

5 file without going through the file?

6     **A.**   **You're usually told by the -- whoever the**

7 **interviewer is.  Just to let the panel know you've got**

8 **to have letters from -- like I said earlier, Susan**

9 **Smith, Joe Jackson, on behalf of the offender.**

10    Q.   So are those read before voting?

11    **A.**   **Not always.  They're aware of them.**

12 **They're not read in detail.**

13    Q.   So there's no requirement that that

14 information be read before voting?

15    **A.**   **To my knowledge -- I don't know what you**

16 **mean by "requirement."  There's not -- I've never seen**

17 **written down that everybody has to read each and every**

18 **word of a letter on behalf of the offender.  At some**

19 **point in time, they do.  They can read them if they**

20 **choose to at the hearing before we make a decision.**

21    Q.   Right.  So --

22    **A.**   **But we make them aware of the letters.**

23    Q.   But isn't the relevant time to read the

24 contents of the file, in particular letters of

25 recommendation, before voting?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 163 of 258

1      A.    They're made -- yes.

2      Q.    Okay.

3      A.    But they're made aware of those letters in

4   the file.

5      Q.    And then they choose whether or not they

6   want to read them?

7      A.    Right.

8      Q.    Okay.  What is your practice?  Do you

9   read --

10      A.    I try and read them.  I scan them.  Read

11   the heart of the letters.  And use it for the offender.

12   Find out how they're related, and who they're related

13   to and why they're -- you know.  Sometimes you can have

14   a file with 17 letters in it, you know.

15      Q.    Do you distinguish between letters of

16   recommendation and other letters that deal with, this

17   individual will have a position, a job, upon release or

18   a letter that's dealing with an actual innocence claim?

19   Do you treat those any differently than --

20      A.    No.  I treat them all the same.

21      Q.    So when you -- when you --

22      A.    Try to be fair to everybody.

23      Q.    All right.  Okay.  So when you tell an

24   analyst there's letters of recommendation in the file,

25   is that a general term to include letters that --

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 164 of 258

1      **A.   I'll usually push them over.  And if they,**

2  **you know, they know they exist.  If they want to take**

3  **the time to read them at that time, they can do so.**

4      Q.   And I -- and I can appreciate that.  But

5  what I'm getting at is, do you signal, hey, there's --

6  there's a letter in here about actual innocence.

7      **A.   Do I signal?  No.**

8      Q.   Okay.  You just say, here's some letters

9  that are in the file?

10     **A.   Right.  Yeah.**

11     Q.   And you don't -- you can't sit here today

12  and say definitively that all the panel members have

13  read the entire file before they vote?  They --

14     **A.   The entire file?**

15     Q.   Yes.  Yes.

16     **A.   No.**

17     Q.   Or any percentage of the file, you -- it's

18  your understanding that they have the parole hearing

19  report, right?  But beyond that, you don't know what

20  they've read?

21     **A.   Well, I can assume that the person at the**

22  **institution has gone back and -- they could have gone**

23  **back and looked at these reports in the computer**

24  **before.  I don't know that.**

25     Q.   Have they ever indicated that --

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 165 of 258

1     A.    Maybe -- usually the analyst has not looked

2  at them either that I'm aware of.

3     Q.    Has the director ever indicated that

4  they've reviewed the file before the hearing?

5     A.    Not to my knowledge.

6     Q.    And the prehearing report is prepared by

7  the IPO, correct?

8     A.    For the most part.  It's my understanding.

9     Q.    Do you ever review any underlying documents

10 that the IPO may have relied upon in preparing the

11 prehearing report?

12    A.    No.  I don't think so.  Maybe I don't

13 understand your question.

14    Q.    Well, to the extent that they are

15 relating or -- referring to other reports that are in

16 the file, because we talked about --

17    A.    Oh.

18    Q.    Do you ever, you know, go through all

19 those?

20    A.    Letters and whatever?

21    Q.    Well, all the -- all the individual things

22 in the parole file.

23    A.    At the time of the hearing?

24    Q.    Uh-huh.

25    A.    They're at least scanned, you know.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 166 of 258

1          Q.   How much weight do you give to --

2          A.   Some of those are unnecessary to do the

3     hearing with.  I'll just put it that way.  Some things

4     in the file you don't really need to conduct an

5     appropriate hearing.

6          Q.   Okay.  Like what?

7          A.   I don't know.  You got me.  But I know

8     there is.  There's so many things in all those files.

9               A lot of times they'll put -- the analyst

10    will have a -- the sentence and judgment, whatever you

11    call it legally.

12         Q.   Uh-huh.

13         A.   And you know they're in there, but you

14    don't look at them unless there's a restitution.

15    That's one of the stipulations for parole is release,

16    and you go back and look at that and see how much it is

17    and make them aware that they -- you know, one of the

18    stipulations for parole is you have to pay back $1400.

19    Do you understand that.  You know.

20              But I don't usually look at that particular

21    document in detail until I feel it's necessary.

22         Q.   Okay.

23         A.   Because I see it's part of the stipulations

24    of parole.

25         Q.   Have there been occasions where a file in

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 167 of 258

1    one of the 590 hearings had a letter from an expert

2    regarding some of the Miller factors?

3         A.    I don't remember.

4         Q.    Would you give any additional weight -- or

5    what weight would you give an expert report that speaks

6    to the Miller factors?

7         A.    I would read it in detail and give it what

8    it deserves.

9         Q.    Would you give it any more weight than a

10   letter of a recommendation from a family member?

11        A.    Of the offender?

12        Q.    Uh-huh.

13        A.    I would try and treat them both the same,

14   equal.  And I think probably if the person was a

15   professional, they probably should know a little bit

16   better than the family member.  If that's their line of

17   work, per se.

18        Q.    Are you aware of any expert reports being

19   presented at any of the 590 hearings?

20        A.    I don't remember.  I don't know for sure.

21        Q.    Does the board meet regularly?

22        A.    We have a monthly board meeting.

23        Q.    Do you-all discuss issues that have come up

24   in specific hearings?

25        A.    Sometimes.  As I told you earlier on, we --

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 168 of 258

1    sometimes we'll hand walk a file to another board

2    member, as to why we're doing the release, if it's a

3    violent crime.  And try to let them know why we did

4    this and why we felt like they should be released.  But

5    they don't have to agree with us though.

6          Q.   Have there been occasions where you-all

7    have discussed the 590 hearings?

8          A.   Just in passing.

9          Q.   So it's not --

10         A.   The individual hearings?

11         Q.   Well, I mean, issues that are arising, the

12   Miller factors, the type of --

13         A.   Yeah, I mean, in general office talk.

14   Speaking -- you know, but we've not had a meeting that

15   I can recall involving that particular issue.

16         Q.   I'm trying to get a sense of what the

17   members, if anything, are discussing amongst themselves

18   about these 590 hearings.

19              Are you aware of any expert --

20         A.   I don't think we've had a direct meeting

21   where the parole board members have got in a room and

22   just talked about -- about that particular issue.  We

23   might have office talk where I -- where I had a

24   juvenile without life hearing today -- without parole

25   hearing today, but no details.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 169 of 258

1        Q.    And I'm not getting at that -- the fact

2    that it occurs.  But how it's occurring and any issues

3    that are coming up in those hearings, are you talking

4    about --

5        **A.    No.  Not really.  Generally speaking.**

6        Q.    Is it your opinion that these hearings are

7    pretty much similar to the other parole hearings you're

8    doing?

9        **A.    I put a little more -- I put -- I**

10   **shouldn't -- I'll put effort into everything, but I put**

11   **a little more effort into those hearings, I think, than**

12   **I do the others.**

13       Q.    But is it -- is it presenting -- are they

14   presenting any additional challenges for you-all as the

15   board?

16       **A.    No, not personally.**

17       Q.    So the board feels like it's equipped to

18   handle these?

19       **A.    I have no doubt about that.**

20       Q.    Okay.  And why is that?

21       **A.    Because I know all the board members.  And**

22   **they're all fair-minded people.  And they'll do the**

23   **right thing in all their decisions.**

24       Q.    Is that the sole reason why you think

25   you-all are equipped, because you-all are doing

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 170 of 258

1    the -- you are committed to doing the right thing?

2          A.    That's a good reason to.

3          Q.    I understand that, but any other reason?

4          A.    There's other factors, you know.  The

5    person that you're dealing with, they're human beings,

6    you know.  You want to give them the benefit of any

7    doubts.  You know, if we feel like they're not a risk

8    to the community, and it's fair to let them go, we'll

9    do that if everything's in place.

10                You know the board -- can I make a comment?

11         Q.    Yes.

12         A.    The parole board has a lot of

13   responsibility that the public doesn't realize.  And

14   that's why -- we deal in risk every day.  And then

15   we're fair to everybody.  Everybody -- it will be these

16   offenders, or anybody else that comes before the board.

17   I have no doubt about that, so ...  but that's what we

18   deal with is risk to the community and to the public.

19         Q.    And I am not trying to suggest that the

20   board isn't doing that.

21                My question is that Miller requires

22   analysis of certain factors that get into the

23   psychological development of children, and I am asking

24   about the board's ability to analyze the factors that

25   are required under --

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 171 of 258

1    **A.    I think everyone on the board has the**
2    **capability and the education to analyze all those**
3    **factors.**
4    Q.    When you say "the education," do you mean
5    generally because they're educated people?  Or because
6    they have training in psychology and childhood
7    psychology?
8    **A.    None of us are psychiatrists and whatever.**
9    Q.    Okay.  So I guess what -- I'm just trying
10   to understand.  Separate and apart from being
11   well-intended, educated individuals who are committed
12   to doing their job, do they have something in addition
13   to that that makes them qualified to do some of the
14   psychological analysis that's required under 590?
15   **A.    I'm not a psychiatrist.  But I'm saying**
16   **that experience in life attributes to a lot of the**
17   **decisions.  And relating to people.**
18   Q.    Okay.  How do you-all determine the
19   rehearing date?
20   **A.    Well, you can only go out five years.  And**
21   **I guess that's a -- that's someplace -- that's in one**
22   **of the policies.  I've never seen it personally.  We**
23   **can go out as far as five years to re-hear.  Then on**
24   **down two to five, four, three or two.**
25   Q.    So what does --

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 172 of 258

1      A.    That's just been the policy since I've been

2  here.

3      Q.    So they can get a rehearing date between

4  two and five years?

5      A.    Correct.

6      Q.    What warrants a two-year rehearing date?

7      A.    Say that again.

8      Q.    Under what circumstances would you give a

9  two-year rehearing date?

10     A.    Probably the behavior.  The seriousness of

11 the crime.  I mean, if they've done pretty well in

12 prison.

13           This one here that you're talking about,

14 obviously the seriousness of the crime was taken into

15 consideration.  Someone lost their life.  And the

16 behavior was taken.

17     Q.    So does that mean --

18     A.    Into consideration.

19     Q.    What's the difference between a two-year

20 rehearing date and a five-year rehearing date?

21     A.    Well, there's a lot of factors that go into

22 that.  I guess discipline/conduct, and the seriousness

23 of the crime, as I just indicated.

24     Q.    Uh-huh.

25     A.    Programs, what programs are they taking,

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 173 of 258

1    other than being rehabilitated.

2              There's a number of factors that would go

3    into that.  Is their conduct better than it was the

4    last time when we gave them -- you know, are they

5    improving their conduct.  There's a zillion factors.

6         Q.   Is any factor given more weight than

7    another?

8         A.   Well, obviously we -- no.  Probably not.

9    Probably equal.  For the most part.

10        Q.   What's considered poor conduct?

11        A.   To get lots of violations in a short period

12   of time.  And seriousness of the violations.

13        Q.   What's considered a lot of violations?

14        A.   I guess that's in the eyes of the beholder

15   sometimes.

16             I would say if you had more than four or

17   five violations within a year, that's -- you'd have a

18   conduct problem.  And it depends on how serious those

19   violations are.  There's so many scenarios here, you

20   know.

21        Q.   Fair enough.

22             So if someone had -- you know -- who's been

23   in prison for 30 years, has 30 violations, is that

24   number in and of itself a lot or it just depends on --

25        A.   Thirty years, thirty violations?  I

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 174 of 258

1    guess -- again, it depends upon the eyes of the

2    beholder.

3        Q.    Uh-huh.

4        A.    I've seen offenders that's been in for

5    35 years, had zero violations; and I've seen offenders

6    that's been in for 1 or 2 years, had 40 violations.

7    You know?

8        Q.    Uh-huh.

9        A.    So every case is different.

10       Q.    So do the board members have any uniformity

11   in determining what's considered poor conduct?

12       A.    No, I don't think there's anything written

13   down on paper.

14       Q.    So what you consider poor conduct, may not

15   be considered poor conduct by one of your fellow board

16   members?

17       A.    I can assume that.  And that's why

18   everybody looks at it.  Everybody has a chance to look

19   at the file.

20       Q.    So we talked about the different factors

21   that are considered, the seriousness of the crime,

22   conduct, programs completed.  Can you think of anything

23   else?

24       A.    Me?

25       Q.    Yes.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 175 of 258

1       A.   No.  No, ma'am.

2       Q.   But there could be?

3       A.   There could be.

4       Q.   How often are you giving someone a

5   five-year setback?

6       A.   Again, that depends upon the workload, the

7   caseload, the number of cases that you see in a certain

8   period of time.  I don't know -- I don't understand the

9   word "often," I guess.

10      Q.   Do you have a default?  Do you start with

11  five?  Do you start with two?

12      A.   Depends upon the seriousness of the crime

13  I'd say.

14      Q.   Okay.  So for --

15      A.   It might be if you had a drug charge, you

16  know -- well, probably wouldn't have a drug charge.

17  Could have.  I mean, there's -- I -- there's not a

18  barometer for that, I guess, is the best way to put it.

19      Q.   So for these juvenile life without parole

20  people --

21      A.   Uh-huh.

22      Q.   -- do they start with a five?

23      A.   Do they start with a five?  I wouldn't

24  necessarily say that.  It depends upon the case.  We

25  might want to re-hear them in three.  It depends --

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 176 of 258

1   there's so many scenarios and so many factors in each

2   case.

3       Q.   Does the board have to agree on the

4   rehearing date?  Like, how do you-all -- how does that

5   get set?  What if one thinks two, one thinks three, one

6   thinks four?

7       A.   They can go back on this sheet and put

8   three years and three years.

9       Q.   So the --

10      A.   And then majority would rule.

11      Q.   The majority rules?

12      A.   Uh-huh.

13      Q.   Okay.

14      A.    If that's what the -- if that's what the

15  final decision -- I mean, if that's what the board

16  determines.  Majority rules.

17      Q.   And so would that require four votes every

18  hearing date?

19      A.   Uh-huh.

20      Q.   Okay.

21      A.    It could be three -- you know, if I put --

22  like on this one, five years, somebody else puts down

23  12 of, what, '19, three years, so whatever it is.

24  12/18, I guess.  It would be a three -- three years.

25      Q.   Okay.  How much weight is given to the

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 177 of 258

1   IPO's recommendation in the prehearing report?

2       A.   I, personally?  I see what their

3   recommendation is.  I can't speak for every board

4   member.  Sometimes I agree with it.  Sometimes I don't.

5       Q.   How often do you agree with it?

6       A.   I hate to put a number on that.  I'm not

7   sure.  I agree with it quite often, but not all --

8   60 percent of the time.  I don't know.

9       Q.   Okay.

10      A.   It's hard to give you -- we hear so many

11   cases.

12      Q.   Well -- and I'm -- I'm referring to

13   agreement with parole or not parole.  Not necessarily

14   rehearing date, but parole or not parole.

15      A.   Right.  Right.  Often that's -- often

16   that's where the -- if the IPO says -- gives a date and

17   we look at the guidelines and we make a determination,

18   "we," being the board, we may not all agree.  You know.

19   The analyst may give us reason to say we -- you know,

20   look at this and look at this.  You know.  Whatever.

21   Guideline dates.

22           There's a -- there's a lot of

23   decision-making that goes into that too.  But I don't

24   always agree with the IPO's recommendation, if that's

25   your question.  And the percentage is probably --

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 178 of 258

1    probably at least 50 percent of the time I do, but not

2    always.  And we can have disagreements among the three

3    of us.  And the board could end up agreeing with the

4    analyst over me with that recommendation.  If they want

5    to.  If he has a different date.

6         Q.   What about in the context of these 509

7    hearings?  How often do you-all agree with the IPO's

8    recommendation?

9         A.   No, I've only done -- been around two or

10   three of them.  I don't know if we went with the

11   recommendation of the IPO on all those or not to tell

12   you the truth.

13        Q.   Are you aware of any 590 hearings, ones you

14   were involved in or not, where they didn't go with what

15   the IPO recommended?

16        A.   I'm not aware.

17             Sometimes I'll never -- sometimes you never

18   see a file.  If it gets to the board before it gets to

19   me.  You understand what I'm saying?

20        Q.   Yes.

21        A.   So that's -- I'm not aware.

22        Q.   About how long does it take to make it

23   through that process to get all the votes from the

24   other board members needed to finalize?

25        A.   We tell the offender -- and I don't think

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 179 of 258

1  it takes us long normally.  We tell the offender that

2  you'll hear something back in about six to eight weeks.

3  Gives us some leeway.  Generally I would say -- and I

4  don't know this for a fact, but they probably hear back

5  within a month.  I'm guessing.  But we tell the

6  offender, you'll hear something back in about six to

7  eight weeks as to your hearing.

8         Q.   So what happens after it's finalized?

9  Where's does the file and the paper go?  How is that

10  communicated to the -- to the inmate?

11        A.   One of the girls that handles the file --

12  there's so many of them back there.  Once there's a

13  decision made, they find out the decision.  They get

14  ahold of the IPO.  I think.  I'm not for sure about

15  this.  They get ahold of the IPO at the institution.

16  And they tell her -- he or she what the hearing results

17  were.  And at some point in time within the next week

18  or two, they call the offender out to their office and

19  give them the decision.  That's my understanding of the

20  process.

21        Q.   Okay.  It's your understanding that the

22  offender is given the paper in person?

23        A.   I don't know what -- I don't know what

24  paperwork they get.

25        Q.   Okay.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 180 of 258

1      A.    But they're told what the results of the
2  hearing were.  I can't tell you that.
3      Q.    Do they have any -- is there any grievance
4  process that an inmate can go through if they're not
5  satisfied with the decision?
6      A.    Well, yeah, oftentimes they can send in --
7  then they'll agree -- I've not seen too many of them,
8  but they can send in a complaint, I guess is what you
9  want to say, as to the hearing results.  And there's a
10 word for that.  And I drew -- drew a blank.  I
11 apologize.
12     Q.    There's no right to formally appeal it,
13 correct?
14     A.    They can -- they can appeal.  Yeah, there's
15 an appeal form.  They all have the right to appeal.
16 And it will come back before the board.  And they'll
17 put on there why -- what they're appealing.  What the
18 institute -- why they're appealing something.  And like
19 I said, if they felt like they got too much time or
20 whatever -- there's other appeals that come through
21 there too.
22     Q.    So there's a form that's available for an
23 inmate to complete to appeal?
24     A.    He or she can fill that out and send in an
25 appeal.  Not just about that particular reason.  There

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 181 of 258

1  could be other reasons also; that their guidelines are

2  wrong.  They feel like they got -- there's a lot --

3  numerous factors they can send in an appeal on.

4       Q.  So if they think it was a calculation

5  error --

6       A.  Yes.  They can send in appeal and say, I

7  think the numbers are wrong.  It should be my outdate

8  or guideline date, CR date, whatever.

9       Q.  Uh-huh.

10      A.  There's -- they can -- they can appeal for

11  a lot of reasons.  They want to go back to be with

12  their family, which I understand, you know.  They have

13  a lot reasons they can appeal.  They can appeal before

14  a hearing too or after, you know.  There's a lot of

15  circumstances.

16      Q.  Where's does that appeal form go?

17      A.  Where does it go?  The institution gets it

18  to us and we get in -- put in their file and it goes to

19  the board.

20      Q.  So you review all appeals?

21      A.  And that's a majority too.  Board -- yes.

22  But there's a lot of different reasons that they can

23  appeal something.  I mean, there's a lot of things that

24  they can appeal.

25      Q.  So when you say it's a majority vote on the

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 182 of 258

1  appeal --

2       **A.**   **Same as a hearing.**

3       Q.   So the form comes in.  Do you-all need to

4  talk about appeals?  Is it put on your shelf?  Like,

5  how does it get voted --

6       **A.**   **It's put on our shelf, and we pass it on**

7  **just like any other hearing.  And read.  Read what the**

8  **appeal is.  And read the file.  See what's going on.**

9  **And either grant the -- grant or deny.  You know.  It's**

10  **usually for minor things though.  You know.  I mean,**

11  **there could be any number of reasons.  Like I said, if**

12  **they want to go home.  They have a sick parent at home.**

13  **They feel like they should be released.**

14       Q.   Uh-huh.  So --

15       **A.**   **Any number of things you can get an --**

16       Q.   So it doesn't have to be an established

17  ground for requesting an appeal.  It can just be like,

18  I'm unhappy with your decision?

19       **A.**   **Being incarcerated, I guess.**

20       Q.   Uh-huh.  And you-all will review all of

21  those?

22       **A.**   **Correct.  I mean, they fill out the form**

23  **theirself.  The offender does.**

24       Q.   Okay.  Have you-all gotten any appeals from

25  juvenile life without parole people?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 183 of 258

1      A.    Not to my knowledge, but I don't know.  I

2   don't know.

3      Q.    And when we talk about appeal, the appeal

4   is limited to a second review at the board, correct?

5   We're not talking about a court judicial review?

6      A.    Right.

7      Q.    Okay.

8      A.    That they don't agree with the finding.

9            Most of them are for minor things, these

10   appeals.  I consider them minor.  And I'm sure they

11   don't.  'Cause I'm not the one incarcerated.  But, you

12   know, most of them are -- they don't agree with what

13   the board's decision was.  Or -- or they have some

14   other problems.  There's multi numbers of reasons they

15   could appeal -- send an appeal to the board.

16      Q.    How often is an appeal granted, let's say?

17      A.    I can't answer that.  I don't know.

18   Sometimes I never see the final on any of these.

19      Q.    Do they appeal rehearing dates?

20      A.    I've not ever seen one, no.  To my

21   knowledge.

22      Q.    Are you aware of any misconduct occurring

23   during parole hearings from the panel members?

24      A.    Could you repeat that.

25      Q.    Are you aware of any misconduct on behalf

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 184 of 258

1    of the panel members during parole hearings?

2         A.   No.  Other than the deal that one of them

3    was dismissed for it.  I heard about it later, after

4    the fact.

5         Q.   Uh-huh.

6         A.   I guess that's -- I assume that's what

7    you're alluding to.

8         Q.   Well, that would be included, but I'm just

9    saying any --

10        A.   No.

11        Q.   Okay.  Were you ever involved in any of

12   those hearings where that conduct occurred?

13        A.   No.

14        Q.   And just for the record, who are you

15   referring to when you say that individual?

16        A.   Mr. Ruzicka, I guess.

17        Q.   Okay.

18        A.   Yes.  Mr. Ruzicka.

19        Q.   Have you heard of any parole -- any parole

20   board members or panel members saying any offensive

21   things during hearings?

22        A.   No.  What do you mean by "offensive?"  To

23   who?

24        Q.   To an inmate about an inmate, you know,

25   during the hearing?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 185 of 258

1    A.   No.

2    Q.   Okay.

3    A.   I know the analysts, or the IPOs, or the

4  district administrator's accused me of that.  They've

5  never -- that's -- there's usually only one member

6  there, you know, board member.  You asked me about

7  other board members.  I'm not aware of it.

8    Q.   Have you ever used the term "terrorist" to

9  describe an inmate?

10   A.   Have I?

11   Q.   Uh-huh.

12   A.   Ever used the term terrorist?  I'll tell

13 what I did -- what did happen.  There was a guy that --

14 after the hearing was over, not in front of him -- and

15 it was only in -- in joking.  Of course, nowadays you

16 can't say anything.  It's all too serious.  There was a

17 guy that just took up Islam faith.  And after his

18 hearing was over, he wasn't in the room or around and

19 I -- jokingly I looked to the analyst and I said, I

20 hope he doesn't become a terrorist.  I said that.

21 Yeah.

22   Q.   So who heard you say that?

23   A.   Just the people in the room.

24   Q.   Who were they?

25   A.   Only in joking.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 186 of 258

1      Q.    Like, who were the, like, the analyst and

2  the victim --

3      **A.    No, the victim -- there was nobody else in**

4  **the room but the three of us.**

5      Q.    So just the panel members were there?

6      **A.    Yes, ma'am.**

7      Q.    When you say the three of us, you're

8  talking about the three panel members?

9      **A.    Yes.   I'm trying to be honest with you**

10  **about that, okay.**

11     Q.    No, no, I'm just --

12     **A.    I did make that statement.   I'll tell you**

13  **anything I've done.   And it was only a joke at the**

14  **time.**

15     Q.    Uh-huh.   Are you aware of any public

16  complaints that have been made about the 590 parole

17  hearings?

18     **A.    Public complaints?**

19     Q.    Uh-huh.

20     **A.    No, ma'am.**

21           MS. JONES:   Can we take a quick break.

22           (A break was taken.)

23  BY MS. JONES:

24     Q.    You were on the panel for the hearing of

25  ██████████████   --

*Pohlman USA Court Reporting*
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 187 of 258

1    A.   Yes, ma'am.

2    Q.   -- do you recall that?

3    ████    ████████████████████████████

4    ████████████████████

5    A.   Yes, ma'am.

6    Q.   Did you review any documents relating to

7    his parole hearing in preparation for today's depo?

8    A.   Yeah, I did.

9    Q.   You did?

10   A.   I had a copy of this -- no, I did not.  I

11   had a copy.  Can I look?  I can tell you.  No.  It was

12   the ████ case.

13   Q.   Okay.  Do you have any, like, recollection

14   of that hearing?

15   A.   No.  I'll be honest with you, I don't.

16   Q.   Okay.

17   A.   I can't remember what happened yesterday.

18   This was back in December of '16.

19   Q.   So you learned that you were on his panel

20   on the day of the hearing?

21   A.   Correct.

22   Q.   Which was December 13 of 2016?

23   A.   Yeah.

24   Q.   Do you know who else was on the panel?

25   A.   No.  I can't tell you who the analyst was,

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 188 of 258

1    because I can't make out his or her -- it's not her.

2    His initials.

3            Q.    ██████████████████████?

4            A.    It could be true.

5            Q.    Okay.

6            A.    But I'm not -- I'm not going to say yes.

7    That looks like that might be his initials.

8            Q.    Okay.  And the parole supervisor?

9            A.    I don't -- well, we were -- what

10   institution is that?

11           Q.    ███████   ██████████████████.

12           A.    Yeah, you're right.  That's correct.

13                 Buerck, is -- I think he pronounces it,

14   Buerck.

15           Q.    Okay.  Thank you.

16                 You were provided his parole file on that

17   day; is that correct?

18           A.    Correct.

19           Q.    And did you review that file prior to the

20   start of the hearing?

21           A.    Yes.

22           Q.    Okay.  About how much time do you think you

23   spent on that -- reviewing that file?

24           A.    I'm gonna guess 10, 15 minutes, 20 minutes.

25   No more than 20 minutes.  Probably.  Those -- those --

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 189 of 258

1  these are relatively -- not very bill files for --

2      Q.   Yeah.  I have his file.

3      A.   Not much happened.  So it doesn't take long

4  to review.  I mean, he was a juvenile.  That's why it

5  didn't take as long as normal.

6      Q.   If I represent that that's his parole file,

7  would you consider this --

8      A.   The whole parole file?

9      Q.   Uh-huh.

10     A.   It might be.  Yeah.  It could be.

11     Q.   Okay.  What do you consider that?  A lot or

12 a little?

13     A.   A little compared to some.

14     Q.   Okay.  And this is something that you could

15 get through in 20 minutes?

16     A.   I could if I looked at all the right

17 places, yeah.

18     Q.   And for the record, I'm representing the

19 documents that I printed out that were produced --

20     A.   I don't know if all those files were in

21 that file.  But I don't know.

22     Q.   Okay.  Well, I'm just basing it on all of

23 what was produced to us in the production as being part

24 of the file.

25     A.   Yeah, I assume that's what they were.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 190 of 258

1        Q.   Do you have any idea of how many hearings

2 you heard on that day?

3        **A.**   **No.**

4        Q.   Did you travel to the facility that day?

5        **A.**   **Yes.**

6        Q.   Okay.  About how --

7        **A.**   **I think so.  Let me think about that.  I'm**

8 **sure I did.  I -- I don't know.**

9        Q.   Is that one of the ones that you would do

10 the day of or the night before?

11        **A.**   **If we went down there, we probably -- if we**

12 **went down, Buerck was there.  But he could have been on**

13 **video too.  I don't remember if we traveled there or**

14 **not.  I think so though.**

15        Q.   It was an in-person hearing.

16        **A.**   **Yeah.  Well, we would have traveled there**

17 **then.**

18        Q.   Do you -- I think I just asked you this.

19 Do you know how many hearings you had on that day?

20        **A.**   **No, ma'am.  You asked me.  I'm not sure.**

21        Q.   Do you know about how long his hearing

22 lasted?  Mr. ███████?

23        **A.**   **I'm going to guess.  It's merely a guess on**

24 **my part.**

25        Q.   Uh-huh.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 191 of 258

1      A.   Thirty, twenty-eight, thirty,

2  thirty-five minutes.  Thirty minutes.  Thirty,

3  thirty-five minutes.  That's a guess only.  I don't

4  know.

5      Q.   Do you think that that's typical for the

6  590 hearings?

7      A.   Well, I don't know what's typical, because

8  I haven't done that many of them.  I don't know what

9  the average is.

10     Q.   And yesterday we produced -- we had a

11 supplemental document production.  We produced the

12 hearing transcripts.

13          MS. JONES:  Did you-all get those?

14          MR. CRANE:  Yeah.

15          MS. JONES:  And to the extent necessary, I

16 may refer to that in today's depo.

17          (Deposition Exhibit No. 6 was marked for

18 identification.)

19 BY MS. JONES:

20     Q.   I'm going to hand to you Exhibit 6, which

21 is plaintiff's Document 69 through page 118, which is a

22 transcription of the audio recording of ███████s

23 hearing.

24     A.   Uh-huh.

25     Q.   If you want to flip through those pages

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 192 of 258

1    quickly or however much time you want to spend.  I'm

2    going to ask you some things about that hearing.  And

3    maybe you can refer to the transcript as we're going

4    through the questions --

5        A.    Sure.

6        Q.    -- to refresh your recollection.

7              MR. CRANE:  Are you going to tell who the

8    names are or give him a key?

9              MS. JONES:  You know what, I didn't bring

10   the -- I have one copy, if you want to make

11   photocopies.

12       A.    This is the hearing for what, ma'am?  This

13   is the hearing for what?

14             (Deposition Exhibit No. 7 was marked for

15   identification.)

16   BY MS. JONES:

17       Q.    His parole hearing, Mr. ███████.

18       A.    I don't remember a lot of this.

19       Q.    And that's why I brought the transcript.

20       A.    So this is the hearing, the hearing that

21   was recorded on Mr. ███████?

22       Q.    Correct.

23       A.    That I participated in?

24       Q.    Correct.

25       A.    Okay.  How do you determine who is panel

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 193 of 258

1    **number one and --**

2        Q.   He's making a copy of the key?

3            MR. CRANE:  Because these normally wouldn't

4    be public, they've redacted everyone's name.

5            THE WITNESS:  Okay.

6            (An off-the-record discussion was held.)

7    BY MS. JONES:

8        Q.   My first question relates to the start of

9    the hearing.  It appears that there was some comment, a

10   statement from the ████████████ prior to the time

11   that Mr. ███████ and his delegate were brought in.

12       **A.   I don't remember the circuit attorney**

13   **thing.  They were at the hearing?**

14       Q.   Yes.

15            You'll note that on page 9, on line 8,

16   that's where they talk about -- that's when they

17   brought the offender into the room.  Him and his

18   delegate.  So you'll note that the hearing started

19   prior to the time he was brought in?

20       **A.   All right.**

21       Q.   Okay.  Do you see that the circuit attorney

22   made a statement to the board panel, let me say, before

23   he was brought in?

24       **A.   I see that.  But I'll be honest with you, I**

25   **don't remember that.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 194 of 258

1    Q.   Do you have any reason to think that that

2    is inaccurate?

3         **A.   No, ma'am.  I just don't remember it.**

4    Q.   Fair enough.

5         Is there a reason why you would allow the

6    prosecutor to speak to the panel prior to the time

7    Mr. ███████ was brought into the room?

8         **A.   I do not know that reason, and I don't**

9    **remember him being there.**

10   Q.   I'm sorry, what was the last part?  You

11   don't remember what?

12        **A.   I don't remember the circuit attorney being**

13   **there.  Obviously you say he was.**

14   Q.   The ████████████████ doesn't address the

15   590 factors in her statement; is that a fair statement?

16        **A.   Are you talking to me, ma'am?**

17   Q.   Yes.  So you'll see her statement to

18   begin --

19        **A.   Can I read that?  'Cause I don't remember**

20   **the circuit attorney being there.**

21   Q.   Yes.  It begins on page 7 at line 17.

22        **A.   ███████████   ██████████████**

23   Q.   ████

24        ██████████   ████████████   ███████████.

25        THE WITNESS:  I do not remember her being

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 195 of 258

1  there.  I apologize.

2          You said on page 7, what, please?

3  BY MS. JONES:

4      Q.   Line 7.

5      **A.   Uh-huh.  And names?**

6          MR. CRANE:  You're panel member one, for

7  the record.

8          THE WITNESS:  Okay.  Okay.

9          MR. CRANE:  If you want to -- there's a

10 copy of the key sheet.

11         THE WITNESS:  Okay.  Thank you.  Okay.

12         Page 7 you referred to?

13 BY MS. JONES:

14     Q.   Yeah.  Page 7 line 17 is where she starts

15 to make her statement.

16     **A.   I don't remember that.  I'm sorry.  If it's**

17 **so, it's so.**

18     Q.   And my question is that her statement

19 doesn't address the 590 factors?

20     **A.   ████████  ████████████  ███████████**

21 ███████████████████████████   ████████████████

22 ████████  ██████.

23     Q.   So do you agree with my summary of -- my

24 characterization that her statement doesn't address all

25 the Miller factors?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 196 of 258

1      **A.**    **Correct, I would agree with that.**

2      Q.    And by Miller factors, I mean, not to use

3  them interchangeably, but the Senate Bill 590 factors.

4      **A.**    **Right. I agree. She didn't say anything**

5  **about them.**

6      Q.    Is there a reason why she would be allowed

7  to speak before Mr. ███████ was brought into the room?

8      **A.**    **I cannot answer that for you. I guess that**

9  **was the process at the time that I was aware of.**

10     Q.    Do you know who was present in the room at

11 the time when she spoke to the panel?

12     **A.**    **Well, by looking at this, I could probably**

13 **tell you it would have been the rest of the panel.**

14     Q.    Okay.

15     **A.**    **Which was Mr.** ████████████.  **I'm**

16 **not sure if there could have been a correctional**

17 **officer in there also. It's a possibility. Or another**

18 **staff observing. They could have been in there. I**

19 **don't know.**

20     Q.    And I'll represent that there was someone

21 from the victim advocacy group, but there was no one

22 from the victim's family in the room.

23     **A.**    **Okay. I don't remember. You're saying**

24 **that there was somebody there from -- was it Kim Evans?**

25     Q.    I'm saying -- Kim Evans?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 197 of 258

1    A.    She's in charge of the victim's advocacy.

2    Q.    Right.  Well, somebody from that office was

3    there.

4    A.    Yeah, they could have been.  I don't

5    remember.

6    Q.    So you'll note on page 4, starting on line

7    24, the IPO says, "I'm not the IPO here.  And

8    Mr. ███████ likes me, too.  I mean, you're going to be

9    glad you put me here."

10    A.    Just one second.  I'm sorry.  I'm not with

11    you.  On page 4?

12    Q.    That's on page 4, like line --

13    A.    Okay.

14    Q.    It's line 24 and it goes on to the first

15    line of the next --

16    A.    And I'm panel member number one, right?

17    Q.    Yes.

18    A.    Okay.  (I don't recall that.

19    Q.    Okay.  So you don't what that --

20    A.    I don't know what that means.  No.

21    Q.    Okay.  And I believe you testified earlier

22    that IPOs are not typically at the hearing?

23    A.    Usually the district administrator is

24    there.  I mean, it can be an IPO, I guess.  I don't

25    know what the policy is on that.

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 198 of 258

1    Q.    So when you talk about --

2        **A.    Mr. ▮▮▮▮ was there.  He's the district**

3    **administrator.**

4    Q.    Okay.  So there are two then there, right,

5    Buerck and --

6        **A.    I don't remember this lady being there to**

7    **tell you the truth.**

8    Q.    Okay.

9        **A.    The IPO lady.**

10    Q.    So it's unusual to have both the district

11    manager -- supervisor and --

12        **A.    It's not the norm.  I'll just put it that**

13    **way.  That I've been involved with.**

14    Q.    Did you use -- or do you use any specific

15    document to kind of guide you through the hearing?

16        **A.    Yeah.  The prehearing report.  Correct.**

17    **For the most part.**

18    Q.    So Exhibit 8 is the prehearing report,

19    which is Bates number AGO002447 to 2454.

20        (Deposition Exhibit No. 8 was marked for

21    identification.)

22    BY MS. JONES:

23    Q.    Do you recall this report?

24        **A.    Yes.**

25    Q.    And who prepared this report?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 199 of 258

1      A.    Probation and Parole officer Miss ███,

2  and the unit supervisor is Ms. Shankle.  Probably Miss

3  Hobeck did.

4      Q.    Okay.  Do you recall that Mr. ███

5  maintains his innocence of this crime?

6      A.    No.

7      Q.    So if you go to page 12 in the transcript,

8  around line 12 -- I'm sorry, around line 14 of page 12.

9  In that section where you are talking, you asked him to

10 tell you a little bit about the crime?

11     A.    Yes, ma'am.

12     Q.    And you'll note that starting on line 25,

13 is the first time where he talks about maintaining his

14 innocence.

15     A.    I don't -- I see it now, but I don't recall

16 it at the time.

17     Q.    So did the fact that he maintained his

18 innocence have any impact on the way the hearing was

19 conducted?

20     A.    No.

21     Q.    Did it have any impact on whether or not he

22 was going to be given -- granted parole?

23     A.    No.

24     Q.    And why is that?

25     A.    Just didn't have any impact.  I can't speak

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 200 of 258

1    **for the other two panel members.  It didn't with me.**

2         Q.   Are you aware that 590 contemplates that

3    that should not be used against someone; the failure to

4    take accountability should not be used against someone

5    maintaining their innocence?

6         **A.   I might have recalled reading that.  I**

7    **can't say directly that I knew that.**

8         Q.   On page 16 --

9         **A.   Yes, ma'am.**

10        Q.   -- starting around line 11 --

11        **A.   Sixteen?**

12        Q.   Page 16, line 11 reads, "You brought up the

13   fact apparently that you were physically, mentally,

14   sexually abused growing up, but stated you did not

15   commit the current offense.  So it had no bearing on

16   your -- it has no bearing on your parole release."

17             Did I read that correctly?

18        **A.   (Witness reviews document.)**

19             **If I said it, I said it.**

20        Q.   So that means that you were not considering

21   that childhood abuse in, you know, evaluating his

22   parole petition?

23        **A.   No, I would disagree with you there.**

24        Q.   What does it mean?

25        **A.   It means that is not -- just what it says.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 201 of 258

1   I mean, that you brought up the fact, apparently, that

2   you -- I told this to the defendant, the offender.

3   Apparently -- you brought up the fact, apparently, that

4   you were physically, mentally, and sexually abused

5   growing up.  In general, it does not -- it did not have

6   a bearing on the hearing.  Personally?  The other -- I

7   can't speak for the other two.  It could have had a

8   bearing.  And it might have had a bearing on me, too.

9   But generally speaking -- generally speaking, no.

10          Q.    Generally speaking --

11          A.    Generally speaking, it had no affect on the

12   parole hearing, in general terms.

13                Personally, you know, that's different.  I

14   can't speak for the other two board members.

15   Personally, I had to -- I knew about it and what was

16   going on.

17          Q.    When you --

18          A.    The fact that -- when somebody's high on

19   drugs or intoxicated and commits a murder, that's not a

20   defense for murder.

21          Q.    Okay.

22          A.    And because this happened to this person,

23   unfortunately, I mean, that's not a defense for murder

24   either.

25          Q.    I understand that --

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 202 of 258

1   A.   So it didn't affect my overall thinking on

2   it.

3   Q.   But it --

4   A.   Because that's happened to him.

5   Q.   Let me follow up with, did you consider it

6   in doing the SB 590 analysis, the fact that he was

7   physically, mentality, and sexually abused?

8   A.   Did I?

9   Q.   Yes.

10   A.   I knew he was, obviously.  It was in the

11   equation.

12   Q.   I'm asking you, was that part of the

13   analysis you did when considering the 590 factors?

14   A.   Yeah, I think so.

15   Q.   So when you say it has no bearing on your

16   parole release, what does that mean?

17   A.   The fact that this unfortunately happened

18   to this gentleman -- I mean, because this happened to

19   him, and this crime was committed, that means that, you

20   know, it's not a defense for him committing the crime,

21   that he was sexually abused or physically or mentally

22   abused.  It was unfortunate.

23        Just like I would tell somebody -- as I

24   indicated before in my example, if somebody murdered

25   somebody because they were intoxicated, that's not a

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 203 of 258

1  **defense neither.  Unfortunately it happens.**

2      Q.   Okay.  And in here it's not being presented

3  as a defense to the crime, but a factor to be

4  considered in the parole release.  And you're saying

5  here in the transcript, you said, "it has no bearing on

6  your parole release.  It's not saying it has no bearing

7  on --

8      **A.   Well, yes, in fact, it did.  It**

9  **personally -- on a personal note, but generally**

10  **speaking, not.**

11      Q.   So this is -- this is incorrect.  What you

12  said here --

13      **A.   Well, I said it.  So I'm not going to say**

14  **it's incorrect.**

15      Q.   But you're saying you still -- you still

16  considered it -- you still considered that abuse in

17  doing the 590 analysis?

18      **A.   Yes.**

19      Q.   Okay.  How do we know that?  I mean, other

20  than you saying that, is that reflected anywhere else?

21      **A.   No.  And I'm telling you that's the way it**

22  **is.  It's the truth.**

23      Q.   I want to go back to the prehearing report,

24  which is Exhibit 8.

25          Did you essentially use this prehearing

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 204 of 258

1  report to go through -- to conduct the hearing?

2      **A.   Yes.  For the most part.**

3      Q.   And if you look at the second page, the

4  first, the fourth full paragraph that starts with "when

5  interviewed by this officer."

6      **A.   Yes, ma'am.**

7      Q.   Okay.  If you can review that paragraph for

8  a second, and I'm going to ask you a question.

9      **A.   Sure.  (Witness reviews document.)**

10          **Yes, ma'am.**

11     Q.   Okay.  So when you made that statement that

12 we were just referring to from the hearing about the

13 abuse, are you just -- are you just reading from --

14     **A.   I picked it out of here.**

15     Q.   Okay.  Okay.

16     **A.   I probably read that.**

17     Q.   So is that the reason why you stated it has

18 no bearing on his parole release?

19     **A.   It could have been, but I -- you know.**

20 **That's probably where I got that information from.**

21 **Recalled that information.**

22     Q.   And do you believe that to be a correct

23 statement, that it has no bearing on his parole

24 release?

25     **A.   In general, like I said earlier.  Because**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 205 of 258

1   this unfortunately happened to him growing up.  I mean,

2   he still committed the crime.  But my personal?  No.

3       Q.  And I'm sorry for keep -- repeating this.

4   But I want to make sure I understand your answer.

5           It says he was abused.  And then it also

6   says that that's not going to be considered,

7   because it's stated that he did not commit the offense.

8   So, therefore, it has no bearing on his parole release.

9   Right?  We're talking about whether or not this is a

10  factor that should be considered under his parole

11  release.  And you're saying that you did consider it

12  for his parole release?

13      A.  It came up in the hearing, but I didn't

14  just -- consider just this (indicating.)  Just like I

15  said to you earlier, generally speaking, it's like my

16  previous example.  You know, intoxication of alcohol or

17  drugs is not a reason -- not a defense to commit a

18  crime.  It's unfortunate that this happened to this

19  gentleman.  But I didn't base it solely on this

20  (indicating.)

21      Q.  So, you know, I can appreciate your attempt

22  analogize this to intoxication.

23      A.  Uh-huh.

24      Q.  But this is dealing with one of the factors

25  set forth in Senate Bill 590 that says "must be

Pohlman USA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 206 of 258

1    considered" -- right -- "for parole release?"

2        A.    Uh-huh.

3        Q.    Right.  And I'm trying to get an

4    understanding of whether or not you considered it.

5    Because as we --

6        A.    I did consider it.  Yes.

7        Q.    Okay.  So this statement is just wrong.  I

8    mean, I get that's what was said, but it's not an

9    accurate statement as to what should be considered?

10       A.    I would say yes.  The way it was

11   interpreted.

12       Q.    Do you recall talking about any of the

13   circumstances or details about that abuse after this

14   point in the hearing?

15       A.    I don't recall.  I mean, if I'm not telling

16   you right ...

17       Q.    So if you did consider it, would it be

18   something that you would ask follow-up questions on?

19       A.    If I did consider it, it would it be

20   something I'd ask follow-up questions on.

21       Q.    Would you get into the abuse that he

22   suffered as a child?

23       A.    Sometimes, in some cases, I do; and

24   sometimes I don't.

25       Q.    So why wouldn't you -- why -- when wouldn't

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 207 of 258

1    you consider it?

2         A.    I don't know, 'cause every case is

3    different.

4         Q.    So for --

5         A.    I'm not saying I didn't consider it.  Maybe

6    I did, and maybe I didn't.

7         Q.    So when you say you --

8         A.    But I did consider it when I read the

9    report.

10         Q.    Okay.  Would -- is that something you would

11    ask questions about of an individual who was sentenced

12    to life without parole as a juvenile who was having a

13    hearing pursuant to Senate Bill 590?

14         A.    I don't know.

15         Q.    Did you receive any training or instruction

16    about considering childhood abuses for those offenders

17    who maintain their innocence?

18         A.    Not directly, no.

19         Q.    Did you -- did you receive any training as

20    it relates to those juveniles who maintain their

21    innocence?

22         A.    Those that maintain their innocence?

23         Q.    Uh-huh.

24         A.    No.

25         Q.    Okay.  So is it fair to say that a

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 208 of 258

1  significant portion -- a notable portion of the hearing

2  focuses on accountability and acceptance of their

3  behavior, of the crime that they've committed?

4       **A.   Could you repeat that.**

5       Q.   Would you say that that is a focal point of

6  a hearing, whether or not the inmate had accepted

7  responsibility for the crime?

8       **A.   What is the focal point?**

9       Q.   Whether he's accepted responsibility for a

10 crime; is that something that you --

11      **A.   Oh, no.  I'm sorry.  I misunderstood.  No.**

12      Q.   No?

13      **A.   No.**

14           **I mean, maybe I don't understand what**

15 **you're asking me.**

16      Q.   In these parole hearings --

17      **A.   I would take into consideration -- if he**

18 **said he was innocent of the crime, I would not hold**

19 **that against him.  If that's what you're asking me.**

20      Q.   Well, I was asking, you -- you typically

21 ask these inmates whether or not they accept

22 responsibility for their crime, correct?

23      **A.   Yeah, for the most part.**

24      Q.   And that's something that you factor into

25 whether or not to grant parole, correct?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 209 of 258

1      **A.    For the most part.**

2      Q.    So the next question is:  For those

3  individuals who maintain their innocence, they don't

4  accept responsibility for the crime that they were

5  charged with?

6      **A.    And the question was?**

7      Q.    Is that held against them in any way?

8      **A.    No.  No.**

9      Q.    Okay.

10      **A.    Which is what I was trying to get around**

11  **to.**

12            MS. JONES:  I have an Exhibit No. 9.

13            (Deposition Exhibit No. 9 was marked for

14  identification.)

15  BY MS. JONES:

16      Q.    Exhibit 9 is a letter from

17  Paul ████████████, Bates number AGO002482, which

18  supports Mr. ██████████ innocence claim.

19      **A.    Uh-huh.**

20      Q.    Do you recall reviewing that letter?

21      **A.    I think I did, but I can't recall it**

22  **directly.  It was some time ago.  If it was in the**

23  **file, I read it.**

24            **Can you give me a minute to read it?**

25      Q.    Sure.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 210 of 258

1       A.      (Witness reviews document.)  Okay.

2       Q.      Do you recall reading that letter before

3  you voted on whether to grant or deny parole?

4       A.      No, I don't know.  I don't know.  I think I

5  did, but I don't know for sure.  I'm not going to tell

6  you something I don't know for sure.

7       Q.      Would that letter -- what amount of weight

8  would you have given to that letter?

9       A.      Quite a bit of weight.

10      Q.      Do you find it to be credible?

11      A.      I don't know how you measure that.  I would

12  certainly have taken it into consideration.

13      Q.      Do you find the letter to be credible?

14      A.      I have no reason not to.

15      Q.      Would that be a letter that you would point

16  out to the other panels members to read?

17      A.      If, in fact, I read it, I probably would

18  have.  They probably would have been made aware of it.

19      Q.      So it was in his parole file --

20      A.      Uh-huh.

21      Q.      -- right?  And --

22      A.      I assume it was.  I don't remember the

23  letter, like I told you earlier.

24      Q.      But if it was in his parole file, you would

25  have read it?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 211 of 258

1      **A.    More than likely.**

2      Q.    But you don't know for sure?

3      **A.    I don't know for sure.**

4      Q.    And you don't know whether or not you

5      pointed that out to the other panel members?

6      **A.    Not for sure.**

7      Q.    You described Mr. ████████ as an aggressive

8      person.  Do you recall that?

9      **A.    I do not.**

10     Q.    If you look at page 21 of the transcript,

11     the second full paragraph, you'll see -- you conclude

12     that, "so you are kind of an aggressive person I would

13     say."

14             Do you see that?

15     **A.    Yes, ma'am.**

16     Q.    What's the basis for you labeling him as an

17     aggressive person?

18     **A.    Well, just being involved with the mere**

19     **crime that occurred, you know.**

20     Q.    The offense that he was convicted of?

21     **A.    And also he stabbed an inmate with a**

22     **homemade knife.**

23     Q.    So those two things would be the reason why

24     he was labeled aggressive?

25     **A.    I would say that's pretty aggressive, any**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 212 of 258

1    time you assault someone.

2        Q.    Does the circumstances of that assault

3    matter, the stabbing matter?

4        A.    Well, it's a behavior problem.  Conduct.

5        Q.    Again, do the circumstances matter?  For

6    example, if he was acting in self defense, does that

7    matter --

8        A.    Well, sure.

9        Q.    -- in determining whether or not he was --

10       A.    It could, other than the fact that he

11   probably shouldn't have had the homemade knife in the

12   first place.

13       Q.    So possession of a homemade knife makes you

14   aggressive?

15       A.    Well, in general terms, probably not.  But,

16   you know, obviously there was a reason he had the

17   knife.

18       Q.    So when you say "aggressive," you mean --

19   that could be a relative term.  Aggressive as it

20   relates to someone who is incarcerated?

21       A.    Could be for anybody.

22       Q.    Anybody.  So the circumstances -- his

23   circumstances don't factor into the label of being

24   aggressive?

25       A.    Repeat that, please.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 213 of 258

1      Q.    His circumstances don't factor into him

2   being labeled as aggressive?

3      **A.    That it was in self defense?**

4      Q.    That it was in self defense.  We're talking

5   about an individual --

6      **A.    Well, first of all, an inmate's not**

7   **supposed to have a homemade knife in prison.**

8      Q.    Right.  And so -- that's not my question

9   exactly.

10     **A.    Okay.**

11     Q.    Right.  I mean, I get what you're saying

12  that --

13     **A.    Okay.**

14     Q.    But, you know, you said that the stabbing

15  of the -- of someone, the assault is a part of the

16  reason why you have labeled him aggressive.  And I'm

17  talking about the circumstances of that incident.  Are

18  those considered, when you give him that label of being

19  an aggressive person?

20     **A.    This particular incident?  It shows being**

21  **assaultive to me.  I guess I don't understand your**

22  **question.**

23     Q.    My question is, you labeled him aggressive,

24  correct?

25     **A.    Yes, ma'am.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 214 of 258

1    Q.    And you said you based it on two things.

2    The offense that --

3        **A.    Occurred.**

4        Q.    -- that got him incarcerated back in ███,

5    and the assault?

6        **A.    Yes, ma'am.**

7        Q.    I'm saying, do the circumstances of the

8    assault matter at all when you are --

9        **A.    To some degree.  I mean, when you're**

10       **incarcerated things --**

11       Q.    Okay.

12       **A.    Hate to say it; things like that happen.**

13       Q.    Okay.  Exactly.  Exactly.

14            And to the extent he was acting in self

15   defense, does that have any impact on whether or not

16   you labeled him as aggressive?

17       **A.    Yeah.**

18       Q.    And even though he represented and stated

19   that he was acting in self defense, did you find

20   that -- his statements to be credible?

21       **A.    I had no reason not to.**

22       Q.    So even though he was acting in self

23   defense, you still --

24       **A.    He was still being aggressive.**

25       Q.    Are there any circumstances, when that

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 215 of 258

1  particular assault could occur, and the person not be

2  labeled aggressive?

3      **A.    Probably not.**

4      Q.   Okay.  So stabbing someone is always --

5      **A.    I don't recall the exact thing that went on**

6  **here without reading all this.  You know, he had a**

7  **homemade knife obviously.**

8      Q.   Uh-huh.  So if you continue on page 21 and

9  at line 17, he explains what happens.

10     **A.    Okay.  I've read that, ma'am.**

11     Q.   Okay.  So you said that you had no reason

12  to not believe his statements, correct?

13     **A.    I believe the statement.**

14     Q.   Okay.

15     **A.    I mean, that's what he told us.**

16     Q.   Okay.  And in that statement he says that

17  someone was attacking him, and he took the knife from

18  that person?

19     **A.    Uh-huh.**

20     Q.   And he was out numbered, and so he was

21  defending himself with the knife?

22     **A.    Yes, ma'am.**

23     Q.   Okay.  That supports your position of

24  labeling him as an aggressive person?

25     **A.    He took part in the fight.  He could just**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 216 of 258

1    **as well have left, you know.  I still maintain he's an**

2    **aggressive person.  There was a reason why those other**

3    **people were there.**

4        Q.  You'll note that the majority of the

5    transcript mirrors the prehearing report?

6        **A.  Yes, ma'am.**

7        Q.  And that, you know, there were a number of

8    times when you're reading that directly from the

9    prehearing report at the hearing.  Is that typical?

10       **A.  Pretty much so.**

11       Q.  Okay.  And so you'll note that there's a

12    section in the prehearing report at the

13    second-to-the-last page in the prehearing report.  It's

14    Bates labeled 2453, called social family history.

15       **A.  Yes, ma'am.**

16       Q.  You didn't ask him any questions or even

17    address that section when you were interviewing him at

18    the hearing.  Do you recall that?

19       **A.  I don't recall that.**

20       Q.  Is there a reason why you wouldn't address

21    those social family history issues?

22       **A.  No.  Not really.  Sometimes it happens.  In**

23    **any hearing, you skip over certain parts of the report,**

24    **so whatever, it could have been -- could have been an**

25    **innocent mistake.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 217 of 258

1    Q.   Okay.  But in a 590 hearing where that's

2  one of the factors that you are to consider in granting

3  parole or not, wouldn't that be something important to

4  cover?

5    **A.   It would be.  And somebody else on the**

6  **panel may have covered it.  I don't know.**

7    Q.   Well, we have the transcript.

8    **A.   I understand that.**

9    Q.   Okay.

10   **A.   I don't recall skipping over this section,**

11 **if that's what you're asking me.**

12   Q.   And you were the one conducting the

13 hearing, correct?

14   **A.   Initially.**

15   Q.   Okay.  And so what is your responsibility

16 as the person conducting the hearing?

17   **A.   To oversee the hearing in general.**

18   Q.   I mean, are you supposed to ask the

19 significant -- the main questions that need to be

20 answered in order to consider the parole petition?

21   **A.   For the most part, yes, ma'am.**

22   Q.   So would that be on --

23   **A.   There could be follow-up questions from the**

24 **other panel members, also.**

25   Q.   So follow-up questions --

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 218 of 258

1          **A.    If I missed something.**

2          Q.    Okay.

3          **A.    I ask them if they have any questions.**

4          Q.    Okay.  So you'll note your part of

5    conducting the hearing went through page 28, and then

6    the second panel member started with some questions.

7          **A.    Who was Mr. █████.  Page 28, ma'am?**

8          Q.    Yeah, that's where he -- the second one

9    starts.

10         **A.    Okay.**

11         Q.    And he goes through about page 32.  And

12   you'll note that they don't ask any questions about it

13   either.

14         **A.    (No response.)**

15              MR. CRANE:  I think the last thing she said

16   was, "you'll note that."

17              MS. JONES:  Well, he said that it's

18   possible that another panel member asked questions

19   about that social and family history.  And I want to go

20   back to section 28.

21         **A.    And I don't remember it.  That's why I'm**

22   **reading here.  I don't remember whether they did or**

23   **not.  I'm still with panel -- with Brian George here.**

24              MR. CRANE:  So just to clarify, you're

25   asking him to read that section and tell you whether or

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 219 of 258

1    not he sees anyone ask a question about that?

2              MS. JONES:  Well, based on his answer, he

3    said he doesn't know.  It could have been a second

4    panel member.

5              MR. CRANE:  Sure.

6              MS. JONES:  So I'm --

7              MR. CRANE:  I'm just clarifying.  You want

8    him to confirm that the transcript doesn't have a

9    question from the second panel member about that topic?

10             MS. JONES:  Yeah, I want to confirm that he

11   was not asked about the social and family history --

12             MR. CRANE:  Okay.

13             MS. JONES:  -- during the hearing.

14        **A.    I don't see where he did, Mr. ███████.**

15   BY MS. JONES:

16        Q.    Okay.  And you'll note in the prehearing

17   report, under that section, they talk about him having

18   a rough childhood and being abused by his mother's

19   girlfriend and being given away by his father.  Would

20   those be the types of issues that you would ask

21   questions about in order to do a 590 analysis?

22        **A.    It probably should have been.  I now know**

23   **that I -- apparently I did not.  It was an oversight on**

24   **my part perhaps, but I don't recall.**

25        Q.    Do you recall that he had a delegate --

*PohlmanUSA Court Reporting*
*(877) 421-0099   www.PohlmanUSA.com*
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 220 of 258

1      **A.    I read this.  I knew of this information.**

2           **Go ahead, ma'am.**

3      Q.    Okay.

4      **A.    Sorry.**

5      Q.    You're aware that he had a delegate there?

6      **A.    Well, I am since I read the reports.  It's**

7      **been so long ago.**

8      Q.    Is any of this coming back to you, looking

9      at the transcript?

10     **A.    Well, some of it.**

11     Q.    I mean, I understand you see hundreds of

12     them.

13     **A.    Some of it is.  Not all of it.**

14     Q.    Okay.

15     **A.    You know, that's why I amazed when you**

16     **brought the ████████████ in at the beginning,**

17     **because I didn't remember that at all.**

18     Q.    Do you -- do the panels typically ask

19     delegates questions?

20     **A.    Normally for the ones that I've done in**

21     **that last -- over two years, normally not.  On rare**

22     **occasions, they do.  I'll ask -- I'll ask -- and**

23     **sometimes I don't ask.  Usually we do not question the**

24     **delegates.  We just let them have their say.**

25     Q.    And that's the same in all parole hearings,

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 221 of 258

1   without regard to whether they were originally

2   parolable or a 590 hearing?

3       A.   Yes, ma'am.  For the most part.

4       Q.   And then you'll note that Mr. ███████ was

5   given the opportunity to speak as well.

6       A.   Only at hearings.  Any particular place

7   that you're talking about?  At the end -- toward the

8   end of the hearing?

9       Q.   Yeah.

10      A.   We usually ask if they have anything else

11  to tell to the panel or -- I assume that happened here.

12      Q.   So his part started around page 38, I

13  think.

14      A.   Yeah, I'm getting close.

15      Q.   38, 39 I guess is where...

16      A.   Okay.  38, 39.

17          MR. CRANE:  Right.  Page 38, around line 9.

18      A.   Yeah, I got it.  So anything -- that's

19  normally the question I ask.

20  BY MS. JONES:

21      Q.   Okay.  Was he -- do you-all normally allow

22  the inmate to speak as long as they want?

23      A.   Normally we let them speak as long as they

24  want.  Sometimes they have a -- they'll have a --

25  they'll actually write out a list of their goals and

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 222 of 258

1  things and -- once they're released.  And sometimes if

2  they're too lengthy, we ask them to just kind of

3  capsulize (sic) it.  Due to the time frame, you know.

4       Q.   And how much time do they typically speak,

5  if you can estimate?

6       A.   Most of them don't speak too often.  I

7  don't remember how long he did, but not too long.  I

8  don't know.  That's hard to gauge.  Some of them

9  speak -- have a couple lines, or some of them might

10 speak for over five minutes.

11      Q.   Okay.

12      A.   You know, it's not much more than that.

13      Q.   It's not a situation where you're having to

14 cut them off, right?

15      A.   No.  The only time I've ever cut off

16 anybody is if they've got a lengthy thing.  Maybe it's

17 something this long they want to read.

18      Q.   Yeah, uh-huh.

19      A.   And due to the interest of time, we just

20 don't have the time.  We take it.  You know, get a copy

21 of it or take it from them.  But normally we let them

22 speak within reason as long as they want to.

23      Q.   So you'll note that after he finished his

24 statement, you-all didn't ask him any questions about

25 his statement.  I understand that you interviewed him

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 223 of 258

1    before he made his final statement.

2              Is it typical that you-all don't ask

3    questions after they make their final statement?

4         **A.   Is it typical?  I'd say probably so.**

5    **'Cause I always ask them, is there anything else?**

6         Q.    Uh-huh.

7         **A.   And they've had their say.  And we listen**

8    **to what they have to say.  And we don't -- your**

9    **question was we don't ask any questions after they've**

10   **made their statement?**

11        Q.    About their statement, right.  So --

12        **A.   Normally, we don't.  That would be a fair**

13   **answer.**

14        Q.    Mr. ████████ presented a home plan.  And had

15   the support and family -- of his family and fiancée.

16   And he also had a job internship at a dry cleaners that

17   was --

18        **A.   Is that in the transcript here?**

19        Q.    I have these letters.  Well, it may be in

20   the prehearing report as well, but I also have --

21        **A.   Oh, I got it.  Yeah.  I have it in front of**

22   **me.  I didn't remember it till I'm looking at it now.**

23             MS. JONES:  Let's mark AGO002476 as

24   Exhibit 10, which is the letter regarding the

25   internship at the dry cleaners.

Pohlman USA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 224 of 258

1          (Deposition Exhibit No. 10 was marked for

2   identification.)

3   BY MS. JONES:

4          Q.   Do you recall reviewing that --

5          **A.   No, ma'am.**

6          Q.   -- in his file?

7          **A.   I don't know that it was in the file.   It**

8   **could have been.   Sometimes these things show up later**

9   **in the files.**

10          MS. JONES:

11          And I'm going to mark as

12   Exhibit 11,AGO002479 through 81, which is a letter from

13   his fiancée, ███████████.

14          (Deposition Exhibit No. 11 was marked for

15   identification.)

16   BY MS. JONES:

17          Q.   Do you recall seeing that document?

18          **A.   If it was in the file, I'm sure I probably**

19   **saw it or read it, both.   But I don't recall today**

20   **seeing the letter.**

21          Q.   What did you think --

22          **A.   I don't recall seeing the letter, but, you**

23   **know.**

24          Q.   What did you think of the home plan that

25   was presented -- was included, that letter representing

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 225 of 258

1   he had an internship and that --

2        **A.   I thought it was good plan, if I remember**

3   **right.**

4        Q.   Okay.

5        **A.   I didn't have a problem with it.  I thought**

6   **it was okay.  At least he had a plan, a home plan.  A**

7   **lot of them come before us and don't, you know.  And he**

8   **had one in place.**

9        Q.   So does the home plan factor into any kind

10  of risk analysis you do for these individuals?

11       **A.   Speaking about me generally?**

12       Q.   Yes.

13       **A.   Sure.  They have a good home plan.**

14       Q.   Okay.

15       **A.   That somebody out there is supporting them.**

16       Q.   So does that lower their risk of release?

17       **A.   In my opinion it would.**

18            MR. SPILLANE:  I'm going to ask --

19            THE WITNESS:  Lower their risk --

20            MR. SPILLANE:  -- did you ask, does it

21  lower their risk?  And I don't know what that means.

22  BY MS. JONES:

23       Q.   Lower their risk -- you know, so you

24  said low- -- earlier when you were testifying, you said

25  it's all about risk and managing risk, correct?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 226 of 258

1      A.   Uh-huh.

2      Q.   And that --

3      A.   Would that lower -- make their -- go ahead.

4   I'm sorry.

5      Q.   Yeah.  And so does having a good home plan

6   lower their risk, I guess, of re-offending --

7      A.   It's to their advantage.  I'll put it that

8   way.

9      Q.   Okay.

10     A.   They have a home -- 'cause some do not have

11  home plans.

12          But I don't recall the letters.  I

13  probably -- if I they were in the file, I read them.

14     Q.   Uh-huh.

15     A.   I looked over them at least, at the very

16  lease and -- to see if they had support.  And I don't

17  recall --

18     Q.   Is that --

19     A.   If they were there, they were there.

20     Q.   Is that something that you would point out

21  to the other panel members?

22     A.   Yes.

23     Q.   That --

24     A.   That the letters were in the file.

25     Q.   Do you recall any debate or discussion

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 227 of 258

1  about Mr. █████ after the hearing concluded?  You're

2  saying that you-all -- that the panel talks a little

3  bit about the hearing after --

4      **A.   Once the recording was shut off?**

5      Q.   Yes.

6      **A.   I'm sure we talked about it.  I can't tell**

7  **you in detail what was discussed.  I know we talked**

8  **about it.**

9      Q.   Do you know after you-all -- after that

10  day, and those files are put into the next voting

11  member's shelf, did you share anything, any

12  observations about Mr. █████

13      **A.   No.  I don't remember that very well.**

14      Q.   So is it typical for you-all to have

15  statements or discussions after the recording is off?

16      **A.   Well, to my knowledge, it's always shut off**

17  **as soon as the offender leaves the room.**

18      Q.   Okay.

19      **A.   I mean, I guess it could be left on**

20  **accidentally.**

21      Q.   Okay.

22      **A.   Normally, it's shut off when the offender**

23  **leaves the room.**

24      Q.   Are there any notes or anything that

25  you-all take during that part?

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 228 of 258

1       A.   As I told you earlier, any notes that I

2  took probably would have been wadded up and put in the

3  waste can.  I can't say --

4       Q.   But during -- during your deliberations?

5       A.   Rephrase that, please.

6       Q.   During your deliberations or at that

7  time -- like, after the hearing has concluded and the

8  panel members are taking, do you take any notes?

9       A.   While we're talking about it?  I don't

10  recall any being taken.  There could have been.

11      Q.   So you'll note that on Exhibit 8, which is

12  the parole hearing report, the last page --

13      A.   The prehearing --

14      Q.   Yeah, that one, the last page.

15      A.   Yes, ma'am.

16      Q.   The last paragraph, it says "due to his

17  attitude regarding the offense and the victim, she

18  recommends he be rescheduled for rehearing in 2021."

19      A.   This is a recommendation from the field.

20      Q.   Correct.  How much weight did you give this

21  recommendation?

22      A.   Obviously I took it into consideration.

23  That was the final determination.

24      Q.   In the paragraph --

25      A.   I gave it some weight.  I can't give you a

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 229 of 258

1  **number, you know.**

2      Q.   In the paragraph above that, you'll note

3  that she writes in the second line, "he takes no

4  responsibility for the present offense and shows no

5  remorse."

6      **A.   I see that.  Yes, ma'am.**

7      Q.   Do you read that to be -- using the fact

8  that he's maintaining his innocence as being used

9  against him?

10     **A.   I don't -- he shows no remorse?**

11     Q.   "He takes no responsibility for the present

12  offense and shows no remorse."

13     **A.   No.**

14     Q.   "He never talks about the victim and only

15  talks about what he was going to do if released."

16          So your takeaway from that is his

17  maintaining --

18     **A.   I did not hold it against the offender, if**

19  **that's what you're asking me.  What her statement was.**

20     Q.   So Exhibit 4, which was the board action

21  sheet that we were looking at earlier, that was the one

22  for Mr. ██████.  And you wrote -- we talked about this

23  a little bit already, but your comment was good --

24  not -- "conduct not good," correct?

25     **A.   Uh-huh.  That's my writing -- printing,**

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 230 of 258

1    yes.

2         Q.    And, again, what are you basing that on?

3    That that assault that he was --

4         A.    I think he had -- can I look back through

5    these documents?

6         Q.    Yes.

7         A.    I think he had 24-some --

8         Q.    Okay.

9         A.    -- conduct violations up until 2012.  And

10   the last one was the introduction of control substance

11   into the institution.  That's my assessment.  I mean,

12   if the other parole members don't want to go along with

13   it, that's their prerogative.  I just didn't feel like

14   his conduct was good.

15        Q.    You'll note in the transcript at page 24,

16   you state, "you've done pretty good as far as conducted

17   violations since 2012."

18        A.    Correct.

19        Q.    Okay.

20        A.    I think I just mentioned that.

21        Q.    Okay.  Yes.

22        A.    What page was that?

23        Q.    24, line 20.

24        A.    Uh-huh.

25        Q.    And he's been incarcerated for 30 years, as

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 231 of 258

1   of the time of the parole hearing, correct?

2        **A.**   **Yes, ma'am. Approximately.**

3        Q.   Okay. So he had less than one violation a

4   year, if my math is correct, right?

5        **A.**   **From what time to what time?**

6        Q.   The entire time that he's been

7   incarcerated, he's had 24 violations.

8        **A.**   **Correct. I don't remember the seriousness**

9   **of all of them, but, you know, it sounds right.**

10        Q.   Is there any period of time that could

11   elapse for Mr. ▬▬▬ where you would change that

12   assessment, that his conduct was not good?

13        **A.**   **Probably five or six years. Five years.**

14   **Like I said, we have people in prison that's been there**

15   **for 30 years and have not had one conduct violation.**

16        Q.   How common is that?

17        **A.**   **They've abided by the rules and**

18   **regulations.**

19        Q.   But I mean, how common is that?

20        **A.**   **How common is it? I can't put a number on**

21   **that. But there's people in prison that's been there**

22   **for 20 to 30 years without conduct violations.**

23        Q.   Are we talking half of the individuals?

24        **A.**   **No. Maybe -- I'm just guessing.**

25        Q.   Okay.

Pohlman USA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 232 of 258

1          A.    Ten, fifteen percent.  I don't know.

2          Q.    Okay.  Is an average of one violation a

3    year a lot?

4          A.    An average of one violation a year.  I

5    guess -- how do you determine a lot?  What the

6    definition of a lot is.

7          Q.    So when you say another five or -- you

8    know, five or six years that he wouldn't get this label

9    of conduct not good, so like a total of ten years of

10   having no violations?

11         A.    Say that again, please.

12         Q.    So before I was asking you, is there a

13   period of time that could elapse that his conduct would

14   no longer be labeled as not good?  And you said, like,

15   five or six years.  You mean -- so that would be a

16   total of 10 or 11 years it would take, in order to get

17   a different label of his conduct?

18         A.    I don't know.  Every case is different,

19   ma'am.  I don't know if I have a number to give you on

20   that.  You know what I mean?

21         Q.    Yeah, and I guess --

22         A.    It depends upon the seriousness of the

23   conduct violations.

24         Q.    Uh-huh.

25         A.    There's multiple factors involved in all

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 233 of 258

1  this, in all of this scenario and situation.  You know,

2  what I consider not being good conduct, as I put,

3  "conduct not good."  The other parole board members may

4  think just the opposite and give a different date.  I

5  don't -- you know -- what goes on in the mind of men.

6          MS. JONES:  I'm going to mark Exhibit 12,

7  which is AGO002444 to 4445.

8          (Deposition Exhibit No. 12 was marked for

9  identification.)

10  BY MS. JONES:

11      Q.   Have you seen these forms before?

12      A.   I've seen them in files before.

13      Q.   And you'll note that it says, "the reasons

14  for denial is that circumstances surrounding the

15  present offense and poor institutional adjustment."

16      A.   Where is that at?

17      Q.   On the first page in the bottom where

18  there's lines.

19      A.   Okay.  Which is what was checked on the

20  back sheet of the parole board --

21      Q.   Yes.

22      A.   -- action sheet.

23           Yes, I see that.

24      Q.   What does "circumstances surrounding the

25  present offense" mean, as it relates to Mr. ██████?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 234 of 258

1      A.    The actual crime, murder, I would say.

2      Q.    Okay.  So is that always a reason given for

3 people convicted of murder?

4      A.    Not always.  But I imagine it shows up

5 quite often.  Violent behavior, violent offense, any

6 time you take somebody's life.

7      Q.    Is there a way in which that won't appear

8 for -- going forward?  So, like -- I mean, is there any

9 way for him to overcome that?  The circumstances

10 surrounding the present offense?

11      A.    My opinion?

12      Q.    Uh-huh.

13      A.    Probably if it's a violent hideous crime,

14 probably not.

15      Q.    And you --

16      A.    But I don't particularly agree with the

17 asterisk about there does not appear to be a reasonable

18 probably that -- at this time that you would live and

19 remain --

20           COURT REPORTER:  You need to slow down.

21 You're reading to yourself.

22           (Whereupon, the last answer was read back

23 by the reporter.)

24           THE WITNESS:  I don't particularly agree

25 with the circumstances surrounding the present offense.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 235 of 258

1  There's an asterisk that says, "there does not appear

2  to be a reasonable probability at this time that you

3  would live and remain at liberty without again

4  violating the law based on."

5          That might not necessarily be true in my

6  opinion.

7  BY MS. JONES:

8          Q.   Sir, do you remember earlier when we were

9  talking about what Miller stands for?  And that Miller,

10  the court -- the U.S. Supreme Court in Miller said

11  that, you know, life without parole will be reserved

12  for those individuals whose crimes reflect permanent

13  incorrigibility, that that's going to be a rare

14  occurrence?

15          **A.   (No response.)**

16          Q.   Let me restate or do that again?

17          We were talking about the Miller versus

18  Alabama case, the United States Supreme Court that

19  sparked Senate Bill 590, and we were talking about what

20  it stood for.  And the Court, in that opinion, wrote

21  "only the rarest juvenile offenders, those whose crimes

22  reflect permanent incorrigibility, are eligible for

23  life without parole."

24          Do you remember speaking about that

25  earlier?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 236 of 258

1      A.    Uh-huh.

2      Q.    And that that would be -- you understood

3  that to mean that it would be rare that juveniles would

4  be eligible for life without parole?

5      A.    Yes.

6      Q.    All right.  So now we're talking about --

7  on this form where -- for the reasons why he was

8  denied, it says, "circumstances surrounding the present

9  offense."  And you stated, oh, well, because it's a

10 violent crime, that's probably going to be the reason

11 given.  But does it make a difference that it was a

12 juvenile that committed that crime, as opposed to an

13 adult?

14     A.    My personal opinion?

15     Q.    Uh-huh.

16     A.    Yeah, it does.

17     Q.    Okay.

18     A.    Yes.

19     Q.    So is there any way for these individuals

20 to overcome that, as being a reason for denial for

21 parole?

22     A.    My personal opinion?

23     Q.    Yes.

24     A.    Probably not the way that it's stated.

25 It's seriousness of the present offense.  At this time

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 237 of 258

1  it would depreciate the seriousness of the present

2  offense.  Because the offense is the offense.  I mean,

3  you can't change it.

4              But I don't know that every crime of this

5  magnitude -- I don't know if that was always on there

6  like that.

7        Q.   Okay.

8        A.   I guess it is.  I don't know that for a

9  fact.

10       Q.   It also states poor institutional

11  adjustment.

12       A.   Yes, ma'am.

13       Q.   What does that mean as it relates to Mr.

14  ██████?

15       A.   The conduct violations.  Generally

16  speaking.

17       Q.   How is it that he was given -- or, like,

18  what led to a rehearing date of five years, December of

19  2021?

20       A.   That was the decision of the panel at that

21  time.  And I can't tell you exactly what words were --

22  the discussion was word for word or at all.  I don't

23  remember for sure.

24       Q.   Okay.  So I want to just spend a little

25  time talking about a few of the Miller factors and get

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 238 of 258

1  an understanding of what evidence or information that

2  you consider in evaluating those factors?

3          A.    Yes, ma'am.

4          Q.    The first one being the substantive growth

5  and increased maturity of the person since the offense

6  occurred.

7                What did you consider for that?

8          A.    **Talking to him one-on-one, first of all.**

9  **You can tell -- really kind of tell how somebody has**

10 **matured in life.  And under these -- and then also --**

11 **can I read through this?**

12         Q.    Yeah.  What are you pointing to?

13         A.    **(Indicating.)**

14         Q.    Okay.

15         A.    **I would say this occurred during the**

16 **hearing.**

17         Q.    And for the record, you're talking about

18 the --

19         A.    **Exhibit 1.  No. 2.  Works as a wheelchair**

20 **pusher.  Conduct improved.  No CDOs since 2012 -- CDEs,**

21 **excuses me.**

22         Q.    So that factor was a positive factor for

23 him?

24         A.    **I'm sorry?**

25         Q.    So that --

Pohlman USA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 239 of 258

1          A.    Yes, ma'am.

2          Q.    That was a positive for him?

3          A.    Yes, ma'am.

4          Q.    Okay.  The defendant's age and maturity,

5    intellectual capacity, mental and emotional health and

6    development at the time of the offense.

7          A.    That's where?

8          Q.    Well, that's one of the factors of 590.

9          A.    The nine other issues that you brought up.

10         Q.    Well, yeah.  There's actually ten but, yes.

11         A.    And your question is?

12         Q.    What evidence did you consider in

13   evaluating that factor?

14         A.    And which factor again?

15         Q.    The defendant's age, maturity, intellectual

16   capacity and mental and emotional health and

17   development at the time of the offense.

18         A.    By interviewing him.

19         Q.    What did you get from him?

20         A.    Well, I don't remember all the details of

21   that particular portion.  So, you know...

22         Q.    So what you're saying is what you got is

23   reflected in the transcript?

24         A.    What I got, I extracted from him

25   personally, out of my feelings about those particular

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 240 of 258

1   **issues.**

2        Q.   Is there anything else you considered in

3   evaluating that factor?

4        **A.   Not that I can remember.**

5        Q.   The defendant's background, including his

6   or her family, home, and community environment.

7             What did you consider in evaluating that

8   factor?

9        **A.   If I remember right -- it's been a long**

10  **time ago when we talked to him about his background,**

11  **his family problems, and issues.  That was discussed.**

12  **I don't -- I don't remember for sure, you know, exactly**

13  **what was said.**

14       Q.   So you believe it would have been reflected

15  on the transcript, whatever you went over?

16       **A.   I think it was at one point.  There were --**

17  **I brought up about the part -- sexual abuse, et cetera,**

18  **was not a defense for --**

19       Q.   Well, that wasn't discussed, right?  That

20  was just something that was read.

21       **A.   I don't remember.**

22       Q.   Okay.

23       **A.   It was -- it's been a long time ago.**

24       Q.   The next factor is the affect of familial

25  pressure or peer pressure on the defendant's actions.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 241 of 258

1          What did you consider for that factor?

2     **A.    I don't remember.**

3     Q.    The affect of characteristics attributable

4  to defendant's youth on the defendant's judgment.

5          What did you consider for that factor.

6     **A.    I don't remember that either.**

7     Q.    Do you believe that you had the tools,

8  however, to analyze each of those factors we just went

9  over?

10     **A.    I'm sorry?**

11     Q.    Do you believe that you had the tools,

12  meaning the qualifications and the training, in order

13  to analyze those factors?

14     **A.    Me personally?**

15     Q.    Yes.

16     **A.    Yes.**

17     Q.    And what did you base that on?

18     **A.    On lots of interviews I've done and my**

19  **education.  And my overall -- all throughout my life**

20  **I've been involved in law enforcement.  And talked to a**

21  **lot of people in my life.**

22          **(Deposition Exhibit No. 13 was marked for**

23  **identification.)**

24  BY MS. JONES:

25     Q.    Does Exhibit 13, which is your resume,

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 242 of 258

1  which is AGO94 through 95 -- and just for the record,

2  when you talk about your education as being one of the

3  things that qualifies you to do these analyses of these

4  590 factors, your education, as you testified, and

5  what's reflected on your resume, is what?  Criminal

6  justice?

7      A.    Administration.

8      Q.    Uh-huh.

9      A.    That's what it should be.  A Bachelor of

10  Science in criminal justice administration and Bachelor

11  of Science, criminal justice administration.

12     Q.    Uh-huh.  And that's the education that you

13  were referring to as qualifying you to do a 590

14  analysis?

15     A.    Some of it, yes, ma'am.

16     Q.    Well, when you say your education --

17     A.    Formal education.  Formal education.

18     Q.    Okay.  So what informal education did you

19  have?

20     A.    Life itself.  My experiences in life and

21  dealing with law enforcement.

22     Q.    Did you have experiences with juveniles?

23     A.    Yes, ma'am.

24     Q.    In what context?

25     A.    A lot of different arrests of juveniles,

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 243 of 258

1   when I was on the patrol, in my career.  Lots of them.

2   Lots of them I took home as a matter of fact.  But

3   anyhow, that's beside the point.

4        Q.   Okay.  So when you were -- your arresting

5   of juveniles, you're saying, helps qualify you to

6   interview and do some analysis of psychological

7   childhood issues?

8        A.   Yes.  I've talked to juveniles and put them

9   under arrest.  And other situations where I've talked

10  to them in-depth about what was -- in-depth about

11  what's going on in this particular crime.  And actually

12  been around their families.

13            MS. JONES:  I think I am about done.  I

14  want to step out and make sure.

15            (A break was taken.)

16  BY MS. JONES:

17       Q.   So you were testifying earlier that you

18  didn't recall how many juvenile life without parole

19  hearings you were involved in.

20            Do you recall that you have voted on all of

21  the parole proceedings for each of the named defendants

22  in this case?

23       A.   No, I don't.

24       Q.   So do you recall voting on the parole of

25  Norman Brown?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 244 of 258

1        A.   I think I did.

2             We see so many cases, ma'am.

3        Q.   Yeah, that's fair enough.

4        A.   I'm sure -- I'm not -- I'm not hundred --

5  I'm sure I did.

6        Q.   Do you recall voting on Theron Roland?

7        A.   I don't -- I don't recall that.

8        Q.   Do you recall voting on Sidney Roberts?

9        A.   I don't recall that.

10       Q.   Do you remember anything about Norman

11  Brown?  It seems like you have a little bit of a --

12       A.   I remember the crime --

13       Q.   Okay.

14       A.   -- that was committed.  He was shot and

15  killed, the victim.  I can't recall his name.  Starts

16  with an H.  And that his wife was seriously injured.

17       Q.   Have you reviewed any of their parole files

18  since this lawsuit was filed?

19       A.   No.  Other than this one that I brought

20  with me.

21       Q.   Which was Norman Brown?

22       A.   For some reason I was thinking it was about

23  this.

24       Q.   Okay.

25       A.   And it was ████.  I just looked over it

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 245 of 258

1  **yesterday.  Glanced over it.**

2      Q.    So you glanced over ██████████

3      **A.    No.  ████████**

4      Q.    Over Brown.  Okay.

5            MS. JONES:  Okay.  No further questions.

6                     CROSS-EXAMINATION

7  QUESTIONS BY MR. SPILLANE:

8      Q.    All right.  I'm Mike Spillane.  I have a

9  few questions.

10           You testified that at the board meeting in

11  May of 2017, you seconded the motion to raise the cap

12  for serious offenders at high level institutions, the

13  number of hearings to 15 and at lower level

14  institutions to 18; is that accurate?

15     **A.    Yes, sir.**

16     Q.    Are the gentleman involved in JL WOP, to

17  your knowledge, at high level institutions?

18     **A.    Would you say that again, please.**

19     Q.    Are they confined in high level

20  institutions that would be under the 15 cap, as opposed

21  to the 18 cap?

22     **A.    I think so.**

23     Q.    Earlier you testified about the average, if

24  I remember correctly, the number of hearings that you

25  do being 6 to 12; is that accurate?

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 246 of 258

1       A.    No.   Twelve -- well, yeah, 6 to 12.   I
2  figured around 12.

3       Q.    And also I think you were asked a question
4  as if you had ever done, I think, 18 in a day.   And you
5  said -- I think you said that that was rare.   Tell me
6  how rare it is?

7       A.    Very rare.   Now, since I've been there.
8  'Cause they've cut -- you know, they've cut back.
9  They've capped them 1 at 18, but we don't -- we rarely
10 hear 18.

11      Q.    Now, when you hear 18, I'm assuming that's
12 at a low level institution, because that's the cap?

13      A.    Normally.   Since that took effect.

14      Q.    When you're at a high level institution,
15 such as the one that has the caps of 15, like where
16 these JL WOPs you think may be, do -- where does that
17 fall on your average of 6 to 12 hearings?   Is that at
18 the low end?

19      A.    I think that would be at the high end
20 maybe.   It's a 12.   Maybe I misunderstood your
21 question.

22      Q.    I didn't ask a very good question.

23            You said your average is 6 to 12.   Is
24 that --

25      A.    That was my guess at the time I was asked.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 247 of 258

1    Q.   And that's the average of all the hearings

2  you do?

3        **A.   Yes, 6 to 12.   Now.**

4    Q.   A day.  And is it different if you're at a

5  high level institution than a low level institution, or

6  is that the average for everything?

7        **A.   That's probably the average now.   Eighteen**

8  **is what we capped it at.   Eighteen and fifteen, if I**

9  **remember right.   But that doesn't necessarily mean that**

10 **follows through to be.   Does that makes sense?**

11       Q.   Okay.

12       **A.   'Cause sometimes we've gone over both those**

13 **numbers for logistical reasons.**

14       Q.   Okay.   I guess I'm going to try this one

15 more time.

16       **A.   Sorry.**

17       Q.   Is there a difference in the average number

18 of hearings that you do when you're at a high level

19 institution as opposed to when you're at a low level

20 institution?

21       **A.   No.**

22       Q.   All the same?

23       **A.   Pretty much.**

24       Q.   Good enough.

25            You talked about the board action sheet,

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 248 of 258

1  and you showed us the board action sheet.  And you also

2  showed us the second page, where you have really two

3  boxes to check.  One of which is circumstances of the

4  offense -- I mean one of which is the seriousness and

5  circumstances of the offense; and the other one is that

6  they can't live and remain at liberty.  And then you

7  have subcategories.

8         Are those the only -- those two main

9  categories, one and two, is that all you have the

10 option of --

11     **A.   No.**

12     Q.   -- checking?

13     **A.   No.  We have the option of checking one of**

14 **those boxes.**

15     Q.   Well, I'm guessing I'm not making myself

16 clear again.

17         There are only -- number one is "release at

18 this time would depreciate the seriousness of the

19 present offense."

20     **A.   Correct.**

21     Q.   And that's one.  And then you have A

22 through G under that?

23     **A.   Correct.**

24     Q.   And then two you have "reasonable

25 probability that the offender at this time would live

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 249 of 258

1  and remain at liberty."  And you have A through K under

2  that.

3          But all of your options are in one and two;

4  is that accurate?

5      A.   Correct.

6      Q.   Do one and two represent an exclusive or an

7  inclusive thing of everything you considered in the

8  parole process?

9      A.   I would say yes.

10     Q.   So let me --

11     A.   For the most part.

12     Q.   For the most part?

13     A.   Uh-huh.

14     Q.   So you feel like all of the factors that

15  you talked about, you consider under Miller, can be fit

16  within one or two?  And whatever you say is fine.  I

17  just want to know the answer.

18     A.   Yes.

19     Q.   Okay.  But you still think about all those

20  factors.  You just put them into one or two?

21     A.   Yes.

22     Q.   Okay.  Fair enough.

23          When you're talking about your review of

24  JL WOP cases, as I understood your testimony, you said

25  you read every piece of paper in the parole file of one

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 250 of 258

1    that you're reviewing; is that accurate?

2         **A.   On the juvenile ones?**

3         Q.   Yes, sir.

4         **A.   At some point in time, yeah.**

5         Q.   I mean, when you're reviewing it before you

6    do an initial vote, after someone that -- someone else

7    handled the hearing, you read every piece of paper in

8    the file?

9         **A.   Well, on that particular day at the**

10   **hearing.**

11        Q.   Okay.  Again, I'm not asking a good

12   question.

13        **A.   Well, maybe it's just me not comprehending.**

14        Q.   Well, first of all, let's ask about the

15   hearing.  If you do the hearing -- if you're the

16   hearing officer that's running that, do you read every

17   piece of paper in the file?

18        **A.   For the most part, yes.  I wouldn't say a**

19   **hundred percent.  Nothing's a hundred percent.**

20        Q.   Is it your intention to read every piece of

21   paper?

22        **A.   It is.**

23        Q.   And let's go through the cases where you're

24   reviewing a JL WOP where someone else has handled the

25   hearing.  Do you read every piece of paper in that

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 251 of 258

1   file?

2       A.   Not always.

3       Q.   Tell me what you don't read and why?

4       A.   Well, it could be the sentence and judgment

5   from the Court.  As I indicated earlier, if

6   there's a -- if there's a restitution involved.  Some

7   documents I don't -- do not read all of them.  There's

8   numerous documents in those file.

9       Q.   Do you always read the prehearing report --

10      A.   Yes.

11      Q.   -- in every case?

12      A.   Yes.

13      Q.   If there's victim information, saying this

14  guy should be let go for reason X, Y, and Z, do you

15  always read that?

16      A.   Yes.

17      Q.   If there's information from the prosecutor

18  saying he shouldn't be let go for reason X, Y, and Z,

19  do you always read that?

20      A.   If it's in the report, I read it.  Whether

21  they oppose.  But that very seldom happens in the

22  prosecutor's prehearing notes.

23      Q.   Well, not just --

24      A.   Revocations.

25      Q.   Not just the prehearing report.  But if

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 252 of 258

1    there's separate victim information in the file that's

2    separate from the prehearing report, do you read that?

3        **A.   Yes.**

4        Q.   And if there's separate information from

5    the prosecutor, do you read that?

6        **A.   Yes.**

7        Q.   Okay.  You were asked a lot of questions

8    about the transcript from the ████████ hearing this

9    morning.  When was the -- was this the first time you

10   saw it since you conducted the hearing?

11       **A.   Yes.  To my knowledge, that's the first**

12   **time I've seen it.**

13       Q.   Do you have a firm recollection of the

14   things you said at the hearing and why you said them?

15       **A.   Not a firm recollection, no.**

16       Q.   Okay.

17       **A.   That was a long time ago.**

18       Q.   Okay.  I heard you testify on direct, as I

19   understood it, that one of Mr. ████████ conduct

20   violations was introducing drugs into an institution;

21   is that correct?

22       **A.   Correct.**

23       Q.   Is that a very serious conduct violation?

24       **A.   That is considered a major offense.**

25       Q.   Why?

Pohlman USA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 253 of 258

1      **A.    Conduct.  Obviously bringing drugs into an**

2   **institution, where they're not allowed.**

3          Q.   I also noticed that you talked about, he

4   caused serious injury to another -- I don't know if you

5   used these words, but he caused serious injury to

6   another inmate by stabbing him.  Is that serious?

7          **A.    That's considered a serious violation, yes.**

8          Q.   Okay.  And also, I think on multiple

9   occasions, if I read the report correctly, he had

10  violations for carrying weapons.  Is that a serious

11  violation?

12         **A.    I don't recall that particular violation,**

13  **but it is a serious violation.**

14         Q.   Is that something you think about in your

15  calculation of whether or not someone's aggressive or

16  whether or not someone is --

17         **A.    Sure.**

18         Q.   -- has bad conduct?

19         **A.    Bad conduct, yeah, sure.  If you're**

20  **aggressive.**

21         Q.   So it isn't just the number of conduct

22  violations.  It's the type?

23         **A.    The seriousness of them, too.**

24         Q.   Okay.  Have some of the offenders that have

25  been sentenced to JL WOP and then become parole

Pohlman USA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 254 of 258

1  eligible under 55884 -- 558047 and had parole hearings,

2  been given release dates?

3      A.   Yes.  Let me clarify that.  5558 is --

4      Q.   558047 is part of Senate Bill 590.

5      A.   Okay.  Take that back.

6           What was your question?

7      Q.   Have some of them -- although, I'm not

8  asking if they've been released yet, but have they been

9  given dates for release?

10     A.   I'm sure that at least -- I feel sure.  I

11 don't know for a fact, but I think there's one I know.

12 And maybe more than one.

13     Q.   All right.

14     A.   But I don't know the number.

15     Q.   Very good.

16          Let me ask you about the circumstances of

17 the offense.  You indicated that an offense is serious

18 and it's not going to become less serious over time.

19 But all of these gentleman that are in -- that are

20 under a JL WOP sentence and then become parole

21 eligible, they've all committed murder, haven't they?

22     A.   Correct.  Been convicted of murder.

23     Q.   And some of them are released even though

24 the offense is very serious?

25     A.   Correct.

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 255 of 258

1    Q.    So the fact that you find that release at

2  this time would depreciate the seriousness of the

3  offense, that doesn't mean that they couldn't be

4  released at some future date; is that correct?

5        **A.    That's correct.**

6    Q.    All right.

7        **A.    I think 5 -- you said 559?  It's my**

8  **understanding from reading it and under- -- taking --**

9  **digesting it all, that they are allowed to have a**

10 **parole hearing as juvenile offenders.  Just like**

11 **anybody else.**

12   Q.    Very good.

13       Now, when the -- and I don't know if you

14 remember this, but do you remember the delegate at Mr.

15 ███████  parole hearing talking about his abuse and

16 his life at home before his crime?

17       **A.    I don't remember it.**

18   Q.    If the delegate had talked about that, is

19 that something you would have listened to and

20 considered in your decision?

21       **A.    Sure.**

22   Q.    If that was mentioned in the parole report,

23 is that something you would have read and considered in

24 your decision?

25       **A.    Yes.  I indicated that previously.**

PohlmanUSA Court Reporting
(877) 421-0099    www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 256 of 258

1     Q.   Okay.  You mentioned a little bit that you

2 had been involved with juveniles while you were on the

3 Highway Patrol.  And you said something that stood out

4 to me.  You said sometimes you would take them home.

5          What did that mean?

6     **A.   That means just what I said.  They'd be in**

7 **trouble.  And rather than incarcerate them or put them**

8 **in the juvenile system, I would take them home and turn**

9 **them over to their parents, and tell them what they did**

10 **was wrong.  And hopefully it didn't happen again.  That**

11 **occasion had arisen several times.**

12          MR. SPILLANE:  Thank you.

13          That's all I have.

14          MS. JONES:  Nothing further.

15          THE WITNESS:  Okay.  Thank you.

16          MR. CRANE:  Now, you have the choice to

17 reserve the right to read over the deposition

18 transcript and correct any typographical errors if

19 you'd like, or you can waive signature on that and just

20 trust the court reporter.

21          THE WITNESS:  Okay.

22          MR. CRANE:  What would you like to do?

23          THE WITNESS:  Yeah, I'd like to read it

24 over.

25

PohlmanUSA Court Reporting
(877) 421-0099   www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 257 of 258

1                CERTIFICATE OF REPORTER

2          I, Kim D. Murphy, Certified Court Reporter,

3     for the State of Missouri, do hereby certify that the

4     witness whose testimony appears in the foregoing

5     deposition was duly sworn by me; that the testimony of

6     said witness was taken by me to the best of my ability

7     and thereafter reduced to typewriting under my

8     direction; that I am neither counsel for, related to,

9     nor employed by any of the parties to the action in

10    which this deposition was taken, and further that I am

11    not a relative or employee of any attorney or counsel

12    employed by the parties thereto, nor financially or

13    otherwise interested in the outcome of the action.

14

15

16

17

18          _____

19                Kim D. Murphy, CCR

20

21

22

23

24

25

PohlmanUSA Court Reporting
(877) 421-0099     www.PohlmanUSA.com
Case 2:17-cv-04082-NKL   Document 134-14   Filed 06/12/18   Page 258 of 258