# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISION

| | | |
|---|---|---|
| NORMAN BROWN, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 17-cv-4082 |
| | ) | |
| ANNE L. PRECYTHE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## SUGGESTIONS IN SUPPORT OF
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT[1]

---

[1] This brief contains redactions pursuant to the parties' Protective Order (Doc. #54). An unredacted version of this brief is filed under seal with the Court. *See* Doc. #136.

# TABLE OF CONTENTS

I. Introduction ............................................................................................................. 1

II. Statement of Uncontroverted Material Facts ......................................................... 4

   A. Board members have inadequate training on Senate Bill 590 and inadequate training or experience regarding considerations of youth or adolescent development. ..................... 6

   B. Defendants have failed to fully implement the requirements of Senate Bill 590, and do not give adequate consideration to Proposed Class Members' youth and attendant characteristics. ................................................................................................ 9

   C. SB 590 hearings are treated largely like any other parole consideration hearing ............. 13

   D. The Proposed Class Members' parole files are not reviewed in full before their hearings and are rarely read in full before the Board votes. ......................................................... 17

   E. Defendants impose unfair limitations on inmates and their delegates, but not on victims, victim representatives, or prosecuting attorneys. ......................................................... 18

   F. Defendants have denied parole to the vast majority of Proposed Class Members. ........... 21

   G. Defendants' parole decisions are arbitrary. ...................................................... 22

   H. Defendants' parole decisions are primarily based on seriousness of the offense—not the inmate's maturity and rehabilitation, or likeness to reoffend. ......................................... 24

      1. Norman Brown .................................................................................. 27

      2. Ralph McElroy .................................................................................. 29

      3. Sidney Roberts .................................................................................. 30

      4. Theron "Pete" Roland ......................................................................... 32

   I. The parole review process is highly secretive and Defendants provide Plaintiffs with insufficient notice and explanation of their decisions. .................................................... 33

   J. Misconduct by Board members and parole staff, concealed by Defendants and other parole staff, illustrates a lack of professionalism and integrity brought to parole consideration generally. ................................................................................. 38

III. Summary Judgment Standard ............................................................................. 40

IV. Argument ........................................................................................................... 40

   A. Plaintiffs have a liberty interest in parole proceedings that provide a meaningful opportunity for release based on demonstrated maturity and rehabilitation. ................. 40

i

B.  Plaintiffs have produced uncontroverted evidence of multiple due process deprivations within Defendants' parole review process for the Class (Counts II and IV). ................ 43

    1.  Defendants violated Plaintiffs' due process rights by denying them the access to their parole files, the ability to present multiple witnesses on their behalf, and the opportunity to be heard by all those Board members determining their release. ... 45

    2.  Defendants deny Plaintiffs due process by providing mere boilerplate generalities as explanation for the Board's decisions. .................................................................... 48

    3.  Defendants systemically deprive the Proposed Class of due process because the Board's decisions are arbitrary and unreliable. .................................................................... 49

C.  Plaintiffs are entitled to summary judgment on their claims that Defendants' current policies, procedures, and customs constitute cruel and unusual punishment (Counts I and III). ..................................................................................................................... 50

D.  Plaintiffs are entitled to a judgment and declaration that Defendants are not complying with Missouri Statute (Count V). .......................................................................... 54

V.  Conclusion ......................................................................................................................... 56

# TABLE OF AUTHORITIES

**Cases**

*Adams v. Alabama*, 136 S. Ct. 1796 (2016) ................................................................. 52

*Armstrong v. Manzo*, 380 U.S. 545 (1965) ................................................................. 44

*Atwell v. State*, 197 So. 3d 1040 (Fla. 2016), *reh'g denied*, No. SC14-193, 2016 WL 4440673 (Fla. Aug. 23, 2016) ................................................................. 41, 51, 52

*Board of Regents v. Roth*, 408 U.S. 564 (1972) ................................................................. 43

*Candarini v. Attorney General of the United States*, 369 F.Supp. 1132 (E.D.N.Y.1974) ........... 45

*Casiano v. Comm'r of Corr.*, 115 A.3d 1031 (Conn. 2015) ........................................... 51

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ................................................................. 40

*Cooper v. Missouri Bd. of Prob. & Parole*, 866 S.W.2d 135 (Mo. banc 1993) ...................... 45

*Craft v. Attorney General of the United States*, 379 F.Supp. 538 (M.D.Pa. 1974) ............... 45, 48

*Diatchenko v. Dist. Attorney for Suffolk Dist.*, 1 N.E.3d 270 (Mass. 2013) ........................ 41

*Diatchenko v. Dist. Attorney for Suffolk Dist.*, 27 N.E.3d 349 (Mass. 2015) ..................... 42, 51

*Evitts v. Lucey*, 469 U.S. 387 (1985) ................................................................. 49

*Graham v. Florida*, 560 U.S. 48 (2010) ................................................................. passim

*Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1 (1979) ......................... 42, 43

*Greiman v. Hodges*, 79 F. Supp. 3d 933 (S.D. Iowa 2015) ........................................... passim

*Grey v. City of Oak Grove*, 396 F.3d 1031 (8th Cir. 2005) ........................................... 40

*Hawkins v. New York State Dep't of Corr. & Cmty. Supervision*, 30 N.Y.S.3d 397 (N.Y. App. Div. 2016) ................................................................. 41

*Hayden v. Keller*, 134 F. Supp. 3d 1000 (E.D. N.C. 2015) ........................................ 41, 43, 47, 52

*Maryland Restorative Justice Initiative v. Hogan*, No. ELH-16-1021, 2017 WL 467731 (D. Md. Feb. 3, 2017) ................................................................. 41, 42, 52

*Miller v. Alabama*, 567 U.S. 460 (2012) ................................................................. passim

*Montgomery v. Louisiana*, 577 U.S. ---, 136 S. Ct. 718 (2016) .................................... 1, 4, 50, 51

*Olds v. Norman*, No. 4:09CV-1782 CAS/TCM, 2013 WL 316017 (E.D. Mo. Jan. 8, 2013), *report and recommendation adopted,* No. 4:09-CV-1782 CAS, 2013 WL 315974 (E.D. Mo. Jan. 28, 2013) ................................................................. 44, 48, 49

*Parker v. Corrothers*, 750 F.2d 653 (8th Cir. 1984)........................................................ 44, 48, 49

*People v. Contreras*, 411 P.3d 445 (Cal. 2018) .................................................................. 51

*Proctor v. LeClaire*, 846 F.3d 597 (2d Cir. 2017) ............................................................. 44

*State ex rel. Cavallaro v. Groose*, 908 S.W.2d 133 (Mo. 1995).......................................... 40

*State v. Moore*, 76 N.E.3d 1127 (Ohio 2016) ..................................................................... 51

*State v. Young*, 794 S.E.2d 274 (N.C. 2016)........................................................................ 52

*Swarthout v. Cooke*, 131 S. Ct. 859 (2011) ........................................................................ 44

*Tatum v. Arizona*, 137 S. Ct. 11 (2016) ................................................................................ 1

*U.S. ex rel. Brown v. U.S. Bd. of Parole*, 443 F. Supp. 477 (M.D. Pa. 1977) ............................. 45

*U.S. ex rel. Richerson v. Wolff*, 525 F.2d 797 (7th Cir. 1975)..................................................... 45

*United States ex rel. Johnson v. Chairman of New York State Board of Parole*, 500 F.2d 925 (2d Cir.), *vacated as moot*, 419 U.S. 1015 (1974)........................................................................ 45

*United States v. Grant*, 887 F.3d 131 (3d Cir. 2018)................................................................. 54

*Wershe v. Combs*, 1:12-cv-1375, 2016 WL 1253036 (W.D. Mich. Mar. 31, 2016) .................... 41

*Wilkinson v. Austin*, 545 U.S. 209 (2005).................................................................................... 40

*Williams v. Missouri Bd. of Prob. & Parole*, 661 F.2d 697 (8th Cir. 1981)................................ 45

**Statutes**

RSMo. § 217.692 ............................................................................................................... 40

RSMo. § 558.047 ......................................................................................................... passim

RSMo. § 565.033 ......................................................................................................... passim

**Other Authorities**

Sarah French Russell, *The Role of the Crime at Juvenile Parole Hearings: A Response to Beth Caldwell's* Creating Meaningful Opportunities for Release, 41 Harbinger 227 (Dec. 8, 2016) 51

**Rules**

Fed. R. Civ. P. 25(d) ............................................................................................................ 1

Fed. R. Civ. P. 56(a) ......................................................................................................... 40

**Regulations**

14 CSR § 80-2.010.......................................................................................................... 19, 34

iv

**Constitutional Provisions**

MO. CONST. art. I, § 10 ........................................................................................................... 2, 3

MO. CONST. art. I, § 21 ........................................................................................................... 2, 3

U.S. CONST. amd. VIII............................................................................................................. 2, 3

U.S. CONST. amend. XIV............................................................................................................. 2

# I.   INTRODUCTION

"[C]hildren are different."[2] Despite this repeated proclamation from the country's highest court, Missouri's Parole Board still treats youthful offenders the same as adults:

```
 6        Q.      Do you know if there are specific protocols
 7   for hearings for juvenile life without parole offenders?
 8        A.      No, ma'am.
 9        Q.      Do you notice anything different during --
10   between how they're conducted, a juvenile life without
11   parole versus a nonjuvenile life without parole?  Are you
12   aware of any differences in how they're conducted?
13        A.      No, ma'am.
14        Q.      Since the new statute came down and these
15   juvenile life without parole offender hearings have been
16   happening, have there been any changes in how those
17   hearings are conducted?
18        A.      No, ma'am.
```

January 26, 2018 Deposition of Brian George, attached hereto as **Exhibit A** ("George Depo"), at 66:6-18.

The law clearly requires Defendants[3] to provide juvenile offenders with a meaningful and realistic opportunity for release based on demonstrated maturity and rehabilitation. *Graham v. Florida*, 560 U.S. 48, 75 (2010). Instead, each of the parole-eligible putative class members is

---

[2] *Miller v. Alabama*, 567 U.S. 460, 480-81 (2012); *Montgomery v. Louisiana*, 136 S. Ct. 718, 733 (2016); *Tatum v. Arizona*, 137 S. Ct. 11 (2016).

[3] As used herein, the term "Defendants" shall mean defendants Anne L. Precythe, Kenneth Jones, Jim Wells, Martin Rucker, Jennifer Zamkus, Gary Dusenberg, and Paul Fitzwater, collectively. Since the filing of this lawsuit, originally-named defendants Ellis McSwain and Don Ruzicka retired from the Parole Board. Paul Fitzwater is automatically substituted as a party for Mr. Ruzicka pursuant to Fed. R. Civ. P. 25(d).

subject to policies, procedures, and customs that preclude *Miller*-impacted individuals from presenting mitigating evidence of their youth; place undue reliance on the seriousness of the underlying offense; give insufficient consideration to Proposed Class Members' maturity, rehabilitation, and other factors the Board is statutorily required to consider; and result in arbitrary and unfair decisions.

In short, Defendants have denied Plaintiffs[4] a meaningful and realistic opportunity for release. Absent intervention by this Court, Defendants will continue to deny that chance to the Proposed Class Members in violation of the Eighth and Fourteenth Amendments to the United States Constitution and in violation of the Missouri Constitution, Art. I, §§ 10, 21. In light of these unlawful policies, procedures, and customs, Plaintiffs seek declaratory and injunctive relief on behalf of themselves and a class of individuals defined as:

> Individuals in the custody of the Missouri Department of Corrections who were sentenced to life without parole under a mandatory sentencing scheme and who were under 18 years of age at the time of the offense.

(the "Proposed Class" and each member of the Proposed Class a "Proposed Class Member").[5]

The uncontroverted material facts demonstrate that the Proposed Class is entitled to relief on all five counts. Unquestionably, Defendants deny Proposed Class Members the ability to meaningfully present mitigating evidence in their defense or confront the evidence against them. Inmates are universally denied access to their parole files, and Defendants have no formal mechanism in place through which Proposed Class Members can submit evidence of mitigating

---

[4] As used herein, the term "Plaintiffs" shall mean named plaintiffs Norman Brown, Ralph McElroy, Sidney Roberts, and Theron Roland, collectively.

[5] Plaintiffs filed a Motion for Class Certification on March 30, 2018. (Doc. # 103-104). That motion is fully briefed and remains pending.

2

factors of youth. Often, inmates' parole files contain errors which the Proposed Class Members cannot confront and correct.

Unquestionably, Defendants fail to devote adequate time to Proposed Class Members' parole considerations or give adequate consideration to Proposed Class Members' youthful characteristics at the time of their crimes. The Parole Board conducts more than 11,000 parole hearings every year, and Defendants routinely fail to review Plaintiffs' parole files before voting. During the actual hearings, the hearing panels did not ask any questions regarding the incompetencies associated with Plaintiffs' youth at the time of the underlying offenses and did not give meaningful consideration to Plaintiffs' home environment growing up or their "chronological age and its hallmark features – among them, immaturity, impetuosity, and failure to appreciate risks and consequences." *Miller*, 567 U.S. at 477.

Unquestionably, Defendants fail to give adequate explanation for their decisions and improperly focus on the seriousness of the offense rather than the inmate's maturity and rehabilitation over time. Defendants provide only boilerplate explanations for their decisions— relayed to the inmate on a two-page notice. The Board's own Chairs admit this notice does not provide adequate explanation for the Board's decision or any guidance to the inmate regarding steps they need to take to increase their readiness for parole.

These undisputed facts prove multiple due process violations, and further demonstrate that Plaintiffs are being denied a meaningful and realistic opportunity for release in violation of the Eighth Amendment and Article I, Sections 10 and 21 of the Missouri Constitution. Even setting aside the constitutional issues here, the facts prove that, at the very least, Defendants fail to comply with their statutory obligations under RSMo. §§ 558.047 and 565.033. For these reasons, Plaintiffs are entitled to judgment as a matter of law.

## II.    STATEMENT OF UNCONTROVERTED MATERIAL FACTS[6]

1.    In the State of Missouri, 95 individuals—including the four Plaintiffs—are currently incarcerated and serving life without parole sentences ("LWOP") for offenses they are convicted of committing when they were under 18 years of age.[7] *See* List of Proposed Class Members, attached hereto as **Exhibit B**.

2.    In 2012, the Supreme Court of the United States held that LWOP sentences should only be imposed upon the rarest juvenile offender, and that the mandatory imposition of LWOP sentences on juveniles is unconstitutional. *Miller*, 567 U.S. at 477, 479-80.

3.    In 2016, the Supreme Court of the United States held that *Miller* "announced a substantive rule of constitutional law," which applied retroactively to cases on collateral review. *Montgomery*, 136 S. Ct. at 732, 736.

4.    On March 15, 2016, after the Supreme Court's opinion in *Montgomery* was announced, the Missouri Supreme Court issued a uniform order providing that *Miller*-impacted individuals who had petitioned for habeas relief would be eligible to apply for parole after serving 25 years of their sentence, "unless his sentence is otherwise brought into conformity with *Miller* and *Montgomery* by action of the governor or enactment of necessary legislation." *See* Second Am. Compl. (Doc. #65) at ¶ 51; Defs.' Answer to Second Am. Compl. (Doc. #73) at ¶ 51.

5.    This March 15 Order was not the end for those habeas petitions. On July 19, 2016, the Missouri Supreme Court on its own motion vacated the March 15 Order, denied the petitions, and referred petitioners to new legislation: Senate Bill 590, 98th General Assembly ("SB 590").

---

[6] Within the Argument section of these Suggestions, these facts are cited as "SOF."

[7] As used herein, the term "JLWOP" refers to a mandatory LWOP sentence imposed on an individual who was under 18 years of age at the time of the underlying offense.

4

*See* Second Am. Compl. (Doc. #65) at ¶ 52; Defs.' Answer to Second Am. Compl. (Doc. #73) at ¶ 52.

6.     The State of Missouri passed SB 590 on May 12, 2016. *See* Second Am. Compl. (Doc. #65) at ¶ 53 and Exhibit 1 thereto (Doc. #65-1); Defs.' Answer to Second Am. Compl. (Doc. #73) at ¶ 53.

7.     SB 590 provides, in relevant part, that any person sentenced to JLWOP prior to August 28, 2016, "may submit to the parole board a petition for a review of his or her sentence, regardless of whether the case is final for purposes of appeal, after serving twenty-five years of incarceration on the sentence of life without parole." *See* Second Am. Compl. (Doc. #65) at ¶ 54 and Exhibit 1 thereto (Doc. #65-1); Defs.' Answer to Second Am. Compl. (Doc. #73) at ¶ 54; *see also* RSMo. § 558.047.1(1).

8.     SB 590 further provides that, at a "parole review hearing" under RSMo. § 558.047, the Parole Board must consider the following factors:

> (1) Efforts made toward rehabilitation since the offense or offenses occurred, including participation in educational, vocational, or other programs during incarceration, when available;
>
> (2) The subsequent growth and increased maturity of the person since the offense or offenses occurred;
>
> (3) Evidence that the person has accepted accountability for the offense or offenses, except in cases where the person has maintained his or her innocence;
>
> (4) The person's institutional record during incarceration; and
>
> (5) Whether the person remains the same risk to society as he or she did at the time of the initial sentencing[;]

as well as:

> (1) The nature and circumstances of the offense committed by the defendant;

(2) The degree of the defendant's culpability in light of his or her age and role in the offense;

(3) The defendant's age, maturity, intellectual capacity, and mental and emotional health and development at the time of the offense;

(4) The defendant's background, including his or her family, home, and community environment;

(5) The likelihood for rehabilitation of the defendant;

(6) The extent of the defendant's participation in the offense;

(7) The effect of familial pressure or peer pressure on the defendant's actions;

(8) The nature and extent of the defendant's prior criminal history, including whether the offense was committed by a person with a prior record of conviction for murder in the first degree, or one or more serious assaultive criminal convictions;

(9) The effect of characteristics attributable to the defendant's youth on the defendant's judgment; and

(10) A statement by the victim or the victim's family member as provided by section 557.041 until December 31, 2016, and beginning January 1, 2017, section 595.229.

RSMo. §§ 558.047.5, 565.033.2; *see also* Second Am. Compl. (Doc. #65) at ¶ 55 and Exhibit 1 thereto (Doc. #65-1); Defs.' Answer to Second Am. Compl. (Doc. #73) at ¶ 55.

9.      Plaintiffs allege that the parole process made available to them and the Proposed Class fails to comply with the statutory requirements of SB 590 and is constitutionally inadequate for several reasons.

**A. Board members have inadequate training on Senate Bill 590 and inadequate training or experience regarding considerations of youth or adolescent development.**

10.     The Missouri Parole Board currently consists of six members, with one seat vacant. *See* January 25, 2018 Deposition of Kenny Jones, attached hereto as **Exhibit C** ("Jones Depo"), at 109:12-22; *see also* Board of Probation and Parole, Missouri Boards & Commissions, https://boards.mo.gov/userpages/Board.aspx?9 (last visited June 18, 2018).

6

11.    None of the Board members have professional experience in adolescent development or child psychology. *See* December 20, 2017 Deposition of Ellis McSwain, attached hereto as **Exhibit D** ("McSwain Depo"), at 124:15-24.

12.    None of the Board members is trained in adolescent development or child psychology. *See* December 28, 2017 Deposition of Jessica Bliesath, attached hereto as **Exhibit E** ("Bliesath Depo, Vol. II"), at 69:11-70:13; *see also* December 6, 2017 Deposition of Kelly Dills, attached hereto as **Exhibit F** ("Dills Depo"), at 36:21-37:5 and 49:7-50:13; Jones Depo, Ex. C, at 23:20-24:21.

13.    No one on the Board has requested any juvenile-related training. *See* Dills Depo, Ex. F, at 177:19-179:13; *see also* McSwain Depo, Ex. D, at 122:7-123:11.

14.    Board members generally have law enforcement or legislative backgrounds, to wit:

a.    Kenny Jones, the current Chairman, is a former Moniteau County sheriff and Republican state representative. *See* Second Am. Compl. (Doc. #65) at ¶ 63; Defs.' Answer to Second Am. Compl. (Doc. #73) at ¶ 63.

b.    Jimmie Wells, who has served on the Board since 2009, is a former Pike County sheriff. *See* Second Am. Compl. (Doc. #65) at ¶ 64; Defs.' Answer to Second Am. Compl. (Doc. #73) at ¶ 64.

c.    Martin Rucker is a former Democratic state representative. *See* Second Am. Compl. (Doc. #65) at ¶ 65; Defs.' Answer to Second Am. Compl. (Doc. #73) at ¶ 65. Mr. Rucker does not have a college degree, and his sole professional experience is with Silvey Containers Corporation. *See* January 19, 2018 Deposition of Martin Rucker, attached hereto as **Exhibit G** ("Rucker Depo"), at 9:3-10:24.

7

d.   Ellis McSwain, a former Board member who was the Board Chairman until Mr. Jones took over those duties, was formerly a probation and parole officer, Warden at Algoa Correctional Center, and manager at other MDOC institutions. *See* Second Am. Compl. (Doc. #65) at ¶ 66; Defs.' Answer to Second Am. Compl. (Doc. #73) at ¶ 66; *see also* McSwain Depo, Ex. D, at 229:18-230:19.

e.   Don Ruzicka is a former Republican state representative from Mount Vernon, Missouri. *See* Second Am. Compl. (Doc. #65) at ¶ 67; Defs.' Answer to Second Am. Compl. (Doc. #73) at ¶ 67. Mr. Ruzicka resigned from the Board following revelation of an Inspector General's report detailing his misconduct at multiple parole hearings. *See* Jones Depo, Ex. C, at 108:3-109:3.

f.   Jennifer Zamkus, the only woman on the Board, is a military veteran, the former human resources director for MDOC, and formerly worked as a probation and parole officer and managed the Office of Civil Rights at the Missouri Department of Social Services. *See* Second Am. Compl. (Doc. #65) at ¶ 68; Defs.' Answer to Second Am. Compl. (Doc. #73) at ¶ 68. She is currently the Vice Chair of the Board. *See* December 13, 2017 Deposition of Jennifer Zamkus, attached hereto as **Exhibit H** ("Zamkus Depo"), at 21:13-23.

g.   Gary Dusenberg is a former Republican state representative, state trooper, and Vietnam veteran from Blue Springs, Missouri. *See* Second Am. Compl. (Doc. #65) at ¶ 69; Defs.' Answer to Second Am. Compl. (Doc. #73) at ¶ 69.

15.   Board members are supported in their work by parole analysts. *See* George Depo, Ex. A, at 14:3-16:25; *see also* Dills Depo, Ex. F, at 75:6-79:10 and 110:5-25.

16. Parole analysts are generally hired from within probation and parole and are not given any training or tools specifically tailored to juveniles or the *Miller* factors. *See* Jones Depo, Ex. C, at 43:18-44:2; *see also* George Depo, Ex. A, at 76:5-18; November 2, 2017 Deposition of Steven Mueller, attached hereto as **Exhibit I** ("Mueller Depo"), at 150:1-3; January 24, 2018 Deposition of Michelle Kasak, attached hereto as **Exhibit J** ("Kasak Depo"), at 37:9-38:2.

17. Although the Board was invited to attend a convention held by the Campaign for Fair Sentencing of Youth, they declined to accept the invitation because it was, in their opinion, too political. *See* Dills Depo, Ex. F, at 178:4-179:10.

**B. Defendants have failed to fully implement the requirements of Senate Bill 590, and do not give adequate consideration to Proposed Class Members' youth and attendant characteristics.**

18. Internally, the Board's operations are governed by regulations or administrative rules, a divisional manual, and any operation memos the Chair might issue. *See* Dills Depo, Ex. F, at 33:18-34:16; McSwain Depo, Ex. D, at 79:8-21.

19. Director Precythe is the final authority in approving changes to administrative rules and the divisional manual. *See* Dills Depo, Ex. F, at 31:11-32:17

20. The Board has now acknowledged a change in the law in its booklet *Procedures Governing the Granting of Paroles and Conditional Releases* (also known as the "Bluebook"), revised in January 2017: "Certain offenders who were under the age of eighteen (18) at the time of the offense may petition the Board after serving twenty-five (25) years in accordance with 558.047 RSMo. Parole consideration will be determined by the Board on an individual basis." *See*

9

Bluebook, attached hereto as **Exhibit K**, at ¶ 20(D); *see also* Second Am. Compl. (Doc. # 65) at ¶ 78; Defs.' Answer to Second Am. Compl. (Doc. #73) at ¶ 78.

21.     Aside from this change to the Bluebook, the Board has no written juvenile-, JLWOP- or SB 590-specific policies or procedures. *See* Mueller Depo, Ex. I, at 86:24-87:7; *see also* Dills Depo, Ex. F, at 27:17-29:20; Kasak Depo, Ex. J, at 103:14-106:18.

22.     In preparation for their parole hearing, Proposed Class Members are interviewed by an Institutional Parole Officer ("IPO"). *See* Dills Depo, Ex. F, at 80:15-20.

23.     IPOs use the same pre-hearing report worksheet ("PHR Worksheet") to conduct pre-hearing interviews with all Proposed Class Members. *See* Dills Depo, Ex. F, at 140:11-141:1 and Exhibit 23 thereto. A true and correct copy of the PHR Worksheet is attached hereto as **Exhibit L**.

24.     Michelle Kasak, the current Probation and Parole Regional Administrator, prepared the PHR Worksheet template after SB 590 was passed. *See* Kasak Depo, Ex. J, at 25:11-16, 46:20-47:7, 47:16-48:6, 56:19-59:13 and Exhibit 4 thereto.

25.     The PHR Worksheet does not identify all the elements SB 590 requires the Board to consider when reviewing the Proposed Class Members for parole release. *Compare* PHR Worksheet, Ex. L, *with* SB 590 (Doc. #65-1).

26.     More specifically, the PHR Worksheet does not expressly require that the IPO discuss with the inmate: (a) the inmate's subsequent growth and increased maturity since the underlying offense(s) occurred (RSMo. § 558.047.5(2)); (b) whether the inmate remains the same risk to society as they did at the time of the initial sentencing (RSMo. § 558.047.5(5)); or (c) the effect of characteristics attributable to the inmate's youth on their judgment (RSMo. § 565.033.2(9)). *See* PHR Worksheet, Ex. L; *see also* Dills Depo, Ex. F, at 146:13-17.

27.     IPOs were not provided any training on how to use this slightly modified PHR Worksheet. *See* December 21, 2017 Deposition of Jessica Bliesath, attached hereto as **Exhibit M** ("Bliesath Depo, Vol. I"), at 28:9-16 and 29:17-22; *see also* Kasak Depo, Ex. J, at 51:24-52:14; George Depo, Ex. A, at 23:5-24:6.

28.     Until December 2017, IPOs were routinely shredding the PHR Worksheets and any notes taken during their pre-hearing interviews. *See* Bliesath Depo, Vol. II, Ex. E, at 17:8-19:7 and Exhibit 7 thereto.

29.     After conducting a pre-hearing interview with the inmate, the IPO authors a Pre-Hearing Report ("PHR"). *See* Dills Depo, Ex. F, at 82:20-83:6.

30.     The format of the PHR is dictated by MDOC Procedure No. P6-4.1. *See* Bliesath Depo, Vol. II, Ex. E, at 24:17-25:1 and Exhibit 8 thereto. A true and correct copy of MDOC Procedure No. P6-4.1, attached hereto as **Exhibit N**.

31.     Procedure No. P6-4.1 does not require that PHRs contain a specific section on the characteristics of youth. *See* MDOC Procedure No. P6-4.1, Ex. N.

32.     In fact, the only reference in Procedure No. P6-4.1 specific to consideration of an inmate's youth at the time of the underlying offense is that which requires a discussion of the inmate's juvenile criminal record. *See* MDOC Procedure No. P6-4.1, Ex. N, at Section III(C)(8)(a).

33.     IPOs do not use any clinical tools in generating any portion of the PHR, including their assessment and recommendation for release or reconsideration. *See* Bliesath Depo, Vol. II, Ex. E, at 29:11-13.

34.     Much of the juvenile history in the PHRs is self-reported during the inmate's pre-hearing interview with their IPO. S*ee* Expert Report of Heidi Rummel, attached hereto as **Exhibit O** ("Rummel Report"), at 11.

11

35.     As Prof. Rummel explained in her expert report, juvenile offenders are not, in her experience "reliable reporters of the mitigating factors of youth such as childhood trauma and abuse, cognitive deficits, and mental and emotional health. In many cases, the most relevant information must be obtained from third-party sources." Rummel Report, Ex. O, at 11; *see also* Bliesath Depo, Vol. I, Ex. M, at 47:1-12.

36.     The PHR summarizes programs the inmate completed but does not discuss what programs were or were not available to them. *See* PHR Worksheet, Ex. L.

37.     Sidney Roberts' PHR ████████████████████████████████████ ███████████. *See* Bliesath Depo, Vol. II, Ex. E, at 44:1-11. *Compare* Sidney Roberts' PHR, attached hereto as **Exhibit P** ("Roberts PHR") *with* February 27, 2017 Report of Forensic Psychological Evaluation by Brooke Kraushaar, Psy.D., attached hereto as **Exhibit Q** ("Roberts' Kraushaar Report"), *and* Letters to Board regarding Sidney Roberts, attached hereto as **Group Exhibit R**.

38.     ████████████████████████████████████████████████ ███████. *See* Theron Roland's PHR, attached hereto as **Exhibit S** ("Roland PHR").

39.     Norman Brown's PHR ████████████████████████████████ ████████████████████████████████████████████████████████ ████████. *See* Norman Brown's PHR, attached hereto as **Exhibit T** ("Brown PHR").

40.     In fact, Mr. Brown's PHR ██████████████████████████████ ██████████████████████████████████████████████████████████. *See* Brown PHR, Ex. T, at 11.

41.     Ralph McElroy's PHR ██████████████████████████████████ █████████████████████████████████████████████. *See* Ralph McElroy's PHR, attached hereto as **Exhibit U** ("McElroy PHR").

42. Mr. Roberts' PHR ████████████████████████████

████████████████████████████████████████████

████████████████████████. *See* Bliesath Depo, Vol. I, Ex. M, at 74:14-22;

*see also* Roberts PHR, Ex. P; Sidney Roberts' Diagnostic Center Report, attached hereto as

**Exhibit V** ("Roberts Diagnostic Center Report"), at 3.

43. As with other parole consideration hearings, SB 590 hearings are guided by the

format and content of the PHR. *See* McSwain Depo, Ex. D, at 46:23-47:4.

44. In the opinion of Prof. Rummel, the many "deficiencies in the structure and

implementation of the Missouri's SB 590 parole process substantially undermine a meaningful

opportunity for release…." Rummel Report, Ex. O, at 15.

**C. SB 590 hearings are treated largely like any other parole consideration hearing.**

45. On average, the Parole Board conducts between 11,800 to 15,000 parole hearings

each year. *See* Dills Depo, Ex. F, at 206:12-14; *see also* December 21, 2017 Deposition of Gary

Dusenberg, attached hereto as **Exhibit W** ("Dusenberg Depo"), at 17:18-24; McSwain Depo, Ex.

D, at 25:8-26:13.

46. The number of hearings the Board conducts per day is currently capped at 18.

Kenny Jones raised this from 14 after he became Chairman of the Board. *See* Dills Depo, Ex. F, at

92:11-94:3; *see also* Jones Depo, Ex. C, at 57:23-58:14.

47. On average, parole hearings are no more than 30 minutes long; the average SB 590

hearing is 45 minutes long. *See* Dusenberg Depo, Ex. W, at 114:9-24; *see also* George Depo, Ex.

A, at 60:19-61:12; McSwain Depo, Ex. D, at 31:21-32:15.

48. Parole decisions for the Proposed Class Members are sometimes made in a matter

of days. *See* Norman Brown's Denial Notice, attached hereto as **Exhibit X** ("Brown Denial

13

Notice"); *see also* Lisa Harris' Denial Notice, attached hereto as **Exhibit Y** ("Harris Denial Notice").[8]

49.     SB 590 hearings are substantively no different than any other type of parole consideration hearing. *See* Jan. 6, 2017 Board Meeting Minutes, attached hereto as **Exhibit Z**; *see also* Bliesath Depo, Vol. II, Ex. E, at 51:14-20; Dills Depo, Ex. F, at 110:23-25; Dusenberg Depo, Ex. W, at 114:25-115:11 and 116:15-117:17; Jones Depo, Ex. C, at 48:2-49:16; George Depo, Ex. A, at 66:6-18; McSwain Depo, Ex. D, at 105:12-106:3; Rucker Depo, Ex. G, at 35:8-24.

50.     Like all other parole consideration hearings, SB 590 hearings are conducted by a panel consisting of one Board member, one parole analyst, and one other parole staff member (the "Hearing Panel"). *See* MDOC Procedure No. P6-6.1, attached hereto as **Exhibit AA**; *see also* McSwain Depo, Ex. D, at 127:16-24; Dills Depo, Ex. F, at 88:9-89:3.

51.     Typically, the Board member on a SB 590 Hearing Panel is the individual who runs the hearing. *See* George Depo, Ex. A, at 36:9-18.

52.     Plaintiffs each have had a parole hearing under SB 590:

    a.   Norman Brown's parole hearing took place on May 24, 2017. His hearing panel consisted of ███████████████████████████████████████ ████████████████████████████████████████. *See* ██████ ███████████████████████████████████████.

    b.   Ralph McElroy's parole hearing took place on December 13, 2016. His hearing panel consisted of ██████████████████████████████████ ████████████████████████████████████████████

---

[8] Lisa Harris is a Proposed Class Member, not a named plaintiff.

▮▮▮▮▮▮▮▮. *See* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮.

    c.    Sidney Roberts' parole hearing took place on March 9, 2017. His hearing panel consisted of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See*

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

    d.    Theron Roland's parole hearing took place via videoconference on January 3, 2017. His hearing panel consisted of ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮. *See* Cover Sheet to Theron Roland's parole file, attached hereto as **Exhibit EE**. ▮▮▮▮ and ▮▮▮▮ appeared by videoconference. *See* ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮.

53.    All JLWOP parole decisions are made by a majority of the Board; they are not full Board decisions. *See* McSwain Depo, Ex. D, at 127:1-8; *see also* Jones Depo, Ex. C, at 68:7-16.

54.    Voting Board members and Hearing Panel members use a Board Action Sheet ("BAS") to indicate their vote. *See* McSwain Depo, Ex. D, at 128:13-24. A blank BAS template is attached hereto as **Exhibit GG**. *See* McSwain Depo, Ex. D, at 133:20-134:5 and Exhibit 7 thereto.

55.    The BAS contains a box for the Hearing Panel to make comments intended to give other voting Board members insight into what the panel saw or heard in the hearing. *See* Rucker Depo, Ex. G, at 51:2-7.

56.    Chairman Jones believes the comments in the box further explain the basis for the Board's decision. *See* Jones Depo, Ex. C, at 80:16-23.

15

57. The parole analysts group created a third page to the BAS ("BAS Supplement") specifically for SB 590 hearings. *See* Dills Depo, Ex. F, at 110:19-25, 155:2-21. A blank BAS Supplement template is attached hereto as **Exhibit HH**.

58. The BAS Supplement is intended to document evidence in support of each of the elements in SB 590. *See* Dills Depo, Ex. F, at 155:16-21.

59. Board members were not provided training on how to use the BAS Supplement. *See* Zamkus Depo, Ex. H, at 30:14-24 and 67:22-68:1.

60. The BAS Supplement does not identify all the elements SB 590 requires the Board to consider—in fact, it omits the ten elements listed in RSMo. § 565.033.2. *Compare* BAS Supplement, Ex. HH, *with* RSMo. § 565.033.2; *see also* George Depo, Ex. A, at 102:9-16.

61. Neither the BAS Supplemental nor SB 590 itself indicate what weight should be assigned to any of the elements. *See* RSMo. §§ 558.047, 565.033.2; *see also* Dills Depo, Ex. F, at 146:18-20; Mueller Depo, Ex. I, at 126:10-127:20.

62. Mr. Roberts' IPO was unable to articulate what weight she applied to any of the various factors in arriving at her assessment and recommendation. *See* Bliesath Depo, Vol. I, Ex. M, at 55:3-16, 61:3-63:22, and 73:4-83:2; Bliesath Depo, Vol. II, Ex. E, at 28:7-29:13 and 42:20-43:7.

63. Parole analysts are under the impression that the factors listed on the BAS Supplement are the only additional factors the Board is required to consider when conducting parole reviews for the Proposed Class Members. *See* George Depo, Ex. A, at 25:13-16 and 50:5-18.

64. This belief is shared by the Board: McSwain testified that he likely did not ask ▬▬▬▬▬▬ about abuse he suffered as a child because it was not listed as one of the five

questions in the BAS Supplement (*see* McSwain Depo, Ex. D, at 159:5-20); Dusenberg testified that there is nothing in the parole file that deals specifically with the SB 590 factors other than the BAS Supplement (*see* Dusenberg Depo, Ex. W, at 79:23-80:5).

### D. The Proposed Class Members' parole files are not reviewed in full before their hearings and are rarely read in full before the Board votes.

65.     The Hearing Panel is not required to review the inmate's entire parole file—including the PHR—prior to the hearing, and most Board members do not do so. *See* Dills Depo, Ex. F, at 106:20-107:15; *see also* George Depo, Ex. A, at 32:14-23; Jones Depo, Ex. C, at 62:12-25; Mueller Depo, Ex. I, at 165:15-166:13; McSwain Depo, Ex. D, at 141:4-7 and 142:1-14; Rucker Depo, Ex. G, at 43:16.

66.     The first time Gary Dusenberg saw ███████████'s parole file was the day of ███ ███████'s hearing. *See* Dusenberg Depo, Ex. W, at 24:5-27:11 and 189:22-190:25.

67.     ███████████'s parole file consists of approximately 179 pages, yet Mr. Dusenberg spent only 10-20 minutes reviewing it prior to ████████'s hearing. *See* Dusenberg Depo, Ex. W, at 189:22-190:25; *see also* ██████████████████████████████.

68.     Typically, the Hearing Panel does not discuss an inmate's case prior to their hearing. *See* George Depo, Ex. A, at 43:11-19.

69.     Hearing Panel members typically review parole file materials while SB 590 hearings are being conducted. *See* George Depo, Ex. A, at 44:2-17.

70.     After hearings are conducted, the Hearing Panel votes on release. *See* Dusenberg Depo, Ex. W, at 38:5-46:1.

71.     Hearing Panel members typically discuss cases for approximately 5-10 minutes before voting. *See* Dusenberg Depo, Ex. W, at 160:1-25.

72.     However, Board members on a Hearing Panel are not required to read the inmate's entire parole file before voting, and many Board members do not do so as a general practice. *See* Dusenberg Depo, Ex. W, at 160:1-169:17 and 251:14-253:6; *see also* Jones Depo, Ex. C, at 69:22-71:10; McSwain Depo, Ex. D, at 142:15-20. At ████████'s hearing, the Board member leading the hearing acknowledged, "This is the first time I've encountered this case, believe it or not." ████████████████████████████████████.

73.     Voting Board members do not listen to audio of hearings they do not attend. *See* Dusenberg Depo, Ex. W, at 48:12-25.

74.     Even when voting Board members were not a part of the inmate's Hearing Panel, they do not always review the inmate's entire parole file before voting. *See* Dusenberg Depo, Ex. W, at 50:2-53:1.

75.     In fact, Dusenberg voted on ████████████████████████, but he only recalls reviewing two JLWOP parole files. *See* Dusenberg Depo, Ex. W, at 72:12-13; *see also* Norman Brown's BAS, attached hereto as **Exhibit II** ("Brown BAS"); Ralph McElroy's BAS, attached hereto as **Exhibit JJ** ("McElroy BAS"); Sidney Roberts' BAS, attached hereto as **Exhibit KK** ("Roberts BAS"); Theron Roland's BAS, attached hereto as **Exhibit LL** ("Roland BAS").

**E. Defendants impose unfair limitations on inmates and their delegates, but not on victims, victim representatives, or prosecuting attorneys.**

76.     Generally speaking, inmates face greater restrictions at their hearings than victims, victim representatives, or prosecuting attorneys.

77.     Inmates are permitted to have only one person present at their hearing. That individual is referred to as the inmate's delegate. *See* McSwain Depo, Ex. D, at 242:2-13; *see also* February 8, 2018 Deposition of Don Ruzicka, attached hereto as **Exhibit MM** ("Ruzicka Depo"),

18

at 25:14-24; Second Am. Compl. (Doc. #65) at ¶ 81; Defs.' Answer to Second Am. Compl. (Doc. #73) at ¶ 81.

78.     For example, Mr. Roberts was precluded from having both his mother and attorney present at his parole hearing. *See* Second Am. Compl. (Doc. #65) at ¶ 158; Defs.' Answer to Second Am. Compl. (Doc. #73) at ¶ 158.

79.     But more than one victim or victim representative is permitted to appear, despite the fact that State regulations limit them to one person as well. *See* 14 CSR § 80-2.010(5)(B)(1); *see also* McSwain Depo, Ex. D, at 132:3-133:16 and Exhibit 3 thereto; Kasak Depo, Ex. J, at 24:25-25:10; Apr. 27, 2017 letter from A. Precythe (Doc. #65-3).

80.     Hearing Panels limit an inmate's delegate to speaking only to the inmate's home plan, in contravention of State regulations. *Compare* McSwain Depo, Ex. D, at 242:6-18 and 14 CSR § 80-2.010(5)(A)(1) *with* Apr. 27, 2017 letter from A. Precythe (Doc. #65-3).

81.     At ███████'s hearing, his delegate (his sister) asked whether she could speak to anything regarding her brother's parole consideration and was told to only speak to his home plan. *See* ████████████████████████████, at 17:12-20 and 42:14-20.

82.     Victims' family members are the first non-parole staff permitted to speak at an inmate's SB 590 hearing, and they may speak for any length of time. *See* Second Am. Compl. (Doc. #65) at ¶ 84; Defs.' Answer to Second Am. Compl. (Doc. #73) at ¶ 84; *see also* McSwain Depo, Ex. D, at 41:17-44:23.

83.     They also may speak outside the inmate's presence if they so choose. *See* Jones Depo, Ex. C, at 50:4-51:21.

84.     At ███████'s parole hearing, a surviving victim made legal arguments in response to court documents filed with the United States Supreme Court on ████'s behalf.

*See* ███████████████████████████████████████████████████████

███████████████████████████, at 11:2-13:11.

85.     She also suggested that ████████ might have been armed that day, despite the fact that the evidence adduced at trial demonstrated ████████ was an unarmed accomplice to his co-defendant. *See* ██████████████████████████, at 13:12-23.

86.     The prosecuting attorney also spoke at length—outside of ████████'s presence—regarding the crime. He even presented a diagram and photographs of the crime scene. *See* ████

██████████████████, at 19:11-25:2.

87.     The attorney's statement was noted in the BAS: "████████████████████████

█████████████████████████████████████." Brown BAS, Ex. II.

88.     At ████████████ hearing, the █████████████ also spoke outside of ████

████████ presence. *See* Tran█████████████████████████████████████████

████████████████████████████████, at 7:2-13:25. She spoke at length about the facts of the crime and told the Board that ████████ "definitely likes weapons" and that his conduct in prison was "pretty awful." ███████████████████████, at 13:1-7.

89.     At the time of Mr. Roberts' parole hearing, he had not had a conduct violation in eight years. *See* Letters to Board regarding Sidney Roberts, Group Ex. R.

90.     Inmates do not have a right to have an attorney present at their parole hearing. *See* McSwain Depo, Ex. D, at 241:23-242:1.

91.     When an inmate does have an attorney present as their sole delegate, that attorney is admonished against advocating for their client during the hearing. *See* Second Am. Compl. (Doc. #65) at ¶ 131; Defs.' Answer to Second Am. Compl. (Doc. #73) at ¶ 131; *see also* McSwain Depo, Ex. D, at 86:3-16.

20

92.     In Prof. Rummel's expert opinion, "[l]egal representation at parole hearings is critical to ensuring that the Board affords each juvenile offender the procedural protections that ensure a meaningful opportunity for release." Rummel Report, Ex. O, at 8.

93.     The Board warned ███████'s sister "[w]e're not going to retry the case." ████ ███████████████████████████████████ .

94.     Prosecuting attorneys appeared at Plaintiffs' hearings and did not receive the same admonishment. *See* ███████████████████████████████████ ███████████████████████████████████████████ ████████████████████████████████████ .

## F. Defendants have denied parole to the vast majority of Proposed Class Members.

95.     The majority of *Miller*-impacted individuals who have been denied parole under this new process have received five-year setbacks – the maximum permitted under Board policy. Others were not, in the Board's opinion, yet eligible for parole and received setbacks of many more years. Yet no explanation was provided for the lengthy delay in review or what might be needed to satisfy *Miller* factors the next time around. *See* Second Am. Compl. (Doc. #65) at ¶ 102; Defs.' Answer to Second Am. Compl. (Doc. #73) at ¶ 102.

96.     As of the date of this Motion, Defendants have denied parole to approximately 86% of those individuals who have requested SB 590 hearings. *See* May 18, 2018 Spreadsheet of JLWOP hearing dates and outcomes, attached hereto as **Exhibit QQ** ("SB 590 Hearing Results Chart").[9]

---

[9] The SB 590 Hearing Results chart does not reflect the most recent parole decision as of the date of this Motion: on or about April 18, 2018, Proposed Class Member Lisa Harris was denied parole based on the seriousness of the underlying offense. *See* Harris Denial Notice, Ex. Y.

21

97.     For those four Proposed Class Members who were given out dates, their out dates were set, on average, over three and a half years in the future. *See* SB 590 Hearing Results Chart, Ex. QQ.

98.     Yet these out dates are not guarantees of release—out dates may be moved or taken away. *See* McSwain Depo, Ex. D, at 204:5-21.

99.     Plaintiffs have presented an expert opinion of Heidi Rummel—an attorney and current law professor with experience regarding inmates sentenced to juvenile life without parole and the parole process for individuals incarcerated at a young age. S*ee* Rummel Report, Ex. O.

100.    In Professor Rummel's expert opinion, "a 16% chance of being granted parole falls short of providing a constitutionally meaningful opportunity for release." Rummel Report, Ex. O, at 15.

101.    Defendants have not provided any expert opinion or testimony to contradict Professor Rummel's opinion.

**G.  Defendants' parole decisions are arbitrary.**

102.    The Board is not provided with any training or tools that are specifically tailored to considering youthful characteristics when making parole decisions. *See* Jones Depo, Ex. C, at 65:4-7.

103.    The Board does not use any formal risk assessment tool in evaluating the Proposed Class Members' parole consideration. *See* Jones Depo, Ex. C, at 64:1-65:7.

104.    For example, unlike with many other inmates, Defendants do not calculate a salient factor score for the Proposed Class Members. *See* Bliesath Depo, Vol. I, Ex. M, at 33:6-35:25; *see also* Jones Depo, Ex. C, at 64:1-3.

105.    Defendants use guideline matrices when considering other inmates for parole release, but those matrices are not used for the Proposed Class Members. *See* Bliesath Depo, Vol.

22

II, Ex. E, at 25:22-26:10; *see also* Jones Depo, Ex. C, at 64:13-23; McSwain Depo, Ex. D, at 59:18-60:1.

106.    Hearing Panel members do not apply any evidence-based, objective criteria in making their decisions. *See* George Depo, Ex. A, at 64:7-11; *see also* Jones Depo, Ex. C, at 64:4-12.

107.    Chairman Jones acknowledges the use of evidence-based risk assessment tools is best practice. *See* Jones Depo, Ex. C, at 17:21-18:8.

108.    The Board's decisions are largely subjective, and not based on objective criteria. *See* George Depo, Ex. A, at 62:2-63:12; *see also* Dills Depo, Ex. F, at 59:22-60:5; Mueller Depo, Ex. I, at 130:18-23; McSwain Depo, Ex. D, at 71:16-73:7.

109.    For example, in making a parole decision, former Chairman McSwain would determine whether in his mind the inmate had served the retributive portion of his sentence. *See* McSwain Depo, Ex. D, at 60:9-61:21 and 71:2-73:7.

110.    McSwain also expressed concern over the reception of Board decisions in the press. *See* Roberts Parole Hearing Transcript, Ex. OO, at 46:1-6.

111.    If an inmate receives a parole denial, the Hearing Panel at any subsequent reconsideration hearing might be comprised of different people from his first Hearing Panel—individuals with different backgrounds who consider different things in making their decisions. *See* Mueller Depo, Ex. I, at 229:8-13; *see also* Zamkus Depo, Ex. H, at 109:22-24; McSwain Depo, Ex. D, at 237:21-240:6.

112.    None of the Board's decisions for the Proposed Class Members are subject to appeal. *See* Brown Denial Notice, Ex. X; *see also* Ralph McElroy's Denial Notice, attached hereto as **Exhibit RR** ("McElroy Denial Notice"); Sidney Roberts' Denial Notice, attached hereto as

**Exhibit SS** ("Roberts Denial Notice"); Theron Roland's Denial Notice, attached hereto as **Exhibit TT** ("Roland Denial Notice"); Harris Denial Notice, Ex. Y; Exhibit 7 to Second Am. Compl. (Doc. #65-7).

### H. Defendants' parole decisions are primarily based on seriousness of the offense—not the inmate's maturity and rehabilitation, or likeness to reoffend.

113. The majority of parole hearings is spent discussing details regarding the facts of the underlying offense, rather than the *Miller* factors or elements delineated in SB 590. *See* Rucker Depo, Ex. G, at 76:14; *see also* Rummel Report, Ex. O, at 14-15.

114. Mr. Brown's parole hearing lasted approximately 64 minutes. The panel asked questions for over 28 minutes, with many of the questions focused on the specifics of the underlying offense. The prosecuting attorney spoke for over 6 minutes. The victim spoke for nearly 15 minutes. ██████████████████████████████.[10]

115. Mr. Brown had one representative – his attorney – who spoke for less than two minutes. Mr. Brown's representative was limited to speaking about "support on [Mr. Brown's] behalf." ████████████████████████████████.

116. At Mr. Roberts' parole hearing, the Hearing Panel spent over half of the hearing discussing the circumstances of the underlying offense. The prosecuting attorney spoke for over 12 minutes. *See* ████████████████████████████.

117. Mr. McElroy's parole hearing lasted approximately 45 minutes. The panel asked questions for roughly 23 minutes, with many of the questions (nearly eight minutes) focused on

---

[10] Counsel for Plaintiffs conducted a review of each plaintiff's parole hearing, reviewing both the hearing transcript and an audio recording of the hearing, in order to determine the type of questions asked during the hearing. The results of this review are included in the analyses attached hereto as **Exhibit UU**. Plaintiffs will provide audio recordings of the parole hearing at the Court's request.

the specifics of the underlying offense. The prosecuting attorney spoke for just over two minutes. *See* ███████████████████████████.

118.    During Mr. McElroy's hearing, there were no questions concerning peer pressure or familial pressure, past abuse, Mr. McElroy's home life at the time of the offense, Mr. McElroy's ability to resist specific crime settings, the extent of autonomous choice on Mr. McElroy's decision-making, Mr. McElroy's intellectual capacity at the time of the offense, or other characteristics that made Mr. McElroy's judgment different than that of adults. *See* ███████████ ████████████████.

119.    At both Sidney Roberts' and Theron Roland's parole hearings, nearly two-thirds of the questions posed by the Hearing Panel focused on the circumstances of the underlying offense. *See* ███████████████████████; ████████████████████████.

120.    At Theron Roland's parole hearing, the Hearing Panel spent over 80% of the hearing time discussing the circumstances of the underlying offense. *See* ███████████████████ ████████████.

121.    Mr. Roland was not given an opportunity to make a statement on his own behalf. *See* ███████████████████████.

122.    During Mr. Roland's hearing, there were no questions concerning Mr. Roland's home life at the time of the offense, Mr. Roland's ability to resist specific crime settings, the extent of autonomous choice on Mr. Roland's decision-making, Mr. Roland's age or maturity at the time of the offense, Mr. Roland's intellectual capacity at the time of the offense, or other characteristics that made Mr. Roland's judgment different than that of adults. *Id.*

123.    Plaintiffs' Hearing Panels spent little-to-no time considering Plaintiffs' home environment growing up or their "chronological age and its hallmark features – among them,

25

immaturity, impetuosity, and failure to appreciate risks and consequences." *Miller*, 567 U.S. at 477; *see* ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████.

124.    At none of Plaintiffs' parole hearings did the Hearing Panels asked any questions regarding the incompetencies associated with Plaintiffs' youth at the time of the underlying offenses. *See* ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████.

125.    At their parole hearings, Plaintiffs fielded few or no questions regarding their mental health:

    a.    The only mental health-related question asked at ███████████ hearing was: "Physical, mental health okay?" ████████████████████████████████████

    █.

    b.    The only mental health-related questions asked at ███████████ hearing were: "Mental health?" "Basically, your mental health's…." "You're not taking any medication or anything like that?" ████████████████████████████████

    ███████.

    c.    The only mental health-related questions asked at ███████████ hearing were: "How about your mental health now?" "You stable?" "You're stable?" "Have you ever taken any meds for any mental health?" ████████████████████████████

    ████████████.

    d.    At Mr. Roberts' hearing, the Hearing Panel did not ask any questions regarding Mr. Roberts' mental health. *See* ████████████████████████████████.

26

126.     Likewise, at ██████████████████████████████████████
███████████████████████████████████████████ Transcript of ████████████████
██████ Parole Hearing, attached hereto as **Exhibit VV**, at 63:6-10.

127.     Under Missouri law, the Parole Board may grant parole to an individual who is incarcerated when in the Board's opinion there is a "reasonable probability" the inmate may be released "without detriment to the community or to himself." RSMo. § 217.690.1.

128.     But the Board does not always consider risk to reoffend in making a parole determination for the Proposed Class Members. *See* George Depo, Ex. A, at 64:12-16.

129.     Instead, the circumstances of the underlying offense are the driving factor in parole denials. *See* Rummel Report, Ex. O, at 14; *see also* Brown Denial Notice, Ex. X; McElroy Denial Notice, Ex. RR; Roberts Denial Notice, Ex. SS; Roland Denial Notice, Ex. TT; Harris Denial Notice, Ex. Y; Exhibit 7 to Second Am. Compl. (Doc. #65-7).

### 1. *Norman Brown*

130.     Norman Brown is a model inmate. *See* Second Am. Compl. (Doc. #65) at ¶ 130; Defs.' Answer to Second Am. Compl. (Doc. #73) at ¶ 130.

131.     There is sound evidence that Mr. Brown has matured and rehabilitated himself over his many years of incarceration.

132.     Norman Brown's PHR ██████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████. *See* Brown PHR, Ex. T.

133.     His PHR █████████████████████████████████████████
████████████████████████████████. *See* Brown PHR, Ex. T.

134.     In advance of his parole hearing, Mr. Brown's attorneys submitted various materials to the Parole Board, including a report of a forensic psychological evaluation conducted

by Brooke Kraushaar, Psy.D. *See* Letter to Board regarding Norman Brown, attached hereto as **Exhibit WW**; *see also* May 16, 2017 Report of Forensic Psychological Evaluation by Brooke Kraushaar, Psy.D., attached hereto as **Exhibit XX** ("Brown's Kraushaar Report").

135.    MDOC does not have resources to conduct such in-depth psychiatric or psychological evaluations of inmates. *See* Dills Depo, Ex. F, at 60:14-61:19.

136.    Dr. Kraushaar concludes that Mr. Brown's involvement in the underlying offense "was the product of a vulnerable adolescent being manipulated by a powerful adult rather than the product of bad character." *See* Brown's Kraushaar Report, Ex. XX, at 14.

137.    Dr. Kraushaar further concludes that Mr. Brown has "long since outgrown the antisocial behavior of his youth, that his "psychological risk factors for future violence and criminality are low," and that "he has developed a skill set that would allow him to be a viable and productive member of society should he be granted parole." *See* Brown's Kraushaar Report, Ex. XX, at 14.

138.    ██████████████████████████████████████████████████

██████████████████████████████████████████████████

████  *See* Brown BAS, Ex. II.

139.    Mr. Brown was denied parole based on the circumstances of the offense alone and given a four-year setback:



Brown Denial Notice, Ex. X; *see also* Second Am. Compl. (Doc. #65) at ¶ 145 and Exhibit 10 thereto (Doc. #65-10); Defs.' Answer to Second Am. Compl. (Doc. #73) at ¶ 145.

### 2. *Ralph McElroy*

140.    Materials submitted to the Board by Ralph McElroy's attorneys demonstrate his rehabilitation over his 30 years of incarceration. *See* Letter to Board regarding Ralph McElroy, attached hereto as **Exhibit YY**.

141.    Those materials also discuss the difficult circumstances under which Mr. McElroy was raised in inner-city St. Louis. *See* Letter to Board regarding Ralph McElroy, Ex. YY.

142.    ███████████████████████████████████████████
███████████████████████████████████████████. *See* McElroy BAS, Ex. JJ.

143.    The BAS Supplement notes ████████████████████████████
████████████████████ McElroy BAS, Ex. JJ.

29

144. Mr. McElroy was denied based in part upon the circumstances surrounding the underlying offense and given a five-year setback:

```
The reasons for the action taken are:

**THIS DECISION IS NOT SUBJECT TO APPEAL.

*Release at this time would depreciate the seriousness of the present
offense based on:
 A. Circumstances surrounding the present offense.
*There does not appear to be a reasonable probability at this time that you
 would live and remain at liberty without again violating the law based on:
 A. Poor institutional adjustment.

                                        RECEIVED

                                        JAN 2 4 2017
```

McElroy Denial Notice, Ex. RR.

### 3. *Sidney Roberts*

145. Sidney Roberts' PHR ███████████████████████████████

██████████. *See* Roberts PHR, Ex. P, at 12.

146. In the PHR, █████████████████████████████████████████

████████████████████████████████████████████ Roberts

PHR, Ex. P, at 5-6 and 12.

147. The PHR also notes ███████████████████████████████████

██████████████████████████ Roberts PHR, Ex. P, at 12.

148. Dr. Kraushaar conducted a forensic psychological evaluation of Sidney Roberts. *See* Roberts' Kraushaar Report, Ex. Q.

149. In Dr. Kraushaar's opinion, Mr. Roberts's personality assessment showed that "he has no current problems with impulsivity, aggression, or behavioral disconstraint…" Roberts' Kraushaar Report, Ex. Q, at 12.

30

150.    Dr. Kraushaar also notes that Mr. Roberts' conduct violations have declined throughout his incarceration, indicating he has had no problems with aggression for the past 15 years and noting:

> This is the typical trajectory for most people who commit a violent crime at a young age; aggressive behavior peaks in adolescence and early adulthood, and then declines with age and maturity. Therefore, at the age of 45, the likelihood that Mr. Roberts will continue to abstain from violent behavior is greater than the likelihood that he will commit another violent offense.

Roberts' Kraushaar Report, Ex. Q, at 13.

151.    ▮▮▮▮▮▮▮, who ran Mr. Roberts' hearing, could not say whether he considered Dr. Kraushaar's expert opinion in arriving at his decision, and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. See McSwain Depo, Ex. D, at 169:8-172:16.

152.    In fact, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.
See Roberts BAS, Ex. KK.

153.    Mr. Roberts' BAS Supplement ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. See Roberts BAS, Ex. KK.

154.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. See Roberts BAS, Ex. KK.

155.    Mr. Roberts was denied based on the circumstances of the underlying offense alone and given a four-year setback:



```
The reasons for the action taken are:

**THIS DECISION IS NOT SUBJECT TO APPEAL.

*Release at this time would depreciate the seriousness of the present
offense based on:
A. Circumstances surrounding the present offense.
```

Roberts Denial Notice, Ex. SS.

156.    Mr. Roberts' IPO told him he could not be denied parole based solely on the seriousness of the offense. So, when that occurred, Mr. Roberts expressed confusion. *See* Bliesath Depo, Vol. II, Ex. E, at 54:14-59:10 and Exhibits 11 and 12 thereto.

### 4. *Theron "Pete" Roland*

157.    Theron Roland's PHR notes █████████████████████████████████████
████████████████████████████. *See* Roland PHR, Ex. S, at 6.

158.    His PHR also indicates ████████████████████████████████████
████████████████████████████. *See* Roland PHR, Ex. S, at 7 and 10.

159.    The PHR concludes that ██████████████████████████████████
████████████████████ Roland PHR, Ex. S, at 10.

160.    ████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████ Roland PHR, Ex. S, at 10; *see also* Rucker Depo, Ex. G, at 89:8-90:13.

161.    Mr. Roland's BAS ████████████████████████████████████████
████████████████████████████ *See* Roland BAS, Ex. LL.

162.    The BAS also ██████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████. *See* Roland BAS, Ex. LL.

163.    ████████████████████████████████████████████████
████████████████████████████████████████. *See* Roland BAS, Ex. LL.

164.     Mr. Roland was denied based on the circumstances of the underlying offense alone and given a five-year setback:

```
The reasons for the action taken are:

**THIS DECISION IS NOT SUBJECT TO APPEAL.

Release at this time would depreciate the seriousness of the present offense
based upon:
  A. Circumstances Surrounding the Present Offense
```

Roland Denial Notice, Ex. TT.

165.     In the opinion of the former and current Chairs of the Board, a decision based on the circumstances surrounding the present offense indicates that, in the Board's opinion, the inmate had not served enough retributive time behind bars. *See* McSwain Depo, Ex. D, at 197:1-203:7; *see also* Jones Depo, Ex. C, at 83:6-84:5. Mr. Roberts' IPO could not articulate what such a decision meant. *See* Bliesath Depo, Vol. II, Ex. E, at 66:16-67:21.

**I.  The parole review process is highly secretive and Defendants provide Plaintiffs with insufficient notice and explanation of their decisions.**

166.     The Parole Board has been publicly criticized as being overly secretive and "closed to the extreme." Beth Schwartzapfel, *Life Without Parole*, THE MARSHALL PROJECT (July 10, 2015) (quoting former operations manager of Missouri's Parole Board referring to Board as "paranoid closed . . . [c]losed to the extreme."); *see also* Jesse Bogan, *Missouri Parole Board Lumbers on in Secrecy with Unfilled Seats*, ST. LOUIS POST DISPATCH, Sept. 20, 2015; David Leib, *Missouri Parole Board Among the More Secretive Agencies*, SOUTHEAST MISSOURIAN, Mar. 15, 2011.

167.     At one point, delegates were prohibited from taking notes during parole hearings. *See* Apr. 27, 2017 letter from A. Precythe (Doc. #65-3); *see also* Second Am. Compl. (Doc. #65)

33

at ¶¶ 90 and 133; Defs.' Answer to Second Am. Compl. (Doc. #73) at ¶¶ 90 and 133; Mueller Depo, Ex. I, at 195:22-196:7.

168.    One of the stated purposes of parole hearings is to give inmates the opportunity to "[p]resent and discuss any other matters that are appropriate for consideration including challenging allegations of fact that they perceive to be false." 14 CSR § 80-2.010(3)(A)(6).

169.    As a matter of practice and custom, Defendants refuse to give inmates access to recordings of their hearings. *See* McSwain Depo, Ex. D, at 138:13-15 and 241:10-13.

170.    As a matter of practice and custom, Defendants prohibit inmates from viewing their parole files—including the BAS, BAS Supplement, and PHR. *See* McSwain Depo, Ex. D, at 137:20-25, 138:10-12, and 241:18-22; *see also* Exhibits 4 and 5 to Second Am. Compl. (Doc. #65-4 and 65-5).

171.    As a result, the Named Plaintiffs were unable to correct errors in their parole file. Examples of such errors include:



    a.  Pete Roland's Diagnostic Center Report indicates ███████████████████ ████████████████████████████████. *See* Theron Roland's Diagnostic Center Report, attached hereto as **Exhibit ZZ** ("Roland Diagnostic Center Report"), at 2; *see also* ██████████████████████ ██.

    b.  Mr. Roland's Diagnostic Center Report ██████████████████████ ██████. *See* Roland Diagnostic Center Report, Ex. ZZ, at 6; *see also* Affidavit of

Theron Roland, attached hereto as **Exhibit AAA**[11] ("Roland Aff."), at ¶¶ 3-5 and

7.

c.  A formal opposition to Mr. Roland's request for parole filed by ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████, attached hereto as **Exhibit**

**BBB**; *see also* ████████████████████████████████.

d.  Mr. Roland's PHR indicates ████████████████████████████████

████████████████████████████████████████. *See* Roland PHR,

Ex. S, at 9; *see also* Roland Aff., Ex. AAA, at ¶¶ 6-7.

e.  Mr. Roland's PHR ████████████████████████████████

████████████████████████████████████████████████████████

████████. *See* Roland PHR, Ex. S, at 7 and 9; *see also* Roland Aff., Ex. AAA, at

¶¶ 6-7.

f.  Mr. Brown's PHR ████████████████████████. *See* Brown PHR at 5;

*see also* Affidavit of Norman Brown, attached hereto as **Exhibit CCC** ("Brown

Aff."), at ¶¶ 3-5.

---

[11] On June 6, 2018, Plaintiffs' counsel sent an affidavit to Mr. Roland for execution, along with a return-addressed, stamped envelope, via FedEx Standard Overnight delivery. That package was delivered the morning of June 7, 2018. As of the date of this filing, Plaintiffs' counsel have not yet received Mr. Roland's executed affidavit in return, likely due to the lockdown situation at Crossroads Correctional Center, where Mr. Roland is incarcerated. Due to this situation, Plaintiffs have attached as Exhibit AAA an unsigned version of the affidavit and, with the Court's permission, will supplement these Suggestions with a final, executed affidavit once it is received.



g.  Mr. Brown's PHR ███████████████████████████████(Brown

PHR, Ex. T, at 4) ██████████████████████████████████

██████████████████(Brown PHR, Ex. T, at 5).

h.  In a written submission to the Parole Board, █████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████. *See* **Group Exhibit DDD** hereto.

i.  ████████████████████████████████████████████████

███████. *See* **Exhibit EEE** hereto.

j.  During Mr. Brown's hearing, his delegate (his former attorney) attempted to

provide clarity regarding the ACA charges and Mr. Brown's minimum prison term

and was told she could not speak to that. *See* █████████████████████

████, at 50:6-22.

k.  A fax submitted by ███████████████████████████████

████████████████████████████████████████████████

██████████████████. *See* Victim's Written Statement, attached hereto as

**Exhibit FFF**.

172.    In one instance, the Board conducted a parole hearing for a man believed to be

impacted by SB 590 and did not find out until after the fact that his file contained an error—the

individual was in fact 18 years or older at the time of the underlying offense, and thus not eligible

for parole review under SB 590. Nonetheless, this inmate was provided a parole denial notice and

an apparent five-year setback. *See* Dills Depo, Ex. F, at 121:7-122:20 and Exhibit 17 thereto; *see*

*also* Rucker Depo, Ex. G, at 106:2-108:8 and Exhibit 11 thereto.

36

173. The Board's decisions are provided to inmates on a two-page notice – a barebones, boilerplate form that is used to notify inmates of all manner of events related to parole considerations. *See* Second Am. Compl. (Doc. #65) at ¶ 106 and Exhibit 7 thereto (Doc. #65-7); Defs.' Answer to Second Am. Compl. (Doc. #73) at ¶ 106.

174. The basis for the Board's decision provided in the notice to the inmate consists of standard language selected from the BAS. *See* Jones Depo, Ex. C, at 78:2-80:6; *see also, e.g.,* Exhibit 7 to Second Am. Compl. (Doc. #65-7).

175. There is no indication on these forms who made the decision or how the Board voted; the forms are not signed. *See* Second Am. Compl. (Doc. #65) at ¶ 107 and Exhibit 7 thereto (Doc. #65-7); Defs.' Answer to Second Am. Compl. (Doc. #73) at ¶ 107.

176. Defendants freely admit that these forms do not provide adequate explanation for the Board's decisions. *See* Second Am. Compl. (Doc. #65) at ¶¶ 13, 109, 160, 167; Defs.' Answer to Second Am. Compl. (Doc. #73) at ¶¶ 13, 109, 160, 167; *see also* Jones Depo, Ex. C, at 81:1-22.

177. Nor does the notice provide any guidance to the inmate regarding steps they need to take to increase their readiness for parole. *See* McSwain Depo, Ex. D, at 200:19-23.

178. Inmates are expected to get further information regarding their parole decision from their IPO, but the IPO's ability to explain the Board's decision is limited because they are not present during the parole hearing and may not know the reason for the Board's decision. *See* Zamkus Depo, Ex. H, at 96:13-21; *see also* Jones Depo, Ex. C, at 82:11-83:5; MDOC Procedure No. P6-6.1, Ex. AA.

**J. Misconduct by Board members and parole staff, concealed by Defendants and other parole staff, illustrates a lack of professionalism and integrity brought to parole consideration generally.**

179.     Ruzicka was a member of the Board until June 2017, when he resigned following publication of an Inspector General's Report regarding his misconduct at multiple parole hearings. *See* Jones Depo, Ex. C, at 108:3-109:3.

180.     In 2016, Ruzicka and a parole analyst were investigated by the Inspector General for playing word games during parole hearings. *See* Sept. 9, 2016 e-mail from P. Rogers and enclosed memorandum, attached hereto as **Exhibit GGG** ("McSwain Parole Hearing Conduct Memo"); *see also* Nov. 1, 2016 Investigation Report by Office of the Inspector General, attached hereto as **Exhibit HHH** (the "IG Report").

181.     Inspector General Amy Roderick concluded that Mr. Ruzicka had failed to conduct the business of the State of Missouri in a manner that inspires confidence and trust, and failed to conduct work with respect, concern, and courtesy towards inmates, coworker, and the general public. *See* Nov. 15, 2016 letter from E. McSwain, attached hereto as **Exhibit III**; *see also* IG Report, Ex. HHH, at 29-31; George Depo, Ex. A, at 122:15-132:21.

182.     Ms. Roderick ██████████████████████████████████████████████ ████████████████████████. *See* Nov. 3, 2016 e-mail from A. Roderick, attached hereto as **Exhibit JJJ**.

183.     The Board did not make Ms. Roderick's report public until Plaintiffs' counsel submitted a Sunshine request in March 2017. *See* McSwain Depo, Ex. D, at 210:10-17 and 212:17-23.[12]

---

[12] *See also* Jesse Bogan, *Missouri parole board played word games during hearings with inmates*, ST. LOUIS POST DISPATCH, June 9, 2017, http://www.stltoday.com/news/local/crime-and-

184. ████████████████████████████████████████████

████████████████. *See* IG Report, Ex. HHH, at Supplemental Report; *see also* McSwain

Parole Hearing Conduct Memo, Ex. GGG.

185. While Roderick's investigation was ongoing, Ruzicka did not conduct hearings.

*See* McSwain Depo, Ex. D, at 208:17-209:7.

186. Shortly after her report was finalized, he resumed his full duties. *See* McSwain

Depo, Ex. D, at 209:8-14.

187. He was not otherwise disciplined. *See* McSwain Depo, Ex. D, at 207:7-209:21;

Jones Depo, Ex. C, at 108:10-15.

188. Ruzicka presided over ██████████'s parole hearing. *See* Ruzicka Depo, Ex.

MM, at 22:23-23:7.

189. Ruzicka's misconduct is not isolated—other Board members have behaved

unprofessionally in the past. *See* Dills Depo, Ex. F, at 199:9-200:5; *see also* Dusenberg Depo, Ex.

W, at 186:12-187:14; Mueller Depo, Ex. I, at 250:10-16.

190. McSwain acknowledged that this type of unprofessional conduct occurs when

hearings are unchecked or unsupervised. *See* McSwain Depo, Ex. D, at 206:18-24.

191. The Board has no regular process through which they regularly and proactively

monitor parole hearings. *See* Dills Depo, Ex. F, at 196:22-197:14; *see also* McSwain Responses

to Plaintiffs' First Set of Interrogatories, attached hereto as **Exhibit KKK**, at Interrogatories Nos.

12-13.

---

courts/missouri-parole-board-played-word-games-during-hearings-with-
inmates/article_ce6cba9b-5932-52a4-899a-f7644ec4d7d8.html.

### III.    SUMMARY JUDGMENT STANDARD

This Court should grant summary judgment to Plaintiffs because, viewing the uncontroverted evidence in the light most favorable to Defendants, there is no genuine issue of material fact and Plaintiffs are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Grey v. City of Oak Grove*, 396 F.3d 1031, 1034 (8th Cir. 2005).

### IV.    ARGUMENT

**A. Plaintiffs have a liberty interest in parole proceedings that provide a meaningful opportunity for release based on demonstrated maturity and rehabilitation.**

The majority of Plaintiffs' claims in this lawsuit are grounded in core constitutional rights to due process and to be free from cruel and unusual punishment. Their claims are well-founded as a matter of law because the Proposed Class Members all have a liberty interest in parole due to the fact that all Proposed Class Members were children at the time of their underlying offenses.

Plaintiffs' liberty interest arises under Missouri law because SB 590 constrained the Parole Board's discretion by requiring consideration of certain so-called *Miller* factors. *Compare* RSMo. § 217.692.4 ("The parole board shall consider, *but not be limited to the following criteria* when making its parole decision.") (emphasis added), *with* RSMo. §§ 558.047.5 & 565.033.2 (enumerating some of the so-called *Miller* factors without providing that other factors may be considered).

But this liberty interest also is constitutionally-derived. "A liberty interest may arise from the Constitution itself." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005); *see also State ex rel. Cavallaro v. Groose*, 908 S.W.2d 133, 135 (Mo. 1995). Through *Graham*, *Miller*, and *Montgomery*, the Supreme Court has granted juvenile offenders Fourteenth Amendment due process protections when being considered for parole. Just as *Miller* and *Montgomery* require that

youth be treated differently than adults at sentencing, so, too, they must also be treated differently in the parole process.

*Graham*, *Miller*, and *Montgomery* create a constitutionally-protected liberty interest in parole proceedings that provide a meaningful opportunity for release. This Court and district courts in other circuits have held that *Graham*'s requirement that states provide juvenile offenders a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation," 560 U.S. at 75, extends to juveniles serving parolable life sentences, and the parole process itself. *See* Oct. 31, 2017 Order on Defs.' Mot. to Dismiss (Doc. #64), at 23; s*ee also, e.g., Greiman v. Hodges*, 79 F. Supp. 3d 933, 945 (S.D. Iowa 2015); *Hayden v. Keller*, 134 F. Supp. 1000, 1009 (E.D. N.C. 2015) ("If a juvenile offender's life sentence, while ostensibly labeled as one "with parole," is the functional equivalent of a life sentence without parole, then the State has denied that offender the "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation" that the Eighth Amendment demands.); *Wershe v. Combs*, 1:12-cv-1375, 2016 WL 1253036, *3 (W.D. Mich. Mar. 31, 2016) (*Graham*'s "discussion of a meaningful opportunity to obtain release . . . suggests that the decision imposes some requirements after sentencing as well."); *Maryland Restorative Justice Initiative v. Hogan*, No. ELH-16-1021, 2017 WL 467731, at *21 (D. Md. Feb. 3, 2017).[13]

---

[13] Numerous State courts have reached the same conclusion. *See, e.g., Atwell v. State*, 197 So. 3d 1040, 1042 (Fla. 2016), *reh'g denied*, No. SC14-193, 2016 WL 4440673 (Fla. Aug. 23, 2016) (mandatory life imprisonment sentence unconstitutional under *Miller* and *Graham*, even though it provided for parole, because the Florida parole process "fails to take into account the offender's juvenile status at the time of the offense" and "effectively forces juvenile offenders to serve disproportionate sentences of the kind forbidden by *Miller*."); *Hawkins v. New York State Dep't of Corr. & Cmty. Supervision*, 30 N.Y.S.3d 397 (N.Y. App. Div. 2016) (at the parole release hearing stage, defendant who was sentenced to 25-years-to-life entitled to a *Miller*-type hearing where "youth and its attendant characteristics" are considered) (internal citations omitted); *Diatchenko v. Dist. Attorney for Suffolk Dist.*, 1 N.E.3d 270 (Mass. 2013) (juveniles should have their unconstitutional JLWOP sentences modified to reflect parole eligibility after serving fifteen years);

41

In *Hogan*, a Maryland district court concluded that, given *Graham*'s mandate and the substantive rule announced in *Miller*, it would be nonsensical if *Graham* did not apply to parole: "It is difficult to reconcile the Supreme Court's insistence that juvenile offenders with life sentences must be afforded a 'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation' if the precept does not apply to the parole proceedings that govern the opportunity for release." *Hogan*, 2017 WL 467731 at *21. And in *Greiman*, an Iowa district court distinguished *Graham*'s guarantee from *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1 (1979), clarifying that the former established a categorical and constitutional right to meaningful parole consideration for juvenile offenders:

> The present case is distinguishable because although *Graham* stops short of guaranteeing parole, it does provide the juvenile offender with substantially more than a *possibility* of parole or a "mere hope" of parole; it creates a categorical entitlement to "demonstrate maturity and reform," to show that "he is fit to rejoin society," and to have a "meaningful opportunity for release."

*Greiman*, 79 F. Supp. 3d at 945 (emphasis original) (quoting *Graham*, 560 U.S. at 79). Here, as in *Greiman*, the responsibility for ensuring Plaintiffs receive their constitutionally mandated "meaningful opportunity," to demonstrate that "he is fit to rejoin society," and to have a "meaningful opportunity for release" lies squarely with the Parole Board. *Id*. at 943.

The Court in *Graham* made clear that, regardless of the mechanism a State chooses, it must provide a *meaningful* opportunity for release. 560 U.S. at 75; *see also Miller*, 567 U.S. at 479-80 (juvenile offenders "*must* be given the opportunity to show their crime did not reflect irreparable corruption; and, if it did not, their hope for some years of life outside prison walls *must* be

---

*Diatchenko v. Dist. Attorney for Suffolk Dist.*, 27 N.E.3d 349 (Mass. 2015) (at parole hearings, those juvenile homicide offenders were entitled to certain procedural protections, including the right to counsel, access to funds for expert witnesses, and the availability of judicial review).

restored") (emphasis added). This means the opportunity must be "realistic" and more than a "remote possibility." *Graham*, 560 U.S. at 70, 75, 82.

In sum, this Court was right to conclude that Plaintiffs have a liberty interest in a meaningful parole review. *See* Oct. 31, 2017 Order on Defs.' Mot. to Dismiss (Doc. #64), at 23. Sadly, Missouri's parole system wholly fails to provide Plaintiffs and the Proposed Class with a meaningful and realistic opportunity for release based on demonstrated maturity and rehabilitation.

**B. Plaintiffs have produced uncontroverted evidence of multiple due process deprivations within Defendants' parole review process for the Class (Counts II and IV).**

Defendants are routinely violating Proposed Class Members' due process rights by denying the Proposed Class a meaningful opportunity to be heard, adequate explanation for the Board's decision, and the ability to access adverse information in their parole file.

This Court has previously ruled that the Proposed Class Members have a liberty interest in a meaningful opportunity for parole review. *See* Oct. 31, 2017 Order on Defs.' Mot. to Dismiss (Doc. #64), at 23. As a result, due process applies to Plaintiffs' parole considerations under SB 590. "[D]ue process is flexible and calls for such procedural protections as the particular situation demands" and requires looking to "the nature of the interest at stake." *Greenholtz*, 442 U.S. at 12, 1 (citing *Board of Regents v. Roth*, 408 U.S. 564, 570-571 (1972)). Parole reviews for juvenile offenders in particular "demand more procedural protections." *Hayden*, 134 F. Supp. 3d at 1010–11 (citing *Graham*, 560 U.S. at 79); *Greiman*, 79 F. Supp. 3d at 945.

Here, the interest at stake is *Graham* and *Miller*'s promise of a meaningful and realistic opportunity for release based on demonstrated maturity and rehabilitation and complying with *Miller*'s mandate that life without parole sentences be reserved only for the rarest juvenile offender. In light of these serious constitutional rights and the Proposed Class Members' youthful status at the time of their underlying offenses, strict compliance with due process is required.

43

This means that, at a minimum, Plaintiffs and the Proposed Class must be provided an "'opportunity to be heard' … at a meaningful time and in a meaningful manner," *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965). The hearings themselves must be meaningful—that is, they must "involve real evaluations of the [record and] they consider all of the relevant evidence." *Proctor v. LeClaire*, 846 F.3d 597, 614 (2d Cir. 2017) (involving due process protections for continuous solitary confinement). Proposed Class Members also must be given the ability to adequately prepare for the parole hearing and receive "a statement of the reasons why parole was denied." *Swarthout v. Cooke*, 131 S. Ct. 859, 861 (2011) (finding sufficient due process procedural protections where petitioners "were allowed to speak at their parole hearings and to contest the evidence against them, were afforded access to their records in advance, and were notified as to the reasons why parole was denied"); *see also Parker v. Corrothers*, 750 F.2d 653, 662 (8th Cir. 1984) (explaining that "if the decisionmaker paroles some inmates convicted of murder, but denied parole to other inmates on the ground that they were convicted of murder, it must explain why").

That explanation must consist of more than "boilerplate generalities" why the underlying offense requires deferral of parole. *Parker*, 750 F.2d at 662 ("[T]he Board may deny [the plaintiff] parole release because of the severity of her criminal act and sentence, but it must explain in more than boilerplate generalities why the severity of her particular offense and sentence requires deferral of parole."); *see also Olds v. Norman*, No. 4:09CV-1782 CAS/TCM, 2013 WL 316017, at *5 (E.D. Mo. Jan. 8, 2013), *report and recommendation adopted,* No. 4:09-CV-1782 CAS, 2013 WL 315974 (E.D. Mo. Jan. 28, 2013) ("A parole board may deny release to an inmate based on the severity of the inmate's criminal act and sentence, but, where a liberty interest is involved, the parole board must explain in more than boilerplate generalities why the severity of the particular

offense and sentence requires a deferral of parole.") (citing *Cooper v. Missouri Bd. of Prob. & Parole*, 866 S.W.2d 135, 138 (Mo. banc 1993)).[14]

Furthermore, due process entitles Plaintiffs access to adverse information in their parole file. *Williams v. Missouri Bd. of Prob. & Parole*, 661 F.2d 697, 700 (8th Cir. 1981) ("minimum due process requires that an inmate in Missouri seeking parole be advised of adverse information in his file."). The uncontroverted evidence proves Defendants are, without question, failing to meet even minimal due process standards.

### 1. Defendants violated Plaintiffs' due process rights by denying them the access to their parole files, the ability to present multiple witnesses on their behalf, and the opportunity to be heard by all those Board members determining their release.

Here, the uncontroverted facts demonstrate that Defendants' policies, procedures, and customs denied Plaintiffs the opportunity to be heard and to receive a constitutionally-adequate explanation for the Board's decision. State regulations indicate that one of the purposes of a parole hearing is to give the inmate an opportunity to "[p]resent and discuss any other matters that are appropriate for consideration including challenging allegations of fact that they perceive to be false." SOF ¶ 168. Yet all Proposed Class Members are denied access to their entire parole file as a matter of custom and practice, and thus do not have an opportunity to confront, challenge, or correct information contained therein. SOF ¶¶ 169-170. Plaintiffs' parole files contained multiple

---

[14] *See also U.S. ex rel. Richerson v. Wolff (Wolff)*, 525 F.2d 797, 800 (7th Cir. 1975) ("We conclude that due process includes as a minimum requirement that reasons be given for the denial of parole release.")*; Candarini v. Attorney General of the United States*, 369 F.Supp. 1132, 1137 (E.D.N.Y.1974) ("'(m)ere pro forma language . . . will not suffice" as an explanation for parole denial); *Craft v. Attorney General of the United States*, 379 F.Supp. 538, 540 (M.D.Pa. 1974) (denying due to seriousness of the offense "was tantamount to no reason and afforded the Petitioner none of the safeguards" of due process"); *U.S. ex rel. Brown v. U.S. Bd. of Parole*, 443 F. Supp. 477, 482 (M.D. Pa. 1977) ("Due process requires that, when misconduct is the basis for the denial of parole, the prisoner must be informed in the statement of reasons of that reliance."); *United States ex rel. Johnson v. Chairman of New York State Board of Parole*, 500 F.2d 925 (2d Cir.), *vacated as moot*, 419 U.S. 1015 (1974); *see also Wolff*, 525 F.2d at 804.

errors or pieces of misinformation. SOF ¶ 171. In one instance, an error in the parole file led the Board to conduct a SB 590 hearing for someone who was not even impacted by the law. SOF ¶ 172.

Prohibiting Plaintiffs' access to their parole files also prevents them from knowing what information is *not* contained in the file so that they can gather and submit that information for the Board's consideration. Where victim representatives or prosecuting attorneys participate in a hearing outside the inmate's presence, Proposed Class Members are further denied the opportunity to confront and challenge adverse information. And restrictions on victim representatives and prosecutors are more relaxed than those imposed on the Proposed Class Members. SOF ¶¶ 76-94.

Defendants also do not have any formal mechanism in place through which Proposed Class Members can submit evidence of mitigating factors of youth. SOF ¶ 99. Instead, much of the information considered by the Board in the PHRs is self-reported during the inmate's pre-hearing interview with their IPO. SOF ¶¶ 33-34. But, as Prof. Rummel explained in her expert report:

> In my experience, juvenile offenders are not reliable reporters of the mitigating factors of youth such as childhood trauma and abuse, cognitive deficits, and mental and emotional health. In many cases, the most relevant information must be obtained from third-party sources.

SOF ¶ 35. Defendants admit this information is lacking in the Plaintiffs' parole files. Proposed Class Members may submit written materials to the Board, but it is generally unlikely that they will have the resources or ability to do that, and even less likely that the materials will be read in full by all voting members. Even where Plaintiffs have been able to provide expert opinions regarding their readiness for release, the Board has largely ignored those reports—even though the Board itself does not have the resources for such expert evaluations. SOF ¶¶ 65-75, 135, 150.

Plaintiffs are only permitted one delegate at their hearings. SOF ¶¶ 76-78. Notably, this same restriction is not enforced against victim representatives. SOF ¶ 79. Victim representatives

and prosecutors can speak outside of the inmate's presence, such that the inmate may never know whether there was victim opposition at their hearing. SOF ¶¶ 82-89. The Board customarily restricts delegates from discussing mitigating factors unless they relate directly to the inmate's home plan—seemingly in direct contravention of State regulations. SOF ¶¶ 80-81. Again, no such restriction is imposed on victim representatives or prosecuting attorneys, the latter appearing at each of Plaintiffs' hearings. SOF ¶ 52. All Proposed Class Members are denied access to the full Parole Board. Instead, their hearings are conducted in person or via videoconference before a hearing panel which includes only one Board member. SOF ¶¶ 50-51. Other Board members subsequently vote based largely on a three-page Board Action Sheet alone. SOF ¶¶ 54-75.

Where Plaintiffs were able to submit written letters of support, or even expert reports, the Board was unlikely to read them. Defendants' policies do not require Board members to review the inmate's entire parole file at any time. SOF ¶¶ 65-72. Board members on a Hearing Panel are not required to read the inmate's entire parole file before voting, and many Board members generally do not do so. SOF ¶¶ 65-75. At ███████'s parole hearing, the Board member leading the hearing admitted it was the first time he had encountered the case at all. SOF ¶ 72. Voting members do not listen to audio of hearings they do not attend. SOF ¶ 73. Even when voting Board members were not a part of the inmate's Hearing Panel, they do not always review the inmate's entire parole file before voting. SOF ¶¶ 65-75. Overall, the Board devotes inadequate time and consideration to the Proposed Class Members' parole reviews. In fact, the Board's workload alone (over 11,000 hearings per year) amounts to a due process violation. SOF ¶¶ 45-48; *see Hayden*, 134 F. Supp. 3d at 1009 ("The sheer volume of work may itself preclude any consideration of the salient and constitutionally required meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.").

47

These facts prove that not only are the Proposed Class Members prohibited from developing mitigating evidence in support of release and confronting adverse or false information, the Board is systematically failing to conduct a real evaluation of the record and consider all relevant evidence when conducting parole reviews.

### 2. Defendants deny Plaintiffs and the Proposed Class due process by providing mere boilerplate generalities as explanation for the Board's decisions.

Proposed Class Members also are denied adequate explanation for the Board's decisions. Plaintiffs' hearings primarily focused on the circumstances of the underlying offense. SOF ¶¶ 113-165. Not surprisingly, the Board's decisions also are based on the circumstances of the offense. In fact, the Board denied parole to each of the Plaintiffs due to the circumstances of the underlying offense. SOF ¶¶ 139, 144, 155, and 164. The same is true for many absent Proposed Class Members as well. SOF ¶ 129. Denials due to the seriousness of the offense—as the Board has done with every Proposed Class Member to whom it has denied parole—are "tantamount to no reason and afford[s] [Plaintiffs] none of the safeguards" of due process. *Craft*, 379 F.Supp. at 540.

If any further basis exists for the Board's decision, it was not provided to Plaintiffs. The parole denial notices given to the Proposed Class Members consist of standard language selected from the BAS and a notation reminding Plaintiffs the decisions are not subject to appeal. SOF ¶¶ 112, 173-175. But Plaintiffs are entitled to more than these "boilerplate generalities." *Parker*, 750 F.2d at 662; *Olds*, 2013 WL 316017 at *5.

Even the Chair of the Board admits these notices are inadequate. SOF ¶¶ 176-177. Yet his solution to this problem is to refer inmates to their IPOs for further information. At the same time, he acknowledges that the IPO's ability to explain the Board's decision is limited because they are not present during the parole hearing and may not know the reason for the Board's decision. SOF ¶ 178. An IPO's best guess at what the Board was thinking when it made its decision is no

48

substitute for the constitutional requirement that the Board provide an explanation as to why, for example, "the severity of the particular offense and sentence requires a deferral of parole." *Olds*, 2013 WL 316017 at *5; *Parker*, 750 F.2d at 662; *see also* n14, supra.

The notices Defendants routinely provided to Plaintiffs and the Proposed Class are constitutionally inadequate. By denying Plaintiffs and Proposed Class Members access to the material in their parole file, prohibiting them from presenting mitigating evidence of their youth in a meaningful way, and providing them mere boilerplate explanations for their decisions, the Board has repeatedly denied the Proposed Class' due process rights and denied Plaintiffs a meaningful and realistic opportunity for release.

### 3. Defendants systemically deprive the Proposed Class of due process because the Board's decisions are arbitrary and unreliable.

Defendants further violated Plaintiffs' due process rights by issuing arbitrary and unreliable decisions. *See Evitts v. Lucey*, 469 U.S. 387, 401 (1985) ("[W]hen a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution-and, in particular, in accord with the Due Process clause.").

The uncontroverted evidence shows that the Board's decisions are arbitrary and are not evidence-based. The Board does not use any formal risk assessment tool, guideline matrices, or objective criteria in evaluating the Proposed Class Members' parole consideration. SOF ¶¶ 33, 61-62, and 102-111. Former Chairman McSwain agreed decisions are based largely on the Hearing Panel's gut. SOF ¶ 109. Defendants also testified that, when a Proposed Class Member receives a parole denial, the Hearing Panel at any subsequent reconsideration hearing might be comprised of completely different people from the first Hearing Panel—individuals with different backgrounds who consider different things in making their decisions. SOF ¶ 111. Without any objective criteria

49

or methodology to guide the Board, an individual could end up with varying decisions over the years based on the same set of facts and circumstances.

Such an unreliable and arbitrary system fails to provide even basic due process protections to Plaintiffs and the Proposed Class they seek to represent.

**C. Plaintiffs are entitled to summary judgment on their claims that Defendants' current policies, procedures, and customs constitute cruel and unusual punishment (Counts I and III).**

The uncontroverted material facts demonstrate that Defendants' policies, procedures, and customs deny Plaintiffs and the Proposed Class Members a meaningful and realistic opportunity at parole, in contravention of the Eighth Amendment and Article I, Sections 10 and 21 of the Missouri Constitution.

Under clear Supreme Court precedence, the mere existence of a parole process that provides a *possibility* (no matter how remote) of release without adequate procedural protections does not satisfy the constitutional requirement that the State provide *Miller*-impacted prisoners a meaningful and realistic opportunity for release. In *Graham*, the Supreme Court noted that a constitutionally-adequate opportunity for release must enable the inmate to "rejoin society" and "achieve maturity of judgment and self-recognition of human worth and potential." *Graham*, 560 U.S. at 79. More recently the Supreme Court in *Montgomery* held that juvenile offenders like Plaintiffs, "*must* be given the opportunity to show their crime did not reflect irreparable corruption; and, if it did not, their hope for some years of life outside prison walls *must* be restored." 136 S. Ct. at 736-37 (emphasis added). In *Montgomery*, the Supreme Court further reiterated the need for parole release for the "vast majority" of *Miller*-impacted youth:

> *Miller*'s conclusion that the sentence of life without parole is disproportionate for the vast majority of juvenile offenders raises a grave risk that many are being held in violation of the Constitution. . . Allowing those offenders to be considered for parole ensures that juveniles whose crimes reflected only transient immaturity —and

> who have since matured—will not be forced to serve a
> disproportionate sentence in violation of the Eighth Amendment.

*Id.* at 736. Absent this meaningful and realistic opportunity for release, Plaintiffs' sentences remain

unconstitutionally disproportionate. *See, e.g., Diatchenko*, 27 N.E.3d at 365 ("the parole hearing

acquires a constitutional dimension for a juvenile homicide offender because the availability of a

meaningful opportunity for release on parole is what makes the juvenile's mandatory life sentence

constitutionally proportionate"); *Greiman*, 79 F. Supp. 3d at 944.

Lower level courts examining what a meaningful opportunity for release through parole

means have considered the point in time at which the individual receives the opportunity, as well

as the procedures which govern the parole review. *See, e.g., People v. Contreras*, 411 P.3d 445

(Cal. 2018) (holding *Graham* requires "more than the mere act of release or a de minimis quantum

of time outside of prison" but, rather, an "opportunity to reclaim one's 'value and place in

society.'") (internal citation omitted); *Casiano v. Comm'r of Corr.*, 115 A.3d 1031 (Conn. 2015)

("The United States Supreme Court viewed the concept of 'life' in *Miller* and *Graham* more

broadly than biological survival; it implicitly endorsed the notion that an individual is effectively

incarcerated for 'life' if he will have no opportunity to truly reenter society or have any meaningful

life outside of prison."); *State v. Moore*, 76 N.E.3d 1127 (Ohio 2016) ("[I]t is clear that the court

intended more than to simply allow juveniles-turned-nonagenarians the opportunity to breathe

their last breaths as free people. The intent was not to eventually allow juvenile offenders the

opportunity to leave prison in order to die but to live part of their lives in society"); *Atwell*, 197

So. 3d at 1048-49 (same); Sarah French Russell, *The Role of the Crime at Juvenile Parole

Hearings: A Response to Beth Caldwell's* Creating Meaningful Opportunities for Release, 41

Harbinger 227 (Dec. 8, 2016).

A system which provides a remote or uncertain possibility of release in light of the Parole Board's unfettered discretion fails to provide a meaningful and realistic opportunity for release in contravention of the Eighth Amendment. *Hogan*, 2017 WL 467731 at 25-26. Furthermore, the Board's decision whether to grant parole must be based on maturity and rehabilitation, not the seriousness of the offense or victim impact statements. *See Graham*, 560 U.S. at 75; *see also Adams v. Alabama*, 136 S. Ct. 1796, 1800 (2016) ("gruesomeness of a crime is not sufficient to demonstrate that a juvenile offender is beyond redemption"); *Greiman*, 79 F. Supp. 3d at 943-44 (opportunities for release cannot be merely "theoretical"); *Hayden*, 134 F. Supp. 3d at 1010-11; *Hogan*, 2017 WL 467731 at *20 (same); *State v. Young*, 794 S.E.2d 274, 279 (N.C. 2016) (same); *Funchess v. Prince*, No. 142105, 2016 WL 756530, at *5 (E.D. La. Feb. 25, 2016) (same); *Atwell*, 197 So. 3d at 1048-49 (same); Sarah French Russell, *The Role of the Crime at Juvenile Parole Hearings: A Response to Beth Caldwell's* Creating Meaningful Opportunities for Release, 41 Harbinger 227 (Dec. 8, 2016).

In Missouri, the Parole Board is denying, not granting, parole for the vast majority of *Miller*-impacted youth. **The Board has denied parole in approximately 86% of cases.** SOF ¶¶ 95-96. Not a single individual has been released from prison pursuant to the promise of SB 590. SOF ¶¶ 97-98. The Board's decisions in these cases are arbitrary and subjective, but not subject to appeal or oversight, despite the need for it to prevent misconduct and ensure accurate and fair decisions. SOF ¶¶ 112 and 179-191. They utilize no risk assessment tools, matrices, or evidence-based practices. *See* Section IV(B)(3), *supra*. Yet they are driven by the seriousness of the underlying offense (circumstances which will never change over time), not the inmate's maturity and rehabilitation. SOF ¶¶ 99-101 and 128.

Plaintiffs' BAS and BAS Supplements ███████████████████████████████████████

███████████████████████████████. SOF ¶¶ 137, 141, 153, and 162.

Indeed, the majority of parole hearings is spent discussing details regarding the facts of the underlying offense, rather than the *Miller* factors or elements delineated in SB 590. SOF ¶¶ 113-128. For example, over half of ███████████ hearing was spent discussing the circumstances of the underlying offense. SOF ¶ 116. At both ███████████ and ██████████ parole hearings, nearly two-thirds of the questions posed by the Hearing Panel focused on the circumstances of the underlying offense. SOF ¶ 119.

During ██████████ hearing, there were no questions concerning ██████████ home life at the time of the offense, ██████████ ability to resist specific crime settings, the extent of autonomous choice on ██████████ decision-making ██████████ age or maturity at the time of the offense, ██████████ intellectual capacity at the time of the offense, or other characteristics that made ██████████ judgment different than that of adults. SOF ¶ 122.

Plaintiffs' Hearing Panels spent little-to-no time considering Plaintiffs' home environment growing up or their "chronological age and its hallmark features – among them, immaturity, impetuosity, and failure to appreciate risks and consequences." *Miller*, 567 U.S. at 477; SOF ¶ 123. At none of Plaintiffs' parole hearings did the Hearing Panels asked any questions regarding the incompetencies associated with Plaintiffs' youth at the time of the underlying offenses. SOF ¶ 124. At their parole hearings, Plaintiffs fielded few or no questions regarding their mental health. When questions touched on the topic of mental health, the discussion was superficial at best (for example, to ██████████: "You stable?" and to ██████████: "Physical, mental health okay?"). SOF ¶ 125.

Plaintiffs were children when they were arrested decades ago. But they certainly are not young anymore. Each is in his forties, and Mr. Roland, Mr. Roberts, and Mr. McElroy all will be in their fifties at the time of their next parole hearing. Sadly, given how the Board has handled SB 590 hearings to date, it is unlikely that they will be released from prison before the age of retirement. *See United States v. Grant*, 887 F.3d 131, 147, 150-51 (3d Cir. 2018) (adopting rebuttable presumption that non-incorrigible juvenile offender should be afforded opportunity for release before national age of retirement). This is the case despite the fact that Plaintiffs' files contain evidence of maturity and rehabilitation over time.

Given the extremely small likelihood of release on parole, as well as the Board's unfettered and unguided discretion in these cases, Defendants' parole process utterly fails provide Plaintiffs with a meaningful and realistic opportunity for release. Other Proposed Class Members who are afforded parole hearings under existing policies, procedures, and customs likewise will be denied constitutionally-adequate parole review, absent an order and judgment by this Court.

### D. Plaintiffs are entitled to a judgment and declaration that Defendants are not complying with Missouri Statute (Count V).

Even setting aside the constitutional deficiencies in Missouri's parole process for *Miller*-impacted individuals, Plaintiffs are still entitled to judgment as a matter of law because the uncontroverted facts prove that Defendants are not complying with SB 590.

Defendants are treating parole review for this class of individuals as they would for any other inmate, despite the requirements of SB 590. SOF ¶¶ 1-9, 18-25, and 49. When preparing the PHR to guide and inform the Hearing Panel, IPOs are not required to discuss (a) the inmate's subsequent growth and increased maturity since the underlying offense(s) occurred (RSMo. § 558.047.5(2)); (b) whether the inmate remains the same risk to society as they did at the time of the initial sentencing (RSMo. § 558.047.5(5)); or (c) the effect of characteristics attributable to the

inmate's youth on their judgment (RSMo. § 565.033.2(9)). SOF ¶¶ 26-32. The only youth-focused topic IPOs are instructed to cover during pre-hearing interviews with Proposed Class Members is their juvenile criminal record, if any. SOF ¶¶ 31-32.

The only additional documentation parole staff prepared in anticipation of SB 590 hearings is the BAS Supplement—a one-page supplement to the Board Action Sheet which regurgitates only a portion of the elements the Board is statutorily required to consider. SOF ¶¶ 57-64. The Board was not provided training on this new worksheet. SOF ¶ 59. Multiple Board members and parole analysts testified that the factors listed on the BAS Supplement are the only additional factors the Board is required to consider for the Proposed Class, yet the BAS Supplement omits the factors set forth in RSMo. § 565.033.2. SOF ¶¶ 63-64. Even when the Hearing Panel completes the BAS Supplement, it is clear from the content of those documents that the Board is at most conducting only a cursory review of the five elements listed in RSMo. § 558.047.

Nowhere does the Board document how, if at all, it considered the factors listed in RSMo. § 565.033. And in practice the Board fails to consider the factors delineated in Sections 558.047 and 565.033.2. For example, Section 558.047(5)(3) prohibits the Board from holding an inmate's innocence claim against them. Yet that is exactly what the Board did in ███████████████████ ████████████████████████████████████████████████████████████████ ████████████████████ SOF ¶ 143. Section 558.047 also requires the Board to consider "[e]fforts made toward rehabilitation since the offense or offenses occurred, including participation in educational, vocational, or other programs during incarceration, *when available*." RSMo. § 558.047(1) (emphasis added). ████████████████████████████████████████████████ █████████████████████████████████████████. SOF ¶ 36.

55

In addition, Section 565.033.2(3) requires the Board to consider the individual's "age, maturity, intellectual capacity, and mental and emotional health and development at the time of the offense." SOF ¶¶ 125-156. Yet the Hearing Panels asked Plaintiffs few or no questions regarding their mental and emotional health. When such questions were posed, they were very superficial (for example, to ███████: "You stable?" and to ███████: "Physical, mental health okay?"). SOF ¶ 125. At ███████ hearing, the Hearing Panel did not ask any questions regarding ███████ mental health. SOF ¶ 125(d). Furthermore, a close review of Plaintiffs' PHRs and hearing transcripts also reveals the Board failed to fully investigate and consider "the effect of characteristics attributable to the defendant's youth on the defendant's judgment" as required by Section 565.033.2(9). SOF ¶¶ 37-44, 52, and 113-165.

It is plain that Missouri's Parole Board is not complying with the letter of the law. Therefore, Plaintiffs are entitled to judgment as a matter of law on their Count V.

## V.     CONCLUSION

For the reasons discussed above, Plaintiffs are entitled to summary judgment on all their claims. Plaintiffs ask that this Court:

(A) Grant Plaintiffs' Motion for Summary Judgment;

(B) Declare that Defendants' policies, procedures, and customs for Plaintiffs' and the Proposed Class Members' parole reviews violate the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 21 of the Missouri Constitution, and fail to satisfy RSMo. §§ 558.047.5 and 565.033.2;

(C) Grant injunctive relief ordering: (i) that Defendants comply with RSMo. §§ 558.047.5 and 565.033.2; (ii) that Defendants to produce within 30 days a plan to formulate or revise policies, procedures, and customs so as to ensure that all Class members are provided a meaningful and realistic opportunity for release based on demonstrated

maturity and rehabilitation; and (iii) any further appropriate injunctive relief to prevent the future deprivation of the rights of Plaintiffs and members of the Proposed Class;

(D) For the named Plaintiffs and Proposed Class Members who have already had a hearing pursuant to SB 590, but have been denied parole, grant injunctive relief ordering that Defendants provide those individuals with a parole review hearing within 90 days that complies with *Graham*, *Miller*, and *Montgomery*'s constitutional mandate and ensures a realistic and meaningful opportunity for release based on demonstrated maturity;

(E) Award Plaintiffs' costs, including reasonable attorneys' fees, under 29 U.S.C. § 794a and other relevant provisions of law; and

(F) Allow for such other and further relief as is just and appropriate.

Respectfully submitted,

RODERICK AND SOLANGE MACARTHUR JUSTICE CENTER

By: /s/ Amy E. Breihan
Amy E. Breihan, # 65499MO
3115 South Grand Blvd., Suite 300
St. Louis, MO 63118
Phone: (314) 254-8540
Fax: (314) 254-8547
amy.breihan@macarthurjustice.org

HUSCH BLACKWELL LLP

By: /s/ Denyse L. Jones
Matthew D. Knepper, # 61731MO
Sarah L. Zimmerman, # 69440MO
Denyse L. Jones, # 53611
190 Carondelet Plaza, Suite 600
St. Louis, MO 63105
Phone: (314) 480-1500
Fax: (314) 480-1505
Matt.Knepper@huschblackwell.com
Sarah.Zimmerman@huschblackwell.com
Denyse.Jones@huschblackwell.com

57

Jordan T. Ault, #59599MO
235 East High Street
P.O. Box 1251
Jefferson City, MO 65102
Phone: (573) 635-9118
Fax: (573) 634-7854
Jordan.Ault@huschblackwell.com

Dated: June 19, 2018

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of June, 2018, a true and correct copy of the foregoing

was electronically filed using the Court's online case filing system, which will send notice to all

counsel of record.

By: /s/ Amy E. Breihan
One of Plaintiffs' Attorneys

## INDEX OF EXHIBITS TO PLAINTIFFS' SUGGESTIONS
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT*

(A)     January 26, 2018 Deposition of Brian George*

(B)     List of proposed class members

(C)     January 25, 2018 Deposition of Kenny Jones*

(D)     December 20, 2017 Deposition of Ellis McSwain*

(E)     December 28, 2017 Deposition of Jessica Bliesath (Volume II)*

(F)     December 6, 2017 Deposition of Kelly Dills*

(G)     January 19, 2018 Deposition of Martin Rucker*

(H)     December 13, 2017 Deposition of Jennifer Zamkus

(I)     November 2, 2017 Deposition of Steven Mueller

(J)     January 24, 2018 Deposition of Michelle Kasak

(K)     Bluebook

(L)     Pre-Hearing Report Worksheet

(M)     December 21, 2017 Deposition of Jessica Bliesath (Volume I)*

(N)     MDOC Procedure No. P6-4.1

(O)     Expert Report of H. Rummel

(P)     Sidney Roberts' Pre-Hearing Report*

(Q)     February 27, 2017 Report of Forensic Psychological Evaluation by Brooke Kraushaar, Psy.D.

(R)     Letters to Board regarding Sidney Roberts

(S)     Theron Roland's Pre-Hearing Report*

(T)     Norman Brown's Pre-Hearing Report*

(U)     Ralph McElroy's Pre-Hearing Report*

* Indicates an unredacted copy was filed under seal.

(V)     Sidney Roberts Diagnostic Center Report*

(W)     December 21, 2017 Deposition of Gary Dusenberg*

(X)     Norman Brown's Denial Notice

(Y)     Lisa Harris' Denial Notice

(Z)     Jan. 6, 2017 Board Meeting Minutes

(AA)    MDOC Procedure No. P6-6.1

(BB)    ███████████████████████████████*

(CC)    ████████████████████████████████*

(DD)    ██████████████████████████████*

(EE)    ████████████████████████████████*

(FF)    Transcript of ██████████████████ Parole Hearing*

(GG)    Board Action Sheet template

(HH)    Board Action Sheet Supplement template

(II)    Norman Brown's Board Action Sheet*

(JJ)    Ralph McElroy's Board Action Sheet*

(KK)    Sidney Roberts' Board Action Sheet*

(LL)    Theron Roland's Board Action Sheet*

(MM)    February 8, 2018 Deposition of Don Ruzicka*

(NN)    Transcript of ████████████████████ Parole Hearing*

(OO)    Transcript of ██████████████████ Parole Hearing*

(PP)    Transcript of ████████████████████ Parole Hearing*

(QQ)    May 18, 2018 Spreadsheet of SB 590 hearing dates and outcomes

(RR)    Ralph McElroy's Denial Notice

* Indicates an unredacted copy was filed under seal.

(SS)    Sidney Roberts' Denial Notice

(TT)    Theron Roland's Denial Notice

(UU)    Parole hearing content analyses

(VV)    Transcript of ████████████████ Parole Hearing*

(WW)   Letter to Board regarding Norman Brown

(XX)    May 16, 2017 Report of Forensic Psychological Evaluation by Brooke Kraushaar, Psy.D.

(YY)    Letter to Board regarding Ralph McElroy

(ZZ)    Theron Roland's Diagnostic Center Report*

(AAA)  Affidavit of Theron Roland*

(BBB)  Dec. 28, 2016 letter ████████████████████████████████████*

(CCC)  Affidavit of Norman Brown*

(DDD)  ██████████████████████ written submission to Board*

(EEE)   Brown initial Board Action Sheet with eligibility calculation*

(FFF)   Victim's Written Statement*

(GGG)  Sept. 9, 2016 e-mail from P. Rogers and enclosed memorandum*

(HHH)  Nov. 1, 2016 Investigation Report by Office of the Inspector General*

(III)    Nov. 15, 2016 letter from E. McSwain

(JJJ)    Nov. 3, 2016 e-mail from A. Roderick*

(KKK)  McSwain Responses to Plaintiffs' First Set of Interrogatories

* Indicates an unredacted copy was filed under seal.