**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION**

| | | |
|---|---|---|
| NORMAN BROWN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 2:17-cv-04082-NKL |
| | ) | |
| ANNE L. PRECYTHE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

Plaintiffs Norman Brown, Ralph McElroy, Sidney Roberts, and Theron Roland (together, "Plaintiffs") are serving Missouri prison sentences for homicide offenses committed when they were less than 18 years of age. Each originally received a mandatory sentence of life without the possibility of parole. However, the United States Supreme Court recently held that a mandatory sentence of life without parole for a person who was under the age of 18 when he committed the offense violates the Eighth Amendment prohibition on cruel and unusual punishment.[1] After the Supreme Court clarified that this holding applies retroactively, the Missouri legislature enacted a law permitting those who had received JLWOP sentences to petition for parole after serving 25 years in prison. Each of the plaintiffs subsequently petitioned for, but was denied, parole.

Plaintiffs claim that Missouri's parole policies and practices violate their rights to be free from cruel and unusual punishment and their rights to due process under the Constitutions of both the United States and Missouri, and that Defendants fail to satisfy the requirements of Missouri

---

[1] The Court hereafter uses the term "JLWOP" to refer to a mandatory sentence of life without parole imposed on an individual who was under 18 years of age at the time of the commission of the underlying offense.

Revised Statutes Sections 558.047.5 and 565.033.2. On behalf of a class of similarly situated individuals ("Class Members"), they sue the Director of the Missouri Department of Corrections ("MDOC") and members of the Missouri Board of Probation and Parole (the "Board"), seeking declaratory and injunctive relief.

Both the defendants and Plaintiffs seek summary judgment with respect to all of the claims in this action. For the reasons discussed below, the parties' summary judgment motions are granted in part and denied in part.

## I. The Uncontested Facts

### a. The Plaintiffs

Each of the plaintiffs was convicted of first-degree murder for an offense committed when he was under the age of 18, and each was sentenced to life without parole. Doc. 143, p. 1. Each recently had a parole hearing under SB 590 and was denied parole, but scheduled for another hearing in the future. Doc. 147, pp. 78, 80, 83, 85-86.

### i. Norman Brown

Plaintiff Norman Brown is, by Defendant's own standards, a model inmate. Doc. 147, p. 75. Although he accumulated multiple conduct violations in his youth, in recent years, the violations tapered off and then ceased. *Id.* Brown has improved his conduct and taken responsibility for his actions. *Id.*



. Doc. 138-20, p. 3.

*Id.*, p. 9.

*Id.*

. *Id.*, p. 4.

███████████████████████████████████████████████. *Id.*

In advance of his parole hearing,[2] Brown's attorneys submitted, *inter alia*, a report of a forensic psychological evaluation conducted by Brooke Kraushaar, Psy.D. Doc. 147, p. 76. Dr. Kraushaar concluded that Brown's involvement in the underlying offense "was the product of a vulnerable adolescent being manipulated by a powerful adult rather than the product of bad character." *Id.*, p. 77. Dr. Kraushaar further concluded that Mr. Brown has "long since outgrown the antisocial behavior of his youth," that his "psychological risk factors for future violence and criminality are low," and that "he has developed a skill set that would allow him to be a viable and productive member of society should he be granted parole." *Id.* ████████████████████

███████████████████████████████████████████████████████████████████

██████████████ Doc. 138-20, p. 11.

████████████████████████████████████████ he was only 15 years old at the time of the underlying offense. ███████████████████████████████████████████████

███████████████████████████████████████. *Id.* (█████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████). The prehearing report ████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████████████" Doc. 147, p. 76. ████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████ Doc. 138-20, p.

---

[2] Defendants argue that Brown is not yet eligible for parole because he is serving consecutive sentences. Plaintiffs dispute the legal conclusion. Regardless of whether Brown is currently eligible for parole, there is no dispute that he is a member of the class, and that he was given a parole hearing under SB 590. Defendants have not suggested that evidence concerning his experiences is not relevant.

11.

Brown's parole hearing took place on May 24, 2017 before a panel consisting of ███

████████████████, ███████████████, and █████████████████

███████████████. Doc. 147, p. 31.



The Board Action Sheet ██████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████. Doc. 138-35.

The sole basis for Brown's parole denial was the circumstances of the underlying offense (although the Board also stated that it does not consider him statutorily eligible for parole until 2025 because of his three consecutive sentences of 15, 15, and 30 years). Doc. 147, p. 78.

### ii. Ralph McElroy

A letter that Plaintiff Ralph McElroy's *pro bono* counsel submitted on his behalf in support of his parole petition noted that "[h]is childhood was ████████████████████



████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████" Doc. 138-51, at 3-4; Doc. 147, p. 79. The materials submitted to the Board include ███████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████ Doc. 138-51, at 13-22. McElroy's conduct violations, some of which were serious, ceased in 2012—around the time, Defendants

point out, when his chances of parole consideration improved because of various court decisions. Doc. 147, p. 79. (The Supreme Court decided *Miller* in 2012.) The prehearing report states ▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇ Doc. 138-21, p. 8.

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ he was 17 years of age when the offense for which he was convicted took place. *Id.*, p. 2. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇ *Id.*, p. 3. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ *Id.*, p. 6.

McElroy has always denied committing the offense; ▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇ *Id.*, p. 8. The prehearing report recommended that ▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

*Id.*

McElroy's parole hearing took place on December 13, 2016 before a panel consisting of ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇, and ▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. Doc. 147, p. 31.

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ *Id.*, p. 79.

McElroy was denied release based in part upon the circumstances surrounding the underlying offense and given a five-year setback. Doc. 147, p. 80.

### iii. Sidney Roberts

Plaintiff Sidney Roberts' attorney submitted a Forensic Psychological Evaluation by Dr. Kraushaar to the Board. Doc. 138-17; Doc. 147, pp. 80-81. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇



*Id.*, p. 2.

*Id.*,

p. 3. *Id.*

*Id.*

*Id.* *Id.*

*Id.*

*Id.*

*Id.*, p. 11.

, (Doc.

138-22, p. 3, the prehearing report

Doc. 147, pp. 26-27.  The prehearing report also

Doc. 147, pp. 24-25 (stating that the report

contains information about childhood and community in the "social/family history" section); *see*

Doc. 138-16, pp. 10-11

. The prehearing report notes that



Doc. 138-16, p. 11. The prehearing report notes that ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮ *Id.*, p. 3.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Roberts was 17 years old ▮▮▮▮▮

▮▮▮▮▮▮▮▮ when he committed the offense at issue. *Id.*, pp. 2, 3.

The prehearing report summarizes ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ *Id.*, p. 9. The prehearing report also ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ Doc. 138-16, p. 12. The prehearing report

states that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*

Dr. Kraushaar opined that Roberts's personality assessment showed that "he has no current problems with impulsivity, aggression, or behavioral disconstraint . . . ." Doc. 147, pp. 80-81. Dr. Kraushaar also noted that Roberts' conduct violations had declined throughout his incarceration, indicating that he had no problems with aggression for the past 15 years. *Id.*, p. 81. Dr. Kraushaar noted:

> This is the typical trajectory for most people who commit a violent crime at a young age; aggressive behavior peaks in adolescence and early adulthood, and then declines with age and maturity. Therefore, at the age of 45, the likelihood that Mr. Roberts will continue to abstain from violent behavior is greater than the likelihood that he will commit another violent offense.

*Id.*

Roberts' parole hearing took place on March 9, 2017 before a panel consisting of ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮, ▮▮▮▮▮▮▮▮▮▮▮▮▮, and ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.*, pp. 31-32.



Doc. 147, pp. 82-83.

Doc. 138-37, at 4; Doc. 147, pp. 82-83. ▮▮▮▮▮, who ran Roberts' hearing, could not recall if he had reviewed Dr. Kraushaar's report. *Id.*, pp. 81-82.

*Id.*, p. 82.

Roberts' institutional parole officer had told him that parole could not be denied based solely on the seriousness of the offense. *Id.*, p. 83. Nonetheless, Roberts' notice of denial cited the circumstances of the underlying offense alone as the basis for his parole denial. *Id.* The parole officer could not articulate what that explanation meant. *Id.*, p. 86.

### iv. Theron Roland

Plaintiff Theron Roland's ▮▮▮▮▮ overall adjustment as "good" and ▮▮▮ he has not had a conduct violation in at least 15 years. *Id.*, pp. 83-84. ▮▮▮ Roland has resided in honor dorm for thirteen years, and that file materials indicate that he worked in factory or warehouse areas for at least 15 years. *Id.*, p. 84.



. Doc. 138-19, p. 4.

*Id.*

*Id.*, p. 5. ▮

*Id.*

*Id.*, p. 6.

*Id.*

The prehearing report notes that

*Id.*, p. 8.

*Id.*

*Id.*, p. 9.

*Id.*, p. 5.

*Id.*, p. 10. The prehearing report concludes as follows:



*Id.*, p. 11.

*Id.*; Doc. 147, p. 84.

Theron Roland's parole hearing took place via videoconference on January 3, 2017 with a panel consisting of who appeared in person, and and

who appeared by videoconference.  Doc. 147, p. 32.



Doc. 138-38, p. 1.  Although ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ mentions a "rough start" in prison, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*id.*, at 4 and 2), ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Doc. 138-38; *see also* Doc. 147, p. 85.

The reason for Roland's parole denial is listed as the circumstances of the present office.  Doc. 147, pp. 85-86.

### b.  The Class

Just four of the Class Members who have had parole hearings to date were provided release dates—but those dates are, on average, three-and-a-half years in the future.  *Id.*, p. 54.[3]  The majority of class members who have had an SB 590 hearing—nearly 85%, even after excluding those who Defendants state were not yet eligible for parole consideration—did not receive a release date.  *Id.*, pp. 52, 54.

Each Plaintiff's parole denial notice indicated that parole was denied at least partly because of the circumstances of the underlying offense.  *Id.*, pp. 78, 80, 83, 85-86.[4] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[3] These dates do not guarantee release.  The dates may be moved or taken away.  *Id.*

[4] Defendants deny that the reason given in the parole denial notices is the only reason for the denial. *Id.*

████████████████████████████████████████████████████

████████████████████ Doc. 138-4, at 43 (Tr. 198:1- 199:22); *see also* Doc. 138-3, at 30 (Tr. 83:6-84:12) (██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ ).

The majority of *Miller*-impacted individuals who have been denied parole under the new process have received five-year setbacks—the maximum setback permitted under Board policy. Doc. 147, p. 53. The Board did not provide any explanation for the lengthy setback. *Id.*

The Board's decisions are communicated to inmates on a two-page notice—"a barebones, boilerplate form" that is used to notify inmates of all types of events related to parole considerations. Doc. 147, p. 93. Defendants admit that this form does not provide adequate explanation for the Board's decision. *Id.*, p. 94. The notice also does not provide any guidance to the inmate regarding steps they should to take to become better suited for parole. *Id.* Inmates are expected to get further information regarding their parole decisions from their institutional parole officers, but the officers' ability to explain the Board's decisions is necessarily limited because the officers are not present during the parole hearings and may not know the reasons for the Board's decisions. *Id.*, pp. 94-95.

The Board's decision on parole for an inmate serving a JLWOP sentence is not subject to appeal. *Id.*, pp. 61-62.

## II.     Procedural History

Plaintiffs assert five claims. Doc. 65, ¶¶ 176-188. In Counts I and III, Plaintiffs allege that "Defendants' current policies, procedures, and customs with respect to the parole review process for Plaintiffs and the putative class fail to provide a realistic and meaningful opportunity for release

upon demonstrated rehabilitation," and that "[t]hese policies, procedures, and customs lack legitimate penological justification, are arbitrary and capricious, and constitute cruel and unusual punishment," in violation of the Eighth Amendment to the U.S. Constitution (as incorporated to the states by the Fourteenth Amendment) and Article I, Section 21 of the Missouri Constitution. Doc. 65, ¶¶ 177 and 181. In Counts II and IV, Plaintiffs allege that Defendants' "ongoing failure to provide Plaintiffs and the putative class with (1) a meaningful opportunity for release upon demonstrating their growth, maturity, and rehabilitation, (2) the right to review and rebut evidence presented against them at parole hearings, and (3) sufficient notice and explanation of the basis for parole determinations," violates their rights to due process under the Fourteenth Amendment to the U.S. Constitution and Article I, Section 10 of the Missouri Constitution. Doc. 65, ¶¶ 179 and 183. Finally, in Count V, Plaintiffs seek a declaration regarding whether "Defendants' policies, practices, and customs with respect to the parole review process for Plaintiffs and the putative class satisfy the requirements of" Sections 558.047.5 and 565.033.2 of the Missouri Revised Statutes. Doc. 65, ¶ 185. Specifically, Plaintiffs alleged upon information and belief that Defendants were not giving adequate consideration to the following factors identified in those statutes: Plaintiffs' rehabilitative efforts, Plaintiffs' growth and maturity since the date of the underlying offense(s), Plaintiffs' age, maturity, intellectual capacity, and mental and emotional health and development at the time of the offense, and whether Plaintiffs remain the same risk to society as at the time of initial sentencing. *Id.*, ¶ 187. The five claims are based on the same alleged conduct.

Plaintiffs and Defendants both argue that they are entitled to summary judgment as to all of the claims brought by Plaintiffs.

### III.    Standard

Summary judgment is warranted where a movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

To succeed on their § 1983 claims, Plaintiffs must prove: (1) that Defendants deprived them of a right secured by the United States Constitution, and (2) that Defendants acted under color of state law.  *Gonzales-Perez v. Harper*, 241 F.3d 633, 637 (8th Cir. 2001).  There is no dispute that Defendants at all relevant times acted under color of state law.

Because Missouri interprets its corresponding constitutional provisions similarly, analysis of Plaintiffs' claims under the Missouri Constitution is the same as under the United States Constitution.  *See Jamison v. State Dep't of Social Services, Div. of Family Services,* 218 S.W.3d 399, 405 n.7 (Mo. 2007) (noting that "Missouri's due process clause parallels its federal counterpart"); *Burnett v. State,* 311 S.W.3d 810, 814 n.3 (Mo. App. 2009) (noting that Missouri courts "apply the same standard in determining whether a punishment violates the United States Constitution or Missouri Constitution" because both provide the "same protection against cruel and unusual punishment").

IV.    **Analysis**

a.  **Parole for Those Serving JLWOP Sentences**

The ordinary adult inmate's interest in parole is not constitutionally protected.  *See Greenholtz v. Inmates of Nebraska Penal & Corr. Complex*, 442 U.S. 1, 11 (1979) ("That the state holds out the possibility of parole provides no more than a mere hope that the benefit will be obtained.  To that extent the general interest asserted here . . . is not protected by due process.") (citations omitted).

However, in a series of cases over the last decade, the United States Supreme Court has held that those who were children at the time of the crimes for which they were convicted

may be subject to certain additional protections. First, in *Graham v. Florida,* 560 U.S. 48 (2010), the Supreme Court held that sentencing juvenile, non-homicide offenders to life without the possibility of parole violates the Eighth Amendment. Subsequently, in *Miller v. Alabama*, 567 U.S. 460 (2012), the Supreme Court held that mandatory life without parole for juvenile homicide offenders, too, violates the Eighth Amendment. Finally, in *Montgomery v. Louisiana*, 136 S. Ct. 718 (2016), the Supreme Court clarified that *Miller*'s holding constitutes substantive law that must be applied retroactively to offenders already facing mandatory sentences of life in prison.

The rationale for treating juvenile offenders differently from adult offenders is that "children are different . . . ." *Miller*, 567 U.S. at 481. "[D]evelopments in psychology and brain science continue to show fundamental differences between juvenile and adult minds." *Graham*, 560 U.S. at 68. As *Miller* explained,

> First, children have a lack of maturity and an underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking. Second, children are more vulnerable to negative influences and outside pressures, including from their family and peers; they have limited control over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings. And third, a child's character is not as well formed as an adult's; his traits are less fixed and his actions less likely to be evidence of irretrievable depravity.

*Miller*, 567 U.S. at 471 (quotation marks and citations omitted). Youth "is a time of immaturity, irresponsibility, impetuousness, and recklessness." *Id.* at 476 (quotation marks and citation omitted). It is "a condition of life when a person may be most susceptible to influence and to psychological damage." *Id.* (quotation marks and citation omitted).

"Parts of the brain involved in behavior control continue to mature through late adolescence." *Graham*, 560 U.S. at 68. Studies have shown that "only a relatively small proportion of adolescents who engage in illegal activity develop entrenched patterns of problem behavior." *Miller*, 567 U.S. at 471 (quotation marks and citation omitted). Thus, the actions of a

juvenile "are less likely to be evidence of irretrievably depraved character than are the actions of adults." *Graham*, 560 U.S. at 68 (quotation marks and citation omitted).

Because "a greater possibility exists that a minor's character deficiencies will be reformed," it "would be misguided" to treat a juvenile offender in the same fashion as an adult. *Id.* (quotation marks and citation omitted). A mandatory sentence of life without parole takes no account of the fact that the "signature qualities" of youth described above "are all transient." *Miller*, 567 U.S. at 476 (quotation marks and citation omitted). As *Miller* explains,

> Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. . . . It ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys.

*Id.* at 477-78. The sentence of life without parole for a juvenile "disregards the possibility of rehabilitation even when the circumstances most suggest it." *Id.* at 478.

Although the rule enunciated in *Miller* applies retroactively, it "does not require States to relitigate sentences, let alone convictions, in every case where a juvenile offender received mandatory life without parole." *Montgomery*, 136 S. Ct at 736. Instead a state could "remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them." *Id.*

In light of *Montgomery*, on May 12, 2016, the Missouri legislature passed Senate Bill 590, 98th General Assembly ("SB 590"). Doc. 147, pp. 5-6. In relevant part, SB 590 provides that any person sentenced as a juvenile to life without parole prior to August 28, 2016, "may submit to the parole board a petition for a review of his or her sentence, regardless of whether the case is final for purposes of appeal, after serving twenty-five years of incarceration on the sentence of life

without parole." Mo. Rev. Stat. § 558.047.1.1; Doc. 147, p. 6. The statute requires the Board to hold a hearing to determine "if the defendant shall be granted parole." Mo. Rev. Stat. § 558.047.4. The statute further directs the Board to consider five enumerated factors at the hearing and also incorporates by reference ten additional factors that the Board must consider. Mo. Rev. Stat. § 558.047.5; Mo. Rev. Stat. § 565.033; Doc. 147, pp. 6-8.

### b. Whether *Graham*, *Miller*, or *Montgomery* Require Anything More than an Ordinary Parole Hearing

Defendants first rehash the argument—which the Court rejected at the motion to dismiss stage—that *Graham*, *Miller*, and *Montgomery* require nothing more than standard parole review for those serving JLWOP sentences.

*Graham* and its progeny explain that, while a state need not guarantee freedom to the juvenile offender, it must provide "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Miller*, 567 U.S. at 479 (quoting *Graham*, 560 U.S. at 75); *see also Montgomery*, 136 S. Ct. at 736 ("Those prisoners who have shown an inability to reform will continue to serve life sentences. The opportunity for release will be afforded to those who demonstrate the truth of Miller's central intuition—that children who commit even heinous crimes are capable of change."). The cases "bar life without parole . . . for all but the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility." *Montgomery*, 136 S. Ct at 734. "[G]iven . . . children's diminished culpability and heightened capacity for change, . . . appropriate occasions for sentencing juveniles to this harshest possible penalty" are supposed to "be uncommon." *Miller*, 567 U.S. at 479.

Thus, there can be no dispute that, under the Eighth Amendment as interpreted by the Supreme Court, one serving a JLWOP sentence is entitled to a meaningful and realistic opportunity to secure release upon demonstrated maturity and rehabilitation. *See Graham*, 560 U.S. at 75

16

("What the State must do . . . is give defendants like Graham some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation."); *id.* at 82 ("[I]f [a State] imposes a sentence of life it must provide [the juvenile offender] with some realistic opportunity to obtain release before the end of that term."). Failure to provide such an opportunity thus violates, at a minimum, the Eighth Amendment ban on cruel and unusual punishment. *See Montgomery*, 136 S. Ct. at 736-37 (explaining that those serving JLWOP sentences should "be given the opportunity to show their crime did not reflect irreparable corruption; and if it did not, their hope for some years of life outside prison walls must be restored").

Other courts considering the issue have come to the same conclusion. *See Greiman v. Hodges*, 79 F. Supp. 3d 933, 945 (S.D. Iowa 2015) ("[A]lthough *Graham* stops short of guaranteeing parole, it does provide the juvenile offender with substantially more than a *possibility* of parole or a 'mere hope' of parole; it creates a categorical entitlement to 'demonstrate maturity and reform,' to show that 'he is fit to rejoin society,' and to have a 'meaningful opportunity for release.'"); *Hayden v. Keller*, 134 F. Supp. 3d 1000, 1009 (E.D.N.C. 2015) ("If a juvenile offender's life sentence, while ostensibly labeled as one 'with parole,' is the functional equivalent of a life sentence without parole, then the State has denied that offender the 'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation' that the Eighth Amendment demands."); *Maryland Restorative Justice Initiative v. Hogan*, No. 16-1021, 2017 WL 467731, at *21 (D. Md. Feb. 3, 2017) ("It is difficult to reconcile the Supreme Court's insistence that juvenile offenders with life sentences must be afforded a 'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation,' *Graham*, 560 U.S. at 75, if the precept does not apply to the parole proceedings that govern the opportunity for release."); *Wershe v. Combs*, No. 12-1375, 2016 WL 1253036, at *3 (W.D. Mich. Mar. 31, 2016) (noting that

*Graham*'s "discussion of a meaningful opportunity to obtain release . . . suggests that the decision imposes some requirements after sentencing as well"); *Atwell v. State*, 197 So. 3d 1040, 1041-42 (Fla. 2016) (finding that even mandatory life sentence for juvenile that *provided* for parole was unconstitutional because the parole process "fail[ed] to take into account the offender's juvenile status at the time of the offense" and "effectively force[d] juvenile offenders to serve disproportionate sentences of the kind forbidden by *Miller*"), *reh'g denied*, No. SC14-193, 2016 WL 4440673 (Fla. Aug. 23, 2016); *Diatchenko v. Dist. Attorney for Suffolk Dist.*, 27 N.E.3d 349 (Mass. 2015) (holding that juvenile homicide offenders were entitled to certain procedural protections at parole hearings "to ensure that the board's determination whether to grant or deny parole to a juvenile homicide offender is 'constitutionally exercised,' in the sense that the board properly has taken into account the offender's status as a child when the crime was committed") (citation omitted); *Matter of Hawkins v. New York State Dep't of Corr. & Cmty. Supervision*, 140 A.D.3d 34, 39 (N.Y. App. Div. 2016) ("For those persons convicted of crimes committed as juveniles who, but for a favorable parole determination will be punished by life in prison, the Board must consider youth and its attendant characteristics in relationship to the commission of the crime at issue.") (citations omitted).

Defendants argue that the Supreme Court's citation in *Montgomery* of a Wyoming statute that permitted juvenile offenders to apply for parole after 25 years but did not provide for any special parole procedures for juvenile homicide offenders demonstrates that there are no special requirements for *Miller*-affected offenders' parole proceedings. Doc. 147, p. 99. However, immediately after referring to the Wyoming statute, the Supreme Court in *Montgomery* added that "[a]llowing those offenders to be considered for parole ensures that juveniles whose crimes reflected only transient immaturity—and *who have since matured*—will not be forced to serve a

disproportionate sentence in violation of the Eighth Amendment." *Montgomery*, 136 S. Ct. at 736 (emphasis added). Thus, even though the Wyoming statute did not on its face provide special protections for a juvenile offender's parole proceedings, the Supreme Court expected that a *Miller*-affected offender would be permitted to show maturity and how transient immaturity factored into the crime.

In any event, the mere fact that the Wyoming statute on its face did not require consideration of maturity or rehabilitation does not mean that consideration of maturity and rehabilitation is not required. What is important in determining whether there is a constitutional violation in this context is not merely the language of the statute, but also how it is applied. *See, e.g., Turner v. Fouche*, 396 U.S. 346, 353 (1970) (holding that "the District Court properly entertained the question whether the constitutional and statutory complex, *even if not invalid on its face*, was unconstitutionally administered") (emphasis added). Nothing in the Wyoming statute prevents the JLWOP-sentenced inmate from presenting evidence of maturity and rehabilitation, and nothing prevents the parole decision-makers from properly considering it in making a parole determination. Thus, the statute is wholly consistent with the requirement articulated by the Supreme Court that those serving JLWOP sentences be given a meaningful opportunity for release based on demonstrated rehabilitation.

For these reasons, the Court reaffirms its prior holding that the U.S. and Missouri Constitutions invest those serving JLWOP sentences with a right to a meaningful and realistic opportunity for release based on demonstrated maturity and rehabilitation.

> **c. Whether There Is Undisputed Evidence that Defendants' Policies, Procedures, and Customs Deprive Class Members of a Meaningful Opportunity for Release Based on Demonstrated Maturity and Rehabilitation**

The facts surrounding the parole review process are largely undisputed, but the parties

vigorously dispute whether they establish violation of the class members' constitutional rights.[5] The Court finds that a number of Defendants' policies, practices, and customs combine to deprive those serving JLWOP sentences who receive parole hearings of a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.

First, Defendants limit the inmates' access to information and opportunities to advocate consideration of the *Miller* factors. Defendants prohibit inmates from viewing their parole files, including the prehearing report that largely guides the format and content of the SB 590 hearings. Doc. 147, pp. 88, 27. Yet, one of the stated purposes of parole hearings is to give inmates the opportunity to "[p]resent and discuss any other matters that are appropriate for consideration including challenging allegations of fact that they perceive to be false." 14 CSR § 80-2.010(3)(A)(6); *see also* Doc. 147, p. 88. Without knowing what information is being presented in opposition to their petitions for parole, *Miller*-affected inmates cannot know of, let alone challenge, "allegations of fact that they perceive to be false." *See Williams v. Missouri Bd. of Prob. & Parole*, 661 F.2d 697, 700 (8th Cir. 1981) (finding that "minimum due process requires that an inmate in Missouri seeking parole" under a statute that created an expectancy of release must "be advised of adverse information in his file"); *cf. Swarthout v. Cooke*, 562 U.S. 216, 220, 131 S. Ct. 859, 862 (2011) (finding sufficient due process procedural where petitioners were, *inter alia*, "afforded access to their records in advance" and "allowed to contest the evidence against them").

An inmate is permitted to have just one person, a "delegate" present at the hearing on his behalf. Doc. 147, pp. 43-44. The "Parole Hearing Procedures" adopted by Director Precythe state that "[t]he delegate [for the offender] will address *only issues related to transition to the*

---

[5] The analysis herein applies to Plaintiffs' Eighth Amendment and due process claims equally.

*community*, which could include offender growth, support system, home and employment," and that "[t]he hearing panel may limit any irrelevant or repetitious statement(s)." Doc. 65-3, at 4 (emphasis added). In practice, too, delegates are directed to discuss only inmates' home plans. *See, e.g.,* Doc. 138-32, at 20 (Tr. 17:12-21); *id.*, at 45 (Tr. at 42:14-20). Delegates have been prohibited from taking notes during parole hearings. Doc. 147, p. 87. When an attorney acts as an offender's sole delegate at a parole hearing, she is prevented from arguing legal issues before the Board. *Id.*, pp. 50-51. In other words, delegates—whether lawyers or not—are foreclosed from advocating for consideration of the *Miller* factors and other factors that the Board is required to consider.

In contrast with inmates, and despite a Missouri regulation permitting a victim or victim representative to be accompanied by just one other person at a parole hearing (14 C.S.R. § 80-2.010(5)(B)(1)), in practice, victims may be accompanied by multiple supporters, including MDOC employees acting as "clerical administrative office support assistants." Doc. 147, pp. 44-45. Outside of parole staff, victims or their family members are the first people permitted to speak at an SB 590 hearing. Doc. 147, p. 47. They may speak for any length of time. *Id.* They may speak outside of an inmate's presence if they wish. *Id.* Thus, again, the inmate is routinely prevented from having access to information presented at his hearing. Unlike the delegates, who may not argue the law, victims are free to argue law before the Board; indeed, they may even urge the Board to reject the law set forth in *Graham*, *Miller*, *Montgomery*, and SB 590. *See* Doc. 138-40, at 14-16 (Tr. at 11:2-5, 12:6-13:1).

Like victim representatives, prosecuting attorneys may speak for any length of time and are free to present argument and even unproven theories regarding the crimes for which the inmates were convicted. *See* Doc. 147, p. 49; *see also id.*, p. 52.

If parole staff were focused on eliciting evidence concerning and considering the *Miller* factors, the limitations on the inmates' access to information and opportunity to advocate might not have been a barrier to meaningful review. However, the very form on which Board decisions are communicated demonstrates that the Board's focus in the parole hearings for those serving JLWOP sentences is not on the *Miller* factors, but on the circumstances of the offense. All parole decisions must be attributed to one of two concededly "barebones, boilerplate" reasons: the seriousness of the offense or inability to live and remain at liberty without again violating the law. *Id.*, pp. 93-94, 74-75. These reasons are not specific to *Miller*-impacted individuals. Indeed, they are the same two reasons for denial that may be provided to any inmate who has a parole hearing. *Id.*, p. 93.

The "circumstances of the offense" explanation is directly at odds with the requirement that maturity and rehabilitation be considered. Consideration of maturity and rehabilitation requires a review of how the inmate has changed since the offense was committed. Permitting the Board to base a denial of parole to a *Miller*-impacted individual on the "circumstances of the offense" alone necessarily authorizes the Board to disregard evidence of the inmate's subsequent rehabilitation and maturity—in contravention of the Supreme Court's edict.[6]

---

[6] Each of the Plaintiffs' parole denial notices indicated that parole was denied—at least in part—because of the circumstances of the underlying offense. Indeed, ▮▮▮

▮▮▮. Doc. 138-19, p. 10

Even putting aside the tension between the Board's explanation and the requirements of *Miller*, the denial notices are inadequate, as Defendants themselves admit. *Id.*, p. 94; *see Craft v. Attorney Gen. of United States*, 379 F. Supp. 538, 540 (M.D. Pa. 1974) (holding that "a cursory explanation is insufficient"); *see also Parker v. Corrothers*, 750 F.2d 653, 662 (8th Cir. 1984) (stating that "the Board may deny Parker parole release because of the severity of her criminal act and sentence, but it must explain in more than boilerplate generalities why the severity of her particular offense and sentence requires deferral of parole"). Defendants expect inmates to get additional information regarding the parole decision from their institutional parole officers, yet Defendants simultaneously concede that the ability of those officers to explain the Board's decision is necessarily limited because they are not present during the parole hearing and therefore may not be privy to the reasons for the decision. *Id.*, pp. 94-95.[7]

Defendants' failure to focus on the factors mandated by *Miller* is exacerbated by their lack of any objective tools, matrices, or criteria to evaluate those serving JLWOP sentences. Doc. 147, pp. 57-59. Defendants acknowledge that they apply objective criteria in making parole determinations for those serving fewer than 30 years in prison. *Id.*, p. 58. They also acknowledge using wholly subjective standards in deciding whether those serving JLWOP sentences are eligible for release. *Id.*, pp. 58-59. Implementation of objective guidelines, matrices, or criteria for release might have ensured that Defendants are giving due consideration to the *Miller* factors.

Standing alone, any one of the foregoing limitations may not have amounted to a constitutional violation. However, in combination, they deprive the *Miller*-impacted inmate of a meaningful and realistic opportunity to demonstrate maturity and rehabilitation. *Graham* and its

---

[7] Defendants cite hearing panel comments during parole hearings to argue that inmates were given some guidance (Doc. 147, p. 101), but those comments are irrelevant, as all of that "guidance" was given before the Board had even reached a decision.

progeny place the burden of demonstrating maturity and rehabilitation on the juvenile offender, but the cases also place on the state the obligation to ensure that those offenders have a *meaningful* and *realistic* opportunity to make that showing. Thus, while parole staff may not be under any obligation to elicit evidence of maturity or rehabilitation, they are under an obligation to ensure that the *Miller*-affected inmate is realistically able to present such evidence. Therefore, if the Board will not affirmatively elicit evidence relevant to the *Miller* factors, it must allow the affected inmates to draw the relevant evidence to the Board's attention. However, without access to the parole files and victim and prosecutor statements, and deprived of a spokesperson who can advocate on their behalf with respect to the requirements and factors discussed in the Supreme Court cases, the *Miller*-impacted inmate cannot have the "meaningful" opportunity that the law requires. Defendants cannot refuse to take affirmative steps to effectuate the law enunciated in *Graham*, *Miller*, and *Montgomery* while simultaneously handicapping the affected inmates' ability to make the requisite showing.

The Court accordingly finds that Defendants' policies, procedures, and customs for parole review for *Miller*-impacted inmates violate the constitutional requirement that those inmates be provided a meaningful and realistic opportunity for release based on demonstrated maturity and rehabilitation.

### d. Whether There Is Undisputed Evidence that Defendants Are Violating SB 590

The statutes embodying SB 590 require the Board to consider 15 enumerated factors. Mo. Rev. Stat. § 558.047.5 (listing five factors that "the board shall consider, in addition to the factors listed in section 565.033"); Mo. Rev. Stat. § 565.033.2 (listing ten factors). Plaintiffs argue that the Board nonetheless treats SB 590-impacted inmates like any other inmate, ignoring several factors that it is required by statute to consider.

Plaintiffs have failed to make a *prima facie* case of a statutory violation with respect to the class. First, evidence that some Board members were aware of only a subset of the SB 590 factors (Doc. 138-1, at 11 and 16 (Tr. at 25:13-16 and 50:5-24); Doc. 138-23, at 25-26 (Tr. at 79:23-80:5); Doc. 138-4, at 37 (Tr. at 159:5-20)) does not constitute evidence that the Board as a whole generally failed to consider all of the factors. Indeed, Defendants presented evidence that other Board members were aware of, and purported to consider, the various SB 590 factors. *See* Doc. 147, pp. 103-04.

Second, the fact that the Board or parole analysts have been giving more weight to certain SB 590 factors than others does not amount to a statutory violation, as the statutes do not specify how much weight should be given to any particular factors. *See* Mo. Rev. Stat. 558.047.5.

Third, isolated incidents that Plaintiffs reference—including the Board's characterization of Mr. McElroy's protestation of innocence as lack of accountability and the "general[]" failure to discuss what programs were available to an inmate alongside discussion of the programs they actually completed—do not establish a classwide statutory violation.

Fourth, neither the Board's general failure to question inmates seeking parole review under SB 590 with respect to certain enumerated factors, such as mental health, nor its failure to memorialize in the Board Action Sheet analysis of all SB 590 factors establishes as a matter of law a failure to consider the factors. Plaintiffs argue that the evidence establishes that "the Board is not giving meaningful consideration to the factors set forth in RSMO. §§ 558.047 and 565.033" (Doc. 154, p. 9), but this argument confuses the applicable standard. Plaintiffs graft the "meaningful opportunity" requirements of *Graham* and its progeny (which apply to the right to demonstrate maturity and rehabilitation) onto the SB 590 statutes (which concern not only maturity and rehabilitation, but also multiple other factors). However, the Missouri statutes do not require

require more than ordinary "consider[ation]" of the enumerated factors—they certainly do not require that the consideration be meaningful or realistic. Thus, even if the evidence established that Defendants are not giving meaningful or realistic consideration to the enumerated factors, it would not establish a statutory violation.

The Court notes that there is not sufficient evidence in the record to establish as a matter of law that Defendants *are* complying with the statute. The mere fact that the SB 590 factors are incorporated into the prehearing report or Board Action Sheet supplement does not mean that the Board actually considers those factors in making parole determinations for SB 590-impacted inmates, and certain parole staff testimony and parole hearing transcripts contradict Defendants' contention that the Board always considers the requisite factors. But the fact that Defendants have not established that they always consider each of the enumerated factors is irrelevant because Plaintiffs have failed to make a *prima facie* case on this issue. Because the burden of proving the statutory violation rests on Plaintiffs, the Court denies Plaintiffs' motion for summary judgment on Count V.

This is not a case in which genuine issues of material fact remain that could change the calculus on this issue. The facts are largely undisputed—although their implications are contested—and none of the parties suggests that additional factual development would alter the balance in their favor. Because there is no indication that factual development at trial would help Plaintiffs make a prima facie case, the Court grants Defendants' summary judgment motion on Count V.

## V.        Conclusion

For the reasons discussed above, the parties' motions for summary judgment, Docs. 133 and 137, are GRANTED in part and DENIED in part. The evidence establishes that certain of

Defendants' policies, procedures, and customs for parole review for those serving JLWOP sentences violate the class members' constitutional rights. However, Plaintiffs have failed to make a *prima facie* showing as to the statutory violation.

In light of the Supreme Court's admonition that "[i]t is for the State, in the first instance, to explore the means and mechanisms for compliance," *Graham*, 560 U.S. at 75, 130 S. Ct. at 2011, the Court denies without prejudice Plaintiffs' request for injunctive relief and directs Defendants to present, within 60 days, a plan for compliance with applicable statutory and constitutional requirements. *See Hayden*, 134 F. Supp. 3d at 1011 ("[T]he court denies without prejudice Hayden's request for the injunctive relief and gives the parties 60 days to present a plan for the means and mechanism for compliance with the mandates of Graham to provide a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation to juvenile offenders convicted as adults."). The plan should include revised policies, procedures, and customs designed to ensure that all Class members are provided a meaningful and realistic opportunity for release based on demonstrated maturity and rehabilitation. The plan also should include a proposal for providing those Class Members who were denied a release date following an SB 590 hearing and who are eligible for parole with a meaningful and realistic opportunity for release based on demonstrated maturity and rehabilitation.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  October 12, 2018
Jefferson City, Missouri