# Exhibit 2

to

**PLAINTIFFS' RESPONSE TO DEFENDANTS' PLAN FOR COMPLIANCE**

March 29, 2018

Amy Breihan, Esq.
Roderick & Solange MacArthur Justice Center
Husch Blackwell LLP
3115 South Grand Blvd., Suite 300
St. Louis, MO 63118

Re:    **Brown, et al. v. Precythe, et al., Case No. 2:17-cv-04082-NKL**

Dear Ms. Breihan:

You have asked me to provide an expert opinion in this matter. My opinions, as detailed below, are based upon my years of experience as a criminal attorney. I have practiced criminal law since 1994, including as a federal prosecutor with the United States Attorney's Offices in the District of Columbia and Central District of California; as a clinical law professor supervising law student representation of California inmates sentenced to juvenile life without parole on resentencing and on parole matters, as well as life-term inmates on parole and post-conviction matters; and I have drafted and co-sponsored California legislation addressing juvenile life without parole sentences and the Youth Offender Parole Process.

Since 2006, I have been a Clinical Professor of Law at the University of Southern California Gould School of Law where I co-direct the Post-Conviction Justice Project (PCJP). PCJP is a clinical program where certified law students represent life-term inmates in the parole process and on habeas corpus petitions challenging the denial of parole. During that time, I have represented life-term inmates or supervised law students representing life-term inmates at several hundred parole hearings and on more than 50 writs of habeas corpus. More than 100 PCJP clients have been released from life sentences through the parole process or on habeas corpus. PCJP successfully litigated the landmark California Supreme Court decision *In re Lawrence* (2008) 44 Cal.4th 1181 which expanded the scope of judicial review of California parole decisions and has filed amicus briefs on parole issues in several significant California Supreme Court cases, including *People v. Franklin* (2016) 63 Cal.4th 261, *In re Butler* Case No. S237014 (decision pending), *In re Cook* Case No. S240153 (decision pending).

699 EXPOSITION BOULEVARD ◆ LOS ANGELES, CALIFORNIA ◆ 90089
office (213) 740-2865 ◆ mobile (818) 720-2620 ◆ hrummel@law.usc.edu

Case 2:17-cv-04082-NKL   Document 166-2   Filed 01/10/19   Page 2 of 25

I have witnessed firsthand and been involved in significant changes in California's parole process over the past ten years. Although the courts have recognized a due process liberty interest in California's parole process since 2002, more robust judicial review of parole decisions following the California Supreme Court's *Lawrence* decision in 2008 had a significant positive impact on the parole process, including accountability and consistency in decisions and increased grant rates. In 2010, a change in administration at the Board of Parole Hearings which significantly increased transparency in the process and public participation in the promulgation of regulations and policies significantly improved consistency and reliability in parole decisions and meaningfully increased grant rates while maintaining a very low recidivism rate (approximately 1%).

Since 2012, PCJP has represented 20 clients sentenced to life without parole for juvenile crimes on petitions for resentencing, resentencing hearings and appeals, and parole hearings and habeas. In the past five years, eight JLWOP clients have been resentenced to parole-eligible terms and four JLWOP clients have been released through California's Youth Offender Parole Process. A fifth JLWOP client has been granted parole and the parole grant is pending Governor review.

I have also worked to pass legislative reforms related to California's parole process, including requiring the parole board to give specialized consideration to a history of battering at parole hearings (AB 1593 amending Cal. Penal Code § 4801); creating the Youth Offender Parole Process (SB 260, SB 261 and AB 1308 amending Cal. Penal Code §§ 3051 and 4801); creating eligibility for juveniles sentenced to life without parole to be released through the Youth Offender Parole Process (SB 394 amending Cal. Penal Code § 3051). I was involved in the implementation of these laws, including the promulgation of regulations and training for the Board of Parole Hearings. I have conducted various workshops and trainings related to parole, including MCLE trainings for attorneys, trainings for California's Board of Parole Hearings commissioners on Youth Offender Parole, and workshops for inmates who qualify for Youth Offender Parole hearings at more than ten California prisons. I am scheduled to present on Youth Offender Parole at the upcoming Association of Paroling Authorities International (APAI) Training Conference in April. I have also conducted various trainings on JLWOP.

My curriculum vitae is attached as Exhibit A.

I have considered the following documents in forming my opinions herein:

- The Second Amended Complaint and exhibits thereto;
- The parties' protective order;
- The order denying Defendants' Motion to Dismiss;

- Plaintiffs Ralph McElroy, Sidney Roberts, and Theron Roland's state habeas petitions filed with the Missouri Supreme Court;
- Plaintiff Norman Brown's petition for writ of certiorari filed with the United States Supreme Court;
- Defendants' Amended Rule 26(a)(1) Initial Disclosures;
- Transcripts of the depositions of Jessica Bliesath (Volumes I & II), Kelly Dills, Gary Dusenberg, Brian George, Kenny Jones, Michelle Kasak, Ellis McSwain, Steven Mueller, Martin Rucker, Jennifer Zamkus;
- AGO0002332-3593;
- Peter Roland and Marlys Newberry's video-recorded statements;
- AGO0003749-81;
- AGO0000028;
- AGO0000061-61;
- Audio recordings of Plaintiffs' parole hearings, and written transcripts of same (PLTSF0000001-238);
- Parole hearing content analyses for each of Plaintiffs' parole hearings;
- Senate Bill 590;
- Notices of parole decisions for Edward Anderson, Kevin Bradshaw, Norman Brown, Roland Clements, Jonathan Collier, Ike Crawford, Aaron Frazier, James Hardy, Ralph McElroy, Daryll McNair, Sidney Roberts, Donald Steward, Tino Wedlow, and Liddell Wilson;
- JLWOP Spreadsheet dated January 5, 2018; and
- A transcript of Tommy Thomas' March 14, 2018 parole hearing.

I am being compensated for my time spent preparing the report and any deposition preparation, deposition or trial testimony in this matter at a rate of $500 per hour plus reasonable travel expenses.

Based upon my review of the materials related to the above-captioned case, you have asked me to render an opinion on the following question:

Does the parole process created in Senate Bill 590, as implemented through the procedures and customs of the Missouri Parole Board, provide a meaningful opportunity for release for juvenile offenders serving life without parole?

For the reasons discussed below, it is my opinion that the SB 590 parole process does not provide juvenile life without parole offenders a meaningful opportunity for release because the hearings are conducted within the existing adult parole process where the Board exercises broad, unreviewable discretion with little or no accountability or transparency, and where offenders are not afforded legal representation or notice and opportunity to be heard or to challenge the evidence

against them. The SB 590 process also fails to provide a meaningful opportunity for release because the Board does not give adequate consideration to the mitigating factors of youth such as the offender's growth, maturity and rehabilitation.

<u>Missouri Parole Procedures</u>

In Missouri, aside from executive clemency, the only opportunity for release for juvenile offenders sentenced to life without parole prior to August 28, 2016 is through the parole process.

Missouri parole decisions are made by the Missouri Board of Probation and Parole comprised of seven (currently six due to a vacancy) politically appointed full-time members, most of whom have a law enforcement background. It does not appear that any of the members have formal legal training or formal education or experience in adolescent development. The Board members have not received training on the legal issues related to juvenile sentencing or adolescent brain development. (McSwain 11:6-10, 13:17-21, 15:5-9, 16:11-14, 91:25-92:22; Rucker 18:8-13, 21:18-23:14, 105:6-24, 110:15-22; Dusenberg 61:1-63:24, 66:14-24, 155:16-25, 208:15-24; Jones 23:17-24:3, 42:11-17, 64:24-65:12, 77:4-7; Ruzicka 13:8-25, 14:15-15:21; Zamkus 21:10-12, 23:16-24, 29:14-31:1, 68:2-69:5; Michelle Kasak 39:3-46:7, 49:18-53:3, 87:20-23, 88:18-25, 99:8-10.) In fact, the Board declined training by the Campaign for the Fair Sentencing of Youth on the legal/scientific issues related to juvenile sentencing.

The Missouri Parole Board has absolute discretion to grant or deny parole for any reason or no reason. (Mo. Rev. Stat. § 217.670(1)-(2).) There is no process to appeal majority parole decisions, no administrative review of decisions, and no judicial review.

Prior to the parole hearing, the inmate meets with an Institutional Parole Officer (IPO) who prepares a report and recommendation for the Board members. Like Board members, IPOs have not received training on the legal issues related to juvenile sentencing or adolescent brain development. (See Bliesath Depo (Vol. II) at 70:5-13.)

The IPO's report and recommendation is not provided to the inmate. In fact, the record for the hearing (a portion of the inmate's central parole file) is not made available to inmates at any point in the process. There is no opportunity for an inmate to correct inaccuracies, provide context for confusing or misleading information, or supplement the report with relevant information. Aside from written submissions by the inmate and the inmate's supporters, there is no formal mechanism for a juvenile life without parole offender to supplement the record with

documentation of the youth factors for the Board's consideration of how the youth factors relate to culpability or the extent of the inmate's growth and maturity.

The Missouri Parole Board averages 38 parole hearings each business day, and may schedule a single panel (Board member, parole analyst, and a local supervisor) to conduct up to 18 parole hearings in a single day. Hearings typically last less than an hour and can be as short as 15-30 minutes. Following the hearing, the panel completes a Board Action Sheet with comments. The Board Action Sheet is then circulated to the other Board members – who do not attend the hearing, do not listen to the transcript, and may or may not review the parole file. Each member indicates a vote on the Board Action Sheet until a majority vote (four members) is reached. That vote becomes the final decision, which is not reviewable.

Missouri parole hearings are closed proceedings; the public may not participate and the record of the hearing and the decision are not made available to the public or even to the inmate. In fact, it is the Board's expectation that the IPO will explain the decision to the inmate (Jones 81:9-83:5), but the IPO is not present for the parole hearing and is not privy to the Board's decision process (*See* Bliesath Depo Vol. II at 55:6-68:2).

Missouri does not provide legal representation to inmates seeking parole. In fact, even when an inmate retains counsel for the parole hearing, it is the practice of the Board not to allow the attorney to act as counsel for the inmate during the hearing. (Parole Hearing Procedures Rules of Conduct of Delegate; *see* McSwain Depo at 86:14-18.)

### Senate Bill 590 Parole Procedure for Juvenile Life Without Parole Inmates

Following the US Supreme Court's decision in *Montgomery*, the Missouri legislature amended state law to allow inmates sentenced to mandatory life without parole for juvenile crimes to petition for a "for review of his or her sentence" after serving 25 years. (Senate Bill 590, 98th General Assembly.) The statute requires the Missouri Parole Board (the Board) to consider various factors including the inmate's rehabilitative efforts; the inmate's growth and maturity since the crime; evidence that the inmate has accepted responsibility for the crime; the inmate's institutional record; and whether the inmate's risk to society remains the same as at the time of the initial sentencing. Mo. Rev. Stat. § 558.047.5. The statute also requires the Board to consider the nature and circumstances of the crime; the inmate's culpability in light of his/her age; the inmate's age, maturity, intellectual capacity and mental and emotional health and development; the likelihood of rehabilitation; the juvenile's role in the offense; the effects of familial and peer pressure on the juvenile's actions; the juvenile's prior criminal history; how the

juvenile's judgment was affected by youthful characteristics; and victim impact statements. Mo. Rev. Stat. § 565.033.2.

The statute does not provide guidance on how the Board should consider these factors – whether the factors should be mitigating, aggravating or neutral -- or how much weight the Board should give to the various factors. SB 590 did not revise the statutes governing the Board's discretion in parole decisions or the legal standards for granting parole. Mo. Rev. Stat. § 217.690. The Missouri Parole Board has not promulgated regulations or adopted any specific procedures to implement SB 590 aside from the adding a provision to the <u>Procedures Governing the Granting of Paroles and Conditional Releases</u> (Bluebook) allowing offenders who were under 18 to petition for a parole review hearing after serving 25 years and adding a third page to the Board Action Sheet.

My review of the three-paged Board Action Sheets for the named plaintiffs indicates that the Board's parole decisions for these juvenile offenders note the existence of some but not all of the statutory factors. In most cases, the three-paged Board Action Sheets note the inmate's accountability, remorse and rehabilitative efforts, but do not indicate how those factors weighed into the Board's decision. The three-paged Board Action Sheets do not discuss adolescent brain development or how age, maturity, intellectual functioning, mental and emotional factors, or familial and peer pressure contributed to the crime. Neither do they identify any evidence of the Section 565.033.2 factors that was available or considered in the parole determination. According to the deposition testimony of Chairman Jones, in juvenile life without parole cases, the Board only considers the additional factors listed on the third page of the three-page Board Action sheet. (Jones 95:11-96:1.) In the case of each of the named plaintiffs, the circumstances of the crime were cited as a basis for the denial of parole.

<u>Meaningful Opportunity for Release</u>

The Eighth Amendment requires states to provide juvenile offenders with an opportunity to obtain release "based on demonstrated maturity and rehabilitation" that is both "realistic" and "meaningful." (*Graham v. Florida*, 560 U.S. 48, 68-69 (2010); *Miller v. Alabama*, 567 U.S. 460, 472-73 (2012); *Montgomery v. Louisiana*, 136 S.Ct. 718, 733 (2016).) A state must do more than technically provide for the possibility of release on parole. A constitutionally meaningful opportunity for release must be more than a remote possibility or the chance of commutation by executive clemency.

*Graham*'s meaningful requirement contemplates that release will be at a point in time that provides a chance to live a meaningful life outside of prison – a

chance to rebuild a life and be self-sufficient. Although *Graham* does not define what it means for a juvenile offender to "rejoin society" (*Graham*, *supra*, 560 U.S. at 79), the Court speaks of the chance to rejoin society in qualitative terms – "the rehabilitative ideal" (*id*. at 74), the "chance for reconciliation with society" (*id*. at 79), "the right to reenter the community" (*id*. at 74), and the opportunity to reclaim one's "value and place in society" (*ibid*.) -- contemplating a sufficient period to reintegrate as a productive and respected member of the community. Geriatric, end-of-life release is not sufficient.

*Graham*'s realistic requirement implies that release on parole must be attainable if a juvenile offender demonstrates the requisite maturity and rehabilitation, notwithstanding the circumstances of the crime or other immutable factors. The release decision may not turn on the nature of the crime, but must be driven by whether the juvenile has "demonstrated growth and maturity" since the crime. That determination necessarily requires the decision maker to have information about the juvenile offender's maturity and life circumstances at the time of the crime.

The opportunity for release is not realistic if the possibility of parole is remote or uncertain in light of a decision maker's unguided discretion. The Missouri Parole Board does not have a definition or guidelines for its determinations of "reasonable probability that an offender . . . can be released without detriment to the community or to himself" or "best interest of society" or "able and willing to fulfill the obligations of a law-abiding citizen." (Mo. Rev. Stat. § 217.690.) The Board does not conduct or utilize any type of psychological evaluation or clinical risk-assessment tools, actuarial or otherwise, to evaluate the risk of recidivism. (McSwain 71:20-72:7, 231:13-15, 239:3-240:6; Jones 19:1-25, 64:1-23; Dills 59:22-60:5; George 82:12-23; Mueller 129:3-134:17; Rucker 101:7-14.)

The relevant inquiries in determining whether a process, such as the parole process created by Missouri SB 590, provides a constitutionally meaningful opportunity for release are the structure and design of the opportunity for release and the practical effect of its operation. (C.f. *Trevino v. Thaler* (2013) 133 S.Ct. 1911, 1921 (looking to the "structure, design, and operation" of a procedure regarding claims of ineffective assistance of counsel to assess whether the procedure provides a "meaningful opportunity.")

SB 590 provides juveniles with parole consideration in the context of the existing adult parole process that does not provide a meaningful opportunity for release by design or in practice for the reasons set forth in this letter. Although SB 590 requires the Board to consider relevant youth factors, it does not require the Board to give mitigating effect to those factors or limit the Board's discretion to

deny parole for any reason or no reason. In practice, the Board's implementation of SB 590 treats juvenile life without parole inmates essentially the same as other inmates seeking parole (Jones 47:24-48:5, 66:4-67:4; Dills 130:17-132:20; Rucker 33:10-36:4, 104:9-105:5; McSwain 105:2-106:7) and has not provided juvenile offenders with the constitutionally required meaningful opportunity for release.

<u>The Structure of Missouri's Parole System Fails to Provide a Meaningful Opportunity for Release.</u>

1.    *Absence of Legal Representation*

Legal representation at parole hearings is critical to ensuring that the Board affords each juvenile offender the procedural protections that ensure a meaningful opportunity for release. (C.f. *Diatchenko v. District Attorney for Suffolk Dist.*, 27 N.E.3d 349 (Mass. 2015).) The legal determination that governs whether or not the Board can exercise its discretion to grant parole – whether an offender "can be released without detriment to the community or to himself" -- requires the Board to consider and weigh complex and multifaceted issues that may require the collection, presentation, and rebuttal of information from many sources. (*Id.* at 360.) The nature of the hearing is quasi-adversarial: the juvenile offender's parole is frequently opposed by the victim's family and public officials. Many unrepresented, indigent juvenile offenders lack the skills and resources to adequately collect, analyze and present the relevant evidence in this context. (*Id.* at 361.) Attorneys are necessary to help clarify complicated legal and factual issues for the decision maker.

Attorneys can investigate and gather relevant information relating to the mitigating youth factors and the juvenile offender's mental state and maturity at the time of the crime. Specifically, it is often necessary to locate and interview witnesses who can provide evidence of childhood trauma; to obtain dependency and delinquency records through a court order; to obtain/subpoena records from schools, youth centers, medical facilities; and to develop expert testimony on adolescent brain development and the impact of trauma on the juvenile offender. In cases where this information is decades old, it can be difficult and time-consuming to obtain.

Most inmates do not have sufficient knowledge of the law or access to the necessary resources to conduct a full investigation of the factors that the Board is required to consider at these hearings. This is especially true for juvenile offenders who will have been incarcerated their entire adult life and many of their teenage years. These individuals almost always enter prison with a host of personal challenges, including a lack of formal education; learning disabilities, often undiagnosed; underdeveloped critical thinking and organizational skills; and a

history of trauma including physical and sexual abuse, neglect, drug use, mental illness and/or exposure to violence. In my experience, these challenges, especially following a long period of incarceration and isolation from the community, preclude an inmate from successfully collecting and presenting this information. In many cases, these juvenile offender struggle to understand the legal significance of this information. And most inmates who were incarcerated at a young age and have spent many years in prison have great difficulty discussing childhood trauma, especially with prison or parole authorities.

Attorneys are critical not only to gathering the relevant evidence of youth factors for the Board's consideration, but to contextualizing the information and arguing the legal significance to the juvenile's culpability, dangerousness, and subsequent growth and maturity. It is extremely difficult for even the most capable juvenile offender to balance the need to demonstrate accountability and remorse with making the argument that the relevant youth factors demonstrate reduced moral culpability for the crime. In my experience, inmates who make legal arguments about reduced culpability are often viewed by parole authorities as failing to take accountability for their actions or minimizing their actions and are denied parole.

Attorneys serve other critical functions. Attorneys are best situated to assess disabilities that require accommodation under the Americans with Disabilities Act and to ensure that the Board puts in place appropriate accommodations. In my experience, inmates with cognitive deficits, learning disabilities, and verbal processing disorders are significantly disadvantaged in the parole process. Their limited ability to understand and answer questions and to understand and discuss abstract concepts can result in them appearing to be untruthful or lacking in accountability. In my experience, inmates with cognitive challenges often develop strategies to mask their deficits to avoid embarrassment and victimization in prison and the deficits may not be readily apparent in the first few meetings or interviews.

In my experience, inmates with effective attorneys are much more likely to be successful communicating their personal growth, maturity and rehabilitation in the parole process. To be effective, an attorney must review the prison file, explain the parole process and the significance of the youth factors to the inmate, spend time preparing the inmate to testify at the hearing, and in some cases, collect and present information about the youth factors to the Board. During the hearing, an effective attorney can challenge unreliable evidence in the record and make legal arguments that the inmate is often not able or well positioned to make. Even when individuals have attorneys present as their delegate, the current process in Missouri does not permit their attorneys from providing this representation. In California's parole process, where there is a due process liberty interest in parole

and judicial review of parole denials, it is my experience that the Board is more likely to respect an inmate's legal rights during the parole process and render a decision that comports with law when the Board is aware that the inmate has an attorney who is willing and able to challenge the parole decision on habeas.

> 2.    *Failure to Provide Notice and Opportunity to Challenge Evidence and to be Heard*

Missouri's failure to provide juvenile offenders access to the record relied on by the Board at the hearing, including the parole file, not only fails to provide a meaningful opportunity for release, but offends the fundamental requirements of due process. In the parole context, where a constitutional liberty interest exists, the Fourteenth Amendment requires "an opportunity to be heard," including an adequate ability to prepare for the hearing and to receive "a statement of the reasons why parole was denied." (*Swarthout v. Cooke*, 131 S. Ct. 859, 861 (2011) (finding sufficient due process procedural protections where petitioners "were allowed to speak at their parole hearings and to contest the evidence against them, were afforded access to their records in advance, and were notified as to the reasons why parole was denied").)

The Missouri Parole Board's practice of not providing a juvenile offender access to the parole file or any other materials relied on by the Board in making its parole decision precludes the juvenile offender from knowing the source and nature of the information being considered by the Board and from preparing to respond to the information or to challenge inaccurate or incomplete information. Moreover, the juvenile offender does not have notice of relevant information that may not be contained in the file so that he or she can gather and submit that information for the Board's consideration.

The information in parole files will often be in summary form, and information may be incomplete or inaccurate, may be contradicted by other information in the parole file or full prison file, and may contain multiple levels of hearsay. Without access to the parole file or prison file, the inmate cannot correct, clarify or explain information that may be critical to the Board's assessment of dangerousness and subsequent growth and maturity in making its parole decision. In my experience, even where the Board spends significant time reviewing a prison file, it is not possible for the Board to have a complete working knowledge of the file and it is frequently the case that the attorney or the inmate can more readily identify information from the file that is responsive to the Board's concerns or relevant to the parole decision.

3. *No Opportunity to Present Evidence of Mitigating Factors of Youth*

SB 590 requires the Missouri Parole Board to consider various factors related to youth in making parole determinations for juvenile offenders. In order to evaluate maturity and rehabilitation, as required by *Miller*, the Board must have information about the juvenile offender's maturity and life circumstances at the time of the crime. Yet Missouri's parole system does not provide a formal mechanism for juvenile offenders to collect or submit evidence of the mitigating factors of youth for the Board's consideration at the hearing. In these cases, the sentence of life without parole was mandatory, so it is unlikely that youth mitigation evidence was developed or presented at the original sentencing hearing. As two different Board members testified in deposition, most of the juvenile history is "self-reported." (Zamkus 39:5-6; McSwain 66:6-10.) In my experience, juvenile offenders are not reliable reporters of the mitigating factors of youth such as childhood trauma and abuse, cognitive deficits, and mental and emotional health. In many cases, the most relevant information must be obtained from third-party sources.

Evidence of youth factors may be contained in official reports and documents, such as delinquency and dependency records, school records, medical records, psychological/ psychiatric reports and records, Department of Social Services reports and investigations, and law enforcement reports. The evidence may also include statements or declarations from family members, friends, teachers, neighbors, religious leaders, co-defendants or former criminal associates. In some cases, it may be necessary to obtain expert opinions on adolescent brain development, intellectual function, psychological development and mental health, gang culture or prison conduct.

4. *Lack of Transparency and Broad, Unreviewable Discretion*

Missouri's parole system provides very little accountability for the Parole Board's process and decision making. First, the statute provides the Board with unfettered discretion to deny parole for any reason or no reason and limits a grant of parole to cases where release "is in the best interest of society." (Mo. Rev. Stat. § 217.670(1)-(2).) Second, there is almost no transparency in the system. Parole hearings and records of hearings are not available to the public or even to the offender. (14 CSR 80-2.010(5)(F).) Any Board meeting, record, or vote may also be closed to the public. (Mo. Rev. Stat. § 217.670(5).) The Board also appears to follow Parole Hearing Procedures that are not promulgated through any formal administrative process. (Ex. 3 to Second Amended Complaint.) Finally, the Board's parole decisions are essentially unreviewable. The offender may administratively appeal the panel's denial of parole, but majority Board decisions are not reviewable.

Lack of transparency in the parole process and parole decisions makes it difficult for juvenile offenders to understand the Board's expectations for release and to meet those expectations. In my experience working within the California parole process, I have seen firsthand how a realistic, predictable possibility of release provides a powerful incentive for inmates to take accountability for their crimes and to program and rehabilitate. If the parole process is secretive and appears arbitrary, some, perhaps many, inmates who have the ability to successfully rehabilitate will not be incentivized or motivated to do so. Just as *Graham* counsels against the prison system being complicit in a juvenile offender's failure to rehabilitate by withholding programs, the parole process should not be complicit by making release on parole appear arbitrary and unpredictable.

In my experience, transparency in the parole process and Board procedures improves the accountability of the Board as a whole and of individual decision makers. Public attendance and opportunity to comment at Board meetings and trainings promote the effectiveness of trainings and policy development. Public availability of parole hearing transcripts leads to more consistency and reliability in parole decisions.

5. *No Guidance on Consideration of Disadvantages to Juvenile Offenders in Parole Process*

It does not appear that Missouri's parole process has any requirement or guidance for the Board's parole consideration to account for the significant disadvantages that juvenile offenders face in the parole process. Individuals who are sentenced to prison as children often lack formal education, work experience, relationship experience, and contacts with the outside world to support reentry. Parole consideration should also account for the reality that juvenile offenders' maturation is often delayed by the fact of their incarceration. Conduct violations in prison should be viewed in the context of the juvenile's age and maturity at the time of the conduct, as well as the reality of serving a "hopeless" life without parole sentence. The failure to rehabilitate in the face of that sentence does not necessarily reflect irreparable corruption. As the *Graham* court recognized, a juvenile offender sentenced to life without parole "has little incentive to become a responsible individual." (*Graham*, *supra*, 560 U.S. at 79.)

Inmates serving life without parole are often low priority for rehabilitative and educational opportunities due to limited resources. (Rucker 40:5-21.) As the Supreme Court recognized in *Graham*, a meaningful opportunity for release contemplates access to rehabilitative services such as "vocational training" and "education." (*Id*. (recognizing that the prison system may "become[] complicit in the lack of development" of a juvenile offender by "withhold[ing] counseling, education,

and rehabilitation programs"].) The failure of the parole process to recognize and account for these disadvantages undermines a meaningful opportunity for release.

      6.    *Failure to Provide Explanation or Basis of Denial of Parole*

The Board's failure to provide more than the briefest, boilerplate reasons for the denial of parole (*see* Jones 81:9-83:5) not only eliminates the possibility of effectively challenging or appealing the parole decision, but denies the juvenile offender the opportunity to address the Board's concerns in denying parole. In my experience, many inmates will take the Board's reasons for a parole denial to heart and work hard to program or rehabilitate in ways that meet the Board's concerns for the subsequent hearing. The Missouri Board's failure to explain its reasons for denying parole also denies inmates guidance on how to work toward the growth and maturity required for release, and further undermines a meaningful opportunity for release.

<u>The Policies and Practices of Missouri's Parole System Fail to Provide a Meaningful Opportunity for Release.</u>

      1.    *Arbitrary Exercise of Discretion in Decision Making Process*

Many of the Missouri Parole Board's practices in conducting hearings support the conclusion that the Board regularly exercises its discretion whether to grant parole in an arbitrary and capricious manner.

      a.  Volume of Hearings and Limited Time for Review of Record

It is the Board's policy that a panel (Board member, parole analyst, and a local supervisor) may conduct up to 18 parole hearings a single day. (McSwain 27:25-39:9; Jones 57:19-60:6.) The length of each hearing varies between 15 minutes and one hour, and SB 590 hearings average 45 minutes. (See McSwain 31:16-325:4; Jones 58:15-25; Dusenberg 23:13-17, 114:9-24.) Generally, Board members do not review the full record prior to the hearing or voting on a case. (McSwain 141:21-142:6; George 38:22-24; Dusenberg 162:3-163:2.) In some cases, the Board members may only review the IPO prehearing report and support letters, and sometimes not even that, prior to the hearing. (McSwain 141:21-142:6, 168:10-171:22; Rucker 42:3-43:20; Dusenberg 161:1-164:14.) One analyst estimated spending 10-15 minutes reviewing the file. (George 42:25-43:2.) In the case of one of the named plaintiffs, the Chair spent between 10-20 minutes reviewing the file prior to the hearing. (Jones 118:21-120:19, 189:19-190:25.)

Such limited review of the file precludes sufficient consideration of the youth factors and subsequent growth and maturity to provide a meaningful opportunity for release as required by the Eighth Amendment. In fact, the cursory consideration given to the record, combined with limited duration of the hearing, suggests that the Board is not giving serious consideration to the complex and difficult question of whether a juvenile homicide offender can safely be released into the community.

### b. Qualifications and Training of Board Members

The absence of any Board member with a legal or adolescent development background, combined with the lack of training for Board members on the legal issues related to juvenile sentencing and adolescent brain development, suggests that the Missouri Parole Board does not take seriously the requirement to provide a meaningful opportunity for release to juvenile offenders sentenced to life without parole.

In fact, the Inspector General investigated and confirmed that Board member Ruzicka turned parole hearings into a game where the object was to solicit certain phrases or song titles from the inmate seeking parole. Although Board member Ruzicka was removed from the schedule during the investigation, he resumed conducting parole hearings following the investigation. This type of conduct by a Board member during hearings and the response of the Board further suggest that the Missouri Parole Board does not take seriously the requirement to provide a meaningful opportunity for release to juvenile offenders sentenced to life without parole.

### 2. *Nature of Crime is Driving Factor in Parole Denials*

Based on my review of the available decision notices, it appears that the Board has cited to the circumstances of the offense as a basis for its decision in every SB 590 case where it has denied parole. In most cases, the offense is the only basis cited for the denial of parole. These decisions belie the fact that the Board is not giving meaningful consideration to the juvenile offender's maturity and rehabilitation. As the Supreme Court has made clear in its juvenile sentencing proportionality cases, the gravity of the crime cannot drive the determination that a juvenile is irreparably depraved and undeserving of release. "The opportunity for release will be afforded to those who demonstrate the truth of *Miller*'s central intuition – that children who commit even heinous crimes are capable of change." *Montgomery*, 136 S.Ct. at 736. In order for Missouri's SB 590 parole process to satisfy the Eighth Amendment, the circumstances of the crime cannot be the basis to deny release where the juvenile offender has demonstrated subsequent growth and maturity.

3.  *No JLWOPs released in Missouri*

As of January 5, 2018, the Board has held 25 hearings for SB 590 eligible inmates and has granted parole in only four cases, all with future release dates (which may be changed or revoked). In my opinion, a 16% chance of being granted parole falls short of providing a constitutionally meaningful opportunity for release.

Conclusion

Missouri's SB 590 parole process is not designed in a way that provides a meaningful opportunity for release. Although SB 590 enumerates youth factors for the Board's consideration, the Board retains absolute, unreviewable discretion to deny parole for any reason or no reason. The Board's meetings, actions, and decisions are closed to the public and to the individuals seeking parole, effectively eliminating accountability or transparency in the process. And juvenile offenders are significantly disadvantaged in the process because they are not afforded legal representation and they are denied access to the hearing record and a meaningful explanation of the Board's decision.

Furthermore, the Board's implementation of the SB 590 parole process belies any suggestion that the Board takes seriously its legal obligation to provide juvenile offenders with a meaningful opportunity for release. Board members spend only a nominal amount of time reviewing the record and conducting the hearing or casting the vote. The Board has cited to the crime as the primary basis for the denial of parole in every case to date. And, in at least one documented case, a Board member repeatedly treated parole hearings as a game.

In my opinion, each of these individual deficiencies in the structure and implementation of the Missouri's SB 590 parole process substantially undermine a meaningful opportunity for release, and collectively they create a system that fails to provide juvenile offenders with the constitutionally mandated meaningful opportunity for release.

I declare under penalty of perjury that the foregoing is true and correct. Executed at *Los Angeles*, California, on *March 29* 2018.

HEIDI L. RUMMEL

## **EXHIBITS**

**EXHIBIT A**  Curriculum vitae

**EXHIBIT B**  Expert testimony provided in the previous four years

**EXHIBIT C**  Publications authored in previous 10 years

**EXHIBIT A**

Curriculum vitae

**HEIDI L. RUMMEL**
Clinical Professor of Law
USC Gould School of Law
Los Angeles, CA 90089
(213) 740-2865
hrummel@law.usc.edu

## EDUCATION

**University of Chicago Law School**
J.D., with Honors, 1993

**University of North Carolina at Chapel Hill**
B.A., English Literature, with Highest Honors, 1989

## TEACHING EXPERIENCE

**University of Southern California Gould School of Law**

Clinical Professor of Law, 2014-present
  • Post-Conviction Justice Project  (Director)

Courses Taught: Legislative Policy Practicum; Criminal Law; Post-Conviction Justice Project Seminar; Trial Advocacy; Legal Analysis of Evidence

Clinical Associate Professor of Law, 2010-2013
  • Clinical Programs Director, 2011-2013
  • Student Bar Association Faculty Appreciation Award

Clinical Assistant Professor of Law, 2008-2010

Visiting Clinical Assistant Professor of Law, 2006-2008
  • Children's Legal Issues Clinic (2007-2008)
  • Post-Conviction Justice Project (2006)

Adjunct Professor, Legal Writing Program, 2004-2005

## LEGAL EXPERIENCE

**United States Attorney's Office for the Central District of California**
Assistant United States Attorney

  • Criminal Civil Rights Section, 2002-2005

Investigated and prosecuted human trafficking, involuntary servitude, police misconduct and hate crime offenses.

Established Los Angeles Metropolitan Task Force on Human Trafficking. Oversaw coordination between state and federal law enforcement and non-governmental service providers, administration of federal grant monies, design and implementation of media and public outreach efforts, and development of law enforcement curriculum.

Conducted numerous trainings for law enforcement and non-governmental agencies on human trafficking investigations and prosecutions.

Testified at state legislative hearing on AB 22 (California Trafficking Victims Protection Act).

• Deputy Chief, General Crimes Section, 2000-2002

Trained and supervised new trial attorneys in all aspects of their practice, including prosecutorial decisionmaking and plea-bargaining, legal memoranda and motions, motions hearings, bench and jury trials, sentencing proceedings, probation and supervised release hearings, and post-conviction relief. Reviewed all written pleadings, authorized plea agreements, and supervised court trials and hearings.

Developed training curriculum for new attorneys.

• Major Crimes Section, 1998-2000

Investigated and prosecuted child-victim and other violent crimes. Served as liaison to FBI task force targeting crimes against children and prosecuted cases involving internet child pornography and enticement to engage in sexual acts with children. Successfully investigated and prosecuted child prostitution trafficking, gang, federal firearms, and arson offenses.

• General Crimes/Complaints Rotation, 1996-1998

Investigated and prosecuted various federal cases involving immigration, bank robbery, narcotics, and fraud offenses. Litigated post-conviction and Ninth Circuit appellate matters.

**United States Attorney's Office for the District of Columbia**
Assistant United States Attorney, 1994-1996

• Prosecuted misdemeanor and felony cases in state trial court, conducted numerous bench and jury trials, investigated and indicted felony cases before state grand juries, and litigated appellate matters.

**Judge Thomas Penfield Jackson**, U.S. District Court for the District of Columbia
Law Clerk, 1993-1994

## SIGNIFICANT PROSECUTIONS

United States v. Gonzalez (color of law sexual abuse)
United States v. Cheung (child prostitution trafficking conspiracy)
United States v. Trisanti (involuntary servitude)
United States v. Valle-Maldonado (child prostitution trafficking conspiracy)
United States v. Nikrasch (counterfeit currency conspiracy)
United States v. Rose (armed bank robbery conspiracy)
United States v. Naeem (arson)
United States v. Delgado (arson/homicide)
United States v. Recinos (Mara Salvatrucha Gang federal firearms offenses)

**SELECTED CONFERENCES, TRAININGS AND SPEAKING ENGAGEMENTS**

Law Enforcement Trainings
- Los Angeles Sheriff's Department Human Trafficking Training
- FBI Conference on Human Trafficking
- ICE Training, Investigation and Prosecution of Human Trafficking Offenses

UC Berkeley, Human Rights Center, Working Group on Human Trafficking
- Published Report, "Safety After Slavery: Protecting Victims of Human Trafficking"

Loyola Law School, Conference on Human Trafficking (Panelist)

Lifetime Television-sponsored Presentation – "Slavery in the 21st Century: An Evening of Awareness on Human Trafficking" (Speaker)

Western University College of Law (Speaker)

Human Rights Watch – "Hopes Betrayed: Trafficking of Women and Children at Home and Abroad" (Featured Speaker)

Testimony before California Legislative Committee, California Trafficking Victims Protection Act

U.S. State Department Presentations on Human Trafficking Laws and Prosecutions
- Presentations to visiting foreign dignitaries from countries including Japan, Armenia, Mexico, Chile, and Poland

Jiangxi Research Institute of Criminology Delegation – "Juvenile Offenders in the Adult Criminal System" (Speaker)

Testimony before California Assembly Public Safety Committee, Fair Sentencing for Youth Act (SB399)

U.S. District Court for the Central District of California Re-entry Summit, "Systemic Challenges in Facilitating Reentry" (Panelist)

Testimony before California Senate Public Safety Committee, Fair Sentencing for Youth Act (SB9)

US Human Rights Fund Conference, "California's Efforts to Pass Juvenile Life Without Parole Legislation" (Panelist)

Introductory Remarks, *Crime After Crime*, USC School of Cinematic Arts (2011)

Gender Responsive Strategies Commission Conference (2011)

California Lifer Parole MCLE Training (Organizer, Panelist, Moderator) (2011)

Consultant, Sin By Silence Legislation (AB 593 and AB 1593) (2012)

Speaker and Organizer, Post-Conviction Justice Project 30th Reunion (2012)

Southwestern Law School, "Battering as a Defense to Murder:  Legal and Moral Implications" (Presenter)

Board of Parole Hearings Training, "Sin by Silence Legislation and the Parole Process"

Southwestern Law Review Symposium, "Women in the Criminal Justice System: Incarceration, Sentencing, and Collateral Consequences" (Panelist)

Skirball Cultural Center for the USC Emeriti College's Great Decisions Course, "Human Trafficking in the 21st Century" (Presenter)

Survivor Series at the UC-Irvine Initiative to End Family Violence, Inaugural Speaker Event (Presenter with former PCJP client)

California Women's Law Center, "Incarcerated Women and Girls" (Moderator)

National Fair Sentencing For Youth Annual Convening, "Legislative Implementation and Litigation"

Board of Parole Hearings Training, "Youth Offender Parole Process" (Presenter)

Southwestern Law School, "Women in the Criminal Justice System" (Presenter)

Capital Case Defense Seminar (CACJ), "Litigating *Miller/Graham/Caballero* Issues" (Presenter)

Appellate Judges Education Institute (AJEI), "Riding the Wave of Litigation Following a 'Bombshell' Change in Criminal Law and Procedure" (Panelist)

Pacific Juvenile Defender Center and Loyola Law School, "Franklin Hearings" (Panelist)

Testimony before California Senate Public Safety Committee, *Montgomery* Bill (SB394)

Testimony before California Assembly Public Safety Committee, *Montgomery* Bill (SB394)

Symposium on Litigating Miller/1170(d) cases following SB 394, Human Rights Watch and Munger, Tolles & Olsen (Organizer/Panelist)

Day of Empathy at the Capitol (Speaker/Team Leader)

Imagine Justice Concert and Lobby Day at the Capitol (Speaker/Team Leader)

Transformative Justice Symposium at San Quentin Prison (Organizer/Speaker)

CARES (Californians Advocating for Reform of Extreme Sentences for Youth), "Prop 57 Regulations Public Comment" (Presenter)

CARES (Californians Advocating for Reform of Extreme Sentences for Youth), "Passage

of SB 394" (Presenter)

YOUTH group at California State Prison Lancaster, "Youth Offender Parole Process" (Presenter)

Lifeline Group at Solano State Prison (Graduation Speaker)

## AFFILIATIONS

Bar Admissions
- Illinois, 1993
- District of Columbia, 1994
- California and Ninth Circuit Court of Appeals, 1996

Advisory Committee, California Habeas Project
- Peace Over Violence Humanitarian Advocacy Award (2011)

Campaign for the Fair Sentencing of Youth (SB9 Working Group)

SB9/*Miller/Caballero* Litigation Strategies Working Group (Member)

SB9/*Miller/Caballero* Representation Committee (Member)

Juvenile Justice Next Steps Committee (Member)

SB 260 Implementation Working Group (Co-chair)

SB 394 Co-sponsor and Working Group Member

AB 1308 Co-sponsor and Working Group Member

## COMMUNITY ACTIVITIES

Human Rights Watch (Women's Rights Committee Board Member)

Public Counsel Adoptions Program (Office Coordinator, U.S. Attorney's Office)

Project LEAD, Legal Enrichment and Decisionmaking for 5th grade students (Instructor)

The Sherman Oaks Nursery School (Board Member and Committee Chairperson)

San Jose Highly Gifted Magnet (Executive Board Vice-President, Treasurer)

The Center for Restorative Justice Works (Board Member)

Camp Kesem (National Parent Committee Member and Board Meeting Presenter)

**EXHIBIT B**

<u>Expert testimony provided in previous four years</u>

1. *O'Connell v. J.D. Smith, et al.*, Case No. 2:13-cv-01905-MWF-PJW (C.D. Cal.). I testified in a deposition. The case settled prior to trial.

**EXHIBIT C**

<u>Publications authored in previous 10 years</u>

None.