```
 1              IN THE UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF MISSOURI
 2                     CENTRAL DIVISION


 3
       NORMAN BROWN, et al.,            )
 4                                      )
                      Plaintiffs,       )  No. 17-04082-CV-C-NKL
 5                                      )  March 27, 2019
               V.                       )  Jefferson City, Missouri
 6                                      )  CIVIL
       ANNE L. PRECYTHE, et al.,        )
 7                                      )
                      Defendants.       )
 8                                      )

 9

10

11             TRANSCRIPT OF EVIDENTIARY HEARING

       BEFORE THE HONORABLE NANETTE K. LAUGHREY
12            UNITED STATES DISTRICT JUDGE

13      Proceedings recorded by electronic stenography
              Transcript produced by computer
14

15                      APPEARANCES

16
       For Plaintiffs:          MS. MEGAN G. CRANE
17                              MacArthur Justice Center
                                3115 South Grand, Suite 300
18                              St. Louis, MO 63118

19                              MR. MATTHEW D. KNEPPER
                                MS. SARAH L. ZIMMERMAN
20                              Husch Blackwell LLP
                                190 Carondelet Plaza, Suite 600
21                              St. Louis, MO 63105

22      For Defendants:         MR. MICHAEL JOSEPH SPILLANE
                                Missouri Attorney General's Office
23                              P.O. Box 899
                                Jefferson City, MO 65102
24

25



               Kathleen M. Wirt, RDR, CRR
               United States Court Reporter
       400 E. 9th Street, Suite 7452 * Kansas City, MO 64106
                         816-512-5698
```

1                          I N D E X

2   PLAINTIFFS' WITNESS:

3       HEIDI RUMMEL
            Direct Examination by Ms. Crane            11
4           Cross-examination by Mr. Spillane          59
            Redirect Examination by Ms. Crane          81
5           Recross-examination by Mr. Spillane        124

6

7                       *  *  *  *  *
                          *  *  *  *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MARCH 27, 2019

- - -

1

2

3          THE COURT:  Good morning, everyone.  Let's go ahead

4  and introduce ourselves.  First of all, the representatives for

5  the class?

6          MS. CRANE:  Megan Crane, C-r-a-n-e, from MacArthur

7  Justice Center on behalf of the plaintiffs.

8          MS. ZIMMERMAN:  Sarah Zimmerman from Husch

9  Blackwell, also on behalf of the plaintiffs.

10          MR. KNEPPER:  Matthew Knepper from Husch Blackwell

11  on behalf of plaintiffs.  And, Your Honor, we have an extern

12  from MacArthur Justice, Rebecca Bayetti.  Would you mind if she

13  sat down here, behind here, to help with documents?

14          THE COURT:  That's fine.

15          MR. KNEPPER:  Okay.  Thank you.

16          MR. SPILLANE:  Mike Spillane for the defendants,

17  Your Honor.

18          THE COURT:  All right.  Welcome to you all.  I

19  wanted to again thank Judge Maughmer for the discussions in

20  this matter.

21          I'd like to know from each side what they view the

22  purpose of this hearing is and where we are at in terms of a

23  settlement of this matter.  Because I know I have entered an

24  order, a summary judgment order, finding partially in favor of

25  the plaintiff, the class, but -- and I know there's been

settlement discussions, Mr. Spillane.  But I'm not clear, first
of all, whether there is a settlement of anything; and
secondly, specifically what the purpose, then, of this hearing
is.

So I'll let the plaintiff speak first.

MS. CRANE:  Your Honor, our understanding --

THE COURT:  You should stand up.

MS. CRANE:  Yes.  I'll come up here for a moment.

Our understanding is that we're here today regarding
the plans proposed by each party.  The plan initially filed by
respondents failed to address several key points and key due
process violations laid out by your Court's order.

As you said, we did go to mediation per Your Honor's
order, and I don't want to speak for respondents, but I think
we -- both sides found mediation extremely productive.  As laid
out in defendants' amended proposed plan and in our response to
that plan, we reached several points of agreement.  Now, you're
right, Your Honor, those have not been drafted into a proposed
settlement agreement at this stage.  I think that is something
we are prepared to do and could do, and I believe the amended
plan filed by defendants, it to some extent laid that out.  All
of the points of agreement are what would be in a settlement
agreement.

I think there are several issues that remain in
dispute, and at mediation, the way we were phrasing it at that

1  point were that those were issues we were going to, perhaps,

2  reserve for Your Honor.

3         So plaintiffs' vision of how today will go is that

4  today is to talk about those remaining issues and disputes.

5  And plaintiffs' position is that those issues really aren't

6  just a couple more issues in the list.  These are really

7  macro-level issues.

8         THE COURT:  We'll get to the argument.

9         MS. CRANE:  Okay.

10         THE COURT:  Thank you very much.  And, Mr. Spillane?

11         I guess, Mr. Spillane, what I want to get a sense

12  of, I'm assuming that, by proposing this plan, you are agreeing

13  to that plan, should you be required to do any plan; is that

14  correct?

15         MR. SPILLANE:  I think that to be accurate, Your

16  Honor.  I think what we're here for, I think there is no

17  settlement, and because of the issues they mentioned, there's

18  not likely to ever be a settlement.  That is, I think they're

19  inflexible on that we must pay for counsel, that we must pay

20  for experts, and that we must have a monitor.  My client will

21  never agree to that.  So if that's necessary for a settlement,

22  that won't happen.

23         I've given the Court a proposed plan, and my

24  understanding of the law -- and it may be inaccurate, but my

25  understanding of it is if that plan complies with the United

1 States Constitution, this Court could order it, and that would

2 be the end of the case. Because --

3         THE COURT: Well, that could be the end of the case,

4 unless you appeal --

5         MR. SPILLANE: Unless I appeal --

6         THE COURT: -- the Court's original summary judgment

7 order.

8         MR. SPILLANE: If my client wants me to appeal the

9 summary judgment, I will. But that could, then, end the case

10 at this level. So I'm not sure we're here about settlement

11 because I think maybe we're here about whether the plan I

12 proposed complies with the Constitution because I think the

13 case law teaches that the state should be given the first

14 chance to comply; and if it does and this Court finds it does,

15 then I don't think there's anything else to talk about because

16 the case law doesn't permit the other side to micromanage or to

17 get more if our plan is accurate.

18         So I think that's what we're here for today. And as

19 I understand it, they're going to provide an expert that's

20 going to testify, I think, on the three points that we're never

21 going to be agreeing on. And at some point, either before the

22 expert testifies or whenever, I will object, make a *Daubert*

23 objection, because it's basically a law professor who I think

24 is going to tell you how to decide on constitutional issues.

25 But I'll let the Court decide how I should do that.

1          Thank you, Your Honor.

2          THE COURT:  Well, I'm not going to decide how you

3  should do what you want to do.

4          MR. SPILLANE:  Well, I'll object, Your Honor.

5          THE COURT:  All right.

6          MR. SPILLANE:  And I think you should hear it as an

7  offer of proof and then decide my objection later, if you think

8  it does pass *Daubert* and have any value.

9          THE COURT:  Plaintiff may proceed.

10          MS. CRANE:  Thank you, Your Honor.  What we propose

11  for today is we give a very brief opening statement -- at this

12  point, I think it will be about two minutes -- that kind of

13  outlines what we expect to present today.  And then we have a

14  brief closing argument planned, and I expect respondents would

15  make a closing argument, as well.

16          THE COURT:  Okay.  You may proceed.

17          MS. CRANE:  Thank you, Your Honor.  So as I

18  initially said, plaintiffs are cognizant of this Court's order

19  pursuant to *Graham* giving the respondents the first opportunity

20  to explore the mechanisms for compliance in this case.  And

21  that's exactly what transpired in this case.

22          As I said, respondents filed an initial plan.  They

23  were given that opportunity, but, unfortunately, it failed to

24  address a majority of the specific constitutional violations

25  found by this Court.

1          THE COURT:  Do you agree with the defendants'

2     position that if their plan complies with *Miller* that it is

3     sufficient?

4          MS. CRANE:  I think if it complies with *Miller* and

5     if it complies with due process, because Your Honor has now

6     found that class members have a due process liberty interest in

7     this parole process, then it is sufficient.  Our position,

8     however, is --

9          THE COURT:  You understand I've never found that due

10    process limits are defined differently than the Eighth

11    Amendment?

12         MS. CRANE:  Than the Eighth Amendment.  I understand

13    that, yes.

14         THE COURT:  Okay.  You may proceed.

15         MS. CRANE:  I just want to underscore that there are

16    two constitutional rights now of interest, and I believe the

17    Court has outlined them as having the same scope.

18         Even if that is sufficient, however, the plan

19    currently proposed by defendants does not meet *Miller*, does not

20    meet the Eighth Amendment, and it does not meet due process.

21         As I said, significant progress was made in

22    mediation.  I think protections have now been agreed upon to be

23    put in place that makes progress towards a constitutional

24    system, but the issues that remain in dispute and the issues

25    that will be the focus of our expert, Professor Heidi Rummel's,

1  testimony today are foundational and integral to the
2  constitutionality of the entire parole process.  Without these
3  protections in place, it is plaintiffs' position that the
4  constitutionality of the other protections implemented will be
5  undermined and perhaps rendered actually meaningless.

6          At the outset, we want to stress that we are only
7  seeking to satisfy due process and the Eighth Amendment here.
8  Nothing more.  As respondents just asserted, they claim we are
9  overstepping and we're asking the Court to micromanage the
10 operations of the Department of Corrections, and that is simply
11 not the case.  Instead of details of micromanagement, these are
12 macro-level issues that if not implemented will leave in place
13 a piecemeal, hodgepodge plan that leaves unfettered discretion
14 for the board and provides for little to no transparency or
15 accountability.  These are critical basic requirements of a
16 due -- of due process, and this cannot be what the Constitution
17 and what *Miller* requires.

18         The only thing that makes these -- the sentences for
19 these 98 men and women constitutional is a meaningful and
20 realistic opportunity for release based upon demonstrated
21 rehabilitation and maturity.  Each and every protection we
22 discuss today is necessary and required to fulfilling that
23 constitutional promise.

24         THE COURT:  Thank you.  Mr. Spillane?
25         MR. SPILLANE:  May it please the Court.  The first

thing I would like to do is make a continuing *Daubert* objection to the testimony today because I don't want to stand up and interfere with it. So if I could have a continuing objection, that would be great.

We have a person today who is going to come in, as I understand her report, is going to tell this Court what's constitutional and what's not constitutional. She has no background in child psychology. She has no degree in it. This is a law professor who has an undergraduate degree in English literature, then was a law clerk, then an AUSA, and now is a law professor, who I believe in her report said she's done 50 habeas cases, represented 20 AWOL -- JLWOP inmates, and done many parole hearings. No expertise that the Court does not have. And as far as published papers on this or any other subject in the last ten years, the number is zero. As far as testimony as an expert in the last four years, as far as I know, in actual trial, the number is zero, and I think she's done one deposition.

So I don't think under *Daubert* there's anything that this expert is qualified to help the Court with. I think she's going to get up and tell the Court what's constitutional and what is not constitutional, and I think the case law teaches that an expert can't do that because it invades the province of the Court. So I would just ask for a continuing objection and the Court to rule on it after the Court has heard the

1  testimony.

2          I think we've provided a very good plan that you've

3  seen that addresses all of the issues.  The case law teaches it

4  doesn't have to be a perfect plan.  Whatever we draft, someone

5  is always going to be able to find something wrong with it, but

6  it's the board's job to draft the plan and to carry it out to

7  the best of their ability; and if the plan is constitutional, I

8  think that ends the case at this level, Your Honor.  Thank you.

9          THE COURT:  Thank you.  Plaintiff, you may proceed.

10         MS. CRANE:  Your Honor, I plan to qualify Professor

11 Heidi Rummel while she's on the stand.

12         THE COURT:  Sure.

13         MS. CRANE:  Okay.  Thank you, Your Honor.  So I

14 would like to call Professor Heidi Rummel to the stand.

15                          - - -

16                       HEIDI RUMMEL,

17  being first duly sworn by the courtroom deputy, testified as

18 follows:

19                          - - -

20                    DIRECT EXAMINATION

21  By Ms. Crane:

22  Q.     Good morning, Professor Rummel.

23  A.     Good morning.

24  Q.     Would you like some water?

25  A.     I'm okay for now.  Thank you.

1  Q.      Will you please state your full name and spell it for

2  the record?

3  A.      Heidi Rummel; H-e-i-d-i, R-u-m-m-e-l.

4  Q.      And were you provided -- retained to provide an opinion

5  in this case?

6  A.      I was.

7  Q.      What was the purpose of that retainer?

8  A.      Initially, I was asked to provide an opinion on whether

9  in Missouri Senate Bill 590, coupled with the Missouri Parole

10 Board's practices and procedures provided a meaningful

11 opportunity for release for persons who were sentenced to life

12 without parole for crimes committed under the age of 18.

13 Q.      And has the purpose of your retainer evolved since

14 then?

15 A.      During the course of the litigation, I was subsequently

16 asked to render an opinion on the defendants' proposed plan

17 following the Court's order and the amended plan on whether the

18 procedures that they set out constituted, or could provide a

19 meaningful opportunity for release for the same class.

20 Q.      Are your opinions reflected in a document in this case?

21 A.      I did -- initially I drafted a report on the first

22 question, and I subsequently submitted an affidavit on the

23 second question, opining on the defendants' proposed plan.

24         MS. CRANE:  And, Your Honor, I'd just like to point

25 out for the record that both of those documents were already

1  filed with this Court as Exhibit 1 to Document 166.  And I have

2  them here, if you would like to admit them as exhibits for

3  purposes of this hearing, as well.  It would be her expert

4  report, her expert affidavit.

5          THE COURT:  Everybody needs to remember that I don't

6  tell you whether I want you to do something.  You -- this is an

7  adversarial proceeding.  You tell me what you want to do, and

8  then I'll rule on it.

9          MS. CRANE:  Okay, thank you.  Well, these were filed

10  as Exhibit 1 to Document 166, so they are in the record, and

11  we'll proceed on that basis.

12  BY MS. CRANE:

13  Q.      Professor Rummel, have you been paid for your services

14  in this case?

15  A.      Yes, I have.

16  Q.      How much?

17  A.      I have been compensated at a rate of $500 per hour for

18  my time.

19  Q.      And approximately how many hours have you worked on

20  this matter so far?

21  A.      Approximately 40 hours, not including my testimony

22  today.

23  Q.      And Professor Rummel, I would like to briefly review

24  your qualifications before we get to the substance of your

25  opinions in this case.  What is your profession?

A.      I'm currently a clinical professor of law at the
University of Southern California, and I direct the
Post-Conviction Justice Project there.

Q.      And where did you attend law school?

A.      The University of Chicago.

Q.      Where have you been admitted to practice?

A.      In Illinois, the District of Columbia, and California.

Q.      How long have you practiced law?

A.      Oh, since 1990.  I clerked from '93 to '94; but since
1994, about 25 years.

Q.      How did you start your career as an attorney?

A.      I spent my first year after law school as a clerk for a
federal district court judge in the District of Columbia.  And
subsequent to that, I was employed -- I worked as an Assistant
United States Attorney in the District of Columbia where I
handled state court prosecutions.  And then for the following
ten years, from '96 to the end of 2005, I was an Assistant
United States Attorney in the Central District of California
where I prosecuted major -- I was in the major crime section,
which is violent crime, gang crime, and I was a supervising --
I was a deputy chief, supervising new attorneys in our training
section and the trial rotation.  And subsequent to that, I
prosecuted criminal civil rights cases, primarily human
trafficking and color of law.

Q.      How long -- how many years did you spend in U.S.

1 Attorneys' offices in general?

2 A.      Twelve.

3 Q.      And approximately when did you become a law professor?

4 A.      Following -- I left the U.S. Attorney's Office at the

5 end of 2005 and began working at the University of

6 California -- Southern California in 2006.

7 Q.      And you mentioned the clinic that you direct at USC.

8 Could you tell the Court a little bit more about that clinic?

9 A.      I am not a traditional academic law professor.  My

10 primary responsibility, maybe 80 to 85 percent of my time, is

11 running a clinical program where law students -- which predates

12 me at the University of Southern California where law

13 students when I came were almost exclusively representing

14 late-term -- determined late-term inmates who committed first

15 or second degree murder in the California parole process, and

16 then challenging denials of parole, either by the board or the

17 governor, on habeas petitions in initially the state courts and

18 federal court, but eventually the federal court remedy for

19 violation in the context of the California parole process.

20         And then when I came into the project, I began

21 working on the issue shortly -- after I joined the project, I

22 began working on the issue of juvenile life without parole.

23 Initially I was involved in legislative drafting and efforts to

24 pass what eventually became Senate Bill 9, which allowed those

25 persons to seek, in certain cases under certain circumstances,

1  to seek resentencing in court of their life-without-parole

2  sentences.

3          But I continued to be involved in legislative

4  efforts to create the youth offender parole process in

5  California to -- and then representing clients.  Through my

6  clinic supervising students, we've represented clients on

7  juvenile-life-without-parole resentencing --

8          COURT REPORTER:  Could you please slow down?

9  A.      In the past ten years, students in the project have

10 represented persons serving life without parole for juvenile

11 crimes at resentencing hearings on appeal in the California

12 courts of appeal and federal court and at parole hearings in

13 California.

14 Q.      And you mentioned the legislative work you've done,

15 specifically in terms of setting up and implementing the youth

16 offender parole process in California.  Have you given any

17 legislative testimony related to that work?

18 A.      I've testified in front of the legislature several

19 times, both the Senate Public Safety Committee and the Assembly

20 Public Safety Committee, on juvenile life without parole, on

21 youth offender parole, and the parole board process, in front

22 of a budget committee about the parole board process.

23 Q.      Have you conducted trainings regarding this legislation

24 that has been implemented, as well as the parole process for

25 juveniles more generally?

1   A.    I have.  I've done several trainings for the full board

2   in California, which is all the commissioners and chief legal

3   counsel, on youth offender parole.  I've also done trainings on

4   intimate partner battering.  I've presented training recently

5   to the Forensic Assessment Division of the California Board of

6   Parole Hearings, which is all of the psychologists that conduct

7   the risk assessments for the inmates going through the parole

8   process.

9         I did a training at the Association of Parole -- the

10  APAI, the international paroling association -- I don't know

11  exactly what the letters stand for -- which is commissioners

12  and parole authorities from around the world meet once a year,

13  and we provided training on the youth offender parole process

14  in California at their most recent meeting.

15        I also do trainings for attorneys to conduct parole

16  hearings in California for CLE credit and train them on

17  generally the parole process, and then subsequent to the

18  passage of the youth offender laws, the youth offender parole

19  process.

20  Q.    So pulling that all together, Professor Rummel, can you

21  briefly explain to the Court why you are specifically qualified

22  to testify about ways to ensure that the juvenile offender

23  parole process provides a meaningful and realistic opportunity

24  for release?

25  A.    You know, in -- in the context of my professional

1  experience, I've conducted hundreds of parole hearings in

2  California where there is a due process liberty interest in

3  parole, both at a time where that -- that -- that due process

4  liberty interest was not being routinely upheld by the parole

5  board, and I've been involved in the reforms that have led to a

6  much more robust -- where that interest has been much more

7  protected by -- through litigation and through legislative

8  change, through regulations.  I've been involved in helping to

9  draft and comment on regulations that the parole board has

10  adopted to implement.

11        So I think I'm uniquely situated to understand the

12  dynamics of the parole process and where that process, even

13  where there are certainly protections or policies in place, can

14  fall short of meeting a person's due process liberty interest

15  and/or failing to provide a meaningful opportunity for release.

16        I think my work with persons serving juvenile life

17  without parole and the resentencing hearings I've been through

18  and the experience in the parole process also helps me to

19  understand how the special considerations that need to be

20  given --

21        THE COURT:  Slow down.

22  A.     How the special considerations and protections afforded

23  by the United States Supreme Court in the *Miller* and the

24  *Montgomery* cases -- how a parole board can uphold those and how

25  a parole board might fall short of those, even in a structure

1  that seems to protect due process liberty interests.

2          MS. CRANE:  Your Honor, at this point, I would like

3  to qualify Professor Heidi Rummel as an expert on juvenile

4  offender parole processes.

5          MR. SPILLANE:  Your Honor, in case I need to still,

6  I object.

7          THE COURT:  All right.  I'm going to take it as a

8  continuing objection on all issues that could be raised.  And

9  I'm going to go ahead and listen to the testimony, and then

10  maybe a summary at the end as to why you think that I should

11  not consider this for purposes of this hearing.  So I will

12  permit you to continue.

13          MS. CRANE:  Thank you.

14          THE COURT:  Subject to the continuing objection.

15          MS. CRANE:  Thank you.

16          THE COURT:  I do have a question I'm curious about.

17  You talk about resentencing.  Are you talking about

18  resentencing of juveniles without --

19          THE WITNESS:  That's correct.  In California, we

20  have discretionary juvenile life without parole.  If a person

21  is convicted of a special circumstance murder --

22          THE COURT:  These are future people who have been

23  sentenced after *Miller*, are you saying?

24          THE WITNESS:  No, pre-*Miller*.  It's about going back

25  into court post-*Miller*.  There are two mechanisms in California

1  for a person to go back for resentencing post-*Miller*.  One is

2  to file a *Miller* habeas petition challenging the

3  constitutionality of their sentence; and, too, really there was

4  a presumption in favor of life without parole in California

5  before *Miller*, and in most cases the *Miller* factors weren't

6  presented or considered.  So we've represented people on *Miller*

7  habeas resentencings.

8          And we have also -- under the law that passed in

9  California in 2012, it's a statutory remedy, it's not a robust

10 *Miller* hearing, but certain individuals who meet certain

11 criteria had the opportunity to go back into court and present

12 mostly their rehabilitative efforts in an effort to have the

13 court just impose the discretionary 25-to-life sentence and --

14 to vacate the life without and replace it with a 25-to-life

15 sentence.

16          So those are the types of hearings where I've

17 represented individuals.

18          THE COURT:  Based on state law.

19          THE WITNESS:  Based on -- well the *Miller* habeas

20 would be based on federal law in California.  The resentencing

21 under California law would based on state law.

22          THE COURT:  All right.  Go ahead.

23  BY MS. CRANE:

24 Q.     Professor Rummel, just to start off, did you review

25 materials in this case in preparation for your report and your

1  testimony here today?

2  A.      I did.

3  Q.      Can you briefly summarize those materials for the

4  record?

5  A.      Yes.  Prior to generating my original report -- and

6  I've listed the materials that I reviewed -- I reviewed the

7  pleadings that had been filed in the case.  I reviewed most of

8  the discovery, including decision hearing forms and recordings

9  and summaries of parole hearings for class members, and the

10 other discovery materials that were provided, and the statutes

11 and policies that govern the Missouri parole process.

12 Q.      And more recently when these proposed plans and

13 responses by both parties have been filed in this case, have

14 you reviewed all of those documents?

15 A.      I did.  I reviewed all of the pleadings and proposed

16 plans and responses leading up to today's hearing.

17 Q.      And based on your review of all of those materials, in

18 your opinion, does the amended plan most recently proposed by

19 the defendants provide class members due process and a

20 meaningful and realistic opportunity for release?

21 A.      In my opinion, it does not provide that.

22 Q.      Okay.  We will go point by point on your opinion about

23 why it does not.

24          Just as an initial matter, in your affidavit

25 responding to the defendants' initial proposed plan, you stated

1  it was problematic that the defendants' plan requires an inmate

2  to initiate the process.  Can you briefly explain why you see

3  that as problematic?

4  A.     In my opinion, it's an unnecessary obstacle to

5  obtaining the parole hearing that doesn't really serve any

6  purpose.  And in my experience, there are many -- many inmates

7  don't have a full understanding of their legal rights, aren't

8  in a position cognitively, educationally to evaluate whether

9  it's in their best interests to apply for and proceed with a

10  parole hearing and may not apply for a hearing, even though

11  it's in their best interests to do so.  Sometimes they're just

12  overwhelmed by the paperwork and the process, and a lack of

13  understanding would lead them to not -- to not apply.

14  Q.     Based on your professional experience, what would be a

15  better option?

16  A.     Automatic parole consideration at the appropriate time.

17  Q.     In your affidavit responding to defendants' initial

18  proposed plan, you referred to the unfettered discretion

19  granted to the board.

20          THE COURT:  I'm assuming that whatever you're

21  dealing with in this initial plan wasn't changed in the amended

22  plan.

23          MS. CRANE:  Right.

24          THE COURT:  Okay.

25          MS. CRANE:  And I will make that clear going forward

1 in the questions.

2 THE COURT: Please go ahead.

3 BY MS. CRANE:

4 Q. What is the biggest problem with the board having

5 unfettered discretion?

6 A. In order for release to be meaningful and realistic, in

7 my opinion, there has to be a legal standard. If the board can

8 deny parole for any reason, or any reason other than the crime,

9 or no reason at all, that doesn't provide a meaningful and

10 realistic opportunity for release.

11 Q. And in your opinion, does the amended plan most

12 recently proposed by defendants sufficiently rein in the

13 board's discretion?

14 A. No. It does not.

15 Q. And what is one way, based on your professional

16 experience and expertise, that you would recommend to

17 effectively limit a board's discretion?

18 A. In my opinion, there has to be a legal standard that

19 the -- that the inmate is required to meet in order to be

20 granted parole and that the board has to follow in order for

21 someone to be granted parole that relates to the considerations

22 set forth in *Miller* and *Montgomery*.

23 Q. And what is a legal standard that would relate to those

24 *Miller* considerations and would provide a constitutional

25 process here?

1   A.      For example, the irreparable corruption is language

2   that comes directly from those cases which hold that, except in

3   rare cases where someone is determined to be irreparably

4   corrupt, they are constitutionally entitled to an opportunity

5   for release.  So one possible standard is, in the absence of

6   irreparable corruption, or an examination of whether someone is

7   irreparably corrupt.

8           THE COURT:  Let me make sure I understand.  You're

9   saying that you believe that if an inmate shows that they are

10  not irreparably corrupt that they have a constitutional right

11  to be released?

12          THE WITNESS:  No, that's one possible legal standard

13  that could be put in place for the board to follow.  I don't

14  think it's the only legal standard that would meet

15  constitutional muster.

16  BY MS. CRANE:

17  Q.      Is there an alternative that you believe would meet

18  constitutional muster based on your experience?

19  A.      Demonstrated maturity and rehabilitation, also language

20  that comes directly from the cases.  I think that that is --

21  something closer to that might actually be constitutionally

22  required.  That's obviously a question for the Court.  But the

23  meaningful opportunity for release based on the case law turns

24  on maturity and rehabilitation, and that is a legal standard

25  that would set a goalpost for the board and for the persons

1  seeking release that, once you demonstrate maturity and

2  rehabilitation, that you would be entitled to be released.

3   Q.      And that speaks to my next question.  Based on your

4  experience, what impact have you observed a legal standard

5  having on the board and how they conduct hearings and their

6  decision-making?

7   A.      The legal standard drives the hearing.  It determines

8  what evidence is relevant or not.  It provides a framework for

9  evaluating all of the critical factors that *Miller* deems must

10  be considered and that, in fact, the Missouri, you know, law

11  lists as having to be considered.  It creates the framework for

12  those factors for consideration, and ultimately it allows

13  someone -- anyone in their reviewing body to determine whether

14  the decision was arbitrary and capricious or not, whether

15  there's evidence sufficient to meet the legal standard or not.

16   Q.      And in your professional experience, what benefit, if

17  any, can a legal standard have for the inmates?

18   A.      In my experience, inmates take very seriously these

19  parole hearings.  When the parole hearing is a full and fair

20  process that can result in release, an inmate -- California has

21  not always been that way, and the shift in that has been really

22  enlightening for me as I've worked with people in prison.

23          When there is a standard, a meaningful standard that

24  can be met and they see other people meeting that standard and

25  going home and the people who don't meet that standard

1 remaining in prison, it gives them a goalpost, it gives them
2 something to work toward. When they leave a hearing and the
3 parole board says, you know, you still don't meet our standard
4 because you need more substance abuse programming, you need to
5 figure out how to manage your anger or need to be more truthful
6 in here, whatever it is they say to them, there's something for
7 them to work toward. It provides an opportunity for them to
8 mature and rehabilitate in a way that I think *Miller* and
9 *Montgomery* envision.

10          So it benefits the hearing process and the fairness
11 of the hearing process and the accountability of the hearing
12 process, and it gives a framework to look and see whether the
13 board has evaluated the factors in a meaningful way leading to
14 the standard. But on the other hand, it also incentivizes and
15 motivates those inmates who can and are interested in -- which
16 is many more than you might imagine, it's been surprising for
17 me in California -- to do the work that they need to do to be
18 able to return to society.
19 Q.    Based on your professional experience and your
20 expertise, is a legal standard simply a best practice, or is it
21 a constitutional requirement for *Miller* parole processes?
22 A.    I don't believe you can have a meaningful opportunity
23 for release if there's not a legal standard. The board's
24 discretion has to be reined in in some way. There can't be the
25 possibility of denying parole for any reason or no reason.

1    Q.      And in your professional opinion, does the amended plan

2    proposed by defendants include an adequate legal standard?

3    A.      The only thing I see in that, in their proposed, is one

4    prohibited basis.  You know, they can't consider the crime,

5    which I think is appropriate and goes a long way toward getting

6    them where we need -- getting them where they need to be, but

7    it's not the same as having a legal standard.

8              THE COURT:  I don't think they said they can't

9    consider the crime, it can't be the sole consideration.

10             THE WITNESS:  I'm sorry.  I misspoke.

11   BY MS. CRANE:

12   Q.      That is correct, the board's proposed plan does,

13   indeed, propose at least one limit on the board's discretion,

14   this prohibition of decisions based solely on the circumstances

15   of the offense.  Can you explain a little more about why that

16   isn't a sufficient limit in and of itself without a legal

17   standard also attached to it?

18   A.      Even if the crime isn't considered at all, the basis --

19   under the -- under the framework they propose, the basis of the

20   decision can be someone's -- I'm not saying they would do this,

21   but someone's race, where they grew up, criminal conduct they

22   engaged in as a very young person.  You know, what they ate for

23   lunch the day before.  Those are all bases that they could use

24   to deny parole, and that can't provide a meaningful opportunity

25   for release.

1   Q.     In your affidavit, another way you recommended to
2   appropriately limit the board's discretion was documented
3   decision-making or structured decision-making.  Can you talk a
4   little bit about why documented decision-making is so important
5   in your professional experience?
6   A.     Again, it's the ability of a body to review the reasons
7   for a parole decision to ensure that they are not arbitrary and
8   capricious.  If the basis for the decision is not documented
9   somewhere, there's no ability to look back and know whether the
10  board adequately considered the *Miller* factors or used
11  illegitimate bases to make their parole decision.
12  Q.     And when you're talking about documenting
13  decision-making, what specifically do you want documented?
14  A.     The basis of the decision, the reasons for the
15  decision.  The evidence considered and the explanation for the
16  decision.
17  Q.     And in your professional experience, is it important
18  for those reasons and the evidence relied upon to be documented
19  related to each *Miller* or statutory factor?
20  A.     I think in this case where the case law driving the
21  meaningful opportunity for release requires consideration of
22  those factors, that, yes, it would be important to know how the
23  board evaluated the mitigating factors of youth, the childhood
24  environment, the trauma, adolescent brain development and
25  subsequent growth and maturity in forming its decision to grant

1  or deny parole.

2   Q.     And you talked about structured decision-making.  What
3  does structured decision-making require?

4   A.     That's one way to get to documenting a decision.  It's
5  not my opinion that structured decision-making is the only way.
6  We are currently in the process of shifting to structured
7  decision-making in California.  I think the benefit it serves
8  is structured decision-making sets out the factors that need to
9  be required and require the decision-maker to cite, here is the
10 evidence that favors that factor, and here is the evidence that
11 disfavors that factor.  And so it's a guidepost, it's a
12 framework to understanding how the decision-maker reached its
13 decision.

14          I think it does a couple different things.  It gives
15 us the basis to evaluate whether the decision was appropriate
16 or arbitrary and capricious.  It gives us -- it gives the
17 decision-maker sort of a framework and a roadmap.  It doesn't
18 mean they can't consider other things or ask other questions or
19 think about other things, but it does go a long way to ensuring
20 they're thinking about the right things, at a minimum, and
21 understanding how they weighed the evidence in favor of or
22 against the critical factors that need to be considered in the
23 decision.

24  Q.     And in your professional opinion and based on your
25 expertise, is documented decision-making a best practice, or is

1  it constitutionally required for a *Miller* parole process?

2   A.      In my opinion, it's critical, it's required that the

3  basis of the decision and the evidence considered is available

4  to be reviewed and is documented in some fashion.  It's also a

5  benefit --

6          THE COURT:  Tell me why.  I mean, we have *Miller*,

7  and it explains to us what's required.  How is that required by

8  *Miller*?

9          THE WITNESS:  Because if we have no understanding of

10 how the -- if the board just says, we followed *Miller* and here

11 is our decision, there's no way to review that.  There's no way

12 to know if that's what they did, if they did it appropriately,

13 if they considered evidence appropriately, if they failed to

14 consider important relevant evidence in making their decision.

15 There's no ability to review that or have any idea whether it

16 was done appropriately or correctly.

17          And due process guards against arbitrary and

18 capricious decision-making.  And in a system where it's just a

19 check box yes/no, yes, we considered everything, yes or no,

20 this is our decision, there's no way to ensure that due process

21 was afforded to the person seeking parole.

22  BY MS. CRANE:

23  Q.      Another issue that remains somewhat in dispute between

24 the parties and that you address in your report and affidavit

25 is what the Court initially identified as the class members'

1   inadequate access to evidence.

2           In your professional opinion, does the new plan most
3   recently proposed by defendants adequately remedy this problem?

4   A.      It goes a long way, but I don't think it completely
5   remedies the issue.

6   Q.      And in your professional opinion, what needs to be
7   included in that parole file or in the materials provided to
8   the class member before a hearing?

9   A.      In my opinion, any evidence that is part of the record
10  of the decision, any evidence that is considered by the board,
11  can be considered by the board, needs to be available to the
12  person seeking parole and their counsel.  And it needs to be
13  provided in a timely fashion with sufficient time to review and
14  digest and understand it and prepare to respond to it.

15  Q.      How does this work in California?

16  A.      In California, there's a memorandum of understanding
17  between the California Department of Corrections and
18  Rehabilitation and the parole board where a person's entire
19  prison file -- the entire prison file is part of the record for
20  the parole hearing.  The parole commissioners have electronic
21  access to the entire prison file and can look at anything in
22  that file when they're asking questions and making their
23  decision.  So that entire file is disclosed to inmate counsel
24  at least several months before the hearing, and it's updated at
25  each subsequent parole hearing.

1  Q.     And is it updated in the time frame between when it's

2  initially provided to the class member and leading up to the

3  hearing if anything is added?

4  A.     Yes.  If anything is added to the parole file or -- to

5  the C-file or to the -- there's the prison file, which we call

6  the C-file, and all of that is the record for the parole

7  hearing; but additional documents, such as evidence of the

8  mitigating factors of youth, materials submitted by the

9  district attorneys' offices, letters of support, parole plans,

10  if anything is added to the record for the board's

11  consideration at the hearing, it's provided to the inmate no

12  later than ten days prior to the hearing.  And, you know, to

13  me, it's a due process notice and opportunity to be heard

14  requirement.

15  Q.     And we talked about access to the prison file and what

16  we here in Missouri call a parole file.  What is your opinion

17  about access to statements made by victims or victims'

18  representatives or prosecutors?  Is this also required?

19  A.     If it's considered -- my opinion is that anything that

20  is considered or presented to the parole board needs to be made

21  available to the inmate and counsel.

22         Now, there's protections.  You know, victims

23  obviously have some privacy interests.  We would -- you know,

24  personal information, any information that would identify where

25  they live or would allow a person to contact them obviously can

1    be rejected, but the substance of their opinions and their

2    testimony, if it's going to be presented to the decision-maker,

3    needs to also be presented to the person seeking parole so they

4    have an opportunity to respond.

5    Q.    And another issue that remains in dispute between the

6    parties and that you addressed in your recent affidavit is that

7    the plan proposed most recently by defendants does not include

8    an official comprehensive policy that would govern this parole

9    process.   In your professional opinion, what are the risks or

10   downsides posed by an informal piecemeal policy like that

11   proposed by defendants?

12   A.    I mean, I -- it's my opinion you need to have a legal

13   standard, and once you have a legal standard -- or just because

14   the board is tasked with implementing these laws, it's critical

15   that everyone understand how that's going to be done.   They can

16   do it however they want that meets due process, but it's

17   critical that those policies be published and that everyone

18   understands how the process will work and what the limits are

19   and what the parameters are so that the rules are set out ahead

20   of time, you know, just to make a fair playing field.

21          And, I mean, typically in my -- in my experience,

22   when an administrative agency is implementing laws, they go

23   through the administrative law process and promulgate

24   regulations that govern their implementation of the law and are

25   subject to public comment.   But at some point the process that

1  this decision -- this constitutional right is going to be

2  implemented needs to be set out and provided to all of the

3  people who are -- who are part of the process.

4  Q.     You have also expressed concern in both reports about

5  the role that the IPO plays in the Missouri parole process and

6  the impact this has on the constitutionality or the meaningful

7  release for these class members.

8            As an initial question, are you suggesting that the

9  involvement of an IPO, which is an institutional parole

10 officer, in the juvenile offender parole process is, in itself,

11 always unconstitutional?

12 A.     No.

13 Q.     What is your concern with the specific role the IPO is

14 proposed to play in this *Miller* parole process?

15 A.     In my opinion, there are components of the IPO's role

16 that usurp the decision-makers' authority, that infringe on the

17 decision-making process, which is exactly the process that

18 we're -- that needs to have the protections attached to it.

19 The IPO's assessment of the evidence, the IPO's recommendation

20 about the outcome of the hearing, even, to some extent, the IPO

21 making the initial determination of what evidence is relevant

22 to the *Miller* considerations and what evidence may not be

23 relevant to the *Miller* consideration is problematic to me.  The

24 fact-gathering, the collecting documents, providing documents

25 to the decision-makers, I don't think there's any

1  constitutional implications with that.

2  Q.    So you mentioned infringement on the decision-making

3  authority.  In your professional experience, what is the

4  effect, if any, of providing the parole board a recommended

5  decision in advance of a hearing?

6  A.    Once -- if a decision-maker is presented with a

7  recommendation, that's going to drive the decision in some --

8  in some way.  I mean, more or less, I suppose, with different

9  decision-makers.  But when your starting point is this should

10 be a grant or this should be a denial, it's much easier for the

11 decision-maker to shortcut some of the consideration of some of

12 the factors or just to be influenced -- to be influenced by the

13 IPO's recommendation that isn't surrounded by some of the

14 protections that are required for meaningful opportunity for

15 release.

16 Q.    Are you also concerned about the fact that the IPO is

17 not present at the actual parole hearing?

18 A.    To the extent that the IPO is summarizing -- is

19 reviewing evidence and summarizing it or assessing it or

20 presenting it to the decision-makers, if there's a question of

21 accuracy, if there's a question of information that's been left

22 out, if there's a question of in what context did this

23 information appear, there's no one -- there's no one to answer

24 that at the decision-making process.  And, again, all of those

25 things are being done without benefit of counsel, without

1  benefit of the inmate having the opportunity to review all of

2  the evidence before it's presented and respond to it.

3  Q.     And given the evidence --

4         THE COURT:  Let me stop you.  Are you assuming that

5  there's no counsel in any of these cases?

6         THE WITNESS:  I know that question hasn't been

7  answered.  As you know, my opinion is that there is a right to

8  counsel, there should be a right to counsel, certainly at the

9  hearing process.

10        My concern would be that if the IPO is doing some of

11  the preliminary decision-making processes, that counsel be

12  involved at that point too, I suppose, is what I would suggest.

13  But, yes, yes.  I have a big concern about there not being

14  counsel in the process, depending on how the process is

15  structured.

16        THE COURT:  So, for example, you were an AUSA.  You

17  know that probation makes recommendations to the court.  Would

18  you expect that there be counsel involved before they can make

19  that recommendation to the court?

20        THE WITNESS:  In federal court in the Central

21  District of California, both the AUSA and the defense attorney

22  have the opportunity to weigh in to the probation officer's

23  report; and if the client was interviewed, counsel would have

24  the opportunity to be present.

25        But, no, certainly counsel doesn't need to draft the

1  report or sign off on the report; but when the report is
2  presented in court, counsel is there to argue about the
3  accuracy, the context of the report, the evidence that was used
4  as the basis of the report, hearsay statements that may be in
5  the report that might not be accurate.

6          And at least when I did sentencings, the probation
7  officer was in court so the Court could say, is it true that
8  this happened or that happened, or what did you base this
9  opinion on, or why do you believe this is an appropriate
10 aggravating sentencing factor, and counsel was there when the
11 probation officer would explain the basis of the report.  That
12 seems like a perfectly appropriate process.  That's not quite
13 what's set forth yet in the defendants' plan.
14  BY MS. CRANE:
15 Q.     And is there a reason, in your professional opinion,
16 given the factors and evidence required in the *Miller* inquiry,
17 that counsel's -- assistance of counsel at the IPO stage might
18 be more necessary in these proceedings than in the typical
19 probation-type interview?
20 A.     To the extent that the IPO is collecting evidence of
21 the mitigating factors of youth, which is required to be
22 considered under *Miller*, that's complicated and difficult and
23 requires some very complex legal analysis of what's relevant,
24 what's important, how it -- and how to -- and how to gather it.
25          And in my experience, usually that data collection

1  begins with an interview of the client, who might be very

2  reluctant to expose traumatic childhood experiences or items

3  that -- you know, circumstances that they might believe

4  mitigate against them or hurt them when, in fact, they actually

5  mitigate ultimately at the hearing to provide that information

6  to someone they view as an authority figure or part of the

7  institutional structure.  So there's -- so that's a starting

8  point of why it's problematic.

9         But just the task of understanding *Miller*, what it

10  requires, what factors will be relevant to a subsequent

11  determination of someone's growth and maturity is a complicated

12  task for a nonlawyer to accomplish, and I believe that

13  assistance of counsel at that stage would be critical if

14  that's, in fact, what the IPOs are going to be tasked with.

15  Q.    And if the IPO were to not provide a recommendation in

16  this process, what role would you envision them playing?

17  A.    I mean, I can imagine an IPO collecting evidence,

18  summarizing evidence.  You know, like the function of a

19  probation officer, as the Court stated, that makes sense to me.

20  That makes sense to me.

21         But as long as the recommendation can be addressed

22  by counsel, can be discussed with the probation officer, the

23  IPO, at the hearing and the basis of it can be understood, and

24  the records supporting the assessment and opinion are available

25  to the inmate and counsel so that they can present it if

1   there's -- if it's worth presenting a different view or a

2   different context or argument about that evidence, or something

3   is missing from the IPO's report that can be identified by

4   counsel and brought to the attention of the decision-maker.

5   Q.    Just briefly, I want to address the use of a risk

6   assessment tool in a *Miller* parole process hearing here in

7   Missouri.

8         In your report, you provided an opinion about the

9   board's proposed use of a risk assessment tool designed for

10  adults and the use of that tool on class members in this case

11  who were all sentenced to prison as juveniles.  Can you explain

12  a little more about your professional -- your concern about

13  such a tool, based on your professional experience?

14  A.    And this is my professional experience using risk

15  assessments in parole hearings.  I don't have a background in

16  risk assessments or psychology.

17        But I think there's two critical things to think

18  about.  Whether the risk assessment tool is normed to the

19  population that it's going to be applied to.  Most tools are

20  normed for adults.  I believe the Ohio tool is normed to

21  adults, so it may be useful in evaluating juvenile offenders,

22  but we don't know until that research is done.  And the courts

23  have now told us that juveniles are constitutionally different

24  than adults in meaningful ways relating to culpability and

25  rehabilitation, and so that would be my first concern.

1          And my second concern is that most risk assessment
2 tools aggregate risk based on factors that *Miller* now require
3 to be mitigating.  For example, a juvenile -- criminal juvenile
4 history, an unstable childhood or exposure to trauma as a
5 child, you know, and just certain social milestones.
6 Graduation from high school, a driver's license, long-standing
7 employment, marriage, those are factors that can be used in
8 these risk assessment tools to aggregate risk; whereas, *Miller*
9 counsels, I believe, that the fact that someone commits a crime
10 very young and doesn't -- wouldn't have accomplished those
11 things shouldn't be held against them in this context.
12          So that's my other concern about using the standard
13 risk assessment tools that are normed for adults.
14 Q.    And --
15          THE COURT:  Let me make sure I understand.  Are you
16 saying this tool is inconsistent with the requirements of
17 *Miller*?
18          THE WITNESS:  I think some of the factors that are
19 used to aggregate risks are inconsistent with the dictates of
20 *Miller*, yes.
21          THE COURT:  So you're saying this particular test
22 has factors that aggregate the risks that *Miller* counsels
23 against --
24          THE WITNESS:  Correct.
25          THE COURT:  -- weighing that heavily, given the

1  youthfulness of the offender.

2          THE WITNESS:  Correct.

3  BY MS. CRANE:

4  Q.     And you already started to speak to the critical need

5  for counsel in a *Miller* parole process, but let's talk a little

6  bit more about that.

7          Is it your opinion that assistance of counsel is

8  required for a constitutional *Miller* parole process?

9  A.     Absolutely.

10 Q.     And in your professional opinion and based on your

11 experience, how important is assistance of counsel to

12 guaranteeing that the opportunity for release is meaningful and

13 realistic?

14 A.     I believe it's critical.

15         I'm going to ask for the water that was offered

16 earlier now, if I can.  Thanks.

17         MR. KNEPPER:  May I approach?

18         THE WITNESS:  Thank you.

19 BY MS. CRANE:

20 Q.     So you were talking about the critical importance of

21 the assistance of counsel.  Why do you see it as the most

22 important protection?

23 A.     First, based on my experience, effective counsel is the

24 most critical difference in someone being granted or denied

25 parole.  And I'm talking now about the population of people who

1    are sufficiently rehabilitated and changed to be -- to qualify

2    for parole.  Whether or not you have an effective attorney in

3    the room, preparing you ahead of time, marshaling the evidence

4    in your favor and arguing it to the parole board, and then

5    protecting your rights in the hearing is the biggest difference

6    in the process of granting parole to people who are deserving

7    of it or not.

8     Q.    Let's get into a little more detail about those

9    specific functions that you see an attorney playing in these

10   cases.  Could you just list some of the specific functions they

11   would be needed to play?

12    A.    I think in the context of juvenile-life-without-parole

13   inmates seeking parole, what's one of the most critical is

14   understanding what evidence is relevant to that determination,

15   what evidence is required by the *Miller* and *Montgomery* hearings

16   and obtaining it.  Especially 25 years after the fact, that

17   evidence can be very difficult to locate.  It's -- they're

18   sensitive topics that the client and the family may not want to

19   openly discuss, and it's a process to collect and be able to

20   present that evidence, and then to understand how that evidence

21   relates to the question of meaningful opportunity for release,

22   maturity and rehabilitation, whatever the standard is, how to

23   present that evidence and how to argue that it -- how it should

24   affect the outcome of the decision-making process are two

25   critical components.

1  Q.      What do you see as counsel's role, and why is it

2  important for counsel to also be there to prepare a client for

3  this type of hearing?

4  A.      In my experience, there are many people who have

5  sufficiently rehabilitated and changed to be eligible for

6  parole or to be safely released to the community who are not

7  able to navigate the parole process, understand what it

8  requires of them, understand their rights, and just communicate

9  effectively to the board that change and that rehabilitation

10  and to understand the questions, you know.

11        That's even the best and brightest inmates that come

12  in front of the parole board, but it is certainly even more

13  important for many inmates who struggle with intellectual and

14  cognitive ability, undiagnosed learning disabilities, verbal

15  processing disorders, trauma, you know.  And we're talking

16  about kids who grew up in prison where discussing trauma is not

17  norm -- the norm, and it's certainly not safe in most contexts.

18  You know, gaining someone's trust, preparing them to be able

19  to -- and just convincing them that you can sit in front of

20  these paroling authorities and talk about childhood abuse or

21  childhood sexual abuse or the things that led you to make the,

22  you know, the most -- the worst choices of your life.

23        So an attorney's ability to understand that, to

24  explain that, to gain someone's trust, and to communicate those

25  important factors to the board in a way that is relevant to

1   their ultimate determination of parole suitability is critical.

2   Just having an advocate, having someone to advocate for you

3   through this process is critical to me.  It makes -- it makes

4   more difference than I think almost anything else you can put

5   in place.

6   Q.      Speaking of advocacy, does it make a difference to your

7   opinion on this issue that the victims and the prosecutors are

8   a part of the process here in Missouri?

9   A.      I mean, it's an adversarial process.  I know that it's

10  an administrative process, and, I mean, I think in the best

11  case scenario, you're trying to get to the truth.  I mean,

12  everyone in the room is trying to figure out if someone has

13  grown and changed in a way that they're safe to be released to

14  the community, but it's inherently adversarial.  In most cases,

15  the district attorney is going to oppose release, and in many

16  cases, the victims -- not in all cases, but in many cases, the

17  victims will oppose release.  There's a political interest in

18  not releasing people on parole in most systems, certainly in

19  California.

20          And so it is by nature, to some extent, an

21  adversarial process; and to have a person who grew up in prison

22  alone in the room without an adversary -- without an advocate

23  to protect their rights, explain the process, you know, and

24  make the complex legal arguments that need to be made,

25  especially in these *Miller* cases, is critical.

1  Q.       You talked about some of the sensitive information that

2  needs to be presented at these hearings.  In your professional

3  experience, is it possible for someone to effectively argue on

4  their own for mitigating evidence and *Miller* evidence within a

5  process that also requires and values a showing of

6  accountability and remorse?

7  A.       There is an inherent tension between coming in front of

8  a parole board and taking responsibility for a crime you've

9  committed, especially in those cases where the role -- your

10 role may be more limited, a felony murder case, or just have a

11 more limited role in the case.

12           But in all cases, taking accountability for your

13 crime, demonstrating remorse for your crime and showing you're

14 changed, and also being put in the position of having to

15 protect your legal rights within the framework of the hearing,

16 being able to point out where the board may or may not be

17 following their policies or procedures or protecting your

18 rights, objecting to evidence that may be prejudicial or

19 irrelevant, there's an inherent tension.  I don't think a

20 person, especially an inmate who went to prison at 16 or 17

21 years old, can be asked to do that.  I don't think most

22 attorneys would be able to do that.

23           THE COURT:  What do you mean by protecting your

24 legal rights?  This is 25 years after the sentencing.

25           THE WITNESS:  I mean, it's difficult to -- for

1  example, in California, we have rules and regulations that

2  govern the parole process.  Using someone's innocence against

3  them, asking objectionable questions, introducing irrelevant

4  evidence.  You know, there are -- there are certain -- it's a

5  pretty wide open, you know, administrative hearing where lots

6  of things can be asked and done, but there are certain legal

7  rights that someone has.  Asking for accommodations for a

8  disability, those types of things.  It's very difficult to

9  be -- to --

10        THE COURT:  But you were talking specifically in the

11  context of innocence and accountability.

12        THE WITNESS:  Well, that's a unique situation, and I

13  think that's especially difficult when someone has maintained

14  innocence for a long time to be -- to be presenting evidence

15  that they're innocent, but also taking accountability in

16  whatever way the board requires it.

17        In California, for example, there's a plausibility

18  standard.  If you've maintained innocence or if your account of

19  the offense doesn't match with the official record of the

20  crime, which happens in many, many cases, if your account is

21  plausible, that's sufficient.

22        And there's a lot of legal wrangling about what's

23  plausible or not plausible, especially when the account of the

24  crime many years later is different.  You know, I was tried as

25  the shooter, but I wasn't the shooter.  And marshaling evidence

1  to demonstrate that's a plausible account, and arguing, you

2  know, those types of things, while still saying, this was the

3  worst decision I ever made, and because I was part of the

4  robbery, I'm still responsible for the murder, but I wasn't the

5  shooter, puts someone in a very difficult position.

6  BY MS. CRANE:

7  Q.    You mentioned the need for accommodations for people

8  with a disability or an intellectual disability and the

9  importance assistance of counsel plays there.

10          What disabilities are you speaking of?  Are you

11 talking only about people who are diagnosed as intellectually

12 disabled and have an IQ of 70 or below?

13 A.    I think any disability that falls within the ADA -- I'm

14 not an expert on the ADA, but there would be physical

15 disabilities, you know, hearing and language and seeing, but I

16 think what's more typical and problematic is undiagnosed

17 learning disorders.  I certainly have clients who don't meet

18 the threshold of, you know, MR or their IQ isn't below a

19 certain level, but it's just a little bit above, and the

20 abstract concepts are impossible for them to -- so they need to

21 be asked questions in a certain way.  They can ultimately get

22 to where they need to be, but they need to be asked very

23 concrete questions about what happened, how did you feel, how

24 did you respond.

25          Verbal processing disorders are very prevalent.  I

1 don't know if there's any testing or evaluation, in California

2 there's none.  But the ability to understand the question being

3 asked, to take in information verbally, or to articulate

4 thoughts and ideas verbally.  There's a high incidence of

5 verbal processing disorders in prison.

6 So someone who works closely enough with the client

7 to be able to present that and hope the board understands the

8 way questions are --

9 THE COURT:  Slow down.

10 THE WITNESS:  Sorry.  Sorry.

11 A.    Just someone with a lower cognitive function, a

12 lower -- compound questions can become very confusing and

13 difficult.  And it's my experience that often persons with

14 those challenges present as lying or not credible or minimizing

15 when really there's just a fundamental inability to establish

16 effective communication.  And a lawyer who has spent time

17 working with that client and preparing them can point out those

18 problems during a hearing or request the appropriate

19 accommodations so that they can be properly and fairly

20 evaluated by the decision-maker.

21 Q.    And you were talking about how an attorney can protect

22 class members' legal rights at a hearing.  I just want to

23 circle back on the innocence issue because here in Missouri, by

24 statute, where a class member maintains his or her innocence,

25 by statute, accountability and remorse cannot be required of

1  them.

2          So what could you envision the role an attorney

3  would play in protecting that statutory protection?

4  A.      I mean, in my experience when someone does not take

5  responsibility for the crime and maintains their innocence,

6  there is often a series of probing questions by the board, and

7  perhaps rightfully so, trying to determine whether that --

8  they're legitimately maintaining innocence or not.  So an

9  attorney can help to protect their rights in that context and

10 to make the legal arguments and remind the board that lack of

11 remorse and accountability cannot be considered, or argue about

12 the interpretation of answers in the context of that

13 questioning.

14         In my experience -- we have a similar standard in

15 California.  In my experience, when I present a case where my

16 client is maintaining innocence -- there are not many, but it

17 happens -- it's important for me to present some sort of

18 evidence from the record or make some sort of argument that

19 supports their claim of innocence, point out why the evidence

20 at trial was deficient, or have an affidavit from someone

21 involved in the case, or something else that's required.  And,

22 again, that takes an attorney.

23         It's hard to imagine every scenario, but it's a

24 complicated and difficult position to be in to be maintaining

25 innocence in the context of a proceeding that is expecting

1  accountability and remorse.

2  Q.    And in general, in your professional experience, have

3  you found that the California boards you've appeared before

4  appreciate having an attorney in the room?  Is it helpful to

5  them?

6  A.    It honestly is.  In my -- the attorney's ability to

7  prepare the client, to answer the questions, to synthesize the

8  materials for the board -- because it's a voluminous record

9  when you're considering the entire prison file, to synthesize

10  what's relevant and important, and even sometimes to organize

11  it or identify it, to -- you know, to contextualize the legal

12  arguments, to present the mitigating youth factors.  It often

13  streamlines hearings, and, yes, the commissioners are actually

14  very appreciative, and it's easier to do a hearing with

15  effective counsel in the room than not with effective counsel

16  in the room.

17  Q.    I'm going to move on to the importance of expert

18  witnesses in this parole process which you opined on in your

19  reports in this case.

20       We've talked about the need for attorneys, and some

21  of the reasons may be similar here.  But why is the ability to

22  retain a psychological expert in addition to counsel so

23  important to this *Miller* parole process?

24  A.    In my opinion, the *Miller* factors, the adolescent brain

25  development especially and the impact of trauma in a young

1   person, the child's environment on their ultimate criminal

2   conduct, is -- they're critical to the *Miller* consideration.

3   They are sometimes difficult for a layperson to understand and

4   break down.  Even if you can document the adolescent brain

5   development and the trauma, how those two factors impact the

6   criminal decision, and then, again, how someone recovers and

7   rehabilitates and matures from those crime-causing factors are

8   really within the purview of a psychologist, more so than

9   lawyers, and I think it's extremely helpful and critical to a

10   decision-maker who is tasked with considering those factors.

11   Q.      In addition to the scientific basis for the *Miller*

12   inquiry and adolescent development, are there cases -- are

13   there specific issues that some cases present that would have

14   an additional reason for needing an expert psychologist?

15   A.      I do think there are certain cases, there are certain

16   cognitive/intellectual learning disability challenges that may

17   not be easily understood by a layperson that an expert can test

18   for and explain the impact of and suggest accommodations for.

19   I think there's sometimes complicated mental health diagnoses

20   where an expert can be extremely useful in helping the

21   decision-maker understand the mental health challenges and

22   understand what's going to be necessary in terms of the person

23   addressing the mental health challenges and, you know, putting

24   in place mechanisms for successful reentry to manage mental

25   health challenges.  Experts can be helpful -- very helpful in

1  those realms, as well.

2  Q.      And in terms of the evidence and factors of --

3          THE COURT:  Can you stop for just a minute?  I'm

4  trying to put in context this issue of disability.

5          THE WITNESS:  Yes.

6          THE COURT:  So for the *Miller* factors, disability is

7  really not a factor.

8          THE WITNESS:  It can be.  Someone with low cognitive

9  function or -- you know, I've had experts tell me that someone

10 who doesn't have abstract thinking or problem-solving skills is

11 much more likely to get caught up in group activity and not be

12 able to understand how to navigate their way out of a quickly

13 developing criminal situation.  So it could relate to their

14 culpability for the original commitment offense.

15         THE COURT:  But *Miller* is about youthfulness.

16         THE WITNESS:  Right.  Well, *Miller* is about

17 youthfulness in that the adolescent brain is underdeveloped,

18 recklessness, impulsivity, heedless risk-taking.  There are

19 certain diagnoses, ADHD, that aggravate, that accentuate the

20 youth factors.  So while they're present maybe -- they're

21 present in every youth, they might be especially amplified in

22 this youth because of ADHD or a history of trauma.  Trauma --

23 trauma -- I'm not a psychological expert, but this is what I've

24 learned from working with experts, that trauma stunts brain

25 growth and brain development, it inhibits executive

1 functioning.

2      So sometimes I have clients where my expert will

3 say, he wasn't functioning as a 16- or 17-year-old, he was

4 functioning as a 12-year-old because of these factors in his

5 life that likely stunted his brain growth or additionally

6 inhibited his impulse control or -- you know, I mean, one thing

7 that was surprising to me was when you don't have -- when

8 you're a very concrete thinker, your problem-solving abilities

9 are very limited.  So where one child might be in a situation

10 where it's like, let's get a gun, let's go rob here, let's do

11 this, and it's quickly happening, certain individuals could

12 navigate their way out of that if they wanted to not be

13 involved in it or navigate -- and some individuals really have

14 trouble with problem-solving, especially in quickly developing

15 situations.

16      It's important, I think, to the consideration of

17 culpability, and it's important to look at who they are now.

18 Have they put in place mechanisms where they do have impulse

19 control?  You know, someone -- have they put in place

20 mechanisms where they're not so susceptible to peer pressure?

21 Or how do they navigate difficult negative peer-influence

22 situations now that they're an adult?

23      And in my experience, the psychological experts in

24 some cases, not all, have been very helpful in flushing that

25 out in ways that none of the laypeople in the room were able to

1  do.

2  BY MS. CRANE:

3  Q.      You just spoke about why a disability or diminished

4  cognitive function due to a trauma history is relevant to

5  culpability at the time of the crime, maturity and

6  developmental status at the time of the crime.

7          Would those disabilities or trauma history also be

8  relevant to interpreting a class member's rehabilitation?

9  A.      Yes.  If they were -- if they were part and parcel --

10 if they were part of the causative factors of the crime or they

11 contributed to the decision to commit a crime, that's something

12 you're definitely going to want to look at on the back end and

13 make sure that it's managed or under control or they've matured

14 past it or they've put in place mechanisms to, you know, be

15 sure it's not going to happen again or it's not going to

16 influence them in the same way as an adult.

17 Q.      And why is it not sufficient -- you've spoken to this,

18 but just a more complete explanation of just why is it not

19 sufficient to rely on class members themselves and/or their

20 families to provide the evidence related to the *Miller* inquiry,

21 their childhood experiences, who they were at the time of the

22 crime?

23 A.      I mean, I think it's a natural human instinct to

24 protect or hide the most shameful components of our life.

25 There's a lot of shame that surrounds -- I mean, even just

1  illiteracy.  I have so many clients where their greatest

2  shame -- they've been sexually abused, they've been physically

3  abused, and their greatest shame is illiteracy.

4       There's a lot of shame, there's a lot of

5  misunderstanding about how these things impacted them, and

6  there's a -- there's an assumption that that's going to hurt

7  them in the parole process.  The fact that my dad went to

8  prison or was involved in a gang, which may be the driving

9  reason they made those same decisions, isn't something they're

10 going to want to broadcast.  And you need an attorney or a

11 psychologist -- I'm sorry, I'm going -- to explain to them the

12 relevance of it, the importance of it, and gain their trust so

13 that those important considerations can ultimately be presented

14 to the decision-maker, and those aren't things people are

15 openly willing to share.  Sometimes they don't even realize

16 that it's outside the norm of what happens in other families.

17      I've spent a lot of time in workshops in groups with

18 inmates in prison, and I say, what is trauma?  And they can

19 talk about Vietnam veterans, but they can't talk about the fact

20 that, you know, they got beaten every night when their dad came

21 home high on meth.  That doesn't even register for them that

22 that's something that might have influenced their choices and

23 something they need to deal with and process to fully mature

24 and rehabilitate.

25 Q.    You just spoke about a class member's fear that this

1    mitigating information pursuant to *Miller* will actually be held

2    against them.  And in your reports, you talked about that

3    historically our criminal justice system and our parole system

4    have held *Miller* factors against them as aggravators, they can

5    be viewed as aggravators.

6             Can you talk a little bit about the cultural and

7    mental shift required, based on your experience in California,

8    to shift from viewing these things as aggravators to

9    mitigators?

10   A.      In California, prior to the youth offender parole laws

11   and *Miller* decision, an unstable social history was always a

12   major factor mitigating against parole.  It's an enumerated

13   unsuitability factor in our regulations.  A juvenile criminal

14   history, you know, and things like gang involvement, all, you

15   know, were -- there wasn't -- there was no gray, those always

16   mitigated against suitability for parole and were used to

17   aggregate the prediction of risk.

18            And since the youth offender parole laws have come

19   into play, there's -- it's been a long and slow process, but

20   there's been training in the presentation of this evidence in a

21   different way to the board of parole, and them just hearing

22   people speak about it and speak about the impact of it on their

23   decision-making and how they've used it as a launching board to

24   mature and rehabilitate has been really important, and I think

25   has provided -- the more that cultural shift takes hold, the

1 fuller and fairer the hearings have become, and the greater the

2 ability, I think, of the board to really discern who is

3 suitable to be released and who is not.  And who is not.

4 Q.     And you just mentioned how critical effective training

5 was to sparking and ensuring the shift happened for the board

6 in California and its staff.

7          Could you just briefly talk about what you think an

8 effective training on these issues would include?

9 A.     Yes.  I think it's multi-dimensional.  Certainly, legal

10 training.  Most of the decision-makers are probably not legally

11 trained, so a basic understanding of the laws that govern the

12 *Miller* factors, how they relate to the decision and how

13 policies and procedures must be upheld and implemented.  So

14 basic legal training.

15          I think psychological training, an understanding of

16 the science behind the *Miller* decision, adolescent brain

17 development, training on trauma.  What is trauma, what does it

18 look like, and what is the impact of trauma?  How do people

19 respond to it?  How does it drive their decisions, and how do

20 they heal from it?  I think training on some of the

21 cognitive/intellectual verbal deficits that people might have

22 when they come to a parole hearing.

23          I would -- I would provide -- I would suggest

24 training -- some of the best training I've done has been

25 bringing former clients who have been through the parole

process to talk to commissioners about, here is who I was, very
openly and honestly, here's the terrible things I did and the
choices I made and why, and here is my process of change.
Because understanding how other people have accomplished that
process can help you dig into the right questions for
evaluating a new person's process of change.

I would propose training for -- on victims'
experiences in the parole hearing. We do some restorative
justice work about -- the parole process can be very
traumatizing for victims, and there are things you can put in
place to make it less so. And to understand their needs in the
parole process, I would suggest having commissioners who have
been trained and conducted these hearings participate in that
training.

But I think the legal, the psychological, and I'm a
fan of the restorative justice, protecting victims' rights,
too, all being important components of training on how to do
these parole hearings.

MS. CRANE: Your Honor, before we close Professor
Rummel's direct exam, I would just like a moment to confer with
counsel, if that's acceptable with Your Honor.

THE COURT: Yes.

(So done.)

MS. CRANE: Thank you very much, Professor Rummel.
That's all we have. No further questions.

1                             - - -

2                        CROSS-EXAMINATION

3    By Mr. Spillane:

4    Q.      Good morning, Professor.

5    A.      Good morning.

6    Q.      What's your undergraduate degree in?

7    A.      English literature.

8    Q.      What did you do after you graduated?

9    A.      I went to Japan for a year and taught English.

10   Q.      What did you do next?

11   A.      I went to law school.

12   Q.      Okay.  What did you study in law school?  Anything

13   about parole or child development or anything like that?

14   A.      No, nothing specific.  I took criminal law and the

15   typical law school classes.

16   Q.      What did you do after law school?

17   A.      I clerked in the federal district court in the District

18   of Columbia.

19   Q.      What kind of cases did you do?

20   A.      All cases -- all of the cases that came before that

21   court.

22   Q.      No specialty on parole or child development or anything

23   like that?

24   A.      No.

25   Q.      What did you do after you clerked?

1  A.      I went to work for the U.S. Attorney's Office in the

2  District of Columbia.

3  Q.      What kind of cases did you do?

4  A.      I did misdemeanor cases, simple felony cases, I did

5  grand jury work, and I did appellate work.

6  Q.      What did you do when you were done with that?

7  A.      I moved to the Central District of California and --

8          (Cross-talking.)

9  Q.      What did you do there?

10         COURT REPORTER:  For the record --

11         MR. SPILLANE:  I'm sorry --

12         COURT REPORTER:  -- could you speak one at a time?

13         MR. SPILLANE:  I talked over her, I'm sorry.

14 BY MR. SPILLANE:

15 Q.      What did you do when you were in the Central District

16 of California?

17 A.      I did an -- I did an original trial rotation, I did a

18 grand jury rotation, I worked for several years in the major

19 crimes section prosecuting violent crimes, gang-related crimes,

20 I was a deputy chief in the training, trial rotation section

21 for new attorneys coming into the office, and then I did

22 civil -- criminal civil rights prosecutions until I left.

23 Q.      Anything to do with parole?

24 A.      I don't believe so, no.

25 Q.      There was no --

1  A.     No federal parole --

2  Q.     That was my --

3         (Cross-talking.)

4         COURT REPORTER:  For the record, could you speak one

5  at a time, please?

6  BY MR. SPILLANE:

7  Q.     I was going to say, I agree with you now, unless it's a

8  very old grandfathered-in case, there's not going to be federal

9  parole.

10 A.     There was no federal parole when I was a U.S. Attorney.

11 Q.     What did you do after you finished with the U.S.

12 Attorney's Office?

13 A.     I began teaching at the University of Southern

14 California and running the Post-Conviction Justice Project

15 there.

16 Q.     What did you teach?

17 A.     My main -- my main responsibility was directing the

18 Post-Conviction Justice Project and teaching the seminar that

19 accompanies that clinic.  I have also taught legal -- legal

20 analysis of evidence, trial advocacy, criminal law.  I taught

21 the -- I had supervised the children's clinic for one year, and

22 I -- for the last two years, I've taught a legislative policy

23 practicum.

24 Q.     Let's go back to the children's clinic.  Tell me what

25 that was about.

A.     That was mostly adoptions for foster youth, uncontested
adoptions for foster youth, and it was in conjunction with a
nonprofit public council in California.  There were some
special education law cases, some -- so just the -- immigration
relief for juveniles.  It was a long time ago.

Q.     On direct examination, you said you conducted, I
believe that was your word, parole hearings.  Tell me what you
meant by that.

A.     I was the legal representative or supervising the
student who was the legal representative at those hearings.

Q.     So what did you do at the hearings?

A.     Represented the client.  It was their -- an adversarial
process where our client is advised of their rights -- well,
prior to the hearing, we prepare the client and present
evidence, supplement the record as necessary.

          At the hearing, the majority of questioning is asked
by the commissioners.  There's a time where the DA asks
questions, there's a time where the representative, me or the
student, would ask questions, and there's an opportunity for
closing arguments.

Q.     Were those hearings controlled by California statutory
law?

A.     Yes.

Q.     And California regulations?

A.     Correct.

1  Q.      Tell me what those regulations and laws required as far

2  as the inmate had to show to get out?

3  A.      Well, the legal standard for parole in California?

4  Q.      Yes, ma'am.

5  A.      Is whether the inmate poses an unreasonable risk of

6  current danger to society.  There's a presumption in favor of

7  parole in California with a public safety exception in the

8  statute.  Subsequently, actually in one of our cases, we filed

9  a writ of habeas corpus because over and over again the parole

10  board was relying on historical factors, such as the commitment

11  offense, to deny parole.

12          We challenged that process in the courts.

13  Ultimately, the California Supreme Court ruled in the *In Re*

14  *Lawrence* case that interpreted the statute as requiring some

15  evidence -- a showing of some evidence of an unreasonable risk

16  of current danger to be able to deny parole.  That is generally

17  California's life-with-parole process, that's not specific to

18  the youth offender parole process or persons serving juvenile

19  life without parole.

20  Q.      Let's get to that.  How many -- did you have any

21  involvement before the parole board, except representing

22  offenders who were asking for parole?

23  A.      I'm not sure I understand the question.

24  Q.      When you went to the parole hearings, did you ever

25  represent the board, did you ever represent the state?

1    A.    No.

2    Q.    You were always opposing -- you were always in favor of
3    release?

4    A.    I was always representing the inmate seeking parole,
5    yes.

6    Q.    Well, when you say representing them, did you ever have
7    a case where you said, gosh, my client doesn't want to get out,
8    doesn't deserve to get out?

9    A.    I've had cases where I said I think -- we've had a few
10   cases -- in California, you don't -- typically, a client
11   wouldn't go through with their hearing if they don't believe
12   they have -- they're suitable.

13         I've had many cases where I've advised clients to
14   postpone or stipulate or put their hearing off because I didn't
15   think they were ready for parole.  And I've had a few cases
16   where the client insisted on going forward, and our argument
17   was a three-year denial, a minimum denial would be the most
18   appropriate outcome in this case, because it was clear our
19   client wasn't ready, suitable for parole.

20         In the vast majority of people I've taken to the
21   parole board, we have believed that there was -- that they were
22   suitable for parole and have argued for their release.

23   Q.    Tell me about representing juvenile-life-without-parole
24   cases before the parole board.  How many times have you done
25   that?

1  A.      I would say between six and ten.  I don't have an exact

2  count.  Not very many of our clients are -- have -- they've

3  only recently become parole eligible.

4            I have, however, conducted workshops in California,

5  and I've met nearly every person serving juvenile life without

6  parole in the context of advising them about the new laws that

7  govern their parole eligibility, and have, both supervising

8  students or myself, meeting with them one on one, pursuant to a

9  limited-scope retainer agreement, given them legal advice about

10 how to -- how to prepare themselves for the parole board.

11 Q.      Besides representing offenders at parole hearings in

12 general and representing six to ten JLWOP inmates, what gives

13 you -- makes you an expert to opine on the constitutionality of

14 Missouri's parole statute?

15 A.      I think I've set forth what I believe are my

16 requirements and my areas of expertise.  My experience in the

17 process, my working, you know, on legislation and policies and

18 regulations, and my trainings of the parole board to work

19 toward a full and fair process.

20 Q.      Well, let me -- let me ask you this.  When you say you

21 worked with the legislature, I'm assuming you lobbied for

22 parole procedures that you considered to be more fair and

23 constitutional?

24 A.      Yes, I did.  I drafted legislation, worked on

25 amendments with legislators to legislation to create the youth

1   offender parole process, consulted with the Board of Parole

2   Hearings on that legislation to make sure it was agreeable for

3   them and they would support us in the legislative process

4   before the governor.  Testified at hearings, met with

5   legislators.

6           But, yes, my position was to lobby and advocate for

7   the creation of a youth offender parole process.

8   Q.      You said on direct examination that you trained

9   psychologists.  Do you have a degree in psychology?

10  A.      I don't.  I did one presentation for the Forensic

11  Assessment Division on desistance at their annual --

12  Q.      Could you say that word again?  I did not understand

13  it.

14  A.      Desistance?

15  Q.      What's that?

16  A.      The opposite of recidivism is my understanding of

17  desistance.

18  Q.      So --

19  A.      How offenders can -- how people released on parole can

20  be successful in the community.

21  Q.      And what did you base that presentation on?

22  A.      It was very much, here are our experiences with the

23  parole board.  I brought with me former clients, I think two of

24  whom were juvenile-life-without-parole clients, to present on

25  their experiences in the parole board, to talk about the

1 experience of the attorney in assessing their ultimate reports

2 that go to the board, and then the experience of the offender

3 in the parole process.

4 Q.     So as -- and correct me if I'm wrong.  As I understand

5 it, your expertise is based on your representation before the

6 parole board, your lobbying the legislature, and your teaching

7 classes to folks.  Am I missing anything?

8 A.     That seems right.

9 Q.     But when you taught the classes, the only thing you had

10 to go -- the experience you taught the classes on was the

11 representation before the parole board; is that accurate?

12 A.     I mean, I taught them about the laws.  I mean, my

13 classes prepared the students to -- to do presentations in

14 front of the board.  But, yes, that's the experience it's based

15 on.

16 Q.     Okay.  On direct examination, you said that you were

17 going to opine on whether there was a due -- due process was

18 satisfied by Missouri parole procedures and whether the

19 offenders had a realistic opportunity at release.  Is that

20 accurate?

21 A.     I think my opinion today goes to whether the process

22 and procedures presented in Missouri's plan will result in a

23 meaningful and realistic opportunity for release as required by

24 the Constitution and due process.  But I think we're saying the

25 same thing.

Q.       So I think you're opining on whether it -- whether

Missouri parole procedures are constitutional.  Is that fair?

A.       And I hope to give from my experience specific examples

of where procedures can -- how different procedures can succeed

or fail in protecting those constitutional interests.

Q.       As I understood your direct testimony, you said if

there isn't an objective factor that the inmate can meet in

order to entitle him to parole, then he doesn't have a

meaningful opportunity of release.  Is that fair?

A.       A legal standard.  A legal standard, not an objective

factor.

Q.       Tell me what a legal standard is.  Help me out.

A.       I mean, a legal standard -- a legal standard, what -- a

legal -- a test, a standard that someone has to meet.  A

standard that the board has to evaluate in order to make a

determination of whether or not to grant or deny parole.

Q.       If the board is required to give strong consideration

to certain factors dealing with rehabilitation and maturation

that does not have an objective standard or test, as you've

said, do the inmates not have a meaningful opportunity of

release?

A.       If the board can grant -- no matter what the board

considers, if the board can grant or deny parole for any reason

or no reason, I don't believe that's a meaningful opportunity

for release.

1  Q.      Tell me what documents you read in this case.

2  A.      I've listed them in my report, if I could refer to my

3  report?

4  Q.      Certainly, please.

5  A.      Do you want me to just read through the list?

6  Q.      Well, let me ask you this.  Did you read the submission

7  the defendants made about the percentage of offenders who are

8  released on parole in Missouri or conditional release?

9  A.      I believe I did.

10  Q.      And what was that percentage?

11          THE COURT:  Are we talking about juvenile life

12  without --

13          MR. SPILLANE:  No, I'm talking about in general,

14  ma'am.

15  A.      Oh, in general, how many --

16  BY MR. SPILLANE:

17  Q.      Yeah.

18  A.      -- are released on parole?  I'm not sure -- I don't

19  remember seeing that document.

20  Q.      Well, let me give you a hypothetical that roughly 90

21  percent of offenders in Missouri are eventually released either

22  on parole or conditional release and do not complete their

23  sentences, and the board has absolute discretion to grant or

24  deny parole in those cases.

25          Do those offenders not have a meaningful opportunity

1  of release, even when 90 percent of them are released?

2  A.      It's possible they do.  And it's -- I don't know -- I

3  don't think you can set an exact percentage, if you meet this

4  percentage, then it's a meaningful opportunity for release or

5  not.

6          What I've been asked to opine on is whether these

7  policies and procedures would ensure a meaningful opportunity

8  for release.  It's not my testimony that there's no chance

9  anyone would get a meaningful opportunity for release, absent

10 them.  I'm giving my opinion about what types of policies and

11 procedures would ensure that someone would receive a meaningful

12 opportunity for release.

13         But I don't know enough about the other -- the

14 release rates or the other inmates in Missouri released on

15 parole to really give an opinion on that.

16 Q.      Do you have Document 172 in front of you?

17 A.      I do not, unless it's my affidavit or my report.

18 Q.      It is not.  Let me give you a hypothetical based on

19 Document 172.

20 A.      What is Document 172?

21 Q.      Document 172 is the plan for compliance with the

22 applicable requirements.

23 A.      Is that the amended plan?

24 Q.      That is the amended plan.

25 A.      I believe I do have that.

1  Q.    All right.

2  A.    Okay.

3  Q.    Does that plan indicate that if either the offender --

4  excuse me, the victim or the prosecutor does not wish to speak

5  in the presence of the offender, their opinions cannot be used

6  for developing the basis of the offense, and the Court must

7  rely -- excuse me.  The board must rely on court documents,

8  such as the appellate opinions, or, if the appellate opinions

9  are inadequate, the briefs?

10  A.    I believe it does.  Can you point to the page so I can

11  just confirm that?

12  Q.    Sure.  I believe it is --

13          THE COURT:  Let me ask you a question.

14          MR. SPILLANE:  Yes, ma'am.

15          THE COURT:  If that's the case, then why are you --

16  why are they testifying?

17          MR. SPILLANE:  Because there's --

18          THE COURT:  If the board can't rely on it, then --

19          MR. SPILLANE:  Only --

20          THE COURT:  -- why are they hearing it?

21          MR. SPILLANE:  I will answer, Your Honor.

22          First of all, they have a statutory right to present

23  evidence; but we, as a matter of policy, are going to say that

24  if you will not do it in the inmate's presence, you can have

25  your right, you can say whatever you want, but we won't

1  consider that for the -- for what happened in the offense, we

2  will only look at the court records.  Because we're in a

3  statutory bind.

4          THE COURT:  So you're going to hear all of this

5  evidence, and then you're going to say, oh, we pretend like we

6  never heard it?

7          MR. SPILLANE:  That's exactly right, unless they

8  choose to do it in the inmate's presence.  And that's a

9  concession that I would rather not make, but my client has

10 said, you know, we'll do that if they feel that they don't

11 want this to be considered if the -- because we have a problem.

12 We can't -- if the victim doesn't want the inmate to see them

13 when they're coming in there and saying don't parole them, we

14 can't make them do that in the presence of the inmate.  But

15 we're saying if you don't do it in the presence of the inmate,

16 we're not going to consider it.  So...

17 BY MR. SPILLANE:

18 Q.      Go ahead.

19 A.      So in California, the victim has the right to appear

20 telephonically.  The victim also has a right to appear by

21 videoconference at the parole hearing, which goes a long way to

22 protect them from the trauma of having to sit in the same room

23 as the offender.  But they are still able to give their

24 statement, and the person seeking parole is still able to hear

25 it.

1          Would the -- in terms of -- you referred me to the

2    report.  Would the victim's statements and the district

3    attorney's argument be done prior to the decision, or would it

4    be done --

5    Q.      Yes, ma'am.

6    A.      -- post-decision?

7    Q.      I think we're looking at Paragraph 14 on Document 172,

8    Page 5.

9    A.      I wouldn't have -- I don't think there would be any

10   issue if they're not going to be considering it if the

11   statements were made post-decision.

12   Q.      No --

13   A.      In my experience, I've been in a lot of hearings where

14   victims speak both in favor of parole and often opposed to

15   parole.  It's very powerful testimony.  It's very, very

16   powerful testimony.  Even the most conscientious decision-maker

17   can have a lot of difficulty putting it completely to the side

18   when they're making a decision, but certainly that -- that

19   would be true of victim statements.  In terms of a district

20   attorney's argument, I think clearly there's a right for the --

21   for the person seeking parole to hear the district attorney's

22   argument and respond.

23   Q.      All right.  I'm going to ask you to look at Document

24   172, Page 20.

25          It says there that the board should consider the 15

1  factors in 558.047 and 565.033, and I'm going to quote now.

2  Pursuant to relevant law, great weight must be given to the

3  inmate's demonstrated rehabilitation --

4              THE COURT:  I'm sorry, I'm having trouble finding

5  where you are at.  Is this the amended plan?

6              MR. SPILLANE:  Yes, ma'am, Document 172, Page 20.

7  I'm looking at this -- there's a big box, and then there's some

8  writing under it.  May I continue?

9              THE COURT:  Yes.

10  BY MR. SPILLANE:

11  Q.    Pursuant to the relevant law, great weight -- and it's

12  in bold -- must be given to the inmate's demonstrated

13  rehabilitation and maturity over time.

14              Is that inadequate?

15  A.    Great weight to what consideration, to what decision?

16  Q.    Well, then there are 15 factors listed below.  You can

17  take a look at them, if you like.  They're on Page 20 and 21.

18  Only one of them is the circumstances of the offense.

19  A.    Right.

20  Q.    And as I took from your testimony on direct, in a

21  sense, the circumstances of the offense are important, at least

22  when they cut in favor of the offender, such as his, perhaps,

23  mental state or being a follower of whatever at the time of the

24  offense.

25  A.    I'm not sure I would say important.  I think the

1  circumstances of the offense are never irrelevant, and it's

2  always a consideration at the parole hearing.  But in my

3  opinion -- in my opinion, understanding why someone committed a

4  crime is critical to two things:  understanding whether they've

5  successfully matured and rehabilitated, and to understanding --

6  and to giving a baseline to the growth and maturity.  You have

7  to understand where someone was, why they committed the crime

8  and what the circumstances of that were, in order to evaluate

9  those two considerations, their growth and maturity and their

10  rehabilitation.

11  Q.     All right.  Let's go to the second factor, the degree

12  of the defendant's culpability in light of his or her age and

13  role in the offense.  Is that important?

14  A.     *Miller* says it is, yes.

15  Q.     Okay.  And that's one of the things they have to give

16  great weight to, is it not?

17  A.     Correct.

18  Q.     No. 3 is the defendant's age, maturity, intellectual

19  capacity, and mental and emotional health and development at

20  the time of the offense.

21  A.     I've lost you.

22  Q.     I'm still -- I'm reading No. 3, right below No. 2 --

23  A.     Oh, okay.

24  Q.     -- on Page 20.  Is that important?

25  A.     Yes.  *Miller* says it is.

Q.     No. 4.  The defendant's background, including his or
her family, home, and community environment.  Is that
important?

A.     Yes.

Q.     Five, the likelihood for rehabilitation of the
defendant.  Is that important?

A.     *Miller* says it is, yes.

Q.     Six, the extent of the defendant's participation in the
offense.  Is that important?

A.     I'm not sure exactly what's meant by extent; but, yes,
I think the role of the defendant -- the role of the defendant
in the offense and understanding the offense is important.

Q.     Seven, the effect of familia pressure -- excuse me --
familial pressure or peer pressure on the defendant's actions.
Is that important?

A.     Yes, I would agree it is.

Q.     Eight, the nature and extent of the defendant's prior
criminal history, including whether the offense was committed
by a person with a prior rec -- record of conviction for murder
in the first degree or was committed by a person with one or
more serious assaultive convictions.  Is that important?

A.     This is one of the factors that I believe *Miller*
indicates that -- I mean, in my opinion, in the -- it could be
important, but in the context of demonstrating growth,
maturity, and rehabilitation, you know, juvenile criminal

1  history is similar to the juvenile commitment offense in the --

2  in the context in which it should be considered.

3  Q.      Okay.  No. 9, the effect of characteristics

4  attributable to the defendant's youth on the defendant's

5  judgment.  Is that important?

6  A.      I believe it is, yes.

7  Q.      Ten, a statement by the victim or the victim's family

8  member as provided by Section 557.041 until December 31, 2016,

9  and beginning January 1, two thousand -- well, I won't get into

10  the dates, but the statement attributable to the victim or

11  victim's family.

12  A.      I appreciate that in Missouri, like in California,

13  there's a due process right for the victim to make that

14  statement, but I don't believe that a victim's statement is

15  relevant to the ultimate determination the board is being asked

16  to make.

17  Q.      No. 11, efforts made toward rehabilitation since the

18  offense or offenses occurred, including participation in

19  educational, vocational, or other programs during

20  incarceration, when available.  Is that important?

21  A.      I believe it is.

22          THE COURT:  Could I stop for a minute and go back to

23  No. 10?

24          MR. SPILLANE:  Yes, Your Honor.

25          THE COURT:  What do you mean by the Court's --

 1  ultimate determination the board is being asked to make?  Why

 2  would a victim's statement not be relevant to the ultimate

 3  determination the board is being asked to make?

 4          THE WITNESS:  Well, again, we don't have a legal

 5  standard in place.  But if you're speaking about a person's

 6  irreparable corruption or demonstrated growth and

 7  rehabilitation and maturity, I don't think the impact of the

 8  crime on the victim -- while important and significant, and it

 9  should be stated at a hearing, but I don't think the impact of

10  the crime is relevant to an evaluation of the person's maturity

11  and rehabilitation.

12          THE COURT:  Okay.

13  BY MR. SPILLANE:

14  Q.      I'm going to ask you about 12, the subsequent growth

15  and increased maturity of the person since the offense or

16  offenses occurred.  Is that important?

17  A.      Yes, *Miller* says it is.

18  Q.      Thirteen, evidence that the person has accepted

19  accountability for the offense or offenses, except in cases

20  where the person has maintained his or her innocence.  Is that

21  important?

22  A.      I think less important than some of the other factors,

23  but it can be significant.

24  Q.      The person's institutional record during incarceration.

25  Is that important?

1  A.     Yes.

2  Q.     Sixteen, whether the person remains the same risk to

3  society as he or she did at the time of the initial sentencing.

4  A.     I mean, I think that -- to the extent that speaks to a

5  person's growth and rehabilitation and maturity, which I don't

6  know how it wouldn't, I think that is important.

7  Q.     Do the 15 factors I just listed go to the maturation

8  and rehabilitation that you believe is dictated for

9  consideration by *Miller* and *Montgomery*?

10 A.     Except where I've indicated they don't, yes.

11 Q.     Okay.  Let's go to Page 24 on Document 172.  This is

12 the Juvenile Parole Board Action Sheet.  And this, again, says

13 that the board will give great weight to the factors that I've

14 just read; is that accurate?

15 A.     It says that the relevant law requires great weight to

16 be given.

17 Q.     All right.  Let's move on to Page 26 with the heading

18 Final Decision.  And then it has a place for writing, and it

19 says above the place for writing, steps the board recommends

20 the offender take to improve their chance for parole in the

21 future.  Is that important?

22 A.     Yes.  You mean is it important that the board --

23 Q.     Yes.

24 A.     -- give guidance to the offender on what they can do

25 to --

1  Q.      Yes.

2  A.      -- rehabilitate in a way that will afford them release?

3  Q.      Yes.

4  A.      Yes, I think that's significant.

5  Q.      Let's move on to Page 27, which is titled Juvenile

6  Parole Written Opinion and Decision Notice.  There is a space

7  there, which -- above which -- above the space it's entitled,

8  the reasons for this decision, as well as specific evidence

9  supporting each reason, are as follows.  Do you see that?

10  A.      I do.

11  Q.      What's wrong with it?

12  A.      I'm not sure I understand the question.

13  Q.      That's a good thing that we're telling him the reasons

14  for the decision and the evidence supporting each reason, is it

15  not?

16  A.      Yes, absolutely.

17  Q.      Is there anything wrong with the way we're doing that?

18  A.      As long as every decision-maker is explaining the basis

19  for their decision.

20  Q.      I'm going to stop you there and ask you why, as opposed

21  to the board explaining that, why each individual member has to

22  give the reasons for his or her vote.

23  A.      I think the decision-makers -- maker or decision-makers

24  need to give the reasons for the decision.

25  Q.      Well, if the board as a whole writes that, is that

1  adequate?

2  A.      Yeah, if it's a -- if it's a -- yes.  The reason for

3  the board's decision needs to be documented is my testimony.

4  Q.      Okay.

5  A.      And if this accomplishes that, then, yes, that's

6  sufficient.

7  Q.      Well -- and in your mind, you're testifying as a legal

8  expert here, is that analogous to a court of appeal where a

9  decision is written by a single judge, but everyone doesn't

10 have to give their individual reasons in the opinion?

11 A.      I would say so.

12         MR. SPILLANE:  Okay.  I don't have any further

13 questions.  Thank you.

14         THE WITNESS:  Thank you.

15         THE COURT:  Let's go ahead and finish up redirect.

16         MS. CRANE:  Just one moment, Your Honor.

17         Thank you, Your Honor.  I'll be brief.  I only have,

18 I think, three to four questions on redirect.

19                           - - -

20                    REDIRECT EXAMINATION

21 By Ms. Crane:

22 Q.      As an initial matter, Professor Rummel, on cross you

23 testified that you have represented six to ten LWOP, juvenile

24 offenders with life without parole applicable hearings; but, in

25 fact, you've also represented many more inmates in the youth

1   offender parole process that you are testifying to here.

2   A.      My other juvenile-life-without-parole clients were on

3   the resentencing, in the resentencing process and on appeal of

4   the resentencing.  So gathering the mitigation evidence,

5   presenting that to a court at a resentencing hearing, or

6   challenging the reimposition of LWOP on appeal.

7           But I believe only six or eight of my clients --

8   every client I've had who is eligible for the parole process

9   we've taken to the parole board, and -- but I think that's

10  about six or eight.

11  Q.      And you have represented other inmates in the parole

12  process, though, in addition to those six to ten LWOP inmates.

13  A.      Hundreds, and many who were under 18, and many who are

14  qualified youth offenders on parole in California.

15  Q.      On cross, defendants characterized your experience,

16  your relevant experience as essentially only representing these

17  inmates in parole and lobbying.  But isn't it true that, in

18  fact, you also trained the California board on how to run and

19  effectuate a constitutional youth offender parole process?

20  A.      Yes.

21  Q.      And isn't it true that you've also trained parole

22  officials from across the country and the world on the same

23  thing?

24  A.      Yes.

25  Q.      And isn't it true that you were actually part of

1  drafting the legislation that set up that program and the
2  regulations that implemented it?

3  A.    Yes.

4  Q.    Defendants walked you through the forms that they
5  proposed in their recently amended plan.  And I want to clarify
6  that we actually have not objected to this worksheet that they
7  were walking through point by point, we agree that those
8  factors do speak to *Miller*.  What we object to is that they
9  omitted the space for documenting the reasons for their
10 decision on each factor and evidence that they find relevant to
11 each factor.

12         Can you testify again, you did on direct, but why
13 documentation specific to each factor they consider is
14 important?

15 A.    I mean, it's very helpful to understand -- later
16 understanding or review of the decision to understand how they
17 weighed the factors, what evidence they considered to make sure
18 it was done appropriately, it wasn't arbitrary and capricious.
19 Whether they do it, you know, after each factor individually,
20 or whether they're conscientious enough to include it all at
21 the end, I don't think it makes a big difference.

22         But it's the -- understanding the basis of the
23 decision and being able to evaluate whether there was actually
24 evidence to support the decision to ensure that it wasn't an
25 arbitrary and capricious decision, that, in my opinion, is

1  critical to the meaningful and realistic opportunity for

2  release.

3          MS. CRANE:  Thank you, Professor Rummel.  Thank you,

4  Your Honor.

5          MR. SPILLANE:  I have a couple of redirect

6  questions.

7                          - - -

8                    RECROSS-EXAMINATION

9  By Mr. Spillane:

10 Q.     Could we go back to Page 27 of 172?  Do you see the

11 lines there at the bottom?

12 A.     Yes.

13 Q.     Could you read the sentence above those lines?

14 A.     The reasons for this decision, as well as the specific

15 evidence supporting each reason, are as follows.

16 Q.     Is that fine?

17 A.     I think reasons for decisions are different than an

18 evaluation of each of the factors.  It could be fine, I

19 can't -- it might not be fine, but it could be fine.  It's a

20 form.

21 Q.     I've heard on redirect that you taught classes, but --

22 and you taught the parole board, but was the experience that

23 you based your teaching on your representation before the

24 parole board?

25 A.     In part, yes, and my understanding of the laws and the

1   intention of the laws.  But it was legal training, as well as

2   experiential training.

3   Q.     So your experience -- so your -- what you taught the

4   classes on was based on -- was your experience representing

5   offenders before the parole board and your understanding of the

6   law.

7   A.     Yes.  Primarily, yes.

8   Q.     Anything else?

9   A.     Conferences and workshops I attend, but primarily my

10  experience and my legal knowledge.

11            MR. SPILLANE:  Thank you.

12            THE COURT:  Anything further?

13            MS. CRANE:  No further questions, Your Honor.

14            THE COURT:  Thank you very much, you may step down.

15            We're going to go ahead and take a break.  And so is

16  there any other evidence that you intend to present?

17            MS. CRANE:  No, Your Honor.

18            THE COURT:  And is there any evidence for the

19  defendant?

20            MR. SPILLANE:  No, Your Honor.

21            THE COURT:  All right.  So then the only thing we

22  have left is closing argument for each side; is that correct?

23            MS. CRANE:  That's correct on our end, Your Honor.

24            MR. SPILLANE:  Yes, Your Honor.

25            THE COURT:  All right.  Let's go ahead and take a

1  break.  How long do you think the closing argument will take

2  for the plaintiff?

3          MS. ZIMMERMAN:  Less than five minutes, Your Honor.

4          THE COURT:  Less than five minutes?

5          MR. SPILLANE:  That's about as long as I can talk,

6  Your Honor.

7          THE COURT:  Okay.  Let's be in recess, then, until

8  12:15.

9          MS. CRANE:  Thank you, Your Honor.

10         THE COURT:  Court's in recess.

11         (A recess was taken from 11:55 a.m. to 12:19 p.m.)

12         THE COURT:  We'll begin with the plaintiff.

13         MS. ZIMMERMAN:  Thank you, Your Honor.  May it

14  please the Court.

15         We just heard an abundance of testimony regarding

16  the reasons that the elements of plaintiffs' plan are not only

17  important, but constitutionally necessary.

18         It's been a long road for these class members.  It's

19  been seven years since the United States Supreme Court held in

20  *Miller* that their sentences were unconstitutional.  *Miller*

21  changed their lives, providing hope to adults who were sent to

22  die in prison as children.  Some of these class members have

23  been serving nearly 40 years with a sentence that has only

24  recently been found unjust.

25         THE COURT:  Remind me again how many of these

1  inmates are in the Missouri system that are -- had rights under
2  *Miller*.

3       MS. ZIMMERMAN:  I believe the exact count is
4  undetermined, but it is roughly 98 to 100 individuals.

5       THE COURT:  Okay.  Go ahead.

6       MS. ZIMMERMAN:  The process being litigated here
7  today is a remedy for that unconstitutional sentencing.

8       Some states completely abolished life without parole
9  for juveniles.  Others have provided resentencings with all the
10 constitutional rights --

11      COURT REPORTER:  Could you please speak up?  I'm
12 having a hard time...

13      THE COURT:  You might bring that microphone a little
14 closer.

15      MS. ZIMMERMAN:  Is that better?

16      THE COURT:  That's better.

17      MS. ZIMMERMAN:  Perfect.  Probably need to lower it.

18      Missouri opted to attempt to satisfy *Miller* through
19 a parole process.  That does not mean that the class members'
20 due process rights and entitlement to a meaningful and
21 realistic opportunity for release can be waved aside.

22      What we're asking for is straightforward.  We are
23 asking for the minimum requirements under the Constitution to
24 ensure a consistent, transparent, and enduring process in which
25 the factors for the class members' youth, maturity, and

1  rehabilitation can be thoughtfully considered by the parole

2  board.

3         We have been reasonable and compromised where we

4  can, but in light of our role as class counsel, we are required

5  to ensure that the remedy put in place for each class member,

6  whether entitled to a hearing tomorrow or in 15 years, is

7  ensured protections that make sure he has -- he or she has a

8  meaningful and realistic opportunity for release.

9         While there are elements of defendants' plan that

10  are adequate and meet that constitutional requirement, without

11  more, those pieces will fall flat.  While Mr. Spillane said

12  that the defendants' plan does not need to be perfect, and we

13  don't believe that it does, it does need to, as a whole,

14  provide a process that is constitutional.

15         We have reached a point where we can no longer

16  compromise.  A right to counsel, comprehensive written

17  policies, and a legal standard, to name a few, are essential to

18  meet that constitutional minimum requirement.

19         THE COURT:  Tell me why -- I'm assuming you're

20  saying a right to counsel that is paid for by the state.

21         MS. ZIMMERMAN:  Yes, Your Honor.

22         THE COURT:  There's no indication here that the

23  state is going to deny somebody having a lawyer represent them

24  in the parole process, is there?

25         MS. ZIMMERMAN:  No.  We do believe that these

 1  individuals are entitled to have a constitutional right to

 2  counsel.  While if they can afford one, they can certainly

 3  receive one, and we agree that defendants are not saying that

 4  counsel will not be welcome at hearings.

 5       However, if you have a right to counsel, and we

 6  believe that counsel is instrumental in ensuring that the due

 7  process rights for these individuals are met --

 8       THE COURT:  I guess, though, what I'm trying to

 9  understand, what are you saying they must do to meet that

10  requirement that you've identified?  Give an attorney and pay

11  for it?

12       MS. ZIMMERMAN:  In the event that an individual

13  cannot afford one, yes, Your Honor.

14       THE COURT:  Okay.  And why is that?

15       MS. ZIMMERMAN:  We believe that, per your order, one

16  of the deficiencies found in the parole process was the

17  inability and lack of the ability for class members to advocate

18  for their positions.  It's plaintiffs' position that an

19  attorney is instrumental in being able to present evidence to

20  the board, provide -- present -- make legal arguments to the

21  board in a way that ensures that the *Miller* factors are being

22  appropriately considered.

23       THE COURT:  Okay.  And so if they can't afford one,

24  the state still has to pay for it.  There's not a system by

25  which the MacArthur Foundation or the bar or some other

1  organization commits to, in fact, provide that legal

2  representation for them.  They're not being denied the right to

3  have an attorney present.

4          MS. ZIMMERMAN:  Understood.  And our greatest

5  concern with having an organization like you suggest commit to

6  provide that counsel is that we are talking about a prolonged

7  process.  It is not that individuals will only be in front of

8  the parole board in the coming year or couple of years.  But a

9  system needs to be in place and a process where someone in 15

10 years who is in front of the parole board is ensured that

11 mechanism, that right to counsel, and we think that the only

12 way to do that is through the state.

13          THE COURT:  Okay.  Go ahead.

14          MS. ZIMMERMAN:  As I started to mention, your

15 summary judgment order highlighted some specific deficiencies

16 in the state's parole process.  The elements in plaintiffs'

17 compliance plan and articulated by Professor Rummel today

18 specifically addressed the concerns raised by this Court.

19          For example, your order pointed out that the

20 deprivation of a spokesperson who can advocate on behalf of the

21 class member results in a lack of meaningful opportunity as

22 required by law.  As I just mentioned, it's plaintiffs'

23 position that counsel is the fundamental advocate for class

24 members being able to present evidence and legal arguments to

25 the parole board.

1          Similarly, an expert is key to being able -- for the

2    class members' ability to demonstrate their maturity and

3    rehabilitation on complex and scientific factors.

4          This Court also found that the process lacked

5    objective criteria.  Requiring the use of a legal standard

6    ensures that the parole board does not have unfettered

7    discretion.

8          THE COURT:  Well, I'm a little confused on that.

9    There is a legal standard, and that's *Miller*.  They're not

10   entitled to anything more than what *Miller* provides, are they?

11         MS. ZIMMERMAN:  And that's why the legal standard

12   that we have requested is directly drawn from the language of

13   *Miller*.  We would just, I suppose, recommend a formal legal

14   standard within the policy and procedures of the process.

15         THE COURT:  Mr. Spillane went through the form, and

16   that form identifies, I believe, what the *Miller* standards are.

17   I'm assuming that's going to be his argument.  Why isn't that

18   the legal standard that has to be met?

19         MS. ZIMMERMAN:  I believe that the --

20         THE COURT:  I mean, there's lots of legal standards.

21   When I enter -- when I consider evidence, I have a standard

22   that, a legal standard that I have to take into account in

23   deciding whether or not to admit evidence.  But I also have

24   discretion because there are certain areas of the law that are

25   not just black and white, where there is an element of

 1   discretion and appropriate discretion.

 2           So why isn't the *Miller* factors the legal standard

 3   and discretion an appropriate thing for the -- and I'm not

 4   saying appropriate.  A constitutional process, which is all I'm

 5   here to decide.

 6           MS. ZIMMERMAN:  Well, I believe that the

 7   Constitution does require consideration of the *Miller* factors.

 8   The legal standard contributes to assessing the weight each

 9   factor should be considered and making a final determination,

10   using the board's discretion in a structured fashion to come to

11   the ultimate conclusion.  The legal standard provides that

12   final guidepost of whether or not based on the --

13           THE COURT:  What are you saying the legal standard

14   should be?

15           MS. ZIMMERMAN:  I believe we are -- we stated in our

16   brief that --

17           MS. CRANE:  Your Honor, if I may join counsel to

18   answer questions?

19           THE COURT:  No.

20           MS. CRANE:  Okay.

21           THE COURT:  No, we don't do it that way.  She can

22   approach you and ask for assistance or help, but we don't have

23   two people up here at once.

24           MS. ZIMMERMAN:  May I ask my co-counsel for a

25   clarification on the legal standard, Your Honor?

1          THE COURT:  Yes.

2          MS. ZIMMERMAN:  Thank you.

3          (Plaintiffs' counsel conferred privately.)

4          MS. ZIMMERMAN:  Your Honor, the legal standard we've

5    proposed is that there is a presumption of release, unless

6    there is some evidence that the individuals are irreparably

7    corrupt, and that language is directly from the case law.  From

8    *Montgomery*, I believe.

9          THE COURT:  So *Montgomery* is the standard, and

10   you're saying that's what *Montgomery* says.

11         MS. ZIMMERMAN:  Yes, Your Honor.

12         THE COURT:  Okay.  Go ahead.

13         MS. ZIMMERMAN:  In addition, ordering the board to

14   articulate its consideration of each factor under *Miller* and

15   SB 590, as we've just discussed, in a written worksheet

16   prevents arbitrary and subjective decision-making.

17         Finally, Your Honor's summary judgment order

18   observed the class members' limited access to information.  A

19   clear policy entitling class members to their parole files and

20   all materials that will be considered by the board, including

21   prosecutor and victim statements, remedies this lack of access.

22         THE COURT:  Now, what about what the defendant has

23   proposed here, which is, you know, if it turns out that they

24   won't agree to appear or have their testimony reviewed by the

25   counsel for the defendant, that, then, the board can't consider

1  it?

2         MS. ZIMMERMAN:  I believe, based on Professor

3  Rummel's testimony, it will be very difficult to unring the

4  bell, if you will.  If victims and prosecutors are allowed

5  to -- permitted to make a statement, especially prior to the

6  hearing beginning, and then ask to completely disregard that

7  entire testimony, I do think there could be implications on the

8  weight that that may be given.  There are certain protections

9  to help with that, like the structured decision-making we've

10 discussed.

11        THE COURT:  What's in your proposal as to how we

12 deal with the security concerns of, certainly the victim or

13 anybody testifying on behalf of the victim?

14        MS. ZIMMERMAN:  I think Professor Rummel mentioned

15 some suggestions, like appearing by telephone or other

16 mechanisms, where the victim is shielded from having to be in

17 the presence of the class member.

18        Other options that we have -- that could be

19 considered would be that the attorney for the class member is

20 able to be present during those statements, and, therefore, the

21 privacy concerns are minimized.

22        THE COURT:  Okay.

23        MS. ZIMMERMAN:  Finally, a written comprehensive

24 policy and a compliance monitor will ensure that these

25 protections remedy the deficiencies identified by this Court

1  and can stand the test of time.

2          Plaintiffs are not seeking to micromanage the state.

3  All of the elements in our plan are directly connected to this

4  Court's order.  They are integral for the constitutionality of

5  the process and ensuring that the state provide a meaningful

6  and realistic opportunity for release consistent with the

7  Supreme Court standards.

8          Without a right to counsel or a legal standard, for

9  example, the other protections provided for in the state's plan

10  could be undermined or potentially rendered meaningless.  Each

11  and every protection discussed today is required for ensuring

12  the class members' due process and Eighth Amendment rights.

13          Finally, Your Honor, on behalf of the class and the

14  attorneys at MacArthur Justice Center and Husch Blackwell, we

15  really do appreciate the opportunity to appear and present

16  evidence.  We believe that the plan and conclusions presented

17  here today and discussed are what's minimally necessary to meet

18  the constitutional requirements and our obligations as class

19  counsel.

20          THE COURT:  And the Court is very appreciative to

21  Husch Blackwell, as well as to the MacArthur Center, to provide

22  these services to our legal system so that the adversarial

23  process can work.

24          MS. ZIMMERMAN:  Thank you, Your Honor.

25          THE COURT:  Before you go, I have a question.

1          MS. ZIMMERMAN:  Of course.

2          THE COURT:  So you're coming here on behalf of the

3    class members.  The prosecutor says you've already got the

4    files for all of these people.  What more do you need?

5          MS. ZIMMERMAN:  I believe --

6          THE COURT:  I mean, access in terms of the files.

7    There's some debate about what you can get from the files and

8    what you can't get from the files.

9          MS. ZIMMERMAN:  What we're requesting is a process

10   and a mechanism for providing those files directly to the

11   offenders.  The discovery process occurred through litigation.

12   And while I believe we have some files, I don't know that

13   actually we have every single class member's parole file,

14   entire parole file.

15          In addition, as things will go moving forward, there

16   will be additional elements, I think, based on the outcome of

17   this litigation, that will be included in that parole file; and

18   I think having a mechanism in place to share those additional

19   elements and a process by which the class members get access to

20   those files at various times throughout the stages of the

21   parole process is really necessary to their ability to

22   understand what's going to occur in the parole hearing and

23   their ability to digest the evidence that the board will

24   eventually consider.

25          THE COURT:  Okay.  So you're asking here for a

1   remedy for the class to remedy the existing deficiencies in the

2   process.  If the Court enters an order requiring the state to

3   do something and that order is eventually upheld, does that

4   mean that the state now is guaranteed that, in fact, they are

5   complying with *Miller* going forward?  In other words, there's

6   not individual challenges that could be made at some future

7   time by these class members because we have litigated here what

8   is, in fact, an appropriate parole hearing under *Miller*?

9            MS. ZIMMERMAN:  I believe it's hard to gauge the

10  future litigation.  I do think this makes big steps -- as

11  Professor Rummel testified, in California they have seen parole

12  processes and they have experienced instances where on paper

13  something sounded constitutional, but, in practice, it was done

14  differently.

15           I think that the mechanisms that the plaintiffs are

16  asking for go a very long way to ensuring that the

17  constitutional parole hearing is held.  However, in practice,

18  things can, I think, always be different.  It's hard for me to

19  say with absolute certainty that there would be no future

20  litigation regarding the constitutionality of a particular

21  parole hearing.

22           THE COURT:  Okay.  Thank you.

23           MS. ZIMMERMAN:  Any further questions?

24           THE COURT:  Not for me.  Thank you.

25           MS. ZIMMERMAN:  Thank you.

1          MR. SPILLANE:  May it please the Court.

2          The first thing I'm going to spend a few seconds on

3    is I think the *Daubert* motion wins.  I think we've heard that

4    the expert witness's expertise is based on defending offenders,

5    including -- the numbers I heard were six to eight and six to

6    ten JLWOP's in parole hearings, and that all of her teaching

7    and lobbying is based on that.  I don't think that makes the

8    expert -- excuse me, the proposed expert someone who can tell

9    this Court expert opinions on what's constitutional and what's

10   not, and that was the thrust of her testimony.  She's been to

11   law school, she represented people at parole hearings.  She's

12   not an expert in any traditional sense.

13          As far as --

14          THE COURT:  So you're saying she's not an expert at

15   all, she's not qualified as an expert, and that her -- even if

16   she were, it was not helpful to the Court.

17          MR. SPILLANE:  Yes.  I'm saying two things:  one,

18   she's not qualified as an expert; and, two, it invades the

19   province of the Court to have someone come in and tell the

20   Court what the law is and what the Constitution is.  That's why

21   we have judges.  That's why we have advocates.  I can't go and

22   be an expert on whether the death penalty is constitutional

23   just because I've done a lot of death penalty cases, and I

24   think that's a good analogy.  I'm not an expert in the sense

25   that I'm any more qualified than judges to determine how the

1 law applies to the facts, and that's what she's doing.

2 THE COURT: Would you say that your opinions on that

3 might be helpful to the judge?

4 MR. SPILLANE: I don't think so, except in the role

5 of an advocate because I just don't see it being helpful to the

6 judge or any other fact finder, and particularly -- well, the

7 judge particularly has got to judge the law and is presumed to

8 know and follow it. As a matter of law, to have an expert come

9 in and say the law is X, that's the judge's job.

10 THE COURT: Okay.

11 MR. SPILLANE: And, like I said, the other argument

12 is, even if that were something that was proper for expert

13 testimony, which it's not, this is not a qualified expert

14 because she did a few parole cases and then taught a class

15 based on it. Well, probably not a few based in all contexts,

16 but a few doing JLWOP's.

17 I think the plaintiffs agreed when we started that

18 if our proposed procedures are constitutional, that ends the

19 case at this level. Our argument is they are constitutional.

20 The 15 factors coincide with *Miller* --

21 THE COURT: Wait a second, what are you saying?

22 That you're -- before you did any of this work and made these

23 changes, as a matter of law, you believe that your process was

24 constitutional?

25 MR. SPILLANE: I personally did, but --

1          THE COURT:  No, your client.

2          MR. SPILLANE:  No.

3          THE COURT:  Because I'm back to the issue of I'm

4  assuming that your client continues to take the position that

5  they don't need to do any of these things, that their process

6  as they were functioning prior to this lawsuit were

7  constitutional.  Is that correct?

8          MR. SPILLANE:  That is the position that we have

9  taken.

10          THE COURT:  No, is that the position you're taking

11  now?  I just want to know what we're deciding here today.

12          MR. SPILLANE:  I'm not disavowing the petition in

13  our motion.  The legal argument in our motion to dismiss is

14  that our procedures were adequate.

15          THE COURT:  That's all I wanted to know.

16          MR. SPILLANE:  What I'm talking about now is the new

17  procedures I filed with the Court, the 15 factors in that, the

18  admonition to the board that they must give great weight to

19  those factors, the admonition to the board that they cannot

20  deny based solely on the seriousness of the offense, the

21  forms --

22          THE COURT:  Could they deny it 99.9 percent based

23  upon the seriousness of the offense?

24          MR. SPILLANE:  Well, prob --

25          THE COURT:  And give one tenth of 1 percent to the

1    other factors that *Miller* takes into account?

2            MR. SPILLANE:  I believe that to be inconsistent

3    with the direction that the board give great weight to all of

4    the factors.  Circumstances of the offense is one factor.

5            THE COURT:  Right.  But I can give great weight to

6    all of them and then decide there's only one really that

7    requires me to make my decision.

8            MR. SPILLANE:  I suppose theoretically you could,

9    and I suppose theoretically the board could do that, but

10   there's no requirement for an objective -- well, I'd better

11   choose my words carefully here.

12           There is no requirement that in every case, if an

13   offender does X, then he's entitled to parole.  You can write a

14   parole statute like that.  Before 1982, Missouri had a parole

15   statute like that.  Now it does not.  *Miller* and *Montgomery* do

16   not require it.

17           They require consideration -- well, the summary

18   judgment motion argues that they require in the parole process

19   consideration of maturity and rehabilitation.  We certainly do

20   that in our new proposed order, and it's constitutional, and

21   that should end the case at this level.

22           They have no real authority for the proposition that

23   we should hire counsel for all of them.  I'm not even sure how

24   we --

25           THE COURT:  Right.  I'm not talking about that.

1          MR. SPILLANE:  Right, yeah, that's --

2          THE COURT:  I'm talking about the question as to the

3     legal standard and what the parole board needs to know.  I

4     mean, certainly they're going to know that this offender got

5     life without parole.

6          MR. SPILLANE:  Yes.

7          THE COURT:  So there's already a thumb on the

8     scale --

9          MR. SPILLANE:  Yes.

10          THE COURT:  -- as to the seriousness of the offense.

11          MR. SPILLANE:  Yes.

12          THE COURT:  And so if they can give the greatest

13     weight to the seriousness of the offense, then it's probably

14     unlikely that there's going to be any parole granted.

15          MR. SPILLANE:  Well --

16          THE COURT:  In many cases.

17          MR. SPILLANE:  There might be some case out there

18     where they --

19          THE COURT:  I understand your statistic about

20     eventually everybody gets parole.  But one of the reasons, as

21     you know, is they get old and they get expensive --

22          MR. SPILLANE:  Yes.

23          THE COURT:  -- and they get paroled.

24          MR. SPILLANE:  Right.  And --

25          THE COURT:  Because we don't want to pay for them.

1          MR. SPILLANE:  And I think -- I don't know the

2     correct number, but perhaps -- it's at least four, perhaps

3     four, perhaps five, perhaps more of these JLWOP offenders have

4     already gotten out-dates on their first hearing.  But everybody

5     doesn't get an out-date on their first hearing, and they're not

6     entitled to an out-date on the first hearing if the board

7     thinks it's not appropriate.

8          THE COURT:  Sure.  I understand that.  We're looking

9     rather at how they weigh these factors --

10          MR. SPILLANE:  Right.

11          THE COURT:  -- under the Constitution.  I'm

12     struggling with that one myself.

13          MR. SPILLANE:  Right.  And I'm not sure there's any

14     constitutional dictation in *Miller* and *Montgomery* about how

15     they weigh them.  I think they -- you know, if we assume that

16     there isn't a dictate that they consider them, and even if they

17     give them great weight, I think we do that.  And can something

18     that has great weight be outweighed by one factor?  Possibly.

19     But it doesn't make it unconstitutional.

20          I mean, what they're asking for, and they say it

21     different ways, they're asking for if the offender does X, then

22     he has to be released, and that's not our statute.  It used to

23     be our statute, you know, 27 years ago.  It's not anymore.  The

24     board can still have discretion, as the Court pointed out, just

25     like the Court has discretion.

1          THE COURT:  This is slightly different because it's

2   correcting a constitutional violation.  That's the problem we

3   have is we're trying to correct a constitutional violation with

4   this remedy.  The violation has already occurred.  Getting life

5   without parole is a constitutional violation.

6          MR. SPILLANE:  Exactly right.

7          THE COURT:  We all -- we all can agree on that, so

8   there's already the thumb on the scale.  So it's not like every

9   other parolee.

10         MR. SPILLANE:  Well, that's right.  That's right,

11  but I don't think -- I don't think there's a dictation that --

12  I mean, from what I'm hearing from the other side and what I

13  think I heard from the proposed expert is that you can't

14  consider seriousness of the offense at all.

15         THE COURT:  No, that's not what --

16         MR. SPILLANE:  And then I think she backed off

17  that --

18         THE COURT:  -- they -- I think they became clear

19  here that there was a presumption that if they had X, Y, and Z,

20  then they could get out.

21         MR. SPILLANE:  I think that --

22         THE COURT:  The presumption is that if they were no

23  longer a threat, that they, you know, were no -- were not

24  incorrigible, that the conduct that they engaged in, while at

25  that time may have indicated that they were corrupt,

1  irrevocably corrupt, that things now have changed, as we

2  understand the development of the brain scientifically, and

3  also we have actual evidence as to whether they are, as an

4  adult, irrevocably corrupt.

5      MR. SPILLANE:  Exactly.  And I think that's covered

6  by the 15 factors to which the board must give great weight,

7  and I think that's all we can do, without creating an

8  unworkable standard that if they do X, then they're out, and

9  then we can litigate in every case whether or not they did X.

10  The board has got to have some discretion.  Because that's what

11  this would be --

12      THE COURT:  But no burden shifting.

13      MR. SPILLANE:  No, exactly right.  It would be a

14  litigation engine.  I mean, you saw the cases during the

15  pre-1982 statute where it said shall release if X, and then

16  everybody said they met X when they go to court.  And that was

17  a bad statute, and that's why it was replaced.  And I think

18  this is better.  And what we've produced as a remedy I believe

19  to be constitutional.  And I think if it is, then that should

20  end the case at this level, and then my client will tell me

21  whether that's enough or we keep fighting someplace else.

22      THE COURT:  I have a question about the access to

23  the files.  You have responded that, in fact, they have access

24  to the files because you've already turned it over as part of

25  this litigation.

1          MR. SPILLANE:  I think that to be accurate, but I

2   think what they're saying -- and I'm going to ask -- I'm going

3   to turn them around and ask them if I've got this wrong -- is

4   that if they haven't defined everybody in the entire class,

5   there may be somebody out there that they haven't got the file.

6   And if that's true, I mean, I think that's fixable on an

7   individual basis.  Is that your concern?

8          MS. CRANE:  If I may, Your Honor?

9          THE COURT:  Well, just yes or no, and then I'll let

10  them proceed.

11         MS. CRANE:  No.

12         THE COURT:  Okay.  I didn't think so.

13         MS. CRANE:  I mean, it's along those lines, but

14  that's not our complete concern.

15         THE COURT:  Well, one of my questions is these

16  people aren't going to be -- I mean, one of the problems here

17  in terms of getting the remedy as a class is that I can only do

18  it based on the present.  I can't say what's going to happen

19  ten years from now.  So I -- whatever I'm doing, I can only do

20  it based upon the information that I have currently in front of

21  me.  But, in fact, there are going to be changes in these

22  files.

23         MR. SPILLANE:  Yes.

24         THE COURT:  In other words, there's some people that

25  maybe will be 15 years out before they are eligible under

1   *Miller* or under the statute to be considered for parole.  And
2   certainly they would have a right, would they not, to their
3   parole file?

4            MR. SPILLANE:  I think --

5            THE COURT:  I mean, if they had a right as part of
6   this litigation, why wouldn't they have a --

7            MR. SPILLANE:  I think if this litigation holds that
8   they have a right, then that right would continue, but it would
9   have whatever redactions this Court put in.  And I thought I
10  addressed that someplace, but perhaps I didn't.

11           THE COURT:  You may have, but I'm going based
12  upon -- obviously, I've got all of this paper up here.  During
13  the oral argument that we've had, that was not addressed.

14           MR. SPILLANE:  Yeah, and I -- to be honest with you,
15  I don't remember what I wrote, and it was just earlier this
16  month.  But I thought that I would -- I had addressed it.  But
17  if I didn't, I don't think that's a hard thing to address that
18  they could have access to --

19           THE COURT:  Okay.  Let's go ahead, and I'll take a
20  look at it.  If there's anything that you want to add, how
21  about if we give you -- the parties a week if they have
22  anything more that they want to provide to the Court.

23           MR. SPILLANE:  Right.  And I think we talked about
24  this, perhaps, in the IPO context too.  And I don't know if
25  that's something the Court is interested in, as well, but --

1   yeah, it's a good thing to have more information from the

2   parole officer, and I don't see that as being a bad thing or

3   something where there's a right to counsel and that you can't

4   have a recommendation from an IPO.  More information is better.

5           And what I recall putting in there about the IPO is

6   that they're supposed to help them apply for this process and

7   to make sure that the application gets to the right place, and,

8   if they want them to, to help them get documents about their

9   youth, as far as when they were a juvenile and so forth.  So, I

10  mean, I think that's a good thing.

11          But as far as addressing that --

12          THE COURT:  But not help them enough to tell them

13  that their time has come to seek parole?

14          MR. SPILLANE:  I think we did talk about -- in there

15  about them getting notices.  I'm -- I'm digging through this

16  here.  Initiation of process.  Institutional parole officers

17  will provide class members with a form for requesting a hearing

18  and help ensure completed copies get to the appropriate persons

19  for the process to proceed.  So I think I did address that --

20          THE COURT:  So a --

21          MR. SPILLANE:  -- on Point 4.

22          THE COURT:  -- hearing is same as initiating the

23  request for parole?

24          MR. SPILLANE:  Initiation of the hearing process was

25  the heading I used there, and what our statute says is that the

offender needs to file an application for parole.  That's what
our law says.  So what we have proposed is that the
institutional parole officer notifies the offenders, the class
members of that, helps them fill out the paperwork, and makes
sure it gets to the right place.  I'm not sure what else we can
do when we've got a requirement that they ask for it.

THE COURT:  Well, maybe I'm missing something.

MR. SPILLANE:  Maybe I'm --

THE COURT:  Are you saying that the IPO is required
under your proposal here to notify the offender that it is time
for him to initiate a request for parole and that the IPO then
will, in fact, provide the necessary forms?

MR. SPILLANE:  Oh, I think we're doing more than
that, so I wasn't very clear.  But I will invite the Court to
read 4 when it has a chance.  But I don't think --

THE COURT:  I just read it.

MR. SPILLANE:  Right.

THE COURT:  It's in front of me.

MR. SPILLANE:  I don't think what our intention is
is that there's some specific days, X number of days before the
hearing when the IPO starts helping them get documents.  I
think it's long before that that they file -- that they give
them the notice and --

THE COURT:  Well, this is --

MR. SPILLANE:  Maybe I'm not addressing the Court's

1  question.

2  THE COURT:  Mike, you probably know more about this

3  than I do.  So what I'm trying to get at is there is an

4  eligibility date in the system by which people have a right to

5  apply and get a hearing --

6  MR. SPILLANE:  Yes.

7  THE COURT:  -- for parole.  So what I'm trying to

8  find out is you all know that --

9  MR. SPILLANE:  Yes.

10  THE COURT:  -- better than the inmate knows that.

11  MR. SPILLANE:  Yes.

12  THE COURT:  So are you saying that you're agreeing

13  to, for X number of days before that, give them the form

14  notifying them that they now are eligible to seek parole, and

15  then these are the things on your No. 4 that you are going to

16  help them with?

17  MR. SPILLANE:  I think that to be accurate, but

18  that's --

19  THE COURT:  I've reviewed that, and that doesn't say

20  that.

21  MR. SPILLANE:  Yeah.

22  THE COURT:  It's certainly ambiguous.

23  MR. SPILLANE:  The concept I'm trying to get across

24  is that before they're eligible, if they're eligible five years

25  from now to apply, the IPO can start helping them now get their

1  documents together.  There isn't a kick-in date on that.

2  That's what I was trying to convey.

3          And so I think we have a notice requirement here.

4  Let me take a look.  I think they get a notice X number of days

5  before the hearing, and, as I understand it, it is a

6  universal -- that everyone is going to get the application, and

7  that is not tied to a particular date, if that makes sense.

8          THE COURT:  Well, I'm just trying to -- I'm trying

9  to put myself in the position of somebody who is uneducated and

10  has some issues.  How do they know when it's time to be doing

11  this?  Because I'm not seeing that.  The hearing only comes

12  after, I assume, you apply for parole.  There isn't going to be

13  any hearing if nobody applies for parole.

14          And maybe you can -- you know, we can --

15          MR. SPILLANE:  Let me see if I can --

16          THE COURT:  Let me ask you this.  I think this is a

17  better question.  Are you saying that there's no objection by

18  the state to, in fact, notify within no less than 60 days

19  before they have a right to file an application for parole?  Do

20  you have any objection to that?

21          MR. SPILLANE:  No.  No.

22          THE COURT:  Okay.

23          MR. SPILLANE:  And the way I looked at it, I think

24  it's controlled by the last sentence in Paragraph 4, which is

25  probably unclear.  The institutional parole officer will

1   provide notice to all class members as listed on a spreadsheet
2   prepared for that purpose.

3          So what I was talking about is they get -- everybody
4   gets notice now, but what the Court is talking about is they
5   want an additional specific notice that kicks in X number of
6   days before the 25 years, and I have no objection to that.

7          THE COURT:  Okay.  All right.  Great.  Then what
8   happens if they don't ask for it?  Does it continue on
9   indefinitely?  So if, you know, at 25 years, they have a right,
10  but they wait until 25 and a half years...

11         MR. SPILLANE:  I think that's theoretically possible
12  because what the statute requires is that they make an
13  application, and the procedure that I've written is that
14  everybody gets the application and gets help filling it out and
15  getting it to the right people; but if they say, no, I don't
16  want to be paroled now, I don't want to fill out my
17  application, I'm not sure what we can do.

18         THE COURT:  I'm not worried about that.

19         MR. SPILLANE:  Yeah, I'm not saying that that's --
20  yeah, everybody gets the application and we help them get it to
21  the right -- maybe there's somebody out there that's not going
22  to apply.

23         THE COURT:  Well, I think we're all in agreement
24  that what you're intending here is that there be notice at
25  least 60 days before the deadline, in addition to this notice.

1          MR. SPILLANE:  Yeah, because --

2          THE COURT:  I know that 25 years from now I probably

3    am not going to remember something that, you know, somebody

4    gave me today.  It's possible.

5          MR. SPILLANE:  Very good.  Does the Court have any

6    other questions?  Because I'm sure there's probably a lot of

7    other stuff that --

8          THE COURT:  I do.

9          MR. SPILLANE:  Good.

10         THE COURT:  I do, Mike.  Okay.  Mr. Spillane.

11         The other issue I've got is this -- the presence of

12   the victim and the prosecuting -- I assume the thing we were

13   discussing is just about the victim, not the prosecutor.

14   You're not suggesting that the prosecutor has a right not to

15   have the offender present while the prosecutor is testifying.

16         MR. SPILLANE:  That may be in the Missouri statute,

17   but I'm not sure I feel as strongly about that as I do about

18   the victim.  You know, if the Court said that the statute is

19   unconstitutional as to X, if it orders that, I'm not sure.  But

20   the victim I really do feel strongly about.

21         THE COURT:  And I understand that.  What about this?

22         If the attorney is capable of being present -- and I

23   know that that's not the ideal for the plaintiff because there

24   may be things that the client would want to respond to if a

25   victim said a certain thing.  But do you have any objection to

1  the attorney being present and being able to --

2          MR. SPILLANE:  I don't.  But what I will do is I
3  will get on the phone with my client when I get back to my
4  office and say, do you have any objection?  And if they do,
5  I'll tell you; and if they don't, let's just assume that I --
6  and let me make sure I understand the question correctly, which
7  is do we have an objection to the attorney being present while
8  the victim --

9          THE COURT:  Victim is testifying.

10          MR. SPILLANE:  -- is testifying.  Yeah, I'm going to
11  have to run that by the client because the client's solution to
12  this was we'll just ignore the testimony.  We have a statutory
13  thing that says they have to be able to testify outside the
14  presence, but we just won't take it into consideration.  But
15  that may not be a sufficient thing.

16          THE COURT:  What is the language of the statute?

17          MR. SPILLANE:  I don't have it in front of me.

18          THE COURT:  Okay.  All right.  I'll take a look at
19  that in this process, as well.  Because I am -- it is -- you
20  know, it's so fundamental to be able to confront somebody who
21  is testifying and has especially a significant impact, as we
22  all know.

23          MR. SPILLANE:  I will be on the phone with my client
24  as soon as I get back to the office and say, is it okay if the
25  lawyer is present?  And if we could just do that maybe for the

1  prosecutor and the victim, that -- yeah.  I'm trying to avoid
2  an appeal here too.

3         THE COURT:  Yes.  I appreciate that.  Let's see.
4  Give me just a minute here.

5         I know that the plaintiff has asked for four people,
6  and you've agreed --

7         MR. SPILLANE:  Yes.

8         THE COURT:  -- to four people.  But they want there
9  to be a safety valve where for just cause they could request
10 more than four people, as I remember.  Is that correct?

11        MR. SPILLANE:  I don't have authority to agree to
12 that.  That may be one of those things where the exception eats
13 the rule because everybody might want more than -- and who
14 decides what's just cause?

15        THE COURT:  I would assume the board would decide.

16        MR. SPILLANE:  Right.  And then that would be a
17 thought for, perhaps, litigation.  I actually needed six.  If I
18 can avoid that, I don't want to do it.

19        THE COURT:  Yeah, I get it.  What about limiting the
20 number of people on both sides?

21        MR. SPILLANE:  A better question -- I'm not --
22 that's not a bad question, but I want to make sure I understand
23 the exact question you're asking.  Limiting the number of --

24        THE COURT:  Yeah.  If the defendant only gets four
25 to present their case, does the victim only get four?

1          MR. SPILLANE:  And the answer to that is --

2          THE COURT:  And I don't mean the victim.  I mean the

3    state, effectively, because that's what we're dealing with.

4          MR. SPILLANE:  Well, I think there's a statutory

5    definition of victim, and it's not just one person.

6          THE COURT:  Right.

7          MR. SPILLANE:  So if somebody killed Dad and ten

8    kids want to come in and say bad, I'm not sure statutorily I

9    can stop them.  So I guess that's not something I could agree

10   to.

11         THE COURT:  Okay.  It's not arbitrary as to the

12   victim.  Why is it arbitrary as to the defendant?

13         MR. SPILLANE:  I guess the answer is I would like to

14   limit the victims if that would solve things, but I can't

15   rewrite the statute, if that makes sense.

16         THE COURT:  So why don't we say that, you know, the

17   defendant has a right to four, but no less than the number that

18   the --

19         MR. SPILLANE:  Okay.

20         THE COURT:  I don't know.

21         MR. SPILLANE:  I hope I'm not getting out on a limb

22   on that.  If I am, I'll tell you.

23         THE COURT:  Yeah.

24         MR. SPILLANE:  Let me write that down.  Minimum

25   four.  Or maximum four, unless...

1          THE COURT:  What's the actual -- do you remember the

2   provision of the statute that talks about the right of the

3   victim not to appear in the presence of the plaintiff -- or the

4   defendant?

5          MR. SPILLANE:  I don't.  I don't.  I think it's

6   probably --

7          THE COURT:  Because there's always a telephone

8   conference.  I know we do that with child molestation cases.

9          MR. SPILLANE:  I think it's in Chapter 217

10  someplace, but I'm going to turn around and ask.

11          Does anybody remember the statute on victims?

12          MS. CRANE:  I have it here.

13          MR. SPILLANE:  Okay.

14          MS. CRANE:  I can pull it up, just give me one

15  moment.  Rule 217.690 speaks to victims, and then there is --

16  victims' rights at parole hearings.  And then there's

17  additionally Statute 595.209, but it's the rights of victims

18  and witnesses.

19          (Counsel conferring.)

20          MS. CRANE:  I've highlighted the portion that

21  relates to victims there, and I believe the relevance to

22  victims in that statute, as well.

23          MR. SPILLANE:  May I approach?

24          THE COURT:  Yes, thank you.

25          MR. SPILLANE:  This is yours, Your Honor, if it's

1  helpful.

2          THE COURT:  All right.

3          MS. CRANE:  In addition, the Missouri Constitution.

4          MR. SPILLANE:  Oh, right.  It is in the

5  Constitution, as well.  May I approach, Your Honor?  Here is

6  the provision in the Missouri Constitution, as well.

7          THE COURT:  Well, presence is a dubious word.  Have

8  they considered telephonic?  Because I don't see any way that,

9  you know, you could -- when we decide whether something is

10 admissible or not, if we say it's not admissible, then we don't

11 hear it.  In other words, if I had said that this was a witness

12 who is not admissible, whose testimony is not admissible, I

13 would just strike her.  And, now, there are some circumstances

14 where I'm having to hear it to decide the question of whether

15 it's admissible or not; but if I already know that some piece

16 of evidence is hearsay or whatever, it's just stricken, we

17 don't hear it.

18         MR. SPILLANE:  And that's just something that we

19 came up with, was a way to work around the statute and still

20 not have this evidence come in.  So if there's a better answer,

21 I'm not sure --

22         THE COURT:  Why not telephonic?  We do that for -- I

23 know either video or --

24         MR. SPILLANE:  Well, what I'm worried about --

25         THE COURT:   -- telephonic testimony by children who

1  have been sexually abused, and we have protection for them.

2  MR. SPILLANE:  Is I think the statutory intent with

3  not being in the presence is that the inmate doesn't know that

4  the victim is coming in and saying this is a bad guy, don't

5  parole him, so there's not retaliation.  I don't know that if

6  doing that over the telephone solves that problem.  At least

7  that's what I'm going to hear from the victims' rights if they

8  decide to sue on this.

9  THE COURT:  Let's work on the attorney being

10  present.

11  MR. SPILLANE:  I will.  It's a call I'll make.  I've

12  got two calls -- I mean, I've got two things now:  presence of

13  the lawyer during the victim and prosecutor, and maximum of

14  four unless there is a larger number for the victim.

15  THE COURT:  All right.  Any other issues that you

16  want to address, Mr. Spillane, that I have not brought up yet?

17  MR. SPILLANE:  No.  I guess this is the wrong time

18  to -- because I think that the prevailing party, if this plays

19  out the way the way it looks like it's going to, and I'm not

20  sure -- it sounded like a whole lot of money for that expert

21  that I'm not sure my client should have to pay for.  I mean,

22  $500 an hour for some huge number of hours that I'm not sure

23  contributed very much.

24  THE COURT:  We'll have to address that at a later

25  time.

1          MR. SPILLANE:  Yeah.  I thought this might not be

2   the right time, but I'm concerned about that.

3          THE COURT:  All right.  Anything else?

4          MR. SPILLANE:  No.  Unless the Court has more

5   questions, I'm happy to answer.

6          THE COURT:  I don't have any other questions.

7          MR. SPILLANE:  Thank you, Your Honor.

8          THE COURT:  Theoretically, the last word goes to the

9   party with the burden of proof.  Does the petitioner or the

10  class have anything further to say?

11         MS. CRANE:  Your Honor, the only thing we would like

12  to respond to is the *Daubert* arguments since we didn't have the

13  opportunity to respond to that previously.

14         THE COURT:  Okay.

15         MS. CRANE:  And I think it will be brief, 30 seconds

16  to a minute.

17         THE COURT:  I love that.

18         MS. CRANE:  Unless Your Honor has questions.

19         In terms of Professor Rummel's qualifications, she

20  is amply qualified.  Her experience keeps being characterized

21  as simply representing people in the parole process and

22  teaching, but she I think testified repeatedly that it also

23  includes training board parole systems on how to conduct a

24  meaningful parole process that provides a realistic opportunity

25  for release based on the constitutionally required factors.

1  She was also a part of drafting the legislation that created

2  that process and drafting the regulations that implemented that

3  process.  So I just think that her expert experience has been

4  mischaracterized thus far.

5          This is a new and evolving landscape because the

6  constitutional law on this issue is relatively new, and

7  Professor Rummel is the most qualified person on this

8  developing topic.

9          Professor Rummel is not opining on the ultimate

10 legal question before the Court.  She's not usurping your role.

11 She's opining on a mixed question of fact and law, and what she

12 is really doing is relying on her practical and pragmatic and

13 extensive experience in California of what initially on

14 paper -- as my colleague spoke about, what initially on paper

15 when it was drafted and implemented was believed to meet

16 constitutional requirements, and that in practice, as it played

17 out over the years and was implemented by a board that was

18 experiencing ongoing training and becoming better educated

19 about the requirements, as time went on what did initially meet

20 constitutional muster required reform.  That is a question of

21 fact that she is uniquely qualified to, and I believe -- I hope

22 is extremely helpful to this Court.  And some of the things

23 that respondent just spoke about underscore why that is

24 helpful.

25          We are not objecting to the forms proposed by

1    respondents.  What we are saying is what Professor Rummel could

2    testify to based upon her experience in California is that

3    having something on paper, having forms that list all of the

4    constitutionally required factors doesn't ensure a

5    constitutional process because the question is how are those

6    forms implemented, how are they interpreted.  And for us to

7    know that they're done so in a constitutional way requires

8    documented decision-making, it requires documentation on the

9    consideration of each factor, and it requires a formalized

10   legal standard.

11         The legal standard we propose does originate with

12   Supreme Court law, but respondents had represented that why do

13   we need to put that policy -- why do we need to put that

14   language in the policy?  Because it's the law.  It's governing

15   them, no matter whether we formalize it or not.

16         But based on the extensive discovery in this case

17   and the depositions from board members, IPOs, and parole

18   analysts, they didn't know what *Miller* was, they hadn't read

19   it.  And the respondents have revised the forms we proposed to

20   omit both the area for documenting evidence and reasons, and

21   also to omit the guiding language quoted from *Graham* and *Miller*

22   that was included precisely for that purpose.

23         If we're not going to have a codified legal

24   standard, we need to have that guiding language in the forms,

25   because otherwise we don't know that they're just ticking off a

1  box, yes, I've heard the home he grew up in.  We don't know

2  what that tick means.  Did it mean they considered it

3  mitigating, aggravating, and did they do it in a constitutional

4  way?

5          I believe on all of those points, Professor Rummel's

6  experience of how that played out initially, how it evolved

7  over time, what legislative reform and what litigation was

8  necessary to ensure constitutionality, what that entailed.  And

9  the hope is it's not only helpful to this Court, but to

10 judicial efficiency going forward, because we can save Missouri

11 a lot of money and a lot of time by doing it right the first

12 time, and I feel Professor Rummel's testimony here today was

13 instructive on what that requires.  Thank you, Your Honor.

14          THE COURT:  All right.  I'm going to go ahead and

15 take the matter under advisement, and I'll wait to hear if you

16 are going to offer any further amendments, as well as letting

17 the opposing counsel know, as well.

18          MR. SPILLANE:  Yes, Your Honor.

19          THE COURT:  Thank you.

20          MS. CRANE:  Thank you, Your Honor.  Very well done

21 to everybody.  Are you with Husch also?

22          MS. ZIMMERMAN:  Yes.

23          THE COURT:  And you are too?

24          UNIDENTIFIED SPEAKER:  I thought you were looking at

25 me.

1          MS. CRANE:  MacArthur Justice Center intern.

2          THE COURT:  I very much appreciate -- you know, it's

3  so important for this process to have lawyers who step up, as

4  I'm sure will be, perhaps, required in the future, as well.  So

5  I very much appreciate it.  We have a great profession.

6          MR. KNEPPER:  Thank you, Your Honor.

7          THE COURT:  Court's in recess.

8          (Hearing adjourned.)

9                          - - -

10                         - - -

11                      CERTIFICATE

12          I certify that the foregoing is a correct transcript

13  from the record of proceedings in the above-entitled matter.

14

15

16  April 2, 2019

17                          /s/_____
                            Kathleen M. Wirt, RDR, CRR
18                          U.S. Court Reporter

19

20

21

22

23

24

25