**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**CENTRAL DIVISION**

| | | |
|---|---|---|
| NORMAN BROWN, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 17-cv-4082 |
| | ) | |
| ANNE L. PRECYTHE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATORY AND INJUNCTIVE RELIEF ORDER

Plaintiffs Norman Brown, Ralph McElroy, Sidney Roberts, and Theron Roland (together, "Plaintiffs") are serving mandatory sentences of life without parole for homicide offenses committed when they were less than 18 years of age. Doc. 143 (Plaintiffs' Suggestions in Opposition to Defendants' Motion for Summary Judgment), p. 1. The United States Supreme Court, however, has held that sentencing a juvenile to a mandatory life sentence without the possibility of parole violates the Eighth Amendment. This is because the mind of a child is structurally different from the mind of an adult.

As explained in *Miller v. Alabama*, 567 U.S. 460 (2012),

> First, children have a lack of maturity and an underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking. Second, children are more vulnerable to negative influences and outside pressures, including from their family and peers; they have limited control over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings. And third, a child's character is not as well formed as an adult's; his traits are less fixed and his actions less likely to be evidence of irretrievable depravity.

*Miller*, 567 U.S. at 471 (quotation marks and citations omitted).

1

"Parts of the brain involved in behavior control continue to mature through late adolescence." *Graham v. Florida,* 560 U.S. 48, 68 (2010). Studies have shown that "only a relatively small proportion of adolescents who engage in illegal activity develop entrenched patterns of problem behavior." *Miller*, 567 U.S. at 471 (quotation marks and citation omitted). Thus, the actions of a juvenile "are less likely to be evidence of irretrievably depraved character than are the actions of adults." *Graham*, 560 U.S. at 68 (quotation marks and citation omitted).

Because "a greater possibility exists that a minor's character deficiencies will be reformed," it "would be misguided" to treat a juvenile offender in the same fashion as an adult. *Id.* (quotation marks and citation omitted). A mandatory sentence of life without parole fails to take account of the fact that the "signature qualities" of youth described above "are all transient." *Miller*, 567 U.S. at 476 (quotation marks and citation omitted).

> Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. . . . It ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys.

*Id.* at 477-78. A mandatory sentence of life without parole for a juvenile "disregards the possibility of rehabilitation even when the circumstances most suggest it." *Id.* at 478.

In *Montgomery v. Louisiana*, 577 U.S. ___, 136 S. Ct. 718 (2016), the Supreme Court held that Miller applies retroactively because it announced a rule of substantive law. A state need not guarantee freedom to the juvenile offender, but it must provide "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Miller*, 567 U.S. at 479 (quoting *Graham*, 560 U.S. at 75); *see also Montgomery*, 136 S. Ct. at 736 ("Those prisoners who have shown an inability to reform will continue to serve life sentences. The opportunity for release

2

will be afforded to those who demonstrate the truth of Miller's central intuition—that children who commit even heinous crimes are capable of change.").  The cases "bar life without parole . . . for all but the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility." *Montgomery*, 136 S. Ct at 734.  "[G]iven . . . children's diminished culpability and heightened capacity for change, . . . appropriate occasions for sentencing juveniles to this harshest possible penalty" are supposed to "be uncommon."  *Miller*, 567 U.S. at 479.

*   *   *

On May 12, 2016, the Missouri legislature passed Senate Bill 590, 98th General Assembly ("SB 590").  In relevant part, SB 590 provides that any person sentenced as a juvenile to life without parole prior to August 28, 2016, "may submit to the parole board a petition for a review of his or her sentence, regardless of whether the case is final for purposes of appeal, after serving twenty-five years of incarceration on the sentence of life without parole."  Mo. Rev. Stat. § 558.047.1.1.  The statute requires the Board to hold a hearing to determine "if the defendant shall be granted parole."  Mo. Rev. Stat. § 558.047.4.

Each of the Plaintiffs subsequently petitioned for but was denied parole.

## I.    <u>Factual Background</u>

### a)  <u>The Named Plaintiffs</u>

#### *1.  Norman Brown*

Plaintiff Norman Brown was in seventh grade when he was arrested for the offenses for which he is now serving time.  Doc. 138-20 (Pre-Hearing Report for Norman Brown), p. 9. Brown's prehearing report for parole review acknowledged that he was only 15 years old at the time of the underlying offense, that his participation appeared to be the result of peer pressure, and

that it "d[id] not appear he had a direct involvement in the death" of the homicide victim. *Id.*, p. 11.

Brown is, by Defendant's own standards, a model inmate. Doc. 147 (Defendants['] Suggestions in Opposition to Plaintiffs' Motion for Summary Judgment), p. 75. Although he accumulated multiple conduct violations in his youth, in recent years, the violations tapered off and then ceased. *Id.* Brown has improved his conduct and taken responsibility for his actions. *Id.* The prehearing report that the institutional parole officer created notes Brown's involvement in many rehabilitative programs and states that, "[a]t this point, it does not appear Brown poses a risk to society . . . ." Doc. 147, p. 76. Nonetheless, "th[e] officer respectfully recommend[ed] Brown be scheduled for a reconsideration hearing in May 2022," and not granted parole, "due to the circumstances of the offense" alone. Doc. 138-20, p. 11.

Outside of noting that it is a juvenile case, the Board Action Sheet does not discuss Brown's youth or immaturity at the time of the underlying offense. Doc. 138-35 (Board Action Sheet for Norman Brown). The sole basis for Brown's parole denial listed on the sheet was the circumstances of the underlying offense. Doc. 147, p. 78.

### 2. Ralph McElroy

Plaintiff Ralph McElroy's prehearing report notes that he was 17 years of age when the offense for which he was convicted took place. *Id.*, p. 2. ████████████████████

████████████████████████████████████████████████

████ *Id.*, p. 6.

The materials submitted to the Board concerning Plaintiff Ralph McElroy include certificates of training for various courses, a Certificate of High School Equivalence, an award for outstanding service at his job, and a certificate for volunteering 600 or more hours towards

restorative justice reparative activities. Doc. 138-51 (November 30, 2016 letter from Matthew D. Knepper, with enclosures), at 13-22. McElroy's conduct violations, some of which were serious, ceased in 2012. The prehearing report states that "[h]e only began taking any type of programming after he was informed that he would be given an opportunity for release." Doc. 138-21 (Pre-Hearing Report for Ralph McElroy), p. 8. (The Supreme Court decided *Miller* in 2012.)

McElroy has always denied committing the offense for which he is serving time; nonetheless, the prehearing report states that "MCELROY takes no accountability for the present offense" and "showed no remorse for his actions." *Id*. The prehearing report recommended that he be scheduled for reconsideration in December 2021 "[d]ue to his attitude regarding the offense and the victim . . . ." *Id.*

Neither McElroy's Board Action Sheet nor the supplement contains any notation regarding his youth or immaturity at the time of the underlying offense. Doc. 147, p. 79. McElroy was denied release based in part upon the circumstances surrounding the underlying offense. *Id.*, p. 80.

### 3. Sidney Roberts

Plaintiff Sidney Roberts was 17 years old and under the influence of alcohol and marijuana when he committed the offense for which he is serving time. Doc. 138-16 (Pre-Hearing Report for Sidney Roberts), p. 3. At the time of his commitment, he was found to function at a sixth-grade level. Doc. 138-22 (Diagnostic Center Report for Sidney Roberts dated December 6, 1989), p. 3.

A forensic psychological evaluation noted that, as a child, he was exposed to his father's physical abuse of his mother and was himself subjected to physical abuse, including whippings with belts and other household items. Doc. 138-17 (Forensic Psychological Report for Sidney

Roberts), p. 3. Both of his parents used cocaine. Doc. 138-16, p. 11. Yet, neither the Board Action Sheet nor the supplement thereto contains any notation regarding Roberts's youth or immaturity at the time of the underlying offense. Doc. 147, pp. 82-83.

The pre-hearing report notes that, since 2009, Roberts' conduct in prison "has improved" and "maturation seems to have occurred." Doc. 138-16, p. 12. A forensic psychological report opined that Roberts "had no problems with aggression for the past 15 years." Doc. 147, p. 81. The supplement notes "Long work HY within DOC," including work in a clothing factory, "Improved conduct," "Obtain HSE," and "participating programs," and that he has had no conduct violations since 2009, but it does not provide details regarding his efforts toward rehabilitation. Doc. 138-37 (Board Action Sheet for Sidney Roberts), at 4; Doc. 147, pp. 82-83. Neither the Board Action Sheet nor the Supplement contains any notation regarding the forensic psychological report. *Id.*, p. 82. Indeed, the Hearing Panel Comments box on Roberts' Board Action Sheet is blank. *Id.* Roberts' notice of denial cited the circumstances of the underlying offense alone as the basis for his parole denial. *Id.* p. 83.

### 4. Theron Roland

Plaintiff Theron Roland's prehearing report states that he was 17 and under the influence of marijuana at the time of the offense for which he is serving time. Doc. 138-19 (Pre-Hearing Report for Theron Roland), p. 4. His report of the circumstances surrounding the crime suggested that he was "initially a follower in the offense," and he acknowledged that "peer pressure was a factor in the offense." *Id.*

█████████████████████████████████████████ *Id.*, p. 8. Roland had begun using alcohol at 11 and drugs by age 14. *Id.*, p. 5.

Roland's prehearing report describes his overall adjustment as "good" and notes that he has not had a conduct violation in at least 15 years. Doc. 147, pp. 83-84. Despite noting his "education," his maintaining "an institutional job throughout his incarceration," his completion of "institutional programs," his "good institutional adjustment," his having lived in "Honor Dorm" for over 13 years, and his "positive employment and recreational plan," the institutional parole officer recommended a reconsideration hearing in May 2023—a six year setback where the maximum allowable setback was just five years—solely "because of the serious nature of the present offense . . . ." *Id.*, p. 84; Doc. 138-19, p. 11.

Although the Board Action Sheet supplement mentions a "rough start" in prison, and the Hearing Panel Comments box on the Board Action Sheet notes "Juvenile Life w/o parole" as the sentence (*id.*, at 4 and 2), neither the Board Action Sheet nor the supplement contain any other notation regarding his youth or immaturity at the time of the offense. Doc. 138-38 (Board Action Sheet for Theron Roland); *see also* Doc. 147, p. 85. The reason listed for Roland's parole denial was the circumstances of the present offense. Doc. 147, pp. 85-86.

### b) The Class[1]

Just four of the Class members who have had parole hearings to date were provided release dates—but those dates are, on average, three-and-a-half years in the future. *Id.*, p. 54. These dates, however, do not guarantee release for these four Class members. The dates may be moved or taken away. *Id.* The majority of Class members who have had an SB 590 hearing—nearly 85%,

---

[1] The Court certified a class of similarly situated individuals, defined as "[i]ndividuals in the custody of the Missouri Department of Corrections who were sentenced to life without parole under a mandatory sentencing scheme and who were under 18 years of age at the time of the offense" (the "Class"). Doc. 140 (Order dated June 25, 2018).

even after excluding those who Defendants state were not yet eligible for parole consideration—did not receive a release date.  *Id.*, pp. 52, 54.

The Chair of the Board explained that the "circumstances of the present offense" language—which was at least one, and often the only, reason cited for each Plaintiff's parole denial—reflects that "retributive time is still being considered."  Doc. 138-4 (Deposition of Ellis McSwain), at 43 (Tr. 198:1- 199:22); *see also* Doc. 138-3 (Deposition of Kenny Jones), at 30 (Tr. 83:6-84:12) (former Chairman testifying that "it could be" that the "circumstances of the present offense" language means that "in the board's opinion the inmate hasn't served the punitive and deterrent portion of their sentence yet").

The majority of *Miller*-impacted individuals who have been denied parole under the new process have received five-year setbacks—the maximum setback permitted under Board policy. Doc. 147, p. 53.  The Board did not provide any explanation for the lengthy setback.  *Id.*

The Board's decisions are communicated to inmates on a two-page notice—an admittedly "barebones, boilerplate form" that is used to notify inmates of all types of events related to parole considerations.  Doc. 147, p. 93.  Defendants admitted that this form does not provide adequate explanation for the Board's decision.  *Id.*, p. 94.  The notice also does not provide any guidance to the inmate regarding steps they should take to become better suited for parole.  *Id.*

The Board's decision on parole for an inmate serving a mandatory juvenile life without parole ("JLWOP") sentence is not subject to appeal.  *Id.*, pp. 61-62.

## II.    <u>Summary Judgment</u>

On October 12, 2018, the Court found that Defendants' policies, procedures, and customs for parole review for *Miller*-impacted inmates violate the constitutional requirement that those inmates be provided a meaningful and realistic opportunity for release based on demonstrated

maturity and rehabilitation. *See Graham*, 560 U.S. at 75 ("What the State must do . . . is give defendants like Graham some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation."); *id.* at 82 ("[I]f [a State] imposes a sentence of life it must provide [the juvenile offender] with some realistic opportunity to obtain release before the end of that term."). Failure to provide the class with a meaningful and realistic opportunity to secure release violates, at a minimum, the Eighth Amendment ban on cruel and unusual punishment. *See Montgomery*, 136 S. Ct. at 736-37 (explaining that those serving JLWOP sentences should "be given the opportunity to show their crime did not reflect irreparable corruption; and if it did not, their hope for some years of life outside prison walls must be restored").[2]

Specifically, the Court found that a number of Defendants' policies, practices, and customs combine to deprive those serving JLWOP sentences of a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.[3]

First, Defendants limit the inmates' access to information and opportunities to advocate for consideration of the *Miller* factors. Defendants prohibit inmates from viewing their parole files, including the prehearing report that largely guides the format and content of the SB 590 hearings. Doc. 147, pp. 88, 27. Yet, one of the stated purposes of parole hearings is to give inmates the opportunity to "[p]resent and discuss any other matters that are appropriate for consideration

---

[2] Other courts considering the issue have come to the same conclusion. *See Greiman v. Hodges*, 79 F. Supp. 3d 933, 945 (S.D. Iowa 2015); *Hayden v. Keller*, 134 F. Supp. 3d 1000, 1009 (E.D.N.C. 2015); *Maryland Restorative Justice Initiative v. Hogan*, No. 16-1021, 2017 WL 467731, at *21 (D. Md. Feb. 3, 2017); *Wershe v. Combs*, No. 12-1375, 2016 WL 1253036, at *3 (W.D. Mich. Mar. 31, 2016); *Atwell v. State*, 197 So. 3d 1040, 1041-42 (Fla. 2016), *reh'g denied*, No. SC14-193, 2016 WL 4440673 (Fla. Aug. 23, 2016); *Diatchenko v. Dist. Attorney for Suffolk Dist.*, 27 N.E.3d 349 (Mass. 2015); *Matter of Hawkins v. New York State Dep't of Corr. & Cmty. Supervision*, 140 A.D.3d 34, 39 (N.Y. App. Div. 2016).

[3] The analysis herein applies to Plaintiffs' Eighth Amendment and due process claims equally.

including challenging allegations of fact that they perceive to be false." 14 CSR § 80-2.010(3)(A)(6); *see also* Doc. 147, p. 88. Without knowing what information is being presented in opposition to their petitions for parole, *Miller*-affected inmates cannot know of, let alone challenge, "allegations of fact that they perceive to be false." *See Williams v. Missouri Bd. of Prob. & Parole*, 661 F.2d 697, 700 (8th Cir. 1981) (finding that "minimum due process requires that an inmate in Missouri seeking parole" under a statute that created an expectancy of release "be advised of adverse information in his file"); *cf. Swarthout v. Cooke*, 562 U.S. 216, 220, 131 S. Ct. 859, 862 (2011) (finding sufficient due process where petitioners were, *inter alia*, "afforded access to their records in advance" and "allowed to contest the evidence against them").

A JLWOP inmate is permitted to have just one person, a "delegate" present at the hearing on his behalf. Doc. 147, pp. 43-44. The "Parole Hearing Procedures" adopted by Director Precythe state that "[t]he delegate [for the offender] will address *only issues related to transition to the community*, which could include offender growth, support system, home and employment," and that "[t]he hearing panel may limit any irrelevant or repetitious statement(s)." Doc. 65-3 (Second Amended Complaint for Declaratory and Injunctive Relief), at 4 (emphasis added). In practice, too, delegates are directed to discuss only inmates' home plans. *See, e.g.,* Doc. 138-32 (Transcript of Audio-Recorded Parole Board Hearing), at 20 (Tr. 17:12-21); *id.*, at 45 (Tr. at 42:14-20). Delegates have been prohibited from taking notes during parole hearings. Doc. 147, p. 87. When attorneys act as offenders' sole delegates at parole hearings, they are prevented from arguing legal issues before the Board. *Id.*, pp. 50-51. In other words, delegates—whether lawyers or not—are foreclosed from advocating for consideration of the *Miller* factors and other statutory factors that the Board is required to consider.

In contrast with inmates, and despite a Missouri regulation permitting a victim or victim representative to be accompanied by just one other person at a parole hearing (14 C.S.R. § 80-2.010(5)(B)(1)), in practice, victims may be accompanied by multiple supporters, including MDOC employees acting as "clerical administrative office support assistants." Doc. 147, pp. 44-45. Outside of parole staff, victims or their family members are the first people permitted to speak at an SB 590 hearing. Doc. 147, p. 47. They may speak for any length of time. *Id.* They may speak outside of an inmate's presence if they wish. *Id.* Thus, again, the inmate is routinely prevented from having access to information presented at his hearing. Unlike the delegates, who may not argue the law, victims are free to argue law before the Board; indeed, they may even urge the Board to reject the law set forth in *Graham*, *Miller*, *Montgomery*, and SB 590. *See* Doc. 138-40 (Transcript of Audio-Recorded Parole Board Hearing), at 14-16 (Tr. at 11:2-5, 12:6-13:1).

Like victim representatives, prosecuting attorneys may speak for any length of time and are free to present argument and even unproven theories regarding the crimes for which the inmates were convicted. *See* Doc. 147, p. 49; *see also id.*, p. 52.

The very form on which Board decisions are communicated demonstrates that the Board's focus in the parole hearings for those serving JLWOP sentences is not on the *Miller* factors, but on the circumstances of the offense. All parole decisions must be attributed to one of two concededly "barebones, boilerplate" reasons: the seriousness of the offense or inability to live and remain at liberty without again violating the law. *Id.*, pp. 93-94, 74-75. These reasons are not specific to *Miller*-impacted individuals. Indeed, they are the same two reasons for denial that may be provided to any inmate who has a parole hearing. *Id.*, p. 93.

The "circumstances of the offense" explanation is directly at odds with the requirement that maturity and rehabilitation be considered. Consideration of maturity and rehabilitation

requires a review of how the inmate has changed since the offense was committed. Permitting the Board to base a denial of parole to a *Miller*-impacted individual on the "circumstances of the offense" alone necessarily authorizes the Board to disregard evidence of the inmate's subsequent rehabilitation and maturity—in contravention of the Supreme Court's edict.[4]

Defendants' failure to focus on the factors mandated by *Miller* is exacerbated by their lack of any objective tools, matrices, or criteria to evaluate those serving JLWOP sentences. Doc. 147, pp. 57-59. Defendants acknowledge that they apply objective criteria in making parole determinations for those serving fewer than 30 years in prison. *Id.*, p. 58. They also acknowledge using wholly subjective standards in deciding whether those serving JLWOP sentences are eligible for release. *Id.*, pp. 58-59. This procedure is especially prejudicial to JLWOP inmates. A judicial sentence of life without parole realistically places a thumb on the scale against release, contrary to the message of *Miller* and *Montgomery*. Thus, it is imperative to have an objective and transparent process that complies with the teaching of *Miller* and *Montgomery*.

## III.    Relief[5]

In light of the Supreme Court's statement that "[i]t is for the State, in the first instance, to explore the means and mechanisms for compliance" with the Constitution (*Graham v. Florida*, 560 U.S. 48, 75 (2010)), the Court directed Defendants to present a plan for future compliance

---

[4] Each of the Plaintiffs' parole denial notices indicated that parole was denied—at least in part—because of the circumstances of the underlying offense. Indeed, the prehearing report for Roland indicated that he has demonstrated maturity and rehabilitation, but nonetheless recommended that he be given a six-year setback—more than the maximum allowable setback—solely because of the nature of the offense. Doc. 138-19, p. 10.

[5] For purposes of this Order, the Court has not relied on the testimony of Plaintiffs' expert Heidi Rummel. Defendants' motion to strike Plaintiffs' designation of Professor Rummel as an expert and to strike her report, Doc. 110, therefore is moot.

with applicable statutory and constitutional requirements. Doc. 157 (Order dated October 12, 2018), p. 27. The Court specified that the plan should include (1) "revised policies, procedures, and customs designed to ensure that all Class members are provided a meaningful and realistic opportunity for release based on demonstrated maturity and rehabilitation," and (2) "a proposal for providing those Class Members who were denied a release date following an SB 590 hearing and who are eligible for parole with a meaningful and realistic opportunity for release based on demonstrated maturity and rehabilitation." *Id.*

After participating in mediation with the Honorable John T. Maughmer, the parties agreed to some changes in the Defendants' proposed plan.

Insofar as Defendants' proposed plan provides the Class members a meaningful opportunity for release based upon demonstrated maturity and rehabilitation, the Court must approve it, regardless of whether the Court finds that better means might have been employed. However, to the extent that the modified plan proposed by Defendants on its face offers less than a meaningful opportunity for release based upon demonstrated maturity and rehabilitation, the plan is deficient.

## IV.   <u>Conclusion</u>

Pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. Section 2201, the Court declares that Defendants' policies, procedures, and customs for JLWOP parole review violate the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 21, of the Missouri Constitution.

To remedy the constitutional violations that Plaintiffs raised in this case, the Court orders

Defendants to promptly implement the following procedures[6]:

1.    **Note-taking during hearings**.  Class members and their delegates may take notes during parole hearings. The Board has adopted this procedure in its minutes.

2.    **Notice of hearings**.  The Board will provide Class members notice of the hearing date at least 60 days before the scheduled date. The Board will schedule the hearing and inform the Institutional Parole Officer, who will provide notice to the Class member of the date at least 60 days in advance of the scheduled hearing date.

3.    **Number of delegates**.  Class members may bring four individuals to their parole hearings. This number may include one or more attorneys, lay witnesses, or expert witnesses.

4.    **Counsel**:  Counsel's ability to present evidence and make arguments before the Board, and their access to information presented to the Board, may not be limited in any fashion inconsistent with this Order.

5.    **Seriousness of the Offense**.  The Board Action Sheet will include an admonition at the top of the form that parole is not to be denied to Class members based solely on the seriousness of the offense.  The Pre-Hearing Interview Form will include an admonition at the top of the form that parole is not to be denied to Class members based solely on the seriousness of the offense. The Board will begin hearings of Class members with a statement that parole will not be denied to Class members based solely on the seriousness of the offense.

6.    **Programming**.  The defendants will remove any impediments to Class members participating in programs that arise from the Class members being coded as serving life without parole sentences.  Class members will not have specific impediments to participating in programs

---

[6] The parties agreed completely on Paragraphs 1 through 10 of this Order.

that arise from having at one time been sentenced to life without parole.  Class members will have the same access to programs and limitations on access as other offenders.

7. **Training Module**.  The Council of State Governments will propose a training module to be completed by the Parole Board, Parole Analysts, and Institutional Parole Officers concerning parole consideration for members of this Class. The Parole Board will adopt a training module.

8. **Hearings for Class Members Who Have Been Denied a Release Date**.  All Class members who have been denied a release date will be offered, within 90 days of the final resolution of this case, new hearing dates. The Institutional Parole Officer will notify Class members who previously have been denied a release date that the Parole Board will rehear the case under the new procedures.

9. **Access to Hearing Recordings**:  Class members shall have access to recordings of their hearings as soon as practicable after the hearing, and no later than two weeks after the hearing.[7]

10. **Special Protections for Prosecutors**:  Although Defendants' new proposed plan for compliance included special protections for prosecutors' statements, Defendants have since decided not to seek special protections for prosecutors' statements.  Doc. 178 (Second Status Report on Questions Asked by the Court at the Evidentiary Hearing Held on 3/27/2019), p. 1.  The Court accordingly finds, consistent with the parties' positions, that prosecutors who wish to present statements at any Class member's parole hearing may do so only in the presence of the Class member and his or her delegates.

---

[7] Defendants' revised plan included such a heading but appeared to inadvertently exclude the paragraph.  Plaintiffs in response stated—and Defendants did not deny—that Defendants had agreed to the term described here.

11.    **Training**.  Each member of the Board and parole staff who participates in pre-hearing interviews, parole hearings, or votes concerning parole for Class members must first have received training on the requirements of *Miller*, *Montgomery*, and *Graham*.  The training must teach the need to focus on the class member's rehabilitation and maturity in order to provide a meaningful and realistic opportunity for release.  This requirement is critical because multiple Board members and parole staff recently not only have exhibited unprofessional behavior that suggests a lack of seriousness (*see, e.g.,* Doc. 147, p. 95-96, ¶¶ 180-182), but also have demonstrated a lack of familiarity with applicable regulations and law (*see, e.g., id.*, p. 35-36, ¶¶ 63-64; p. 46, ¶ 81; p. 73-74, ¶¶ 127-128).  The training may be recorded in order to permit new Board members and staff to receive the training after the initial training session.

12.    **Access to parole files**.  Plaintiffs have represented that they received partially redacted parole files for approximately one-quarter of the 100 Class members.  Thus, Plaintiffs' counsel have not received any parole files for the majority of the Class members, and for the minority of Class members for whom it has received files, the files are not complete.  Without full access to the materials the Board considers in making the parole determinations, Class members cannot have a meaningful opportunity to respond.  Therefore, Defendants must provide an updated parole file to each Class member no less than 180 days before their parole hearing.  The pre-hearing interview report must be provided to the Class member as soon as it is finalized.  Any other material subsequently added to the parole file must be furnished to the Class member and his or her counsel in a timely fashion, and in no event less than two weeks prior to the scheduled hearing date.  Documents not provided to the Class member at least two weeks before the hearing shall be excluded from the hearing and may not be considered by the panel or the Board.  Materials, including recordings, produced during or subsequent to the parole hearing that

are added to the parole files must be provided to the Class member promptly, but no later than two weeks after the hearing. If Defendants redact information in the parole files, they must provide a privilege log identifying the reason for the redaction, such as victim-related information, information concerning individual Board members' votes, or other statutorily-protected information.

13. **Initiation of the Hearing Process.** Plaintiffs' counsel shall provide a list of Class members known to Plaintiffs' counsel, including the date of birth and date of offense, if known. Defendants shall confirm this information and produce a complete list of Class members from their records and Plaintiffs' counsel's submission. The Institutional Parole Officer will provide notice to all Class members, as listed on a spreadsheet prepared for that purpose, one year before they become eligible for parole, or as otherwise provided in this order. The Institutional Parole Officer will provide each Class member with the form for requesting a hearing and ensure that completed copies are presented to the appropriate persons for the Class member's hearings to be scheduled.

14. **Composition of hearing panels**. Currently, the Board has multiple vacancies. Because of these vacancies, the parties agree that parole hearing panels for Class members at this time shall consist of just two Board members and one parole analyst. If the Board becomes fully staffed, the Board will assign three Board members to hearing panels for class members. Both parties agree that, for the reasons discussed above, a majority of the Board must agree to the parole decision for each Class member.[8]

---

[8] Defendants proposed the measures described in Paragraph 14. Doc. 172, p. 3.

15. **Forms**.

- **Pre-hearing Interview Form**: Defendants proposed a pre-hearing interview form for use in the interview that the parole analyst conducts. The Court finds that the form must be modified in multiple respects. First, the form references a "boxed" quotation from *Miller v. Alabama*, Doc. 172, p. 8, but does not include it.[9] Defendants' omission of the quotations from their form appears to have been inadvertent. To ensure that parole staff are properly informed and guided, the form should include the missing quotation because, in the past, parole staff and Board members were not always familiar with the statutes, case law, policies, or procedures that govern hearings for inmates affected by *Miller*. *See, e.g.,* Doc. 147, p. 35-36, ¶¶ 63-64; p. 46, ¶ 81; p. 73-74, ¶¶ 127-128.

  Second, given that that the Institutional Parole Officer is to assist with gathering documents for the hearing, the form should state whether any evidence referenced on the form has been provided to the inmate or still needs to be distributed.

---

[9] The quotation, which was referenced in Plaintiffs' response to Defendants' initial plan, (Doc. 166-5, p. 16 (Juvenile Parole Pre-Hearing Interview Form, p. 1)), is as follows:

Children's "'lack of maturity' and 'underdeveloped sense of responsibility' lead to recklessness, impulsivity, and heedless risk-taking."

***

"[I]n *Graham*, we noted that 'developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds'—for example, in 'parts of the brain involved in behavior control.' We reasoned that those findings—of transient rashness, proclivity for risk, and inability to assess consequences—both lessened a child's 'moral culpability' and enhanced the prospect that, as the years go by and neurological development occurs, his 'deficiencies will be reformed.'"

Third, to enable Class members to demonstrate maturity and rehabilitation, the form should include spaces for the Institutional Parole Officer to note whether any rehabilitative or training programs were unavailable to the inmate and why (for example, because the inmate was sentenced to life without parole, because the correctional center does not offer the program, or because the Class member is on a waitlist). This is particularly important because the Missouri legislature chose to comply with *Miller* by requiring the Board to consider, among other factors, "[e]fforts made toward rehabilitation since the offense or offenses occurred, including participation in educational, vocational, or other programs during incarceration, when available . . . ." Mo. Rev. Stat. 558.047.5(1).

Fourth, Defendants agreed to "include an admonition at the top of the form that parole is not to be denied to class members based solely on the seriousness of the offense." Doc. 172 (Plan for Compliance with Applicable Requirements), p. 3. However, the form proposed does not include this language. Doc. 172, p. 8. The admonition that the Defendants agreed to include should be added to the form.

- **Hearing Worksheet**: The Court approves the hearing worksheet for the hearing panel's use proposed by Defendants.

- **Board Action Sheet:** The board action sheet proposed by Defendant requires two modifications. First, the sheet must require the Board to document the reasons for their votes, as well as any evidence indicating unsuitability for parole. This change will help ensure that the Board's decisions are not arbitrary or based on rationales incompatible with idea that the punishment of life without parole should be barred "for all but the rarest of juvenile offenders, those whose crimes

reflect permanent incorrigibility." *Montgomery*, 136 S. Ct at 734. Second, Defendants agreed that the Board Action Sheet will include an admonition "at the top of the form" that parole is not to be denied to Class members based solely on the seriousness of the offense. However, that language is not at the top of the form that was submitted. Doc. 172, p. 24. It should be modified accordingly.

16. **Record Collection**: The Court at this time finds sufficient Defendants' plan to have an Institutional Parole Officer assist Class members in retrieving various relevant records without waiting for the Class member to become eligible to apply for parole release. With the Class member's consent, the Institutional Parole Officer will request records from juvenile officers, juvenile courts, and schools. In addition, the Institutional Parole Officer shall assist the Class member with requesting reasonably relevant documents from the Department of Social Services, Children's Division, and/or any other similar division or department, should the Class member provide consent. Given the remedial nature of these hearings, these documents must be collected at no cost to the Class members.

17. **Risk Assessment Tool**: Plaintiffs have presented evidence that the Ohio Risk Assessment System weighs most youth-related *Miller* factors as aggravating rather than mitigating factors, and scores positively for prosocial factors that Class members, by virtue of their incarceration since childhood, are less likely to have, such as marriage and employment history. Doc. 166-4 (Affidavit of Todd R. Clear, Ph.D. in Support of Plaintiffs' Response to Defendants' Plan for Compliance), ¶¶ 3-15. The Court therefore finds that the use of the Ohio Risk Assessment System and similar risk assessment tools does not satisfy the standards enunciated in *Graham*, *Montgomery*, and *Miller*. Defendants shall not use any risk assessment tool unless it has been developed to address inmates affected by *Montgomery* or *Miller*. *See id.*,

¶¶ 14-15 (stating that "[i]ndustry best practice according to the National Institution of Corrections is that each jurisdiction create its own risk assessment tool that is tailored to its own population or validate one that is borrowed from another jurisdiction prior to using it," and opining that "[i]t would be relatively easy for the Missouri Department of Corrections, with the aid of local experts," to do so).

18. **Special Protections for Victims**: Victims and their representatives are entitled to special protections in parole hearings. At the same time, a meaningful opportunity for *Miller*-affected inmates to demonstrate maturity and rehabilitation requires notice of all adverse information presented to the parole board. Defendants' proposal to address this conflict was to exclude the Class members from the hearing during such testimony but to limit the Board to considering information presented by victims only if it is effectively public information. Doc. 172, p. 5. In other words, the Board would permit the victim and victim representatives to testify outside of the Class member's presence about any matter, and the Board simply would disregard non-public information. The Court rejects this proposal. Even if the Board members have the best intentions, the evidence in the record does not suggest that Board members have the background to compartmentalize victim statements or that the proposed limitation is capable of enforcement. The Court therefore concludes that, insofar as a victim elects to speak outside of a Class member's presence, Defendants must either (1) provide counsel for the Class member, at no cost to the Class Member, or (2) provide to the Class member and his or her delegates access outside of the hearing room to a live video or audio feed of the victim or victim representative testimony, or (3) within one week of the hearing, provide to class members a transcript of the victim statements, with only victim or victim-representative identifying information redacted, and within two weeks of the Class member's receipt of the transcript, and

before the panel's deliberation and decision, the Class member must have an opportunity to respond in person before the full hearing panel. Victims and their representatives should also be permitted to waive their right to speak outside of the Class member's presence.

19. **Access to Hearing Recordings**: Defendants have already agreed to grant Class members access to recordings of their parole hearings. For the reasons discussed above, to the extent that victim or victim representative statements are excluded from the recordings, the statements must be provided to the Class member with only identifying information for the victim or victim-representative redacted. Other than information identifying victims and victim representatives, no portion of the hearing may be excluded from the recording.

20. **No Right to Counsel at State's Expense**: Despite the fact that courts in Massachusetts (*see Diatchenko v. Dist. Attorney for Suffolk Dist.*, 27 N.E.3d 349, 360 (Mass. 2015)) and state legislatures in California, Connecticut, Florida, and Hawaii have granted similarly-situated individuals a right to counsel, the Court does not at this time find that the Class members have a right under the United States or Missouri Constitutions to state-funded counsel in their parole proceedings, with the exception discussed in Paragraph 18.

21. **Right to Counsel at Pre-Hearing Interview:** The Court finds that Class members have the right to have counsel present, although not at the expense of the State, at the pre-hearing interview with the Institutional Parole Officer. The pre-hearing interview is a critical step in the process of gathering and framing the information presented to the Board, particularly because the Institutional Parole Officer makes a recommendation to the Board concerning parole, and to the extent that a Class member has counsel, that counsel should be free to advocate for his or her client at that interview.

22. **Expert Witnesses**.  Expert witnesses may be among the four delegates that a Class member may bring to the hearing to present statements on his or her behalf, and an expert witness's presentation shall not be limited in any fashion.  However, the Court cannot on the record presented find that the State is constitutionally obligated to fund an expert witness for each Class member.

23. **Monitoring**.  The Court does not find sufficient evidence in the record to warrant the appointment of an external monitor to ensure compliance with constitutional requirements.

*   *   *

The Court emphasizes that the above remedy is based on the law and facts that have been presented here.  While "[t]hose prisoners who have shown an inability to reform will continue to serve life sentences[,] [t]he opportunity for release *will* be afforded to those who demonstrate the truth of *Miller's* central intuition—that children who commit even heinous crimes are capable of change."  *Montgomery*, 136 S. Ct. at 736 (emphasis added).

**IT IS SO ORDERED.**

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  August 1, 2019
Jefferson City, Missouri